No. 5:26-cv-3491

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

## In re:

## WHITEHALL MANOR,
### *Debtor.*

### LEHIGH VALLEY 1, LLC
### *Appellant.*

_____

## JOINT OPENING BRIEF OF APPELLANTS LEHIGH VALLEY 1, LLC AND RECEIVER DUANE MORRIS LLP THROUGH ERIN DUFFY, ESQUIRE

*Appeal from the Order of the United States Bankruptcy Court for the Eastern District of Pennsylvania Denying Lender and Receiver's Joint Motion to Compel the Manor Debtors to Assume or Reject Their Leases, to Establish the Cure Amount, and in the Alternative, for Relief from the Automatic Stay, No. 25-15245 (PMM)*

_____

Matthew A. Hamermesh (I.D. No. 82313)
Sara E. Smith (I.D. No. 330261)
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200

*Counsel for Appellant Secured Creditor Lehigh Valley 1*

Brett L. Messinger (I.D. No. 63020)
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
(215)979-1508

*Attorneys for Receiver Duane Morris LLP, through Erin Duffy*

BERGER LAW GROUP, P.C.
Phillip D. Berger (I.D. No. 58942)
919 Conestoga Road, Building 3,
Suite 114
Bryn Mawr, PA 19010
(610) 668-0800
Berger@BergerLawPC.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 8014(a) of the Federal Rules of Bankruptcy Procedure, the Appellants make the following disclosures:

A.  Appellant Secured Creditor Lehigh Valley 1, LLC ("Lehigh Valley 1"):

1. Is said party a subsidiary or affiliate of a publicly owned corporation?

   No.

2. Is there a parent corporation or publicly held corporation that owns 10% or more of its stock?

   No.

B. Duane Morris LLP, through Eric Duffy:

1. Is said party a subsidiary or affiliate of a publicly owned corporation?

   No.

2. Is there a parent corporation or publicly held corporation that owns 10% or more of its stock?

   No.

**TABLE OF CONTENTS**

I.      Introduction ........................................................................................1

II.     Jurisdiction ....................................................................................... 4

III.    Issue Presented ................................................................................ 6

IV.     Standard of Review ...........................................................................7

V.      Statement of the Case ..................................................................... 8

        A.      The Loans and Defaults................................................... 8

        B.      The Foreclosure Actions.................................................. 9

        C.      The Fraudulent Lease Amendments............................10

        D.      December 19, 2025 Order Voiding The 2023 Lease
                Amendments And Imposing Sanctions ...................... 11

        E.      The Current Status of the Manor Debtors' Leases....................12

        F.      Lender and Receiver are Entitled to Rent from the Manor
                Debtors ..........................................................................17

        G.      The Dismissal of the Trusts' Bankruptcy Cases........................17

        H.      Lender and Receiver's Joint Motion to Compel
                Assumption or Rejection of the Manor Debtors' Leases, or
                for Relief from the Automatic Stay ............................18

        I.      Lender and Receiver's Appeal of the Bankruptcy Court's
                May 15 Order ................................................................ 22

VI.     Summary of the Argument ............................................................ 23

VII.    Argument ....................................................................................... 27

        A.      The Trusts' Failure to Pursue These Claims is Unjustified ...... 29

        B.      Lender and Receiver State a Colorable Claim for Relief
                from the Automatic Stay ........................................... 33

i

C.    Lender and Receiver State a Colorable Claim to Compel
the Manor Debtors to Assume or Reject Their Leases ............. 36

D.    The Reasons the Bankruptcy Court Gave for Declining to
Afford Lender and Receiver Derivative Standing are
Unavailing and Cannot Stand .................................................. 47

VIII. Conclusion.................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU-NJ v. Township of Wall,*
    246 F.3d 258 (3d Cir. 2001) ....................................................................7

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................... 33

*Beal Bank, S.S.B. v. Waters Edge Limited Partnership,*
    248 B.R. 668 (D. Mass. 2000).............................................. 46

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)............................................................... 33

*In re Burch,*
    401 B.R. 153 (Bankr. E.D. Pa. 2008)...........................................16, 33, 35

*Official Committee of Unsecured Creditors of Cybergenics*
    *Corp. ex rel. Cybergenics Corp. v. Chinery,*
    330 F.3d 548 (3d Cir. 2003).......................................... 27, 28

*Danvers Motor Co. v. Ford Motor Co.,*
    432 F.3d 286 (3d Cir. 2005).................................................7

*Matter of Dunes Casino Hotel,*
    63 B.R. 939 (D.N.J. 1986) .................................................... 36

*In re G-I Holdings, Inc.,*
    308 B.R. 196 (D.N.J. 2004)................................................. 37

*In re Global Industrial Technologies, Inc.,*
    645 F.3d 201 (3d Cir. 2011) ...........................................4, 5, 7

*In re Guardian Elder Care at Johnstown, LLC,*
    666 B.R. 651 (Bankr. W.D. Pa. 2025)................................... 28

*In re Johnson,*
    No. 15-00104-NPO, 2015 WL 1508460
    (Bankr. D. Miss. Mar. 27, 2015) ....................................... 33, 35

*In re Lichtin/Wade, LLC,*
    486 B.R. 665 (Bankr. E.D.N.C. 2013)......................................................46

*Mt. McKinley Insurace Co. v. Pittsburgh Corning Corp.,*
    518 B.R. 307 (W.D. Pa. 2014) ................................................................ 4

*In re National Forge Co.,*
    326 B.R. 532 (W.D. Pa 2005) ...................................................... 27, 28, 29

*In re Pack Liquidating, LLC,*
    658 B.R. 305 (Bankr. D. Del. 2024) ...................................................... 27

*In re Physician Health Corp.,*
    262 B.R. 290 (D. Del. 2001) ............................................................ 36, 37

*In re Pittsburgh and Lake Eries Railroad Co. Securities and
    Antitrust Litigation,*
    543 F.2d 1058 (3d Cir. 1976) ................................................................ 4

*In re Riverside Nursing Home,*
    43 B.R. 682 (Bankr. S.D.N.Y. 1984) ..................................................... 20

*In re Rosenblum,*
    545 B.R. 846 (Bankr. E.D. Pa. 2016)...............................................*passim*

*S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP,*
    927 F.3d 763 (3d Cir. 2019)................................................................... 4

*In re Teligent, Inc.,*
    268 B.R. 723 (Bankr. S.D.N.Y. 2001) .................................................... 37

*In re Union Meeting Partners,*
    178 B.R. 664 (Bankr. E.D. Pa. 1995)................................................. 46, 47

*In re Wheeling-Pittsburgh Steel Corp.,*
    54 B.R. 385 (W.D. Pa. 1985)................................................................. 37

*In re White Beauty View, Inc.,*
    841 F.2d 524 (3d Cir. 1988).................................................................. 4

**Statutes**

11 U.S.C. § 105............................................................................................ 6

11 U.S.C. § 109.............................................................................................17

11 U.S.C. § 1121......................................................................................16, 45

11 U.S.C. § 362 ...................................................................................20, 35, 36

11 U.S.C. § 365 .....................................................................................*passim*

11 U.S.C. § 503 .............................................................................................16

11 U.S.C. § 506 ............................................................................................ 46

11 U.S.C. § 507 .............................................................................................16

11 U.S.C. § 543 ...................................................................................21, 49, 50

11 U.S.C. § 552.............................................................................................. 46

28 U.S.C. § 158..........................................................................................4, 18

**Rule**

Fed. R. Bankr. P. 8014............................................................................... 2

## STATEMENT REGARDING ORAL ARGUMENT

Appellants Lehigh Valley 1, LLC and Receiver Duane Morris LLP Through Erin Duffy, Esquire respectfully request oral argument as this appeal involves important questions of law, and oral argument would aid in the decisional process in this appeal from the Order of the Bankruptcy Court of this District.

## I.   INTRODUCTION

The United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court") denied Appellants Lehigh Valley 1, LLC's ("Lender") and Receiver Duane Morris LLP through Erin Duffy, Esquire's ("Receiver") (collectively, the "Appellants")[1] joint motion for entry of an Order (1) compelling the Manor Debtors to assume or reject their Leases pursuant to 11 U.S.C. § 365(d)(2), (2) establishing the cure amount, and (3) in the alternative, for relief from the automatic stay (the "Joint Motion"). ECF 56 (Case No. 25-15245), App. 35. In denying the Joint Motion, the Bankruptcy Court found that Lender and Receiver both lack standing to pursue the relief sought in the Joint Motion and further declined to grant Lender and Receiver derivative standing. ECF 124 (Case No. 25-15245), App. 22 (the "May 15 Order").

---

[1] The Appellees include Whitehall Manor, Inc. and Saucon Valley Manor, Inc. (collectively, the "Manor Debtors" or "Appellees"). Previously, Whitehall Trust and Saucon Trust (collectively, the "Trusts") were also debtors in the underlying bankruptcy proceeding from which this appeal arises. However, on March 19, 2026, the Bankruptcy Court granted Lender's Motion to Dismiss the Trusts' bankruptcy cases because the Trusts are not business trusts and thus are not eligible to be Chapter 11 debtors (the "Dismissal Order"). *See* ECF 264 (Case No. 25-15241). Accordingly, the Trusts are no longer parties to the underlying bankruptcy proceeding. The Dismissal Order was stayed, which created the odd situation where the Bankruptcy Judge is allowing the Manor Defendants and the Trusts to collaborate on certain issues, including, it would seem, the negotiation of the terms of the leases – despite each being controlled by the same principals.

As set forth below, the Bankruptcy Court clearly erred in finding that Lender and Receiver lacked standing and specifically, in declining to afford Lender and Receiver derivative standing to prosecute the Joint Motion. Lender and Receiver are clearly entitled to derivative standing here because Lender and Receiver state a colorable claim for relief from the automatic stay (as the Bankruptcy Court acknowledged), and a colorable claim to compel the Manor Debtors to assume or reject their leases.

Moreover, the Trusts' failure to pursue either of these claims is simply not justified, as the Trusts would objectively benefit from either form of requested relief. Critically, as this Court recently found, there is an actual conflict of interest between the Trusts and the Manor Debtors. Rather than acting in the interests of both the Manor Debtors and the Trusts, the managers of all the entities and their (until now) joint bankruptcy counsel have been acting only in the interest of the Manor Debtors and specifically against the interests of the Trusts. This conflict undoubtedly contributed to the Trusts' refusal to pursue the relief sought and reflects the Trusts' (prior) counsel's failure and refusal to act in the Trusts' best interest.

Accordingly, and for the reasons set forth below, Lender and Receiver ask this Court to vacate the Bankruptcy Court's finding that Lender and Receiver lack standing to prosecute the Joint Motion and remand this matter

to the Bankruptcy Court with a direction to grant Lender and Receiver derivative standing to pursue the Joint Motion and consider the merits of the Joint Motion.

## II.   JURISDICTION

A district court has "jurisdiction to hear appeals ... from final judgments, orders, and decrees" of bankruptcy courts. 28 U.S.C. § 158(a)(1) (internal footnote omitted). Courts "interpret finality pragmatically in bankruptcy cases because these proceedings often are protracted and involve numerous parties with different claims. To delay resolution of discrete claims until after final approval of a reorganization plan ... would waste time and resources[.]" *S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP*, 927 F.3d 763, 770 n.3 (3d Cir. 2019) (quoting *In re White Beauty View, Inc.*, 841 F.2d 524, 526 (3d Cir. 1988)). The Bankruptcy Court's Order denying the Joint Motion on the basis that Lender and Receiver lack standing fully disposed of the Joint Motion and left nothing for the Bankruptcy Court to address with respect to the issues raised in the Joint Motion.

A party denied standing by a Bankruptcy Court has standing to appeal the Bankruptcy Court's order. *See In re Global Indus. Techs., Inc.*, 645 F.3d 201, 209 n.23 (3d Cir. 2011) ("[A] party denied standing to sue, or to intervene, or to object, may obviously appeal such a determination.") (quoting *In re Pittsburgh & L.E. R. Co. Sec. & Antitrust Litig.*, 543 F.2d 1058, 1064 (3d Cir. 1976)); *Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp.*, 518 B.R. 307, 318 (W.D. Pa. 2014) ("A party denied standing by the bankruptcy

4

court may appeal that decision. To hold otherwise 'would risk leaving parties in interest who have been erroneously denied bankruptcy standing … without legal redress for that error.'") (quoting *Global Indus. Techs.*, 645 F.3d at 209 n.23).

5

## III.  ISSUE PRESENTED

1.    Whether the Bankruptcy Court erred because Lender and Receiver should have been afforded derivative standing under 11 U.S.C. § 105(a) to prosecute Lender and Receiver's Joint Motion to (1) Compel the Manor Debtors to Assume or Reject Their Leases, (2) Establish the Cure Amount and (3) Seek Relief from the Automatic Stay?

*Suggested Answer: Yes.*

## IV.   STANDARD OF REVIEW

District courts must "review the Bankruptcy Court's legal conclusions *de novo* and its factual findings for clear error." *Global Indus. Techs.*, 645 F.3d at 209. "A court's decision regarding standing is a legal conclusion subject to *de novo* review." *Id.* (citing *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005)); *accord ACLU-NJ v. Township of Wall*, 246 F.3d 258, 261 (3d Cir. 2001) ("We review the issue of standing de novo.").

## V.    STATEMENT OF THE CASE

This appeal arises from bankruptcy cases involving Appellant Lehigh Valley 1, LLC, as the Lender, Appellees Whitehall Manor and Saucon Valley Manor, as the Debtors, and Appellees Whitehall Trust and Saucon Trust, as former debtors. *See In re Whitehall Manor, Inc.*, Case No. 25-15245 (PMM) (Bankr. E.D. Pa. 2025) (jointly administered). The bankruptcy cases were initiated after Lender brought foreclosure actions against the Trusts for their failures to make any payments on their respective mortgages and loans for over four years. *See* Case Nos. 5:24-cv-2627 (E.D. Pa. 2024) and No. 5:24-cv-2709 (E.D. Pa. 2024).

### A.    The Loans and Defaults

In 2012, M&T Realty Capital Corporation ("M&T") provided loans to the Trusts, secured by mortgages on the Trusts' real properties. ECF 56 at ¶¶ 8-9, App. 38. The Manor Debtors lease these real properties from the Trusts and operate personal care homes on them. *Id.* ¶ 10, App. 38. The loans were insured by the U.S. Department of Housing and Urban Development ("HUD"). *Id.* ¶ 11, App. 39.

Due to the Trusts' payment defaults, M&T sold the mortgages, which were ultimately acquired by Lender. *Id.* Lender now holds mortgages on the Trusts' real property, security interests in all of the Trusts' and Manor Debtors' assets including all rents, and security interests in and the right to

collect rents directly from all the residents living at the personal care homes operated by the Manor Debtors. *Id.*

### B.   The Foreclosure Actions

Due to the Trusts' payment defaults, Lender filed the Foreclosure Actions in the Eastern District of Pennsylvania against both Trusts in June 2024 (Case Nos. 24-cv-02627 and 24-cv-02709). ECF 124 at 12, App. 34. In the Foreclosure Actions, on May 2, 2025, this Court entered an Order appointing Erin Duffy, Esquire of Duane Morris LLP as Receiver for both properties (the "Receiver Order"). ECF 65 (Case No. 24-cv- 02627), App. 540; ECF 58 (Case No. 24-cv-02709).

In the opinion in support of the Receiver Order, the Court noted concerns about a potential diminution in the value of Lender's collateral because the Trusts refused to provide: (a) updated financial statements; (b) information on the Trusts and the Manors' current leases and rent collections; (c) proof that taxes were paid; (d) proof of insurance; or (e) information about other liens. ECF 64 (Case No. 24-cv-02627); ECF 57 (Case No. 24-cv-02709). Notably, any one of these issues could diminish the value of the properties and harm Lender.

The Receiver Order granted the Receiver the authority to "commence, prosecute, continue or defend actions at law or in equity (in its own name or

in the names of Whitehall [Trust] or Saucon [Trust]) that the Receiver deems necessary to protect or preserve the Property, to recover possession of the Property, to collect the rents, or to evict or eject any tenants or occupants in accordance with applicable state laws." ECF 65, at ¶ 6(e) (Case No. 24-cv-02627), App. 544; ECF 58, at ¶ 6(e) (Case No. 24-cv-02709).

The Receiver Order also grants Receiver the power to, among other things: (1) "enter and take immediate possession of the Property, and to demand, collect and receive the rents ... derived from [the] tenants at the Property"; (2) "take all actions necessary to preserve, maintain, operate, and manage the Property"; (3) "obtain and evict occupants"; and (4) "bring or defend any suits in connection with the Leases or Rents". ECF 65, at ¶ 6 (Case No. 24-cv-02627), App. 543-49; ECF 58, at ¶ 6 (Case No. 24-cv-02709).

## C.   The Fraudulent Lease Amendments

Prior to the loan defaults and prior to the HUD sale to Windstream (now Lender), the Lease Agreements between the Manor Debtors on one hand, and the property-owning Trusts, on the other hand, required substantial monthly rent payments as follows:

| Lease | Monthly Rent | Annual Rent |
|---|---|---|
| From Whitehall Manor to Whitehall Trust | $139,000 | $1,668,000 |
| From Saucon Manor to Saucon Trust | $142,118 | $1,705,421 |
| **COMBINED TOTAL** | **$281,118** | **$3,373,421** |

ECF 56 at ¶ 18, App. 41; App. 75; App. 117.

However, effective as of September 21, 2023 – after the mortgages had defaulted, after HUD had taken over the loans, and after HUD had auctioned the loans – Abraham Atiyeh (the Manager of the Trusts) unilaterally, on behalf of the Trusts and the Manor Debtors, drafted, prepared and executed two purported lease amendments (the "Fourth Amendment" for the Whitehall property and the "Sixth Amendment" for the Saucon property) (together, the "2023 Lease Amendments"). ECF 56 at ¶ 19, App. 41.

The 2023 Lease Amendments effectively waived all past-due rent payment obligations for the Manor Debtors from March 2021 through September 2023, and for the year 2024. *Id.* ¶ 20, App. 42. They also capped the maximum rent for the year 2025 at an amount less than the amounts paid by the Manor Debtors for taxes and capital improvements, which counted as a credit against the rent amount. *Id.* The 2023 Lease Amendments were designed to strip rental income from the property-owning Trusts and to keep all cash in the operating Manor Debtors. *Id.*

### D. December 19, 2025 Order Voiding The 2023 Lease Amendments And Imposing Sanctions

In July 2025, as part of the Foreclosure Actions, Lender filed a motion to void and set aside the 2023 Lease Amendments. ECF 56 ¶ 21, App. 42. On December 19, 2025, this Court granted Lender's motion to invalidate the

11

2023 Lease Amendments and Receiver's request for discovery sanctions (the "December 19 Order"). ECF 164 (Case No. 24-cv-02627), App. 166; ECF 138 (Case No. 24-cv-02709). Specifically, the December 19 Order "DECLARED the Sixth Amendment and Fourth Amendment to be NULL, VOID, and OF NO LEGAL EFFECT." *Id.*, App. 169.

The Trusts and the Manor Debtors then filed their respective bankruptcy petitions on December 26, 2025. ECF 56 ¶¶ 21-22, App. 42-43; ECF 124 at 1, App. 22.

### E.    The Current Status of the Manor Debtors' Leases

The Whitehall Manor property is governed by an Operating Lease Agreement originally dated August 14, 2008, amended by the First through Third Amendments. ECF 56 ¶ 24, App. 43. With the Fourth Amendment voided by the December 19 Order, the Third Amendment is the governing Amendment, dated and effective as of August 31, 2018. *Id.* The Whitehall Lease Agreement is a triple net lease, meaning the lease requires Whitehall Manor to pay – separate from and in addition to the stated amount of monthly rent – all taxes, insurance, maintenance, and other operating expenses of the property. *Id.* (citing Whitehall Lease at § 4.05, App. 88).

Section 2 of the Third Amendment to the Whitehall Lease Agreement provides that: "Tenant has exercised the privilege to extend the Term for 5

12

years, such that the original termination date of August 31, 2018 is now agreed to be August 31, 2023." *Id*. ¶ 25, App. 44 (quoting Whitehall Lease at § 2, App. 83-84). The Whitehall Lease Agreement does not contain an automatic renewal provision. Rather, Section 2.02 of the Original Lease provides that "the Lessee shall have the option to extend the Lease Term for three (3) successive periods of five (5) years each upon the terms and conditions contained herein, upon written notice to the Owner given not later than one hundred eighty (180) days prior to the expiration of the initial Lease Term or extended Lease Term, as the case may be." *Id*. ¶ 26, App. 44 (quoting Whitehall Lease at § 2.02, App. 83).

The now-void Fourth Amendment to the Whitehall Lease stated: "Landlord and Tenant have agreed that Tenant has exercised its option to extend the Term of the Lease for a period of Five (5) Years as allowed by the Lease." *Id*. ¶ 27, App. 44. If valid, this purported Fourth Amendment may have extended the Lease until August 31, 2028. However, pursuant to the December 19 Order, this Fourth Amendment was declared null and void and of no legal effect, meaning the Whitehall Lease expired on August 31, 2023. *See* ECF 164 (Case No. 24-cv-02627), App. 166; ECF 138 (Case No. 24-cv-02709). Accordingly, there is no current lease in effect for the Whitehall property.

The Saucon Manor property is governed by a Lease Agreement originally dated January 1, 2006, subsequently amended by the First through Fifth Amendments. ECF 56 at ¶ 29, App. 44-45. With the Sixth Amendment voided by the December 19 Order, the terms established by the Fifth Amendment, dated and effective as of July 1, 2018, govern. *See* ECF 164 (Case No. 24-cv-02627), App. 166; ECF 138 (Case No. 24-cv-02709). The Saucon Lease Agreement, like the Whitehall Lease Agreement, is a triple net lease. ECF 56 ¶ 29, App. 44-45 (citing Saucon Lease at § 5, App. 120). Thus, Saucon Manor is required to pay all taxes, insurance, maintenance, and other operating expenses of the property in addition to the stated monthly rent amount. *Id.*

The Fifth Amendment to the Saucon Lease Agreement provides: "The parties acknowledge that the term of the existing lease extended to July, 2018; and the parties hereto extend the Term of the Lease through August 31, 2023, (which hereby becomes the 'Termination Date')." *Id.* ¶ 30, App. 45 (quoting Saucon Lease, App. 117). It further provides: "The Term shall automatically extend on the Termination Date for three (3) periods of three (3) years, each, (and the termination shall be modified automatically thereby) unless (i) a Default by Lessee occurs, (in which event the rights and

14

remedies of Owner shall be immediately applicable, and no further extension shall automatically occur)[.]" *Id.* (quoting Saucon Lease).

Accordingly, the Fifth Amendment is automatically renewed for a three-year period unless there is an "Event of Default" as defined in the Saucon Lease Agreement. The Lease defines "Events of Default" to include where "Tenant shall fail to pay any installment of Base Rent or any other payment required herein when due, and such failure shall continue for a period of 5 days from the date such payment was due." *Id.* ¶ 31, App. 45 (quoting Saucon Lease, App. 126). Here, there was an obvious "Event of Default" – Saucon Manor's failure to pay rent since 2021. The record is void of any actions taken by Saucon Manor or Saucon Trust to excuse or waive this default by Saucon Manor, other than the purported Sixth Amendment to the Saucon Lease, which was declared null and void, and of no legal effect, by the December 19 Order. *See* ECF 164 (Case No. 24-cv-02627), App. 166; ECF 138 (Case No. 24-cv-02709).

Based on Saucon Manor's failure to pay rent starting in 2021 – which is an "Event of Default" under the Lease Agreement – the Saucon Lease Agreement did not automatically renew for a period of three years upon the expiration of the Lease on August 31, 2023. Accordingly, Whitehall Manor and Saucon Manor have been operating their personal care homes on the

15

respective Trusts' properties without valid Leases since August 31, 2023, when both Leases had expired.

Because the Manor Debtors' Leases have expired by their express terms (*see* ECF 124 at 1, App. 22), the Manor Debtors cannot now assume the Leases under 11 U.S.C. § 365(d)(2). *See id.* at 8, App. 30 ("[I]f the Leases are not unexpired within the meaning of §365, there is nothing for the Court to compel the Manors to accept or reject."); *see also In re Burch*, 401 B.R. 153, 157 (Bankr. E.D. Pa. 2008) ("Where a lease is expired at the time of bankruptcy filing, there is nothing for the debtor to assume[.]").

Nonetheless, even if the Leases have not expired (which they have) and may be assumed, the Manor Debtors, under 11 U.S.C. § 365(b)(1)(A), must cure all existing defaults under their respective Leases, including post-petition rent and any accrued and unpaid pre-petition rent. Under 11 U.S.C. §§ 503(b) & 507(a)(2), the post-petition rent is an administrative expense of the bankruptcy estate, and under 11 U.S.C. § 1129(a)(9)(A), administrative expenses – such as the post-petition rent – have to be paid in full as part of a plan of reorganization in order for the plan to be confirmed. Accordingly, to cure the pre-petition lease obligations, including unpaid rent, Saucon Manor owes $8,460,843.01, and Whitehall Manor owes $8,271,961.00. *See*

16

Whitehall Manor Proof of Claim, ECF 44 (Case No. 25-15245), App. 170;

Saucon Manor Proof of Claim, ECF 26 (Case No. 25-15244), App. 223.

### F. Lender and Receiver are Entitled to Rent from the Manor Debtors

Lenders have a security interest in all rents owed by or to the Manor

Debtors. ECF 56 ¶¶ 44-45, App. 47-48. Lender's collateral package is more

extensive than a typical mortgage. Lender holds by assignment:

- **Mortgages**: Against real property, improvements, equipment, personal property, and "rents, profits and other attributes."

- **Security Agreements (Trusts)**: Security Agreement, with filed UCC-1s against all personal property, accounts receivable, cash, and rents of Whitehall Trust and of Saucon Trust.

- **Lessee Security Agreements (Manor Debtors)**: Lender also holds signed Lessee Security Agreements with filed UCC-1s providing Lender with perfected, first-priority security interests in all personal property, accounts receivable, and rents of both of the Manor Debtors.

*Id.*; App. 273; App. 296; App. 319; App. 342; App. 363; App. 387.

### G. The Dismissal of the Trusts' Bankruptcy Cases

On January 14, 2026, Lender filed a motion to dismiss the Trusts'

bankruptcy cases because the Trusts are not business trusts and thus are not

eligible to be debtors under Section 109 of the Bankruptcy Code. ECF 102

(Case No. 25-15241). The Bankruptcy Court, in agreeing with Lender,

correctly found that the Trusts are not business trusts, and dismissed the

Trusts' bankruptcy cases (the "Dismissal Order"). ECF 263 (Case No. 25-

15241). The Trusts filed appeals of the Dismissal Order and filed petitions with the Third Circuit Court of Appeals for direct appeal pursuant to 28 U.S.C. § 158(d)(2) (the "Petitions"). ECF 1-1 (Case No. 26-8020); ECF 1-1 (Case No. 26-8021). The Petitions are currently pending. During the pendency of the Trusts' appeals of the Dismissal Order, the Bankruptcy Court entered a stay pending appeal. ECF 274 (Case No. 25-15241).

### H. Lender and Receiver's Joint Motion to Compel Assumption or Rejection of the Manor Debtors' Leases, or for Relief from the Automatic Stay

On March 31, 2026 – after the Trusts' bankruptcy cases were dismissed but before the Bankruptcy Court stayed that order – Lender and Receiver filed their Joint Motion seeking entry of an order compelling the Manor Debtors to promptly assume or reject their Leases pursuant to 11 U.S.C. § 365(d)(3) and to establish the cure amount. ECF 56, App. 35.

In the alternative, if the Court found that the Leases were expired, Lender and Receiver sought relief from the automatic stay to allow Lender and Receiver to take possession of the properties and to evict the Manor Debtors (who are holdover tenants as a result of their leases being expired). *Id.* ¶ 54, App. 50.

Both the Trusts and the Manor Debtors opposed the Joint Motion, arguing that Lender and Receiver lack standing to seek to compel

assumption or rejection or relief from the automatic stay. ECF 87 at 6 (Case No. 25-15245), App. 428 ("Neither Secured Creditor nor the Receiver is a party to the leases. Moreover, the Receiver's authority (if any) is stayed. Therefore, Movants lack standing to seek to compel assumption or rejection of the Leases.").

In response, Lender and Receiver contended that there are numerous avenues under which the Court may find that the Appellants have standing and to grant the relief that Lender and Receiver seek in the Joint Motion (which also should have been joined by the Trusts as those entities would have benefitted from the relief sought). Lender and Receiver made several specific arguments as to why they have standing. Alternatively, Lender and Receiver are entitled to derivative standing to take action to enforce the Trusts' rights. ECF 92 at ¶¶ 13-21 (Case No. 25-15245), App. 560-63.

On May 15, 2026, the Bankruptcy Court denied the Joint Motion. The Court held that Lender and Receiver lack standing and should not be afforded derivative standing. ECF 124 at 5, App. 27. As to their ability to compel assumption or rejection of the Manor Debtors' leases, the Bankruptcy Court concluded that Lender "is not a 'party to' the Leases. Therefore, [Lender] lacks standing under §365(d)(2)." *Id.* at 7, App. 29

(citing *In re Riverside Nursing Home*, 43 B.R. 682, 684 (Bankr. S.D.N.Y. 1984)).

With respect to the Receiver, the Bankruptcy Court found that the Receiver is a party to the leases, "[t]hus if the Leases are 'unexpired' within the meaning of §365, nothing in that provision would deprive the Receiver of standing to request prompt rejection or assumption of the Leases." *Id.* However, the Bankruptcy Court concluded that its stay pending appeal prevented the Receiver from having standing to seek this exact relief: "although no order of this Court has deprived the Receiver of its due authorization to act in the Trusts' stead under nonbankruptcy law, her ability to do so was largely short-circuited by the Trusts' bankruptcies and then again by the Stay Order temporarily reinstating them." *Id.* 8, App. 30.

As to Receiver's standing to seek relief from the automatic stay, the Bankruptcy Court found that "[w]ere the[ Trusts] moving for a lift-stay, the Court would likely have little choice but to grant it. By extension, the Receiver also has a compelling case for relief under §362(d)(1)." *Id.* at 10-11, App. 32-33. However, according to the Bankruptcy Court, the Receiver faces an "impediment" to seeking this relief, namely the stay pending appeal. *Id.* at 11, App. 33. The Bankruptcy Court thus concluded that "the Receiver lacks standing for relief from the automatic stay because she cannot accomplish

20

what she seeks permission for in the Motion—i.e., taking possession of the Manor Properties and evicting the Manors therefrom." *Id.*

As to Lender's standing, the Bankruptcy Court similarly found that Lender could not accomplish the sought-after relief because Lender "cites no authority for the proposition that Pennsylvania law allows a mortgagee to evict a mortgagor's holdover tenant because the mortgagee has a security interest in rents owed by the tenant." *Id.*

Finally, the Court declined to grant derivative standing to either Lender or Receiver. *Id.* at 12, App. 34. As to Lender, the Bankruptcy Court found that Lender did not have a colorable claim because it failed to establish that, under Pennsylvania law, it could evict the Manor Debtors. *Id.* As to the Receiver, the Bankruptcy Court conceded that the Receiver possessed the authority to evict the Manor Debtors. However, the Court was "unwilling to confer derivative standing on the Receiver when she failed to timely pursue another, more traditional means at her disposal for obtaining the kind of standing she now seeks." *Id.* (citing 11 U.S.C. § 543(d)).

Because the Bankruptcy Court found that Lender and Receiver lack standing, and because the Court further declined to afford Lender or Receiver derivative standing, the Bankruptcy Court denied the Joint Motion.

## I.    Lender and Receiver's Appeal of the Bankruptcy Court's May 15 Order

Lender and Receiver initiated this appeal by timely filing a joint notice of appeal on May 20, 2026. ECF 137 (Case No. 25-15245-pmm), App 592. On May 29, 2026, Lender and Receiver filed a joint motion to expedite this appeal and proposed a briefing schedule, pursuant to which Lender and Receiver's opening brief is due on or before June 12, 2026. ECF 2 at 19 (Case No. 5:26-cv-3491-CH). Although the joint motion to expedite is currently pending, Lender and Receiver are filing their opening brief in accordance with their proposed expedited briefing schedule.

## VI.    SUMMARY OF THE ARGUMENT

Lender and Receiver filed a Joint Motion seeking relief related to the leases between the Trusts and the Manor Debtors, including setting a deadline for the Manor Debtors to assume or reject their Leases with the Trusts, or in the alternative, for relief from the automatic stay to allow Lender and Receiver to take action regarding the expired leases. In ruling on Lender and Receiver's Joint Motion, the Bankruptcy Court erred by refusing to afford Lender and Receiver derivative standing.

Derivative standing allows a party to bring an action on behalf of a debtor when the debtor fails to act in its own interest, or in the best interest of the estate. Derivative standing is generally recognized where the party has alleged a colorable claim – i.e., a claim that is likely to survive dismissal – that will benefit the bankruptcy estate, and where the debtor's failure to pursue the claim is not justified. Lender and Receiver satisfy both requirements and thus the Bankruptcy Court erred in refusing to afford them derivative standing.

The Trusts' failure to pursue the claims to seek relief from the automatic stay or to compel the Manor Debtors to assume or reject the Leases is not justified. For reasons that are quite apparent here, the Trusts and the Manor Debtors have a familial relationship, and the Trusts and the

23

Manor Debtors are acting primarily to promote the Atiyeh family's interest in retaining control over their properties or businesses (being both the Trusts and the Manor Debtors). Mr. Atiyeh not only controls the Trusts and the Manor Debtors but has been making decisions on behalf of these clearly conflicted entities throughout the bankruptcy proceedings. Mr. Atiyeh's control of the Trusts and the Manor Debtors, and the clear conflict of interest between the Trusts and the Manor Debtors, has repeatedly resulted in the Trusts and the Manor Debtors acting only in the interest of the Manor Debtors, who are currently the only entity generating revenue for the Atiyeh family. Unlike the Manor Debtors, which generate rent from the tenants of their personal care homes, the Trusts' only source of income is rent from the Manor Debtors – rent that the Trusts have refused to collect for five years. Thus, the Trusts are failing to take action to enforce their rights, instead acting directly contrary to their interests for the benefit of the Manor Debtors (and Mr. Atiyeh).

Not only do the Trusts undeniably have standing to pursue both of these claims – as parties to the Leases in question – but the Trusts would objectively benefit from either form of requested relief.

(a) If the Manor Debtors assumed their Leases, the Manor Debtors would be required to cure all defaults under their Leases, including payment of unpaid rent to the Trusts.

(b) If, on the other hand, the Leases have expired (or the Manor Debtors rejected their Leases), the Trusts would have the authority to evict the Manor Debtors for failing to pay rent for five years and to bring in new, rent-paying tenants.

The Trusts have provided no explanation for their failure to pursue this relief on their own, and further, the Trusts affirmatively rejected the requested relief by actively participating in the Manor Debtors' opposition to Lender and Receiver's Joint Motion in the Bankruptcy Court.

In fact, this is not the first time that the Trusts have failed to protect their rights and seek relief that would objectively benefit the Trusts. On May 18, 2026, this Court ordered that the Trusts and the Manor Debtors must retain separate bankruptcy counsel due to an actual conflict of interest between the Trusts and the Manor Debtors which resulted in bankruptcy counsel acting in the Manor Debtors' best interest at the expense of the Trusts' interest. ECF 23 (Case No. 5:26-cv-662-CH).

The Trusts' failure to pursue the relief sought in the Joint Motion – as a result of the same conflict of interest – is unjustified, and Lender and

25

Receiver are entitled to derivative standing to pursue the requested and necessary relief.

With respect to their claim for relief from the automatic stay, Lender and Receiver demonstrated, and the Bankruptcy Court agreed, that the Leases between the Trusts and the Manor Debtors are expired by their terms. This fact is a clear ground for relief from the automatic stay under the Bankruptcy Code. Thus, Lender and Receiver have asserted a colorable claim.

With respect to their claim to compel the Manor Debtors to assume or reject their Leases, Lender and Receiver have demonstrated that the relevant factors weigh in favor of compelling immediate assumption or rejection of the Leases. Critical to this analysis, Lender and Receiver established that the Manor Debtors are no longer performing under their Leases, which make the circumstances of this case distinguishable from other cases where similar such motions to compel assumption or rejection were denied. Accordingly, Lender and Receiver's claim to compel assumption or rejection of the Leases is colorable.

Lender and Receiver are clearly entitled to derivative standing to seek to compel the Manor Debtors to assume or reject their Leases, or to seek

relief from the automatic stay, and the Bankruptcy Court erred in refusing to afford such derivative standing.

## VII.  ARGUMENT

Pursuant to their equitable powers, bankruptcy courts can confer derivative standing on creditors to bring actions "for the benefit of the estate when the debtor fails to do so in violation of its fiduciary duties." *In re Nat'l Forge Co.*, 326 B.R. 532, 542 (W.D. Pa 2005) (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003)). "[T]he ability to confer derivative standing ... is a straightforward application of bankruptcy courts' equitable powers." *Cybergenics Corp.*, 330 F.3d at 568. "[D]erivative standing is a prudent way for bankruptcy courts to remedy lapses in a trustee's execution of its fiduciary duty." *Id.* at 572 (providing that "the [Bankruptcy Code] itself anticipates the existence of derivative standing").

Although *Cybergenics* arose in the avoidance-action context, its reasoning — that bankruptcy courts' equitable powers allow them to "remedy lapses in a trustee's execution of its fiduciary duty," *id.* — applies with equal force where, as here, the debtor has failed to enforce rent obligations against an affiliated tenant that are essential to a secured creditor's collateral. *See In re Pack Liquidating, LLC*, 658 B.R. 305, 327, 333 (Bankr. D. Del. 2024)

27

("[R]eading *Cybergenics* to be limited to avoidance actions, and not to extend to other potentially valuable estate causes of action that a debtor in possession declines to pursue, is to take an unduly blinkered approach to the Third Circuit's decision.") (considering whether to afford derivative standing to pursue claims for breach of fiduciary duty); *see also In re Guardian Elder Care at Johnstown, LLC*, 666 B.R. 651 (Bankr. W.D. Pa. 2025) (considering whether to grant derivative standing to pursue causes of action to diminish the value of secured creditor's claim).

"[C]ourts have generally recognized derivative standing only where: (i) the creditor has alleged a colorable claim that would benefit the estate[;] (ii) the debtor has unjustifiably refused to pursue the claim itself; and (iii) the [movant] has obtained permission from the bankruptcy court to initiate the action on behalf of the estate." *Nat'l Forge Co.*, 326 B.R. at 543 (collecting cases). "[D]erivative standing may be granted even if the creditor did not seek the court's permission to initiate the action where, after examining the creditor's conduct, the Court determines that such action will benefit the estate without usurping the trustee's powers." *In re Rosenblum*, 545 B.R. 846, 863 (Bankr. E.D. Pa. 2016).

Contrary to the Bankruptcy Court's finding, Lender and Receiver are entitled to derivative standing here because: (1) the Trusts' failure to pursue

28

these claims is unjustified; and (2) Lender and Receiver's claims for relief from the automatic stay and to compel the Manor Debtors to assume or reject their leases are colorable claims.

### A.   The Trusts' Failure to Pursue These Claims is Unjustified

With regards to the second requirement for derivative standing, Courts look at (1) whether the debtor's decision not to pursue the claim was justified and (2) "whether granting derivative standing is necessary and beneficial to the fair and efficient resolution of th[e] proceeding." *Rosenblum*, 545 B.R. at 870-71; *see also Nat'l Forge*, 326 B.R. at 549 ("Implicit in the Bankruptcy Court's grant of derivative standing is a finding that the Debtor's opposition to the filing ... was contrary to the best interests of the estate and, therefore, unjustified.").

Here, the Trusts' failure to pursue these claims against the Manor Debtors is unjustified. The Trusts presented no evidence as to why they have not attempted to (1) seek rent payments from the Manor Debtors pursuant to the pre-2023 Lease Agreements, (2) sign new and current lease agreements with the Manor Debtors in light of the expiration of the prior leases, or (3) pursue an eviction action against the Manor Debtors in order to bring in tenants who are able to pay rent to the Trusts.

In fact, this is precisely the conflict of interest that this Court found precluded Dilworth Paxson LLP from jointly representing the Trusts and the Manor Debtors in the bankruptcy proceedings:

> It cannot be denied that there is an actual conflict of interest with respect to the Manor Debtors' obligation to pay rent to the Trust Debtors and in what amount. Accordingly, the same law firm cannot properly advise both the Trust Debtors and the Manor Debtors as to how the leases between the Debtors should be treated in the bankruptcies.

ECF 23 (Case No. 5:26-cv-662-CH). Specifically, then-joint bankruptcy counsel argued on behalf of both the Trusts and the Manor Debtors that Section 365(d)(3) of the Bankruptcy Code does not apply to the leases between the Trusts and the Manor Debtors. *See id.* at 6-7.

Section 365(d)(3) requires a tenant-debtor in a non-residential real property lease to make post-petition rent payments pursuant to that lease during the pendency of the bankruptcy proceeding. *See* 11 U.S.C. § 365(d)(3). The Trusts, as landlords, would absolutely benefit from the application of Section 365(d)(3) because it would require the Manor Debtors to actually pay rent during the bankruptcy proceedings. The Manor Debtors, on the other hand, would benefit from the non-application of Section 365(d)(3) because it would allow the Manor Debtors to retain money that would otherwise be put towards rent payments. By allowing joint bankruptcy counsel to argue

on behalf of *both* the Trusts and the Manor Debtors that Section 365(d)(3) does not apply, the Trusts failed to pursue relief that would objectively benefit them.

The same conflict of interest prevented the Trusts from acting in their own interests with regard to the Joint Motion. As it relates to the relief sought in Lender and Receiver's Joint Motion, the Trusts would undoubtedly benefit from the relief because the Trusts could collect rent from new rent-paying tenants. Moreover, the Trusts – who are parties to the leases in question – have standing to seek the requested relief. The Bankruptcy Court expressly recognized that, had the Trusts moved for this relief (specifically relief from the automatic stay), "the Court would likely have little choice but to grant it." ECF 124 at 10, App. 32. Despite the Trusts' likely success in obtaining relief that would benefit them by allowing them to collect rent (their only source of income), the Trusts *opposed* Lender and Receiver's Joint Motion. ECF 87 (Case No. 25-15245-pmm), App. 423. There is a simple explanation for the Trusts' failure to pursue this relief: there is a conflict of interest that exists between the Trusts and the Manor Debtors, the family controlling those entities decided what they would do to promote their own interests, and their then-joint counsel decided to favor the interests of the Manor Debtors, all to

31

the harm of the Trusts. That is not a justification for the Trusts' refusal to pursue the requested relief.

In light of the Trusts' unjustified failure to pursue this relief, granting derivative standing to Lender and Receiver to prosecute the Joint Motion is both "necessary and beneficial to the fair and efficient resolution of th[e] proceeding." *Rosenblum*, 545 B.R. at 870-71. As set forth below, the Trusts, Lender, and Receiver are harmed by the Trusts' failure to pursue necessary relief against the Manor Debtors. Given the Manor Debtors' current financial situation, there is a risk that their proposed Chapter 11 plan of reorganization will be unsuccessful. To prevent the harms sure to result from an unsuccessful reorganization, it is necessary to allow Lender and Receiver to prosecute the Joint Motion. The Trusts have proven that although they have standing, and would benefit from the relief, they refuse to take necessary action against the Manor Debtors. It is thus incumbent upon Lender and Receiver to pursue relief that is necessary and appropriate under the Bankruptcy Code to move the bankruptcy proceedings forward.

Accordingly, Lender and Receiver are entitled to derivative standing to act on behalf of the Trusts and to pursue the relief sought in the Joint Motion.

### B.   Lender and Receiver State a Colorable Claim for Relief from the Automatic Stay

As to the first requirement, "a creditor's claims are colorable if they would survive a motion to dismiss." *Rosenblum*, 545 B.R. at 863-64 (quotations and citation omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Lender and Receiver's claim for relief from the automatic stay is colorable because the Manor Debtors' leases expired **before** the Trusts and the Manor Debtors filed for bankruptcy, which is cause for relief from the automatic stay. *See* ECF 124 at 1, App. 23 ("[T]he Leases expired by their terms well before the Debtors filed for bankruptcy on December 26, 2025."); *see also Burch*, 401 B.R. at 157; *In re Johnson*, No. 15-00104-NPO, 2015 WL 1508460, at * 6 (Bankr. D. Miss. Mar. 27, 2015).

The Manor Debtors' Leases expired by their terms on August 31, 2023, approximately two years before they filed for bankruptcy. Specifically, the

operative Third Amendment to the Whitehall Lease Agreement states that "the original termination date of August 31, 2018 is now agreed to be August 31, 2023." ECF 56 ¶ 25, App. 44 (quoting Whitehall Lease at § 2, App. 83-84). Although the Fourth Amendment to the Whitehall Lease sought to extend the term of the Lease, the December 19 Order declared that Amendment null and void and of no legal effect, meaning the Whitehall Lease expired by its terms on August 31, 2023. ECF 164 (Case No. 24-cv-02627), App. 166; ECF 138 (Case No. 24-cv-02709).

Likewise, the operative Fifth Amendment to the Saucon Lease Agreement provides that "the parties hereto extend the Term of the Lease through August 31, 2023." ECF 56 ¶ 30, App. 45 (quoting Saucon Lease, App. 117). Although the Saucon Lease Agreement contains automatic renewal language, an automatic renewal will not occur where the lessee – Saucon Manor – failed to pay rent for five years. Here, Saucon Manor stopped paying rent in 2021. As a result of this non-payment of rent, the automatic renewal following the August 31, 2023 expiration date did not occur. Therefore, the Saucon Lease expired by its terms on August 31, 2023.

Accordingly, the Manor Debtors have been operating their personal care homes without a lease since the expiration of their respective Leases on August 31, 2023, which is more than two years before the Manor Debtors

34

filed for bankruptcy. Because the Manor Debtors' Leases expired, cause exists to grant Lender and Receiver relief from the automatic stay.

Section 362(d) of the Bankruptcy Code provides that:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating ... such stay ... for cause, including the lack of adequate protection of an interest in property of such party in interest.

11 U.S.C. § 362(d)(1). Under Section 362(d)(1), expiration of a lease is "cause" for granting relief from the automatic stay. *See Burch*, 401 B.R. at 157 ("If Movants are correct that Debtor's interest in the Lease has been properly terminated, then 'cause' exists under § 362(d)(1) to grant relief from the stay to allow Movants to exercise their state law remedies against Debtor."); *see also Johnson*, 2015 WL 1508460, at * 6 ("[C]ourts have held that a debtor's inability to assume a lease constitutes 'cause' for relief from the automatic stay under § 362(d)(1).") (collecting cases).

In fact, the Bankruptcy Court acknowledged that relief from the automatic stay is a colorable claim, noting that "[w]ere the[ Trusts] moving for a lift-stay, the Court would likely have little choice but to grant it. By extension, the Receiver also has a compelling case for relief under §362(d)(1)." ECF 124 at 10, App. 32.

Lender and Receiver's claim for relief from the automatic stay is clearly colorable because the expiration of the Manor Debtors' Leases constitutes "cause" for relief under Section 362(d)(1) of the Bankruptcy Code.

### C. Lender and Receiver State a Colorable Claim to Compel the Manor Debtors to Assume or Reject Their Leases

Lender and Receiver's claim to compel the Manor Debtors to assume or reject their leases is, at a minimum, a colorable claim. *See Rosenblum*, 545 B.R. at 863-64. The factors courts consider in deciding whether to compel debtors to assume or reject a contract all weigh in favor of compelling the Manor Debtors to assume or reject their leases here. *See* ECF 56 at ¶¶ 65-108, App. 54-62.

"In deciding whether to accelerate the debtor's decision [to assume or reject a contract], the court must balance the interests of the contracting party against the interests of the debtor and its estate." *In re Physician Health Corp.*, 262 B.R. 290, 292 (D. Del. 2001). A court must consider several factors in deciding "what constitutes a reasonable time within which a debtor should assume or reject a contract" including, among others: (1) "[t]he nature of the interests at stake," (2) "the balance of the hurt to the litigants," (3) "the good to be achieved," (4) "the safeguards afforded those litigants," and (5) "whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary." *Matter of*

36

*Dunes Casino Hotel*, 63 B.R. 939, 949 (D.N.J. 1986) (citation omitted); *accord In re G-I Holdings, Inc.*, 308 B.R. 196, 213 (D.N.J. 2004).

Additional relevant considerations include: (1) "the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code"; (2) "the importance of the contract to the debtor's business and reorganization"; (3) "whether the debtor has had sufficient time to appraise its financial situation"; and (4) "the potential value of its assets in formulating a plan, and whether exclusivity has terminated." *In re Teligent, Inc.*, 268 B.R. 723, 738 (Bankr. S.D.N.Y. 2001).

Finally, a critical factor that courts consider – and one that distinguishes this case from others where courts declined to compel assumption or rejection – is whether "[t]he Debtors are performing under the contract." *Physician Health*, 262 B.R. at 294-95 (declining to compel assumption or rejection because the debtor was "performing under the contract" and the non-debtor party was "receiving precisely what it bargained for"); *see also In re Wheeling-Pittsburgh Steel Corp.*, 54 B.R. 385, 388 (W.D. Pa. 1985) ("When the Debtor-in-Possession continues to perform its post-petition obligations, and the obligee under the executory contract or unexpired lease is suffering no harm or prejudice ... there is no need to require the Debtor to assume or reject prior to the confirmation of a plan of

37

reorganization."). Here, the Manor Debtors are not performing under their Leases, nor have they performed for years, evidenced by their more than five-year failure to pay rent.

In addition to their failure to perform under their Leases, a review and weighing of the above factors strongly favors requiring the Manor Debtors to promptly assume or reject their respective Leases, demonstrating that Lender and Receiver have asserted a colorable claim.

**Nature of the interests at stake:** The nature of the interests at stake suggests that a prompt assumption or rejection of the Manor Debtors' respective Leases is necessary to protect Lender's and Receiver's interests. The Manor Debtors operate personal care homes on the Trusts' properties and contend that they have an interest in maintaining their businesses through the bankruptcy cases. As set forth above, Lender has an interest, through its liens and Security Agreements, in receiving the rents that the Manor Debtors owe to the Trusts (rents that have not been paid since February 2021). ECF 56 ¶¶ 44-45, App. 47-48; App. 273; App. 296; App. 319; App. 342; App. 363; App. 387. Likewise, the Receiver, pursuant to the Receiver Order, has standing – absent the bankruptcy cases – to assert the interests of the Trusts in seeking the payment of the rents due from the Manor Debtors. ECF 65, at ¶ 6 (Case No. 24-cv-02627), App. 543-49; ECF

38

58, at ¶ 6 (Case No. 24-cv-02709) (authorizing Receiver to "commence [or] prosecute … actions … to collect the rents").

Despite the Manor Debtors' apparent interest in maintaining their personal care homes, the Manor Debtors' deteriorating financial situation poses a risk to their ability to maintain their businesses and to do so in a way that does not put the residents of their personal care homes at risk. With respect to their financial situation, the Manor Debtors presented testimony – through Mr. Atiyeh – during the April 1, 2026 Bankruptcy Hearing that the Manor Debtors had insufficient cash to make monthly rent payments to the Trusts in the amounts set forth in the pre-2023 Leases:

> Q. What would happen if the manor debtors paid rent to the trust right now?
>
> A. Right now, there is not enough cash flow, net cash flow, to – it would – it would – it would – there wouldn't be enough money to make payroll and cover expenses if we had to pay additional, right now.

Apr. 1, 2026 Bankr. Hr'g Tr. at 27:12-17, App. 886; *see also id.* at 50:25-52:4, App. 889-91.

If, as a result of their financial situation, the Manor Debtors do not pay their vendors and providers, there is a risk that the vendors will stop providing critical services to the residents of the Manor Debtors' personal care homes—i.e., food, medical supplies, medical services, maintenance, staffing, etc. The consequences for the residents if these services are stopped

39

would be severe. Allowing the Manor Debtors to operate personal care homes in their current state of financial disarray is reckless and jeopardizes the health and safety of the residents the Manor Debtors are supposed to be protecting.

Lender and Receiver, on the other hand, are prepared to bring in a qualified, new operator who will maintain the businesses and continue running the personal care homes in a profitable manner and in such a way as to prevent any disruption in care to the current residents. Bringing in a new operator would also quell any potential public health concerns raised by the Manor Debtors' continuing to operate the facilities in their current financial state. Allowing Lender and Receiver to bring in a new operator would effectuate not only the Manor Debtors' interest in maintaining the personal care homes, but it would also effectuate the Trusts', Lender's, and Receiver's interests by allowing the facilities to be run profitably. Once the personal care homes are generating revenue, the Trusts will then be able to enforce any rent-payment obligations due under a new lease with the new operator.

Finally, Receiver has a strong interest in collecting rents from the Manor Debtors because that is precisely what this Court appointed Receiver to do. As set forth in the Receiver Order and as summarized above, there

40

exists a strong basis for Receiver's appointment, and Receiver's interests in the bankruptcy proceedings must be enforced.

**Balance of hurt to litigants:** The harms the Lender and Receiver face by delaying the Manor Debtors' decision to assume or reject their Leases are far in excess of any risk the Manor Debtors face from having to make this decision sooner rather than later. The Manor Debtors have not paid rent for approximately five years. Further, it has become clear in the bankruptcy proceedings that the Manor Debtors are in a dire financial situation. For example, during the April 1, 2026 Bankruptcy Hearing, the Manor Debtors presented testimony that they have insufficient cash to make monthly rent payments to the Trusts. Apr. 1, 2026 Bankr. Hr'g Tr. at 27:12-17, App. 886; *see also id*. at 50:25-52:4, App. 889-91. The Manor Debtors' current financial situation suggests that the Manor Debtors cannot, and will not, be able to pay any of the post-petition rent, nor the outstanding pre-petition rent, which is owed. This directly harms Lender and Receiver, each of whom is entitled to and benefits from rent payments from the Manor Debtors.

To the extent the Manor Debtors face any harm, it will be, by comparison, far less than the harm to Lender and Receiver, who are continually being harmed by the Manor Debtors' failure to pay rent, as well as by their current financial situation.

41

**The good to be achieved:** Given the Manor Debtors' deteriorating financial position, there is significant good in placing a limit on how long the Manor Debtors can continue operating their personal care homes. As set forth above, the Manor Debtors' financial position creates a risk that their vendors and service providers will stop providing services to the residents if they are not paid by the Manor Debtors. This poses a serious health and safety risk to the residents of the Manor Debtors' facilities.

By compelling the Manor Debtors to assume or reject their Leases promptly, and by granting Lender and Receiver relief from the automatic stay, it affords Lender and Receiver the opportunity to bring in a new operator that can safely and profitably operate the personal care homes. Bringing in a responsible, financially stable operator will result in significant good, and will better protect the residents of the personal care homes than the current arrangement.

**The safeguards afforded to litigants:** There are no safeguards available to Lender and Receiver, other than the relief requested in the Joint Motion, to protect their security interests in the rents due to the Trusts from the irreparable harm and substantial risk resulting from the Manor Debtors' bankruptcy cases and deteriorating financial position. If the Manor Debtors do not pay the rent now and their bankruptcy cases fail, the Lender and

42

Receiver will never recover the rent the Manor Debtors owe for the benefit of continuing to operate the personal care homes during the bankruptcy cases. Lender and Receiver need a prompt decision concerning the future of the Leases, and without such a decision, have no other way to avoid the harms described herein.

**Whether the action is in derogation of Congress' scheme:** Setting a deadline for the Manor Debtors to assume or reject their Leases is expressly contemplated and permitted under Section 365(d)(2). 11 U.S.C. § 365(d)(2). Thus, this action is not "so in derogation of Congress' scheme" that it can said to be arbitrary.

**The debtors' inability to satisfy post-petition obligations:** For the reasons explained above, there is little chance that the Manor Debtors will be able to satisfy any of their post-petition obligations unless they are compelled to make the choice whether to do so now. For approximately five years, the Manor Debtors have not paid rent at all. As demonstrated by the Manor Debtors' own reports (*see* Exhibits N (App. 411) and O (App. 417) to ECF 56 showing a net loss in the Manor Debtors' ending cash balance for the months of March 28, 2026 through June 20, 2026), and based on testimony from the Manor Debtors in the Bankruptcy Court (Apr. 1, 2026 Bankr. Hr'g Tr. at 27:12-17, App. 886; *see also id.* at 50:25-52:4, App. 889-91), the Manor

43

Debtors are rapidly approaching a position where they will not be able to pay their current rent, let alone the post-petition accrued balance, to say nothing of the millions of dollars of unpaid pre-petition rent. The Lender and Receiver should not be left to the hope that the Manor Debtors will one day somehow fulfill their obligation, assuming they can successfully emerge from bankruptcy – which is highly speculative – and choose to fulfill the obligations they have ignored for five years.

**The importance of the contract to the debtors' business and reorganization:** The Leases are important to the Manor Debtors' businesses because without the Leases, the Manor Debtors cannot continue to operate their personal care homes on the Trusts' properties. To assume their Leases, the Manor Debtors will have to pay the full arrearages owed. Yet, as set forth above, the Manor Debtors are not in a financial position to pay their obligations as necessary to assume their Leases.

Without a lease for the Trusts' properties upon which the Manor Debtors can operate their personal care homes – and because the Trusts are no longer debtors in bankruptcy – the Manor Debtors do not have a viable plan for reorganization because they will no longer have a legal claim on the property on which they operate their businesses. Thus, although the Leases

are important to the Manor Debtors' businesses, this factor weighs in favor of compelling the Manor Debtors to promptly assume or reject their Leases.

**Whether debtors had sufficient time to appraise financial situation:** The Manor Debtors have had more than ample time to evaluate their financial situation and reach a decision concerning assumption or rejection of the Leases. The Manor Debtors' bankruptcy cases have been pending for approximately six months (four months at the time of the Bankruptcy Court hearing on Lender and Receiver's Joint Motion). Four months is the standard exclusive period for a debtor to propose a plan under 11 U.S.C. § 1121(b) ("[O]nly the debtor may file a plan until after 120 days after the date of the order for relief under this chapter."). Thus, Lender and Receiver submit that the Manor Debtors had sufficient time to evaluate whether to assume or reject the Leases.

**Damage non-debtor will suffer beyond compensation under the Bankruptcy Code:** Without the relief sought in the Joint Motion, Lender and Receiver face the risk of substantial harm, far beyond the compensation available under the Bankruptcy Code. Specifically, if the Manor Debtors cannot pay all accrued and unpaid lease obligations in order to assume their respective Leases - which seems increasingly likely – they will not be able to confirm a Chapter 11 plan. If the Manor Debtors cannot

45

confirm a plan, their bankruptcy cases will either be converted to Chapter 7 or will be dismissed.

If these Chapter 11 bankruptcy cases are converted to Chapter 7 or are dismissed, Lender will suffer damage because Lender will only get the value of the property. But Lender will get nothing from its security interest in the Manor Debtors' accrued and unpaid rent. As set forth above, the Lender has a security interest in the rents due from the Manor Debtors. *See* ECF 41, at ¶ 27 (Case No. 25-15241); App. 273; App. 296; App. 319; App. 342; App. 363; App. 387. The Lender's interest in the rents provides collateral separate from and in addition to the value of the properties on which the Lender holds mortgages. *See In re Union Meeting Partners*, 178 B.R. 664, 674-75 (Bankr. E.D. Pa. 1995) ("It stands to reason, then, that an undersecured creditor's secured claim increases as 'proceeds, product, offspring, rents, [and] profits' accrue post-petition.") (citing 11 USCA § 552; alteration in original); *see also In re Lichtin/Wade, LLC*, 486 B.R. 665, 681 (Bankr. E.D.N.C. 2013) ("Therefore, as held by the majority of courts, adding the amount of the adequate protection payments to the secured portion of the claim and correspondingly reducing the unsecured portion of the claim is the only appropriate mechanism to comply with § 506(b)."); *Beal Bank, S.S.B. v. Waters Edge L.P.*, 248 B.R. 668, 686 (D. Mass. 2000) ("In cases involving

46

undersecured creditors, I am persuaded that the better approach is that collateral consists of the sum of the creditor's separate security interests in the building *and* the accumulated post-petition rents." (emphasis in original) (citing *Union Meeting Partners*, 178 B.R. 664)).

These harms are not compensable under the Bankruptcy Code other than through the Manor Debtors' fulfillment of their payment obligation. If the Manor Debtors are unable to fulfill their obligations – because their bankruptcy cases failed – the Lender and the Receiver are out of luck. Only an order directing the Manor Debtors to assume or reject their Leases, and to pay the amounts owed can protect the Lender and Receiver from these harms.

*****

Given that the above factors weigh in favor of compelling the Manor Debtors to promptly assume or reject their Leases, Lender and Receiver have satisfied the first prong required for derivative standing because they have asserted a colorable claim to compel assumption or rejection.

### D. The Reasons the Bankruptcy Court Gave for Declining to Afford Lender and Receiver Derivative Standing are Unavailing and Cannot Stand

The Bankruptcy Court erred when it declined to afford Lender and Receiver derivative standing. *First*, the Bankruptcy Court reasoned that

47

derivative standing is reserved only for "truly exceptional circumstances." ECF 124 at 11, App. 33. However, as set forth above, the circumstances here are clearly exceptional and warrant derivative standing. Specifically, the Trusts have repeatedly refused to act in their own interests, which is causing ongoing harm to Lender and Receiver. Further, bankruptcy counsel has acted jointly on behalf of both the Trusts and the Manor Debtors despite the actual conflicts of interest that exist between the Trusts and the Manor Debtors. Bankruptcy counsel has repeatedly acted – on behalf of *both* the Trusts and the Manor Debtors – in the best interest of the Manor Debtors and at the expense of the Trusts.

For instance, the Trusts' and the Manor Debtors' joint argument that Section 365(d)(3) – which requires tenant-debtors in a non-residential real property lease to make post-petition rent payments pursuant to that lease during the pendency of the bankruptcy proceeding – does not apply to the leases between the Trusts and the Manor Debtors favors the latter and harms the former. ECF 23 at 6-7 (Case No. 5:26-cv-662-CH). Although the Manor Debtors would benefit from the non-application of Section 365(d)(3) because it would allow them to retain money that would otherwise go towards rent payments, the Trusts would clearly benefit from the application

48

of Section 365(d)(3) because it would allow them to collect monthly rent payments during the pendency of the bankruptcy proceeding.

The Trusts' failure to seek the relief sought in the Lender and Receiver's Joint Motion is another manifestation of this actual conflict of interest. The ongoing problems resulting from this conflict of interest between the Trusts and the Manor Debtors shows why this is precisely the sort of "exceptional circumstance" where derivative standing is necessary. Only Lender and Receiver – acting with derivative standing – can and will seek the relief necessary to protect the Trusts' interests.

*Second*, as to Receiver, the Bankruptcy Court reasoned: "[t]o be sure, the Receiver possesses such authority under the Receivership Order. But the Court is unwilling to confer derivative standing on the Receiver when she failed to timely pursue another, more traditional means at her disposal for obtaining the kind of standing she now seeks." ECF 124 at 12, App. 34 (citing 11 U.S.C. § 543(d)). The Bankruptcy Court's rationale, however, falls short. Lender and Receiver moved for the relief in the Joint Motion only *after* the Trusts' bankruptcy cases were dismissed (and before the Bankruptcy Court stayed that Order). Because the Trusts were no longer in bankruptcy, the Receiver was acting pursuant to the authority expressly granted to it by this

49

Court under the Receiver Order. In other words, before the Bankruptcy Court stayed the Dismissal Order (and apparently also stayed the Receiver's ability to act pursuant to the Receiver Order), the Receiver had no need to seek derivative standing from the Bankruptcy Court.

To deny the Receiver derivative standing based on her decision not to seek relief under Section 543(d) before the Trusts' bankruptcy cases were dismissed is untenable. The Receiver, as this Court granted and as the Bankruptcy Court recognized, has the explicit authority to act on behalf of the Trusts and to seek the very relief sought in Lender and Receiver's Joint Motion. Further, Lender and Receiver did not seek the relief requested in the Joint Motion until the Trusts were no longer parties to the bankruptcy proceedings. Simply put, there was no reason for the Receiver to have sought this standing earlier, and the Bankruptcy Court erred by denying the Receiver derivative standing on this ground.

## VIII. CONCLUSION

For the foregoing reasons, Appellant Lehigh Valley 1, LLC and Receiver Duane Morris LLP Through Erin Duffy, Esquire respectfully requests that this Court vacate the Bankruptcy Court's May 15, 2026 order finding that Lender and Receiver lack standing to seek the relief sought in the Joint

Motion and remand this matter to the Bankruptcy Court for further proceedings.

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

Dated: June 12, 2026

By: */s/ Matthew A. Hamermesh*
   Matthew A. Hamermesh
   Sara E. Smith
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
(215) 568-6200
mhamermesh@hangley.com
ssmith@hangley.com

BERGER LAW GROUP, P.C.
Phillip D. Berger
919 Conestoga Road, Building 3,
Suite 114
Bryn Mawr, PA 19010
(610) 668-0800
Berger@BergerLawPC.com

*Attorneys for Secured Creditor Lehigh Valley 1, LLC*

DUANE MORRIS LLP

By: */s/ Brett L. Messinger*
   Brett L. Messinger
30 S. 17th Street
Philadelphia, PA 19103
215-979-1508
blmessinger@duanemorris.com

*Attorneys for Receiver Duane Morris LLP, by Erin Duffy, Esquire*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this document contains 10,436 words.

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

Dated: June 12, 2026

By: */s/ Matthew A. Hamermesh*
    Matthew A. Hamermesh
    Sara E. Smith
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
(215) 568-6200
mhamermesh@hangley.com
ssmith@hangley.com

No. 5:26-cv-3491

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

In re:

WHITEHALL MANOR,
*Debtor.*

LEHIGH VALLEY 1, LLC
*Appellant*.

_____

APPENDIX OF APPELLANTS LEHIGH VALLEY 1, LLC AND
RECEIVER DUANE MORRIS LLP THROUGH ERIN DUFFY,
ESQUIRE

*Appeal from the Order of the United States Bankruptcy Court for the
Eastern District of Pennsylvania Denying Lender and Receiver's Joint
Motion to Compel the Manor Debtors to Assume or Reject Their Leases, to
Establish the Cure Amount, and in the Alternative, for Relief from the
Automatic Stay, No. 25-15245 (PMM)*

_____

Matthew A. Hamermesh (I.D. No. 82313)
Sara E. Smith (I.D. No. 330261)
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200

*Counsel for Appellant Secured Creditor Lehigh
Valley 1*

Brett L. Messinger (I.D. No. 63020)
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
(215)979-1508

*Attorneys for Receiver Duane Morris LLP,
through Erin Duffy*

BERGER LAW GROUP, P.C.
Phillip D. Berger (I.D. No. 58942)
919 Conestoga Road, Building 3,
Suite 114
Bryn Mawr, PA 19010
(610) 668-0800
Berger@BergerLawPC.com

# TABLE OF CONTENTS

**Document**                                                                    **App.**

Docket Entries, United States Bankruptcy Court for the Eastern
District of Pennsylvania, No. 25-15245 (PMM) ...............................................1

Order Denying Motion To Compel The Manor Debtors To
Assume Or Reject Their Leases, (2) Establish The Cure Amount
and (3) For Relief From The Automatic Stay, ECF 124,
dated May 15, 2026 ..................................................................................... 22

Secured Creditor Lehigh Valley 1, LLC and Receivers Joint (1)
Motion to Compel The Manor Debtors To Assume Or Reject
Their Leases, (2) Establish The Cure Amount and (3) For Relief
From The Automatic Stay, ECF 56, dated March 31, 2026 ........................ 35

Exhibit A –   Lease Agreement By and Between Whitehall
              Fiduciary, LLC, as Trustee of Whitehall Trust and
              Whitehall Manor, Inc., dated August 14, 2008 ......................75

Exhibit B -   Lease Agreement Between Abraham R. Atiyeh and
              Saucon Valley Manor, Inc., dated January 1, 2006 ............. 117

Exhibit C -   Fourth Amendment to Lease and Memorandum of
              Lease Extension, dated September 21, 2023.......................157

Exhibit D -   Sixth Amendment to Lease Agreement,
              dated September 21, 2023 .................................................162

Exhibit E -   Order, dated December 19, 2025, Lehigh Valley 1
              LLC v. Whitehall Fiduciary, E.D. Pa. No. 24-2627 ..............166

Exhibit F -   Proof of Claim, Whitehall Fiduciary, LLC, as
              Trustee of Whitehall Trust, by Duane Morris LLP,
              as receiver, $8,271,961.00, ECF 44, filed March 26,
              2026 (Case No. 25-15245) ...................................................170

Exhibit G –   Proof of Claim, Saucon Management LLC, as
              trustee for the Saucon Trust, $8,460,834.01, ECF
              26, filed March 26, 2026 (Case No. 25-15244) ................... 223

Exhibit H - Whitehall - Open-End Mortgage, dated January 19, 2012 .................................................................. 273

Exhibit I - Whitehall Trust Security Agreement, dated January 26, 2012................................................................. 296

Exhibit J - Whitehall Manor Lessee Security Agreement, dated January 26, 2102 ......................................................319

Exhibit K - Saucon - Mortgage, dated December 1, 2012 ...................... 342

Exhibit L - Saucon Trust Security Agreement, dated December 1, 2012................................................................ 363

Exhibit M - Saucon Valley Manor Security Agreement, dated December 1, 2012................................................................ 387

Exhibit N - Whitehall Manor 13-week projection ................................ 411

Exhibit O - Saucon Valley Manor 13-week projection ...........................417

Opposition to Secured Creditor Lehigh Valley 1, LLC and Receivers Joint (1) Motion to Compel The Manor Debtors To Assume Or Reject Their Leases, (2) Establish The Cure Amount and (3) For Relief From The Automatic Stay filed by Whitehall Manor, ECF 87, dated April 14, 2026 ...................................................... 423

Exhibit A - Saucon Valley Manor Commitment Letter from the U.S. Department of Housing and Urban Development, dated December 10, 2012............................460

Exhibit B - Saucon Trust Regulatory Agreement, dated December 1, 2012...................................................... 511

Exhibit C - Whitehall Trust Regulatory Agreement, dated January 19, 2012 ...................................................... 526

Exhibit D - Order granting Plaintiff's Motion for Appointment of a Receiver, ECF 65, filed May 2, 2025 (Case No. 5:24-cv-02627-CH) .............................................540

Secured Creditor Lehigh Valley 1, LLC and Receivers Joint Reply In Support Of Joint (1) Motion to Compel The Manor Debtors To Assume Or Reject Their Leases, (2) Establish The Cure Amount and (3) For Relief From The Automatic Stay, ECF 92, dated April 17, 2026 ...................................................................557

Exhibit P -    First 60-Day Patient Care Ombudsman Report, ECF 280, filed April 8, 2026 (Case No. 25-15241) .............. 576

Exhibit Q -    Saucon Valley Manor Rent Arrears Analysis....................... 586

Exhibit R -    Whitehall Manor Rent Arrears Analysis ............................588

Exhibit S -    Post-Petition Rent Accruals................................................590

Joint Notice of Appeal, ECF 137, dated May 20, 2026 ............................. 592

Exhibit A -    Order Denying Motion To Compel The Manor Debtors To Assume Or Reject Their Leases, (2) Establish The Cure Amount and (3) For Relief From The Automatic Stay, ECF 124, dated May 15, 2026 .........................................................*omitted, see App. 22*

Transcript of April 21, 2026 Hearing before the Honorable Judge Patricia Mayer ........................................................................................ 595

Exhibit D8 - Saucon Trust: 2012 M&T Mortgage .......*omitted, see App. 342*

Exhibit D9 - Saucon Trust: 2012 HUD Regulatory Agreement .................................................*omitted, see App. 511*

Exhibit D23 - Whitehall 2012 M&T Mortgage ............ *omitted, see App. 273*

Exhibit D24 - Whitehall 2012 HUD Regulatory Agreement.................................................*omitted, see App. 526*

Exhibit D50 - Weekly Reconciliations ....................................................717

Exhibit D51 - Cash Collateral Budgets ................................................... 819

Exhibit D52 - Monthly Censuses by Manor 2026...................................840

Exhibit D55 - Cash Collateral Budget April 25-July 18, 2026 ................. 841

Exhibit D56 - Abraham Kapoor Atiyeh Declaration ............................... 845

Exhibit D57 - Saucon Trust Firm Commitment..........*omitted, see App. 460*

Exhibit D58 - Whitehall Fiduciary Firm Commitment ........................... 852

Excerpts from Transcript of April 1, 2026 Hearing before the Honorable Judge Patricia Mayer ............................................................. 881

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| Whitehall Manor, Inc., et al., | § § | Case No. 25-15245 (PMM) |
| *Debtors*. | § § § § | Jointly Administered |

## ORDER

AND NOW, upon consideration of the joint motion of Secured Creditor Lehigh Valley 1, LLC and Receiver Duane Morris LLP through Erin Duffy, Esquire, for entry of an Order (1) compelling the Manor Debtors to assume or reject their Leases pursuant to 11 U.S.C. §365(d)(2) promptly, (2) establishing the cure amount, and (3) in the alternative, for relief from the automatic stay, doc. #56 (the "Motion"), it is hereby **ORDERED** that:

1.      The Motion is **DENIED.**\*

Date: May 15, 2026

_____
Hon. Patricia M. Mayer,
United States Bankruptcy Judge

App.22

* * *

On March 19, 2026, Whitehall Trust and Saucon Trust (together, the "Trusts"), two of the four above-captioned Debtors, were dismissed from these jointly administered bankruptcies. Doc. #264 (Bankr. E.D. Pa. No. 25-15241) (the "Dismissal Order"). Their dismissals were later stayed on April 2, 2026. Doc. #274 (Bankr. E.D. Pa. No. 25-15241) (the "Stay Order"). The other two Debtors are Whitehall Manor, Inc., and Saucon Valley Manor, Inc., (together, the "Manors"). They operate personal care homes located at 1177 Sixth Street, Unit 1, Whitehall, Pennsylvania and 1050 Main Street, Unit 1, Hellertown, Pennsylvania (together, the "Manor Properties"). The Trusts leased said Properties to the Manors. Lehigh Valley 1, LLC ("Lehigh") holds mortgages on the Manor Properties and security interests in, *inter alia*, the Manors' receivables.

In February of 2021, the Manors stopped paying the full amount of rent due under their leases with the Trusts (the "Leases"). Thereafter, the Trusts were unable to voluntarily service their mortgages. Accordingly, in June of 2024, Lehigh filed foreclosure actions against the Trusts in the United States District Court for the Eastern District of Pennsylvania. See (E.D. Pa. No. 24-cv-02627) (Whitehall Foreclosure Action); (E.D. Pa. No. 24-cv-2709) (Saucon Foreclosure Action). These foreclosure actions were consolidated on March 17, 2025. Doc. #52 (24-cv-2709). On May 2, 2025, the Honorable Catherine Henry entered an Order appointing Duane Morris LLP through Erin Duffy, Esquire (the "Receiver") to receive the Manor Properties on Lehigh's behalf. Doc. #65 (24-cv-02627) (the "Receivership Order"). On December 19, 2026, Judge Henry entered an Order directing that amendments made to the Leases in 2023 were null, void, and of no legal effect. Doc. #164 (24-cv-02627). Accordingly, the Leases expired by their terms well before the Debtors filed for bankruptcy on December 26, 2025. See e.g., LVx-1 at 8, §2.02; id. at 30, 40; LVx-2 at 1, 9, §20(a); id. at 8, §19; id. at 34–35, 37–38.

1

App.23

\* \* \*

Principally, Lehigh and the Receiver (the "Movants") argue that, because the Leases expired by their terms pre-petition, the Leases are not assumable or rejectable under 11 U.S.C. §§365(d)(2) or 1123(b)(2). Therefore, the Movants contend that they are entitled to relief from the automatic stay to "take possession of the [Manor Properties] and evict the Manor Debtors and bring in a new, qualified operator[.]" Mot. at 30. Alternatively, if the Court finds that the Leases are "unexpired," then the Movants contend that the equities weigh in favor of the Court compelling the Manors to promptly assume or reject the Leases under §365(d)(2). In that event, the Movants urge this Court to fix the cure amount at roughly eight million dollars for each of the Manors, consistent with the proofs of claim filed by the Receiver on the Trusts' behalf.[1] Should the Court compel the Manors to promptly assume or reject the Leases, the Movants request prospective stay relief to take possession of the properties if the Manors decide to reject the Leases.

Critically, the Movants contend that the Receivership Order—in tandem with the Dismissal Order—furnishes the Receiver with direct standing to assert the Trusts' interests in all the relief sought. For its part, Lehigh is said to have standing under §365(d)(2) given Lehigh's security interests in the rent due under the Leases. Less clear is on what basis Lehigh asserts "standing" to evict the Manors under §362(d)(1). Failing all that, the Movants urge the Court to either narrow the scope of the Stay Order or invoke 11 U.S.C. §105(a) as a means of conferring upon the Movants derivative standing to pursue such relief.

\* \* \*

---

[1]    Apparently, the Receiver filed these proofs of claim in the interregnum between entries of the Dismissal and Stay Orders. See doc. #44 (25-15245).

2

App.24

In their papers, the Manors submit that Lehigh lacks standing under §365(d)(2) because Lehigh is not a party to the Leases.  Similarly, the Manors argue that the Receiver lacks standing under §365(d)(2) because she was "not appointed to exercise the Trusts' business judgment but is acting in Lehigh's interest[.]"  Resp. at 9.  Regardless, the Manors suggest that the Receiver is effectively estopped from moving under §365(d)(2) by virtue of the Trusts' bankruptcies.  See id. ¶¶ 12, 13.  See also id. at 16 ("The Receiver's pursuit of rent payments . . . is stayed in these cases[.]").  At the April 21, 2026, hearing (the "Hearing"), the Manors clarified that they were grounding the latter argument in 11 U.S.C. §543.  Even if the Movants can invoke §365(d)(2), the Manors believe compulsion thereunder is unwarranted because the equites tip in favor of allowing the Manors to wait and assume or reject the Leases in their Chapter 11 plans.

The Manors also suggested at the Hearing that §543 effectively deprives the Receiver of "standing" under §362(d)(1), at least insofar as the Receiver seeks to take possession of the Manor Properties and evict the Manors.  See Hr'g Tr. at 66–74.  Likewise, the Manors contend that Lehigh lacks standing to evict the Manors under §362(d)(1) because, again, Lehigh is not a party to the Leases.  See id. at 66; Resp. at 29.  In any event, the Manors submit that there is no cause for a lift-stay.  Although they concede that the Leases expired pre-petition, the Manors emphasize the Debtors' longstanding, amicable, landlord-tenant relationship.  And the Manors claim they performed post-default by covering components (e.g., maintenance costs) of the rent.  (For this reason, the Manors contend that any cure amount should be fixed at less than half what the Movants allege.)  The Manors urge the Court to credit this purported course of dealing as an equitable basis for adjudging the Leases "unexpired" within the meaning of §365.

*    *    *

3

App.25

The Motion presents many issues.  Among these are the threshold questions of: (A) whether the Stay Order reinstated the status quo ante; (B) whether the Movants have standing under 11 U.S.C. §365(d)(2); (C) whether the Movants can pursue the relief they request under 11 U.S.C. §362(d)(1); and (D) whether the Movants should be afforded derivative standing under 11 U.S.C. §105(a).  Only the first question is answerable in the affirmative.

*    *    *

A stay pending appeal "suspend[s] judicial alteration of the status quo,'" or "the state of affairs before the . . . order was entered."  Nken v. Holder, 556 U.S. 418, 429 (2009) (alteration in original) (quoting Ohio Citizens for Responsible Energy, Inc. v. NRC, 479 U.S. 1312, 1313 (1986) (Scalia, J., in chambers)).  See also Nken, 556 U.S. at 428–29 (a stay "temporarily suspend[s] the source of authority to act—the order or judgment in question[.]").  Accord Roe by & through Roe v. Johnston, --- F.4th ----, 2026 WL 1143531, at *2 (9th Cir. Apr. 28, 2026); Kansas v. United States, 124 F.4th 529, 532 (8th Cir. 2024); Texas All. for Retired Americans v. Hughs, 976 F.3d 564, 566 (5th Cir. 2020).  Contra Porter v. Pennsylvania Dep't of Corrs., 974 F.3d 431, 439 (3d Cir. 2020) (death sentence did not constitute status quo despite stay of order vacating it).

The status quo rule generally holds where, as here, a stay was granted under Federal Rule of Bankruptcy Procedure 8007(a)(1)(A).[2]  E.g., Int'l Petroleum Prods. & Additives Co., Inc. v. Black Gold S.A.R.L., 115 F.4th 1202, 1213 (9th Cir. 2024) ("For the losing party, a stay under Rule 8007 of an order pending appeal ensures that the estate and the status quo will be preserved in the event that the order is later reversed. (citation modified)); Lardas v. Grcic, 847 F.3d 561,

---

[2]    The Motion for Stay did not specifically invoke Rule 8007(a)(1)(A).  See doc. #30 ¶¶ 17–18 (25-15245). Neither did the Stay Order.  However, the Court construed the Motion for Stay on that basis.

App.26

567 (7th Cir. 2017) ("[I]f [Appellant] wanted to seek judicial review of the sale order, he should have moved for a stay pursuant to Federal Rule of Bankruptcy Procedure 8007(a)(1)(A), thereby preserving the status quo."); Collier on Bankruptcy ¶ 8007.01 (16th 2026) ("Once a bankruptcy court order, judgment, or decree has been entered . . . the losing party is permitted to seek a stay of the judgment, order, or decree so that the status quo pending an appeal is maintained[.]"). Cf. In re City of Chester, Pennsylvania, 2026 WL 607528, at *8 (E.D. Pa. Mar. 3, 2026) (explaining that, when applying the first of the Nken/In re Revel AC, Inc., 802 F.3d 558 (3d Cir. 2015) factors, "[t]he question is whether the movant has . . . raised serious legal questions warranting preservation of the status quo."); In re Est. of Taplin, 2022 WL 2714513, at *2 (Bankr. E.D. Cal. July 11, 2022) ("In general, a court from which an appeal is taken may not alter the status quo. Rather, the court is limited to activity that preserves the status quo.").

That said, the status quo metric can be tricky "because there is no settled way of defining 'the status quo.'" United States v. Texas, 144 S. Ct. 797, 798 n.1 (2024) (Barrett, J.) (mem.). This conundrum is exemplified by Porter, where the Third Circuit seemed to chisel out an exception to Nken. But this exception, whatever its parameters, is probably best understood as limited in application to the unique circumstances of that case.[3] Accordingly, the status quo ante prevails:

---

[3]        In Porter, vacatur of Porter's Pennsylvania death sentence was stayed pending his and the Commonwealth's appeals, which were held in abeyance while another of Porter's post-sentencing petitions worked its way through the state courts. Porter, 974 F.3d at 435. Years later, Porter sued the Department of Corrections, alleging that it violated his constitutional rights by confining him to death row while the death sentence appeals remained in abeyance. Id. at 436. Summary judgment was granted to the Department of Corrections, in part because the magistrate judge relied on Nken in deciding that Porter's death sentence formed an active part of the status quo pending appeal. Id. at 436–39. A split panel disagreed. The majority reasoned that, under "Williams," Porter's procedural due process rights—regarding the proper mode of his confinement—attached once his sentence was vacated, stay notwithstanding, even though vacaturs of the Williams plaintiffs' death sentences were not stayed. Id. at 439 (citing Williams v. Secretary Pennsylvania Dep't of Corrs., 848 F.3d 549, 553 n.4 (3d Cir. 2017)).

Thus, the Porter majority discounted Nken. Id. ("We are unconvinced by the Magistrate Judge's reliance on the Supreme Court's articulation of the legal impact of a stay in Nken[.]"). "That the order granting Porter vacatur and a resentencing hearing is stayed does not mean that the order has no legal import or that Porter currently has a viable death sentence. Porter, like the Williams plaintiffs, is in limbo: he may not be resentenced until his appeals are

5

App.27

the Trusts remain "SARE" debtors in possession while their dismissals are on appeal.  See Doc.

#144 (25-15241) (determining that property of the Trusts' estates is single asset real estate).  This

means that the Trusts retain the rights *and responsibilities* they had on March 18, 2026.  The status

quo also means that the Manor Properties remain property of the Trusts' estates, subject to the

protection of the automatic stay.  See In re Addison, 667 B.R. 94, 101 (Bankr. D.S.C. 2025)

("Granting the Stay Motion [of a dismissed Chapter 13 debtor] would re-impose an automatic stay,

forcing creditors to cease any [collection] actions commenced post-dismissal and wait until after

a final decision on the appeal is issued to resume pursuing their rights.").

* * *

Chapter 11 debtors may assume or reject "unexpired" leases of residential real property "at

any time before the confirmation of a plan[.]"  11 U.S.C. §365(d)(2).  Accord In re Memory Lane

of Bremen, LLC, 535 B.R. 901, 905 (Bankr. N.D. Ga. 2015).  Leases of property used to operate

senior living facilities constitute leases of residential real property.  Id. (citing cases).  See also

doc. #246, at 4 (25-15241) (explaining that senior living facilities "do[] not meet the definition of

'nonresidential real property' specified in §365(d)(3)[.]" (citing In re Guardian Elder Care at

Johnstown, LLC, 665 B.R. 270, 272 (Bankr. W.D. Pa. 2024)).  However, "on the request of any

*party to*" an unexpired lease of residential real property, the court may order the debtor(s)-in-

possession "to determine within a specified period of time whether to assume or reject such . . .

lease." 11 U.S.C. §365(d)(2) (emphasis added).  See also Memory Lane, 535 B.R. at 905 ("When

---

resolved." Id. This occasioned dissent. Compare id. at 455 (Porter, J., concurring in part and dissenting in part) ("The majority's assertion that the habeas court's stay of the vacatur order accomplished nothing, and that Porter's death sentence was actually vacated, is unprecedented and flies directly in the face of Nken.") and id. n.4 ("The majority's unconventional stay doctrine also threatens to destabilize the appellate process and our local practice." (pointing, for example, to 11 U.S.C. §362)) with id. at 439 n.3 (Greenway, Jr., J.) ("The stay certainly has legal effect: as a result of the stay, Porter cannot be resentenced. But the stay does not mean that Porter, *for purposes of his procedural due process rights*, is identical to other death row inmates who have never received any relief[.]" (emphasis added)).

6

App.28

determining whether to compel . . . a bankruptcy court should ensure that assumption or rejection occurs within a reasonable time[.]" (quotations omitted)).

The Manors are correct that Lehigh is not a "party to" the Leases.  Therefore, Lehigh lacks standing under §365(d)(2).  In re Riverside Nursing Home, 43 B.R. 682, 684 (Bankr. S.D.N.Y. 1984) (assignee of right to receive rent from debtor lacked standing under §365(d)(2) because only the assignor—i.e., the original lessor—had a sufficiently close nexus with the lease agreement to qualify as a party thereto).  On the other hand, the Manors baldly suggest that the same can be said of the Receiver because she was appointed for Lehigh's benefit.  This is unpersuasive.  Judge Henry's Receivership Order provides the Receiver with a comprehensive suite of powers and duties.  These include the power to: (1) "enter and take immediate possession of" the Manor Properties; (2) "commence, prosecute, continue or defend actions at law or in equity (in [the Receiver's] own name or in the names of [the Trusts]) that the Receiver deems necessary to . . . collect the rents, or to evict or eject any tenants or occupants in accordance with applicable state laws"; and (3) "make, enter into, enforce, terminate, modify or accept a surrender of any of the Leases[.]"  Doc. #65 (24-cv-02627) ¶ 6(a), (e), (j) (emphasis added).  Essentially then, as the Manors concede, the Receiver stands in the shoes of the Trusts under non-bankruptcy law.  Hr'g Tr. at 69.  Yet the Trusts also retain reservoirs of independent agency—as evidenced by their decisions to file for bankruptcy shortly after being sanctioned by Judge Henry for obstructing the Receiver's efforts at rent collection in the foreclosure action (efforts which the Trusts now seek to co-opt on appeal).  So, it seems both the Receiver and the Trusts are parties to the Leases.

Thus, if the Leases are "unexpired" within the meaning of §365, nothing in that provision would deprive the Receiver of standing to request prompt rejection or assumption of the Leases. However, the Manors are also correct that the Receiver is currently estopped from making such a

7

App.29

request.  This is true because the Receiver qualifies as a "custodian" obligated to turn over—and refrain from administering—property of the Trusts' or their estates.  11 U.S.C. §§101(11)(A), 543(a)–(b).  Any unexpired leases to which the Trusts are parties will remain property of their estates pending their appeals of the Dismissal Order.  See In re Rickel Home Centers, Inc., 209 F.3d 291, 300 (3d Cir. 2000) ("Unexpired leases, like executory contracts, are included in the definition of 'property of the estate' under [11 U.S.C. §541].").

Consequently, although no order of this Court has deprived the Receiver of its due authorization to act in the Trusts' stead under nonbankruptcy law, her ability to do so was largely short-circuited by the Trusts' bankruptcies and then again by the Stay Order temporarily reinstating them.  See doc. #65 (24-cv-02627) ¶ 20(b) (directing that, if the Trusts file for bankruptcy, the Receiver must turn over their property and otherwise comply with §543, unless Lehigh promptly moves under §§362(d) and/or 543(d)).  Of course, if the Leases are not unexpired within the meaning of §365, there is nothing for the Court to compel the Manors to accept or reject.  In re Stoltz, 197 F.3d 625, 629 (2d Cir. 1999) ("Only an 'unexpired' lease may be assumed."); In re Good Works Hous. LLC, --- B.R. ----, 2026 WL 710743, at *3 (Bankr. E.D. Pa. Mar. 13, 2026) ("If [a lease of personal property] is not unexpired, § 365 of the Bankruptcy Code simply does not apply."); In re Burch, 401 B.R. 153, 157 (Bankr. E.D. Pa. 2008) ("Where a lease is expired at the time of bankruptcy filing, there is nothing for the debtor to assume[.]").  Accordingly, there is nothing for the Court to do with the §365(d)(2) slice of the Motion, other than deny it.

*   *   *

The Court is unaware of binding law addressing whether a lease of residential real property that expired by its terms pre-petition nonetheless qualifies as "unexpired" under §365.  In some

8

App.30

jurisdictions, the answer may depend on whether a holdover tenant *qua* debtor retained possessory rights to the leasehold under applicable state law when the debtor filed for bankruptcy. This has been said to govern whether a lease that was "terminated" pre-petition "expired" per §365, which "cannot occur until all the essential procedural steps [necessary to dispossess the tenant under state law] have actually been taken." E.g., Robinson v. Chicago Hous. Auth., 54 F.3d 316, 321 (7th Cir. 1995); Stoltz, 197 F.3d at 631 (holding that, under Vermont law, although a landlord had begun action to legally terminate a lease—which had not expired by its terms—the lease was unexpired under §365 because no writ of possession had issued pre-petition). It has also been said that, for the purposes of §365, the concepts of expiration and termination overlap; but it does not necessarily follow that, for the same purposes, a debtor retains any assumable possessory rights in a lease that expired by its terms pre-petition.[4]

Another view (probably the better one) is that the plain meaning of the terms "expired" and "terminated" are not interchangeable under §365. E.g., In re Morgan, 181 B.R. 579, 584 (Bankr. N.D. Ala. 1994) ("In common parlance, and when used as terms of art . . . the word 'expired' denotes the natural or inevitable end to a contract or lease by lapse of time, while the word 'terminated' denotes the unnatural or premature end to a contract or lease as the result of breach or forfeiture."). Accord In re DiCamillo, 206 B.R. 64, 69 (Bankr. D.N.J. 1997). Indeed, when Pennsylvania law applies, this distinction seems to hold: a lease expires (*i.e.*, is not "unexpired"

---

[4]    In Robinson, the Court of Appeals seemed to hold that a lease properly (*i.e.*, fully) terminated at state (*i.e.*, Illinois) law was no less "expired" than one whose stated terms had run:

> [B]ankruptcy law draws no meaningful distinction between "expired" and "terminated" residential leases and does not provide greater federal protection for lessees under residential leases, the stated terms of which have not run, even though they have been *otherwise terminated*. Instead[,] the federal law allowing "unexpired" leases to be assumed calls for a determination whether a lease has ended under state law.

See Robinson, 54 F.3d at 320 (emphasis added).

App.31

within the meaning of §365) when it comes to a natural end according to its express terms. In re Turner, 326 B.R. 563, 575–76, 78 (Bankr. W.D. Pa. 2005). Moreover, "a mere possessory interest . . . in an expired lease at the time of filing is not enough to sustain the protections of the automatic stay." Id. at 573 (citing In re Hill, 307 B.R. 821 (Bankr. W.D. Pa. 2004) and In re Blaylock, 301 B.R. 443 (Bankr. E.D. Pa. 2003)). Accord Burch, 401 B.R. at 157 ("Absent the ability to assume the Lease, the Debtor merely has a possessory interest in the Lease which, while property of the estate subject to the automatic stay, is protected for a limited time only.").

As noted above, no one disputes here that the Leases expired by their terms pre-petition. See e.g., Resp. at 30 ("The parties continue in a course of performance that indicates their Leases have not *terminated*, though their stated terms have passed." (emphasis added)).[5] Nor has it been argued that the Movants are not "parties in interest" capable of requesting relief from the automatic stay under §362(d)(1). In this Circuit, such party-in-interest status is interpreted broadly "to include 'anyone who has a legally protected interest that could be affected by a bankruptcy proceeding.'" In re Potter, 2024 WL 3177775, at *3 (3d Cir. June 26, 2024) (quoting In re Global Indus. Techs., Inc., 645 F.3d 201, 210-11 (3d Cir. 2011)).

That certainly applies to the Trusts. Were they moving for a lift-stay, the Court would likely have little choice but to grant it. See Turner, 326 B.R. at 573. By extension, the Receiver

---

[5]    For this proposition the Manors rely on In re Schnur Enterprises, Inc., 42 B.R. 202, 205 (Bankr. W.D. Pa. 1984) ("[T]echnical compliance with contractual provisions can be waived by the conduct of the parties."). But that case is readily distinguishable. Unlike here, the commercial lease at issue there did not expire by its terms pre-petition. Id. at 203. Furthermore, by all indications, the Schnur Enterprises debtor continued paying rent pursuant to the terms of the lease until its expiry. Clearly, that is not the case here. At best, the Manors have established that they were partially performing under the pre-2023 Lease terms. Moreover, the Schnur Enterprises debtor's noncompliance was excused because the lessor's proposed renewal terms were onerous. Id. at 206. Here, the since-voided renewal terms agreed to by the Debtors in 2023 were onerous. These amendments were "effected" the day after the mortgages were assigned to Lehigh's parent. There can be little doubt that the purpose of these amendments was to starve the Trusts of income pledged to the mortgagee. This is the only course of dealing in evidence. And the Court has no appetite to credit such dealing as an equitable basis for extending the Lease terms beyond the petition date.

10

App.32

also has a compelling case for relief under §362(d)(1). Except she currently faces a similar impediment to the one presented by §365. Namely, the admixture of §543 and the Stay Order, whereby the Manor Properties are off limits to the Receiver while they remain property of the Trusts' estates. At least in this practical sense, the Receiver lacks standing for relief from the automatic stay because she cannot accomplish what she seeks permission for in the Motion—*i.e.*, taking possession of the Manor Properties and evicting the Manors therefrom. Neither, it seems, can Lehigh, who cites no authority for the proposition that Pennsylvania law allows a mortgagee to evict a mortgagor's holdover tenant because the mortgagee has a security interest in rents owed by the tenant. Instead, Lehigh cites a line of cases where relief was granted to Pennsylvania *landlords* whose tenants' leases had either fully terminated or expired by their terms pre-petition. See Turner, 326 B.R. at 578; Burch, 401 B.R. at 160. Accordingly, the Movants have failed to establish sufficient bases upon which the Court can grant them relief from the automatic stay, regardless of whether such relief may otherwise be warranted.

*    *    *

Lastly, the Court declines the Movants' invitations to afford them derivative standing pursuant to §105(a). Such is reserved for truly exceptional circumstances, often involving the bankruptcy trustee's failure to avoid fraudulent transfers. In re Rosenblum, 545 B.R. 846, 863 (Bankr. E.D. Pa. 2016) (conferring derivative standing on Chapter 13 creditors seeking to avoid fraudulent transfers, which the trustee lacked resources to pursue). Even then, "[d]erivative standing is appropriate only if: '(i) the movant has alleged a colorable claim that would benefit the estate (ii) the trustee has unjustifiably refused to pursue the claim itself; and (iii) the movant has obtained permission from the bankruptcy court to initiate the action on behalf of the estate.'" Id. at 863 (quoting In re Stewart, 473 B.R 612, 637 (Bankr. W.D. Pa. 2012), aff'd, 2013 WL 4041963

11

App.33

(W.D. Pa. Aug. 8, 2013)).

Lehigh flunks the first prong because, as just discussed, it has failed to establish that it can evict the Manors under Pennsylvania law.  To be sure, the Receiver possesses such authority under the Receivership Order.  But the Court is unwilling to confer derivative standing on the Receiver when she failed to timely pursue another, more traditional means at her disposal for obtaining the kind of standing she now seeks.  See 11 U.S.C. §543(d).  Accord In re Watkins, 63 B.R. 46, 47–49 (Bankr. D. Colo. 1986) (holding that, once a receiver complies with §543(a)–(b), the court cannot revest in the receiver the right to administer and/or possess property of the debtor).  Moreover, "[i]t is hornbook law that § 105(a) 'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.'"  L. v. Siegel, 571 U.S. 415, 421 (2014) (quoting Collier on Bankruptcy ¶ 105.01[2] (16th ed. 2013)).  Section 543 is explicit.  It mandates that a receiver "may not make any disbursement from, or take any action in the administration of, property of the debtor . . . or property of the estate[.]"  11 U.S.C. §543(a).  See also id. §543(b) (providing that a "custodian shall . . . deliver to the trustee any property of the debtor held by or transferred to such custodian[.]").  Thus, the Court's general authority under §105(a) must yield to those specific prohibitions found in §543.  Siegel, 571 U.S. at 421 ("Section 105(a) confers authority to 'carry out' the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits.").

*   *   *

For these reasons, the Motion must be denied.

12

App.34

**CERTIFICATE OF SERVICE**

I, Matthew A. Hamermesh, hereby certify that on June 12, 2026, I caused the foregoing Joint Opening Brief of Appellants Lehigh Valley 1, LLC and Receiver Duane Morris LLP Through Erin Duffy, Esquire to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

By: */s/ Matthew A. Hamermesh*
Matthew A. Hamermesh

53