## No. 5:26-cv-3491

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

### In re:

### WHITEHALL MANOR,
### *Debtor.*

### LEHIGH VALLEY 1, LLC
### *Appellant*.

---

## APPENDIX OF APPELLANTS LEHIGH VALLEY 1, LLC AND RECEIVER DUANE MORRIS LLP THROUGH ERIN DUFFY, ESQUIRE

*Appeal from the Order of the United States Bankruptcy Court for the Eastern District of Pennsylvania Denying Lender and Receiver's Joint Motion to Compel the Manor Debtors to Assume or Reject Their Leases, to Establish the Cure Amount, and in the Alternative, for Relief from the Automatic Stay, No. 25-15245 (PMM)*

---

Matthew A. Hamermesh (I.D. No. 82313)
Sara E. Smith (I.D. No. 330261)
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200

*Counsel for Appellant Secured Creditor Lehigh Valley 1*

Brett L. Messinger (I.D. No. 63020)
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
(215)979-1508

*Attorneys for Receiver Duane Morris LLP, through Erin Duffy*

BERGER LAW GROUP, P.C.
Phillip D. Berger (I.D. No. 58942)
919 Conestoga Road, Building 3,
Suite 114
Bryn Mawr, PA 19010
(610) 668-0800
Berger@BergerLawPC.com

# TABLE OF CONTENTS

**Document**                                                                                    **App.**

Docket Entries, United States Bankruptcy Court for the Eastern
District of Pennsylvania, No. 25-15245 (PMM) ...............................................1

Order Denying Motion To Compel The Manor Debtors To
Assume Or Reject Their Leases, (2) Establish The Cure Amount
and (3) For Relief From The Automatic Stay, ECF 124,
dated May 15, 2026 ....................................................................... 22

Secured Creditor Lehigh Valley 1, LLC and Receivers Joint (1)
Motion to Compel The Manor Debtors To Assume Or Reject
Their Leases, (2) Establish The Cure Amount and (3) For Relief
From The Automatic Stay, ECF 56, dated March 31, 2026 ........................ 35

Exhibit A – Lease Agreement By and Between Whitehall
Fiduciary, LLC, as Trustee of Whitehall Trust and
Whitehall Manor, Inc., dated August 14, 2008 .....................75

Exhibit B - Lease Agreement Between Abraham R. Atiyeh and
Saucon Valley Manor, Inc., dated January 1, 2006 ............. 117

Exhibit C - Fourth Amendment to Lease and Memorandum of
Lease Extension, dated September 21, 2023.......................157

Exhibit D - Sixth Amendment to Lease Agreement,
dated September 21, 2023 .................................................162

Exhibit E - Order, dated December 19, 2025, Lehigh Valley 1
LLC v. Whitehall Fiduciary, E.D. Pa. No. 24-2627 ..............166

Exhibit F - Proof of Claim, Whitehall Fiduciary, LLC, as
Trustee of Whitehall Trust, by Duane Morris LLP,
as receiver, $8,271,961.00, ECF 44, filed March 26,
2026 (Case No. 25-15245) ....................................................170

Exhibit G – Proof of Claim, Saucon Management LLC, as
trustee for the Saucon Trust, $8,460,834.01, ECF
26, filed March 26, 2026 (Case No. 25-15244) ................... 223

i

Exhibit H -  Whitehall - Open-End Mortgage, dated January 19, 2012 ............................................................... 273

Exhibit I -  Whitehall Trust Security Agreement, dated January 26, 2012................................................................. 296

Exhibit J -  Whitehall Manor Lessee Security Agreement, dated January 26, 2102 .....................................................319

Exhibit K -  Saucon - Mortgage, dated December 1, 2012 ..................... 342

Exhibit L -  Saucon Trust Security Agreement, dated December 1, 2012............................................................... 363

Exhibit M -  Saucon Valley Manor Security Agreement, dated December 1, 2012............................................................... 387

Exhibit N -  Whitehall Manor 13-week projection ................................ 411

Exhibit O -  Saucon Valley Manor 13-week projection ...........................417

Opposition to Secured Creditor Lehigh Valley 1, LLC and Receivers Joint (1) Motion to Compel The Manor Debtors To Assume Or Reject Their Leases, (2) Establish The Cure Amount and (3) For Relief From The Automatic Stay filed by Whitehall Manor, ECF 87, dated April 14, 2026 ...................................................... 423

Exhibit A -  Saucon Valley Manor Commitment Letter from the U.S. Department of Housing and Urban Development, dated December 10, 2012............................460

Exhibit B -  Saucon Trust Regulatory Agreement, dated December 1, 2012....................................................... 511

Exhibit C -  Whitehall Trust Regulatory Agreement, dated January 19, 2012 ...................................................... 526

Exhibit D -  Order granting Plaintiff's Motion for Appointment of a Receiver, ECF 65, filed May 2, 2025 (Case No. 5:24-cv-02627-CH) .............................................. 540

Secured Creditor Lehigh Valley 1, LLC and Receivers Joint Reply In Support Of Joint (1) Motion to Compel The Manor Debtors To Assume Or Reject Their Leases, (2) Establish The Cure Amount and (3) For Relief From The Automatic Stay, ECF 92, dated April 17, 2026 ....................................................................557

Exhibit P -    First 60-Day Patient Care Ombudsman Report, ECF 280, filed April 8, 2026 (Case No. 25-15241).............. 576

Exhibit Q -    Saucon Valley Manor Rent Arrears Analysis....................... 586

Exhibit R -    Whitehall Manor Rent Arrears Analysis ............................ 588

Exhibit S -    Post-Petition Rent Accruals................................................ 590

Joint Notice of Appeal, ECF 137, dated May 20, 2026 ............................. 592

Exhibit A -    Order Denying Motion To Compel The Manor Debtors To Assume Or Reject Their Leases, (2) Establish The Cure Amount and (3) For Relief From The Automatic Stay, ECF 124, dated May 15, 2026 ........................................................*omitted, see App. 22*

Transcript of April 21, 2026 Hearing before the Honorable Judge Patricia Mayer ........................................................................................ 595

Exhibit D8 - Saucon Trust: 2012 M&T Mortgage .......*omitted, see App. 342*

Exhibit D9 - Saucon Trust: 2012 HUD Regulatory Agreement ...............................................*omitted, see App. 511*

Exhibit D23 - Whitehall 2012 M&T Mortgage ............ *omitted, see App. 273*

Exhibit D24 - Whitehall 2012 HUD Regulatory Agreement................................................*omitted, see App. 526*

Exhibit D50 - Weekly Reconciliations ..................................................... 717

Exhibit D51 - Cash Collateral Budgets ..................................................... 819

Exhibit D52 - Monthly Censuses by Manor 2026....................................840

Exhibit D55 - Cash Collateral Budget April 25-July 18, 2026 ................. 841

Exhibit D56 - Abraham Kapoor Atiyeh Declaration ............................... 845

Exhibit D57 - Saucon Trust Firm Commitment..........*omitted, see App. 460*

Exhibit D58 - Whitehall Fiduciary Firm Commitment ........................... 852

Excerpts from Transcript of April 1, 2026 Hearing before the Honorable Judge Patricia Mayer ............................................................ 881

**PlnDue, APPEAL, JNTADMN, STOP_POC, LEAD**

# U.S. Bankruptcy Court
## Eastern District of Pennsylvania (Reading)
## Bankruptcy Petition #: 25-15245-pmm

*Date filed:* 12/26/2025
*341 meeting:* 01/30/2026

*Assigned to:* Judge Patricia M. Mayer
Chapter 11
Voluntary
Asset

| | |
|---|---|
| ***Debtor*** | represented by **ANNE M. AARONSON** |
| **Whitehall Manor, Inc.** | Dilworth Paxson LLP |
| 1177 Sixth Street | 1650 Market Street |
| Whitehall, PA 18052 | Ste 1200 |
| LEHIGH-PA | Philadelphia, PA 19103 |
| Tax ID / EIN: 23-2945606 | 215-575-7110 |
| | Fax : 215-754-4603 |
| | Email: aaaronson@dilworthlaw.com |
| | |
| | **MICHELLE LEE** |
| | Dilworth Paxson LLP |
| | 1650 Market Street |
| | Suite 1200 |
| | Philadelphia, PA 19103 |
| | 267-794-0225 |
| | Email: bky@dilworthlaw.com |
| | |
| ***U.S. Trustee*** | represented by **RACHEL WOLF** |
| **United States Trustee** | DOJ-Ust |
| Office of United States Trustee | One Newark Center |
| Robert N.C. Nix Federal Building | Ste 2100 |
| 900 Market Street | Newark, NJ 07102 |
| Suite 320 | 973-645-3014 |
| Philadelphia, PA 19107 | Email: rachel.wolf@usdoj.gov |
| (215)597-4411 | |

| Filing Date | # | Docket Text |
|---|---|---|
| 12/26/2025 | 1<br>(10 pgs) | Chapter 11 Voluntary Petition for Non-individual. Fee Amount $1738 Filed by Whitehall Manor, Inc.. Chapter 11 Plan due by 04/27/2026. Atty Disclosure Statement due 01/9/2026. Schedule A/B due 01/9/2026. Schedule D due 01/9/2026. Schedule E/F due 01/9/2026. Schedule G due 01/9/2026. Schedule H due 01/9/2026. Statement of Financial Affairs due 01/9/2026. Summary of Assets and Liabilities due 01/9/2026. Incomplete Filings due by 01/9/2026.Appointment of health care ombudsman due by 01/26/2026 (LEE, MICHELLE) (Entered: 12/26/2025) |

App.1

| | | |
|---|---|---|
| 12/26/2025 | 2 | Matrix List of Creditors Filed. Number of pages filed: 4, Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 12/26/2025) |
| 12/26/2025 | 3 (1 pg) | Corporate Resolution Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 12/26/2025) |
| 12/26/2025 | 4 (4 pgs; 2 docs) | Chapter 11 or Chapter 9 Cases Non-Individual: List of Creditors Who Have 20 Largest Unsecured Claims Against You and Are Not Insiders. Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (Attachments: # 1 Declaration) (LEE, MICHELLE) (Entered: 12/26/2025) |
| 12/26/2025 | 5 (2 pgs) | Document in re: *Statement of Qualification as Complex Chapter 11 Case* Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 12/26/2025) |
| 12/26/2025 | 6 (1 pg) | Statement of Corporate Ownership filed. Corporate parents added to case: Manor Trust. Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 12/26/2025) |
| 12/26/2025 | 7 (1 pg) | Document in re: *List of Equity Security Holders* Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 12/26/2025) |
| 12/26/2025 | 8 (3 pgs) | Document in re: *List Pursuant to Local Bankruptcy Rule 1007(a)(1) of Creditors that the Debtors believe claim a Security Interest in Cash Collateral* Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 12/26/2025) |
| 12/26/2025 | 9 (11 pgs) | Motion for Joint Administration Filed by Whitehall Manor, Inc. Represented by MICHELLE LEE (Counsel). (LEE, MICHELLE) (Entered: 12/26/2025) |
| 12/26/2025 | 11 (1 pg) | Equity Security Holders Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc. . (CW) (Entered: 12/29/2025) |
| 12/27/2025 | 10 | ENTRY OF APPEARANCE AND REQUEST FOR NOTICES, pursuant to Federal Bankruptcy Rules 2002 and 9010, RACHEL WOLF hereby appears in this matter on behalf of the United States trustee for Region 3, and demands that all notices, motions, etc., given or required to be given in this case, and that all papers, etc., served in this case, be given to and served upon me at the address listed on this case party list. Filed by RACHEL WOLF on behalf of United States Trustee. (WOLF, RACHEL) (Entered: 12/27/2025) |
| 12/27/2025 | | Receipt of Voluntary Petition (Chapter 11)( 25-15245) [misc,volp11a] (1738.00) Filing Fee. Receipt number A30796263. Fee Amount $1738.00. (re: Doc# 1) (U.S. Treasury) (Entered: 12/27/2025) |
| 12/29/2025 | 12 (1 pg) | Order Entered the debtor having failed to file or submit with the petition all of the documents required by Fed. R. Bankr.P.1007, It is hereby ORDERED that this case **MAY BE DISMISSED WITHOUT FURTHER NOTICE** if the documents listed are not filed by deadlines listed. ***Any request for an extension of time must be filed prior to the expiration of the deadlines listed***. Atty Disclosure Statement due |

Live Database Area

| | | 1/9/2026. Schedule A/B due 1/9/2026. Schedule D due 1/9/2026. Schedule E/F due 1/9/2026. Schedule G due 1/9/2026. Schedule H due 1/9/2026. Statement of Financial Affairs due 1/9/2026. Summary of Assets and Liabilities due 1/9/2026. (CW) (Entered: 12/29/2025) |
|---|---|---|
| 12/29/2025 | 13 (4 pgs) | Expedited Notice of (related document(s): 9 Motion for Joint Administration ) Filed by Whitehall Manor, Inc.. Hearing scheduled 12/30/2025 at 09:00 AM at Reading Video Hearing. (LEE, MICHELLE) (Entered: 12/29/2025) |
| 12/29/2025 | 14 (1 pg) | Notice of Appearance and Request for Notice by PHILLIP D. BERGER Filed by PHILLIP D. BERGER on behalf of Lehigh Valley 1, LLC. (BERGER, PHILLIP) (Entered: 12/29/2025) |
| 12/29/2025 | 15 (2 pgs) | Notice of Appearance and Request for Notice by MATTHEW A. HAMERMESH Filed by MATTHEW A. HAMERMESH on behalf of Lehigh Valley 1, LLC. (HAMERMESH, MATTHEW) (Entered: 12/29/2025) |
| 12/29/2025 | 16 (2 pgs) | Notice of Appearance and Request for Notice by BRETT L. MESSINGER Filed by BRETT L. MESSINGER on behalf of Receiver Duane Morris LLP, by Erin Duffy, Esquire. (MESSINGER, BRETT) (Entered: 12/29/2025) |
| 12/30/2025 | 17 (1 pg) | Notice of Appearance and Request for Notice by MATTHEWR. KAUFMANN, ESQUIREFiled by PHILLIP D. BERGER on behalf of Lehigh Valley 1, LLC. (BERGER, PHILLIP)Modified on 12/30/2025 to match the pdf. (CW). (Entered: 12/30/2025) |
| 12/30/2025 | 18 (3 pgs) | Order Granting Motion For Joint Administration on Lead Case 4:25-bk-15241 with Member Case 4:25-bk-15245. All further pleadings and other papers shall be filed in, and all further docket entries shall be made in Case 25-15241. (Related Doc # 9) (CW) (Entered: 12/30/2025) |
| 12/31/2025 | 19 (2 pgs) | BNC Certificate of Mailing - Order Requiring Documents. Number of Notices Mailed: (related document(s) (Related Doc # 12)). No. of Notices: 1. Notice Date 12/31/2025. (Admin.) (Entered: 01/01/2026) |
| 01/01/2026 | 20 (5 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 18)). No. of Notices: 1. Notice Date 01/01/2026. (Admin.) (Entered: 01/02/2026) |
| 01/05/2026 | 21 (2 pgs) | Meeting of Creditors. 341(a) meeting to be held on 1/30/2026 at 01:00 PM at ALTERNATE TELEPHONIC CONFERENCE (For Trustee Use Only). (MILLER, NANCY) (Entered: 01/05/2026) |
| 01/06/2026 | 22 (4 pgs; 2 docs) | Chapter 11 or Chapter 9 Cases Non-Individual: List of Creditors Who Have 20 Largest Unsecured Claims Against You and Are Not Insiders. *AMENDED* Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (Attachments: # 1 Declaration) (LEE, MICHELLE) (Entered: 01/06/2026) |
| 01/07/2026 | 23 (5 pgs) | BNC Certificate of Mailing - Meeting of Creditors. Number of Notices Mailed: (related document(s) (Related Doc # 21)). No. of Notices: 34. Notice Date 01/07/2026. (Admin.) (Entered: 01/08/2026) |

App.3

| | | |
|---|---|---|
| 01/12/2026 | 24<br>(1 pg) | The upcoming 341(a) meeting is scheduled to be held remotely..For participation by telephone, please call 888-330-1716 and use (access code/meeting id/passcode) 3684976 to join the meeting.. More information can be found in the attached pdf document.. (MILLER, NANCY) (Entered: 01/12/2026) |
| 03/19/2026 | 25<br>(1 pg) | Copy of Order entered on 25-15241-pmm. The cases of affiliated Debtors Whitehall Manor (25-15245-pmm) and Saucon Valley Manor (25-15244-pmm) will be jointly administered on the docket of Whitehall Manor. (Entered: 03/20/2026) |
| 03/20/2026 | 26<br>(3 pgs) | Notice of Appearance and Request for Notice by PAMELA ELCHERT THURMOND Filed by PAMELA ELCHERT THURMOND on behalf of CITY OF PHILADELPHIA. (THURMOND, PAMELA) (Entered: 03/20/2026) |
| 03/20/2026 | 27<br>(6 pgs) | Document in re: *Notice of Agenda for Hearing March 24, 2026 at 11:00 a.m. (ET) [Regarding Docket Nos. 16, 17, 97, 102, 174 and 209]* Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 03/20/2026) |
| 03/20/2026 | 28<br>(57 pgs) | Chapter 11 Monthly Operating Report for the Month Ending: 02/28/2026 Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 03/20/2026) |
| 03/20/2026 | 29<br>(59 pgs) | Chapter 11 Monthly Operating Report for Case Number Saucon Valley Manor for the Month Ending: 02/28/2026 Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 03/20/2026) |
| 03/23/2026 | 30<br>(38 pgs; 4 docs) | Emergency Motion *FOR STAY AND EXPEDITED CONSIDERATION* Filed by Whitehall Manor, Inc. Represented by MICHELLE LEE (Counsel). (Attachments: # 1 Ex A # 2 Ex B # 3 Proposed Orders) (LEE, MICHELLE) (Entered: 03/23/2026) |
| 03/23/2026 | 31<br>(4 pgs) | Certificate of Service *re: Notice of Agenda for Hearing March 24, 2026 at 11:00 A.M. (ET) [Docket No. 27]* Filed by Omni Agent Solutions, Inc. (related document(s)27). (Lowry, Randy) (Entered: 03/23/2026) |
| 03/24/2026 | 32<br>(13 pgs) | Copy of Third Interim Order Authorizing the Debtors to use Cash Collateral of Existing Secured Party and Granting Adequate Protection for such use and Prescribing the Form and Manner of Notice and Setting the time for Final Hearing. Hearing scheduled 03/24/2026 at 11:00 AM at PENN4 - 4TH fl Courtroom.. (Copy of Order from 25-15241-pmm dated 02/26/2026) (SR) (Entered: 03/24/2026) |
| 03/24/2026 | 33<br>(8 pgs; 2 docs) | Copy of Debtor's Motion for Release of Funds. (Attachments: # 1 Proposed Order) (Copy from 25-15241-pmm e-filed 01/13/2026 as document 99) This Motion is Under Advisement. (SR) (Entered: 03/24/2026) |
| 03/24/2026 | 34<br>(46 pgs; 5 docs) | Copy of Objection of Secured Creditor Lehigh Valley 1, LLC to Debtors' Motion for Release of Funds filed by Debtor Whitehall Manor, Inc. Filed by Lehigh Valley 1, LLC (related document(s)33). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Proposed |

App.4

| | | |
|---|---|---|
| | | Order) (Copy from 25-15241-pmm e-filed 01/22/2026 as document 115) (SR) (Entered: 03/24/2026) |
| 03/24/2026 | 35 (4 pgs) | Copy of Debtor's Response in Opposition to Lender's Objection to Debtor's Motion for Release of Funds filed by Creditor Lehigh Valley 1, LLC Filed by Whitehall Manor, Inc. (related document(s)34). (Copy from 25-15241-pmm e-filed 01/26/2026 as document 125) (SR) (Entered: 03/24/2026) |
| 03/24/2026 | 36 (71 pgs; 4 docs) | Copy of Debtors' Brief in Support of the Motion for Release of Funds... Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc. (related document(s)33). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C) ((Copy from 25-15241-pmm e-filed 02/16/2026 as document 204) (SR) (Entered: 03/24/2026) |
| 03/24/2026 | 37 (17 pgs; 2 docs) | Copy of Supplemental Brief of Secured Creditor Lehigh Valley 1, LLC in Support of Objection to Debtors' Motion for Rlease of Funds... Filed by MATTHEW A. HAMERMESH on behalf of Lehigh Valley 1, LLC (related document(s)34). (Attachments: # 1 Exhibit D) (Copy from 25-15241-pmm e-filed 03/02/2026 as document 252)(SR) (Entered: 03/24/2026) |
| 03/24/2026 | 38 (1 pg) | Order Setting Expedited Hearing re:30 Debtor's Motion for Stay filed by Debtor Whitehall Manor, Inc. Hearing scheduled 3/25/2026 at 11:00 AM at Reading Video Hearing. (SR) (Entered: 03/24/2026) |
| 03/24/2026 | 39 | Hearing Held and Continued on Motion for (1) Interim and Final Orders (A) Authorizing Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Use and (B) Prescribing Form and Manner of Notice and Setting the Time for the Final Hearing and (2) Expedited Hearing on the Relief Sought Herein (the Cash Collateral Motion) Filed by Whitehall Trust Represented by MICHELLE LEE (Counsel). Hearing scheduled 4/21/2026 at 02:30 PM at PENN4 - 4TH fl Courtroom. (related to 32) (SR) (Entered: 03/24/2026) |
| 03/25/2026 | 40 (13 pgs) | Proposed Order Re: *Motion for (1) Interim and Final Orders (A) Authorizing Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Use and (B) Prescribing Form and Manner of Notice and Setting the Time for The Final Hearing and (2) Expedited Hearing on The Relief Sought Herein* Filed by ANNE M. AARONSON on behalf of Whitehall Manor, Inc. (related document(s)32). (AARONSON, ANNE) (Entered: 03/25/2026) |
| 03/25/2026 | 41 | Hearing Held and Continued on 30 Emergency Motion FOR STAY AND EXPEDITED CONSIDERATION Filed by Whitehall Manor, Inc. Represented by MICHELLE LEE (Counsel).. Hearing scheduled 04/01/2026 at 10:00 AM at Reading Video Hearing. (SR) (Entered: 03/25/2026) |
| 03/25/2026 | 42 (4 pgs) | Certificate of Service *re: Order Setting Expedited Hearing [Docket No. 38] and Notice of Emergency Motion, Expedited Response Deadline and Expedited Telephonic or Video Hearing Date* Filed by Omni Agent Solutions, Inc. (related document(s)38). (Lowry, Randy) (Entered: 03/25/2026) |

App.5

Live Database Area

| | | |
|---|---|---|
| 03/25/2026 | [43](#)<br>(3 pgs) | Certificate of Service *re: Emergency Motion for Stay and Expedited Consideration [Docket No. 30] and Order Setting Expedited Hearing [Docket No. 38]* Filed by Omni Agent Solutions, Inc. (related document(s)[38](#), [30](#)). (Lowry, Randy) (Entered: 03/25/2026) |
| 03/26/2026 | [44](#)<br>(52 pgs) | Document in re: *(Proof of Claim is being filed in the main case as bar date is today, since we are cutoff from the Claims Registry and Omni has not posted our claim in the registry despite forwarding to it days ago)* Filed by BRETT L. MESSINGER on behalf of Receiver Duane Morris LLP, by Erin Duffy, Esquire. (MESSINGER, BRETT) (Entered: 03/26/2026) |
| 03/26/2026 | 45 | Conference Call Held at parties request regarding the form of order to present following the 3/25/2026 hearing. (related document(s)[30](#)). (SR) (Entered: 03/26/2026) |
| 03/26/2026 | [46](#)<br>(102 pgs) | Document in re: *(Proof of Claim was filed with Omni several days ago, but Omni has not provided confirmation, and the claim is not posted in the claims registry)* Filed by MATTHEW A. HAMERMESH on behalf of Lehigh Valley 1, LLC. (HAMERMESH, MATTHEW) (Entered: 03/26/2026) |
| 03/26/2026 | [47](#)<br>(2 pgs) | Proposed Order Re: *Emergency Motion for Stay and Expedited Consideration* Filed by ANNE M. AARONSON on behalf of Whitehall Manor, Inc. (related document(s)[30](#)). (AARONSON, ANNE) (Entered: 03/26/2026) |
| 03/26/2026 | [48](#)<br>(4 pgs) | Certificate of Service *re: Proposed Fourth Interim Order (A) Authorizing the Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Such Use and (B) Prescribing the Form and Manner of Notice and Setting the Time for a Final Hearing [Docket No. 40]* Filed by Omni Agent Solutions, Inc. (related document(s)[40](#)). (Lowry, Randy) (Entered: 03/26/2026) |
| 03/26/2026 | [49](#)<br>(3 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # [38](#))). No. of Notices: 2. Notice Date 03/26/2026. (Admin.) (Entered: 03/27/2026) |
| 03/27/2026 | [51](#)<br>(2 pgs) | Order Granting in part, Denying in part Motion (Related Doc [30](#)) (Mayer, Patricia) Further Hearing scheduled 04/01/2026 at 10:00 AM at Reading Video Hearing *Modified on 3/30/2026 to add hearing information(SR).* (Entered: 03/27/2026) |
| 03/27/2026 | [52](#)<br>(4 pgs) | Certificate of Service *re: Proposed Order [Docket No. 47]* Filed by Omni Agent Solutions, Inc. (related document(s)[47](#)). (Lowry, Randy) (Entered: 03/27/2026) |
| 03/30/2026 | [53](#)<br>(13 pgs) | Fourth Interim Order (A) Authorizing the Debtors to use Cash Collateral of Existing Secured Party and Granting Adequate Protection for such use and (B) Prescribing the Form and Manner of Notice and Setting the Time for a Final Hearing. Further Hearing scheduled 4/21/2026 at 02:30 PM at PENN4 - 4TH fl Courtroom. (related document(s)[32](#)). (SR) (Entered: 03/30/2026) |
| 03/30/2026 | [54](#)<br>(2 pgs) | Document in re: *Notice of Agenda for Hearing April 1, 2026 at 10:00 a.m. (ET)* Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc. |

App.6

Live Database Area

| | | (related document(s)30). (LEE, MICHELLE) (Entered: 03/30/2026) |
|---|---|---|
| 03/31/2026 | 55<br>(10 pgs) | Memorandum of Law in Support of Stay Pending Appeal. Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc. (related document(s)30). (LEE, MICHELLE)Modified on 4/1/2026 to match the pdf.(CW). (Entered: 03/31/2026) |
| 03/31/2026 | 56<br>(388 pgs; 18 docs) | *Secured Creditor Lehigh Valley 1,LLC and Receivers Joint (1)* Motion to Compel *The Manor Debtors To Assume Or Reject Their Leases, (2) Establish The Cure Amount and (3) For Relief From The Automatic Stay.* Filed by Lehigh Valley 1, LLC, Receiver Duane Morris LLP, by Erin Duffy, Esquire Represented by MATTHEW A. HAMERMESH (Counsel). (Attachments: # 1 Proposed Order # 2 Proposed Order # 3 Exhibit A Whitehall Lease # 4 Exhibit B Saucon Lease # 5 Exhibit C Whitehall Lease Amendment # 6 Exhibit D Saucon Lease Amendment # 7 Exhibit E 2025-12-19 - 164 - ORDER # 8 Exhibit F POC Whitehall Fiduciary # 9 Exhibit G POC Saucon Management # 10 Exhibit H Whitehall - Mortgage # 11 Exhibit I WM Security Agreement # 12 Exhibit J WM Lessee Security Agreement # 13 Exhibit K Saucon - Mortgage # 14 Exhibit L SVM Security Agreement # 15 Exhibit M SVM Security Agreement # 16 Exhibit N projection Whitehall # 17 Exhibit O projection Saucon Valley Manor) (HAMERMESH, MATTHEW)Modified on 4/1/2026 to match the pdf. (CW). Modified on 4/2/2026 to add statistical (BW). (Entered: 03/31/2026) |
| 03/31/2026 | 57<br>(2 pgs) | Notice of (related document(s): 56 Motion to Compel *The Manor Debtors To Assume Or Reject Their Leases, (2) Establish The Cure Amount and (3) For Relief From The Automatic Stay*) Filed by Lehigh Valley 1, LLC. Hearing scheduled 4/21/2026 at 02:30 PM at PENN4 - 4TH fl Courtroom. (HAMERMESH, MATTHEW) (Entered: 03/31/2026) |
| 03/31/2026 | 58<br>(3 pgs) | Certificate of Service *re: Emergency Motion for Stay and Expedited Consideration [Docket No. 30] and Order [Docket No. 51]* Filed by Omni Agent Solutions, Inc. (related document(s)30, 51). (Lowry, Randy) (Entered: 03/31/2026) |
| 03/31/2026 | 59<br>(4 pgs) | Certificate of Service *re: Notice of Agenda for Hearing April 1, 2026 at 10:00 A.M. (ET) [Docket No. 54]* Filed by Omni Agent Solutions, Inc. (related document(s)54). (Lowry, Randy) (Entered: 03/31/2026) |
| 03/31/2026 | 61<br>(37 pgs; 2 docs) | *** correct entry***Motion for Relief from Stay.Fee Amount $199.00, Filed by Lehigh Valley 1, LLC Represented by MATTHEW A. HAMERMESH (Counsel). (Attachments: # 1 Proposed Order) (CW) Modified on 4/1/2026 (related document(s)56 ) All exhibits attached to original motion. (CW). (Entered: 04/01/2026) |
| 04/01/2026 | 60<br>(4 pgs) | Certificate of Service *re: Notice of Emergency Motion, Response Deadline and Telephonic or Video Hearing Date and Order [Docket No. 51]* Filed by Omni Agent Solutions, Inc. (related document(s)51). (Lowry, Randy) (Entered: 04/01/2026) |
| 04/01/2026 | 62<br>(1 pg) | Notice of Fee Due $199 Re: Secured Creditor Lehigh Valley 1,LLC and Receivers Joint (1) Motion to Compel The Manor Debtors To Assume Or Reject Their Leases, (2) Establish The Cure Amount and (3) For Relief From The Automatic Stay. (related document(s)56). Fee due by 4/8/2026. (CW) (Entered: 04/01/2026) |

App.7

| | | |
|---|---|---|
| 04/01/2026 | | Receipt of Motion for Relief From Stay( 25-15245-pmm) ( 199.00) Filing Fee. Receipt number A31955935. Fee Amount $ 199.00. (re: Doc# 56) (U.S. Treasury) (Entered: 04/01/2026) |
| 04/01/2026 | 63 (4 pgs) | Certificate of Service re: Fourth Interim Order (A) Authorizing the Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Such Use and (B) Prescribing the Form and Manner of Notice and Setting the Time for a Final Hearing [Docket No. 53] and Memorandum of Law in Support of a Stay Pending Appeal [Docket No. 55] Filed by Omni Agent Solutions, Inc. (related document(s)55, 53). (Lowry, Randy) (Entered: 04/01/2026) |
| 04/01/2026 | 64 (4 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 51)). No. of Notices: 1. Notice Date 04/01/2026. (Admin.) (Entered: 04/02/2026) |
| 04/01/2026 | 65 (15 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 53)). No. of Notices: 2. Notice Date 04/01/2026. (Admin.) (Entered: 04/02/2026) |
| 04/01/2026 | 66 | Hearing Held on 30 Emergency Motion FOR STAY AND EXPEDITED CONSIDERATION Filed by Whitehall Manor, Inc. Represented by MICHELLE LEE (Counsel). Matter under advisement. (SR) (Entered: 04/02/2026) |
| 04/02/2026 | 67 (1 pg) | Order Granting Motion for a Stay Pending Appeal Filed by Whitehall Manor, Inc. Represented by MICHELLE LEE (Related Doc # 30) In the event that the dismissals of the Whitehall Trust 25-15241 and Saucon Valley Trust 25-15243 cases are reversed on appeal, Debtors cases will continue to be jointly administered on Debtor Whitehall Manors docket, Case No. 25-15245. (SR) (Entered: 04/02/2026) |
| 04/03/2026 | 68 (1 pg) | ◉))) PDF with attached Audio File (admin). (Entered: 04/03/2026) |
| 04/04/2026 | 69 (3 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 67)). No. of Notices: 2. Notice Date 04/04/2026. (Admin.) (Entered: 04/05/2026) |
| 04/06/2026 | 70 (6 pgs) | Order Denying Debtors Motion for Release of Funds (Related Doc # 33) (OC) (Entered: 04/06/2026) |
| 04/07/2026 | 71 (1 pg) | Transcript regarding Hearing Held 04/02/26 RE: Motion for Stay pending Appeal. The transcript may be viewed at the Bankruptcy Court Clerk's Office. [For information about how to contact the transcriber, call the Clerk's Office] (related document(s)67). Notice of Intent to Request Redaction Deadline Due By 4/14/2026. Redaction Request Due By 4/28/2026. Redacted Transcript Submission Due By 5/8/2026. Transcript access will be restricted through 7/6/2026. (KB) (Entered: 04/07/2026) |
| 04/07/2026 | 72 (26 pgs; 4 docs) | Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement Filed by Whitehall Manor, Inc. Represented by MICHELLE LEE (Counsel). (Attachments: # 1 Proposed Order # 2 Exhibit A # 3 Notice) (LEE, MICHELLE) (Entered: 04/07/2026) |

App.8

| | | |
|---|---|---|
| 04/08/2026 | 73 (4 pgs; 2 docs) | Notice of Motion (related document(s): 72 Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement ) Filed by Whitehall Manor, Inc. . Hearing scheduled 4/21/2026 at 02:30 PM at PENN4 - 4TH fl Courtroom. (OC) (Entered: 04/08/2026) |
| 04/08/2026 | 74 (8 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 70)). No. of Notices: 2. Notice Date 04/08/2026. (Admin.) (Entered: 04/09/2026) |
| 04/09/2026 | 75 (9 pgs) | Ombudsman Report for the period of 02/19/26 through 04/02/26 Filed by RACHEL WOLF on behalf of United States Trustee. (WOLF, RACHEL) (Entered: 04/09/2026) |
| 04/09/2026 | 76 (1 pg) | Transcript regarding Hearing Held 04/01/26 RE: Motion for Stay on Appeal. The transcript may be viewed at the Bankruptcy Court Clerk's Office. [For information about how to contact the transcriber, call the Clerk's Office] (related document(s) 66 ). Notice of Intent to Request Redaction Deadline Due By 4/16/2026. Redaction Request Due By 4/30/2026. Redacted Transcript Submission Due By 5/11/2026. Transcript access will be restricted through 7/8/2026. (KB) (Entered: 04/09/2026) |
| 04/10/2026 | 77 (4 pgs) | Certificate of Service *re: Motion for Entry of an Order Pursuant to 11 U.S.C. § 1121(d) Extending Debtors Exclusive Periods Within Which to File a Chapter 11 Plan and Solicit Acceptances Thereof [Docket No. 72]* Filed by Omni Agent Solutions, Inc. (related document(s)72). (Lowry, Randy) (Entered: 04/10/2026) |
| 04/10/2026 | 78 (4 pgs) | Certificate of Service *re: Notice of Motion [Docket No. 73]* Filed by Omni Agent Solutions, Inc. (related document(s)73). (Lowry, Randy) (Entered: 04/10/2026) |
| 04/10/2026 | 79 (16 pgs; 2 docs) | Motion to Dismiss Debtor *Cases Pursuant to 11 USC Section 1112(b)(4)*, or in the alternative Motion to Appoint Trustee *Pursuant to 11 USC Section 1104(a)* Filed by United States Trustee Represented by RACHEL WOLF (Counsel). (Attachments: # 1 Proposed Order) (WOLF, RACHEL) (Entered: 04/10/2026) |
| 04/10/2026 | 80 (5 pgs; 2 docs) | Motion to Expedite Hearing (related documents Motion to Dismiss Debtor, Motion to Appoint Trustee) *On the Motion of the United States Trustee to Dismiss Debtors' Cases Or, In the Alternative, Appoint Chapter 11 Trustee* Filed by United States Trustee Represented by RACHEL WOLF (Counsel) (related document(s)79). (Attachments: # 1 Proposed Order) (WOLF, RACHEL) (Entered: 04/10/2026) |
| 04/10/2026 | 81 (4 pgs) | BNC Certificate of Mailing. - Notice of Motion. Number of Notices Mailed: (related document(s) (Related Doc # 73)). No. of Notices: 2. Notice Date 04/10/2026. (Admin.) (Entered: 04/11/2026) |
| 04/13/2026 | 82 (2 pgs) | Order Granting Motion Expedite Hearing (Related Doc # 80) In Re: (79 Motion to Dismiss Debtor Cases Pursuant to 11 USC Section 1112(b)(4), or in the alternative Motion to Appoint Trustee Pursuant to 11 USC Section 1104(a)) Hearing scheduled 4/23/2026 at 02:00 PM at PENN4 - 4TH fl Courtroom. (CW) (Entered: 04/13/2026) |

App.9

Live Database Area

| | | |
|---|---|---|
| 04/13/2026 | 83 (2 pgs) | Notice of Motion to Dismiss Debtor79 Filed by United States Trustee. Hearing scheduled 4/23/2026 at 02:00 PM at PENN4 - 4TH fl Courtroom. (WOLF, RACHEL) (Entered: 04/13/2026) |
| 04/13/2026 | 84 (2 pgs) | Certificate of Service Filed by United States Trustee (related document(s)79, 82, 83). (WOLF, RACHEL) (Entered: 04/13/2026) |
| 04/14/2026 | 85 (5 pgs) | Fifth Objection to Order (Generic) *Fifth Objection to Debtors' Cash Collateral Motion* Filed by Lehigh Valley 1, LLC (related document(s)53). (HAMERMESH, MATTHEW) (Entered: 04/14/2026) |
| 04/14/2026 | 86 (1 pg) | Document in re: *Notice of Filing Motion to Vacate or Modify the Stay Pending Appeal* Filed by MATTHEW A. HAMERMESH on behalf of Lehigh Valley 1, LLC. (HAMERMESH, MATTHEW) (Entered: 04/14/2026) |
| 04/14/2026 | 87 (134 pgs; 6 docs) | Objection to Motion to Compel filed by Other Prof. Receiver Duane Morris LLP, by Erin Duffy, Esquire, Creditor Lehigh Valley 1, LLC Filed by Whitehall Manor, Inc. (related document(s)56). (Attachments: # 1 Proposed Order # 2 Exhibit A # 3 Exhibit B # 4 Exhibit C # 5 Exhibit D) (LEE, MICHELLE) (Entered: 04/14/2026) |
| 04/15/2026 | 88 (4 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 82)). No. of Notices: 1. Notice Date 04/15/2026. (Admin.) (Entered: 04/16/2026) |
| 04/16/2026 | 89 (5 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 83)). No. of Notices: 37. Notice Date 04/16/2026. (Admin.) (Entered: 04/17/2026) |
| 04/17/2026 | 90 (4 pgs) | Certificate of Service *re: Opposition to Joint Motion to Compel [Docket No. 87]* Filed by Omni Agent Solutions, Inc. (related document(s)87). (Lowry, Randy) (Entered: 04/17/2026) |
| 04/17/2026 | 91 (7 pgs) | Objection to Motion to Extend/Limit Exclusivity Period filed by Debtor Whitehall Manor, Inc. Filed by Lehigh Valley 1, LLC (related document(s)72). (HAMERMESH, MATTHEW) (Entered: 04/17/2026) |
| 04/17/2026 | 92 (35 pgs; 5 docs) | Reply to Motion to Compel filed by Other Prof. Receiver Duane Morris LLP, by Erin Duffy, Esquire, Creditor Lehigh Valley 1, LLC, Motion for Relief From Stay filed by Creditor Lehigh Valley 1, LLC Filed by Lehigh Valley 1, LLC, Receiver Duane Morris LLP, by Erin Duffy, Esquire (related document(s)61, 56). (Attachments: # 1 Exhibit P # 2 Exhibit Q # 3 Exhibit R # 4 Exhibit S) (HAMERMESH, MATTHEW) (Entered: 04/17/2026) |
| 04/17/2026 | 93 (4 pgs) | Document in re: / *Notice of Agenda for Hearing April 21, 2026 at 2:30 p.m. (ET) [Regarding Docket Nos. 17, 56 and 72]* Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 04/17/2026) |
| 04/19/2026 | 94 (4 pgs) | Amended Document *Notice of Agenda - 4/21/2026 at 2:30pm* Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc. (related document(s)93). (LEE, MICHELLE) (Entered: 04/19/2026) |

| | | |
|---|---|---|
| 04/19/2026 | 95<br>(28 pgs; 4 docs) | Objection to Objection filed by Creditor Lehigh Valley 1, LLC Filed by Whitehall Manor, Inc. (related document(s)85). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Proposed Order) (LEE, MICHELLE) (Entered: 04/19/2026) |
| 04/20/2026 | 96<br>(4 pgs) | Amended Document *Notice of Agenda* Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc. (related document(s)93, 94). (LEE, MICHELLE) (Entered: 04/20/2026) |
| 04/20/2026 | 97<br>(66 pgs) | Chapter 11 Monthly Operating Report for the Month Ending: 03/31/2026 Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 04/20/2026) |
| 04/20/2026 | 98<br>(63 pgs) | Chapter 11 Monthly Operating Report for Case Number Saucon Valley Manor for the Month Ending: 03/31/2026 Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 04/20/2026) |
| 04/21/2026 | 99<br>(323 pgs; 10 docs) | Objection to Motion to Dismiss Debtor filed by U.S. Trustee United States Trustee, Motion to Appoint Trustee */ Debtors' Objection to Motion of The United States Trustee for Entry of An Order Dismissing the Cases or, In The Alternative, Directing the Appointment of a Trustee* Filed by Whitehall Manor, Inc. (related document(s)79). (Attachments: # 1 Exhibit A Nimita Kapoor-Atiyeh Declaration # 2 Exhibit B David Ferraris Declaration # 3 Exhibit C Charles Lehmann Declaration. # 4 Exhibit D Lascelles Williams Declaration. # 5 Exhibit E Abraham Kapoor Atiyeh Declaration # 6 Exhibit F WHM Permanent Lease 2026 # 7 Exhibit G WH Certificate of Compliance # 8 Exhibit H December LIS. # 9 Exhibit I February LIS) (LEE, MICHELLE) (Entered: 04/21/2026) |
| 04/21/2026 | 100 | Hearing Held on 72 Motion to Extend/Limit Exclusivity Period Filed by Whitehall Manor, Inc.. Order to be entered. (SR) (Entered: 04/21/2026) |
| 04/21/2026 | 101 | Hearing Held on 56 , 61 Motion to Compel The Manor Debtors To Assume Or Reject Their Leases, (2) Establish The Cure Amount and (3) For Relief From The Automatic Stay Filed by Lehigh Valley 1, LLC, Receiver Duane Morris LLP, by Erin Duffy, Esquire Represented by MATTHEW A. HAMERMESH (Counsel). Matter Under Advisement. (SR) (Entered: 04/21/2026) |
| 04/21/2026 | 102<br>(4 pgs) | Certificate of Service *re: Notice of Agenda for Hearing April 21, 2026 at 2:30 P.M. (ET) [Docket No. 93]* Filed by Omni Agent Solutions, Inc. (related document(s)93). (Lowry, Randy) (Entered: 04/21/2026) |
| 04/21/2026 | 103<br>(19 pgs) | Chapter 11 Monthly Operating Report for Case Number Saucon Trust for the Month Ending: 03/31/2026 Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 04/21/2026) |
| 04/21/2026 | 104<br>(19 pgs) | Chapter 11 Monthly Operating Report for Case Number Saucon Trust for the Month Ending: 02/28/2026 Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 04/21/2026) |
| 04/21/2026 | 105<br>(19 pgs) | Chapter 11 Monthly Operating Report for Case Number Whitehall Trust for the Month Ending: 03/31/2026 Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 04/21/2026) |

App.11

| | | |
|---|---|---|
| 04/21/2026 | [106](#) (19 pgs) | Chapter 11 Monthly Operating Report for Case Number Whitehall Trust for the Month Ending: 02/28/2026 Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 04/21/2026) |
| 04/21/2026 | 109 | Hearing Held and Continued on [53](#) Motion for (1) Interim and Final Orders (A) Authorizing Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Use and (B) Prescribing Form and Manner of Notice and Setting the Time for the Final Hearing and (2) Expedited Hearing on the Relief Sought Herein (the Cash Collateral Motion) Filed by Whitehall Trust Represented by MICHELLE LEE (Counsel).. Hearing scheduled 05/26/2026 at 02:30 PM at Reading Video Hearing. Order to be entered upon filing. (SR) (Entered: 04/23/2026) |
| 04/22/2026 | [107](#) (60 pgs) | Amended Chapter 11 Monthly Operating Report for Case Number Saucon Valley Manor for the Month Ending: 02/28/2026 Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 04/22/2026) |
| 04/22/2026 | [108](#) (58 pgs) | Amended Chapter 11 Monthly Operating Report for the Month Ending: 02/28/2026 Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 04/22/2026) |
| 04/23/2026 | [110](#) (2 pgs) | Order Granting Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement. The Exclusive Filing Period within which the Debtors may propose a plan of reorganization in these Chapter 11 Cases shall be extended through and including 5/19/26.(Related Doc # [72](#)) (CW) (Entered: 04/23/2026) |
| 04/23/2026 | 111 | Hearing Held and Continued on [79](#) Motion to Dismiss Debtor Cases Pursuant to 11 USC Section 1112(b)(4), or in the alternative Motion to Appoint Trustee Pursuant to 11 USC Section 1104(a) Filed by United States Trustee Represented by RACHEL WOLF (Counsel).Hearing scheduled 05/26/2026 at 02:30 PM at Reading Video Hearing. (SR) (Entered: 04/24/2026) |
| 04/24/2026 | [112](#) (4 pgs) | Certificate of Service *re: Debtors Response to Secured Creditor Lehigh Valley 1, LLCs Fifth Objection to Debtors Cash Collateral Motion [Docket No. 95] and Amended Notice of Agenda for Hearing April 21, 2026 at 2:30 P.M. (ET) [Docket No. 96]* Filed by Omni Agent Solutions, Inc. (related document(s)[96](#), [95](#)). (Lowry, Randy) (Entered: 04/24/2026) |
| 04/24/2026 | [113](#) (4 pgs) | Certificate of Service *re: Debtors Objection to Motion of the United States Trustee for Entry of an Order Dismissing the Cases or, in the Alternative, Directing the Appointment of a Trustee [Docket No. 99]* Filed by Omni Agent Solutions, Inc. (related document(s)[99](#)). (Lowry, Randy) (Entered: 04/24/2026) |
| 04/25/2026 | [114](#) (4 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # [110](#))). No. of Notices: 1. Notice Date 04/25/2026. (Admin.) (Entered: 04/26/2026) |

App.12

| | | |
|---|---|---|
| 04/28/2026 | 115<br>(4 pgs) | Certificate of Service *re: Order Pursuant to 11 U.S.C. § 1121(d) Extending Debtors Exclusive Periods Within which to File a Chapter 11 Plan and Solicit Acceptances Thereof [Docket No. 110]* Filed by Omni Agent Solutions, Inc. (related document(s)110). (Lowry, Randy) (Entered: 04/28/2026) |
| 04/28/2026 | 116<br>(1 pg) | Transcript regarding Hearing Held 04-21-26 RE: Interim Motion for Cash Collateral, Motion to Compel. The transcript may be viewed at the Bankruptcy Court Clerk's Office. [For information about how to contact the transcriber, call the Clerk's Office] (related document(s) 101 , 100 ). Notice of Intent to Request Redaction Deadline Due By 5/5/2026. Redaction Request Due By 5/19/2026. Redacted Transcript Submission Due By 5/29/2026. Transcript access will be restricted through 7/27/2026. (KB) (Entered: 04/28/2026) |
| 04/28/2026 | 117<br>(1 pg) | Transcript regarding Hearing Held 04/23/26 RE: Motion to Dismiss Case. The transcript may be viewed at the Bankruptcy Court Clerk's Office. [For information about how to contact the transcriber, call the Clerk's Office] (related document(s) 111 ). Notice of Intent to Request Redaction Deadline Due By 5/5/2026. Redaction Request Due By 5/19/2026. Redacted Transcript Submission Due By 5/29/2026. Transcript access will be restricted through 7/27/2026. (KB) (Entered: 04/28/2026) |
| 04/28/2026 | 118<br>(1 pg) | Transcript regarding Hearing Held 03/24/26 RE: Motion for Interim and Final order. The transcript may be viewed at the Bankruptcy Court Clerk's Office. [For information about how to contact the transcriber, call the Clerk's Office] (related document(s) 39 ). Notice of Intent to Request Redaction Deadline Due By 5/5/2026. Redaction Request Due By 5/19/2026. Redacted Transcript Submission Due By 5/29/2026. Transcript access will be restricted through 7/27/2026. (KB) (Entered: 04/28/2026) |
| 05/01/2026 | 119<br>(13 pgs) | Proposed Order Re: *Motion for (1) Interim and Final Orders (A) Authorizing Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Use and (B) Prescribing Form and Manner of Notice and Setting the Time for The Final Hearing and (2) Expedited Hearing on The Relief Sought Herein* Filed by ANNE M. AARONSON on behalf of Whitehall Manor, Inc. (related document(s)53). (AARONSON, ANNE) (Entered: 05/01/2026) |
| 05/01/2026 | 120<br>(13 pgs) | Fifth Interim Order re:53 (A) Authorizing the Debtors to use Cash Collateral of Existing Secured Party and Granting Adequate Protection for such use and (B) Prescribing the Form and Manner of Notice and Setting the Time for a Final Hearing. Hearing scheduled 5/26/2026 at 02:30 PM at Reading Video Hearing. (CW) (Entered: 05/01/2026) |
| 05/03/2026 | 121<br>(15 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 120)). No. of Notices: 1. Notice Date 05/03/2026. (Admin.) (Entered: 05/04/2026) |
| 05/05/2026 | 122<br>(4 pgs) | Certificate of Service *re: Proposed Fifth Interim Order (A) Authorizing the Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Such Use and (B) Prescribing the Form and Manner of Notice and Setting the Time for a Final Hearing [Docket No. 119] and Fifth Interim Order (A) Authorizing the Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Such Use and (B) Prescribing the Form and Manner of Notice and Setting the Time for a Final Hearing [Docket No. 120]* Filed |

App.13

| | | |
|---|---|---|
| | | by Omni Agent Solutions, Inc. (related document(s)120, 119). (Lowry, Randy) (Entered: 05/05/2026) |
| 05/12/2026 | 123 (1 pg) | Creditor Request for Notices Filed by American Express National Bank. (Cramer, Christopher) (Entered: 05/12/2026) |
| 05/15/2026 | 124 (13 pgs) | Order Denying Motion To Compel The Manor Debtors To Assume Or Reject Their Leases, (2) Establish The Cure Amount and (3) For Relief From The Automatic Stay. (Related Doc # 56) (CW) (Entered: 05/15/2026) |
| 05/15/2026 | 125 (17 pgs) | Expedited Motion for Adequate Protection Filed by Whitehall Manor, Inc. Represented by MICHELLE LEE (Counsel). (LEE, MICHELLE) (Entered: 05/15/2026) |
| 05/15/2026 | 126 (122 pgs; 2 docs) | Disclosure Statement Filed by Whitehall Manor, Inc.. (Attachments: # 1 Exhibit A - Chapter 11 Plan)(LEE, MICHELLE) (Entered: 05/15/2026) |
| 05/15/2026 | 127 (50 pgs) | Chapter 11 Plan of Reorganization Filed by Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 05/15/2026) |
| 05/15/2026 | 128 (138 pgs) | Motion *for Entry of an Order Scheduling a Hearing to Approve: (I) Disclosure Statement; (II) Procedures for the Solicitation and Tabulation of Votes to Accept or Reject The Debtors' Chapter 11; and (III) Related Notice and Objection Procedures* Filed by Whitehall Manor, Inc. Represented by MICHELLE LEE (Counsel). (LEE, MICHELLE) (Entered: 05/15/2026) |
| 05/17/2026 | 129 (21 pgs) | Expedited Motion *for Entry of an Order to Extend Debtors' Exclusive Time to File a Plan of Reorganization and Solicit Acceptances Thereof and Request for Expedited Consideration* Filed by Whitehall Manor, Inc. Represented by MICHELLE LEE (Counsel). (LEE, MICHELLE) (Entered: 05/17/2026) |
| 05/17/2026 | 130 (15 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 124)). No. of Notices: 1. Notice Date 05/17/2026. (Admin.) (Entered: 05/18/2026) |
| 05/18/2026 | 131 (1 pg) | Order Scheduling Expedited Hearing re:125 Expedited Motion for Adequate Protection Filed by Whitehall Manor, Inc. Hearing scheduled 5/26/2026 at 02:30 PM at Reading Video Hearing. (CW) (Entered: 05/18/2026) |
| 05/18/2026 | 132 (1 pg) | Order Scheduling Expedited Hearing re:129 Expedited Motion *for Entry of an Order to Extend Debtors' Exclusive Time to File a Plan of Reorganization and Solicit Acceptances Thereof and Request for Expedited Consideration.Filed by Whitehall Manor, Inc.Hearing scheduled 5/26/2026 at 02:30 PM at Reading Video Hearing. (CW)* (Entered: 05/18/2026) |
| 05/19/2026 | 133 (3 pgs; 2 docs) | Exhibit *B - Manor Liquidation Analyses* Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc. (related document(s)126). (Attachments: # 1 Liquidation Trust Notice re. Finalized and will be filed by new counsel) (LEE, MICHELLE) (Entered: 05/19/2026) |

App.14

| 05/20/2026 | 134 (3 pgs) | Notice of Appearance and Request for Notice by JASON CHRISTOPHER MANFREY Filed by JASON CHRISTOPHER MANFREY on behalf of Abraham Atiyeh. (MANFREY, JASON) (Entered: 05/20/2026) |
| --- | --- | --- |
| 05/20/2026 | 135 (59 pgs) | Chapter 11 Monthly Operating Report for Case Number Saucon Valley Manor for the Month Ending: 04/30/2026 Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 05/20/2026) |
| 05/20/2026 | 136 (63 pgs) | Chapter 11 Monthly Operating Report for the Month Ending: 04/30/2026 Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 05/20/2026) |
| 05/20/2026 | 137 (17 pgs; 2 docs) | Joint Notice of Appeal to District Court. . Fee Amount $298.00 Filed by Lehigh Valley 1, LLC, Receiver Duane Morris LLP, by Erin Duffy, Esquire (related document(s)124). Appellant Designation due by 06/3/2026. Transmission of record on appeal to District Court Due Date:06/17/2026. (Attachments: # 1 Exhibit A)(HAMERMESH, MATTHEW)*Modified entry on 6/9/2026 to add word "Joint" to match PDF* (MK). (Entered: 05/20/2026) |
| 05/20/2026 | | Receipt of Notice of Appeal( 25-15245-pmm) [appeal,ntcapl] ( 298.00) Filing Fee. Receipt number A32712240. Fee Amount $ 298.00. (re: Doc# 137) (U.S. Treasury) (Entered: 05/20/2026) |
| 05/20/2026 | 138 (3 pgs; 2 docs) | Supplemental Response to Objection filed by Debtor Whitehall Manor, Inc. Filed by Whitehall Manor, Inc. (related document(s)99). (Attachments: # 1 Exhibit A) (LEE, MICHELLE) (Entered: 05/20/2026) |
| 05/20/2026 | 139 (4 pgs) | Certificate of Service *re: Debtors Motion for Entry of an Order Approving Modified Adequate Protection Pending Confirmation of a Chapter 11 Plan and Expedited Consideration [Docket No. 125], Debtors Motion for Entry of an Order to Extend Debtors Exclusive Time to File a Plan of Reorganization and Solicit Acceptances Thereof and Request for Expedited Consideration [Docket No. 129], Order [Docket No. 131] and Order [Docket No. 132]* Filed by Omni Agent Solutions, Inc. (related document(s)131, 132, 129, 125). (Lowry, Randy) (Entered: 05/20/2026) |
| 05/20/2026 | 140 (3 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 131)). No. of Notices: 1. Notice Date 05/20/2026. (Admin.) (Entered: 05/21/2026) |
| 05/20/2026 | 141 (3 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 132)). No. of Notices: 1. Notice Date 05/20/2026. (Admin.) (Entered: 05/21/2026) |

| | | |
|---|---|---|
| 05/21/2026 | [142](link)<br>(18 pgs; 2 docs) | Courts Certificate of Service Re: Notice of Appeal filed by Other Prof. Receiver Duane Morris LLP, by Erin Duffy, Esquire, Creditor Lehigh Valley 1, LLC. The following Party(s) have been notified: Case Judge - via email Case Trustee - via CM/ECF Debtor - via Regular mail through the BNC Debtors Counsel - via CM/ECF Office of the U.S. Trustee - via CM/ECF U.S. District Court - via email Matthew A. Hamermesh, Esquire for Appellant Lehigh Valley 1, LLC; Phillip D. Berger,Esquire for Appellant Lehigh Valley 1, LLC; Brett L. Messinger,Esquire for Receiver Duane Morris LLP, by Erin Duffy, Esquire; - via Email/CMECF (related document(s)[137](link)). (CW) (Entered: 05/21/2026) |
| 05/21/2026 | [143](link)<br>(1 pg) | Transmission of Notice of Appeal to District Court. (related document(s)[137](link)). (CW) (Entered: 05/21/2026) |
| 05/21/2026 | [144](link)<br>(2 pgs) | **Docketed in Error - see Amended filing docket #150**Withdrawal of Appearance of Attorneys Michelle Lee and Anne M. Aronson and entry of appearance of Attorneys Natalie D. Ramsey, Rachel Jaffe Mauceri and Eric Del Pozo Filed by NATALIE D. RAMSEY on behalf of Whitehall Manor, Inc.. (RAMSEY, NATALIE)Modified on 5/28/2026 (KB). (Entered: 05/21/2026) |
| 05/21/2026 | [145](link)<br>(1 pg) | Notice of Docketing Record on Appeal to District Court. Case Number:26-cv-3491.Assigned to Judge Catherine Henry. (related document(s)[137](link)). (CW) (Entered: 05/21/2026) |
| 05/21/2026 | [146](link)<br>(5 pgs) | Objection to Scheduling Hearing *Sixth Objection to Debtors' Cash Collateral Motion* Filed by Lehigh Valley 1, LLC (related document(s)[120](link)). (HAMERMESH, MATTHEW) (Entered: 05/21/2026) |
| 05/21/2026 | [147](link)<br>(8 pgs) | Objection to Generic Motion filed by Debtor Whitehall Manor, Inc. Filed by Lehigh Valley 1, LLC (related document(s)[129](link)). (HAMERMESH, MATTHEW) (Entered: 05/21/2026) |
| 05/21/2026 | [148](link)<br>(7 pgs) | Objection to Motion for Adequate Protection filed by Debtor Whitehall Manor, Inc. Filed by Lehigh Valley 1, LLC (related document(s)[125](link)). (HAMERMESH, MATTHEW) (Entered: 05/21/2026) |
| 05/21/2026 | [149](link)<br>(6 pgs) | Certificate of Service *re: Disclosure Statement Relating to Debtors Chapter 11 Plan of Reorganization [Docket No. 126], Debtors Joint Chapter 11 Plan of Reorganization Dated May 15, 2026 [Docket No. 127], and Debtors Motion for Entry of an Order Scheduling a Hearing to Approve: (I) Disclosure Statement; (II) Procedures for the Solicitation and Tabulation of Votes to Accept or Reject the Debtors Chapter 11 Plan; and (III) Related Notice and Objection Procedures [Docket No. 128]* Filed by Omni Agent Solutions, Inc. (related document(s)[127](link), [128](link), [126](link)). (Lowry, Randy) (Entered: 05/21/2026) |
| 05/22/2026 | [150](link)<br>(2 pgs) | Amended Notice of Appearance and Request for Notice *and Notice of Substitution* by ANNE M. AARONSON, MICHELLE LEE, NATALIE D. RAMSEY, RACHEL JAFFE MAUCERI Filed by ANNE M. AARONSON, MICHELLE LEE, NATALIE D. RAMSEY, RACHEL JAFFE MAUCERI on behalf of Saucon Trust, Whitehall Trust. (MAUCERI, RACHEL). Related document(s) [144](link) Withdrawal and entry of appearance filed by Debtor Whitehall Manor, Inc.. Modified on 5/28/2026 (KB). (Entered: 05/22/2026) |

App.16

| | | |
|---|---|---|
| 05/22/2026 | [151](#)<br>(6 pgs) | Document in re: *Notice of Agenda 5/26/2026 hearing* Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc.. (LEE, MICHELLE) (Entered: 05/22/2026) |
| 05/23/2026 | [152](#)<br>(2 pgs) | Declaration re: *of Abraham Atiyeh in Further Support of Debtors' Cash Collateral Motion and in Support of Debtors' Motion for Entry of an Order Approving Modified Adequate Protection Pending Confirmation of a Chapter 11 Plan and Expedited Consideration* Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc. (related document(s)[119](#), [125](#)). (LEE, MICHELLE) (Entered: 05/23/2026) |
| 05/23/2026 | [153](#)<br>(4 pgs; 2 docs) | Declaration re: *of Abraham Kapoor Atiyeh in Further Support of Debtors' Cash Collateral Motion and in Support of Debtors' Motion for Entry of an Order Approving Modified Adequate Protection Pending Confirmation of a Chapter 11 Plan and Expedited Consideration* Filed by MICHELLE LEE on behalf of Whitehall Manor, Inc. (related document(s)[120](#), [125](#)). (Attachments: # [1](#) Attachment A) (LEE, MICHELLE) (Entered: 05/23/2026) |
| 05/23/2026 | [154](#)<br>(3 pgs) | BNC Certificate of Mailing -Court's Certificate of Mailing or Service. Number of Notices Mailed: (related document(s) (Related Doc # [142](#))). No. of Notices: 1. Notice Date 05/23/2026. (Admin.) (Entered: 05/24/2026) |
| 05/23/2026 | [155](#)<br>(19 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # [142](#))). No. of Notices: 1. Notice Date 05/23/2026. (Admin.) (Entered: 05/24/2026) |
| 05/24/2026 | [156](#)<br>(4 pgs) | Amended Objection to Scheduling Hearing *Amended Sixth Objection to Debtors' Cash Collateral Motion* Filed by Lehigh Valley 1, LLC (related document(s)[120](#)). (HAMERMESH, MATTHEW) (Entered: 05/24/2026) |
| 05/26/2026 | 157 | Hearing Held on [79](#) Motion to Dismiss Debtor,Motion to Appoint Trustee Filed by United States Trustee. Order to be entered Denying Motion. (SR) (Entered: 05/26/2026) |
| 05/26/2026 | 158 | Hearing Held on [125](#) Motion for Adequate Protection Filed by Whitehall Manor, Inc.. Order to be entered Denying Motion. (SR) (Entered: 05/26/2026) |
| 05/26/2026 | 159 | Hearing Held and Continued on [129](#) Expedited Motion for Entry of an Order to Extend Debtors Exclusive Time to File a Plan of Reorganization and Solicit Acceptances Thereof and Request for Expedited Consideration Filed by Whitehall Manor, Inc. Represented by MICHELLE LEE (Counsel). Hearing scheduled 06/30/2026 at 01:00 PM at Reading Video Hearing. (SR) (Entered: 05/26/2026) |
| 05/26/2026 | 160 | Hearing Held and Continued on [53](#) Motion for (1) Interim and Final Orders (A) Authorizing Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Use and (B) Prescribing Form and Manner of Notice and Setting the Time for the Final Hearing and (2) Expedited Hearing on the Relief Sought Herein (the Cash Collateral Motion) Filed by Whitehall Trust Represented by MICHELLE LEE (Counsel).. Hearing scheduled 06/30/2026 at 01:00 PM at Reading Video Hearing. (SR) (Entered: 05/27/2026) |

Live Database Area

| 05/26/2026 | [161](#)<br>(1 pg) | Order Denying Motion For Adequate Protection (Related Doc # [125]) (OC) (Entered: 05/27/2026) |
|---|---|---|
| 05/26/2026 | [165](#)<br>(1 pg) | Order Denying Motion to Dismiss Debtor Cases Pursuant to 11 USC Section 1112(b)(4), or in the alternative Motion to Appoint Trustee Pursuant to 11 USC Section 1104(a) Filed by United States Trustee Represented by RACHEL WOLF (Related Doc # [79]) (SR) (Entered: 05/27/2026) |
| 05/27/2026 | [162](#)<br>(4 pgs) | Certificate of Service re: *Debtor Saucon Valley Manors Supplement to the Objection to Motion of the United States Trustee for Entry of an Order Dismissing the Cases or, in the Alternative, Directing the Appointment of a Trustee [Docket No. 138]* Filed by Omni Agent Solutions, Inc. (related document(s)[138]). (Lowry, Randy) (Entered: 05/27/2026) |
| 05/27/2026 | [163](#)<br>(4 pgs) | Certificate of Service re: *Notice of Agenda for Hearing May 26, 2026 at 2:30 P.M. (ET) [Docket No. 151]* Filed by Omni Agent Solutions, Inc. (related document(s)[151]). (Lowry, Randy) (Entered: 05/27/2026) |
| 05/27/2026 | 164 | Hearing Set re: [128] Motion *for Entry of an Order Scheduling a Hearing to Approve: (I) Disclosure Statement; (II) Procedures for the Solicitation and Tabulation of Votes to Accept or Reject The Debtors' Chapter 11; and (III) Related Notice and Objection Procedures* Filed by Whitehall Manor, Inc. Represented by MICHELLE LEE (Counsel). filed by Debtor Whitehall Manor, Inc.. Hearing scheduled 6/30/2026 at 01:00 PM at Reading Video Hearing. (SR) (Entered: 05/27/2026) |
| 05/27/2026 | [166](#)<br>(1 pg) | Order Entered. The exclusivity period is extended until and through June 30, 2026. Further Hearing scheduled 6/30/2026 at 01:00 PM at Reading Video Hearing. (related document(s)[129]). (SR) (Entered: 05/27/2026) |
| 05/27/2026 | [167](#)<br>(13 pgs) | Proposed Order Re: *Motion for (1) Interim and Final Orders (A) Authorizing Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Use and (B) Prescribing Form and Manner of Notice and Setting the Time for The Final Hearing and (2) Expedited Hearing on The Relief Sought Herein* Filed by ANNE M. AARONSON on behalf of Whitehall Manor, Inc. (related document(s)[120]). (AARONSON, ANNE) (Entered: 05/27/2026) |
| 05/29/2026 | [168](#)<br>(13 pgs) | Sixth Interim Order Authorizing (A) Authorizing the Debtors to use Cash Collateral of Existing Secured Party and Granting Adequate Protection for such use and (B) Prescribing the Form and Manner of Notice and Setting the Time for a Final Hearing.. Hearing scheduled 6/30/2026 at 01:00 PM at Reading Video Hearing. (Related Doc) [120] [167]. (CW) (Entered: 05/29/2026) |
| 05/29/2026 | [169](#)<br>(6 pgs) | Appellant Designation of Contents For Inclusion in Record On Appeal *and Statement of Issues Presented for Review* Filed by Lehigh Valley 1, LLC, Receiver Duane Morris LLP, by Erin Duffy, Esquire. Appellee designation due by 06/12/2026. Transmission of Designation Due by 06/29/2026. (HAMERMESH, MATTHEW) (Entered: 05/29/2026) |
| 05/29/2026 | [170](#)<br>(4 pgs) | Certificate of Service re: *Declaration of Abraham Atiyeh in Further Support of Debtors' Cash Collateral Motion and in Support of Debtors' Motion for Entry of an Order Approving Modified Adequate Protection Pending Confirmation of a Chapter 11 Plan and Expedited Consideration* |

App.18

Live Database Area

| | | |
|---|---|---|
| | | *[Docket No. 152] and Declaration of Abraham Kapoor Atiyeh in Further Support of Debtors' Cash Collateral Motion and in Support of Debtors' Motion for Entry of an Order Approving Modified Adequate Protection Pending Confirmation of a Chapter 11 Plan and Expedited Consideration [Docket No. 153]* Filed by Omni Agent Solutions, Inc. (related document(s)152, 153). (Lowry, Randy) (Entered: 05/29/2026) |
| 05/29/2026 | 171 (4 pgs) | Certificate of Service *re: Proposed Sixth Interim Order (A) Authorizing the Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Such Use and (B) Prescribing the Form and Manner of Notice and Setting the Time for a Final Hearing [Docket No. 167]* Filed by Omni Agent Solutions, Inc. (related document(s)167). (Lowry, Randy) (Entered: 05/29/2026) |
| 05/29/2026 | 172 (4 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 161)). No. of Notices: 4. Notice Date 05/29/2026. (Admin.) (Entered: 05/30/2026) |
| 05/29/2026 | 173 (4 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 165)). No. of Notices: 4. Notice Date 05/29/2026. (Admin.) (Entered: 05/30/2026) |
| 05/29/2026 | 174 (4 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 166)). No. of Notices: 4. Notice Date 05/29/2026. (Admin.) (Entered: 05/30/2026) |
| 05/31/2026 | 175 (15 pgs) | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 168)). No. of Notices: 1. Notice Date 05/31/2026. (Admin.) (Entered: 06/01/2026) |
| 06/01/2026 | 176 (126 pgs; 5 docs) | Application for Administrative Expenses Filed by Receiver Duane Morris LLP, by Erin Duffy, Esquire Represented by BRETT L. MESSINGER (Counsel). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Proposed Order) (MESSINGER, BRETT) (Entered: 06/01/2026) |
| 06/01/2026 | 177 (1 pg) | Transcript regarding Hearing Held 05-26-26 RE: Motions for Cash Collateral, Relief, Dismss, Adequate Protection. The transcript may be viewed at the Bankruptcy Court Clerk's Office. [For information about how to contact the transcriber, call the Clerk's Office] (related document(s) 157 , 159 , 160 , 158 ). Notice of Intent to Request Redaction Deadline Due By 6/8/2026. Redaction Request Due By 6/22/2026. Redacted Transcript Submission Due By 7/2/2026. Transcript access will be restricted through 8/31/2026. (KB) (Entered: 06/01/2026) |
| 06/01/2026 | 178 (2 pgs) | Notice of (related document(s): 176 Application for Administrative Expenses ) Filed by Receiver Duane Morris LLP, by Erin Duffy, Esquire . Hearing scheduled 6/30/2026 at 01:00 PM at Reading Video Hearing (AMS) *Modified Court location on 6/2/2026 (SR).* (Entered: 06/02/2026) |
| 06/02/2026 | 179 (4 pgs) | Certificate of Service *re: Order [Docket No. 161] and Order [Docket No. 166]* Filed by Omni Agent Solutions, Inc. (related document(s)161, 166). (Lowry, Randy) (Entered: 06/02/2026) |
| 06/03/2026 | 180 (4 pgs) | Certificate of Service *re: Sixth Interim Order (A) Authorizing the Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Such Use and (B) Prescribing the Form and Manner of* |

App.19

| | | |
|---|---|---|
| | | *Notice and Setting the Time for a Final Hearing [Docket No. 168]* Filed by Omni Agent Solutions, Inc. (related document(s)168). (Lowry, Randy) (Entered: 06/03/2026) |
| 06/03/2026 | 181 (24 pgs; 5 docs) | Application to Employ Robinson & Cole LLP as as Counsel for Whitehall Trust and Saucon Trust Filed by Saucon Trust, Whitehall Trust Represented by RACHEL JAFFE MAUCERI (Counsel). (Attachments: # 1 Notice # 2 Exhibit A (Proposed Order) # 3 Exhibit B (Mauceri Statement) # 4 Certificate of Service) (MAUCERI, RACHEL) (Entered: 06/03/2026) |
| 06/09/2026 | 182 (369 pgs; 7 docs) | Motion *// Joint Motion Pursuant to 11 U.S.C. § 363 for Entry of an Order Authorizing the Debtors To Enter Into and Perform Under Use And Occupancy Agreements* Filed by Saucon Trust, Whitehall Trust Represented by RACHEL JAFFE MAUCERI (Counsel). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C (Proposed Order) # 4 Exhibit D # 5 Exhibit E # 6 Certificate of Service) (MAUCERI, RACHEL) (Entered: 06/09/2026) |
| 06/09/2026 | 183 (3 pgs) | Notice of (related document(s): 182 Motion *// Joint Motion Pursuant to 11 U.S.C. § 363 for Entry of an Order Authorizing the Debtors To Enter Into and Perform Under Use And Occupancy Agreements*) Filed by Saucon Trust, Whitehall Trust. Hearing scheduled 6/30/2026 at 11:00 AM at PENN4 - 4TH fl Courtroom. (MAUCERI, RACHEL) (Entered: 06/09/2026) |
| 06/09/2026 | 185 (1 pg) | District Court Acknowledgement of Receiving the Transmission of Appellant Designation of Contents For Inclusion in Record On Appeal. Civil Case Number. 26-3491. Assigned to Judge Catherine Henry. (related document(s)184). (CW)*Modified on 6/11/2026 -changed file date from 6-10-2026 To 6-9-2026 to match PDF.* (MK). (Entered: 06/10/2026) |
| 06/10/2026 | 184 (1 pg) | Transmission of Appellant Designation of Contents For Inclusion in Record On Appeal to District Court. Civil Case Number. 26-3491. Assigned to Judge Catherine Henry. (related document(s)169). (CW) (Entered: 06/10/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/11/2026 12:14:40 | | | |
| **PACER Login:** | saraesmith | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 25-15245-pmm Fil or Ent: filed Doc From: 0 Doc To: 99999999 Term: included Format: html Page counts for documents: included |
| **Billable Pages:** | 17 | **Cost:** | 1.70 |

Live Database Area

App.21

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| Whitehall Manor, Inc., et al., | § § | Case No. 25-15245 (PMM) |
| *Debtors*. | § § § | Jointly Administered |

### ORDER

AND NOW, upon consideration of the joint motion of Secured Creditor Lehigh Valley 1, LLC and Receiver Duane Morris LLP through Erin Duffy, Esquire, for entry of an Order (1) compelling the Manor Debtors to assume or reject their Leases pursuant to 11 U.S.C. §365(d)(2) promptly, (2) establishing the cure amount, and (3) in the alternative, for relief from the automatic stay, doc. #56 (the "Motion"), it is hereby **ORDERED** that:

1.      The Motion is **DENIED.***

Date: May 15, 2026

_____
Hon. Patricia M. Mayer,
United States Bankruptcy Judge

App.22

\*   \*   \*

On March 19, 2026, Whitehall Trust and Saucon Trust (together, the "Trusts"), two of the four above-captioned Debtors, were dismissed from these jointly administered bankruptcies.  Doc. #264 (Bankr. E.D. Pa. No. 25-15241) (the "Dismissal Order").  Their dismissals were later stayed on April 2, 2026.  Doc. #274 (Bankr. E.D. Pa. No. 25-15241) (the "Stay Order").  The other two Debtors are Whitehall Manor, Inc., and Saucon Valley Manor, Inc., (together, the "Manors").  They operate personal care homes located at 1177 Sixth Street, Unit 1, Whitehall, Pennsylvania and 1050 Main Street, Unit 1, Hellertown, Pennsylvania (together, the "Manor Properties").  The Trusts leased said Properties to the Manors.  Lehigh Valley 1, LLC ("Lehigh") holds mortgages on the Manor Properties and security interests in, *inter alia*, the Manors' receivables.

In February of 2021, the Manors stopped paying the full amount of rent due under their leases with the Trusts (the "Leases").  Thereafter, the Trusts were unable to voluntarily service their mortgages.  Accordingly, in June of 2024, Lehigh filed foreclosure actions against the Trusts in the United States District Court for the Eastern District of Pennsylvania.  See (E.D. Pa. No. 24-cv-02627) (Whitehall Foreclosure Action); (E.D. Pa. No. 24-cv-2709) (Saucon Foreclosure Action).  These foreclosure actions were consolidated on March 17, 2025.  Doc. #52 (24-cv-2709).  On May 2, 2025, the Honorable Catherine Henry entered an Order appointing Duane Morris LLP through Erin Duffy, Esquire (the "Receiver") to receive the Manor Properties on Lehigh's behalf.  Doc. #65 (24-cv-02627) (the "Receivership Order").  On December 19, 2026, Judge Henry entered an Order directing that amendments made to the Leases in 2023 were null, void, and of no legal effect.  Doc. #164 (24-cv-02627).  Accordingly, the Leases expired by their terms well before the Debtors filed for bankruptcy on December 26, 2025.  See e.g., LVx-1 at 8, §2.02; id. at 30, 40; LVx-2 at 1, 9, §20(a); id. at 8, §19; id. at 34–35, 37–38.

1

App.23

\*    \*    \*

Principally, Lehigh and the Receiver (the "Movants") argue that, because the Leases expired by their terms pre-petition, the Leases are not assumable or rejectable under 11 U.S.C. §§365(d)(2) or 1123(b)(2).  Therefore, the Movants contend that they are entitled to relief from the automatic stay to "take possession of the [Manor Properties] and evict the Manor Debtors and bring in a new, qualified operator[.]"  Mot. at 30.  Alternatively, if the Court finds that the Leases are "unexpired," then the Movants contend that the equities weigh in favor of the Court compelling the Manors to promptly assume or reject the Leases under §365(d)(2).  In that event, the Movants urge this Court to fix the cure amount at roughly eight million dollars for each of the Manors, consistent with the proofs of claim filed by the Receiver on the Trusts' behalf.[1]  Should the Court compel the Manors to promptly assume or reject the Leases, the Movants request prospective stay relief to take possession of the properties if the Manors decide to reject the Leases.

Critically, the Movants contend that the Receivership Order—in tandem with the Dismissal Order—furnishes the Receiver with direct standing to assert the Trusts' interests in all the relief sought.  For its part, Lehigh is said to have standing under §365(d)(2) given Lehigh's security interests in the rent due under the Leases.  Less clear is on what basis Lehigh asserts "standing" to evict the Manors under §362(d)(1).  Failing all that, the Movants urge the Court to either narrow the scope of the Stay Order or invoke 11 U.S.C. §105(a) as a means of conferring upon the Movants derivative standing to pursue such relief.

\*    \*    \*

---

[1]    Apparently, the Receiver filed these proofs of claim in the interregnum between entries of the Dismissal and Stay Orders.  See doc. #44 (25-15245).

2

App.24

In their papers, the Manors submit that Lehigh lacks standing under §365(d)(2) because Lehigh is not a party to the Leases. Similarly, the Manors argue that the Receiver lacks standing under §365(d)(2) because she was "not appointed to exercise the Trusts' business judgment but is acting in Lehigh's interest[.]" Resp. at 9. Regardless, the Manors suggest that the Receiver is effectively estopped from moving under §365(d)(2) by virtue of the Trusts' bankruptcies. See id. ¶¶ 12, 13. See also id. at 16 ("The Receiver's pursuit of rent payments . . . is stayed in these cases[.]"). At the April 21, 2026, hearing (the "Hearing"), the Manors clarified that they were grounding the latter argument in 11 U.S.C. §543. Even if the Movants can invoke §365(d)(2), the Manors believe compulsion thereunder is unwarranted because the equites tip in favor of allowing the Manors to wait and assume or reject the Leases in their Chapter 11 plans.

The Manors also suggested at the Hearing that §543 effectively deprives the Receiver of "standing" under §362(d)(1), at least insofar as the Receiver seeks to take possession of the Manor Properties and evict the Manors. See Hr'g Tr. at 66–74. Likewise, the Manors contend that Lehigh lacks standing to evict the Manors under §362(d)(1) because, again, Lehigh is not a party to the Leases. See id. at 66; Resp. at 29. In any event, the Manors submit that there is no cause for a lift-stay. Although they concede that the Leases expired pre-petition, the Manors emphasize the Debtors' longstanding, amicable, landlord-tenant relationship. And the Manors claim they performed post-default by covering components (e.g., maintenance costs) of the rent. (For this reason, the Manors contend that any cure amount should be fixed at less than half what the Movants allege.) The Manors urge the Court to credit this purported course of dealing as an equitable basis for adjudging the Leases "unexpired" within the meaning of §365.

* * *

3

App.25

The Motion presents many issues.  Among these are the threshold questions of: (A) whether the Stay Order reinstated the status quo ante; (B) whether the Movants have standing under 11 U.S.C. §365(d)(2); (C) whether the Movants can pursue the relief they request under 11 U.S.C. §362(d)(1); and (D) whether the Movants should be afforded derivative standing under 11 U.S.C. §105(a).  Only the first question is answerable in the affirmative.

<div align="center">*   *   *</div>

A stay pending appeal "suspend[s] judicial alteration of the status quo,'" or "the state of affairs before the . . . order was entered."  Nken v. Holder, 556 U.S. 418, 429 (2009) (alteration in original) (quoting Ohio Citizens for Responsible Energy, Inc. v. NRC, 479 U.S. 1312, 1313 (1986) (Scalia, J., in chambers)).  See also Nken, 556 U.S. at 428–29 (a stay "temporarily suspend[s] the source of authority to act—the order or judgment in question[.]").  Accord Roe by & through Roe v. Johnston, --- F.4th ----, 2026 WL 1143531, at *2 (9th Cir. Apr. 28, 2026); Kansas v. United States, 124 F.4th 529, 532 (8th Cir. 2024); Texas All. for Retired Americans v. Hughs, 976 F.3d 564, 566 (5th Cir. 2020).  Contra Porter v. Pennsylvania Dep't of Corrs., 974 F.3d 431, 439 (3d Cir. 2020) (death sentence did not constitute status quo despite stay of order vacating it).

The status quo rule generally holds where, as here, a stay was granted under Federal Rule of Bankruptcy Procedure 8007(a)(1)(A).[2]  E.g., Int'l Petroleum Prods. & Additives Co., Inc. v. Black Gold S.A.R.L., 115 F.4th 1202, 1213 (9th Cir. 2024) ("For the losing party, a stay under Rule 8007 of an order pending appeal ensures that the estate and the status quo will be preserved in the event that the order is later reversed. (citation modified)); Lardas v. Grcic, 847 F.3d 561,

---

[2]    The Motion for Stay did not specifically invoke Rule 8007(a)(1)(A).  See doc. #30 ¶¶ 17–18 (25-15245).  Neither did the Stay Order.  However, the Court construed the Motion for Stay on that basis.

<div align="center">4</div>

<div align="center">App.26</div>

567 (7th Cir. 2017) ("[I]f [Appellant] wanted to seek judicial review of the sale order, he should have moved for a stay pursuant to Federal Rule of Bankruptcy Procedure 8007(a)(1)(A), thereby preserving the status quo."); Collier on Bankruptcy ¶ 8007.01 (16th 2026) ("Once a bankruptcy court order, judgment, or decree has been entered . . . the losing party is permitted to seek a stay of the judgment, order, or decree so that the status quo pending an appeal is maintained[.]").  Cf. In re City of Chester, Pennsylvania, 2026 WL 607528, at *8 (E.D. Pa. Mar. 3, 2026) (explaining that, when applying the first of the Nken/In re Revel AC, Inc., 802 F.3d 558 (3d Cir. 2015) factors, "[t]he question is whether the movant has . . . raised serious legal questions warranting preservation of the status quo."); In re Est. of Taplin, 2022 WL 2714513, at *2 (Bankr. E.D. Cal. July 11, 2022) ("In general, a court from which an appeal is taken may not alter the status quo.  Rather, the court is limited to activity that preserves the status quo.").

That said, the status quo metric can be tricky "because there is no settled way of defining 'the status quo.'"  United States v. Texas, 144 S. Ct. 797, 798 n.1 (2024) (Barrett, J.) (mem.).  This conundrum is exemplified by Porter, where the Third Circuit seemed to chisel out an exception to Nken.  But this exception, whatever its parameters, is probably best understood as limited in application to the unique circumstances of that case.[3]  Accordingly, the status quo ante prevails:

---

[3]      In Porter, vacatur of Porter's Pennsylvania death sentence was stayed pending his and the Commonwealth's appeals, which were held in abeyance while another of Porter's post-sentencing petitions worked its way through the state courts.  Porter, 974 F.3d at 435.  Years later, Porter sued the Department of Corrections, alleging that it violated his constitutional rights by confining him to death row while the death sentence appeals remained in abeyance.  Id. at 436.  Summary judgment was granted to the Department of Corrections, in part because the magistrate judge relied on Nken in deciding that Porter's death sentence formed an active part of the status quo pending appeal.  Id. at 436–39.  A split panel disagreed.  The majority reasoned that, under "Williams," Porter's procedural due process rights—regarding the proper mode of his confinement—attached once his sentence was vacated, stay notwithstanding, even though vacaturs of the Williams plaintiffs' death sentences were not stayed.  Id. at 439 (citing Williams v. Secretary Pennsylvania Dep't of Corrs., 848 F.3d 549, 553 n.4 (3d Cir. 2017)).

Thus, the Porter majority discounted Nken.  Id. ("We are unconvinced by the Magistrate Judge's reliance on the Supreme Court's articulation of the legal impact of a stay in Nken[.]").  "That the order granting Porter vacatur and a resentencing hearing is stayed does not mean that the order has no legal import or that Porter currently has a viable death sentence.  Porter, like the Williams plaintiffs, is in limbo: he may not be resentenced until his appeals are

5

App.27

the Trusts remain "SARE" debtors in possession while their dismissals are on appeal.  See Doc. #144 (25-15241) (determining that property of the Trusts' estates is single asset real estate).  This means that the Trusts retain the rights *and responsibilities* they had on March 18, 2026.  The status quo also means that the Manor Properties remain property of the Trusts' estates, subject to the protection of the automatic stay.  See In re Addison, 667 B.R. 94, 101 (Bankr. D.S.C. 2025) ("Granting the Stay Motion [of a dismissed Chapter 13 debtor] would re-impose an automatic stay, forcing creditors to cease any [collection] actions commenced post-dismissal and wait until after a final decision on the appeal is issued to resume pursuing their rights.").

\* \* \*

Chapter 11 debtors may assume or reject "unexpired" leases of residential real property "at any time before the confirmation of a plan[.]"  11 U.S.C. §365(d)(2).  Accord In re Memory Lane of Bremen, LLC, 535 B.R. 901, 905 (Bankr. N.D. Ga. 2015).  Leases of property used to operate senior living facilities constitute leases of residential real property.  Id. (citing cases).  See also doc. #246, at 4 (25-15241) (explaining that senior living facilities "do[] not meet the definition of 'nonresidential real property' specified in §365(d)(3)[.]" (citing In re Guardian Elder Care at Johnstown, LLC, 665 B.R. 270, 272 (Bankr. W.D. Pa. 2024)).  However, "on the request of any *party to*" an unexpired lease of residential real property, the court may order the debtor(s)-in-possession "to determine within a specified period of time whether to assume or reject such . . . lease." 11 U.S.C. §365(d)(2) (emphasis added).  See also Memory Lane, 535 B.R. at 905 ("When

---

resolved." Id. This occasioned dissent. Compare id. at 455 (Porter, J., concurring in part and dissenting in part) ("The majority's assertion that the habeas court's stay of the vacatur order accomplished nothing, and that Porter's death sentence was actually vacated, is unprecedented and flies directly in the face of Nken.") and id. n.4 ("The majority's unconventional stay doctrine also threatens to destabilize the appellate process and our local practice." (pointing, for example, to 11 U.S.C. §362)) with id. at 439 n.3 (Greenway, Jr., J.) ("The stay certainly has legal effect: as a result of the stay, Porter cannot be resentenced. But the stay does not mean that Porter, *for purposes of his procedural due process rights*, is identical to other death row inmates who have never received any relief[.]" (emphasis added)).

6

App.28

determining whether to compel . . . a bankruptcy court should ensure that assumption or rejection occurs within a reasonable time[.]" (quotations omitted)).

The Manors are correct that Lehigh is not a "party to" the Leases. Therefore, Lehigh lacks standing under §365(d)(2). In re Riverside Nursing Home, 43 B.R. 682, 684 (Bankr. S.D.N.Y. 1984) (assignee of right to receive rent from debtor lacked standing under §365(d)(2) because only the assignor—*i.e.*, the original lessor—had a sufficiently close nexus with the lease agreement to qualify as a party thereto). On the other hand, the Manors baldly suggest that the same can be said of the Receiver because she was appointed for Lehigh's benefit. This is unpersuasive. Judge Henry's Receivership Order provides the Receiver with a comprehensive suite of powers and duties. These include the power to: (1) "enter and take immediate possession of" the Manor Properties; (2) "commence, prosecute, continue or defend actions at law or in equity (in [the Receiver's] own name *or in the names of* [the Trusts]) that the Receiver deems necessary to . . . collect the rents, or to evict or eject any tenants or occupants in accordance with applicable state laws"; and (3) "make, enter into, enforce, terminate, modify or accept a surrender of any of the Leases[.]" Doc. #65 (24-cv-02627) ¶ 6(a), (e), (j) (emphasis added). Essentially then, as the Manors concede, the Receiver stands in the shoes of the Trusts under non-bankruptcy law. Hr'g Tr. at 69. Yet the Trusts also retain reservoirs of independent agency—as evidenced by their decisions to file for bankruptcy shortly after being sanctioned by Judge Henry for obstructing the Receiver's efforts at rent collection in the foreclosure action (efforts which the Trusts now seek to co-opt on appeal). So, it seems both the Receiver and the Trusts are parties to the Leases.

Thus, if the Leases are "unexpired" within the meaning of §365, nothing in that provision would deprive the Receiver of standing to request prompt rejection or assumption of the Leases. However, the Manors are also correct that the Receiver is currently estopped from making such a

7

App.29

request.  This is true because the Receiver qualifies as a "custodian" obligated to turn over—and refrain from administering—property of the Trusts' or their estates.  11 U.S.C. §§101(11)(A), 543(a)–(b).  Any unexpired leases to which the Trusts are parties will remain property of their estates pending their appeals of the Dismissal Order.  See In re Rickel Home Centers, Inc., 209 F.3d 291, 300 (3d Cir. 2000) ("Unexpired leases, like executory contracts, are included in the definition of 'property of the estate' under [11 U.S.C. §541].").

Consequently, although no order of this Court has deprived the Receiver of its due authorization to act in the Trusts' stead under nonbankruptcy law, her ability to do so was largely short-circuited by the Trusts' bankruptcies and then again by the Stay Order temporarily reinstating them.  See doc. #65 (24-cv-02627) ¶ 20(b) (directing that, if the Trusts file for bankruptcy, the Receiver must turn over their property and otherwise comply with §543, unless Lehigh promptly moves under §§362(d) and/or 543(d)).  Of course, if the Leases are not unexpired within the meaning of §365, there is nothing for the Court to compel the Manors to accept or reject.  In re Stoltz, 197 F.3d 625, 629 (2d Cir. 1999) ("Only an 'unexpired' lease may be assumed."); In re Good Works Hous. LLC, --- B.R. ----, 2026 WL 710743, at *3 (Bankr. E.D. Pa. Mar. 13, 2026) ("If [a lease of personal property] is not unexpired, § 365 of the Bankruptcy Code simply does not apply."); In re Burch, 401 B.R. 153, 157 (Bankr. E.D. Pa. 2008) ("Where a lease is expired at the time of bankruptcy filing, there is nothing for the debtor to assume[.]").  Accordingly, there is nothing for the Court to do with the §365(d)(2) slice of the Motion, other than deny it.

*   *   *

The Court is unaware of binding law addressing whether a lease of residential real property that expired by its terms pre-petition nonetheless qualifies as "unexpired" under §365.  In some

8

App.30

jurisdictions, the answer may depend on whether a holdover tenant *qua* debtor retained possessory rights to the leasehold under applicable state law when the debtor filed for bankruptcy. This has been said to govern whether a lease that was "terminated" pre-petition "expired" per §365, which "cannot occur until all the essential procedural steps [necessary to dispossess the tenant under state law] have actually been taken." E.g., Robinson v. Chicago Hous. Auth., 54 F.3d 316, 321 (7th Cir. 1995); Stoltz, 197 F.3d at 631 (holding that, under Vermont law, although a landlord had begun action to legally terminate a lease—which had not expired by its terms—the lease was unexpired under §365 because no writ of possession had issued pre-petition). It has also been said that, for the purposes of §365, the concepts of expiration and termination overlap; but it does not necessarily follow that, for the same purposes, a debtor retains any assumable possessory rights in a lease that expired by its terms pre-petition.[4]

Another view (probably the better one) is that the plain meaning of the terms "expired" and "terminated" are not interchangeable under §365. E.g., In re Morgan, 181 B.R. 579, 584 (Bankr. N.D. Ala. 1994) ("In common parlance, and when used as terms of art . . . the word 'expired' denotes the natural or inevitable end to a contract or lease by lapse of time, while the word 'terminated' denotes the unnatural or premature end to a contract or lease as the result of breach or forfeiture."). Accord In re DiCamillo, 206 B.R. 64, 69 (Bankr. D.N.J. 1997). Indeed, when Pennsylvania law applies, this distinction seems to hold: a lease expires (*i.e.*, is not "unexpired"

---

[4]    In Robinson, the Court of Appeals seemed to hold that a lease properly (*i.e.*, fully) terminated at state (*i.e.*, Illinois) law was no less "expired" than one whose stated terms had run:

> [B]ankruptcy law draws no meaningful distinction between "expired" and "terminated" residential leases and does not provide greater federal protection for lessees under residential leases, the stated terms of which have not run, even though they have been *otherwise terminated*. Instead[,] the federal law allowing "unexpired" leases to be assumed calls for a determination whether a lease has ended under state law.

See Robinson, 54 F.3d at 320 (emphasis added).

App.31

within the meaning of §365) when it comes to a natural end according to its express terms.  In re

Turner, 326 B.R. 563, 575–76, 78 (Bankr. W.D. Pa. 2005).  Moreover, "a mere possessory interest

. . . in an expired lease at the time of filing is not enough to sustain the protections of the automatic

stay."  Id. at 573 (citing In re Hill, 307 B.R. 821 (Bankr. W.D. Pa. 2004) and In re Blaylock, 301

B.R. 443 (Bankr. E.D. Pa. 2003)).  Accord Burch, 401 B.R. at 157 ("Absent the ability to assume

the Lease, the Debtor merely has a possessory interest in the Lease which, while property of the

estate subject to the automatic stay, is protected for a limited time only.").

As noted above, no one disputes here that the Leases expired by their terms pre-petition.

See e.g., Resp. at 30 ("The parties continue in a course of performance that indicates their Leases

have not *terminated*, though their stated terms have passed." (emphasis added)).[5]  Nor has it been

argued that the Movants are not "parties in interest" capable of requesting relief from the automatic

stay under §362(d)(1).  In this Circuit, such party-in-interest status is interpreted broadly "to

include 'anyone who has a legally protected interest that could be affected by a bankruptcy

proceeding.'"  In re Potter, 2024 WL 3177775, at *3 (3d Cir. June 26, 2024) (quoting In re Global

Indus. Techs., Inc., 645 F.3d 201, 210-11 (3d Cir. 2011)).

That certainly applies to the Trusts.  Were they moving for a lift-stay, the Court would

likely have little choice but to grant it.  See Turner, 326 B.R. at 573.  By extension, the Receiver

---

[5]    For this proposition the Manors rely on In re Schnur Enterprises, Inc., 42 B.R. 202, 205 (Bankr. W.D. Pa.
1984) ("[T]echnical compliance with contractual provisions can be waived by the conduct of the parties.").  But that
case is readily distinguishable.  Unlike here, the commercial lease at issue there did not expire by its terms pre-petition.
Id. at 203.  Furthermore, by all indications, the Schnur Enterprises debtor continued paying rent pursuant to the terms
of the lease until its expiry.  Clearly, that is not the case here.  At best, the Manors have established that they were
partially performing under the pre-2023 Lease terms.  Moreover, the Schnur Enterprises debtor's noncompliance was
excused because the lessor's proposed renewal terms were onerous.  Id. at 206.  Here, the since-voided renewal terms
agreed to by the Debtors in 2023 were onerous.  These amendments were "effected" the day after the mortgages were
assigned to Lehigh's parent.  There can be little doubt that the purpose of these amendments was to starve the Trusts
of income pledged to the mortgagee.  This is the only course of dealing in evidence.  And the Court has no appetite to
credit such dealing as an equitable basis for extending the Lease terms beyond the petition date.

10

App.32

also has a compelling case for relief under §362(d)(1). Except she currently faces a similar impediment to the one presented by §365. Namely, the admixture of §543 and the Stay Order, whereby the Manor Properties are off limits to the Receiver while they remain property of the Trusts' estates. At least in this practical sense, the Receiver lacks standing for relief from the automatic stay because she cannot accomplish what she seeks permission for in the Motion—*i.e.*, taking possession of the Manor Properties and evicting the Manors therefrom. Neither, it seems, can Lehigh, who cites no authority for the proposition that Pennsylvania law allows a mortgagee to evict a mortgagor's holdover tenant because the mortgagee has a security interest in rents owed by the tenant. Instead, Lehigh cites a line of cases where relief was granted to Pennsylvania *landlords* whose tenants' leases had either fully terminated or expired by their terms pre-petition. See Turner, 326 B.R. at 578; Burch, 401 B.R. at 160. Accordingly, the Movants have failed to establish sufficient bases upon which the Court can grant them relief from the automatic stay, regardless of whether such relief may otherwise be warranted.

*    *    *

Lastly, the Court declines the Movants' invitations to afford them derivative standing pursuant to §105(a). Such is reserved for truly exceptional circumstances, often involving the bankruptcy trustee's failure to avoid fraudulent transfers. In re Rosenblum, 545 B.R. 846, 863 (Bankr. E.D. Pa. 2016) (conferring derivative standing on Chapter 13 creditors seeking to avoid fraudulent transfers, which the trustee lacked resources to pursue). Even then, "[d]erivative standing is appropriate only if: '(i) the movant has alleged a colorable claim that would benefit the estate (ii) the trustee has unjustifiably refused to pursue the claim itself; and (iii) the movant has obtained permission from the bankruptcy court to initiate the action on behalf of the estate.'" Id. at 863 (quoting In re Stewart, 473 B.R 612, 637 (Bankr. W.D. Pa. 2012), aff'd, 2013 WL 4041963

11

App.33

(W.D. Pa. Aug. 8, 2013)).

Lehigh flunks the first prong because, as just discussed, it has failed to establish that it can evict the Manors under Pennsylvania law. To be sure, the Receiver possesses such authority under the Receivership Order. But the Court is unwilling to confer derivative standing on the Receiver when she failed to timely pursue another, more traditional means at her disposal for obtaining the kind of standing she now seeks. See 11 U.S.C. §543(d). Accord In re Watkins, 63 B.R. 46, 47–49 (Bankr. D. Colo. 1986) (holding that, once a receiver complies with §543(a)–(b), the court cannot revest in the receiver the right to administer and/or possess property of the debtor). Moreover, "[i]t is hornbook law that § 105(a) 'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.'" L. v. Siegel, 571 U.S. 415, 421 (2014) (quoting Collier on Bankruptcy ¶ 105.01[2] (16th ed. 2013)). Section 543 is explicit. It mandates that a receiver "may not make any disbursement from, or take any action in the administration of, property of the debtor . . . or property of the estate[.]" 11 U.S.C. §543(a). See also id. §543(b) (providing that a "custodian shall . . . deliver to the trustee any property of the debtor held by or transferred to such custodian[.]"). Thus, the Court's general authority under §105(a) must yield to those specific prohibitions found in §543. Siegel, 571 U.S. at 421 ("Section 105(a) confers authority to 'carry out' the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits.").

\* \* \*

For these reasons, the Motion must be denied.

12

App.34

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 11 |
| WHITEHALL MANOR, Inc., *Debtor*. | Case No. 25-15245 (PMM) (Jointly Administered) |

**SECURED CREDITOR LEHIGH VALLEY 1, LLC'S AND RECEIVER'S JOINT
MOTION TO (1) COMPEL THE MANOR DEBTORS TO ASSUME OR REJECT
THEIR LEASES, (2) ESTABLISH THE CURE AMOUNT AND
(3) FOR RELIEF FROM THE AUTOMATIC STAY**

Secured Creditor Lehigh Valley 1, LLC ("Lender") and Receiver Duane Morris LLP through Erin Duffy, Esquire ("Receiver") hereby jointly move this Court for entry of an Order (1) compelling the Manor Debtors to assume or reject their Leases pursuant to 11 U.S.C. § 365(d)(2) promptly, (2) establishing the cure amount, and (3) in the alternative, for relief from the automatic stay. In support thereof, Lender and Receiver state as follows:

**INTRODUCTION**

1.      The Manor Debtors currently operate personal care homes on the Trusts' properties. They leased these properties from the Trusts.[1] But they have not paid rent in five years, and the Leases have likely expired by their terms. And, as a result of this Court's ruling that Section 365(d)(3) does not apply to the Manor Debtors, ECF 246, at 4 (Case No. 25-15241), the Manor Debtors have not paid any rent since the Petition Date.

---

[1] "Leases" as used in this Motion shall mean the Whitehall Manor Lease Agreement (originally dated August 14, 2008, and amended by the First through Third Amendments) (attached hereto as Exhibit A), and the Saucon Valley Manor Lease Agreement (originally dated January 1, 2006, and subsequently amended by the First through Fifth Amendments) (attached hereto as Exhibit B).

2.      Accordingly, the Lender – which has a lien on the rents due from the Manor

Debtors – and the Receiver – appointed to take possession of the properties and collect

those rents – seek relief from this Court to protect their interest in those rents. As set forth

below, the Court should enter an order either: (1) compelling the Manor Debtors to

assume or reject their Leases promptly and, if assumed, fully cure all payment defaults by

immediate payment; or (2) if the Leases have already expired, grant relief from the

automatic stay to permit the Receiver to take possession of the property and evict the

Manor Debtors so that the personal care homes can be operated safely and profitably. As

set forth below, the factors that a Court must consider in deciding whether to compel a

debtor to assume or reject a lease all weigh in favor of granting Lender and Receiver's

motion to compel the Manor Debtors to make this decision immediately. An analysis of

these factors demonstrates that Lender and Receiver will face ongoing harm if the

insolvent Manor Debtors are not given a deadline by which to assume or reject their

respective Leases. Based on their own reports, the Manor Debtors are insolvent, and there

is little chance that they will be able to pay the full arrearage necessary to assume the

Leases or propose a viable Chapter 11 plan of reorganization that resolves the pre- and

post-petition arrearages. Allowing the Manor Debtors to continue operating their

personal care homes in their current financial state will not only harm Lender and

Receiver, but also the residents of the personal care homes. Lender and Receiver are

willing and prepared to put in a qualified operator who can safely and profitably operate

these personal care homes. Accordingly, the factors to be considered all weigh in favor of

the Court compelling the Manor Debtors to assume or reject their Leases promptly.

3.      Moreover, if the Manor Debtors choose to assume their respective Leases,

they are required under Section 365(b)(1) to cure all past-due lease payments (including

2

App.36

pre-and post-petition rent obligations). Accordingly, Lender and Receiver request that the Court determine that the amount required to cure the Manor Debtors' pre-petition default on their respective Leases is $8,460,843.01 for Saucon Manor and $8,271,961.00 for Whitehall Manor. *See* Whitehall Manor Proof of Claim, ECF 44 (Case No. 25-15245); Saucon Manor Proof of Claim, ECF 26 (Case No. 25-15244). Given the Manor Debtors' financial difficulties and current financial situation—described in detail below—the Manor Debtors will not be able to provide adequate assurance of a prompt cure. Thus, the Court should direct the Manor Debtors to cure immediately as a condition of the Manor Debtors' assumption of their Leases.

4.      In the alternative, the Court should grant Lender and Receiver relief from the automatic stay. The Manor Debtors' Leases have expired by their express terms and thus the Manor Debtors cannot assume them. *See In re Turner*, 326 B.R. 563, 578 (W.D. Pa. 2005). Accordingly, there is cause to grant Lender and Receiver relief from the automatic stay in order to take possession of the properties and evict the Manor Debtors, and bring in a new, qualified operator to operate and maintain the personal care homes. *See* 11 U.S.C. § 362(d)(1); *In re Burch*, 401 B.R. 153, 157, 160 (Bankr. E.D. Pa. 2008).

**JURISDICTION**

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (G), and (O).

6.      The statutory bases for the relief requested herein is 11 U.S.C. §§ 362(d) and 365(b)(1) and (d)(2).

## FACTUAL BACKGROUND

7.     Lender and Receiver incorporate by reference the detailed Factual Background set forth in the First Objection of Secured Creditor Lehigh Valley 1, LLC to Motion for (1) Interim and Final Orders (A) Authorizing Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Use and (B) Prescribing Form and Manner of Notice and Setting the Time for the Final Hearing and (2) Expedited Hearing on the Relief Sought Herein (ECF 41). The Lender and Receiver repeat here for emphasis particular portions of the background that are relevant to this motion.

## I.     The Loans and Defaults

8.     On January 26, 2012, M&T Realty Capital Corporation ("M&T") provided a loan to Whitehall Trust in the amount of $15,788,700, secured by a mortgage on the real property located at 1177 6th Street, Whitehall, Pennsylvania. Lender's Obj. to Cash Collateral Mot.,[2] ECF No. 41, at ¶ 10 (Case No. 25-15241).

9.     On December 1, 2012, M&T provided a loan to Saucon Trust in the amount of $19,462,800, secured by a mortgage on the real property located at 1050 Main Street, Unit #1, Hellertown, Pennsylvania. *Id.*

10.     Debtor Whitehall Manor and Debtor Saucon Valley Manor (collectively, the "Manor Debtors"), leased these real properties from the respective Trusts and operate personal care homes on them. Lender's Obj. to Appl. to Employ, ECF No. 71, at ¶ 6 (Case No. 25-15241).

---

[2] The full name of what is referred to in short as the "Cash Collateral Motion" is Motion for (1) Interim and Final Orders (A) Authorizing Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Use and (B) Prescribing Form and Manner of Notice and Setting the Time for the Final Hearing and (2) Expedited Hearing on the Relief Sought Herein, ECF 41 (Case No. 25-15241).

11.     The loans were insured by U.S. Department of Housing and Urban Development ("HUD"). Due to Whitehall Trust's and Saucon Trust's (collectively, the "Trusts") payment defaults, both notes and both mortgages were assigned by M&T to HUD effective November 16, 2022. ECF No. 41, at ¶ 12 (Case No. 25-15241). HUD then held a publicly advertised loan sale, at which Windstream Capital LLC was the authorized and winning bidder on these two loans. HUD then assigned both notes, both mortgages, all security agreements, and all related loan documents to Windstream Capital LLC on September 20, 2023. *Id.* Windstream Capital subsequently assigned the loan documents to Lender on May 15, 2024. *Id.* Lender now holds mortgages on the Trusts' real property, security interests in all of the Trusts' and Manor Debtors' assets including rents, and security interests in and the right to collect rents directly from all the residents living at the personal care homes operated by the Manor Debtors. ECF No. 71, at ¶ 9 (Case No. 25-15241).

12.     Neither of the Trusts has made a single voluntary mortgage payment on either loan since February 2021—a period of more than five years. ECF 41, at ¶ 13 (Case No. 25-15241). Due to the Trusts' defaults, both Loans were accelerated, and demand was made for the immediate payment of all amounts due. *Id.* However, the Trusts and the Manor Debtors continue to refuse to make any mortgage payments on either loan. *Id.*

13.     Additionally, as a result of the Trusts' and the Manor Debtors' failure to pay real estate taxes, both Properties were subject to significant tax and municipal liens which caused the Properties to be listed for tax sale. *Id.* ¶ 15. The Trusts (through the Manor Debtors) entered into a tax repayment plan, which to date has repaid the past-due 2023 property taxes. *Id.* However, the Trusts and the Manor Debtors currently still owe hundreds of thousands of dollars in property taxes for Whitehall and Saucon. *Id.* ¶ 16.

## II.    Appointment of Receiver

14.    On June 20, 2024, Lender filed foreclosure actions in the Eastern District of Pennsylvania against both Trusts (Case Nos. 24-cv-02627 and 24-cv-02709). Lender filed Motions to Appoint a Receiver for both Properties. ECF 8 (Case No. 24-cv-02627); ECF 12 (Case No. 24-cv-02709); *see also* ECF No. 41, at ¶ 18 (Case No. 25-15241).

15.    On May 2, 2025, presiding District Judge Catherine Henry entered an Order appointing Erin Duffy, Esquire of Duane Morris LLP as Receiver for both Properties for the benefit of Lender. ECF 65 (Case No. 24-cv-02627); ECF 58 (Case No. 24-cv-02709); *see also* ECF No. 41, at ¶ 19 (Case No. 25-15241). In the Opinion in Support of the Order, the Court found that: (a) the mortgages themselves provided that the holder "shall be entitled to the appointment of a Receiver of the rents and profits of the mortgaged premises as a matter of right and without notice"; (b) Defendants had failed to make payments since February 2021—over four years; (c) audited financial statements showed "substantial doubt about the Trusts' ability to continue as a going concern"; and (d) appointment of a receiver was necessary to manage the Properties and ensure bills would be paid on time and structures maintained. ECF 64, at 5-8 (Case No. 24-cv-02627); ECF 57, at 5-8 (Case No. 24-cv-02709).

16.    In its opinion appointing Receiever, the Court also noted concerns about a potential diminution in the value of Lender's collateral because the Trusts refused to provide: (a) updated financial statements; (b) information on the Trusts and the Manors' current leases and rent collections; (c) proof that taxes were paid; (d) proof of insurance; or (e) information about other liens. *See* ECF 64 (Case No. 24-cv-02627); ECF 57 (Case No. 24-cv-02709). Notably, any one of these issues could diminish the value of the properties and harm Lender.

17.     The Receiver's Order authorized and directed the Receiver to collect all rents and directed that "Rents and Leases shall be turned over to Receiver and the Defendant shall be enjoined and restrained from collecting the Rents and Leases of the Properties or interfering with Receiver's ability to collect said Rents and Leases." ECF 65, at ¶ 6(j) (Case No. 24-cv-02627); ECF 58, at ¶ 6(j) (Case No. 24-cv-02709).

### III.   The Fraudulent Lease Amendments

18.     Prior to the loan defaults and prior to the HUD sale to Windstream (now Lender), the Lease Agreements between the Manor Debtors on one hand, and the property-owning Trusts, on the other hand, required substantial monthly rent payments as follows:

| Lease | Monthly Rent | Annual Rent |
|---|---|---|
| Whitehall Manor from Whitehall Trust | $139,000 | $1,668,000 |
| Saucon Manor from Saucon Trust | $142,118 | $1,705,421 |
| **COMBINED TOTAL** | **$281,118** | **$3,373,421** |

ECF No. 41, at ¶ 21 (Case No. 25-15241); Whitehall Lease Agreement, attached hereto as Exhibit A; Saucon Lease Agreement, attached hereto as Exhibit B.

19.     However, effective as of September 21, 2023 – after the mortgages had defaulted, after HUD had taken over the loans, and after HUD had auctioned the loans – Abraham Atiyeh (the Manager of the Trusts) unilaterally, on behalf of the Trusts and the Manor Debtors, drafted, prepared and executed two purported lease amendments (the "Fourth Amendment" for the Whitehall property and the "Sixth Amendment" for the Saucon property) (together, the "2023 Lease Amendments"). *See* Fourth Amendment to Whitehall Lease attached hereto as Exhibit C; Sixth Amendment to Saucon Lease, attached hereto as Exhibit D.

20.    The 2023 Lease Amendments, for which the Trusts received no consideration, effectively waived all past-due rent payment obligations for the Manor Debtors from March 2021 through September 2023 – which the Manor Debtors to that point had not paid – and for the year 2024. *See* Fourth Amendment to Whitehall Lease; Sixth Amendment to Saucon Lease. They also capped the maximum rent for the year 2025 at an amount less than the amounts paid by the Manor Debtors for taxes and capital improvements, which counted as a credit against the rent amount. *See* Fourth Amendment to Whitehall Lease; Sixth Amendment to Saucon Lease. The 2023 Lease Amendments were designed to strip rental income from the property-owning Trusts (whose cash flow was pledged to the mortgage lender) and to keep all cash in the operating Manor Debtors. ECF No. 71, at ¶ 14 (Case No. 25-15241).

## IV.    December 19, 2025 Order Voiding The 2023 Lease Amendments And Imposing Sanctions

21.    In July 2025, as part of the Foreclosure Actions, Lender filed a motion to void and set aside the 2023 Lease Amendments, which essentially waived all rent obligations for the Manor Debtors. ECF 41, at ¶ 24 (Case No. 25-15241). The Receiver later filed a Motion for Sanctions based on the Trusts' failure to comply with prior Court-ordered document production. *Id.*

22.    On December 19, 2025 – just one week before the bankruptcy filings – District Judge Henry entered an Order in the Foreclosure Actions granting the Lender's motion to invalidate the 2023 Lease Amendments and Receiver's request for discovery sanctions. Specifically, the Order:

1. GRANTED the Receiver's Motion for Sanctions;

2. Ordered Respondents to pay $21,281.00 to the Receiver by December 29, 2025;

3. Ordered Respondents to produce all documents required by the Court's September 2, 2025 Order by December 29, 2025;

4. Warned that failure to comply would result in striking Defendants' Answer and Affirmative Defenses and entering Judgment of Foreclosure;

5. GRANTED Lehigh's Motion to Void and Set Aside Lease Amendments;

6. DECLARED the Sixth Amendment and Fourth Amendment to be NULL, VOID, and OF NO LEGAL EFFECT;

7. Ordered the Manors to turn over to the Receiver any rental payments received from Good Shepherd Rehabilitation Hospital since October 31, 2025;

8. Ordered the Manors to turn over to the Receiver ALL receipts from occupants to be paid beginning January 2026.

*See* ECF 164 (Case No. 24-cv-02627); ECF 138 (Case No. 24-cv-02709), (A copy of the December 19, 2025 Order is attached hereto as Exhibit E).

23.     The Trusts' and the Manor Debtors' respective bankruptcy petitions were filed on December 26, 2025.[3]

**V.      The Current Status of the Manor Debtors' Leases**

24.     The Whitehall Manor property is governed by an Operating Lease Agreement originally dated August 14, 2008, amended by the First through Third Amendments. *See* Ex. A, Whitehall Lease Agreement. With the Fourth Amendment voided by the December 19 Order, the Third Amendment is the governing Amendment, dated and effective as of August 31, 2018. The Whitehall Lease Agreement is a triple net lease, meaning the lease requires Whitehall Manor to pay – separate from and in addition to the stated amount of monthly rent – all taxes, insurance, maintenance, and other operating expenses of the property. *See id*. at § 4.05.

---

[3] On March 19, 2026, this Court granted Lender's Motion to Dismiss the Trust Debtors' bankruptcy cases because the Trusts are not business trusts and thus are not eligible to be Chapter 11 debtors. ECF 264 (Case No. 25-15241).

25.    Section 2 of the Third Amendment to the Whitehall Lease Agreement provides that: "Tenant has exercised the privilege to extend the Term for 5 years, such that the original termination date of August 31, 2018 is now agreed to be August 31, 2023." Ex. A, Whitehall Lease Agreement.

26.    The Whitehall Lease Agreement does not contain an automatic renewal provision. Rather, Section 2.02 of the Original Lease provides that "the Lessee shall have the option to extend the Lease Term for three (3) successive periods of five (5) years each upon the terms and conditions contained herein, upon written notice to the Owner given not later than one hundred eighty (180) days prior to the expiration of the initial Lease Term or extended Lease Term, as the case may be." *Id.*

27.    The now-void Fourth Amendment to the Whitehall Lease states: "Landlord and Tenant have agreed that Tenant has exercised its option to extend the Term of the Lease for a period of Five (5) Years as allowed by the Lease." If valid, this may have extended the Lease until August 31, 2028. However, pursuant to the December 19 Order, this Amendment was declared null and void and of no legal effect, meaning the Whitehall Lease expired on August 31, 2023.

28.    Accordingly, there is no current lease in effect for the Whitehall property. The Whitehall Lease expired on its own terms on August 31, 2023.

29.    The Saucon Manor property is governed by a Lease Agreement originally dated January 1, 2006, subsequently amended by the First through Fifth Amendments. *See* Ex. B, Saucon Manor Lease Agreement. With the Sixth Amendment voided by the December 19 Order, the terms established by the Fifth Amendment, dated and effective as of July 1, 2018, govern. The Saucon Lease Agreement, like the Whitehall Lease Agreement, is a triple net lease. *See id.* at § 5. Thus, Saucon Manor is required to pay all

10

App.44

taxes, insurance, maintenance, and other operating expenses of the property in addition to the stated monthly rent amount. *See id.*

30.    The Fifth Amendment to the Saucon Lease Agreement provides: "The parties acknowledge that the term of the existing lease extended to July, 2018; and the parties hereto extend the Term of the Lease through August 31, 2023, (which hereby becomes the 'Termination Date')." Saucon Lease Agreement. It further provides: "The Term shall automatically extend on the Termination Date for three (3) periods of three (3) years, each, (and the termination shall be modified automatically thereby) unless (i) a Default by Lessee occurs, (in which event the rights and remedies of Owner shall be immediately applicable, and no further extension shall automatically occur)[.]" *Id.*

31.    Accordingly, the Fifth Amendment is automatically renewed for a three-year period unless there is an "Event of Default" as defined in the Saucon Lease Agreement. The Lease defines "Events of Default" to include where "Tenant shall fail to pay any installment of Base Rent or any other payment required herein when due, and such failure shall continue for a period of 5 days from the date such payment was due." Saucon Lease Agreement.

32.    Here, there was an obvious "Event of Default" – Saucon Manor's failure to pay rent since 2021. Lender and Receiver are not aware of any actions taken by Saucon Manor or Saucon Trust to excuse or waive this default by Saucon Manor, other than the Sixth Amendment to the Saucon Lease.

33.    The Sixth Amendment was declared null and void, and of no legal effect, by the December 19 Order.

34.    Based on Saucon Manor's failure to pay rent starting in 2021 – which is an "Event of Default" under the Lease Agreement – the Saucon Lease Agreement did not

11

App.45

automatically renew for a period of three years upon the expiration of the Lease on August 31, 2023.

35.    The Manor Debtors may contend that the now-voided Sixth Amendment to the Saucon Lease Agreement effectively waived rent obligations during the period from 2021 through 2024, and that therefore no "Event of Default" existed at the time the automatic renewal would have triggered on August 31, 2023. This argument fails. The December 19 Order declared the Sixth Amendment "NULL, VOID, and OF NO LEGAL EFFECT." Ex. E, December 19, 2025 Order, ¶ 8. A judicial declaration that an instrument is "null" and "void" operates retroactively — it is a determination that the instrument was void *ab initio*, as if it never existed. Accordingly, the Sixth Amendment never validly waived any rent obligations, meaning the rent was always due. Saucon Manor's failure to pay rent beginning in 2021 was always an "Event of Default" under the Lease Agreement, which means the automatic renewal provision was never triggered, and the Saucon Lease expired on its own terms on August 31, 2023.

36.    Accordingly, Whitehall Manor and Saucon Manor have been operating their personal care homes on the respective Trusts' properties without valid Leases since August 31, 2023, when the Leases expired.

37.    Because the Manor Debtors' Leases have expired by the express terms of the Leases, the Manor Debtors cannot assume the Leases under 11 U.S.C. § 365(d)(2).

38.    Nonetheless, even if the Court concludes the Leases have not expired (which they have) and may be assumed, the Manor Debtors, under 11 U.S.C. § 365(b)(1)(A), must cure all existing defaults under their respective Leases, including post-petition rent and any accrued and unpaid pre-petition rent.

App.46

39.     Saucon Manor owes $8,460,843.01, and Whitehall Manor owes $8,271,961.00 in pre-petition lease obligations, including unpaid rent. *See* Whitehall Manor Proof of Claim, ECF 44 (Case No. 25-15245), attached hereto as Exhibit F; Saucon Manor Proof of Claim, ECF 26 (Case No. 25-15244), attached hereto as Exhibit G.

## VI.    The Manor Debtors' Post-Petition Rent Obligations

40.     On February 26, 2026, this Court ruled that 11 U.S.C. § 365(d)(3) does not apply because "a senior living facility does not meet the definition of 'nonresidential real property' specified in §365(d)(3)." ECF 246, at 4 (Case No. 25-15241). Accordingly, the Manor Debtors are not obligated to pay post-petition rent currently.

41.     Nonetheless, under 11 U.S.C. §§ 503(b) & 507(a)(2), the post-petition rent is an administrative expense of the bankruptcy estate. Under 11 U.S.C. § 1129(a)(9)(A), administrative expenses – such as the post-petition rent – have to be paid in full as part of a plan of reorganization in order for it to be confirmed.

42.     Additionally, if the Manor Debtors assume their Leases, they will have to pay the unpaid post-petition rent as part of their cure of these amounts pursuant to 11 U.S.C. § 365(b)(1).

43.     Thus, the Manor Debtors must pay all of the accrued and unpaid pre- and post-petition rent in order to assume the Leases or confirm a plan of reorganization.

## VII.   Lender and Receiver are Entitled to Rent from the Manor Debtors

44.     Lenders have a security interest in all rents owed by or to the Manor Debtors. ECF 41, at ¶ 27 (Case No. 25-15241); Mortgages, Security Agreements, and Lessee Security Agreements attached hereto as Exhibits H through M.

45.     Lender's collateral package is more extensive than a typical mortgage. Lender holds by assignment:

- **Mortgages**: Against real property, improvements, equipment, personal property, and "rents, profits and other attributes."

- **Security Agreements (Trusts)**: Security Agreement, with filed UCC-1s against all personal property, accounts receivable, cash, and rents of Debtor Whitehall Trust and of Debtor Saucon Trust.

- **Lessee Security Agreements (Manor Debtors)**: Lender also holds signed Lessee Security Agreements with filed UCC-1's providing Lender with perfected, first-priority security interests in all personal property, accounts receivable, and rents of both of the Manor Debtors.

*See* ECF 41, at ¶ 27 (Case No. 25-15241).

**VIII.  The Manor Debtors' Financial Problems in the Bankruptcy Cases**

46.    The Manor Debtors are experiencing serious financial issues in their respective bankruptcy cases. *See* Debtors' 13-week projection ending 6-20-26, attached hereto as Exhibits N and O.

47.    Based on the Manor Debtors' 13-week projection ending in the week of June 20, 2026, the Manor Debtors will each lose hundreds of thousands of dollars on a purely cash basis over the course of the 13-week period from March 28, 2026 to June 20, 2026. *See id.*

48.    Moreover, the Manor Debtors are administratively insolvent and will not be able to pay the expenses of operating in their bankruptcy cases. For example, if you take Whitehall Manor's cash balance for the week of March 28, 2026, and subtract its post-petition accounts receivable as of February 28, 2026, its accrued professional fees during the bankruptcy, and the accrued and unpaid post-petition rent, the resulting amount is negative. *See* Ex. N, Whitehall Manor's 13-week projection ending 6-20-26.

| Whitehall Manor: Week of March 28, 2026 | |
|---|---|
| End of Week Cash Balance | $508,114.92 |
| Post-Petition Accounts Receivable as of February 28, 2026 | -$72,890.00 |
| Accrued legal/professional fees | -$250,000.00 |
| Accrued and unpaid rent | -$417,000.00 |
| **Insolvency** | **-$231,775.08** |

49.     Doing this same calculation for the rest of the weeks in the 13-week projection shows that Whitehall Manor will remain administratively insolvent – and in fact become significantly more administratively insolvent – through the entire 13-week budget period. *See id.*

50.     Similarly for Saucon Manor, if you take its cash balance for the week of March 28, 2026, and subtract its post-petition accounts receivable as of February 28, 2026, its accrued professional fees during the bankruptcy, and the accrued and unpaid rent, the resulting amount is negative. *See* Ex. O, Saucon Valley Manor's 13-week projection ending 6-20-26.

| Saucon Manor: Week of March 28, 2026 | |
|---|---|
| End of Week Cash Balance | $734,507.21 |
| Post-Petition Accounts Receivable as of February 28, 2026 | -$180,302.00 |
| Accrued legal/professional fees | -$250,000.00 |
| Accrued and unpaid rent | -$426,355.26 |
| **Insolvency** | **-$122,150.05** |

Again, doing this same calculation for the rest of the weeks in the 13-week projection shows that Saucon Manor will remain administratively insolvent – and in fact become

significantly more administratively insolvent – through the entire 13-week budget period. *See id.*

## RELIEF REQUESTED

51.     Lender and Receiver respectfully request that this Court enter an order requiring the Manor Debtors to promptly assume or reject their Leases with the Trusts, and notify the Lender and Receiver of that decision. Lender and Receiver ask that any such order provide that Lender and Receiver must *receive* notice of the assumption or rejection.

52.     If the Manor Debtors choose to assume their Leases, then this Court will need to find that the cure amount necessary to cure all defaults in the Manor Debtors' Leases is the full arrearage.

53.     For Saucon Manor, the amount of pre-petition obligations owed is 8,460,843.01, and for Whitehall Manor, $8,271,961.00. *See* Whitehall Manor Proof of Claim, ECF 44 (Case No. 25-15245); Saucon Manor Proof of Claim, ECF 26 (Case No. 25-15244). The Manor Debtors must also cure the post-petition arrearage.

54.     In the alternative, Lender and Receiver request relief from the automatic stay in order to take possession of the properties and evict the Manor Debtors, put in place a new, qualified operator to maintain and operate the personal care homes currently being operated by the Manor Debtors because the Manor Debtors' Leases have expired and they have no right to assume said Leases. The Lender and Receiver also request relief from the automatic stay for the same purposes to the extent the Debtors reject or otherwise are unable to assume the Leases if the Court grants them time to do so.

## ARGUMENT

### I.  This Court Should Compel the Manor Debtors to Assume or Reject their Leases Immediately

55.    Section 365(d)(2) of the Bankruptcy Code governs the time limits for a debtor to assume or reject an executory contract or unexpired lease of residential real property. It provides that:

> In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

11 U.S.C. § 365(d)(2).

56.    "In deciding whether to accelerate the debtor's decision, the court must balance the interests of the contracting party against the interests of the debtor and its estate." *In re Physician Health Corp.*, 262 B.R. 290, 292 (D. Del. 2001).

57.    A court must consider several factors in deciding "what constitutes a reasonable time within which a debtor should assume or reject a contract" including: (1) "[t]he nature of the interests at stake," (2) "the balance of the hurt to the litigants," (3) "the good to be achieved," (4) "the safeguards afforded those litigants," and (5) "whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary." *Matter of Dunes Casino Hotel*, 63 B.R. 939, 949 (D.N.J. 1986) (citation omitted); *accord In re G-I Holdings, Inc.*, 308 B.R. 196, 213 (D.N.J. 2004).

58.    Additionally, "court[s] should interpret reasonable time consistent with the broad purpose of Chapter 11, which is to permit successful rehabilitation of debtors." *Dunes Casino Hotel*, 63 B.R. at 949 (quotations omitted).

59.    Another factor courts consider in deciding whether to compel debtors to assume or reject a contract is whether "[t]he Debtors are performing under the contract." *Physician Health,* 262 B.R. at 295; *see also In re Wheeling-Pittsburgh Steel Corp.*, 54 B.R. 385, 388 (W.D. Pa. 1985) ("When the Debtor-in-Possession continues to perform its post-petition obligations, and the obligee under the executory contract or unexpired lease is suffering no harm or prejudice … there is no need to require the Debtor to assume or reject prior to the confirmation of a plan of reorganization.").

60.    Other relevant considerations include: (1) "the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code"; (2) "the importance of the contract to the debtor's business and reorganization"; (3) "whether the debtor has had sufficient time to appraise its financial situation"; and (4) "the potential value of its assets in formulating a plan, and whether exclusivity has terminated." *In re Teligent, Inc.*, 268 B.R. 723, 738 (Bankr. S.D.N.Y. 2001).

61.    The critical distinguishing fact in this case, as compared to cases where courts have declined to compel assumption or rejection, is that the Manor Debtors are not performing their post-petition obligations. In *In re Physician Health Corporation*, 262 B.R. 290 (D. Del. 2001), the court declined to compel assumption or rejection because the debtor was "performing under the contract" and the non-debtor party was "receiving precisely what it bargained for." *Id.* at 294-95 (citation omitted). Here, the opposite is true: the Manor Debtors have not paid rent for approximately five years, have not paid real estate taxes and are hemorrhaging cash even without paying these obligations. The Manor Debtors are not performing, and Lender and Receiver are suffering ongoing harm. The rationale for deferring the assumption or rejection decision is therefore inapplicable.

18

62.    The Receiver has a direct interest in the relief sought in this Motion because the Receiver was appointed "with the usual powers and directions for the benefit of the Plaintiff of all the rents and profits now due and unpaid or to become due during the pendency of this mortgage foreclosure action, effective immediately" for all property owned by Whitehall Trust and Saucon Trust "with respect to income of any kind; and with respect to any and all other property and property interests pledged or assigned to Plaintiff under the Loan Documents." ECF 65, at ¶ 1 (Case No. 24-cv-02627); ECF 58, at ¶ 1 (Case No. 24-cv-02709). The Receiver Order grants Receiver the power to, among other things: (1) "enter and take immediate possession of the Property, and to demand, collect and receive the rents … derived from the tenants at the Property"; (2) "take all actions necessary to preserve, maintain, operate, and manage the Property"; (3) "commence, prosecute, continue or defend actions at law or in equity … that the Receiver deems necessary to protect or preserve the property, to recover possession of the Property, to collect the rents, or to evict or eject any tenants or occupants in accordance with applicable state laws"; (4) "obtain and evict occupants"; and (5) "bring or defend any suits in connection with the Leases or Rents".  ECF 65, at ¶ 6 (Case No. 24-cv-02627); ECF 58, at ¶ 6 (Case No. 24-cv-02709).

63.    The Lender also has a direct interest in the relief sought in this Motion. As set forth above, the Lender has a security interest in the rents due from the Manor Debtors. *See* ECF 41, at ¶ 27 (Case No. 25-15241); Mortgages; Security Agreements. The Lender's interest in the rents provides collateral separate from and in addition to the value of the properties on which the Lender holds mortgages. *See In re Union Meeting Partners*, 178 B.R. 664, 674-75 (Bankr. E.D. Pa. 1995) ("It stands to reason, then, that an undersecured creditor's secured claim increases as 'proceeds, product, offspring, rents,

[and] profits' accrue post-petition.") (citing 11 USCA § 552; alteration in original); *see also In re Lichtin/Wade, LLC,* 486 B.R. 665 (Bankr. E.D.N.C. 2013) ("Therefore, as held by the majority of courts, adding the amount of the adequate protecting payments to the secured portion of the claim and correspondingly reducing the unsecured portion of the claim is the only appropriate mechanism to comply with § 506(b)."); *Beal Bank, S.S.B. v. Waters Edge L.P.,* 248 B.R. 668, 686 (D. Mass. 2000) ("In cases involving undersecured creditors, I am persuaded that the better approach is that collateral consists of the sum of the creditor's separate security interests in the building *and* the accumulated post-petition rents." (emphasis in original) (citing *Union Meeting Partners*, 178 B.R. 664)).

64.     Lender and Receiver submit that a review and weighing of the above factors strongly favors requiring the Manor Debtors to immediately decide whether to assume or reject their respective Leases.

### A.     The nature of the interests at stake

65.     The nature of the interests at stake suggests that a prompt assumption or rejection of the Manor Debtors' respective Leases is necessary to protect Lender's and Receiver's interests.

66.     The Manor Debtors operate personal care homes on the Trusts' properties. They contend that they have an interest in maintaining their businesses through these bankruptcy cases.

67.     Lender has an interest, through its liens and Security Agreements, in receiving the rents that the Manor Debtors owe to the Trusts. *See* ECF 41, at ¶ 27 (Case No. 25-15241); Mortgages; Security Agreements. The Manor Debtors have not paid rent to the Trusts since approximately February or March 2021. Lender, through its Mortgages and Security Agreements, has a lien on the rents due from the Manor Debtors to the

Trusts, and it has an interest in this bankruptcy to be paid those rents. *See* ECF 41, at ¶ 27 (Case No. 25-15241); Mortgages; Security Agreements.

68.    Likewise, the Receiver, pursuant to the Receiver Order, has direct standing to assert the interests of the Trusts in seeking the payment of the rents due from the Manor Debtors. *See* ECF 65, at ¶ 6 (Case No. 24-cv-02627) (granting the Receiver the authority to "commence, prosecute, continue or defend actions at law or in equity (in its own name or in the names of Whitehall [Trust] or Saucon [Trust]) that the Receiver deems necessary to protect or preserve the property, to recover possession of the Property, to collect the rents, or to evict or eject any tenants or occupants in accordance with applicable state laws"); ECF 58, at ¶ 6 (Case No. 24-cv-02709) (same).

69.    Moreover, despite their apparent interest in maintaining their businesses, the Manor Debtors' deteriorating financial situation also poses a risk to their ability to maintain their businesses and to do so in a way that does not put the residents of their personal care homes at risk.

70.    Vendors and service providers who contract to provide services to the Manor Debtors' residents cannot be expected to continue working indefinitely without payment from the Manor Debtors. There is a risk that if the Manor Debtors do not pay their vendors and providers, the vendors will stop providing critical services to the residents—i.e., food, medical supplies, medical services, maintenance, staffing, etc.

71.    The consequences for the residents if the above services are stopped would be severe. Allowing the Manor Debtors to operate personal care homes in their current state of financial disarray is reckless and jeopardizes the health and safety of the residents the Manor Debtors are supposed to be protecting.

72.    Lender and Receiver, on the other hand, are ready, willing, and able to effectuate the continued operation of the personal care homes and do so in a way that protects the health and safety of the residents of those facilities.

73.    Lender and Receiver are prepared to bring in a qualified, new operator who will maintain the businesses and continue running the personal care homes in a profitable manner and in such a way as to prevent any disruption in care to the current residents. In doing so, Lender and Receiver will ensure that there is a full continuation of services to the residents with no disruption to care and no gap in operations. Bringing in a new operator would also quell any potential public health concerns raised by the Manor Debtors' continuing to operate the facilities in their current financial state.

74.    Lender's and Receiver's proposed transition to a responsible, financially stable operator will better protect the residents than would maintaining the status quo with the Manor Debtors operating the facilities while deeply insolvent and continuously failing to meet their most basic obligations

75.    Allowing Lender and Receiver to bring in a new operator would effectuate not only the Manor Debtors' interest in maintaining the personal care homes, but it would also effectuate the Trusts', Lender's, and Receiver's interests by allowing the facilities to be run profitably. Once the personal care homes are generating revenue, the Trusts will be able to enforce any rent-payment obligations under a new lease with the new operator.

76.    Finally, Receiver has a strong interest in collecting rents from the Manor Debtors. That is precisely what Judge Henry appointed Receiver to do. As set forth in Judge Henry's opinion appointing Receiver and as summarized above, there exists a strong basis for Receiver's appointment, and Receiver's interests in this bankruptcy must be enforced.

77.    This factor weighs strongly in favor of the Court compelling the Manor Debtors to assume or reject their Leases promptly.

### B.    The balance of hurt to the litigants

78.    The harms the Lender and Receiver face by delaying the Manor Debtors' decision to assume or reject their Leases are far in excess of any risk the Manor Debtors face from having to make this decision sooner rather than later.

79.    The Manor Debtors have not paid rent at all for approximately five years and allowed a substantial real estate tax balance to accrue unpaid. Based on their own reports, and at a time when the Manor Debtors are *not* paying rent, the Manor Debtors are hemorrhaging cash. They are rapidly going in the direction of never being able to pay rent.  This directly harms Lender and Receiver, each of whom is entitled to and benefits from rent payments from the Manor Debtors.

80.    Further, the Manor Debtors' current financial situation suggests that the Manor Debtors cannot and will not be able to pay any of the post-petition rent, or the outstanding pre-petition rent, which is owed.

81.    To be able to assume their Leases, the Manor Debtors must pay all of these amounts. Based on their years-long failure to pay rent, and given their current dire financial situation, it is unlikely that the Manor Debtors will be able to assume their Leases. Thus, the Manor Debtors will not be harmed by this Court's setting a firm deadline for their decision to assume or reject their Leases.

82.    To the extent the Manor Debtors face any harm, it will be, by comparison, far less than the harm to the Lender and Receiver, who are continually being harmed by the Manor Debtors' failure to pay rent, as well as their current financial situation.

83.    Because requiring the Manor Debtors to assume or reject their Leases sooner, rather than later, poses little to no harm to the Manor Debtors, this factor weighs in favor of the Court compelling the Manor Debtors to assume or reject their Leases promptly.

### C.    The good to be achieved

84.    Given the Manor Debtors' deteriorating financial position, there is significant good in placing a limit on how long Manor Debtors can continue operating these personal care homes.

85.    As set forth above, the Manor Debtors' financial position creates a risk that their vendors and service providers will stop providing services to the residents if they are not paid by the Manor Debtors. This poses a serious health and safety risk to the residents of the Manor Debtors' facilities.

86.    By compelling the Manor Debtors to assume or reject their Leases promptly, and by granting Lender and Receiver relief from the automatic stay, it affords Lender and the Receiver the opportunity to bring in a new operator that can safely and profitably operate the personal care homes.

87.    Bringing in a responsible, financially stable operator will result in significant good, and will better protect the residents of the personal care homes than the current arrangement. Accordingly, this factor weighs in favor of the Court compelling the Manor Debtors to assume or reject their Leases promptly.

### D.    The safeguards afforded to those litigants

88.    There are no safeguards available to Lender and Receiver, other than the relief requested herein, protecting their security interests from the irreparable harm and

App.58

substantial risk to Lender's and Receiver's interests resulting from the Manor Debtors' bankruptcy cases and deteriorating financial position.

89.     Lender and Receiver need a prompt decision concerning the future of the Leases, and without such a decision have no other way to avoid the harms described herein.

90.     Thus, the Court should compel the Manor Debtors to assume or reject their Leases promptly.

**E.     Whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary**

91.     Setting a deadline for the Manor Debtors to assume or reject their Leases is expressly contemplated and permitted under Section 365(d)(2). Thus, this action is not "so in derogation of Congress' scheme" that it can said to be arbitrary.

**F.     The Debtors' inability to satisfy post-petition obligations**

92.     For all of the reasons explained above, there is little chance that the Manor Debtors will be able to satisfy any of their post-petition obligations. For approximately five years, the Manor Debtors have not paid rent at all and allowed a substantial real estate tax balance to accrue unpaid.

93.     As demonstrated by the Manor Debtors' own reports, they are losing cash, are insolvent, and are rapidly approaching a position where they will not be able to pay current rent, let alone the post-petition accrued balance, to say nothing of the millions of dollars of unpaid pre-petition rent. It is unlikely, then, that the Manor Debtors will be in a position to pay their post-petition obligations of $8,460,843.01 for Saucon Manor and $8,271,961.00 for Whitehall Manor. Accordingly, this factor weighs in favor of granting Lender and Receiver's requested relief.

### G.    The importance of the contract to the Debtors' business and reorganization

94.    The Leases are important to the Manor Debtors' businesses because without the Leases, the Manor Debtors cannot continue to operate their personal care homes on the Trusts' properties.

95.    To assume their Leases as part of their reorganization plan, the Manor Debtors will have to pay the full arrearages owed. Yet, as set forth above, the Manor Debtors are insolvent, and thus are not in a financial position to pay their obligations as necessary to assume their Leases.

96.    Without a lease for the Trusts' properties upon which the Manor Debtors can operate their personal care homes – and because the Trusts are no longer debtors in bankruptcy – the Manor Debtors do not have a viable plan for reorganization because they will no longer have a legal claim on the property on which they operate their businesses.

97.    Thus, although the Leases are important to the Manor Debtors' businesses, this factor weighs in favor of compelling the Manor Debtors to assume or reject their Leases immediately.

### H.    Whether the debtor has had sufficient time to appraise its financial situation

98.    By the time of the hearing on this Motion, the Manor Debtors will have had more than ample time to evaluate their financial situation and reach a decision concerning assumption or rejection of the Leases.

99.    These bankruptcy cases were not filed yesterday; they have been pending for almost three months already, and almost four by the time of the hearing on this Motion.

App.60

100.    Four months is the standard exclusive period for a debtor to propose a plan under 11 U.S.C. § 1121(b) ("[O]nly the debtor may file a plan until after 120 days after the date of the order for relief under this chapter.").

101.    Lender and Receiver submit that the Manor Debtors have had, and at all events will have had by the time of the hearing, sufficient time to evaluate whether to assume or reject the Leases.

102.    In particular, Lender and Receiver submit that this Court should promptly require the Manor Debtors' assumption or rejection of the Leases pursuant to Section 365(d)(2).

103.    Lender acknowledges that it has been a relatively short period of time since the Trusts' bankruptcy cases were dismissed by this Court on March 19, 2026. *See* ECF 264 (Case No. 25-15241). That makes this factor, at worst, neutral in the Court's analysis of whether to grant Lender and Receiver's Motion.

## I.    The damage the non-debtor will suffer beyond compensation available under the Bankruptcy Code

104.    If this Court does not grant the relief requested herein, Lender and Receiver face the risk of substantial harm, far beyond the compensation available under the Bankruptcy Code.

105.    Specifically, if the Manor Debtors cannot pay all accrued and unpaid lease obligations in order to assume their respective Leases - which seems increasingly likely – they will not be able to confirm a Chapter 11 plan. If the Manor Debtors cannot confirm a plan, their bankruptcy cases will either be converted to Chapter 7 or will be dismissed.

106.    If these Chapter 11 bankruptcy cases are converted to Chapter 7 or are dismissed, Lender will suffer damage because Lender will only get the value of the

27

App.61

property. But Lender will get nothing from its security interest in the Manor Debtors' accrued and unpaid rent, for which Lender has a lien. *See* ECF 41, at ¶ 27 (Case No. 25-15241); Mortgages; *see also Union Meeting Partners*, 178 B.R. at 674-75. These harms are not compensable under the Bankruptcy Code.

107.   An order from this Court directing the Manor Debtors to assume or reject their Leases, however, would eliminate the prospect of any of these harms.

### J.   Weighing all these factors together should tip in favor of setting an immediate deadline for assumption or rejection

108.   Lender and Receiver submit that weighing the factors that courts have identified as relevant under Section 365(d)(2) decisively favors setting a short deadline. The potential harms Lender and Receiver face is substantial and overwhelms any risk the Manor Debtors would take on in being compelled to make a prompt decision on assuming or rejecting their respective Leases. The factors that ordinarily might favor giving a debtor a longer time, such as a need for time for the debtors to analyze their financial situation, exclusivity, or the purposes of Chapter 11, are not substantial in these bankruptcy cases given that this is not the first day or month of these cases.

### II.   The Court Should Determine that the Cure Amount for Pre-Petition Defaults Under the Manor Debtors' Leases is $8,460,843.01 for Saucon Manor and $8,271,961.00 for Whitehall Manor

109.   Lender and Receiver request that this Court: (a) find that the amount necessary to cure the Manor Debtors' pre-petition defaults under their Leases is $8,460,843.01 for Saucon Manor and $8,271,961.00 for Whitehall Manor; and (b) direct the Manor Debtors to pay Lender and Receiver that amount promptly as a condition of assumption of their Leases. *See* Whitehall Manor Proof of Claim, ECF 44 (Case No. 25-15245); Saucon Manor Proof of Claim, ECF 26 (Case No. 25-15244)

110.    Section 365(b)(1) of the Bankruptcy Code provides:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee--
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default ...;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

111.    As set forth above and in the proofs of claim submitted by Receiver, the amount of $8,460,843.01 for Saucon Manor and $8,271,961.00 for Whitehall Manor remains due for the Manor Debtors' pre-petition lease obligations. *See* Whitehall Manor Proof of Claim, ECF 44 (Case No. 25-15245); Saucon Manor Proof of Claim, ECF 26 (Case No. 25-15244).

112.    In addition, post-petition rents are accruing at the rate of $139,000 per month for Whitehall Manor and $142,118 for Saucon Manor. Unpaid post-petition rent must also be paid to cure defaults in order to assume the Leases.

113.    Accordingly, this Court should find that the Manor Debtors' pre-petition payment default under their respective Leases was $8,460,843.01 for Saucon Manor and $8,271,961.00 for Whitehall Manor, and direct prompt payment of all pre- and post-petition arrearages as a condition of the Manor Debtors' assuming their Leases.

App.63

### III.   Alternatively, the Court Should Grant Lender and Receiver Relief from the Automatic Stay

114.    In the alternative, Lender and Receiver respectfully request that the Court grant them relief from the automatic stay to allow them to take possession of the properties and evict the Manor Debtors and bring in a new, qualified operator to maintain and continue operating the personal care homes.

115.    The Manor Debtors' Leases, by their terms, expired approximately two years before the bankruptcy on August 31, 2023. Specifically, the operative Third Amendment to the Whitehall Lease Agreement states that "the original termination date of August 31, 2018 is now agreed to be August 31, 2023." Ex. A, Whitehall Lease Agreement. Although the Fourth Amendment to the Whitehall Lease sought to extend the term of the Lease, the December 19 Order declared that Amendment null and void and of no legal effect, meaning the Whitehall Lease expired by its terms on August 31, 2023.

116.    The operative Fifth Amendment to the Saucon Lease Agreement provides that "the parties hereto extend the Term of the Lease through August 31, 2023." Saucon Lease Agreement. Although the Saucon Lease Agreement contains automatic renewal language, an automatic renewal will not occur where the lessee – Saucon Manor – failed to pay rent for five years. Here, Saucon Manor stopped paying rent in 2021. As a result of this non-payment of rent, the automatic renewal following the August 31, 2023 expiration date did not occur. Therefore, the Saucon Lease expired by its terms on August 31, 2023.

117.    Accordingly, the Manor Debtors have been operating their personal care homes without a lease since the expiration of their respective Leases on August 31, 2023, more than two years before the Manor Debtors filed for bankruptcy.

118. Because the Manor Debtors' Leases have expired, the Manor Debtors cannot assume them pursuant to Section 365. *See In re Burch*, 401 B.R. 153, 157 (E.D. Pa. 2008) ("Where a lease is expired at the time of bankruptcy filing, there is nothing for the debtor to assume, even if it can be established that adequate assurance of performance exists."); *In re Turner*, 326 B.R. 563, 578 (W.D. Pa. 2005) ("Since the lease expired, Turner holds no interest capable of assumption pursuant to 11 U.S.C. § 365(d).").

119. Specifically, the Bankruptcy Court for the Western District of Pennsylvania reasoned as follows in *Turner*:

> Prior to the filing of this bankruptcy, the lease between Turner and Crawford naturally ended according to its express terms. . . . Accordingly, at the time of filing this [bankruptcy] action, although Turner remained in possession, she held no recognizable legal interest in the lease. Pursuant to Pennsylvania law, although Turner may have retained an equitable interest in the property as a tenant at sufferance or "squatter" in an expired lease, this mere possessory interest is not equivalent to an interest in an unexpired lease. Since the lease expired, Turner holds no interest capable of assumption pursuant to 11 U.S.C. § 365(b).

*In re Turner*, 326 B.R. at 578.

120. Here, because the Manor Debtors cannot assume their expired Leases, cause exists to grant Lender and Receiver relief from the automatic stay. Section 362(d) of the Bankruptcy Code provides that:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating ... such stay ... for cause, including the lack of adequate protection of an interest in property of such party in interest.

11 U.S.C. § 362(d)(1).

121. Expiration of a lease by its express terms is "cause" for granting relief from the automatic stay under Section 362(d)(1). *See Burch*, 401 B.R. at 157 ("If Movants are

correct that Debtor's interest in the Lease has been properly terminated, then 'cause' exists under § 362(d)(1) to grant relief from the stay to allow Movants to exercise their state law remedies against Debtor."); *see also In re Johnson*, No. 15-00104-NPO, 2015 WL 1508460, at * 6 (Bankr. D. Miss. Mar. 27, 2015) ("[C]ourt have held that a debtor's inability to assume a lease constitutes 'cause' for relief from the automatic stay under § 362(d)(1).") (collecting cases). In *Burch*, the Bankruptcy Court for the Eastern District of Pennsylvania concluded that "termination of Debtor's Lease by reason of the expiration of its term and the provision of proper written notice was effective and precludes her from having any leasehold interest to be assumed under a Chapter 13 plan. As such, there is cause for relief under § 362(d)(1)." *Burch*, 401 B.R. at 160.

122.   Granting relief from the automatic stay will not cause irreparable harm to the Manor Debtors. The Manor Debtors no longer have valid, enforceable Leases for the Trusts' properties, meaning they cannot assume these Leases as part of their Chapter 11 plan of reorganization. *See Burch*, 401 B.R. at 157; *Turner*, 326 B.R. at 578. Courts routinely grant relief from the automatic stay to parties when the debtor's lease expired by its express terms before the bankruptcy. *See Burch*, 401 B.R. at 160; *Johnson*, 2015 WL 1508460, at * 6. Further, because their Leases are expired, there is no realistic prospect for the Manor Debtors' reorganization under Chapter 11.

123.   The Manor Debtors' possible reorganization is made even more unlikely as a result of this Court's dismissal of the Trusts from the bankruptcy cases. *See* ECF 264 (Case No. 25-15241). The properties on which the Manor Debtors operate their personal care homes are owned by the Trusts. Because the Trusts are no longer part of the bankruptcy, their properties are not a part of the bankruptcy estates. Without ownership

32

App.66

or a valid lease of the properties upon which the Manor Debtors operate their personal care homes, the Manor Debtors' Chapter 11 bankruptcy cases have no viable foundation.

124.    Conversely, maintaining the status quo – in which the Manor Debtors continue to operate their personal care homes on properties that they do not own, and under Leases that have expired, while accumulating additional unpaid obligations (in addition to their unpaid rent obligations) – is an ongoing source of harm to Lender, Receiver, the residents of the Manor Debtors' personal care homes, and to the public interest.

125.    Indeed, if the Court were to allow this current status quo to persist by denying Lender and Receiver relief from the automatic stay, then Lender and Receiver will suffer irreparable harm. The Manor Debtors will continue operating their personal care homes without a valid lease, without sufficient capital to pay rent or their vendors who are providing services to the residents at the facilities, and increasing the risk to Lender and Receiver that the Manor Debtors will diminish the value of the property during the course of the bankruptcy.

126.    Lender and Receiver are clearly entitled to relief from the automatic stay because the expiration of the Manor Debtors' Leases constitutes "cause" under Section 362(d)(1). Manor Debtors have no legal claim to the property on which they operate their personal care homes and thus have no viable chance of a successful reorganization under Chapter 11. And Lender and Receiver will continue suffering harm if relief from the automatic stay is not granted.

127.    For the same reasons, to the extent the Court sets a deadline for the Manor Debtors to assume or reject their Leases, and the Manor Debtors elect to reject their

Leases, the Lender and Receiver request relief from the automatic stay to retake possession of the properties upon such rejection.

WHEREFORE, the Lender and Receiver respectfully request that this Court enter an order: (1) compelling the Manor Debtors to assume or reject their Leases; (2) determining that the amount required to cure the Manor Debtor's pre-petition default on the Leases is $8,460,843.01 for Saucon Manor and $8,271,961.00, and requiring that the Manor Debtors pay all amounts necessary to cure existing pre- and post-petition defaults as a condition of assuming the Leases; and (3) granting Lender and Receiver relief from the automatic stay.

Respectfully Submitted,

HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER

Dated: March 31, 2026

By: */s/ Matthew A. Hamermesh*
 Matthew A. Hamermesh
 Sara E. Smith
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
(215) 568-6200
mhamermesh@hangley.com

BERGER LAW GROUP, P.C.
Phillip D. Berger
919 Conestoga Road, Building 3, Suite 114
Bryn Mawr, PA 19010
(610) 668-0800
Berger@BergerLawPC.com

*Attorneys for Secured Creditor Lehigh Valley 1, LLC*

-and-

34
App.68

DUANE MORRIS LLP

By: */s/ Brett L. Messinger*
     Brett L. Messinger
30 S. 17th Street
Philadelphia, PA 19103
215-979-1508
blmessinger@duanemorris.com

*Attorneys for Receiver Duane Morris LLP,
by Erin Duffy, Esquire*

App.69

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re: | Chapter 11 |
| WHITEHALL MANOR, Inc.,<br>*Debtor*. | Case No. 25-15245 (PMM)<br>(Jointly Administered) |

**ORDER: (1) COMPELLING MANOR DEBTORS TO ASSUME
OR REJECT THEIR LEASES, (2) AUTHORIZING DEBTORS
TO ASSUME OR REJECT LEASES WITHOUT FURTHER
MOTION OR HEARING AND (3) GRANTING JOINT MOTION
FOR RELIEF FROM THE AUTOMATIC STAY**

AND NOW, this _____ day of _____, 2026, upon consideration of the Joint Motion of Secured Creditor Lehigh Valley 1, LLC ("Lender") and Receiver Duane Morris LLP through Erin Duffy, Esquire ("Receiver") for entry of an Order compelling the Manor Debtors to assume or reject their leases pursuant to 11 U.S.C. § 365(d)(2) and for relief from the automatic stay ("Motion"), and any responses thereto and hearing and argument thereon; and this Court having found that (i) this Court has jurisdiction to consider the Motion and the relief requested therein under 28 U.S.C. §§ 157 and 1334, (ii) this Court may enter an order consistent with Article III of the United States Constitution, (iii) this is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (iv) venue of this proceeding and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409, (v) notice of the Motion and opportunity for a hearing were adequate and appropriate under the circumstances and no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor,

It is hereby **FOUND** and **ORDERED** that the Motion is granted as set forth herein:

App.70

1.      On or before 5:00 p.m. on _____, the Manor Debtors[1] shall decide whether to assume or reject the Leases, immediately file with this Court a Notice of Assumption or Notice of Rejection, as appropriate, reflecting that decision, and serve a copy of such Notice on Lender and Receiver.

2.      The amount required to cure any pre-petition default under the Leases is $8,460,843.01 for Saucon Manor and $8,271,961.00 for Whitehall Manor.

3.      The amount required to cure any post-petition default under the Leases as of _____ is _____.

4.      If the Manor Debtors choose to assume the Leases, assumption of the Leases is hereby approved subject to payment of all pre- and post-petition arrearages. Assumption of the Leases shall take effect after and only upon payment in full of the pre- and post-petition arrearages due to the Lender or Receiver.

5.      If the pre- and post-petition arrearages are not paid in full within ten days of the Manor Debtors' filing of a Notice of Assumption of the Leases, the Leases shall be deemed rejected effective immediately.

6.      If the Manor Debtors choose to assume the Leases, to the extent the Lender or Receiver become aware, subsequent to assumption of the Leases, of other amounts due under the Leases with respect to any period of time prior to the date of assumption, the Manor Debtors shall promptly pay those amounts upon request of the Lender or Receiver.

7.      If the Manor Debtors choose to reject their Leases, such rejection shall take effect immediately.

---

[1] All capitalized terms used but not defined herein shall bear the meaning set forth in the Motion.

8. Upon rejection or deemed rejection of the Leases as set forth above, the automatic stay pursuant to section 362 of the Bankruptcy Code, 11 U.S.C. § 362, is hereby modified and vacated effective immediately to allow the Lender and Receiver to pursue any and all remedies or other actions with respect to the Manor Debtors and the Leases, including, without limitation, to take possession of the properties, evict the Manor Debtors, and engage another operator or operators to manage the personal care homes located at the properties, including, without limitation, filing any actions in any appropriate court and obtaining and executing on any judgments appropriate to effectuate the foregoing.

9. The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

10. This Court waives any automatic stay of this Order, including, without limitation, pursuant to Fed. R. Bankr. P. 4001(a)(3), and this Order shall take immediate effect.

BY THE COURT:

Dated: _____          _____
                               Patricia M. Mayer
                               Judge, United States Bankruptcy Court

3

App.72

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 11 |
| WHITEHALL MANOR, Inc., <br> *Debtor.* | Case No. 25-15245 (PMM) <br> (Jointly Administered) |

**ORDER GRANTING JOINT MOTION FOR RELIEF FROM
THE AUTOMATIC STAY**

AND NOW, this _____ day of _____, 2026, upon consideration of the Joint Motion of Secured Creditor Lehigh Valley 1, LLC ("Lender") and Receiver Duane Morris LLP through Erin Duffy, Esquire ("Receiver") for entry of an Order compelling the Manor Debtors to assume or reject their leases pursuant to 11 U.S.C. § 365(d)(2) and for relief from the automatic stay ("Motion"), and any responses thereto and hearing and argument thereon; and this Court having found that (i) this Court has jurisdiction to consider the Motion and the relief requested therein under 28 U.S.C. §§ 157 and 1334, (ii) this Court may enter an order consistent with Article III of the United States Constitution, (iii) this is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (iv) venue of this proceeding and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409, (v) notice of the Motion and opportunity for a hearing were adequate and appropriate under the circumstances and no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor,

It is hereby **FOUND** and **ORDERED** that the Motion is granted as set forth herein:

1. The Court finds that the terms of the Leases expired before the Petition Date, December 26, 2025, and the Manor Debtors have no remaining legal or equitable

App.73

interest in the Properties. Accordingly, cause exists to modify any stay to the extent applicable.

2. The automatic stay pursuant to section 362 of the Bankruptcy Code, 11 U.S.C. § 362, is hereby modified and vacated effective immediately to allow the Lender and Receiver to pursue any and all remedies or other actions with respect to the Manor Debtors and the Leases, including, without limitation, to take possession of the properties, evict the Manor Debtors, and engage another operator or operators to manage the personal care homes located at the properties, including, without limitation, filing any actions in any appropriate court and obtaining and executing on any judgments appropriate to effectuate the foregoing.

3. The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

4. This Court waives any automatic stay of this Order pursuant to Fed. R. Bankr. P. 4001(a)(3), and this Order shall take immediate effect.

BY THE COURT:

Dated: _____          _____
Patricia M. Mayer
Judge, United States Bankruptcy Court

App.74

App.75

# EXHIBIT A

LEASE AGREEMENT
DATED AND EFFECTIVE AS OF August _14_ , 2008

By and Between
WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007,
a Pennsylvania Trust, as Owner and Lessor

and

WHITEHALL MANOR, INC.,
a Pennsylvania corporation, as Lessee

## Table of Contents

Page

ARTICLE I        DEFINITIONS ............................................................................................ 1
   1.01          Definitions.............................................................................................1

ARTICLE II       LEASE OF LEASED PREMISES, TERM OF LEASE ................................... 5
   2.01          Lease of Leased Premises ......................................................................5
   2.02          Term of Lease .......................................................................................5
   2.03          Subordination........................................................................................5
   2.04          Quiet Enjoyment ...................................................................................6
   2.05          Ownership of Capital Improvements .....................................................6
   2.06          No Personal Liability ............................................................................6

ARTICLE III      HUD REQUIREMENTS ........................................................................... 6
   3.01          Precedence of Article III .......................................................................7
   3.02          Assignment and Subletting ....................................................................7
   3.03          Compliance With HUD Requirements and Terms of Mortgage
                  Loan Documents ...................................................................................7
   3.04          Acknowledgment ...................................................................................7
   3.05          License; Bed Authority ..........................................................................7
   3.06          Financial Statements .............................................................................7
   3.07          Medicaid and Medicare..........................................................................8
   3.08          State Licensure Requirements................................................................8
   3.09          MAP Guide Requirements......................................................................8
   3.10          Execution of Lessee Regulatory Agreement by Lessee ..........................8
   3.11          Management Contract Requirements......................................................8
   3.12.         Inspections ...........................................................................................8
   3.13          Insurance ..............................................................................................8
   3.14          Certain Payments ..................................................................................8
   3.15          Eminent Domain ...................................................................................9
   3.16          Ownership of Capital Improvements .....................................................9

ARTICLE IV       RENTALS; APPLICATION OF GROSS REVENUES................................. 9
   4.01          General Obligation.................................................................................9
   4.02          Rental Payments....................................................................................9
   4.03          Security Interest In Gross Revenues .....................................................9
   4.04          Obligations Unconditional ...................................................................10
   4.05          Net Lease.............................................................................................10

ARTICLE V        COVENANTS AND REPRESENTATIONS OF THE LESSEE................... 10
   5.01          Maintenance and Operation of Leased Premises ...................................10

| 5.02 | Maintenance of Entity Existence | 11 |
| 5.03 | Management | 11 |
| 5.04 | Payment of Lawful Taxes and Charges; Discharge of Liens | 12 |
| 5.05 | Compliance With Law | 12 |
| 5.06 | Additions and Alterations | 12 |
| 5.07 | Financial and Other Restrictions | 13 |
| 5.08 | Inspections | 13 |
| 5.09 | Assignment and Subletting | 14 |
| 5.10 | Indemnification Concerning the Leased Premise | 14 |
| 5.11 | Representations of the Lessee | 14 |

| ARTICLE VI | INSURANCE AND CONDEMNATION | 16 |
| 6.01 | Insurance Coverage and Terms | 16 |
| 6.02 | Insurance Proceeds | 16 |
| 6.03 | Eminent Domain | 16 |

| ARTICLE VII | DEFAULT AND REMEDIES | 16 |
| 7.01 | Events of Default | 16 |
| 7.02 | Remedies | 17 |
| 7.03 | Cumulative Rights; No Implied Waiver | 18 |

| ARTICLE VIII | MISCELLANEOUS | 18 |
| 8.01 | Surrender of Possession | 18 |
| 8.02 | Successors and Assigns | 18 |
| 8.03 | Severability | 18 |
| 8.04 | Counterparts | 18 |
| 8.05 | Notices | 18 |
| 8.06 | Headings | 19 |
| 8.07 | Non-Waiver | 19 |
| 8.08 | Amendments | 19 |
| 8.09 | No Recording | 19 |
| 8.10 | Estoppel Certificates | 19 |
| 8.11 | Governing Law | 19 |
| 8.12 | Entirety of Agreement | 19 |

II

## LEASE AGREEMENT

This LEASE AGREEMENT, (the "Lease Agreement"), is made and dated as of August _14_, 2008, by and between WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST u/t/a dated August 1, 2007 (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Whitehall Fiduciary LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;
AND

WHITEHALL MANOR, INC., (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner desires to lease to the Lessee the Leased Premises (hereinafter defined) on the terms and conditions set forth herein; and

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

The Owner and the Lessee hereby mutually covenant and agree as follows:

1.01    Definitions.

(a)    The following terms shall have the meanings specified below:

"Capital Additions" means property of any kind acquired, constructed or rehabilitated by the Owner or Lessee which is used or useful in connection with the Leased Premises and which is properly chargeable to the plant or property account under generally accepted accounting principles including, without limitation, land, easements, rights-of-way, leaseholds, other interests in real property, personal property, equipment, replacements of property retired or rendered obsolete, and permanent additions and betterments.

"Department of Public Health" means the Pennsylvania Department of Public Welfare.

"Event of Default" means any of the events described in Section 7.01 of this Lease Agreement.

"FHA" means the Federal Housing Administration.

1

"Fiscal Year" means the twelve month period hereby designated by the Owner and the Lessee for financial reporting purposes beginning on the first day of January in any calendar year and ending on the thirty-first day of December of such calendar year.

"Gross Revenues" means all revenues, receipts, income and other moneys at any time received by or on behalf of the Lessee from the operation of the Leased Premises, including, without limitation, revenues derived from the operation of the Leased Premises and all rights to receive the same whether in the form of accounts receivable, contract rights, chattel paper, instruments or other rights, and the proceeds thereof, and any insurance thereon, whether now existing or hereafter coming into existence and whether now owned or held or hereafter acquired by the Lessee, but excluding the proceeds of any loans to the Lessee and partnership contributions and insurance proceeds and eminent domain awards.

"HUD" means the U.S. Department of Housing and Urban Development.

"HUD Requirements" means Section 232 of the National Housing Act of 1934, as amended; any and all regulations now or hereafter adopted pursuant to such Section 232; and any and all HUD rules, requirements and/or handbooks now or hereafter applicable to the Leased Premises.

"Indemnified Parties" means the Lender, the Owner and any person who "controls" the Owner within the meaning of Section 15 of the Securities Act of 1933, as amended; any member, officer, director, official, employee, agent, general partner, limited partner and attorney of the Owner or the Lender; and their respective executors, administrators, heirs, successors and assigns (excluding the Lessee).

"Leased Premises" means all the land located at, and known and identified as Unit 1 of Whitehall Manor Condominium, as Declared by Declaration of Condominium dated August 13, 2008 and recorded in the Office of the Recorder of Deeds in and for Lehigh County, Pennsylvania, said premises being situate in the Township of Whitehall, Lehigh County, Pennsylvania, and more particularly described in Exhibit A attached to this Lease Agreement, together with any additions thereto and substitutions therefor and any buildings, improvements, betterments, fixtures, equipment, furnishings, and other property, real or personal, now existing or at any time acquired, constructed or located thereon, including any Capital Additions.

"Lease Term" means the duration of the term created in this Lease Agreement as specified in Section 2.02.

"Lender" means M&T Realty Capital Corporation, and any future holder of the Mortgage.

"Lessee Regulatory Agreement" means the Regulatory Agreement-Nursing Homes entered into by and between the Lessee and HUD with respect to the Leased Premises.

2

"Lessee Security Agreement" means that certain Lessee Security Agreement between Lessee and Lender with respect to the Leased Premises securing the Mortgage Loan, and any amendments or supplements thereto.

"Mortgage" means that certain Mortgage from the Owner to the Lender with respect to the Leased Premises securing the Mortgage Loan, and any amendments and supplements thereto.

"Mortgage Loan" means the FHA-insured mortgage loan in the original maximum principal amount of up to $15,788,700.00 made by Lender to the Owner, secured, in part, by the Leased Premises, as the same may be amended, increased or decreased.

"Mortgage Loan Documents" means the Lessee Regulatory Agreement, the Owner Regulatory Agreement, the Mortgage, the Security Agreement, the Mortgage Note evidencing the Mortgage Loan executed by the Owner in favor of the Lender, the Lessee Security Agreement entered into by and between the Lessee and Lender with respect to the Leased Premises, and any and all other documents required by HUD and/or the Lender in connection with the Mortgage Loan.

"Operating Expenses" means all expenses required in operating and maintaining the Leased Premises, including, in each case, without limitation, (i) expenses of operation of the Leased Premises, including utilities, maintenance, repair, alteration, insurance and inspection expenses, (ii) expenses of professional, managerial, supervisory, administrative, engineering, architectural, legal, auditing and consulting services, (iii) sums payable to any Person, which sums, under generally accepted accounting principles, constitute expenses of operation and maintenance, and (iv) all taxes, assessments and other governmental charges, including, without limitation, property, franchise and excise taxes, but excluding taxes levied on income and/or profits of the Owner and/or Lessee. Operating Expenses shall exclude Rent. Operating Expenses shall also include deductibles relating to casualty losses of a part of the Property and shall also include all regular and special assessments due to the condominium association of which the Leased Premises forms a part.

"Owner Regulatory Agreement" means the Regulatory Agreement entered into by and between the Owner and HUD with respect to the Leased Premises.

"Person" means any natural person, corporation, partnership, limited liability company, trust, agency or other entity.

"Rent" means the payments of rent in respect of the Leased Premises required pursuant to Section 4.02.A of this Lease Agreement.

"Security Agreement" means that certain Security Agreement between Owner and Lender with respect to the Leased Premises securing the Mortgage Loan, and any amendments and supplements thereto.

3

        (b)     Words importing persons shall include firms, associations and corporations, and words importing the singular number shall include the plural number and vice versa.

4

App.82

## ARTICLE II

## LEASE OF LEASED PREMISES; TERM OF LEASE

2.01    Lease of Leased Premises. The Owner hereby leases to the Lessee, and the Lessee hereby leases from the Owner, the Leased Premises on the terms and conditions set forth in this Lease Agreement.

2.02    Term of Lease. The Lease Term for the Leased Premises shall commence on the date hereof and shall expire on August 31, 2018, or such earlier date as may be hereinafter provided. In addition, the Lessee shall have the option to extend the Lease Term for three (3) successive periods of five (5) years each upon the terms and conditions contained herein, upon written notice to the Owner given not later than one hundred eighty (180) days prior to the expiration of the initial Lease Term or extended Lease Term, as the case may be.

2.03.    Subordination. This Lease Agreement is and shall be subject and subordinate to the Mortgage and other Mortgage Loan Documents; to all renewals, modifications, consolidations, replacements and extensions thereof; to all substitutions therefor; and to all future mortgages upon the Leased Premises and/or other security interests in or to the Leased Premises and any other items which are herein leased to Lessee or which, pursuant to the terms hereof, become a part of the Leased Premises or are otherwise deemed to become the property of Owner or to remain upon the Leased Premises at the end of the Term; and to each advance made or hereafter to be made under any of the foregoing. This Section 2.03 shall be self-operative and no further instrument of subordination shall be required. The Lessee agrees to execute and deliver promptly any and all certificates, agreements and other instruments that the Owner or Lender may reasonably request in order to confirm such subordination. If the Lender shall succeed to the interest of the Owner, then this Lease Agreement shall terminate, or, at the option of the Lender, this Lease Agreement shall nevertheless continue in full force and effect, in which case the Lessee shall and does hereby agree to attorn to the Lender and to recognize the Lender as its landlord under the terms of this Lease Agreement. Any agreements entered into by the Lessee for provision of services to the Leased Premises or the granting of easements, rights of way or other allowances of use or placement of CATV, utilities or other items are, and shall always be, subordinate to (i) the rights of Owner, and (b) the Mortgage and other Mortgage Loan Documents and all other mortgages and security interests now or hereafter encumbering the Leased Premises and/or the property of which it forms a part.

If this Lease Agreement or the Rent due hereunder is assigned to the Lender as collateral security for the Mortgage Loan, the Lender shall not be deemed to have assumed any of the Owner's obligations under this Lease Agreement solely as a result of such assignment. The Lender to whom this Lease Agreement has been so assigned shall be deemed to have assumed such obligations only if (i) by the terms of the instrument of assignment the Lender specifically elects to assume such obligations, or (ii) Lender has (a) foreclosed its mortgage, (b) accepted a deed in lieu thereof, or (c) taken possession of the Leased Premises by entry or otherwise. Even if the Lender so assumes the obligations of the Owner under this Lease Agreement, the Lender will be liable for breaches under this Lease Agreement only to the extent such breaches occur

5

during the period of ownership by the Lender after foreclosure (or after any conveyance by a deed in lieu of foreclosure) and then only to the extent of Lender's interest in the Leased Premises. The Lessee hereby consents to the assignment of this Lease Agreement as provided in the Mortgage.

2.04    Quiet Enjoyment. The Owner covenants and agrees with the Lessee that so long as the Lessee is in compliance with its obligations under this Lease Agreement, including the payment of the Rent and the other payments required under this Lease Agreement and the observance and performance of all the terms, covenants, and conditions on the Lessee's part to be observed and performed, and subject to the provisions of Section 2.03 of this Lease Agreement, the Lessee may peaceably and quietly have, hold and enjoy the Leased Premises for the Lease Term, subject to easements, agreements, restrictions, and covenants of record. The foregoing is subject to the rights reserved to Owner and/or the Declarant and/or others in the Declaration Condominium for the Property of which the Leased Premises is a part.

2.05    Ownership of Capital Improvements. Any and all buildings and improvements now existing and/or hereafter erected on the Leased Premises; any betterments made to the Leased Premises; any and all personal property, equipment, furniture, fixtures, computers, accessories and supplies of all kinds now or hereafter located on and/or used in connection with the Leased Premises; and all additions, substitutions, and replacements thereto during the Lease Term (hereinafter collectively called "Personal Property") shall be owned by the Owner, Lessee hereby conveying any and all such Personal Property to Owner;

Lessee agrees not to remove any Personal Property from the Leased Premises except to replace such Personal Property with other similar items of equal or greater quality and value, which items shall immediately become and remain the property of the Owner.

2.06    No Personal Liability. No recourse under or upon any obligation, covenant or agreement of this Lease Agreement or for any claim based thereon or otherwise in respect thereof, shall be had against any partner (general or limited), member, manager, officer, director, shareholder or employee, trustee, as such, past, present or future, of the Owner or of any successor entity, either directly or through the Owner, at law or in equity, whether by virtue of any constitution, statute or rule of law or by the enforcement of any assessment or penalty, or otherwise; it being expressly understood that no such personal liability whatever shall attach to, or is or shall be incurred by, any such Person, under or by reason of the obligations, covenants or agreements contained in this Lease Agreement or implied herefrom; and that any and all such personal liability, either at common law or in equity or by constitution or statute, of, and any and all such rights and claims against, every such Person under or by reason of the obligations, covenants or agreements contained in this Lease Agreement, or implied herefrom, are hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Lease Agreement.

## ARTICLE III

## HUD REQUIREMENTS

6

3.01    Precedence of Article III.  For so long as, and only for so long as, HUD is the holder or insurer of any indebtedness secured by the Leased Premises, the provisions of this Article III shall apply to this Lease Agreement, notwithstanding anything herein to the contrary. This Article III shall not be amended without the prior written consent of HUD and the Lender.

3.02    Assignment and Subletting.  This Lease Agreement shall not be assigned, in whole or in part (including any transfer of title or right to possession and control of the Leased Premises, or of any right to collect fees or rents), without the prior approval of HUD. Owner and Lessee acknowledge that any proposed assignee will be required to execute a Lessee Regulatory Agreement with HUD as a prerequisite to any such approval. Any consent by Owner to any sublease by the Lessee of the Leased Premises or any portion thereof may be given only upon compliance with the Mortgage Loan Documents and applicable HUD Requirements.

3.03    Compliance With HUD Requirements and Terms of Mortgage Loan Documents. The Lessee agrees to comply with all HUD Requirements that are applicable to the Leased Premises. The Lessee agrees that it will not take any action which would violate any applicable provision of any of the Mortgage Loan Documents.

In the event of any conflict between the terms and provisions of this Lease Agreement and any applicable HUD Requirements or the Mortgage Loan Documents, the HUD Requirements and Mortgage Loan Documents shall control in all respects. Owner and Lessee agree that no provision of this Lease Agreement shall modify any obligation of Owner or Lessee under the Mortgage Loan Documents. Owner and Lessee acknowledge that HUD's acceptance of this Lease Agreement in connection with the closing of the Mortgage Loan shall in no way constitute HUD's consent to arrangements which are inconsistent with HUD Requirements. This Lease Agreement is subordinate and subject to the Mortgage Loan Documents and to all HUD Requirements.

3.04    Acknowledgment.  Owner and Lessee each acknowledges and agrees that the Rent and other amounts payable by Lessee under this Lease Agreement (including Rent, additional rent and all other sums payable under this Lease Agreement) are sufficient to properly maintain the Leased Premises, and to enable the Owner to meet its debt service obligations and related expenses in connection with the Mortgage Loan and the Leased Premises. Owner and Lessee each acknowledges and agrees that the terms and provisions of this Lease Agreement are comparable to the terms and provisions of leases of comparable facilities in the market.

3.05    License; Bed Authority.  Owner and Lessee agree not to undertake or acquiesce to any modification to the assisted living facility license with respect to the Leased Premises or to any "bed authority" related thereto without the prior written approval of HUD.

3.06    Financial Statements.  Lessee agrees to furnish HUD and Lender copies of its annual financial statements with respect to the Leased Premises within sixty (60) days after the close of Lessee's fiscal year or such longer period as may be permitted by HUD.

7

App.85

3.07    Medicaid and Medicare.    Lessee shall be responsible for obtaining and maintaining all necessary licensure, and provider agreements for Medicaid and Medicare residents in the event the Leased Premises has a dual certification. Lessee agrees to furnish HUD and Lender with copies of all such provider agreements.

3.08    State Licensure Requirements.    Lessee shall ensure that the Leased Premises meets all state licensure requirements and standards at all times.

3.09    MAP Guide Requirements.    Owner and Lessee acknowledge and agree that this Lease Agreement complies with applicable requirements of Section 3.9.G of the Multifamily Accelerated Processing Guide dated May 17, 2000, as the same may have been amended, promulgated by the Office of the Assistant Secretary for Housing – FHA Commissioner.

3.10    Execution of Lessee Regulatory Agreement by Lessee.    At the time of the closing of the Mortgage Loan, the Lessee agrees to execute the Lessee Regulatory Agreement. The Lessee agrees to comply with its obligations under the Lessee Regulatory Agreement, and agrees that a default by the Lessee under the Lessee Regulatory Agreement shall be deemed to be a default under this Lease Agreement.

3.11    Management Contract Requirements.    The Lessee agrees not to enter into any management contract involving the Leased Premises unless such management contract shall contain provisions that, in the event of default under the Owner Regulatory Agreement or the Lessee Regulatory Agreement, the management agreement shall be subject to termination upon not more than thirty (30) days notice without penalty upon written request of HUD. Upon such HUD termination request, the Lessee shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to HUD for continuing proper management of the Leased Premises.

3.12.    Inspections.    The Lessee agrees that upon reasonable request, the Lender and/or HUD and their designees and representatives may exercise all rights of examination and inspection that are afforded to the Owner under Section 5.08 of this Lease Agreement.

3.13    Insurance.    The Lessee agrees to procure and maintain, or cause to be procured and maintained, the insurance coverages required pursuant to the Mortgage Loan Documents and/or applicable HUD Requirements, including HUD Notices 04-01 and 04-15. Insurance proceeds shall be applied in accordance with the terms of the Mortgage Loan Documents and applicable HUD Requirements. The decision to repair, reconstruct, restore or replace the Leased Premises shall be made by the Owner, subject to the terms of the Mortgage Loan Documents and applicable HUD Requirements.

3.14    Certain Payments.    The Lessee agrees to pay, as Additional Rent, when due all premiums for (i) FHA mortgage insurance, (ii) liability insurance and full coverage hazard insurance on the Leased Premises, and (iii) all other insurance coverages required under the Mortgage Loan Documents and/or applicable HUD Requirements, and to treat such payments as Operating Expenses. Unless the Lender and Owner agree otherwise, the Lessee shall be

8

responsible for funding all escrows for taxes, reserves for replacements, mortgage insurance premiums, and/or other insurance premiums as may be required by the Lender and/or FHA.

3.15    Eminent Domain.    The proceeds of any condemnation award or other compensation paid by reason of a conveyance in lieu of the exercise of such power, with respect to the Leased Premises or any portion thereof shall be applied in accordance with the terms of the Mortgage Loan Documents and applicable HUD Requirements.

3.16    Ownership of Capital Improvements.    Lessee agrees to execute any and all documents as may be required by Lender or HUD to confirm the provisions of Section 2.05 and/or further effect the transfer of title to the Owner as provided in Section 2.05.

## ARTICLE IV

## RENTALS: APPLICATION OF GROSS REVENUES

4.01    General Obligation.    This Lease Agreement is a general obligation of the Lessee.

4.02    Rental Payments.

A.    The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of One Million Two Hundred Thousand and No/100 Dollars ($1,200,000.00) per year. Payments of Rent shall be due in advance in equal monthly installments of One Hundred Thousand and No/100 Dollars ($100,000.00) on the first day of each month. If the Lessee fails to make any monthly payment of Rent within fifteen (15) days after the due date thereof, the Owner may, at its option, impose a late charge upon the Lessee in an amount not to exceed five percent (5.0%) of the Rent so delinquent.

B.    The Lessee agrees to pay to (or on behalf of) the Owner all payments to the reserve for replacements which are required to be made pursuant to the terms of the Owner Regulatory Agreement.

4.03    Security Interest In Gross Revenues.    As security for the Rent and all other payments due to the Owner under the terms of this Lease Agreement, the Lessee grants to and creates in the Owner a security interest in the Gross Revenues, but the existence of such security interest shall not prevent the expenditure, deposit or commingling of Gross Revenues by the Lessee so long as all payments required under this Lease Agreement are made when due, nor prevent the write-off of any uncollectable accounts or bad debts. In the event of default by the Lessee under the terms and conditions of this Lease Agreement, beyond any applicable notice and cure periods, the Owner, without limitation of any other rights or remedies available to it and with any required consent of the Department of Public Health, shall have the right to appoint a receiver to collect the Gross Revenues and manage payments from such funds as permitted from time to time by the Department of Public Health, if applicable.

9

App.87

4.04     Obligations Unconditional. The obligations of the Lessee to make payments of Rent and all other payments required under this Lease Agreement shall be absolute and unconditional, without defense or set-off by reason of any default or other reason whatsoever, including by the Owner under this Lease Agreement or under any other agreement between the Lessee and the Owner or the Lender, and, except as may be expressly provided herein, such payments shall not be decreased, abated, postponed, or delayed for any reason whatsoever, including, without limitation, any acts or circumstances that may constitute failure of consideration, destruction of or damage to the Leased Premises, the taking by condemnation of any part of the Leased Premises, commercial frustration of purpose, failure of the Owner to perform and observe any agreement, whether expressed or implied, or any duty, liability or obligation arising out of or connected with this Lease Agreement, or failure of any resident or occupant of the Lessee to pay the fees, rentals or other charges owed to the Lessee, and irrespective of whether or not any such resident or occupant of the Lessee receives either partial or total reimbursement as a credit against such payment, it being the intention of the parties that the payments required of the Lessee under this Lease Agreement will be paid in full when due without any delay or diminution whatsoever.

4.05     Net Lease. This Lease Agreement is intended to be an entirely "net" lease, intending hereby to impose the burden of payment of all costs and expenses related to the use and occupancy of the Leased Premises upon the Lessee. The Lessee agrees to pay when due all real estate and personal property taxes and special assessments assessed or imposed upon the Leased Premises or which may be charged to the Owner in connection with the Leased Premises and treat such payments as Operating Expenses. The Lessee agrees also to pay when due all payments required by Section 3.14 of this Lease Agreement (during periods in which Article III is operative), and premiums for liability insurance and full coverage hazard insurance on the Leased Premises, and to treat such payments as Operating Expenses. The Lessee agrees also to pay when due all other Operating Expenses. Notwithstanding the foregoing, the Lessee shall not be liable for any federal, state or local income taxes which may be assessed against the Owner.

## ARTICLE V

## COVENANTS AND REPRESENTATIONS OF THE LESSEE

5.01     Maintenance and Operation of Leased Premises. The Lessee covenants that during the Lease Term of this Lease Agreement, it shall:

A.     pay or cause to be paid all costs of operating the Leased Premises including, without limitation, all charges for water, electricity, light, heat or power, sewage, telephone and other utility service, rendered or supplied during the Lease Term; all water, water meter, and sewer rents, rates, and charges; and any and all other governmental levies, fees, rents, assessments, or taxes and charges;

B.     at its own cost or expense keep and maintain, or cause to be kept and maintained, in good repair and condition (excepting reasonable wear and tear), the Leased

App.88

Premises and all additions and improvements thereto, excluding any rebuilding or restoration following damage to or destruction or condemnation of all or part of the Leased Premises;

     C.     make all repairs, renewals, replacements and improvements to the Leased Premises in order to maintain adequate service and quality resident care;

     D.     not commit or suffer any waste of any of the Leased Premises;

     E.     maintain in good standing its license to operate the Leased Premises as an assisted living facility and any other licenses or permits required to operate the Leased Premises as a licensed facility; and promptly comply, unless contested in good faith, with any and all requests and recommendations of the Department of Public Health and its representatives with respect to the operation of the Leased Premises, in providing care to residents;

     F.     comply with all applicable requirements of Titles XVIII and XIX of the Social Security Act, and the rules and regulations thereunder, as the same may now or hereafter be in effect, in order to maintain its status in good standing as a provider of health care services under such Titles;

     G.     upon receipt, promptly furnish the Owner with copies of any inspection reports made by the Department of Public Health or the United States Department of Health and Human Services, and promptly undertake to correct any deficiencies noted in such inspection reports regarding its operation of the Leased Premises as an assisted living facility; and

     H.     promptly inform the Owner of any decisions on behalf of the Department of Public Health as to a change in status of any certificate or license affecting the Lessee's operation of the Leased Premises as an assisted living facility.

     5.02     Maintenance of Entity Existence.  The Lessee agrees that during the Lease Term (unless this Lease Agreement is assigned in accordance with its terms, in which event this Section shall apply to such assignee), it will maintain its entity existence, will continue to be a corporation organized under the laws of the Commonwealth of Pennsylvania, will promptly pay all taxes assessed against it or any of its assets by any federal, state or local governmental authority, will not dissolve or otherwise dispose of all or substantially all of its assets, and will not consolidate with or merge into another entity or permit one or more other entities to consolidate with or merge into it.

     5.03     Management. The Lessee agrees at all times during the Lease Term of this Lease Agreement to employ or cause to be employed a qualified management firm and/or qualified administrator to supervise the operation of the Leased Premises, who shall be experienced in the management and operation of facilities of the nature and size of the Leased Premises, and who shall be subject to the approval of the Owner (and HUD, in accordance with Section 3.11, during periods in which Article III is operative).

11

App.89

5.04     Payment of Lawful Taxes and Charges: Discharge of Liens.

A.     The Lessee agrees to pay all taxes and assessments or other municipal or governmental charges of any kind whatsoever that may at any time be lawfully imposed, levied or assessed upon or in respect of the Lessee's income, operations, assets or property, including the Leased Premises, or any part thereof, when the same shall become due, including any machinery, equipment or related property installed or brought by the Lessee therein or thereon, and all utility and other charges incurred in the operation, maintenance, use, occupancy and upkeep of the Leased Premises; provided, that with respect to special assessments or other governmental charges that lawfully may be paid in installments over a period of years, the Lessee shall be obligated to pay only such installments as are required to be paid during the term of this Lease Agreement. Notwithstanding the foregoing, the Lessee shall not be liable for any federal, state or local income taxes which may be assessed against the Owner.

B.     The Lessee may, at its own expense and in good faith, contest any such taxes, assessments, charges, claims or demands and, in the event of any such contest, may, with the approval of the Owner (and HUD, in accordance with Section 3.12.A, during periods in which Article III is operative), permit the taxes, assessments, charges, claims and demands so contested to remain unpaid during the period of such contest and may appeal therefrom.

5.05     Compliance With Law.

A.     The Lessee covenants, represents and warrants that at all times during the term of this Lease Agreement:

(1)     all actions heretofore and hereafter taken by the Lessee with respect to the Leased Premises, including all repairs, additions, alterations or improvements thereto, have been and will at all times be in compliance in all material respects with all applicable requirements of federal, state and local laws, ordinances, rules, regulations and orders, and with all applicable requirements of any agency, board, or commission created under the laws of the state where the Leased Premises are located, or any other duly constituted public authority, and any requirement of an insurance company so long as such company is providing insurance in respect to the Lessee or the Leased Premises; and

(2)     it shall not take any action which would cause the Leased Premises to be in violation of such laws, ordinances, rules, regulations or orders.

B.     Notwithstanding any provision of this Lease Agreement, the Lessee shall have the right to contest in good faith any law, ordinance, rule, regulation or order, provided that such action is promptly and diligently pursued, and the Lessee agrees to keep the Owner informed as to the status of such contest and provided further that such action does not, in the Owner's judgment materially adversely affect the Lessee's ability to operate the Leased Premises and pay the Rent.

5.06     Additions and Alterations. Except where an emergency situation exists:

12

A.    The Lessee shall not, without the prior written approval of the Owner, which will not be unreasonably withheld or delayed, make any alterations, changes, replacements, improvements and additions of a structural nature to the Leased Premises;

B.    The Lessee agrees not to permit any alienation, removal, demolition, substitution, improvement, alteration or deterioration of the Leased Premises or any other act which might impair or reduce the usefulness or value thereof or the Owner's interest therein; and

C.    The Lessee agrees to comply with all applicable requirements of law with respect to such alterations, changes, replacements, improvements and additions.

(And Lessee shall also comply with Section 3.12.B during periods in which Article III is operative.)

5.07    Financial and Other Restrictions. So long as this Lease Agreement remains in effect, (and, as to the records required hereunder, for a period of one year thereafter), the Lessee agrees to:

A.    Keep proper books of record and account in which full, true and correct entries will be made of all its business transactions in accordance with generally accepted accounting principles;

B.    Make payment of all indebtedness incurred in the ordinary course of the Lessee's business within the times provided under the terms of such indebtedness and make payments of all taxes, governmental charges and/or payments in lieu of taxes promptly (unless the Lessee is contesting the validity thereof in good faith);

C.    Provide to the Owner annual financial statements with respect to the Leased Premises, prepared by a certified public accountant or firm of certified public accountants acceptable to the Owner (and which meet the requirements of Section 3.06 during periods in which Article III is operative); and

D.    With reasonable promptness provide to the Owner any other data and information which may be reasonably requested from time to time.

5.08    Inspections. The Lessee agrees that upon reasonable request, the Owner and its designees and representatives may at all reasonable times, upon reasonable notice, subject to the rights of patients, residents and tenants, if any, examine and inspect the Leased Premises. The Lessee will, on the request of the Owner, promptly make available for inspection by the Owner and its designees and representatives copies of all of the Lessee's correspondence, books, records and other documentation relating to the Leased Premises, but excepting communications between the Lessee and its attorneys. The Lessee agrees to maintain accounting records for the Leased Premises in accordance with its customary practice, separate from any general accounting records which the Lessee may maintain in connection with the Lessee's general business activities. The

13

Lessee agrees that the Owner and its designees and representatives shall, at any reasonable time, have access to and the right to examine all accounting records of the Lessee which relate directly or indirectly to the Leased Premises. (See also Section 3.13 during periods in which Article III is operative.)

5.09    Assignment and Subletting. Except as set forth in this Section 5.09, the Lessee may not assign this Lease Agreement or sublease the Leased Premises or any portion thereof without the prior written consent of the Owner (and HUD, in accordance with Section 3.02, during periods in which Article III is operative). The Lessee shall be permitted to enter into leases and other possession and use agreements in the nature of assisted living rental, lease and/or services agreements with individual persons in the ordinary course of its operations.

5.10    Indemnification Concerning the Leased Premises.

A.    The Lessee covenants and agrees, at its expense, to pay and to indemnify and save the Indemnified Parties harmless of, from and against, any and all claims, damages, demands, expenses, liabilities, and losses of every kind, character, and nature asserted by or on behalf of any person arising out of, resulting from, or in any way connected with, the condition, use, possession, conduct, management, operation, or leasing of the Leased Premises or any part thereof, except for any claim, damage, demand, expense, liability or loss arising out of the negligence or willful misconduct of the party seeking indemnity.

B.    If any action is brought against any Indemnified Party based upon any of the above and in respect to which indemnity may be sought against the Lessee, the Indemnified Party involved may request in writing that the Lessee assume the defense thereof, including the employment of counsel selected by the Lessee satisfactory to such Indemnified Party (as reasonably determined), the payment of all costs and expenses and the right to negotiate and consent to settlement. Any one or more of the Indemnified Parties shall have the right to employ separate counsel at the sole cost and expense of such Indemnified Party in any such action, to participate in the defense thereof. The Lessee shall not be liable for any settlement of any such action effected without its consent, which consent shall not be unreasonably withheld nor delayed, but if settled with the consent of the Lessee or if there be a final judgment for the plaintiff in any such action, the Lessee agrees to indemnify and hold harmless the Indemnified Parties from and against any loss or liability by reason of such settlement or judgment.

C.    The Lessee shall have the right to obtain insurance, if available, against the risks which it has undertaken in paragraph A of this Section, and to treat the cost of such insurance as a part of Operating Expenses.

5.11    Representations of the Lessee. The Lessee represents and warrants as follows:

A.    Due Organization. The Lessee is a corporation, duly organized, validly existing and in good standing under the laws of Pennsylvania, and is duly authorized and qualified to operate this type of facility in the Commonwealth of Pennsylvania. The Lessee has powers adequate for the execution, delivery and performance of its obligations under this Lease

14

App.92

Agreement and for carrying on the business now conducted by it and contemplated in connection with the Leased Premises. The execution and delivery of, and the performance by the Lessee of its obligations under this Lease Agreement have been duly authorized by all appropriate action by the Lessee, and this Lease Agreement constitutes the valid and binding obligations of the Lessee, enforceable in accordance with its terms, except as enforceability may be subject to the exercise of judicial discretion in accordance with general equitable principles and to applicable bankruptcy, insolvency, reorganization, moratorium and other laws for the relief of debtors heretofore or hereafter enacted to the extent that the same may be constitutionally applied.

B.    Legal Proceedings. There is no action, suit, proceeding (including, without limitation, any condemnation proceeding or proceeding in the nature of bankruptcy or for reorganization or arrangement), or investigation at law or in equity before or by any court or public board or body, pending or, to the knowledge of the Lessee after due investigation, threatened, against the Lessee or the Leased Premises, nor, to the best knowledge of the Lessee, any basis therefor, wherein an unfavorable decision, ruling or finding would, in any material respect, adversely affect the business, assets or condition (financial or otherwise) of the Lessee or the Leased Premises or the transactions contemplated by this Lease Agreement, or which in any way would adversely affect the validity of this Lease Agreement.

C.    Compliance With Law; Consents. The Lessee is not in violation of any term or provision of its organizational documents or in violation of any term or provision of any mortgage, lease, agreement or other instrument which is material to its business or assets, or of any judgment, decree, governmental order, statute, rule or regulation by which it is bound or to which it or any of its assets is subject. The execution, delivery and performance of and compliance with this Lease Agreement will not violate or constitute a default under the organizational documents of the Lessee or of any term or provision of any mortgage, lease, agreement or other instrument, or of any judgment, decree, governmental order, statute, rule or regulation by which the Lessee is bound or to which any of its assets is subject. No approval by, authorization of, or filing with any federal, state, or local or other governmental commission, board, or agency or other governmental authority is necessary in connection with the execution and delivery of this Lease Agreement by the Lessee.

D.    The Facility.

(1)    The Lessee agrees to operate the Leased Premises as an assisted living facility.

(2)    In the occupancy, maintenance, improvement and operation of the Leased Premises, the Lessee shall at all times comply in all respects with all applicable building, zoning and land use, environmental protection, sanitary, safety and other laws, rules and regulations, and shall not permit a nuisance thereon.

E.    The foregoing representations and assurances are made for the benefit of the Owner, the Lender and HUD and not for the benefit of any other third party.

15

App.93

## ARTICLE VI

## INSURANCE AND CONDEMNATION

6.01    Insurance Coverage and Terms.

A.    The Lessee agrees to procure and maintain, or cause to be procured and maintained, commercial general liability insurance and property insurance coverages with respect to the Leased Premises (and, during such periods as applicable, the insurance required under Section 3.14 of this Lease Agreement), naming the Owner and the Lender as additional insureds.

B.    In the event that the Lessee fails to maintain any insurance as provided in this Section 6.01, the Owner may, at its option and upon such notice to the Lessee as is reasonable under the circumstances, procure and maintain such insurance. The Lessee agrees and covenants to pay any amounts so advanced therefor by the Owner, together with interest thereon at the prime rate of interest published in the Wall Street Journal plus five percent (5.0%), from the date thereof.

6.02    Insurance Proceeds. In the event of damage or destruction to the Leased Premises, the decision to repair, reconstruct, restore or replace the Leased Premises shall be made by the Owner (and in accordance with Section 3.14, during periods in which Article III is operative).

6.03    Eminent Domain. Subject to Section 3.16 (during periods in which Article III is operative), the proceeds of any condemnation award or other compensation paid by reason of a conveyance in lieu of the exercise of such power, with respect to the Leased Premises or any portion thereof shall be the property of Owner. The Lessee shall, however, be entitled to recover any amounts payable to it for moving expenses, loss of personal property, and the like so long as they do not affect Owner's award.

## ARTICLE VII

## DEFAULT AND REMEDIES

7.01    Events of Default. Each of the following shall be an "Event of Default" under this Lease Agreement:

A.    If payment of any amount due under Section 4.02 of this Lease Agreement is not made when it becomes due and payable and if such payment remains unpaid for a period of fifteen (15) days; or

B.    If the Lessee shall:

16

1. admit in writing its inability to pay its debts as they become due, or

2. file a petition to be adjudicated a voluntary bankrupt in bankruptcy or a petition to otherwise take advantage of any federal or state bankruptcy or insolvency law, or

3. make an assignment for the benefit of its creditors or seek a composition with its creditors, or

4. consent to the appointment of a receiver of itself or of the whole or any substantial part of the Leased Premises, or

C. If (i) the Lessee shall, upon an involuntary petition under any section or chapter of the federal bankruptcy laws filed against it, be adjudicated a bankrupt; or (ii) a court of competent jurisdiction shall enter an order or decree appointing a trustee or receiver (interim or permanent) or appointing the Lessee a debtor-in-possession, with or without the consent of the Lessee, of the whole or any substantial part of the Leased Premises, or of the Gross Revenues, or approving a petition filed against the Lessee seeking reorganization or an arrangement under the federal bankruptcy laws or any other applicable law or statute of the United States of America or any legal subdivision thereof; and such adjudication, order or decree is not dismissed or vacated within a period of sixty (60) days from the date thereof; or

D. If the Lessee defaults in the due and punctual performance or observance of any other representation, agreement or covenant in this Lease Agreement and such default continues for thirty (30) days after written notice requiring the same to be remedied has been given by the Owner.

7.02    Remedies. Upon or after the occurrence of any Event of Default, the Lessee, upon demand of the Owner, shall forthwith surrender to the Owner the actual possession of the Leased Premises and the Owner may enter and take possession of the Leased Premises and may exclude the Lessee, its agent and employees wholly therefrom. Upon or after the occurrence of any Event of Default the Owner may, upon notice, do any or all of the following at the Lessee's risk:

A. Re-enter and take possession of the Leased Premises or any portion thereof without terminating this Lease Agreement, and lease the Owner's interest in such Leased Premises for the account of the Lessee to any other party, holding the Lessee liable for the difference between (i) the net proceeds to Owner from such re-leasing and (ii) the rent and other amounts payable by the Lessee and due under this Lease Agreement, including the expenses of Owner and Lender, including reasonable attorneys' fees, incurred in connection with such default.

B. Terminate the Lease Term, exclude the Lessee from possession of the Leased Premises and lease the Owner's interest in the Leased Premises for the account of the

17

Lessee, to any other party, holding the Lessee liable for all rents and other amounts due under this Lease Agreement and not paid by such other party.

      C.    Take whatever action at law or in equity may appear necessary or desirable to collect the payment then due and thereafter to become due, or to enforce performance and observance of any obligation, agreement or covenant of the Lessee under this Lease Agreement.

7.03    Cumulative Rights; No Implied Waiver. No remedy conferred upon or reserved to the Owner by this Lease Agreement is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Lease Agreement or now or hereafter existing at law or in equity or by statute. No waiver by the Owner of any obligations, agreements or covenants under this Lease Agreement shall be deemed a waiver of any subsequent breach, and no delay or omission to exercise any right or power shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient.

## ARTICLE VIII

## MISCELLANEOUS

8.01    Surrender of Possession. Except as otherwise expressly provided in this Lease Agreement, at the expiration or earlier termination of the Lease Term, the Lessee agrees to surrender possession of the Leased Premises peacefully and promptly to the Owner in as good a condition as at the commencement of the Lease Term, loss by fire or other casualty covered by insurance, condemnation, or ordinary wear, tear, and obsolescence excepted.

8.02    Successors and Assigns. This Lease Agreement shall inure to the benefit of and shall be binding upon the Owner, the Lessee and their respective successors and assigns.

8.03    Severability. In the event any provision of this Lease Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision of this Lease Agreement.

8.04    Counterparts. This Agreement may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

8.05    Notices. All notices or other communications provided for in this Lease Agreement shall be in writing and shall be delivered personally to, or sent by certified or registered mail or recognized overnight delivery service to the respective offices of the Owner and the Lessee as set forth on the first page of this Lease Agreement, or such other address as may have been previously specified in a notice given in accordance with this Section 8.05.

18

App.96

The Owner or Lessee may from time to time designate other representatives or addresses with respect to receipt of notices or other communications.

8.06    Headings. The Article and Section headings in this Lease Agreement are inserted for convenience of reference only and are not intended to define or limit the scope of any provision of this Lease Agreement.

8.07    Non-Waiver. It is understood and agreed that nothing contained in this Lease Agreement shall be construed as a waiver on the part of the parties, or any of them, of any right not explicitly waived in this Lease Agreement.

8.08    Amendments. This Lease Agreement shall not be amended without the prior written consent of the Owner and Lessee and no such amendment shall be effective unless the same shall be in writing and executed by both parties hereto.

8.09    No Recording. Neither party shall record this Lease Agreement. At the request of Lessee or Owner, the parties shall execute and record a memorandum of lease.

8.10    Estoppel Certificates. The Lessee agrees that upon request by Owner, it will execute and deliver to the Owner, and/or to such third party as is designated by the Owner, a statement in writing certifying (a) that (except as may be otherwise specified by the Lessee) (i) this Lease Agreement is in full force and effect and unmodified and has not been assigned by Lessee, (ii) the Lessee is not in default under this Lease Agreement, and (iii) to the best of Lessee's knowledge, the Owner is not in default under this Lease Agreement, and (b) as to such other factual matters as the Owner may reasonably request about this Lease Agreement.

8.11    Governing Law. The internal laws of the State of Pennsylvania shall govern as to the interpretation, validity and effect of this Lease Agreement, without regard to such state's choice of law principles.

8.12    Entirety of Agreement. This Lease Agreement embodies the entire agreement and understanding of the parties with respect to the subject matter hereof, and supersedes all prior leases, agreements, correspondence, arrangements and understandings relating to the subject matter hereof.

IN WITNESS WHEREOF, the Owner and the Lessee have signed this Lease Agreement as of the date first above written.

19

App.97

OWNER:

WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a/ dated August 1, 2007

By: _____
Abraham R. Atiyeh, Manager

LESSEE:

WHITEHALL MANOR, INC.

By: _____
Abraham R. Atiyeh, President

20

08/04/2008 - Cincinnati 730125.V3

App.98

## EXHIBIT A

UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.

PARCEL ID NO. 5498 9378 8632-1

Together with an undivided interest of 50% of, in and to the Common Elements of the said WHITEHALL MANOR CONDOMINIUM.

FIRST AMENDMENT
Dated and Effective As Of January 1, 2010
To The
LEASE AGREEMENT
Dated and Effective As Of August _____, 2008
By and Between
WHITEHALL TRUST,
a Pennsylvania Trust, as Owner and Lessor
and
WHITEHALL MANOR, INC.,
a Pennsylvania corporation, as Lessee

## FIRST AMENDMENT TO LEASE AGREEMENT

This FIRST AMENDMENT TO LEASE AGREEMENT, (the "First Amendment") , is made and dated as of January 1, 2010, by and between **WHITEHALL TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Whitehall Fiduciary LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

AND

**WHITEHALL MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner and Lessee desire to amend the Lease dated August ___, 2008 between Owner and Lessee (the "Lease") for those certain premises known as Unit 1 of Whitehall Manor Condominium, (the "Leased Premises") on the terms and conditions set forth herein; and

WHEREAS, the terms of this Addendum shall be effective as of the date shown above, subject to the obtaining approval as required by the terms of the Mortgage encumbering the Leased Premises.

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02(A) of the Lease is amended and restated as follows:

"A.    The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of One Million Nine Hundred Fifty Thousand ($1,950,000.00) per year. Payments of Rent shall be due (a) in advance in equal monthly installments of One Hundred Thousand Dollars ($100,000.00) on the first day of each month, each due without setoff and without prior notice or demand, and (b) the remainder of $750,000.00 to be paid on or before December 31 of the then current calendar year, in one or more partial installments, as Lessee shall elect, provided however that the full Base Rental of $1,950,000.00 is paid in full by December 31 of each year.

"A.1    Additionally, all other items set forth as Rent or Additional Rent under the Lease and all obligations of the Lessee are herein considered to be Rent and those additional items are due as set forth in the Lease. If the Lessee fails to make any monthly payment of Rent within fifteen (15) days after the due date thereof, the Owner may, at its option, impose a late charge upon the Lessee in an amount not to exceed

ten percent (10%) of the Rent so delinquent for each calendar month of delinquency.

2.        No other portions of the Lease are amended or modified.

3.        Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

4.        Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Lease as if fully set forth herein at length.

5.        The amendment set forth herein is subject to approval by the Secretary of Housing and Urban Development pursuant to the terms of the Mortgage encumbering the Leased Premises, and this amendment shall be void and of no force or effect if the said approval is not granted, and in such event, the Lease shall remain in full force and effect as if this First Amendment to Lease Agreement was never executed.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this First Amendment to Lease Agreement effective as of January 1, 2010.

WHITEHALL TRUST
By: Whitehall Fiduciary LLC

By: _____
     Abraham Atiyeh, Manager

WHITEHALL MANOR, INC.

By: _____
     (Vice) President

App.102

SECOND AMENDMENT
Dated and Effective As Of January 1, 2012,
To The
LEASE AGREEMENT
Dated on or about August, 2008
By and Between
WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007, as Owner and Lessor

and

WHITEHALL MANOR, INC.,
a Pennsylvania corporation, as Lessee

## SECOND AMENDMENT TO LEASE AGREEMENT

This SECOND AMENDMENT TO LEASE AGREEMENT, (the "Second Amendment"), is made and dated as of January 1, 2012 by and between **WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST u/t/a dated August 1, 2007,** a trust organized and existing under the laws of the Commonwealth of Pennsylvania (the "Owner") having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

AND

**WHITEHALL MANOR, INC.,** (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner and Lessee desire to amend the Lease dated on or about August, 2008 between Owner and Lessee (the "Original Lease") and the First Amendment to Lease Agreement dated as of January 1, 2010, together with this Second Amendment to Lease Agreement being herein called the "Lease", for those certain premises known as Unit 1 of Whitehall Manor Condominium, (the "Leased Premises") on the terms and conditions set forth herein; and

WHEREAS, Owner is refinancing the Mortgage Loan relating to the Premises, and the conditions for such loan require amendment of the Original Lease as amended by the First Amendment and Lessee is agreeable to such modifications; and

WHEREAS, Owner and Lessee agree that the terms of this Addendum shall be effective as of the date shown above.

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 2.02 of the Lease is amended and restated as follows:

   2.02    Term of Lease. The Lease Term for the Leased Premises commenced on August 19, 2008 and shall expire on August 31, 2018, or such earlier date as may be hereinafter provided. In addition, the Lessee shall have the option to extend the Lease Term for three (3) successive periods of five (5) years each upon the terms and conditions contained herein, upon written notice to the Owner given not later than one hundred eighty (180) days prior to the expiration of the initial Lease Term or extended Lease Term, as the case may be.

2. Section 4.02(A) of the Lease is amended and restated as follows:

App.104

"A.    The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of One Million Six Hundred Sixty Eight Thousand ($1,668,000.00) per year. Payments of Rent shall be due (a) in advance in equal monthly installments of Eighty Thousand Dollars ($80,000.00) on the first day of each month, each due without setoff and without prior notice or demand, and (b) the remainder of Seven Hundred Eight Thousand ($708,000.00) Dollars to be paid on or before December 31 of the then current calendar year, in one or more partial installments, as Lessee shall elect, provided however that the full Base Rental of $1,668,000.00 is paid in full by December 31 of each year.

"A.1    Additionally, all other items set forth as Rent or Additional Rent under the Lease and all obligations of the Lessee are herein considered to be Rent and those additional items are due as set forth in the Lease. If the Lessee fails to make any monthly payment of Rent within fifteen (15) days after the due date thereof, the Owner may, at its option, impose a late charge upon the Lessee in an amount not to exceed ten percent (10%) of the Rent so delinquent for each calendar month of delinquency."

3.    Owner and Lessee agree that the terms of the HUD Addendum to Operating Lease, which is attached hereto as Exhibit "A" and incorporated herein by reference, are a part of this Lease and that Owner and Lessee shall be bound thereby.

4.    Other than as set forth in Sections 1 and 2 of this Second Amendment to Lease Agreement, there are no other changes to the Original Lease or the First Amendment to Lease.

5.    Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

6.    Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Original Lease as if fully set forth herein at length and ratified and affirmed herein at length.

[Signature page follows]

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Second Amendment to Lease Agreement effective as of January 1, 2012.

**WHITEHALL FIDUCIARY, LLC,**
**AS TRUSTEE OF WHITEHALL TRUST**
**u/t/a dated August 1, 2007**

By: _____
     Abraham Atiyeh, Manager

**WHITEHALL MANOR, INC.,** a
Pennsylvania corporation

By: _____
     Nimita Kapoor Atiyeh, President

## EXHIBIT A

### HUD ADDENDUM TO OPERATING LEASE

This Addendum is attached to and made a part of that certain Operating Lease Agreement dated on or about August, 2008, as amended by the First Amendment to Lease dated as of January 1, 2010, and the Second Amendment to Lease dated as of January 1, 2012, all entered into by Owner/Lessor and Lessee (the " Operating Lease"), and amends and/or supplements the Operating Lease. In the event of a conflict between the terms of this Addendum and the Operating Lease, the terms of this Addendum shall govern and control. Capitalized terms used herein but not defined shall have the meanings set forth in the Operating Lease.

### DEFINITIONS

The following terms shall have the meanings specified below:

"FF&E" means furnishings, fixtures and equipment of all kinds used in connection with the Leased Premises, including additions, substitutions and replacements thereto.

"FHA" means the Federal Housing Administration.

"Health Care Requirements" shall mean, relating to the Leased Premises, all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions or agreements, in each case, pertaining to or concerned with the establishment, construction, ownership, operation, use or occupancy of the Leased Premises or any part thereof as a health care facility, and all material permits, licenses and authorizations and regulations relating thereto, including all material rules, orders, regulations and decrees of and agreements with health care authorities pertaining to the Leased Premises.

"HUD" means the U.S. Department of Housing and Urban Development.

"HUD Program Requirements" means all applicable statutes and regulations, including all amendments to such statutes and regulations, as they become effective, and all applicable requirements in HUD handbooks, notices and mortgagee letters that apply to the Leased Premises, including all updates and changes to such handbooks, notices and mortgagee letters that apply to the Leased Premise, except that changes subject to notice and comment rulemaking shall become effective upon completion of the rulemaking process.

"Leased Premises" means all the land located at, and known and identified as Unit 1 of Whitehall Manor Condominium, said premises being situated in the Township of Whitehall, Lehigh County, Pennsylvania, and more particularly described in Exhibit "B" attached to this Second Amendment to Lease Agreement dated as of January 1, 2012, together with any additions thereto and substitutions therefore, and any buildings, improvements, betterments, all FF&E and other property, real or personal, now existing or at any time acquired, constructed or located thereon, and all easements and other rights appurtenant thereto.

"Lender" means M&T Realty Capital Corporation, and any future holder of the Mortgage.

"Lessee" means Whitehall Manor, Inc.

"Lessee Regulatory Agreement" means the Regulatory Agreement-Nursing Homes entered into by and between the Lessee and FHA with respect to the Leased Premises and any riders, amendments and supplements thereto.

App.107

"Lessee Security Agreement" means that certain Lessee Security Agreement between Lessee and Lender with respect to the Leased Premises and any amendments or supplements thereto.

"Material Term" is a term in a loan or security agreement that:

1) extends the maturity date of the loan;
2) adds guarantors to the loan;
3) releases guarantors from the loan;
4) adds borrowers to the loan;
5) adds an interest reserve to the loan;
6) amends the interest rate payable on the outstanding principal balance of the loan;
7) increases or decreases the principal amount of the loan;
8) adds collateral as additional security for the loan; and/or
9) amends or expands the type of obligations secured by the loan.

"Mortgage" means that certain mortgage or deed of trust from the Owner/Lessor in favor of the Lender with respect to the Leased Premises securing the Mortgage Loan, and any amendments and supplements thereto.

"Mortgage Loan" means the FHA-insured mortgage loan in the original maximum principal amount of up to $15,788,700.00 made by Lender to the Owner/Lessor, secured, in whole or in part, by the Leased Premises, as the same may be amended, increased or decreased.

"Mortgage Loan Documents" means the Owner/Lessor Regulatory Agreement, the Mortgage, the Promissory Note evidencing the Mortgage Loan executed by the Owner/Lessor in favor of the Lender, the Security Agreement, the Lessee Regulatory Agreement, the Lessee Security Agreement, and any and all other documents required by HUD and/or the Lender in connection with the Mortgage Loan.

"Owner/Lessor" means Whitehall Fiduciary LLC, Trustee of the Whitehall Trust.

"Owner/Lessor Regulatory Agreement" means the Regulatory Agreement entered into by and between the Owner/Lessor and HUD with respect to the Leased Premises and any riders, amendments and supplements thereto.

"Security Agreement" means that certain Security Agreement between Owner/Lessor and Lender with respect to the Leased Premises and any amendments and supplements thereto.


## HUD REQUIREMENTS

1. Precedence of Addendum. For so long as HUD is the holder or insurer of any indebtedness secured by the Leased Premises, the provisions of this Addendum shall apply to this Lease. In the event of any conflict between any provision of this Addendum and any other provision of this Lease, the provision of this Addendum shall be controlling. This Addendum shall not be amended without the prior written consent of HUD and the Lender.

2. Compliance With HUD Program Requirements and Terms of Mortgage Loan Documents.

(a)      The Lessee agrees to comply with all applicable HUD Program Requirements and the Mortgage Loan Documents. The Lessee further agrees that this lease will be part of the collateral pledged by Owner/Lessor to Lender & HUD. The Lessee agrees that it will not take

any action which would violate any applicable HUD Program Requirements or any of the Mortgage Loan Documents.

(b)    In the event of any conflict between the terms and provisions of this Lease Agreement and any applicable HUD Program Requirements or the Mortgage Loan Documents, the HUD Program Requirements and Mortgage Loan Documents shall control in all respects. Owner/Lessor and Lessee agree that no provision of this Lease shall modify any obligation of Owner/Lessor or Lessee under the Mortgage Loan Documents. Owner/Lessor and Lessee acknowledge that HUD's acceptance of this Lease in connection with the closing of the Mortgage Loan shall in no way constitute HUD's consent to arrangements which are inconsistent with HUD Program Requirements. This Lease is subject to all HUD Program Requirements.

3. Subordination.

(a)    This Lease is and shall be subject and subordinate to the Mortgage and other Mortgage Loan Documents; to all renewals, modifications, consolidations, replacements and extensions thereof; to all substitutions thereof; and to all future mortgages upon the Leased Premises and/or other security interests in or to the Leased Premises and any other items which are herein leased to Lessee or which, pursuant to the terms hereof, become a part of the Leased Premises or are otherwise deemed to become the property of Owner/Lessor or to remain upon the Leased Premises at the end of the term; and to each advance made or hereafter to be made under any of the foregoing. This Section shall be self-operative and no further instrument of subordination shall be required. Without limiting the foregoing, the Lessee agrees to execute and deliver promptly any and all certificates, agreements and other instruments that the Owner/Lessor, Lender or HUD may reasonably request in order to confirm such subordination. Unless the Lender shall have agreed otherwise; if the Lender or another person or entity shall succeed to the interest of the Owner/Lessor by reason of foreclosure or other proceedings brought by Lender in lieu of or pursuant to a foreclosure, or by any other manner (Lender or such other person or entity being called a "Successor"), then this Lease shall terminate, or, at the option of the Successor, this Lease shall nevertheless continue in full force and effect, in which case the Lessee shall and does hereby agree to attorn to the Successor and to recognize the Successor as its landlord under the terms of this Lease.

(b)    Agreements for provision of services to the Leased Premises or the granting of easements, rights of way or other allowances of use or placement of CATV, utilities or other items are, and shall always be, subordinate to (i) the right of Owner/Lessor, and (ii) the Mortgage and other Mortgage Loan Documents and all other mortgages and security interests now or hereafter encumbering the Leased Premises and/or the property of which it forms a part. Lessee must obtain HUD written approval prior to entering into any telecommunications services agreement and/or granting of any easements.

4. FF&E. Lessee agrees that (a) except leases of FF&E entered into in the ordinary course of business with third-party lessees and property of tenants and residents of the Leased Premises, all FF&E located on the Leased Premises at the date of the Lease is and shall be the property of the Owner/Lessor, and (b) any FF&E acquired by Owner/Lessor or Lessee during the term of this Lease remaining on the Leased Premises at the termination of the Lease shall be and/or become the property of the Owner/Lessor. Lessee agrees, during the term of the Lease,

not to remove any FF&E from the Leased Premises, except to replace such FF&E with other similar items of equal or greater quality and value.

5. Payments. Owner/Lessor and Lessee each acknowledges and agrees that the rent and other amounts payable by Lessee under this Lease (including rent, additional rent and all other sums payable under this Lease) are sufficient to properly maintain the Leased Premises, and to enable the Owner/Lessor to meet its debt service obligations and related expenses in connection with the Mortgage Loan and the Leased Premises.

(a)    Without limiting the generality of the foregoing, the Lessee agrees to pay, as additional rent, when due all premiums for (i) FHA mortgage insurance, (ii) liability insurance and full coverage property insurance on the Leased Premises, and (iii) all other insurance coverage required under the Mortgage Loan Documents and/or applicable HUD Program Requirements.

(b)    Unless the Lender and Owner/Lessor agree otherwise, the Lessee shall be responsible for funding all escrows for taxes, reserves for replacements, mortgage insurance premiums and/or other insurance premiums as may be required by the Lender and/or HUD.

6. Lessee Regulatory Agreement and Lessee Security Agreement. At the time of the closing of the Mortgage Loan, the Lessee agrees to execute the Lessee Regulatory Agreement and the Lessee Security Agreement, and other applicable documents evidencing the Lender's security interest in the collateral of the Lessee. The Lessee agrees to comply with its obligations under the Lessee Regulatory Agreement and the Lessee Security Agreement, and agrees that a default by the Lessee under the Lessee Regulatory Agreement or Lessee Security Agreement shall be deemed to be a default under this Lease.

7. Management Contract Requirements. The Lessee agrees not to enter into any management contract involving the Leased Premises unless such management contract complies with applicable HUD Program Requirements and contains provisions that, in the event of default under the Owner/Lessor Regulatory Agreement or the Lessee Regulatory Agreement, the management agreement shall be subject to termination upon not more than thirty (30) days notice without penalty upon written request of HUD. Upon such HUD termination request, the Lessee shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to HUD for continuing proper management of the Leased Premises.

8. Licenses; Bed Authority. Lessee shall ensure that the Leased Premises meets all state licensure requirements and standards at all times. Owner/Lessor and Lessee agree not to undertake or acquiesce to any modification to any license with respect to the Leased Premises or to any "bed authority" related thereto without the prior written approval of HUD.

9. Governmental Receivables. Lessee shall be responsible for obtaining and maintaining all necessary provider agreements with Medicaid, Medicare and other governmental third party payors. Lessee agrees to furnish HUD and Lender with copies of all such provider agreements and any and all amendments thereto promptly after execution thereof.

10. Financial Statements and Reporting Requirements. Lessee agrees to furnish HUD and Lender copies of its annual financial statements with respect to the Leased Premises, prepared in compliance with the requirements of the Lessee Regulatory Agreement, within ninety (90) days after the close of Lessee's fiscal year or such longer period as may be permitted by HUD. Lessee agrees to submit to HUD and Lender copies of all other financial reports as specified in the Lessee Regulatory Agreement.

11. Inspections. The Lessee agrees that upon reasonable request, the Lender, HUD and their respective designees and representatives may at all reasonable times, upon reasonable notice, subject to the rights of patients, residents and tenants, examine and inspect the Leased Premises. The Lessee will, on the request of the Lender and/or HUD, promptly make available for inspection by the Lender and/or HUD, and their designees and representatives, copies of all of the Lessee's correspondence, books, records and other documentation relating to the Leased Premises, excepting communications between the Lessee and its attorneys. The Lessee agrees to maintain accounting records for the Leased Premises in accordance with its customary practice and the Lessee Regulatory Agreement, separate from any general accounting records which the Lessee may maintain in connection with the Lessee's other activities. The Lessee agrees that the Lender and/or HUD, and their designees and representatives, shall at any reasonable time, have access to and the right to examine all accounting records of the Lessee which relate directly or indirectly to the Leased Premises. The obligations of Lessee under this Section shall be limited to the extent necessary in order for Lessee to comply with applicable laws regarding the confidentiality of resident/patient medical records and information.

12. Insurance; Casualty; Condemnation. The Lessee agrees to procure and maintain, or cause to be procured and maintained, the insurance coverage required pursuant to the Mortgage Loan Documents and/or applicable HUD Requirements, including HUD Notices H 04-01 and H 04-15. Insurance proceeds and the proceeds of any condemnation award or other compensation paid by reason of a conveyance in lieu of the exercise of such power, with respect to the Leased Premises or any portion thereof shall be applied in accordance with the terms of the Mortgage Loan Documents and applicable HUD Program Requirements. The decision to repair, reconstruct, restore or replace the Leased Premises following a casualty or condemnation shall be subject to the terms of the Mortgage Loan Documents and applicable HUD Requirements.

13. Assignment of Operating Lease and Subletting of the Leased Premises. This Lease shall not be assigned or subleased by Lessee, in whole or in part (including any transfer of title or right to possession and control of the Leased Premises, or of any right to collect fees or rents), without the prior written approval of HUD. The prior written approval of HUD shall be required for (a) any change in or transfer of the management, operation, or control of the project or (b) any change in the ownership of the lessee that requires HUD approval under the Department's previous participation approval requirements. Owner/Lessor and Lessee acknowledge that any proposed assignee will be required to execute a Lessee Regulatory Agreement and a Lessee Security Agreement, each in form and substance satisfactory to HUD, as a prerequisite to any such approval. Any assignment or subletting of the Leased Premises made without such prior approval shall be null and void. This restriction on subletting does not apply to Lessee's leasing of individual units or beds to patient / residents.

14. Accounts Receivable (AR) Financing. The Lessee shall not pledge its accounts receivable or receipts to an accounts receivable lender for any loan without the prior written approval of the Lender and HUD. In the event that the Lender and HUD grant such approval; (i) the holder(s) of such lien shall enter into an Intercreditor and a Rider to Intercreditor Agreement with the AR Lender and Lender on such terms and conditions as may be required by HUD; and (ii) Lessee shall agree to comply with the requirements imposed by the Lender and HUD in connection therewith. Until such approved loan is paid in full, the written approval of HUD is required for any proposed modifications, extensions, renewals or amendments to a Material Term of the AR loan or the security agreement, prior to the effective date of such amendments.

15. Termination of Lease. The Lease shall not be terminated prior to its expiration date without the prior written approval of HUD. If HUD becomes Mortgagee, Mortgagee in Possession, or Successor, HUD can terminate the Lease (A) for any violation of the Lease that is not cured within any applicable notice and cure period given in the Lease, (B) for any violation of the Lessee Regulatory Agreement or other HUD Program Requirements or Health Care Requirements that is not cured within thirty (30) days after receipt by Lessee of written notice of such violation or (C) if HUD, as a result of the occurrence of either of the events described in the foregoing items (A) or (B), is required to advance funds for the operation of the facility located on the Leased Premises.

16. Master Lease. Projects proposed for FHA financing under the Section 232 program that are affiliated by common ownership among Mortgagors and/or Lessee/Operator entities must receive written approval from HUD, and may be required to use a Master Lease between the Mortgagor/Landlord and the Master Tenant/Subtenant/Operator. The Master Lease and the HUD Master Lease Subordination Agreement or Master Lease Subordination Non Disturbance Agreement shall be approved by HUD and the Mortgagee. The Master Lease shall only contain Mortgagors and Operators of FHA-insured projects.

17. Notwithstanding any other terms contained in the Lease, in the event of an assignment of the Lease to HUD or FHA, neither HUD nor FHA shall have any indemnification obligations under the Lease. In addition, any payment obligations of HUD or FHA pursuant to the Lease shall be limited to actual amounts received by HUD or FHA, and otherwise not prohibited by applicable law or regulation, including without limitation, the Anti Deficiency Act, 31 U.S.C. § 1341 et seq.

[signature page follows...]

SIGNATURE PAGE
FOR
HUD ADDENDUM TO OPERATING LEASE

In witness whereof, the undersigned has executed and delivered this Addendum as of the date first above set forth.

OWNER/LESSOR:

> **WHITEHALL FIDUCIARY, LLC,**
> **AS TRUSTEE OF WHITEHALL TRUST**
> **u/t/a dated August 1, 2007**
>
> By: _____
> Name: Abraham Atiyeh
> Title: Manager

LESSEE:

> **WHITEHALL MANOR, INC.,**
> a Pennsylvania corporation
>
> By _____
> Name: Nimita Kapoor Atiyeh
> Title: President

App.113

## EXHIBIT B

### LEGAL DESCRIPTION

UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.

PARCEL ID NO. 5498 9378 8632-1

Together with an undivided interest of 50% of, in and to the Common Elements of the said WHITEHALL MANOR CONDOMINIUM.

1/17/2012 12724384 V.2

App.114

## THIRD AMENDMENT TO LEASE AND
## MEMORANDUM OF LEASE EXTENSION

This Third Amendment to Lease and Memorandum of Lease Extension is effective as of August 31, 2018 by and between **WHITEHALL TRUST**, herein called Landlord;

AND

**WHITEHALL MANOR, INC.**, herein called Tenant.

*Witnesseth:*

*Whereas*, Landlord and Tenant are parties to the Lease dated August, 2008, which was amended by First Amendment to Lease, made and dated as of January 1, 2012, and Second Amendment to Lease, made and dated as of January 1, 2012, (collectively and as amended herein called the "Lease"), by which Landlord has leased to Tenant the real property and improvements thereon situate on Unit 1 of Whitehall Manor Condominium; and

*Whereas*, Landlord and Tenant have agreed that Tenant has exercised its option to extend the Term of the Lease for a period of Five (5) Years as allowed by the Lease; and

*Whereas*, the parties desire that this Third Amendment to Lease and Memorandum of Lease Extension be executed to memorialize the election by Tenant of its exercise of the first of the three (3) extension options granted to Tenant under the Lease.

NOW, THEREFORE, the parties hereto, intending to be legally bound, and for other good and valuable consideration, do hereby agree as follows:

1. The above recitals are incorporated herein, and form a part hereof.

2. Tenant has exercised the privilege to extend the Term for 5 years, such that the original termination date of August 31, 2018 is now agreed to be August 31, 2023.

3. All other terms and conditions of the Lease (as amended through and including the Second Amendment), are ratified and affirmed.

4. Tenant expressly ratifies and affirms the rights granted to Landlord to confess judgment against Tenant as if the same were fully set forth herein at length. Tenant has knowingly and voluntarily granted the warrants of attorney and waivers of rights and authorization for confession of judgment.

App.115

5.      Tenant certifies that it has no claims against Landlord, and that Tenant has no knowledge of any default by Landlord under the Lease or other claim which it does, or could, have against Landlord.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Third Amendment to Lease and Memorandum of Lease Extension, intending to be legally bound effective as of August 31, 2018.

WHITEHALL TRUST ("Landlord")                    WHITEHALL MANOR, INC.  ("Tenant")
By: Whitehall Fiduciary LLC,
        Its Trustee

By: _____                    By: _____
        Abraham Atiyeh,                                           Nimita Kapoor Atiyeh,  President
        Manager of Trustee

App.116

# EXHIBIT B

AUG-01-2007  11:07          BP'"DKSIDE COM. CONST. CO                        6104033409    P.18

## LEASE AGREEMENT

THIS LEASE AGREEMENT is made this 1st day of January, 2006 between ABRAHAM R. ATIYEH ("**Landlord**"), and the Tenant named below.

**Tenant:**              SAUCON VALLEY MANOR, INC., a Pennsylvania corporation

**Tenant's Address for Notices:**
1177 N. 6th Street,
Whitehall, PA  10852

**Landlord's Address for Notices and Payments:**
1177 N. 6th Street,
Whitehall, PA  10852

**Premises:**            Property located at 1050 Main Street, Township of Lower Saucon, County of Northampton, Commonwealth of Pennsylvania, more specifically described on Exhibit A.

**Term:**                The term of the Lease begins on January 1, 2006 and ends on July 31, 2012.

**Base Rent:**           $5,748,000 for the Term, payable in monthly installments of $95,800 each in accordance with Section 4 hereof.

**Additional Rent:**     All other amounts due under this Lease by Tenant to Landlord, which amounts shall be computed as incurred during the Term of the Lease.

**Exhibits:**            A.  Description of Premises

1.    **Granting Clause.** In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant takes from Landlord, the Premises, to have and to hold for the Term, subject to the terms, covenants and conditions of this Lease.

2.    **Acceptance of Premises.**  Tenant shall accept the Premises in its "As Is" condition as of the first day of the Term, subject to all applicable laws, ordinances, regulations, covenants and restrictions. Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes. In no event shall Landlord have any obligation for any defects in the Premises or any limitation on its use. The taking of

- 1 -

DOCS_PH 1867164v.2

App.118

HUG-01-2007  11:07    BROOKSIDE COM. CONST. CO    6104053409    P.19

)                                      )

possession of the Premises shall be conclusive evidence that Tenant accepts the Premises and that the Premises were in good condition at the time possession was taken.

   3.   **Use; Zoning.** The Premises shall be used only for the purpose of a residential assisted living facility. Landlord does not warrant or represent that Tenant shall be able to obtain a permit under any zoning or other ordinance or regulation for such use as Tenant intends to make of the Premises, and nothing in this Lease shall obligate Landlord to assist Tenant in obtaining such permit. Landlord and Tenant further agree that in case the Tenant is unsuccessful in obtaining a permit under any zoning ordinance or regulation, that this Lease will not terminate without Landlord's consent and, should such consent be withheld by Landlord, Tenant agrees to use the Premises only in a manner permitted under such zoning ordinance or regulation. Tenant will use the Premises in a careful, safe and proper manner and will not commit waste, or subject the Premises to use that would damage the Premises. Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise, or vibrations to emanate from the Premises, or take any other action that would constitute a nuisance. Tenant, at its sole expense, shall use and occupy the Premises in compliance with all laws, including, without limitation, the Americans With Disabilities Act, if applicable, orders, judgments, ordinances, regulations, codes, directives, permits, licenses, covenants and restrictions now or hereafter applicable to the Premises (collectively, **"Legal Requirements"**). Tenant shall, at its expense, make any alterations or modifications, within or without the Premises, that are required by Legal Requirements related to Tenant's use or occupation of the Premises. Tenant will not use or permit the Premises to be used for any purpose or in any manner that would void Tenant's or Landlord's insurance, violate its conditions or increase the insurance risk. If any increase in the cost of any insurance on the Premises is caused by Tenant's use or occupation of the Premises, or because Tenant vacates the Premises, then Tenant shall pay the amount of such increase to Landlord.

   4.   **Base Rent.** Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Base Rent in the amount of $137,500 each, commencing on the date hereof and continuing thereafter on or before the first day of each calendar month of the Term. Payments of Base Rent for any fractional calendar month shall be prorated. All payments required to be made by Tenant to Landlord hereunder shall be sent to Landlord's address for notices and payments, as set forth above, or at such other place as Landlord may from time to time designate to Tenant in writing. The obligation of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Tenant shall have no right at any time to abate, reduce, or set-off any rent due hereunder except as may be expressly provided in this Lease. If Tenant is delinquent in any monthly installment of Base Rent or Additional Rent for more than 5 days, Tenant shall pay to Landlord on demand a late charge equal to ten percent (10%) of such delinquent sum, plus interest on any delinquent sum not paid within thirty (30) days after the due date therefor at the rate of 1½% per month (the **"Default Rate"**), which interest shall accrue from the due date to the date of payment. The provision for such late charge and interest shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as a penalty. Tenant shall pay to Landlord on demand a charge of $30.00 (or such higher sum as may be charged to Landlord by its bank) for any returned checks.

- 2 -

DOCS_PH 1867164v.2

AUG-01-2007  11:08        BROOKSIDE COM. CONST. CO                    6104033409    P.20

5.    **Net Lease.** This is a net lease, and, except as the contrary is otherwise expressly herein provided, all costs of taxes, insurance, improvements, maintenance, repairs, alterations, additions, and replacements relating to the Premises shall be at the sole cost and expense of Tenant, and Landlord shall not be obligated to make any improvements, maintenance, repairs, alterations, additions, or replacements to the Premises.

6.    **Utilities and Services.** Tenant shall supply and pay for all water, gas, electricity, heat, light, power, telephone, sewer, sprinkler services, refuse and trash collection, and other utilities and services used on the Premises, all maintenance charges for utilities, and any storm sewer charges or other similar charges for utilities imposed by any governmental entity or utility provider, together with any taxes, penalties, surcharges or the like pertaining to Tenant's use of the Premises. Landlord may cause, at Tenant's expense, any utilities to be charged directly to Tenant by the provider; and otherwise Tenant shall pay such charges to Landlord as Additional Rent. No interruption or failure of utilities shall be deemed to be the responsibility of Landlord, or shall result in the termination of this Lease or the abatement of rent.

7.    **Insurance.**

(a)    Tenant, at its expense, shall maintain during the Term: all risk property insurance covering the full replacement cost of all building(s) and other improvements on the Premises (excluding coverage of Tenant's personal property), and such other insurance as Landlord may reasonably deem appropriate or as any mortgagee of Landlord may require, including, without limitation, rent loss coverage and business personal property coverage including, without limitation, any Tenant-Made Alterations; and

(b)    Tenant, at its expense, shall  maintain during the Term, commercial general liability insurance, including blanket contractual liability insurance, covering Tenant's use of the Premises, with such coverages and limits of liability as Landlord may reasonably require, but not less than combined single limits of $2,000,000 per occurrence and in the aggregate for bodily injury or property damage (together with such umbrella coverage as Landlord may reasonably require); however, such limits shall not limit Tenant's liability hereunder. Landlord may from time to time require reasonable increases in any such limits. Tenant agrees to name Landlord as the insured party and loss payee in the policy for all risk property insurance. The commercial liability policies shall name Landlord as an additional insured and loss payee, and shall insure on an occurrence or a claims-made basis. The insurance policies shall be issued by insurance companies which are reasonably acceptable to Landlord, not be cancelable unless not less than 30 days' prior written notice shall have been given to Landlord, contain a hostile fire endorsement and a contractual liability endorsement and provide primary coverage to Landlord (any policy issued to Landlord providing duplicate or similar coverage shall be deemed excess over Tenant's policies). Such policies or certificates thereof shall be delivered to Landlord by Tenant upon commencement of the Term and upon each renewal of said insurance.

The all risk property insurance obtained by Tenant shall include a waiver of subrogation by the insurers of all rights based upon an assignment from its insured, against Landlord, its officers, directors, employees, managers, agents, invitees and contractors, in

- 3 -

DOCS_PH 1867164v.2

App.120

AUG-01-2007  11:08          P⌐ ⌐OOKSIDE COM. CONST. CO                    6104033409   P.21

connection with any loss or damage thereby insured against. Neither Landlord nor its officers, directors, employees, managers, agents, invitees or contractors shall be liable to Tenant for loss or damage caused by any risk coverable by all risk property insurance, and Tenant waives any claims against Landlord, and its officers, directors, employees, managers, agents, invitees and contractors for such loss or damage. The failure of Landlord to insure its property shall not void this waiver. Landlord and its agents, employees and contractors shall not be liable for, and Tenant hereby waives all claims against such parties for, business interruption and losses occasioned thereby sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence in or upon the Premises from any cause whatsoever, including without limitation, damage caused in whole or in part, directly or indirectly, by the negligence of Landlord or its agents, employees or contractors.

8.    **Landlord's Repairs.** Except as provided in Section 12 of this Lease, Landlord shall have no obligation to inspect or maintain the Premises, or to make repairs or replacements to the Premises of any kind or nature, including those to the roof, foundation, or exterior walls of any building on the Premises (the "**Building**").

9.    **Tenant's Maintenance and Repairs.** Tenant agrees to maintain the Premises, at Tenant's expense, in a good, clean, sanitary and safe condition, including, without limitation, maintenance of the lawn, shrubbery, sidewalks, driveways and other exterior areas of the Premises, snow and ice removal, yearly heater maintenance contract, sewage cost and maintenance, and trash removal. Tenant, at its expense, shall make all necessary repairs and replacements to all portions of the Premises and all areas, improvements and systems exclusively serving the Premises, including, without limitation: the roof, foundation, and exterior walls of the Building; plumbing, water and sewer lines serving the Premises; heating, ventilation and air conditioning systems; fire sprinklers, fire protection systems, security systems and all other systems existing on the Premises for the safety of the Premises and the occupants thereof; and all entries, doors, ceilings, windows, and interior walls. Such repairs and replacements include capital expenditures and repairs whose benefit may extend beyond the Term. Tenant agrees to enter into and maintain, at Tenant's expense, maintenance service contracts for heating, ventilation and air conditioning systems and other mechanical and building systems serving the Premises. The scope of services and contractors under such maintenance contracts shall be reasonably approved by Landlord. If Tenant fails to perform any repair or replacement for which it is responsible, Landlord may, but shall have no obligation to, perform such work and be reimbursed by Tenant within 10 days after demand therefor.

10.    **Tenant-Made Alterations, Removal of Fixtures and/or Personal Property.** Any alterations, additions, or improvements made by or on behalf of Tenant to the Premises ("Tenant-Made Alterations") shall be subject to Landlord's prior written consent. Tenant shall cause, at its expense, all Tenant-Made Alterations to comply with insurance requirements and with Legal Requirements and shall construct at its expense any alteration or modification required by Legal Requirements as a result of any Tenant-Made Alterations. All Tenant-Made Alterations shall be constructed in a good and workmanlike manner by contractors reasonably acceptable to Landlord and only good grades of materials shall be used. All plans and specifications for any Tenant-Made Alterations shall be submitted to Landlord for its approval.

- 4 -

DOCS_PH 1867164v.2

App.121

AUG-01-2007  11:09        ꜰ  ꝑOKSIDE COM. CONST. CO              ꜰ    6104033409    P.22

Landlord may monitor construction of the Tenant-Made Alterations. Tenant shall reimburse Landlord for its costs in reviewing plans and specifications and in monitoring construction. Landlord's right to review plans and specifications and to monitor construction shall be solely for its own benefit, and Landlord shall have no duty to see that such plans and specifications or construction comply with applicable laws, codes, rules and regulations. Tenant shall provide Landlord with the identities and mailing addresses of all persons performing work or supplying materials, prior to beginning such construction, and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable law. Tenant shall furnish security or make other arrangements satisfactory to Landlord to assure payment for the completion of all work free and clear of liens and shall provide certificates of insurance for worker's compensation and other coverage in amounts and from an insurance company satisfactory to Landlord protecting Landlord against liability for personal injury or property damage during construction. Upon completion of any Tenant-Made Alterations, Tenant shall deliver to Landlord sworn statements setting forth the names of all contractors and subcontractors who did work on the Tenant-Made Alterations and final lien waivers from all such contractors and subcontractors. Upon surrender of the Premises, all Tenant-Made Alterations and any leasehold improvements constructed by Landlord or Tenant shall remain on the Premises as Landlord's property, except to the extent Landlord requires removal at Tenant's expense of any such items or Landlord and Tenant have otherwise agreed in writing in connection with Landlord's consent to any Tenant-Made Alterations. Tenant shall repair any damage caused by such removal. Tenant agrees not to remove any fixtures or significant personal property from the Premises during the Term.

11. **Signs.** Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, decorations, balloons, flags, pennants, banners, or painting, or erect or install any signs, windows or door lettering, placards, decorations, or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent. Upon surrender or vacation of the Premises, Tenant shall have removed all signs and repair, paint, and/or replace the building facia surface to which its signs are attached. Tenant shall obtain all applicable governmental permits and approvals for sign and exterior treatments. All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Premises shall be subject to Landlord's approval and conform in all respects to Landlord's requirements. Landlord may erect a suitable sign on the Premises stating the Premises are available to let or for sale.

12. **Restoration.** If at any time during the Term the Premises are damaged by a fire or other casualty, Landlord shall notify Tenant within 30 days after receipt of at least 75% of the insurance proceeds relating to the casualty as to whether or not Landlord has elected to restore the Premises or to terminate the Lease. If this Lease is terminated under this Section, all rent shall be apportioned as of the date of the casualty. If Landlord elects not to terminate this Lease, then, subject to receipt of sufficient insurance proceeds, Landlord shall promptly restore the Premises excluding any improvements installed by Tenant or by Landlord and paid by Tenant, subject to delays arising from the collection of insurance proceeds or from Force Majeure events. Tenant at Tenant's expense shall promptly perform, subject to delays arising from the collection of insurance proceeds, or from Force Majeure events, all repairs or restoration not required to be done by Landlord and shall promptly re-enter the Premises and commence doing business in

- 5 -

DOCS_PH 1867164v.2

AUG-01-2007  11:10      P  )OKSIDE COM. CONST. CO          ;    6104033409    P.23

accordance with this Lease. Base Rent shall be abated for the period of repair and restoration in the proportion which the area of the Premises, if any, which is not usable by Tenant bears to the total area of the Premises. Such abatement shall be the sole remedy of Tenant, and Tenant waives any right to terminate the Lease by reason of damage or casualty loss.

13.    **Condemnation.** If any part of the Premises should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), and the Taking would prevent or materially interfere with Tenant's use of the Premises or in Landlord's judgment would materially interfere with or impair its ownership of the Premises, then upon written notice by Landlord this Lease shall terminate and Base Rent shall be apportioned as of said date. If part of the Premises shall be Taken, and this Lease is not terminated as provided above, the Base Rent payable hereunder during the unexpired Term shall be reduced to such extent as may be fair and reasonable under the circumstances. In the event of any such Taking, Landlord shall be entitled to receive the entire price or award from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to Tenant's Trade Fixtures, if a separate award for such items is made to Tenant.

14.    **Assignment and Subletting.** Without Landlord's prior written consent, Tenant shall not assign this Lease or sublease the Premises or any part thereof or mortgage, pledge, or hypothecate its leasehold interest or grant any concession or license within the Premises and any attempt to do any of the foregoing shall be void and of no effect. For purposes of this Section, a transfer of more than 25% of the ownership interests controlling Tenant or a change in the management of the Premises by Tenant shall be deemed an assignment of this Lease. Tenant shall reimburse Landlord for all of Landlord's reasonable out-of-pocket expenses in connection with any assignment or sublease. Upon Landlord's receipt of Tenant's written notice of a desire to assign or sublet the Premises, or any part thereof, Landlord may, by giving written notice to Tenant within 30 days after receipt of Tenant's notice, terminate this Lease with respect to the space described in Tenant's notice, as of the date specified in Tenant's notice for the commencement of the proposed assignment or sublease.

Notwithstanding any assignment or subletting, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the rent and for compliance with all of Tenant's other obligations under this Lease (regardless of whether Landlord's approval has been obtained for any such assignments or sublettings). In the event that the rent due and payable by a sublessee or assignee (or a combination of the rental payable under such sublease or assignment plus any bonus or other consideration therefor or incident thereto) exceeds the rental payable under this Lease, then Tenant shall be bound and obligated to pay Landlord as Additional Rent hereunder all such excess rental and other excess consideration within 10 days following receipt thereof by Tenant.

- 6 -

DOCS_PH 1867164v.2

App.123

AUG-01-2007  11:10         ! DOKSIDE COM. CONST. CO              j      6104033409    P.24

If this Lease be assigned or if the Premises be subleased (whether in whole or in part) or in the event of the mortgage, pledge, or hypothecation of Tenant's leasehold interest or grant of any concession or license within the Premises or if the Premises be occupied in whole or in part by anyone other than Tenant, then upon a default by Tenant hereunder Landlord may collect rent from the assignee, sublessee, mortgagee, pledgee, party to whom the leasehold interest was hypothecated, concessionee or licensee or other occupant and, except to the extent set forth in the preceding paragraph, apply the amount collected to the next rent payable hereunder; and all such rentals collected by Tenant shall be held in trust for Landlord and immediately forwarded to Landlord. No such transaction or collection of rent or application thereof by Landlord, however, shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties, or obligations hereunder.

15.    **Release and Indemnity.**

(a)    Release. Tenant agrees that Landlord and its agents, employees, officers, directors, shareholders and partners shall not be liable to Tenant and Tenant hereby releases said parties from any liability, for any personal injury, loss of income or damage to or loss of persons or property, or loss of use of any property, in or about the Premises from any cause whatsoever, even if such damage, loss or injury results from the negligence or willful misconduct of Landlord, its officers, employees or agents. The release contained in this Section 15 shall apply, by way of example and not limitation, to damage, loss or injury resulting directly or indirectly from any existing or future condition, matter or thing in the Premises, the Building or any part thereof, or from equipment or appurtenances becoming out of repair, or from accident, or from the flooding of basements or other subsurface areas or from refrigerators, sprinkling devices, air conditioning apparatus, water, snow, frost, steam, excessive heat or cold, falling plaster, broken glass, sewage, gas, odors, or noise, or the bursting or leaking of pipes or plumbing fixtures, and shall apply equally whether any such damage, loss or injury results from the act or omission of Tenant or any other persons, and whether such damage be caused by or result from any thing or circumstance, whether of a like or wholly different nature.

(b)    Indemnity. Tenant shall defend, indemnify, save and hold harmless ("Indemnify") Landlord and its agents, employees, officers, directors, shareholders, and partners from and against all liabilities, obligations, damages, penalties, claims, causes of action, costs, charges and expenses, including reasonable attorneys' fees, court costs, administrative costs, and costs of appeals which may be imposed upon or incurred by or asserted against Landlord or its Agents and arising out of or in connection with loss of life, personal injury or damage to property in or about the Premises or arising out of the occupancy or use of the Premises by Tenant or its Agents or occasioned wholly or in part by any act or omission of Tenant or its Agents, whether prior to, during or after the Term. The obligation of Tenant to Indemnify contained in this Section 15 shall not be limited by any limitation on the amount or type of damages, compensation or benefits payable by or for Tenant, its agents or contractors under workers' or workman's compensation acts, disability benefit acts or other employee benefits acts, or under any other insurance coverage Tenant may obtain. Tenant's obligations pursuant to this subsection are intended to survive the expiration or termination of this Lease. As used in the Section 12, "Agents" of a party means such party's employees, agents, representatives,

- 7 -

DOCS_PH 1867164v.2

App.124

AUG-01-2007  11:11        F  POKSIDE COM. CONST. CO                    6104033409    P.25

contractors, licensees, invitees, and, with regard to Tenant's Agents, shall include all residents and occupants of the Premises.

16.    **Inspection and Access.** Landlord and its agents, representatives, and contractors may enter the Premises at any reasonable time to inspect the Premises and to make repairs, to the extent Landlord elects to do so, and for any other business purpose. Landlord and Landlord's representatives may enter the Premises during business hours for the purpose of showing the Premises to prospective lenders, tenants or purchasers. Landlord may grant easements, make public dedications, and create restrictions on or about the Premises, provided that no such easement, dedication, or restriction materially interferes with Tenant's use or occupancy of the Premises. At Landlord's request, Tenant shall execute such instruments as may be necessary for such easements, dedications or restrictions.

17.    **Quiet Enjoyment.** If Tenant shall perform all of the covenants and agreements herein required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the Term, have peaceful and quiet enjoyment of the Premises against any person claiming by, through or under Landlord.

18.    **Surrender.** Upon termination of the Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in the same condition as received, broom clean, ordinary wear and tear and casualty loss and condemnation covered by Sections 12 and 13 excepted. Any Tenant-Made Alterations and property not so removed by Tenant as permitted or required herein shall be deemed abandoned and may be stored, removed, and disposed of by Landlord at Tenant's expense, and Tenant waives all claims against Landlord for any damages resulting from Landlord's retention and disposition of such property. All obligations of Tenant hereunder not fully performed as of the termination of the Term shall survive the termination of the Term, including without limitation, indemnity obligations and obligations concerning the condition and repair of the Premises.

19.    **Holding Over.** If Tenant retains possession of the Premises after the termination of the Term of this Lease, unless otherwise agreed in writing, such possession shall be subject to immediate termination by Landlord at any time, and all of the other terms and provisions of this Lease shall be applicable during such holdover period, except that Tenant shall pay Landlord from time to time, upon demand, as Base Rent for the holdover period, an amount equal to double the Base Rent in effect on the termination date, computed on a monthly basis for each month or part thereof during such holding over. All other payments shall continue under the terms of this Lease. In addition, Tenant shall be liable for all damages incurred by Landlord as a result of such holding over. No holding over by Tenant, with or without consent of Landlord, shall operate to extend this Lease, except as otherwise expressly provided, and this Section 19 shall not be construed as consent for Tenant to retain possession of the Premises. For purposes of this Section 19, "possession of the Premises" shall continue until, among other things, Tenant has delivered all keys to the Premises to Landlord, Landlord has complete and total dominion and control over the Premises, and Tenant has completely fulfilled all obligations required of it upon termination of the Lease as set forth in this Lease, including, without limitation, those concerning the condition and repair of the Premises.

- 8 -

DOCS_PH 1867164v.2

App.125

AUG-01-2007  11:11        P  ⁻OOKSIDE COM. CONST. CO              ¦        6104033409    P.26

20.    **Events of Default.** Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

(a)    Tenant shall fail to pay any installment of Base Rent or any other payment required herein when due, and such failure shall continue for a period of 5 days from the date such payment was due.

(b)    Tenant or any guarantor or surety of Tenant's obligations hereunder shall (i) make a general assignment for the benefit of creditors; (ii) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "proceeding for relief"); (iii) become the subject of any proceeding for relief which is not dismissed within 60 days of its filing or entry; or (iv) die or suffer a legal disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

(c)    Any insurance required to be maintained by Tenant pursuant to this Lease shall be cancelled or terminated or shall expire or shall be reduced or materially changed, except, in each case, as permitted in this Lease.

(d)    Tenant shall not occupy or shall vacate the Premises or shall remove its personal property and/or fixtures from the Premises, whether or not Tenant is in monetary or other default under this Lease.

(e)    Tenant shall attempt or there shall occur any assignment, subleasing or other transfer of Tenant's interest in or with respect to this Lease except as otherwise permitted in this Lease.

(f)    Tenant shall fail to discharge any lien placed upon the Premises in violation of this Lease within 30 days after any such lien or encumbrance is filed against the Premises.

(g)    Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Section 20.

21.    **Landlord's Remedies.**

(a)    Cumulative Remedies. In the event Tenant commits an event of default or otherwise breaches the terms of this Lease, Landlord shall have the following rights and remedies which shall be distinct, separate and cumulative and shall not operate to exclude or deprive Landlord of any other right or remedy allowed it by law or equity:

(i)    To declare due and payable and sue for recovery, all unpaid Base Rent for the unexpired Term of the Lease (and also all Additional Rent as the amounts of same

- 9 -

DOCS_PH 1867164v.2

App.126

AUG-01-2007  11:11       F  )OKSIDE COM. CONST. CO            6104033409   P.27

can be determined or reasonably estimated) as if by the terms of this Lease the same were payable in advance, together with all reasonable legal fees and other expenses incurred by Landlord in connection with the enforcement of any Landlord's rights or remedies hereunder; and/or

(ii)    To distrain, collect or bring action for such Base Rent and Additional Rent as being rent in arrears, or may enter judgment therefore in an action as herein elsewhere provided for in case of rent in arrears, or may file a Proof of Claim in any bankruptcy or insolvency proceeding for such Base Rent and Additional Rent, or institute any other proceedings, whether similar or dissimilar to the foregoing, to enforce payment thereof; and/or

(iii)    If Landlord has not elected to accelerate rent under clause (i) above, to terminate this Lease by giving written notice thereof to Tenant and, upon the giving of such notice, this Lease shall expire and terminate with the same force and effect as though the date of such notice was the date hereinabove fixed for the expiration of the Lease, and all rights of Tenant hereunder shall expire and terminate, but Tenant shall remain liable as hereinafter provided; and/or

(b)    Repossession of Premises. If any event of default shall have occurred and be continuing, Landlord may, whether or not the Lease has been terminated as herein provided, re-enter and repossess the Premises or any part thereof by force, summary proceedings, ejectment or otherwise and Landlord shall have the right to remove all persons and property therefrom. Landlord shall be under no liability for or by reason of any such entry, repossession or removal and no such re-entry or taking of possession of the Premises by Landlord shall be construed as an election on Landlord's part to terminate the Lease unless a written notice of such intention be given to Tenant or unless the termination of this Lease be by a court of competent jurisdiction. At any time or from time to time after the repossession of the Premises or any part thereof whether or not the Lease shall have been terminated, Landlord may (but shall be under no obligation to) relet all or any part of the Premises for the account of Tenant for such term or terms (which may be greater or less in the period which would otherwise have constituted the balance of the term) and on such conditions and for such uses as Landlord, in its absolute discretion, may determine and Landlord may collect and receive any rents payable by reason of such reletting. Landlord shall not be required to exercise any care or diligence with respect to such reletting or to the mitigation of damages. For the purpose of such reletting, Landlord may decorate or make repairs, changes, alterations or additions in or to the Premises or any part thereof to the extent deemed by Landlord desirable or convenient, and the cost of such decoration, repairs, changes, alterations or additions and any reasonable brokerage and legal fees expended by Landlord shall be charged to and payable by Tenant as Additional Rent hereunder. No expiration or termination of this Lease, by operation of law or otherwise, and no repossession of the Premises or any part thereof pursuant to this section, or otherwise, and no reletting of the Premises or any part thereof pursuant to this section shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such expiration, termination, repossession or reletting.

(c)    Payment of Damages.

- 10 -

DOCS_PH 1867164v.2

AUG-01-2007  11:12          B.._OOKSIDE COM. CONST. CO                    6104033409    P.28

(i)    In the event of any expiration or termination of this Lease or repossession of the Premises or any part thereof by reason of Tenant's default, and if Landlord has not elected to accelerate rent, Tenant shall pay to Landlord the Base Rent, Additional Rent and all other sums required to be paid by Tenant to and including the date of such expiration, termination, repossession and, thereafter, Tenant shall, until the end of what would have been the expiration of the term in the absence of such expiration, termination, repossession and whether or not the Premises or any part thereof shall have been relet, be liable to Landlord for, and shall pay to Landlord, as liquidated and agreed current damages, the Base Rent, Additional Rent and other sums which would be payable under this Lease by Tenant in the absence of such expiration, termination or repossession, less the net proceeds, if any, of any reletting effective for the account of Tenant, after deducting from such proceeds all of Landlord's reasonable expenses in connection with such reletting (including, without limitation, all related repossession costs, brokerage commissions, attorneys' fees, alterations costs and expenses for preparation of such reletting). Tenant shall pay such current damages on the days on which the rent would have been payable under this Lease in the absence of such expiration, termination, repossession and Landlord shall be entitled to recover the same from Tenant on each such day.

(ii)    At any time after such expiration or termination of this Lease or repossession of the Premises or any part thereof by reason of the occurrence of Tenant's default, whether or not Landlord shall have collected any current damages, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord on demand, unless Tenant has paid the whole or accelerated rent, as and for liquidated and agreed final damages for Tenant's default and in lieu of all current damages beyond the date of such demand (it being agreed that it would be impracticable or extremely difficult to fix the actual damages), an amount equal to the excess, if any, of (A) Base Rent, Additional Rent and other sums which would be payable under this Lease for the remainder of the term from the date of such demand for what would have been the unexpired term of this Lease in the absence of such expiration, termination or repossession, discounted at the rate of six (6%) percent per annum, over (B) the then fair rental value of the Premises for the same period, discounted at a like rate. If any statute or rule of law shall limit the amount of such liquidated final damages to less than the amount above agreed upon, Landlord shall be entitled to the maximum amount allowable under such statute or rule of law.

(iii)    Tenant further hereby expressly the authorizes and empowers Landlord, upon the occurrence of Tenant's default and so long as the same is continuing, to enter upon the Premises, distrain upon and remove therefrom all inventory, equipment, machinery, trade fixtures and personal property of whatsoever kind or nature, whether owned by Tenant or others, and to proceed, without judicial decree, writ of execution or assistance of constables, to conduct a private sale, by auction or sale bid, of such personal property, at which sale Landlord may bid without restriction. Tenant hereby waives the benefit of all laws, whether now in force or hereafter enacted, exempting any personal property on the Premises from sale or levy, whether execution thereon is had by order of any Court of through private sales herein authorized. Tenant waives the right to issue a Writ of Replevin under the Pennsylvania Rules of Civil Procedure, under the laws of the Commonwealth of Pennsylvania or under any law previously enacted and now in force or which hereinafter may be enacted for the recovery of any articles of any nature

- 11 -

DOCS_PH 1867164v.2

App.128

AUG-01-2007  11:13        B. JOOKSIDE COM. CONST. CO              6104033409    P.29

whatsoever seized under a distress for rent, or levy upon an execution for rent, liquidated damages or otherwise.

(d)    CONFESSION OF JUDGMENT.  TENANT HEREBY EMPOWERS ANY PROTHONOTARY OR ATTORNEY FOR ANY COURT OF RECORD TO APPEAR FOR TENANT IN ANY AND ALL ACTIONS WHICH MAY BE BROUGHT FOR RENT HEREUNDER AND TO SIGN FOR TENANT AN AGREEMENT FOR ENTERING INTO ANY COMPETENT COURT AN ACTION OR ACTIONS FOR THE RECOVERY OF RENT, AND IN SAID SUITS OR IN SAID ACTION OR ACTIONS TO CONFESS JUDGMENT AGAINST TENANT FOR ALL OR ANY PART OF THE RENT INCLUDING, AT LANDLORD'S OPTION, THE RENT FOR THE ENTIRE UNEXPIRED BALANCE OF THE TERM OF THIS LEASE, AND ANY CHARGES, PAYMENTS, COSTS AND EXPENSES RESERVED AS RENT OR AGREED TO BE PAID BY THE TENANT, AND FOR INTEREST AND COSTS TOGETHER WITH AN ATTORNEY'S COMMISSION OF TEN (10%) PERCENT THEREOF.  SAID AUTHORITIES SHALL NOT BE EXHAUSTED BY ONE EXERCISE THEREOF, BUT JUDGMENT MAY BE CONFESSED AS AFORESAID FROM TIME TO TIME AND AS OFTEN AS ANY OF THIS SAID RENT OR OTHER CHARGES RESERVED AS RENT OR LIQUIDATED DAMAGES SHALL FALL DUE OR BE IN ARREARS, AND SUCH POWERS MAY BE EXERCISED AS WELL AFTER THE EXPIRATION OF THE ORIGINAL TERM OR DURING ANY EXTENSION OR RENEWAL OF THIS LEASE.

(e)    ACTION FOR EJECTMENT. UPON TERMINATION OF THIS LEASE OR EXPIRATION OF THE TERM OR ANY EXTENSION THEREOF, IT SHALL BE LAWFUL FOR ANY ATTORNEY AS ATTORNEY FOR TENANT TO SIGN AN AGREEMENT FOR ENTERING IN ANY COMPETENT COURT AN ACTION IN EJECTMENT, WITHOUT ANY STAY OF EXECUTION OR APPEAL AGAINST TENANT AND ALL PERSONS CLAIMING UNDER TENANT FOR THE RECOVERY BY LANDLORD OF POSSESSION OF THE HEREIN PREMISES, WITHOUT LIABILITY ON THE PART OF THE SAID ATTORNEY, WHICH THIS LEASE SHALL BE A SUFFICIENT WARRANT, WHEREUPON, IF LANDLORD SO DESIRES A WRIT OF POSSESSION WITH CLAUSES FOR COST MAY ISSUE FORTHWITH WITHOUT ANY PRIOR WRIT OR PROCEEDINGS WHATSOEVER. IF FOR ANY REASON AFTER SUCH ACTION HAS BEEN COMMENCED THE SAME SHALL BE DETERMINED AND THE POSSESSION OF THE PREMISES HEREBY DEMISED REMAIN IN OR BE RESTORED TO TENANT, THE LANDLORD SHALL HAVE THE RIGHT IN ANY SUBSEQUENT DEFAULT OR DEFAULTS TO BRING ONE OR MORE FURTHER ACTIONS IN THE MANNER AND FORM HEREIN BEFORE SET FORTH, TO RECOVER POSSESSION OF SAID PREMISES FOR SUCH SUBSEQUENT DEFAULT. NO SUCH TERMINATION OF THIS LEASE NOR TAKING, NOR RECOVERING POSSESSION OF THE PREMISES SHALL DEPRIVE LANDLORD OF ANY REMEDIES OR ACTION AGAINST TENANT FOR RENT OR DAMAGES DUE OR TO BECOME DUE FOR THE BREACH OF ANY CONDITION OR COVENANT HEREIN CONTAINED, NOR SHALL THE BRINGING OF ANY SUCH ACTION FOR RENT, OR BREACH OF COVENANT OR CONDITION NOR THE RESORT TO ANY OTHER REMEDY HEREIN PROVIDED FOR THE RECOVERY OF RENT OR

- 12 -

DOCS_PH 1867164v.2

AUG-01-2007  11:13        . .00OKSIDE COM. CONST. CO                  ⌐      6104033409     P.30

DAMAGES FOR SUCH BREACH BE CONSTRUED AS A WAIVER OF THE RIGHT TO INSIST UPON THE NATURE AND TO OBTAIN POSSESSION IN THE MANNER HEREIN PROVIDED.

(f)      Landlord's Affidavit.  In any action in ejectment or for rent in arrears, Landlord shall first cause to be filed in such action, an affidavit made by it or someone acting for it setting forth the facts necessary to authorize the entry of judgment, of which facts such affidavit shall be conclusive evidence, and if a true copy of this Lease be filed in such action, it shall not be necessary to file the original as a warrant of attorney, any rule of court, custom or practice to the contrary notwithstanding.

(g)      Judgment Final.  Any judgment, order or decree entered against Tenant by or any court or Magistrate by virtue of the powers of attorney contained in this Lease, or otherwise, shall be final, and Tenant will not take an appeal, certiorari, writ of error, exception or objection to same, or file a motion or rule to strike off or open or to stay execution of the same. Tenant releases Landlord and any and all attorneys who may appear for Tenant all errors in the said proceedings. Tenant expressly waives the benefits of law, now or hereafter in force, exempting any goods on the Premises, or elsewhere, from the distraint, levy or sale in any legal proceedings taken by the Landlord to enforce any rights under this Lease.  Tenant further waives the right to any notice to remove as may be specified in the Pennsylvania Landlord and Tenant Act of April 6, 1951, as amended, or any similar or successor provision of law, and agrees that five (5) days notice shall be sufficient in any case where a longer period may be statutorily specified.

(h)      WAIVER.  IT IS MUTUALLY AGREED BY AND BETWEEN LANDLORD AND TENANT THAT THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF SAID PREMISES, ANY CLAIM OF INJURY OR DAMAGE, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE. IT IS FURTHER MUTUALLY AGREED THAT IN THE EVENT THAT LANDLORD COMMENCES ANY SUMMARY PROCEEDING FOR NON-PAYMENT OF RENT, TENANT WILL NOT INTERPOSE ANY COUNTERCLAIM OF WHATEVER NATURE OR DESCRIPTION IN ANY SUCH PROCEEDING.

(i)      Injunction.  In the event of a breach or threatened breach by Tenant of any of the agreements, conditions, covenants or terms hereof, Landlord shall have the right of injunction to restrain the same and the right to invoke any remedy allowed by law or in equity whether or not other remedies, indemnity or reimbursements are herein provided.

(j) ,    Interest and Costs.  All amounts owed by Tenant to Landlord under this Lease, other than the Base Rent, shall be deemed Additional Rent and, unless otherwise provided, shall be paid within ten (10) days from the date Landlord renders a statement of account. All Base Rent and Additional Rent shall bear interest from the date due until the date

- 13 -

DOCS_PH 1867164v.2

AUG-01-2007 11:14      E. DOKSIDE COM. CONST. CO      / 6104033409   P.31

paid at the Default Rate. Tenant shall pay upon demand all of Landlord's costs, charges and expenses, including the reasonable fees of counsel, agents and others retained by Landlord, incurred in enforcing Tenant's obligations hereunder or incurred by Landlord in any litigation, negotiation or transaction which Tenant causes Landlord, without Landlord's fault, to become involved or concerned.

(k)     Removal of Tenant's Property.  All property removed from the Premises by Landlord pursuant to any provision of this Lease or of law may be handled, removed or stored by Landlord at the cost and expense of the Tenant, and the Landlord shall in no event be responsible for the value, preservation or safekeeping thereof. Tenant shall pay Landlord for all expenses incurred by Landlord in such removal and storage charges against such property while the same shall be in Landlord's possession or under Landlord's control.  All property not removed from the Premises or not retaken from storage by Tenant within thirty (30) days after the end of the term, however terminated, shall be conclusively deemed to be conveyed by Tenant to Landlord as by bill of sale without further payment or credit by Landlord to Tenant.

22.     **Bankruptcy.**  If at any time during the term of this Lease there shall be filed by or against Tenant or Guarantor in any court pursuant to any statute either of the United States or of any State (or Canada, as to Guarantor) a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of Tenant's or Guarantor's property, or if a receiver or trustee takes possession of any of the assets of Tenant or Guarantor, or if the leasehold interest herein passes to a receiver, or if Tenant or Guarantor makes an assignment for the benefit of creditors or petitions for or enters into an arrangement (any of which are referred to herein as "a bankruptcy event"), then such bankruptcy event shall be an event of default under this Lease, and the following provisions shall apply:

Any receiver or trustee in bankruptcy or Tenant as debtor in possession ("debtor") shall either expressly assume or reject this Lease within sixty (60) days following the earlier of the entry of an "Order for Relief", or an order confirming a Plan of Reorganization.

In the event of an assumption of the Lease by a debtor, receiver, or trustee, such debtor, receiver, or trustee shall immediately after such assumption (1) cure any default or provide adequate assurances that defaults will be promptly cured; and (2) compensate Landlord for actual pecuniary loss or provide adequate assurances that compensation will be made for actual pecuniary loss; and (3) provide adequate assurance of future performance.

Where a default exists under the Lease, the party assuming the Lease may not require Landlord to provide services or supplies incidental to the Lease before its assumption by such trustee or debtor, unless Landlord is compensated under the terms of the Lease for such services and supplies provided before the assumption of such Lease.

Landlord specifically reserves any and all remedies available to Landlord in Section 22 hereof or at law or in equity in respect of a bankruptcy event by Tenant to the extent such remedies are permitted by law.

- 14 -

DOCS_PH 1867164v.2

AUG-01-2007  11:14         B.  JOKSIDE COM. CONST. CO              )   6104033409   P.32

23.     **Limitation of Liability.** All obligations of Landlord hereunder shall be construed as covenants, not conditions; and, except as may be otherwise expressly provided in this Lease, Tenant may not terminate this Lease for breach of Landlord's obligations hereunder. Landlord shall have no liability for consequential damages, nor for punitive or exemplary damages. All obligations of Landlord under this Lease will be binding upon Landlord only during the period of its ownership of the Premises and not thereafter. The term "Landlord" in this Lease shall mean only the owner, for the time being of the Premises, and in the event of the transfer by such owner of its interest in the Premises, such owner shall thereupon be released and discharged from all obligations of Landlord thereafter accruing, but such obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership. Any liability of Landlord under this Lease shall be limited solely to its interest in the Premises, and in no event shall any personal liability be asserted against Landlord in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord; and in any proceeding or in the case of any judgment against Landlord, Tenant shall request that the judgment index be noted to reflect such limitation of liability.

24.     **Subordination.** This Lease and Tenant's interest and rights hereunder are and shall be subject and subordinate at all times to the lien of any first mortgage, now existing or hereafter created on or against the Premises, and all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments and extensions thereof, without the necessity of any further instrument or act on the part of Tenant. Tenant agrees, at the election of the holder of any such mortgage, to attorn to any such holder. Tenant agrees upon demand to execute, acknowledge and deliver such instruments, confirming such subordination and such instruments of attornment as shall be requested by any such holder. Tenant hereby appoints Landlord attorney in fact for Tenant irrevocably (such power of attorney being coupled with an interest) to execute, acknowledge and deliver any such instrument and instruments for and in the name of the Tenant and to cause any such instrument to be recorded. Notwithstanding the foregoing, any such holder may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant, and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution, delivery or recording and in that event such holder shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery and recording of such mortgage and had been assigned to such holder. The term "mortgage" whenever used in this Lease shall be deemed to include deeds of trust, security assignments and any other encumbrances, and any reference to the "holder" of a mortgage shall be deemed to include the beneficiary under a deed of trust.

25.     **Mechanic's Liens.** Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in, the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises and that it will save and hold Landlord harmless from all loss, cost or expense based on or arising out of asserted claims or liens against

- 15 -

DOCS_PH 1867164v.2

App.132

AUG-01-2007 11:15          B. JOKSIDE COM. CONST. CO              )    6104033409    P.33

the leasehold estate or against the interest of Landlord in the Premises or under this Lease, Tenant shall give Landlord immediate written notice of the placing of any lien or encumbrance against the Premises and cause such lien or encumbrance to be discharged within 30 days of the filing or recording thereof; provided, however, Tenant may contest such liens or encumbrances as long as such contest prevents foreclosure of the lien or encumbrance and Tenant causes such lien or encumbrance to be bonded or insured over in a manner satisfactory to Landlord within such 30 day period.

26. **Estoppel Certificates.** Tenant agrees, from time to time, within three (3) business days after request of Landlord, to execute and deliver to Landlord, or Landlord's designee, any estoppel certificate requested by Landlord, stating that this Lease is in full force and effect, the date to which rent has been paid, that Landlord is not in default hereunder (or specifying in detail the nature of Landlord's default), the termination date of this Lease and such other matters pertaining to this Lease as may be requested by Landlord. Tenant's obligation to furnish each estoppel certificate in a timely fashion is a material inducement for Landlord's execution of this Lease. No cure or grace period provided in this Lease shall apply to Tenant's obligations to timely deliver an estoppel certificate. Tenant hereby irrevocably appoints Landlord as its attorney in fact to execute on its behalf and in its name any such estoppel certificate if Tenant fails to execute and deliver the estoppel certificate within three (3) business days after Landlord's written request thereof.

27. **Environmental Requirements.** Except for Hazardous Material contained in products used by Tenant in de minimis quantities for ordinary cleaning and office purposes, Tenant shall not permit or cause any party to bring any Hazardous Material upon the Premises or transport, store, use, generate, manufacture or release any Hazardous Material in or about the Premises without Landlord's prior written consent. Tenant, at its sole cost and expense, shall operate its business in the Premises in strict compliance with all Environmental Requirements and shall remediate in a manner satisfactory to Landlord any Hazardous Materials released on or from the Premises by Tenant, its agents, employees, contractors, subtenants or invitees. Tenant shall complete and certify to disclosure statements as requested by Landlord from time to time relating to Tenant's transportation, storage, use, generation, manufacture or release of Hazardous Materials on the Premises. The term "Environmental Requirements" means all applicable present and future statutes, regulations, ordinances, rules, codes, judgments, orders or other similar enactments of any governmental authority or agency regulating or relating to health, safety, or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; and all state and local counterparts thereto, and any regulations or policies promulgated or issued thereunder. The term "Hazardous Materials" means and includes any substance, material, waste, pollutant, or contaminant listed or defined as hazardous or toxic, under any Environmental Requirements, asbestos and petroleum, including crude oil or any fraction thereof, natural gas liquids, liquified natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas). As defined in Environmental Requirements, Tenant is and shall be deemed to be the "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Premises by

- 16 -

DOCS_PH 1867164v.2

App.133

AUG-01-2007  11:15    DOOKSIDE COM. CONST. CO                      6104033409    P.34

Tenant, its agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom.

Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all losses (including, without limitation, diminution in value of the Premises and loss of rental income from the Premises), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation, removal or management of any asbestos brought into the property or disturbed in breach of the requirements of this Section 27, regardless of whether such removal or management is required by law) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials for which Tenant is obligated to remediate as provided above or any other breach of the requirements under this Section 27 by Tenant, its agents, employees, contractors, subtenants, assignees or invitees, regardless of whether Tenant had knowledge of such noncompliance.  The obligations of Tenant under this Section 27 shall survive any termination of this Lease.

Landlord shall have access to, and a right (but not an obligation) to perform inspections and tests of, the Premises to determine Tenant's compliance with Environmental Requirements, its obligations under this Section 27, or the environmental condition of the Premises.  Access shall be granted to Landlord upon Landlord's prior notice to Tenant and at such times so as to minimize, so far as may be reasonable under the circumstances, any disturbance to Tenant's operations.  Such inspections and tests shall be conducted at Landlord's expense, unless such inspections or tests reveal that Tenant has not complied with any Environmental Requirement, in which case Tenant shall reimburse Landlord for the reasonable cost of such inspection and tests.  Landlord's receipt of or satisfaction with any environmental assessment in no way waives any rights that Landlord holds against Tenant.

28.    **Security Service.**  Tenant acknowledges and agrees that Landlord is not providing any security services with respect to the Premises and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises.

29.    **Force Majeure.**  Landlord shall not be held responsible for delays in the performance of its obligations hereunder when caused by strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, delay in issuance of permits, enemy or hostile governmental action, civil commotion, fire or other casualty, and other causes beyond the reasonable control of Landlord ("Force Majeure").

30.    **Entire Agreement.** This Lease constitutes the complete agreement of Landlord and Tenant with respect to the subject matter hereof. No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements,

- 17 -

DOCS_PH 1867164v.2

AUG-01-2007  11:16          .bOOKSIDE COM. CONST. CO          6104033409   P.35

promises, negotiations, or representations are superseded by this Lease. This Lease may not be amended except by an instrument in writing signed by both parties hereto.

    31.    **Severability.**    If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby. It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

    32.    **Brokers.** Tenant represents and warrants that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the broker, if any, set forth on the first page of this Lease, and Tenant agrees to indemnify and hold Landlord harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this leasing transaction.

    33.    **Miscellaneous.**    (a)    Any payments or charges due from Tenant to Landlord hereunder shall be considered rent for all purposes of this Lease.

    (b)    If and when included within the term "Tenant," as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant.

    (c)    All notices required or permitted to be given under this Lease shall be in writing and shall be sent by registered or certified mail, return receipt requested, or by a reputable national overnight courier service, postage prepaid, or by hand delivery addressed to the parties at their addresses as set forth at the beginning of this Lease. Either party may by notice given aforesaid change its address for all subsequent notices. Except where otherwise expressly provided to the contrary, notice shall be deemed given upon delivery or attempted delivery.

    (d)    Except as otherwise expressly provided in this Lease or as otherwise required by law, Landlord retains the absolute right to withhold any consent or approval.

    (e)    At Landlord's request from time to time Tenant shall furnish Landlord with true and complete copies of its most recent annual and quarterly financial statements prepared by Tenant or Tenant's accountants and any other financial information or summaries that Tenant typically provides to its lenders or shareholders.

    (f)    Neither this Lease nor a memorandum of lease shall be filed by or on behalf of Tenant in any public record. Landlord may prepare and file, and upon request by Landlord Tenant will execute, a memorandum of lease.

- 18 -

DOCS_PH 1867164v.2

AUG-01-2007  11:16      L JOOKSIDE COM. CONST. CO              6104033409   P.36

(g)    The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease or any exhibits or amendments hereto.

(h)    The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties.

(i)    Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.  The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

(j)    It is expressly the intent of Landlord and Tenant at all times to comply with applicable law governing the maximum rate or amount of any interest payable on or in connection with this Lease. If applicable law is ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected by Landlord be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to Tenant), and the provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

(k)    Construction and interpretation of this Lease shall be governed by the laws of the state in which the Premises is located, excluding any principles of conflicts of laws.

(l)    Time is of the essence as to the performance of Tenant's obligations under this Lease.

(m)    All riders and addenda now or hereafter attached hereto are hereby incorporated into this Lease and made a part hereof. In the event of any conflict between such riders or addenda and the terms of this Lease, such riders or addenda shall control.

(n)    In the event either party hereto initiates litigation to enforce the terms and provisions of this Lease, the non-prevailing party in such action shall reimburse the prevailing party for its reasonable attorney's fees, filing fees, and court costs.

(o)    Each person executing this Lease on behalf of Tenant certifies that he or she has the authority to do so.

(p)    This Lease shall be binding upon and shall inure to the benefit of Landlord and Tenant, and their respective heirs, personal representatives, principals, successors and assigns, except that no rights shall inure to the benefit of any assignee of Tenant unless the

- 19 -

DOCS_PH 1867164v.2

AUG-01-2007  11:16        b. _OOKSIDE COM. CONST. CO                        6104033409    P.37

assignment of the Lease has previously been approved in writing by Landlord and the assignee or successor to Tenant has executed a consent and authorization for Confession of Judgment and to be otherwise bound hereby.

(q)    Landlord and Tenant both acknowledge that this is a commercial transaction.

(r)    If Landlord accepts the rent at any time after the rent is due, or Landlord fails to enforce any of its rights under this Lease or any of the penalties, forfeitures or conditions contained in this Lease, such forbearance shall not in any way be considered as a waiver of the right to enforce the same; and thereafter Landlord may enforce such rights, penalties or forfeitures against Tenant without any notice whatsoever; and any attempt to collect the rent by one proceeding shall not be considered as a waiver of the right of Landlord to collect the same by any other proceeding.

34.    **Landlord's Lien/Security Interest.**  Tenant hereby grants Landlord a security interest, and this Lease constitutes a security agreement, within the meaning of and pursuant to the Uniform Commercial Code of the state in which the Premises are situated as to all of Tenant's property situated in, or upon, or used in connection with the Premises (except merchandise sold in the ordinary course of business) as security for all of Tenant's obligations hereunder, including, without limitation, the obligation to pay rent.  Such personalty thus encumbered includes specifically all trade and other fixtures for the purpose of this Section and inventory, equipment, contract rights, accounts receivable and the proceeds thereof.  In order to perfect such security interest, Tenant shall execute such financing statements and file the same at Tenant's expense at the state and county Uniform Commercial Code filing offices as often as Landlord in its discretion shall require; and Tenant hereby irrevocably appoints Landlord its agent for the purpose of executing and filing such financing statements on Tenant's behalf as Landlord shall deem necessary.

35.    **Limitation of Liability of Trustees, Shareholders, and Officers of Landlord.**  Any obligation or liability whatsoever of Landlord which may arise at any time under this Lease, or any obligation or liability which may be incurred by Landlord pursuant to any other instrument, transaction, or undertaking contemplated hereby, shall not be personally binding upon, nor shall resort for the enforcement thereof be had to, the property of the trustees, directors, shareholders, officers, employees or agents of Landlord, regardless of whether such obligation or liability is in the nature of contract, tort, or otherwise.

**SECTION 21 OF THIS LEASE PROVIDES FOR THE CONFESSION OF JUDGMENT AGAINST TENANT FOR MONEY AND FOR EJECTMENT.  IN CONNECTION THEREWITH, TENANT, KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND UPON ADVICE OF SEPARATE COUNSEL, UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO PRIOR NOTICE AND AN OPPORTUNITY FOR HEARING UNDER THE RESPECTIVE CONSTITUTIONS AND LAWS OF THE UNITED STATES AND THE COMMONWEALTH OF PENNSYLVANIA. WITHOUT LIMITATION OF THE FOREGOING, TENANT HEREBY SPECIFICALLY WAIVES ALL RIGHTS TENANT HAS OR MAY HAVE TO NOTICE AND OPPORTUNITY FOR**

- 20 -

DOCS_PH 1867164v.2

App.137

AUG-01-2007  11:17        B. .JOOKSIDE COM. CONST. CO                    6104033409    P.38

A HEARING PRIOR TO EXECUTION UPON ANY JUDGMENT CONFESSED AGAINST TENANT BY LANDLORD HEREUNDER.

TENANT FURTHER ACKNOWLEDGES THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS SAID PROVISIONS WITH TENANT'S INDEPENDENT LEGAL COUNSEL AND THAT THE MEANING AND EFFECT OF SUCH PROVISIONS HAVE BEEN FULLY EXPLAINED TO TENANT BY SUCH COUNSEL, AND AS EVIDENCE OF SUCH FACT AN AUTHORIZED OFFICER OF TENANT SIGNS HIS OR HER INITIALS IN THE SPACE PROVIDED BELOW.

_____
(Initials)

IN WITNESS WHEREOF, Landlord and Tenant, intending to be legally bound hereby, have executed this Lease as of the day and year first above written.

_____
ABRAHAM R. ATIYEH

SAUCON VALLEY MANOR, INC.

By: _____
Name: RAMG ANOUN
Title:

(Corporate Seal)

- 21 -

DOCS_PH 1867164v.2

AUG-01-2007  11:17        .bOOKSIDE COM. CONST. CO         6104033409    P.39

## EXHIBIT A

### Description of Premises

**ALL THAT CERTAIN** tract or parcel of land situate in the Township of Lower Saucon, County of Northampton, Commonwealth of Pennsylvania, bounded and described as follows:

**BEGINNING** at a railroad spike (bench mark, elevation 480.00) in Wassergass Road (Legislative Route T-391) and running in an easterly direction M. 82° 43' 30" E. 255.53' to a spike; N 78° 50' 30" E. 354.75' to a spike; N 70° 49' 30" E. 45.54' to a spike; thence in a southerly direction along the property now or late of Jarcu Petran, S 9° 58' E. 580.24' to a pin; S. 77° 31' 30" W. 8.25' to a pin; S. 12° 28' 30" E. 533.26' to a point; thence in a westerly direction along property of the School District of the Township of Lower Saucon (now Saucon Valley School District) S. 81° 26' W. 552.23' to a pin; thence continuing S. 81° 28' W. 210.11' along property now or late of Louis Fortley to an iron pin; thence in a northerly direction bordering the property now or later of George Mar N. 5° 45' W. 464.72' to a pin; thence N. 4° 53' W. 631.24' bordering the property now or late of Ronald J. Sweeney to the point of **BEGINNING**. **CONTAINING** 16.25 acres, more or less.

**BEING THE SAME PREMISES** which Saucon Valley School District, successors in interest to Hellertown-Lower Saucon School Authority, by Indenture dated October 1, 1999, did grant and convey unto Abraham R. Atiyeh, said deed being recorded in the Office for the Recording of Deeds in and for Northampton County, at Easton, Pennsylvania, in Deed Book Volume 1999-1, at Page 153214, reference thereunto had, the same will therein more fully and at large appear.

**UNDER AND SUBJECT** to the right-of-way contained in the foregoing deed.

- 22 -

DOCS_PH 1867164v.2

AUG-01-2007  11:17      B. JOOKSIDE COM. CONST. CO                    6104033409    P.40

## Certification

The undersigned, SAUCON VALLEY MANOR, INC., a Pennsylvania corporation (the "**Tenant**") in connection with the Lease Agreement dated January 1, 2006 (the "**Lease**") entered with ABRAHAM R. ATIYEH, an individual (the "**Landlord**") hereby certifies the following:

1.  Tenant has been represented by legal counsel in connection with the Lease.

2.  Tenant has received advice as to the meaning and consequences of the provisions in the Lease authorizing confession of judgment, execution and attachment, confession of judgment in ejectment, waiver of errors, waiver of the right to appeal, all other waivers provided for under the Lease and have executed the Lease following receipt of such advice of counsel.

3.  Tenant, in furtherance of the above, hereby certifies that it has elected to execute the Lease with full understanding of the consequences of such election.

4.  If Tenant is a Corporation, then signatory certifies that he/she has been authorized to execute the Lease.

5.  Tenant acknowledges that the Lease constitutes a commercial transaction.

Tenant has caused this Certification to be executed this _____ day of January, 2006.

SAUCON VALLEY MANOR, INC.

By: _____

Name: _Rhm i, Brood_

Title: _V f_

(Corporate Seal)

- 23 -

DOCS_PH 1867164v.2

TOTAL P.40

App.140

)

( )

)

## Lease Amendment Agreement

MADE as of the 8th day of December, 2006 by and between ABRAHAM R. ATIYEH, an adult individual, herein called Landlord, having an office at 1177 Sixth Street, Whitehall, PA 18052;

### AND

SAUCON VALLEY MANOR, INC., a Pennsylvania corporation, herein called Tenant, having an office at 1050 Main Street, Hellertown, Pennsylvania.

### *Witnesseth:*

WHEREAS, Landlord and Tenant entered into a Lease for the property known as 1050 Main Street, Hellertown, Northampton County, Pennsylvania, (the "Lease"), which lease included the main building and parking lots and open space, consisting of Northampton County tax parcels Q7SW2A-1-3 and Q7SW2A-1-5, (the Property); and

WHEREAS, pursuant to the agreement and understandings between Landlord and Tenant, Landlord was permitted to redevelop the open space and allow use of some of the parking in common with Tenant; and

)

WHEREAS, Landlord has declared a condominium for the Property; and

WHEREAS, Landlord and Tenant desire to amend the Lease to reflect the revision of the leased area and the reduced obligations of Tenant concerning the Property, as follows.

NOW, THEREFORE, the parties hereto, intending to be legally bound, and for other good and valuable consideration, do hereby agree as follows:

1. The Lease is hereby amended to modify the Leased Premises to be Unit 1 of the Condos at Saucon Valley Manor, a Condominium.

2. The Leased Premises under the Lease shall also include all of the parking rights allowed on Unit 2 for Unit 1 owners, residents, guests, tenants and invitees.

3. The Leased Premises under the Lease shall also include all easements, encroachment and other rights of Unit 1 as exist or as are allowed

)

)                                                      )

in the future under the Declaration of Condominium for the Condos at Saucon Valley Manor.

4.      Landlord, and not Tenant, shall be responsible for the maintenance and lawn cutting and other actions concerning the area known as Unit 4 of the Condos at Saucon Valley Manor.

5.      Landlord, and not Tenant, shall be responsible for the taxes due upon Unit 4 of the the Condos at Saucon Valley Manor; and the successor(s) to Landlord in ownership of Unit 3 shall be responsible for its taxes and related charges.

6.      In the event of any failure of Landlord to exercise the voting rights of the Unit 1 Owner in a manner consistent with the Lease, the Tenant is authorized and empowered to vote for Landlord as the Unit 1 Owner to fulfill the obligations of Landlord, as amended by this Lease Amendment Agreement. This right is granted with an interest so long as Tenant is not in default under the Lease and no event which would be a default with the passage of time or giving of notice, or both, exists.

7.      Landlord acknowledges that the business of Tenant involves the keeping or dealing with medical records and information, and that any entry by Landlord is made with the understanding that the same will not intentionally expose medical records.

8.      The Lease, except as specifically modified herein, is ratified and affirmed, including the rights of Landlord to confession of judgment and other allowances of summary procedures or waivers of rights by Tenant.

IN WITNESS WHEREOF, and intending to be legally bound, the parties have executed this Lease Addendum Agreement intending to be legally bound as of the date and year first above set forth.

SAUCON VALLEY MANOR, INC.

By: _____          _____
Its (Vice) President                              Abraham R. Atiyeh
                                                        (Landlord)

)

App.142

## ADDENDUM TO LEASE AGREEMENT

MADE October 1, 2007, by and between, Saucon Trust hereinafter, sometimes referred to as Landlord;

### AND

Saucon Valley Manor Inc., hereinafter sometimes referred to as Tenant.

### WITNESSETH:

WHEREAS Abraham R. Atiyeh as Landlord (the "Assignor") did enter into an Agreement of Lease with Tenant effective January 1, 2006 as more fully described in the above Assignment of Lease (the "Lease") which Lease was assigned to Landlord by the above Assignment of Lease; and

WHEREAS Landlord and Tenant have agreed to amend the description of the Premises and add and delete certain terms and conditions set forth in this Addendum to Lease Agreement with all terms of the Lease not inconsistent herewith to continue to remain in full force and effect.

NOW, THEREFORE, the parties hereto, intending to be legally bound, do hereby agree as follows:

1. The above Recitals do form a part of this Addendum to Lease Agreement.

2. Section 14 of Lease is deleted in its entirety.

3. The parties acknowledge that the rent set forth on page 1 of the lease (monthly installments of $95,800.) is correct and do correct and modify the amount set forth in Section 4 to read "monthly installments if Base Rent in the amount of $95,800."

4. The Premises is amended to read "Unit 1 of the Condos at Saucon Valley Manor, Lower Saucon Township, Northampton County, Pennsylvania" as more fully described on Exhibit A to this Addendum to Lease.

5. In addition to the Base Rent and other rent or charges set forth in the Lease, Tenant shall pay all common charges for the Premises pursuant the condominium documents of Condos at Saucon Valley ("The Condo Documents") and shall abide by all rules, regulations, terms, covenants and conditions of the Condominium Documents.

6. All other terms, covenants and conditions of the aforementioned Lease not inconsistent herewith are hereby ratified and confirmed by the parties hereto the same as

3

App.143

if set forth herein at length.

IN WITNESS WHEREOF the parties have hereunto affixed their hands and seals to this Addendum to Lease Agreement as of the day and year above first written, intending to be legally bound hereby.

Saucon Trust (Landlord)

_____
Abraham R. Atiyeh, Trustee

Saucon Valley Manor, Inc. (Tenant)

By: _____

Title: _____

4

App.144

AUG-29-2008  16:46                                                                P.01

## SECOND ADDENDUM TO LEASE AGREEMENT

MADE this 29th day of August 2008, by and between, The Saucon Trust,  by and through ABRAHAM R. ATIYEH as  Trustee of the Saucon Trust, hereinafter sometimes referred to as Landlord;

AND

Saucon Valley Manor Inc., hereinafter sometimes referred to as Tenant.

WITNESSETH:

WHEREAS Abraham R. Atiyeh, individually, as Landlord, did enter into an Agreement of Lease with Tenant effective January 1, 2006 (the "Lease"); and the Lease was assigned to Landlord effective October 1, 2007;  and

WHEREAS, Landlord and Tenant entered in the Addendum to Lease Agreement dated October 1, 2007, (the "First Addendum"), which modified the Lease as therein set forth; and

WHEREAS, Landlord and Tenant did agree with National Penn Bank concerning the Assignment of Rents and Leases under date of October 1, 2007 (the "ALR"); and

WHEREAS Landlord and Tenant have agreed to further amend the Lease to change the Base Rental due by Tenant to Landlord effective September 1, 2008, and intend that all terms of the Lease and the First Addendum not inconsistent herewith to continue to remain in full force and effect.

NOW, THEREFORE, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.    The above Recitals do form a part of this Second Addendum to Lease Agreement.

2.    Effective as of September 1, 2008, Base Rent, as defined and/or otherwise stated in Section 4 of the Lease, is amended to be the sum of One Hundred Thirty Two Thousand Five Hundred ($132,500.00) Dollars per month.

3.    The aforesaid increased amount of Base Rent shall be payable monthly starting September 1, 2008 in addition to the continued payment of all amounts due as Additional Rent or otherwise due pursuant to the Lease.

App.145

AUG-29-2008   16:46                                                      P.02

3.     Tenant certifies to Landlord and National Penn Bank that there is no Default of Landlord existing under the Lease and that it has no knowledge of any event which, with the passage of time or giving of notice would be a default of Landlord under the Lease.

4.     All other terms, covenants and conditions of the aforementioned Lease (as amended by the First Addendum) not inconsistent herewith are hereby ratified and confirmed by the parties hereto the same as if set forth herein at length.

5.     All terms, covenants and conditions of the aforementioned ALR are hereby ratified and confirmed by the parties hereto the same as if set forth herein at length.

IN WITNESS WHEREOF the parties have hereunto affixed their hands and seals to this Addendum to Lease Agreement as of the day and year above first written, intending to be legally bound hereby.

**The Saucon Trust (Landlord)**

By: _____
Abraham R. Atiyeh, Trustee of
The Saucon Trust

**Saucon Valley Manor, Inc. (Tenant)**

By: _____
Abraham Atiyeh, President

TOTAL P.02

App.146

THIRD AMENDMENT
Dated and Effective As Of January 1, 2010
To The
LEASE AGREEMENT
Dated and Effective As Of January 1, 2006
By and Between
SAUCON TRUST,
a Pennsylvania Trust, as Owner and Lessor
and
SAUCON VALLEY MANOR, INC.,
a Pennsylvania corporation, as Lessee

## THIRD AMENDMENT TO LEASE AGREEMENT

This THIRD AMENDMENT TO LEASE AGREEMENT, (the "First Amendment") , is made and dated as of January 1, 2010, by and between **SAUCON TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Abraham R. Atiyeh, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

AND

**SAUCON VALLEY MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner and Lessee desire to amend the Lease dated January 1, 2006 between Owner and Lessee (the "Lease") for those certain premises known as Unit 1 of Saucon Valley Manor Condominium, (the "Leased Premises") on the terms and conditions set forth herein; and

WHEREAS, the terms of this Addendum shall be effective as of the date shown above, subject to the obtaining approval as required by the terms of the Mortgage encumbering the Leased Premises.

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02(A) of the Lease is amended and restated as follows:

"A.        The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of Two Million Four Hundred Thousand ($2,400,000.00) per year. Payments of Rent shall be due in advance in equal monthly installments of One Hundred Thousand Dollars ($100,000.00) on the first day of each month. "A. The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of Two Million Four Hundred Thousand ($2,400,000.00) per year. Payments of Rent shall be due (a) in advance in equal monthly installments of One Hundred Thousand Dollars ($100,000.00) on the first day of each month, each due without setoff and without prior notice or demand, and (b) the remainder of $1,200,000.00 to be paid on or before December 31 of the then current calendar year, in one or more partial installments, as Lessee shall elect, provided however that the full Base Rental of $2,400,000.00 is paid in full by December 31 of each year.

"A.1        Additionally, all other items set forth as Rent or Additional Rent under the Lease and all obligations of the Lessee are herein considered to be Rent and those additional items are due as set forth

App.148

in the Lease. If the Lessee fails to make any monthly payment of Rent within fifteen (15) days after the due date thereof, the Owner may, at its option, impose a late charge upon the Lessee in an amount not to exceed ten percent (10%) of the Rent so delinquent for each calendar month of delinquency.

2.          The parties acknowledge that the new areas being added to the Building on Unit 1 form a part of the Premises, and that the Lessee shall take possession of the same when occupancy is allowed by applicable ordinance and inspection(s) and certification(s) as may be required. Lessee acknowledges that it is observing the construction and that it shall bear all risk from failure of the premises to comply with requirements for its intended use. Lessee hereby waives all obligations or warranties of Owner with respect to the construction being made for the benefit of Lessee on the Premises.

3.          No other portions of the Lease are amended or modified.

4.          Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

5.          Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Lease as if fully set forth herein at length.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Third Amendment to Lease Agreement effective as of January 1, 2010.

SAUCON TRUST                                    SAUCON VALLEY MANOR, INC.

By: _____       By: _____
    Abraham Atiyeh, Trustee                       (Vice) President

FOURTH AMENDMENT
Dated and Effective As Of November 1, 2012
To The
LEASE AGREEMENT
Dated and Effective As Of January 1, 2006
By and Between
SAUCON TRUST,
a Pennsylvania Trust, as Owner and Lessor
and
SAUCON VALLEY MANOR, INC.,
a Pennsylvania corporation, as Lessee

## FOURTH AMENDMENT TO LEASE AGREEMENT

This FOURTH AMENDMENT TO LEASE AGREEMENT, (the "First Amendment") , is made and dated as of November 1, 2012, by and between **SAUCON TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Saucon Management LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

AND

**SAUCON VALLEY MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner and Lessee desire to amend the Lease dated January 1, 2006 between Owner and Lessee (the "Lease") for those certain premises known as Unit 1 of Saucon Valley Manor Condominium, (the "Leased Premises") on the terms and conditions set forth herein; and

WHEREAS, the Lease has been amended prior to the date hereof; and

WHEREAS, Owner is obtaining a mortgage loan from M&T Realty Capital Corporation, its successors and/or assigns which will be insured or endorsed by the Secretary of Housing and Urban Development ("HUD"), which is herein called the "HUD Mortgage"; and

WHEREAS, the HUD Mortgage requires certain additional lease terms and other amendments, and the parties desire to amend the Lease as herein set forth.

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02(A) of the Lease is amended and restated as follows:

"A.        The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the greater of:
   (i)        The sum of One Million Seven Hundred Five Thousand Four Hundred Twenty One ($1,705,421.00) Dollars, due in 12 annual installments; or
   (ii)       During each calendar year, in 12 equal installments, an Amount equal to One Hundred Five Percent (105%) of the sum of :
              a. Annual Principal and Interest Payments due by Owner under the HUD Mortgage; and
              b. Annual Mortgage Insurance Premium relating to the HUD Mortgage; and

App.151

        c. Annual Deposit for Reserve for Replacement as required by
the HUD Mortgage; and

        d. Annual Property Insurance Premiums for coverages for the
Leased Premises required to be maintained by Owner
under the HUD Mortgage; and

        e. Annual Property Taxes for the Leased Premises.

(iii)  The obligations of Lessee to pay, as Rent or Additional Rent,
any of the items set forth in subsection (ii), above, are
satisfied by the payment of rental as set forth in subsection
(ii), above.

(iv)  Lessee acknowledges that the foregoing Rent will be variable
due to the potential change in payments required for the items
comprising rental due by subsection (ii), above.

2.      Owner agrees that it, or the holder of any escrow relating to items
within the scope of 1 A (ii), will cause the timely payment of insurance premiums and
taxes.

3.      Lessee or Owner may seek reimbursement or funding from the
Replacement Reserve to fund costs, provided that any sums disbursed to them or for the
use of the Premises are limited by the terms of the Replacement Reserve and the
documents by which it was created or otherwise exists

4.      The HUD Rider, attached hereto as Exhibit "A" is incorporated
herein by reference and forms a part hereof. Lessee agrees that it shall abide by all terms
of the HUD Rider.

5.      Lessee hereby acknowledges the validity of the Lease and confirms
that there are no defenses, setoffs or other claims which it has or could assert under the
Lease.

6.      Lessee hereby ratifies and reaffirms the rights to confess judgment
against Lessee as set forth in the Lease as if fully set forth herein at length.

7.      Lessee acknowledges and agrees that it shall execute and deliver a
Subordination, Nondisturbance and Attornment Agreement in form and content
satisfactory to HUD.

8.      Lessee shall cause its subtenants, Lehigh Valley Health Network and
Good Shepherd Rehabilitation Hospital to execute Subordination, Nondisturbance and
Attornment Agreement in form and content satisfactory to HUD. The said subleases are
subordinate to the terms of this Lease, and shall be subordinate to the HUD Mortgage and
all subsequent mortgages now or hereafter upon the Premises.

App.153

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Fourth Amendment to Lease Agreement effective as of November 1, 2012.

**SAUCON TRUST**
By: Saucon Management LLC, Trustee

By: _____
Abraham Atiych,
Manager of Trustee

**SAUCON VALLEY MANOR, INC.**

By: _____
(Vice) President

App.153

## FIFTH AMENDMENT TO LEASE AGREEMENT

This FIFTH AMENDMENT TO LEASE AGREEMENT, (the "Fifth Amendment") is effective as of July 1, 2018, by and between **SAUCON TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Saucon Management LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

AND

**SAUCON VALLEY MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

*WHEREAS*, the Owner and Lessee are parties to a Lease, originally dated and effective as of January 1, 2006 (the "Lease"), for the lease by Lessee from Owner of those certain premises known as Unit 1 of Saucon Valley Manor Condominium, (the "Leased Premises"); and

*WHEREAS,* the Lease has been amended four (4) times prior to the effective date hereof; and

*WHEREAS,* Owner and Lessee desire to amend the Lease to extend the term thereof upon the terms and conditions set forth herein; and

*WHEREAS,* Owner and Tenant desire to extend the Term of the Lease.

*NOW, THEREFORE,* in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02(A) of the Lease ratified and Rent shall continue to be calculated as follows:

"A.        The Lessee agrees to pay to the Owner during the Lease Term, starting on January 1, 2013,  as Rent for the Leased Premises, the greater of:
   (i)      The sum of One Million Seven Hundred Five Thousand Four Hundred Twenty One ($1,705,421.00) Dollars, due in 12 annual installments; or
   (ii)     During each calendar year, in 12 equal installments, an Amount equal to One Hundred Five Percent (105%) of the sum of :
               a. Annual Principal and Interest Payments due by Owner under the HUD Mortgage; and
               b. Annual Mortgage Insurance Premium relating to the HUD Mortgage; and
               c. Annual Deposit for Reserve for Replacement as required by the HUD Mortgage; and

App.154

                        d. Annual Property Insurance Premiums for coverages for the Leased Premises required to be maintained by Owner under the HUD Mortgage; and

                        e. Annual Property Taxes for the Leased Premises.

(iii) The obligations of Lessee to pay, as Rent or Additional Rent, any of the items set forth in subsection (ii), above, are satisfied by the payment of rental as set forth in subsection (ii), above.

(iv) Lessee acknowledges that the foregoing Rent will be variable due to the potential change in payments required for the items comprising rental due by subsection (ii), above.

(v) The foregoing does not include those obligations, fees or other expenses and reimbursements as are due by Tenant under the Lease.

2. Owner agrees that the holder of any escrow relating to items within the scope of 1 A (ii), will cause the timely payment of insurance premiums and taxes.

3. Lessee or Owner may seek reimbursement or funding from the Replacement Reserve to fund costs, provided that any sums disbursed to them or for the use of the Premises are limited by the terms of the Replacement Reserve and the documents by which it was created or otherwise exists

4. Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

5. Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Lease as if fully set forth herein at length.

6. Lessee acknowledges and agrees that this Lease, and all rights of Lessee and anyone claiming by, through or under Lessee, are, and shall be, subordinate to the HUD Mortgage and all subsequent mortgages now or hereafter upon the Premises.

7. The parties acknowledge that the term of the existing lease extended to July, 2018; and the parties hereto extend the Term of the Lease through August 31, 2023, (which hereby becomes the "Termination Date").

8. The Term shall automatically extend on the Termination Date for three (3) periods of three (3) years, each, (and the Termination Date shall be modified automatically thereby) unless (i) a Default by Lessee occurs, (in which event the rights and remedies of Owner shall be immediately applicable, and no further extension shall automatically occur) or (ii) Owner gives notice of nonrenewal to Lessee at least six (6) months prior to the end of the then-current Term, (in which event no further automatic extensions shall be available), or (iii) Lessee notifies Owner of the intent of Lessee not to renew by notice given at least 9 months prior to the end of the then-current Term.

App.155

9.                      Lessee certifies that there is no default of Owner under the Lease.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Fifth Amendment to Lease Agreement intending to be legally bound effective as of July 1, 2018.

**SAUCON TRUST**
By: Saucon Management LLC, Trustee

By: _____
        Abraham Atiyeh,
        Manager of Trustee

**SAUCON VALLEY MANOR, INC.**

By: _____
      Nikhita Kapoor Atiyeh,  President

App.156

# EXHIBIT C

App.157

### FOURTH AMENDMENT TO LEASE AND MEMORANDUM OF LEASE EXTENSION

This Fourth Amendment to Lease and Memorandum of Lease Extension is effective as of September 21, 2023 by and between **WHITEHALL TRUST,** herein called Landlord;

AND

**WHITEHALL MANOR, INC.,** herein called Tenant,

*Witnesseth:*

*Whereas,* Landlord and Tenant are parties to the Lease dated August, 2008, which was amended by First Amendment to Lease, made and dated as of January 1, 2012, and Second Amendment to Lease, made and dated as of January 1, 2012, and a Third Amendment made August 31, 2018, (collectively and as amended herein called the "Lease"), by which Landlord has leased to Tenant the real property and improvements thereon situate on Unit 1 of Whitehall Manor Condominium; and

*Whereas,* Tenant has made improvements to the Premises; and

*Whereas,* Landlord and Tenant have agreed that Tenant has exercised its option to extend the Term of the Lease for a period of Five (5) Years as allowed by the Lease, and that the terms of such lease extension were orally modified as of September 21, 2023 as more fully set forth herein; and

*Whereas,* the parties desire that this Fourth Amendment to Lease and Memorandum of Lease Extension be executed to memorialize the election by Tenant of its exercise of the second of the three (3) extension options granted to Tenant under the Lease, and to memorialize the modification of terms of the Lease as set forth herein.

NOW, THEREFORE, the parties hereto, intending to be legally bound, and for other good and valuable consideration, do hereby agree as follows:

1.      The above recitals are incorporated herein, and form a part hereof.

2.      Tenant has exercised the privilege to extend the Term for 5 years, such that the modified termination date of August 31, 2023, and to allow for the calculation on a calendar year basis, is now agreed to be December 31, 2028.

3.      Tenant has made repairs and also arranged for other work to be performed to maintain the condition of the Premises.

1

App.158

4.    Landlord and Tenant also have agreed to waive all past due rental and any obligations of Tenant or Landlord not performed by one or both through September 21, 2023, and hereby waive and release all unpaid sums and all performance not fully and timely provided.

   a.  Tenant waives any rights to refund or for calculation of overpayment previously made.
   b.  Tenant waives any right to payment for improvements made and any repairs or remodeling performed, other than any insurance coverage payments or proceeds as may be available.
   c.  This Fourth Amendment is a full waiver and release of all defaults, deficient performance and any other obligation of Landlord or of Tenant which has arisen or could have been asserted at any time through and including the date hereof.

5.    Landlord and Tenant also have agreed that Tenant shall have two (2) additional extension periods of five (5) years, each, and that any renewal may be exercised by notice from Tenant to Landlord given not less than 90 days prior to the end of the then current termination date of the then current lease extension.

6.    Landlord and Tenant have agreed to the following modifications of the Lease:

   a.  Base Rental
       i.    For the period through December 31, 2024, no Base Rental shall be due.
       ii.   For the remainder of the current renewal Term (i.e. calendar years 2025, 2026, 2027 and 2028) Base Rent shall be the greater of (i) One Hundred Twenty Thousand ($120,000.00) Dollars or (ii) Twenty-five (25%) percent of the net operating profit of Tenant from the operation of a personal care home at the Premises [reduced by all capital expenditures and by payment for any real property obligation which Tenant may elect to pay, and by uncollected accounts receivable or bad debt] for each calendar year of the Term, limited to the sum of Three Hundred Thousand ($300,000.00) per annum, to be paid on April 30 of the year following the calendar year for which the calculation shall be made; and
       iii.  Base Rental for each calendar year of the Renewal Terms (i.e. Calendar years starting after December 31, 2028 shall be the greater of (i) Two Hundred Forty Thousand ($240,000.00)

2

App.159

Dollars or (ii) Twenty-five (25%) percent of the net operating profit of Tenant from the operation of a personal care home at the Premises [reduced by all capital expenditures and by payment for any real property obligation which Tenant may elect to pay and by uncollected accounts receivable or bad debt] during a calendar year, limited to the sum of Five Hundred Thousand ($500,000.00) per annum. Base Rental shall be due on April 30 of the year following the calendar year for which the calculation shall be made; and

b.  Tenant shall pay all charges for electric, water and sewer services provided to the Premises prior to the same being made a lien upon the Premises; and

c.  Tenant shall pay the premiums for one or more insurance policies to provide (i) property casualty insurance for the Premises and (ii) general liability insurance for the Premises; and

d.  Repairs to the Premises as are required to maintain the Premises in the condition required for lawful operation of a personal care home.

7.    The obligations of Landlord and/or Tenant under any Regulatory Agreement and all agreements, security interests and other rights, privileges, obligations or performance required under any Regulatory Agreement or other agreement made with the United States Department of Housing and Urban Development ("USHUD") or anyone required by, for or concerning USHUD or arising under any obligation with, concerning or associated with USHUD (collectively "HUD Obligations"), are hereby terminated and void as of September 20, 2023. Any past violations or continuing violation of the terms or conditions of any HUD Obligations are hereby waived and released.

8.    All other terms and conditions of the Lease (as amended through and including the Third Amendment and the oral amendment memorialized herein), are ratified and affirmed.

9.    This Agreement is effective as of September 21, 2023 notwithstanding a later date of execution.

3

App.160

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Fourth Amendment to Lease and Memorandum of Lease Extension, intending to be legally bound effective as of September 21, 2023.

WHITEHALL TRUST ("Landlord")

By: Whitehall Fiduciary LLC, its Trustee

By: _____

    Abraham Atiyeh, its Manager

WHITEHALL MANOR, INC. ("Tenant")

By: _____

    Nimita Kapoor Atiyeh, President

4

App.161

# EXHIBIT D

## SIXTH AMENDMENT TO LEASE AGREEMENT

This SIXTH AMENDMENT TO LEASE AGREEMENT, (the "Sixth Amendment") is effective as of September 21, 2023, by and between **SAUCON TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Saucon Management LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

AND

**SAUCON VALLEY MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

*WHEREAS*, the Owner and Lessee are parties to a Lease, originally dated and effective as of January 1, 2006 (the "Lease"), for the lease by Lessee from Owner of those certain premises known as Unit 1 of Saucon Valley Manor Condominium, (the "Leased Premises"); and

*WHEREAS,* the Lease has been amended five (5) times prior to the effective date hereof; and

*WHEREAS,* Owner and Lessee desire to amend the Lease to extend the term thereof upon the terms and conditions set forth herein; and

*WHEREAS,* Owner and Tenant desire to extend the Term of the Lease and to grant extensions to Tenant as hereinafter set forth; and

*NOW, THEREFORE*, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02 of the Lease (and all other parts of the Lease setting forth Base Rent, Additional Rent or other tenant payment obligations) are as follows:

   a. Base Rental
      i. For the period through December 31, 2024, no Base Rental shall be due.
      ii. For the remainder of the current renewal Term (i.e. calendar years 2025, 2026, 2027 and 2028) Base Rent shall be the greater of (i) One Hundred Twenty Thousand ($120,000.00) Dollars or (ii) Twenty-five (25%) percent of the net operating profit of Tenant from the operation of a personal care home at the Premises [reduced by all capital expenditures and by payment

1

for any real property obligation which Tenant may elect to pay, and by uncollected accounts receivable or bad debt] for each calendar year of the Term, limited to the sum of Three Hundred Thousand ($300,000.00) per annum, to be paid on April 30 of the year following the calendar year for which the calculation shall be made; and

iii.   Base Rental for each calendar year of the Renewal Terms (i.e. Calendar years starting after December 31, 2028 shall be the greater of (i) Two Hundred Forty Thousand ($240,000.00) Dollars or (ii) Twenty-five (25%) percent of the net operating profit of Tenant from the operation of a personal care home at the Premises [reduced by all capital expenditures and by payment for any real property obligation which Tenant may elect to pay and by uncollected accounts receivable or bad debt] during a calendar year, limited to the sum of Five Hundred Thousand ($500,000.00) per annum. Base Rental shall be due on April 30 of the year following the calendar year for which the calculation shall be made; and

b.   Tenant shall pay all charges for electric, water and sewer services provided to the Premises prior to the same being made a lien upon the Premises; and

c.   Tenant shall pay the premiums for one or more insurance policies to provide (i) property casualty insurance for the Premises and (ii) general liability insurance for the Premises; and

d.   Repairs to the Premises as are required to maintain the Premises in the condition required for lawful operation of a personal care home.

2.      The Term is hereby extended to December 31, 2028 (which date shall hereafter be called the Termination Date, unless extended as per subsection (a), below).

a.   The Term shall automatically extend on the Termination Date for three (3) periods of five (5) years, each, (and the Termination Date shall be modified automatically thereby) unless Lessee notifies Owner of the intent of Lessee not to renew by notice given at least 90 days prior to the end of the then-current Term.

3.      Landlord and Tenant also have agreed to waive all past due rental and any obligations of Tenant or Landlord not performed by one or both through September 21, 2023, and hereby waive and release all unpaid sums and all performance not fully and timely provided.

a.   Tenant waives any rights to refund or for calculation of overpayment previously made.

2

App.164

4.      Landlord acknowledges that Tenant has made repairs and replacements and betterments for the Premises. Tenant hereby waives obligation of Landlord to reimburse or perform such repairs, replacements or betterments, other than such funds are are now or hereafter due from insurers or loss payment sources other than Landlord.

5.      This Sixth Amendment is a full waiver and release of all defaults, deficient performance and any other obligation of Landlord or of Tenant which has arisen or could have been asserted at any time through and including the date hereof.

6.      The obligations of Landlord and/or Tenant under any Regulatory Agreement and all agreements, security interests and other rights, privileges, obligations or performance required under any Regulatory Agreement or other agreement made with the United States Department of Housing and Urban Development ("USHUD") or anyone required by, for or concerning USHUD or arising under any obligation with, concerning or associated with USHUD (collectively "HUD Obligations"), are hereby terminated and void as of September 20, 2023. Any past violations or continuing violation of the terms or conditions of any HUD Obligations are hereby waived and released.

7.      All other terms and conditions of the Lease (as amended through and including the Fifth Amendment and the oral amendment memorialized herein), are ratified and affirmed.

8.      This Agreement is effective as of September 21, 2023 notwithstanding a later date of execution.


        IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Sixth Amendment, intending to be legally bound effective as of September 21, 2023.


SAUCON TRUST ("Landlord")                SAUCON VALLEY MANOR, INC.
                                         ("Tenant")
By: Saucon Management LLC, its Trustee

By: _____           By: _____
    Abraham Atiyeh, its Manager              Nimita Kapoor Atiyeh, President


3

App.165

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LEHIGH VALLEY 1 LLC, successor by assignment to WINDSTREAM CAPITAL LLC, successor by assignment to the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, successor by assignment to M&T REALTY CAPITAL CORPORATION** | : : : : : : : : | **CIVIL ACTION**<br><br>**NO.  24-2627** |
| **v.** | : : : | |
| **WHITEHALL FIDUCIARY LLC, as TRUSTEE OF WHITEHALL TRUST U/T/A DATED AUGUST 1, 2007** | : : : | |

| | | |
|---|---|---|
| **LEHIGH VALLEY 1, LLC, successor by assignment to WINDSTREAM CAPITAL LLC, successor by assignment to the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, successor by assignment to M&T REALTY CAPITAL CORPORATION** | : : : : : : : : | **CIVIL ACTION**<br><br>**NO. 24-2709** |
| **v.** | : : : | |
| **SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007** | : : | |

**<u>ORDER</u>**

**AND NOW**, this 19th day of December, 2025, upon consideration of Receiver's Motion for Sanctions (the "Motion for Sanctions"), the Responses filed by Defendants Whitehall Fiduciary LLC ("Whitehall Trust") and Saucon Trust and Non-Parties Nimita Kapoor Atiyeh and Abraham Atiyeh (collectively, "Respondents"), the Receiver's Reply in Further Support of the Motion, along with Receiver's Affidavit setting for the amount of attorneys' fees and costs incurred in the preparation, filing and presentment of the Motion for Sanctions, and upon consideration of Plaintiff's Motion to Void and Set Aside Lease Amendments and for Declaratory Judgment ("Motion to Void Amendments'), and the Response thereto, the oral argument held in Court on December 18, 2025,

App.167

and the concessions, admissions and statements made by the Parties, and the Court having found that
Respondents have each violated the September 2, 2025 Order by failing to produce documents
ordered to be produced in the aforementioned Order; it is hereby **ORDERED** as follows:

1.    The Receiver's Motion for Sanctions (Docket No. 102, Case No. 24-2709) is

       **GRANTED**.

2.    On or before December 29, 2025, Respondents shall produce each and every

       document ordered to be produced by this Court's Order dated September 2, 2025.

       Respondents are each deemed to have possession, control or the practical ability to

       obtain the documents, and may not claim that they cannot obtain the documents

       ordered to be produced.

3.    On or before December 29, 2025, Respondents shall pay to Receiver the sum of

       $21,281.00 to compensate her for the preparation, filing and presentment of the

       Motion for Sanctions.

4.    Receiver shall file a Report to the Court on or before January 2, 2026, indicating

       whether Respondents have complied with the requirements of the above paragraphs 2

       and 3.  If it is reported in the Report that Respondents have not complied with

       requirements of paragraphs 2 and 3, the Court will consider striking Defendants'

       Answer and Affirmative Defenses and entering Judgment of Foreclosure and Sale in

       favor of Plaintiff and against Defendants.

5.    On or before December 29, 2025, Respondents, Whitehall Manor, Inc. and Saucon

       Valley Manor, Inc. are directed to turn over to Receiver any rental payments received

       from October 31, 2025 (the date Good Shepherd Rehabilitation Hospital was directed

       to make payments to the Receiver). This includes rent received from Good Shepherd

       Rehabilitation Hospital only.

6.   Respondents, Whitehall Manor, Inc. and Saucon Valley Manor, Inc. are restrained from interfering with Receivers' efforts to collect rent, licensing fees, other occupancy fees or income of any sort from any and all occupants of the Properties. As agreed to by the Parties, any rent, licensing fee, occupancy fee or income of any sort that is or was paid to Respondents, Whitehall Manor, Inc. or Saucon Valley Manor, Inc. or any other entity over which Respondents, Whitehall Manor, Inc. or Saucon Valley Manor, Inc. have an interest or otherwise control, for rent or fees due and owing for January of 2026 and thereafter, shall be turned over to Receiver within 3 days of the date of this Order (in the case where money has already been received) or within 3 days of receipt (in the case where money is hereinafter received), along with a complete accounting of the source of the money received.

7.   Plaintiff's Motion to Void and Set Aside Lease Amendments (Docket No. 92, Case No. 24-2627) is **GRANTED**.

8.   The Sixth Amendment to Lease Agreement executed on September 21, 2023, affecting the property at 1050 Main Street, Unit #1, Hellertown, Pennsylvania, and the Fourth Amendment to Lease and Memorandum of Lease Extension executed on September 21, 2023, affecting the property at 1177 Sixth Street, Whitehall, Pennsylvania (the "Amendments"), are hereby **DECLARED NULL**, **VOID**, and **OF NO LEGAL EFFECT**.

**BY THE COURT:**

/s/ Catherine Henry
**CATHERINE HENRY, J.**

App.169

# EXHIBIT F

Case 5:26-cv-03491-CH   Document 5-1   Filed 06/12/26   Page 176 of 897

Case 2:25-15245-mmm   Doc 456-6   Filed 03/26/26   Entered 03/26/26 19:55:39   Desc Main
Exhibit F POC Whitehall Page 1 of 52   Page 2 of 53

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
</table>

| | |
|---|---|
| Debtor 1 | Whitehall Manor, Inc. |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Eastern District of Pennsylvania |
| Case number | 4:25BK15245 |

Official Form 410

# Proof of Claim

04/25

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Whitehall Fiduciary, LLC, as Trustee of Whitehall Trust, by Duane Morris LLP, as Receiver
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.   From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Brett L. Messinger - Duane Morris LLP
Name

30 South 17th Street
Number      Street

Philadelphia          PA          19103
City                State        ZIP Code

Contact phone  215.979.1508

Contact email  blmessinger@duanemorris.com

Where should payments to the creditor be sent? (if different)

Name

Number      Street

City                State        ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.   Claim number on court claims registry (if known) _____   Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.   Who made the earlier filing? _____

App.171

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No
☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  <u>1</u>  <u>9</u>  <u>1</u>  <u>7</u>

**7. How much is the claim?**   $_____8,271,961.00   **Does this amount include interest or other charges?**

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other
      charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Lease

**9. Is all or part of the claim secured?**

☑ No
☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim
         Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe:  _____

**Basis for perfection:**  _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for
example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has
been filed or recorded.)

Value of property:                   $_____
Amount of the claim that is secured:      $_____

Amount of the claim that is unsecured:  $_____ (The sum of the secured and unsecured
                                           amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:     $_____

Annual Interest Rate (when case was filed)_____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☐ No
☑ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____7,993,961.00

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

App.172

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 178 of 897

Case 25-15245-pmm Doc 456-3 Filed 03/26/26 Entered 03/26/26 19:55:33 Desc Main
Exhibit F POC Whitehall Fiduciary Page 4 of 53

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check one:* | **Amount entitled to priority** |

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____

☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____

☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.    $_____

\* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    03/25/2026
                    MM / DD / YYYY

/s/ Brett L. Messinger
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Brett   Lawrence Messinger |
|---|---|
| | First name        Middle name        Last name |
| Title | Attorney for Receiver |
| Company | _____ |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 30 South 17th Street |
| | Number        Street |
| | Philadelphia        PA    19103 |
| | City        State    ZIP Code |
| Contact phone | 215.979.1508        Email  blmessinger@duanemorris.com |

---

Official Form 410    **Proof of Claim**    page 3

App.173

# WHITEHALL PROPERTY — Rent Arrears Analysis

*Whitehall Trust (Landlord) / Whitehall Manor, Inc. (Tenant)*
*Governing: Second Amendment (Jan 1, 2012) as ratified by Third Amendment (Aug 31, 2018)*
*Fourth Amendment (Sept 21, 2023) — REJECTED / NULL AND VOID*

| KEY LEASE TERMS (Second Amendment) | |
|---|---|
| **Annual Base Rent:** | **$1,668,000.00** |
| Monthly Rent (as actually paid — $1,668,000 ÷ 12): | **$139,000.00** |
| *Contractual Structure: $80,000/mo + $708,000 by Dec 31* | |
| *Actual Practice: Paid as $139,000/mo (confirmed by bank statements)* | |
| Monthly Mortgage Payment (M&T Realty Capital): | $115,766.68 |
| Last Rent Payment Received: | February 22, 2021 ($139,000 remote deposit) |
| Arrears Period: | March 1, 2021 through December 31, 2025 |

### MONTHLY ARREARS SCHEDULE — March 2021 through December 2025

| Year | Months Unpaid | Monthly Rent | Annual Rent Due | Cumulative Arrears | Notes |
|---|---|---|---|---|---|
| 2021 | 10 | $139,000.00 | $1,390,000.00 | $1,390,000.00 | Mar–Dec 2021 (10 months) |
| 2022 | 12 | $139,000.00 | $1,668,000.00 | $3,058,000.00 | Full year |
| 2023 | 12 | $139,000.00 | $1,668,000.00 | $4,726,000.00 | Full year |
| 2024 | 12 | $139,000.00 | $1,668,000.00 | $6,394,000.00 | Full year |
| 2025 | 12 | $139,000.00 | $1,668,000.00 | $8,062,000.00 | Full year (through Dec 31, 2025) |

**TOTAL MONTHS UNPAID:** 58

**GROSS BASE RENT ARREARS:** **$8,062,000.00**

| CREDITS / OFFSETS | | | |
|---|---|---|---|
| **Less: Property Taxes Paid by WMI on behalf of Whitehall Trust:** | | **-$68,039.00** | Credit to tenant |
| **Total Credits:** | | **-$68,039.00** | |

**NET AMOUNT DUE — WHITEHALL:** **$7,993,961.00**

LEASE AGREEMENT
DATED AND EFFECTIVE AS OF August __14__, 2008

By and Between
WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007,
a Pennsylvania Trust, as Owner and Lessor

and

WHITEHALL MANOR, INC.,
a Pennsylvania corporation, as Lessee

## Table of Contents

Page

ARTICLE I      DEFINITIONS ............................................................................................ 1
   1.01        Definitions ........................................................................................... 1

ARTICLE II     LEASE OF LEASED PREMISES, TERM OF LEASE .......................... 5
   2.01        Lease of Leased Premises ................................................................... 5
   2.02        Term of Lease ..................................................................................... 5
   2.03        Subordination ..................................................................................... 5
   2.04        Quiet Enjoyment ................................................................................. 6
   2.05        Ownership of Capital Improvements ................................................. 6
   2.06        No Personal Liability ......................................................................... 6

ARTICLE III    HUD REQUIREMENTS ..................................................................... 6
   3.01        Precedence of Article III ................................................................... 7
   3.02        Assignment and Subletting ................................................................ 7
   3.03        Compliance With HUD Requirements and Terms of Mortgage
                Loan Documents ................................................................................. 7
   3.04        Acknowledgment ................................................................................ 7
   3.05        License; Bed Authority ...................................................................... 7
   3.06        Financial Statements .......................................................................... 7
   3.07        Medicaid and Medicare ...................................................................... 8
   3.08        State Licensure Requirements ............................................................ 8
   3.09        MAP Guide Requirements .................................................................. 8
   3.10        Execution of Lessee Regulatory Agreement by Lessee ..................... 8
   3.11        Management Contract Requirements ................................................. 8
   3.12.       Inspections ......................................................................................... 8
   3.13        Insurance ............................................................................................ 8
   3.14        Certain Payments ............................................................................... 8
   3.15        Eminent Domain ................................................................................. 9
   3.16        Ownership of Capital Improvements ................................................. 9

ARTICLE IV     RENTALS; APPLICATION OF GROSS REVENUES ........................ 9
   4.01        General Obligation ............................................................................. 9
   4.02        Rental Payments ................................................................................. 9
   4.03        Security Interest In Gross Revenues .................................................. 9
   4.04        Obligations Unconditional ................................................................. 10
   4.05        Net Lease ............................................................................................ 10

ARTICLE V     COVENANTS AND REPRESENTATIONS OF THE LESSEE .......... 10
   5.01        Maintenance and Operation of Leased Premises ............................... 10

| 5.02 | Maintenance of Entity Existence | 11 |
| 5.03 | Management | 11 |
| 5.04 | Payment of Lawful Taxes and Charges; Discharge of Liens | 12 |
| 5.05 | Compliance With Law | 12 |
| 5.06 | Additions and Alterations | 12 |
| 5.07 | Financial and Other Restrictions | 13 |
| 5.08 | Inspections | 13 |
| 5.09 | Assignment and Subletting | 14 |
| 5.10 | Indemnification Concerning the Leased Premise | 14 |
| 5.11 | Representations of the Lessee | 14 |
| ARTICLE VI | INSURANCE AND CONDEMNATION | 16 |
| 6.01 | Insurance Coverage and Terms | 16 |
| 6.02 | Insurance Proceeds | 16 |
| 6.03 | Eminent Domain | 16 |
| ARTICLE VII | DEFAULT AND REMEDIES | 16 |
| 7.01 | Events of Default | 16 |
| 7.02 | Remedies | 17 |
| 7.03 | Cumulative Rights; No Implied Waiver | 18 |
| ARTICLE VIII | MISCELLANEOUS | 18 |
| 8.01 | Surrender of Possession | 18 |
| 8.02 | Successors and Assigns | 18 |
| 8.03 | Severability | 18 |
| 8.04 | Counterparts | 18 |
| 8.05 | Notices | 18 |
| 8.06 | Headings | 19 |
| 8.07 | Non-Waiver | 19 |
| 8.08 | Amendments | 19 |
| 8.09 | No Recording | 19 |
| 8.10 | Estoppel Certificates | 19 |
| 8.11 | Governing Law | 19 |
| 8.12 | Entirety of Agreement | 19 |

ii

## LEASE AGREEMENT

This LEASE AGREEMENT, (the "Lease Agreement"), is made and dated as of August _14_, 2008, by and between WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST u/t/a dated August 1, 2007 (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Whitehall Fiduciary LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;
AND

WHITEHALL MANOR, INC., (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner desires to lease to the Lessee the Leased Premises (hereinafter defined) on the terms and conditions set forth herein; and

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

## ARTICLE I

## DEFINITIONS

The Owner and the Lessee hereby mutually covenant and agree as follows:

1.01    Definitions.

(a)    The following terms shall have the meanings specified below:

"Capital Additions" means property of any kind acquired, constructed or rehabilitated by the Owner or Lessee which is used or useful in connection with the Leased Premises and which is properly chargeable to the plant or property account under generally accepted accounting principles including, without limitation, land, easements, rights-of-way, leaseholds, other interests in real property, personal property, equipment, replacements of property retired or rendered obsolete, and permanent additions and betterments.

"Department of Public Health" means the Pennsylvania Department of Public Welfare.

"Event of Default" means any of the events described in Section 7.01 of this Lease Agreement.

"FHA" means the Federal Housing Administration.

1

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 184 of 897

Case 5:25-15243-mm   Doc 456-1 Filed 03/06/26 Entered 03/06/26 13:07:55 Desc Main
Exhibit F PDC of Whitehall Manor Page 9 of 52 Page 10 of 53

"Fiscal Year" means the twelve month period hereby designated by the Owner and the Lessee for financial reporting purposes beginning on the first day of January in any calendar year and ending on the thirty-first day of December of such calendar year.

"Gross Revenues" means all revenues, receipts, income and other moneys at any time received by or on behalf of the Lessee from the operation of the Leased Premises, including, without limitation, revenues derived from the operation of the Leased Premises and all rights to receive the same whether in the form of accounts receivable, contract rights, chattel paper, instruments or other rights, and the proceeds thereof, and any insurance thereon, whether now existing or hereafter coming into existence and whether now owned or held or hereafter acquired by the Lessee, but excluding the proceeds of any loans to the Lessee and partnership contributions and insurance proceeds and eminent domain awards.

"HUD" means the U.S. Department of Housing and Urban Development.

"HUD Requirements" means Section 232 of the National Housing Act of 1934, as amended; any and all regulations now or hereafter adopted pursuant to such Section 232; and any and all HUD rules, requirements and/or handbooks now or hereafter applicable to the Leased Premises.

"Indemnified Parties" means the Lender, the Owner and any person who "controls" the Owner within the meaning of Section 15 of the Securities Act of 1933, as amended; any member, officer, director, official, employee, agent, general partner, limited partner and attorney of the Owner or the Lender; and their respective executors, administrators, heirs, successors and assigns (excluding the Lessee).

"Leased Premises" means all the land located at, and known and identified as Unit 1 of Whitehall Manor Condominium, as Declared by Declaration of Condominium dated August 13, 2008 and recorded in the Office of the Recorder of Deeds in and for Lehigh County, Pennsylvania, said premises being situate in the Township of Whitehall, Lehigh County, Pennsylvania, and more particularly described in Exhibit A attached to this Lease Agreement, together with any additions thereto and substitutions therefor and any buildings, improvements, betterments, fixtures, equipment, furnishings, and other property, real or personal, now existing or at any time acquired, constructed or located thereon, including any Capital Additions.

"Lease Term" means the duration of the term created in this Lease Agreement as specified in Section 2.02.

"Lender" means M&T Realty Capital Corporation, and any future holder of the Mortgage.

"Lessee Regulatory Agreement" means the Regulatory Agreement-Nursing Homes entered into by and between the Lessee and HUD with respect to the Leased Premises.

2

App.179

"Lessee Security Agreement" means that certain Lessee Security Agreement between Lessee and Lender with respect to the Leased Premises securing the Mortgage Loan, and any amendments or supplements thereto.

"Mortgage" means that certain Mortgage from the Owner to the Lender with respect to the Leased Premises securing the Mortgage Loan, and any amendments and supplements thereto.

"Mortgage Loan" means the FHA-insured mortgage loan in the original maximum principal amount of up to $15,788,700.00 made by Lender to the Owner, secured, in part, by the Leased Premises, as the same may be amended, increased or decreased.

"Mortgage Loan Documents" means the Lessee Regulatory Agreement, the Owner Regulatory Agreement, the Mortgage, the Security Agreement, the Mortgage Note evidencing the Mortgage Loan executed by the Owner in favor of the Lender, the Lessee Security Agreement entered into by and between the Lessee and Lender with respect to the Leased Premises, and any and all other documents required by HUD and/or the Lender in connection with the Mortgage Loan.

"Operating Expenses" means all expenses required in operating and maintaining the Leased Premises, including, in each case, without limitation, (i) expenses of operation of the Leased Premises, including utilities, maintenance, repair, alteration, insurance and inspection expenses, (ii) expenses of professional, managerial, supervisory, administrative, engineering, architectural, legal, auditing and consulting services, (iii) sums payable to any Person, which sums, under generally accepted accounting principles, constitute expenses of operation and maintenance, and (iv) all taxes, assessments and other governmental charges, including, without limitation, property, franchise and excise taxes, but excluding taxes levied on income and/or profits of the Owner and/or Lessee. Operating Expenses shall exclude Rent. Operating Expenses shall also include deductibles relating to casualty losses of a part of the Property and shall also include all regular and special assessments due to the condominium association of which the Leased Premises forms a part.

"Owner Regulatory Agreement" means the Regulatory Agreement entered into by and between the Owner and HUD with respect to the Leased Premises.

"Person" means any natural person, corporation, partnership, limited liability company, trust, agency or other entity.

"Rent" means the payments of rent in respect of the Leased Premises required pursuant to Section 4.02.A of this Lease Agreement.

"Security Agreement" means that certain Security Agreement between Owner and Lender with respect to the Leased Premises securing the Mortgage Loan, and any amendments and supplements thereto.

3

 

 

(b)   Words importing persons shall include firms, associations and corporations, and words importing the singular number shall include the plural number and vice versa.

4

App.181

( )                                               )

## ARTICLE II

## LEASE OF LEASED PREMISES: TERM OF LEASE

2.01     Lease of Leased Premises.  The Owner hereby leases to the Lessee, and the Lessee hereby leases from the Owner, the Leased Premises on the terms and conditions set forth in this Lease Agreement.

2.02     Term of Lease.  The Lease Term for the Leased Premises shall commence on the date hereof and shall expire on August 31, 2018, or such earlier date as may be hereinafter provided.  In addition, the Lessee shall have the option to extend the Lease Term for three (3) successive periods of five (5) years each upon the terms and conditions contained herein, upon written notice to the Owner given not later than one hundred eighty (180) days prior to the expiration of the initial Lease Term or extended Lease Term, as the case may be.

2.03     Subordination.  This Lease Agreement is and shall be subject and subordinate to the Mortgage and other Mortgage Loan Documents; to all renewals, modifications, consolidations, replacements and extensions thereof; to all substitutions therefor; and to all future mortgages upon the Leased Premises and/or other security interests in or to the Leased Premises and any other items which are herein leased to Lessee or which, pursuant to the terms hereof, become a part of the Leased Premises or are otherwise deemed to become the property of Owner or to remain upon the Leased Premises at the end of the Term; and to each advance made or hereafter to be made under any of the foregoing.  This Section 2.03 shall be self-operative and no further instrument of subordination shall be required.  The Lessee agrees to execute and deliver promptly any and all certificates, agreements and other instruments that the Owner or Lender may reasonably request in order to confirm such subordination.  If the Lender shall succeed to the interest of the Owner, then this Lease Agreement shall terminate, or, at the option of the Lender, this Lease Agreement shall nevertheless continue in full force and effect, in which case the Lessee shall and does hereby agree to attorn to the Lender and to recognize the Lender as its landlord under the terms of this Lease Agreement. Any agreements entered into by the Lessee for provision of services to the Leased Premises or the granting of easements, rights of way or other allowances of use or placement of CATV, utilities or other items are, and shall always be, subordinate to (i) the rights of Owner, and (b) the Mortgage and other Mortgage Loan Documents and all other mortgages and security interests now or hereafter encumbering the Leased Premises and/or the property of which it forms a part.

If this Lease Agreement or the Rent due hereunder is assigned to the Lender as collateral security for the Mortgage Loan, the Lender shall not be deemed to have assumed any of the Owner's obligations under this Lease Agreement solely as a result of such assignment. The Lender to whom this Lease Agreement has been so assigned shall be deemed to have assumed such obligations only if (i) by the terms of the instrument of assignment the Lender specifically elects to assume such obligations, or (ii) Lender has (a) foreclosed its mortgage, (b) accepted a deed in lieu thereof, or (c) taken possession of the Leased Premises by entry or otherwise. Even if the Lender so assumes the obligations of the Owner under this Lease Agreement, the Lender will be liable for breaches under this Lease Agreement only to the extent such breaches occur

5

App.182

during the period of ownership by the Lender after foreclosure (or after any conveyance by a deed in lieu of foreclosure) and then only to the extent of Lender's interest in the Leased Premises. The Lessee hereby consents to the assignment of this Lease Agreement as provided in the Mortgage.

2.04    Quiet Enjoyment.  The Owner covenants and agrees with the Lessee that so long as the Lessee is in compliance with its obligations under this Lease Agreement, including the payment of the Rent and the other payments required under this Lease Agreement and the observance and performance of all the terms, covenants, and conditions on the Lessee's part to be observed and performed, and subject to the provisions of Section 2.03 of this Lease Agreement, the Lessee may peaceably and quietly have, hold and enjoy the Leased Premises for the Lease Term, subject to easements, agreements, restrictions, and covenants of record. The foregoing is subject to the rights reserved to Owner and/or the Declarant and/or others in the Declaration Condominium for the Property of which the Leased Premises is a part.

2.05    Ownership of Capital Improvements.  Any and all buildings and improvements now existing and/or hereafter erected on the Leased Premises; any betterments made to the Leased Premises; any and all personal property, equipment, furniture, fixtures, computers, accessories and supplies of all kinds now or hereafter located on and/or used in connection with the Leased Premises; and all additions, substitutions, and replacements thereto during the Lease Term (hereinafter collectively called "Personal Property") shall be owned by the Owner, Lessee hereby conveying any and all such Personal Property to Owner.

Lessee agrees not to remove any Personal Property from the Leased Premises except to replace such Personal Property with other similar items of equal or greater quality and value, which items shall immediately become and remain the property of the Owner.

2.06    No Personal Liability.  No recourse under or upon any obligation, covenant or agreement of this Lease Agreement or for any claim based thereon or otherwise in respect thereof, shall be had against any partner (general or limited), member, manager, officer, director, shareholder or employee, trustee, as such, past, present or future, of the Owner or of any successor entity, either directly or through the Owner, at law or in equity, whether by virtue of any constitution, statute or rule of law or by the enforcement of any assessment or penalty, or otherwise; it being expressly understood that no such personal liability whatever shall attach to, or is or shall be incurred by, any such Person, under or by reason of the obligations, covenants or agreements contained in this Lease Agreement or implied herefrom; and that any and all such personal liability, either at common law or in equity or by constitution or statute, of, and any and all such rights and claims against, every such Person under or by reason of the obligations, covenants or agreements contained in this Lease Agreement, or implied herefrom, are hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Lease Agreement.

ARTICLE III

HUD REQUIREMENTS

6

Case 5:26-cv-03491-CH  Document 5-1  Filed 06/12/26  Page 189 of 897

Case 2:21-5-15243-pmm  Doc 456 - Filed 03/06/21/26  Entered 03/06/21/26 17:52:53  Desc Main
Exhibit F POC Whitehall Page 14 of 32 Page 15 of 53

3.01  Precedence of Article III. For so long as, and only for so long as, HUD is the holder or insurer of any indebtedness secured by the Leased Premises, the provisions of this Article III shall apply to this Lease Agreement, notwithstanding anything herein to the contrary. This Article III shall not be amended without the prior written consent of HUD and the Lender.

3.02  Assignment and Subletting. This Lease Agreement shall not be assigned, in whole or in part (including any transfer of title or right to possession and control of the Leased Premises, or of any right to collect fees or rents), without the prior approval of HUD. Owner and Lessee acknowledge that any proposed assignee will be required to execute a Lessee Regulatory Agreement with HUD as a prerequisite to any such approval. Any consent by Owner to any sublease by the Lessee of the Leased Premises or any portion thereof may be given only upon compliance with the Mortgage Loan Documents and applicable HUD Requirements.

3.03  Compliance With HUD Requirements and Terms of Mortgage Loan Documents. The Lessee agrees to comply with all HUD Requirements that are applicable to the Leased Premises. The Lessee agrees that it will not take any action which would violate any applicable provision of any of the Mortgage Loan Documents.

In the event of any conflict between the terms and provisions of this Lease Agreement and any applicable HUD Requirements or the Mortgage Loan Documents, the HUD Requirements and Mortgage Loan Documents shall control in all respects. Owner and Lessee agree that no provision of this Lease Agreement shall modify any obligation of Owner or Lessee under the Mortgage Loan Documents. Owner and Lessee acknowledge that HUD's acceptance of this Lease Agreement in connection with the closing of the Mortgage Loan shall in no way constitute HUD's consent to arrangements which are inconsistent with HUD Requirements. This Lease Agreement is subordinate and subject to the Mortgage Loan Documents and to all HUD Requirements.

3.04  Acknowledgment. Owner and Lessee each acknowledges and agrees that the Rent and other amounts payable by Lessee under this Lease Agreement (including Rent, additional rent and all other sums payable under this Lease Agreement) are sufficient to properly maintain the Leased Premises, and to enable the Owner to meet its debt service obligations and related expenses in connection with the Mortgage Loan and the Leased Premises. Owner and Lessee each acknowledges and agrees that the terms and provisions of this Lease Agreement are comparable to the terms and provisions of leases of comparable facilities in the market.

3.05  License; Bed Authority. Owner and Lessee agree not to undertake or acquiesce to any modification to the assisted living facility license with respect to the Leased Premises or to any "bed authority" related thereto without the prior written approval of HUD.

3.06  Financial Statements. Lessee agrees to furnish HUD and Lender copies of its annual financial statements with respect to the Leased Premises within sixty (60) days after the close of Lessee's fiscal year or such longer period as may be permitted by HUD.

7

3.07    Medicaid and Medicare.    Lessee shall be responsible for obtaining and maintaining all necessary licensure, and provider agreements for Medicaid and Medicare residents in the event the Leased Premises has a dual certification. Lessee agrees to furnish HUD and Lender with copies of all such provider agreements.

3.08    State Licensure Requirements.    Lessee shall ensure that the Leased Premises meets all state licensure requirements and standards at all times.

3.09    MAP Guide Requirements.    Owner and Lessee acknowledge and agree that this Lease Agreement complies with applicable requirements of Section 3.9.G of the Multifamily Accelerated Processing Guide dated May 17, 2000, as the same may have been amended, promulgated by the Office of the Assistant Secretary for Housing – FHA Commissioner.

3.10    Execution of Lessee Regulatory Agreement by Lessee.    At the time of the closing of the Mortgage Loan, the Lessee agrees to execute the Lessee Regulatory Agreement. The Lessee agrees to comply with its obligations under the Lessee Regulatory Agreement, and agrees that a default by the Lessee under the Lessee Regulatory Agreement shall be deemed to be a default under this Lease Agreement.

3.11    Management Contract Requirements.    The Lessee agrees not to enter into any management contract involving the Leased Premises unless such management contract shall contain provisions that, in the event of default under the Owner Regulatory Agreement or the Lessee Regulatory Agreement, the management agreement shall be subject to termination upon not more than thirty (30) days notice without penalty upon written request of HUD. Upon such HUD termination request, the Lessee shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to HUD for continuing proper management of the Leased Premises.

3.12.    Inspections.    The Lessee agrees that upon reasonable request, the Lender and/or HUD and their designees and representatives may exercise all rights of examination and inspection that are afforded to the Owner under Section 5.08 of this Lease Agreement.

3.13    Insurance.    The Lessee agrees to procure and maintain, or cause to be procured and maintained, the insurance coverages required pursuant to the Mortgage Loan Documents and/or applicable HUD Requirements, including HUD Notices 04-01 and 04-15. Insurance proceeds shall be applied in accordance with the terms of the Mortgage Loan Documents and applicable HUD Requirements. The decision to repair, reconstruct, restore or replace the Leased Premises shall be made by the Owner, subject to the terms of the Mortgage Loan Documents and applicable HUD Requirements.

3.14    Certain Payments.    The Lessee agrees to pay, as Additional Rent, when due all premiums for (i) FHA mortgage insurance, (ii) liability insurance and full coverage hazard insurance on the Leased Premises, and (iii) all other insurance coverages required under the Mortgage Loan Documents and/or applicable HUD Requirements, and to treat such payments as Operating Expenses. Unless the Lender and Owner agree otherwise, the Lessee shall be

8

Case 5:26-cv-03491-CH     Document 5-1     Filed 06/12/26     Page 191 of 897

Case 25-15245-pmm  Doc 456-1  Filed 03/06/25  Entered 03/06/25 19:55:33  Desc Main
Exhibit F POC Whitehall Page 16 of 53  Page 17 of 53

responsible for funding all escrows for taxes, reserves for replacements, mortgage insurance premiums, and/or other insurance premiums as may be required by the Lender and/or FHA,

3.15    Eminent Domain.    The proceeds of any condemnation award or other compensation paid by reason of a conveyance in lieu of the exercise of such power, with respect to the Leased Premises or any portion thereof shall be applied in accordance with the terms of the Mortgage Loan Documents and applicable HUD Requirements.

3.16    Ownership of Capital Improvements.    Lessee agrees to execute any and all documents as may be required by Lender or HUD to confirm the provisions of Section 2.05 and/or further effect the transfer of title to the Owner as provided in Section 2.05.

## ARTICLE IV

### RENTALS; APPLICATION OF GROSS REVENUES

4.01    General Obligation.    This Lease Agreement is a general obligation of the Lessee.

4.02    Rental Payments.

A.    The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of One Million Two Hundred Thousand and No/100 Dollars ($1,200,000.00) per year.  Payments of Rent shall be due in advance in equal monthly installments of One Hundred Thousand and No/100 Dollars ($100,000.00) on the first day of each month. If the Lessee fails to make any monthly payment of Rent within fifteen (15) days after the due date thereof, the Owner may, at its option, impose a late charge upon the Lessee in an amount not to exceed five percent (5.0%) of the Rent so delinquent.

B.    The Lessee agrees to pay to (or on behalf of) the Owner all payments to the reserve for replacements which are required to be made pursuant to the terms of the Owner Regulatory Agreement.

4.03    Security Interest In Gross Revenues.    As security for the Rent and all other payments due to the Owner under the terms of this Lease Agreement, the Lessee grants to and creates in the Owner a security interest in the Gross Revenues, but the existence of such security interest shall not prevent the expenditure, deposit or commingling of Gross Revenues by the Lessee so long as all payments required under this Lease Agreement are made when due, nor prevent the write-off of any uncollectable accounts or bad debts. In the event of default by the Lessee under the terms and conditions of this Lease Agreement, beyond any applicable notice and cure periods, the Owner, without limitation of any other rights or remedies available to it and with any required consent of the Department of Public Health, shall have the right to appoint a receiver to collect the Gross Revenues and manage payments from such funds as permitted from time to time by the Department of Public Health, if applicable.

9

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 192 of 897

Case 2:25-15245-pmm   Doc 456-1 Filed 03/03/26   Entered 03/03/26 19:25:33   Desc Main
Exhibit F POC Whitehall Page 17 of 52  age 18 of 53

4.04    Obligations Unconditional. The obligations of the Lessee to make payments of Rent and all other payments required under this Lease Agreement shall be absolute and unconditional, without defense or set-off by reason of any default or other reason whatsoever, including by the Owner under this Lease Agreement or under any other agreement between the Lessee and the Owner or the Lender, and, except as may be expressly provided herein, such payments shall not be decreased, abated, postponed, or delayed for any reason whatsoever, including, without limitation, any acts or circumstances that may constitute failure of consideration, destruction of or damage to the Leased Premises, the taking by condemnation of any part of the Leased Premises, commercial frustration of purpose, failure of the Owner to perform and observe any agreement, whether expressed or implied, or any duty, liability or obligation arising out of or connected with this Lease Agreement, or failure of any resident or occupant of the Lessee to pay the fees, rentals or other charges owed to the Lessee, and irrespective of whether or not any such resident or occupant of the Lessee receives either partial or total reimbursement as a credit against such payment, it being the intention of the parties that the payments required of the Lessee under this Lease Agreement will be paid in full when due without any delay or diminution whatsoever.

4.05    Net Lease. This Lease Agreement is intended to be an entirely "net" lease, intending hereby to impose the burden of payment of all costs and expenses related to the use and occupancy of the Leased Premises upon the Lessee. The Lessee agrees to pay when due all real estate and personal property taxes and special assessments assessed or imposed upon the Leased Premises or which may be charged to the Owner in connection with the Leased Premises and treat such payments as Operating Expenses. The Lessee agrees also to pay when due all payments required by Section 3.14 of this Lease Agreement (during periods in which Article III is operative), and premiums for liability insurance and full coverage hazard insurance on the Leased Premises, and to treat such payments as Operating Expenses. The Lessee agrees also to pay when due all other Operating Expenses. Notwithstanding the foregoing, the Lessee shall not be liable for any federal, state or local income taxes which may be assessed against the Owner.

ARTICLE V

COVENANTS AND REPRESENTATIONS OF THE LESSEE

5.01    Maintenance and Operation of Leased Premises. The Lessee covenants that during the Lease Term of this Lease Agreement, it shall:

A.    pay or cause to be paid all costs of operating the Leased Premises including, without limitation, all charges for water, electricity, light, heat or power, sewage, telephone and other utility service, rendered or supplied during the Lease Term; all water, water meter, and sewer rents, rates, and charges; and any and all other governmental levies, fees, rents, assessments, or taxes and charges;

B.    at its own cost or expense keep and maintain, or cause to be kept and maintained, in good repair and condition (excepting reasonable wear and tear), the Leased

10

App.187

Premises and all additions and improvements thereto, excluding any rebuilding or restoration following damage to or destruction or condemnation of all or part of the Leased Premises;

C. make all repairs, renewals, replacements and improvements to the Leased Premises in order to maintain adequate service and quality resident care;

D. not commit or suffer any waste of any of the Leased Premises;

E. maintain in good standing its license to operate the Leased Premises as an assisted living facility and any other licenses or permits required to operate the Leased Premises as a licensed facility; and promptly comply, unless contested in good faith, with any and all requests and recommendations of the Department of Public Health and its representatives with respect to the operation of the Leased Premises, in providing care to residents;

F. comply with all applicable requirements of Titles XVIII and XIX of the Social Security Act, and the rules and regulations thereunder, as the same may now or hereafter be in effect, in order to maintain its status in good standing as a provider of health care services under such Titles;

G. upon receipt, promptly furnish the Owner with copies of any inspection reports made by the Department of Public Health or the United States Department of Health and Human Services, and promptly undertake to correct any deficiencies noted in such inspection reports regarding its operation of the Leased Premises as an assisted living facility; and

H. promptly inform the Owner of any decisions on behalf of the Department of Public Health as to a change in status of any certificate or license affecting the Lessee's operation of the Leased Premises as an assisted living facility.

5.02    Maintenance of Entity Existence. The Lessee agrees that during the Lease Term (unless this Lease Agreement is assigned in accordance with its terms, in which event this Section shall apply to such assignee), it will maintain its entity existence, will continue to be a corporation organized under the laws of the Commonwealth of Pennsylvania, will promptly pay all taxes assessed against it or any of its assets by any federal, state or local governmental authority, will not dissolve or otherwise dispose of all or substantially all of its assets, and will not consolidate with or merge into another entity or permit one or more other entities to consolidate with or merge into it.

5.03    Management. The Lessee agrees at all times during the Lease Term of this Lease Agreement to employ or cause to be employed a qualified management firm and/or qualified administrator to supervise the operation of the Leased Premises, who shall be experienced in the management and operation of facilities of the nature and size of the Leased Premises, and who shall be subject to the approval of the Owner (and HUD, in accordance with Section 3.11, during periods in which Article III is operative).

11

App.188

5.04    Payment of Lawful Taxes and Charges; Discharge of Liens.

A.    The Lessee agrees to pay all taxes and assessments or other municipal or governmental charges of any kind whatsoever that may at any time be lawfully imposed, levied or assessed upon or in respect of the Lessee's income, operations, assets or property, including the Leased Premises, or any part thereof, when the same shall become due, including any machinery, equipment or related property installed or brought by the Lessee therein or thereon, and all utility and other charges incurred in the operation, maintenance, use, occupancy and upkeep of the Leased Premises; provided, that with respect to special assessments or other governmental charges that lawfully may be paid in installments over a period of years, the Lessee shall be obligated to pay only such installments as are required to be paid during the term of this Lease Agreement. Notwithstanding the foregoing, the Lessee shall not be liable for any federal, state or local income taxes which may be assessed against the Owner.

B.    The Lessee may, at its own expense and in good faith, contest any such taxes, assessments, charges, claims or demands and, in the event of any such contest, may, with the approval of the Owner (and HUD, in accordance with Section 3.12.A, during periods in which Article III is operative), permit the taxes, assessments, charges, claims and demands so contested to remain unpaid during the period of such contest and may appeal therefrom.

5.05    Compliance With Law.

A.    The Lessee covenants, represents and warrants that at all times during the term of this Lease Agreement:

(1)    all actions heretofore and hereafter taken by the Lessee with respect to the Leased Premises, including all repairs, additions, alterations or improvements thereto, have been and will at all times be in compliance in all material respects with all applicable requirements of federal, state and local laws, ordinances, rules, regulations and orders, and with all applicable requirements of any agency, board, or commission created under the laws of the state where the Leased Premises are located, or any other duly constituted public authority, and any requirement of an insurance company so long as such company is providing insurance in respect to the Lessee or the Leased Premises; and

(2)    it shall not take any action which would cause the Leased Premises to be in violation of such laws, ordinances, rules, regulations or orders.

B.    Notwithstanding any provision of this Lease Agreement, the Lessee shall have the right to contest in good faith any law, ordinance, rule, regulation or order, provided that such action is promptly and diligently pursued, and the Lessee agrees to keep the Owner informed as to the status of such contest and provided further that such action does not, in the Owner's judgment materially adversely affect the Lessee's ability to operate the Leased Premises and pay the Rent.

5.06    Additions and Alterations.  Except where an emergency situation exists:

12

A.    The Lessee shall not, without the prior written approval of the Owner, which will not be unreasonably withheld or delayed, make any alterations, changes, replacements, improvements and additions of a structural nature to the Leased Premises;

B.    The Lessee agrees not to permit any alienation, removal, demolition, substitution, improvement, alteration or deterioration of the Leased Premises or any other act which might impair or reduce the usefulness or value thereof or the Owner's interest therein; and

C.    The Lessee agrees to comply with all applicable requirements of law with respect to such alterations, changes, replacements, improvements and additions.

(And Lessee shall also comply with Section 3.12.B during periods in which Article III is operative.)

5.07    Financial and Other Restrictions.  So long as this Lease Agreement remains in effect, (and, as to the records required hereunder, for a period of one year thereafter), the Lessee agrees to:

A.    Keep proper books of record and account in which full, true and correct entries will be made of all its business transactions in accordance with generally accepted accounting principles;

B.    Make payment of all indebtedness incurred in the ordinary course of the Lessee's business within the times provided under the terms of such indebtedness and make payments of all taxes, governmental charges and/or payments in lieu of taxes promptly (unless the Lessee is contesting the validity thereof in good faith);

C.    Provide to the Owner annual financial statements with respect to the Leased Premises, prepared by a certified public accountant or firm of certified public accountants acceptable to the Owner (and which meet the requirements of Section 3.06 during periods in which Article III is operative); and

D.    With reasonable promptness provide to the Owner any other data and information which may be reasonably requested from time to time.

5.08    Inspections.  The Lessee agrees that upon reasonable request, the Owner and its designees and representatives may at all reasonable times, upon reasonable notice, subject to the rights of patients, residents and tenants, if any, examine and inspect the Leased Premises. The Lessee will, on the request of the Owner, promptly make available for inspection by the Owner and its designees and representatives copies of all of the Lessee's correspondence, books, records and other documentation relating to the Leased Premises, but excepting communications between the Lessee and its attorneys. The Lessee agrees to maintain accounting records for the Leased Premises in accordance with its customary practice, separate from any general accounting records which the Lessee may maintain in connection with the Lessee's general business activities. The

13

Lessee agrees that the Owner and its designees and representatives shall, at any reasonable time, have access to and the right to examine all accounting records of the Lessee which relate directly or indirectly to the Leased Premises. (See also Section 3.13 during periods in which Article III is operative.)

5.09     Assignment and Subletting.  Except as set forth in this Section 5.09, the Lessee may not assign this Lease Agreement or sublease the Leased Premises or any portion thereof without the prior written consent of the Owner (and HUD, in accordance with Section 3.02, during periods in which Article III is operative). The Lessee shall be permitted to enter into leases and other possession and use agreements in the nature of assisted living rental, lease and/or services agreements with individual persons in the ordinary course of its operations.

5.10     Indemnification Concerning the Leased Premises.

A.     The Lessee covenants and agrees, at its expense, to pay and to indemnify and save the Indemnified Parties harmless of, from and against, any and all claims, damages, demands, expenses, liabilities, and losses of every kind, character, and nature asserted by or on behalf of any person arising out of, resulting from, or in any way connected with, the condition, use, possession, conduct, management, operation, or leasing of the Leased Premises or any part thereof, except for any claim, damage, demand, expense, liability or loss arising out of the negligence or willful misconduct of the party seeking indemnity.

B.     If any action is brought against any Indemnified Party based upon any of the above and in respect to which indemnity may be sought against the Lessee, the Indemnified Party involved may request in writing that the Lessee assume the defense thereof, including the employment of counsel selected by the Lessee satisfactory to such Indemnified Party (as reasonably determined), the payment of all costs and expenses and the right to negotiate and consent to settlement. Any one or more of the Indemnified Parties shall have the right to employ separate counsel at the sole cost and expense of such Indemnified Party in any such action, to participate in the defense thereof. The Lessee shall not be liable for any settlement of any such action effected without its consent, which consent shall not be unreasonably withheld nor delayed, but if settled with the consent of the Lessee or if there be a final judgment for the plaintiff in any such action, the Lessee agrees to indemnify and hold harmless the Indemnified Parties from and against any loss or liability by reason of such settlement or judgment.

C.  The Lessee shall have the right to obtain insurance, if available, against the risks which it has undertaken in paragraph A of this Section, and to treat the cost of such insurance as a part of Operating Expenses.

5.11     Representations of the Lessee.  The Lessee represents and warrants as follows:

A.     Due Organization.  The Lessee is a corporation, duly organized, validly existing and in good standing under the laws of Pennsylvania, and is duly authorized and qualified to operate this type of facility in the Commonwealth of Pennsylvania. The Lessee has powers adequate for the execution, delivery and performance of its obligations under this Lease

14

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 197 of 897

Case 25-51234-pmm    Doc 456-6 Filed 03/03/26 Entered 03/03/26 17:55:3 Desc Main
Exhibit F PODocWhitehall Pageia22 of B2ge 23 of 53

Agreement and for carrying on the business now conducted by it and contemplated in connection with the Leased Premises. The execution and delivery of, and the performance by the Lessee of its obligations under this Lease Agreement have been duly authorized by all appropriate action by the Lessee, and this Lease Agreement constitutes the valid and binding obligations of the Lessee, enforceable in accordance with its terms, except as enforceability may be subject to the exercise of judicial discretion in accordance with general equitable principles and to applicable bankruptcy, insolvency, reorganization, moratorium and other laws for the relief of debtors heretofore or hereafter enacted to the extent that the same may be constitutionally applied.

B.    Legal Proceedings. There is no action, suit, proceeding (including, without limitation, any condemnation proceeding or proceeding in the nature of bankruptcy or for reorganization or arrangement), or investigation at law or in equity before or by any court or public board or body, pending or, to the knowledge of the Lessee after due investigation, threatened, against the Lessee or the Leased Premises, nor, to the best knowledge of the Lessee, any basis therefor, wherein an unfavorable decision, ruling or finding would, in any material respect, adversely affect the business, assets or condition (financial or otherwise) of the Lessee or the Leased Premises or the transactions contemplated by this Lease Agreement, or which in any way would adversely affect the validity of this Lease Agreement.

C.    Compliance With Law; Consents. The Lessee is not in violation of any term or provision of its organizational documents or in violation of any term or provision of any mortgage, lease, agreement or other instrument which is material to its business or assets, or of any judgment, decree, governmental order, statute, rule or regulation by which it is bound or to which it or any of its assets is subject. The execution, delivery and performance of and compliance with this Lease Agreement will not violate or constitute a default under the organizational documents of the Lessee or of any term or provision of any mortgage, lease, agreement or other instrument, or of any judgment, decree, governmental order, statute, rule or regulation by which the Lessee is bound or to which any of its assets is subject. No approval by, authorization of, or filing with any federal, state, or local or other governmental commission, board, or agency or other governmental authority is necessary in connection with the execution and delivery of this Lease Agreement by the Lessee.

D.    The Facility.

(1)    The Lessee agrees to operate the Leased Premises as an assisted living facility.

(2)    In the occupancy, maintenance, improvement and operation of the Leased Premises, the Lessee shall at all times comply in all respects with all applicable building, zoning and land use, environmental protection, sanitary, safety and other laws, rules and regulations, and shall not permit a nuisance thereon.

E.    The foregoing representations and assurances are made for the benefit of the Owner, the Lender and HUD and not for the benefit of any other third party.

15

App.192

## ARTICLE VI

### INSURANCE AND CONDEMNATION

6.01    Insurance Coverage and Terms.

A.    The Lessee agrees to procure and maintain, or cause to be procured and maintained, commercial general liability insurance and property insurance coverages with respect to the Leased Premises (and, during such periods as applicable, the insurance required under Section 3.14 of this Lease Agreement), naming the Owner and the Lender as additional insureds.

B.    In the event that the Lessee fails to maintain any insurance as provided in this Section 6.01, the Owner may, at its option and upon such notice to the Lessee as is reasonable under the circumstances, procure and maintain such insurance. The Lessee agrees and covenants to pay any amounts so advanced therefor by the Owner, together with interest thereon at the prime rate of interest published in the Wall Street Journal plus five percent (5.0%), from the date thereof.

6.02    Insurance Proceeds. In the event of damage or destruction to the Leased Premises, the decision to repair, reconstruct, restore or replace the Leased Premises shall be made by the Owner (and in accordance with Section 3.14, during periods in which Article III is operative).

6.03    Eminent Domain. Subject to Section 3.16 (during periods in which Article III is operative), the proceeds of any condemnation award or other compensation paid by reason of a conveyance in lieu of the exercise of such power, with respect to the Leased Premises or any portion thereof shall be the property of Owner. The Lessee shall, however, be entitled to recover any amounts payable to it for moving expenses, loss of personal property, and the like so long as they do not affect Owner's award.

## ARTICLE VII

### DEFAULT AND REMEDIES

7.01    Events of Default. Each of the following shall be an "Event of Default" under this Lease Agreement:

A.    If payment of any amount due under Section 4.02 of this Lease Agreement is not made when it becomes due and payable and if such payment remains unpaid for a period of fifteen (15) days; or

B.    If the Lessee shall:

- 16

1.     admit in writing its inability to pay its debts as they become due, or

2.     file a petition to be adjudicated a voluntary bankrupt in bankruptcy or a petition to otherwise take advantage of any federal or state bankruptcy or insolvency law, or

3.     make an assignment for the benefit of its creditors or seek a composition with its creditors, or

4.     consent to the appointment of a receiver of itself or of the whole or any substantial part of the Leased Premises, or

C.     If (i) the Lessee shall, upon an involuntary petition under any section or chapter of the federal bankruptcy laws filed against it, be adjudicated a bankrupt; or (ii) a court of competent jurisdiction shall enter an order or decree appointing a trustee or receiver (interim or permanent) or appointing the Lessee a debtor-in-possession, with or without the consent of the Lessee, of the whole or any substantial part of the Leased Premises, or of the Gross Revenues, or approving a petition filed against the Lessee seeking reorganization or an arrangement under the federal bankruptcy laws or any other applicable law or statute of the United States of America or any legal subdivision thereof; and such adjudication, order or decree is not dismissed or vacated within a period of sixty (60) days from the date thereof; or

D.     If the Lessee defaults in the due and punctual performance or observance of any other representation, agreement or covenant in this Lease Agreement and such default continues for thirty (30) days after written notice requiring the same to be remedied has been given by the Owner.

7.02     Remedies. Upon or after the occurrence of any Event of Default, the Lessee, upon demand of the Owner, shall forthwith surrender to the Owner the actual possession of the Leased Premises and the Owner may enter and take possession of the Leased Premises and may exclude the Lessee, its agent and employees wholly therefrom. Upon or after the occurrence of any Event of Default the Owner may, upon notice, do any or all of the following at the Lessee's risk:

A.     Re-enter and take possession of the Leased Premises or any portion thereof without terminating this Lease Agreement, and lease the Owner's interest in such Leased Premises for the account of the Lessee to any other party, holding the Lessee liable for the difference between (i) the net proceeds to Owner from such re-leasing and (ii) the rent and other amounts payable by the Lessee and due under this Lease Agreement, including the expenses of Owner and Lender, including reasonable attorneys' fees, incurred in connection with such default.

B.     Terminate the Lease Term, exclude the Lessee from possession of the Leased Premises and lease the Owner's interest in the Leased Premises for the account of the

17

Case 25-15245-pmm   Doc 456-1   Filed 03/26/26   Entered 03/26/26 19:55:38   Desc Main
Exhibit F POC Whitehall Page 25 of 52   Page 26 of 53

Lessee, to any other party, holding the Lessee liable for all rents and other amounts due under this Lease Agreement and not paid by such other party.

C.    Take whatever action at law or in equity may appear necessary or desirable to collect the payment then due and thereafter to become due, or to enforce performance and observance of any obligation, agreement or covenant of the Lessee under this Lease Agreement.

7.03    Cumulative Rights; No Implied Waiver.   No remedy conferred upon or reserved to the Owner by this Lease Agreement is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Lease Agreement or now or hereafter existing at law or in equity or by statute. No waiver by the Owner of any obligations, agreements or covenants under this Lease Agreement shall be deemed a waiver of any subsequent breach, and no delay or omission to exercise any right or power shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient.

## ARTICLE VIII

## MISCELLANEOUS

8.01    Surrender of Possession.   Except as otherwise expressly provided in this Lease Agreement, at the expiration or earlier termination of the Lease Term, the Lessee agrees to surrender possession of the Leased Premises peacefully and promptly to the Owner in as good a condition as at the commencement of the Lease Term, loss by fire or other casualty covered by insurance, condemnation, or ordinary wear, tear, and obsolescence excepted.

8.02    Successors and Assigns.   This Lease Agreement shall inure to the benefit of and shall be binding upon the Owner, the Lessee and their respective successors and assigns.

8.03    Severability.   In the event any provision of this Lease Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision of this Lease Agreement.

8.04    Counterparts.   This Agreement may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

8.05    Notices.   All notices or other communications provided for in this Lease Agreement shall be in writing and shall be delivered personally to, or sent by certified or registered mail or recognized overnight delivery service to the respective offices of the Owner and the Lessee as set forth on the first page of this Lease Agreement, or such other address as may have been previously specified in a notice given in accordance with this Section 8.05.

18

App.195

The Owner or Lessee may from time to time designate other representatives or addresses with respect to receipt of notices or other communications.

    8.06    Headings. The Article and Section headings in this Lease Agreement are inserted for convenience of reference only and are not intended to define or limit the scope of any provision of this Lease Agreement.

    8.07    Non-Waiver. It is understood and agreed that nothing contained in this Lease Agreement shall be construed as a waiver on the part of the parties, or any of them, of any right not explicitly waived in this Lease Agreement.

    8.08    Amendments. This Lease Agreement shall not be amended without the prior written consent of the Owner and Lessee and no such amendment shall be effective unless the same shall be in writing and executed by both parties hereto.

    8.09    No Recording. Neither party shall record this Lease Agreement. At the request of Lessee or Owner, the parties shall execute and record a memorandum of lease.

    8.10    Estoppel Certificates. The Lessee agrees that upon request by Owner, it will execute and deliver to the Owner, and/or to such third party as is designated by the Owner, a statement in writing certifying (a) that (except as may be otherwise specified by the Lessee) (i) this Lease Agreement is in full force and effect and unmodified and has not been assigned by Lessee, (ii) the Lessee is not in default under this Lease Agreement, and (iii) to the best of Lessee's knowledge, the Owner is not in default under this Lease Agreement, and (b) as to such other factual matters as the Owner may reasonably request about this Lease Agreement.

    8.11    Governing Law. The internal laws of the State of Pennsylvania shall govern as to the interpretation, validity and effect of this Lease Agreement, without regard to such state's choice of law principles.

    8.12    Entirety of Agreement. This Lease Agreement embodies the entire agreement and understanding of the parties with respect to the subject matter hereof, and supersedes all prior leases, agreements, correspondence, arrangements and understandings relating to the subject matter hereof.

IN WITNESS WHEREOF, the Owner and the Lessee have signed this Lease Agreement as of the date first above written.

19

OWNER:

WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a/ dated August 1, 2007

By:_____
Abraham R. Atiyeh, Manager

LESSEE:

WHITEHALL MANOR, INC.

By:_____
Abraham R. Atiyeh, President

20

08/04/2008 - Cincinnati 730126.V3

App.197

## EXHIBIT A

UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.

PARCEL ID NO. 5498 9378 8632-1

Together with an undivided interest of 50% of, in and to the Common Elements of the said WHITEHALL MANOR CONDOMINIUM.

FIRST AMENDMENT
Dated and Effective As Of January 1, 2010
To The
LEASE AGREEMENT
Dated and Effective As Of August ____, 2008
By and Between
WHITEHALL TRUST,
a Pennsylvania Trust, as Owner and Lessor
and
WHITEHALL MANOR, INC.,
a Pennsylvania corporation, as Lessee

## FIRST AMENDMENT TO LEASE AGREEMENT

This FIRST AMENDMENT TO LEASE AGREEMENT, (the "First Amendment") , is made and dated as of January 1, 2010, by and between **WHITEHALL TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Whitehall Fiduciary LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

AND

**WHITEHALL MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner and Lessee desire to amend the Lease dated August ___, 2008 between Owner and Lessee (the "Lease") for those certain premises known as Unit 1 of Whitehall Manor Condominium, (the "Leased Premises") on the terms and conditions set forth herein; and

WHEREAS, the terms of this Addendum shall be effective as of the date shown above, subject to the obtaining approval as required by the terms of the Mortgage encumbering the Leased Premises.

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02(A) of the Lease is amended and restated as follows:

> "A.      The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of One Million Nine Hundred Fifty Thousand ($1,950,000.00) per year. Payments of Rent shall be due (a) in advance in equal monthly installments of One Hundred Thousand Dollars ($100,000.00) on the first day of each month, each due without setoff and without prior notice or demand, and (b) the remainder of $750,000.00 to be paid on or before December 31 of the then current calendar year, in one or more partial installments, as Lessee shall elect, provided however that the full Base Rental of $1,950,000.00 is paid in full by December 31 of each year.

> "A.1·      Additionally, all other items set forth as Rent or Additional Rent under the Lease and all obligations of the Lessee are herein considered to be Rent and those additional items are due as set forth in the Lease. If the Lessee fails to make any monthly payment of Rent within fifteen (15) days after the due date thereof, the Owner may, at its option, impose a late charge upon the Lessee in an amount not to exceed

App.200

ten percent (10%) of the Rent so delinquent for each calendar month of delinquency.

2.          No other portions of the Lease are amended or modified.

3.          Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

4.          Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Lease as if fully set forth herein at length.

5.          The amendment set forth herein is subject to approval by the Secretary of Housing and Urban Development pursuant to the terms of the Mortgage encumbering the Leased Premises, and this amendment shall be void and of no force or effect if the said approval is not granted, and in such event, the Lease shall remain in full force and effect as if this First Amendment to Lease Agreement was never executed.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this First Amendment to Lease Agreement effective as of January 1, 2010.

WHITEHALL TRUST
By: Whitehall Fiduciary LLC

By: _____
Abraham Atiyeh, Manager

WHITEHALL MANOR, INC.

By: _____
(Vice) President

SECOND AMENDMENT
Dated and Effective As Of January 1, 2012,
To The
LEASE AGREEMENT
Dated on or about August, 2008
By and Between
WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007, as Owner and Lessor

and

WHITEHALL MANOR, INC.,
a Pennsylvania corporation, as Lessee

App.202

## SECOND AMENDMENT TO LEASE AGREEMENT

This SECOND AMENDMENT TO LEASE AGREEMENT, (the "Second Amendment"), is made and dated as of January 1, 2012 by and between **WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST u/t/a dated August 1, 2007,** a trust organized and existing under the laws of the Commonwealth of Pennsylvania (the "Owner") having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

AND

**WHITEHALL MANOR, INC.,** (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner and Lessee desire to amend the Lease dated on or about August, 2008 between Owner and Lessee (the "Original Lease") and the First Amendment to Lease Agreement dated as of January 1, 2010, together with this Second Amendment to Lease Agreement being herein called the "Lease", for those certain premises known as Unit 1 of Whitehall Manor Condominium, (the "Leased Premises") on the terms and conditions set forth herein; and

WHEREAS, Owner is refinancing the Mortgage Loan relating to the Premises, and the conditions for such loan require amendment of the Original Lease as amended by the First Amendment and Lessee is agreeable to such modifications; and

WHEREAS, Owner and Lessee agree that the terms of this Addendum shall be effective as of the date shown above.

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 2.02 of the Lease is amended and restated as follows:

    2.02    Term of Lease. The Lease Term for the Leased Premises commenced on August 19, 2008 and shall expire on August 31, 2018, or such earlier date as may be hereinafter provided. In addition, the Lessee shall have the option to extend the Lease Term for three (3) successive periods of five (5) years each upon the terms and conditions contained herein, upon written notice to the Owner given not later than one hundred eighty (180) days prior to the expiration of the initial Lease Term or extended Lease Term, as the case may be.

2. Section 4.02(A) of the Lease is amended and restated as follows:

App.203

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 209 of 897

Case 5:21-cv-02345-pmm  Doc 46-1  Filed 03/03/21  Entered 03/03/21 13:17:55  Desc Main
Exhibit F POC Whitehall Page 34 of 52  Page 35 of 53

"A.        The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of One Million Six Hundred Sixty Eight Thousand ($1,668,000.00) per year.  Payments of Rent shall be due (a) in advance in equal monthly installments of Eighty Thousand Dollars ($80,000.00) on the first day of each month, each due without setoff and without prior notice or demand, and (b) the remainder of Seven Hundred Eight Thousand ($708,000.00) Dollars to be paid on or before December 31 of the then current calendar year, in one or more partial installments, as Lessee shall elect, provided however that the full Base Rental of $1,668,000.00 is paid in full by December 31 of each year.

"A.1      Additionally, all other items set forth as Rent or Additional Rent under the Lease and all obligations of the Lessee are herein considered to be Rent and those additional items are due as set forth in the Lease. If the Lessee fails to make any monthly payment of Rent within fifteen (15) days after the due date thereof, the Owner may, at its option, impose a late charge upon the Lessee in an amount not to exceed ten percent (10%) of the Rent so delinquent for each calendar month of delinquency."

3.        Owner and Lessee agree that the terms of the HUD Addendum to Operating Lease, which is attached hereto as Exhibit "A" and incorporated herein by reference, are a part of this Lease and that Owner and Lessee shall be bound thereby.

4.        Other than as set forth in Sections 1 and 2 of this Second Amendment to Lease Agreement, there are no other changes to the Original Lease or the First Amendment to Lease.

5.        Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

6.        Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Original Lease as if fully set forth herein at length and ratified and affirmed herein at length.

[Signature page follows]

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Second Amendment to Lease Agreement effective as of January 1, 2012.

WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007

By: _____
Abraham Atiyeh, Manager

WHITEHALL MANOR, INC., a
Pennsylvania corporation

By: _____
Nimita Kapoor Atiyeh, President

App.205

## EXHIBIT A

### HUD ADDENDUM TO OPERATING LEASE

This Addendum is attached to and made a part of that certain Operating Lease Agreement dated on or about August, 2008, as amended by the First Amendment to Lease dated as of January 1, 2010, and the Second Amendment to Lease dated as of January 1, 2012, all entered into by Owner/Lessor and Lessee (the " Operating Lease"), and amends and/or supplements the Operating Lease. In the event of a conflict between the terms of this Addendum and the Operating Lease, the terms of this Addendum shall govern and control. Capitalized terms used herein but not defined shall have the meanings set forth in the Operating Lease.

### DEFINITIONS

The following terms shall have the meanings specified below:

"FF&E" means furnishings, fixtures and equipment of all kinds used in connection with the Leased Premises, including additions, substitutions and replacements thereto.

"FHA" means the Federal Housing Administration.

"Health Care Requirements" shall mean, relating to the Leased Premises, all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions or agreements, in each case, pertaining to or concerned with the establishment, construction, ownership, operation, use or occupancy of the Leased Premises or any part thereof as a health care facility, and all material permits, licenses and authorizations and regulations relating thereto, including all material rules, orders, regulations and decrees of and agreements with health care authorities pertaining to the Leased Premises.

"HUD" means the U.S. Department of Housing and Urban Development.

"HUD Program Requirements" means all applicable statutes and regulations, including all amendments to such statutes and regulations, as they become effective, and all applicable requirements in HUD handbooks, notices and mortgagee letters that apply to the Leased Premises, including all updates and changes to such handbooks, notices and mortgagee letters that apply to the Leased Premise, except that changes subject to notice and comment rulemaking shall become effective upon completion of the rulemaking process.

"Leased Premises" means all the land located at, and known and identified as Unit 1 of Whitehall Manor Condominium, said premises being situated in the Township of Whitehall, Lehigh County, Pennsylvania, and more particularly described in Exhibit "B"  attached to this Second Amendment to Lease Agreement dated as of January 1, 2012, together with any additions thereto and substitutions therefore, and any buildings, improvements, betterments, all FF&E and other property, real or personal, now existing or at any time acquired, constructed or located thereon, and all easements and other rights appurtenant thereto.

"Lender" means M&T Realty Capital Corporation, and any future holder of the Mortgage.

"Lessee" means Whitehall Manor, Inc.

"Lessee Regulatory Agreement" means the Regulatory Agreement-Nursing Homes entered into by and between the Lessee and FHA with respect to the Leased Premises and any riders, amendments and supplements thereto.

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 212 of 897

Case 2:21-cv-12345-pmm    Doc 456-1  Filed 03/06/21  Entered 03/06/21 13:17:55  Desc Main
Exhibit F PDF Cwhitehall Page 37 of 53Page 38 of 53

"Lessee Security Agreement" means that certain Lessee Security Agreement between Lessee and Lender with respect to the Leased Premises and any amendments or supplements thereto.

"Material Term" is a term in a loan or security agreement that:

1) extends the maturity date of the loan;
2) adds guarantors to the loan;
3) releases guarantors from the loan;
4) adds borrowers to the loan;
5) adds an interest reserve to the loan;
6) amends the interest rate payable on the outstanding principal balance of the loan;
7) increases or decreases the principal amount of the loan;
8) adds collateral as additional security for the loan; and/or
9) amends or expands the type of obligations secured by the loan.

"Mortgage" means that certain mortgage or deed of trust from the Owner/Lessor in favor of the Lender with respect to the Leased Premises securing the Mortgage Loan, and any amendments and supplements thereto.

"Mortgage Loan" means the FHA-insured mortgage loan in the original maximum principal amount of up to $15,788,700.00 made by Lender to the Owner/Lessor, secured, in whole or in part, by the Leased Premises, as the same may be amended, increased or decreased.

"Mortgage Loan Documents" means the Owner/Lessor Regulatory Agreement, the Mortgage, the Promissory Note evidencing the Mortgage Loan executed by the Owner/Lessor in favor of the Lender, the Security Agreement, the Lessee Regulatory Agreement, the Lessee Security Agreement, and any and all other documents required by HUD and/or the Lender in connection with the Mortgage Loan.

"Owner/Lessor" means Whitehall Fiduciary LLC, Trustee of the Whitehall Trust.

"Owner/Lessor Regulatory Agreement" means the Regulatory Agreement entered into by and between the Owner/Lessor and HUD with respect to the Leased Premises and any riders, amendments and supplements thereto.

"Security Agreement" means that certain Security Agreement between Owner/Lessor and Lender with respect to the Leased Premises and any amendments and supplements thereto.

## HUD REQUIREMENTS

1. Precedence of Addendum. For so long as HUD is the holder or insurer of any indebtedness secured by the Leased Premises, the provisions of this Addendum shall apply to this Lease. In the event of any conflict between any provision of this Addendum and any other provision of this Lease, the provision of this Addendum shall be controlling. This Addendum shall not be amended without the prior written consent of HUD and the Lender.

2. Compliance With HUD Program Requirements and Terms of Mortgage Loan Documents.

(a)    The Lessee agrees to comply with all applicable HUD Program Requirements and the Mortgage Loan Documents. The Lessee further agrees that this lease will be part of the collateral pledged by Owner/Lessor to Lender & HUD. The Lessee agrees that it will not take

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 213 of 897

Case 2:25-cv-12345-pmm  Doc 456-1  Filed 03/26/25  Entered 03/26/25 13:37:55  Desc Main Exhibit F PDC Whitehall  Page 38 of 52  Page 39 of 53

any action which would violate any applicable HUD Program Requirements or any of the Mortgage Loan Documents.

(b)    In the event of any conflict between the terms and provisions of this Lease Agreement and any applicable HUD Program Requirements or the Mortgage Loan Documents, the HUD Program Requirements and Mortgage Loan Documents shall control in all respects. Owner/Lessor and Lessee agree that no provision of this Lease shall modify any obligation of Owner/Lessor or Lessee under the Mortgage Loan Documents. Owner/Lessor and Lessee acknowledge that HUD's acceptance of this Lease in connection with the closing of the Mortgage Loan shall in no way constitute HUD's consent to arrangements which are inconsistent with HUD Program Requirements. This Lease is subject to all HUD Program Requirements.

3. Subordination.
(a)    This Lease is and shall be subject and subordinate to the Mortgage and other Mortgage Loan Documents; to all renewals, modifications, consolidations, replacements and extensions thereof; to all substitutions thereof; and to all future mortgages upon the Leased Premises and/or other security interests in or to the Leased Premises and any other items which are herein leased to Lessee or which, pursuant to the terms hereof, become a part of the Leased Premises or are otherwise deemed to become the property of Owner/Lessor or to remain upon the Leased Premises at the end of the term; and to each advance made or hereafter to be made under any of the foregoing. This Section shall be self-operative and no further instrument of subordination shall be required. Without limiting the foregoing, the Lessee agrees to execute and deliver promptly any and all certificates, agreements and other instruments that the Owner/Lessor, Lender or HUD may reasonably request in order to confirm such subordination. Unless the Lender shall have agreed otherwise; if the Lender or another person or entity shall succeed to the interest of the Owner/Lessor by reason of foreclosure or other proceedings brought by Lender in lieu of or pursuant to a foreclosure, or by any other manner (Lender or such other person or entity being called a "Successor"); then this Lease shall terminate, or, at the option of the Successor, this Lease shall nevertheless continue in full force and effect, in which case the Lessee shall and does hereby agree to attorn to the Successor and to recognize the Successor as its landlord under the terms of this Lease.

(b)    Agreements for provision of services to the Leased Premises or the granting of easements, rights of way or other allowances of use or placement of CATV, utilities or other items are, and shall always be, subordinate to (i) the right of Owner/Lessor, and (ii) the Mortgage and other Mortgage Loan Documents and all other mortgages and security interests now or hereafter encumbering the Leased Premises and/or the property of which it forms a part. Lessee must obtain HUD written approval prior to entering into any telecommunications services agreement and/or granting of any easements.

4. FF&E. Lessee agrees that (a) except leases of FF&E entered into in the ordinary course of business with third-party lessees and property of tenants and residents of the Leased Premises, all FF&E located on the Leased Premises at the date of the Lease is and shall be the property of the Owner/Lessor, and (b) any FF&E acquired by Owner/Lessor or Lessee during the term of this Lease remaining on the Leased Premises at the termination of the Lease shall be and/or become the property of the Owner/Lessor. Lessee agrees, during the term of the Lease,

not to remove any FF&E from the Leased Premises, except to replace such FF&E with other similar items of equal or greater quality and value.

5. Payments. Owner/Lessor and Lessee each acknowledges and agrees that the rent and other amounts payable by Lessee under this Lease (including rent, additional rent and all other sums payable under this Lease) are sufficient to properly maintain the Leased Premises, and to enable the Owner/Lessor to meet its debt service obligations and related expenses in connection with the Mortgage Loan and the Leased Premises.

(a)    Without limiting the generality of the foregoing, the Lessee agrees to pay, as additional rent, when due all premiums for (i) FHA mortgage insurance, (ii) liability insurance and full coverage property insurance on the Leased Premises, and (iii) all other insurance coverage required under the Mortgage Loan Documents and/or applicable HUD Program Requirements.

(b)    Unless the Lender and Owner/Lessor agree otherwise, the Lessee shall be responsible for funding all escrows for taxes, reserves for replacements, mortgage insurance premiums and/or other insurance premiums as may be required by the Lender and/or HUD.

6. Lessee Regulatory Agreement and Lessee Security Agreement. At the time of the closing of the Mortgage Loan, the Lessee agrees to execute the Lessee Regulatory Agreement and the Lessee Security Agreement, and other applicable documents evidencing the Lender's security interest in the collateral of the Lessee. The Lessee agrees to comply with its obligations under the Lessee Regulatory Agreement and the Lessee Security Agreement, and agrees that a default by the Lessee under the Lessee Regulatory Agreement or Lessee Security Agreement shall be deemed to be a default under this Lease.

7. Management Contract Requirements. The Lessee agrees not to enter into any management contract involving the Leased Premises unless such management contract complies with applicable HUD Program Requirements and contains provisions that, in the event of default under the Owner/Lessor Regulatory Agreement or the Lessee Regulatory Agreement, the management agreement shall be subject to termination upon not more than thirty (30) days notice without penalty upon written request of HUD. Upon such HUD termination request, the Lessee shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to HUD for continuing proper management of the Leased Premises.

8. Licenses; Bed Authority. Lessee shall ensure that the Leased Premises meets all state licensure requirements and standards at all times. Owner/Lessor and Lessee agree not to undertake or acquiesce to any modification to any license with respect to the Leased Premises or to any "bed authority" related thereto without the prior written approval of HUD.

9. Governmental Receivables. Lessee shall be responsible for obtaining and maintaining all necessary provider agreements with Medicaid, Medicare and other governmental third party payors. Lessee agrees to furnish HUD and Lender with copies of all such provider agreements and any and all amendments thereto promptly after execution thereof.

10. Financial Statements and Reporting Requirements. Lessee agrees to furnish HUD and Lender copies of its annual financial statements with respect to the Leased Premises, prepared in compliance with the requirements of the Lessee Regulatory Agreement, within ninety (90) days after the close of Lessee's fiscal year or such longer period as may be permitted by HUD. Lessee agrees to submit to HUD and Lender copies of all other financial reports as specified in the Lessee Regulatory Agreement.

11. Inspections. The Lessee agrees that upon reasonable request, the Lender, HUD and their respective designees and representatives may at all reasonable times, upon reasonable notice, subject to the rights of patients, residents and tenants, examine and inspect the Leased Premises. The Lessee will, on the request of the Lender and/or HUD, promptly make available for inspection by the Lender and/or HUD, and their designees and representatives, copies of all of the Lessee's correspondence, books, records and other documentation relating to the Leased Premises, excepting communications between the Lessee and its attorneys. The Lessee agrees to maintain accounting records for the Leased Premises in accordance with its customary practice and the Lessee Regulatory Agreement, separate from any general accounting records which the Lessee may maintain in connection with the Lessee's other activities. The Lessee agrees that the Lender and/or HUD, and their designees and representatives, shall at any reasonable time, have access to and the right to examine all accounting records of the Lessee which relate directly or indirectly to the Leased Premises. The obligations of Lessee under this Section shall be limited to the extent necessary in order for Lessee to comply with applicable laws regarding the confidentiality of resident/patient medical records and information.

12. Insurance; Casualty; Condemnation. The Lessee agrees to procure and maintain, or cause to be procured and maintained, the insurance coverage required pursuant to the Mortgage Loan Documents and/or applicable HUD Requirements, including HUD Notices H 04-01 and H 04-15. Insurance proceeds and the proceeds of any condemnation award or other compensation paid by reason of a conveyance in lieu of the exercise of such power, with respect to the Leased Premises or any portion thereof shall be applied in accordance with the terms of the Mortgage Loan Documents and applicable HUD Program Requirements. The decision to repair, reconstruct, restore or replace the Leased Premises following a casualty or condemnation shall be subject to the terms of the Mortgage Loan Documents and applicable HUD Requirements.

13. Assignment of Operating Lease and Subletting of the Leased Premises. This Lease shall not be assigned or subleased by Lessee, in whole or in part (including any transfer of title or right to possession and control of the Leased Premises, or of any right to collect fees or rents), without the prior written approval of HUD. The prior written approval of HUD shall be required for (a) any change in or transfer of the management, operation, or control of the project or (b) any change in the ownership of the lessee that requires HUD approval under the Department's previous participation approval requirements. Owner/Lessor and Lessee acknowledge that any proposed assignee will be required to execute a Lessee Regulatory Agreement and a Lessee Security Agreement, each in form and substance satisfactory to HUD, as a prerequisite to any such approval. Any assignment or subletting of the Leased Premises made without such prior approval shall be null and void. This restriction on subletting does not apply to Lessee's leasing of individual units or beds to patient / residents.

App.210

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 216 of 897

Case 2:21-cv-12345-pmm    Doc 456-6 Filed 03/06/26/26  Entered 03/06/26/26 19:53:3  Desc Main
Exhibit F POC Whitehall Page 41 of 52  Page 42 of 53

14. <u>Accounts Receivable (AR) Financing</u>. The Lessee shall not pledge its accounts receivable or receipts to an accounts receivable lender for any loan without the prior written approval of the Lender and HUD. In the event that the Lender and HUD grant such approval; (i) the holder(s) of such lien shall enter into an Intercreditor and a Rider to Intercreditor Agreement with the AR Lender and Lender on such terms and conditions as may be required by HUD; and (ii) Lessee shall agree to comply with the requirements imposed by the Lender and HUD in connection therewith. Until such approved loan is paid in full, the written approval of HUD is required for any proposed modifications, extensions, renewals or amendments to a Material Term of the AR loan or the security agreement, prior to the effective date of such amendments.

15. <u>Termination of Lease</u>. The Lease shall not be terminated prior to its expiration date without the prior written approval of HUD. If HUD becomes Mortgagee, Mortgagee in Possession, or Successor, HUD can terminate the Lease (A) for any violation of the Lease that is not cured within any applicable notice and cure period given in the Lease, (B) for any violation of the Lessee Regulatory Agreement or other HUD Program Requirements or Health Care Requirements that is not cured within thirty (30) days after receipt by Lessee of written notice of such violation or (C) if HUD, as a result of the occurrence of either of the events described in the foregoing items (A) or (B), is required to advance funds for the operation of the facility located on the Leased Premises.

16. <u>Master Lease</u>. Projects proposed for FHA financing under the Section 232 program that are affiliated by common ownership among Mortgagors and/or Lessee/Operator entities must receive written approval from HUD, and may be required to use a Master Lease between the Mortgagor/Landlord and the Master Tenant/Subtenant/Operator. The Master Lease and the HUD Master Lease Subordination Agreement or Master Lease Subordination Non Disturbance Agreement shall be approved by HUD and the Mortgagee. The Master Lease shall only contain Mortgagors and Operators of FHA-insured projects.

17. Notwithstanding any other terms contained in the Lease, in the event of an assignment of the Lease to HUD or FHA, neither HUD nor FHA shall have any indemnification obligations under the Lease. In addition, any payment obligations of HUD or FHA pursuant to the Lease shall be limited to actual amounts received by HUD or FHA, and otherwise not prohibited by applicable law or regulation, including without limitation, the Anti Deficiency Act, 31 U.S.C. § 1341 et seq.

[signature page follows...]

SIGNATURE PAGE
FOR
HUD ADDENDUM TO OPERATING LEASE

In witness whereof, the undersigned has executed and delivered this Addendum as of the date first above set forth.

OWNER/LESSOR:

WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007

By: _____
     Name: Abraham Atiyeh
     Title: Manager

LESSEE:

WHITEHALL MANOR, INC.,
a Pennsylvania corporation

By: _____
     Name: Nimita Kapoor Atiyeh
     Title: President

App.212

## EXHIBIT B

### LEGAL DESCRIPTION

UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.

PARCEL ID NO. 5498 9378 8632-1

Together with an undivided interest of 50% of, in and to the Common Elements of the said WHITEHALL MANOR CONDOMINIUM.

1/17/2012 12724384 V.2

### THIRD AMENDMENT TO LEASE AND
### MEMORANDUM OF LEASE EXTENSION

This Third Amendment to Lease and Memorandum of Lease Extension is effective as of August 31, 2018 by and between **WHITEHALL TRUST**, herein called Landlord;

AND

**WHITEHALL MANOR, INC.**, herein called Tenant.

*Witnesseth:*

*Whereas*, Landlord and Tenant are parties to the Lease dated August, 2008, which was amended by First Amendment to Lease, made and dated as of January 1, 2012, and Second Amendment to Lease, made and dated as of January 1, 2012, (collectively and as amended herein called the "Lease"), by which Landlord has leased to Tenant the real property and improvements thereon situate on Unit 1 of Whitehall Manor Condominium; and

*Whereas*, Landlord and Tenant have agreed that Tenant has exercised its option to extend the Term of the Lease for a period of Five (5) Years as allowed by the Lease; and

*Whereas*, the parties desire that this Third Amendment to Lease and Memorandum of Lease Extension be executed to memorialize the election by Tenant of its exercise of the first of the three (3) extension options granted to Tenant under the Lease.

NOW, THEREFORE, the parties hereto, intending to be legally bound, and for other good and valuable consideration, do hereby agree as follows:

1. The above recitals are incorporated herein, and form a part hereof.

2. Tenant has exercised the privilege to extend the Term for 5 years, such that the original termination date of August 31, 2018 is now agreed to be August 31, 2023.

3. All other terms and conditions of the Lease (as amended through and including the Second Amendment), are ratified and affirmed.

4. Tenant expressly ratifies and affirms the rights granted to Landlord to confess judgment against Tenant as if the same were fully set forth herein at length. Tenant has knowingly and voluntarily granted the warrants of attorney and waivers of rights and authorization for confession of judgment.

5.      Tenant certifies that it has no claims against Landlord, and that Tenant has no knowledge of any default by Landlord under the Lease or other claim which it does, or could, have against Landlord.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Third Amendment to Lease and Memorandum of Lease Extension, intending to be legally bound effective as of August 31, 2018.

WHITEHALL TRUST ("Landlord")
By: Whitehall Fiduciary LLC,
    Its Trustee

By: _____
        Abraham Atiyeh,
        Manager of Trustee

WHITEHALL MANOR, INC.  ("Tenant")

By: _____
        Nimita Kapoor Atiyeh,  President

## FOURTH AMENDMENT TO LEASE AND
## MEMORANDUM OF LEASE EXTENSION

This Fourth Amendment to Lease and Memorandum of Lease Extension is effective as of September 21, 2023 by and between **WHITEHALL TRUST**, herein called Landlord;

### AND

**WHITEHALL MANOR, INC.**, herein called Tenant.

*Witnesseth:*

*Whereas,* Landlord and Tenant are parties to the Lease dated August, 2008, which was amended by First Amendment to Lease, made and dated as of January 1, 2012, and Second Amendment to Lease, made and dated as of January 1, 2012, and a Third Amendment made August 31, 2018, (collectively and as amended herein called the "Lease"), by which Landlord has leased to Tenant the real property and improvements thereon situate on Unit 1 of Whitehall Manor Condominium; and

*Whereas,* Tenant has made improvements to the Premises; and

*Whereas,* Landlord and Tenant have agreed that Tenant has exercised its option to extend the Term of the Lease for a period of Five (5) Years as allowed by the Lease, and that the terms of such lease extension were orally modified as of September 21, 2023 as more fully set forth herein; and

*Whereas,* the parties desire that this Fourth Amendment to Lease and Memorandum of Lease Extension be executed to memorialize the election by Tenant of its exercise of the second of the three (3) extension options granted to Tenant under the Lease, and to memorialize the modification of terms of the Lease as set forth herein.

NOW, THEREFORE, the parties hereto, intending to be legally bound, and for other good and valuable consideration, do hereby agree as follows:

1. The above recitals are incorporated herein, and form a part hereof.

2. Tenant has exercised the privilege to extend the Term for 5 years, such that the modified termination date of August 31, 2023, and to allow for the calculation on a calendar year basis, is now agreed to be December 31, 2028.

3. Tenant has made repairs and also arranged for other work to be performed to maintain the condition of the Premises.

1

4.      Landlord and Tenant also have agreed to waive all past due rental and any obligations of Tenant or Landlord not performed by one or both through September 21, 2023, and hereby waive and release all unpaid sums and all performance not fully and timely provided.

        a.  Tenant waives any rights to refund or for calculation of overpayment previously made.

        b.  Tenant waives any right to payment for improvements made and any repairs or remodeling performed, other than any insurance coverage payments or proceeds as may be available.

        c.  This Fourth Amendment is a full waiver and release of all defaults, deficient performance and any other obligation of Landlord or of Tenant which has arisen or could have been asserted at any time through and including the date hereof.

5.      Landlord and Tenant also have agreed that Tenant shall have two (2) additional extension periods of five (5) years, each, and that any renewal may be exercised by notice from Tenant to Landlord given not less than 90 days prior to the end of the then current termination date of the then current lease extension.

6.      Landlord and Tenant have agreed to the following modifications of the Lease:

      a.  Base Rental

          i.      For the period through December 31, 2024, no Base Rental shall be due.

          ii.     For the remainder of the current renewal Term (i.e. calendar years 2025, 2026, 2027 and 2028) Base Rent shall be the greater of (i) One Hundred Twenty Thousand ($120,000.00) Dollars or (ii) Twenty-five (25%) percent of the net operating profit of Tenant from the operation of a personal care home at the Premises [reduced by all capital expenditures and by payment for any real property obligation which Tenant may elect to pay, and by uncollected accounts receivable or bad debt] for each calendar year of the Term, limited to the sum of Three Hundred Thousand ($300,000.00) per annum, to be paid on April 30 of the year following the calendar year for which the calculation shall be made; and

          iii.    Base Rental for each calendar year of the Renewal Terms (i.e. Calendar years starting after December 31, 2028 shall be the greater of (i) Two Hundred Forty Thousand ($240,000.00)

2

App.217

Dollars or (ii) Twenty-five (25%) percent of the net operating profit of Tenant from the operation of a personal care home at the Premises [reduced by all capital expenditures and by payment for any real property obligation which Tenant may elect to pay and by uncollected accounts receivable or bad debt] during a calendar year, limited to the sum of Five Hundred Thousand ($500,000.00) per annum. Base Rental shall be due on April 30 of the year following the calendar year for which the calculation shall be made; and

b. Tenant shall pay all charges for electric, water and sewer services provided to the Premises prior to the same being made a lien upon the Premises; and

c. Tenant shall pay the premiums for one or more insurance policies to provide (i) property casualty insurance for the Premises and (ii) general liability insurance for the Premises; and

d. Repairs to the Premises as are required to maintain the Premises in the condition required for lawful operation of a personal care home.

7.    The obligations of Landlord and/or Tenant under any Regulatory Agreement and all agreements, security interests and other rights, privileges, obligations or performance required under any Regulatory Agreement or other agreement made with the United States Department of Housing and Urban Development ("USHUD") or anyone required by, for or concerning USHUD or arising under any obligation with, concerning or associated with USHUD (collectively "HUD Obligations"), are hereby terminated and void as of September 20, 2023. Any past violations or continuing violation of the terms or conditions of any HUD Obligations are hereby waived and released.

8.    All other terms and conditions of the Lease (as amended through and including the Third Amendment and the oral amendment memorialized herein), are ratified and affirmed.

9.    This Agreement is effective as of September 21, 2023 notwithstanding a later date of execution.

3

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Fourth Amendment to Lease and Memorandum of Lease Extension, intending to be legally bound effective as of September 21, 2023.

WHITEHALL TRUST ("Landlord")

By: Whitehall Fiduciary LLC, its Trustee

By: _____

Abraham Atiyeh, its Manager

WHITEHALL MANOR, INC.
("Tenant")

By: _____

Nimita Kapoor Atiyeh, President

4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEHIGH VALLEY 1 LLC, successor by assignment to WINDSTREAM CAPITAL LLC, successor by assignment to the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, successor by assignment to M&T REALTY CAPITAL CORPORATION | : : : CIVIL ACTION : : : : : NO.  24-2627 : | |
| v. | : : | |
| WHITEHALL FIDUCIARY LLC, as TRUSTEE OF WHITEHALL TRUST U/T/A DATED AUGUST 1, 2007 | : : : | |

| | | |
|---|---|---|
| LEHIGH VALLEY 1, LLC, successor by assignment to WINDSTREAM CAPITAL LLC, successor by assignment to the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, successor by assignment to M&T REALTY CAPITAL CORPORATION | : : : CIVIL ACTION : : : : NO. 24-2709 : | |
| v. | : : : | |
| SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007 | : : | |

**ORDER**

**AND NOW**, this 19th day of December, 2025, upon consideration of Receiver's Motion for Sanctions (the "Motion for Sanctions"), the Responses filed by Defendants Whitehall Fiduciary LLC ("Whitehall Trust") and Saucon Trust and Non-Parties Nimita Kapoor Atiyeh and Abraham Atiyeh (collectively, "Respondents"), the Receiver's Reply in Further Support of the Motion, along with Receiver's Affidavit setting for the amount of attorneys' fees and costs incurred in the preparation, filing and presentment of the Motion for Sanctions, and upon consideration of Plaintiff's Motion to Void and Set Aside Lease Amendments and for Declaratory Judgment ("Motion to Void Amendments'), and the Response thereto, the oral argument held in Court on December 18, 2025,

and the concessions, admissions and statements made by the Parties, and the Court having found that Respondents have each violated the September 2, 2025 Order by failing to produce documents ordered to be produced in the aforementioned Order; it is hereby **ORDERED** as follows:

1. The Receiver's Motion for Sanctions (Docket No. 102, Case No. 24-2709) is **GRANTED**.

2. On or before December 29, 2025, Respondents shall produce each and every document ordered to be produced by this Court's Order dated September 2, 2025. Respondents are each deemed to have possession, control or the practical ability to obtain the documents, and may not claim that they cannot obtain the documents ordered to be produced.

3. On or before December 29, 2025, Respondents shall pay to Receiver the sum of $21,281.00 to compensate her for the preparation, filing and presentment of the Motion for Sanctions.

4. Receiver shall file a Report to the Court on or before January 2, 2026, indicating whether Respondents have complied with the requirements of the above paragraphs 2 and 3. If it is reported in the Report that Respondents have not complied with requirements of paragraphs 2 and 3, the Court will consider striking Defendants' Answer and Affirmative Defenses and entering Judgment of Foreclosure and Sale in favor of Plaintiff and against Defendants.

5. On or before December 29, 2025, Respondents, Whitehall Manor, Inc. and Saucon Valley Manor, Inc. are directed to turn over to Receiver any rental payments received from October 31, 2025 (the date Good Shepherd Rehabilitation Hospital was directed to make payments to the Receiver). This includes rent received from Good Shepherd Rehabilitation Hospital only.

6.    Respondents, Whitehall Manor, Inc. and Saucon Valley Manor, Inc. are restrained from interfering with Receivers' efforts to collect rent, licensing fees, other occupancy fees or income of any sort from any and all occupants of the Properties. As agreed to by the Parties, any rent, licensing fee, occupancy fee or income of any sort that is or was paid to Respondents, Whitehall Manor, Inc. or Saucon Valley Manor, Inc. or any other entity over which Respondents, Whitehall Manor, Inc. or Saucon Valley Manor, Inc. have an interest or otherwise control, for rent or fees due and owing for January of 2026 and thereafter, shall be turned over to Receiver within 3 days of the date of this Order (in the case where money has already been received) or within 3 days of receipt (in the case where money is hereinafter received), along with a complete accounting of the source of the money received.

7.    Plaintiff's Motion to Void and Set Aside Lease Amendments (Docket No. 92, Case No. 24-2627) is **GRANTED**.

8.    The Sixth Amendment to Lease Agreement executed on September 21, 2023, affecting the property at 1050 Main Street, Unit #1, Hellertown, Pennsylvania, and the Fourth Amendment to Lease and Memorandum of Lease Extension executed on September 21, 2023, affecting the property at 1177 Sixth Street, Whitehall, Pennsylvania (the "Amendments"), are hereby **DECLARED NULL**, **VOID**, and **OF NO LEGAL EFFECT**.

BY THE COURT:

/s/ Catherine Henry
**CATHERINE HENRY, J.**

App.222

# EXHIBIT G

| Fill in this information to identify the case: | |
| --- | --- |
| Debtor 1 | Saucon Valley Manor, Inc. |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Eastern District of Pennsylvania |
| Case number | 4:25BK15244 |

## Official Form 410

# Proof of Claim

04/25

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:  Identify the Claim

**1. Who is the current creditor?**

Saucon Management LLC, as trustee for the Saucon Trust
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Brett L. Messinger - Duane Morris LLP
Name

30 South 17th Street
Number     Street

Philadelphia          PA          19103
City            State          ZIP Code

Contact phone 215.979.1508

Contact email blmessinger@duanemorris.com

**Where should payments to the creditor be sent?** (if different)

Name _____

Number     Street _____

City            State          ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

Official Form 410                          Proof of Claim                          page 1

App.224

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  __1__  __9__  __1__  __7__

**7. How much is the claim?**   $ _____8,460,834.01__ . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_Lease_____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:**  _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____

**Amount of the claim that is secured:**   $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☐ No

☑ Yes. **Amount necessary to cure any default as of the date of the petition.**  $_____8,176,597.17

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410     **Proof of Claim**     page 2

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 231 of 897

Case 2:25-15244-pmm   Doc 266-9   Filed 03/26/25   Entered 03/26/25 16:35:35   Desc Main
Exhibit G POC Document Manager Page 3 of 49 Page 4 of 50

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | | |
|---|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check one:* | | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| | ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| | ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | | $_____ |
| | * Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment. | | |

## Part 3:    Sign Below

| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐  I am the creditor.<br>☑  I am the creditor's attorney or authorized agent.<br>☐  I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐  I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date  03/25/2026<br>      MM / DD / YYYY |
|---|---|

/s/ Brett L. Messinger
  Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Brett    Lawrence    Messinger |
|---|---|
| | First name     Middle name     Last name |
| Title | Attorney for Receiver |
| Company | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 30 South 17th Street |
| | Number   Street |
| | Philadelphia        PA   19103 |
| | City           State  ZIP Code |
| Contact phone | 215.979.1508     Email blmessinger@duanemorris.com |

Official Form 410          **Proof of Claim**          page 3

App.226

App.227

## SAUCON PROPERTY — Rent Arrears Analysis

*Saucon Trust (Landlord) / Saucon Valley Manor, Inc. (Tenant)*
*Governing: Fourth Amend. (Nov 1, 2012) rent terms, as ratified by Fifth Amend. (July 1, 2018)*
*Sixth Amendment (Sept 21, 2023) — REJECTED / NULL AND VOID*

| KEY LEASE TERMS (Fourth/Fifth Amendment) | |
|---|---|
| **Annual Minimum Rent:** | **$1,705,421.00** |
| Monthly Rent ($1,705,421 ÷ 12): | **$142,118.42** |
| *Alternative: 105% of HUD costs (P&I + MIP + reserves + insurance + taxes)* | |
| *Rent is the GREATER of $1,705,421 or 105% of HUD costs* | |
| Arrears Period (assumed same as Whitehall): | March 1, 2021 through December 31, 2025 |

| MONTHLY ARREARS SCHEDULE — March 2021 through December 2025 | | | | | |
|---|---|---|---|---|---|
| Year | Months Unpaid | Monthly Rent | Annual Rent Due | Cumulative Arrears | Notes |
| 2021 | 10 | $142,118.42 | $1,421,184.17 | $1,421,184.17 | Mar–Dec 2021 (10 months) |
| 2022 | 12 | $142,118.42 | $1,705,421.00 | $3,126,605.17 | Full year |
| 2023 | 12 | $142,118.42 | $1,705,421.00 | $4,832,026.17 | Full year |
| 2024 | 12 | $142,118.42 | $1,705,421.00 | $6,537,447.17 | Full year |
| 2025 | 12 | $142,118.42 | $1,705,421.00 | $8,242,868.17 | Full year (through Dec 31, 2025) |

| | | |
|---|---|---|
| **TOTAL MONTHS UNPAID:** | 58 | |
| **GROSS BASE RENT ARREARS (minimum):** | | **$8,242,868.17** |

| CREDITS / OFFSETS | | |
|---|---|---|
| **Less: Property Taxes Paid by SVM on behalf of Saucon Trust:** | -$66,271.00 | Credit to tenant |
| **Total Credits:** | -$66,271.00 | |

| | |
|---|---|
| **NET AMOUNT DUE — SAUCON:** | **$8,176,597.17** |

AUG-01-2007  11:07          BROOKSIDE COM. CONST. CO                    6104033409   P.18

## LEASE AGREEMENT

THIS LEASE AGREEMENT is made this 1st day of January, 2006 between ABRAHAM R. ATIYEH ("**Landlord**"), and the Tenant named below.

**Tenant:**                     SAUCON VALLEY MANOR, INC., a Pennsylvania corporation

**Tenant's Address for**         1177 N. 6th Street,
**Notices:**                     Whitehall, PA  10852

**Landlord's Address for**       1177 N. 6th Street,
**Notices and Payments:**        Whitehall, PA  10852

**Premises:**                    Property located at 1050 Main Street, Township of Lower Saucon, County of Northampton, Commonwealth of Pennsylvania, more specifically described on Exhibit A.

**Term:**                        The term of the Lease begins on January 1, 2006 and ends on July 31, 2012.

**Base Rent:**                   $5,748,000 for the Term, payable in monthly installments of $95,800 each in accordance with Section 4 hereof.

**Additional Rent:**             All other amounts due under this Lease by Tenant to Landlord, which amounts shall be computed as incurred during the Term of the Lease.

**Exhibits:**                    A.  Description of Premises

1.      **Granting Clause.**  In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant takes from Landlord, the Premises, to have and to hold for the Term, subject to the terms, covenants and conditions of this Lease.

2.      **Acceptance of Premises.**  Tenant shall accept the Premises in its "As Is" condition as of the first day of the Term, subject to all applicable laws, ordinances, regulations, covenants and restrictions. Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes. In no event shall Landlord have any obligation for any defects in the Premises or any limitation on its use. The taking of

- 1 -

DOCS_PH 1867164v.2

Case 5:25-cv-05445-pmm   Doc 266-9 Filed 03/06/26 Entered 03/06/26 16:72:35 Desc Main
Exhibit G PODoc Management Page 6 of 49Page 7 of 50

HUG-01-2007  11:07        BROOKSIDE COM. CONST. CO              5104655405   P.15

)                                                )

possession of the Premises shall be conclusive evidence that Tenant accepts the Premises and that the Premises were in good condition at the time possession was taken.

3.    **Use; Zoning.** The Premises shall be used only for the purpose of a residential assisted living facility. Landlord does not warrant or represent that Tenant shall be able to obtain a permit under any zoning or other ordinance or regulation for such use as Tenant intends to make of the Premises, and nothing in this Lease shall obligate Landlord to assist Tenant in obtaining such permit. Landlord and Tenant further agree that in case the Tenant is unsuccessful in obtaining a permit under any zoning ordinance or regulation, that this Lease will not terminate without Landlord's consent and, should such consent be withheld by Landlord, Tenant agrees to use the Premises only in a manner permitted under such zoning ordinance or regulation. Tenant will use the Premises in a careful, safe and proper manner and will not commit waste, or subject the Premises to use that would damage the Premises. Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise, or vibrations to emanate from the Premises, or take any other action that would constitute a nuisance. Tenant, at its sole expense, shall use and occupy the Premises in compliance with all laws, including, without limitation, the Americans With Disabilities Act, if applicable, orders, judgments, ordinances, regulations, codes, directives, permits, licenses, covenants and restrictions now or hereafter applicable to the Premises (collectively, "**Legal Requirements**"). Tenant shall, at its expense, make any alterations or modifications, within or without the Premises, that are required by Legal Requirements related to Tenant's use or occupation of the Premises. Tenant will not use or permit the Premises to be used for any purpose or in any manner that would void Tenant's or Landlord's insurance, violate its conditions or increase the insurance risk. If any increase in the cost of any insurance on the Premises is caused by Tenant's use or occupation of the Premises, or because Tenant vacates the Premises, then Tenant shall pay the amount of such increase to Landlord.

4.    **Base Rent.** Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Base Rent in the amount of $137,500 each, commencing on the date hereof and continuing thereafter on or before the first day of each calendar month of the Term. Payments of Base Rent for any fractional calendar month shall be prorated. All payments required to be made by Tenant to Landlord hereunder shall be sent to Landlord's address for notices and payments, as set forth above, or at such other place as Landlord may from time to time designate to Tenant in writing. The obligation of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Tenant shall have no right at any time to abate, reduce, or set-off any rent due hereunder except as may be expressly provided in this Lease. If Tenant is delinquent in any monthly installment of Base Rent or Additional Rent for more than 5 days, Tenant shall pay to Landlord on demand a late charge equal to ten percent (10%) of such delinquent sum, plus interest on any delinquent sum not paid within thirty (30) days after the due date therefor at the rate of 1½% per month (the "**Default Rate**"), which interest shall accrue from the due date to the date of payment. The provision for such late charge and interest shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as a penalty. Tenant shall pay to Landlord on demand a charge of $30.00 (or such higher sum as may be charged to Landlord by its bank) for any returned checks.

-2-

DOCS_PH 1867164v.2

AUG-01-2007  11:08        BROOKSIDE COM. CONST. CO                6104033409    P.20

5.    **Net Lease.** This is a net lease, and, except as the contrary is otherwise expressly herein provided, all costs of taxes, insurance, improvements, maintenance, repairs, alterations, additions, and replacements relating to the Premises shall be at the sole cost and expense of Tenant, and Landlord shall not be obligated to make any improvements, maintenance, repairs, alterations, additions, or replacements to the Premises.

6.    **Utilities and Services.** Tenant shall supply and pay for all water, gas, electricity, heat, light, power, telephone, sewer, sprinkler services, refuse and trash collection, and other utilities and services used on the Premises, all maintenance charges for utilities, and any storm sewer charges or other similar charges for utilities imposed by any governmental entity or utility provider, together with any taxes, penalties, surcharges or the like pertaining to Tenant's use of the Premises. Landlord may cause, at Tenant's expense, any utilities to be charged directly to Tenant by the provider; and otherwise Tenant shall pay such charges to Landlord as Additional Rent. No interruption or failure of utilities shall be deemed to be the responsibility of Landlord, or shall result in the termination of this Lease or the abatement of rent.

7.    **Insurance.**

(a)    Tenant, at its expense, shall maintain during the Term: all risk property insurance covering the full replacement cost of all building(s) and other improvements on the Premises (excluding coverage of Tenant's personal property), and such other insurance as Landlord may reasonably deem appropriate or as any mortgagee of Landlord may require, including, without limitation, rent loss coverage and business personal property coverage including, without limitation, any Tenant-Made Alterations; and

(b)    Tenant, at its expense, shall  maintain during the Term, commercial general liability insurance, including blanket contractual liability insurance, covering Tenant's use of the Premises, with such coverages and limits of liability as Landlord may reasonably require, but not less than combined single limits of $2,000,000 per occurrence and in the aggregate for bodily injury or property damage (together with such umbrella coverage as Landlord may reasonably require); however, such limits shall not limit Tenant's liability hereunder. Landlord may from time to time require reasonable increases in any such limits. Tenant agrees to name Landlord as the insured party and loss payee in the policy for all risk property insurance. The commercial liability policies shall name Landlord as an additional insured and loss payee, and shall insure on an occurrence or a claims-made basis. The insurance policies shall be issued by insurance companies which are reasonably acceptable to Landlord, not be cancelable unless not less than 30 days' prior written notice shall have been given to Landlord, contain a hostile fire endorsement and a contractual liability endorsement and provide primary coverage to Landlord (any policy issued to Landlord providing duplicate or similar coverage shall be deemed excess over Tenant's policies). Such policies or certificates thereof shall be delivered to Landlord by Tenant upon commencement of the Term and upon each renewal of said insurance.

The all risk property insurance obtained by Tenant shall include a waiver of subrogation by the insurers of all rights based upon an assignment from its insured, against Landlord, its officers, directors, employees, managers, agents, invitees and contractors, in

- 3 -

DOCS_PH 1867164v.2

connection with any loss or damage thereby insured against. Neither Landlord nor its officers, directors, employees, managers, agents, invitees or contractors shall be liable to Tenant for loss or damage caused by any risk coverable by all risk property insurance, and Tenant waives any claims against Landlord, and its officers, directors, employees, managers, agents, invitees and contractors for such loss or damage. The failure of Landlord to insure its property shall not void this waiver. Landlord and its agents, employees and contractors shall not be liable for, and Tenant hereby waives all claims against such parties for, business interruption and losses occasioned thereby sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence in or upon the Premises from any cause whatsoever, including without limitation, damage caused in whole or in part, directly or indirectly, by the negligence of Landlord or its agents, employees or contractors.

8.     **Landlord's Repairs.** Except as provided in Section 12 of this Lease, Landlord shall have no obligation to inspect or maintain the Premises, or to make repairs or replacements to the Premises of any kind or nature, including those to the roof, foundation, or exterior walls of any building on the Premises (the "**Building**").

9.     **Tenant's Maintenance and Repairs.** Tenant agrees to maintain the Premises, at Tenant's expense, in a good, clean, sanitary and safe condition, including, without limitation, maintenance of the lawn, shrubbery, sidewalks, driveways and other exterior areas of the Premises, snow and ice removal, yearly heater maintenance contract, sewage cost and maintenance, and trash removal. Tenant, at its expense, shall make all necessary repairs and replacements to all portions of the Premises and all areas, improvements and systems exclusively serving the Premises, including, without limitation: the roof, foundation, and exterior walls of the Building; plumbing, water and sewer lines serving the Premises; heating, ventilation and air conditioning systems; fire sprinklers, fire protection systems, security systems and all other systems existing on the Premises for the safety of the Premises and the occupants thereof; and all entries, doors, ceilings, windows, and interior walls. Such repairs and replacements include capital expenditures and repairs whose benefit may extend beyond the Term. Tenant agrees to enter into and maintain, at Tenant's expense, maintenance service contracts for heating, ventilation and air conditioning systems and other mechanical and building systems serving the Premises. The scope of services and contractors under such maintenance contracts shall be reasonably approved by Landlord. If Tenant fails to perform any repair or replacement for which it is responsible, Landlord may, but shall have no obligation to, perform such work and be reimbursed by Tenant within 10 days after demand therefor.

10.     **Tenant-Made Alterations, Removal of Fixtures and/or Personal Property.** Any alterations, additions, or improvements made by or on behalf of Tenant to the Premises ("Tenant-Made Alterations") shall be subject to Landlord's prior written consent. Tenant shall cause, at its expense, all Tenant-Made Alterations to comply with insurance requirements and with Legal Requirements and shall construct at its expense any alteration or modification required by Legal Requirements as a result of any Tenant-Made Alterations. All Tenant-Made Alterations shall be constructed in a good and workmanlike manner by contractors reasonably acceptable to Landlord and only good grades of materials shall be used. All plans and specifications for any Tenant-Made Alterations shall be submitted to Landlord for its approval.

-4-

DOCS_PH 1867164v.2

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 237 of 897

Case 5:25-cv-02445-mmm   Doc 266-9 Filed 03/06/26   Entered 03/06/26 16:22:35   Desc Main
Exhibit G POC Document Management Page 10 of 50   Page 10 of 50

AUG-01-2007 11:09        r  POKSIDE COM. CONST. CO                 ,      6104033409    P.22

Landlord may monitor construction of the Tenant-Made Alterations. Tenant shall reimburse Landlord for its costs in reviewing plans and specifications and in monitoring construction. Landlord's right to review plans and specifications and to monitor construction shall be solely for its own benefit, and Landlord shall have no duty to see that such plans and specifications or construction comply with applicable laws, codes, rules and regulations. Tenant shall provide Landlord with the identities and mailing addresses of all persons performing work or supplying materials, prior to beginning such construction, and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable law. Tenant shall furnish security or make other arrangements satisfactory to Landlord to assure payment for the completion of all work free and clear of liens and shall provide certificates of insurance for worker's compensation and other coverage in amounts and from an insurance company satisfactory to Landlord protecting Landlord against liability for personal injury or property damage during construction. Upon completion of any Tenant-Made Alterations, Tenant shall deliver to Landlord sworn statements setting forth the names of all contractors and subcontractors who did work on the Tenant-Made Alterations and final lien waivers from all such contractors and subcontractors. Upon surrender of the Premises, all Tenant-Made Alterations and any leasehold improvements constructed by Landlord or Tenant shall remain on the Premises as Landlord's property, except to the extent Landlord requires removal at Tenant's expense of any such items or Landlord and Tenant have otherwise agreed in writing in connection with Landlord's consent to any Tenant-Made Alterations. Tenant shall repair any damage caused by such removal. Tenant agrees not to remove any fixtures or significant personal property from the Premises during the Term.

11. **Signs.** Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, decorations, balloons, flags, pennants, banners, or painting, or erect or install any signs, windows or door lettering, placards, decorations, or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent. Upon surrender or vacation of the Premises, Tenant shall have removed all signs and repair, paint, and/or replace the building facia surface to which its signs are attached. Tenant shall obtain all applicable governmental permits and approvals for sign and exterior treatments. All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Premises shall be subject to Landlord's approval and conform in all respects to Landlord's requirements. Landlord may erect a suitable sign on the Premises stating the Premises are available to let or for sale.

12. **Restoration.** If at any time during the Term the Premises are damaged by a fire or other casualty, Landlord shall notify Tenant within 30 days after receipt of at least 75% of the insurance proceeds relating to the casualty as to whether or not Landlord has elected to restore the Premises or to terminate the Lease. If this Lease is terminated under this Section, all rent shall be apportioned as of the date of the casualty. If Landlord elects not to terminate this Lease, then, subject to receipt of sufficient insurance proceeds, Landlord shall promptly restore the Premises excluding any improvements installed by Tenant or by Landlord and paid by Tenant, subject to delays arising from the collection of insurance proceeds or from Force Majeure events. Tenant at Tenant's expense shall promptly perform, subject to delays arising from the collection of insurance proceeds, or from Force Majeure events, all repairs or restoration not required to be done by Landlord and shall promptly re-enter the Premises and commence doing business in

- 5 -

DOCS_PH 1867164v.2

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 238 of 897

Case 2:15-cv-05244-pmm  Doc 56-9 Filed 03/26/26  Entered 03/26/26 16:37:25  Desc Main
Exhibit G POC Document Management Page 10 of 49 Page 11 of 50

AUG-01-2007  11:10       B  OOKSIDE COM. CONST. CO              ;      6104033409    P.23

accordance with this Lease. Base Rent shall be abated for the period of repair and restoration in the proportion which the area of the Premises, if any, which is not usable by Tenant bears to the total area of the Premises. Such abatement shall be the sole remedy of Tenant, and Tenant waives any right to terminate the Lease by reason of damage or casualty loss.

13.    **Condemnation.** If any part of the Premises should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), and the Taking would prevent or materially interfere with Tenant's use of the Premises or in Landlord's judgment would materially interfere with or impair its ownership of the Premises, then upon written notice by Landlord this Lease shall terminate and Base Rent shall be apportioned as of said date. If part of the Premises shall be Taken, and this Lease is not terminated as provided above, the Base Rent payable hereunder during the unexpired Term shall be reduced to such extent as may be fair and reasonable under the circumstances. In the event of any such Taking, Landlord shall be entitled to receive the entire price or award from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to Tenant's Trade Fixtures, if a separate award for such items is made to Tenant.

14.    **Assignment and Subletting.** Without Landlord's prior written consent, Tenant shall not assign this Lease or sublease the Premises or any part thereof or mortgage, pledge, or hypothecate its leasehold interest or grant any concession or license within the Premises and any attempt to do any of the foregoing shall be void and of no effect. For purposes of this Section, a transfer of more than 25% of the ownership interests controlling Tenant or a change in the management of the Premises by Tenant shall be deemed an assignment of this Lease. Tenant shall reimburse Landlord for all of Landlord's reasonable out-of-pocket expenses in connection with any assignment or sublease. Upon Landlord's receipt of Tenant's written notice of a desire to assign or sublet the Premises, or any part thereof, Landlord may, by giving written notice to Tenant within 30 days after receipt of Tenant's notice, terminate this Lease with respect to the space described in Tenant's notice, as of the date specified in Tenant's notice for the commencement of the proposed assignment or sublease.

Notwithstanding any assignment or subletting, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the rent and for compliance with all of Tenant's other obligations under this Lease (regardless of whether Landlord's approval has been obtained for any such assignments or sublettings). In the event that the rent due and payable by a sublessee or assignee (or a combination of the rental payable under such sublease or assignment plus any bonus or other consideration therefor or incident thereto) exceeds the rental payable under this Lease, then Tenant shall be bound and obligated to pay Landlord as Additional Rent hereunder all such excess rental and other excess consideration within 10 days following receipt thereof by Tenant.

- 6 -

DOCS_PH 1867164v.2

App.233

AUG-01-2007  11:10         !  POKSIDE COM. CONST. CO              j        6104033409    P.24

If this Lease be assigned or if the Premises be subleased (whether in whole or in part) or in the event of the mortgage, pledge, or hypothecation of Tenant's leasehold interest or grant of any concession or license within the Premises or if the Premises be occupied in whole or in part by anyone other than Tenant, then upon a default by Tenant hereunder Landlord may collect rent from the assignee, sublessee, mortgagee, pledgee, party to whom the leasehold interest was hypothecated, concessionee or licensee or other occupant and, except to the extent set forth in the preceding paragraph, apply the amount collected to the next rent payable hereunder; and all such rentals collected by Tenant shall be held in trust for Landlord and immediately forwarded to Landlord. No such transaction or collection of rent or application thereof by Landlord, however, shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties, or obligations hereunder.

15.    **Release and Indemnity.**

(a)    Release. Tenant agrees that Landlord and its agents, employees, officers, directors, shareholders and partners shall not be liable to Tenant and Tenant hereby releases said parties from any liability, for any personal injury, loss of income or damage to or loss of persons or property, or loss of use of any property, in or about the Premises from any cause whatsoever, even if such damage, loss or injury results from the negligence or willful misconduct of Landlord, its officers, employees or agents. The release contained in this Section 15 shall apply, by way of example and not limitation, to damage, loss or injury resulting directly or indirectly from any existing or future condition, matter or thing in the Premises, the Building or any part thereof, or from equipment or appurtenances becoming out of repair, or from accident, or from the flooding of basements or other subsurface areas or from refrigerators, sprinkling devices, air conditioning apparatus, water, snow, frost, steam, excessive heat or cold, falling plaster, broken glass, sewage, gas, odors, or noise, or the bursting or leaking of pipes or plumbing fixtures, and shall apply equally whether any such damage, loss or injury results from the act or omission of Tenant or any other persons, and whether such damage be caused by or result from any thing or circumstance, whether of a like or wholly different nature.

(b)    Indemnity. Tenant shall defend, indemnify, save and hold harmless ("Indemnify") Landlord and its agents, employees, officers, directors, shareholders, and partners from and against all liabilities, obligations, damages, penalties, claims, causes of action, costs, charges and expenses, including reasonable attorneys' fees, court costs, administrative costs, and costs of appeals which may be imposed upon or incurred by or asserted against Landlord or its Agents and arising out of or in connection with loss of life, personal injury or damage to property in or about the Premises or arising out of the occupancy or use of the Premises by Tenant or its Agents or occasioned wholly or in part by any act or omission of Tenant or its Agents, whether prior to, during or after the Term. The obligation of Tenant to Indemnify contained in this Section 15 shall not be limited by any limitation on the amount or type of damages, compensation or benefits payable by or for Tenant, its agents or contractors under workers' or workman's compensation acts, disability benefit acts or other employee benefits acts, or under any other insurance coverage Tenant may obtain. Tenant's obligations pursuant to this subsection are intended to survive the expiration or termination of this Lease. As used in the Section 12, "Agents" of a party means such party's employees, agents, representatives,

- 7 -

DOCS_PH 1867164v.2

App.234

AUG-01-2007  11:11        F  POKSIDE COM. CONST. CO              6104033409    P.25

contractors, licensees, invitees, and, with regard to Tenant's Agents, shall include all residents and occupants of the Premises.

16.    **Inspection and Access.** Landlord and its agents, representatives, and contractors may enter the Premises at any reasonable time to inspect the Premises and to make repairs, to the extent Landlord elects to do so, and for any other business purpose. Landlord and Landlord's representatives may enter the Premises during business hours for the purpose of showing the Premises to prospective lenders, tenants or purchasers. Landlord may grant easements, make public dedications, and create restrictions on or about the Premises, provided that no such easement, dedication, or restriction materially interferes with Tenant's use or occupancy of the Premises. At Landlord's request, Tenant shall execute such instruments as may be necessary for such easements, dedications or restrictions.

17.    **Quiet Enjoyment.** If Tenant shall perform all of the covenants and agreements herein required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the Term, have peaceful and quiet enjoyment of the Premises against any person claiming by, through or under Landlord.

18.    **Surrender.** Upon termination of the Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in the same condition as received, broom clean, ordinary wear and tear and casualty loss and condemnation covered by Sections 12 and 13 excepted. Any Tenant-Made Alterations and property not so removed by Tenant as permitted or required herein shall be deemed abandoned and may be stored, removed, and disposed of by Landlord at Tenant's expense, and Tenant waives all claims against Landlord for any damages resulting from Landlord's retention and disposition of such property. All obligations of Tenant hereunder not fully performed as of the termination of the Term shall survive the termination of the Term, including without limitation, indemnity obligations and obligations concerning the condition and repair of the Premises.

19.    **Holding Over.** If Tenant retains possession of the Premises after the termination of the Term of this Lease, unless otherwise agreed in writing, such possession shall be subject to immediate termination by Landlord at any time, and all of the other terms and provisions of this Lease shall be applicable during such holdover period, except that Tenant shall pay Landlord from time to time, upon demand, as Base Rent for the holdover period, an amount equal to double the Base Rent in effect on the termination date, computed on a monthly basis for each month or part thereof during such holding over. All other payments shall continue under the terms of this Lease. In addition, Tenant shall be liable for all damages incurred by Landlord as a result of such holding over. No holding over by Tenant, with or without consent of Landlord, shall operate to extend this Lease, except as otherwise expressly provided, and this Section 19 shall not be construed as consent for Tenant to retain possession of the Premises. For purposes of this Section 19, "possession of the Premises" shall continue until, among other things, Tenant has delivered all keys to the Premises to Landlord, Landlord has complete and total dominion and control over the Premises, and Tenant has completely fulfilled all obligations required of it upon termination of the Lease as set forth in this Lease, including, without limitation, those concerning the condition and repair of the Premises.

- 8 -

App.235

AUG-01-2007  11:11          P' 'QOKSIDE COM. CONST. CO                    6104033409    P.26

20.    **Events of Default.**  Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

(a)    Tenant shall fail to pay any installment of Base Rent or any other payment required herein when due, and such failure shall continue for a period of 5 days from the date such payment was due.

(b)    Tenant or any guarantor or surety of Tenant's obligations hereunder shall (i) make a general assignment for the benefit of creditors; (ii) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "proceeding for relief"); (iii) become the subject of any proceeding for relief which is not dismissed within 60 days of its filing or entry; or (iv) die or suffer a legal disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

(c)    Any insurance required to be maintained by Tenant pursuant to this Lease shall be cancelled or terminated or shall expire or shall be reduced or materially changed, except, in each case, as permitted in this Lease.

(d)    Tenant shall not occupy or shall vacate the Premises or shall remove its personal property and/or fixtures from the Premises, whether or not Tenant is in monetary or other default under this Lease.

(e)    Tenant shall attempt or there shall occur any assignment, subleasing or other transfer of Tenant's interest in or with respect to this Lease except as otherwise permitted in this Lease.

(f)    Tenant shall fail to discharge any lien placed upon the Premises in violation of this Lease within 30 days after any such lien or encumbrance is filed against the Premises.

(g)    Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Section 20.

21.    **Landlord's Remedies.**

(a)    Cumulative Remedies.  In the event Tenant commits an event of default or otherwise breaches the terms of this Lease, Landlord shall have the following rights and remedies which shall be distinct, separate and cumulative and shall not operate to exclude or deprive Landlord of any other right or remedy allowed it by law or equity:

(i)    To declare due and payable and sue for recovery, all unpaid Base Rent for the unexpired Term of the Lease (and also all Additional Rent as the amounts of same

- 9 -

DOCS_PH 1867164v.3

App.236

AUG-01-2007  11:11     F  )OKSIDE COM. CONST. CO              6104033409   P.27

can be determined or reasonably estimated) as if by the terms of this Lease the same were payable in advance, together with all reasonable legal fees and other expenses incurred by Landlord in connection with the enforcement of any Landlord's rights or remedies hereunder; and/or

    (ii) To distrain, collect or bring action for such Base Rent and Additional Rent as being rent in arrears, or may enter judgment therefore in an action as herein elsewhere provided for in case of rent in arrears, or may file a Proof of Claim in any bankruptcy or insolvency proceeding for such Base Rent and Additional Rent, or institute any other proceedings, whether similar or dissimilar to the foregoing, to enforce payment thereof; and/or

    (iii) If Landlord has not elected to accelerate rent under clause (i) above, to terminate this Lease by giving written notice thereof to Tenant and, upon the giving of such notice, this Lease shall expire and terminate with the same force and effect as though the date of such notice was the date hereinabove fixed for the expiration of the Lease, and all rights of Tenant hereunder shall expire and terminate, but Tenant shall remain liable as hereinafter provided; and/or

    (b) Repossession of Premises. If any event of default shall have occurred and be continuing, Landlord may, whether or not the Lease has been terminated as herein provided, re-enter and repossess the Premises or any part thereof by force, summary proceedings, ejectment or otherwise and Landlord shall have the right to remove all persons and property therefrom. Landlord shall be under no liability for or by reason of any such entry, repossession or removal and no such re-entry or taking of possession of the Premises by Landlord shall be construed as an election on Landlord's part to terminate the Lease unless a written notice of such intention be given to Tenant or unless the termination of this Lease be by a court of competent jurisdiction. At any time or from time to time after the repossession of the Premises or any part thereof whether or not the Lease shall have been terminated, Landlord may (but shall be under no obligation to) relet all or any part of the Premises for the account of Tenant for such term or terms (which may be greater or less in the period which would otherwise have constituted the balance of the term) and on such conditions and for such uses as Landlord, in its absolute discretion, may determine and Landlord may collect and receive any rents payable by reason of such reletting. Landlord shall not be required to exercise any care or diligence with respect to such reletting or to the mitigation of damages. For the purpose of such reletting, Landlord may decorate or make repairs, changes, alterations or additions in or to the Premises or any part thereof to the extent deemed by Landlord desirable or convenient, and the cost of such decoration, repairs, changes, alterations or additions and any reasonable brokerage and legal fees expended by Landlord shall be charged to and payable by Tenant as Additional Rent hereunder. No expiration or termination of this Lease, by operation of law or otherwise, and no repossession of the Premises or any part thereof pursuant to this section, or otherwise, and no reletting of the Premises or any part thereof pursuant to this section shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such expiration, termination, repossession or reletting.

    (c) Payment of Damages.

- 10 -

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 243 of 897

Case 2:25-cv-02445-pmm    Doc 266-9 Filed 03/26/26 Entered 03/26/26 12:36:25 Desc Main
Exhibit G POD Document Manager 16 of 49 Page 16 of 50

AUG-01-2007  11:12          BROOKSIDE COM. CONST. CO                6104033409   P.28

(i)    In the event of any expiration or termination of this Lease or repossession of the Premises or any part thereof by reason of Tenant's default, and if Landlord has not elected to accelerate rent, Tenant shall pay to Landlord the Base Rent, Additional Rent and all other sums required to be paid by Tenant to and including the date of such expiration, termination, repossession and, thereafter, Tenant shall, until the end of what would have been the expiration of the term in the absence of such expiration, termination, repossession and whether or not the Premises or any part thereof shall have been relet, be liable to Landlord for, and shall pay to Landlord, as liquidated and agreed current damages, the Base Rent, Additional Rent and other sums which would be payable under this Lease by Tenant in the absence of such expiration, termination or repossession, less the net proceeds, if any, of any reletting effective for the account of Tenant, after deducting from such proceeds all of Landlord's reasonable expenses in connection with such reletting (including, without limitation, all related repossession costs, brokerage commissions, attorneys' fees, alterations costs and expenses for preparation of such reletting). Tenant shall pay such current damages on the days on which the rent would have been payable under this Lease in the absence of such expiration, termination, repossession and Landlord shall be entitled to recover the same from Tenant on each such day.

(ii)    At any time after such expiration or termination of this Lease or repossession of the Premises or any part thereof by reason of the occurrence of Tenant's default, whether or not Landlord shall have collected any current damages, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord on demand, unless Tenant has paid the whole or accelerated rent, as and for liquidated and agreed final damages for Tenant's default and in lieu of all current damages beyond the date of such demand (it being agreed that it would be impracticable or extremely difficult to fix the actual damages), an amount equal to the excess, if any, of (A) Base Rent, Additional Rent and other sums which would be payable under this Lease for the remainder of the term from the date of such demand for what would have been the unexpired term of this Lease in the absence of such expiration, termination or repossession, discounted at the rate of six (6%) percent per annum, over (B) the then fair rental value of the Premises for the same period, discounted at a like rate. If any statute or rule of law shall limit the amount of such liquidated final damages to less than the amount above agreed upon, Landlord shall be entitled to the maximum amount allowable under such statute or rule of law.

(iii)    Tenant further hereby expressly the authorizes and empowers Landlord, upon the occurrence of Tenant's default and so long as the same is continuing, to enter upon the Premises, distrain upon and remove therefrom all inventory, equipment, machinery, trade fixtures and personal property of whatsoever kind or nature, whether owned by Tenant or others, and to proceed, without judicial decree, writ of execution or assistance of constables, to conduct a private sale, by auction or sale bid, of such personal property, at which sale Landlord may bid without restriction. Tenant hereby waives the benefit of all laws, whether now in force or hereafter enacted, exempting any personal property on the Premises from sale or levy, whether execution thereon is had by order of any Court of through private sales herein authorized. Tenant waives the right to issue a Writ of Replevin under the Pennsylvania Rules of Civil Procedure, under the laws of the Commonwealth of Pennsylvania or under any law previously enacted and now in force or which hereinafter may be enacted for the recovery of any articles of any nature

- 11 -

DOCS_PH 1867164v.2

App.238

AUG-01-2007  11:13         B. JOOKSIDE COM. CONST. CO                  6104033409    P.29

whatsoever seized under a distress for rent, or levy upon an execution for rent, liquidated damages or otherwise.

(d)    CONFESSION OF JUDGMENT.  TENANT HEREBY EMPOWERS ANY PROTHONOTARY OR ATTORNEY FOR ANY COURT OF RECORD TO APPEAR FOR TENANT IN ANY AND ALL ACTIONS WHICH MAY BE BROUGHT FOR RENT HEREUNDER AND TO SIGN FOR TENANT AN AGREEMENT FOR ENTERING INTO ANY COMPETENT COURT AN ACTION OR ACTIONS FOR THE RECOVERY OF RENT, AND IN SAID SUITS OR IN SAID ACTION OR ACTIONS TO CONFESS JUDGMENT AGAINST TENANT FOR ALL OR ANY PART OF THE RENT INCLUDING, AT LANDLORD'S OPTION, THE RENT FOR THE ENTIRE UNEXPIRED BALANCE OF THE TERM OF THIS LEASE, AND ANY CHARGES, PAYMENTS, COSTS AND EXPENSES RESERVED AS RENT OR AGREED TO BE PAID BY THE TENANT, AND FOR INTEREST AND COSTS TOGETHER WITH AN ATTORNEY'S COMMISSION OF TEN (10%) PERCENT THEREOF.  SAID AUTHORITIES SHALL NOT BE EXHAUSTED BY ONE EXERCISE THEREOF, BUT JUDGMENT MAY BE CONFESSED AS AFORESAID FROM TIME TO TIME AND AS OFTEN AS ANY OF THIS SAID RENT OR OTHER CHARGES RESERVED AS RENT OR LIQUIDATED DAMAGES SHALL FALL DUE OR BE IN ARREARS, AND SUCH POWERS MAY BE EXERCISED AS WELL AFTER THE EXPIRATION OF THE ORIGINAL TERM OR DURING ANY EXTENSION OR RENEWAL OF THIS LEASE.

(e)    ACTION FOR EJECTMENT.  UPON TERMINATION OF THIS LEASE OR EXPIRATION OF THE TERM OR ANY EXTENSION THEREOF, IT SHALL BE LAWFUL FOR ANY ATTORNEY AS ATTORNEY FOR TENANT TO SIGN AN AGREEMENT FOR ENTERING IN ANY COMPETENT COURT AN ACTION IN EJECTMENT, WITHOUT ANY STAY OF EXECUTION OR APPEAL AGAINST TENANT AND ALL PERSONS CLAIMING UNDER TENANT FOR THE RECOVERY BY LANDLORD OF POSSESSION OF THE HEREIN PREMISES, WITHOUT LIABILITY ON THE PART OF THE SAID ATTORNEY, WHICH THIS LEASE SHALL BE A SUFFICIENT WARRANT, WHEREUPON, IF LANDLORD SO DESIRES A WRIT OF POSSESSION WITH CLAUSES FOR COST MAY ISSUE FORTHWITH WITHOUT ANY PRIOR WRIT OR PROCEEDINGS WHATSOEVER.  IF FOR ANY REASON AFTER SUCH ACTION HAS BEEN COMMENCED THE SAME SHALL BE DETERMINED AND THE POSSESSION OF THE PREMISES HEREBY DEMISED REMAIN IN OR BE RESTORED TO TENANT, THE LANDLORD SHALL HAVE THE RIGHT IN ANY SUBSEQUENT DEFAULT OR DEFAULTS TO BRING ONE OR MORE FURTHER ACTIONS IN THE MANNER AND FORM HEREIN BEFORE SET FORTH, TO RECOVER POSSESSION OF SAID PREMISES FOR SUCH SUBSEQUENT DEFAULT.  NO SUCH TERMINATION OF THIS LEASE NOR TAKING, NOR RECOVERING POSSESSION OF THE PREMISES SHALL DEPRIVE LANDLORD OF ANY REMEDIES OR ACTION AGAINST TENANT FOR RENT OR DAMAGES DUE OR TO BECOME DUE FOR THE BREACH OF ANY CONDITION OR COVENANT HEREIN CONTAINED, NOR SHALL THE BRINGING OF ANY SUCH ACTION FOR RENT, OR BREACH OF COVENANT OR CONDITION NOR THE RESORT TO ANY OTHER REMEDY HEREIN PROVIDED FOR THE RECOVERY OF RENT OR

- 12 -

DOCS_PH 1867164v.2

App.239

AUG-01-2007  11:13        . BROOKSIDE COM. CONST. CO              |      6104033409    P.30

DAMAGES FOR SUCH BREACH BE CONSTRUED AS A WAIVER OF THE RIGHT TO INSIST UPON THE NATURE AND TO OBTAIN POSSESSION IN THE MANNER HEREIN PROVIDED.

(f)     Landlord's Affidavit.  In any action in ejectment or for rent in arrears, Landlord shall first cause to be filed in such action, an affidavit made by it or someone acting for it setting forth the facts necessary to authorize the entry of judgment, of which facts such affidavit shall be conclusive evidence, and if a true copy of this Lease be filed in such action, it shall not be necessary to file the original as a warrant of attorney, any rule of court, custom or practice to the contrary notwithstanding.

(g)     Judgment Final.  Any judgment, order or decree entered against Tenant by or any court or Magistrate by virtue of the powers of attorney contained in this Lease, or otherwise, shall be final, and Tenant will not take an appeal, certiorari, writ of error, exception or objection to same, or file a motion or rule to strike off or open or to stay execution of the same. Tenant releases Landlord and any and all attorneys who may appear for Tenant all errors in the said proceedings. Tenant expressly waives the benefits of law, now or hereafter in force, exempting any goods on the Premises, or elsewhere, from the distraint, levy or sale in any legal proceedings taken by the Landlord to enforce any rights under this Lease. Tenant further waives the right to any notice to remove as may be specified in the Pennsylvania Landlord and Tenant Act of April 6, 1951, as amended, or any similar or successor provision of law, and agrees that five (5) days notice shall be sufficient in any case where a longer period may be statutorily specified.

(h)     WAIVER.  IT IS MUTUALLY AGREED BY AND BETWEEN LANDLORD AND TENANT THAT THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF SAID PREMISES, ANY CLAIM OF INJURY OR DAMAGE, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE.  IT IS FURTHER MUTUALLY AGREED THAT IN THE EVENT THAT LANDLORD COMMENCES ANY SUMMARY PROCEEDING FOR NON-PAYMENT OF RENT, TENANT WILL NOT INTERPOSE ANY COUNTERCLAIM OF WHATEVER NATURE OR DESCRIPTION IN ANY SUCH PROCEEDING.

(i)     Injunction.  In the event of a breach or threatened breach by Tenant of any of the agreements, conditions, covenants or terms hereof, Landlord shall have the right of injunction to restrain the same and the right to invoke any remedy allowed by law or in equity whether or not other remedies, indemnity or reimbursements are herein provided.

(j)     Interest and Costs.  All amounts owed by Tenant to Landlord under this Lease, other than the Base Rent, shall be deemed Additional Rent and, unless otherwise provided, shall be paid within ten (10) days from the date Landlord renders a statement of account. All Base Rent and Additional Rent shall bear interest from the date due until the date

- 13 -

DOCS_PH 1867164v.2

AUG-01-2007  11:14        E.  BOKSIDE COM. CONST. CO                J    6104033409   P.31

paid at the Default Rate. Tenant shall pay upon demand all of Landlord's costs, charges and expenses, including the reasonable fees of counsel, agents and others retained by Landlord, incurred in enforcing Tenant's obligations hereunder or incurred by Landlord in any litigation, negotiation or transaction which Tenant causes Landlord, without Landlord's fault, to become involved or concerned.

(k)    Removal of Tenant's Property.  All property removed from the Premises by Landlord pursuant to any provision of this Lease or of law may be handled, removed or stored by Landlord at the cost and expense of the Tenant, and the Landlord shall in no event be responsible for the value, preservation or safekeeping thereof. Tenant shall pay Landlord for all expenses incurred by Landlord in such removal and storage charges against such property while the same shall be in Landlord's possession or under Landlord's control.  All property not removed from the Premises or not retaken from storage by Tenant within thirty (30) days after the end of the term, however terminated, shall be conclusively deemed to be conveyed by Tenant to Landlord as by bill of sale without further payment or credit by Landlord to Tenant.

22.    Bankruptcy.  If at any time during the term of this Lease there shall be filed by or against Tenant or Guarantor in any court pursuant to any statute either of the United States or of any State (or Canada, as to Guarantor) a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of Tenant's or Guarantor's property, or if a receiver or trustee takes possession of any of the assets of Tenant or Guarantor, or if the leasehold interest herein passes to a receiver, or if Tenant or Guarantor makes an assignment for the benefit of creditors or petitions for or enters into an arrangement (any of which are referred to herein as "a bankruptcy event"), then such bankruptcy event shall be an event of default under this Lease, and the following provisions shall apply:

Any receiver or trustee in bankruptcy or Tenant as debtor in possession ("debtor") shall either expressly assume or reject this Lease within sixty (60) days following the earlier of the entry of an "Order for Relief", or an order confirming a Plan of Reorganization.

In the event of an assumption of the Lease by a debtor, receiver, or trustee, such debtor, receiver, or trustee shall immediately after such assumption (1) cure any default or provide adequate assurances that defaults will be promptly cured; and (2) compensate Landlord for actual pecuniary loss or provide adequate assurances that compensation will be made for actual pecuniary loss; and (3) provide adequate assurance of future performance.

Where a default exists under the Lease, the party assuming the Lease may not require Landlord to provide services or supplies incidental to the Lease before its assumption by such trustee or debtor, unless Landlord is compensated under the terms of the Lease for such services and supplies provided before the assumption of such Lease.

Landlord specifically reserves any and all remedies available to Landlord in Section 22 hereof or at law or in equity in respect of a bankruptcy event by Tenant to the extent such remedies are permitted by law.

- 14 -

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 247 of 897

Case 2:15-cv-02445-pmm   Doc 266-9   Filed 03/06/26/26   Entered 03/06/26/26 16:37:25   Desc Main
Exhibit G POD Document Management Page 10 of 49 Page 20 of 50

AUG-01-2007  11:14       B.  JOKSIDE COM. CONST. CO            )     6104033409    P.32

23. **Limitation of Liability.** All obligations of Landlord hereunder shall be construed as covenants, not conditions; and, except as may be otherwise expressly provided in this Lease, Tenant may not terminate this Lease for breach of Landlord's obligations hereunder. Landlord shall have no liability for consequential damages, nor for punitive or exemplary damages. All obligations of Landlord under this Lease will be binding upon Landlord only during the period of its ownership of the Premises and not thereafter. The term "Landlord" in this Lease shall mean only the owner, for the time being of the Premises, and in the event of the transfer by such owner of its interest in the Premises, such owner shall thereupon be released and discharged from all obligations of Landlord thereafter accruing, but such obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership. Any liability of Landlord under this Lease shall be limited solely to its interest in the Premises, and in no event shall any personal liability be asserted against Landlord in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord; and in any proceeding or in the case of any judgment against Landlord, Tenant shall request that the judgment index be noted to reflect such limitation of liability.

24. **Subordination.** This Lease and Tenant's interest and rights hereunder are and shall be subject and subordinate at all times to the lien of any first mortgage, now existing or hereafter created on or against the Premises, and all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments and extensions thereof, without the necessity of any further instrument or act on the part of Tenant. Tenant agrees, at the election of the holder of any such mortgage, to attorn to any such holder. Tenant agrees upon demand to execute, acknowledge and deliver such instruments, confirming such subordination and such instruments of attornment as shall be requested by any such holder. Tenant hereby appoints Landlord attorney in fact for Tenant irrevocably (such power of attorney being coupled with an interest) to execute, acknowledge and deliver any such instrument and instruments for and in the name of the Tenant and to cause any such instrument to be recorded. Notwithstanding the foregoing, any such holder may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant, and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution, delivery or recording and in that event such holder shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery and recording of such mortgage and had been assigned to such holder. The term "mortgage" whenever used in this Lease shall be deemed to include deeds of trust, security assignments and any other encumbrances, and any reference to the "holder" of a mortgage shall be deemed to include the beneficiary under a deed of trust.

25. **Mechanic's Liens.** Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in, the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises and that it will save and hold Landlord harmless from all loss, cost or expense based on or arising out of asserted claims or liens against

- 15 -

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 248 of 897

Case 5:25-cv-02445-pmm  Doc 56-9  Filed 03/06/26  Entered 03/06/26 16:37:25  Desc Main
Exhibit G Document Management Page 21 of 50

AUG-01-2007  11:15          B. JOKSIDE COM. CONST. CO          )          6104033409    P.33

the leasehold estate or against the interest of Landlord in the Premises or under this Lease. Tenant shall give Landlord immediate written notice of the placing of any lien or encumbrance against the Premises and cause such lien or encumbrance to be discharged within 30 days of the filing or recording thereof, provided, however, Tenant may contest such liens or encumbrances as long as such contest prevents foreclosure of the lien or encumbrance and Tenant causes such lien or encumbrance to be bonded or insured over in a manner satisfactory to Landlord within such 30 day period.

26.    **Estoppel Certificates.**    Tenant agrees, from time to time, within three (3) business days after request of Landlord, to execute and deliver to Landlord, or Landlord's designee, any estoppel certificate requested by Landlord, stating that this Lease is in full force and effect, the date to which rent has been paid, that Landlord is not in default hereunder (or specifying in detail the nature of Landlord's default), the termination date of this Lease and such other matters pertaining to this Lease as may be requested by Landlord. Tenant's obligation to furnish each estoppel certificate in a timely fashion is a material inducement for Landlord's execution of this Lease. No cure or grace period provided in this Lease shall apply to Tenant's obligations to timely deliver an estoppel certificate. Tenant hereby irrevocably appoints Landlord as its attorney in fact to execute on its behalf and in its name any such estoppel certificate if Tenant fails to execute and deliver the estoppel certificate within three (3) business days after Landlord's written request thereof.

27.    **Environmental Requirements.**    Except for Hazardous Material contained in products used by Tenant in de minimis quantities for ordinary cleaning and office purposes, Tenant shall not permit or cause any party to bring any Hazardous Material upon the Premises or transport, store, use, generate, manufacture or release any Hazardous Material in or about the Premises without Landlord's prior written consent. Tenant, at its sole cost and expense, shall operate its business in the Premises in strict compliance with all Environmental Requirements and shall remediate in a manner satisfactory to Landlord any Hazardous Materials released on or from the Premises by Tenant, its agents, employees, contractors, subtenants or invitees. Tenant shall complete and certify to disclosure statements as requested by Landlord from time to time relating to Tenant's transportation, storage, use, generation, manufacture or release of Hazardous Materials on the Premises. The term "Environmental Requirements" means all applicable present and future statutes, regulations, ordinances, rules, codes, judgments, orders or other similar enactments of any governmental authority or agency regulating or relating to health, safety, or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; and all state and local counterparts thereto, and any regulations or policies promulgated or issued thereunder. The term "Hazardous Materials" means and includes any substance, material, waste, pollutant, or contaminant listed or defined as hazardous or toxic, under any Environmental Requirements, asbestos and petroleum, including crude oil or any fraction thereof, natural gas liquids, liquified natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas). As defined in Environmental Requirements, Tenant is and shall be deemed to be the "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Premises by

- 16 -

DOCS_PH 1867164v.2

AUG-01-2007  11:15            BOOKSIDE COM. CONST. CO          )       6104033409    P.34

Tenant, its agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom.

Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all losses (including, without limitation, diminution in value of the Premises and loss of rental income from the Premises), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation, removal or management of any asbestos brought into the property or disturbed in breach of the requirements of this Section 27, regardless of whether such removal or management is required by law) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials for which Tenant is obligated to remediate as provided above or any other breach of the requirements under this Section 27 by Tenant, its agents, employees, contractors, subtenants, assignees or invitees, regardless of whether Tenant had knowledge of such noncompliance.  The obligations of Tenant under this Section 27 shall survive any termination of this Lease.

Landlord shall have access to, and a right (but not an obligation) to perform inspections and tests of, the Premises to determine Tenant's compliance with Environmental Requirements, its obligations under this Section 27, or the environmental condition of the Premises.  Access shall be granted to Landlord upon Landlord's prior notice to Tenant and at such times so as to minimize, so far as may be reasonable under the circumstances, any disturbance to Tenant's operations.  Such inspections and tests shall be conducted at Landlord's expense, unless such inspections or tests reveal that Tenant has not complied with any Environmental Requirement, in which case Tenant shall reimburse Landlord for the reasonable cost of such inspection and tests.  Landlord's receipt of or satisfaction with any environmental assessment in no way waives any rights that Landlord holds against Tenant.

28.    **Security Service.**  Tenant acknowledges and agrees that Landlord is not providing any security services with respect to the Premises and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises.

29.    **Force Majeure.**  Landlord shall not be held responsible for delays in the performance of its obligations hereunder when caused by strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, delay in issuance of permits, enemy or hostile governmental action, civil commotion, fire or other casualty, and other causes beyond the reasonable control of Landlord ("Force Majeure").

30.    **Entire Agreement.**  This Lease constitutes the complete agreement of Landlord and Tenant with respect to the subject matter hereof.  No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements,

- 17 -

DOCS_PH 1867164v.2

AUG-01-2007  11:16            .DOOKSIDE COM. CONST. CO            |      6104033409    P.35

promises, negotiations, or representations are superseded by this Lease. This Lease may not be amended except by an instrument in writing signed by both parties hereto.

31.    **Severability.**  If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby. It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

32.    **Brokers.**  Tenant represents and warrants that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the broker, if any, set forth on the first page of this Lease, and Tenant agrees to indemnify and hold Landlord harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this leasing transaction.

33.    **Miscellaneous.**      (a)    Any payments or charges due from Tenant to Landlord hereunder shall be considered rent for all purposes of this Lease.

(b)    If and when included within the term "Tenant," as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant.

(c)    All notices required or permitted to be given under this Lease shall be in writing and shall be sent by registered or certified mail, return receipt requested, or by a reputable national overnight courier service, postage prepaid, or by hand delivery addressed to the parties at their addresses as set forth at the beginning of this Lease. Either party may by notice given aforesaid change its address for all subsequent notices. Except where otherwise expressly provided to the contrary, notice shall be deemed given upon delivery or attempted delivery.

(d)    Except as otherwise expressly provided in this Lease or as otherwise required by law, Landlord retains the absolute right to withhold any consent or approval.

(e)    At Landlord's request from time to time Tenant shall furnish Landlord with true and complete copies of its most recent annual and quarterly financial statements prepared by Tenant or Tenant's accountants and any other financial information or summaries that Tenant typically provides to its lenders or shareholders.

(f)    Neither this Lease nor a memorandum of lease shall be filed by or on behalf of Tenant in any public record. Landlord may prepare and file, and upon request by Landlord Tenant will execute, a memorandum of lease.

- 18 -

DOCS_PH 1867164v.2

AUG-01-2007  11:16      ʟ ᴊOOKSIDE COM. CONST. CO            ᴵ      6104033409    P.36

(g)    The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease or any exhibits or amendments hereto.

(h)    The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties.

(i)    Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.  The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

(j)    It is expressly the intent of Landlord and Tenant at all times to comply with applicable law governing the maximum rate or amount of any interest payable on or in connection with this Lease.  If applicable law is ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected by Landlord be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to Tenant), and the provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

(k)    Construction and interpretation of this Lease shall be governed by the laws of the state in which the Premises is located, excluding any principles of conflicts of laws.

(l)    Time is of the essence as to the performance of Tenant's obligations under this Lease.

(m)    All riders and addenda now or hereafter attached hereto are hereby incorporated into this Lease and made a part hereof.  In the event of any conflict between such riders or addenda and the terms of this Lease, such riders or addenda shall control.

(n)    In the event either party hereto initiates litigation to enforce the terms and provisions of this Lease, the non-prevailing party in such action shall reimburse the prevailing party for its reasonable attorney's fees, filing fees, and court costs.

(o)    Each person executing this Lease on behalf of Tenant certifies that he or she has the authority to do so.

(p)    This Lease shall be binding upon and shall inure to the benefit of Landlord and Tenant, and their respective heirs, personal representatives, principals, successors and assigns, except that no rights shall inure to the benefit of any assignee of Tenant unless the

- 19 -

DOCS_PH 1867164v.2

App.246

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 252 of 897

Case 2:51-52445-pmm Doc 256-9 Filed 03/03/261/26 Entered 03/03/261/26 36 7 25:3 Desc Main
Exhibit G POD Document Manage 24 of 49 Page 25 of 50

AUG-01-2007  11:16        B...OOKSIDE COM. CONST. CO              6104033409    P.37

assignment of the Lease has previously been approved in writing by Landlord and the assignee or successor to Tenant has executed a consent and authorization for Confession of Judgment and to be otherwise bound hereby.

    (q)    Landlord and Tenant both acknowledge that this is a commercial transaction.

    (r)    If Landlord accepts the rent at any time after the rent is due, or Landlord fails to enforce any of its rights under this Lease or any of the penalties, forfeitures or conditions contained in this Lease, such forbearance shall not in any way be considered as a waiver of the right to enforce the same; and thereafter Landlord may enforce such rights, penalties or forfeitures against Tenant without any notice whatsoever; and any attempt to collect the rent by one proceeding shall not be considered as a waiver of the right of Landlord to collect the same by any other proceeding.

    34.    **Landlord's Lien/Security Interest.**  Tenant hereby grants Landlord a security interest, and this Lease constitutes a security agreement, within the meaning of and pursuant to the Uniform Commercial Code of the state in which the Premises are situated as to all of Tenant's property situated in, or upon, or used in connection with the Premises (except merchandise sold in the ordinary course of business) as security for all of Tenant's obligations hereunder, including, without limitation, the obligation to pay rent.  Such personalty thus encumbered includes specifically all trade and other fixtures for the purpose of this Section and inventory, equipment, contract rights, accounts receivable and the proceeds thereof.  In order to perfect such security interest, Tenant shall execute such financing statements and file the same at Tenant's expense at the state and county Uniform Commercial Code filing offices as often as Landlord in its discretion shall require; and Tenant hereby irrevocably appoints Landlord its agent for the purpose of executing and filing such financing statements on Tenant's behalf as Landlord shall deem necessary.

    35.    **Limitation of Liability of Trustees, Shareholders, and Officers of Landlord.** Any obligation or liability whatsoever of Landlord which may arise at any time under this Lease, or any obligation or liability which may be incurred by Landlord pursuant to any other instrument, transaction, or undertaking contemplated hereby, shall not be personally binding upon, nor shall resort for the enforcement thereof be had to, the property of the trustees, directors, shareholders, officers, employees or agents of Landlord, regardless of whether such obligation or liability is in the nature of contract, tort, or otherwise.

**SECTION 21 OF THIS LEASE PROVIDES FOR THE CONFESSION OF JUDGMENT AGAINST TENANT FOR MONEY AND FOR EJECTMENT.  IN CONNECTION THEREWITH, TENANT, KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND UPON ADVICE OF SEPARATE COUNSEL, UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO PRIOR NOTICE AND AN OPPORTUNITY FOR HEARING UNDER THE RESPECTIVE CONSTITUTIONS AND LAWS OF THE UNITED STATES AND THE COMMONWEALTH OF PENNSYLVANIA. WITHOUT LIMITATION OF THE FOREGOING, TENANT HEREBY SPECIFICALLY WAIVES ALL RIGHTS TENANT HAS OR MAY HAVE TO NOTICE AND OPPORTUNITY FOR**

- 20 -

DOCS_PH 1867164v.2

App.247

AUG-01-2007  11:17          b. .OOKSIDE COM. CONST. CO               6104033409   P.38

A HEARING PRIOR TO EXECUTION UPON ANY JUDGMENT CONFESSED
AGAINST TENANT BY LANDLORD HEREUNDER.

TENANT FURTHER ACKNOWLEDGES THAT IT HAS HAD THE OPPORTUNITY
TO DISCUSS SAID PROVISIONS WITH TENANT'S INDEPENDENT LEGAL
COUNSEL AND THAT THE MEANING AND EFFECT OF SUCH PROVISIONS HAVE
BEEN FULLY EXPLAINED TO TENANT BY SUCH COUNSEL, AND AS EVIDENCE
OF SUCH FACT AN AUTHORIZED OFFICER OF TENANT SIGNS HIS OR HER
INITIALS IN THE SPACE PROVIDED BELOW.

_____
(Initials)

IN WITNESS WHEREOF, Landlord and Tenant, intending to be legally bound hereby,
have executed this Lease as of the day and year first above written.

_____
ABRAHAM R. ATIYEH

SAUCON VALLEY MANOR, INC.

By: _____
Name:   _____  _____
Title:   _____

(Corporate Seal)

- 21 -

DOCS_PH 1867164v.2

App.248

AUG-01-2007  11:17        .BOOKSIDE COM. CONST. CO        )    6104033409   P.39

## EXHIBIT A

### Description of Premises

**ALL THAT CERTAIN** tract or parcel of land situate in the Township of Lower Saucon, County of Northampton, Commonwealth of Pennsylvania, bounded and described as follows:

**BEGINNING** at a railroad spike (bench mark, elevation 480.00) in Wassergass Road (Legislative Route T-391) and running in an easterly direction M. 82° 43' 30" E. 255.53' to a spike; N 78° 50' 30" E. 354.75' to a spike; N 70° 49' 30" E. 45.54' to a spike; thence in a southerly direction along the property now or late of Jarcu Petran, S 9° 58' E. 580.24' to a pin; S. 77° 31' 30" W. 8.25' to a pin; S. 12° 28' 30" E. 533.26' to a point; thence in a westerly direction along property of the School District of the Township of Lower Saucon (now Saucon Valley School District) S. 81° 26' W. 552.23' to a pin; thence continuing S. 81° 28' W. 210.11' along property now or late of Louis Fortley to an iron pin; thence in a northerly direction bordering the property now or later of George Mar N. 5° 45' W. 464.72' to a pin; thence N. 4° 53' W. 631.24' bordering the property now or late of Ronald J. Sweeney to the point of **BEGINNING.** **CONTAINING** 16.25 acres, more or less.

**BEING THE SAME PREMISES** which Saucon Valley School District, successors in interest to Hellertown-Lower Saucon School Authority, by Indenture dated October 1, 1999, did grant and convey unto Abraham R. Atiyeh, said deed being recorded in the Office for the Recording of Deeds in and for Northampton County, at Easton, Pennsylvania, in Deed Book Volume 1999-1, at Page 153214, reference thereunto had, the same will therein more fully and at large appear.

**UNDER AND SUBJECT** to the right-of-way contained in the foregoing deed.

- 22 -

DOCS_PH 1867164v.2

AUG-01-2007  11:17        b. JOOKSIDE COM. CONST. CO              6104033409   P.40

## Certification

The undersigned, SAUCON VALLEY MANOR, INC., a Pennsylvania corporation (the "Tenant") in connection with the Lease Agreement dated January 1, 2006 (the "Lease") entered with ABRAHAM R. ATIYEH, an individual (the "Landlord") hereby certifies the following:

1.   Tenant has been represented by legal counsel in connection with the Lease.

2.   Tenant has received advice as to the meaning and consequences of the provisions in the Lease authorizing confession of judgment, execution and attachment, confession of judgment in ejectment, waiver of errors, waiver of the right to appeal, all other waivers provided for under the Lease and have executed the Lease following receipt of such advice of counsel.

3.   Tenant, in furtherance of the above, hereby certifies that it has elected to execute the Lease with full understanding of the consequences of such election.

4.   If Tenant is a Corporation, then signatory certifies that he/she has been authorized to execute the Lease.

5.   Tenant acknowledges that the Lease constitutes a commercial transaction.

Tenant has caused this Certification to be executed this _____ day of January, 2006.

SAUCON VALLEY MANOR, INC.

By: _____

Name:   Rami i; Broad
Title:    VP

(Corporate Seal)

- 23 -

DOCS_PH 1867164v.2

TOTAL P.40

## Lease Amendment Agreement

MADE as of the 8th day of December, 2006 by and between ABRAHAM R. ATIYEH, an adult individual, herein called Landlord, having an office at 1177 Sixth Street, Whitehall, PA 18052;

### A N D

SAUCON VALLEY MANOR, INC., a Pennsylvania corporation, herein called Tenant, having an office at 1050 Main Street, Hellertown, Pennsylvania.

### *Witnesseth:*

WHEREAS, Landlord and Tenant entered into a Lease for the property known as 1050 Main Street, Hellertown, Northampton County, Pennsylvania, (the "Lease"), which lease included the main building and parking lots and open space, consisting of Northampton County tax parcels Q7SW2A-1-3 and Q7SW2A-1-5, (the Property); and

WHEREAS, pursuant to the agreement and understandings between Landlord and Tenant, Landlord was permitted to redevelop the open space and allow use of some of the parking in common with Tenant; and

WHEREAS, Landlord has declared a condominium for the Property; and

WHEREAS, Landlord and Tenant desire to amend the Lease to reflect the revision of the leased area and the reduced obligations of Tenant concerning the Property, as follows.

NOW, THEREFORE, the parties hereto, intending to be legally bound, and for other good and valuable consideration, do hereby agree as follows:

1. The Lease is hereby amended to modify the Leased Premises to be Unit 1 of the Condos at Saucon Valley Manor, a Condominium.

2. The Leased Premises under the Lease shall also include all of the parking rights allowed on Unit 2 for Unit 1 owners, residents, guests, tenants and invitees.

3. The Leased Premises under the Lease shall also include all easements, encroachment and other rights of Unit 1 as exist or as are allowed

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 257 of 897

Case 5:25-52445-mmm    Doc 56-9 Filed 03/26/21/26 Entered 03/26/21/26 16:25:39 Desc Main
Exhibit G POD Document Manager 29 of 49 Page 30 of 50

)                                                                    )

in the future under the Declaration of Condominium for the Condos at Saucon Valley Manor.

4.    Landlord, and not Tenant, shall be responsible for the maintenance and lawn cutting and other actions concerning the area known as Unit 4 of the Condos at Saucon Valley Manor.

5.    Landlord, and not Tenant, shall be responsible for the taxes due upon Unit 4 of the the Condos at Saucon Valley Manor; and the successor(s) to Landlord in ownership of Unit 3 shall be responsible for its taxes and related charges.

6.    In the event of any failure of Landlord to exercise the voting rights of the Unit 1 Owner in a manner consistent with the Lease, the Tenant is authorized and empowered to vote for Landlord as the Unit 1 Owner to fulfill the obligations of Landlord, as amended by this Lease Amendment Agreement. This right is granted with an interest so long as Tenant is not in default under the Lease and no event which would be a default with the passage of time or giving of notice, or both, exists.

7.    Landlord acknowledges that the business of Tenant involves the keeping or dealing with medical records and information, and that any entry by Landlord is made with the understanding that the same will not intentionally expose medical records.

8.    The Lease, except as specifically modified herein, is ratified and affirmed, including the rights of Landlord to confession of judgment and other allowances of summary procedures or waivers of rights by Tenant.

IN WITNESS WHEREOF, and intending to be legally bound, the parties have executed this Lease Addendum Agreement intending to be legally bound as of the date and year first above set forth.

SAUCON VALLEY MANOR, INC.

By: _____
Its (Vice) President

_____
Abraham R. Atiyeh
(Landlord)

)

## ADDENDUM TO LEASE AGREEMENT

MADE October 1, 2007, by and between, Saucon Trust hereinafter, sometimes referred to as Landlord;

### AND

Saucon Valley Manor Inc., hereinafter sometimes referred to as Tenant.

### WITNESSETH:

WHEREAS Abraham R. Atiyeh as Landlord (the "Assignor") did enter into an Agreement of Lease with Tenant effective January 1, 2006 as more fully described in the above Assignment of Lease (the "Lease") which Lease was assigned to Landlord by the above Assignment of Lease; and

WHEREAS Landlord and Tenant have agreed to amend the description of the Premises and add and delete certain terms and conditions set forth in this Addendum to Lease Agreement with all terms of the Lease not inconsistent herewith to continue to remain in full force and effect.

NOW, THEREFORE, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.    The above Recitals do form a part of this Addendum to Lease Agreement.

2.    Section 14 of Lease is deleted in its entirety.

3.    The parties acknowledge that the rent set forth on page 1 of the lease (monthly installments of $95,800.) is correct and do correct and modify the amount set forth in Section 4 to read "monthly installments if Base Rent in the amount of $95,800."

4.    The Premises is amended to read "Unit 1 of the Condos at Saucon Valley Manor, Lower Saucon Township, Northampton County, Pennsylvania" as more fully described on Exhibit A to this Addendum to Lease.

5.    In addition to the Base Rent and other rent or charges set forth in the Lease, Tenant shall pay all common charges for the Premises pursuant the condominium documents of Condos at Saucon Valley ("The Condo Documents") and shall abide by all rules, regulations, terms, covenants and conditions of the Condominium Documents.

6.    All other terms, covenants and conditions of the aforementioned Lease not inconsistent herewith are hereby ratified and confirmed by the parties hereto the same as

3

App.253

if set forth herein at length.

IN WITNESS WHEREOF the parties have hereunto affixed their hands and seals to this Addendum to Lease Agreement as of the day and year above first written, intending to be legally bound hereby.

Saucon Trust (Landlord)

_____
Abraham R. Atiyeh, Trustee


Saucon Valley Manor, Inc. (Tenant)

By: _____

Title: _____


4

AUG-29-2008  16:46                                                                P.01

## SECOND ADDENDUM TO LEASE AGREEMENT

MADE this 29th day of August 2008, by and between, The Saucon Trust, by and through ABRAHAM R. ATIYEH as Trustee of the Saucon Trust, hereinafter sometimes referred to as Landlord;

AND

Saucon Valley Manor Inc., hereinafter sometimes referred to as Tenant.

WITNESSETH:

WHEREAS Abraham R. Atiyeh, individually, as Landlord, did enter into an Agreement of Lease with Tenant effective January 1, 2006 (the "Lease"); and the Lease was assigned to Landlord effective October 1, 2007; and

WHEREAS, Landlord and Tenant entered in the Addendum to Lease Agreement dated October 1, 2007, (the "First Addendum"), which modified the Lease as therein set forth; and

WHEREAS, Landlord and Tenant did agree with National Penn Bank concerning the Assignment of Rents and Leases under date of October 1, 2007 (the "ALR"); and

WHEREAS Landlord and Tenant have agreed to further amend the Lease to change the Base Rental due by Tenant to Landlord effective September 1, 2008, and intend that all terms of the Lease and the First Addendum not inconsistent herewith to continue to remain in full force and effect.

NOW, THEREFORE, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.    The above Recitals do form a part of this Second Addendum to Lease Agreement.

2.    Effective as of September 1, 2008, Base Rent, as defined and/or otherwise stated in Section 4 of the Lease, is amended to be the sum of One Hundred Thirty Two Thousand Five Hundred ($132,500.00) Dollars per month.

3.    The aforesaid increased amount of Base Rent shall be payable monthly starting September 1, 2008 in addition to the continued payment of all amounts due as Additional Rent or otherwise due pursuant to the Lease.

App.255

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 261 of 897

Case 5-51-5244-pmm Doc 56-9 Filed 03/26/21 Entered 03/26/21 16:35:33 Desc Main
Exhibit G PCDocument Manager 38 of 49 Page 34 of 50

AUG-29-2008  16:46                                                      P.02

 3.    Tenant certifies to Landlord and National Penn Bank that there is no Default of Landlord existing under the Lease and that it has no knowledge of any event which, with the passage of time or giving of notice would be a default of Landlord under the Lease.

 4.    All other terms, covenants and conditions of the aforementioned Lease (as amended by the First Addendum) not inconsistent herewith are hereby ratified and confirmed by the parties hereto the same as if set forth herein at length.

 5.    All terms, covenants and conditions of the aforementioned ALR are hereby ratified and confirmed by the parties hereto the same as if set forth herein at length.

 IN WITNESS WHEREOF the parties have hereunto affixed their hands and seals to this Addendum to Lease Agreement as of the day and year above first written, intending to be legally bound hereby.


                                    **The Saucon Trust** (Landlord)

                                    By: _____
                                         Abraham R. Atiyeh, Trustee of
                                         The Saucon Trust


                                    **Saucon Valley Manor, Inc.** (Tenant)

                                    By: _____
                                         Abraham Atiyeh, President


                                                            TOTAL P.02

THIRD AMENDMENT
Dated and Effective As Of January 1, 2010
To The
LEASE AGREEMENT
Dated and Effective As Of January 1, 2006
By and Between
SAUCON TRUST,
a Pennsylvania Trust, as Owner and Lessor
and
SAUCON VALLEY MANOR, INC.,
a Pennsylvania corporation, as Lessee

### THIRD AMENDMENT TO LEASE AGREEMENT

This THIRD AMENDMENT TO LEASE AGREEMENT, (the "First Amendment") , is made and dated as of January 1, 2010, by and between **SAUCON TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Abraham R. Atiyeh, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

AND

**SAUCON VALLEY MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner and Lessee desire to amend the Lease dated January 1, 2006 between Owner and Lessee (the "Lease") for those certain premises known as Unit 1 of Saucon Valley Manor Condominium, (the "Leased Premises") on the terms and conditions set forth herein; and

WHEREAS, the terms of this Addendum shall be effective as of the date shown above, subject to the obtaining approval as required by the terms of the Mortgage encumbering the Leased Premises.

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02(A) of the Lease is amended and restated as follows:

"A.      The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of Two Million Four Hundred Thousand ($2,400,000.00) per year. Payments of Rent shall be due in advance in equal monthly installments of One Hundred Thousand Dollars ($100,000.00) on the first day of each month. "A. The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of Two Million Four Hundred Thousand ($2,400,000.00) per year. Payments of Rent shall be due (a) in advance in equal monthly installments of One Hundred Thousand Dollars ($100,000.00) on the first day of each month, each due without setoff and without prior notice or demand, and (b) the remainder of $1,200,000.00 to be paid on or before December 31 of the then current calendar year, in one or more partial installments, as Lessee shall elect, provided however that the full Base Rental of $2,400,000.00 is paid in full by December 31 of each year.

"A.1      Additionally, all other items set forth as Rent or Additional Rent under the Lease and all obligations of the Lessee are herein considered to be Rent and those additional items are due as set forth

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 264 of 897

Case 5:15-cv-05244-pmm   Doc 266-9   Filed 03/26/21   Entered 03/26/21 16:37:25   Desc Main
Exhibit G PODocument Mager 36 of 49Page 37 of 50

in the Lease. If the Lessee fails to make any monthly payment of Rent within fifteen (15) days after the due date thereof, the Owner may, at its option, impose a late charge upon the Lessee in an amount not to exceed ten percent (10%) of the Rent so delinquent for each calendar month of delinquency.

2.      The parties acknowledge that the new areas being added to the Building on Unit 1 form a part of the Premises, and that the Lessee shall take possession of the same when occupancy is allowed by applicable ordinance and inspection(s) and certification(s) as may be required. Lessee acknowledges that it is observing the construction and that it shall bear all risk from failure of the premises to comply with requirements for its intended use. Lessee hereby waives all obligations or warranties of Owner with respect to the construction being made for the benefit of Lessee on the Premises.

3.      No other portions of the Lease are amended or modified.

4.      Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

5.      Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Lease as if fully set forth herein at length.   ·

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Third Amendment to Lease Agreement effective as of January 1, 2010.

SAUCON TRUST

By: _____
    Abraham Atiyeh, Trustee

SAUCON VALLEY MANOR, INC.

By: _____
    (Vice) President

App.259

FOURTH AMENDMENT
Dated and Effective As Of November 1, 2012
To The
LEASE AGREEMENT
Dated and Effective As Of January 1, 2006
By and Between
SAUCON TRUST,
a Pennsylvania Trust, as Owner and Lessor
and
SAUCON VALLEY MANOR, INC.,
a Pennsylvania corporation, as Lessee

## FOURTH AMENDMENT TO LEASE AGREEMENT

This FOURTH AMENDMENT TO LEASE AGREEMENT, (the "First Amendment") , is made and dated as of November 1, 2012, by and between **SAUCON TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Saucon Management LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

AND

**SAUCON VALLEY MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner and Lessee desire to amend the Lease dated January 1, 2006 between Owner and Lessee (the "Lease") for those certain premises known as Unit 1 of Saucon Valley Manor Condominium, (the "Leased Premises") on the terms and conditions set forth herein; and

WHEREAS, the Lease has been amended prior to the date hereof; and

WHEREAS, Owner is obtaining a mortgage loan from M&T Realty Capital Corporation, its successors and/or assigns which will be insured or endorsed by the Secretary of Housing and Urban Development ("HUD"), which is herein called the "HUD Mortgage"; and

WHEREAS, the HUD Mortgage requires certain additional lease terms and other amendments, and the parties desire to amend the Lease as herein set forth.

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02(A) of the Lease is amended and restated as follows:

"A.　　　The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the greater of:

(i)　　　The sum of One Million Seven Hundred Five Thousand Four Hundred Twenty One ($1,705,421.00) Dollars, due in 12 annual installments; or

(ii)　　　During each calendar year, in 12 equal installments, an Amount equal to One Hundred Five Percent (105%) of the sum of :

a. Annual Principal and Interest Payments due by Owner under the HUD Mortgage; and

b. Annual Mortgage Insurance Premium relating to the HUD Mortgage; and

App.261

      c. Annual Deposit for Reserve for Replacement as required by the HUD Mortgage; and

      d. Annual Property Insurance Premiums for coverages for the Leased Premises required to be maintained by Owner under the HUD Mortgage; and

      e. Annual Property Taxes for the Leased Premises.

(iii)    The obligations of Lessee to pay, as Rent or Additional Rent, any of the items set forth in subsection (ii), above, are satisfied by the payment of rental as set forth in subsection (ii), above.

(iv)    Lessee acknowledges that the foregoing Rent will be variable due to the potential change in payments required for the items comprising rental due by subsection (ii), above.

2.    Owner agrees that it, or the holder of any escrow relating to items within the scope of 1 A (ii), will cause the timely payment of insurance premiums and taxes.

3.    Lessee or Owner may seek reimbursement or funding from the Replacement Reserve to fund costs, provided that any sums disbursed to them or for the use of the Premises are limited by the terms of the Replacement Reserve and the documents by which it was created or otherwise exists

4.    The HUD Rider, attached hereto as Exhibit "A" is incorporated herein by reference and forms a part hereof. Lessee agrees that it shall abide by all terms of the HUD Rider.

5.    Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

6.    Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Lease as if fully set forth herein at length.

7.    Lessee acknowledges and agrees that it shall execute and deliver a Subordination, Nondisturbance and Attornment Agreement in form and content satisfactory to HUD.

8.    Lessee shall cause its subtenants, Lehigh Valley Health Network and Good Shepherd Rehabilitation Hospital to execute Subordination, Nondisturbance and Attornment Agreement in form and content satisfactory to HUD. The said subleases are subordinate to the terms of this Lease, and shall be subordinate to the HUD Mortgage and all subsequent mortgages now or hereafter upon the Premises.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Fourth Amendment to Lease Agreement effective as of November 1, 2012.

SAUCON TRUST
By: Saucon Management LLC, Trustee

By: _____
    Abraham Atiych,
    Manager of Trustee

SAUCON VALLEY MANOR, INC.

By: _____
    (Vice) President

## FIFTH AMENDMENT TO LEASE AGREEMENT

This FIFTH AMENDMENT TO LEASE AGREEMENT, (the "Fifth Amendment") is effective as of July 1, 2018, by and between **SAUCON TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Saucon Management LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

AND

**SAUCON VALLEY MANOR, INC.,** (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

*WHEREAS*, the Owner and Lessee are parties to a Lease, originally dated and effective as of January 1, 2006 (the "Lease"), for the lease by Lessee from Owner of those certain premises known as Unit 1 of Saucon Valley Manor Condominium, (the "Leased Premises"); and

*WHEREAS,* the Lease has been amended four (4) times prior to the effective date hereof; and

*WHEREAS,* Owner and Lessee desire to amend the Lease to extend the term thereof upon the terms and conditions set forth herein; and

*WHEREAS,* Owner and Tenant desire to extend the Term of the Lease.

*NOW, THEREFORE*, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02(A) of the Lease ratified and Rent shall continue to be calculated as follows:

"A.         The Lessee agrees to pay to the Owner during the Lease Term, starting on January 1, 2013, as Rent for the Leased Premises, the greater of:
   (i)       The sum of One Million Seven Hundred Five Thousand Four Hundred Twenty One ($1,705,421.00) Dollars, due in 12 annual installments; or
   (ii)      During each calendar year, in 12 equal installments, an Amount equal to One Hundred Five Percent (105%) of the sum of :
      a. Annual Principal and Interest Payments due by Owner under the HUD Mortgage; and
      b. Annual Mortgage Insurance Premium relating to the HUD Mortgage; and
      c. Annual Deposit for Reserve for Replacement as required by the HUD Mortgage; and

 

         d. Annual Property Insurance Premiums for coverages for the Leased Premises required to be maintained by Owner under the HUD Mortgage; and

         e. Annual Property Taxes for the Leased Premises.

(iii)    The obligations of Lessee to pay, as Rent or Additional Rent, any of the items set forth in subsection (ii), above, are satisfied by the payment of rental as set forth in subsection (ii), above.

(iv)    Lessee acknowledges that the foregoing Rent will be variable due to the potential change in payments required for the items comprising rental due by subsection (ii), above.

(v)    The foregoing does not include those obligations, fees or other expenses and reimbursements as are due by Tenant under the Lease.

2.    Owner agrees that the holder of any escrow relating to items within the scope of 1 A (ii), will cause the timely payment of insurance premiums and taxes.

3.    Lessee or Owner may seek reimbursement or funding from the Replacement Reserve to fund costs, provided that any sums disbursed to them or for the use of the Premises are limited by the terms of the Replacement Reserve and the documents by which it was created or otherwise exists

4.    Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

5.    Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Lease as if fully set forth herein at length.

6.    Lessee acknowledges and agrees that this Lease, and all rights of Lessee and anyone claiming by, through or under Lessee, are, and shall be, subordinate to the HUD Mortgage and all subsequent mortgages now or hereafter upon the Premises.

7.    The parties acknowledge that the term of the existing lease extended to July, 2018; and the parties hereto extend the Term of the Lease through August 31, 2023, (which hereby becomes the "Termination Date").

8.    The Term shall automatically extend on the Termination Date for three (3) periods of three (3) years, each, (and the Termination Date shall be modified automatically thereby) unless (i) a Default by Lessee occurs, (in which event the rights and remedies of Owner shall be immediately applicable, and no further extension shall automatically occur) or (ii) Owner gives notice of nonrenewal to Lessee at least six (6) months prior to the end of the then-current Term, (in which event no further automatic extensions shall be available), or (iii) Lessee notifies Owner of the intent of Lessee not to renew by notice given at least 9 months prior to the end of the then-current Term.

9.          Lessee certifies that there is no default of Owner under the Lease.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Fifth Amendment to Lease Agreement intending to be legally bound effective as of July 1, 2018.

**SAUCON TRUST**
By: Saucon Management LLC, Trustee

By: _____
          Abraham Atiyeh,
          Manager of Trustee

**SAUCON VALLEY MANOR, INC.**

By: _____
          Nimita Kapoor Atiyeh,  President

## SIXTH AMENDMENT TO LEASE AGREEMENT

This SIXTH AMENDMENT TO LEASE AGREEMENT, (the "Sixth Amendment") is effective as of September 21, 2023, by and between **SAUCON TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Saucon Management LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

### AND

**SAUCON VALLEY MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

**WHEREAS**, the Owner and Lessee are parties to a Lease, originally dated and effective as of January 1, 2006 (the "Lease"), for the lease by Lessee from Owner of those certain premises known as Unit 1 of Saucon Valley Manor Condominium, (the "Leased Premises"); and

**WHEREAS**, the Lease has been amended five (5) times prior to the effective date hereof; and

**WHEREAS**, Owner and Lessee desire to amend the Lease to extend the term thereof upon the terms and conditions set forth herein; and

**WHEREAS**, Owner and Tenant desire to extend the Term of the Lease and to grant extensions to Tenant as hereinafter set forth; and

**NOW, THEREFORE**, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02 of the Lease (and all other parts of the Lease setting forth Base Rent, Additional Rent or other tenant payment obligations) are as follows:

    a. Base Rental
        i. For the period through December 31, 2024, no Base Rental shall be due.
        ii. For the remainder of the current renewal Term (i.e. calendar years 2025, 2026, 2027 and 2028) Base Rent shall be the greater of (i) One Hundred Twenty Thousand ($120,000.00) Dollars or (ii) Twenty-five (25%) percent of the net operating profit of Tenant from the operation of a personal care home at the Premises [reduced by all capital expenditures and by payment

1

for any real property obligation which Tenant may elect to pay, and by uncollected accounts receivable or bad debt] for each calendar year of the Term, limited to the sum of Three Hundred Thousand ($300,000.00) per annum, to be paid on April 30 of the year following the calendar year for which the calculation shall be made; and

    iii.    Base Rental for each calendar year of the Renewal Terms (i.e. Calendar years starting after December 31, 2028 shall be the greater of (i) Two Hundred Forty Thousand ($240,000.00) Dollars or (ii) Twenty-five (25%) percent of the net operating profit of Tenant from the operation of a personal care home at the Premises [reduced by all capital expenditures and by payment for any real property obligation which Tenant may elect to pay and by uncollected accounts receivable or bad debt] during a calendar year, limited to the sum of Five Hundred Thousand ($500,000.00) per annum. Base Rental shall be due on April 30 of the year following the calendar year for which the calculation shall be made; and

    b.  Tenant shall pay all charges for electric, water and sewer services provided to the Premises prior to the same being made a lien upon the Premises; and

    c.  Tenant shall pay the premiums for one or more insurance policies to provide (i) property casualty insurance for the Premises and (ii) general liability insurance for the Premises; and

    d.  Repairs to the Premises as are required to maintain the Premises in the condition required for lawful operation of a personal care home.

2.    The Term is hereby extended to December 31, 2028 (which date shall hereafter be called the Termination Date, unless extended as per subsection (a), below).

    a.  The Term shall automatically extend on the Termination Date for three (3) periods of five (5) years, each, (and the Termination Date shall be modified automatically thereby) unless Lessee notifies Owner of the intent of Lessee not to renew by notice given at least 90 days prior to the end of the then-current Term.

3.    Landlord and Tenant also have agreed to waive all past due rental and any obligations of Tenant or Landlord not performed by one or both through September 21, 2023, and hereby waive and release all unpaid sums and all performance not fully and timely provided.

    a.  Tenant waives any rights to refund or for calculation of overpayment previously made.

2

4.      Landlord acknowledges that Tenant has made repairs and replacements and betterments for the Premises. Tenant hereby waives obligation of Landlord to reimburse or perform such repairs, replacements or betterments, other than such funds are are now or hereafter due from insurers or loss payment sources other than Landlord.

5.      This Sixth Amendment is a full waiver and release of all defaults, deficient performance and any other obligation of Landlord or of Tenant which has arisen or could have been asserted at any time through and including the date hereof.

6.      The obligations of Landlord and/or Tenant under any Regulatory Agreement and all agreements, security interests and other rights, privileges, obligations or performance required under any Regulatory Agreement or other agreement made with the United States Department of Housing and Urban Development ("USHUD") or anyone required by, for or concerning USHUD or arising under any obligation with, concerning or associated with USHUD (collectively "HUD Obligations"), are hereby terminated and void as of September 20, 2023. Any past violations or continuing violation of the terms or conditions of any HUD Obligations are hereby waived and released.

7.      All other terms and conditions of the Lease (as amended through and including the Fifth Amendment and the oral amendment memorialized herein), are ratified and affirmed.

8.      This Agreement is effective as of September 21, 2023 notwithstanding a later date of execution.


        IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Sixth Amendment, intending to be legally bound effective as of September 21, 2023.


SAUCON TRUST ("Landlord")                    SAUCON VALLEY MANOR, INC. ("Tenant")

By: Saucon Management LLC, its Trustee

By: _____                   By: _____
    Abraham Atiyeh, its Manager                   Nimita Kapoor Atiyeh, President


3

Case 5:25-cv-01245-mmm   Doc 266-9   Filed 03/26/26   Entered 03/26/26 13:37:25   Desc Main
Exhibit G POC Document Management   Page 47 of 49   Page 48 of 50
Case 5:24-cv-02627-CH   Document 164   Filed 12/19/25   Page 1 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEHIGH VALLEY 1 LLC, successor by assignment to WINDSTREAM CAPITAL LLC, successor by assignment to the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, successor by assignment to M&T REALTY CAPITAL CORPORATION | : <br> : <br> : CIVIL ACTION <br> : <br> : <br> : <br> : <br> : NO. 24-2627 <br> : |
| v. | : <br> : |
| WHITEHALL FIDUCIARY LLC, as TRUSTEE OF WHITEHALL TRUST U/T/A DATED AUGUST 1, 2007 | : <br> : <br> : |
| LEHIGH VALLEY 1, LLC, successor by assignment to WINDSTREAM CAPITAL LLC, successor by assignment to the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, successor by assignment to M&T REALTY CAPITAL CORPORATION | : <br> : <br> : CIVIL ACTION <br> : <br> : <br> : NO. 24-2709 <br> : |
| v. | : <br> : |
| SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007 | : <br> : |

ORDER

**AND NOW**, this 19th day of December, 2025, upon consideration of Receiver's Motion for Sanctions (the "Motion for Sanctions"), the Responses filed by Defendants Whitehall Fiduciary LLC ("Whitehall Trust") and Saucon Trust and Non-Parties Nimita Kapoor Atiyeh and Abraham Atiyeh (collectively, "Respondents"), the Receiver's Reply in Further Support of the Motion, along with Receiver's Affidavit setting for the amount of attorneys' fees and costs incurred in the preparation, filing and presentment of the Motion for Sanctions, and upon consideration of Plaintiff's Motion to Void and Set Aside Lease Amendments and for Declaratory Judgment ("Motion to Void Amendments'), and the Response thereto, the oral argument held in Court on December 18, 2025,

and the concessions, admissions and statements made by the Parties, and the Court having found that Respondents have each violated the September 2, 2025 Order by failing to produce documents ordered to be produced in the aforementioned Order; it is hereby **ORDERED** as follows:

1. The Receiver's Motion for Sanctions (Docket No. 102, Case No. 24-2709) is **GRANTED**.

2. On or before December 29, 2025, Respondents shall produce each and every document ordered to be produced by this Court's Order dated September 2, 2025. Respondents are each deemed to have possession, control or the practical ability to obtain the documents, and may not claim that they cannot obtain the documents ordered to be produced.

3. On or before December 29, 2025, Respondents shall pay to Receiver the sum of $21,281.00 to compensate her for the preparation, filing and presentment of the Motion for Sanctions.

4. Receiver shall file a Report to the Court on or before January 2, 2026, indicating whether Respondents have complied with the requirements of the above paragraphs 2 and 3. If it is reported in the Report that Respondents have not complied with requirements of paragraphs 2 and 3, the Court will consider striking Defendants' Answer and Affirmative Defenses and entering Judgment of Foreclosure and Sale in favor of Plaintiff and against Defendants.

5. On or before December 29, 2025, Respondents, Whitehall Manor, Inc. and Saucon Valley Manor, Inc. are directed to turn over to Receiver any rental payments received from October 31, 2025 (the date Good Shepherd Rehabilitation Hospital was directed to make payments to the Receiver). This includes rent received from Good Shepherd Rehabilitation Hospital only.

6. Respondents, Whitehall Manor, Inc. and Saucon Valley Manor, Inc. are restrained from interfering with Receivers' efforts to collect rent, licensing fees, other occupancy fees or income of any sort from any and all occupants of the Properties. As agreed to by the Parties, any rent, licensing fee, occupancy fee or income of any sort that is or was paid to Respondents, Whitehall Manor, Inc. or Saucon Valley Manor, Inc. or any other entity over which Respondents, Whitehall Manor, Inc. or Saucon Valley Manor, Inc. have an interest or otherwise control, for rent or fees due and owing for January of 2026 and thereafter, shall be turned over to Receiver within 3 days of the date of this Order (in the case where money has already been received) or within 3 days of receipt (in the case where money is hereinafter received), along with a complete accounting of the source of the money received.

7. Plaintiff's Motion to Void and Set Aside Lease Amendments (Docket No. 92, Case No. 24-2627) is **GRANTED**.

8. The Sixth Amendment to Lease Agreement executed on September 21, 2023, affecting the property at 1050 Main Street, Unit #1, Hellertown, Pennsylvania, and the Fourth Amendment to Lease and Memorandum of Lease Extension executed on September 21, 2023, affecting the property at 1177 Sixth Street, Whitehall, Pennsylvania (the "Amendments"), are hereby **DECLARED NULL**, **VOID**, and **OF NO LEGAL EFFECT**.

<div align="right">

**BY THE COURT:**

/s/ Catherine Henry

**CATHERINE HENRY, J.**

</div>

# EXHIBIT H

**Return to:**
Kelly Kremer
Vorys, Sater, Seymour and Pease LLP
Atrium Two, Suite 2000
221 East Fourth Street
Cincinnati, Ohio 45202

RECORDED
01/26/2012 8:52:21 AM
RECORDER OF DEEDS
LEHIGH COUNTY
PENNSYLVANIA
Inst Num:    2012002757

**PIN: 5498 9378 8632-1**

FHA Form No. 4171-b
  (CORPORATE)
Rev. March 1971

---

### PA OPEN-END MORTGAGE

This mortgage is an "Open-End" Mortgage that secures future advances.
**42 Pa.C.S.Ann. § 8143**

---

# OPEN-END MORTGAGE

THIS MORTGAGE made **as of the** 19th **day of January, ~~19~~ 2012, to be effective as of January** 26, **2012,** between **WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST u/t/a dated August 1, 2007, a Pennsylvania trust**, the Mortgagor, **having its principal place of business at 1177 Sixth Street, Whitehall, Pennsylvania 18052** and **M&T REALTY CAPITAL CORPORATION**, a corporation organized and existing under the laws of **Maryland** and having its principal place of business at **25 South Charles Street, 17th Floor, Baltimore, Maryland 21201**, the Mortgagee.

In order to secure the payment of an indebtedness in the principal sum of **Fifteen Million Seven Hundred Eighty-Eight Thousand Seven Hundred and No/100** Dollars (**$15,788,700.00**), lawful money of the United States, which sum or so much thereof as may be advanced with interest thereon at **three and thirty-eight hundredths** percent (**3.38**%) per annum, is payable in accordance with the terms of a certain note bearing even date herewith as follows:

**Interest only payable on the first day of February, 2012. Commencing on the first day of March, 2012, monthly installments of interest and principal shall be paid in the sum of Sixty-Nine Thousand Eight Hundred Forty-Four and 95/100 Dollars ($69,844.95) each, such payments to continue monthly thereafter on the first day of each succeeding month until the entire indebtedness has been paid in full. In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest, shall be due and payable on February 1, 2042. The installments of interest and principal shall be applied first to interest at the rate of three and thirty-eight hundredths per centum (3.38%) per annum upon the principal sum or so much thereof as shall from time to time remain unpaid and the balance thereof shall be applied on account of principal.**

which note provides: (1) ~~that privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due, on the first day of any month prior to maturity upon at least thirty (30) days prior written notice to the holder; (2)~~ that if the debt is paid in full prior to maturity and while insured under the National Housing Act, all parties liable for payment thereof hereby agree to

1

be jointly and severally bound to pay to the holder hereof any adjusted premium charge required by the applicable Regulations; (3) that notwithstanding any provision for a prepayment charge or premium, prepayments of principal made as aforesaid, which do not exceed an aggregate of fifteen per centum (15%) of the original principal sum of the note in any one calendar year, may be made without any prepayment charge or premium; and (4) that no default shall exist by reason of nonpayment of any required installment of principal so long as the amount of optional additional prepayments of principal made pursuant to the privilege of prepayment equals or exceeds the amount of such required installment of principal; and (2) that in the event any installment or part of any installment due under the Note becomes delinquent for more than fifteen (15) days, there shall be due, at the option of the holder of the Note, in addition to other sums due, a late charge in an amount equal to two percent (2%) of the amount of principal and/or interest so delinquent, as further provided in the Note.

And also to secure payment by the Mortgagor to the Mortgagee of all sums expended or advanced by the Mortgagee pursuant to any term or provision of this mortgage;

And also to secure performance of each covenant, term, condition and agreement of the Mortgagor herein contained and in a certain ~~Building Loan Agreement and~~ Regulatory Agreement hereinafter referred to;

The Mortgagor for valuable consideration, the receipt of which is hereby acknowledged, hath granted, bargained, sold, aliened, enfeoffed, released and confirmed, and by these presents doth grant, bargain, sell, alien, enfeoff, release and confirm unto the said Mortgagee, all the following-described real estate situate in the **Township** of **Whitehall,** County of **Lehigh,** and Commonwealth of Pennsylvania; to wit:

**See Exhibit A, attached hereto and incorporated herein by reference.**

TOGETHER with all and singular the buildings and improvements on said premises, as well as all alterations, additions, or improvements now or hereafter made to said premises, and any and all appliances, machinery, furniture, and equipment (whether fixtures or not) of any nature whatsoever now or hereafter installed in or upon said premises, streets, alleys, passages, ways, waters, water courses, rights, liberties, privileges, hereditaments, and appurtenances whatsoever thereunto belonging, or in anywise appertaining, and the reversions and remainders, rents, issues and profits thereof; and

TOGETHER with all building materials and equipment now or hereafter delivered to said premises and intended to be installed therein; and

TOGETHER with all fixtures and articles of personal property now or hereafter attached to or in and about the building or buildings now erected or hereafter to be erected on the lands herein described which are necessary to the complete and comfortable use and occupancy of such building or buildings for the purposes for which they were or are to be erected, including all goods, chattels, and personal property as are ever used or furnished in operating a building, or the activities conducted therein, similar to the one herein described and referred to, and all renewals or replacements thereof or articles in substitution therefor, whether or not the same are, or shall be attached to said building or buildings in any manner.

And the said Mortgagor, for itself, its successors and assigns does hereby covenant, promise, and agree with said Mortgagee, its successors and assigns, that all furnaces, heaters, ranges, mantels, cabinets, gas and electric light fixtures, elevators, laundry equipment, refrigerator, air-conditioning equipment, including all operating equipment, Murphy beds and all apparatus, appliances, and fixtures for the creation and distribution of light, heat, power, and water, including all pipes, wires, faucets, bathroom and

2

kitchen fixtures of whatever kind and nature at present contained or hereafter placed in the building or hereafter standing upon the mortgaged premises and all structures, gas and oil tanks, screens, shades, awnings and Venetian blinds, storm doors and windows and equipment erected or placed in or upon the mortgaged premises are to be considered as annexed to and forming part of the freehold.

TO HAVE AND TO HOLD the said lot or piece of ground described, with the buildings and improvements thereon erected, the hereditaments and premises hereby granted or mentioned and intended so to be, with the appurtenances unto the said Mortgagee, its successors or assigns, to and for the only proper use and behoof of the said Mortgagee, its successors or assign forever;

Provided however that if said Mortgagor does and shall well and truly pay or cause to be paid unto the said Mortgagee, the aforesaid debt or principal sum secured by this mortgage, on the day and time and in the manner hereinbefore mentioned and appointed for payment of the same, together with interest and all sums advanced for payment of any ground rents, taxes, water rents, charges, claims or insurance premiums and any other advance hereunder as aforesaid, without any fraud or further delay and without any deduction, defalcation or abatement to be made of anything, for or in respect of any ground rents, taxes or water rents or charges or claims or advances whatsoever, then this mortgage and the estate hereby granted, shall cease and become void.

The Mortgagor covenants with the Mortgagee as follows:

1.      That the Mortgagor will deposit with the Mortgagee concurrently with payments of interest or of interest and principal, on the first day of each month after the date hereof until the said note is fully paid, the following sums:

(a)      An amount sufficient to provide the holder hereof with funds to pay the next mortgage insurance premium if this mortgage and the note secured hereby are insured, or a monthly service charge, if they are held by the Secretary of Housing and Urban Development, as follows:

(i)      if and so long as said note of even date and this mortgage are insured or are reinsured under the provisions of the National Housing Act, an amount sufficient to accumulate in the hands of the holder one month prior to its due date the annual mortgage insurance premium, in order to provide such holder with funds to pay such premium to the Secretary of Housing and Urban Development pursuant to the National Housing Act, as amended, and applicable Regulations thereunder, or

(ii)      Beginning with the first day of the month following an assignment of this mortgage and the note secured hereby to the Secretary of Housing and Urban Development, a monthly service charge which shall be an amount equal to one-twelfth of one-half per centum of the average outstanding principal balance due on the note computed for each successive year, beginning with the first of the month following such assignment, without taking into account delinquencies or prepayments.

(b)      A sum equal to the ground rents, if any, next due, plus the premium that will next become due and payable on policies of fire and other ~~hazard~~ insurance covering the mortgaged property, plus water rents, taxes and assessments next due on the mortgaged property (all as estimated by the Mortgagee) less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, water rents, taxes and assessments will become delinquent, such sums to be held by Mortgagee in trust to pay said ground rents, premiums, water rents, taxes, and special assessments.

(c)      All monthly installments of interest or of principal and interest and all payments mentioned in paragraphs (a) and (b) above shall be added together, and the aggregate amount thereof shall

3

App.276

be paid by the Mortgagor each month in a single payment to be applied by the Mortgagee to the following items in the order set forth:

(i)    Premium charges under the contract of insurance with the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner or service charge;

(ii)    Ground rents, taxes, water rents, assessments, fire and other ~~hazard~~ insurance premiums;

(iii)    Interest on the debt secured hereby; and

(iv)    Amortization of the principal of the debt secured hereby.

Provided that any excess funds accumulated under paragraph (b) above remaining after payment of the items therein mentioned shall be credited to subsequent monthly payments of the same nature required thereunder; but if any such item shall exceed the estimate therefor, the Mortgagor shall without demand forthwith make good the deficiency. Failure to do so before the due date of such item shall be a default hereunder. In case of termination of the contract of mortgage insurance by prepayment of the mortgage in full, or otherwise (except as hereinafter provided), accumulations under paragraph (a) above not required to meet payments due under the contract of mortgage insurance, shall be credited to the Mortgagor. If the property is sold under foreclosure or is otherwise acquired by the Mortgagee after default, any remaining balance of the accumulations under paragraph (b) above shall be credited to the principal of the debt as of the date of commencement of foreclosure proceedings or as of the date the property is otherwise acquired; and accumulations under paragraph (a) above shall be similarly applied unless required to pay sums due to the Secretary of Housing and Urban Development, acting by and through the Commissioner under the contract of mortgage insurance.

2.    That the Mortgagor will keep the improvements now existing or hereafter erected on the mortgaged property insured against loss by fire and such other hazards, casualties, and contingencies, as may be stipulated by the Secretary of Housing and Urban Development, acting by and through the Commissioner upon the insurance of the mortgage and other hazards **and liabilities** as may be required from time to time by the Mortgagee, and all such insurance shall be carried in such companies and be for such periods as may be required by the Mortgagee, and be in an amount which will comply with the coinsurance clause applicable to the location and character of the property but not less than eighty per centum (80%) of the actual cash value of the insurable improvements and equipment of the property and will pay when due any insurance premiums not provided for by monthly payments hereunder and in default thereof the Mortgagee may effect such insurance. Such policies shall be in standard form and endorsed with standard mortgagee clause with loss payable to the Mortgagee ~~and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner as interest may appear,~~ and shall be deposited with the Mortgagee; **the insurance carrier shall be selected by the Mortgagor, subject to approval by the Mortgagee, which shall not be unreasonably withheld.** If the premises covered hereby, or any part thereof, shall be destroyed or damaged by fire or other hazard against which insurance is held as hereinabove provided, the amounts paid by any insurance company or companies by reason of such damage, in pursuance of the contract or contracts of such fire or other hazard insurance, to the extent of the indebtedness secured hereby remaining unpaid, shall be paid to the Mortgagee, and, at its option, may be applied to the debt or released for the repairing or rebuilding of the premises.

3.    That the Mortgagor will keep said premises in as good order and condition as they now are, and will not commit or permit any waste of said premises, reasonable wear and tear excepted. If the Mortgagor shall refuse or neglect to make or cause to be made all necessary repairs to the mortgaged property, then at the option of the Mortgagee, such repairs may be made at the expense of the Mortgagee,

4

App.277

and the cost thereof, with interest at the rate provided in the note secured hereby shall be added to and made a part of the principal debt secured hereby and shall be payable on demand.

4.  The Mortgagee shall have the right to advance and pay any ground rents, taxes, assessments, water rents, and all other charges and claims which are provided to be made by the Mortgagor in paragraphs 1(a) and (b) above, and to advance and pay any sums of money that in its or their judgment may be necessary to perfect or preserve the title of the premises covered hereby. Any amount or amounts so paid by the Mortgagee shall be added to the principal debt secured hereby, shall bear interest at the rate provided in the note secured hereby from the date of payment, and shall be payable on demand. The Mortgagee, at its option, shall be entitled to be subrogated to any lien, claim or demand paid by it, or discharged with money advanced by it and secured by this mortgage.

5.  That so long as this mortgage and the said note secured hereby are insured under the provisions of the National Housing Act, or held by the Secretary of Housing and Urban Development, the Mortgagor will not execute or file for record any instrument which imposes a restriction upon the sale or occupancy of the mortgaged property on the basis of race, color or creed.

6.  That so long as this mortgage and the note secured hereby are insured under the provisions of the National Housing Act, or held by the Secretary of Housing and Urban Development, the Mortgagor will not rent dwelling accommodations in the mortgaged premises at rental rates in excess of the rates permitted by the Secretary of Housing and Urban Development, acting by, and through the Federal Housing Commissioner or for periods of less than one (1) month or in excess of three (3) years, nor rent the premises as an entirety.

7.  ~~That the indebtedness secured by this mortgage represents funds to be used in the construction of certain improvements on the lands herein described, in accordance with a building-loan agreement between the Mortgagor and the Mortgagee dated ———— 19 , a copy of which is attached hereto and made a part hereof (provided, however, that if and to the extent that said building-loan agreement is inconsistent herewith, this mortgage shall govern). If the construction of the improvements to be made pursuant to said building-loan agreement shall not be carried on with reasonable diligence, or shall be discontinued at any time for any reason other than strikes or lock-outs, the Mortgagee, after due notice to the Mortgagor, or any subsequent owner, is hereby vested with full and complete authority to enter upon the said premises to employ watchmen to protect such improvements from depredation or injury and to preserve and protect the personal property therein, to continue any and all outstanding contracts for the erection and completion of said building or buildings, to make and enter into any contracts and obligations wherever necessary, either in its own name or in the name of the Mortgagor, or other owner, and to pay and discharge all debts, obligations, and liabilities incurred thereby. All such sums so advanced by the Mortgagee (exclusive of advances of the principal of the indebtedness secured hereby) shall be added to the principal of the indebtedness secured hereby and all shall be secured by this mortgage and shall be due and payable on demand with interest at the rate provided in the note secured hereby, but no such advances shall be insured unless same are specifically approved by the Federal Housing Commissioner prior to the making thereof. The principal sum and the other charges provided for herein shall, at the option of the Mortgagee or holder of this mortgage and the note secured hereby become due and payable on the failure of the Mortgagor, or other owner, to keep and perform any of the covenants, conditions and agreements of said building-loan agreement. This covenant shall be terminated upon the completion of the improvement to the satisfaction of the Mortgagee and the making of the final advance as provided in said building-loan agreement.~~

8.  That the Mortgagor will not voluntarily create or permit to be created against the property subject to this mortgage any lien or liens inferior or superior to the lien of this mortgage; and further, that it will keep and maintain said property free from the claim of all persons supplying labor or materials

5

which will enter into the construction of any and all buildings now being erected or to be erected on said property.

9.    That the improvements ~~about to be made~~ upon the premises above described and all plans and specifications comply with all municipal ordinances and regulations made or promulgated by lawful authority, and that the same ~~will upon completion~~ comply with all such municipal ordinances and regulations and with the rules of the Board of Fire Underwriters having jurisdiction.

10.    That the Mortgagor will not permit or suffer the use of any of the property for any purpose other than that for which the same is now agreed upon to be used; nor will it permit or suffer any alteration of or addition to the buildings or improvements ~~hereafter constructed~~ in or upon said property without the consent of the Mortgagee.

11.    That the Regulatory Agreement, if any, executed by the Mortgagor and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner, which is being recorded simultaneously herewith, is incorporated in and made a part of this Mortgage. Upon default under the Regulatory Agreement and upon the request of the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner, the Mortgagee, at its option, may declare the whole of the indebtedness secured hereby to be due and payable.

It is agreed that if at any time, a Writ of Fieri Facias or other execution is properly issued upon a judgment obtained upon the note secured hereby, or if an Action of Mortgage Foreclosure is brought or a Writ of Scire Facias is issued or other foreclosure proceedings instituted upon this mortgage, an attorney's fee ~~commission~~ for collection, viz: **five** per centum (**5.0%**) of said principal debt or sum shall be payable, and shall be recovered in addition to all principal and interest and all other recoverable sums then due, besides costs of suit.  The Mortgagor does hereby expressly waive and relinquish all benefit that may accrue to him by virtue of any and every law, civil or military, made or to be made hereafter exempting the mortgaged premises from attachment, levy and sale under execution.

It is further agreed that the holder of this mortgage, in any action to foreclose, shall be entitled to the appointment of a Receiver of the rents and profits of the mortgaged premises as a matter of right and without notice, with power to collect the rents, issues, and profits of said mortgaged premises, due and becoming due during the pendency of such foreclosure suit, such rents and profits being hereby expressly assigned and pledged as additional security for the payment of the indebtedness secured by this mortgage, without regard to the value of the mortgaged premises or the solvency of any person or persons liable for the payment of the mortgage indebtedness.  The Mortgagor for itself and any subsequent owner hereby waives any and all defenses to the application for a Receiver and hereby specifically consents to such appointment without notice, but nothing herein contained is to be construed to deprive the holder of the mortgage of any other right, remedy, or privilege it may now have under the law to have a Receiver appointed.  The provision for the appointment of a Receiver of the rents and profits, and the assignment of such rents and profits, is made an express condition upon which the loan hereby secured is made.  The rights and remedies herein provided for shall be deemed to be cumulative and in addition to, and not in limitation of, those provided by law.

It is also agreed that, for the purpose of procuring possession of said mortgaged premises to the Mortgagee, its successors and assigns, in the event of any default as defined below, the Mortgagor, for the Mortgagor and for the successors and assigns of the Mortgagor, does hereby authorize and empower any attorney of any court as attorney for the Mortgagor, and for the successors or assigns of the Mortgagor, to sign an agreement for entering in any competent court an amicable action or judgment in ejectment, without any stay of execution, against the Mortgagor, or the successors or assigns of the Mortgagor and against all persons claiming under the Mortgagor, or the successors or assigns of the Mortgagor and for

6

the recovery by the Mortgagee, its successors or assigns, of possession of the mortgaged premises. In any such action, this mortgage or a copy thereof, verified by affidavit, shall be a sufficient warrant of attorney. Thereupon a Writ of Habere Facias Possessionem may issue forthwith without any prior writ or proceeding whatsoever. It is hereby expressly agreed that if for any reason after such action has been commenced the same shall be discontinued, marked satisfied of record or be determined, or possession of the mortgaged premises shall remain in or be restored to the Mortgagor, or the successors or assigns of the Mortgagor, the Mortgagee, its successors and assigns, shall have the right for the same default or in the event of any subsequent defaults, to bring on or more further amicable actions in the manner hereinbefore set forth to recover possession of the mortgaged premises. The Mortgagee, its successors and assigns, shall have the right to bring such amicable action in ejectment after an Action of Mortgage Foreclosure is brought or after the issuance of a Scire Facias sur Mortgage or other foreclosure proceedings are instituted upon this mortgage and after judgment thereon or therein, and after a sale of the mortgaged premises by the sheriff.

It is also expressly agreed that if the Mortgagor should fail to pay any installment of principal and interest or payment due pursuant to covenant one above within thirty (30) days after the due date of such installment or payment, or if the Mortgagor should fail to perform any of the terms, conditions or covenants of the mortgage, the note, ~~the building loan agreement~~, or the regulatory agreement, such failure shall constitute a default and in every such case, the whole principal debt shall, at the option of the Mortgagee, become due and payable immediately, and it shall and may be lawful for said Mortgagee forthwith to bring an Action of Mortgage Foreclosure, to sue out of a Writ of Scire Facias, or to institute other foreclosure proceedings upon this mortgage, and to proceed to judgment and execution for recovery of said principal debt, all interest thereon, all sums advanced for payment of any ground rent, taxes, water rents, charges, claims or insurance premiums as aforesaid, and all other recoverable sums, together with an attorney's commission for collection, without further stay of execution or other process, any law, usage or custom to the contrary notwithstanding. The Mortgagor hereby waives and relinquishes unto and in favor of the Mortgagee, all benefit under the laws now in effect or hereafter passed to relieve the Mortgagor in any manner, or to reduce the amount of the note to any greater extent than the amount actually paid for the premises hereby mortgaged at the sale thereof in any judicial proceedings upon the said note or upon this mortgage.

This mortgage and every covenant and agreement herein contained shall be binding upon and inure to the benefit of the Mortgagor and the Mortgagee and their respective successors and assigns and to the extent permitted by law shall bind every subsequent owner of the mortgaged premises.

**Notwithstanding any other provision contained herein or in the Note, it is agreed that the Execution of the Note shall impose no personal liability upon the Mortgagor for payment of the indebtedness evidenced thereby and in the event of a default, the holder of the Note shall look solely to the "Collateral" (defined below) in satisfaction of the indebtedness evidenced by the Note and will not seek or obtain any deficiency or personal judgment against the Mortgagor except such judgment or decree as may be necessary to foreclose and/or bar its interest in the Collateral, provided, that nothing in this condition and no action so taken shall operate to impair any obligation of the Mortgagor under the Regulatory Agreement herein referred to and made a part hereof. As used herein, "Collateral" shall mean and include (i) the property subject to this Mortgage, including, but not limited to, the land, improvements, equipment, personal property, and appurtenances thereto and to the rents, issues and profits thereof, as set forth in this Mortgage and (ii) the collateral described in the Security Agreement of even date herewith given to further secure the Note between the Mortgagor and Mortgagee.**

**See Assignment of Leases Rider to Mortgage attached hereto.**

IN WITNESS WHEREOF, **the Mortgagor has caused this instrument to be duly executed in its behalf by its duly authorized representative.**

7

**WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007**

By: _____
          Abraham R. Atiyeh, Manager

**COMMONWEALTH OF PENNSYLVANIA
COUNTY OF LEHIGH**

On this the 19th day of January, 2012, before me, the undersigned officer, personally appeared Abraham R. Atiyeh who acknowledged himself to be a manager and duly authorized representative of the said Whitehall Fiduciary, LLC, a Pennsylvania limited liability company, sole Trustee of Whitehall Trust, a Pennsylvania trust, and that he as such manager, being authorized to do so, executed the foregoing instrument, for the purposes therein contained, by signing the name of the limited liability company by himself as such manager.

_____
**Notary Public**

Commonwealth of Pennsylvania
NOTARIAL SEAL
MARIANNE L. RICE, Notary Public
City of Allentown, Lehigh County
My Commission Expires Aug. 20, 2015

(To be executed, witnesses and acknowledged as required by the laws of the State of Pennsylvania)

**CERTIFICATE OF RESIDENCE**

I, **Brianne Schwanitz, Esq.,** do hereby certify that the correct address of the within-named Mortgagee is **25 South Charles Street, 17th Floor, Baltimore, Maryland 21201** witness my hand this 19th day of **January, 2012.** 19_____.

_____
(On behalf of the Mortgagee)

**COMMONWEALTH OF PENNSYLVANIA**

Loan No. 034-22084

**Mortgage**

**WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL
TRUST**

TO

**M&T REALTY CAPITAL
CORPORATION**

COMMONWEALTH OF PENNSYLVANIA,
COUNTY OF LEHIGH

RECORDED on this _____ day of **January,** A.D. 19 **2012,** in the Recorder's Office of said County, in Mortgage Book, _____, Vol. _____ Page _____.

Given under my hand and seal of the said office, the day and year aforesaid.

_____
Recorder.

8

App.281

**Exhibit A**

**UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.**

**PARCEL ID NO.  5498 9378 8632-1**

**Together with an undivided interest of 50% of, in and to the Common Elements of the said WHITEHALL MANOR CONDOMINIUM.**

9

12/28/2011 12696553

App.282

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 288 of 897

Case 25-15245-pmm , Doc 56-10    Filed 03/31/26    Entered 03/31/26 17:25:33    Desc
Exhibit H Whitehall - Mortgage    Page 11 of 23

Whitehall Manor Senior Living
FHA Project No. 034-22084

## ASSIGNMENT OF LEASES RIDER
## TO MORTGAGE

This Assignment of Leases Rider to Mortgage is dated as of January 19, 2012 and is incorporated by reference into that certain Open-End Mortgage dated of even date herewith by and between WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST u/t/a dated August 1, 2007, a Pennsylvania trust, ("Mortgagor"), and M&T REALTY CAPITAL CORPORATION, a Maryland corporation ("Mortgagee"), as if fully set forth therein.

1.    Mortgagor hereby assigns, grants and transfers over to Mortgagee, its successors and assigns, all interest of the Mortgagor in and under that certain Lease Agreement by and between Mortgagor, as "Landlord", and Whitehall Manor, Inc., a Pennsylvania corporation, as "Tenant", together with any subsequent leases affecting the property described in the Mortgage (the "Leases"), together with all rents, income, revenues and profits now due, or which may become due under the Leases or arising otherwise out of the property covered by this Mortgage (the "Property"), or any interest therein, together with all rights which Mortgagor may have against all tenants or others under said Leases or otherwise in connection with the Property (collectively, the "Rents"), and including without limitation the rights and interests of Mortgagor as secured party under those provisions of the Leases whereby Tenant grants to Mortgagor a security interest in certain assets of Tenant; including Tenant's accounts receivable, licenses, provider agreements and certificates of need. This assignment is subject to a license hereby reserved to Mortgagor, but limited as hereinafter provided, to collect said Rents. For purposes of the security interests and rights of Mortgagor, as secured party, under each of the Leases which are assigned to Mortgagee under this Section 1, Mortgagor and Mortgagee agree that the term "Mortgagee" shall mean and include both the Mortgagee first named above and U.S. Department of Housing and Urban Development.

2.    Mortgagor agrees to timely perform and discharge all obligations of Mortgagor as Landlord under the Lease.

3.    Mortgagor further agrees not to receive or collect any Rents in advance, nor pledge, or assign future Rents, nor release or discharge any Tenant thereof from any obligation under the Lease; nor to cancel, modify, extend or renew any Lease or dispossess any Tenant without the prior written approval of Mortgagee.

4.    So long as Mortgagor shall not be in default hereunder, Mortgagor shall have the license reserved hereby to collect all Rents.

5.    Upon default by Mortgagor under this Mortgage, Mortgagee may, at its option, terminate the license of Mortgagor to collect the Rents and bring an action to appoint a receiver to enter upon, take possession of, manage and operate the Property and collect the Rents, make, enforce, and modify the Leases now or hereafter in effect, and otherwise perform all acts with respect to the Property, Leases and Rents as fully as Mortgagor could do if personally present, and Mortgagee shall, after payment of all expenses, credit the net amount of income which it may receive to the indebtedness secured hereby, in the manner, order and amounts as Mortgagee shall determine.

App.283

6.      In the event Tenant defaults under its Lease with Mortgagor entitling Mortgagor, as Landlord, under the Lease to cause a receiver to be appointed to operate the Property, and after ten (10) days written notice from Mortgagee to Mortgagor directing Mortgagor to take such actions as are required to have a receiver appointed to so operate the Property, Mortgagor fails to commence such actions and diligently pursue them to completion, such failure shall be a default by Mortgagor under this Mortgage entitling Mortgagee to exercise its rights and remedies under this Mortgage and applicable law. In addition, upon such default or other default by Mortgagor under this Mortgage or the Note secured by this Mortgage that is not cured within any applicable cure period, Mortgagee may initiate such actions as may be necessary, whether in Mortgagee's name or in the name of, and/or in the place, of Mortgagor, to have a receiver appointed to operate the Property.

7.      Notwithstanding anything herein to the contrary, acceptance by Mortgagee of this assignment shall not constitute Mortgagee a mortgagee in possession, or obligate Mortgagee to appear in or defend any action or proceeding relating to the Rents, Leases or the Property, or to take any action hereunder, or incur any expenses; nor shall Mortgagee be liable for any injury or damage to person or property sustained by any persons, in or about the Property. This assignment is an assignment of rights only, and not a delegation of duties.

8.      Mortgagor hereby irrevocably appoints Mortgagee its true and lawful attorney, coupled with an interest, in the name of Mortgagor, to subordinate any Lease to the lien of this Mortgage and to collect all Rents payable under the Leases upon termination of the license herein granted. This assignment shall constitute a direction to and full authority to Tenant and any other tenant under the Leases to pay all Rents to Mortgagee. The foregoing powers are irrevocable, continuing, and exclusive in Mortgagee, its successors and assigns.

9.      Upon payment in full of the indebtedness secured by this Mortgage, this assignment shall be of no further force and effect and Mortgagee shall execute such documents, in recordable form, as may be required or needed to reconvey and/or rescind this assignment.

R-2

13130752 V.2

App.284

*ANDREA E. NAUGLE*
*LEHIGH COUNTY CLERK OF JUDICIAL RECORDS*



**Recorder of Deeds Division**
**Deborah A. Casciotti, Chief Deputy**
**Lehigh County Courthouse**
**455 W. Hamilton Street - Room 122**
**Allentown, PA  18101-1614**
**(610) 782-3162**

\*RETURN DOCUMENT TO:
WIENER AND WIENER
512 HAMILTON STREET
ALLENTOWN, PA 18101

**Instrument Number - 2012002759**
Recorded On 1/26/2012 At 8:52:21 AM
\* Instrument Type - MORTGAGE
Invoice Number - 114086          User ID: LSA
\* Mortgagor - WHITEHALL FIDUCIARY LLC
\* Mortgagee - M&T REALTY CAPITAL CORP
\* Customer - WIENER AND WIENER

**\*Total Pages - 12**

**\* FEES**

| | |
|---|---|
| STATE WRIT TAX | $0.50 |
| STATE JCS | $23.50 |
| RECORDING FEES | $27.00 |
| AFFORDABLE HOUSING | $11.50 |
| COUNTY ARCHIVES FEE | $2.00 |
| ROD ARCHIVES FEE | $3.00 |
| UPI CERTIFICATION FEES | $10.00 |
| TOTAL PAID | $77.50 |

I hereby CERTIFY that this document is
Recorded in the Recorder of Deeds Office
of Lehigh County, Pennsylvania



Andrea E. Naugle
Clerk of Judicial Records
Recorder of Deeds Division

**LCGIS Registry UPI Certification**
**On January 26, 2012 By SB**

THIS IS A CERTIFICATION PAGE

# Do Not Detach

THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

INSTRUMENT NUMBER - **2012002759**

002XU7

App.285

Project No.:   **034-22084**     *1177 6th St. Whitehall PA 18052*
Project Name: **Whitehall Manor Senior Living**
Location:      **Lehigh County, Pennsylvania**
                *Whitehall Township*

## ASSIGNMENT OF MORTGAGE

**Dated November 8, 2022, Effective as of November _16_, 2022**

KNOW ALL MEN BY THESE PRESENTS:

THAT, M&T REALTY CAPITAL CORPORATION, a corporation organized and existing under the laws of the State of Maryland, hereinafter referred to as the "Assignor", having offices at One Light Street, 12th Floor, Baltimore, Maryland 21202, for value received, does by these presents, without recourse, representation or warranty, except as hereinafter set forth, grant, bargain, sell, assign, transfer and set over unto the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, his/her successors and assigns, hereinafter referred to as "Assignee", having offices at 451 7th Street, SW, Washington D.C., 20410, all right, title and interest in and to that certain:

Mortgage Note and Open-End Mortgage each dated January 19, 2012, to be effective January 26, 2012 (the "Mortgage"), each executed by WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST U/T/A DATED AUGUST 1, 2007, each being in the original principal amount of Fifteen Million Seven Hundred Eighty-Eight Thousand Seven Hundred and No/100 Dollars ($15,788,700.00), which Mortgage Note was made payable to M&T Realty Capital Corporation and which Mortgage Note is secured by the Mortgage recorded January 26, 2012, as Instrument No. 2012002759 in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania.

SEE ATTACHED EXHIBIT "A" FOR A DESCRIPTION OF THE REAL PROPERTY.

TO HAVE AND TO HOLD the same unto said UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, HIS/HER SUCCESSORS AND ASSIGNS.

THIS Assignment is without recourse or warranty, except that the undersigned hereby warrants that no act or omission of the undersigned has impaired the validity or priority of said Mortgage. The undersigned also warrants that said Mortgage is prior to all mechanics' and materialmen's liens filed of record subsequent to the recording of such Mortgage regardless of whether such liens attached prior to such recording date, and prior to all liens and encumbrances

App.286

which may have attached or defects which may have arisen subsequent to the recording of such Mortgage (except such liens or other matters as have been approved by the Assignee hereunder). The undersigned also warrants that, as of the execution of this Assignment, the sum of Twelve Million Four Hundred Eighty-Seven Thousand Six Hundred Sixty-Nine and 04/100  Dollars ($12,487,669.04), together with the interest accruing at the rate of 3.38% per annum, as provided in the said Mortgage Note and Mortgage, is actually due and owing under said Mortgage Note and Mortgage, that there are no offsets or counterclaims thereto, and that the undersigned has a good right to assign the said Mortgage Note and Mortgage.


[THIS SPACE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Assignor has caused this instrument to be executed on its behalf as of the date first above written.

> **M&T REALTY CAPITAL CORPORATION**, a
> Maryland corporation
>
> By:_____
> Name: Michael Angles
> Title:  Senior Vice President

STATE OF MARYLAND              }
                              } ss.
CITY OF BALTIMORE              }

    Before me, _Melissa L. First_____, a Notary Public, in and for said City and State, on this day personally appeared **Michael Angles**, known to me to be the person whose name is subscribed to the foregoing instrument, and known to me to be the **Senior Vice President** of M&T Realty Capital Corporation, a Maryland corporation, and acknowledged to me that he executed said instrument for the purposes and consideration therein expressed and as the authorized act of said corporation.

    Given under my hand and seal of office, this the _8th_ day of _November_, 2022.

> _____
> Notary Public
> My Commission Expires:

> MELISSA L FIRST
> Notary Public - State of Maryland
> Baltimore County
> My Commission Expires Apr 6, 2026

This instrument prepared by:    Ariel A. Mullin
    Vorys, Sater, Seymour and Pease LLP
    301 E. Fourth Street, Suite 3500
    Cincinnati, Ohio 45202

## EXHIBIT A

### Legal Description

UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of
Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office
of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.

PARCEL ID NO. 5498 9378 8632-2

Together with an undivided interest of 50% of, in and to the Common Elements of the said
WHITEHALL MANOR CONDOMINIUM.

Whitehall Township

App.289

Project No.:   **034-22084**    *1177 6ᵗʰ St. Whitehall PA 18052*
Project Name: **Whitehall Manor Senior Living**
Location:      **Lehigh County, Pennsylvania**
               *Whitehall Township*

### ASSIGNMENT OF MORTGAGE

**Dated November 8, 2022, Effective as of November _16_ , 2022**

KNOW ALL MEN BY THESE PRESENTS:

THAT, M&T REALTY CAPITAL CORPORATION, a corporation organized and existing under the laws of the State of Maryland, hereinafter referred to as the "Assignor", having offices at One Light Street, 12ᵗʰ Floor, Baltimore, Maryland 21202, for value received, does by these presents, without recourse, representation or warranty, except as hereinafter set forth, grant, bargain, sell, assign, transfer and set over unto the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, his/her successors and assigns, hereinafter referred to as "Assignee", having offices at 451 7ᵗʰ Street, SW, Washington D.C., 20410, all right, title and interest in and to that certain:

> Mortgage Note and Open-End Mortgage each dated January 19, 2012, to be effective January 26, 2012 (the "Mortgage"), each executed by WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST U/T/A DATED AUGUST 1, 2007, each being in the original principal amount of Fifteen Million Seven Hundred Eighty-Eight Thousand Seven Hundred and No/100 Dollars ($15,788,700.00), which Mortgage Note was made payable to M&T Realty Capital Corporation and which Mortgage Note is secured by the Mortgage recorded January 26, 2012, as Instrument No. 2012002759 in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania.

SEE ATTACHED EXHIBIT "A" FOR A DESCRIPTION OF THE REAL PROPERTY.

TO HAVE AND TO HOLD the same unto said UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, HIS/HER SUCCESSORS AND ASSIGNS.

THIS Assignment is without recourse or warranty, except that the undersigned hereby warrants that no act or omission of the undersigned has impaired the validity or priority of said Mortgage. The undersigned also warrants that said Mortgage is prior to all mechanics' and materialmen's liens filed of record subsequent to the recording of such Mortgage regardless of whether such liens attached prior to such recording date, and prior to all liens and encumbrances

which may have attached or defects which may have arisen subsequent to the recording of such Mortgage (except such liens or other matters as have been approved by the Assignee hereunder). The undersigned also warrants that, as of the execution of this Assignment, the sum of Twelve Million Four Hundred Eighty-Seven Thousand Six Hundred Sixty-Nine and 04/100 Dollars ($12,487,669.04), together with the interest accruing at the rate of 3.38% per annum, as provided in the said Mortgage Note and Mortgage, is actually due and owing under said Mortgage Note and Mortgage, that there are no offsets or counterclaims thereto, and that the undersigned has a good right to assign the said Mortgage Note and Mortgage.

[THIS SPACE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Assignor has caused this instrument to be executed on its behalf as of the date first above written.

> **M&T REALTY CAPITAL CORPORATION**, a
> Maryland corporation
>
> By:_____
> Name: Michael Angles
> Title:  Senior Vice President

STATE OF MARYLAND            }
                             } ss.
CITY OF BALTIMORE            }

Before me, _Melissa L. First_____, a Notary Public, in and for said City and State, on this day personally appeared **Michael Angles**, known to me to be the person whose name is subscribed to the foregoing instrument, and known to me to be the **Senior Vice President** of M&T Realty Capital Corporation, a Maryland corporation, and acknowledged to me that he executed said instrument for the purposes and consideration therein expressed and as the authorized act of said corporation.

Given under my hand and seal of office, this the _8th_ day of _November_, 2022.

_____
Notary Public
My Commission Expires:

> MELISSA L FIRST
> Notary Public - State of Maryland
> Baltimore County
> My Commission Expires Apr 6, 2026

This instrument prepared by:        Ariel A. Mullin
                                    Vorys, Sater, Seymour and Pease LLP
                                    301 E. Fourth Street, Suite 3500
                                    Cincinnati, Ohio 45202

## EXHIBIT A
## LEGAL DESCRIPTION

UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.

PARCEL ID NO. 5498 9378 8632-2

Together with an undivided interest of 50% of, in and to the Common Elements of the said WHITEHALL MANOR CONDOMINIUM.

*Whitehall TowShip*
*1177 6th Whitehall, PA*
*18052*

Certificate of Residence

I do hereby certify that the correct address of the within-named Assignee is:

Offices at 451 7th St. SW.
Washington, PA 20410

### *ANDREA E. NAUGLE*
### *LEHIGH COUNTY CLERK OF JUDICIAL RECORDS*



**Recorder of Deeds Division**
**Karen S. Collura, Chief Deputy**
**Lehigh County Courthouse**
**455 W. Hamilton Street - Room 122**
**Allentown, PA  18101-1614**
**(610) 782-3162**

**\*RETURN DOCUMENT TO:**
FIDELITY NATIONAL TITLE - WESTERVILLE
(10043)
4111 EXECUTIVE PKWY, SUITE 30
WESTERVILLE, OH 43081

**Instrument Number - 2022038363**
Recorded On 11/16/2022 At 2:43:56 PM
\* Instrument Type - ASSIGNMENT OF MORTGAGE
Invoice Number - 506774          User ID: CMF          **\*Total Pages - 6**
\* Grantor - M&T REALTY CAPITAL CORP  WHITEHALL TRUST
\* Grantee - UNITED STATES SECRETARY OF HOUSING & URBAN DEVELOPMENT
\* Customer - FIDELITY NATIONAL TITLE - WESTERVILLE (10043)

\* FEES

| | |
|---|---|
| STATE WRIT TAX | $0.50 |
| STATE JCS | $40.25 |
| RECORDING FEES | $17.00 |
| COUNTY ARCHIVES FEE | $2.00 |
| ROD ARCHIVES FEE | $3.00 |
| UPI CERTIFICATION FEES | $10.00 |
| TOTAL PAID | $72.75 |

I hereby CERTIFY that this document is
Recorded in the Recorder of Deeds Office
of Lehigh County, Pennsylvania



Andrea E. Naugle
Clerk of Judicial Records
Recorder of Deeds Division

**LCGIS Registry UPI Certification**
**On November 16, 2022 By CJ**

## THIS IS A CERTIFICATION PAGE

# <u>Do Not Detach</u>

## THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

00D66N

**INSTRUMENT NUMBER - 2022038363**

# EXHIBIT I

WHITEHALL MANOR SENIOR LIVING
FHA Project No. 034-22084

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "Agreement") is made, entered into and dated as of the ___26th___ day of January, 2012 by and between **WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST u/t/a dated August 1, 2007**, a trust organized and existing under the laws of the Commonwealth of Pennsylvania, whose principal place of business is located at 1177 Sixth Street, Whitehall, Pennsylvania 18052 ("Debtor"); and **M&T REALTY CAPITAL CORPORATION**, a corporation organized and existing under the laws of the State of Maryland and having an address at 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201 (the "Secured Party"), as follows:

## Recitals

A.    Contemporaneously with this Agreement, the Secured Party has made a loan to the Debtor in the maximum principal amount of $15,788,700.00 (the "Loan"). The Loan is (i) evidenced by the Mortgage Note made by the Debtor in favor of the Secured Party, dated as of even date herewith (the "Note") and (ii) secured, in part, by an assisted living project known as Whitehall Manor Senior Living, FHA Project No. 034-22084 (the "Project") located at 1177 Sixth Street, Whitehall, Pennsylvania 18052, as more particularly described in Exhibit A attached hereto and incorporated herein by reference (the "Premises"). The Project is the subject of the Regulatory Agreement between the Debtor and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner ("HUD"), dated as of even date herewith (the "Regulatory Agreement").

B.    As security, in part, for the Obligations (as defined below), the Debtor (i) granted to the Secured Party the Mortgage, dated as of even date herewith, encumbering the Project, which has been or is being recorded in the real estate records of the jurisdiction in which the Premises are located (the "Mortgage") and (ii) is entering into this Agreement with the Secured Party. The Note, the Mortgage, this Agreement, the Regulatory Agreement and all other agreements, instruments, and documents which are now existing or are in the future signed or delivered by, or on behalf of, the Debtor to the Secured Party and/or HUD in connection with, or related to, the Loan or the other Obligations are sometimes collectively referred to as the "Loan Documents."

C.    As used herein, "Healthcare Assets" means (i) any and all licenses, permits, and/or approvals issued by any governmental authority with respect to the use or operation of the Project for its "Approved Use" (as defined in the Regulatory Agreement), (ii) any and all Medicare and Medicaid provider agreements and (iii) any and all "Government Accounts" and "Government Payments" (each as defined below).

## Statement of Agreement

### 1.    SECURITY INTEREST; SETOFF.

(a)    To secure the full, prompt and complete payment and performance of all Obligations, the Debtor hereby, to the fullest extent permitted by applicable law with respect to Healthcare Assets, grants to, and creates in favor of, the Secured Party a continuing security interest in all of Debtor's right, title and interest in and to the property described on Exhibit B attached hereto and incorporated herein by reference (the "Collateral"). "Obligations" means, as of any date, the Loan and all other indebtedness, liabilities, obligations, covenants, debts and amounts owing from the Debtor to the Secured Party and/or HUD arising out of, in connection with, described in, or evidenced by the Loan Documents, whether direct or indirect, absolute or contingent, related or unrelated, now or in the future existing and whether consisting of principal, interest, fees, indemnities, expenses (including attorneys' fees), charges or other sums, however any of that indebtedness, obligations, or liabilities may be evidenced or acquired, all as now exist or may, after the date of this Agreement, be incurred, renewed, extended, consolidated, adjusted or amended.

(b)    In addition to (and without limitation of) any right of setoff, lien or counterclaim the Secured Party may otherwise have, the Secured Party may, at its option, setoff and retain, and may refuse to allow withdrawals by, or for the benefit of the Debtor of, any and all funds, monies, securities and other property held in escrow or for the account of the Debtor pursuant to the Loan Documents, against any amount payable by the Debtor under the Note, the Mortgage or any of the other Loan Documents which is not paid when due (whether or not any of the funds, monies, securities, or other property are then distributable to, or on behalf of, the Debtor).

(c)    Notwithstanding any provisions to the contrary contained in this Agreement, nothing set forth in this Agreement shall be construed as granting to Secured Party a security interest, assigning receivables, giving dominion and control or designating an attorney-in-fact with respect to Healthcare Assets in violation of any applicable law.

(d)    The Debtor hereby assigns and transfers to Secured Party all of Debtor's rights, titles and interests in, to and under any and all security agreements now or hereafter entered into by the Debtor with any lessee of all or any portion of the Project and all of Debtor's rights, titles and interests in the collateral described therein.

### 2.    REPRESENTATIONS; GENERAL COVENANTS.

(a)    To induce the Secured Party to make the Loan, the Debtor promises to the Secured Party that the following statements are, and will continue throughout the term of this Agreement to be, true: (i) except to the extent expressly permitted pursuant to Section 19 hereof, the security interest granted to the Secured Party in the Collateral constitutes a valid, first priority security interest; (ii) the Debtor has good title to, and is the sole and lawful owner of, the Collateral; (iii) the Debtor has full power and authority to enter into and perform its obligations under this Agreement; (iv) except to the extent expressly permitted pursuant to Section 19 hereof and taxes that are not yet due and payable, the Collateral is free and clear of any lien, security

2

interest, claim, interest, pledge, assignment or other encumbrance (a "Lien") except (A) the security interest in favor of the Secured Party and (B) those Liens, if any, approved in writing by Secured Party (the "Permitted Liens"); (v) the Debtor keeps all tangible Collateral at the Property; (vi) all trade names, assumed names, fictitious names and other names used by the Debtor during the five year period preceding the date of this Agreement are set forth on Exhibit C, and the Debtor has not, during the preceding five year period, except as may be set forth on Exhibit C, acquired any of its assets in any bulk transfer; (vii) Debtor's chief executive office is as set forth in the first paragraph of this Agreement; (viii) Debtor's jurisdiction of organization is as set forth in the first paragraph of this Agreement; (ix) Debtor's exact legal name is as set forth in the first paragraph of this Agreement; (x) Debtor's organizational number (if any) as assigned by the State in which Debtor is organized is the number identified as Debtor's organizational ID # on the financing statement(s) filed in connection with the closing of the Loan, and (xi) except as may be set forth on Exhibit C, the Debtor has no rights, titles or interests in, or with respect to, any investment property, any letters of credit, any electronic chattel paper, any commercial tort claims, any instruments, including promissory notes, or any Deposit Accounts (as defined below).

(b)    Debtor will (i) cause, at its expense, any and all UCC financing statements naming as secured party anyone other than Secured Party, which represent or evidence a Lien or potential Lien against any or all of the Collateral, to be terminated within thirty (30) days of the date hereof (except Permitted Liens, if any) and (ii) provide within forty-five (45) days of the date hereof, at its expense, to Secured Party one or more UCC search reports with respect to each office in which a UCC filing may be required in order for Secured Party to validly perfect its security interest in any or all of the Collateral, confirming that a UCC financing statement has been filed in such office in favor of Secured Party and that there are no other UCC financing statements in effect with respect to any of the Collateral except those in favor of Secured Party and Permitted Liens. The Debtor will not grant, create or permit to exist any Lien on any of the Collateral except for the Liens in favor of the Secured Party and Permitted Liens and except to the extent expressly permitted pursuant to Section 19 hereof. The Debtor, at the Secured Party's request, will defend the Collateral against the claims and demands of any other individual, unincorporated association, partnership, joint venture, trust, business trust, corporation, limited liability company, institution, entity or any governmental authority ("Persons") at any time claiming any interest in the Collateral.

(c)    The Collateral will only be used by the Debtor in the operation of the Project. Until an Event of Default (as defined below) occurs, the Debtor may have possession of the Collateral and use it in any lawful manner not inconsistent with the Loan Documents and any policy of insurance thereon. The Debtor will not sell, assign, lease, or otherwise dispose of any of the Collateral without the prior written consent of the Secured Party; however, the Debtor will have the right, without the Secured Party's consent, to transfer, sell or dispose of any Collateral which is (i) tangible personal property and (ii) obsolete or worn out ("Consumed Property") if the Debtor, concurrently with such transfer, sale or disposition, replaces the Consumed Property with replacement personal property which is free and clear of any Liens except for the Liens in favor of the Secured Party and has the same or greater value and utility as the Consumed Property originally had (any such replacement personal property will automatically become a part of the Collateral under this Agreement). The Secured Party's interests in the proceeds of the Collateral (or notification of its interests in the proceeds of the Collateral in financing statements

3

or otherwise) will not be construed as modifying this Agreement or as the Secured Party's consent to the disposition of any Collateral other than as provided in this Agreement.

(d)     All tangible Collateral is to be located at the Project ("Collateral Location"), and no tangible Collateral may be removed therefrom without the prior consent of the Secured Party unless the Collateral is (i) Consumed Property under the terms of Section 2(c) above or (ii) being removed in accordance with the terms of Section 2(e) below.  Immediately on demand therefor by the Secured Party, the Debtor will deliver to the Secured Party any and all evidences of ownership of the Collateral (including certificates of title and applications for title). The Debtor will give the Secured Party not less than 30 days prior written notice of any change of (A) Debtor's corporate, partnership, limited liability company, doing business, trade or legal name or (B) any Collateral Location.

(e)     The Debtor will, at its own cost and expense, maintain all of the tangible Collateral in good working condition and make all necessary renewals, repairs, replacements, additions, betterments and improvements thereto, and, in this connection, the Debtor may temporarily remove the same, or any part thereof, from the Project if such removal is necessary or advisable in connection with the Debtor's fulfilling of its obligations under this Section 2(e), and does not affect the priority of the security interests created under this Agreement.

(f)     The Debtor will, upon request of Secured Party, deliver to Secured Party copies of all reports, financial statements and other information which the Debtor is obligated to provide to HUD in connection with the Project and/or Collateral not later than the earlier of (i) the delivery of such reports, financial statements and other information to HUD or (ii) ten (10) days after Secured Party makes such request.

(g)     The Debtor will not change (i) without thirty (30) days prior notice to the Secured Party, the location of its chief executive office or (ii) without the prior written consent of Secured Party, which shall not be unreasonably withheld, its jurisdiction of organization.

(h)     The Debtor will not merge or consolidate with or into any other Person without the prior written consent of Secured Party.

(i)     The provisions of this Section 2(i) shall only apply in the event that the Debtor operates the Project.  As used in this Agreement, the capitalized term "Deposit Account" means (1) any deposit account into which payments to the Debtor with respect to the operation of the Project are initially deposited, as opposed to being transferred from another Project account, and (2) any deposit account into which Government Payments are directly transferred from a Government Account (defined below).  The Debtor will not establish a Deposit Account unless (A) with respect to any such proposed Deposit Account (other than those set forth on Exhibit C) at least thirty (30) days prior written notice of the name and address of the depository bank, the type of account and any other information reasonably requested by the Secured Party is provided to Secured Party and (B) contemporaneously therewith, if requested by the Secured Party consistent with the Debtor's obligations under Section 14, a control agreement in form and substance acceptable to the Secured Party is entered into among the Debtor, the Secured Party and the depository bank where the Deposit Account would be maintained (any such depository bank is referred to herein as a "Depository Bank" and any such control agreement is referred to

4

herein as a "DACA"), unless the Deposit Account is a Government Account. A DACA may not be changed or terminated without the prior written consent of the Secured Party. Upon the Secured Party's written request (which request need be made only once and not on a recurring basis), the Debtor will take all reasonable steps to cause each Depository Bank to provide to the Secured Party (I) whether by Internet access or otherwise, on-line screen access to daily activity in the Deposit Accounts, and (II) a copy of each periodic account statement relating to the Deposit Accounts ordinarily furnished by such Depository Bank to the Debtor. The Debtor authorizes and approves of the Secured Party communicating directly with each Depository Bank. Unless the Debtor receives no Government Payments, the Debtor will maintain one or more separate Deposit Account(s) into which only Government Payments (defined below) are deposited (collectively, the "Government Accounts"), and the Debtor will not commingle in any Government Account proceeds of accounts from non-governmental payors with proceeds of accounts owing from governmental authorities, including Government Payments. The Debtor shall cause all Government Payments related to the operation of the Project to be paid directly into the Government Accounts. Prior to establishing a Government Account, the Debtor shall cause the Depository Bank that maintains such Government Account to enter into a deposit account instruction services agreement with the Secured Party and the Debtor in form and substance acceptable to the Secured Party with respect to such Government Account (each, a "DAISA"), which requires initiation of a funds transfer each business day, unless the Secured Party approves otherwise, of all available funds in the applicable Government Account to a Deposit Account of Debtor that is subject to a DACA and is not a Government Account. Not less than thirty (30) days prior to the effective date thereof, the Debtor will provide to the Secured Party a copy of (i) any change to any DAISA, or (ii) any new directions with respect to a Government Account issued to a Depository Bank maintaining such Government Account, in each case contemporaneously with providing the change or directions to the Depository Bank. Without limiting the generality of the foregoing, without the prior written consent of the Secured Party, neither a change to any DAISA nor any such new directions shall instruct a Depository Bank to transfer funds from the Government Account to a Deposit Account that is not then subject to a DACA. No change to or termination of a DAISA, nor any such new directions with respect to a Government Account, shall be made without the prior written consent of the Secured Party. Also, the Debtor shall not close a Government Account subject to a DAISA without the prior written consent of the Secured Party. Failure of Debtor to comply with any of the provisions of this Section 2(i) shall constitute an "Event of Default." As used herein, "Government Payment" means a payment from a governmental entity and shall include, without limitation, payments governed under the Social Security Act (42 U.S.C. §§ 1395 et seq.), including payments under Medicare, Medicaid and TRICARE/CHAMPUS, and payments administered or regulated by the Centers for Medicare and Medicaid Services of Department of Health and Human Services.

3.    **COMPLIANCE WITH LAWS.** The Debtor will comply with the requirements of all valid and applicable federal, state and local laws.

4.    **TAXES; EXPENSES.** The Debtor will pay, when due, all taxes, assessments and other charges lawfully and validly levied or assessed on the Collateral or any part thereof. The Debtor will pay and, as applicable, reimburse the Secured Party for (i) any and all fees, costs and expenses, of whatever kind and nature, including the fees, expenses and disbursements of the Secured Party's counsel (including, but not limited to, fees, expenses and disbursements for

5

preparation of documents, making title examinations and rendering opinion letters) which the Secured Party may incur in connection with filing any financing statements or other public notices to protect its interests hereunder, the enforcement, preservation and/or protection of the Secured Party's rights and/or remedies under the Loan Documents, whether incurred through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or relating to the Loan, and (ii) all filing and recording fees and taxes payable in connection with the transactions contemplated by the Loan Documents. All amounts payable by Debtor to Secured Party under this Section 4 will be paid by the Debtor upon the Secured Party's demand therefor.

       **5.    INSPECTION; NOTICES.** Subject to resident privacy rights, the Secured Party, or its agents, may enter on the Project and any other Collateral Location at any time during normal business hours, and from time to time, for the purpose of inspecting the Project and/or the Collateral and making copies or abstracts of all of the Debtor's records pertaining to the Collateral. The Debtor will keep accurate and complete records of the Collateral. The Debtor will give the Secured Party prompt notice of any Event of Default.

       **6.    INSURANCE.** The Debtor will purchase and maintain insurance at all times with respect to the Premises, all improvements now or hereafter located thereon, and all tangible Collateral against risks of fire (including so-called extended coverage), theft, vandalism, and such other risks as the Secured Party may require, in such form, for such periods, and written by such companies as may be satisfactory to the Secured Party, such insurance to include "law and ordinance" coverage, and to be payable to the Secured Party as its interests may appear. In addition, the Debtor will purchase and maintain at all times liability insurance and business interruption insurance in such amounts and issued by such companies as may be required from time to time by the Secured Party. The Debtor covenants to pay to the Secured Party, together with monthly payments under the Note, installments on account of the premiums that will next become due and payable on such liability and business interruption insurance, the payment amounts to be determined in the same manner and the payments to be applied in the same priority as specified in the Mortgage with respect to payments of property insurance premiums. All policies of insurance will provide for thirty (30) days advance written notice to the Secured Party of cancellation or any material change in coverages of such insurance. The Debtor will furnish the Secured Party with certificates or other evidence satisfactory to the Secured Party of compliance with the foregoing insurance provisions.

       **7.    DISCHARGE OF LIENS.** At its option but without any obligation to do so, the Secured Party may (a) discharge any taxes or other Liens at any time levied or placed on the Collateral, (b) pay for insurance on the Collateral, and/or (c) pay for the maintenance and preservation of the Collateral. The Debtor will reimburse the Secured Party on its demand for any payment made, or any expense incurred, by the Secured Party pursuant to this Section 7. All of the foregoing sums paid or advanced by the Secured Party will constitute part of the Obligations and will be secured by the Collateral.

       **8.    EVENTS OF DEFAULT.** Each of the following events or circumstances, whether or not caused by or within the control of the Debtor, will be an "Event of Default" under this Agreement:

<div align="center">6</div>

(a)    The Debtor does not pay when due any of the Obligations, subject to any grace period provided under the Note;

(b)    The Debtor does not observe, perform or comply with any of the terms or conditions of this Agreement;

(c)    A default or breach under any of the Loan Documents (exclusive of this Agreement, which is covered by the other subsections of this Section 8) has occurred, which default or breach is not cured within any applicable grace period;

(d)    Any warranty, representation or statement made or furnished to the Secured Party by, or on behalf of, the Debtor proves to have been false in any material respect when made or furnished or when treated as being made or furnished to the Secured Party;

(e)    The Secured Party does not have, for any reason, a perfected, first priority security interest in all of the Collateral except to the extent expressly permitted pursuant to Section 19 hereof;

(f)    There occurs any actual or threatened demolition of or injury or waste to the Project premises, not covered by insurance, or not replaced or restored by the Debtor, which may materially impair the value of the Collateral or the Project;

(g)    Filing by or against the Debtor of a petition in bankruptcy, for a reorganization, arrangement or debt adjustment, or for a receiver, trustee, or similar creditors' representative for Debtor's property or any part thereof, or of any other proceeding under any federal or state insolvency or similar law (and if such petition or proceeding is an involuntary petition or proceeding filed against the Debtor without its acquiescence therein or thereto at any time, the same is not promptly contested and, within 60 days of the filing of such involuntary petition or proceeding, dismissed or discharged), or the making of any general assignment by the Debtor for the benefit of creditors, or the Debtor dissolves or is the subject of any dissolution, winding up or liquidation;

(h)    The Debtor is dissolved and liquidation of the Debtor is commenced in accordance with the Debtor's organizational documents and/or the law of the jurisdiction of organization; or

(i)    The Debtor changes its name or the jurisdiction in which it is organized or merges or consolidates with or into another Person without the prior written consent of the Secured Party.

## 9.    REMEDIES ON DEFAULT.

(a)    If an Event of Default occurs, the Secured Party may then, or at any time after the occurrence of an Event of Default, (A) declare all Obligations immediately due and payable, and whereupon the Obligations will be due and payable automatically and immediately, without notice or demand, which the Debtor expressly waives, and proceed to enforce payment of the Obligations; (B) exercise all of the rights and remedies afforded to the Secured Party under (i) the terms of this Agreement and/or any of the other Loan Documents, (ii) under the UCC (as

7

defined in Section 12 below), and/or (iii) by law and/or in equity (subject, however, to any limitations imposed by applicable law with respect to Healthcare Assets); (C) collect and receive the proceeds of all Awards (as defined in Exhibit B), the rights of Debtor thereto and shares of Debtor therein being hereby assigned to the Secured Party, and give proper receipts and acquittances therefor and apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the Obligations; (D) require the Debtor to assemble the Collateral and make it available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient to both parties, and (E) without limiting the provisions of Section 1(b), apply (or instruct another Person to apply) to the Obligations the balance of any deposit account that is part of the Collateral.

(b)    Without limitation of those rights and remedies, the Secured Party may, upon written notice to the Debtor, take, and publicly or privately sell or convey, full right, title and interest in and to the Collateral, or any part of it, in the name of the Secured Party and/or its designees. To the extent not prohibited by applicable law with respect to Healthcare Assets, the Debtor hereby constitutes and appoints the Secured Party as its true and lawful attorney in fact to assign and transfer its interest in any or all of the Collateral if an Event of Default occurs.

(c)    If any notice is required by law for the Secured Party to make a sale or other disposition of the Collateral, the Secured Party and the Debtor agree that notice will not be unreasonable as to time if given in compliance with this Agreement ten (10) days before any sale or other disposition of the Collateral. All reasonable attorneys' and paralegal fees and other legal expenses incurred by the Secured Party to collect the Obligations, to retake, hold, prepare for sale, and to dispose of the Collateral will be (i) payable to the Secured Party on its demand for payment, (ii) part of the Obligations, and (iii) secured by the Collateral.

(d)    The Debtor further specifically agrees that, in any exercise of the rights of the Secured Party under this Agreement or under any other Loan Document, (i) any combination of the Collateral and/or other security for the Obligations may be offered for sale and (ii) all of the Collateral and/or other security for the Obligations may be sold for one total price, and the proceeds of any such sale accounted for in one account without distinction among the items of security or without assigning to them any proportion of such proceeds, the Debtor hereby waiving the application of any doctrine of marshaling.

(e)    The Debtor shall cooperate in any legal and lawful manner necessary or required to permit the Secured Party or its successors and assigns to continue to operate and maintain the Project for its Approved Use in Debtor's name, place and stead. For this purpose and to the extent not prohibited by applicable law with respect to Healthcare Assets, Debtor irrevocably appoints the Secured Party, its successors and assigns, as Debtor's true and lawful attorney-in-fact, to do all things necessary or required by the state in which the Project is located or any other government entity with jurisdiction over the Project, including, but not limited to, the provision of any and all information and data, the payment of fees and other charges, and the execution of documents, all in the name of the Debtor. This power is coupled with an interest.

**10.    NO WAIVER BY SECURED PARTY; CUMULATIVE RIGHTS.**

8

(a)    No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will be effective unless such waiver is in writing and signed by duly authorized representatives of the Secured Party. No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will operate as a waiver of any other Event of Default or default or of the same Event of Default or default on a future occasion. The Secured Party may delay in exercising or omit to exercise any right or remedy under this Agreement, any other Loan Document or by law or equity provided without waiving that or any past, present or future right or remedy. All rights and remedies of the Secured Party in this Agreement and the other Loan Documents will be cumulative, and none of these rights or remedies will be exclusive of any other right or remedy allowed at law or in equity or in any other Loan Document, and all of these rights and remedies may be exercised and enforced concurrently.

(b)    Neither the Debtor nor any other Persons interested in the Collateral or the proceeds of the Collateral shall have any right to require the Secured Party first to resort to or proceed personally against any other Person or to proceed against any other collateral security, or to give priority or preference to any item of Collateral, or to proceed upon any guaranty, prior to exercising its rights hereunder. No renewal or extension of the Loan, no release or surrender of the Collateral and/or other security for the Obligations, no release of any obligor with respect to the Obligations, and no delay by the Secured Party in enforcing the Obligations or exercising any right or power with respect to the Obligations shall affect the Secured Party's rights with respect to the Collateral.

11.    **BINDING EFFECT; JOINT OBLIGATIONS.** All rights and remedies of the Secured Party under this Agreement will inure to the benefit of the Secured Party's successors and assigns; and all agreements, obligations, and duties of the Debtor will bind its heirs, personal representatives and permitted successors and assigns; however, the Debtor may not assign this Agreement or any of its rights under this Agreement or delegate any of its duties or obligations under this Agreement without the consent of the Secured Party. If there be more than one Debtor, their obligations, agreements and duties under this Agreement are made jointly and severally.

12.    **GOVERNING LAW; CONSTRUCTION; WAIVER OF TRIAL BY JURY.**

(a)    This Agreement and all rights and obligations under this Agreement, including matters of construction, validity and performance, will be governed by the laws of the state in which the Project is located (the "State") except as to the existence, validity, perfection or priority (and the effect of perfection or non-perfection or invalidity) of any Lien of the Secured Party on any deposit account which will be governed by the laws of the state in which the applicable deposit account is maintained at the applicable bank, savings and loan association, credit union or like organization. If any term of this Agreement is found to be invalid by a court with jurisdiction under the laws of the State or laws of mandatory application, then the invalid term will be considered excluded from this Agreement and will not invalidate the remaining terms of this Agreement. All uncapitalized terms used herein which are now or hereafter defined in the Uniform Commercial Code, as now enacted in the State or as hereafter amended or superseded (the "UCC"), will have the same meaning herein as in the UCC unless the context indicates otherwise. Every power given herein is coupled with an interest and is irrevocable by

9

death, dissolution or otherwise. The definition of any document includes all schedules, attachments and exhibits to that document, and all renewals, extensions, supplements, amendments, modifications, restatements and consolidations of that document, and any document given in substitution for or replacement of that document. The term "including" is used by way of example only and not by way of limitation, and the singular includes the plural and conversely. The captions or headings contained in this Agreement are for reference purposes only and will not affect or relate to the interpretation of this Agreement.

(b) AS A SPECIFICALLY BARGAINED INDUCEMENT FOR THE SECURED PARTY TO ENTER INTO THE AGREEMENT AND EXTEND CREDIT TO DEBTOR, SECURED PARTY AND DEBTOR EACH HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES ANY AND ALL RIGHT(S) TO A TRIAL BY JURY FOR ANY CAUSE OF ACTION, CLAIM OR DEFENSE RELATING TO, RESULTING FROM OR ARISING OUT OF ANY OF THE LOAN AND/OR ANY TRANSACTIONS, RIGHTS AND/OR OBLIGATIONS CONTEMPLATED BY THIS AGREEMENT AND/OR ANY OF THE OTHER LOAN DOCUMENTS. DEBTOR FURTHER ACKNOWLEDGES THAT SUCH WAIVER OF THE RIGHT TO A TRIAL BY JURY IS MADE AFTER CONSULTATION WITH COUNSEL.

13.    **TERM OF AGREEMENT.** The term of this Agreement will begin on the date of this Agreement and continue in full force and effect and be binding on the Debtor until the date that all of the Obligations are fully and finally paid and satisfied.

14.    **PERFECTION; FURTHER ASSURANCES.** The Debtor agrees to comply with all applicable laws and requirements in order to grant to the Secured Party a valid, perfected first Lien on the Collateral except to the extent expressly permitted pursuant to Section 19 hereof. At any time and from time to time, the Debtor, on request of the Secured Party, will give, execute, file and/or record any notice, financing statement, instrument, document or agreement that the Secured Party may consider necessary or desirable to create, preserve, continue, perfect or validate any security interest or other Lien granted under this Agreement or which the Secured Party may consider necessary or desirable to exercise or enforce its rights under this Agreement. Without limiting the generality of the foregoing, the Secured Party is authorized to file with respect to the Collateral one or more financing statements or other documents without the signature of the Debtor and to name therein the Debtor as debtor and the Secured Party and/or HUD as secured parties; and correct or complete, or cause to be corrected or completed, any financing statements or other such documents as have been filed naming the Debtor as debtor and the Secured Party and/or HUD as secured parties. The Debtor hereby appoints the Secured Party as its attorney-in-fact and authorizes the Secured Party, acting alone on behalf of the Debtor, to execute, acknowledge, deliver, file and/or record any and all documents requiring execution by the Debtor and necessary or desirable to effectuate or facilitate the purposes of this Agreement and/or the obligations or covenants of the Debtor under this Agreement. The power of attorney granted hereby is coupled with an interest and is irrevocable. The Secured Party is also authorized by the Debtor to give notice to any Person that the Secured Party may consider necessary or desirable under applicable law to preserve, perfect or protect the Secured Party's and/or HUD's interests in the Collateral. Without limiting the generality of the foregoing, with respect to any of the Collateral for which control of such Collateral is a method of perfection under the UCC, including all of the Debtor's rights, titles and interests in deposit

10

accounts, investment property, electronic chattel paper and letter-of-credit rights, the Debtor will, on Secured Party's request, cause to be executed by each Person that the Secured Party determines is appropriate, a control agreement in a form acceptable to the Secured Party.

**15. INTEREST.** Any amounts payable by the Debtor under this Agreement will bear interest at the rate of interest provided in the Note from the date on which such amounts are payable under this Agreement until the date on which such payments are made by the Debtor to the Secured Party; however, nothing in this Agreement will be deemed to give to the Debtor the right to withhold payment in consideration of the payment of such interest.

**16. DELIVERY OF NOTICES.** All notices must be in writing and sent (a) in person, (b) by certified or registered mail, or (c) by overnight delivery carrier for next day delivery, in each case to the address listed in the opening paragraph of this Agreement (or if notice of a new address is given in accordance with this Agreement, to the new address). Notice given in any other manner will not be considered delivered or given unless and until actually received. A notice period will start (i) if mailed, three business days after notice was sent by certified or registered mail, (ii) the next business day after being sent by overnight delivery, and (iii) the day the notice was delivered in person.

**17. REVIVAL OF SECURITY INTEREST.** If the Debtor makes a payment or payments to the Secured Party (or the Secured Party receives any payment or proceeds of the Collateral) that are subsequently voided, avoided, set aside, annulled, or disregarded under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of the payment or proceeds received, the Obligations or part intended to be satisfied will be revived and will continue in full force and effect as if these payment(s) or proceeds had not been received by the Secured Party, and the security interest granted herein shall be enforceable as to such Obligations as fully as if such payments had never been made.

**18. CLAIMS AGAINST SECURED PARTY.**

(a) <u>Notification</u>. The Secured Party shall not be in default under this Agreement, or under any of the other Loan Documents, unless a written notice specifically setting forth the claim of the Debtor shall have been given to Secured Party within one hundred eighty (180) days after the occurrence of the event which the Debtor alleges gave rise to such claim and the Secured Party does not remedy or cure the default, if any, with reasonable promptness thereafter.

(b) <u>Remedies</u>. If it is determined by the final, non-appealable order of a court of competent jurisdiction that the Secured Party has breached any of its obligations under the Loan Documents and has not remedied or cured same with reasonable promptness following receipt of notice thereof, the Secured Party's responsibilities shall be limited to the following: (i) where the breach consists of the failure to grant consent or give approval in violation of the terms and requirements of any of the Loan Documents, the obligation to grant such consent or give such approval; and (ii) where the breach involves any other violation of the Loan Documents, or where the Secured Party is determined to have acted in bad faith, the payment of any actual, direct, compensatory damages sustained by the Debtor as a result thereof.

11

(c)    <u>Limitations</u>.  In no event, however, shall the Secured Party be liable to the Debtor, or to any other party claiming through the Debtor, for any other damages, including, without limitation, indirect, speculative, or punitive damages, whatever the nature of the breach by the Secured Party of its obligations under any of the Loan Documents.  In no event shall the Secured Party be liable to the Debtor, or to any other party claiming through the Debtor, unless a written notice specifically setting forth the nature of the claim shall have been given to the Secured Party within the time period specified above.

**19.    PROVISIONS REGARDING ACCOUNTS RECEIVABLE LOANS.**  This Section 19 shall apply when the Debtor operates the Project, and there is no lease of the Premises.  In all other instances, there shall be no accounts receivable financing under this Section.

(a)    <u>Definitions</u>.  The following words and terms shall have the meanings hereinafter set forth:

"<u>Accounts</u>" shall mean all right, title and interest of the Debtor in and to the following, in each case arising from the Debtor's operation of the Project in the ordinary course of the Debtor's business: (a) all rights to payment of a monetary obligation, whether or not earned by performance, including, but not limited to, accounts (including, but not limited to accounts receivable, health-care insurance receivables, Medicaid and Medicare receivables, Veterans Administration receivables, or other governmental receivables, private patient receivables, and HMO receivables), (b) payment intangibles, (c) guaranties, letter-of-credit rights and other supporting obligations relating to the property described in clauses (a) and (b), and (d) all of the proceeds of the property described in clauses (a), (b) and (c).  Notwithstanding the foregoing, "<u>Accounts</u>" do not include accounts rising from the sale of the Debtor's equipment, inventory or other goods, other than accounts arising from the sale of Debtor's inventory in the ordinary course of the Debtor's business.

"<u>Eligible AR Lender</u>" means a bank, financial institution or other institutional lender which is in the business of making loans to provide working capital to businesses and which is not affiliated with the Debtor.

"<u>Eligible AR Loan</u>" means a loan or line of credit obtained by the Debtor from an Eligible AR Lender (a) for the sole purpose of providing working capital for the operation of the Project and, with the approval of HUD and Secured Party, other projects that are encumbered by mortgage loans insured or held by HUD and (b) which satisfies all of the requirements of this Section 19.

"<u>Required Intercreditor Agreement</u>" means an Intercreditor Agreement (including any HUD-required Rider) executed by the Secured Party, the Eligible AR Lender and the Debtor, in form and substance satisfactory to Secured Party and approved by HUD.

(b)    <u>Eligible AR Loan</u>.  Subject to the written approval of the Secured Party and HUD, the Debtor may obtain and maintain at any time one, and only one, Eligible AR Loan, which Eligible AR Loan may be secured by a first lien on the "AR Lender Priority Collateral"

(composed of Accounts and as further defined in the Required Intercreditor Agreement), subject to the following limitations and requirements:

> (i) in no event shall the principal amount of the Eligible AR Loan ever exceed such amount as may be approved in writing by Secured Party and HUD;

> (ii) without the written approval of the Secured Party, none of the Collateral, except the AR Lender Priority Collateral, shall be given as security for any Eligible AR Loan;

> (iii) with respect to any existing Eligible AR Loan, the Eligible AR Lender, Debtor and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement prior to closing of the Loan;

> (iv) with respect to any other Eligible AR Loan, the Eligible AR Lender, Debtor and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement before such Eligible AR Loan is closed, any funds are disbursed thereunder, any UCC financing statements are filed in connection therewith or any security interest in connection therewith is granted or perfected;

> (v) the Eligible AR Loan, the collateral therefor and all of the terms and conditions thereof shall at all times comply with all of the terms and conditions of the applicable Required Intercreditor Agreement; and

> (vi) until the Eligible AR Loan is paid in full, the written approval of the Secured Party and HUD is required for any proposed modifications, extensions, renewals, or amendments to a Material Term of the Eligible AR Loan or the related security agreement, prior to the effective date of such amendment(s). As used herein, "Material Term" means a term in a loan or security agreement that (1) extends the maturity date of the loan, (2) adds guarantors to the loan, (3) releases guarantors from the loan, (4) adds borrowers to the loan, (5) adds an interest reserve to the loan, (6) amends the interest rate payable on the outstanding principal balance of the loan, (7) increases or decreases the principal amount of the loan, (8) adds collateral as additional security for the loan, and/or (9) amends or expands the type of obligations secured by the loan.

(c) <u>Required Intercreditor Agreement</u>. Each Required Intercreditor Agreement shall be included in the definition of the Loan Documents while it is in effect. The Debtor shall comply at all times with the Required Intercreditor Agreement then in effect.

(d) <u>Information</u>. Debtor shall, from time to time, promptly following a request by Secured Party or HUD, provide to Secured Party and/or HUD (i) any and all information and documents available to Debtor regarding any Eligible AR Loan and/or AR Lender Priority Collateral (including, but not limited to histories of draws upon, payments on account of, and outstanding balances with respect to, the Eligible AR Loan) and (ii) copies of

13

any and all documents evidencing, securing and/or related to any Eligible AR Loan and/or any amendments thereto.

**20.    PROJECT CAPITAL NEEDS ASSESSMENTS.** Debtor agrees to pay the cost of Project Capital Needs Assessments ("PCNA Reports") that may be required after the date hereof by HUD (for periodic ten (10) year re-evaluation of the amount of deposits to the reserve fund for replacements created under the Regulatory Agreement), the first such report to be obtained on or before October 1, 2018, pursuant to any HUD requirement (including, but not limited to, the commitment issued by HUD to insure the Loan). Without limiting the above obligation, Debtor authorizes Secured Party to make withdrawals for this purpose from the reserve fund for replacements created under the Regulatory Agreement.  The Debtor shall cooperate in any legal and lawful manner necessary to obtain PCNA Reports, including, but not limited to, providing access to the Property and copies of all reports, documents relating to past capital expenditures and any other information reasonably requested by the party preparing the PCNA Reports, the Secured Party and/or HUD.

**21.    MISCELLANEOUS.**

(a)    This Agreement is intended to be supplemental to and not in substitution or in derogation of any security agreement contained in any other Loan Document.

(b)    In any instance where the consent or approval of the Secured Party may be given or is required or any determination is to be rendered by the Secured Party hereunder, the granting, withholding or denial of such consent or approval and the rendering of such determination shall be made or exercised by the Secured Party at its sole and exclusive option.

(c)    It is understood and agreed that no judgment or decree which may be entered on any debt secured or intended to be secured by the Mortgage shall operate to abrogate or lessen the effect of this Agreement, but that this Agreement shall continue in full force and effect until the payment and discharge of the Obligations.

(d)    This Agreement, any Required Intercreditor Agreement and the other Loan Documents represent the entire agreement between the Secured Party and the Debtor with respect to the subject matter of this Agreement and supersede all previous agreements, negotiations, and understandings with respect to the subject matter of this Agreement. Neither this Agreement nor any of the other Loan Documents may be amended, altered or changed other than in a writing signed by the Secured Party and the Debtor.  The Debtor's warranties and representations in this Agreement will be treated as being continuing warranties and representations, made by the Debtor with the same effect as though the representations and warranties had been made again on, and as of, each day of the term of this Agreement.

(e)    This Agreement may be executed in several counterparts and each counterpart will be considered an original of this Agreement.

**22.    RIGHTS OF SECRETARY OF HOUSING AND URBAN DEVELOPMENT.**

(a)    Debtor and Secured Party hereby agree that HUD shall be an additional

14

secured party under this Security Agreement together with Secured Party, as their interests may appear, and that HUD shall be listed on the Uniform Commercial Code Financing Statements to be filed contemporaneously herewith; provided, however, that nothing herein or in the Uniform Commercial Code Financing Statements shall require the execution, now or any future time, of any amendment, extension, or other document by HUD.

(b)    To the extent any party herein is required or desires to give notice to HUD hereunder, such notice shall be delivered in accordance with the provisions hereof, as follows: U.S. Department of Housing and Urban Development, c/o Office of Healthcare Programs, 451 7th Street S.W., Washington, DC 20410.

**IN WITNESS WHEREOF**, the Debtor and the Secured Party have signed this Agreement as of the date in the first paragraph of this Agreement.

[SEE ATTACHED COUNTERPART SIGNATURE PAGES]

## COUNTERPART SIGNATURE PAGE TO SECURITY AGREEMENT

**DEBTOR:**

**WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007**

By: _____
    Abraham R. Atiyeh, Manager

## COUNTERPART SIGNATURE PAGE TO SECURITY AGREEMENT

**SECURED PARTY:**

**M&T REALTY CAPITAL CORPORATION,**
a Maryland corporation

By: _____
Christine R. Chandler, Vice President

17

## EXHIBIT A TO SECURITY AGREEMENT

**UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of
Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the
Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID #
7494518.**

**PARCEL ID NO.  5498 9378 8632-1**

**Together with an undivided interest of 50% of, in and to the Common Elements of the said
WHITEHALL MANOR CONDOMINIUM.**

## EXHIBIT B TO SECURITY AGREEMENT

All of the following described property and interests in property, whether now owned or existing or hereafter acquired, arising or created:

a.    All fixtures, equipment and other goods and tangible personal property of every kind and description whatsoever now or hereafter located on, in or at the premises described in Exhibit A to this Security Agreement (the "Premises"), including, but not limited to, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, motors, furnaces, compressors and transformers; all power generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment and fixtures, fans and switchboards; all telephone equipment (except that telephone equipment leased from a telephone company); all piping, tubing, and plumbing equipment and fixtures; all heating, refrigeration, air-conditioning, cooling, ventilating, sprinkling, water, power, waste disposal and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm, and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, kitchen and laundry fixtures, utensils, appliances and equipment, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture now or hereafter installed or used or usable in the operation of any part of the buildings, structures or improvements erected or to be erected in or upon the Premises and every replacement thereof, accession thereto, or substitution therefor, whether or not the same are now or hereafter attached to the Premises in any manner;

b.    All articles of tangible personal property not otherwise described herein which are now or hereafter located in, attached to or used in, on or about the buildings, structures or improvements now or hereafter located, placed, erected, constructed or built on the Premises and all replacements thereof, accessions thereto, or substitution therefor, whether or not the same are, or will be, attached to such buildings, structures or improvements in any manner;

c.    All rents, leases, lease contracts, lease agreements, income, revenues, issues, profits, royalties and other benefits arising or derived or to be derived from, or related to, directly or indirectly, the Premises, whether or not any of the property described in this item (c) constitutes accounts, chattel paper, documents, general intangibles, instruments, investment property, deposit accounts or money;

d.    All awards now or hereafter made ("Awards") with respect to the Premises as a result of (i) the exercise of the power of condemnation or eminent domain, or the police power, (ii) the alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Premises (including, but not limited to, any destruction or decrease in the value by fire or other casualty), whether or not any of the property described in this item (d) constitutes accounts, chattel paper, documents, general intangibles, instruments, investment property, deposit accounts or money;

e.      All land surveys, plans and specifications, drawings, briefs and other work product of the Debtor or its employees, contractors or agents, and other papers and records now or hereafter used in the construction, reconstruction, alteration, repair or operation of the Premises;

f.      All licenses, permits, certificates and agreements for the provision of property or services to or in connection with, or otherwise benefiting, the Premises, including, but not limited to, nursing home and/or assisted living facility licenses, certificates of need, "bed authority" and Medicare and Medicaid provider agreements; however, the Secured Party disclaims a security interest in such of the property described in this item (f) to the extent that a security interest in such property may not be granted to the Secured Party without the forfeiture of the rights of the Debtor (or any assignee of the Debtor) or a default resulting thereunder;

g.      Any and all funds, monies, securities, and other property held in escrow or as reserves, and all rights to receive (or to have distributed to the Debtor) any funds, monies, securities, or other property held in escrow or as a reserve, including, but not limited to, all of Debtor's rights (if any) to any and all funds or amounts held in reserves or accounts created under the Regulatory Agreement, including, but not limited to, replacement reserve accounts and residual receipts accounts;

h.      All of the Debtor's accounts (including, but not limited to, health-care-insurance receivables and other accounts receivable), general intangibles (including, but not limited to, payment intangibles, tax refunds, tax refund claims and low income housing tax credits, if any, applicable to the Premises), chattel paper (including, but not limited to, tangible chattel paper and electronic chattel paper), leases, lease contracts, lease agreements, instruments, documents, inventory, as-extracted collateral, cash, money, deposit accounts, lock boxes, blocked accounts, certificates of deposit, investment property, insurance policies, letter-of-credit rights, judgments, liens, causes of action, warranties, guaranties, supporting obligations, and all other properties and assets of the Debtor, tangible or intangible, whether or not similar to the property described in this item (h) or elsewhere in this Exhibit B;

i.      All books, records and files of whatever type or nature relating to any or all of the property or interests in property described herein or the proceeds thereof, whether or not written, stored electronically, optically or electromagnetically or in any other form, and whether or not such books, records, or files constitute accounts, equipment or general intangibles;

j.      All current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, waters, watercourses, and appurtenances related to or benefiting the Premises, and all rights-of-way, streets, alleys and roads which may have been or in the future may be vacated;

k.      All contracts, options and other agreements for the sale of the Premises or the improvements thereon, entered into by the Debtor now or in the future, including cash or securities or other security deposited to secure performance by the parties of their obligations, and all construction contracts, architectural and engineering agreements and management

contracts now or in the future existing pertaining to the construction, rehabilitation, development, repair, operation, ownership, equipping or management of the Premises;

l.      Any and all rights of Debtor in tenant security deposits which have not been forfeited by any tenant under any lease;

m.      All names under or by which any part of the Premises may be operated or known, and all trademarks, trade names, and goodwill relating to any part of the Premises;

n.      The interest of the Debtor in and to any and all funds and monies created or established and held pursuant to any indenture of trust or similar instrument authorizing the issuance of bonds or notes for the purpose of financing the Project located upon the Premises;

o.      All rights, titles and interests of the Debtor under any and all security agreements now or hereafter entered into by the Debtor with any lessee of all or any portion of the Premises and all of the Debtor's rights, titles and interests in the collateral described therein; and

p.      All products and proceeds of any and all of the property (and interests in property) described herein, including, but not limited to, proceeds of any insurance, whether or not in the form of original collateral, accounts, contract rights, chattel paper, general intangibles, equipment, fixtures, goods, investment property, letter-of-credit rights, leases, lease contracts, lease agreements, instruments, inventory, documents, deposit accounts, supporting obligations or cash proceeds.

## EXHIBIT C TO SECURITY AGREEMENT

**Other Names Used by Debtor in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Assets Acquired in Bulk Transfer in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Debtor's Rights in the Following** (see Section 2(a) of Agreement):

*Investment property*:  **None**

*Letters of Credit*: **None**

*Electronic Chattel Paper*: **None**

*Commercial Tort Claims*: **None**

*Instruments (including promissory notes)*: **None**

*Deposit Accounts*:

| Account Number | Depository Bank | Account Type (e.g., operating or payroll) | Government Accounts (see note below) |
|---|---|---|---|
| None | | | |

Note:  Designate if Deposit Account receives deposits of proceeds of accounts from federal, state or local governments (e.g., Medicare and Medicaid), and if so, whether such Deposit Account is solely for such deposits or whether the Deposit Account commingles other non-governmental deposits.  See Section 2(i) of the Agreement for the Debtor's obligations in this regard.

12/20/2011 12698409

# EXHIBIT J

WHITEHALL MANOR SENIOR LIVING
FHA Project No. 034-22084

## LESSEE SECURITY AGREEMENT

THIS LESSEE SECURITY AGREEMENT (the "Agreement") is made, entered into and dated as of the $\mathcal{Ub}^{th}$ day of January, 2012, by and between **WHITEHALL MANOR, INC.**, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, whose principal place of business is located at 1177 Sixth Street, Whitehall, Pennsylvania 18052 (the "Lessee" or "Debtor"); and **M&T REALTY CAPITAL CORPORATION**, a corporation organized and existing under the laws of the State of Maryland and having an address at 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201 (the "Secured Party"), as follows:

### Recitals

A.    Contemporaneously with this Agreement, the Secured Party has made a loan to Whitehall Fiduciary, LLC, as Trustee of Whitehall Trust u/t/a dated August 1, 2007 (the "Borrower") in the maximum principal amount of $15,788,700.00 (the "Loan"). The Loan is (i) evidenced by the Mortgage Note made by the Borrower in favor of the Secured Party, dated as of even date herewith (the "Note") and (ii) secured, in part, by an assisted living project known as Whitehall Manor Senior Living, FHA Project No. 034-22084 (the "Project") located at 1177 Sixth Street, Whitehall, Pennsylvania 18052, as more particularly described in Exhibit A attached hereto and incorporated herein by reference (the "Premises"). The Premises are leased to the Lessee by the Borrower pursuant to a Lease Agreement dated on or about August, 2008, as amended by a First Amendment to Lease Agreement dated as of January 1, 2010 and a Second Amendment to Lease Agreement dated as of January 1, 2012 (collectively, the "Lease"), and are the subject of the Regulatory Agreement Nursing Homes between the Lessee and the Federal Housing Commissioner, dated as of even date herewith (the "Regulatory Agreement Nursing Homes").

B.    As security, in part, for the Obligations (as defined below), the Borrower (i) granted to the Secured Party the Mortgage, dated as of even date herewith, encumbering the Project, which has been or is concurrently herewith being recorded in the real estate records of the jurisdiction in which the Premises are located (the "Mortgage"), (ii) entered into a Security Agreement, dated as of even date herewith, with the Secured Party (the "Borrower Security Agreement") and (iii) entered into a Regulatory Agreement with the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner ("HUD"), dated as of even date herewith (the "Borrower Regulatory Agreement"). As additional security, the Lessee has entered into this Agreement with the Secured Party. The Note, the Mortgage, the Borrower Security Agreement, the Borrower Regulatory Agreement, this Agreement, the Regulatory Agreement Nursing Homes and all other agreements, instruments, and documents which are now existing or are in the future signed or delivered by, or on behalf of, the Borrower to the Secured Party and/or HUD, or by or on behalf of the Lessee to the Secured Party and/or HUD, in connection with, or related to, the Lease, the Loan or the other Obligations are sometimes collectively referred to as the "Loan Documents."

App.320

      **C.**     The Lessee is affiliated with and/or shares common ownership with the Borrower, and shall benefit directly from the making of the Loan.

      **D.**     As used herein, "Healthcare Assets" means (i) any and all licenses, permits and/or approvals issued by any governmental authority with respect to the use or operation of the Project for its "Approved Use" (as defined in the Regulatory Agreement Nursing Homes), (ii) any and all Medicare and Medicaid provider agreements, and (iii) any and all "Government Accounts" and "Government Payments" (each as defined below).

<p align="center"><u>Statement of Agreement</u></p>

**1.**    **SECURITY INTEREST; SETOFF.**

      (a)    To secure the full, prompt and complete payment and performance of all Obligations, the Lessee hereby, to the fullest extent permitted by applicable law with respect to Healthcare Assets, grants to, and creates in favor of, the Secured Party a continuing security interest in all of Lessee's right, title and interest in and to the property described on <u>Exhibit B</u> attached hereto and incorporated herein by reference (the "Collateral"). "Obligations" means, as of any date, the Loan and all other indebtedness, liabilities, obligations, covenants, debts and amounts owing from the Borrower and/or the Lessee to the Secured Party and/or HUD arising out of, in connection with, described in, or evidenced by the Loan Documents, whether direct or indirect, absolute or contingent, related or unrelated, now or in the future existing and whether consisting of principal, interest, fees, indemnities, expenses (including attorneys' fees), charges or other sums, however any of that indebtedness, obligations, or liabilities may be evidenced or acquired, all as now exist or may, after the date of this Agreement, be incurred, renewed, extended, consolidated, adjusted or amended.

      (b)    In addition to (and without limitation of) any right of setoff, lien or counterclaim the Secured Party may otherwise have, the Secured Party may, at its option, setoff and retain, and may refuse to allow withdrawals by, or for the benefit of the Borrower and/or Lessee of, any and all funds, monies, securities and other property held in escrow or for the account of the Borrower and/or the Lessee pursuant to the Loan Documents, against any amount payable by the Borrower and/or the Lessee under the Note, the Mortgage or any of the other Loan Documents which is not paid when due (whether or not any of the funds, monies, securities, or other property are then distributable to, or on behalf of, the Lessee).

      (c)    Notwithstanding any provisions to the contrary contained in this Agreement, nothing set forth in this Agreement shall be construed as granting to Secured Party a security interest, assigning receivables, giving dominion and control or designating an attorney-in-fact with respect to Healthcare Assets in violation of any applicable law.

**2.**    **REPRESENTATIONS; GENERAL COVENANTS.**

      (a)    To induce the Secured Party to make the Loan, the Lessee promises to the Secured Party that the following statements are, and will continue throughout the term of this Agreement to be, true: (i) except to the extent expressly permitted pursuant to Section 19 hereof, the security interest granted to the Secured Party in the Collateral constitutes a valid, first priority security interest; (ii) the Lessee has good title to, and is the sole and lawful owner of, the

<p align="center">-2-</p>

Collateral; (iii) the Lessee has full power and authority to enter into and perform its obligations under this Agreement; (iv) except to the extent expressly permitted pursuant to Section 19 hereof, rights granted to the Borrower under the Lease, if any, which are subordinate to the liens in favor of the Secured Party ("Subordinate Lease Rights") and taxes that are not yet due and payable, the Collateral is free and clear of any lien, security interest, claim, interest, pledge, assignment or other encumbrance (a "Lien") except (A) the security interest in favor of the Secured Party and (B) those Liens, if any, approved in writing by Secured Party (the "Permitted Liens"); (v) the Lessee keeps all tangible Collateral at the Premises; (vi) all trade names, assumed names, fictitious names and other names used by the Lessee during the five year period preceding the date of this Agreement are set forth on Exhibit C, and the Lessee has not, during the preceding five year period, except as may be set forth on Exhibit C, acquired any of its assets in any bulk transfer; (vii) Lessee's chief executive office is as set forth in the first paragraph of this Agreement; (viii) Lessee's jurisdiction of organization is as set forth in the first paragraph of this Agreement; (ix) Lessee's exact legal name is as set forth in the first paragraph of this Agreement; (x) Lessee's organizational number (if any) as assigned by the State in which Lessee is organized is the number identified as Lessee's organizational ID # on the financing statement(s) filed in connection with the closing of the Loan, and (xi) except as may be set forth on Exhibit C, the Lessee has no rights, titles or interests in, or with respect to, any investment property, any letters of credit, any electronic chattel paper, any commercial tort claims, any instruments, including promissory notes, or any Deposit Accounts (as defined below).

(b)    The Lessee will (i) cause, at its expense, any and all UCC financing statements naming as secured party anyone other than Secured Party, which represent or evidence a Lien or potential Lien against any or all of the Collateral, to be terminated within thirty (30) days of the date hereof (except Permitted Liens, if any), and (ii) provide within forty-five (45) days of the date hereof, at its expense, to Secured Party one or more UCC search reports with respect to each office in which a UCC filing may be required in order for Secured Party to validly perfect its security interest in any or all of the Collateral, confirming that a UCC financing statement has been filed in such office in favor of Secured Party and that there are no other UCC financing statements in effect with respect to any of the Collateral except those in favor of Secured Party and Permitted Liens. The Lessee will not grant, create or permit to exist any Lien on any of the Collateral except for the Liens in favor of the Secured Party, Permitted Liens, and Subordinate Lease Rights, and except to the extent expressly permitted pursuant to Section 19 hereof. The Lessee, at the Secured Party's request, will defend the Collateral against the claims and demands of any other individual, unincorporated association, partnership, joint venture, trust, business trust, corporation, limited liability company, institution, entity or any governmental authority ("Persons") at any time claiming any interest in the Collateral.

(c)    The Collateral will only be used by the Lessee in the operation of the Project. Until an Event of Default (as defined below) occurs, the Lessee may have possession of the Collateral and use it in any lawful manner not inconsistent with the Loan Documents and any policy of insurance thereon. The Lessee will not sell, assign, lease, or otherwise dispose of any of the Collateral without the prior written consent of the Secured Party; however, the Lessee will have the right, without the Secured Party's consent, to transfer, sell or dispose of any Collateral which is (i) tangible personal property and (ii) obsolete or worn out ("Consumed Property") if the Lessee, concurrently with such transfer, sale or disposition, replaces the Consumed Property with replacement personal property which is free and clear of any Liens except for the Liens in

-3-

favor of the Secured Party and Subordinate Lease Rights and has the same or greater value and utility as the Consumed Property originally had (any such replacement personal property will automatically become a part of the Collateral under this Agreement). The Secured Party's interests in the proceeds of the Collateral (or notification of its interests in the proceeds of the Collateral in financing statements or otherwise) will not be construed as modifying this Agreement or as the Secured Party's consent to the disposition of any Collateral other than as provided in this Agreement.

(d)    All tangible Collateral is to be located at the Project ("Collateral Location"), and no tangible Collateral may be removed therefrom without the prior consent of the Secured Party unless the Collateral is (i) Consumed Property under the terms of Section 2(c) above or (ii) being removed in accordance with the terms of Section 2(e) below. Immediately on demand therefor by the Secured Party, the Lessee will deliver to the Secured Party any and all evidences of ownership of the Collateral (including certificates of title and applications for title). The Lessee will give the Secured Party not less than 30 days prior written notice of any change of (A) Lessee's corporate, partnership, limited liability company, doing business, trade or legal name or (B) any Collateral Location.

(e)    The Lessee will, at its own cost and expense, maintain all of the tangible Collateral in good working condition and make all necessary renewals, repairs, replacements, additions, betterments and improvements thereto, and, in this connection, the Lessee may temporarily remove the same, or any part thereof, from the Project if such removal is necessary or advisable in connection with the Lessee's fulfilling of its obligations under this Section 2(e), and does not affect the priority of the security interests created under this Agreement.

(f)    The Lessee will, upon request of Secured Party, deliver to Secured Party copies of all reports, financial statements and other information which the Lessee is obligated to provide to HUD in connection with the Project and/or Collateral not later than the earlier of (i) the delivery of such reports, financial statements and other information to HUD or (ii) ten (10) days after Secured Party makes such request.

(g)    The Lessee will not change (i) without thirty (30) days prior notice to the Secured Party, the location of its chief executive office or (ii) without the prior written consent of the Secured Party, which shall not be unreasonably withheld, its jurisdiction of organization.

(h)    The Lessee will not merge or consolidate with or into any other Person without the prior written consent of the Secured Party.

(i)    As used in this Agreement, the capitalized term "Deposit Account" means (1) any deposit account into which payments to the Lessee with respect to the operation of the Project are initially deposited, as opposed to being transferred from another Project account, and (2) any deposit account into which Government Payments are directly transferred from a Government Account (defined below). The Lessee will not establish a Deposit Account unless (A) with respect to any such proposed Deposit Account (other than those set forth on Exhibit C) at least thirty (30) days prior written notice of the name and address of the depository bank, the type of account and any other information reasonably requested by the Secured Party is provided to Secured Party and (B) contemporaneously therewith, if requested by the Secured Party

-4-

consistent with the Lessee's obligations under Section 14, a control agreement in form and substance acceptable to the Secured Party is entered into among the Lessee, the Secured Party and the depository bank where the Deposit Account would be maintained (any such depository bank is referred to herein as a "Depository Bank" and any such control agreement is referred to herein as a "DACA"), unless the Deposit Account is a Government Account. A DACA may not be changed or terminated without the prior written consent of the Secured Party. Upon the Secured Party's written request (which request need be made only once and not on a recurring basis), the Lessee will take all reasonable steps to cause each Depository Bank to provide to the Secured Party (I) whether by Internet access or otherwise, on-line screen access to daily activity in the Deposit Accounts, and (II) a copy of each periodic account statement relating to the Deposit Accounts ordinarily furnished by such Depository Bank to the Lessee. The Lessee authorizes and approves of the Secured Party communicating directly with each Depository Bank. Unless the Lessee receives no Government Payments, the Lessee will maintain one or more separate Deposit Account(s) into which only Government Payments (defined below) are deposited (collectively, the "Government Accounts"), and the Lessee will not commingle in any Government Account proceeds of accounts from non-governmental payors with proceeds of accounts owing from governmental authorities, including Government Payments. The Lessee shall cause all Government Payments related to the operation of the Project to be paid directly into the Government Accounts. Prior to establishing a Government Account, the Lessee shall cause the Depository Bank that maintains such Government Account to enter into a deposit account instruction services agreement with the Secured Party and the Lessee in form and substance acceptable to the Secured Party with respect to such Government Account (each, a "DAISA"), which requires initiation of a funds transfer each business day, unless the Secured Party approves otherwise, of all available funds in the applicable Government Account to a Deposit Account of Lessee that is subject to a DACA and is not a Government Account. Not less than thirty (30) days prior to the effective date thereof, the Lessee will provide to the Secured Party a copy of (i) any change to any DAISA, or (ii) any new directions with respect to a Government Account issued to a Depository Bank maintaining such Government Account, in each case contemporaneously with providing the change or directions to the Depository Bank. Without limiting the generality of the foregoing, without the prior written consent of the Secured Party, neither a change to any DAISA nor any such new directions shall instruct a Depository Bank to transfer funds from the Government Account to a Deposit Account that is not then subject to a DACA. No change to or termination of a DAISA, nor any such new directions with respect to a Government Account, shall be made without the prior written consent of the Secured Party. Also, the Lessee shall not close a Government Account subject to a DAISA without the prior written consent of the Secured Party. Failure of Lessee to comply with any of the provisions of this Section 2(i) shall constitute an "Event of Default." As used herein, "Government Payment" means a payment from a governmental entity and shall include, without limitation, payments governed under the Social Security Act (42 U.S.C. §§ 1395 et seq.), including payments under Medicare, Medicaid and TRICARE/CHAMPUS, and payments administered or regulated by the Centers for Medicare and Medicaid Services of Department of Health and Human Services.

3.    **COMPLIANCE WITH LAWS.** The Lessee will comply with the requirements of all valid and applicable federal, state and local laws.

-5-

4. **TAXES; EXPENSES.** Lessee will pay, when due, all taxes, assessments and other charges lawfully and validly levied or assessed on the Collateral or any part thereof. The Lessee will pay and, as applicable, reimburse the Secured Party for (i) any and all fees, costs and expenses, of whatever kind and nature, including the fees, expenses and disbursements of the Secured Party's counsel (including, but not limited to, fees, expenses and disbursements for preparation of documents, making title examinations and rendering opinion letters) which the Secured Party may incur in connection with filing any financing statements or other public notices to protect its interests hereunder, the enforcement, preservation and/or protection of the Secured Party's rights and/or remedies under the Loan Documents, whether incurred through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or relating to the Loan, and (ii) all filing and recording fees and taxes payable in connection with the transactions contemplated by the Loan Documents. All amounts payable by Lessee to Secured Party under this Section 4 will be paid by the Lessee upon the Secured Party's demand therefor.

5. **INSPECTION; NOTICES.** Subject to resident privacy rights, the Secured Party, or its agents, may enter on the Project and any other Collateral Location at any time during normal business hours, and from time to time, for the purpose of inspecting the Project and/or the Collateral and making copies or abstracts of all of the Lessee's records pertaining to the Collateral. The Lessee will keep accurate and complete records of the Collateral. The Lessee will give the Secured Party prompt notice of any Event of Default.

6. **INSURANCE.** The Lessee will purchase and maintain insurance at all times with respect to the Premises, all improvements now or hereafter located thereon, and all tangible Collateral against risks of fire (including so-called extended coverage), theft, vandalism, and such other risks as the Secured Party may require, in such form, for such periods, and written by such companies as may be satisfactory to the Secured Party, such insurance to include "law and ordinance" coverage, and to be payable to the Secured Party as its interests may appear. The Lessee will purchase and maintain at all times liability insurance and business interruption insurance in such amounts and issued by such companies as may be required from time to time by the Secured Party. All policies of insurance will provide for thirty (30) days advance written notice to the Secured Party of cancellation or any material change in coverages of such insurance. The Lessee will furnish the Secured Party with certificates or other evidence satisfactory to the Secured Party of compliance with the foregoing insurance provisions.

7. **DISCHARGE OF LIENS.** At its option but without any obligation to do so, the Secured Party may (a) discharge any taxes or other Liens at any time levied or placed on the Collateral, (b) pay for insurance on the Collateral, and/or (c) pay for the maintenance and preservation of the Collateral. The Lessee will reimburse the Secured Party on its demand for any payment made, or any expense incurred, by the Secured Party pursuant to this Section 7. All of the foregoing sums paid or advanced by the Secured Party will constitute part of the Obligations and will be secured by the Collateral.

8. **EVENTS OF DEFAULT.** Each of the following events or circumstances, whether or not caused by or within the control of the Lessee, will be an "Event of Default" under this Agreement:

-6-

(a)      The Lessee does not pay when due any of the Obligations, subject to any grace period provided under the Note;

(b)      The Lessee does not observe, perform or comply with any of the terms or conditions of this Agreement;

(c)      A default or breach under the Lease or under any of the Loan Documents (exclusive of this Agreement which is covered by the other subsections of this Section 8) has occurred, which default or breach is not cured within any applicable grace period;

(d)      Any warranty, representation or statement made or furnished to the Secured Party by, or on behalf of, the Lessee proves to have been false in any material respect when made or furnished or when treated as being made or furnished to the Secured Party;

(e)      The Secured Party does not have, for any reason, a perfected, first priority security interest in all of the Collateral except to the extent expressly permitted pursuant to Section 19 hereof;

(f)      There occurs any actual or threatened demolition of or injury or waste to the Project premises, not covered by insurance, or not replaced or restored by the Lessee or the Borrower, which may materially impair the value of the Collateral or the Project;

(g)      Filing by or against the Lessee of a petition in bankruptcy, for a reorganization, arrangement or debt adjustment, or for a receiver, trustee, or similar creditors' representative for Lessee's property or any part thereof, or of any other proceeding under any federal or state insolvency or similar law (and if such petition or proceeding is an involuntary petition or proceeding filed against the Lessee without its acquiescence therein or thereto at any time, the same is not promptly contested and, within 60 days of the filing of such involuntary petition or proceeding, dismissed or discharged), or the making of any general assignment by the Lessee for the benefit of creditors, or the Lessee dissolves or is the subject of any dissolution, winding up or liquidation;

(h)      The Lessee is dissolved and liquidation of the Lessee is commenced in accordance with the Lessee's organizational documents and/or the law of the jurisdiction of organization; or

(i)      The Lessee changes its name or the jurisdiction in which it is organized or merges or consolidates with or into another Person without the prior written consent of the Secured Party.

## 9.      REMEDIES ON DEFAULT.

(a)      If an Event of Default occurs, the Secured Party may then, or at any time after the occurrence of an Event of Default, (A) declare all Obligations immediately due and payable, and whereupon the Obligations will be due and payable automatically and immediately, without notice or demand, which the Lessee expressly waives, and proceed to enforce payment of the Obligations; (B) exercise all of the rights and remedies afforded to the Secured Party under (i) the terms of this Agreement and/or any of the other Loan Documents, (ii) under the UCC (as

-7-

defined in Section 12 below), and/or (iii) by law and/or in equity (subject, however, to any limitations imposed by applicable law with respect to Healthcare Assets); (C) collect and receive the proceeds of all Awards (as defined in Exhibit B), the rights of Lessee thereto and shares of Lessee therein being hereby assigned to the Secured Party, and give proper receipts and acquittances therefor and apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the Obligations; (D) require the Lessee to assemble the Collateral and make it available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient to both parties, and (E) without limiting the provisions of Section 1(b), apply (or instruct another Person to apply) to the Obligations the balance of any deposit account that is part of the Collateral.

(b)      Without limitation of those rights and remedies, the Secured Party may, upon written notice to the Lessee, take, and publicly or privately sell or convey, full right, title and interest in and to the Collateral, or any part of it, in the name of the Secured Party and/or its designees.  To the extent not prohibited by applicable law with respect to Healthcare Assets, the Lessee hereby constitutes and appoints the Secured Party as its true and lawful attorney in fact to assign and transfer its interest in any or all of the Collateral if an Event of Default occurs.

(c)      If any notice is required by law for the Secured Party to make a sale or other disposition of the Collateral, the Secured Party and the Lessee agree that notice will not be unreasonable as to time if given in compliance with this Agreement ten (10) days before any sale or other disposition of the Collateral.  All reasonable attorneys' and paralegal fees and other legal expenses incurred by the Secured Party to collect the Obligations, to retake, hold, prepare for sale, and to dispose of the Collateral will be (i) payable to the Secured Party on its demand for payment, (ii) part of the Obligations, and (iii) secured by the Collateral.

(d)      The Lessee further specifically agrees that, in any exercise of the rights of the Secured Party under this Agreement or under any other Loan Document, (i) any combination of the Collateral and/or any other security for the Obligations may be offered for sale and (ii) all of the Collateral and/or any other security for the Obligations may be sold for one total price, and the proceeds of any such sale accounted for in one account without distinction among the items of security or without assigning to them any proportion of such proceeds, the Lessee hereby waiving the application of any doctrine of marshaling.

(e)      The Lessee shall cooperate in any legal and lawful manner necessary or required, to permit the Secured Party or its successors and assigns to continue to operate and maintain the Project for its Approved Use in Lessee's name, place and stead.  For this purpose, and to the extent not prohibited by applicable law with respect to Healthcare Assets, Lessee irrevocably appoints the Secured Party, its successors and assigns, as Lessee's true and lawful attorney-in-fact, to do all things necessary or required by the state in which the Project is located or any other government entity with jurisdiction over the Project, including, but not limited to, the provision of any and all information and data, the payment of fees and other charges, and the execution of documents, all in the name of the Lessee.  This power is coupled with an interest.

## 10.      NO WAIVER BY SECURED PARTY; CUMULATIVE RIGHTS.

(a)     No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will be effective unless such waiver is in writing and signed by duly authorized representatives of the Secured Party. No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will operate as a waiver of any other Event of Default or default or of the same Event of Default or default on a future occasion. The Secured Party may delay in exercising or omit to exercise any right or remedy under this Agreement, any other Loan Document or by law or equity provided without waiving that or any past, present or future right or remedy. All rights and remedies of the Secured Party in this Agreement and the other Loan Documents will be cumulative, and none of these rights or remedies will be exclusive of any other right or remedy allowed at law or in equity or in any other Loan Document, and all of these rights and remedies may be exercised and enforced concurrently.

(b)     Neither the Lessee nor any other Persons interested in the Collateral or the proceeds of the Collateral shall have any right to require the Secured Party first to resort to or proceed personally against any other Person or to proceed against any other collateral security, or to give priority or preference to any item of Collateral, or to proceed upon any guaranty, prior to exercising its rights hereunder. No renewal or extension of the Loan, no release or surrender of the Collateral and/or any other security for the Obligations, no release of any obligor with respect to the Obligations, and no delay by the Secured Party in enforcing the Obligations or exercising any right or power with respect to the Obligations shall affect the Secured Party's rights with respect to the Collateral.

**11.     BINDING EFFECT.**  All rights and remedies of the Secured Party under this Agreement will inure to the benefit of the Secured Party's successors and assigns; and all agreements, obligations, and duties of the Lessee will bind its heirs, personal representatives and permitted successors and assigns; however, the Lessee may not assign this Agreement or any of its rights under this Agreement or delegate any of its duties or obligations under this Agreement without the consent of the Secured Party.

**12.     GOVERNING LAW; CONSTRUCTION; WAIVER OF TRIAL BY JURY.**

(a)     This Agreement and all rights and obligations under this Agreement, including matters of construction, validity and performance, will be governed by the laws of the state in which the Project is located (the "State") except as to the existence, validity, perfection or priority (and the effect of perfection or non-perfection or invalidity) of any Lien of the Secured Party on any deposit account which will be governed by the laws of the state in which the applicable deposit account is maintained at the applicable bank, savings and loan association, credit union or like organization. If any term of this Agreement is found to be invalid by a court with jurisdiction under the laws of the State or laws of mandatory application, then the invalid term will be considered excluded from this Agreement and will not invalidate the remaining terms of this Agreement. All uncapitalized terms used herein which are now or hereafter defined in the Uniform Commercial Code, as now enacted in the State or as hereafter amended or superseded (the "UCC"), will have the same meaning herein as in the UCC unless the context indicates otherwise. Every power given herein is coupled with an interest and is irrevocable by death, dissolution or otherwise.  The definition of any document includes all schedules, attachments and exhibits to that document, and all renewals, extensions, supplements,

<div align="center">-9-</div>

<div align="center">App.328</div>

amendments, modifications, restatements and consolidations of that document, and any document given in substitution for or replacement of that document. The term "including" is used by way of example only and not by way of limitation, and the singular includes the plural and conversely. The captions or headings contained in this Agreement are for reference purposes only and will not affect or relate to the interpretation of this Agreement.

(b)    AS A SPECIFICALLY BARGAINED INDUCEMENT FOR THE SECURED PARTY TO ENTER INTO THE AGREEMENT AND EXTEND CREDIT TO BORROWER, SECURED PARTY AND LESSEE EACH HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES ANY AND ALL RIGHT(S) TO A TRIAL BY JURY FOR ANY CAUSE OF ACTION, CLAIM OR DEFENSE RELATING TO, RESULTING FROM OR ARISING OUT OF ANY OF THE LOAN AND/OR ANY TRANSACTIONS, RIGHTS AND/OR OBLIGATIONS CONTEMPLATED BY THIS AGREEMENT AND/OR ANY OF THE OTHER LOAN DOCUMENTS. LESSEE FURTHER ACKNOWLEDGES THAT SUCH WAIVER OF THE RIGHT TO A TRIAL BY JURY IS MADE AFTER CONSULTATION WITH COUNSEL.

13.    **TERM OF AGREEMENT.** The term of this Agreement will begin on the date of this Agreement and continue in full force and effect and be binding on the Lessee until the date that all of the Obligations are fully and finally paid and satisfied.

14.    **PERFECTION; FURTHER ASSURANCES.** The Lessee agrees to comply with all applicable laws and requirements in order to grant to the Secured Party a valid, perfected first Lien on the Collateral except to the extent expressly permitted pursuant to Section 19 hereof. At any time and from time to time, the Lessee, on request of the Secured Party, will give, execute, file and/or record any notice, financing statement, instrument, document or agreement that the Secured Party may consider necessary or desirable to create, preserve, continue, perfect or validate any security interest or other Lien granted under this Agreement or which the Secured Party may consider necessary or desirable to exercise or enforce its rights under this Agreement. Without limiting the generality of the foregoing, the Secured Party is authorized to file with respect to the Collateral one or more financing statements or other documents without the signature of the Lessee and to name therein the Lessee as debtor and the Secured Party and/or HUD as secured parties; and correct or complete, or cause to be corrected or completed, any financing statements or other such documents as have been filed naming the Lessee as debtor and the Secured Party and/or HUD as secured parties. The Lessee hereby appoints the Secured Party as its attorney-in-fact and authorizes the Secured Party, acting alone on behalf of the Lessee, to execute, acknowledge, deliver, file and/or record any and all documents requiring execution by the Lessee and necessary or desirable to effectuate or facilitate the purposes of this Agreement and/or the obligations or covenants of the Lessee under this Agreement. The power of attorney granted hereby is coupled with an interest and is irrevocable. The Secured Party is also authorized by the Lessee to give notice to any Person that the Secured Party may consider necessary or desirable under applicable law to preserve, perfect or protect the Secured Party's and or HUD's interests in the Collateral. Without limiting the generality of the foregoing, with respect to any of the Collateral for which control of such Collateral is a method of perfection under the UCC, including all of the Lessee's rights, titles and interests in deposit accounts, investment property, electronic chattel paper and letter-of-credit rights, the Lessee will, on

-10-

Secured Party's request, cause to be executed by each Person that the Secured Party determines is appropriate, a control agreement in a form acceptable to the Secured Party.

15.    **INTEREST.**  Any amounts payable by the Lessee under this Agreement will bear interest at the rate of interest provided in the Note from the date on which such amounts are payable under this Agreement until the date on which such payments are made by the Lessee to the Secured Party; however, nothing in this Agreement will be deemed to give to the Lessee the right to withhold payment in consideration of the payment of such interest.

16.    **DELIVERY OF NOTICES.**  All notices must be in writing and sent (a) in person, (b) by certified or registered mail, or (c) by overnight delivery carrier for next day delivery, in each case to the address listed in the opening paragraph of this Agreement (or if notice of a new address is given in accordance with this Agreement, to the new address). Notice given in any other manner will not be considered delivered or given unless and until actually received. A notice period will start (i) if mailed, three business days after notice was sent by certified or registered mail, (ii) the next business day after being sent by overnight delivery, and (iii) the day the notice was delivered in person.

17.    **REVIVAL OF SECURITY INTEREST.**  If the Lessee makes a payment or payments to the Secured Party (or the Secured Party receives any payment or proceeds of the Collateral) that are subsequently voided, avoided, set aside, annulled, or disregarded under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of the payment or proceeds received, the Obligations or part intended to be satisfied will be revived and will continue in full force and effect as if these payment(s) or proceeds had not been received by the Secured Party, and the security interest granted herein shall be enforceable as to such Obligations as fully as if such payments had never been made.

18.    **CLAIMS AGAINST SECURED PARTY.**

(a)    Notification.  The Secured Party shall not be in default under this Agreement, or under any of the other Loan Documents, unless a written notice specifically setting forth the claim of the Lessee shall have been given to Secured Party within one hundred eighty (180) days after the occurrence of the event which the Lessee alleges gave rise to such claim and the Secured Party does not remedy or cure the default, if any, with reasonable promptness thereafter.

(b)    Remedies.  If it is determined by the final, non-appealable order of a court of competent jurisdiction that the Secured Party has breached any of its obligations under the Loan Documents and has not remedied or cured same with reasonable promptness following receipt of notice thereof, the Secured Party's responsibilities shall be limited to the following: (i) where the breach consists of the failure to grant consent or give approval in violation of the terms and requirements of any of the Loan Documents, the obligation to grant such consent or give such approval; and (ii) where the breach involves any other violation of the Loan Documents, or where the Secured Party is determined to have acted in bad faith, the payment of any actual, direct, compensatory damages sustained by the Lessee as a result thereof.

(c)    Limitations. In no event, however, shall the Secured Party be liable to the Lessee, or to any other party claiming through the Lessee, for any other damages, including, without

-11-

limitation, indirect, speculative, or punitive damages, whatever the nature of the breach by the Secured Party of its obligations under any of the Loan Documents. In no event shall the Secured Party be liable to the Lessee, or to any other party claiming through the Lessee, unless a written notice specifically setting forth the nature of the claim shall have been given to the Secured Party within the time period specified above.

### 19. PROVISIONS REGARDING ACCOUNTS RECEIVABLE LOANS.

(a)    Definitions. The following words and terms shall have the meanings hereinafter set forth:

"Accounts" shall mean all right, title and interest of the Lessee in and to the following, in each case arising from the Lessee's operation of the Project in the ordinary course of the Lessee's business: (a) all rights to payment of a monetary obligation, whether or not earned by performance, including, but not limited to, accounts (including, but not limited to accounts receivable, health-care insurance receivables, Medicaid and Medicare receivables, Veterans Administration receivables, or other governmental receivables, private patient receivables, and HMO receivables), (b) payment intangibles, (c) guaranties, letter-of-credit rights and other supporting obligations relating to the property described in clauses (a) and (b), and (d) all of the proceeds of the property described in clauses (a), (b) and (c). Notwithstanding the foregoing, "Accounts" do not include accounts rising from the sale of the Lessee's equipment, inventory or other goods, other than accounts arising from the sale of Lessee's inventory in the ordinary course of the Lessee's business.

"Eligible AR Lender" means a bank, financial institution or other institutional lender which is in the business of making loans to provide working capital to businesses and which is not affiliated with the Lessee.

"Eligible AR Loan" means a loan or line of credit obtained by the Lessee from an Eligible AR Lender (a) for the sole purpose of providing working capital for the operation of the Project and, with the approval of HUD and Secured Party, other projects that are encumbered by mortgage loans insured or held by HUD and (b) which satisfies all of the requirements of this Section 19.

"Required Intercreditor Agreement" means an Intercreditor Agreement (including any HUD-required Rider) executed by the Secured Party, the Eligible AR Lender, the Lessee and the Borrower, in form and substance satisfactory to Secured Party and approved by HUD.

(b)    Eligible AR Loan. Subject to the written approval of Secured Party and HUD, the Lessee may obtain and maintain at any time one, and only one, Eligible AR Loan, which Eligible AR Loan may be secured by a first lien on the "AR Lender Priority Collateral" (composed of Accounts and as further defined in the Required Intercreditor Agreement), subject to the following limitations and requirements:

(i)    in no event shall the principal amount of the Eligible AR Loan ever exceed such amount as may be approved in writing by Secured Party and HUD;

(ii)    without the written approval of the Secured Party, none of the Collateral, except the AR Lender Priority Collateral, shall be given as security for any Eligible AR Loan;

(iii)    with respect to any existing Eligible AR Loan, the Eligible AR Lender, Lessee and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement prior to closing of the Loan;

(iv)    with respect to any other Eligible AR Loan, the Eligible AR Lender, Lessee and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement before such Eligible AR Loan is closed, any funds are disbursed thereunder, any UCC financing statements are filed in connection therewith or any security interest in connection therewith is granted or perfected;

(v)    the Eligible AR Loan, the collateral therefor and all of the terms and conditions thereof shall at all times comply with all of the terms and conditions of the applicable Required Intercreditor Agreement; and

(vi)    until the Eligible AR Loan is paid in full, the written approval of the Secured Party and HUD is required for any proposed modifications, extensions, renewals, or amendments to a Material Term of the Eligible AR Loan or the related security agreement, prior to the effective date of such amendment(s).    As used herein, "Material Term" means a term in a loan or security agreement that (1) extends the maturity date of the loan, (2) adds guarantors to the loan, (3) releases guarantors from the loan, (4) adds borrowers to the loan, (5) adds an interest reserve to the loan, (6) amends the interest rate payable on the outstanding principal balance of the loan, (7) increases or decreases the principal amount of the loan, (8) adds collateral as additional security for the loan, and/or (9) amends or expands the type of obligations secured by the loan.

(c)    Required Intercreditor Agreement.    Each Required Intercreditor Agreement shall be included in the definition of the Loan Documents while it is in effect.    The Lessee shall comply at all times with the Required Intercreditor Agreement then in effect.

(d)    Information.    Lessee shall, from time to time, promptly following a request by Secured Party or HUD, provide to Secured Party and/or HUD (i)  any and all information and documents available to Lessee regarding any Eligible AR Loan and/or AR Lender Priority Collateral (including, but not limited to histories of draws upon, payments on account of, and outstanding balances with respect to, the Eligible AR Loan) and (ii) copies of any and all documents evidencing, securing and/or related to any Eligible AR Loan and/or any amendments thereto.

## 20.    WAIVERS.

(a)    No act or thing need occur to establish the liability of the Lessee hereunder, and no act or thing, except full payment and discharge of all of the Obligations, shall

-13-

in any way exonerate the Lessee or modify, reduce, limit or release the liability of the Lessee hereunder.

(b)    The Lessee will not exercise or enforce any right of contribution, reimbursement, recourse or subrogation available to the Lessee against any Person liable for payment of the Obligations, or as to any collateral security therefor, unless and until all of the Obligations shall have been fully paid and discharged.

(c)    Whether or not any existing relationship between the Lessee and the Borrower has been changed or ended and whether or not this Agreement has been terminated, the Secured Party may, but shall not be obligated to, enter into transactions resulting in the creation or continuance of Obligations without any consent or approval by the Lessee and without any notice to the Lessee.  The liability of the Lessee shall not be affected or impaired by any of the following acts or things (which the Secured Party is expressly authorized to do, omit or suffer from time to time, both before and after termination of this Agreement, without notice to or consent or approval by the Lessee): (i) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all Obligations; (ii) any one or more extensions or renewals of Obligations (whether or not for longer than the original period) or any modification of the interest rates, maturities or other contractual terms applicable to any Obligations; (iii) any waiver or indulgence granted to Borrower, any delay or lack of diligence in the enforcement of Obligations, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Obligations; (iv) any full or partial release of, settlement with, or agreement not to sue Borrower or any other Person liable in respect of any Obligations; (v) any discharge of any evidence of Obligations or the acceptance of any instrument in renewal thereof of substitution therefor; (vi) any failure to obtain collateral security (including rights of setoff) for Obligations, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure, or enforce any collateral security; or any modification, substitution, discharge, impairment, or loss of any collateral security; (vii) any foreclosure or enforcement of any collateral security; (viii) any transfer of any Obligations or any evidence thereof; (ix) any order of application of any payments of credits upon Obligations; (x) any election by Secured Party under §1111(b)(2) of the United States Bankruptcy Code.

(d)    The Lessee waives any and all defenses, claims and discharges of Borrower, or any other obligor, pertaining to Obligations, except the defense of discharge by payment in full.  Without limiting the generality of the foregoing, the Lessee will not assert, plead or enforce against Secured Party any defense of waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to Borrower or any other Person liable in respect of any indebtedness, or any setoff available against Secured Party to Borrower or any such other Person, whether or not on account of a related transaction.  The Lessee expressly agrees that the Lessee shall be and remain liable, to the extent of the Collateral, for any deficiency remaining after foreclosure of any security interest securing the Obligations, whether or not the liability of Borrower or any other obligor for such deficiency is discharged pursuant to statute or judicial decision.

(e)     The Lessee waives presentment, demand for payment, notice of dishonor or nonpayment, and protest of any instrument evidencing the Obligations. To the extent of the Collateral, this Agreement constitutes an absolute, unlimited, unconditional and continuing guaranty of payment, not collection.  The Secured Party shall not be required first to resort for payment of the Obligations to Borrower, or any other Persons or their properties, or first to enforce, realize upon or exhaust any collateral security for Obligations, before enforcing this Agreement.

(f)     The liability of the Lessee under this Agreement is in addition to and shall be cumulative with all other liabilities of the Lessee to Secured Party as obligor or otherwise, without any limitation as to amount, and all other liabilities of any other Person who guarantees all or any portion of the Obligations, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

(g)     This Agreement shall be effective upon delivery to Secured Party, without further act, condition or acceptance by Secured Party.  Any invalidity or unenforceability of any provision of application of this Agreement shall not affect other lawful provisions and application hereof, and to this end the provisions of this Agreement are declared to be severable.

(h)     Lessee hereby covenants that this Agreement will not be discharged except by complete performance of the obligations contained in this Agreement.  Lessee waives all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of, and reliance on, this Agreement.  Lessee further waives all (i) notices of the existence, creation or incurring of new or additional indebtedness, arising either from additional loans extended to Lessee or Borrower, or otherwise, (ii) notices that the principal amount, or any portion thereof (and any interest thereon), of the Loan or any of the other Obligations is due, (iii) notices of any and all proceedings to collect from Lessee and/or Borrower of all or any part of the Obligations, or from anyone else, (iv), to the extent permitted by law, notices of exchange, sale, surrender or other handling of any security or collateral given to Secured Party to secure payment of all or any part of the Obligations, and (v) defenses based on suretyship or impairment of collateral.

## 21.     MISCELLANEOUS.

(a)     This Agreement is intended to be supplemental to and not in substitution or in derogation of any security agreement contained in any other Loan Document.

(b)     In any instance where the consent or approval of the Secured Party may be given or is required or any determination is to be rendered by the Secured Party hereunder, the granting, withholding or denial of such consent or approval and the rendering of such determination shall be made or exercised by the Secured Party at its sole and exclusive option.

(c)     It is understood and agreed that no judgment or decree which may be entered on any debt secured or intended to be secured by the Mortgage shall operate to abrogate or lessen the effect of this Agreement, but that this Agreement shall continue in full force and effect until the payment and discharge of the Obligations.

(d)    This Agreement, any Required Intercreditor Agreement and the other Loan Documents represent the entire agreement between the Secured Party and the Lessee with respect to the subject matter of this Agreement and supersede all previous agreements, negotiations, and understandings with respect to the subject matter of this Agreement. Neither this Agreement nor any of the other Loan Documents to which Lessee is a party may be amended, altered or changed other than in a writing signed by the Secured Party and the Lessee. The Lessee's warranties and representations in this Agreement will be treated as being continuing warranties and representations, made by the Lessee with the same effect as though the representations and warranties had been made again on, and as of, each day of the term of this Agreement.

(e)    This Agreement may be executed in several counterparts and each counterpart will be considered an original of this Agreement.

## 22.    RIGHTS OF SECRETARY OF HOUSING AND URBAN DEVELOPMENT.

(a)    Lessee and Secured Party hereby agree that HUD shall be an additional secured party under this Security Agreement together with Secured Party, as their interests may appear, and that HUD shall be listed on the Uniform Commercial Code Financing Statements to be filed contemporaneously herewith; provided, however, that nothing herein or in the Uniform Commercial Code Financing Statements shall require the execution, now or any future time, of any amendment, extension, or other document by HUD.

(b)    To the extent any party herein is required or desires to give notice to HUD hereunder, such notice shall be delivered in accordance with the provisions hereof, as follows: U.S. Department of Housing and Urban Development, c/o Office of Healthcare Programs, 451 7th Street S.W., Washington, DC 20410.

**IN WITNESS WHEREOF,** the Lessee and the Secured Party have signed this Agreement as of the date in the first paragraph of this Agreement.

[SEE ATTACHED COUNTERPART SIGNATURE PAGES]

-16-

## COUNTERPART SIGNATURE PAGE TO LESSEE SECURITY AGREEMENT

**THE LESSEE:**

**WHITEHALL MANOR, INC.,**
a Pennsylvania corporation

By: _____
Nimita Kapoor Atiyeh, President

-17-

## COUNTERPART SIGNATURE PAGE TO LESSEE SECURITY AGREEMENT

**THE SECURED PARTY:**

**M&T REALTY CAPITAL CORPORATION,**
a Maryland corporation

By: _Christine R. Chandler_
    Christine R. Chandler, Vice President

-18-

## EXHIBIT A TO LESSEE SECURITY AGREEMENT

**UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.**

**PARCEL ID NO.  5498 9378 8632-1**

**Together with an undivided interest of 50% of, in and to the Common Elements of the said WHITEHALL MANOR CONDOMINIUM.**

## EXHIBIT B TO LESSEE SECURITY AGREEMENT

All of the following described property and interests in property, whether now in existence or hereafter arising, and relating to, situated or located on or used or usable in connection with the maintenance and/or operation of the property described in Exhibit A (hereafter referred to as the "Premises").

(a) All fixtures, furniture, equipment and other goods and tangible personal property of every kind and description whatsoever now or hereafter located on, in or at the Premises, including, but not limited to, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, radiators, motors, furnaces, compressors and transformers; all power generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment, and fixtures, fans and switchboards; all telephone equipment; all piping, tubing and plumbing equipment and fixtures; all heating, refrigeration, air-conditioning, cooling, ventilating, sprinkling, water, power, waste disposal and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, kitchen and laundry fixtures, utensils, appliances and equipment, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture now or hereafter installed or used or usable in the operation of any part of the buildings, structures or improvements erected or to be erected in or upon the Premises and every replacement thereof, accession thereto, or substitution therefor, whether or not all of the above are now or hereafter acquired or attached to the Premises in any manner;

(b) All articles of tangible personal property not otherwise described herein which are now or hereafter located in, attached to or used in, on or about the buildings, structures or improvements now or hereafter located, placed, erected, constructed or built on the Premises and all replacements thereof, accessions thereto, or substitution therefor, whether or not the same are, or will be, attached to such buildings, structures or improvements in any manner;

(c) All rents, leases, income, revenues, issues, profits, royalties and other benefits arising or derived or to be derived from, or related to, directly or indirectly, the Premises, whether or not any of the property described in this item (c) constitutes accounts, chattel paper, documents, general intangibles, instruments or money;

(d) All awards now or hereafter made ("Awards") with respect to the Premises as a result of (i) the exercise of the power of condemnation or eminent domain, or the police power, (ii) the alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Premises (including, but not limited to, any destruction or decrease in the value by fire or other casualty), whether or not any of the property described in this item (d) constitutes accounts, chattel paper, documents, general intangibles, instruments, investment property, deposit accounts, or money;

-20-

(e) All land surveys, plans and specifications, drawings, briefs and other work product and other papers and records now or hereafter used in the construction, reconstruction, alteration, repair or operation of the Premises;

(f) All licenses, permits, certificates and agreements for the provision of property or services to or in connection with, or otherwise benefiting, the Premises, any nursing home license, assisted living facility license, any and all Medicaid/Medicare Provider Agreements, and any other license necessary for the provision of services at the Premises; however, the Secured Party disclaims a security interest in such of the property described in this item (f) to the extent that a security interest in such property may not be granted to the Secured Party without the forfeiture of the rights of the Debtor (or any assignee of the Debtor) or a default resulting thereunder.

(g) All funds, monies, securities and other property held in escrow, lock boxes, depository or blocked accounts or as reserves and all rights to receive (or to have distributed to the Debtor) any funds, monies, securities or property held in escrow, lock boxes, depository or blocked accounts or as reserves, including, but not limited to, all of Debtor's rights (if any) to any funds or amounts in that certain reserve funds and/or residual receipts accounts created under the Regulatory Agreement required by the Secretary of Housing and Urban Development or the Federal Housing Administration Commissioner;

(h) All accounts, accounts receivable, general intangibles, chattel paper, instruments, documents, inventory, goods, cash, bank accounts, certificates of deposits, securities, insurance policies, letters of credit, deposits, judgments, liens, causes of action, warranties, guaranties and all other properties and assets of the Debtor, tangible or intangible, whether or not similar to the property described in this item (h). As used herein, the term "accounts receivable" shall include (i) all healthcare insurance receivables, including, but not limited to Medicaid and Medicare receivables, Veterans Administration or other governmental receivables, private patient receivables, and HMO 10 receivables; (ii) any payments due or to be made to the Debtor relating to the Premises or (iii) all other rights of the Debtor to receive payment of any kind with respect to the Premises;

(i) All books, records and files of whatever type or nature relating to any or all of the property or interests in property described herein or the proceeds thereof, whether or not written, stored electronically or electromagnetically or in any other form, and whether or not such books, records, or files constitute accounts, equipment or general intangibles.

(j) Any and all security or other deposits which have not been forfeited by any tenant under any lease; and

(k) All products and proceeds of any and all of the property (and interests in property) described herein, including, but not limited to, proceeds of any insurance, whether or not in the form of original collateral, accounts, contract rights, chattel paper, general intangibles, equipment, fixtures, goods, securities, leases, instruments, inventory, documents, deposit accounts or cash.

-21-

## EXHIBIT C TO LESSEE SECURITY AGREEMENT

**Other Names Used by Lessee in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Assets Acquired in Bulk Transfer in Previous Five Years** (see Section 2(a) of Agreement):
**None**

**Lessee's Rights in the Following** (see Section 2(a) of Agreement):

*Investment property*:  None

*Letters of Credit*: None

*Electronic Chattel Paper*: None

*Commercial Tort Claims*: None

*Instruments (including promissory notes)*: None

*Deposit Accounts*:

| Account Number | Depository Bank | Account Type (e.g., operating or payroll) | Government Accounts (see note below) |
|---|---|---|---|
| 8172587 | National Penn Bank | Operating | None |

Note:  Designate if Deposit Account receives deposits of proceeds of accounts from federal, state or local governments (e.g., Medicare and Medicaid), and if so, whether such Deposit Account is solely for such deposits or whether the Deposit Account commingles other non-governmental deposits.  See Section 2(i) of the Agreement for the Lessee's obligations in this regard.

-22-

1/18/2012 12698621

# EXHIBIT K

# COUNTY OF NORTHAMPTON



### RECORDER OF DEEDS
NORTHAMPTON COUNTY GOVERNMENT CENTER
669 WASHINGTON STREET
EASTON, PENNSYLVANIA 18042-7486
Area Code (610) 559-3077

Andrea F. Suter - Recorder
Dorothy J. Edelman - Deputy

Book - 2012-1   Starting Page - 300709
*Total Pages -   11

Instrument Number - 2012040239

Recorded On 12/13/2012 At 1:05:05 PM

| NCGIS Registry UPI Certification |
| On December 13, 2012 By HG |

* Instrument Type - MORTGAGE

Invoice Number - 727362

* Mortgagor - SAUCON TRUST

* Mortgagee - M&T REALTY CAPITAL CORPORATION

User - BLM

* Customer - SIMPLIFILE LC E-RECORDING

| *FEES | | *RECORDED BY: |
|---|---|---|
| STATE WRIT TAX | $0.50 | OMEGA ABSTRACT |
| JCS/ACCESS TO JUSTICE | $23.50 | 512 W HAMILTON STREET |
| RECORDING FEES | $25.00 | ALLENTOWN, PA 18101 |
| AFFORDABLE HOUSING | $14.02 | |
| AFFORDABLE HOUSING – ADMIN FEE | $2.48 | |
| COUNTY RECORDS IMPROVEMENT FEE | $2.00 | I hereby CERTIFY that this document is recorded in the Recorder's Office Of Northampton County, Pennsylvania |
| DEEDS RECORDS IMPROVEMENT FEE | $3.00 | |
| UPI CERTIFICATION FEE | $10.00 | |
| TOTAL PAID | $80.50 | |

Andrea F. Suter
Recorder of Deeds

THIS IS A CERTIFICATION PAGE

# Do Not Detach

THIS PAGE IS NOW THE FIRST PAGE
OF THIS LEGAL DOCUMENT

00AE99

## Book: 2012-1        Page: 300709

\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

App.343

Return to:
-Donald B. Lewis
Vorys, Satci, Seymour and Pease LLP
301 East Fourth Street
Suite 3500, Great American Tower
Cincinnati, Ohio 45202

UPI: Q 7SW2A-1-3-0715

FHA Form No. 4171-b
   (CORPORATE)
Rev. March 1971

# MORTGAGE

THIS MORTGAGE made as of the 1st day of December, 192012 , between SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007, a trust formed under the laws of Pennsylvania, the Mortgagor and M&T REALTY CAPITAL CORPORATION, a corporation organized and existing under the laws of the state of Maryland and having its principal place of business at 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201, the Mortgagee

In order to secure the payment of an indebtedness in the principal sum of Nineteen Million Four Hundred Sixty-Two Thousand Eight Hundred and No/100 Dollars ($19,462,800.00), lawful money of the United States, which sum or so much thereof as may be advanced with interest thereon at Two and one half percent (2.50%) per annum, is payable in accordance with the terms of a certain note bearing even date herewith as follows:

Interest only payable on the first day of January, 2013. Commencing on the first day of February, 2013, monthly installments of interest and principal shall be paid in the sum of Sixty-Nine Thousand Five Hundred Seventy-Eight and 58/100 Dollars ($69,578.58) each, such payments to continue monthly thereafter on the first day of each succeeding month until the entire indebtedness has been paid in full. In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest, shall be due and payable on January 1, 2048. The installments of interest and principal shall be applied first to interest at the rate of two and one half percent (2.50%) per annum upon the principal sum or so much thereof as shall from time to time remain unpaid and the balance thereof shall be applied on account of principal.

which note provides:  (1) that privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due, on the first day of any month prior to maturity upon at least thirty (30) days prior written notice to the holder; (2) that if the debt is paid in full prior to maturity and while insured under the National Housing Act, all parties liable for payment thereof hereby agree to be jointly and severally bound to pay to the holder hereof any adjusted premium charge required by the applicable Regulations; (3) that notwithstanding any provision for a prepayment charge or premium, prepayments of principal made as aforesaid, which do not exceed an aggregate of fifteen per centum (15%) of the original principal sum of the note in any one calendar year, may be made without any prepayment charge or premium; and (4) that no default shall exist by reason of nonpayment of any required installment of principal so long as the amount of optional additional prepayments of principal made pursuant to the privilege of prepayment equals or exceeds the amount of such required installment of principal; and (2) that in the event any installment or part of any installment due under the Note becomes delinquent for more than fifteen (15) days, there shall be due, at the option of the holder of the Note, in addition to other sums due, a late charge in an amount equal to two percent (2%) of the amount of principal and/or interest so delinquent, as further provided in the Note.

1

And also to secure payment by the Mortgagor to the Mortgagee of all sums expended or advanced by the Mortgagee pursuant to any term or provision of this mortgage;

And also to secure performance of each covenant, term, condition and agreement of the Mortgagor herein contained and in a certain ~~Building Loan Agreement and~~ Regulatory Agreement hereinafter referred to;

The Mortgagor for valuable consideration, the receipt of which is hereby acknowledged, hath granted, bargained, sold, aliened, enfeoffed, released and confirmed, and by these presents doth grant, bargain, sell, alien, enfeoff, release and confirm unto the said Mortgagee, all the following-described real estate situate in the **Borough** of **Hellertown**, County of **Northampton**, and Commonwealth of Pennsylvania; to wit:

See **Exhibit A**, attached hereto and incorporated herein by reference.

TOGETHER with all and singular the buildings and improvements on said premises, as well as all alterations, additions, or improvements now or hereafter made to said premises, and any and all appliances, machinery, furniture, and equipment (whether fixtures or not) of any nature whatsoever now or hereafter installed in or upon said premises, streets, alleys, passages, ways, waters, water courses, rights, liberties, privileges, hereditaments, and appurtenances whatsoever thereunto belonging, or in anywise appertaining, and the reversions and remainders, rents, issues and profits thereof; and

TOGETHER with all building materials and equipment now or hereafter delivered to said premises and intended to be installed therein; and

TOGETHER with all fixtures and articles of personal property now or hereafter attached to or in and about the building or buildings now erected or hereafter to be erected on the lands herein described which are necessary to the complete and comfortable use and occupancy of such building or buildings for the purposes for which they were or are to be erected, including all goods, chattels, and personal property as are ever used or furnished in operating a building, or the activities conducted therein, similar to the one herein described and referred to, and all renewals or replacements thereof or articles in substitution therefor, whether or not the same are, or shall be attached to said building or buildings in any manner.

And the said Mortgagor, for itself, its successors and assigns does hereby covenant, promise, and agree with said Mortgagee, its successors and assigns, that all furnaces, heaters, ranges, mantels, cabinets, gas and electric light fixtures, elevators, laundry equipment, refrigerator, air-conditioning equipment, including all operating equipment, Murphy beds and all apparatus, appliances, and fixtures for the creation and distribution of light, heat, power, and water, including all pipes, wires, faucets, bathroom and kitchen fixtures of whatever kind and nature at present contained or hereafter placed in the building or hereafter standing upon the mortgaged premises and all structures, gas and oil tanks, screens, shades, awnings and Venetian blinds, storm doors and windows and equipment erected or placed in or upon the mortgaged premises are to be considered as annexed to and forming part of the freehold.

TO HAVE AND TO HOLD the said lot or piece of ground described, with the buildings and improvements thereon erected, the hereditaments and premises hereby granted or mentioned and intended so to be, with the appurtenances unto the said Mortgagee, its successors or assigns, to and for the only proper use and behoof of the said Mortgagee, its successors or assign forever;

Provided however that if said Mortgagor does and shall well and truly pay or cause to be paid unto the said Mortgagee, the aforesaid debt or principal sum secured by this mortgage, on the day and

2

time and in the manner hereinbefore mentioned and appointed for payment of the same, together with interest and all sums advanced for payment of any ground rents, taxes, water rents, charges, claims or insurance premiums and any other advance hereunder as aforesaid, without any fraud or further delay and without any deduction, defalcation or abatement to be made of anything, for or in respect of any ground rents, taxes or water rents or charges or claims or advances whatsoever, then this mortgage and the estate hereby granted, shall cease and become void.

The Mortgagor covenants with the Mortgagee as follows:

1.    That the Mortgagor will deposit with the Mortgagee concurrently with payments of interest or of interest and principal, on the first day of each month after the date hereof until the said note is fully paid, the following sums:

(a)    An amount sufficient to provide the holder hereof with funds to pay the next mortgage insurance premium if this mortgage and the note secured hereby are insured, or a monthly service charge, if they are held by the Secretary of Housing and Urban Development, as follows:

(i)    if and so long as said note of even date and this mortgage are insured or are reinsured under the provisions of the National Housing Act, an amount sufficient to accumulate in the hands of the holder one month prior to its due date the annual mortgage insurance premium, in order to provide such holder with funds to pay such premium to the Secretary of Housing and Urban Development pursuant to the National Housing Act, as amended, and applicable Regulations thereunder, or

(ii)    Beginning with the first day of the month following an assignment of this mortgage and the note secured hereby to the Secretary of Housing and Urban Development, a monthly service charge which shall be an amount equal to one-twelfth of one-half per centum of the average outstanding principal balance due on the note computed for each successive year, beginning with the first of the month following such assignment, without taking into account delinquencies or prepayments.

(b)    A sum equal to the ground rents, if any, next due, plus the premium that will next become due and payable on policies of fire and other hazard insurance covering the mortgaged property, plus water rents, taxes and assessments next due on the mortgaged property (all as estimated by the Mortgagee) less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, water rents, taxes and assessments will become delinquent, such sums to be held by Mortgagee in trust to pay said ground rents, premiums, water rents, taxes, and special assessments.

(c)    All monthly installments of interest or of principal and interest and all payments mentioned in paragraphs (a) and (b) above shall be added together, and the aggregate amount thereof shall be paid by the Mortgagor each month in a single payment to be applied by the Mortgagee to the following items in the order set forth:

(i)    Premium charges under the contract of insurance with the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner or service charge;

(ii)    Ground rents, taxes, water rents, assessments, fire and other hazard insurance premiums;

(iii)    Interest on the debt secured hereby; and

(iv)    Amortization of the principal of the debt secured hereby.

3

Provided that any excess funds accumulated under paragraph (b) above remaining after payment of the items therein mentioned shall be credited to subsequent monthly payments of the same nature required thereunder; but if any such item shall exceed the estimate therefor, the Mortgagor shall without demand forthwith make good the deficiency. Failure to do so before the due date of such item shall be a default hereunder. In case of termination of the contract of mortgage insurance by prepayment of the mortgage in full, or otherwise (except as hereinafter provided), accumulations under paragraph (a) above not required to meet payments due under the contract of mortgage insurance, shall be credited to the Mortgagor. If the property is sold under foreclosure or is otherwise acquired by the Mortgagee after default, any remaining balance of the accumulations under paragraph (b) above shall be credited to the principal of the debt as of the date of commencement of foreclosure proceedings or as of the date the property is otherwise acquired; and accumulations under paragraph (a) above shall be similarly applied unless required to pay sums due to the Secretary of Housing and Urban Development, acting by and through the Commissioner under the contract of mortgage insurance.

2. That the Mortgagor will keep the improvements now existing or hereafter erected on the mortgaged property insured against loss by fire and such other hazards, casualties, and contingencies, as may be stipulated by the Secretary of Housing and Urban Development, acting by and through the Commissioner upon the insurance of the mortgage and other hazards **and liabilities** as may be required from time to time by the Mortgagee, and all such insurance shall be carried in such companies and be for such periods as may be required by the Mortgagee, and be in an amount which will comply with the coinsurance clause applicable to the location and character of the property but not less than eighty per centum (80%) of the actual cash value of the insurable improvements and equipment of the property and will pay when due any insurance premiums not provided for by monthly payments hereunder and in default thereof the Mortgagee may effect such insurance. Such policies shall be in standard form and endorsed with standard mortgagee clause with loss payable to the Mortgagee ~~and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner as interest may appear,~~ and shall be deposited with the Mortgagee; **the insurance carrier shall be selected by the Mortgagor, subject to approval by the Mortgagee, which shall not be unreasonably withheld.** If the premises covered hereby, or any part thereof, shall be destroyed or damaged by fire or other hazard against which insurance is held as hereinabove provided, the amounts paid by any insurance company or companies by reason of such damage, in pursuance of the contract or contracts of such fire or other hazard insurance, to the extent of the indebtedness secured hereby remaining unpaid, shall be paid to the Mortgagee, and, at its option, may be applied to the debt or released for the repairing or rebuilding of the premises.

3. That the Mortgagor will keep said premises in as good order and condition as they now are, and will not commit or permit any waste of said premises, reasonable wear and tear excepted. If the Mortgagor shall refuse or neglect to make or cause to be made all necessary repairs to the mortgaged property, then at the option of the Mortgagee, such repairs may be made at the expense of the Mortgagee, and the cost thereof, with interest at the rate provided in the note secured hereby shall be added to and made a part of the principal debt secured hereby and shall be payable on demand.

4. The Mortgagee shall have the right to advance and pay any ground rents, taxes, assessments, water rents, and all other charges and claims which are provided to be made by the Mortgagor in paragraphs 1(a) and (b) above, and to advance and pay any sums of money that in its or their judgment may be necessary to perfect or preserve the title of the premises covered hereby. Any amount or amounts so paid by the Mortgagee shall be added to the principal debt secured hereby, shall bear interest at the rate provided in the note secured hereby from the date of payment, and shall be payable on demand. The Mortgagee, at its option, shall be entitled to be subrogated to any lien, claim or demand paid by it, or discharged with money advanced by it and secured by this mortgage.

4

App.347

5.    That so long as this mortgage and the said note secured hereby are insured under the provisions of the National Housing Act, or held by the Secretary of Housing and Urban Development, the Mortgagor will not execute or file for record any instrument which imposes a restriction upon the sale or occupancy of the mortgaged property on the basis of race, color or creed.

6.    That so long as this mortgage and the note secured hereby are insured under the provisions of the National Housing Act, or held by the Secretary of Housing and Urban Development, the Mortgagor will not rent dwelling accommodations in the mortgaged premises at rental rates in excess of the rates permitted by the Secretary of Housing and Urban Development, acting by, and through the Federal Housing Commissioner or for periods of less than one (1) month or in excess of three (3) years, nor rent the premises as an entirety.

7.    That the indebtedness secured by this mortgage represents funds to be used in the construction of certain improvements on the lands herein described, in accordance with a building loan agreement between the Mortgagor and the Mortgagee dated ——————— 19 , a copy of which is attached hereto and made a part hereof (provided, however, that if and to the extent that said building loan agreement is inconsistent herewith, this mortgage shall govern). If the construction of the improvements to be made pursuant to said building loan agreement shall not be carried on with reasonable diligence, or shall be discontinued at any time for any reason other than strikes or lock-outs, the Mortgagee, after due notice to the Mortgagor, or any subsequent owner, is hereby vested with full and complete authority to enter upon the said premises to employ watchmen to protect such improvements from depredation or injury and to preserve and protect the personal property therein, to continue any and all outstanding contracts for the erection and completion of said building or buildings, to make and enter into any contracts and obligations wherever necessary, either in its own name or in the name of the Mortgagor, or other owner, and to pay and discharge all debts, obligations, and liabilities incurred thereby. All such sums so advanced by the Mortgagee (exclusive of advances of the principal of the indebtedness secured hereby) shall be added to the principal of the indebtedness secured hereby and all shall be secured by this mortgage and shall be due and payable on demand with interest at the rate provided in the note secured hereby, but no such advances shall be insured unless same are specifically approved by the Federal Housing Commissioner prior to the making thereof. The principal sum and the other charges provided for herein shall, at the option of the Mortgagee or holder of this mortgage and the note secured hereby become due and payable on the failure of the Mortgagor, or other owner, to keep and perform any of the covenants, conditions and agreements of said building loan agreement. This covenant shall be terminated upon the completion of the improvement to the satisfaction of the Mortgagee and the making of the final advance as provided in said building loan agreement.

8.    That the Mortgagor will not voluntarily create or permit to be created against the property subject to this mortgage any lien or liens inferior or superior to the lien of this mortgage; and further, that it will keep and maintain said property free from the claim of all persons supplying labor or materials which will enter into the construction of any and all buildings now being erected or to be erected on said property.

9.    That the improvements about to be made upon the premises above described and all plans and specifications comply with all municipal ordinances and regulations made or promulgated by lawful authority, and that the same will upon completion comply with all such municipal ordinances and regulations and with the rules of the Board of Fire Underwriters having jurisdiction.

10.    That the Mortgagor will not permit or suffer the use of any of the property for any purpose other than that for which the same is now agreed upon to be used; nor will it permit or suffer any alteration of or addition to the buildings or improvements hereafter constructed in or upon said property without the consent of the Mortgagee.

5

App.348

11.    That the Regulatory Agreement, if any, executed by the Mortgagor and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner, which is being recorded simultaneously herewith, is incorporated in and made a part of this Mortgage. Upon default under the Regulatory Agreement and upon the request of the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner, the Mortgagee, at its option, may declare the whole of the indebtedness secured hereby to be due and payable.

It is agreed that if at any time, a Writ of Fieri Facias or other execution is properly issued upon a judgment obtained upon the note secured hereby, or if an Action of Mortgage Foreclosure is brought or a Writ of Scire Facias is issued or other foreclosure proceedings instituted upon this mortgage, an attorney's fee commission for collection, viz: five per centum (5.0%) of said principal debt or sum shall be payable, and shall be recovered in addition to all principal and interest and all other recoverable sums then due, besides costs of suit. The Mortgagor does hereby expressly waive and relinquish all benefit that may accrue to him by virtue of any and every law, civil or military, made or to be made hereafter exempting the mortgaged premises from attachment, levy and sale under execution.

It is further agreed that the holder of this mortgage, in any action to foreclose, shall be entitled to the appointment of a Receiver of the rents and profits of the mortgaged premises as a matter of right and without notice, with power to collect the rents, issues, and profits of said mortgaged premises, due and becoming due during the pendency of such foreclosure suit, such rents and profits being hereby expressly assigned and pledged as additional security for the payment of the indebtedness secured by this mortgage, without regard to the value of the mortgaged premises or the solvency of any person or persons liable for the payment of the mortgage indebtedness. The Mortgagor for itself and any subsequent owner hereby waives any and all defenses to the application for a Receiver and hereby specifically consents to such appointment without notice, but nothing herein contained is to be construed to deprive the holder of the mortgage of any other right, remedy, or privilege it may now have under the law to have a Receiver appointed. The provision for the appointment of a Receiver of the rents and profits, and the assignment of such rents and profits, is made an express condition upon which the loan hereby secured is made. The rights and remedies herein provided for shall be deemed to be cumulative and in addition to, and not in limitation of, those provided by law.

It is also agreed that, for the purpose of procuring possession of said mortgaged premises to the Mortgagee, its successors and assigns, in the event of any default as defined below, the Mortgagor, for the Mortgagor and for the successors and assigns of the Mortgagor, does hereby authorize and empower any attorney of any court as attorney for the Mortgagor, and for the successors or assigns of the Mortgagor, to sign an agreement for entering in any competent court an amicable action or judgment in ejectment, without any stay of execution, against the Mortgagor, or the successors or assigns of the Mortgagor and against all persons claiming under the Mortgagor, or the successors or assigns of the Mortgagor and for the recovery by the Mortgagee, its successors or assigns, of possession of the mortgaged premises. In any such action, this mortgage or a copy thereof, verified by affidavit, shall be a sufficient warrant of attorney. Thereupon a Writ of Habere Facias Possessionem may issue forthwith without any prior writ or proceeding whatsoever. It is hereby expressly agreed that if for any reason after such action has been commenced the same shall be discontinued, marked satisfied of record or be determined, or possession of the mortgaged premises shall remain in or be restored to the Mortgagor, or the successors or assigns of the Mortgagor, the Mortgagee, its successors and assigns, shall have the right for the same default or in the event of any subsequent defaults, to bring on or more further amicable actions in the manner hereinbefore set forth to recover possession of the mortgaged premises. The Mortgagee, its successors and assigns, shall have the right to bring such amicable action in ejectment after an Action of Mortgage Foreclosure is brought or after the issuance of a Scire Facias sur Mortgage or other foreclosure

6

proceedings are instituted upon this mortgage and after judgment thereon or therein, and after a sale of the mortgaged premises by the sheriff.

It is also expressly agreed that if the Mortgagor should fail to pay any installment of principal and interest or payment due pursuant to covenant one above within thirty (30) days after the due date of such installment or payment, or if the Mortgagor should fail to perform any of the terms, conditions or covenants of the mortgage, the note, the building loan agreement, or the regulatory agreement, such failure shall constitute a default and in every such case, the whole principal debt shall, at the option of the Mortgagee, become due and payable immediately, and it shall and may be lawful for said Mortgagee forthwith to bring an Action of Mortgage Foreclosure, to sue out of a Writ of Scire Facias, or to institute other foreclosure proceedings upon this mortgage, and to proceed to judgment and execution for recovery of said principal debt, all interest thereon, all sums advanced for payment of any ground rent, taxes, water rents, charges, claims or insurance premiums as aforesaid, and all other recoverable sums, together with an attorney's commission for collection, without further stay of execution or other process, any law, usage or custom to the contrary notwithstanding. The Mortgagor hereby waives and relinquishes unto and in favor of the Mortgagee, all benefit under the laws now in effect or hereafter passed to relieve the Mortgagor in any manner, or to reduce the amount of the note to any greater extent than the amount actually paid for the premises hereby mortgaged at the sale thereof in any judicial proceedings upon the said note or upon this mortgage.

Notwithstanding any other provision contained herein or in the Note, it is agreed that the execution of the Note shall impose no personal liability upon the Mortgagor for payment of the indebtedness evidenced thereby and in the event of a default, the holder of the Note shall look solely to the "Collateral" (defined below) in satisfaction of the indebtedness evidenced by the Note and will not seek or obtain any deficiency or personal judgment against the Mortgagor except such judgment or decree as may be necessary to foreclose and/or bar its interest in the Collateral, provided, that nothing in this condition and no action so taken shall operate to impair any obligation of the Mortgagor under the Regulatory Agreement herein referred to and made a part hereof. As used herein, "Collateral" shall mean and include (i) the property subject to this Mortgage, including, but not limited to, the land, improvements, equipment, personal property, and appurtenances thereto and the rents, issues and profits thereof, as set forth in this Mortgage and (ii) the collateral described in the Security Agreement of even date herewith given to further secure the Note between the Mortgagor and Mortgagee.

This mortgage and every covenant and agreement herein contained shall be binding upon and inure to the benefit of the Mortgagor and the Mortgagee and their respective successors and assigns and to the extent permitted by law shall bind every subsequent owner of the mortgaged premises.

[Signatures appear on following page]

GPO 912-217

7

IN WITNESS WHEREOF, the Mortgagor has caused this instrument to be duly executed in its behalf by the Manager of its Sole Trustee as of the date first set forth above.

SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007,
a trust formed under the laws of Pennsylvania

By: SAUCON MANAGEMENT LLC,
  a Pennsylvania limited liability company,
  Trustee

By: _____
Name: Abraham R. Atiyeh
Title: Manager

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF __Lehigh__

On this ¹² day of December, 2012, before me, the undersigned officer, personally appeared Abraham R. Atiyeh who acknowledged himself to be the Manager of the Sole Trustee of Saucon Trust, u/t/a dated October 1, 2007, a trust formed under the laws of Pennsylvania, and that he, as Manager of the Sole Trustee, being authorized to do so, executed the foregoing instrument for the purpose therein contained by signing the names of the limited liability company and such trust.

_____
Notary Public in and for said County and State

(To be executed, witnesses and acknowledged as required by the laws of the State of Pennsylvania)

**CERTIFICATE OF RESIDENCE**

> NOTARIAL SEAL
> TARA S PALETSKI
> Notary Public
> ALLENTOWN CITY, LEHIGH COUNTY
> My Commission Expires Jun 20, 2016

I, Christine R. Chandler, do hereby certify that the correct address of the within-named Mortgagee is 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201, witness my hand this _____ day of December, 2012 19.

_____
Christine R. Chandler, Vice President
(On behalf of the Mortgagee)

COMMONWEALTH OF PENNSYLVANIA

Loan No. 034-22096

**Mortgage**

SAUCON TRUST, U/T/A OCTOBER 1, 2007
TO
M&T REALTY CAPITAL CORPORATION

COMMONWEALTH OF PENNSYLVANIA, COUNTY OF

RECORDED on this _____ day of _____, A.D. ____, in the Recorder's Office of said County, in Mortgage Book, _____ Vol. _____, Page _____

Given under my hand and seal of the said office, the day and year aforesaid.

_____ Recorder.

**EXHIBIT A**

LEGAL DESCRIPTION

UNIT I of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715

Being more fully bounded as set forth on attached page

DESCRIPTION OF 1050 MAIN STREET

ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 20065 Page 759, bounded and described as follows to wit:

BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

1.    South 86'47'33" West 266.09 feet; thence-in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;

2.    North 03' 14'23" West 59.03 feet;

3.    North 86' 41'33" East 18.00 feet;

4.    North 03' 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same

5.    North 86' 48'59" East 247.48 feet to the westerly right of way line of Main Street; thence along the same

6.    South 03' 18'24" East 470.30 feet to the place of beginning.

CONTAINS:    117,610.588 Sq. Ft.    2.7000 Acres

12/07/2012 14916670 V 4

App.353

MAY 0 9 2022

I hereby CERTIFY that this document is recorded in the
Recorder's Office Of Northampton County, Pennsylvania

Andrea F. Suter
Recorder of Deeds

Dorothy J. Edelman
Lead Deputy Recorder of Deeds

App.354

# COUNTY OF NORTHAMPTON

### RECORDER OF DEEDS
NORTHAMPTON COUNTY GOVERNMENT CENTER
669 WASHINGTON STREET
EASTON, PENNSYLVANIA 18042-7486
Area Code (610) 829-6210

Andrea F. Suter - Recorder
Dorothy J. Edelman - Lead Deputy
Barbara L. Manieri - Deputy



**Book - 2022-1   Starting Page - 306345**
**\*Total Pages -  7**

Instrument Number - 2022036070
Recorded On 11/21/2022 At 11:33:26 AM

| NCGIS Registry UPI Certification |
| On November 18, 2022 By SRM |

\* Instrument Type - ASSIGNMENT OF MORTGAGE
Invoice Number - 1047996
\* Grantor - M&T REALTY CAPITAL CORPORATION
\* Grantee - UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT
User - KABE
\* Customer - FIDELITY NATIONAL TITLE - WESTERVILLE (10043)

| \*FEES | | \*RECORDED BY: |
|---|---|---|
| STATE WRIT TAX | $0.50 | FIDELITY NATIONAL TITLE - WESTERVILLE |
| JCS/ACCESS TO JUSTICE | $40.25 | (10043) |
| RECORDING FEES | $19.00 | 4111 EXECUTIVE PKWY, SUITE 30 |
| COUNTY RECORDS | $2.00 | WESTERVILLE, OH 43081 |
| IMPROVEMENT FEE | | |
| DEEDS RECORDS | $3.00 | |
| IMPROVEMENT FEE | | I hereby CERTIFY that this document is recorded in the |
| UPI CERTIFICATION FEE | $10.00 | Recorder's Office Of Northampton County, Pennsylvania |
| TOTAL PAID | $74.75 | |



Andrea R. Suter

**Andrea F. Suter**
**Recorder of Deeds**

| THIS IS A CERTIFICATION PAGE |
| :---: |
| ## Do Not Detach |
| THIS PAGE IS NOW THE FIRST PAGE |
| OF THIS LEGAL DOCUMENT |

00IPI9

**Book: 2022-1        Page: 306345**

\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

*1050 main St. Unit #1 Hellertown , 1055*
*Borrough Hellertown    PA*

Project No.:    034-22096

Project Name: **Saucon Valley Manor**

Location:    **Northampton County, Pennsylvania**

*Q 7Sw 24 -1-3- 0715*

## ASSIGNMENT OF MORTGAGE

**Dated November 8, 2022, Effective as of November _16_ , 2022**

KNOW ALL MEN BY THESE PRESENTS:

THAT, M&T REALTY CAPITAL CORPORATION, a corporation organized and existing under the laws of the State of Maryland, hereinafter referred to as the "Assignor", having offices at One Light Street, 12th Floor, Baltimore, Maryland 21202, for value received, does by these presents, without recourse, representation or warranty, except as hereinafter set forth, grant, bargain, sell, assign, transfer and set over unto the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, his/her successors and assigns, hereinafter referred to as "Assignee", having offices at 451 7th Street, SW, Washington D.C., 20410, all right, title and interest in and to that certain:

> Mortgage Note dated December 1, 2012, and Mortgage dated December 1, 2012, each executed by Saucon Trust, U/T/A Dated October 1, 2007, each being in the original principal amount of Nineteen Million Four Hundred Sixty-Two Thousand Eight Hundred and No/100 Dollars ($19,462,800.00), which Mortgage Note was made payable to M&T Realty Capital Corporation and which Mortgage Note is secured by a Mortgage recorded December 13, 2012, in Book 2012-1, at Page 300709 in the Office of the Recorder of Deeds of Northampton County, Pennsylvania.

SEE ATTACHED EXHIBIT "A" FOR A DESCRIPTION OF THE REAL PROPERTY.

TO HAVE AND TO HOLD the same unto said UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, HIS/HER SUCCESSORS AND ASSIGNS.

THIS Assignment is without recourse or warranty, except that the undersigned hereby warrants that no act or omission of the undersigned has impaired the validity or priority of said Mortgage. The undersigned also warrants that said Mortgage is prior to all mechanics' and materialmen's liens filed of record subsequent to the recording of such Mortgage regardless of whether such liens attached prior to such recording date, and prior to all liens and encumbrances which may have attached or defects which may have arisen subsequent to the recording of such

App.356

Mortgage (except such liens or other matters as have been approved by the Assignee hereunder). The undersigned also warrants that, as of the execution of this Assignment, the sum of Sixteen Million Two Hundred Thirty-Eight Thousand Eight Hundred Sixty-Two and 47/100  Dollars ($16,238,862.47), together with the interest accruing at the rate of 2.50% per annum, as provided in the said Mortgage Note and Mortgage, is actually due and owing under said Mortgage Note and Mortgage, that there are no offsets or counterclaims thereto, and that the undersigned has a good right to assign the said Mortgage Note and Mortgage.

[THIS SPACE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Assignor has caused this instrument to be executed on its behalf as of the date first above written.

**M&T REALTY CAPITAL CORPORATION**, a Maryland corporation

By:_____

Name: Michael Angles

Title:  Senior Vice President

STATE OF MARYLAND      }

                            } ss.

CITY OF BALTIMORE       }

Before me, ___Melissa L. First_____, a Notary Public, in and for said City and State, on this day personally appeared **Michael Angles**, known to me to be the person whose name is subscribed to the foregoing instrument, and known to me to be the **Senior Vice President** of M&T Realty Capital Corporation, a Maryland corporation, and acknowledged to me that he executed said instrument for the purposes and consideration therein expressed and as the authorized act of said corporation.

Given under my hand and seal of office, this the 8th day of November, 2022.

_____

Notary Public

My Commission Expires:

MELISSA L FIRST
Notary Public - State of Maryland
Baltimore County
My Commission Expires Apr 6, 2026

This instrument prepared by:     Ariel A. Mullin
                                    Vorys, Sater, Seymour and Pease LLP
                                    301 E. Fourth Street, Suite 3500
                                    Cincinnati, Ohio 45202

## EXHIBIT A

### Legal Description

UNIT I of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715

Being more fully bounded as set forth on attached page

Borrough Helkertown
1050 main St. unit #1
Hellertown, PA
18055

DESCRIPTION OF 1050 MAIN STREET

    ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 20065 Page 759, bounded and described as follows to wit:

    BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

1.    South 86'47'33" West 266.09 feet; thence-in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;

2.    North 03' 14'23" West 59.03 feet;

3.    North 86' 41'33" East 18.00 feet;

4.    North 03' 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same

5.    North 86' 48'59" East 247.48 feet to the westerly right of way line of Main Street; thence along the same

6.    South 03' 18'24" East 470.30 feet to the place of beginning.

    CONTAINS:    117,610.588 Sq. Ft.    2.7000 Acres

Certificate of Residence

I do hereby certify that the correct address of the within-named Assignee is:

Offices at 451 7th St. SW.
Washington, PA 2 0410

**SAUCON VALLEY MANOR**
FHA PROJECT NO. 034-22096

## DOCUMENT CERTIFICATION

The document attached hereto is certified to be a true and correct copy of the
original of the following document:

## <u>ASSIGNMENT OF MORTGAGE</u>

Naming the **United States Secretary of Housing and Urban Development,
his/her successors and assigns as Assignee
Dated November 8, Effective November 16, 2022**

Was submitted to the Office of the Recorder of Northampton County,
Pennsylvania (the "Recorder's Office") on November 16, 2022, but due to delays
in processing for recording in the Recorder's Office, such was ultimately recorded
on November 21, 2022, in Book 2022-1 at Page 306345.

**Commonwealth Land Title Insurance
Company**

By: _____
Name: _____
Title:  Authorized Agent

App.362

# EXHIBIT L

SAUCON VALLEY MANOR
FHA Project No. 034-22096

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "Agreement") is made, entered into and dated as of the 1st day of December 2012, by and between SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007, a trust formed under the laws of the State of Pennsylvania, whose principal place of business is located at 1050 Main Street, Hellertown, Pennsylvania 18055 ("Debtor"); and M&T REALTY CAPITAL CORPORATION, a corporation organized and existing under the laws of the State of Maryland and having an address at 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201 (the "Secured Party"), as follows:

### Recitals

A.    Contemporaneously with this Agreement, the Secured Party has made a loan to the Debtor in the maximum principal amount of $19,462,800.00 (the "Loan"). The Loan is (i) evidenced by the Mortgage Note made by the Debtor in favor of the Secured Party, dated as of even date herewith (the "Note") and (ii) secured, in part, by an assisted living project known as Saucon Valley Manor, FHA Project No. 034-22096 (the "Project") located at 1050 Main Street, Hellertown, Pennsylvania 18055, as more particularly described in Exhibit A attached hereto and incorporated herein by reference (the "Premises"). The Project is the subject of the Regulatory Agreement between the Debtor and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner ("HUD"), dated as of even date herewith (the "Regulatory Agreement").

B.    As security, in part, for the Obligations (as defined below), the Debtor (i) granted to the Secured Party the Mortgage, dated as of even date herewith, encumbering the Project, which has been or is concurrently herewith being recorded in the real estate records of the jurisdiction in which the Premises are located (the "Mortgage") and (ii) is entering into this Agreement with the Secured Party. The Note, the Mortgage, this Agreement, the Regulatory Agreement and all other agreements, instruments, and documents which are now existing or are in the future signed or delivered by, or on behalf of, the Debtor to the Secured Party and/or HUD in connection with, or related to, the Loan or the other Obligations are sometimes collectively referred to as the "Loan Documents."

C.    As used herein, "Healthcare Assets" means (i) any and all licenses, permits, and/or approvals issued by any governmental authority with respect to the use or operation of the Project for its "Approved Use" (as defined in the Regulatory Agreement), (ii) any and all Medicare and Medicaid provider agreements and (iii) any and all "Government Accounts" and "Government Payments" (each as defined below).

### Statement of Agreement

1.   **SECURITY INTEREST; SETOFF.**

(a)   To secure the full, prompt and complete payment and performance of all Obligations, the Debtor hereby, to the fullest extent permitted by applicable law with respect to Healthcare Assets, grants to, and creates in favor of, the Secured Party a continuing security interest in all of Debtor's right, title and interest in and to the property described on Exhibit B attached hereto and incorporated herein by reference (the "Collateral"). "Obligations" means, as of any date, the Loan and all other indebtedness, liabilities, obligations, covenants, debts and amounts owing from the Debtor to the Secured Party and/or HUD arising out of, in connection with, described in, or evidenced by the Loan Documents, whether direct or indirect, absolute or contingent, related or unrelated, now or in the future existing and whether consisting of principal, interest, fees, indemnities, expenses (including attorneys' fees), charges or other sums, however any of that indebtedness, obligations, or liabilities may be evidenced or acquired, all as now exist or may, after the date of this Agreement, be incurred, renewed, extended, consolidated, adjusted or amended.

(b)   In addition to (and without limitation of) any right of setoff, lien or counterclaim the Secured Party may otherwise have, the Secured Party may, at its option, setoff and retain, and may refuse to allow withdrawals by, or for the benefit of the Debtor of, any and all funds, monies, securities and other property held in escrow or for the account of the Debtor pursuant to the Loan Documents, against any amount payable by the Debtor under the Note, the Mortgage or any of the other Loan Documents which is not paid when due (whether or not any of the funds, monies, securities, or other property are then distributable to, or on behalf of, the Debtor).

(c)   Notwithstanding any provisions to the contrary contained in this Agreement, nothing set forth in this Agreement shall be construed as granting to Secured Party a security interest, assigning receivables, giving dominion and control or designating an attorney-in-fact with respect to Healthcare Assets in violation of any applicable law.

(d)   The Debtor hereby assigns and transfers to Secured Party all of Debtor's rights, titles and interests in, to and under any and all security agreements now or hereafter entered into by the Debtor with any lessee of all or any portion of the Project and all of Debtor's rights, titles and interests in the collateral described therein.

2.   **REPRESENTATIONS; GENERAL COVENANTS.**

(a)   To induce the Secured Party to make the Loan, the Debtor promises to the Secured Party that the following statements are, and will continue throughout the term of this Agreement to be, true: (i) except to the extent expressly permitted pursuant to Section 19 hereof, the security interest granted to the Secured Party in the Collateral constitutes a valid, first priority security interest; (ii) the Debtor has good title to, and is the sole and lawful owner of, the Collateral; (iii) the Debtor has full power and authority to enter into and perform its obligations under this Agreement; (iv) except to the extent expressly permitted pursuant to Section 19 hereof and taxes that are not yet due and payable, the Collateral is free and clear of any lien, security

2

App.365

interest, claim, interest, pledge, assignment or other encumbrance (a "Lien") except (A) the security interest in favor of the Secured Party and (B) those Liens, if any, approved in writing by Secured Party (the "Permitted Liens"); (v) the Debtor keeps all tangible Collateral at the Property; (vi) all trade names, assumed names, fictitious names and other names used by the Debtor during the five year period preceding the date of this Agreement are set forth on Exhibit C, and the Debtor has not, during the preceding five year period, except as may be set forth on Exhibit C, acquired any of its assets in any bulk transfer; (vii) Debtor's chief executive office is as set forth in the first paragraph of this Agreement; (viii) Debtor's jurisdiction of organization is as set forth in the first paragraph of this Agreement; (ix) Debtor's exact legal name is as set forth in the first paragraph of this Agreement; (x) Debtor's organizational number (if any) as assigned by the State in which Debtor is organized is the number identified as Debtor's organizational ID # on the financing statement(s) filed in connection with the closing of the Loan, and (xi) except as may be set forth on Exhibit C, the Debtor has no rights, titles or interests in, or with respect to, any investment property, any letters of credit, any electronic chattel paper, any commercial tort claims, any instruments, including promissory notes, or any Deposit Accounts (as defined below).

(b)      Debtor will (i) cause, at its expense, any and all UCC financing statements naming as secured party anyone other than Secured Party, which represent or evidence a Lien or potential Lien against any or all of the Collateral, to be terminated within thirty (30) days of the date hereof (except Permitted Liens, if any) and (ii) provide within forty-five (45) days of the date hereof, at its expense, to Secured Party one or more UCC search reports with respect to each office in which a UCC filing may be required in order for Secured Party to validly perfect its security interest in any or all of the Collateral, confirming that a UCC financing statement has been filed in such office in favor of Secured Party and that there are no other UCC financing statements in effect with respect to any of the Collateral except those in favor of Secured Party and Permitted Liens.  The Debtor will not grant, create or permit to exist any Lien on any of the Collateral except for the Liens in favor of the Secured Party and Permitted Liens and except to the extent expressly permitted pursuant to Section 19 hereof.  The Debtor, at the Secured Party's request, will defend the Collateral against the claims and demands of any other individual, unincorporated association, partnership, joint venture, trust, business trust, corporation, limited liability company, institution, entity or any governmental authority ("Persons") at any time claiming any interest in the Collateral.

(c)      The Collateral will only be used by the Debtor in the operation of the Project.  Until an Event of Default (as defined below) occurs, the Debtor may have possession of the Collateral and use it in any lawful manner not inconsistent with the Loan Documents and any policy of insurance thereon.  The Debtor will not sell, assign, lease, or otherwise dispose of any of the Collateral without the prior written consent of the Secured Party; however, the Debtor will have the right, without the Secured Party's consent, to transfer, sell or dispose of any Collateral which is (i) tangible personal property and (ii) obsolete or worn out ("Consumed Property") if the Debtor, concurrently with such transfer, sale or disposition, replaces the Consumed Property with replacement personal property which is free and clear of any Liens except for the Liens in favor of the Secured Party and has the same or greater value and utility as the Consumed Property originally had (any such replacement personal property will automatically become a part of the Collateral under this Agreement).  The Secured Party's interests in the proceeds of the Collateral (or notification of its interests in the proceeds of the Collateral in financing statements

3

or otherwise) will not be construed as modifying this Agreement or as the Secured Party's consent to the disposition of any Collateral other than as provided in this Agreement.

(d)    All tangible Collateral is to be located at the Project ("Collateral Location"), and no tangible Collateral may be removed therefrom without the prior consent of the Secured Party unless the Collateral is (i) Consumed Property under the terms of Section 2(c) above or (ii) being removed in accordance with the terms of Section 2(e) below. Immediately on demand therefor by the Secured Party, the Debtor will deliver to the Secured Party any and all evidences of ownership of the Collateral (including certificates of title and applications for title). The Debtor will give the Secured Party not less than 30 days prior written notice of any change of (A) Debtor's corporate, partnership, limited liability company, doing business, trade or legal name or (B) any Collateral Location.

(e)    The Debtor will, at its own cost and expense, maintain all of the tangible Collateral in good working condition and make all necessary renewals, repairs, replacements, additions, betterments and improvements thereto, and, in this connection, the Debtor may temporarily remove the same, or any part thereof, from the Project if such removal is necessary or advisable in connection with the Debtor's fulfilling of its obligations under this Section 2(e), and does not affect the priority of the security interests created under this Agreement.

(f)    The Debtor will, upon request of Secured Party, deliver to Secured Party copies of all reports, financial statements and other information which the Debtor is obligated to provide to HUD in connection with the Project and/or Collateral not later than the earlier of (i) the delivery of such reports, financial statements and other information to HUD or (ii) ten (10) days after Secured Party makes such request.

(g)    The Debtor will not change (i) without thirty (30) days prior notice to the Secured Party, the location of its chief executive office or (ii) without the prior written consent of Secured Party, which shall not be unreasonably withheld, its jurisdiction of organization.

(h)    The Debtor will not merge or consolidate with or into any other Person without the prior written consent of Secured Party.

(i)    The provisions of this Section 2(i) shall only apply in the event that the Debtor operates the Project. As used in this Agreement, the capitalized term "Deposit Account" means (1) any deposit account into which payments to the Debtor with respect to the operation of the Project are initially deposited, as opposed to being transferred from another Project account, and (2) any deposit account into which Government Payments are directly transferred from a Government Account (defined below). The Debtor will not establish a Deposit Account unless (A) with respect to any such proposed Deposit Account (other than those set forth on Exhibit C) at least thirty (30) days prior written notice of the name and address of the depository bank, the type of account and any other information reasonably requested by the Secured Party is provided to Secured Party and (B) contemporaneously therewith, if requested by the Secured Party consistent with the Debtor's obligations under Section 14, a control agreement in form and substance acceptable to the Secured Party is entered into among the Debtor, the Secured Party and the depository bank where the Deposit Account would be maintained (any such depository bank is referred to herein as a "Depository Bank" and any such control agreement is referred to

4

herein as a "DACA"), unless the Deposit Account is a Government Account. A DACA may not be changed or terminated without the prior written consent of the Secured Party. Upon the Secured Party's written request (which request need be made only once and not on a recurring basis), the Debtor will take all reasonable steps to cause each Depository Bank to provide to the Secured Party (I) whether by Internet access or otherwise, on-line screen access to daily activity in the Deposit Accounts, and (II) a copy of each periodic account statement relating to the Deposit Accounts ordinarily furnished by such Depository Bank to the Debtor. The Debtor authorizes and approves of the Secured Party communicating directly with each Depository Bank. Unless the Debtor receives no Government Payments, the Debtor will maintain one or more separate Deposit Account(s) into which only Government Payments (defined below) are deposited (collectively, the "Government Accounts"), and the Debtor will not commingle in any Government Account proceeds of accounts from non-governmental payors with proceeds of accounts owing from governmental authorities, including Government Payments. The Debtor shall cause all Government Payments related to the operation of the Project to be paid directly into the Government Accounts. Prior to establishing a Government Account, the Debtor shall cause the Depository Bank that maintains such Government Account to enter into a deposit account instruction services agreement with the Secured Party and the Debtor in form and substance acceptable to the Secured Party with respect to such Government Account (each, a "DAISA"), which requires initiation of a funds transfer each business day, unless the Secured Party approves otherwise, of all available funds in the applicable Government Account to a Deposit Account of Debtor that is subject to a DACA and is not a Government Account. Not less than thirty (30) days prior to the effective date thereof, the Debtor will provide to the Secured Party a copy of (i) any change to any DAISA, or (ii) any new directions with respect to a Government Account issued to a Depository Bank maintaining such Government Account, in each case contemporaneously with providing the change or directions to the Depository Bank. Without limiting the generality of the foregoing, without the prior written consent of the Secured Party, neither a change to any DAISA nor any such new directions shall instruct a Depository Bank to transfer funds from the Government Account to a Deposit Account that is not then subject to a DACA. No change to or termination of a DAISA, nor any such new directions with respect to a Government Account, shall be made without the prior written consent of the Secured Party. Also, the Debtor shall not close a Government Account subject to a DAISA without the prior written consent of the Secured Party. Failure of Debtor to comply with any of the provisions of this Section 2(i) shall constitute an "Event of Default." As used herein, "Government Payment" means a payment from a governmental entity and shall include, without limitation, payments governed under the Social Security Act (42 U.S.C. §§ 1395 et seq.), including payments under Medicare, Medicaid and TRICARE/CHAMPUS, and payments administered or regulated by the Centers for Medicare and Medicaid Services of Department of Health and Human Services.

**3.    COMPLIANCE WITH LAWS.** The Debtor will comply with the requirements of all valid and applicable federal, state and local laws.

**4.    TAXES; EXPENSES.** The Debtor will pay, when due, all taxes, assessments and other charges lawfully and validly levied or assessed on the Collateral or any part thereof. The Debtor will pay and, as applicable, reimburse the Secured Party for (i) any and all fees, costs and expenses, of whatever kind and nature, including the fees, expenses and disbursements of the Secured Party's counsel (including, but not limited to, fees, expenses and disbursements for

5

preparation of documents, making title examinations and rendering opinion letters) which the Secured Party may incur in connection with filing any financing statements or other public notices to protect its interests hereunder, the enforcement, preservation and/or protection of the Secured Party's rights and/or remedies under the Loan Documents, whether incurred through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or relating to the Loan, and (ii) all filing and recording fees and taxes payable in connection with the transactions contemplated by the Loan Documents. All amounts payable by Debtor to Secured Party under this Section 4 will be paid by the Debtor upon the Secured Party's demand therefor.

5.    **INSPECTION; NOTICES.**  Subject to resident privacy rights, the Secured Party, or its agents, may enter on the Project and any other Collateral Location at any time during normal business hours, and from time to time, for the purpose of inspecting the Project and/or the Collateral and making copies or abstracts of all of the Debtor's records pertaining to the Collateral. The Debtor will keep accurate and complete records of the Collateral. The Debtor will give the Secured Party prompt notice of any Event of Default.

6.    **INSURANCE.**  The Debtor will purchase and maintain insurance at all times with respect to the Premises, all improvements now or hereafter located thereon, and all tangible Collateral against risks of fire (including so-called extended coverage), theft, vandalism, and such other risks as the Secured Party may require, in such form, for such periods, and written by such companies as may be satisfactory to the Secured Party, such insurance to include "law and ordinance" coverage, and to be payable to the Secured Party as its interests may appear. In addition, the Debtor will purchase and maintain at all times liability insurance and business interruption insurance in such amounts and issued by such companies as may be required from time to time by the Secured Party. The Debtor covenants to pay to the Secured Party, together with monthly payments under the Note, installments on account of the premiums that will next become due and payable on such liability and business interruption insurance, the payment amounts to be determined in the same manner and the payments to be applied in the same priority as specified in the Mortgage with respect to payments of property insurance premiums. All policies of insurance will provide for thirty (30) days advance written notice to the Secured Party of cancellation or any material change in coverages of such insurance. The Debtor will furnish the Secured Party with certificates or other evidence satisfactory to the Secured Party of compliance with the foregoing insurance provisions.

7.    **DISCHARGE OF LIENS.**  At its option but without any obligation to do so, the Secured Party may (a) discharge any taxes or other Liens at any time levied or placed on the Collateral, (b) pay for insurance on the Collateral, and/or (c) pay for the maintenance and preservation of the Collateral. The Debtor will reimburse the Secured Party on its demand for any payment made, or any expense incurred, by the Secured Party pursuant to this Section 7. All of the foregoing sums paid or advanced by the Secured Party will constitute part of the Obligations and will be secured by the Collateral.

8.    **EVENTS OF DEFAULT.**  Each of the following events or circumstances, whether or not caused by or within the control of the Debtor, will be an "Event of Default" under this Agreement:

6

(a)    The Debtor does not pay when due any of the Obligations, subject to any grace period provided under the Note;

(b)    The Debtor does not observe, perform or comply with any of the terms or conditions of this Agreement;

(c)    A default or breach under any of the Loan Documents (exclusive of this Agreement, which is covered by the other subsections of this Section 8) has occurred, which default or breach is not cured within any applicable grace period;

(d)    Any warranty, representation or statement made or furnished to the Secured Party by, or on behalf of, the Debtor proves to have been false in any material respect when made or furnished or when treated as being made or furnished to the Secured Party;

(e)    The Secured Party does not have, for any reason, a perfected, first priority security interest in all of the Collateral except to the extent expressly permitted pursuant to Section 19 hereof;

(f)    There occurs any actual or threatened demolition of or injury or waste to the Project premises, not covered by insurance, or not replaced or restored by the Debtor, which may materially impair the value of the Collateral or the Project;

(g)    Filing by or against the Debtor of a petition in bankruptcy, for a reorganization, arrangement or debt adjustment, or for a receiver, trustee, or similar creditors' representative for Debtor's property or any part thereof, or of any other proceeding under any federal or state insolvency or similar law (and if such petition or proceeding is an involuntary petition or proceeding filed against the Debtor without its acquiescence therein or thereto at any time, the same is not promptly contested and, within 60 days of the filing of such involuntary petition or proceeding, dismissed or discharged), or the making of any general assignment by the Debtor for the benefit of creditors, or the Debtor dissolves or is the subject of any dissolution, winding up or liquidation;

(h)    The Debtor is dissolved and liquidation of the Debtor is commenced in accordance with the Debtor's organizational documents and/or the law of the jurisdiction of organization; or

(i)    The Debtor changes its name or the jurisdiction in which it is organized or merges or consolidates with or into another Person without the prior written consent of the Secured Party.

## 9.    REMEDIES ON DEFAULT.

(a)    If an Event of Default occurs, the Secured Party may then, or at any time after the occurrence of an Event of Default, (A) declare all Obligations immediately due and payable, and whereupon the Obligations will be due and payable automatically and immediately, without notice or demand, which the Debtor expressly waives, and proceed to enforce payment of the Obligations; (B) exercise all of the rights and remedies afforded to the Secured Party under (i) the terms of this Agreement and/or any of the other Loan Documents, (ii) under the UCC (as

7

defined in Section 12 below), and/or (iii) by law and/or in equity (subject, however, to any limitations imposed by applicable law with respect to Healthcare Assets); (C) collect and receive the proceeds of all Awards (as defined in Exhibit B), the rights of Debtor thereto and shares of Debtor therein being hereby assigned to the Secured Party, and give proper receipts and acquittances therefor and apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the Obligations; (D) require the Debtor to assemble the Collateral and make it available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient to both parties, and (E) without limiting the provisions of Section 1(b), apply (or instruct another Person to apply) to the Obligations the balance of any deposit account that is part of the Collateral.

(b)    Without limitation of those rights and remedies, the Secured Party may, upon written notice to the Debtor, take, and publicly or privately sell or convey, full right, title and interest in and to the Collateral, or any part of it, in the name of the Secured Party and/or its designees.  To the extent not prohibited by applicable law with respect to Healthcare Assets, the Debtor hereby constitutes and appoints the Secured Party as its true and lawful attorney in fact to assign and transfer its interest in any or all of the Collateral if an Event of Default occurs.

(c)    If any notice is required by law for the Secured Party to make a sale or other disposition of the Collateral, the Secured Party and the Debtor agree that notice will not be unreasonable as to time if given in compliance with this Agreement ten (10) days before any sale or other disposition of the Collateral.  All reasonable attorneys' and paralegal fees and other legal expenses incurred by the Secured Party to collect the Obligations, to retake, hold, prepare for sale, and to dispose of the Collateral will be (i) payable to the Secured Party on its demand for payment, (ii) part of the Obligations, and (iii) secured by the Collateral.

(d)    The Debtor further specifically agrees that, in any exercise of the rights of the Secured Party under this Agreement or under any other Loan Document, (i) any combination of the Collateral and/or other security for the Obligations may be offered for sale and (ii) all of the Collateral and/or other security for the Obligations may be sold for one total price, and the proceeds of any such sale accounted for in one account without distinction among the items of security or without assigning to them any proportion of such proceeds, the Debtor hereby waiving the application of any doctrine of marshaling.

(e)    The Debtor shall cooperate in any legal and lawful manner necessary or required to permit the Secured Party or its successors and assigns to continue to operate and maintain the Project for its Approved Use in Debtor's name, place and stead.  For this purpose and to the extent not prohibited by applicable law with respect to Healthcare Assets, Debtor irrevocably appoints the Secured Party, its successors and assigns, as Debtor's true and lawful attorney-in-fact, to do all things necessary or required by the state in which the Project is located or any other government entity with jurisdiction over the Project, including, but not limited to, the provision of any and all information and data, the payment of fees and other charges, and the execution of documents, all in the name of the Debtor.  This power is coupled with an interest.

8

10.    **NO WAIVER BY SECURED PARTY; CUMULATIVE RIGHTS.**

(a)    No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will be effective unless such waiver is in writing and signed by duly authorized representatives of the Secured Party. No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will operate as a waiver of any other Event of Default or default or of the same Event of Default or default on a future occasion. The Secured Party may delay in exercising or omit to exercise any right or remedy under this Agreement, any other Loan Document or by law or equity provided without waiving that or any past, present or future right or remedy. All rights and remedies of the Secured Party in this Agreement and the other Loan Documents will be cumulative, and none of these rights or remedies will be exclusive of any other right or remedy allowed at law or in equity or in any other Loan Document, and all of these rights and remedies may be exercised and enforced concurrently.

(b)    Neither the Debtor nor any other Persons interested in the Collateral or the proceeds of the Collateral shall have any right to require the Secured Party first to resort to or proceed personally against any other Person or to proceed against any other collateral security, or to give priority or preference to any item of Collateral, or to proceed upon any guaranty, prior to exercising its rights hereunder. No renewal or extension of the Loan, no release or surrender of the Collateral and/or other security for the Obligations, no release of any obligor with respect to the Obligations, and no delay by the Secured Party in enforcing the Obligations or exercising any right or power with respect to the Obligations shall affect the Secured Party's rights with respect to the Collateral.

11.    **BINDING EFFECT; JOINT OBLIGATIONS.** All rights and remedies of the Secured Party under this Agreement will inure to the benefit of the Secured Party's successors and assigns; and all agreements, obligations, and duties of the Debtor will bind its heirs, personal representatives and permitted successors and assigns; however, the Debtor may not assign this Agreement or any of its rights under this Agreement or delegate any of its duties or obligations under this Agreement without the consent of the Secured Party. If there be more than one Debtor, their obligations, agreements and duties under this Agreement are made jointly and severally.

12.    **GOVERNING LAW; CONSTRUCTION; WAIVER OF TRIAL BY JURY.**

(a)    This Agreement and all rights and obligations under this Agreement, including matters of construction, validity and performance, will be governed by the laws of the state in which the Project is located (the "State") except as to the existence, validity, perfection or priority (and the effect of perfection or non-perfection or invalidity) of any Lien of the Secured Party on any deposit account which will be governed by the laws of the state in which the applicable deposit account is maintained at the applicable bank, savings and loan association, credit union or like organization. If any term of this Agreement is found to be invalid by a court with jurisdiction under the laws of the State or laws of mandatory application, then the invalid term will be considered excluded from this Agreement and will not invalidate the remaining terms of this Agreement. All uncapitalized terms used herein which are now or hereafter defined in the Uniform Commercial Code, as now enacted in the State or as hereafter amended or

9

App.372

superseded (the "UCC"), will have the same meaning herein as in the UCC unless the context indicates otherwise. Every power given herein is coupled with an interest and is irrevocable by death, dissolution or otherwise.   The definition of any document includes all schedules, attachments and exhibits to that document, and all renewals, extensions, supplements, amendments, modifications, restatements and consolidations of that document, and any document given in substitution for or replacement of that document.   The term "including" is used by way of example only and not by way of limitation, and the singular includes the plural and conversely.   The captions or headings contained in this Agreement are for reference purposes only and will not affect or relate to the interpretation of this Agreement.

(b)   AS A SPECIFICALLY BARGAINED INDUCEMENT FOR THE SECURED PARTY TO ENTER INTO THE AGREEMENT AND EXTEND CREDIT TO DEBTOR, SECURED PARTY AND DEBTOR EACH HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES ANY AND ALL RIGHT(S) TO A TRIAL BY JURY FOR ANY CAUSE OF ACTION, CLAIM OR DEFENSE RELATING TO, RESULTING FROM OR ARISING OUT OF ANY OF THE LOAN AND/OR ANY TRANSACTIONS, RIGHTS AND/OR OBLIGATIONS CONTEMPLATED BY THIS AGREEMENT AND/OR ANY OF THE OTHER LOAN DOCUMENTS.   DEBTOR FURTHER ACKNOWLEDGES THAT SUCH WAIVER OF THE RIGHT TO A TRIAL BY JURY IS MADE AFTER CONSULTATION WITH COUNSEL.

13.   **TERM OF AGREEMENT.**   The term of this Agreement will begin on the date of this Agreement and continue in full force and effect and be binding on the Debtor until the date that all of the Obligations are fully and finally paid and satisfied.

14.   **PERFECTION; FURTHER ASSURANCES.**   The Debtor agrees to comply with all applicable laws and requirements in order to grant to the Secured Party a valid, perfected first Lien on the Collateral except to the extent expressly permitted pursuant to Section 19 hereof.   At any time and from time to time, the Debtor, on request of the Secured Party, will give, execute, file and/or record any notice, financing statement, instrument, document or agreement that the Secured Party may consider necessary or desirable to create, preserve, continue, perfect or validate any security interest or other Lien granted under this Agreement or which the Secured Party may consider necessary or desirable to exercise or enforce its rights under this Agreement.   Without limiting the generality of the foregoing, the Secured Party is authorized to file with respect to the Collateral one or more financing statements or other documents without the signature of the Debtor and to name therein the Debtor as debtor and the Secured Party and/or HUD as secured parties; and correct or complete, or cause to be corrected or completed, any financing statements or other such documents as have been filed naming the Debtor as debtor and the Secured Party and/or HUD as secured parties.   The Debtor hereby appoints the Secured Party as its attorney-in-fact and authorizes the Secured Party, acting alone on behalf of the Debtor, to execute, acknowledge, deliver, file and/or record any and all documents requiring execution by the Debtor and necessary or desirable to effectuate or facilitate the purposes of this Agreement and/or the obligations or covenants of the Debtor under this Agreement.   The power of attorney granted hereby is coupled with an interest and is irrevocable. The Secured Party is also authorized by the Debtor to give notice to any Person that the Secured Party may consider necessary or desirable under applicable law to preserve, perfect or protect the Secured Party's and/or HUD's interests in the Collateral.   Without limiting the generality of the

10

foregoing, with respect to any of the Collateral for which control of such Collateral is a method of perfection under the UCC, including all of the Debtor's rights, titles and interests in deposit accounts, investment property, electronic chattel paper and letter-of-credit rights, the Debtor will, on Secured Party's request, cause to be executed by each Person that the Secured Party determines is appropriate, a control agreement in a form acceptable to the Secured Party.

15.     **INTEREST.**  Any amounts payable by the Debtor under this Agreement will bear interest at the rate of interest provided in the Note from the date on which such amounts are payable under this Agreement until the date on which such payments are made by the Debtor to the Secured Party; however, nothing in this Agreement will be deemed to give to the Debtor the right to withhold payment in consideration of the payment of such interest.

16.     **DELIVERY OF NOTICES.**  All notices must be in writing and sent (a) in person, (b) by certified or registered mail, or (c) by overnight delivery carrier for next day delivery, in each case to the address listed in the opening paragraph of this Agreement (or if notice of a new address is given in accordance with this Agreement, to the new address).  Notice given in any other manner will not be considered delivered or given unless and until actually received.  A notice period will start (i) if mailed, three business days after notice was sent by certified or registered mail, (ii) the next business day after being sent by overnight delivery, and (iii) the day the notice was delivered in person.

17.     **REVIVAL OF SECURITY INTEREST.**  If the Debtor makes a payment or payments to the Secured Party (or the Secured Party receives any payment or proceeds of the Collateral) that are subsequently voided, avoided, set aside, annulled, or disregarded under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of the payment or proceeds received, the Obligations or part intended to be satisfied will be revived and will continue in full force and effect as if these payment(s) or proceeds had not been received by the Secured Party, and the security interest granted herein shall be enforceable as to such Obligations as fully as if such payments had never been made.

18.     **CLAIMS AGAINST SECURED PARTY.**

(a)     Notification.  The Secured Party shall not be in default under this Agreement, or under any of the other Loan Documents, unless a written notice specifically setting forth the claim of the Debtor shall have been given to Secured Party within one hundred eighty (180) days after the occurrence of the event which the Debtor alleges gave rise to such claim and the Secured Party does not remedy or cure the default, if any, with reasonable promptness thereafter.

(b)     Remedies.  If it is determined by the final, non-appealable order of a court of competent jurisdiction that the Secured Party has breached any of its obligations under the Loan Documents and has not remedied or cured same with reasonable promptness following receipt of notice thereof, the Secured Party's responsibilities shall be limited to the following: (i) where the breach consists of the failure to grant consent or give approval in violation of the terms and requirements of any of the Loan Documents, the obligation to grant such consent or give such approval; and (ii) where the breach involves any other violation of the Loan Documents, or where the Secured Party is determined to have acted in bad faith, the payment of any actual, direct, compensatory damages sustained by the Debtor as a result thereof.

11

App.374

(c)    Limitations.  In no event, however, shall the Secured Party be liable to the Debtor, or to any other party claiming through the Debtor, for any other damages, including, without limitation, indirect, speculative, or punitive damages, whatever the nature of the breach by the Secured Party of its obligations under any of the Loan Documents.  In no event shall the Secured Party be liable to the Debtor, or to any other party claiming through the Debtor, unless a written notice specifically setting forth the nature of the claim shall have been given to the Secured Party within the time period specified above.

**19.    PROVISIONS REGARDING ACCOUNTS RECEIVABLE LOANS.**  This Section 19 shall apply when the Debtor operates the Project, and there is no lease of the Premises.  In all other instances, there shall be no accounts receivable financing under this Section.

(a)    Definitions.  The following words and terms shall have the meanings hereinafter set forth:

"Accounts" shall mean all right, title and interest of the Debtor in and to the following, in each case arising from the Debtor's operation of the Project in the ordinary course of the Debtor's business: (a) all rights to payment of a monetary obligation, whether or not earned by performance, including, but not limited to, accounts (including, but not limited to accounts receivable, health-care insurance receivables, Medicaid and Medicare receivables, Veterans Administration receivables, or other governmental receivables, private patient receivables, and HMO receivables), (b) payment intangibles, (c) guaranties, letter-of-credit rights and other supporting obligations relating to the property described in clauses (a) and (b), and (d) all of the proceeds of the property described in clauses (a), (b) and (c).  Notwithstanding the foregoing, "Accounts" do not include accounts rising from the sale of the Debtor's equipment, inventory or other goods, other than accounts arising from the sale of Debtor's inventory in the ordinary course of the Debtor's business.

"Eligible AR Lender" means a bank, financial institution or other institutional lender which is in the business of making loans to provide working capital to businesses and which is not affiliated with the Debtor.

"Eligible AR Loan" means a loan or line of credit obtained by the Debtor from an Eligible AR Lender (a) for the sole purpose of providing working capital for the operation of the Project and, with the approval of HUD and Secured Party, other projects that are encumbered by mortgage loans insured or held by HUD and (b) which satisfies all of the requirements of this Section 19.

"Required Intercreditor Agreement" means an Intercreditor Agreement (including any HUD-required Rider) executed by the Secured Party, the Eligible AR Lender and the Debtor, in form and substance satisfactory to Secured Party and approved by HUD.

(b)    Eligible AR Loan.  Subject to the written approval of the Secured Party and HUD, the Debtor may obtain and maintain at any time one, and only one, Eligible AR Loan, which Eligible AR Loan may be secured by a first lien on the "AR Lender Priority Collateral"

12

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 381 of 897

Case 25-15245-pmm    Doc 56-14    Filed 03/31/26    Entered 03/31/26 17:25:33    Desc
Exhibit L SVM Security Agreement    Page 14 of 24

(composed of Accounts and as further defined in the Required Intercreditor Agreement), subject to the following limitations and requirements:

(i)    in no event shall the principal amount of the Eligible AR Loan ever exceed such amount as may be approved in writing by Secured Party and HUD;

(ii)    without the written approval of the Secured Party, none of the Collateral, except the AR Lender Priority Collateral, shall be given as security for any Eligible AR Loan;

(iii)    with respect to any existing Eligible AR Loan, the Eligible AR Lender, Debtor and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement prior to closing of the Loan;

(iv)    with respect to any other Eligible AR Loan, the Eligible AR Lender, Debtor and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement before such Eligible AR Loan is closed, any funds are disbursed thereunder, any UCC financing statements are filed in connection therewith or any security interest in connection therewith is granted or perfected;

(v)    the Eligible AR Loan, the collateral therefor and all of the terms and conditions thereof shall at all times comply with all of the terms and conditions of the applicable Required Intercreditor Agreement; and

(vi)    until the Eligible AR Loan is paid in full, the written approval of the Secured Party and HUD is required for any proposed modifications, extensions, renewals, or amendments to a Material Term of the Eligible AR Loan or the related security agreement, prior to the effective date of such amendment(s).    As used herein, "Material Term" means a term in a loan or security agreement that (1) extends the maturity date of the loan, (2) adds guarantors to the loan, (3) releases guarantors from the loan, (4) adds borrowers to the loan, (5) adds an interest reserve to the loan, (6) amends the interest rate payable on the outstanding principal balance of the loan, (7) increases or decreases the principal amount of the loan, (8) adds collateral as additional security for the loan, and/or (9) amends or expands the type of obligations secured by the loan.

(c)    Required Intercreditor Agreement.    Each Required Intercreditor Agreement shall be included in the definition of the Loan Documents while it is in effect.  The Debtor shall comply at all times with the Required Intercreditor Agreement then in effect.

(d)    Information.    Debtor shall, from time to time, promptly following a request by Secured Party or HUD, provide to Secured Party and/or HUD (i)  any and all information and documents available to Debtor regarding any Eligible AR Loan and/or AR Lender Priority Collateral (including, but not limited to histories of draws upon, payments on account of, and outstanding balances with respect to, the Eligible AR Loan) and (ii) copies of

13

App.376

any and all documents evidencing, securing and/or related to any Eligible AR Loan and/or any amendments thereto.

**20.    PROJECT CAPITAL NEEDS ASSESSMENTS.** Debtor agrees to pay the cost of Project Capital Needs Assessments ("PCNA Reports") that may be required after the date hereof by HUD (for periodic ten (10) year re-evaluation of the amount of deposits to the reserve fund for replacements created under the Regulatory Agreement), pursuant to any HUD requirement (including, but not limited to, the commitment issued by HUD to insure the Loan). Without limiting the above obligation, Debtor authorizes Secured Party to make withdrawals for this purpose from the reserve fund for replacements created under the Regulatory Agreement. The Debtor shall cooperate in any legal and lawful manner necessary to obtain PCNA Reports, including, but not limited to, providing access to the Property and copies of all reports, documents relating to past capital expenditures and any other information reasonably requested by the party preparing the PCNA Reports, the Secured Party and/or HUD.

**21.    MISCELLANEOUS.**

(a)    This Agreement is intended to be supplemental to and not in substitution or in derogation of any security agreement contained in any other Loan Document.

(b)    In any instance where the consent or approval of the Secured Party may be given or is required or any determination is to be rendered by the Secured Party hereunder, the granting, withholding or denial of such consent or approval and the rendering of such determination shall be made or exercised by the Secured Party at its sole and exclusive option.

(c)    It is understood and agreed that no judgment or decree which may be entered on any debt secured or intended to be secured by the Mortgage shall operate to abrogate or lessen the effect of this Agreement, but that this Agreement shall continue in full force and effect until the payment and discharge of the Obligations.

(d)    This Agreement, any Required Intercreditor Agreement and the other Loan Documents represent the entire agreement between the Secured Party and the Debtor with respect to the subject matter of this Agreement and supersede all previous agreements, negotiations, and understandings with respect to the subject matter of this Agreement. Neither this Agreement nor any of the other Loan Documents may be amended, altered or changed other than in a writing signed by the Secured Party and the Debtor. The Debtor's warranties and representations in this Agreement will be treated as being continuing warranties and representations, made by the Debtor with the same effect as though the representations and warranties had been made again on, and as of, each day of the term of this Agreement.

(e)    This Agreement may be executed in several counterparts and each counterpart will be considered an original of this Agreement.

**22.    RIGHTS OF SECRETARY OF HOUSING AND URBAN DEVELOPMENT.**

(a)    Debtor and Secured Party hereby agree that HUD shall be an additional

14

secured party under this Security Agreement together with Secured Party, as their interests may appear, and that HUD shall be listed on the Uniform Commercial Code Financing Statements to be filed contemporaneously herewith; provided, however, that nothing herein or in the Uniform Commercial Code Financing Statements shall require the execution, now or any future time, of any amendment, extension, or other document by HUD.

(b)    To the extent any party herein is required or desires to give notice to HUD hereunder, such notice shall be delivered in accordance with the provisions hereof, as follows: U.S. Department of Housing and Urban Development, c/o Office of Healthcare Programs, 451 7th Street S.W., Washington, DC 20410.

**IN WITNESS WHEREOF**, the Debtor and the Secured Party have signed this Agreement as of the date in the first paragraph of this Agreement.

[SEE ATTACHED COUNTERPART SIGNATURE PAGES]

15

## COUNTERPART SIGNATURE PAGE TO SECURITY AGREEMENT

### DEBTOR:

SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007,
a trust formed under the laws of Pennsylvania

By: SAUCON MANAGEMENT LLC,
   a Pennsylvania limited liability company,
   Trustee

By: _____
Name: Abraham R. Atiyeh
Title: Manager

## COUNTERPART SIGNATURE PAGE TO SECURITY AGREEMENT

### SECURED PARTY:

**M&T REALTY CAPITAL CORPORATION,**
a Maryland corporation

By: _Christine R. Chandler_

Name: Christine R. Chandler
Title: Vice President

## EXHIBIT A TO SECURITY AGREEMENT

### LEGAL DESCRIPTION

UNIT I of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715
Being more fully bounded as set forth on attached page

A-1

## DESCRIPTION OF 1050 MAIN STREET

ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 20065 Page 759, bounded and described as follows to wit:

BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

1.    South 86'47'33" West 266.09 feet; thence-in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;

2.    North 03' 14'23" West 59.03 feet;

3.    North 86' 41'33" East 18.00 feet;

4.    North 03' 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same

5.    North 86' 48'59" East 247.48 feet to the westerly right of way line of Main Street; thence along the same

6.    South 03' 18'24" East 470.30 feet to the place of beginning.

CONTAINS:    117,610.588 Sq. Ft.    2.7000 Acres

A-2

## EXHIBIT B TO SECURITY AGREEMENT

All of the following described property and interests in property, whether now owned or existing or hereafter acquired, arising or created:

a.    All fixtures, equipment and other goods and tangible personal property of every kind and description whatsoever now or hereafter located on, in or at the premises described in Exhibit A to this Security Agreement (the "Premises"), including, but not limited to, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, motors, furnaces, compressors and transformers; all power generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment and fixtures, fans and switchboards; all telephone equipment (except that telephone equipment leased from a telephone company); all piping, tubing, and plumbing equipment and fixtures; all heating, refrigeration, air-conditioning, cooling, ventilating, sprinkling, water, power, waste disposal and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm, and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, kitchen and laundry fixtures, utensils, appliances and equipment, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture now or hereafter installed or used or usable in the operation of any part of the buildings, structures or improvements erected or to be erected in or upon the Premises and every replacement thereof, accession thereto, or substitution therefor, whether or not the same are now or hereafter attached to the Premises in any manner;

b.    All articles of tangible personal property not otherwise described herein which are now or hereafter located in, attached to or used in, on or about the buildings, structures or improvements now or hereafter located, placed, erected, constructed or built on the Premises and all replacements thereof, accessions thereto, or substitution therefor, whether or not the same are, or will be, attached to such buildings, structures or improvements in any manner;

c.    All rents, leases, lease contracts, lease agreements, income, revenues, issues, profits, royalties and other benefits arising or derived or to be derived from, or related to, directly or indirectly, the Premises, whether or not any of the property described in this item (c) constitutes accounts, chattel paper, documents, general intangibles, instruments, investment property, deposit accounts or money;

d.    All awards now or hereafter made ("Awards") with respect to the Premises as a result of (i) the exercise of the power of condemnation or eminent domain, or the police power, (ii) the alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Premises (including, but not limited to, any destruction or decrease in the value by fire or other casualty), whether or not any of the property described in this item (d) constitutes accounts, chattel paper, documents, general intangibles, instruments, investment property, deposit accounts or money;

B-1

e.      All land surveys, plans and specifications, drawings, briefs and other work product of the Debtor or its employees, contractors or agents, and other papers and records now or hereafter used in the construction, reconstruction, alteration, repair or operation of the Premises;

f.      All licenses, permits, certificates and agreements for the provision of property or services to or in connection with, or otherwise benefiting, the Premises, including, but not limited to, nursing home and/or assisted living facility licenses, certificates of need, "bed authority" and Medicare and Medicaid provider agreements; however, the Secured Party disclaims a security interest in such of the property described in this item (f) to the extent that a security interest in such property may not be granted to the Secured Party without the forfeiture of the rights of the Debtor (or any assignee of the Debtor) or a default resulting thereunder;

g.      Any and all funds, monies, securities, and other property held in escrow or as reserves, and all rights to receive (or to have distributed to the Debtor) any funds, monies, securities, or other property held in escrow or as a reserve, including, but not limited to, all of Debtor's rights (if any) to any and all funds or amounts held in reserves or accounts created under the Regulatory Agreement, including, but not limited to, replacement reserve accounts and residual receipts accounts;

h.      All of the Debtor's accounts (including, but not limited to, health-care-insurance receivables and other accounts receivable), general intangibles (including, but not limited to, payment intangibles, tax refunds, tax refund claims and low income housing tax credits, if any, applicable to the Premises), chattel paper (including, but not limited to, tangible chattel paper and electronic chattel paper), leases, lease contracts, lease agreements, instruments, documents, inventory, as-extracted collateral, cash, money, deposit accounts, lock boxes, blocked accounts, certificates of deposit, investment property, insurance policies, letter-of-credit rights, judgments, liens, causes of action, warranties, guaranties, supporting obligations, and all other properties and assets of the Debtor, tangible or intangible, whether or not similar to the property described in this item (h) or elsewhere in this Exhibit B;

i.      All books, records and files of whatever type or nature relating to any or all of the property or interests in property described herein or the proceeds thereof, whether or not written, stored electronically, optically or electromagnetically or in any other form, and whether or not such books, records, or files constitute accounts, equipment or general intangibles;

j.      All current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, waters, watercourses, and appurtenances related to or benefiting the Premises, and all rights-of-way, streets, alleys and roads which may have been or in the future may be vacated;

k.      All contracts, options and other agreements for the sale of the Premises or the improvements thereon, entered into by the Debtor now or in the future, including cash or securities or other security deposited to secure performance by the parties of their obligations, and all construction contracts, architectural and engineering agreements and management

B-2.

contracts now or in the future existing pertaining to the construction, rehabilitation, development, repair, operation, ownership, equipping or management of the Premises;

l.      Any and all rights of Debtor in tenant security deposits which have not been forfeited by any tenant under any lease;

m.      All names under or by which any part of the Premises may be operated or known, and all trademarks, trade names, and goodwill relating to any part of the Premises;

n.      The interest of the Debtor in and to any and all funds and monies created or established and held pursuant to any indenture of trust or similar instrument authorizing the issuance of bonds or notes for the purpose of financing the Project located upon the Premises;

o.      All rights, titles and interests of the Debtor under any and all security agreements now or hereafter entered into by the Debtor with any lessee of all or any portion of the Premises and all of the Debtor's rights, titles and interests in the collateral described therein; and

p.      All products and proceeds of any and all of the property (and interests in property) described herein, including, but not limited to, proceeds of any insurance, whether or not in the form of original collateral, accounts, contract rights, chattel paper, general intangibles, equipment, fixtures, goods, investment property, letter-of-credit rights, leases, lease contracts, lease agreements, instruments, inventory, documents, deposit accounts, supporting obligations or cash proceeds.

B-3

## EXHIBIT C TO SECURITY AGREEMENT

**Other Names Used by Debtor in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Assets Acquired in Bulk Transfer in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Debtor's Rights in the Following** (see Section 2(a) of Agreement):

*Investment property*:  **None**

*Letters of Credit*: **None**

*Electronic Chattel Paper*: **None**

*Commercial Tort Claims*: **None**

*Instruments (including promissory notes)*: **None**

*Deposit Accounts*:

| Account Number | Depository Bank | Account Type (e.g., operating or payroll) | Government Accounts (see note below) |
|---|---|---|---|
| N/A | | | |

Note:  Designate if Deposit Account receives deposits of proceeds of accounts from federal, state or local governments (e.g., Medicare and Medicaid), and if so, whether such Deposit Account is solely for such deposits or whether the Deposit Account commingles other non-governmental deposits.  See Section 2(i) of the Agreement for the Debtor's obligations in this regard.

C-1

11/05/2012 14918134 V.2

# EXHIBIT M

**SAUCON VALLEY MANOR**
**FHA Project No. 034-22096**

## LESSEE SECURITY AGREEMENT

**THIS LESSEE SECURITY AGREEMENT** (the "Agreement") is made, entered into and dated as of the 1st day of December, 2012, by and between **SAUCON VALLEY MANOR, INC.**, a corporation organized and existing under the laws of the state of Pennsylvania, whose principal place of business is located at 1050 Main Street, Hellertown, Pennsylvania 18055 (the "Lessee" or "Debtor"); and **M&T REALTY CAPITAL CORPORATION**, a corporation organized and existing under the laws of the State of Maryland and having an address at 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201 (the "Secured Party"), as follows:

### Recitals

**A.**    Contemporaneously with this Agreement, the Secured Party has made a loan to **SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007** (the "Borrower") in the maximum principal amount of $19,462,800.00 (the "Loan"). The Loan is (i) evidenced by the Mortgage Note made by the Borrower in favor of the Secured Party, dated as of even date herewith (the "Note") and (ii) secured, in part, by an assisted living project known as Saucon Valley Manor, FHA Project No. 034-22096 (the "Project") located at 1050 Main Street, Hellertown, Pennsylvania 18055, as more particularly described in Exhibit A attached hereto and incorporated herein by reference (the "Premises"). The Premises are leased to the Lessee by the Borrower pursuant to a Lease dated January 1, 2006, as amended (the "Lease"), and are the subject of the Regulatory Agreement Nursing Homes between the Lessee and the Federal Housing Commissioner, dated as of even date herewith (the "Regulatory Agreement Nursing Homes").

**B.**    As security, in part, for the Obligations (as defined below), the Borrower (i) granted to the Secured Party the Mortgage, dated as of even date herewith, encumbering the Project, which has been or is concurrently herewith being recorded in the real estate records of the jurisdiction in which the Premises are located (the "Mortgage"), (ii) entered into a Security Agreement, dated as of even date herewith, with the Secured Party (the "Borrower Security Agreement") and (iii) entered into a Regulatory Agreement with the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner ("HUD"), dated as of even date herewith (the "Borrower Regulatory Agreement"). As additional security, the Lessee has entered into this Agreement with the Secured Party. The Note, the Mortgage, the Borrower Security Agreement, the Borrower Regulatory Agreement, this Agreement, the Regulatory Agreement Nursing Homes and all other agreements, instruments, and documents which are now existing or are in the future signed or delivered by, or on behalf of, the Borrower to the Secured Party and/or HUD, or by or on behalf of the Lessee to the Secured Party and/or HUD, in connection with, or related to, the Lease, the Loan or the other Obligations are sometimes collectively referred to as the "Loan Documents."

**C.**    The Lessee is affiliated with and/or shares common ownership with the Borrower, and shall benefit directly from the making of the Loan.

App.388

**D.**     As used herein, "Healthcare Assets" means (i) any and all licenses, permits and/or approvals issued by any governmental authority with respect to the use or operation of the Project for its "Approved Use" (as defined in the Regulatory Agreement Nursing Homes), (ii) any and all Medicare and Medicaid provider agreements, and (iii) any and all "Government Accounts" and "Government Payments" (each as defined below).

### Statement of Agreement

**1.     SECURITY INTEREST; SETOFF.**

(a)     To secure the full, prompt and complete payment and performance of all Obligations, the Lessee hereby, to the fullest extent permitted by applicable law with respect to Healthcare Assets, grants to, and creates in favor of, the Secured Party a continuing security interest in all of Lessee's right, title and interest in and to the property described on Exhibit B attached hereto and incorporated herein by reference (the "Collateral"). "Obligations" means, as of any date, the Loan and all other indebtedness, liabilities, obligations, covenants, debts and amounts owing from the Borrower and/or the Lessee to the Secured Party and/or HUD arising out of, in connection with, described in, or evidenced by the Loan Documents, whether direct or indirect, absolute or contingent, related or unrelated, now or in the future existing and whether consisting of principal, interest, fees, indemnities, expenses (including attorneys' fees), charges or other sums, however any of that indebtedness, obligations, or liabilities may be evidenced or acquired, all as now exist or may, after the date of this Agreement, be incurred, renewed, extended, consolidated, adjusted or amended.

(b)     In addition to (and without limitation of) any right of setoff, lien or counterclaim the Secured Party may otherwise have, the Secured Party may, at its option, setoff and retain, and may refuse to allow withdrawals by, or for the benefit of the Borrower and/or Lessee of, any and all funds, monies, securities and other property held in escrow or for the account of the Borrower and/or the Lessee pursuant to the Loan Documents, against any amount payable by the Borrower and/or the Lessee under the Note, the Mortgage or any of the other Loan Documents which is not paid when due (whether or not any of the funds, monies, securities, or other property are then distributable to, or on behalf of, the Lessee).

(c)     Notwithstanding any provisions to the contrary contained in this Agreement, nothing set forth in this Agreement shall be construed as granting to Secured Party a security interest, assigning receivables, giving dominion and control or designating an attorney-in-fact with respect to Healthcare Assets in violation of any applicable law.

**2.     REPRESENTATIONS; GENERAL COVENANTS.**

(a)     To induce the Secured Party to make the Loan, the Lessee promises to the Secured Party that the following statements are, and will continue throughout the term of this Agreement to be, true: (i) except to the extent expressly permitted pursuant to Section 19 hereof, the security interest granted to the Secured Party in the Collateral constitutes a valid, first priority security interest; (ii) the Lessee has good title to, and is the sole and lawful owner of, the Collateral; (iii) the Lessee has full power and authority to enter into and perform its obligations under this Agreement; (iv) except to the extent expressly permitted pursuant to Section 19

-2-

hereof, rights granted to the Borrower under the Lease, if any, which are subordinate to the liens in favor of the Secured Party ("Subordinate Lease Rights") and taxes that are not yet due and payable, the Collateral is free and clear of any lien, security interest, claim, interest, pledge, assignment or other encumbrance (a "Lien") except (A) the security interest in favor of the Secured Party and (B) those Liens, if any, approved in writing by Secured Party (the "Permitted Liens"); (v) the Lessee keeps all tangible Collateral at the Premises; (vi) all trade names, assumed names, fictitious names and other names used by the Lessee during the five year period preceding the date of this Agreement are set forth on Exhibit C, and the Lessee has not, during the preceding five year period, except as may be set forth on Exhibit C, acquired any of its assets in any bulk transfer; (vii) Lessee's chief executive office is as set forth in the first paragraph of this Agreement; (viii) Lessee's jurisdiction of organization is as set forth in the first paragraph of this Agreement; (ix) Lessee's exact legal name is as set forth in the first paragraph of this Agreement; (x) Lessee's organizational number (if any) as assigned by the State in which Lessee is organized is the number identified as Lessee's organizational ID # on the financing statement(s) filed in connection with the closing of the Loan, and (xi) except as may be set forth on Exhibit C, the Lessee has no rights, titles or interests in, or with respect to, any investment property, any letters of credit, any electronic chattel paper, any commercial tort claims, any instruments, including promissory notes, or any Deposit Accounts (as defined below).

   (b) The Lessee will (i) cause, at its expense, any and all UCC financing statements naming as secured party anyone other than Secured Party, which represent or evidence a Lien or potential Lien against any or all of the Collateral, to be terminated within thirty (30) days of the date hereof (except Permitted Liens, if any), and (ii) provide within forty-five (45) days of the date hereof, at its expense, to Secured Party one or more UCC search reports with respect to each office in which a UCC filing may be required in order for Secured Party to validly perfect its security interest in any or all of the Collateral, confirming that a UCC financing statement has been filed in such office in favor of Secured Party and that there are no other UCC financing statements in effect with respect to any of the Collateral except those in favor of Secured Party and Permitted Liens. The Lessee will not grant, create or permit to exist any Lien on any of the Collateral except for the Liens in favor of the Secured Party, Permitted Liens, and Subordinate Lease Rights, and except to the extent expressly permitted pursuant to Section 19 hereof. The Lessee, at the Secured Party's request, will defend the Collateral against the claims and demands of any other individual, unincorporated association, partnership, joint venture, trust, business trust, corporation, limited liability company, institution, entity or any governmental authority ("Persons") at any time claiming any interest in the Collateral.

   (c) The Collateral will only be used by the Lessee in the operation of the Project. Until an Event of Default (as defined below) occurs, the Lessee may have possession of the Collateral and use it in any lawful manner not inconsistent with the Loan Documents and any policy of insurance thereon. The Lessee will not sell, assign, lease, or otherwise dispose of any of the Collateral without the prior written consent of the Secured Party; however, the Lessee will have the right, without the Secured Party's consent, to transfer, sell or dispose of any Collateral which is (i) tangible personal property and (ii) obsolete or worn out ("Consumed Property") if the Lessee, concurrently with such transfer, sale or disposition, replaces the Consumed Property with replacement personal property which is free and clear of any Liens except for the Liens in favor of the Secured Party and Subordinate Lease Rights and has the same or greater value and utility as the Consumed Property originally had (any such replacement personal property will

-3-

App.390

automatically become a part of the Collateral under this Agreement).  The Secured Party's interests in the proceeds of the Collateral (or notification of its interests in the proceeds of the Collateral in financing statements or otherwise) will not be construed as modifying this Agreement or as the Secured Party's consent to the disposition of any Collateral other than as provided in this Agreement.

(d)    All tangible Collateral is to be located at the Project ("Collateral Location"), and no tangible Collateral may be removed therefrom without the prior consent of the Secured Party unless the Collateral is (i) Consumed Property under the terms of Section 2(c) above or (ii) being removed in accordance with the terms of Section 2(e) below.  Immediately on demand therefor by the Secured Party, the Lessee will deliver to the Secured Party any and all evidences of ownership of the Collateral (including certificates of title and applications for title). The Lessee will give the Secured Party not less than 30 days prior written notice of any change of (A) Lessee's corporate, partnership, limited liability company, doing business, trade or legal name or (B) any Collateral Location.

(e)    The Lessee will, at its own cost and expense, maintain all of the tangible Collateral in good working condition and make all necessary renewals, repairs, replacements, additions, betterments and improvements thereto, and, in this connection, the Lessee may temporarily remove the same, or any part thereof, from the Project if such removal is necessary or advisable in connection with the Lessee's fulfilling of its obligations under this Section 2(e), and does not affect the priority of the security interests created under this Agreement.

(f)    The Lessee will, upon request of Secured Party, deliver to Secured Party copies of all reports, financial statements and other information which the Lessee is obligated to provide to HUD in connection with the Project and/or Collateral not later than the earlier of (i) the delivery of such reports, financial statements and other information to HUD or (ii) ten (10) days after Secured Party makes such request.

(g)    The Lessee will not change (i) without thirty (30) days prior notice to the Secured Party, the location of its chief executive office or (ii) without the prior written consent of the Secured Party, which shall not be unreasonably withheld, its jurisdiction of organization.

(h)    The Lessee will not merge or consolidate with or into any other Person without the prior written consent of the Secured Party.

(i)    As used in this Agreement, the capitalized term "Deposit Account" means (1) any deposit account into which payments to the Lessee with respect to the operation of the Project are initially deposited, as opposed to being transferred from another Project account, and (2) any deposit account into which Government Payments are directly transferred from a Government Account (defined below).  The Lessee will not establish a Deposit Account unless (A) with respect to any such proposed Deposit Account (other than those set forth on Exhibit C) at least thirty (30) days prior written notice of the name and address of the depository bank, the type of account and any other information reasonably requested by the Secured Party is provided to Secured Party and (B) contemporaneously therewith, if requested by the Secured Party consistent with the Lessee's obligations under Section 14, a control agreement in form and substance acceptable to the Secured Party is entered into among the Lessee, the Secured Party

-4-

and the depository bank where the Deposit Account would be maintained (any such depository bank is referred to herein as a "Depository Bank" and any such control agreement is referred to herein as a "DACA"), unless the Deposit Account is a Government Account. A DACA may not be changed or terminated without the prior written consent of the Secured Party. Upon the Secured Party's written request (which request need be made only once and not on a recurring basis), the Lessee will take all reasonable steps to cause each Depository Bank to provide to the Secured Party (I) whether by Internet access or otherwise, on-line screen access to daily activity in the Deposit Accounts, and (II) a copy of each periodic account statement relating to the Deposit Accounts ordinarily furnished by such Depository Bank to the Lessee. The Lessee authorizes and approves of the Secured Party communicating directly with each Depository Bank. Unless the Lessee receives no Government Payments, the Lessee will maintain one or more separate Deposit Account(s) into which only Government Payments (defined below) are deposited (collectively, the "Government Accounts"), and the Lessee will not commingle in any Government Account proceeds of accounts from non-governmental payors with proceeds of accounts owing from governmental authorities, including Government Payments. The Lessee shall cause all Government Payments related to the operation of the Project to be paid directly into the Government Accounts. Prior to establishing a Government Account, the Lessee shall cause the Depository Bank that maintains such Government Account to enter into a deposit account instruction services agreement with the Secured Party and the Lessee in form and substance acceptable to the Secured Party with respect to such Government Account (each, a "DAISA"), which requires initiation of a funds transfer each business day, unless the Secured Party approves otherwise, of all available funds in the applicable Government Account to a Deposit Account of Lessee that is subject to a DACA and is not a Government Account. Not less than thirty (30) days prior to the effective date thereof, the Lessee will provide to the Secured Party a copy of (i) any change to any DAISA, or (ii) any new directions with respect to a Government Account issued to a Depository Bank maintaining such Government Account, in each case contemporaneously with providing the change or directions to the Depository Bank. Without limiting the generality of the foregoing, without the prior written consent of the Secured Party, neither a change to any DAISA nor any such new directions shall instruct a Depository Bank to transfer funds from the Government Account to a Deposit Account that is not then subject to a DACA. No change to or termination of a DAISA, nor any such new directions with respect to a Government Account, shall be made without the prior written consent of the Secured Party. Also, the Lessee shall not close a Government Account subject to a DAISA without the prior written consent of the Secured Party. Failure of Lessee to comply with any of the provisions of this Section 2(i) shall constitute an "Event of Default." As used herein, "Government Payment" means a payment from a governmental entity and shall include, without limitation, payments governed under the Social Security Act (42 U.S.C. §§ 1395 et seq.), including payments under Medicare, Medicaid and TRICARE/CHAMPUS, and payments administered or regulated by the Centers for Medicare and Medicaid Services of Department of Health and Human Services.

     **3.**     **COMPLIANCE WITH LAWS.** The Lessee will comply with the requirements of all valid and applicable federal, state and local laws.

     **4.**     **TAXES; EXPENSES.** Lessee will pay, when due, all taxes, assessments and other charges lawfully and validly levied or assessed on the Collateral or any part thereof. The Lessee will pay and, as applicable, reimburse the Secured Party for (i) any and all fees, costs and

expenses, of whatever kind and nature, including the fees, expenses and disbursements of the Secured Party's counsel (including, but not limited to, fees, expenses and disbursements for preparation of documents, making title examinations and rendering opinion letters) which the Secured Party may incur in connection with filing any financing statements or other public notices to protect its interests hereunder, the enforcement, preservation and/or protection of the Secured Party's rights and/or remedies under the Loan Documents, whether incurred through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or relating to the Loan, and (ii) all filing and recording fees and taxes payable in connection with the transactions contemplated by the Loan Documents. All amounts payable by Lessee to Secured Party under this Section 4 will be paid by the Lessee upon the Secured Party's demand therefor.

5.    **INSPECTION; NOTICES.** Subject to resident privacy rights, the Secured Party, or its agents, may enter on the Project and any other Collateral Location at any time during normal business hours, and from time to time, for the purpose of inspecting the Project and/or the Collateral and making copies or abstracts of all of the Lessee's records pertaining to the Collateral. The Lessee will keep accurate and complete records of the Collateral. The Lessee will give the Secured Party prompt notice of any Event of Default.

6.    **INSURANCE.** The Lessee will purchase and maintain insurance at all times with respect to the Premises, all improvements now or hereafter located thereon, and all tangible Collateral against risks of fire (including so-called extended coverage), theft, vandalism, and such other risks as the Secured Party may require, in such form, for such periods, and written by such companies as may be satisfactory to the Secured Party, such insurance to include "law and ordinance" coverage, and to be payable to the Secured Party as its interests may appear. The Lessee will purchase and maintain at all times liability insurance and business interruption insurance in such amounts and issued by such companies as may be required from time to time by the Secured Party. All policies of insurance will provide for thirty (30) days advance written notice to the Secured Party of cancellation or any material change in coverages of such insurance. The Lessee will furnish the Secured Party with certificates or other evidence satisfactory to the Secured Party of compliance with the foregoing insurance provisions.

7.    **DISCHARGE OF LIENS.** At its option but without any obligation to do so, the Secured Party may (a) discharge any taxes or other Liens at any time levied or placed on the Collateral, (b) pay for insurance on the Collateral, and/or (c) pay for the maintenance and preservation of the Collateral. The Lessee will reimburse the Secured Party on its demand for any payment made, or any expense incurred, by the Secured Party pursuant to this Section 7. All of the foregoing sums paid or advanced by the Secured Party will constitute part of the Obligations and will be secured by the Collateral.

8.    **EVENTS OF DEFAULT.** Each of the following events or circumstances, whether or not caused by or within the control of the Lessee, will be an "Event of Default" under this Agreement:

(a)    Any of the Obligations are not paid on or before the date when due, subject to any grace period provided under the Note;

-6-

(b)    The Lessee does not observe, perform or comply with any of the terms or conditions of this Agreement;

(c)    A default or breach under the Lease or under any of the Loan Documents (exclusive of this Agreement which is covered by the other subsections of this Section 8) has occurred, which default or breach is not cured within any applicable grace period;

(d)    Any warranty, representation or statement made or furnished to the Secured Party by, or on behalf of, the Lessee proves to have been false in any material respect when made or furnished or when treated as being made or furnished to the Secured Party;

(e)    The Secured Party does not have, for any reason, a perfected, first priority security interest in all of the Collateral except to the extent expressly permitted pursuant to Section 19 hereof;

(f)    There occurs any actual or threatened demolition of or injury or waste to the Project premises, not covered by insurance, or not replaced or restored by the Lessee or the Borrower, which may materially impair the value of the Collateral or the Project;

(g)    Filing by or against the Lessee of a petition in bankruptcy, for a reorganization, arrangement or debt adjustment, or for a receiver, trustee, or similar creditors' representative for Lessee's property or any part thereof, or of any other proceeding under any federal or state insolvency or similar law (and if such petition or proceeding is an involuntary petition or proceeding filed against the Lessee without its acquiescence therein or thereto at any time, the same is not promptly contested and, within 60 days of the filing of such involuntary petition or proceeding, dismissed or discharged), or the making of any general assignment by the Lessee for the benefit of creditors, or the Lessee dissolves or is the subject of any dissolution, winding up or liquidation;

(h)    The Lessee is dissolved and liquidation of the Lessee is commenced in accordance with the Lessee's organizational documents and/or the law of the jurisdiction of organization; or

(i)    The Lessee changes its name or the jurisdiction in which it is organized or merges or consolidates with or into another Person without the prior written consent of the Secured Party.

## 9.    REMEDIES ON DEFAULT.

(a)    If an Event of Default occurs, the Secured Party may then, or at any time after the occurrence of an Event of Default, (A) declare all Obligations immediately due and payable, and whereupon the Obligations will be due and payable automatically and immediately, without notice or demand, which the Lessee expressly waives, and proceed to enforce payment of the Obligations; (B) exercise all of the rights and remedies afforded to the Secured Party under (i) the terms of this Agreement and/or any of the other Loan Documents, (ii) under the UCC (as defined in Section 12 below), and/or (iii) by law and/or in equity (subject, however, to any limitations imposed by applicable law with respect to Healthcare Assets); (C) collect and receive the proceeds of all Awards (as defined in Exhibit B), the rights of Lessee thereto and shares of

-7-

Lessee therein being hereby assigned to the Secured Party, and give proper receipts and acquittances therefor and apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the Obligations; (D) require the Lessee to assemble the Collateral and make it available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient to both parties, and (E) without limiting the provisions of Section 1(b), apply (or instruct another Person to apply) to the Obligations the balance of any deposit account that is part of the Collateral.

(b)    Without limitation of those rights and remedies, the Secured Party may, upon written notice to the Lessee, take, and publicly or privately sell or convey, full right, title and interest in and to the Collateral, or any part of it, in the name of the Secured Party and/or its designees. To the extent not prohibited by applicable law with respect to Healthcare Assets, the Lessee hereby constitutes and appoints the Secured Party as its true and lawful attorney in fact to assign and transfer its interest in any or all of the Collateral if an Event of Default occurs.

(c)    If any notice is required by law for the Secured Party to make a sale or other disposition of the Collateral, the Secured Party and the Lessee agree that notice will not be unreasonable as to time if given in compliance with this Agreement ten (10) days before any sale or other disposition of the Collateral. All reasonable attorneys' and paralegal fees and other legal expenses incurred by the Secured Party to collect the Obligations, to retake, hold, prepare for sale, and to dispose of the Collateral will be (i) payable to the Secured Party on its demand for payment, (ii) part of the Obligations, and (iii) secured by the Collateral.

(d)    The Lessee further specifically agrees that, in any exercise of the rights of the Secured Party under this Agreement or under any other Loan Document, (i) any combination of the Collateral and/or any other security for the Obligations may be offered for sale and (ii) all of the Collateral and/or any other security for the Obligations may be sold for one total price, and the proceeds of any such sale accounted for in one account without distinction among the items of security or without assigning to them any proportion of such proceeds, the Lessee hereby waiving the application of any doctrine of marshaling.

(e)    The Lessee shall cooperate in any legal and lawful manner necessary or required, to permit the Secured Party or its successors and assigns to continue to operate and maintain the Project for its Approved Use in Lessee's name, place and stead. For this purpose, and to the extent not prohibited by applicable law with respect to Healthcare Assets, Lessee irrevocably appoints the Secured Party, its successors and assigns, as Lessee's true and lawful attorney-in-fact, to do all things necessary or required by the state in which the Project is located or any other government entity with jurisdiction over the Project, including, but not limited to, the provision of any and all information and data, the payment of fees and other charges, and the execution of documents, all in the name of the Lessee. This power is coupled with an interest.

## 10.    NO WAIVER BY SECURED PARTY; CUMULATIVE RIGHTS.

(a)    No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan Documents will be effective unless such waiver is in writing and signed by duly authorized representatives of the Secured Party. No waiver by the Secured Party of any Event of Default or default under this Agreement or any of the other Loan

-8-

Documents will operate as a waiver of any other Event of Default or default or of the same Event of Default or default on a future occasion. The Secured Party may delay in exercising or omit to exercise any right or remedy under this Agreement, any other Loan Document or by law or equity provided without waiving that or any past, present or future right or remedy. All rights and remedies of the Secured Party in this Agreement and the other Loan Documents will be cumulative, and none of these rights or remedies will be exclusive of any other right or remedy allowed at law or in equity or in any other Loan Document, and all of these rights and remedies may be exercised and enforced concurrently.

(b)     Neither the Lessee nor any other Persons interested in the Collateral or the proceeds of the Collateral shall have any right to require the Secured Party first to resort to or proceed personally against any other Person or to proceed against any other collateral security, or to give priority or preference to any item of Collateral, or to proceed upon any guaranty, prior to exercising its rights hereunder. No renewal or extension of the Loan, no release or surrender of the Collateral and/or any other security for the Obligations, no release of any obligor with respect to the Obligations, and no delay by the Secured Party in enforcing the Obligations or exercising any right or power with respect to the Obligations shall affect the Secured Party's rights with respect to the Collateral.

**11.     BINDING EFFECT.** All rights and remedies of the Secured Party under this Agreement will inure to the benefit of the Secured Party's successors and assigns; and all agreements, obligations, and duties of the Lessee will bind its heirs, personal representatives and permitted successors and assigns; however, the Lessee may not assign this Agreement or any of its rights under this Agreement or delegate any of its duties or obligations under this Agreement without the consent of the Secured Party.

**12.     GOVERNING LAW; CONSTRUCTION; WAIVER OF TRIAL BY JURY.**

(a)     This Agreement and all rights and obligations under this Agreement, including matters of construction, validity and performance, will be governed by the laws of the state in which the Project is located (the "State") except as to the existence, validity, perfection or priority (and the effect of perfection or non-perfection or invalidity) of any Lien of the Secured Party on any deposit account which will be governed by the laws of the state in which the applicable deposit account is maintained at the applicable bank, savings and loan association, credit union or like organization. If any term of this Agreement is found to be invalid by a court with jurisdiction under the laws of the State or laws of mandatory application, then the invalid term will be considered excluded from this Agreement and will not invalidate the remaining terms of this Agreement. All uncapitalized terms used herein which are now or hereafter defined in the Uniform Commercial Code, as now enacted in the State or as hereafter amended or superseded (the "UCC"), will have the same meaning herein as in the UCC unless the context indicates otherwise. Every power given herein is coupled with an interest and is irrevocable by death, dissolution or otherwise. The definition of any document includes all schedules, attachments and exhibits to that document, and all renewals, extensions, supplements, amendments, modifications, restatements and consolidations of that document, and any document given in substitution for or replacement of that document. The term "including" is used by way of example only and not by way of limitation, and the singular includes the plural

-9-

App.396

and conversely.    The captions or headings contained in this Agreement are for reference purposes only and will not affect or relate to the interpretation of this Agreement.

(b)    AS A SPECIFICALLY BARGAINED INDUCEMENT FOR THE SECURED PARTY TO ENTER INTO THE AGREEMENT AND EXTEND CREDIT TO BORROWER, SECURED PARTY AND LESSEE EACH HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES ANY AND ALL RIGHT(S) TO A TRIAL BY JURY FOR ANY CAUSE OF ACTION, CLAIM OR DEFENSE RELATING TO, RESULTING FROM OR ARISING OUT OF ANY OF THE LOAN AND/OR ANY TRANSACTIONS, RIGHTS AND/OR OBLIGATIONS CONTEMPLATED BY THIS AGREEMENT AND/OR ANY OF THE OTHER LOAN DOCUMENTS. LESSEE FURTHER ACKNOWLEDGES THAT SUCH WAIVER OF THE RIGHT TO A TRIAL BY JURY IS MADE AFTER CONSULTATION WITH COUNSEL.

13.    **TERM OF AGREEMENT.**  The term of this Agreement will begin on the date of this Agreement and continue in full force and effect and be binding on the Lessee until the date that all of the Obligations are fully and finally paid and satisfied.

14.    **PERFECTION; FURTHER ASSURANCES.**  The Lessee agrees to comply with all applicable laws and requirements in order to grant to the Secured Party a valid, perfected first Lien on the Collateral except to the extent expressly permitted pursuant to Section 19 hereof.  At any time and from time to time, the Lessee, on request of the Secured Party, will give, execute, file and/or record any notice, financing statement, instrument, document or agreement that the Secured Party may consider necessary or desirable to create, preserve, continue, perfect or validate any security interest or other Lien granted under this Agreement or which the Secured Party may consider necessary or desirable to exercise or enforce its rights under this Agreement. Without limiting the generality of the foregoing, the Secured Party is authorized to file with respect to the Collateral one or more financing statements or other documents without the signature of the Lessee and to name therein the Lessee as debtor and the Secured Party and/or HUD as secured parties; and correct or complete, or cause to be corrected or completed, any financing statements or other such documents as have been filed naming the Lessee as debtor and the Secured Party and/or HUD as secured parties.  The Lessee hereby appoints the Secured Party as its attorney-in-fact and authorizes the Secured Party, acting alone on behalf of the Lessee, to execute, acknowledge, deliver, file and/or record any and all documents requiring execution by the Lessee and necessary or desirable to effectuate or facilitate the purposes of this Agreement and/or the obligations or covenants of the Lessee under this Agreement.  The power of attorney granted hereby is coupled with an interest and is irrevocable.  The Secured Party is also authorized by the Lessee to give notice to any Person that the Secured Party may consider necessary or desirable under applicable law to preserve, perfect or protect the Secured Party's and or HUD's interests in the Collateral.  Without limiting the generality of the foregoing, with respect to any of the Collateral for which control of such Collateral is a method of perfection under the UCC, including all of the Lessee's rights, titles and interests in deposit accounts, investment property, electronic chattel paper and letter-of-credit rights, the Lessee will, on Secured Party's request, cause to be executed by each Person that the Secured Party determines is appropriate, a control agreement in a form acceptable to the Secured Party.

-10-

**15.    INTEREST.**  Any amounts payable by the Lessee under this Agreement will bear interest at the rate of interest provided in the Note from the date on which such amounts are payable under this Agreement until the date on which such payments are made by the Lessee to the Secured Party; however, nothing in this Agreement will be deemed to give to the Lessee the right to withhold payment in consideration of the payment of such interest.

**16.    DELIVERY OF NOTICES.**  All notices must be in writing and sent (a) in person, (b) by certified or registered mail, or (c) by overnight delivery carrier for next day delivery, in each case to the address listed in the opening paragraph of this Agreement (or if notice of a new address is given in accordance with this Agreement, to the new address). Notice given in any other manner will not be considered delivered or given unless and until actually received. A notice period will start (i) if mailed, three business days after notice was sent by certified or registered mail, (ii) the next business day after being sent by overnight delivery, and (iii) the day the notice was delivered in person.

**17.    REVIVAL OF SECURITY INTEREST.**  If the Lessee makes a payment or payments to the Secured Party (or the Secured Party receives any payment or proceeds of the Collateral) that are subsequently voided, avoided, set aside, annulled, or disregarded under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of the payment or proceeds received, the Obligations or part intended to be satisfied will be revived and will continue in full force and effect as if these payment(s) or proceeds had not been received by the Secured Party, and the security interest granted herein shall be enforceable as to such Obligations as fully as if such payments had never been made.

**18.    CLAIMS AGAINST SECURED PARTY.**

(a)    Notification.   The Secured Party shall not be in default under this Agreement, or under any of the other Loan Documents, unless a written notice specifically setting forth the claim of the Lessee shall have been given to Secured Party within one hundred eighty (180) days after the occurrence of the event which the Lessee alleges gave rise to such claim and the Secured Party does not remedy or cure the default, if any, with reasonable promptness thereafter.

(b)    Remedies.   If it is determined by the final, non-appealable order of a court of competent jurisdiction that the Secured Party has breached any of its obligations under the Loan Documents and has not remedied or cured same with reasonable promptness following receipt of notice thereof, the Secured Party's responsibilities shall be limited to the following: (i) where the breach consists of the failure to grant consent or give approval in violation of the terms and requirements of any of the Loan Documents, the obligation to grant such consent or give such approval; and (ii) where the breach involves any other violation of the Loan Documents, or where the Secured Party is determined to have acted in bad faith, the payment of any actual, direct, compensatory damages sustained by the Lessee as a result thereof.

(c)    Limitations.  In no event, however, shall the Secured Party be liable to the Lessee, or to any other party claiming through the Lessee, for any other damages, including, without limitation, indirect, speculative, or punitive damages, whatever the nature of the breach by the Secured Party of its obligations under any of the Loan Documents. In no event shall the Secured Party be liable to the Lessee, or to any other party claiming through the Lessee, unless a written

-11-

App.398

notice specifically setting forth the nature of the claim shall have been given to the Secured Party within the time period specified above.

**19.    PROVISIONS REGARDING ACCOUNTS RECEIVABLE LOANS.** Written approval from HUD and Secured Party must be obtained prior to the Lessee's obtaining any accounts receivable financing, as set forth in paragraph (b) of this Section.

(a)    Definitions.  The following words and terms shall have the meanings hereinafter set forth:

"Accounts" shall mean all right, title and interest of the Lessee in and to the following, in each case arising from the Lessee's operation of the Project in the ordinary course of the Lessee's business: (a) all rights to payment of a monetary obligation, whether or not earned by performance, including, but not limited to, accounts (including, but not limited to accounts receivable, health-care insurance receivables, Medicaid and Medicare receivables, Veterans Administration receivables, or other governmental receivables, private patient receivables, and HMO receivables), (b) payment intangibles, (c) guaranties, letter-of-credit rights and other supporting obligations relating to the property described in clauses (a) and (b), and (d) all of the proceeds of the property described in clauses (a), (b) and (c).  Notwithstanding the foregoing, "Accounts" do not include accounts rising from the sale of the Lessee's equipment, inventory or other goods, other than accounts arising from the sale of Lessee's inventory in the ordinary course of the Lessee's business.

"Eligible AR Lender" means a bank, financial institution or other institutional lender which is in the business of making loans to provide working capital to businesses and which is not affiliated with the Lessee.

"Eligible AR Loan" means a loan or line of credit obtained by the Lessee from an Eligible AR Lender (a) for the sole purpose of providing working capital for the operation of the Project and, with the approval of HUD and Secured Party, other projects that are encumbered by mortgage loans insured or held by HUD and (b) which satisfies all of the requirements of this Section 19.

"Required Intercreditor Agreement" means an Intercreditor Agreement (including any HUD-required Rider) executed by the Secured Party, the Eligible AR Lender, the Lessee and the Borrower, in form and substance satisfactory to Secured Party and approved by HUD.

(b)    Eligible AR Loan.  Provided that prior written approval of HUD and Secured Party is obtained, the Lessee may obtain and maintain an Eligible AR Loan, which Eligible AR Loan may be secured by a first lien on the "AR Lender Priority Collateral" (composed of Accounts and as further defined in the Required Intercreditor Agreement), subject to the following limitations and requirements:

(i)    no more than one Eligible AR Loan shall be maintained at any time;

(ii)    in no event shall the principal amount of the Eligible AR Loan ever exceed such amount as may be approved in writing by Secured Party and HUD;

-12-

(iii)    without the written approval of the Secured Party, none of the Collateral, except the AR Lender Priority Collateral, shall be given as security for any Eligible AR Loan;

(iv)    with respect to any existing Eligible AR Loan, the Eligible AR Lender, Lessee and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement prior to closing of the Loan;

(v)    with respect to any other Eligible AR Loan, the Eligible AR Lender, Lessee and Secured Party shall have executed, and HUD shall have approved, the Required Intercreditor Agreement before such Eligible AR Loan is closed, any funds are disbursed thereunder, any UCC financing statements are filed in connection therewith or any security interest in connection therewith is granted or perfected;

(vi)    the Eligible AR Loan, the collateral therefor, and all of the terms and conditions thereof shall at all times comply with all of the terms and conditions of the applicable Required Intercreditor Agreement; and

(vii)    until the Eligible AR Loan is paid in full, the written approval of the Secured Party and HUD is required for any proposed modifications, extensions, renewals, or amendments to a Material Term of the Eligible AR Loan or the related security agreement, prior to the effective date of such amendment(s).  As used herein, "Material Term" means a term in a loan or security agreement that (1) extends the maturity date of the loan, (2) adds guarantors to the loan, (3) releases guarantors from the loan, (4) adds borrowers to the loan, (5) adds an interest reserve to the loan, (6) amends the interest rate payable on the outstanding principal balance of the loan, (7) increases or decreases the principal amount of the loan, (8) adds collateral as additional security for the loan, and/or (9) amends or expands the type of obligations secured by the loan.

(c)    Required Intercreditor Agreement.    Each Required Intercreditor Agreement shall be included in the definition of the Loan Documents while it is in effect.  The Lessee shall comply at all times with the Required Intercreditor Agreement then in effect.

(d)    Information.  Lessee shall, from time to time, promptly following a request by Secured Party or HUD, provide to Secured Party and/or HUD (i) any and all information and documents available to Lessee regarding any Eligible AR Loan and/or AR Lender Priority Collateral (including, but not limited to histories of draws upon, payments on account of, and outstanding balances with respect to, the Eligible AR Loan) and (ii) copies of any and all documents evidencing, securing and/or related to any Eligible AR Loan and/or any amendments thereto.

## 20.    WAIVERS.

(a)    No act or thing need occur to establish the liability of the Lessee hereunder, and no act or thing, except full payment and discharge of all of the Obligations, shall

-13-

in any way exonerate the Lessee or modify, reduce, limit or release the liability of the Lessee hereunder.

(b)    The Lessee will not exercise or enforce any right of contribution, reimbursement, recourse or subrogation available to the Lessee against any Person liable for payment of the Obligations, or as to any collateral security therefor, unless and until all of the Obligations shall have been fully paid and discharged.

(c)    Whether or not any existing relationship between the Lessee and the Borrower has been changed or ended and whether or not this Agreement has been terminated, the Secured Party may, but shall not be obligated to, enter into transactions resulting in the creation or continuance of Obligations without any consent or approval by the Lessee and without any notice to the Lessee. The liability of the Lessee shall not be affected or impaired by any of the following acts or things (which the Secured Party is expressly authorized to do, omit or suffer from time to time, both before and after termination of this Agreement, without notice to or consent or approval by the Lessee): (i) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all Obligations; (ii) any one or more extensions or renewals of Obligations (whether or not for longer than the original period) or any modification of the interest rates, maturities or other contractual terms applicable to any Obligations; (iii) any waiver or indulgence granted to Borrower, any delay or lack of diligence in the enforcement of Obligations, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Obligations; (iv) any full or partial release of, settlement with, or agreement not to sue Borrower or any other Person liable in respect of any Obligations; (v) any discharge of any evidence of Obligations or the acceptance of any instrument in renewal thereof of substitution therefor; (vi) any failure to obtain collateral security (including rights of setoff) for Obligations, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure, or enforce any collateral security; or any modification, substitution, discharge, impairment, or loss of any collateral security; (vii) any foreclosure or enforcement of any collateral security; (viii) any transfer of any Obligations or any evidence thereof; (ix) any order of application of any payments of credits upon Obligations; (x) any election by Secured Party under §1111(b)(2) of the United States Bankruptcy Code.

(d)    The Lessee waives any and all defenses, claims and discharges of Borrower, or any other obligor, pertaining to Obligations, except the defense of discharge by payment in full. Without limiting the generality of the foregoing, the Lessee will not assert, plead or enforce against Secured Party any defense of waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to Borrower or any other Person liable in respect of any indebtedness, or any setoff available against Secured Party to Borrower or any such other Person, whether or not on account of a related transaction. The Lessee expressly agrees that the Lessee shall be and remain liable, to the extent of the Collateral, for any deficiency remaining after foreclosure of any security interest securing the Obligations, whether or not the liability of Borrower or any other obligor for such deficiency is discharged pursuant to statute or judicial decision.

-14-

(e)    The Lessee waives presentment, demand for payment, notice of dishonor or nonpayment, and protest of any instrument evidencing the Obligations. To the extent of the Collateral, this Agreement constitutes an absolute, unlimited, unconditional and continuing guaranty of payment, not collection. The Secured Party shall not be required first to resort for payment of the Obligations to Borrower, or any other Persons or their properties, or first to enforce, realize upon or exhaust any collateral security for Obligations, before enforcing this Agreement.

(f)    The liability of the Lessee under this Agreement is in addition to and shall be cumulative with all other liabilities of the Lessee to Secured Party as obligor or otherwise, without any limitation as to amount, and all other liabilities of any other Person who guarantees all or any portion of the Obligations, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

(g)    This Agreement shall be effective upon delivery to Secured Party, without further act, condition or acceptance by Secured Party. Any invalidity or unenforceability of any provision of application of this Agreement shall not affect other lawful provisions and application hereof, and to this end the provisions of this Agreement are declared to be severable.

(h)    Lessee hereby covenants that this Agreement will not be discharged except by complete performance of the obligations contained in this Agreement. Lessee waives all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of, and reliance on, this Agreement. Lessee further waives all (i) notices of the existence, creation or incurring of new or additional indebtedness, arising either from additional loans extended to Lessee or Borrower, or otherwise, (ii) notices that the principal amount, or any portion thereof (and any interest thereon), of the Loan or any of the other Obligations is due, (iii) notices of any and all proceedings to collect from Lessee and/or Borrower of all or any part of the Obligations, or from anyone else, (iv), to the extent permitted by law, notices of exchange, sale, surrender or other handling of any security or collateral given to Secured Party to secure payment of all or any part of the Obligations, and (v) defenses based on suretyship or impairment of collateral.

## 21.    MISCELLANEOUS.

(a)    This Agreement is intended to be supplemental to and not in substitution or in derogation of any security agreement contained in any other Loan Document.

(b)    In any instance where the consent or approval of the Secured Party may be given or is required or any determination is to be rendered by the Secured Party hereunder, the granting, withholding or denial of such consent or approval and the rendering of such determination shall be made or exercised by the Secured Party at its sole and exclusive option.

(c)    It is understood and agreed that no judgment or decree which may be entered on any debt secured or intended to be secured by the Mortgage shall operate to abrogate or lessen the effect of this Agreement, but that this Agreement shall continue in full force and effect until the payment and discharge of the Obligations.

-15-

(d)    This Agreement, any Required Intercreditor Agreement and the other Loan Documents represent the entire agreement between the Secured Party and the Lessee with respect to the subject matter of this Agreement and supersede all previous agreements, negotiations, and understandings with respect to the subject matter of this Agreement. Neither this Agreement nor any of the other Loan Documents to which Lessee is a party may be amended, altered or changed other than in a writing signed by the Secured Party and the Lessee. The Lessee's warranties and representations in this Agreement will be treated as being continuing warranties and representations, made by the Lessee with the same effect as though the representations and warranties had been made again on, and as of, each day of the term of this Agreement.

(e)    This Agreement may be executed in several counterparts and each counterpart will be considered an original of this Agreement.

## 22.    RIGHTS OF SECRETARY OF HOUSING AND URBAN DEVELOPMENT.

(a)    Lessee and Secured Party hereby agree that HUD shall be an additional secured party under this Security Agreement together with Secured Party, as their interests may appear, and that HUD shall be listed on the Uniform Commercial Code Financing Statements to be filed contemporaneously herewith; provided, however, that nothing herein or in the Uniform Commercial Code Financing Statements shall require the execution, now or any future time, of any amendment, extension, or other document by HUD.

(b)    To the extent any party herein is required or desires to give notice to HUD hereunder, such notice shall be delivered in accordance with the provisions hereof, as follows: U.S. Department of Housing and Urban Development, c/o Office of Healthcare Programs, 451 7th Street S.W., Washington, DC 20410.

**IN WITNESS WHEREOF**, the Lessee and the Secured Party have signed this Agreement as of the date in the first paragraph of this Agreement.

[SEE ATTACHED COUNTERPART SIGNATURE PAGES]

## COUNTERPART SIGNATURE PAGE TO LESSEE SECURITY AGREEMENT

**THE LESSEE:**

SAUCON VALLEY MANOR, INC.,
a Pennsylvania corporation

By: _____

Name: Nimita Kapoor Atiyeh

Title: President

## COUNTERPART SIGNATURE PAGE TO LESSEE SECURITY AGREEMENT

**THE SECURED PARTY:**

**M&T REALTY CAPITAL CORPORATION,**
a Maryland corporation

By: _____

Name: Christine R. Chandler
Title: Vice President

## EXHIBIT A TO LESSEE SECURITY AGREEMENT

### LEGAL DESCRIPTION

UNIT I of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715

Being more fully bounded as set forth on attached page

A-1

## DESCRIPTION OF 1050 MAIN STREET

ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 20065 Page 759, bounded and described as follows to wit:

BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

1.   South 86°47'33" West 266.09 feet; thence-in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;

2.   North 03' 14'23" West 59.03 feet;

3.   North 86' 41'33" East 18.00 feet;

4.   North 03' 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same

5.   North 86' 48'59" East 247.48 feet to the westerly right of way line of Main Street; thence along the same

6.   South 03' 18'24" East 470.30 feet to the place of beginning.

CONTAINS:    117,610.588 Sq. Ft.        2.7000 Acres

Exhibit A

A-2

App.407

## EXHIBIT B TO LESSEE SECURITY AGREEMENT

All of the following described property and interests in property, whether now in existence or hereafter arising, and relating to, situated or located on or used or usable in connection with the maintenance and/or operation of the property described in Exhibit A (hereafter referred to as the "Premises").

(a) All fixtures, furniture, equipment and other goods and tangible personal property of every kind and description whatsoever now or hereafter located on, in or at the Premises, including, but not limited to, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, radiators, motors, furnaces, compressors and transformers; all power generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment, and fixtures, fans and switchboards; all telephone equipment; all piping, tubing and plumbing equipment and fixtures; all heating, refrigeration, air-conditioning, cooling, ventilating, sprinkling, water, power, waste disposal and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, kitchen and laundry fixtures, utensils, appliances and equipment, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture now or hereafter installed or used or usable in the operation of any part of the buildings, structures or improvements erected or to be erected in or upon the Premises and every replacement thereof, accession thereto, or substitution therefor, whether or not all of the above are now or hereafter acquired or attached to the Premises in any manner;

(b) All articles of tangible personal property not otherwise described herein which are now or hereafter located in, attached to or used in, on or about the buildings, structures or improvements now or hereafter located, placed, erected, constructed or built on the Premises and all replacements thereof, accessions thereto, or substitution therefor, whether or not the same are, or will be, attached to such buildings, structures or improvements in any manner;

(c) All rents, leases, income, revenues, issues, profits, royalties and other benefits arising or derived or to be derived from, or related to, directly or indirectly, the Premises, whether or not any of the property described in this item (c) constitutes accounts, chattel paper, documents, general intangibles, instruments or money;

(d) All awards now or hereafter made ("Awards") with respect to the Premises as a result of (i) the exercise of the power of condemnation or eminent domain, or the police power, (ii) the alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Premises (including, but not limited to, any destruction or decrease in the value by fire or other casualty), whether or not any of the property described in this item (d) constitutes accounts, chattel paper, documents, general intangibles, instruments, investment property, deposit accounts, or money;

B-1

App.408

(e) All land surveys, plans and specifications, drawings, briefs and other work product and other papers and records now or hereafter used in the construction, reconstruction, alteration, repair or operation of the Premises;

(f) All licenses, permits, certificates and agreements for the provision of property or services to or in connection with, or otherwise benefiting, the Premises, any nursing home license, assisted living facility license, any and all Medicaid/Medicare Provider Agreements, and any other license necessary for the provision of services at the Premises; however, the Secured Party disclaims a security interest in such of the property described in this item (f) to the extent that a security interest in such property may not be granted to the Secured Party without the forfeiture of the rights of the Debtor (or any assignee of the Debtor) or a default resulting thereunder.

(g) All funds, monies, securities and other property held in escrow, lock boxes, depository or blocked accounts or as reserves and all rights to receive (or to have distributed to the Debtor) any funds, monies, securities or property held in escrow, lock boxes, depository or blocked accounts or as reserves, including, but not limited to, all of Debtor's rights (if any) to any funds or amounts in that certain reserve funds and/or residual receipts accounts created under the Regulatory Agreement required by the Secretary of Housing and Urban Development or the Federal Housing Administration Commissioner;

(h) All accounts, accounts receivable, general intangibles, chattel paper, instruments, documents, inventory, goods, cash, bank accounts, certificates of deposits, securities, insurance policies, letters of credit, deposits, judgments, liens, causes of action, warranties, guaranties and all other properties and assets of the Debtor, tangible or intangible, whether or not similar to the property described in this item (h).  As used herein, the term "accounts receivable" shall include (i) all healthcare insurance receivables, including, but not limited to Medicaid and Medicare receivables, Veterans Administration or other governmental receivables, private patient receivables, and HMO 10 receivables; (ii) any payments due or to be made to the Debtor relating to the Premises or (iii) all other rights of the Debtor to receive payment of any kind with respect to the Premises;

(i) All books, records and files of whatever type or nature relating to any or all of the property or interests in property described herein or the proceeds thereof, whether or not written, stored electronically or electromagnetically or in any other form, and whether or not such books, records, or files constitute accounts, equipment or general intangibles.

(j) Any and all security or other deposits which have not been forfeited by any tenant under any lease; and

(k) All products and proceeds of any and all of the property (and interests in property) described herein, including, but not limited to, proceeds of any insurance, whether or not in the form of original collateral, accounts, contract rights, chattel paper, general intangibles, equipment, fixtures, goods, securities, leases, instruments, inventory, documents, deposit accounts or cash.

B-2

## EXHIBIT C TO LESSEE SECURITY AGREEMENT

**Other Names Used by Lessee in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Assets Acquired in Bulk Transfer in Previous Five Years** (see Section 2(a) of Agreement): **None**

**Lessee's Rights in the Following** (see Section 2(a) of Agreement):

*Investment property*:  None

*Letters of Credit*: None

*Electronic Chattel Paper*: None

*Commercial Tort Claims*: None

*Instruments (including promissory notes)*: None

*Deposit Accounts*:

| Account Number | Depository Bank | Account Type (e.g., operating or payroll) | Government Accounts (see note below) |
|---|---|---|---|
| | | | |

Note:  Designate if Deposit Account receives deposits of proceeds of accounts from federal, state or local governments (e.g., Medicare and Medicaid), and if so, whether such Deposit Account is solely for such deposits or whether the Deposit Account commingles other non-governmental deposits.  See Section 2(i) of the Agreement for the Lessee's obligations in this regard.

C-1

App.410

# EXHIBIT N

Case 25-15245-pmm    Doc 56-16    Filed 03/31/26    Entered 03/31/26 17:25:33    Desc
Exhibit N projection Whitehall    Page 2 of 6

**Whitehall Manor**
**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS FORECAST | 13 WEEKS | | |
|---|---|---|---|
| | Week of Mar 28 26 | Week of Apr 4 26 | Week of Apr 11 26 |
| **Cash Beginning Balance** | ** 391,029.92 | 508,114.92 | 495,988.34 |
| INCOME | 209,500.00 | 184,500.00 | 95,500.00 |
| Intercompany reimbursements | 0.00 | 6,850.00 | 0.00 |
| Intercompany reimbursements- employees | 13,000.00 | 0.00 | 0.00 |
| Disbursements | 105,415.00 | 203,476.58 | 55,200.00 |
| **Ending Cash Balance** | 508,114.92 | 495,988.34 | 536,288.34 |
| | | | |
| **Expense** | | | |
| DIETARY | 15,000.00 | 15,000.00 | 15,000.00 |
| SUPPLIES | 5,500.00 | 5,500.00 | 5,500.00 |
| REFUNDS | 12,000.00 | 0.00 | 0.00 |
| MAINTENANCE | 2,500.00 | 0.00 | 2,500.00 |
| UTILITIES | 4,300.00 | 15,500.00 | 18,300.00 |
| PAYROLL & BENEFITS | 6,500.00 | 133,006.58 | 0.00 |
| OFFICE & MARKETING EXPENSES | 8,500.00 | 5,000.00 | 5,000.00 |
| REAL ESTATE TAXES & INSURANCE | 32,000.00 | 7,170.00 | 0.00 |
| EQUIPMENT | 3,015.00 | 0.00 | 0.00 |
| US TRUSTEE QUARTERLY FEES | 0.00 | 0.00 | 0.00 |
| DILWORTH PAXSON/Committee Counsel | 0.00 | 0.00 | 0.00 |
| Omni | 7,500.00 | 0.00 | 0.00 |
| ADEQUATE PROTECTION | 0.00 | 0.00 | 0.00 |
| LEGAL/PROFESSIONAL FEES | 2,500.00 | 2,500.00 | 2,500.00 |
| MANAGEMENT FEE | 0.00 | 14,250.00 | 0.00 |
| Miscellaneous | 6,100.00 | 5,550.00 | 6,400.00 |
| **Total Expense** | 105,415.00 | 203,476.58 | 55,200.00 |

**

| | |
|---|---|
| Ending budgeted cash balance @ 3-7-26 | 241,773.97 |
| Actual cash balance @ 3-7-26 | 484,736.50 |
| Diff is being added to opening cash balance as of 3-28-26 | 242,962.53 |

Page 1 of 5

App.412

**Whitehall Manor**
**Profit/Loss**

| CASH RECEIPTS & DISBURSEMENTS FORECAST | 13 WEEKS | Week of Apr 18 26 | Week of Apr 25 26 | Week of May 2 26 |
|---|---|---|---|---|
| Cash Beginning Balance | | 536,288.34 | 419,281.76 | 282,666.76 |
| INCOME | | 95,500.00 | 209,500.00 | 184,500.00 |
| Intercompany reimbursements | | 0.00 | 0.00 | 6,850.00 |
| Intercompany reimbursements- employees | | 0.00 | 13,000.00 | 0.00 |
| Disbursements | | 212,506.58 | 359,115.00 | 203,851.58 |
| Ending Cash Balance | | 419,281.76 | 282,666.76 | 270,165.18 |
| | | | | |
| Expense | | | | |
| DIETARY | | 15,000.00 | 15,000.00 | 15,000.00 |
| SUPPLIES | | 5,500.00 | 5,500.00 | 5,500.00 |
| REFUNDS | | 0.00 | 12,000.00 | 0.00 |
| MAINTENANCE | | 0.00 | 2,500.00 | 0.00 |
| UTILITIES | | 0.00 | 2,800.00 | 15,500.00 |
| PAYROLL & BENEFITS | | 133,006.58 | 6,500.00 | 133,006.58 |
| OFFICE & MARKETING EXPENSES | | 5,000.00 | 8,500.00 | 5,000.00 |
| REAL ESTATE TAXES & INSURANCE | | 0.00 | 36,700.00 | 7,170.00 |
| EQUIPMENT | | 0.00 | 3,015.00 | 0.00 |
| US TRUSTEE QUARTERLY FEES | | 12,000.00 | 500.00 | 0.00 |
| DILWORTH PAXSON/Committee Counsel | | 0.00 | 250,000.00 | 0.00 |
| Omni | | 0.00 | 7,500.00 | 0.00 |
| ADEQUATE PROTECTION | | 35,000.00 | 0.00 | 0.00 |
| LEGAL/PROFESSIONAL FEES | | 2,500.00 | 2,500.00 | 2,500.00 |
| MANAGEMENT FEE | | 0.00 | 0.00 | 14,625.00 |
| Miscellaneous | | 4,500.00 | 6,100.00 | 5,550.00 |
| Total Expense | | 212,506.58 | 359,115.00 | 203,851.58 |

**

Ending budgeted cash balance @ 3-7-26

Actual cash balance @ 3-7-26

Diff is being added to opening cash balance as of 3-28-26

Case 25-15245-pmm   Doc 56-16   Filed 03/31/26   Entered 03/31/26 17:25:33   Desc
Exhibit N projection Whitehall    Page 4 of 6

**Whitehall Manor**
**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS FORECAST | 13 WEEKS | Week of May 9 26 | Week of May 16 26 | Week of May 23 26 |
|---|---|---|---|---|
| Cash Beginning Balance | | 270,165.18 | 289,932.18 | 141,792.61 |
| INCOME | | 63,667.00 | 63,667.00 | 63,666.00 |
| Intercompany reimbursements | | 0.00 | 0.00 | 0.00 |
| Intercompany reimbursements- employees | | 0.00 | 0.00 | 13,000.00 |
| Disbursements | | 43,900.00 | 211,806.58 | 96,515.00 |
| Ending Cash Balance | | 289,932.18 | 141,792.61 | 121,943.61 |
| | | | | |
| Expense | | | | |
| DIETARY | | 15,000.00 | 15,000.00 | 15,000.00 |
| SUPPLIES | | 5,500.00 | 5,500.00 | 5,500.00 |
| REFUNDS | | 0.00 | 0.00 | 0.00 |
| MAINTENANCE | | 2,500.00 | 0.00 | 2,500.00 |
| UTILITIES | | 7,000.00 | 11,300.00 | 2,800.00 |
| PAYROLL & BENEFITS | | 0.00 | 133,006.58 | 6,500.00 |
| OFFICE & MARKETING EXPENSES | | 5,000.00 | 5,000.00 | 8,500.00 |
| REAL ESTATE TAXES & INSURANCE | | 0.00 | 0.00 | 43,200.00 |
| EQUIPMENT | | 0.00 | 0.00 | 3,015.00 |
| US TRUSTEE QUARTERLY FEES | | 0.00 | 0.00 | 0.00 |
| DILWORTH PAXSON/Committee Counsel | | 0.00 | 0.00 | 0.00 |
| Omni | | 0.00 | 0.00 | 0.00 |
| ADEQUATE PROTECTION | | 0.00 | 35,000.00 | 0.00 |
| LEGAL/PROFESSIONAL FEES | | 2,500.00 | 2,500.00 | 2,500.00 |
| MANAGEMENT FEE | | 0.00 | 0.00 | 0.00 |
| Miscellaneous | | 6,400.00 | 4,500.00 | 7,000.00 |
| Total Expense | | 43,900.00 | 211,806.58 | 96,515.00 |

**

Ending budgeted cash balance @ 3-7-26

Actual cash balance @ 3-7-26

Diff is being added to opening cash balance as of 3-28-26

Page 3 of 5

App.414

**4:36 PM**
**12/12/14**
**Accrual Basis**

**Whitehall Maner**
**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS FORECAST | 13 WEEKS | | |
| --- | --- | --- | --- |
| | Week of May 30 26 | Week of June 6 26 | Week of June 13 26 |
| Cash Beginning Balance | 121,943.61 | 142,667.03 | 123,967.03 |
| INCOME | 209,500.00 | 114,625.00 | 114,625.00 |
| Intercompany reimbursements | 6,850.00 | 0.00 | 0.00 |
| Intercompany reimbursements- employees | 0.00 | 0.00 | 0.00 |
| Disbursements | 195,626.58 | 133,325.00 | 165,506.58 |
| Ending Cash Balance | 142,667.03 | 123,967.03 | 73,085.45 |
| | | | |
| Expense | | | |
| DIETARY | 15,000.00 | 15,000.00 | 15,000.00 |
| SUPPLIES | 5,500.00 | 5,500.00 | 5,500.00 |
| REFUNDS | 12,000.00 | 0.00 | 0.00 |
| MAINTENANCE | 0.00 | 2,500.00 | 0.00 |
| UTILITIES | 2,000.00 | 31,800.00 | 0.00 |
| PAYROLL & BENEFITS | 133,006.58 | 0.00 | 133,006.58 |
| OFFICE & MARKETING EXPENSES | 5,000.00 | 5,000.00 | 5,000.00 |
| REAL ESTATE TAXES & INSURANCE | 7,170.00 | 0.00 | 0.00 |
| EQUIPMENT | 0.00 | 0.00 | 0.00 |
| US TRUSTEE QUARTERLY FEES | 0.00 | 0.00 | 0.00 |
| DILWORTH PAXSON/Committee Counsel | 0.00 | 50,000.00 | 0.00 |
| Omni | 7,500.00 | 0.00 | 0.00 |
| ADEQUATE PROTECTION | 0.00 | 0.00 | 0.00 |
| LEGAL/PROFESSIONAL FEES | 2,500.00 | 2,500.00 | 2,500.00 |
| MANAGEMENT FEE | 0.00 | 14,625.00 | 0.00 |
| Miscellaneous | 5,950.00 | 6,400.00 | 4,500.00 |
| Total Expense | 195,626.58 | 133,325.00 | 165,506.58 |

**\*\***

Ending budgeted cash balance @ 3-7-26

Actual cash balance @ 3-7-26

Diff is being added to opening cash balance as of 3-28-26

**Whitehall Manor**
**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS FORECAST | 13 WEEKS | | | |
|---|---|---|---|---|
| | | **Week of June 20 26** | **TOTAL** | |
| **Cash Beginning Balance** | | 73,085.45 | 164,685.45 | |
| **INCOME** | | 133,500.00 | 1,742,250.00 | |
| **Intercompany reimbursements** | | 0.00 | 20,550.00 | |
| **Intercompany reimbursements- employees** | | 0.00 | 39,000.00 | 1,801,800.00 |
| **Disbursements** | | 41,900.00 | 2,028,144.47 | -2,028,144.47 |
| **Ending Cash Balance** | | 164,685.45 | -61,659.03 | -226,344.47 Loss |
| | | | | |
| **Expense** | | | | |
| **DIETARY** | | 15,000.00 | 195,000.00 | |
| **SUPPLIES** | | 5,500.00 | 71,500.00 | |
| **REFUNDS** | | 0.00 | 36,000.00 | |
| **MAINTENANCE** | | 2,500.00 | 17,500.00 | |
| **UTILITIES** | | 2,800.00 | 114,100.00 | |
| **PAYROLL & BENEFITS** | | 0.00 | 817,539.47 | |
| **OFFICE & MARKETING EXPENSES** | | 8,500.00 | 79,000.00 | |
| **REAL ESTATE TAXES & INSURANCE** | | 0.00 | 133,410.00 | |
| **EQUIPMENT** | | 0.00 | 9,045.00 | |
| **US TRUSTEE QUARTERLY FEES** | | 0.00 | 12,500.00 | |
| **DILWORTH PAXSON/Committee Counsel** | | 0.00 | 300,000.00 | |
| **Omni** | | 0.00 | 22,500.00 | |
| **ADEQUATE PROTECTION** | | 0.00 | 70,000.00 | |
| **LEGAL/PROFESSIONAL FEES** | | 2,500.00 | 32,500.00 | |
| **MANAGEMENT FEE** | | 0.00 | 43,500.00 | |
| **Miscellaneous** | | 5,100.00 | 74,050.00 | |
| **Total Expense** | | 41,900.00 | 2,028,144.47 | |

**

**Ending budgeted cash balance @ 3-7-26**

**Actual cash balance @ 3-7-26**

**Diff is being added to opening cash balance as of 3-28-26**

App.416

# EXHIBIT O

App.417

**4:36 PM**
**12/12/14**
**Accrual Basis**

**Saucon Valley Manor**
**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS    13 WEEKS FORECAST | Week of Mar 28 26 | Week of Apr 4 26 | Week of Apr 11 26 |
|---|---|---|---|
| **Cash Beginning Balance** | 592,337.21 ** | 734,507.21 | 782,152.21 |
| INCOME | 244,000.00 | 410,000.00 | 150,000.00 |
| Intercompany reimbursements | 15,120.00 | 0.00 | 0.00 |
| Intercompany reimbursements- employees | 28,300.00 | 5,600.00 | 0.00 |
| Disbursements | -145,250.00 | 367,955.00 | -66,300.00 |
| **Ending Cash Balance** | 734,507.21 | 782,152.21 | 865,852.21 |
| | | | |
| **Expense** | | | |
| DIETARY | 20,000.00 | 20,000.00 | 20,000.00 |
| REFUNDS | 25,000.00 | 0.00 | 0.00 |
| SUPPLIES | 6,000.00 | 6,000.00 | 6,000.00 |
| MAINTENANCE | 6,000.00 | 6,000.00 | 6,000.00 |
| UTILITIES | 4,000.00 | 18,000.00 | 21,250.00 |
| PAYROLL & BENEFITS | 0.00 | 242,000.00 | 0.00 |
| OFFICE & MARKETING EXPENSES | 9,650.00 | 6,650.00 | 6,650.00 |
| REAL ESTATE TAXES & INSURANCE | 62,500.00 | 40,205.00 | 0.00 |
| EQUIPMENT | 0.00 | 0.00 | 0.00 |
| US TRUSTEE QUARTERLY FEES | 0.00 | 0.00 | 0.00 |
| LEGAL/PROFESSIONAL FEES | 2,000.00 | 2,000.00 | 2,000.00 |
| ADEQUATE PROTECTION | 0.00 | 0.00 | 0.00 |
| DILWORTH PAXSON/Committee Counsel | 0.00 | 0.00 | 0.00 |
| Omni | 7,500.00 | 0.00 | 0.00 |
| MANAGEMENT FEE | 0.00 | 22,000.00 | 0.00 |
| MISCELLANEOUS | 2,600.00 | 5,100.00 | 4,400.00 |
| **Total Expense** | 145,250.00 | 367,955.00 | 66,300.00 |

**

| | |
|---|---|
| **Ending budgeted cash balance @ 3-7-26** | 364,111.17 |
| **Actual cash balance @ 3-7-26** | 767,961.87 |
| **Diff is being added to opening cash balance as of 3-28-26** | 403,850.70 |

**Page 1 of 5**

App.418

**4:36 PM**
**12/12/14**
**Accrual Basis**

**Saucon Valley Manor**

**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS          13 WEEKS FORECAST | Week of Apr 18 26 | Week of Apr 25 26 | Week of May 2 26 |
|---|---|---|---|
| **Cash Beginning Balance** | 865,852.21 | 601,402.21 | 484,672.21 |
| INCOME | 80,000.00 | 245,000.00 | 410,000.00 |
| Intercompany reimbursements | 0.00 | 15,120.00 | 0.00 |
| Intercompany reimbursements- employees | 5,600.00 | 28,300.00 | 5,600.00 |
| Disbursements | -350,050.00 | 405,150.00 | 352,080.00 |
| **Ending Cash Balance** | 601,402.21 | 484,672.21 | 548,192.21 |
| | | | |
| **Expense** | | | |
| DIETARY | 20,000.00 | 20,000.00 | 20,000.00 |
| REFUNDS | 0.00 | 20,000.00 | 0.00 |
| SUPPLIES | 6,000.00 | 6,000.00 | 6,000.00 |
| MAINTENANCE | 6,000.00 | 6,000.00 | 6,000.00 |
| UTILITIES | 4,000.00 | 30,000.00 | 18,000.00 |
| PAYROLL & BENEFITS | 242,000.00 | 10,000.00 | 242,000.00 |
| OFFICE & MARKETING EXPENSES | 6,650.00 | 9,650.00 | 6,650.00 |
| REAL ESTATE TAXES & INSURANCE | 0.00 | 41,500.00 | 24,205.00 |
| EQUIPMENT | 0.00 | 0.00 | 0.00 |
| US TRUSTEE QUARTERLY FEES | 24,000.00 | 500.00 | 0.00 |
| LEGAL/PROFESSIONAL FEES | 2,000.00 | 2,000.00 | 2,000.00 |
| ADEQUATE PROTECTION | 35,000.00 | 0.00 | 0.00 |
| DILWORTH PAXSON/Committee Counsel | 0.00 | 250,000.00 | 0.00 |
| Omni | 0.00 | 7,500.00 | 0.00 |
| MANAGEMENT FEE | 0.00 | 0.00 | 22,125.00 |
| MISCELLANEOUS | 4,400.00 | 2,000.00 | 5,100.00 |
| **Total Expense** | 350,050.00 | 405,150.00 | 352,080.00 |

**\*\***

**Ending budgeted cash balance @ 3-7-26**

**Actual cash balance @ 3-7-26**

**Diff is being added to opening cash balance as of 3-28-26**

**4:36 PM**
**12/12/14**
**Accrual Basis**

**Saucon Valley Manor**

**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS FORECAST | 13 WEEKS | | |
|---|---|---|---|
| | Week of May 9 26 | Week of May 16 26 | Week of May 23 26 |
| Cash Beginning Balance | 548,192.21 | 571,892.21 | 329,342.21 |
| INCOME | 85,000.00 | 75,000.00 | 75,000.00 |
| Intercompany reimbursements | 0.00 | 0.00 | 0.00 |
| Intercompany reimbursements- employees | 0.00 | 5,600.00 | 28,300.00 |
| Disbursements | 61,300.00 | 323,150.00 | 124,650.00 |
| Ending Cash Balance | 571,892.21 | 329,342.21 | 307,992.21 |
| | | | |
| Expense | | | |
| DIETARY | 20,000.00 | 20,000.00 | 20,000.00 |
| REFUNDS | 0.00 | 0.00 | 25,000.00 |
| SUPPLIES | 6,000.00 | 6,000.00 | 6,000.00 |
| MAINTENANCE | 6,000.00 | 6,000.00 | 6,000.00 |
| UTILITIES | 16,250.00 | 3,500.00 | 0.00 |
| PAYROLL & BENEFITS | 0.00 | 242,000.00 | 0.00 |
| OFFICE & MARKETING EXPENSES | 6,650.00 | 6,650.00 | 9,650.00 |
| REAL ESTATE TAXES & INSURANCE | 0.00 | 0.00 | 46,500.00 |
| EQUIPMENT | 0.00 | 0.00 | 0.00 |
| US TRUSTEE QUARTERLY FEES | 0.00 | 0.00 | 0.00 |
| LEGAL/PROFESSIONAL FEES | 2,000.00 | 2,000.00 | 2,000.00 |
| ADEQUATE PROTECTION | 0.00 | 35,000.00 | 0.00 |
| DILWORTH PAXSON/Committee Counsel | 0.00 | 0.00 | 0.00 |
| Omni | 0.00 | 0.00 | 7,500.00 |
| MANAGEMENT FEE | 0.00 | 0.00 | 0.00 |
| MISCELLANEOUS | 4,400.00 | 2,000.00 | 2,000.00 |
| Total Expense | 61,300.00 | 323,150.00 | 124,650.00 |

**\*\***

**Ending budgeted cash balance @ 3-7-26**

**Actual cash balance @ 3-7-26**

**Diff is being added to opening cash balance as of 3-28-26**

App.420

**4:36 PM**
**12/12/14**
**Accrual Basis**

**Saucon Valley Manor**
**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS          13 WEEKS FORECAST | Week of May 30 26 | Week of June 6 26 | Week of June 13 26 |
|---|---|---|---|
| Cash Beginning Balance | 307,992.21 | 260,062.21 | 492,707.21 |
| INCOME | 245,000.00 | 410,000.00 | 155,000.00 |
| Intercompany reimbursements | 15,120.00 | 0.00 | 0.00 |
| Intercompany reimbursements- employees | 5,600.00 | 0.00 | 5,600.00 |
| Disbursements | 313,650.00 | 177,355.00 | 330,500.00 |
| Ending Cash Balance | 260,062.21 | 492,707.21 | 322,807.21 |
| | | | |
| Expense | | | |
| DIETARY | 20,000.00 | 20,000.00 | 20,000.00 |
| REFUNDS | 0.00 | 0.00 | 0.00 |
| SUPPLIES | 6,000.00 | 6,000.00 | 6,000.00 |
| MAINTENANCE | 6,000.00 | 6,000.00 | 6,000.00 |
| UTILITIES | 3,000.00 | 32,750.00 | 3,500.00 |
| PAYROLL & BENEFITS | 252,000.00 | 0.00 | 242,000.00 |
| OFFICE & MARKETING EXPENSES | 6,650.00 | 6,650.00 | 6,500.00 |
| REAL ESTATE TAXES & INSURANCE | 16,000.00 | 24,205.00 | 0.00 |
| EQUIPMENT | 0.00 | 0.00 | 0.00 |
| US TRUSTEE QUARTERLY FEES | 0.00 | 0.00 | 0.00 |
| LEGAL/PROFESSIONAL FEES | 2,000.00 | 2,000.00 | 2,000.00 |
| ADEQUATE PROTECTION | 0.00 | 0.00 | 35,000.00 |
| DILWORTH PAXSON/Committee Counsel | 0.00 | 50,000.00 | 0.00 |
| Omni | 0.00 | 0.00 | 7,500.00 |
| MANAGEMENT FEE | 0.00 | 22,250.00 | 0.00 |
| MISCELLANEOUS | 2,000.00 | 7,500.00 | 2,000.00 |
| Total Expense | 313,650.00 | 177,355.00 | 330,500.00 |

**\*\***

**Ending budgeted cash balance @ 3-7-26**

**Actual cash balance @ 3-7-26**

**Diff is being added to opening cash balance as of 3-28-26**

**4:36 PM**
**12/12/14**
**Accrual Basis**

**Saucon Valley Manor**

**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS 13 WEEKS FORECAST | Week of June 20 26 | TOTAL | | |
|---|---|---|---|---|
| **Cash Beginning Balance** | 322,807.21 | 358,557.21 | | |
| INCOME | 82,000.00 | 2,666,000.00 | | |
| Intercompany reimbursements | 0.00 | 45,360.00 | | |
| Intercompany reimbursements- employees | 0.00 | 118,500.00 | 2,829,860.00 | |
| Disbursements | 46,250.00 | 3,063,640.00 | -3,063,640.00 | |
| **Ending Cash Balance** | 358,557.21 | 124,777.21 | -233,780.00 | Loss |
| | | | | |
| **Expense** | | | | |
| DIETARY | 20,000.00 | 260,000.00 | | |
| REFUNDS | 0.00 | 70,000.00 | | |
| SUPPLIES | 6,000.00 | 78,000.00 | | |
| MAINTENANCE | 6,000.00 | 78,000.00 | | |
| UTILITIES | 0.00 | 154,250.00 | | |
| PAYROLL & BENEFITS | 0.00 | 1,472,000.00 | | |
| OFFICE & MARKETING EXPENSES | 9,650.00 | 98,300.00 | | |
| REAL ESTATE TAXES & INSURANCE | 0.00 | 255,115.00 | | |
| EQUIPMENT | 0.00 | 0.00 | | |
| US TRUSTEE QUARTERLY FEES | 0.00 | 24,500.00 | | |
| LEGAL/PROFESSIONAL FEES | 2,000.00 | 26,000.00 | | |
| ADEQUATE PROTECTION | 0.00 | 105,000.00 | | |
| DILWORTH PAXSON/Committee Counsel | 0.00 | 300,000.00 | | |
| Omni | 0.00 | 30,000.00 | | |
| MANAGEMENT FEE | 0.00 | 66,375.00 | | |
| MISCELLANEOUS | 2,600.00 | 46,100.00 | | |
| **Total Expense** | 46,250.00 | 3,063,640.00 | | |

**\*\***

Ending budgeted cash balance @ 3-7-26

Actual cash balance @ 3-7-26

Diff is being added to opening cash balance as of 3-28-26

App.422

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| Whitehall Manor, Inc., et al.,[1] | Case No. 25-15245 (PMM) |
| Debtors. | Jointly Administered |

## OPPOSITION TO JOINT MOTION TO COMPEL

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their counsel, Dilworth Paxson LLP, hereby file their Opposition to Secured Creditor Lehigh Valley 1 LLC's and Receiver's Joint Motion to (1) Compel the Manor Debtors to Assume or Reject Their Leases, (2) Establish the Cure Amount and (3) for Relief from the Automatic Stay (the "Motion"), D.I. 56 (March 31, 2026). In support thereof, the Debtors state as follows:

## I.    BACKGROUND[2]

1.    The Debtors consist of two Pennsylvania corporations, Whitehall Manor, Inc. and Saucon Valley Manor, Inc. (with Whitehall Manor, Inc., the "Manor

---

[1] The Debtors and debtors-in-possession in these Chapter 11 Cases and the last four digits of their respective taxpayer identification numbers are as follows: (i) Whitehall Trust (4229); (ii) Saucon Trust (4229); (iii) Whitehall Manor, Inc. (5606); and (iv) Saucon Valley Manor, Inc. (2894). The Debtors' mailing address is 1177 6th Street, Whitehall, PA 18052. The Order and Memorandum Opinion Granting Motion to Dismiss [D.I.s 263 and 264], entered on March 20, 2026, dismissed the cases of debtor Whitehall Trust, Case No. 25-15241-PMM and debtor Saucon Trust, Case No. 25-15243-PMM.

[2] The factual and procedural background of the instant matter and the Debtors' bankruptcy proceedings are summarized in detail in the Bankruptcy Court's Order. In the interest of brevity, the Debtors will not reiterate this history in full here, and have included only a short summary of the pertinent facts.

1

#125581586v1

Debtors"), which operate Personal Care Homes. The properties upon which those Personal Care Homes operate are owned by two business trusts, Whitehall Trust and Saucon Valley Trust (with Whitehall Trust, the "Trusts" or "Trust Debtors" and with the Manor Debtors, the "Debtors"). Saucon Valley Manor, Inc. has a lease agreement with Saucon Trust for use of the Saucon property; similarly, Whitehall Manor, Inc. has a lease agreement with Whitehall Trust for the use of its property (together, and as amended, the "Leases").

2. The Trusts were created with the purpose of carrying out business operations through their ownership and maintenance of improved real property on which their affiliated Manor Debtors operate personal care homes for senior residents. [3]

**Rental Payments**

3. HUD required the agreements between the Manors and the Trusts to comply with the HUD and LEAN program requirements. See SVM HUD Commitment Letter, pg 19, attached as Exhibit "A". The rental payments were based on a formula determined by HUD. Per HUD, the rental payments included:

---

[3] Prior to the hearing of the Motion to Dismiss, the Trusts applied for registration as Domestic Business Trusts with the Pennsylvania Department of State, Bureau of Corporations and Charitable Organizations. After oral arguments of the Motion to Dismiss, Debtors received confirmation that the State assigned Saucon Trust with the Domestic Business Trust ID 0015237229 on February 18, 2026, and Whitehall Trust with the Domestic Business Trust ID 0015255713 on February 27, 2026. Whitehall Trust is named "Whitehall Trust for Senior Care" to satisfy the State's requirement that a name must be sufficiently distinguishable from other entities on record.

2

7. **Operating Lease:** The Operating Lease between Saucon Trust and Saucon Valley Manor, Inc. must be revised to conform to current HUD and LEAN program requirements, include the HUD Operating Lease Addendum, be approved by HUD Counsel and OHP and executed prior to closing. The lease must have a minimum annual lease payment of $1,705,421, which is 1.05 times the sum of: annual principal and interest payments, annual mortgage insurance premium, annual deposit to reserve for replacement, annual property insurance, and annual property taxes. Paragraph 5 of the Lease Addendum must also require this 1.05 coverage. Any reduction to the minimum lease payment amount of $1,705,421 must be explained and HUD review and approval is required.

See Ex. B at pg. 19.

4.      The purpose of the reserve fund was to cover replacement of structural elements and mechanical equipment. See Saucon Trust Regulatory Agreement paragraph 6(e) and Whitehall Trust Regulatory Agreement, paragraph 6(e) attached as Exhibits "B" and "C" respectfully. Disbursement required HUD approval. The Trusts and Manors would conduct yearly audits for HUD. Upon review, HUD would determine distributions of surplus cash from the reserves.

5.      If the Trusts were unable to make a payment or defaulted, HUD would permit the reserves to be used to prevent or cure the amount in default. See Exhibits "B" and "C" at paragraph 2.

6.      The Manor Debtors suffered financial stress as a result of COVID-19. The Trusts sought loan modifications with HUD as a result. However, the modifications were denied.

7.      HUD applied the then-existing reserves to the mortgage arrears. Secured Creditor claims that this brought the mortgage current to 2023. A dispute

3

#125581586v1

exists as to the amount and distribution of the reserves.[4]

8.    Even though the Manors did not make direct rental payments to the Trusts, the Manors paid for the maintenance that would have been paid for the by Trusts, as well as management fees, taxes, and insurance that were included in the HUD rent payment.

9.    Pursuant to the Monthly Operating Reports filed by the Trusts, the pre-petition account receivables total $4,629,325 for Whitehall Trust and $4,623,676.88 for Saucon Trust. Debtors reserve the right to adjust these numbers. These are intercompany debts that will be resolved through a Chapter 11 plan along with all of the other mutual and separate debts of each Debtor.

**Trusts Dismissal**

10.    On January 14, 2026, Lehigh Valley 1, LLC ("Lehigh")[5] filed a Motion to Dismiss the Trusts' bankruptcy cases (the "Motion"). [D.I. 102]. The Debtors (including the Trusts) opposed the Motion [D.I. 190], Lehigh replied [D.I. 202], and the Debtors sur-replied [D.I. 220]. The Bankruptcy Court held an evidentiary hearing

---

[4] The Trusts' assets include unaccounted for M&T Bank escrows. See Whitehall Trust and Saucon Trust December Monthly Operating Reports and Global Notes.

[5] Windstream Capital LLC (a venture capital and private equity firm) purchased the Trust Debtors' loans in a private auction from the Housing of Urban Development ("HUD"). Whitehall's $12.5 million loan was purchased for $2.77 million and Saucon's $16.24 million loan was purchased for $3.35 million. Windstream assigned its loans its affiliate, Lehigh. On May 14, 2024, Lehigh entered a Collateral Assignment with Northeast Bank. As security for a loan, Lehigh pledged the Trust Debtors' mortgages, notes, security agreements, and other documents as collateral.

4

on the Motion on February 24, 2026. The Bankruptcy Court then issued its Order

and Memorandum granting the Motion on March 19, 2026, after determining that

the Trusts were not business trusts [D.I. 263; D.I. 264] ("Dismissal Order").

11.    The Trusts filed an emergency motion seeking to stay the effectiveness

of the Dismissal Order pending appeal [the "Stay Motion", Case No. 25-15245,[6] D.I.

30], a notice of appeal of the Dismissal Order [Case No. 25-15241, D.I. 269], and a

motion for certification of direct appeal to the Third Circuit [Case No. 25-15241,

D.I. 270]. Following an emergency hearing on the Stay Motion, the Court granted

Debtors' Stay Motion.

12.    The Dismissal Order, if not stayed, would have reinstated the

foreclosure action, *Lehigh Valley 1, LLC v. Whitehall Fiduciary, LLC*, Case No.

5:24-cv-02627-CH (E.D. Pa. June 14, 2024) ("Whitehall Foreclosure"), filed against

the Trusts in the United States District Court for the Eastern District of Pennsylvania

(the "District Court").

13.    At this stage in these Chapter 11 cases, the relief sought in the Motion

is not available to Lehigh or the Receiver and, in any event, is premature.  The Trusts

remain Debtors pending appeal of the Dismissal Order.  At this time, and in the event

that the Dismissal Order is reversed, the relief sought in the Motion, if granted,

---

[6] Following dismissal of the Trust Debtors, *In re Whitehall Manor, Inc.* became the new lead case
for the jointly-administered Debtors. However, as many of these filings concerned the Dismissal
Order, they were necessarily filed on the *In re Whitehall Trust* docket.

5

#125581586v1

would result in payment of intercompany obligations ahead of unrelated, arm's length creditors and in advance of an orderly payment of all of the Debtors' obligations in a Chapter 11 plan.

14.    Moreover, there is no indication that any party to the Leases contends that either of the Leases is expired, that the Manor Debtors no longer have rights under the Leases, or that any party to the Leases wants the relief sought by the Movants in the Motion. The Leases are "unexpired" under Pennsylvania law for purposes of Section 365 of the Bankruptcy Code, rendering Movants' "cause" for relief from the automatic stay flatly wrong.

15.    Accordingly, there is no cause to grant Lender and Receiver relief from the automatic stay in order to take possession of the properties or to evict the Manor Debtors.

## II.    ARGUMENT

### A. Movants Lack Standing to Seek to Compel Assumption or Rejection.

Neither Secured Creditor nor the Receiver is a party to the leases. Moreover, the Receiver's authority (if any) is stayed. Therefore, Movants lack standing to seek to compel assumption or rejection of the Leases.

Section 365(d)(2) of the Bankruptcy Code provides:

> In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, **on the request of any party**

6

#125581586v1

App.428

> **to such contract or lease**, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

11 U.S.C. §365(d)(2) (emphasis added).

The plain language of § 365(d)(2) provides that the court may set a timeline for the assumption or rejection of a residential real property lease following a request from a party to such lease.

Case law interpreting Section 365(d)(2) instructs that the Bankruptcy Code does not extend this particular relief to non-parties. *See In re EnCap Golf Holdings, LLC*, 2008 WL 5955350, at *3 (Bankr. D.N.J. Dec. 24, 2008) ("§ 365 of the Bankruptcy Code . . . affords [debtors] the opportunity to assume or reject a contract 'at any time before the confirmation of a plan.' However, a debtor's discretion is not unfettered as the same section provides that, 'on request of any party to such contract or agreement', the court 'may order the [debtor-in-possession] to determine within a specified period of time whether to assume or reject such contract or lease.'") (quoting 11 U.S.C. § 325(d)(2)); *In re Walden Ridge Dev., LLC*, 292 B.R. 58, 65 (Bankr. D.N.J. 2003) ("In a Chapter 11 proceeding, the trustee or debtor-in-possession may assume or reject an executory contract at any time before the confirmation of a plan subject only to the condition that the court may, on the request of a party to such contract, order the debtor to determine within a specified period of time whether to assume or reject such contract.) (internal citation omitted); *In re*

7

*PNW Healthcare Holdings, LLC*, 617 B.R. 354, 361 (Bankr. W.D. Wash. 2020) ("If the leases are determined to be of 'residential real property,' § 365(d)(2) applies and the Debtors can assume or reject any time up until plan confirmation, unless the Court orders earlier assumption upon motion of the Canyon Landlords.").

Interestingly, under the prior Bankruptcy Act, any party in interest could move to compel a debtor to assume or reject a residential real property lease, including the debtor, receiver, trustee, creditors' committee or a creditor, but Congress deliberately narrowed the scope when it enacted the Bankruptcy Code in 1978. *In re Riverside Nursing Home*, 43 B.R. 682, 684 (Bankr. S.D.N.Y. 1984). Under the Bankruptcy Code, only the other party to the lease has standing to move to compel a debtor to assume or reject a lease of residential real property. As the Court in *Riverside* held, a bank, as assignee of rents but not a party to the lease itself, lacks standing to compel the debtor to assume or reject a lease. *Id.* at 684-85 ("In adopting 11 U.S.C. § 365(d)(2), Congress expressly rejected the concept that any party in interest may compel a debtor to assume or reject an executory contract or a lease. In a sense, a special relationship of contract or estate is required; only the other party to the lease or contract has standing to request the court to fix the time for its assumption or rejection.") (citing and quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 348 (1977); S. Rep. 989, 95th Cong., 2d Sess. 59 (1978), *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 5845, 6304). The same rationale applies to Lehigh in these cases,

8

#125581586v1

App.430

since Lehigh is not a party to the original contract. Therefore, it lacks standing to compel assumption or rejection of the leases.

While the Receiver may have authority to take certain actions with respect to the Trusts pursuant to the Receiver Order, that order is presently stayed by these Chapter 11 cases and the Order specifically provides that the Receiver was appointed for Lehigh's benefit, not the benefit of the Trusts. Accordingly, the Receiver in these cases is not appointed to exercise the Trusts' business judgment but is acting in Lehigh's interest; therefore, the Receiver also lacks standing to seek the relief sought in the Motion.

Here, neither Lehigh nor the Receiver is a party to either of the Leases and lack standing to move to compel the Debtors to assume or reject the Leases in question. Movants lack standing to pursue the relief sought in the Motion; therefore, the Motion must be denied.

## B. **The Court Should Not Compel the Debtors to Assume or Reject the Leases at this Time**

Assuming *arguendo* that Movants have standing to pursue assumption or rejection of the Leases prior to confirmation of a Chapter 11 plan in these cases, no basis exists to compel the Debtors to make this decision now.

9

#125581586v1

App.431

"[The right to reject burdensome contracts is potentially one of the most powerful rights provided to a debtor under the Bankruptcy Code."[7] *In re Good Works Hous. LLC*, 2026 WL 710743, at *1 (Bankr. E.D. Pa. Mar. 13, 2026). Absent a motion from a party to the contracts in question, the Debtors have the right to assume or reject the Leases "at any time before the confirmation of a plan" pursuant to § 365(d)(2).

Nevertheless, in the appropriate case, a court can require a debtor to assume or reject a lease prior to confirmation of a plan.  In these cases, however, considering the factors the Movants themselves outline in the Motion the relief must be denied.

When evaluating motions to compel assumption or rejection of residential real property leases, courts in the Third Circuit utilize a multi-factor analysis. "In general, when determining whether to impose a deadline courts consider factors such as (i) the nature of the interests at stake, (ii) the balance of the hurt the litigants, (iii) the good to be achieved, (iv) the safeguards afforded the litigants and (v) whether the action to be taken is so in derogation of the statutory scheme that the court may be said to be arbitrary." *In re G-1 Holdings, Inc*., 308 B.R. 196, 213 (Bankr. D.N.J. 2004) (citing *In re Dunes Casino Hotel*, 63 B.R. 93, 949 (D.N.J.1986) (citations omitted)); *accord In re Pocono Springs Co.*, No. 97-0232DAS, 1997 WL 347906, at *3 (Bankr. E.D. Pa. June 18, 1997) (internal citations omitted). Another

---

[7] As used herein, "Bankruptcy Code" shall refer to 11 U.S.C. § 101, *et seq.*

10

#125581586v1

App.432

consideration by courts in the Third Circuit is whether "[t]he Debtors are performing under the contract[.]"[8]

Courts in the Second Circuit have outlined other factors for consideration as well[9]: (1) "the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code"; (2) "the importance of the contract to the debtor's business and reorganization"; (3) "whether the debtor has had sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan"; and (4) "whether exclusivity has terminated." *In re Teligent, Inc.*, 268 B.R. 723, 738 (Bankr. S.D.N.Y. 2001) (internal citations omitted).

It is in the bankruptcy court's discretion, based on the circumstances of the particular case, to determine what constitutes a reasonable period of time for a debtor to assume or reject a contract. *G-1 Holdings*, 308 B.R. at 213 (citing *Dunes*, 63 B.R. at 949). This exercise of discretion requires the court to "balance[] the interests of the bankruptcy estate and its creditors against the interests of the movant." *In re EnCap Golf Holdings, LLC*, No. 08-18581 (NLW), 2008 WL 5955350, at *3 (Bankr. D.N.J. Dec. 24, 2008); *accord In re Guardian Elder Care at Johnstown, LLC*, 665 B.R. 270, 282 (Bankr. W.D. Pa. 2024) (describing Section 365(d)(2) as "reflect[ing]

---

[8] The Debtors are actively performing under the contracts. See Section II.A.1., *infra*, for analysis of this factor.

[9] No court in the Third Circuit that the Debtors are aware of has relied upon the *Teligent* case for the outlined considerations. However, because Movants delve into these factors in the Motion, the Debtors briefly address them as well.

11

#125581586v1

App.433

the Bankruptcy Code's balanced approach"). "Most importantly, however, 'the court should interpret reasonable time consistent with the broad purpose of Chapter 11, which is to permit [the] successful rehabilitation of debtors.'" *G-1 Holdings*, 308 B.R. at 213 (quoting *Dunes*, 63 B.R. at 949); *accord Dunes*, 63 B.R. at 949 (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)).

In this case, each factor weighs against the relief sought in the Motion.

### 1. The Nature of the Interests at Stake

The nature of the interests at stake weighs in favor of the Debtors in these cases.

The Debtors' continued existence is at stake.  The Trusts have an interest in retaining their tenants – the Manor Debtors – through the restructuring process so that the Trusts can resolve its debts to Lehigh and their other creditors in these cases. The Manor Debtors have an interest in retaining use and occupancy of their facilities, which are owned by the Trust Debtors, so that they can receive rental payments from their residents in exchange for providing those residents with uninterrupted, skilled care.

The Debtors have a strong interest in successfully reorganizing so that they may continue operations to recover financially and to again become profitable businesses. This interest is at the heart of the bankruptcy process. The Debtors have been in bankruptcy for three and a half months – months that have been plagued with

12

#125581586v1

relentless and costly pressure and litigation from Lehigh. Nevertheless, the Debtors'
financial condition is modestly positive, and improving. The Debtors are actively
working on a plan of reorganization, which has had to pivot to some extent due to
the uncertainty around the Dismissal Order and its impact on the Debtors' available
options to resolve their debts in a Chapter 11 plan. Nevertheless, the Debtors are
striving to retool themselves in Chapter 11 and expect to have their valuations,
revised to account for the potential impacts of the Dismissal Order, in advance of the
April 21, 2026 hearing so that they can finalize a draft Chapter 11 plan and disclosure
statement to resolve their cases shortly thereafter.

Lehigh continues with unsupported allegations that vendors are not being paid
post-petition, that the Manors are deteriorating, and that the Debtors are
"hemorrhaging" cash. However, the vendors are being paid, the Debtors' operations
are improving, the residents are safe and well cared for, and the properties are being
maintained and repaired regularly.

As to the condition of the Manors, the Debtors acknowledge the issues raised
in the most recent report of the Patient Care Ombudsman.  The Debtors addressed
each concern. For example, the Manors suffered damage due to unique intervening
weather conditions, including two historic snowstorms, more than two weeks of
below-freezing temperatures, and the subsequent melting of record snowfall. The
Debtors improvised to mitigate the harm caused by these conditions, working to

13

#125581586v1

make sure pipes did not freeze and utilities were maintained. Because of the shapes of the roof, the Manors experienced roof leaks. To repair the leaks, maintenance had to wait for the ice to melt to gain access to the roof. In the meantime, to avoid mold, panels were removed. Repairs are now complete.

Debtors always had regular exterminator services. Debtors' kitchens, however, experienced an unusual amount of mice activity because of the weather. Debtors have taken additional steps to mitigate the mouse issue, including increasing the exterminator services from monthly to bi-weekly, requesting to mow the lawn of an abandoned property, moving dumpsters 50 feet away, and increasing walk-throughs by the administrators. Debtors also hired a quality control person whose sole job is to assure state compliance. Still, the report shows that the Residents are well cared for and receive services despite the difficulties.

Since the Ombudsman's visits, the Debtors have diligently resolved all of the issues noted in the recently-submitted ombudsman report, have provided receipts and pictures to the Ombudsman, and are working with the state ombudsman toward full license restoration. The Debtors are also working to schedule follow-up visits for the Ombudsman to confirm that all issues have been resolved.

As to the Debtors' cash position, the Debtors have explained why they anticipate a reduction in cash over the next several weeks due to a third payroll in May and anticipated and estimated bankruptcy costs being approved for payment;

14

#125581586v1

App.436

however, actual expense numbers will become available as the weeks progress. The
Debtors have been making all adequate protection payments and other approved
post-petition payments[10] and no creditor, vendor or other party has discontinued
service or asserted that it is not being paid when due post-petition, other than
mortgage service payments owed to Lehigh that will be addressed in the Debtors'
Chapter 11 plan along with all other obligations.

While the issues involving Lehigh have been front and center before the Court
in these cases as the relationship there is contentious, the Debtors have been working
diligently outside of court proceedings to formulate a feasible plan and obtain
requisite funds to ensure a successful reorganization.

By contrast, Lehigh has consistently pursued relief that only benefits itself, to
the exclusion of all other parties in interest in these cases, and that hinders the
Debtors' ability to reorganize. Its interests, as set forth in the Motion, are again self-
serving and detrimental to all other parties in interest.

Lehigh's interests are pecuniary in nature and the relief that Lehigh wants is
to maximize a return on investment for its investors. The best way for Lehigh to do
this is to force the Manor Debtors out of business and take the Debtors' assets for

---

[10] The Debtors will separately address the allegations in the Motion to Dismiss filed by the Office of the United
States Trustee, but note that the funds paid to Dilworth that are referenced in the Motion to Dismiss are rent
payments from Good Shepherd that the Debtors were directed to turnover to Dilworth's trust account pending the
Court's further direction regarding those rents. The payments to Reeves & Lukens were the retainer payment
approved by the Court as part of their retention to perform the valuation of the Debtors' businesses. The other
allegations will be addressed in response to the Motion to Dismiss.

15

#125581586v1

itself.  Lehigh is not interested in allowing the Debtors the opportunity to propose a feasible plan, even if that plan would pay Lehigh in full over time, because it will reduce the immediate recovery Lehigh would receive if its efforts to put the Debtors out of business are successful.

Movants express a strong interest in collecting rents from the Manor Debtors, noting the Receiver having been appointed for that purpose and asserting that the Receiver's interests must be enforced in the Debtors' bankruptcy cases. Motion ¶ 76. The Receiver's pursuit of rent payments, however, is stayed in these cases, and Movants cite no authority that would require the Receiver's interests to be enforced in these bankruptcy cases.  Indeed, the effect of enforcing the Receiver's ability to collect rents from the Manor Debtors would be the collapse of the Debtors' operations and inability to reorganize.  In any event, it appears from the Motion that Movants are seeking relief that runs contrary to the Receiver Order, which requires the Receiver to apply the collected rents first to the Receiver's fees, then to operating expenses, and lastly to payment of rent to the Trusts. Receiver Order at 6.

Lehigh and the Receiver contend in the Motion, as they did at the April 1, 2026 hearing, that they have an operator ready, willing, and able to step in and operate the personal care homes; however, when pressed on cross-examination at the April 1, 2026 hearing as to the identity of that operator and steps taken to obtain licensure of such an operator, Lehigh's witnesses admitted that they had not

16

#125581586v1

identified an operator yet and had taken no steps toward licensure, a process that was described as taking thirty days if the state ombudsman found safety reasons to expedite the replacement of the operator and that would otherwise take longer.

The Debtors submit that the nature of interests in these cases strongly favor denying the relief sought in the Motion because the Debtors' interests in reorganizing their operations for the benefit of all parties in interest and continuing their operations are significantly more important than Movants' pecuniary interests that can be resolved in a number of ways under the Bankruptcy Code in a Chapter 11 plan.

### 2.  The Balance of the Hurt to the Litigants

The balance of hurt to the litigants, too, weighs in favor of the Debtors. The Debtors face substantial and immediate harm if they are forced to make one of the most important contractual decisions in their reorganization earlier than intended.

The Debtors have several options to resolve their debts in a Chapter 11 plan, whether or not the Dismissal Order is affirmed or reversed.  Some of those options would require the Debtors to assume their Leases, while others would not and the Debtors should have a full opportunity to exercise their sound business judgment and determine the best course of action for their estates to present in a Chapter 11 plan.

17

#125581586v1

App.439

Forcing the Debtors to prematurely assume or reject the Leases will limit the Debtors' options in these cases and could have irreversible consequences that are detrimental to the Debtors' creditor body.

There is no Official Committee of Creditors in these cases, but the Debtors suspect that such a committee would also oppose the relief sought in the Motion which presents a Hobson's choice to the Debtors: reject the Leases and cease operations because the Manor Debtors would have no facilities within which to operate, or assume the Leases and elevate the full amount of unpaid rent to an administrative cure claim, with rights ahead of all unsecured creditors, before the Debtors obtain confirmation of a plan.

Movants face little harm if the Debtors are allowed to decide whether to assume or reject the Leases as part of confirmation of a plan. The Debtors' deadline to submit a plan of reorganization is currently April 27, 2026, with the Debtors having requested a short extension to take into account the impact of the Dismissal Order and potential outcomes on appeal. While unfortunate, the Trust Debtors have been unable to make mortgage payments to Lehigh and its predecessors for five years – though the HUD reserves established by the Debtors were applied by HUD to satisfy the rent obligations from 2021 to 2023.

The value of the Debtors' real estate is not depreciating, and their operations are improving.    The Bankruptcy Code, adequate protection payments, and

18

#125581586v1

App.440

confirmation requirements are sufficient to protect Lehigh's interests and provide a mechanism for the Debtors to resolve their obligations to Lehigh.

As such, the harm that would befall the Debtors if they were compelled to prematurely assume or reject the Leases and either cease operations or elevate significant unsecured, intercompany debt to administrative claim status if the Motion was granted far outweighs Lehigh and the Receiver having to wait until confirmation to receive payment of the Debtors' obligations to them.

### 3. The Good to Be Achieved

The pinnacle of the good to which the bankruptcy system aspires is reorganized debtors emerging from bankruptcy and being an immediate benefit to their communities. The Debtors here can achieve this result, if they are allowed the space and time to formulate a plan of reorganization and decide, based on that plan, what leases and contracts will be assumed and rejected.  Indeed, as to the Leases, the Debtors have options that would render the Leases unnecessary, as well as options that would require them to assume the Leases, and some depend on the outcome of the appeal of the Dismissal Order.[11]

Successful reorganization of the Debtors would be a benefit not just to the Debtors themselves, but also to their residents, their employees, their creditors, and

---

[11] The Debtors do not intend to await the outcome of the appeal of the Dismissal Order before filing a plan.  Instead, due to the impact of that order, the Debtors intend to file a plan in the near future that contains options and contingencies depending on the outcome of that appeal.

19

App.441

their community.  Vendors would retain their business with the Debtors, employees would retain their jobs, and residents would retain the stability and care to which they've become accustomed, particularly through their long-term relationships with staff members and administrators. There is significant good to be achieved in denying the Motion.

Movants contend that they could bring in a financially stable operator. However, Movants have provided no explanation as to how they believe they can operate the Manors more profitably than the Atiyeh family.  They have provided no evidence that residents are unhappy with the services being provided, that residents are not safe or at risk.  They have provided no evidence of any vendor discontinuing provision of goods or services.  Lehigh's bald assertion that it would put a financially stable operator in place is no basis for displacing the Debtors' current operator that is in the process of reorganizing.  If such a basis existed, the owners and operators of any company experiencing financial difficulties would be precluded from reorganizing and, instead, replaced by a new operator that, at the time, claims to be more financially stable and better able to operate the business.  This is the antithesis of the purpose of the Bankruptcy Code.

The good to be achieved by allowing the Debtors the opportunity to propose a plan and decide which leases to assume or reject as part of that plan vastly

20

#125581586v1

App.442

outweighs any good to be achieved by allowing Lehigh to displace the Debtors and take over their operation with an unknown, unproven operator to the exclusion of all other creditors.

### 4. The Safeguards Afforded the Litigants

Despite Movants' terse argument to the contrary, their interests here are significantly safeguarded.

The Manor Debtors' reorganization ultimately inures to Movants' benefit. Lehigh asserts a security interest in essentially all assets of each of the Debtors. The Debtors' assets are more valuable as a going concern and, through reorganization, the Debtors' operations will again be successful and profitable, enabling the Debtors to service their obligations to Movants.

Lehigh is retaining all of its interest pending confirmation of a plan and is receiving adequate protection payments. Moreover, the Bankruptcy Code provides several avenues by which the Debtors can provide for their obligations to Movants in a Chapter 11 plan.

The Leases are residential real property leases. If the Debtors assume the Leases, they must fully cure the default, or provide adequate assurances of prompt cure, before doing so. 11 U.S.C. § 365(b)(1); *In re Kiwi Int'l Air Lines, Inc.*, 344 F.3d 311, 318 (3d Cir. 2003). If the Debtors instead opt to reject the Leases, the respective

21

#125581586v1

lessors are entitled to unsecured claims for breach of their respective agreements (11 U.S.C. § 365(g)) but Movants would retain their secured and other interests in the Debtors' assets, including the rent received by the Manor Debtors.

Accordingly, Movants' interests are protected regardless of whether, and when, the Debtors assume or reject the Leases.

### 5. Whether the Action Contemplated Is in Derogation of the Statutory Scheme

The action contemplated by the Motion is indeed in derogation of the statutory scheme. Neither Movant is a party to the Leases; therefore, they are not contemplated by the Bankruptcy Code as parties entitled to the relief they seek under Section 365(d)(2). To the contrary, allowing non-parties to the Leases to seek this relief would directly contravene not only the scheme contemplated by the Bankruptcy Code but would displace the Debtors' exercise of business judgment and the Debtors' obligations to their respective estates to evaluate whether assumption or rejection is in the best interests of all interested parties. *See In re PNW Healthcare Holdings, LLC*, 617 B.R. 354, 358-59 (Bankr. W.D. Wash. 2020) ("In the original version of § 365 enacted in the 1978 Bankruptcy Code ('1978 Code'), Congress attempted to balance the rights of debtors and non-debtor parties to these contracts and leases, reflecting some of the practical realities in the context of the different types of bankruptcy cases and different factual contexts . . . In doing so, Congress

22

#125581586v1

App.444

gave the bankruptcy courts substantial discretion to address the needs of particular bankruptcy cases, especially regarding deadlines for assumption or rejection.").

Because affording Movants rights under Section 365(d)(2) contravenes Congressional intent, this factor, too, weighs in favor of the Debtors.

Accordingly, each of the factors considered by courts in the Third Circuit favors allowing the Debtors the opportunity to decide whether to assume or reject the Leases pursuant to a Chapter 11 plan and denial of the relief sought in the Motion. The remaining factors raised by Movants in the Motion are those that are considered by Courts in the Second Circuit – which also favor the Debtors here. To the extent that this Court considers those factors, they are discussed briefly below.

### 6. Damages Beyond Compensation Available Under the Bankruptcy Code

As was the case at the April 1, 2026 hearing, the damages alleged by Lehigh in the Motion are pure speculation about what might happen if vendors discontinue services or repairs are not made or a parade of other horribles, none of which has happened in these cases. No actual damages alleged by Movants in the Motion are beyond compensation that can be provided under the confirmation and distribution scheme of the Bankruptcy Code.

As set forth in subsections 1 and 2 above addressing the nature of interests and balance of harms, the lack of damages beyond compensation under the

23

#125581586v1

App.445

Bankruptcy Code favors allowing the Debtors time to determine whether to assume or reject the Leases and favors denying the relief sought by Movants.

### 7. The Importance of the Contract to the Debtors' Business and Reorganization

Prior to proposing a plan through which they will reorganize and emerge from Chapter 11, the Leases may just be the most important contracts to the Debtors' business and restructuring. Indeed, it is through the Leases that the Manor Debtors have access to and the right to operate at the facilities and on the real property owned by the Trust Debtors. Without the Leases, the Manor Debtors would be forced to cease operations. In turn, without the Leases and the Manor Debtors' reorganization, the Trust Debtors will receive no income from the Leases and be unable to reorganize their debts or otherwise pay their debts if they are not permitted to be debtors under the Dismissal Order. The Leases, therefore, are foundational to the Debtors' reorganization efforts, at least until a plan can be confirmed that will provide for the Debtors to resolve their debts to creditors. The Debtors' decisions with respect to the Leases are fundamentally important to their reorganization efforts. Accordingly, they should be allowed the full time provided to them under the Bankruptcy Code to determine how best to utilize these critical contracts in their reorganization.

### 8. Whether the Debtor Has Had Sufficient Time to Appraise Its Financial Situation and the Potential Value of Its Assets in Formulating a Plan

24

#125581586v1

App.446

The Debtors filed their bankruptcy petitions on December 26, 2025. While they have been in bankruptcy for less than four months, they expect to receive a final valuation report on or before April 20, 2026 with which they intend to finalize a Chapter 11 plan of reorganization. The Debtors have been diligent in their efforts to value their operations, increase revenues, and work toward proposing a feasible plan. Their efforts were recently disrupted when this Court dismissed the bankruptcies of the Trust Debtors on March 20, 2026. Case No. 25-15241, D.I.s 263, 264. Nevertheless, the Debtors intend to finalize a plan shortly after receiving their valuation report.

Four months is not a lengthy period of time, particularly where the Debtors' cases were recently fundamentally changed, having potential implications on the value of the Debtors' assets and treatment of various creditor claims depending whether the Trust Debtors remain debtors or become non-debtors. *See In re Physician Health Corp.*, 262 B.R. 290, 295 (Bankr. D. Del. 2001) ("The Debtors are evaluating and analyzing their businesses and making progress in deciding which contracts to keep and which to divest. The bankruptcy case is only five months old. There is no evidence that the Debtors are being dilatory in addressing these issues, which must be resolved before a plan of reorganization can be filed.").

25

#125581586v1

App.447

Based on the short tenure of these cases and steps taken by the Debtors despite the extent of litigation in these cases, the Debtors are well on their way to resolving these cases in the near term.  This factor weighs in favor of allowing the Debtors time to decide whether to assume or reject the Leases pending confirmation of a Chapter 11 plan.

### 9.  Whether Exclusivity Has Terminated

Exclusivity has not terminated. 11 U.S.C. § 1121(1)(c)(2) provides a Chapter 11 debtor with an exclusivity period of 120 days from the entry of the order of relief to file a plan of reorganization. The Debtors filed their bankruptcy petitions on December 26, 2025. The exclusivity period ends Saturday, April 25, 2026. Pursuant to Fed. R. Bankr. P. 9006(a)(1)(C), because this date is a Saturday, the exclusivity period end date is moved to the next business day. The Debtors' exclusivity periods, therefore, remain in effect until their end date, Monday, April 27, 2026, unless extended by the Court.

Because all of the factors considered by courts in the Third Circuit, as well as those considered by courts in the Second Circuit, favor the Debtors' having the ability to decide whether to assume or reject the Leases as part of a Chapter 11 plan, this Court should exercise its discretion and deny the relief sought in the Motion.

### C.  Court Should Not Determine the Pre-Petition Cure Amounts at This Juncture – And Should Certainly Not Use Movants' Calculations.

26

#125581586v1

App.448

The Leases involve intercompany obligations between the parties to the Leases. As stated previously, the parties to the Leases have several options under the Bankruptcy Code and applicable case law to address the cure of lease defaults upon assumption of a lease. This includes, for example, the Debtors' right to address the alleged amounts owed pursuant to the Receiver's proof of claims at the appropriate time through the claims allowance process. Likewise, post-petition rent obligations can be addressed through the administrative claims allowance process and the assumption or rejection of the Leases in a plan in the event that the Leases are necessary to a plan of reorganization.

Movants provide no basis for the parties to the Leases or the Court to determine these claims at this time, nor do they provide a basis for the Court to "direct the Manor Debtors to pay Lender and Receiver that amount promptly as a condition of assumption of their Leases." Motion at ¶109. The cure amount, if prematurely determined at this time, would be payable to the Trust Debtors, who are the landlords. If the Dismissal Order is affirmed, the cure amount would be subject to the Receiver Order and directed to the Receiver alone for distribution in accordance with the scheme set forth in that Order.[12] Therefore, the relief requested would

---

[12] When Judge Henry entered the Receiver Order, she instructed that payments should be made to the Receiver, who would apply said payments in a specific priority order:

[F]irst, to pay Receiver's approved fees and expenses which include the Receiver's attorneys' fees related to the receivership;
[S]econd, to pay all operating expenses with respect to the Properties (other than the obligations owed to Plaintiff under the Loan Documents);

27

#125581586v1

require this Court to contravene the Receiver Order if rent is paid to the Secured Creditor. By seeking a direction from this Court that moneys should be paid to "Lender and Receiver" the Movants ask this Court to circumvent the priority order outlined by the District Court, providing yet another reason the Motion should be denied and this Court should not set cure amounts for the Leases at this time.

If this Court determines that an amount is required, Movants' arrearage amount is inaccurate. Movants do not account for the HUD Lean requirements discussed above that no longer exist. Movants, for example, must show that mortgage insurance premiums are still required. Movants have not established a procedure to replace the reserve fund or its distribution for profit. Movants cite that the leases are "triple net leases". However, HUD required the Trusts to pay the insurance, taxes and major maintenance. Now, Movants seek to double dip, by requiring rent payments in addition to direct insurance, taxes and maintenance payments. Moreover, the Receiver relies on the Secured Creditor for this information, and the Secured Creditor has its own interests as a private equity firm.

### D. No Cause Exists for Relief from the Automatic Stay

---

[T]hird, to pay all capital obligations with respect to the Properties;
[F]ourth, to fund reasonable reserves for anticipated operating expenses and capital obligations with respect to the Properties; and
[L]astly, to pay the obligations owed to [Lehigh] under the Loan Documents[.]

Receiver Order, *Lehigh Valley 1 LLC v. Whitehall Fiduciary LLC*, Case No. 5:24-cv-02627-CH, D.I. 65, at 6 (E.D. Pa. May 2, 2025). See Attached Receiver Order as Exhibit "D"

28

#125581586v1

App.450

The Court should also deny Movants' request for relief from the automatic stay.

Pursuant to Section 362(d)(1) of the Bankruptcy Code, "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay [. . .] for cause, including the lack of adequate protection of an interest in property of such party in interest[.]"

Movants base their request for relief from the automatic stay on their premise that the Leases are expired and cannot be assumed by the Debtors; therefore, the Manor Debtors do not have a right to operate on the Trust Debtors' properties and cannot reorganize. Movants are wrong. Moreover, Movants have cited no case in which a secured party, as opposed to the non-debtor party to a lease, has been granted relief from the automatic stay for cause due to a lease to which it was not a party having expired.

The Debtors' Leases are not "expired," as the term has been interpreted for purposes of section 365. In the Motion, Movants assert that the District Court voiding the most recent amendments to the Leases voided the extension of the Lease terms, rendering the Leases expired and unassumable.

29

#125581586v1

App.451

As reflected: (i) in the Leases themselves; (ii) in the contract parties' performance; and (iii) under applicable Pennsylvania law, the Leases are not "expired" as contemplated by Section 365 of the Bankruptcy Code.

The parties' lessor-lessee relationships have not ended. To the contrary, the Trusts continue to allow the Debtors to occupy their properties, acting as they did prior and performing maintenance on the properties as needed. Testimony to this effect was provided by the Debtors' witnesses in the April 1, 2026 evidentiary hearing. Meanwhile, the Debtors operate their care homes on the Trust properties, alerting the Trusts of needed repairs on a regular basis. The parties continue in a course of performance that indicates their Leases have not terminated, though their stated terms have passed. Rather, as Saucon Valley Manor and the Saucon Trust did from 2012 through 2018, they continue to abide by lease terms without officially executing a lease extension.

This interpretation is supported by case law. Where the stated term of a lease has run but the parties continue to perform, however, bankruptcy courts applying Pennsylvania law have found leases to be "unexpired" – even if the parties fail to follow renewal procedures required by their lease terms. In *Matter of Schnur Enterprises*, the debtor lessee orally notified its lessor of its intent to exercise its lease renewal option prior to the lease expiry and the parties entered into negotiations, but the lessee did not send the required written notice of intent to renew.

30

#125581586v1

App.452

*Matter of Schnur Enters., Inc.*, 42 B.R. 202, 204 (Bankr. W.D. Pa. 1984). The parties did not reach an agreement prior to the end of the stated lease term, and the lessee filed for bankruptcy on the day prior. *Id.* at 203-04. Deciding the lessor's motion for relief from stay (so it could commence ejectment proceedings), the court found that "technical compliance with contractual provisions can be waived by the conduct of the parties." *Id.* at 205. Quoting the Pennsylvania Supreme Court, the court continued:

> Even though the time fixed in an agreement for settlement is stated to be of the essence of the agreement, it may be extended by oral agreement or be waived by the conduct of the parties; and where the parties treat the agreement as in force after the expiration of time specified for settlement it becomes indefinite as to time and neither can terminate it without reasonable notice to the other.

*Id.* (quoting *Warner Company v. MacMullen*, 381 Pa. 22, 112 A.2d 74 (1955)). Here, the Debtors and the Trusts have continued in the same course of conduct, proceeding as landlords and tenants since well before 2023, and continuing through the present. They failed to adhere to the official provisions of the Leases regarding renewal, but have otherwise treated the Leases as in full force and effect. Neither has provided any statement of intent to terminate, as occurred in *Turner*. As such, the Leases are "unexpired," as the term has been interpreted by the case law, and are therefore assumable in bankruptcy by the Debtors.

The Honorable Derek J. Baker, of this Court, analyzed the meaning of "unexpired" in the context of Section 365 as recently as a month ago. *See In re Good*

31

#125581586v1

App.453

*Works Hous. LLC*, No. 25-12224 (DJB), -- B.R. ----, 2026 WL 710743, at \*3 (Bankr.

E.D. Pa. Mar. 13, 2026). Turning first to the ordinary-meaning canon of construction,

Judge Baker found "Thus, the ordinary meaning of 'unexpired' as used in § 365 of

the Bankruptcy Code describes a lease of personal property whose demands and

requirements are not yet satisfied, concluded, or completed." *Id.* at \*3. Examining

the technical meaning of the term, Judge Baker concluded that both led to the same

conclusion:

> [E]ven the technical meaning of 'unexpired' as used in § 365 of the
> Bankruptcy Code to describe a lease of personal property—consistent
> with the term 'executory contract'—is a lease where the obligations of
> the parties are not concluded or completed. Therefore, whether the
> Court uses the 'ordinary meaning' or the 'technical meaning,' the term
> unexpired must mean a lease which is not concluded.

*Id.* at \*4. Judge Baker's analysis can be distilled to a simple shorthand: if the

parties' obligations are "not concluded or completed," the lease is not expired.

In the instant matter, as demonstrated by their conduct, the obligations of the

Debtors and the Trusts under the Leases have not come to an end. The Debtors still

occupy the premises, still incur rent obligations, and still alert their respective

landlords of needed repairs. The Trusts perform repairs when alerted, and are

responsive to their Manor tenants. The Leases, and the parties' respective obligations

under the Leases, are far from concluded. The Leases are therefore "unexpired" for

purposes of Section 365 of the Bankruptcy Code, rendering Movants' arguments that

32

#125581586v1

App.454

the Debtors cannot assume the Leases and, consequently, cannot possibly reorganize wholly misplaced.

The Movants' estimation of the Debtors' likelihood of successful reorganization, based in part upon their interpretation of the Leases as "expired" and not assumable, is similarly inaccurate. The Debtors' possible reorganization is not unlikely, as Movants allege. Despite the Lender's best efforts, the Debtors are still operating and, with informed guidance, are making progress with respect to formulating a plan of reorganization. The Debtors' likelihood of successfully reorganizing increases by the day. Their progress should not be disrupted by a grant of relief from the automatic stay, and sufficient cause for such a grant is nowhere to be found.

Because the leases are not expired and the Debtors are actively completing negotiations and valuations necessary to propose their Chapter 11 plan, Movants have presented no evidence that the Debtors cannot reorganize and no cause for relief from the automatic stay.

WHEREFORE, the Debtors respectfully request that the Court exercise its discretion to deny the Motion in its entirety.

Dated:  4/14/2026                    /s/ Michelle V. Lee
         Philadelphia,               **DILWORTH PAXSON LLP**
         Pennsylvania                Lawrence G. McMichael

33

#125581586v1

App.455

Anne M. Aaronson
Michelle V. Lee
1650 Market St., Suite 1200
Philadelphia, PA 19103
Telephone: (215) 575-7000
Facsimile: (215) 575-7200
Email: lmcmichael@dilworthlaw.com
       aaronson@dilworthlaw.com
       mlee@dilworthlaw.com

*Counsel for the Debtors and Debtors-in-Possession*

34

#125581586v1

**THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA (READING)**

| In re:<br>Whitehall Manor, Inc., et al.,<br><br>Debtors. | Chapter 11<br>Case No. 25-15245 (PMM)<br><br>(Jointly Administered)<br><br>Objection Deadline: TBD<br>Hearing: TBD |
| --- | --- |

This Opposition has been served upon (a) the Office of the United States Trustee for the Eastern District of Pennsylvania; (b) the entities listed on the Consolidated List of Creditors Holdings the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Lehigh Valley 1 c/o Phillip Berger and Matt Hamermesh; (d) Duane Morris c/o Brett Messinger (e) all parties who have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

Dated:  4/14/2026
      Philadelphia,
      Pennsylvania

/s/ Michelle V. Lee
**DILWORTH PAXSON LLP**
Lawrence G. McMichael
Anne M. Aaronson
Michelle V. Lee
1650 Market St., Suite 1200
Philadelphia, PA 19103
Telephone: (215) 575-7000
Facsimile: (215) 575-7200
Email: lmcmichael@dilworthlaw.com

35

#125581586v1

App.457

aaaronson@dilworthlaw.com
mlee@dilworthlaw.com

*Counsel for the Debtors and Debtors-in-Possession*

36

#125581586v1

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| Whitehall Manor, Inc., et al., | : | Case No. 25-15245 (PMM) |
|  | : |  |
| *Debtors.* | : | Jointly Administered[1] |
|  | : |  |

## ORDER

AND NOW, this _____ day of April, 2026, upon consideration of Secured Creditor Lehigh Valley 1,LLC and Receivers Joint (1) Motion to Compel The Manor Debtors To Assume Or Reject Their Leases, (2) Establish The Cure Amount and (3) For Relief From The Automatic Stay. Filed by Lehigh Valley 1, LLC, Receiver Duane Morris LLP, by Erin Duffy, Esquire and Debtors' Objection to Joint Motion to Compel thereto, it is hereby ORDERED that the Motion is DENIED.

BY THE COURT:

_____

Date:                    Honorable Patricia Mayer

---

[1] The Debtors and debtors-in-possession in these Chapter 11 Cases and the last four digits of their respective taxpayer identification numbers are as follows: (i) Whitehall Trust (4229); (ii) Saucon Trust (4229); (iii) Whitehall Manor, Inc. (5606); (iv) Saucon Valley Manor, Inc. (2894). The Debtors' mailing address is 1177 6th Street, Whitehall, PA 18052. The Dismissal Order, entered on March 19, 2026, dismissed the cases of debtor Whitehall Trust, Case No. 25-15241-PMM and debtor Saucon Trust, Case No. 25-15243-PMM.



OFFICE OF HOUSING

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC  20410-8000

December 10, 2012

Christine Chandler, Vice President
Chief FHA Underwriter
M&T Realty Capital Corporation
255 Charles Street, 17th Floor
Baltimore, MD  21201

Dear Ms. Chandler:

SUBJECT:    Amendment No. 2 to Firm Commitment Issued September 27, 2012
            Project Name: Saucon Valley Manor
            Project No: 034-22096
            Mortgagor:  Saucon Trust

     This is in response to your letter dated December 7, 2012, requesting an amendment to the Firm Commitment issued on September 27, 2012, for the subject property.  Based on the information provided in the letter, the Firm Commitment is amended as follows:

1.  The initial deposit to the replacement reserve account is increased in the amount of $63,847, from $245,000 **to $308,847**
2.  The critical repair costs have increased from $70 **to $109**

     A revised form HUD 92264A reflecting the changes above, is attached.  All other terms and agreements set forth in the Firm Commitment issued on September 27, 2012, and Amendment #1 issued October 31, 2012, remain in effect.

     If you have any questions, please contact Mollie Yeatts, Closing Coordinator, Office of Healthcare Programs at (206) 220-6455, or by email at mollie.yeatts@hud.gov.

Sincerely,

Thomas McMillan
Workload Manager/GTM
Office of Healthcare Programs

Attachment
Form HUD-92264A

# EXHIBIT A

www.hud.gov        espanol.hud.gov

| Supplement to<br>Project Analysis | U.S. Department of Housing<br>and Urban Development<br>Office of Housing<br>Federal Housing Commissioner | OMB Approval No. 2502-0029<br>(exp. 10/31/2012) |
|---|---|---|

Section or Title Number __232/223f LEAN__

☐ Valuation Trial    ☐ Conditional    ☑ Firm    **See last page for Public Reporting burden statement before completing this form**

**Privacy Act Notice:** The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

| Name of Mortgagor (Borrower)<br>Saucon Trust | Project Number<br>034-22096 |
|---|---|

Name of Project
Saucon Valley Manor

Location of Project (street, city & state)
1050 Main Street, Hellertown, PA ·

**Type of Borrower**

☑ Private    ☑ Profit    ☐ Public    ☐ Nonprofit    ☐ State or Federal Instrumentality, etc.

☐ Management Coop.    ☐ Sales Coop.    ☐ Investor-Sponsor    ☐ Builder-Seller    ☐ Limited Distribution

**Type of Project**

☐ Rental Housing    ☐ Mobile Home Court    ☐ Board and Care    ☐ New Construction    ☐ Non-Elevator
☐ Cooperative    ☐ Nursing Home    ☐ Single Rm. Occupancy    ☐ Rehabilitation    ☐ Elevator
☐ Condominium    ☐ Intermediate Care Facility    ☐ Redevelopment    ☑ Existing
☐ Capital Advance 202/811    ☐ Housing for the Elderly    ☐ Supplement Loan    ☐ _____

**I.  Determination of Maximum Insurable Mortgage**

| Criteria | | column 1 | column 2 | column 3 |
|---|---|---|---|---|
| 1. Mortgage or Loan Amount Requested in Application | | | | $ 19,462,800.0 |
| 2. Reserved | | | | $ _____ |
| 3. Amount Based on Value or Replacement Cost | | | | |
| a. Value (Replacement Cost) in Fee Simple | $ 24,350,000.00 x 85.00 % | | $ 20,697,500.0 | |
| b. (1) Value of Leased Fee | $ _____ | | | |
|    (2) Grant/Loan funds attributable to R. C. items | $ _____ | | | |
|    (3) Excess Unusual Land Improvement | $ _____ | | | |
|    (4) Cost Containment Mortgage Deduction | $ _____ | | | |
|    (5) Total lines (1) to (4) | $ 0.00 x ____ % $ | 0.00 | | |
| c. Unpaid Balance of Special Assessment | $ _____ | | | |
| d. Total line b plus line c | | | $ 0.00 | |
| e. Line a minus line d | | | | $ 20,697,500.0 |
| 4. Amount Based on Limitations Per Family Unit | | 0.00 | | |
| a. Number of no Bedroom Units | ____ X $ ____ $ | 0.00 | | |
|    Number of one Bedroom Units | ____ X $ ____ $ | 0.00 | | |
|    Number of two Bedroom Units | ____ X $ ____ $ | 0.00 | | |
|    Number of three Bedroom Units | ____ X $ ____ $ | 0.00 | | |
|    Number of four or more Bedroom Units | ____ X $ ____ $ | 0.00 | | |
| b. Cost Not Attributable to Dwelling Use | $ ____ X ____ % $ | 0.00 | | |
| c. Warranted Price of Land | $ ____ X ____ % $ | 0.00 | | |
| d. Total lines a through c | | | $ 0.00 | |
| e. Total Number of Spaces | ____ X $ ____ | | $ 0.00 | |
| f. Sum: Value of Leased Fee and Unpaid Balance of Special Assessment(s) | | _____ | $ | |
| g. Line d or line e, whichever is applicable, minus line f | | _____ | $ | |
| 5. Amount Based on Debt Service Ratio | | | | |
| a. Mortgage Interest Rate | | 2.50 % | | |
| b. Mortgage Insurance Premium Rate | | 0.50 % | | |
| c. Initial Curtail Rate | | 1.79 % | | |
| d. Sum of Above Rates | | | 4.79 % | |
| e. Net Income | $ 2,311,701 x 68.97 % | | $ 1,594,264.59 | |
| f. Annual Ground Rent $ ____ + Annual Spec. Assmt. $ ____ | | | $ 0.00 | |
| g. Line e minus line f | | | $ 1,594,264.59 | |
| h. Line g divided by line d | | | | $ 33,283,570.0 |
| i. Annual Tax Abatement Savings $ ____ divided by ____ % | | | | $ _____ |
| j. Line h plus line i | | | | $ 33,283,570.0 |

| Previous editions are obsolete | Page 1 of 4 | form HUD-92264-A (03/2010)<br>ref Handbooks 4480.1 & 4470.1 |
|---|---|---|

App.461

**I. Determination of Maximum Insurable Mortgage** (cont.)

| Criteria | column 1 | column 2 | column 3 |
|---|---|---|---|
| **6. Amount Based on Estimated Cost of Rehabilitation Plus** (i) "As Is" Value, or  (ii) Acquisition Cost, or  (iii) Existing Mortgage Indebtedness Against the Property Before Rehabilitation: | | | |
| a.  Total Estimated Development Cost | $ _____ | | |
| b.  Estimated Cost of Off-Site Construction | $ _____ | | |
| c.  Sum of lines a & b | | $ 0.00 | |
| d.  Grant/Loan funds attributable to R. C. items | $ _____ | | |
| e.  Line c minus line d | | $ _____ | |
| f.  "As Is" Value of Prop. Before  Rehab.    $ _____ X _____ % | $ _____ | | |
| g.  Existing Mortgage Indebtedness (Property Owned)  or Purchase Price of Property (to be Acquired) | $ _____ | | |
| h.  Line e plus line f  or line g. whichever is less | | $ _____ | |
| i.   Line h   X _____ % | | | $ _____ |
| **7. Amount Based on Borrower's Total Cost of Acquisition Section 223(f)** | | | |
| a.  Purchase Price of Project | $ _____ | | |
| b.  Repairs and Improvements, if any | $ _____ | | |
| c.  Other fees | $ _____ | | |
| d.  Loan Closing Charges * | $ _____ | | |
| e.  Sum of lines a through d | | $ 0.00 | |
| f.  Enter the Sum of any Grant/Loan and Reserves for Replacement and Major Movable Equipment to be purchased  as an asset of the project | | $ _____ | |
| g.  Line e minus line f | | $ _____ | |
| h.  Line g   X _____ % | | | $ _____ |
| **8. Amount Based on Sum of Unit Mortgage Amounts** | | | $ _____ |
| **9. Amount Based on Estimated Cost to Borrower** | | | |
| a.  Total Estimated Cost  (Exclusive of Site and Required Construction Off the Site) | $ _____ | | |
| b.  Purchase Price of Site | $ _____ | | |
| c.  Total Cost of Clearing Site, if any | $ _____ | | |
| d.  Expense of Relocating Occupants, if any | $ _____ | | |
| e.  Cost of Off-Site Construction, if any | $ _____ | | |
| f.  Sum of line a through line e | | $ 0.00 | |
| g.  Line f   X _____ % | | | $ _____ |
| **10. Amount Based on Existing Indebtedness, Repairs, and Loan Closing Charges Section 223(f)** | | | |
| a.  Total Existing Indebtedness | $ 18,670,244.0 | | |
| b.  Required Repairs | $ 109.00 | | |
| c.  Other Fees | $ _____ | | |
| d.  Loan Closing Charges * | $ 792,447.00 | | |
| e.  Sum of line a through line d | | $ 19,462,800 | |
| f.  Enter the Sum of any Grant/Loan and Reserves for Replacement and Major Movable Equipment on Deposit | | $ _____ | |
| g.  Line e minus line f | | $ 19,462,800.( | |
| h.  80% of Value                      $ _____   X80% | | $ _____ | |
| i.   Greater of line g or line h | | | $ 19,462,800.( |

**11. Amount Based on Deduction of Grant(s), Loan(s), Tax Credit(s) and Gift(s) for Mortgageable items:**

| | | |
|---|---|---|
| a. 100% Project (Replacement) Cost * | $ _____ | |
| b. (1) Grants/loans/gifts | $ _____ | |
|    (2) Tax Credits | $ _____ | |
|    (3) Value of Leased Fee | $ _____ | |
|    (4) Excess Unusual Land Improvement Cost | $ _____ | |
|    (5) Cost Containment Mtge Deduction | $ _____ | |
|    (6) Unpaid Balance of Special Assessment | $ _____ | |
|    (7) Sum of Lines (1) through (6) | | $ 0.00 |
| c. Line a. minus line b. (7) | | $ _____ |

* Project Cost applies to Criteria 7 and 10 under Section 223 (f) and applications pursuant to 223(f).  Project Replacement Cost applies to Section 221 (d) and other Sections of the Act mortgages limited by Replacement Cost.

* Attach format for computing loan closing charges.

Maximum Insurable Mortgage (Lowest of the Foregoing Criteria)                      :$

## II. Total Requirements for Settlement

| Part A | | | Part B | | |
|---|---|---|---|---|---|
| 1. Fees Not to be Paid In Cash | | | 1. a. Development Cost | $ 19,462,800. | |
| a. BSPRA/SPRA | $ | | b. Adjustment for Contracted Amounts in Excess of form HUD-92264 Estimates | | |
| b. Builder's Profit | $ | | (1) Construction Contract | $ | |
| c. Other | $ | | (2) Architect's Contract | $ | |
| Total (enter in part B on line 5) | $ 0.00 | | (3) Other | $ | |
| 2. Commitment, Mktg., Fees and Discounts and Escrows | | | c. Total of lines a & b | | $ 19,462,800. |
| a. Fees    GNMA | $ | | 2. Land Indebtedness (or Cash Required for Land Acquisition) | $ | |
| Other | $ | | 3. Subtotal (lines 1c + 2) | | $ 19,462,800. |
| b. Discounts Permanent Loan | $ | | 4. a. Mortgage Amount | $ 19,462,800. | |
| Construction Loan | $ | | b. Grant/Loan | $ | |
| c. Escrows Debt Service Reserve (Board & Care) | $ | | 5. Fees Not to be Paid in Cash | $ | |
| Other | $ | | 6. Subtotal (lines 4a + 4b + 5) | | $ 19,462,800. |
| Total (enter in part B on line 9) | $ 0.00 | | 7. Cash Investment Required (line 3 minus line 6) | | $ 0.00 |
| 3. Working Capital | | | 8. Initial Operating Deficit * | | $ |
| a. Working Capital | $ | | 9. Commitment, Marketing Fees, Discounts and Escrows | | $ |
| b. Minimum Capital Investment (Sec. 202 & Sec. 811) | $ | | 10. Working Capital | | $ |
| c. Non-Realty Items Not Included in Mortgage | $ | | 11. Offsite Construction and Demolition Costs ($ + $ ) | | $ 0.00 |
| Total (enter in part B on line 10) | $ 0.00 | | 12. Total Estimated Cash Requirement (sum of lines 7 + 8 + 9 + 10 + 11) | | $ 0.00 |
| | | | Front Money Escrow, If Any, (subtract line 6 from line 1) | | $ |

\* **Note:** for Section 223(f) cases, attach the format for computing the operating deficit.

## III. Source of Funds to Meet Cash Requirements

| Source | Funds Available |
|---|---|
| Prepaid Equity | $ |
| Application Fee | $ 58,388.00 |
| Third party reports | $ 23,750.00 |
| | $ |
| | $ |
| **Total Available Cash for Project** | $ 82,138.00 |

## IV. Recommendations, Requirements and Remarks

[✓] Recommend Approval; Subject to Conditions Stated Below, If Any
[ ] Recommend Rejection for Reasons Stated Below (if more space is needed, continue on page 4).

See Narrative for Firm Commitment Conditions.

Signature of the Mortgage Credit Examiner

x _____    Date 12/6/2012

Previous editions are obsolete                    Page 3 of 4

form HUD-92264-A (03/2010)
ref Handbooks 4480.1 & 4470.1

12/7/2012

App.463

**Remarks:**

Format to Compute Fees

| | | |
|---|---|---|
| Mortgage Amount | $ | 19,462,800 |
| Existing Indebtedness | $ | 18,670,244 |
| Prepayment Penalty | $ | — |
| Required Non-Critical Repairs | $ | — |
| Required Critical Repairs | $ | 109 |
| Repl. Reserves- Realty & Non-Realty | $ | 308,847 |

Other Fees

| | | |
|---|---|---|
| Legal & Org./survey | $ | 20,749 |
| Title/Recording | $ | 44,796 |
| Inspection Fee | $ | 6,210 |

Third Party Reports

| | | |
|---|---|---|
| Appraisal | $ | 12,500 |
| Seismic | $ | - |
| PCNA Report | $ | 3,700 |
| Phase I Env. | $ | 7,550 |

Loan Closing Charges

| | | |
|---|---|---|
| Financing Fee (0.6940%) | $ | 135,078 |
| Placement Fee (0%) | $ | - |
| MIP (1.0 %) | $ | 194,628 |
| HUD Exam Fee (.30%) | $ | 58,388 |

| | | |
|---|---|---|
| Less Existing Reserves | $ | - |
| Less Repairs Paid From Current Reserves | $ | |
| Total Costs | $ | 19,462,800 |

Public Reporting Burden for this project analysis is estimated to average 8 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collecton displays a valid OMB control number.

This information is being collected under Public Law 101-625 which requires the Department of to implement a system for mortgage insurance for mortgages insured under Sections 207,221,223,232, or 241 of the National Housing Act. The Information will be used by HUD to approve rents, property appraisals, and mortgage amounts, and to execute a firm commitment. Confidentiality to respondents is ensured if it would result in competitive harm in accord with the Freedom of Information Act (FOIA) provisions or if it could Impact on the ability of the Department's mission to provide housing units under the various Sections of the Housing legislation.

## ATTACHMENT TO FORM HUD-92264-A
### (Office of Healthcare Programs--Section 232)

| Name of Mortgagor: | Saucon Trust | Program Section No: | 232/223f |
|---|---|---|---|
| Name of Project: | Saucon Valley Manor | Project No: | 034-22096 |

**Additional Criteria for Determination of Maximum Insurable Mortgage (Section I of HUD-92264-A)**

**12. Amount Based on Replacement Cost (applicable to New Construction, Substantial Rehabilitation, 241(a), Blended Rate)**

| | | | | | |
|---|---|---|---|---|---|
| a. Replacement Cost in Fee Simple | $0 | x | 90% | | $0 |
| b.(1) Value of Leased Fee | $0 | | | | |
| (2) Grant/Loan funds attributable to R.C items | $0 | | | | |
| (3) Excess Unusual Land Improvement | $0 | | | | |
| (4) Total lines (1) to (3) | $0 | x | 90% | $0 | |
| c. Unpaid Balance of Special Assessment | | | | $0 | |
| d. Total line b plus line c | | | | | $0 |
| e. Line a minus line d | | | | | $0 |

**13. Amount Based on LEAN Required Debt Service Coverage (as applicable)**

| | | | | | |
|---|---|---|---|---|---|
| a. Mortgage Interest Rate | | | | 2.50% | |
| b. Mortgage Insurance Premium Rate | | | | 0.5% | |
| c. Initial Curtail Rate | Loan term (years) | 35 | | 1.789943% | |
| d. Sum of Above Rates | | | | | 4.789943% |
| e. Net Income | $2,311,701 | ÷ | 1.45 | | $1,594,264 |
| f. Annual Ground Rent + Annual Special Assessment | $0 | + | $0 | | $0 |
| g. Line e minus line f | | + | | | $1,594,264 |
| h. Line g divided by line d | | | | | $33,283,578 |
| i. Annual Tax Abatement Savings | $0 | ÷ | 1.45 | | $0 |
| j. Line h plus line i | | ÷ | | | $33,283,578 |

**14. Amount Based on LEAN Required Loan to Value (as applicable)**

| | | | | | |
|---|---|---|---|---|---|
| a. Value in Fee Simple | $24,350,000 | | 80% | | $19,480,000 |
| b. Value of Leased Fee | $0 | x | 0% | $0 | |
| c. Unpaid Balance of Special Assessment | | x | | $0 | |
| d. Total line b plus line c | | | | | $0 |
| e. Line a minus line d | | | | | $19,480,000 |

| | Yes | No | |
|---|---|---|---|
| Criteria 13: Standard LEAN Percentage Utilized | ☑ | ☐ | If "No", Mitigation required in Lender Narrative |
| Criteria 14: Standard LEAN Percentage Utilized | ☑ | ☐ | If "No", Mitigation required in Lender Narrative |

App.465



OFFICE OF HOUSING

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-8000

October 31, 2012

Christine Chandler, Vice President
Chief FHA Underwriter
M&T Realty Capital Corporation
255 Charles Street, 17th Floor
Baltimore, MD 21201

Dear Ms. Chandler:

SUBJECT:    Amendment No. 1 to Firm Commitment Issued September 27, 2012
              Project Name: Saucon Valley Manor
              Project No: 034-22096
              Mortgagor: Saucon Trust

      This is in response to your letter dated October 31, 2012, requesting a 30 day extension of the Firm Commitment issued on September 27, 2012, for the subject loan. The extension is necessary to allow time to address organizational issues in response to HUD Counsel requirements. The extension is not likely to change the underwriting data on which the Firm Commitment was established, or undermine the feasibility of the project due to a change in the market or other factors identified at firm application. Based on this circumstance, HUD hereby agrees to extend the Firm Commitment 30 days. The extension expires on December 26, 2012.

      In addition, your request includes amending the Firm Commitment due to an interest rate lock. Based on the information provided in your letter, the Firm Commitment is amended as follows:

1.  The interest rate is decreased from 3.75% **to 2.50%**
2.  The amount of the principal and interest payment is reduced from $83,282.30 **to $69,578.58**
3.  Based on the new interest rate, the debt service reserve escrow required in Special Condition #4 is reduced from $548,351 **to $466,128**

      A revised form HUD 92264A reflecting the changes above, is attached. All other terms and agreements set forth in the Firm Commitment issued on September 27, 2012, remain in effect.

      If you have any questions, please contact Mollie Yeatts, Closing Coordinator, Office of Healthcare Programs at (206) 220-6455, or by email at mollie.yeatts@hud.gov.

Sincerely,

Thomas McMillan
Workload Manager/GTM
Office of Healthcare Programs

Attachment
Form HUD-92264A

| Supplement to Project Analysis | U.S. Department of Housing and Urban Development Office of Housing Federal Housing Commissioner | OMB Approval No. 2502-0029 (exp. 10/31/2012) |
|---|---|---|

Section or Title Number **232/223f LEAN**

☐ Valuation Trial    ☐ Conditional    ☑ Firm    **See last page for Public Reporting burden statement before completing this form**

**Privacy Act Notice:**  The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

| Name of Mortgagor (Borrower) Saucon Trust | Project Number 034-22096 |
|---|---|

Name of Project
Saucon Valley Manor

Location of Project (street, city & state)
1050 Main Street, Hellertown, PA

**Type of Borrower**

☑ Private    ☑ Profit    ☐ Public    ☐ Nonprofit    ☐ State or Federal Instrumentality, etc.

☐ Management Coop.    ☐ Sales Coop.    ☐ Investor-Sponsor    ☐ Builder-Seller    ☐ Limited Distribution

**Type of Project**

☐ Rental Housing    ☐ Mobile Home Court    ☐ Board and Care    ☐ New Construction    ☐ Non-Elevator
☐ Cooperative    ☐ Nursing Home    ☐ Single Rm. Occupancy    ☐ Rehabilitation    ☐ Elevator
☐ Condominium    ☐ Intermediate Care Facility        ☐ Redevelopment    ☑ Existing
☐ Capital Advance 202/811    ☐ Housing for the Elderly        ☐ Supplement Loan    ☐ _____

**I. Determination of Maximum Insurable Mortgage Criteria**

| Criteria | column 1 | column 2 | column 3 |
|---|---|---|---|
| 1. Mortgage or Loan Amount Requested in Application | | | $ 19,462,800.0 |
| 2. Reserved | | | $ _____ |
| 3. Amount Based on Value or Replacement Cost | | | |
| a. Value (Replacement Cost) in Fee Simple | $ 24,350,000.00 x 85.00 % | | $ 20,697,500.0 |
| b. (1) Value of Leased Fee | $ _____ | | |
| (2) Grant/Loan funds attributable to R. C. items | $ _____ | | |
| (3) Excess Unusual Land Improvement | $ _____ | | |
| (4) Cost Containment Mortgage Deduction | $ _____ | | |
| (5) Total lines (1) to (4) | $ 0.00 x ___ % $ 0.00 | | |
| c. Unpaid Balance of Special Assessment | $ _____ | | |
| d. Total line b plus line c | | $ 0.00 | |
| e. Line a minus line d | | | $ 20,697,500.0 |
| 4. Amount Based on Limitations Per Family Unit | | | |
| a. Number of no Bedroom Units | ___ X $ ___ $ 0.00 | | |
| Number of one Bedroom Units | ___ X $ ___ $ 0.00 | | |
| Number of two Bedroom Units | ___ X $ ___ $ 0.00 | | |
| Number of three Bedroom Units | ___ X $ ___ $ 0.00 | | |
| Number of four or more Bedroom Units | ___ X $ ___ $ 0.00 | | |
| b. Cost Not Attributable to Dwelling Use | $ ___ X ___ % $ 0.00 | | |
| c. Warranted Price of Land | $ ___ X ___ % $ 0.00 | | |
| d. Total lines a through c | | $ 0.00 | |
| e. Total Number of Spaces | ___ X $ ___ | $ 0.00 | |
| f. Sum: Value of Leased Fee and Unpaid Balance of Special Assessment(s) | | ___ | $ |
| g. Line d or line e, whichever is applicable, minus line f | | ___ | $ |
| 5. Amount Based on Debt Service Ratio | | | |
| a. Mortgage Interest Rate | 2.50 % | | |
| b. Mortgage Insurance Premium Rate | 0.50 % | | |
| c. Initial Curtail Rate | 1.79 % | | |
| d. Sum of Above Rates | | 4.79 % | |
| e. Net Income | $ 2,311,701. x 68.97 % | $ 1,594,264.59 | |
| f. Annual Ground Rent $ ___ + Annual Spec. Assmt. $ ___ | | $ 0.00 | |
| g. Line e minus line f | | $ 1,594,264.59 | |
| h. Line g divided by line d | | | $ 33,283,570.0 |
| i. Annual Tax Abatement  Savings $ ___ divided by ___ % | | | $ |
| j. Line h plus line i | | | $ 33,283,570.0 |

Previous editions are obsolete    Page 1 of 4    form HUD-92264-A (03/2010) ref Handbooks 4480.1 & 4470.1

**I. Determination of Maximum Insurable Mortgage** (cont.)

| Criteria | | column 1 | column 2 | column 3 |
|---|---|---|---|---|
| **6. Amount Based on Estimated Cost of Rehabilitation Plus** (i) "As Is" Value, **or** (ii) Acquisition Cost, or (iii) Existing Mortgage Indebtedness Against the Property Before Rehabilitation: | | | | |
| a. Total Estimated Development Cost | | $ _____ | | |
| b. Estimated Cost of Off-Site Construction | | $ _____ | | |
| c. Sum of lines a & b | | | $ 0.00 | |
| d. Grant/Loan funds attributable to R. C. items | | $ _____ | | |
| e. Line c minus line d | | | $ _____ | |
| f. "As Is" Value of Prop. Before Rehab. | $ _____ X _____ % | $ _____ | | |
| g. Existing Mortgage Indebtedness (Property Owned) or Purchase Price of Property (to be Acquired) | | $ _____ | | |
| h. Line e plus line f  or line g, whichever is less | | | $ _____ | |
| i. Line h  X _____ % | | | | $ _____ |
| **7. Amount Based on Borrower's Total Cost of Acquisition Section 223(f)** | | | | |
| a. Purchase Price of Project | | $ _____ | | |
| b. Repairs and Improvements, if any | | $ _____ | | |
| c. Other fees | | $ _____ | | |
| d. Loan Closing Charges * | | $ _____ | | |
| e. Sum of lines a through d | | | $ 0.00 | |
| f. Enter the Sum of any Grant/Loan and Reserves for Replacement and Major Movable Equipment to be purchased as an asset of the project | | | $ _____ | |
| g. Line e minus line f | | | $ _____ | |
| h. Line g  X _____ % | | | | $ _____ |
| **8. Amount Based on Sum of Unit Mortgage Amounts** | | | | $ _____ |
| **9. Amount Based on Estimated Cost to Borrower** | | | | |
| a. Total Estimated Cost (Exclusive of Site and Required Construction Off the Site) | | $ _____ | | |
| b. Purchase Price of Site | | $ _____ | | |
| c. Total Cost of Clearing Site, if any | | $ _____ | | |
| d. Expense of Relocating Occupants, if any | | $ _____ | | |
| e. Cost of Off-Site Construction, if any | | $ _____ | | |
| f. Sum of line a through line e | | | $ 0.00 | |
| g. Line f  X _____ % | | | | $ _____ |
| **10. Amount Based on Existing Indebtedness, Repairs, and Loan Closing Charges Section 223(f)** | | | | |
| a. Total Existing Indebtedness | | $ 18,734,559.0 | | |
| b. Required Repairs | | $ 70.00 | | |
| c. Other Fees | | $ _____ | | |
| d. Loan Closing Charges * | | $ 728,218.00 | | |
| e. Sum of line a through line d | | | $ 19,462,847 | |
| f. Enter the Sum of any Grant/Loan and Reserves for Replacement and Major Movable Equipment on Deposit | | | $ _____ | |
| g. Line e minus line f | | | $ 19,462,800.0 | |
| h. 80% of Value | $ _____ X80% | | $ _____ | |
| i. Greater of line g or line h | | | | $ 19,462,800.0 |

**11. Amount Based on Deduction of Grant(s), Loan(s), Tax Credit(s) and Gift(s) for Mortgageable items:**

| | | |
|---|---|---|
| a. 100% Project (Replacement) Cost * | $ _____ | |
| b. (1) Grants/loans/gifts | $ _____ | |
| (2) Tax Credits | $ _____ | |
| (3) Value of Leased Fee | $ _____ | |
| (4) Excess Unusual Land Improvement Cost | $ _____ | |
| (5) Cost Containment Mtge Deduction | $ _____ | |
| (6) Unpaid Balance of Special Assessment | $ _____ | |
| (7) Sum of Lines (1) through (6) | | $ 0.00 |
| c. Line a. minus line b. (7) | | $ _____ |

* Project Cost applies to Criteria 7 and 10 under Section 223 (f) and applications pursuant to 223(f).  Project Replacement Cost applies to Section 221 (d) and other Sections of the Act mortgages limited by Replacement Cost.

* Attach format for computing loan closing charges.

Maximum Insurable Mortgage (Lowest of the Foregoing Criteria) | $ _____

## II. Total Requirements for Settlement

### Part A

| | | | |
|---|---|---|---|
| **1. Fees Not to be Paid in Cash** | | | |
| a. BSPRA/SPRA | | $ | |
| b. Builder's Profit | | $ | |
| c. Other | | $ | |
| Total (enter in part B on line 5) | | $ 0.00 | |
| **2. Commitment, Mktg., Fees and Discounts and Escrows** | | | |
| a. Fees | GNMA | $ | |
| | Other | $ | |
| b. Discounts | Permanent Loan | $ | |
| | Construction Loan | $ | |
| c. Escrows | Debt Service Reserve (Board & Care) | $ | |
| | Other | $ | |
| Total (enter in part B on line 9) | | $ 0.00 | |
| **3. Working Capital** | | | |
| a. Working Capital | | $ | |
| b. Minimum Capital Investment (Sec. 202 & Sec. 811) | | $ | |
| c. Non-Realty Items Not Included in Mortgage | | $ | |
| Total (enter in part B on line 10) | | $ 0.00 | |

### Part B

| | | |
|---|---|---|
| 1. a. Development Cost | $ 19,462,847. | |
| b. Adjustment for Contracted Amounts in Excess of form HUD-92264 Estimates | | |
| (1) Construction Contract | $ | |
| (2) Architect's Contract | $ | |
| (3) Other | $ | |
| c. Total of lines a & b | | $ 19,462,847. |
| 2. Land Indebtedness (or Cash Required for Land Acquisition) | | $ |
| 3. Subtotal (lines 1c + 2) | | $ 19,462,847. |
| 4. a. Mortgage Amount | $ 19,462,800. | |
| b. Grant/Loan | $ | |
| 5. Fees Not to be Paid in Cash | $ | |
| 6. Subtotal (lines 4a + 4b + 5) | | $ 19,462,800. |
| 7. Cash Investment Required (line 3 minus line 6) | | $ 47.00 |
| 8. Initial Operating Deficit * | | $ |
| 9. Commitment, Marketing Fees, Discounts and Escrows | | $ |
| 10. Working Capital | | $ |
| 11. Offsite Construction and Demolition Costs ($ _____ + $ _____ ) | | $ 0.00 |
| 12. Total Estimated Cash Requirement (sum of lines 7 + 8 + 9 + 10 + 11) | | $ 47.00 |
| Front Money Escrow, If Any, (subtract line 6 from line 1) | | $ |

\* Note: for Section 223(f) cases, attach the format for computing the operating deficit.

## III. Source of Funds to Meet Cash Requirements

| Source | Funds Available |
|---|---|
| Prepaid Equity | $ |
| Application Fee | $ 58,388.00 |
| Third party reports | $ 23,750.00 |
| | $ |
| | $ |
| **Total Available Cash for Project** | $ 82,138.00 |

## IV. Recommendations, Requirements and Remarks

☑ Recommend Approval; Subject to Conditions Stated Below, If Any

☐ Recommend Rejection for Reasons Stated Below (if more space is needed, continue on page 4).

See Narrative for Firm Commitment Conditions.

Signature of the Mortgage Credit Examiner

X _____    Date 10/31/2012

Previous editions are obsolete    Page 3 of 4    form HUD-92264-A (03/2010)
ref Handbooks 4480.1 & 4470.1

10/31/2012

**Remarks:**

Format to Compute Fees

| | | |
|---|---|---|
| Mortgage Amount | $ | 19,462,800 |
| Existing Indebtedness | $ | 18,734,559 |
| Prepayment Penalty | $ | – |
| Required Non-Critical Repairs | $ | – |
| Required Critical Repairs | $ | 70 |
| Repl. Reserves- Realty & Non-Realty | $ | 245,000 |

Other Fees

| | | |
|---|---|---|
| Legal & Org. | $ | 17,500 |
| Title/Recording | $ | 47,663 |
| Inspection Fee | $ | 6,210 |

Third Party Reports

| | | |
|---|---|---|
| Appraisal | $ | 12,500 |
| Seismic | $ | - |
| PCNA Report | $ | 3,700 |
| Phase I Env. | $ | 7,550 |

Loan Closing Charges

| | | |
|---|---|---|
| Financing Fee (0.6940%) | $ | 135,078 |
| Placement Fee (0%) | $ | - |
| MIP (1.0 %) | $ | 194,628 |
| HUD Exam Fee (.30%) | $ | 58,388 |

| | | |
|---|---|---|
| Less Existing Reserves | $ | - |
| Less Repairs Paid From Current Reserves | $ | |
| Total Costs | $ | 19,462,847 |

Public Reporting Burden for this project analysis is estimated to average 8 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number.

This information is being collected under Public Law 101-625 which requires the Department of to implement a system for mortgage insurance for mortgages insured under Sections 207,221,223,232, or 241 of the National Housing Act. The information will be used by HUD to approve rents, property appraisals, and mortgage amounts, and to execute a firm commitment. Confidentiality to respondents is ensured if it would result in competitive harm in accord with the Freedom of Information Act (FOIA) provisions or if it could impact on the ability of the Department's mission to provide housing units under the various Sections of the Housing legislation.

Previous editions are obsolete

form HUD-92264-A (03/2010)
ref Handbooks 4480.1 & 4470.1

**ATTACHMENT TO FORM HUD-92264-A**

(Office of Healthcare Programs--Section 232)

| Name of Mortgagor: | Saucon Trust | Program Section No: | 232/223f | |
|---|---|---|---|---|
| Name of Project: | Saucon Valley Manor | Project No: | 034-22096 | |

**Additional Criteria for Determination of Maximum Insurable Mortgage (Section I of HUD-92264-A)**

**12. Amount Based on Replacement Cost (applicable to New Construction, Substantial Rehabilitation, 241(a), Blended Rate)**

| | | | | | |
|---|---|---|---|---|---|
| a. Replacement Cost in Fee Simple | $0 | x | 90% | | $0 |
| b.(1) Value of Leased Fee | $0 | | | | |
| (2) Grant/Loan funds attributable to R.C. items | $0 | | | | |
| (3) Excess Unusual Land Improvement | $0 | | | | |
| (4) Total lines (1) to (3) | $0 | x | 90% | $0 | |
| c. Unpaid Balance of Special Assessment | | | | $0 | |
| d. Total line b plus line c | | | | | $0 |
| e. Line a minus line d | | | | | $0 |

**13. Amount Based on LEAN Required Debt Service Coverage (as applicable)**

| | | | | | |
|---|---|---|---|---|---|
| a. Mortgage Interest Rate | | | | 2.50% | |
| b. Mortgage Insurance Premium Rate | | | | 0.5% | |
| c. Initial Curtail Rate | Loan term (years) | 35 | | 1.789943% | |
| d. Sum of Above Rates | | | | | 4.789943% |
| e. Net Income | $2,311,701 | ÷ | 1.45 | | $1,594,264 |
| f. Annual Ground Rent ÷ Annual Special Assessment | $0 | + | $0 | | $0 |
| g. Line e minus line f | | + | | | $1,594,264 |
| h. Line g divided by line d | | | | | $33,283,578 |
| i. Annual Tax Abatement Savings | $0 | ÷ | 1.45 | | $0 |
| j. Line h plus line i | | ÷ | | | $33,283,578 |

**14. Amount Based on LEAN Required Loan to Value (as applicable)**

| | | | | | |
|---|---|---|---|---|---|
| a. Value in Fee Simple | $24,350,000 | | 80% | | $19,480,000 |
| b. Value of Leased Fee | $0 | x | 0% | $0 | |
| c. Unpaid Balance of Special Assessment | | x | | $0 | |
| d. Total line b plus line c | | | | | $0 |
| e. Line a minus line d | | | | | $19,480,000 |

| | Yes | No | |
|---|---|---|---|
| Criteria 13: Standard LEAN Percentage Utilized | ☑ | ☐ | If "No", Mitigation required in Lender Narrative |
| Criteria 14: Standard LEAN Percentage Utilized | ☑ | ☐ | If "No", Mitigation required in Lender Narrative |

FHA Form 2453-MM (Modified)
February 2, 2012

**U. S. Department of Housing and Urban Development**
**Office of Healthcare Programs**
**Federal Housing Commissioner**
**COMMITMENT TO INSURE UPON COMPLETION**
**(Section 232 pursuant to Section 223f)**

FHA Project No.: 034-22096

Project Name:    Saucon Valley Manor

Project Address:    1050 Main Street

Hellertown, PA 18055

| M&T Realty Capital Corporation | Saucon Trust |
|---|---|
| (Mortgagee) | (Name of Mortgagor) |
| 25 South Charles Street, 22nd Floor | 1050 Main Street |
| (Address) | (Address) |
| Baltimore, MD 21201 | Hellertown, PA 18055 |
| (City, State, & Zip Code) | (City, State, & Zip Code) |

We understand that you, as Mortgagee, have agreed to make a loan to Saucon Trust, (hereafter called the "Mortgagor"), in an amount not exceeding the sum of nineteen million four hundred sixty two thousand eight hundred  Dollars ($19,462,800) (to be secured by a credit instrument and security instrument (hereafter jointly called the "Mortgage") covering real property with existing building(s) thereon identified above (hereinafter called the "Project"), as shown on the legal description of the property attached hereto and marked **Exhibit A.**

It is your intention to present the said Mortgage to the Federal Housing Commissioner acting herein on behalf of the Secretary of Housing and Urban Development (the "Secretary") for mortgage insurance under the provisions of Section 232, pursuant to Section 223(f) of the National Housing Act (the "NHA"), and the Regulations thereunder now in effect (the "Regulations").

The Secretary hereby agrees to insure said Mortgage under the provisions of the NHA and the Regulations upon the following conditions:

1.  The Mortgage shall bear interest at the rate of 3.75 percent per annum payable on the first day of each month on the outstanding balance of principal. The first payment to principal (commencement of amortization) shall be due not later than the first day of the second month following the date of endorsement of the Mortgage for insurance ("Endorsement"). The Mortgage shall be payable on a level annuity basis by 420 monthly payments of principal and interest in the amount of $83,282.30. The maturity and final payment date shall be 34 years and 11 months following the due date of the first payment to principal.  Note:  Any change in the interest rate may require reprocessing of the mortgage insurance application.

2.  The credit instrument and the security instrument to be insured shall be in the form prescribed by the Secretary for use in connection with loans insured under Section 232, pursuant to Section 223(f) of the NHA in the locality in which the property is situated.  In addition, the Mortgagor (and, if applicable, the lessee/operator of the Project) shall provide a security agreement, UCC financing statements, and deposit account control agreement(s) granting a first lien security interest in such tangible and intangible personal property related to the Project as may be required by the

**Page 1 of 6**

App.472

Secretary (subject only to liens for taxes and assessments which are not delinquent and such other liens, such as with an accounts receivable financing transaction, as may be approved by the Secretary).

3. Prior to Endorsement, the Mortgagor shall present to the Secretary a title policy in conformity with the Regulations which shall show that title to the property (or, if approved by the Secretary, a leasehold estate therein) on the date of Endorsement is vested in the Mortgagor free of all exceptions to title (either junior or prior to said Mortgage) except said Mortgage and such other exceptions to title as are specifically determined to be acceptable by the Secretary. Said title policy shall (a) by its terms inure to the benefit of the Mortgagee and/or the Secretary of Housing and Urban Development, as their interests may appear and (b) unless otherwise approved by the Secretary, be on the ALTA Loan Policy 2006 Form and include ALTA Form 8.1-06, 9-06, (or 9.3-06), ALTA 17-06 and ALTA 22-06 endorsements and an endorsement deleting the arbitration clause. The Mortgagor shall also furnish satisfactory proof that there exist no unpaid obligations contracted in connection with the Mortgage transaction, the purchase of the Project or refinancing of existing indebtedness, or the completion of any repairs, except such obligations as may be approved by the Secretary. Unless waived by the Secretary, prior to Endorsement, the Mortgagor shall present to the Secretary a survey of the Project in form and substance satisfactory to the Secretary.

4. The Mortgagor must possess the powers necessary for operating the Project and meeting all the requirements of the Secretary for insurance of the Mortgage. Prior to Endorsement, there shall be delivered to the Secretary and the Mortgagee (a) copies of ownership entity documentation that complies with applicable requirements of the Secretary, including a copy of the instrument under which the Mortgagor entity is created (unless the Mortgagor is an individual) together with copies of all instruments or agreements necessary under the laws of the applicable jurisdiction to authorize execution of the Mortgage and the other closing documents, and (b) a Regulatory Agreement in the form prescribed by the Secretary for use in connection with loans insured under Section 232, pursuant to Section 223(f), of the NHA (the "Regulatory Agreement). Such Regulatory Agreement shall provide, among other things, for the establishment of a Reserve Fund for Replacements (the "Reserve for Replacements") by payment of $123,165 per annum to be accumulated monthly at the rate of, $10,264 per month (rounded to the nearest dollar), under the control of the Mortgagee, commencing on the date of the first payment to principal as established in the Mortgage unless a later date is agreed to by the Secretary. In addition to the per annum amount required to be accumulated monthly under control of the Mortgagee for the Reserve Fund for Replacements, there shall be an initial deposit in the amount of $245,000 made to the Reserve Fund for Replacements by the Mortgagor at the time of Endorsement. Attached hereto as **Exhibit B** is the Reserve for Replacement Funding Schedule which supports the per annum and initial deposits to the Reserve for Replacements.

The amount of the annual deposits to the Reserve Fund for Replacements shall be subject to change in accordance with the requirements of the Secretary. In connection therewith, the Mortgagee shall obtain a new Project Capital Needs Assessment ("PCNA") for the Secretary to evaluate every ten years. The cost of each such PCNA report may be paid from the Reserve Fund for Replacements. The Request for Endorsement of Credit Instrument to be delivered prior to Endorsement shall include a statement confirming the requirement for such new PCNA reports.

5. The provisions of this Paragraph 5 shall apply to any critical repairs required by this Commitment to be completed and inspected prior to Endorsement and to any non-critical or owner-elective repairs required by this Commitment to be completed after Endorsement. All repairs shall be completed in accordance with the Work Write-up attached hereto as **Exhibit C** ("CRITICAL, NON-CRITICAL & OWNER-ELECTIVE REPAIRS LIST", as applicable") and must meet the specific requirements contained in Chapters 5 and 6 of HUD's Minimum Property Standards. The Secretary estimates

Page **2** of **6**

that these critical repairs will cost $70. Non-critical repairs and owner-elective repairs, if any, must begin promptly following Endorsement and must be completed within 12 months of Endorsement. The Secretary estimates that these repairs will cost $0. An escrow of 120% of this amount must be established prior to Endorsement. It is understood that 100% of the estimated cost of any non-critical and owner-elective repairs come from loan proceeds and an additional cash amount (or letter of credit) of not less than 20% of the repair cost estimate will also be placed in escrow. To cover latent defects, the Mortgagor shall furnish satisfactory evidence that the non-critical and owner-elective repairs will be covered by an escrow in cash, or letter of credit, or a surety bond acceptable to the Secretary (which escrow may be funded upon completion of the repairs from the repair escrow established at the time of Endorsement.) The Secretary encourages mortgagors to utilize energy saving devices and methods when making repairs.

During the course of such repairs, if any, the Secretary and his representatives shall at all times have access to the Project and the right to inspect the progress of the repairs. In addition, if required by the Secretary, the Mortgagor will furnish at the Project site all necessary facilities for the use of the Secretary's inspector. The inspection of the repairs by a representative or representatives of the Secretary shall be for the benefit and protection of the Secretary. The Secretary shall have no obligation to endorse the Mortgage for insurance unless and until all critical repairs have been completed to the satisfaction of the Secretary.

6.  If any repairs are to be made which require additional sewer, water, gas or electrical facilities, evidence satisfactory to the Secretary shall be submitted prior to Endorsement showing that adequate sewer, water, gas and electrical facilities (as applicable) have been or will timely be fully installed. All off-site facilities or utilities required in connection with the repairs shall be included in such evidence.

7.  Upon Endorsement, the Mortgage must be current with respect to all payments required to be made by its terms, including all deposits required to be made with the Mortgagee for mortgage insurance premiums, fire, and other property insurance premiums, ground rents, water rates, taxes and other assessments; and there shall be in full force and effect fire and other property insurance as required by the Mortgage.

8.  Upon Endorsement, the Mortgagee shall pay to the Secretary in advance, a mortgage insurance premium equal to one percentum of the principal amount of the Mortgage to cover the first mortgage insurance premium and shall continue to make payments thereafter as required by the aforesaid Regulations.

9.  (This condition only applies to projects where there is a required Initial Operating Deficit Escrow.) Upon Endorsement, the Mortgagor shall execute form HUD 92476-A "Escrow Agreement Additional Contribution by Sponsors" showing the deposit of $0 in the form of cash, an unconditional irrevocable letter of credit issued to the depository by a banking institution, or United States bearer bonds. In the event a demand under the letter of credit is not promptly met, the Mortgagee shall immediately provide the cash equivalent in the undrawn balance thereunder.

10. Prior to Endorsement, the Mortgagee must submit at loan closing statement signed by the Mortgagee and the Mortgagor detailing the amount of any promissory notes, cash contributions, amounts to be paid to satisfy Mortgagor's obligations for existing or other indebtedness, acquisition, repairs, discounts, financing fees, legal expenses, organizational expenses, title and recording costs, and any Mortgagee-required escrows.

11. Prior to Endorsement, the Mortgagor must certify to the actual cost of this Mortgage using form HUD-2205-A, Mortgagor's Certificate of Actual Costs. A draft form HUD-2205-A with supporting documentation is required at least 10 days prior to Endorsement. Supporting documentation must

**Page 3 of 6**

include a current pay off statement for any existing indebtedness and evidence of prepaid third party costs.

12. The Mortgagor shall not be required to pay to the Mortgagee an initial service charge in excess of two percent (2%) of the original amount of the Mortgage.

13. This Commitment shall expire 60 days from the date hereof, unless extended by the Secretary. Upon such expiration, all rights and obligations of the respective parties shall cease. Prior to any extension of this Commitment, the Secretary may, at his option, reexamine this Commitment to determine whether it shall be extended, shall be extended in the same amount, or shall be amended to include a lesser amount.

14. A request for reopening received within ninety (90) days of expiration of this Commitment must be accompanied by a reopening fee of $.50 per $1,000.00 of the amount of the expired commitment.

15. It is a condition of this Commitment that any change in ownership upon which this Commitment was predicated must be indicated in writing by the Mortgagor and such request must be approved in writing by the Secretary. Any principals of the Mortgagor or lessee/operator which are added prior to Endorsement and which were not disclosed in the mortgage insurance application shall be subject to the Secretary's credit review and previous participation clearance before Endorsement.

16. If the mortgaged property is leased, the Lessee/Operator lease must comply with the Lessee Regulatory Agreement (Form HUD-92466-NHL) and incorporate subordination language approved by HUD. The security agreement between the Lessee/Operator and the Mortgagee must also be approved by HUD. Lease payments must cover the costs of the mortgage, i.e., Mortgage Insurance Premiums (MIP), taxes, mortgage payments, and any other costs that might be required by HUD. If the mortgaged property is operated by a Management Agent, the Management Agreement must comply with the Regulatory Agreement (Form HUD-92466-NHL) and incorporate subordination language approved by HUD. The Management Agent will be required to sign the Regulatory Agreement (Form HUD-92466-NHL). The management agreement must address costs of the mortgage. If the Management Agent is not the licensee, and does not operate the facility, the Management Agent shall sign the Management Certification, HUD-9839A, B, or C as applicable.

17. Any accounts receivable financing obtained by the Mortgagor, lessee/operator, or Management Agent, as applicable, will be subject to approval by the Secretary and the Mortgagee.

18. In the event that additional code requirements are imposed by any state or local authority, after the issuance of this Commitment, that would cause the total cost of all required repairs to exceed fifteen percent (15%) of the Secretary's total estimate of value after repairs, this Commitment shall be null and void.

19. The Secretary reserves the right to examine the Mortgagee's file materials related to the underwriting of the Mortgage at any time during the ten-year period following Endorsement. If there is evidence of fraud or misrepresentation by the Mortgagee, the Secretary reserves his legal rights under the contract of mortgage insurance and Mortgagee Review Board requirements. The Mortgagee agrees to retain, in accessible files, all materials related to the underwriting of the Mortgage for a period of ten years, even though the Mortgage itself may be sold to another entity.

20. All financing arrangements (other than the Mortgage and any other mortgage insured by the Secretary), including repayment obligations and other secondary financing, and occupancy restrictions must be fully disclosed to, and approved by, the Secretary and must comply with the

Page 4 of 6

App.475

Secretary's requirements applicable to loans insured under the Section of the NHA applicable to the Mortgage.

21. This Commitment is conditioned upon and shall not be enforceable against the Secretary until and unless all conditions to Endorsement stated herein have been satisfied or waived by the Secretary.

22. This Commitment is subject to the conclusions stated on the attached forms: HUD-92264A, Supplement to Project Analysis; HUD-92447, Property Insurance Requirements; and, HUD-92329, Property Insurance Schedule.

This commitment is

☒ subject to Special Conditions numbered 1 through 10, which are attached hereto and are made a part hereof.

☐ not subject to any Special Conditions.

23. Prior to Endorsement the Mortgagor must provide evidence that a management conference has been scheduled with the HUD Account Executive assigned to the project. The contact information for the Account Executive assigned to this project is below.

Name: Suechen Smith

Telephone: 904-208-6111

Email: Suechen.smith@hud.gov

Attached to this Commitment as **Exhibit D** is a form closing checklist identifying documents required for loans insured under Section 232, pursuant to Section 223(f), of the NHA. If there are any inconsistencies between the attached closing checklist and this Commitment, this Commitment controls. Draft closing documents, conforming to the terms of this Commitment must be submitted not less than 10 business days prior to Endorsement. This Commitment and exhibits referred to herein together with the applicable Regulations constitute the entire agreement among the parties, and acceptance of the terms hereof is evidenced by the signature of the Mortgagor and Mortgagee upon the lines provided below. Please return one original of this Commitment, signed by the Mortgagee and the Mortgagor, to the OHP Underwriter within 10 business days of the date of the Secretary's execution of this Commitment.

SECRETARY OF HOUSING AND URBAN DEVELOPMENT
BY: FEDERAL HOUSING COMMISSIONER

By: _____          Date: _____September 27, 2012_____
Authorized Agent/ Tim Gruenes

Attachments:
- Exhibit A Legal Description
- Exhibit B Reserve for Replacement Funding Schedule
- Exhibit C Critical, Non-Critical & Owner-Elective Repairs List, as applicable
- Exhibit D Closing Checklist
- Special Conditions
- Form HUD-92264-A

Page **5** of **6**

App.476

- Form HUD-92329
- Form HUD-92447

The above Commitment to Insure Upon Completion, including Special Conditions (if applicable), is hereby accepted by the undersigned, and we hereby agree to be bound by the terms hereof.

MORTGAGOR:                                    Saucon Trust

Date:  9-27-12

By:
Name:  ABRAHAMIR ATIYEH
Title:

MORTGAGEE:                                    M&T Realty Capital Corporation

Date:  10/3/2012

By:
Name:  Sandra DeFelice
Title:  Vice President

Page 6 of 6

App.477

## Special Conditions
## Saucon Valley Manor
## FHA 034-22096

1. **Common Ownership/No Master Lease:** The Regulatory Agreements for Saucon Valley Manor and Whitehall Manor, FHA 034-22084, must include a provision satisfactory to HUD that prohibits distributions of surplus cash if either project is not current on their mortgage payments.
2. **Potential Master Lease Requirement:** All future projects (one or more submitted within 18 months of the endorsement of the subject, Saucon Valley Manor) with common ownership to the subject, may be required to enter into a Master Lease that ties those future projects with Saucon Valley Manor and Whitehall Manor, FHA 034-22084.
3. **Critical Repairs:** All critical repairs identified on Exhibit B must be completed and accepted by HUD prior to closing.
4. **Debt Service Coverage Escrow:** The mortgagor must deposit, in the form of cash or an irrevocable/unconditional letter of credit, six (6) months worth of mortgage payments (or approximately $548,351). To release the escrow, the mortgagor must maintain a minimum DSC of 2.11 for a consecutive twelve (12) month period. The 12 month period may not begin until after closing. This escrow must be established prior to closing.
5. **Fidelity Bond:** The subject has inadequate fidelity (crime/dishonesty) insurance. HUD requires coverage equal to at least two (2) months gross income receipts or $1,463,693. Coverage that meets or exceeds the HUD minimum requirements must be in place prior to closing. The Mortgagee and HUD (451 7th St S.W. Washington D.C. 20410) must be named as additional loss payees.
6. **Legal Punch List:** The Legal Punch List provides an assessment of the title policy, license, operating lease, survey, and organization documents. All comments in the Legal Punch List must be addressed prior to closing. Further, the organizational and other documents of the mortgagor and trustee have not been approved and will be subject to revisions by HUD.
7. **Operating Lease:** The Operating Lease between Saucon Trust and Saucon Valley Manor, Inc. must be revised to conform to current HUD and LEAN program requirements, include the HUD Operating Lease Addendum, be approved by HUD Counsel and OHP and executed prior to closing. The lease must have a minimum annual lease payment of $1,705,421, which is 1.05 times the sum of: annual principal and interest payments, annual mortgage insurance premium, annual deposit to reserve for replacement, annual property insurance, and annual property taxes. Paragraph 5 of the Lease Addendum must also require this 1.05 coverage. Any reduction to the minimum lease payment amount of $1,705,421 must be explained and HUD review and approval is required.
8. **Operating License:** The operating license expires October 24, 2012. The renewal license shall be provided prior to closing.
9. **No remaining debt:** Only the two National Penn Bank notes and Brookside Commercial Construction Company notes shall be paid at closing. Evidence that the $500,000 note to Mr. Gopal Kapoor has been released shall be provided prior to closing. No entity or party to the mortgagor may be a party to the released note.
10. **Swap Termination Fee:** One National Penn Bank note indicated potential a swap termination fee, though it is noted such fee expires October 2012. In the event such fee is imposed at closing, it shall not exceed 10% of the mortgage amount nor result in an LTV exceeding 80% (loan to be no greater than $19,480,000).

'Exhibit A'

## Loan Policy of Title Insurance

### SCHEDULE A CONTINUED

Schedule A, Page 2, Policy No.  **PRO FORMA **

UNIT 1 of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715

Being more fully bounded as set forth on attached page

## DESCRIPTION OF 1050 MAIN STREET

ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 2008-5 Page 759, bounded and described as follows to wit:

BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

1.     South 86°47'33" West 266.09 feet; thence in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;

2.     North 03° 14'23" West 59.03 feet;

3.     North 86° 41'33" East 18.00 feet;

4.     North 03° 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same

5.     North 86° 48'59" East 247.48 feet to the westerly right of way line of Main Street; thence along the same

6.     South 03° 18'24" East 470.30 feet to the place of beginning.

CONTAINS:     117,610.588 Sq. Ft.     2.7000 Acres

Exhibit A

Exhibit 1-4-B

## Reserve for Replacement Fund Schedule

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Interest Earned | 2.00% | $ | - | $ | 6,472 | $ | 7,937 | $ | 7,339 | $ | 7,154 |
| Annual Deposit | | $ | 123,165 | $ | 123,165 | $ | 123,165 | $ | 123,165 | $ | 123,165 |
| Initial Deposit | $ 245,000 | | | | | | | | | | |
| Total Deposits | $ 245,000 | $ | 368,165 | $ | 497,802 | $ | 628,904 | $ | 759,408 | $ | 889,727 |
| | | | | | | | | | | | |
| Claims | | $ | 44,575 | $ | 56,383 | $ | 160,977 | $ | 139,787 | $ | 130,527 |
| Cumulative Claims | | $ | 44,575 | $ | 100,958 | $ | 261,935 | $ | 401,722 | $ | 532,249 |
| Balance | | $ | 323,590 | $ | 396,844 | $ | 366,969 | $ | 357,686 | $ | 357,478 |
| | | | | | | | | | | | |
| Interest Earned | | $ | 7,150 | $ | 5,263 | $ | 4,246 | $ | 2,599 | $ | 1,482 |
| Annual Deposit | | $ | 123,165 | $ | 123,165 | $ | 123,165 | $ | 123,165 | $ | 123,165 |
| Initial Deposit | | | | | | | | | | | |
| Total Deposits | | $1,020,041 | | $1,148,469 | | $1,275,880 | | $1,401,644 | | $1,526,291 | |
| | | | | | | | | | | | |
| Claims | | $ | 224,667 | $ | 179,246 | $ | 209,779 | $ | 181,601 | $ | 107,003 |
| Cumulative Claims | | $ | 756,916 | $ | 936,162 | $1,145,941 | | $1,327,541 | | $1,434,544 | |
| Balance | | $ | 263,125 | $ | 212,307 | $ | 129,939 | $ | 74,102 | $ | 91,747 |
| | | | | | | | | | | | |
| Interest Earned | | $ | 1,835 | $ | 1,546 | $ | 2,278 | $ | 1,853 | $ | 1,792 |
| Annual Deposit | | $ | 123,165 | $ | 123,165 | $ | 123,165 | $ | 123,165 | $ | 123,165 |
| Initial Deposit | | | | | | | | | | | |
| Total Deposits | | $1,651,291 | | $1,776,001 | | $1,901,445 | | $2,026,462 | | $2,151,419 | |
| | | | | | | | | | | | |
| Claims | | $ | 139,465 | $ | 88,086 | $ | 146,725 | $ | 128,055 | $ | 111,375 |
| Cumulative Claims | | $1,574,009 | | $1,662,095 | | $1,808,819 | | $1,936,875 | | $2,048,250 | |
| Balance | | $ | 77,282 | $ | 113,907 | $ | 92,625 | $ | 89,587 | $ | 103,169 |

App.481



Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 488 of 897

Case 25-15245-pmm    Doc 87-2    Filed 04/14/26    Entered 04/14/26 23:18:18    Desc
Exhibit A    Page 24 of 51

App.483



**REPLACEMENT RESERVE ANALYSIS**
**ASSISTED LIVING FACILITY**

Inspection Date: 1/17/2012

Project: Saucon Valley Manor
Address: 1050 Main Street
City, State: Hellertown, PA 18055

Gross Square Footage: 143,141
Year Built: 1900 with substantial renovation in 2000 and an addition in 2010
Number of Parking Spaces: 31
Number of Beds: 250

Cost have been provided by using RS Means Building Construction Cost Data
* Note: The effective age does not necessarily equal the actual age. Many factors determine the effective age of a
certain component including preventative maintenance programs. In addition, select equipment replacement
is spread out over a number of years to help alleviate inflated reserve requirements.
** Owner Provided Cost, which DSG finds reasonable



Case 25-15245-pmm    Doc 87-2    Filed 04/14/26    Entered 04/14/26 23:18:18    Desc
Exhibit A    Page 26 of 51



## APPENDIX B

Major Moveable Schedules





App.488

Case 25-15245-pmm    Doc 87-2    Filed 04/14/26    Entered 04/14/26 23:18:18    Desc
Exhibit A    Page 30 of 51

App.489



**MAJOR MOVABLE EQUIPMENT**
**ASSISTED LIVING FACILITY**

Inspection Date: 1/17/2012
Project: Saucon Valley Manor
Address: 1050 Main Street
City, State: Hellertown, PA 18055

Gross Square Footage: 142,141
Year Built: 1930 w/sub rehab in 2000 and an addition in 2010
Number of Parking Spaces: 31
Number of Beds: 250

App.490



**MAJOR MOVABLE EQUIPMENT**
**ASSISTED LIVING FACILITY**

Inspection Date: 1/17/2012
Project: Saucon Valley Manor
Address: 1050 Main Street
City, State: Hellertown, PA 18055

Gross Square Footage: 142,141
Year Built: 1930 w/sub rehab in 2000 and an addition in 2010
Number of Parking Spaces: 31
Number of Beds: 250

App.491

Exhibit 1-4-C

**CRITICAL REPAIRS (IMMEDIATE NEEDS)**
**ASSISTED LIVING FACILITY**

Inspection Date: 01/17/12
    Project: Saucon Valley Manor
    Address: 1050 Main Street
    City, State: Hellertown, PA 18055

Gross Square Footage:          142,141
Year Built: nd an addition in 2010
Number of Parking Spaces:          31
Number of Beds:          250

| Description | Quantity | Units | Unit Cost | Total Cost |
|---|---|---|---|---|
| No general Critical Repairs were observed. | | | $        - | No Cost |
| 1. During the most recent fire inspection, dated December 12, 2011, the inspector noted the following deficiencies: 1) closet located near unit A-9 was observed with a painted sprinkler head, 2) unit A-5 closet was observed with a painted sprinkler head, 3) unit A-30 was observed missing an escutcheon, 4) unit B-82 closet was observed with a painted sprinkler head, 5) unit B-71 closet was observed with a painted sprinkler head, 6) unit B-61 closet was observed with a painted sprinkler head, 7) unit B-53 closet was observed with a painted sprinkler head and missing escutcheon, 8) unit B-62 closet was observed with a painted sprinkler head and missing escutcheon, 9) lobby was observed with a painted sprinkler head, 10) the main owners office was observed with a painted sprinkler head, 11) unit B-55 closet was observed with a painted sprinkler head and missing escutcheon, 12) unit C-43 was observed with a painted sprinkler head, 13) Floor D, two (2) common shower rooms were observed with painted sprinkler heads, 14) doctor's office was observed with two (2) missing escutcheon, 15) kitchen dry storage was observed with a missing escutcheon, 16) kitchen was observed with a missing escutcheon, 17) kitchen office was observed with a painted sprinkler head and missing escutcheon, 18) therapy elevator room's head was observed capped off, 19) dry system floor and tamper did not report to the panel, 20) new wet system flow and tampers did not report to the panel, 21) the third floor elevator tamper did not report to the panel, 22) gauges due for replacement on old wet system and dry system, 23) dry system due for 3 year leak test and system internal inspection, and 33) old wet system due for 5 year internal inspection. In order to comply with NFPA, the repair of the noted deficiencies is required. See Appendix E for a copy of the inspection report. * | 1 | Lump Sum | $   1,817.04 | Complete |
| 2. Resident rooms C-59 and C-61 feature wall mounted sinks without scald and abrasion protection at the exposed sink pipes. In order to prevent possible injuries to residents, the installation of scald and abrasion protection is required. | 2 | Each | $        35.00 | $   70.00 |
| 3. D3G recommends conducting tank tightness testing of the current 10,000-gallon heating oil UST in order to determine if the UST is a source of Vapor Encroachment and to comply with EPA 510-K-95-002 dated July 1995, which includes implementing Statistical Inventory Reconciliation (SIR) (tank integrity testing) and monitoring of the underground storage tank in order to properly evaluate the physical condition of the on-site UST on a yearly basis. | 1 | Each | $   1,200.00 | Complete |
| 4. D3G recommends that the presumed asbestos-containing materials be managed under a site-specific Operations and Maintenance (O&M) Program. In addition, compliance with 40 CFR 61 Subpart M is recommended prior to any renovation or demolition activities at the subject property. | 1 | Each | $        500.00 | Complete |

Costs have been provided by using RS Means Building Construction Cost Data
*Cost provided by contractor invoice, which D3G finds reasonable.

App.492

## NON-CRITICAL REPAIRS (12-MONTH PROPERTY CONDITION)
### ASSISTED LIVING FACILITY

Inspection Date: 1/17/2012
Project: Saucon Valley Manor
Address: 1050 Main Street
City, State: Hellertown, PA 18055

Gross Square Footage: 142,141
Year Built: 2000 and an addition in 2010
Number of Parking Spaces: 31
Number of Beds: 250



| | | | | | |
|---|---|---|---|---|---|
| No General Non-Critical Repairs were observed. | | | $ | - | No Cost |
| No Specific Non-Critical Repairs were observed. | | | $ | - | No Cost |

Costs have been provided by using RS Means Building Construction Cost Data

'Exhibit D'

**Effective Date : 09/01/2010**

## U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
### SECTION 232/223(f) LEAN PROGRAM
### HUD ATTORNEY CLOSING CHECKLIST

Project Name: _____

Project Location: _____

FHA Project Number: _____

**Please fill out this form and place in front of the draft closing documents before sending. Tab all closing documents according to the numbers indicated below.**

The HUD Closing Attorney will obtain TWO copies of the following documents:

___ 1.   a.   ALTA Title Insurance Loan Policy
___      b.   Copies of all exception documents

___ 2.   Nursing Home/Assisted Living Facility/Board & Care License, as applicable

___ 3.   a.   Operator's Estoppel Certificate (with Lease attached), if applicable
___      b.   Recorded Memorandum of Lease, if applicable
___      c.   Recorded Subordination, Non-Disturbance and Attornment Agreement, if applicable

___ 4.   Survey (dated within 120 days of closing)

___ 5.   Organizational Documents of Mortgagor:
         Incumbency Certificate with the following Exhibits (as applicable):
         ___ a.   Corporate Mortgagor
                  (i)     Articles of Incorporation
                  (ii)    Bylaws
                  (iii)   Authorizing Resolutions
                  (iv)    Certificate of Good Standing (dated within 30 days of closing)
                  (v)     Certificate of Foreign Qualification, if applicable (dated within 30 days of closing)
         ___ b.   Partnership Mortgagor
                  (i)     Partnership Agreement
                  (ii)    Certificate of Partnership
                  (iii)   Authorizing Resolutions
                  (iv)    Certificate of Existence (dated within 30 days of closing)
                  (v)     Certificate of Foreign Qualification, if applicable (dated within 30 days of closing)
         ___ c.   Limited Liability Company Mortgagor
                  (i)     Articles of Organization

App.493

        (ii)     Operating Agreement

        (iii)    Authorizing Resolutions

        (iv)    Certificate of Continued Existence (dated within 30 days of closing)

        (v)     Certificate of Foreign Qualification, if applicable (dated within 30 days of closing)

___ d. Trust Mortgagor

        (i)     Trust Agreement

        (ii)    Authorizing Resolutions

___ 6. Organizational Documents of Entities included in Mortgagor signature block, if applicable (same as No. 5 above)

___ 7. Organizational Documents of Operator, if applicable (same as No. 5 above)

___ 8. Organizational Documents of Entities included in Operator signature block, if applicable (same as No. 5 above)

___ 9. a. Accounts Receivable Financing Documents (itemized in separate checklist)

___    b. HUD Approval

___ 10. Ground Lease (with Ground Lessor's Estoppel Certificate), if applicable

___ 11. Secondary Financing Documents, if applicable

___ 12. a. Commercial Space Leases (with Tenant Estoppel Certificates), if applicable

___     b. Subordination, Non-Disturbance and Attornment Agreements (for non-identity of interest leases only)

___ 13. Organizational Documents of Management Agent, if applicable (same as No. 5 above)

___ 14. Master Lease & SNDA, if applicable

___ 15. a. Executed FHA Firm Commitment

___     b. Executed Amendments, if any

___     c. Executed Assignment, if any

___ 16. Mortgage/Deed of Trust/Security Deed

___ 17. Owner Regulatory Agreement (HUD-92466 or HUD-92466e, with LEAN Rider)

___ 18. Operator Regulatory Agreement (HUD-92466-NHL, with LEAN Rider), if applicable

___ 19. a. Security Agreement (Mortgagor)

___     b. Financing Statement (County)

___     c. Financing Statement (State)

___     d. State UCC Search Report

-2-

___ 20. a.  Operator Security Agreement, if applicable
___     b.  Financing Statement (County), if applicable
___     c.  Financing Statement (State), if applicable
___     d.  State UCC Search Report, if applicable

___ 21. a. Deposit Account Control Agreement (DACA)
___     b. Deposit Account Instructions Service Agreement (DAISA)

___ 22. Mortgagor's Attorney's Opinion with Exhibits
        Exhibit A—legal description
        Exhibit B—Mortgagor Certification
        Exhibit C—Good Standing Certificate/Certificate of Existence (for Mortgagor and each
            entity included in Mortgagor signature block)

___ 23. Operator's Attorney's Opinion with Exhibits, if applicable
        Exhibit A—legal description
        Exhibit B—Operator Certification
        Exhibit C—Good Standing Certificate/Certificate of Existence (for Operator and each
            entity in Operator signature block)

___ 24. Repair Escrow Agreement, if applicable

___ 25. Mortgagor's Critical Repairs Certificate, if applicable

___ 26.  Inspection fee check, if applicable (Please identify project number on check or check
        stub.)

___ 27. Mortgage Insurance Premium (MIP) check  (Please identify project number on check or
        check stub.)

___ 28. Attendance List, if applicable

___ 29. Closing Statement

___ 30. Cost Certification

___31. Request for Endorsement of Credit Instrument, Certificates of Mortgagee and Mortgagor
        (Form FHA-2455, as modified for LEAN Program)

___ 32. Mortgage Note/Deed of Trust Note/Security Deed Note

___ 33. All Special Conditions of Firm Commitment
___     a. _____
___     b. _____
___     c. _____

-3-

## Supplement to Project Analysis

**U.S. Department of Housing and Urban Development**
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0029
(exp. 10/31/2012)

Section or Title Number: **232/223f LEAN**

☐ Valuation Trial   ☐ Conditional   ☑ Firm   See last page for Public Reporting burden statement before completing this form

**Privacy Act Notice:** The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

| Name of Mortgagor (Borrower) | Project Number |
|---|---|
| Saucon Trust | 034-22096 |

Name of Project:
**Saucon Valley Manor**

Location of Project (street, city & state):
**1050 Main Street, Hellertown, PA**

**Type of Borrower**

☑ Private   ☑ Profit   ☐ Public   ☐ Nonprofit   ☐ State or Federal Instrumentality, etc.

☐ Management Coop.   ☐ Sales Coop.   ☐ Investor-Sponsor   ☐ Builder-Seller   ☐ Limited Distribution

**Type of Project**

| | | | | |
|---|---|---|---|---|
| ☐ Rental Housing | ☐ Mobile Home Court | ☐ Board and Care | ☐ New Construction | ☐ Non-Elevator |
| ☐ Cooperative | ☐ Nursing Home | ☐ Single Rm. Occupancy | ☐ Rehabilitation | ☐ Elevator |
| ☐ Condominium | ☐ Intermediate Care Facility | ☑ Assisted *Living* | ☐ Redevelopment | ☑ Existing |
| ☐ Capital Advance 202/811 | ☐ Housing for the Elderly | | ☐ Supplement Loan: | ☐ _____ |

### I. Determination of Maximum Insurable Mortgage

| Criteria | | column 1 | column 2 | column 3 |
|---|---|---|---|---|
| 1. Mortgage or Loan Amount Requested in Application | | | | $ 19,462,800.0 |
| 2. Reserved | | | | $ _____ |
| 3. Amount Based on Value or Replacement Cost: | | | | |
| a. Value (Replacement Cost) in Fee Simple | | $ 24,350,000.00 x 85.00 % | | $ 20,697,500.0 |
| b. (1) Value of Leased Fee | | $ _____ | | |
| (2) Grant/Loan funds attributable to R. C. items | | $ _____ | | |
| (3) Excess Unusual Land Improvement | | $ _____ | | |
| (4) Cost Containment Mortgage Deduction | | $ _____ | | |
| (5) Total lines (1) to (4) | | $ _____ 0.00 x _____ % | $ 0.00 | |
| c. Unpaid Balance of Special Assessment | | | $ _____ | |
| d. Total line b plus line c | | | | $ 0.00 |
| e. Line a minus line d | | | | $ 20,697,500.0 |
| 4. Amount Based on Limitations Per Family Unit: | | | | |
| a. Number of no Bedroom Units | | _____ x $ _____ | $ 0.00 | |
| Number of one Bedroom Units | | _____ x $ _____ | $ 0.00 | |
| Number of two Bedroom Units | | _____ x $ _____ | $ 0.00 | |
| Number of three Bedroom Units | | _____ x $ _____ | $ 0.00 | |
| Number of four or more Bedroom Units | | _____ x $ _____ | $ 0.00 | |
| b. Cost Not Attributable to Dwelling Use | | $ _____ x _____ % | $ 0.00 | |
| c. Warranted Price of Land | | $ _____ x _____ % | $ 0.00 | |
| d. Total lines a through c | | | | $ 0.00 |
| e. Total Number of Spaces | | _____ x $ _____ | | $ 0.00 |
| f. Sum: Value of Leased Fee and Unpaid Balance of Special Assessment(s) | | | | $ _____ |
| g. Line d or line e, whichever is applicable, minus line f | | | | $ _____ |
| 5. Amount Based on Debt Service Ratio | | | | |
| a. Mortgage Interest Rate | | | 3.75 % | |
| b. Mortgage Insurance Premium Rate | | | 0.60 % | |
| c. Initial Curtail Rate | | | 1.38 % | |
| d. Sum of Above Rates | | | 5.63 % | |
| e. Net Income | | $ 2,311,701. x 68.97 % | $ 1,594,264.59 | |
| f. Annual Ground Rent $ _____ + Annual Spec. Assmt: $ _____ | | | $ 0.00 | |
| g. Line e minus line f | | | $ 1,594,264.59 | |
| h. Line g divided by line d | | | | $ 28,292,800.0 |
| i. Annual Tax Abatement  Savings $ _____ divided by _____ % | | | | $ _____ |
| j. Line h plus line i | | | | $ 28,292,800.0 |

Previous editions are obsolete          Page 1 of 4          form HUD-92264-A (03/2010)
ref Handbooks 4460.1 & 4470.1

**I. Determination of Maximum Insurable Mortgage** (cont.)

| Criteria | column 1 | column 2 | column 3 |
|---|---|---|---|

**6. Amount Based on Estimated Cost of Rehabilitation Plus**
(i) "As Is" Value, or  (ii) Acquisition Cost,
or (iii) Existing Mortgage Indebtedness Against the Property Before Rehabilitation:

| | column 1 | column 2 | column 3 |
|---|---|---|---|
| a.  Total Estimated Development Cost | $ _____ | | |
| b.  Estimated Cost of Off-Site Construction | $ _____ | | |
| c.  Sum of lines a & b | | $ 0.00 | |
| d.  Grant/Loan funds attributable to R. C. items | $ _____ | | |
| e.  Line c minus line d | | $ _____ | |
| f.  "As Is" Value of Prop. Before Rehab.        $ _____ X _____ % | $ _____ | | |
| g.  Existing Mortgage Indebtedness (Property Owned)  or Purchase Price of Property (to be Acquired) $ _____ | | | |
| h.  Line e plus line f  or line g, whichever is less | | $ _____ | |
| i.  Line h   X _____ % | | | $ _____ |

**7. Amount Based on Borrower's Total Cost of Acquisition Section 223(f)**

| | column 1 | column 2 | column 3 |
|---|---|---|---|
| a.  Purchase Price of Project | $ _____ | | |
| b.  Repairs and Improvements, if any | $ _____ | | |
| c.  Other fees | $ _____ | | |
| d.  Loan Closing Charges * | $ _____ | | |
| e.  Sum of lines a through d | | $ 0.00 | |
| f.  Enter the Sum of any Grant/Loan and Reserves for Replacement and Major Movable Equipment to be purchased as an asset of the project | | $ _____ | |
| g.  Line e minus line f | | $ _____ | |
| h.  Line g   X _____ % | | | $ _____ |

**8. Amount Based on Sum of Unit Mortgage Amounts** | | | $ _____ |

**9. Amount Based on Estimated Cost to Borrower**

| | column 1 | column 2 | column 3 |
|---|---|---|---|
| a.  Total Estimated Cost  (Exclusive of Site and Required Construction Off the Site) | $ _____ | | |
| b.  Purchase Price of Site | $ _____ | | |
| c.  Total Cost of Clearing Site, if any | $ _____ | | |
| d.  Expense of Relocating Occupants, if any | $ _____ | | |
| e.  Cost of Off-Site Construction, if any | $ _____ | | |
| f.  Sum of line a through line e | | $ 0.00 | |
| g.  Line f   X _____ % | | | $ _____ |

**10. Amount Based on Existing Indebtedness, Repairs, and Loan Closing Charges Section 223(f)**

| | column 1 | column 2 | column 3 |
|---|---|---|---|
| a.  Total Existing Indebtedness | $ 18,734,559.0 | | |
| b.  Required Repairs | $ 70.00 | | |
| c.  Other Fees | $ _____ | | |
| d.  Loan Closing Charges * | $ 728,218.00 | | |
| e.  Sum of line a through line d | | $ 19,462,847 | |
| f.  Enter the Sum of any Grant/Loan and Reserves for Replacement and Major Movable Equipment on Deposit | | $ _____ | |
| g.  Line e minus line f | | $ 19,462,800.( | |
| h.  80% of Value        $ _____ X80% | | $ _____ | |
| i.  Greater of line g or line h | | | $ 19,462,800.( |

**II. Amount Based on Deduction of Grant(s), Loan(s), Tax Credit(s) and Gift(s) for Mortgageable Items:**

| | | column 2 | column 3 |
|---|---|---|---|
| a. 100% Project (Replacement) Cost * | $ _____ | | |
| b. (1) Grants/loans/gifts | $ _____ | | |
| (2) Tax Credits | $ _____ | | |
| (3) Value of Leased Fee | $ _____ | | |
| (4) Excess Unusual Land Improvement Cost | $ _____ | | |
| (5) Cost Containment Mtge Deduction | $ _____ | | |
| (6) Unpaid Balance of Special Assessment | $ _____ | | |
| (7) Sum of Lines (1) through (6) | | $ 0.00 | |
| c. Line a, minus line b. (7) | | $ _____ | |

* Project Cost applies to Criteria 7 and 10 under Section 223 (f) and applications pursuant to 223(f).  Project Replacement
Cost applies to Section 221 (d) and other Sections of the Act mortgages limited by Replacement Cost.

* Attach format for computing loan closing charges.

**Maximum Insurable Mortgage** (Lowest of the Foregoing Criteria) | $ |

Previous editions are obsolete          Page 2 of 4          form HUD-92264-A (03/2010)
ref Handbooks 4480.1 & 4470.1

## II. Total Requirements for Settlement

**Part A.**

| 1. Fees Not to be Paid in Cash | | |
|---|---|---|
| a. BSPRA/SPRA | $ | |
| b. Builder's Profit | $ | |
| c. Other | $ | |
| Total (enter in part B on line 6) | $ | 0.00 |

| 2. Commitment, Mktg., Fees and Discounts and Escrows | | | |
|---|---|---|---|
| a. Fees | GNMA | $ | |
| | Other | $ | |
| b. Discounts | Permanent Loan | $ | |
| | Construction Loan | $ | |
| c. Escrows | Debt Service Reserve (Board & Care) | $ | |
| | Other | $ | |
| Total (enter in part B on line 9) | | $ | 0.00 |

| 3. Working Capital | | |
|---|---|---|
| a. Working Capital | $ | |
| b. Minimum Capital Investment (Sec. 202 & Sec. 81) | } $ | |
| c. Non-Realty Items Not Included in Mortgage | $ | |
| Total (enter in part B on line 10) | $ | 0.00 |

**Part B**

| | | | |
|---|---|---|---|
| 1. a. Development Cost | $ 19,462,847. | | |
| b. Adjustment for Contracted Amounts in Excess of form HUD-92264 Estimates | | | |
| (1) Construction Contract | $ | | |
| (2) Architect's Contract | $ | | |
| (3) Other | $ | | |
| c. Total of lines a & b | | $ | 19,462,847. |
| 2. Land Indebtedness (or Cash Required for Land Acquisition) | | $ | |
| 3. Subtotal (lines 1c + 2) | | $ | 19,462,847. |
| 4. a. Mortgage Amount | $ 19,462,800. | | |
| b. Grant/Loan | $ | | |
| 5. Fees Not to be Paid in Cash | $ | | |
| 6. Subtotal (lines 4a + 4b + 5) | | $ | 19,462,800. |
| 7. Cash Investment Required (line 3 minus line 6) | | $ | 47.00 |
| 8. Initial Operating Deficit * | | $ | |
| 9. Commitment, Marketing Fees, Discounts and Escrows | | $ | |
| 10. Working Capital | | $ | |
| 11. Offsite Construction and Demolition Costs ($        + $        ) | | $ | 0.00 |
| 12. Total Estimated Cash Requirement (sum of lines 7 + 8 + 9 + 10 + 11) | | $ | 47.00 |
| Front Money Escrow, If Any, (subtract line 6 from line 1) | | $ | |

* Note: for Section 223(f) cases, attach the format for computing the operating deficit.

## III. Source of Funds to Meet Cash Requirements

| Source | Funds Available |
|---|---|
| Prepaid Equity | $ |
| Application Fee | $ 58,388.00 |
| Third party reports | $ 23,750.00 |
| | $ |
| | $ |
| **Total Available Cash for Project** | $ 82,138.00 |

## IV. Recommendations, Requirements and Remarks

☑ Recommend Approval; Subject to Conditions Stated Below, If Any
☐ Recommend Rejection for Reasons Stated Below (If more space is needed, continue on page 4).

See Narrative for Firm Commitment Conditions.

Signature of the Mortgage Credit Examiner

X _____    7/12/2012    Date

Previous editions are obsolete    Page 3 of 4    form HUD-92264-A (03/2010)
ref Handbooks 4480.1 & 4470.1

9/24/12

App.498

**Remarks:**

Format to Compute Fees

| | | |
|---|---|---|
| Mortgage Amount | $ | 19,462,800 |
| Existing Indebtedness | $ | 18,734,559 |
| Prepayment Penalty | $ | – |
| Required Non-Critical Repairs | $ | – |
| Required Critical Repairs | $ | 70 |
| Repl. Reserves- Realty & Non-Realty | $ | 245,000 |

Other Fees

| | | |
|---|---|---|
| Legal & Org. | $ | 17,500 |
| Title/Recording | $ | 47,663 |
| Inspection Fee | $ | 6,210 |

Third Party Reports

| | | |
|---|---|---|
| Appraisal | $ | 12,500 |
| Seismic | $ | - |
| PCNA Report | $ | 3,700 |
| Phase I Env. | $ | 7,550 |

Loan Closing Charges

| | | |
|---|---|---|
| Financing Fee (0.6940%) | $ | 135,078 |
| Placement Fee (0%) | $ | - |
| MIP (1.0 %) | $ | 194,628 |
| HUD Exam Fee (.30%) | $ | 58,388 |

| | | |
|---|---|---|
| Less Existing Reserves | $ | - |
| Less Repairs Paid From Current Reserves | $ | |
| Total Costs | $ | 19,462,847 |

Public Reporting Burden for this project analysis is estimated to average 8 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collecton displays a valid OMB control number.

This information is being collected under Public Law 101-625 which requires the Department of to implement a system for mortgage insurance for mortgages insured under Sections 207,221,223,232, or 241 of the National Housing Act. The information will be used by HUD to approve rents, property appraisals, and mortgage amounts, and to execute a firm commitment. Confidentiality to respondents is ensured if it would result in competitive harm in accord with the Freedom of Information Act (FOIA) provisions or if it could impact on the ability of the Department's mission to provide housing units under the various Sections of the Housing legislation.

Previous editions are obsolete                     Page 4 of 4                     form HUD-92264-A (03/2010)
ref Handbooks 4480.1 & 4470.1

## ATTACHMENT TO FORM HUD-92264-A
### (Office of Healthcare Programs--Section 232)

| Name of Mortgagor: | Saucon Trust | Program Section No: | 232/223f |
|---|---|---|---|
| Name of Project: | Saucon Valley Manor | Project No: | 034-22096 |

**Additional Criteria for Determination of Maximum Insurable Mortgage (Section I of HUD-92264-A)**

**12. Amount Based on Replacement Cost (applicable to New Construction, Substantial Rehabilitation, 241(a), Blended Rate)**

| | | | | | |
|---|---|---|---|---|---|
| a. Replacement Cost in Fee Simple | $0 | x | 90% | | $0 |
| b.(1) Value of Leased Fee | $0 | | | | |
| (2) Grant/Loan funds attributable to R.C. items | $0 | | | | |
| (3) Excess Unusual Land Improvement | $0 | | | | |
| (4) Total lines (1) to (3) | $0 | x | 90% | $0 | |
| c. Unpaid Balance of Special Assessment | | | | $0 | |
| d. Total line b plus line c | | | | | $0 |
| e. Line a minus line d | | | | | | $0 |

**13. Amount Based on LEAN Required Debt Service Coverage (as applicable)**

| | | | | | |
|---|---|---|---|---|---|
| a. Mortgage Interest Rate | | | | 3.75% | |
| b. Mortgage Insurance Premium Rate | | | | 0.5% | |
| c. Initial Curtail Rate | Loan term (years) | 35 | | 1.384860% | |
| d. Sum of Above Rates | | | | 5.634860% | |
| e. Net Income | $2,311,701 | ÷ | 1.45 | $1,594,264 | |
| f. Annual Ground Rent + Annual Special Assessment | $0 | + | $0 | $0 | |
| g. Line e minus line f | | + | | $1,594,264 | |
| h. Line g divided by line d | | | | | $28,292,882 |
| i. Annual Tax Abatement Savings | $0 | + | 1.45 | | $0 |
| j. Line h plus line i | | + | | | $28,292,882 |

**14. Amount Based on LEAN Required Loan to Value (as applicable)**

| | | | | | |
|---|---|---|---|---|---|
| a. Value in Fee Simple | $24,350,000 | | 80% | $19,480,000 | |
| b. Value of Leased Fee | $0 | x | 0% | $0 | |
| c. Unpaid Balance of Special Assessment | | x | | $0 | |
| d. Total line b plus line c | | | | | $0 |
| e. Line a minus line d | | | | | $19,480,000 |

| | Yes | No | |
|---|---|---|---|
| Criteria 13: Standard LEAN Percentage Utilized | ☑ | ☐ | If "No", Mitigation required in Lender Narrative |
| Criteria 14: Standard LEAN Percentage Utilized | ☑ | ☐ | If "No", Mitigation required in Lender Narrative |

App.500

Project:    Saucon Valley Manor

### TO COMPUTE FEES IN A REFINANCE TRANSACTION

| | | | |
|---|---|---|---|
| Step 1. | Add the known dollar amounts for: | | |
| | A. Existing Indebtedness | $ | 18,734,559 |
| | B. Repairs | $ | 70 |
| | C. Initial Deposit to Reserve for Replacements | $ | 245,000 |
| | D. Legal & Organizational | $ | 17,500 |
| | F. Title and Recording | $ | 47,663 |
| | G. Other Fees (Inspection, Third Parties) | $ | 29,960 |
| | H. Non-Profit Developer Fee | | N/A |
| | | | |
| | Total: | $ | 19,074,752 |

| | | |
|---|---|---|
| Step 2. | Deduct the amounts of any Replacement Reserve Escrow currently on deposit with the mortgagee | |
| | Result: | |

| | | |
|---|---|---|
| Step 3. | Add the known percentages for: | |
| | A. Financing Fee (Initial Service Charge) | 0.69% |
| | B. MIP | 1.00% |
| | C. Exam Fee | 0.30% |
| | D. FNMA Fee | 0.00% |
| | E. Discounts, if Allowable | 0.00% |
| | Total: | |

| | | |
|---|---|---|
| Step 4. | Subtract the sum from Step 3 from 100% | |
| | Result: | 98.01% |

| | | | | |
|---|---|---|---|---|
| Step 5. | Divide the sum from Step 2 by the result from Step 4. The quotient rounded down to the nearest hundred becomes the mortgage amount | | $ | 19,462,847 |
| | | Round down: | $ | 19,462,800 |

| | | | |
|---|---|---|---|
| Step 6. | Compute and total the actual fees based on the mortgage amount determined in Step 5. | | |
| | A. Financing Fee | $ | 135,078 |
| | B. MIP | $ | 194,628 |
| | C. Exam Fee | $ | 58,388 |
| | D. FNMA Fee | $ | - |
| | E. Discounts | $ | - |
| | Total: | $ | 388,094 |

| | | | |
|---|---|---|---|
| Step 7. | Add to the sum from Step 6, the following: | | |
| | A. Legal and Organizational (Incl. 3rd parties) | $ | 41,250 |
| | B. Initial Deposit to Reserve for Replacements | $ | 245,000 |
| | C. Title and Recording | $ | 47,663 |
| | D. GNMA Fee | $ | - |
| | Total: | $ | 722,007 |

App.501

# INITIAL OPERATING DEFICIT CALCULATION

App.502

| Saucon Valley Manor | Period One | | | | Period Three | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Month 13 | Month 14 |
| Personal Care | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 |
| Assisted Living | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 |
| ALZ | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 |
| Other income | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Occupied Units | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 |
| Total Resident Days | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 |
| EGI | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 |
| e.g. General & Administrative | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) |
| e.g. Payroll Taxes and Benefits | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) |
| e.g. Resident Care | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) |
| e.g. Food Services | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) |
| e.g. Activities | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) |
| e.g. Housekeeping & Laundry | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) |
| e.g. Maintenance | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) |
| e.g. Utilities | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) |
| e.g. Bad Debt | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ground Rent | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Marketing and Promotion | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) |
| Insurance (property & liability) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) |
| Real Estate (Property) Taxes | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) |
| Management Fees* | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) |
| Replacement Reserves | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) |
| Total Expenses | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) |
| NOI | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 |
| P+I | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) |
| MIP | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) |
| Income/Loss per Period | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Expense Ratio | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% |
| % of UW Expense | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Occupancy | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% |

| IOD Base Requirement |
|---|
| $0 |

# INITIAL OPERATING DEFICIT CALCULATION

App.503

| Saucon Valley Manor | Month 15 | Month 16 | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 | Month 23 | Month 24 | Month 25 | Month 26 | Month 27 | Month 28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Personal Care | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 |
| Assisted Living | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 |
| ALZ | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 |
| Other income | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Occupied Units | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 |
| Total Resident Days | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 |
| EGI | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 |
| e.g. General & Administrative | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) |
| e.g. Payroll Taxes and Benefits | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) |
| e.g. Resident Care | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) |
| e.g. Food Services | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) |
| e.g. Activities | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) |
| e.g. Housekeeping & Laundry | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) |
| e.g. Maintenance | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) |
| e.g. Utilities | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) |
| e.g. Bad Debt | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ground Rent | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Marketing and Promotion | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) |
| Insurance (property & liability) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) |
| Real Estate (Property) Taxes | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) |
| Management Fees* | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) |
| Replacement Reserves | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) |
| Total Expenses | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) |
| NOI | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 |
| P+I | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) |
| MIP | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) |
| Income/Loss per Period | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 |
| | | | | | | | | | | | | | | |
| Expense Ratio | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% |
| % of UW Expense | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Occupancy | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% |

**IOD Base Requirement**
**$0**

App.504

**INITIAL OPERATING DEFICIT CALCULATION**

EXHIBIT E

| Saucon Valley Manor | Month 29 | Month 30 | Month 31 | Month 32 | Month 33 | Month 34 | Month 35 | Month 36 |
|---|---|---|---|---|---|---|---|---|
| Personal Care | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 | 113.02 |
| Assisted Living | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 | 8.48 |
| ALZ | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 | 66.88 |
| Other income | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Occupied Units | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 | 188.38 |
| Total Resident Days | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 | 5729.86 |
| EGI | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 | $665,845 |
| e.g. General & Administrative | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) | ($52,186) |
| e.g. Payroll Taxes and Benefits | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) | ($37,660) |
| e.g. Resident Care | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) | ($127,574) |
| e.g. Food Services | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) | ($67,839) |
| e.g. Activities | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) | ($14,384) |
| e.g. Housekeeping & Laundry | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) | ($22,948) |
| e.g. Maintenance | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) | ($27,571) |
| e.g. Utilities | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) | ($29,088) |
| e.g. Bad Debt | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ground Rent | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Marketing and Promotion | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) | ($12,045) |
| Insurance (property & liability) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) | ($9,657) |
| Real Estate (Property) Taxes | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) | ($28,695) |
| Management Fees* | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) | ($33,292) |
| Replacement Reserves | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) | ($10,304) |
| Total Expenses | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) | ($473,244) |
| NOI | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 | $192,601 |
| P+I | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) | ($83,282) |
| MIP | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) | ($8,110) |
| Income/Loss per Period | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 | $101,209 |
| | | | | | | | | |
| Expense Ratio | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% | 71.1% |
| % of UW Expense | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Occupancy | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% | 91.0% |

| **IOD Base Requirement** |
|---|
| **$0** |

## Property Insurance Schedule
Insurable Values for Property
Insurance Coverages

**U.S. Department of Housing
and Urban Development**
Office of Housing
Federal Housing Commissioner

OMB Approval No.2502-0029
(exp. 10/31/2012)

Public Reporting Burden for this collection of information is estimated to average .08 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number.

This information is being collected under Public Law 101-625 which requires the Department of to implement a system for mortgage insurance for mortgages insured under Sections 207,221,223,232, or 241 of the National Housing Act. The information will be used by HUD to approve rents, property appraisals, and mortgage amounts, and to execute a firm commitment.    Confidentiality to respondents is ensured if it would result in competitive harm in accord with the Freedom of Information Act (FOIA) provisions or if it could impact on the ability of the Department's mission to provide housing units under the various Sections of the Housing legislation.

**Note:** The purpose of this form is to provide a guide for the mortgagee in establishing property insurance coverage for each building in the project. Total coverage must be no less than the Total 100% insurable value for the project. Also note attached form HUD-92447.

| 1. Project Number | 2. Project Name | | | |
|---|---|---|---|---|
| 034-22096 | Saucon Valley Manor | | | |

| 3. Identification of Buildings | Cost Per Building | Number of Buildings | 100% Insurable Value |
|---|---|---|---|
| Dwelling Buildings | | 1 | $ 22,590,000 |
| Major Moveables | | | $ 1,000,000 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Garages | | | |
| | | | |
| Other Buildings | | | |
| | | | |
| | | | |
| | | | |
| Total 100% Insurable Value | | | $    23,590,000 |

Form Prepared at    [X] Firm    [ ] Certification

| Prepared by (Cost Analyst) | Date (mm/dd/yyyy) | Reviewed by (Chief, Cost Branch) | Date (mm/dd/yyyy) |
|---|---|---|---|
| Sandra DeFelice, Vice President | 7/11/2012 | | 09 27 2012 |

TIM GRUENES
Auth. Certifying Officer    SEP 2 7 2012    form HUD-92329 (7/91)
66-09-0300                                 ref Handbooks 4460.1, 4480.1

## HUD-92329 Calculation

Dwelling Buildings Calculation:

Appraised Value: $ 24,350,000 (Underwriter Adjusted)

Less: Land Value: $ 760,000

Less: Major Movables Value: $ 1,000,000

Dwelling Buildings Value: $ 22,590,000

Major Movables Vale: $ 1,000,000

Total 100% Insurable Value: $23,590,000

| **Property Insurance Requirements** | **U.S. Department of Housing and Urban Development**<br>Federal Housing Administration | OMB Approval No. 2502-0029<br>(exp. 05/31/2006) |
|---|---|---|

Public reporting burden for this collection of information is estimated to average 5 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This is part of the basic application package for insured mortgages for construction of rental housing projects. This is a requirement under Section 207(b) of the National Housing Act (Public Law 479, 48 Stat. 1246, 12 U.S.C., 1701 et. seq.), authorizing the Secretary of HUD to insured mortgages. The information establishes property insurance requirements for a proposed multifamily project. The information is required to obtain benefits.

**Privacy Act Notice** - The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in this form by virtue of Title 12, United States Code, Section 1701 et. seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurances of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information request. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number.

|  |  |
|---|---|
| | <u>July 11, 2012</u><br>*(Date)* |
| **To:**     <u>**Saucon Trust**</u><br>*(Mortgagee)* | <u>034-22096</u><br>*(Project No.)* |
| <u>1050 Main Street</u><br>*(Street Address)* | <u>Saucon Valley Manor</u><br>*(Project Name)* |
| <u>Hellertown</u><br>*(City)* | <u>Hellertown, PA</u><br>*(Project Location)* |

1.    Reference is made to the applicable Administrative Regulations of the National Housing Act under which the mortgage on the above property (a) is insured by the Assistant Secretary for Housing, Federal Housing Commissioner in accordance with a Commitment For Insurance or (b) will be insured by the Assistant Secretary for Housing, Federal Housing Commissioner in accordance with a previously issued Commitment To Insure Upon Completion.

2.    This notice is for the purpose of advising the Mortgagee of the Requirements of the Assistant Secretary for Housing, Federal Housing Commissioner as to the types of Property Insurance necessary to be maintained upon the subject property and of the estimate of the Commissioner of the Total 100% Insurable Value of the property. The attention of the Mortgagee is directed to the fact that these Requirements, with respect to the types of Property Insurance to be maintained, are continuous Requirements, as long as any mortgage upon the property is insured by the Assistant Secretary for Housing-Federal Housing Commissioner. It is the duty of Mortgagee to require of the Mortgagor maintenance of insurance in types and amounts necessary to comply with the Requirements hereinafter stated and as stated in the insured mortgage. The attention of the Mortgagee is also directed to the pertaining Administrative Regulations wherein of the insured mortgage upon failure of the Mortgagor to do so.

3.    (a) Attached hereto and made a part hereof is Property Insurance Schedule, HUD Form No. 92329, dated ~~July 11, 2012~~, constituting the estimate of the Assistant Secretary for Housing-Federal Housing Commissioner of the Total 100% Insurable Value of the property. The Property Insurance Schedule of Insurable Values is for the purpose of estimating the amount of Permanent Insurance, as well as the amount of Builders Risk Insurance.

    (b) The Total 100% Insurable Value reflected upon the attached Property Insurance Schedule <u>includes</u> the cost of excavations, foundations, piers, or other supports which are below the surface of the lowest basement floor or where there is no basement, which are below the surface of the ground, underground flues, pipes, and drains. These items are generally <u>excluded</u> from the Property Insurance coverage when it is subject to the provisions of the Coinsurance Clause or similar clause. If the Builders Risk Insurance or the Permanent Fire and Extended Coverage Insurance does not insure these items, then an amount acceptable to the Mortgagee may be deducted from the Assistant Secretary for Housing-Federal Housing Commissioner's estimate of the Total 100% Insurable Value for the purpose of estimating the amount of Builders Risk Insurance or the amount of Permanent Insurance.

4.   INSURANCE DURING CONSTRUCTION.

    The Requirements for this type of insurance are inapplicable when a Commitment To Insure Upon Completion is issued.

    (a) Concurrently with or prior to the issuance of mortgage insurance by the Assistant Secretary for Housing-Federal Housing Commissioner of any advance of mortgage proceeds for construction of the property, the Mortgagee shall have in its possession or control and in full force and effect, the standard form of Builders Risk Insurance policy or policies. It shall be written upon the standard Builders Risk Completed Value form, for Fire, Extended Coverage and Vandalism and Malicious Mischief Insurance, in an aggregate amount equal to 100% of the Insurable Value of the completed building or buildings.

    (b) The Builders Risk Insurance policy or policies shall show the Mortgagor as the Insured and may also show as additional insureds the general contractor and other contractors and subcontractors, as their interests may appear. Each policy shall carry the standard form of Non-Contribution Mortgage or Mortgagee Clause showing loss, if any, payable to the Mortgagee (name and address) and the Assistant Secretary for Housing-Federal Housing Commissioner, DHUD, Washington, D.C., his successors or assigns, as interest may appear. The original of such policy or

    form **HUD-92447** (07/2005)

App.507

policies shall be retained in the possession or control of the Mortgagee and shall be maintained in full force and effect.

(c) Upon cancellation of the Builders Risk Insurance or any portion thereof, Permanent Insurance shall be effected as hereinafter stipulated.

5. PERMANENT INSURANCE

(a) Fire and Extended Coverage Insurance shall be provided for the subject property and may be either blanket coverage or by specific allocations to individual structures. Such insurance shall be evidenced by standard Fire and Extended Coverage Insurance policy or policies, in amounts not less than necessary to comply with the applicable Coinsurance Clause percentage, but in no event shall the amounts of coverage be less than 80% of the Insurable Values or not less than the unpaid balance of the insured mortgage, whichever is the lesser.

(b) The Permanent Insurance policy or policies show the Mortgagor as the Insured and shall carry the standard form of Non-Contribution Mortgage or Mortgagee Clause, showing loss, if any, payable to the Mortgagee (name and address) and the Assistant Secretary for Housing-Federal Housing Commissioner, DHUD, Washington, D.C., his successors or assigns, as interest may appear. The original of such policy or policies shall be retained in the possession or control of the Mortgagee shall be maintained in full force and effect.

(c) BOILER EXPLOSION INSURANCE. If the boiler or boilers located in the subject property are other than steam boilers, specific Boiler Explosion Insurance generally is not required. If there is a steam boiler or boilers in operation in connection with the subject property, specific Boiler Explosion Insurance is required. In determining the adequacy of the amount or amounts of this coverage there must be careful review and consideration of all the facts and exposures for the purpose of estimating the maximum possible amount of a single loss by steam boiler explosion. The minimum limit of Boiler Explosion Insurance, when required, is per accident, per location. After due examination of all the related information in any given case, it may be determined this required minimum limit of $100,000 is inadequate. In that event a greater amount of coverage should be provided. Determination of such amount is the responsibility of the Mortgagee.

(d) Boiler Explosion Insurance, as herein required, shall be evidenced by standard form of Boiler and Machinery policy or policies showing the Mortgagor as the Insured and shall have attached standard Mortgagee Interest Endorsement, showing loss, if any, or property of the Insured, to be adjusted with and payable to the Insured and the Mortgagee (name and address) and the Assistant Secretary for Housing-Federal Housing Commissioner, DHUD, Washington, D.C., his successors or assigns, as their interests may appear. The original of such policy or policies shall be retained in the possession or control of the Mortgagee and shall be maintained in full force and effect.

6. FLOOD INSURANCE. *(Required whenever the property is located in an area of special flood hazards in which flood insurance is available under the National Flood Insurance Act.)*

☐ REQUIRED    **X** NOT REQUIRED

Flood insurance shall be provided for the subject property during the term of the mortgage loan. The insurance shall be in an amount at least equal to the outstanding principal balance of the loan, or the maximum amount at insurance available with respect to the project under the National Flood Insurance Act, whichever is lesser. The policy shall show the mortgagor as insured and shall show loss, if any, payable to the mortgagee *(name and address)* and the Assistant Secretary for Housing-Federal Housing Commissioner, Washington, D.C., his successors or assigns, as their interests may appear. The original of such policy or policies shall be retained in the possession or control of the mortgagee and shall be maintained in full force and effect.

7. INSURANCE CARRIERS.

The acceptability of insurance carriers, types of coverage and the forms, conditions, amounts and scope of insurance policies are responsibilities of the Mortgagee. The Assistant Secretary for Housing-Federal Housing Commissioner does not require that any duplicate policies, certificates or memoranda of insurance or other evidence of the foregoing insurance overages be submitted to him or to any of his field offices or authorized agents.

8. LOSS SETTLEMENT DRAFTS AND CHECKS.

(a) Loss settlement drafts and checks in settlement of losses sustained under any of the aforementioned types of insurance overages shall always include the Mortgagee and the Assistant Secretary for Housing-Federal Housing Commissioner as payees.

(b) Loss settlement drafts and checks should be forwarded to the Assistant Secretary for Housing-Federal Housing Commissioner DHUD, Field Office Director having jurisdiction over the area in which the property sustaining the loss is situated, and he is responsible for the endorsement and release of such instruments on behalf of the Assistant Secretary for Housing-Federal Housing Commissioner

ASSISTANT SECRETARY FOR HOUSING-FEDERAL
HOUSING COMMISSIONER

By _____
(Authorized Agent)

TIM GRUENES                    SEP 2 7 2012
Page                                        form **HUD-92447** (07/2005)

App.508

APPENDIX 2                                            02/06/01

### UPDATED AND ADDITIONAL PROPERTY INSURANCE REQUIREMENTS

**I.    Insurance During Construction.**

    A.    Public Liability Insurance on a Commercial General Liability form with limits of not less than $500,000 per occurrence to protect the Owner during the construction phase from claims involving bodily injury and/or death and damage to the property of others. Such Commercial General Liability Insurance shall be endorsed to include owners' and contractors' protective coverage.

    B.    Vehicle Liability Insurance with limits of not less than $300,000 for one person and $500,000 for more than one person to protect the Owners for claims for bodily injury and/or death, and not less than $100,000 against claims for damage to property of others arising from the owner's operation of vehicles. Such insurance shall include coverage for employer's owned, non-owned and/or hired vehicles, where applicable.

**II.    Permanent Insurance**

Upon acceptance of the project, or any portion thereof from the contractor, the owner shall provide a certified duplicate copy of the following insurance coverage. In some instances, continuation of the insurance obtained for the construction period, with proper endorsements thereto, will be acceptable. In any event, the Owner shall assure that there is no gap period in insurance protection during the transition from the Insurance During Construction to the Permanent Insurance.

    A.    Public Liability Insurance on a Commercial General Liability form with limits of not less than $500,000 per occurrence protect to the Owner from claims involving bodily injury and/or death and property damage which may arise from the Owner's operations, including any use or occupancy of its facilities, grounds and structures, and shall include independent contractors coverage, where applicable.

    B.    Vehicle Liability Insurance. If the Owner owns or a vehicle in the operation of the project, including non-owned and/or hired vehicles operated for the benefit of the

1

**APPENDIX 2**                                                02/06/01

Owner, the Owner shall procure and maintain Vehicle Liability Insurance. Such insurance shall provide for limits of liability of not less than $300,000 for one person and $500,000 for more than one person to protect the owner from claims for bodily injury and/or death, and not less than $100,000 against claims for damage to property of others.

2

## DOCUMENT CERTIFICATION

The document attached hereto is certified to be a true and correct copy of the original of the following document:

### Regulatory Agreement

Between SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007
And the Secretary of Housing and Urban Development

Dated as of December 1, 2012
Recorded December 13, 2012,
In Record Book 2012-1 at Page 300720
in the Office of the Recorder of Deeds of Northampton County
in the State of Pennsylvania

Commonwealth Land Title Insurance Company

By:   Omega Abstract Company, authorized agent

By: _____
Name printed: __S WIENER__
Authorized Agent

# Exhibit B

App.511

**After Recording, Return to:**

**OMEGA ABSTRACT COMPANY**
Suite 400 Commonwealth Building
Allentown, PA 18104
610-821-8600
Fax 610-821-8635


**Tax Parcel   Q7SW2A – 1 – 3 - 0715**

**Address:  1050 Main Street
            Hellertown, PA**




# REGULATORY AGREEMENT

## BETWEEN

## SAUCON TRUST

## AND

## SECRETARY OF HOUSING AND URBAN DEVELOPMENT

| **Regulatory Agreement for Multifamily Housing Projects** | **U.S. Department of Housing And Urban Development** Office of Housing Federal Housing Commissioner | | |
|---|---|---|---|
| **Under Sections 207, 220, 221(d)(4), 231 and 232, Except Nonprofits** | | | |
| Project Number<br>**034-22096** | Mortgagee<br>**M&T Realty Capital Corporation** | | |
| Amount of Mortgage Note<br>**$19,462,800.00** | Date<br>**December 1, 2012** | | |
| Mortgage Recorded    State<br>**Pennsylvania**<br>~~Book~~ | County<br>**Northampton**<br>~~Page~~ | Date<br>**Contemporaneously**<br>**herewith** | Originally    endorsed    for insurance under Section<br>**232, pursuant to Section 223(f)** |

This Agreement, **together with the LEAN Rider to Regulatory Agreement for Multifamily Housing Projects attached hereto and made a part hereof (the "Rider"), entered into ~~this~~ as of the 1st day of December, 2012 between Saucon Trust, u/t/a dated October 1, 2007** whose address is **1050 Main Street, Hellertown, Pennsylvania 18055,** their successors, heirs, and assigns (jointly and severally, hereinafter referred to as Owners) and the undersigned Secretary of Housing and Urban Development and his successors (hereinafter referred to as Secretary).

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended, and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgaged property:

1. Owners, except as limited by paragraph 17 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Secretary of an amount equal to **$10,264.00** per month, unless a different date or amount is approved in writing by the Secretary. **See Rider Paragraph A.**

Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at all times be under the control of the mortgagee.

Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary. In the event that the owner is unable to make a mortgage note payment on the due date and that payment cannot be made prior to the due day of the next such installment or when the mortgagee has agreed to forgo making an election to assign the mortgage to the Secretary based on a monetary default, or to withdraw an election already made, the Secretary is authorized to instruct the mortgagee to withdraw funds from the reserve fund for replacements to be applied to the mortgage payment in order to prevent or cure the default. In addition, in the event of a default in the terms of the mortgage, pursuant to which the loan has been accelerated, the Secretary may apply or authorize the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

(b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maintaining the fund is approved in writing by the Secretary.

3. Real property covered by the mortgage and this agreement is described in ~~Schedule~~ Exhibit A attached hereto.

(This paragraph 4 is not applicable to cases insured under Section 232.)

| Replaces FHA-2466 which may be used until supply exhausted | Page 1 of 5 | Form **HUD-92466** (11/2002)<br>ref Handbook 4571.1 |
|---|---|---|

4. (a) Owners shall make dwelling accommodation and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary, for any project subject to regulation of rent by the Secretary. Accommodations shall not be rented for a period of less than thirty (30) days, or, unless the mortgage is insured under Section 231, for more than three years. Commercial facilities shall be rented for such use and upon such terms as approved by the Secretary. Subleasing of dwelling accommodations, except for subleases of single dwelling accommodations by the tenant thereof, shall be prohibited without prior written approval of Owners and the Secretary and any lease shall so provide. Upon discovery of any unapproved sublease, Owners shall immediately demand cancellation and notify the Secretary thereof.

(b) Upon prior written approval by the Secretary, Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or services which may be furnished by the Owners or others to such tenant upon his request, in addition to the facilities and services included in the approved rental schedule. Approval of charges for facilities and services is not required for any project not subject to regulation of rent by the Secretary.

(c) For any project subject to regulation of rent by the Secretary, the Secretary will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

(i) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance cost over which Owners have no effective control or;

(ii) Deny the increase stating the reasons therefor.

5. (a) If the mortgage is originally a Secretary-held purchase money mortgage, or is originally endorsed for insurance under any Section other than Sections 231 or 232 and is not designed primarily for occupancy by elderly persons, Owners shall not in selecting tenants discriminate against any person or persons by reason of the fact that there are children in the family.

(b) If the mortgage is originally endorsed for insurance under Section 221, Owners shall in selecting tenants give to displaced persons or families an absolute preference or priority of occupancy which shall be accomplished as follows:

(1) For a period of sixty (60) days from the date of original offering, unless a shorter period of time is approved in writing by the Secretary, all units shall be held for such preferred applicants, after which time any remaining unrented units may be rented to non-preferred applicants;

(2) Thereafter, and on a continuing basis, such preferred applicants shall be given preference over nonpreferred applicants in their placement on a waiting list to be maintained by the Owners; and

(3) Through such further provisions agreed to in writing by the parties.

(c) Without the prior written approval of the Secretary not more than 25% of the number of units in a project insured under Section 231 shall be occupied by persons other than elderly persons.

(d) All advertising or efforts to rent a project insured under Section 231 shall reflect a bona fide effort of the Owners to obtain occupancy by elderly persons.

6. Owners shall not without the prior written approval of the Secretary:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property.

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c) ~~Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or the interest of any general partner in a partnership owning the property, or any right to manage or receive the rents and profits from the mortgaged property~~
See Rider Paragraph B.

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

(1) All distributions shall be made only as of and after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction;

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3) Any distribution of any funds of the project, which the party receiving such funds is not

entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project; **and**

(5) **No distribution shall be made when either (i) Owners are not current on their mortgage payment obligations under the note identified herein or under the mortgage as defined herein, or (ii) the mortgagor/owner of the project named Whitehall Manor Senior Living, located in Whitehall, Pennsylvania and designated as FHA Project No. 034-22084, is not current on its mortgage payment obligations under the HUD-insured note and mortgage with respect to such project.**

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g) Require, as a condition of the occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h) Permit the use of the dwelling accommodations or nursing facilities of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

**See Rider Paragraph B.**

7. Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the mortgage.

8. Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof by a receiver or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power

of sale, and fail to have such adverse actions set aside within forty-five (45) days.

9. (a) ~~Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project~~
**See Rider Paragraph C.**

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or his duly authorized agents. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or his duly authorized agents. **See Rider Paragraph E.**

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e) Within sixty (60) days following the end of each fiscal year the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, prepared and certified to by an officer or responsible Owner and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary. **See Rider Paragraph D.**

(f) At request of the Secretary, his agents, employees, or attorneys, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to income, assets, liabilities, contracts, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a financial institution, whose deposits are insured by an agency of the Federal Government. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by

paragraph 6(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall hold such funds in trust. At such time as the Owners shall have lost control and/or possession of the project, all funds held in trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

(h) ~~If the mortgage is insured under Section 232:~~
   ~~(1) The Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as a nursing home and shall not lease all or part of the project except on terms approved by the Secretary.~~

   ~~(2) The Owners shall suitably equip the project for nursing home operations.~~

   ~~(3) The Owners shall execute a Security Agreement and Financing Statement (or other form of chattel lien) upon all items of equipment, except as the Secretary may exempt, which are not incorporated as security for the insured mortgage. The Security Agreement and Financing Statement shall constitute a first lien upon such equipment and shall run in favor of the mortgagee as additional security for the insured mortgage.~~

   (i) ~~If the mortgage is insured under Section 231, Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as housing for the elderly.~~

**See Rider Paragraphs F, G and H.**

10. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, religion or creed, sex, or national origin, including Title VIII of the Civil Rights Act of 1968 (Public Law 90-284; 82 Stat. 73), as amended, Executive Order 11063, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities (including 24 CFR Parts 100, 107 and 110, and Subparts I and M of Part 200).

11. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the

Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:

(a)  (i) If the Secretary holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

   (ii) If said note is not held by the Secretary - notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the Owners' obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project.

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with the terms of this Agreement and in compliance with the requirements of the note and mortgage.

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

**See Rider Paragraph I.**

12. As security for the payment due under this Agreement to the reserve fund for replacements, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however, to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to

collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

13. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage", "Security Instrument", and any other security for the note identified herein, and endorsed for insurance or held by the Secretary;

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Owners" refers to the persons named in the first paragraph hereof and designated as Owners, their successors, heirs and assigns;

(d) "Mortgaged Property" includes all property, real, personal or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

(e) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business is providing ~~housing~~ **assisted living facility services** and other activities as are incidental thereto;

(f) "Surplus Cash" means any cash remaining after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

(ii) All amounts required to be deposited in the reserve fund for replacements;

(iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

(2) the segregation of:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project; and

(ii) All tenant security deposits held.

(g) "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 6(e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

(h) "Default" means a default declared by the Secretary when a violation of this Agreement is not corrected to his satisfaction within the time allowed by this Agreement or such further time as may be allowed by the Secretary after written notice;

(i) "Section" refers to a Section of the National Housing Act, as amended.

(j) "Displaced persons or families" shall mean a family or families, or a person, displaced from an urban renewal area, or as the result of government action, or as a result of a major disaster as determined by the President pursuant to the Disaster Relief Act of 1970.

(k) "Elderly person" means any person, married or single, who is sixty-two years of age or over.

**See Rider Paragraph J.**

14. This instrument shall bind, and the benefits shall inure to, the respective Owners, their heirs, legal representatives, executors, administrators, successors in office or interest, and assigns, and to the Secretary and his successors so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage.

15. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

16. The invalidity of any clause, part or provisions of this Agreement shall not affect the validity ~~or~~ of the remaining portions thereof.

17. The following Owners:    **Saucon Trust, u/t/a dated October 1, 2007, its trustees, present and future**

do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated; namely:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

**(To be executed with formalities for recording a deed to real estate.)**

[COUNTERPART SIGNATURE PAGE TO REGULATORY AGREEMENT FOR
MULTIFAMILY HOUSING PROJECTS]

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date first set forth above.

> SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007,
> a trust formed under the laws of Pennsylvania
>
> By:  SAUCON MANAGEMENT LLC,
>      a Pennsylvania limited liability company,
>      Trustee
>
>      By: _____
>      Name: Abraham R. Atiyeh
>      Title: Manager

STATE OF PENNSYLVANIA              )
                                   ) ss:
COUNTY OF _Le high_                )

On this _6th_ day of December, 2012, before me, _Randi Lamb_, a Notary Public in and for said County and State, duly commissioned and sworn, personally appeared Abraham R. Atiyeh, known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity on behalf of which the person acted, executed the instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this Certificate first above written.

_____
Notary Public in and for said County and State

My commission expires _11·15·2016_.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Randi Lamb, Notary Public
City of Allentown, Lehigh County
My Commission Expires Nov. 15, 2016
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

**[COUNTERPART SIGNATURE PAGE TO REGULATORY AGREEMENT FOR MULTIFAMILY HOUSING PROJECTS]**

**IN WITNESS WHEREOF,** the undersigned has executed this Agreement as of the date first set forth above.

Secretary of Housing and Urban Development, acting by and through the **Federal Housing Commissioner**

By: _____

Catherine A. Worley
Authorized Agent
Office of Residential Care Facilities

**ACKNOWLEDGEMENT**

STATE OF WASHINGTON          )
                             ) ss:
COUNTY OF KING               )

I certify that I know or have satisfactory evidence that <u>Catherine A. Worley</u> is the person who appeared before me, on this ___ day of December, 2012 and said person acknowledged that she signed this instrument, on oath stated that she was authorized to execute the instrument and acknowledged it as the Authorized Agent of the Secretary of U.S. Department of Housing and Urban Development, acting by and through the Federal Housing Commissioner, and the Director of the Production Division in the Office of Residential Care Facilities, U.S. Department of Housing and Urban Development, and that she, being authorized to do so by virtue of such office, executed the foregoing instrument on behalf of the Federal Housing Commissioner, acting for the Secretary of the U.S. Department of Housing and Urban Development, to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal.

[SEAL]

_____
Notary Public

(Print Name) _____

Residing at _____

_____
Title (and rank)

My commission expires: _____

LEAN Rider
to Regulatory Agreement for
Multifamily Housing Projects

This Rider is attached to and made a part of that certain Regulatory Agreement for Multifamily Housing Projects dated **December 1**, 20**12** (the "Agreement") by and between **Saucon Trust, u/t/a dated October 1, 2007** ("Owners") and the Secretary of Housing and Urban Development (the "Secretary") with respect to **Saucon Valley Manor**, FHA Project No. **034-22096**. In the event of any conflict between any provision of this Rider and any other provision of the Agreement, the provision of this Rider shall be controlling. The Agreement is hereby amended and supplemented as follows:

A.    Reserve Fund for Replacements. The following is hereby added to the end of the first subparagraph of paragraph 2(a) of the Agreement:

> The amount of the monthly deposits to the reserve fund for replacements shall be subject to change in accordance with the requirements of the Secretary, but such change can be accomplished by a letter from HUD to the Owner and will not necessitate an amendment to the Agreement. In connection therewith, every ten (10) years, the mortgagee shall obtain a physical and capital needs assessment report for the Secretary to evaluate. The cost of such report may be paid from the reserve fund for replacements.

> In addition to the required monthly deposits to the said reserve fund, Owners shall make an initial deposit in an amount not less than $**245,000.00**.

B.    Certain Matters Requiring Approval of the Secretary.

(1)    Paragraph 6(c) of the Agreement is hereby amended to read as follows:

(c) Convey, assign, or transfer any right to manage or receive the rents and profits from the mortgaged property.

(2)    The following is hereby added to the end of paragraph 6 of the Agreement:

(i)    Permit any conveyance, assignment, or transfer of any direct or indirect legal or beneficial interest in the Owners that requires approval of the Secretary under (i) the Secretary's transfer of physical assets requirements and procedures or (ii) the Secretary's previous participation approval requirements and procedures.

(j)    Enter into, or agree to the assignment of, any operating or commercial lease for all or part of the mortgaged property. As a condition of the Secretary's approval of any operating lease or any assignment thereof, the lessee or assignee, as applicable, shall execute a regulatory agreement in form and substance satisfactory to the Secretary.

(k)    Enter into any amendment of any operating or commercial lease of all or any part of the mortgaged property that (i) reduces the rent or other payments due thereunder, (ii) increases the obligations of the Owners or the rights of the lessee, (iii) decreases the rights of the Owners or the obligations of the lessee, or (iv) alters any provision of such lease required by the Secretary to be included therein.

(l)    Use the mortgaged property for any purpose other than the Approved Use.

C.    Management Contracts. Paragraph 9(a) of the Agreement is hereby deleted in its entirety and the following is substituted in lieu thereof:

(a)    Any management contract involving the project entered into by any of the Owners or any lessee shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request Owners shall immediately arrange to terminate such management contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project. In addition to the foregoing, in the event that a management agent is

R-1

(or will be) the holder of the project's license or is (or will be) the payee under one or more third-party payor agreements with respect to the project, the provisions of paragraphs 6(j) and 6(k) of this Agreement shall be applicable to such management agreement as and to the same extent as if such management agreement were an operating lease.

D.    Financial Statements.  Paragraph 9(e) of the Agreement is hereby amended to replace "sixty (60) days" with "ninety (90) days."

E.    Confidentiality of Resident/Patient Medical Records and Information.  Paragraph 9(c) of the Agreement is hereby amended to add the following at its end:

(c)    . . . The obligations of Owners under this paragraph shall be limited to the extent necessary in order for Owners to comply with applicable laws regarding the confidentiality of resident/patient medical records and information.

F.    Permits and Approvals.  Paragraph 9(h) of the Agreement is hereby deleted in its entirety and the following is substituted in lieu therefor:

(h)(1)    The Owners shall at all times maintain in full force and effect, or cause the lessee or management agent (as applicable) to maintain in full force and effect, all certificates of need, bed authority, provider agreements, licenses, permits and approvals required to operate the project for the Approved Use (collectively, the "Permits and Approvals").  Without the prior written consent of the Secretary, none of the Permits or Approvals shall be conveyed, assigned, encumbered, transferred or alienated from the project.  The Owners shall ensure that the project is at all times operated in accordance with the requirements of the Permits and Approvals.

(2)    The security agreement and UCC financing statements referred to in paragraph 9(i) below shall constitute, to the extent permitted by law, a first lien upon all of the Owners' rights, titles and interest, if any, in the Permits and Approvals.  However, in the event of either a monetary or other default under this agreement, the note, or the mortgage, the Owners shall cooperate in any legal and lawful manner necessary or required to permit the continued operation of the project for the Approved Use.  For the intents and purposes herein, Owners hereby irrevocably nominate and appoint the Secretary, his/her successors and assigns, as their attorney-in-fact coupled with an interest to do all things necessary to continue to operate the project for the Approved Use including but not limited to the power and authority to provide any and all information and data, pay such fees as may be required, and execute and sign in the name of the Owners, their successors or assigns, any and all documents, to the extent that such information, data, fees and documents may be required by any governmental entity exercising jurisdiction over the project.

(3)    The Owners shall not alter, or suffer or permit the alteration of, any Permit or Approval, without the prior written approval of the Secretary.  In the event that any such alteration is proposed, upon learning of such proposed alteration, the Owners will advise the Secretary and mortgagee promptly.  The Owners will insert the foregoing requirements into any operating lease for the project.

(4)    The Owners shall deliver to the Secretary and the mortgagee, within ten (10) days after receipt thereof, copies of any and all notices, reports, surveys and other correspondence (regardless of form) received by the Owners from any governmental authority that includes any statement, finding or assertion that (i) the Owners, any lessee, any management agent or the project is or may be in violation of (or default under) any of the Permits or Approvals or any governmental requirements applicable thereto, (ii) any of the Permits or Approvals are to be terminated or not renewed or (iii) the Owners are, or any lessee, any management agent or the project is, subject to any governmental investigation or inquiry involving fraud.  The Owners shall deliver to the Secretary and the mortgagee, simultaneously with delivery thereof to any governmental authority, any and all responses given by or on behalf of the Owners to such governmental authority and shall provide to the Secretary and the mortgagee, promptly upon request, such information regarding any of the foregoing as the Secretary or the mortgagee may request.  The receipt by the

R-2

App.521

Secretary or the mortgagee of notices, reports, surveys, correspondence and other information shall not in any way impose any obligation or liability on the Secretary, the mortgagee or their respective agents, representatives or designees to take (or refrain from taking) any action, and the Secretary, the mortgagee and their respective agents, representatives and designees shall have no liability for any action or failure to act thereon or as a result thereof.

G.    Personal Property; Security Interests. The following is hereby added to the Agreement as paragraph 9(i):

(i)    The Owners shall suitably equip, or cause to be equipped, the project for its use and operation for the Approved Use. Except as otherwise approved in writing by the Secretary, the Owners shall grant to the mortgagee and the Secretary a first lien security interest in all personal property of the Owners as additional security for the obligations of the Owners under the note, mortgage and this agreement. Such security interest shall be evidenced by such security agreements as the mortgagee and/or the Secretary may require and, in connection therewith, the Owners shall execute and deliver such deposit account control agreements as may be required by the mortgagee and/or the Secretary. Owners hereby authorize each of the mortgagee and the Secretary to file such UCC financing statements and continuation statements as either of them may deem to be necessary or appropriate in connection with the foregoing security interest. The Owners shall not be permitted to grant any other liens on any of such personal property without the prior written approval of the mortgagee and the Secretary. If the project includes a skilled nursing home and is not subject to an operating lease, the Owners shall be permitted to pledge their accounts receivable to an accounts receivable lender in a manner approved by the mortgagee and the Secretary. In the event that the mortgagee and the Secretary grant such approval, (i) the holder(s) of such lien shall enter into an intercreditor agreement and a rider thereto with the mortgagee or the Secretary, or both, on such terms and conditions as may be required by the mortgagee and the Secretary and (ii) the Owners shall comply with any requirements imposed on them by the mortgagee or the Secretary (or either of them) in connection therewith.

H.    Professional Liability Insurance. The following is hereby added to the Agreement as paragraph 9(j):

(j)    The Owners shall maintain, or cause the lessee or management agent (as applicable) to maintain, professional liability insurance that complies with the applicable requirements of the Secretary. Annually, the Owners shall provide, or cause the lessee or management agent (as applicable) to provide, to the Secretary and mortgagee, a certification of compliance with the Secretary's professional liability insurance requirements as evidenced by an Accord or certified copy of the insurance policy.

I.    Notices. Notices sent pursuant to Paragraph 11 of the Agreement may be sent by registered or certified mail, hand delivery or by a nationally recognized overnight delivery service.

J.    Defined Terms. The following definitions are hereby added to paragraph 13 of the Agreement:

(l)    "rent," "profits" and "income" shall include: all healthcare insurance receivables, rents, lease payments, revenues, charges, fees and assistance payments arising from the operation of the project, including but not limited to workers' compensation, social security and other third-party reimbursement payments, Accounts Receivable (as defined in the Collateral Description for the Security Agreement and UCC-1 Financing Statement for the Mortgagor) and all payments and income arising from the operation of the project and/or the provision of services to residents or tenants thereof.

(m)    "Approved Use" means the use of the project as a **250-bed assisted living facility** and such other uses as may be approved in writing from time to time by the Secretary based upon a request made by the Owners, lessee or management agent, but excluding any uses that are discontinued with the written approval of the Secretary.

**[To be executed and notarized by the Owners in the same manner as the Regulatory Agreement]**

R-3

[SIGNATURE PAGE TO LEAN RIDER TO REGULATORY AGREEMENT FOR
MULTIFAMILY HOUSING PROJECTS]

IN WITNESS WHEREOF, the undersigned has executed this Rider as of the date first set forth above.

SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007,
a trust formed under the laws of Pennsylvania

By:  SAUCON MANAGEMENT LLC,
a Pennsylvania limited liability company,
Trustee

By: _____
Name: Abraham R. Atiyeh
Title: Manager

STATE OF PENNSYLVANIA                    )
                                         ) ss:
COUNTY OF _Lehigh_____                 )

On this _6th_ day of December, 2012, before me, _Randi Lamb_____, a Notary Public in and for said County and State, duly commissioned and sworn, personally appeared Abraham R. Atiyeh, known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity on behalf of which the person acted, executed the instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this Certificate first above written.

_____
Notary Public in and for said County and State

My commission expires _11·16·2016_ .

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Randi Lamb, Notary Public
City of Allentown, Lehigh County
My Commission Expires Nov. 15, 2016
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

## EXHIBIT A

### LEGAL DESCRIPTION

UNIT I of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715
Being more fully bounded as set forth on attached page

## DESCRIPTION OF 1050 MAIN STREET

ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 20065 Page 759, bounded and described as follows to wit:

BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

1.    South 86'47'33" West 266.09 feet; thence-in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;

2.    North 03' 14'23" West 59.03 feet;

3.    North 86' 41'33" East 18.00 feet;

4.    North 03' 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same

5.    North 86' 48'59" East 247.48 feet to the westerly right of way line of Main Street; thence along the same

6.    South 03' 18'24" East 470.30 feet to the place of beginning.

CONTAINS:    117,610.588 Sq. Ft.    2.7000 Acres

12/05/2012 14917463 V.4

## DOCUMENT CERTIFICATION

The document attached hereto is certified to be a true and correct copy of the original of the following document:

### Regulatory Agreement

Between Whitehall Fiduciary, LLC as Trustee of Whitehall Trust
u/t/a dated August 1, 2007
and the Secretary of Housing and Urban Development

Dated as of January 19, 2012, to be effective January 26, 2012,
Recorded January 26, 2012,
As Instrument #: 2012002760 // At 8:52 a.m.
in the Office of the Recorder of Lehigh County
in the State of Pennsylvania


Commonwealth Land Title Insurance Company

By:    Omega Abstract Company

By: _Marianne L. Rice_____

Name printed: _Marianne L. Rice_____
Authorized Agent


01/22/2012 Cincinnati 732194

# EXHIBIT C

**Return to:**
Andrea K. Durham, Esq.
Attorney Advisor
U.S. Department of Housing and Urban Development
The Wanamaker Building
100 Penn Square East
Philadelphia, PA 19107-3380

PIN: **5498 9378 8632-1**

# Regulatory Agreement for Multifamily Housing Projects

**U.S. Department of Housing
And Urban Development**
Office of Housing
Federal Housing Commissioner

**Under Sections 207, 220, 221(d)(4), 231 and 232, Except Nonprofits**

| Project Number | Mortgagee |
|---|---|
| 034-22084 | **M&T Realty Capital Corporation** |

| Amount of Mortgage Note | Date |
|---|---|
| $15,788,700.00 | **as of January _26_, 2012** |

| Mortgage Recorded  State **Pennsylvania** | County **Lehigh** | Date | Originally endorsed for insurance under Section |
|---|---|---|---|
| ~~Book~~ | ~~Page~~ | **Contemporaneously herewith** | **232, pursuant to Sections 223(f) and 223(a)(7)** |

This Agreement, together with the LEAN Rider to Regulatory Agreement for Multifamily Housing Projects attached hereto and made a part hereof (the "Rider"), entered into ~~this~~ as of the _19th_ day of January, 2012, to be effective as of January_26_, 2012, between **WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITHALL TRUST u/t/a dated August 1, 2007, a Pennsylvania trust** whose address is **1177 Sixth Street, Whitehall, Pennsylvania 18052**

their successors, heirs, and assigns (jointly and severally, hereinafter referred to as Owners) and the undersigned Secretary of Housing and Urban Development and his successors (hereinafter referred to as Secretary).

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended, and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgaged property:

1.  Owners, except as limited by paragraph 17 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2.  (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the

mortgage insured or held by the Secretary of an amount equal to $**8,075.00** per month, unless a different date or amount is approved in writing by the Secretary.  **See Rider Paragraph A.**

Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at all times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary. In the event that the owner is unable to make a mortgage note payment on the due date and that payment cannot be made prior to the due day of the next such installment or when the mortgagee has agreed to forgo making an election to assign the mortgage to the Secretary based on a monetary default, or to withdraw an election already made, the Secretary is authorized to instruct the mortgagee to withdraw funds from the reserve fund for replacements to be applied to the mortgage payment in order to prevent or cure the default. In addition, in the event of a default in the terms of the mortgage, pursuant to which the loan has been accelerated, the Secretary may apply or

---

Replaces FHA-2466 which may be used until supply exhausted                Page 1 of 7                Form HUD-92466 (11/2002)
ref Handbook 4571.1

authorize the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

(b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maintaining the fund is approved in writing by the Secretary.

3. Real property covered by the mortgage and this agreement is described in ~~Schedule~~ **Exhibit** A attached hereto.

(This paragraph 4 is not applicable to cases insured under Section 232.)

4. (a) Owners shall make dwelling accommodation and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary, for any project subject to regulation of rent by the Secretary. Accommodations shall not be rented for a period of less than thirty (30) days, or, unless the mortgage is insured under Section 231, for more than three years. Commercial facilities shall be rented for such use and upon such terms as approved by the Secretary. Subleasing of dwelling accommodations, except for subleases of single dwelling accommodations by the tenant thereof, shall be prohibited without prior written approval of Owners and the Secretary and any lease shall so provide. Upon discovery of any unapproved sublease, Owners shall immediately demand cancellation and notify the Secretary thereof.

(b) Upon prior written approval by the Secretary, Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or services which may be furnished by the Owners or others to such tenant upon his request, in addition to the facilities and services included in the approved rental schedule. Approval of charges for facilities and services is not required for any project not subject to regulation of rent by the Secretary.

(c) For any project subject to regulation of rent by the Secretary, the Secretary will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

(i) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance cost over which Owners have no effective control or;

(ii) Deny the increase stating the reasons therefor.

5. (a) If the mortgage is originally a Secretary-held purchase money mortgage, or is originally endorsed for insurance under any Section other than Sections 231 or 232 and is not designed primarily for occupancy by elderly persons, Owners shall not in selecting tenants discriminate against any person or persons by reason of the fact that there are children in the family.

(b) If the mortgage is originally endorsed for insurance under Section 221, Owners shall in selecting tenants give to displaced persons or families an absolute preference or priority of occupancy which shall be accomplished as follows:

(1) For a period of sixty (60) days from the date of original offering, unless a shorter period of time is approved in writing by the Secretary, all units shall be held for such preferred applicants, after which time any remaining unrented units may be rented to non-preferred applicants;

(2) Thereafter, and on a continuing basis, such preferred applicants shall be given preference over nonpreferred applicants in their placement on a waiting list to be maintained by the Owners; and

(3) Through such further provisions agreed to in writing by the parties.

(c) Without the prior written approval of the Secretary not more than 25% of the number of units in a project insured under Section 231 shall be occupied by persons other than elderly persons.

(d) All advertising or efforts to rent a project insured under Section 231 shall reflect a bona fide effort of the Owners to obtain occupancy by elderly persons.

6. Owners shall not without the prior written approval of the Secretary:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer, or encumbrance of such property.

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c) ~~Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or the interest of any general partner in a partnership owning the property, or any right to manage or receive the rents and profits from the mortgaged property~~
**See Rider Paragraph B.**

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

(1) All distributions shall be made only as of and after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction;

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3) Any distribution of any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g) Require, as a condition of the occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h) Permit the use of the dwelling accommodations or nursing facilities of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

**See Rider Paragraph B.**

7. Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the mortgage.

8. Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof by a receiver or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power of

sale, and fail to have such adverse actions set aside within forty-five (45) days.

9. (a) ~~Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project~~ **See Rider Paragraph C.**

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or his duly authorized agents. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or his duly authorized agents. **See Rider Paragraph E.**

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e) Within sixty (60) days following the end of each fiscal year the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, prepared and certified to by an officer or responsible Owner and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary. **See Rider Paragraph D.**

(f) At request of the Secretary, his agents, employees, or attorneys, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to income, assets, liabilities, contracts, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a financial institution, whose deposits are insured by an agency of the Federal Government. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by paragraph 6(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall

immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall hold such funds in trust. At such time as the Owners shall have lost control and/or possession of the project, all funds held in trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

(h) ~~If the mortgage is insured under Section 232:~~
    ~~(1) The Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as a nursing home and shall not lease all or part of the project except on terms approved by the Secretary.~~

    ~~(2) The Owners shall suitably equip the project for nursing-home operations.~~

    ~~(3) The Owners shall execute a Security Agreement and Financing Statement (or other form of chattel lien) upon all items of equipment, except as the Secretary may exempt, which are not incorporated as security for the insured mortgage. The Security Agreement and Financing Statement shall constitute a first lien upon such equipment and shall run in favor of the mortgagee as additional security for the insured mortgage.~~

      (i) ~~If the mortgage is insured under Section 231, Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as housing for the elderly.~~

**See Rider Paragraphs F, G and H.**

10. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, religion or creed, sex, or national origin, including Title VIII of the Civil Rights Act of 1968 (Public Law 90-284; 82 Stat. 73), as amended, Executive Order 11063, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities (including 24 CFR Parts 100, 107 and 110, and Subparts I and M of Part 200).

11. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement

effective on the date of such declaration of default and upon such default the Secretary may:

(a)   (i) If the Secretary holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

    (ii) If said note is not held by the Secretary - notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the Owners' obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project.

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with the terms of this Agreement and in compliance with the requirements of the note and mortgage.

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

**See Rider Paragraph I.**

12. As security for the payment due under this Agreement to the reserve fund for replacements, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however, to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

13. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage", "Security Instrument", and any other security for the note identified herein, and endorsed for insurance or held by the Secretary;

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Owners" refers to the persons named in the first paragraph hereof and designated as Owners, their successors, heirs and assigns;

(d) "Mortgaged Property" includes all property, real, personal or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

(e) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business is providing housing and other activities as are incidental thereto;

(f) "Surplus Cash" means any cash remaining after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

(ii) All amounts required to be deposited in the reserve fund for replacements;

(iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

(2) the segregation of:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project; and

(ii) All tenant security deposits held.

(g) "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 6(e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

(h) "Default" means a default declared by the Secretary when a violation of this Agreement is not corrected to his satisfaction within the time allowed by this Agreement or such further time as may be allowed by the Secretary after written notice;

(i) "Section" refers to a Section of the National Housing Act, as amended.

(j) "Displaced persons or families" shall mean a family or families, or a person, displaced from an urban renewal area, or as the result of government action, or as a result of a major disaster as determined by the President pursuant to the Disaster Relief Act of 1970.

(k) "Elderly person" means any person, married or single, who is sixty-two years of age or over.

**See Rider Paragraph J.**

14. This instrument shall bind, and the benefits shall inure to, the respective Owners, their heirs, legal representatives, executors, administrators, successors in office or interest, and assigns, and to the Secretary and his successors so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage.

15. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

16. The invalidity of any clause, part or provisions of this Agreement shall not affect the validity or of the remaining portions thereof.

17. The following Owners: **Whitehall Trust, its trustees and beneficiaries, present and future**

do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated; namely:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

**(To be executed with formalities for recording a deed to real estate.)**

1/17/2012 - Cincinnati 759786.V2

**[COUNTERPART SIGNATURE PAGE TO REGULATORY AGREEMENT FOR MULTIFAMILY HOUSING PROJECTS]**

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date first set forth above.

WHITEHALL FIDUCIARY LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007

By: _____
　　　Abraham R. Atiyeh, Manager

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF LEHIGH

On this the 19th day of January, 2012, before me, the undersigned officer, personally appeared Abraham R. Atiyeh, who acknowledged himself to be a manager of the said Whitehall Fiduciary, LLC, the sole Trustee of Whitehall Trust, and that he as such manager, being authorized to do so, executed the foregoing instrument, for the purposes therein contained, by signing the name of the limited liability company by himself as such manager.

_____
Notary Public

Commonwealth of Pennsylvania
NOTARIAL SEAL
MARIANNE L. RICE, Notary Public
City of Allentown, Lehigh County
My Commission Expires Aug. 20, 2015

**[COUNTERPART SIGNATURE PAGE TO REGULATORY AGREEMENT FOR
MULTIFAMILY HOUSING PROJECTS]**

**IN WITNESS WHEREOF,** the undersigned has executed this Agreement as of the date first set forth above.

<div align="right">

**Secretary of Housing and Urban Development**, acting by and
through the **Federal Housing Commissioner**

By: _____

Roger A. Lewis
Authorized Agent
Office of Residential Care Facilities

</div>

**ACKNOWLEDGEMENT**

STATE OF WASHINGTON    )
                                              ) ss:
COUNTY OF KING            )

I certify that I know or have satisfactory evidence that <u>Roger A. Lewis</u> is the person who appeared before me, on this _____ day of <u>January, 2012</u> and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the Authorized Agent of the Secretary of U.S. Department of Housing and Urban Development, acting by and through the Federal Housing Commissioner, and the Acting Director of the Production Division in the Office of Residential Care Facilities, U.S. Department of Housing and Urban Development, and that he, being authorized to do so by virtue of such office, executed the foregoing instrument on behalf of the Federal Housing Commissioner, acting for the Secretary of the U.S. Department of Housing and Urban Development, to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal.

[SEAL]

_____
Notary Public

(Print Name) _____

Residing at _____

_____
Title (and rank)

My commission expires: _____04-19-15_____

Replaces FHA-2466 which may be used until supply exhausted          Page 7 of 7          Form **HUD-92466** (11/2002)
ref Handbook 4571.1

LEAN Rider
to Regulatory Agreement for
Multifamily Housing Projects

This Rider is attached to and made a part of that certain Regulatory Agreement for Multifamily Housing Projects dated **as of January** 19, **2012, to be effective as of January** 26, **2012** (the "Agreement") by and between **WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITHALL TRUST u/t/a dated August 1, 2007** ("Owners") and the Secretary of Housing and Urban Development (the "Secretary") with respect to **Whitehall Manor Senior Living, FHA Project No. 034-22084**. In the event of any conflict between any provision of this Rider and any other provision of the Agreement, the provision of this Rider shall be controlling. The Agreement is hereby amended and supplemented as follows:

A.    Reserve Fund for Replacements. The following is hereby added to the end of the first subparagraph of paragraph 2(a) of the Agreement:

> The amount of the monthly deposits to the reserve fund for replacements shall be subject to change in accordance with the requirements of the Secretary, but such change can be accomplished by a letter from HUD to the Owner and will not necessitate an amendment to the Agreement. In connection therewith, every ten (10) years, the mortgagee shall obtain a physical and capital needs assessment report for the Secretary to evaluate, **the first such report to be obtained on or before October 1, 2018**. The cost of such report may be paid from the reserve fund for replacements.

> In addition to the required monthly deposits to the said reserve fund, the balance in the replacement reserve fund existing with respect to the project under FHA Project No. **034-22020** shall be transferred to the replacement reserve fund to be established pursuant to this Agreement under FHA Project No. **034-22084.**

B.    Certain Matters Requiring Approval of the Secretary.

(1)    Paragraph 6(c) of the Agreement is hereby amended to read as follows:

> (c) Convey, assign, or transfer any right to manage or receive the rents and profits from the mortgaged property.

(2)    The following is hereby added to the end of paragraph 6 of the Agreement:

(i)    Permit any conveyance, assignment, or transfer of any direct or indirect legal or beneficial interest in the Owners that requires approval of the Secretary under (i) the Secretary's transfer of physical assets requirements and procedures or (ii) the Secretary's previous participation approval requirements and procedures.

(j)    Enter into, or agree to the assignment of, any operating or commercial lease for all or part of the mortgaged property. As a condition of the Secretary's approval of any operating lease or any assignment thereof, the lessee or assignee, as applicable, shall execute a regulatory agreement in form and substance satisfactory to the Secretary.

(k)    Enter into any amendment of any operating or commercial lease of all or any part of the mortgaged property that (i) reduces the rent or other payments due thereunder, (ii) increases the obligations of the Owners or the rights of the lessee, (iii) decreases the rights of the Owners or the obligations of the lessee, or (iv)

R-1

alters any provision of such lease required by the Secretary to be included therein.

    (l)    Use the mortgaged property for any purpose other than the Approved Use.

C.    <u>Management Contracts</u>.  Paragraph 9(a) of the Agreement is hereby deleted in its entirety and the following is substituted in lieu thereof:

    (a)    Any management contract involving the project entered into by any of the Owners or any lessee shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request Owners shall immediately arrange to terminate such management contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project. In addition to the foregoing, in the event that a management agent is (or will be) the holder of the project's license or is (or will be) the payee under one or more third-party payor agreements with respect to the project, the provisions of paragraphs 6(j) and 6(k) of this Agreement shall be applicable to such management agreement as and to the same extent as if such management agreement were an operating lease.

D.    <u>Financial Statements</u>.  Paragraph 9(e) of the Agreement is hereby amended to replace "sixty (60) days" with "ninety (90) days."

E.    <u>Confidentiality of Resident/Patient Medical Records and Information</u>.  Paragraph 9(c) of the Agreement is hereby amended to add the following at its end:

    (c)    . . . The obligations of Owners under this paragraph shall be limited to the extent necessary in order for Owners to comply with applicable laws regarding the confidentiality of resident/patient medical records and information.

F.    <u>Permits and Approvals</u>.  Paragraph 9(h) of the Agreement is hereby deleted in its entirety and the following is substituted in lieu therefor:

    (h)(1)    The Owners shall at all times maintain in full force and effect, or cause the lessee or management agent (as applicable) to maintain in full force and effect, all certificates of need, bed authority, provider agreements, licenses, permits and approvals required to operate the project for the Approved Use (collectively, the "Permits and Approvals"). Without the prior written consent of the Secretary, none of the Permits or Approvals shall be conveyed, assigned, encumbered, transferred or alienated from the project. The Owners shall ensure that the project is at all times operated in accordance with the requirements of the Permits and Approvals.

    (2)    The security agreement and UCC financing statements referred to in paragraph 9(i) below shall constitute, to the extent permitted by law, a first lien upon all of the Owners' rights, titles and interest, if any, in the Permits and Approvals. However, in the event of either a monetary or other default under this agreement, the note, or the mortgage, the Owners shall cooperate in any legal and lawful manner necessary or required to permit the continued operation of the project for the Approved Use. For the intents and purposes herein, Owners hereby irrevocably nominate and appoint the Secretary, his/her successors and assigns, as their attorney-in-fact coupled with an interest to do all things necessary to continue to operate the project for the Approved Use including but not limited to the power and authority to provide any and all information and data, pay such fees as may be

R-2

required, and execute and sign in the name of the Owners, their successors or assigns, any and all documents, to the extent that such information, data, fees and documents may be required by any governmental entity exercising jurisdiction over the project.

(3)     The Owners shall not alter, or suffer or permit the alteration of, any Permit or Approval, without the prior written approval of the Secretary. In the event that any such alteration is proposed, upon learning of such proposed alteration, the Owners will advise the Secretary and mortgagee promptly. The Owners will insert the foregoing requirements into any operating lease for the project.

(4)     The Owners shall deliver to the Secretary and the mortgagee, within ten (10) days after receipt thereof, copies of any and all notices, reports, surveys and other correspondence (regardless of form) received by the Owners from any governmental authority that includes any statement, finding or assertion that (i) the Owners, any lessee, any management agent or the project is or may be in violation of (or default under) any of the Permits or Approvals or any governmental requirements applicable thereto, (ii) any of the Permits or Approvals are to be terminated or not renewed or (iii) the Owners are, or any lessee, any management agent or the project is, subject to any governmental investigation or inquiry involving fraud. The Owners shall deliver to the Secretary and the mortgagee, simultaneously with delivery thereof to any governmental authority, any and all responses given by or on behalf of the Owners to such governmental authority and shall provide to the Secretary and the mortgagee, promptly upon request, such information regarding any of the foregoing as the Secretary or the mortgagee may request. The receipt by the Secretary or the mortgagee of notices, reports, surveys, correspondence and other information shall not in any way impose any obligation or liability on the Secretary, the mortgagee or their respective agents, representatives or designees to take (or refrain from taking) any action, and the Secretary, the mortgagee and their respective agents, representatives and designees shall have no liability for any action or failure to act thereon or as a result thereof.

G.     <u>Personal Property; Security Interests</u>. The following is hereby added to the Agreement as paragraph 9(i):

(i)     The Owners shall suitably equip, or cause to be equipped, the project for its use and operation for the Approved Use. Except as otherwise approved in writing by the Secretary, the Owners shall grant to the mortgagee and the Secretary a first lien security interest in all personal property of the Owners as additional security for the obligations of the Owners under the note, mortgage and this agreement. Such security interest shall be evidenced by such security agreements as the mortgagee and/or the Secretary may require and, in connection therewith, the Owners shall execute and deliver such deposit account control agreements as may be required by the mortgagee and/or the Secretary. Owners hereby authorize each of the mortgagee and the Secretary to file such UCC financing statements and continuation statements as either of them may deem to be necessary or appropriate in connection with the foregoing security interest. The Owners shall not be permitted to grant any other liens on any of such personal property without the prior written approval of the mortgagee and the Secretary. If the project includes a skilled nursing home and is not subject to an operating lease, the Owners shall be permitted to pledge their accounts receivable to an accounts receivable lender in a manner approved by the mortgagee and the Secretary. In the event that the mortgagee and the Secretary grant such approval, (i) the holder(s) of such lien shall enter into an intercreditor agreement and a rider thereto with the mortgagee or the Secretary, or both, on such terms and conditions as may be required by the mortgagee and the Secretary and (ii) the

R-3

Owners shall comply with any requirements imposed on them by the mortgagee or the Secretary (or either of them) in connection therewith.

H.    <u>Professional Liability Insurance</u>. The following is hereby added to the Agreement as paragraph 9(j):

(j)    The Owners shall maintain, or cause the lessee or management agent (as applicable) to maintain, professional liability insurance that complies with the applicable requirements of the Secretary. Annually, the Owners shall provide, or cause the lessee or management agent (as applicable) to provide, to the Secretary and mortgagee, a certification of compliance with the Secretary's professional liability insurance requirements as evidenced by an Accord or certified copy of the insurance policy.

I.    <u>Notices</u>. Notices sent pursuant to Paragraph 11 of the Agreement may be sent by registered or certified mail, hand delivery or by a nationally recognized overnight delivery service.

J.    <u>Defined Terms</u>. The following definitions are hereby added to paragraph 13 of the Agreement:

(l)    "rent," "profits" and "income" shall include: all healthcare insurance receivables, rents, lease payments, revenues, charges, fees and assistance payments arising from the operation of the project, including but not limited to workers' compensation, social security and other third-party reimbursement payments, Accounts Receivable (as defined in the Collateral Description for the Security Agreement and UCC-1 Financing Statement for the Mortgagor) and all payments and income arising from the operation of the project and/or the provision of services to residents or tenants thereof.

(m)    "Approved Use" means the use of the project as a **215-bed assisted living facility** and such other uses as may be approved in writing from time to time by the Secretary based upon a request made by the Owners, lessee or management agent, but excluding any uses that are discontinued with the written approval of the Secretary.

**[To be executed and notarized by the Owners in the same manner as the Regulatory Agreement]**

R-4

[SIGNATURE PAGE TO LEAN RIDER TO REGULATORY AGREEMENT FOR
MULTIFAMILY HOUSING PROJECTS]

IN WITNESS WHEREOF, the undersigned has executed this Rider as of the date first set forth above.

WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007

By: _____
Abraham R. Atiyeh, Manager

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF LEHIGH

On this the 9th day of January, 2012, before me, the undersigned officer, personally appeared Abraham R. Atiyeh, who acknowledged himself to be a manager of the said Whitehall Fiduciary, LLC, the sole Trustee of Whitehall Trust, and that he as such manager, being authorized to do so, executed the foregoing instrument, for the purposes therein contained, by signing the name of the limited liability company by himself as such manager.

_____
Notary Public

Commonwealth of Pennsylvania
NOTARIAL SEAL
MARIANNE L. RICE, Notary Public
City of Allentown, Lehigh County
My Commission Expires Aug. 20, 2015

R-5

## Exhibit A

UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.

PARCEL ID NO.  5498 9378 8632-1

Together with an undivided interest of 50% of, in and to the Common Elements of the said WHITEHALL MANOR CONDOMINIUM.

R-6

12/20/2011 12696899

# EXHIBIT D

#125455447v1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEHIGH VALLEY 1 LLC, successor by assignment to WINDSTREAM CAPITAL LLC, successor by assignment to the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, successor by assignment to M&T REALTY CAPITAL CORPORATION** | : : : : : : : : | **CIVIL ACTION**<br><br>**NO.  24-2627** |
| **v.** | : : | |
| **WHITEHALL FIDUCIARY LLC, as TRUSTEE OF WHITEHALL TRUST U/T/A DATED AUGUST 1, 2027** | : : : | |

| | | |
|---|---|---|
| **LEHIGH VALLEY 1, LLC, successor by assignment to WINDSTREAM CAPITAL LLC, successor by assignment to the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, successor by assignment to M&T REALTY CAPITAL CORPORATION** | : : : : : : : : | **CIVIL ACTION**<br><br>**NO. 24-2709** |
| **v.** | : : | |
| **SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007** | : : | |

## <u>ORDER</u>

**AND NOW**, this 2nd day of May 2025, upon consideration of Plaintiff's Motion for Appointment of a Receiver (Docket No. 8 (24-2627) and Docket No. 17 (24-2709)), Defendants' opposition thereto, as well as all replies and sur-replies, and after oral argument being held, it is hereby **ORDERED** that Plaintiff's Motions are **GRANTED**. It is further **ORDERED** as follows:

### I.     APPOINTMENT OF THE RECEIVER

1.     Duane Morris LLP through Erin Duffy, Esq. is appointed as Receiver with the usual powers and  directions for the benefit of the Plaintiff of all the rents and profits now due and unpaid or to become due during the pendency of this mortgage foreclosure action, effective

App.541

immediately for all real and personal, tangible and intangible property (including, without limitation, all structures, leases, fixtures and moveable personal property, in addition to all of the property set forth in paragraph 6(a) hereof) owned by Whitehall Fiduciary LLC, as Trustee of Whitehall Trust U/T/A Dated August 1, 2007 ("Whitehall") at 1177 6th Street, Whitehall, PA  and Saucon Trust U/T/A Dated October 1, 2007 ("Saucon") at 1050 Main Street, Unit # 1, Hellertown, PA (collectively the "Properties"); with respect to income of any kind; and with respect to any and all other property and property interests pledged or assigned to Plaintiff under the Loan Documents, as defined in the Complaints.

## II.    TERM OF THE RECEIVER

2.    The Receiver shall serve as the receiver for the Properties for a period which shall commence on the date of this Order and shall continue, notwithstanding the entry of judgment in favor of Lehigh Valley 1 LLC (by consent or otherwise), subject to the terms of paragraph 3 below, until the earliest to occur of: (i) the termination of such appointment by a subsequent Order of Court; (ii) Lehigh Valley 1 LLC's (or its nominee's, designee's or assignee's) acquisition of title to the Leasehold Estate through the delivery to Lehigh Valley 1 LLC (or its nominee, designee or assignee) of a sheriff's assignment or by assignment in lieu of foreclosure; or (iii) full payment of all sums due and owing under the "Loan Documents" (as defined in Plaintiff's Complaints).

3.    Notwithstanding the terms of paragraph 2, at Lehigh Valley 1 LLC's request, and upon Court approval, following the occurrence of the events described in part (iii) of paragraph 2, the Receiver shall continue the receivership for such reasonable period as may be necessary to wind up the receivership.

4.    The receivership may be terminated at any time by Lehigh Valley 1 LLC filing with the Court and serving upon the Receiver, Whitehall, and Saucon a Notice of Request to Terminate Appointment of the Receiver (a "Termination Request").

5.      Within 30 days after the termination of the receivership, the Receiver shall file with the Court and serve upon Lehigh Valley 1 LLC, Whitehall and Saucon its final report and accounting for the receivership, and the Receiver or Lehigh Valley 1 LLC may request that the Court enter an Order approving such final report and accounting and discharging the Receiver from its duties under this Order.

### III.     POWERS AND DUTIES OF THE RECEIVER

6.      The Receiver shall have all necessary powers to manage the rents and profits of the Property, including the following powers:

(a)      To enter and take immediate possession of the Property, and to demand, collect and receive the rents, income, revenues, proceeds and profits derived from tenants at the Property, their sublessees or any occupants in possession, including maintenance fees, management fees, special assessments and/or other charges relating to the Property, which are now due and unpaid or which may become due hereafter (collectively, the "Rents"), and all personal property owned or utilized by Lehigh Valley 1 LLC that relates to the management or operation of the Property, including all books, records, bank accounts, reserve accounts, cash on hand, keys, and combinations for locks or other access information in the possession of or reasonably available to Whitehall, Saucon or their property managers (collectively, the "Receivership Properties");

(b)      To access and use office equipment at the Properties used by Whitehall, Saucon or their property managers, including computer equipment, software programs and passwords;

(c)      To take all actions necessary to preserve, maintain, operate, and manage the Property. The Receiver must obtain Lehigh Valley 1 LLC's prior written consent before any such expenditures are made;

(d)      To employ counsel and, with the consent of Lehigh Valley 1 LLC, accountants or other professionals, contractors and support personnel and other persons necessary

in order to carry out its duties as the Receiver and to preserve, maintain and operate the Property, and to compensate such persons at competitive rates, without further Order of this Court, at their respective hourly rates, plus reimbursement of all reasonable and necessary out-of- pocket expenses;

(e)    To commence, prosecute, continue or defend actions at law or in equity (in its own name or in the names of Whitehall or Saucon) that the Receiver deems necessary to protect or preserve the Property, to recover possession of the Property, to collect the rents, or to evict or eject any tenants or occupants in accordance with applicable state laws;

(f)    To continue in effect, modify or terminate (if and to the extent terminable without penalty or premium unless such termination penalty or premium shall be paid by the Receiver) agreements, contracts, understandings or commitments entered into by Whitehall or Saucon with respect to the Properties, to the extent permitted by applicable law, and to make additional agreements and contracts reasonably necessary for the operation and preservation of the Properties;

(g)    To retain a reputable management company (including, but not limited to, an affiliate of the Receiver), maintenance personnel, broker, leasing agent and/or marketing agent to operate and manage the Properties, and to market the Properties for rent, without further order of this Court, but with the consent of Lehigh Valley 1 LLC, and at competitive rates plus reimbursement of its reasonable and necessary out-of-pocket expenses;

(h)    To pay all past-due and current insurance premiums, taxes, assessments, sewer and utility charges levied against the Properties, and (with the consent of Lehigh Valley 1 LLC) to purchase merchandise, construction and other materials, supplies and services as the Receiver deems necessary and advisable to assist the Receiver in performing its duties and to pay the ordinary and usual rates and prices;

(i)    To open and utilize any new bank accounts as the Receiver deems necessary

4

App.544

or desirable in connection, and the Receiver is authorized, empowered and directed to use Whitehall's and/or Saucon's tax identification number in connection with the revenue and expenses with respect to the Properties;

(j)    To make, enter into, enforce, terminate, modify or accept a surrender of any of the Leases (as defined in the Mortgage); to obtain and evict occupants (subject to applicable laws and regulations); to bring or defend any suits in connection with the Leases or Rents in its own name or in the name of Whitehall or Saucon; to compromise any Rents or other payments, income or proceeds that may become due; and to sue for or otherwise collect and receive all Rents, including those past due and unpaid. Rents and Leases shall be turned over to Receiver and the Defendant shall be enjoined and restrained from collecting the Rents and Leases of the Properties or interfering with Receiver's ability to collect said Rents and Leases. Tenants, **occupants, and licensees** of the Properties are enjoined from paying any rent or lease payment to the Defendant, its agents, servants or attorneys, and if they do so, they may be held liable to Receiver and Plaintiff for these sums;

(k)    To present for payment any checks, money orders or other forms of payment made payable to Whitehall, Saucon, their property managers, or any other agent, assignee or nominee of Whitehall or Saucon, which constitute Rents, endorse and collect the proceeds, to be used and maintained as elsewhere provided;

(l)    To keep the Properties insured (whether by the existing insurance coverages or new coverages), each of which insurance policy shall name the Receiver and Lehigh Valley 1 LLC as additional insureds, if permitted by the insurer, and shall comply, at a minimum, with the terms of the Loan Documents;

(m)    As Receiver, to use for any such purpose any funds of Whitehall or Saucon, including the Rents;

5

App.545

(n)    To notify all local, state and federal government agencies, all vendors and suppliers, and any and all others who provide goods and services to the Properties of its appointment as the Receiver;

(o)    Receiver is authorized to apply income from the Properties, subject to the lien rights of Lehigh Valley 1 LLC, as follows and in the following order to the extent funds are available: first, to pay Receiver's approved fees and expenses which include the Receiver's attorneys' fees related to the receivership; second, to pay all operating expenses with respect to the Properties (other than the obligations owed to Plaintiff under the Loan Documents); third, to pay all capital obligations with respect to the Properties; fourth, to fund reasonable reserves for anticipated operating expenses and capital obligations with respect to the Properties; and lastly, to pay the obligations owed to Plaintiff under the Loan Documents;

(p)    To take any and all steps necessary to receive, collect and review all mail or other parcels relating to the Properties addressed to Whitehall, Saucon and/or their property managers, including, but not limited to, mail or other parcels addressed to any post office boxes held in the name of Whitehall, Saucon, their property managers, or any other agent, assignee or nominee of Whitehall or Saucon, and to instruct the U.S. Postmaster and any other mail or parcel carrier or service to re-route, hold, and/or release said mail or other parcels to the Receiver; provided that any mail and other parcels addressed to Whitehall or Saucon that do not relate to the Properties and reviewed by the Receiver in the performance of its duties will be forwarded to Whitehall, Saucon or their property managers by the Receiver after its review;

(q)    With prior written consent and authorization from Lehigh Valley 1 LLC to delegate or assign any and all rights and powers of the Receiver set forth herein, in the reasonable discretion of the Receiver;

(r)    To apply to this Court for further direction and for such further powers as may be necessary to enable the Receiver to fulfill its duties;

6

App.546

(s)    To keep a true and accurate account of any and all receipts and expenditures for the Properties;

(t)    Receiver shall, within 30 days of qualification and appointment, provide Lehigh Valley 1 LLC, Whitehall and Saucon with an inventory of all property of which Receiver has taken possession. If Receiver subsequently comes into possession of additional property, Receiver will provide Lehigh Valley 1 LLC, Whitehall and Saucon with a supplemental inventory;

(u)    In addition to any financial, operating, and other reports and information required to be delivered pursuant to the Loan Documents, Receiver shall provide the following documents for the immediate preceding calendar month, which documents are believed by the Receiver as being true, correct, and complete as of the reporting date;

(i) a balance sheet, statement of income and expenses, statement of cash flows for the Properties and on a consolidated basis for all Properties;

(ii) a detailed rent roll for the Properties showing the occupancy of the respective Properties, name of each tenant, occupant, or customer and, for each tenant, occupant, or customer, the space occupied, the lease or occupancy commencement and expiration dates, the rent or fee payable, the rent or fee paid to date and the security deposit being held for such tenant, if any, and a leasing or rental activity report for the Properties each in detail reasonably satisfactory to Petitioner;

(iii) an aged payables report and an aged receivables report for the Properties;

(iv) a capital expenditure report for the Properties;

(v) all bank statements with monthly reconciliations; and

(vi) each of the above will be provided to Plaintiff on a monthly basis.

7

App.547

(v)    To pay all ordinary and reasonable costs associated with the Properties arising on or after the date of the Complaint, that were not invoiced by the vendor or provider prior to the date of this Order;

(w)    To open any new customer accounts necessary to effectively manage the Properties and/or to require Whitehall and/or Saucon to identify the Receiver as an authorized account user for any existing accounts;

(x)    To pay any pre-receivership obligations of Whitehall and Saucon authorized by Lehigh Valley 1 LLC;

(y)    To execute a W-9 as an attorney-in-fact for Whitehall and Saucon;

(z)    To notify tenants and other persons now or hereafter in possession of all or any portion of the Properties to pay all Rents directly to the Receiver;

(aa)    To exercise commercially reasonable discretion in determining whether to refund security deposit to a tenant, in whole or in part, in accordance with the applicable leases or agreements, and to pay any such funds from security deposits turned over from Whitehall, Saucon or (for tenancies arising after the date of this Order) security deposits paid by or on behalf of a tenant first, and then from cash flow generated from Rents, issues, profits, and income from the Properties.

(bb)    Receiver and Lehigh Valley 1 LLC are authorized to enter transactions by which Lehigh Valley 1 LLC may lend monies to Receiver (on a nonrecourse basis as to Receiver) to enable Receiver to perform its duties, which shall be secured by a first and prior lien and security interest on the Properties and on all other collateral of Lehigh Valley 1 LLC, in favor of Lehigh Valley 1 LLC as security for such on the same terms and conditions set forth in the Mortgage, subject, however, to the terms of paragraph (cc) below.

(cc)    Whitehall and Saucon shall hold in trust for Receiver (and not sell, transfer, assign, lend, pledge, hypothecate, return, reject, revoke or in any other way actually or

constructively dispose of, without Court approval or the written consent of Plaintiff), any certificate, deposit, fund, account, trademark, benefit, liquor or food license or permit, or other right or interest owned by it and used in connection with the Properties, and shall assign (to the extent assignable) any of the same to Receiver upon Receiver's written request.

(dd)    Notwithstanding anything contained in this Order, (1) any obligation or liability incurred by the Receiver during the receivership shall not be a personal obligation or liability of Whitehall or Saucon, but shall be collectible only out of the Properties, and the Receiver shall include the foregoing in each agreement, purchase order and other contract it enters into pursuant hereto, and (2) neither Whitehall, Saucon nor any of their affiliates shall be liable for any action or inaction of the Receiver. Receiver covenants not to sue or bring any claim, demand action or suit against Whitehall or Saucon directly or indirectly that is inconsistent with the foregoing and the nonrecourse nature of the obligations of Whitehall and Saucon pursuant to the terms and provisions of the Loan Agreement and other similar provisions contained in the Loan Documents.

7.    Neither the Receiver nor any person or entity employed by the Receiver (collectively, the "Receiver Parties") shall be liable to Whitehall, Saucon or to any third party for any act or omission which he, she, it or they have undertaken in good faith; provided, however, nothing contained herein shall release or limit the liability of the Receiver Parties arising from the gross negligence or willful misconduct of the Receiver Parties. The Receiver shall be entitled to all defenses and immunities provided under applicable law, including under *Barton v. Barbour*, 104 U.S. 126 (1881) and its progeny, for acts or omissions within the scope of the Receiver's appointment.

8.    Except as provided in this Order, the Receiver shall not be responsible for the payment of any services commissioned or incurred, or goods purchased, prior to the date of this Order, including utility invoices (including electricity, gas, water, sewer, garbage, phone/internet,

etc.), payroll and property vendors, all of which shall remain the responsibility of Whitehall or Saucon.

9.      No utility may terminate service to the Properties because of non-payment of pre-receivership obligations without prior order of this Court, nor may the continuation of any utility be conditioned upon the Receiver's payment of any pre-receivership consumption, charges or fees.

10.     No insurance company may cancel its existing current-paid policy without prior order of this Court.

## IV.     TURNOVER BY WHITEHALL AND SAUCON

11.     Whitehall, Saucon and all persons acting under their direction are ordered to immediately deliver to Receiver possession of the Properties and each of the following, to the extent owned by Whitehall or Saucon, in the possession or control of Whitehall or Saucon, and relating to the Properties without any right of offset or recoupment:

(a) Property-related information and other property management database files,

(b) All cash collateral for the indebtedness owed by Whitehall or Saucon to Plaintiff (whether consisting of cash on hand, cash in any and all bank accounts or other accounts, all rights to security deposits, if any, including but not limited to amounts that Whitehall or Saucon may have deposited with utility companies, and all other cash and cash equivalents);

(c) All keys to the Properties;

(d) All security deposits, rent, prepaid rent and other sums relating to the use, enjoyment, possession, improvement or occupancy of all or any part of the Properties, in each case, to the extent received by Whitehall or Saucon and any accounts in which any of the foregoing are deposited;

(e) A current list of the occupants of the Properties;

(f) Any and all current Properties accounts receivable and accounts payable reports;

**10**

App.550

(g) Any and all contracts in effect with respect to the Properties, and any material related correspondence;

(h) Any and all payroll records and other materials reasonably requested by Receiver and related to persons employed by Whitehall, Saucon or their property managers at the Properties;

(i) Certificates evidencing the insurance policies covering the Properties;

(j) Records showing any insured losses to the Properties in the past five years;

(k) Any and all bank statements relating to any accounts maintained by Whitehall or Saucon with respect to the Properties;

(l) The tax identification numbers of Whitehall and Saucon;

(m) Any and all other records pertaining to the management of the Properties to the extent such records are maintained; and

(n) All licenses, certificates, surveys, reports, communications and correspondence from the Commonwealth of Pennsylvania related to the Properties or operations of the Properties for the past twenty-four (24) months.

12.    From and after the date Whitehall and Saucon deliver possession of the Properties to Receiver, Whitehall and Saucon shall continue to perform ·or cause to be performed at the sole cost and expense of Whitehall and Saucon all actions necessary for Whitehall and Saucon to keep their organizational status in good standing with their state of organization and the state where the Properties are located, if different, including, without limitation, the timely filing of all required annual reports, tax returns and other similar state and local filings and paying any required fees and charges.

13.    Whitehall, Saucon and all persons acting under their direction are ordered to cooperate and use their best efforts to ensure a smooth transition of the management and operation of the Properties to the Receiver, including, but not limited to, requests for information or

documents that pertain to the maintenance, operation or leasing of the Properties or any efforts to collect any sums due;

14.     Within three (3) days from the date of this Order, provide the Receiver with the name, title, address, telephone number and email address of a designated representative of Whitehall and Saucon with whom the Receiver shall communicate about the obligations expressed in this Order, and promptly notify the Receiver of any changes.

## V.     NON-INTERFERENCE BY WHITEHALL AND SAUCON

15.     Whitehall, Saucon and their officers, directors, general partners, limited partners, agents, property managers, architects, contractors, subcontractors and employees, and all other persons with actual or constructive knowledge of this Order and their agents and employees, are enjoined from:

(a) Interfering with the Receiver, directly or indirectly, in the management and operation of the Properties or in the collection of Rents;

(b) Extending, dispersing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in or disposing of the whole or any part of the Properties (including the Rents) without the prior written consent of the Receiver;

(c) Doing any act which will, or will tend to, impair, defeat, divert, prevent or prejudice the preservation of the Properties (including the Rents and licenses or certificates) or the interest of Lehigh Valley 1 LLC in the Properties or the Rents;

(d) Undertaking any efforts to cancel, terminate or modify the coverage provided by any existing insurance policies relating to the Properties before their respective expiration dates; or

(e) Transferring, selling, assigning, revoking, returning, terminating or canceling, or taking or failing to take any action that would compromise, without the consent of the Receiver, any contract, permit, approval, license, privilege, or right necessary for the operation

**12**

of business at or use and occupancy of the Properties.

16.    In the event Whitehall or Saucon fail to comply with the terms of this Order, the Receiver may seek assistance from the U.S. Marshal to enforce the same.

## VI.    RECEIVER'S COMPENSATION

17.    The Receiver shall be compensated at its standard hourly rates. The Receiver's fee will be $975 per hour and said monthly fee shall be deducted directly from the rents, income and revenue received by Receiver.

18.    In addition to the Receiver's fees, the Receiver shall be reimbursed for its reasonable costs, including legal fees, travel expenses, and other business expenses associated with the Receivership. The Receiver may pay itself from Rents, the Receivership Properties, and from the sale of the Properties, if any.

19.    The Receiver shall file monthly reports with the Court disclosing its compensation and reimbursement.

## VII.    BANKRUPTCY OF WHITEHALL AND/OR SAUCON

20.    If Whitehall and/or Saucon files a bankruptcy case during the receivership, Lehigh Valley 1 LLC shall give notice of the bankruptcy case to the Court and the Receiver. If the Receiver receives notice that the bankruptcy has been filed and that part of the bankruptcy estate includes the Properties (or any part of them) that are the subject of this Order, the Receiver shall have the following duties:

(a) The Receiver shall give prompt notice of the bankruptcy case to Lehigh Valley 1 LLC.

(b) The Receiver shall immediately contact Lehigh Valley 1 LLC and determine whether Lehigh Valley 1 LLC intends to move in the bankruptcy court for an order for: (i) relief from the automatic stay; and (ii) relief from the Receiver's obligation to turn over the Properties (11 U.S.C. § 543). If Lehigh Valley 1 LLC disclaims in writing any intention to make such a

motion or fails to file such motion within ten court days following its receipt of notice of the bankruptcy filing, the Receiver shall immediately turn over the Properties (or applicable portion thereof) to the appropriate entity (either to the trustee in bankruptcy if one has been appointed or, if not, to the debtor in possession) and otherwise comply with 11 U.S.C. § 543.

If Lehigh Valley 1 LLC intends to seek relief immediately from both the automatic stay and the Receiver's obligation to turn over the Properties, the Receiver may remain in possession and preserve the Properties pending the ruling on those motions unless otherwise ordered by the Bankruptcy Court. (11 U.S.C. § 543(a).) The Receiver's authority to preserve the Properties shall be limited as follows: (i) the Receiver may continue to collect Rents and other income; (ii) the Receiver may make only those disbursements necessary to preserve and protect the Properties; (iii) the Receiver shall not execute any new leases or other long-term contracts without the approval of this Court and the Bankruptcy Court; and (iv) the Receiver shall do nothing that would effect a material change in the circumstances of the Properties.

## VIII.  MISCELLANEOUS

21.    Without limiting any of the general or specific powers granted herein, Receiver is vested with all the powers, rights, and duties provided to receivers under applicable law, and may act in the name of Whitehall and/or Saucon without the approval or consent of the members, managers, directors, officers, partners, or other persons that would be legally required in the absence of the Receiver's appointment to approve or consent to such action.

22.    The Receiver shall notify all known creditors of Whitehall or Saucon of the entry of this Order by sending a copy of the Order to the creditor at its last known mailing address.

23.    Entry of this Order shall operate as a stay applicable to all persons and entities of:

(a) Any act, including without limitation the commencement or continuation of a judicial, administrative, or other action or proceeding including the issuance of process to obtain possession of Receivership Properties or to interfere with or exercise control over Receivership

**14**

App.554

Properties, other than the commencement or continuation of a judicial, administrative, or other action or proceeding to enforce any lien having priority over the rights of the Receiver in the Receivership Properties;

(b) Any act to create or perfect any lien against Receivership Properties to the extent that the lien secures a claim that arose before the date of this Order.

24.     Without first obtaining leave of this Court, all creditors, directors, equity owners, employees, unions, and other persons, and all others acting on behalf of such person, including sheriffs, Marshals, other officers, deputies, servants, agents, are enjoined from:

(a) Terminating any service, whether utility or otherwise, to or for the Properties without first obtaining express authorization from this Court;

(b) Attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate the due date of any lease, loan, mortgage, indebtedness, security agreement or otherwise affecting the Receivership Properties;

(c) Doing any act to interfere with the Receiver taking control, possession, or management of the Receivership Properties, or to interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Properties;

(d) Engaging in any act to collect, assess, or recover Receivership Properties for a claim against Whitehall or Saucon that arose before the appointment of the Receiver;

(e) Exercising a right of set off against Receivership Properties for a debt owing to Whitehall or Saucon that arose before the appointment of the Receiver.

(f) Plaintiff reserves the right to terminate the Receiver at any time.

(g) This receivership will continue in effect until further order of the Court.

(h) Notwithstanding anything in this Order to the contrary, Lehigh Valley 1's consent shall not be required for Receiver to take actions or make expenditures necessary

to comply with federal and state law or directives regarding the operations of the Properties or to comply with state statutory and regulatory requirements.

BY THE COURT:

*s/ Catherine Henry*
_____
**CATHERINE HENRY, J.**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re: | Chapter 11 |
| WHITEHALL MANOR, Inc., *Debtor*. | Case No. 25-15245 (PMM) (Jointly Administered) |

**SECURED CREDITOR LEHIGH VALLEY 1, LLC'S AND RECEIVER'S JOINT REPLY IN SUPPORT OF MOTION TO (1) COMPEL THE MANOR DEBTORS TO ASSUME OR REJECT THEIR LEASES, (2) ESTABLISH THE CURE AMOUNT AND (3) FOR RELIEF FROM THE AUTOMATIC STAY**

Secured Creditor Lehigh Valley 1, LLC ("Lender") and Receiver Duane Morris LLP through Erin Duffy, Esquire ("Receiver") hereby jointly submit this reply in support of their Joint Motion to (1) Compel the Manor Debtors to Assume or Reject their Leases,[1] (2) Establish the Cure Amount, and (3) For Relief from the Automatic Stay (ECF 56, the "Motion"). In support thereof, Lender and Receiver state as follows:

## STANDING

1. In their Opposition to the Motion (the "Opposition", ECF 87), the Debtors argue that Lender and Receiver lack standing to bring this Motion to compel the Manor Debtors to assume or reject their leases. ECF 87 at 6-9.

2. Importantly, while the Debtors rest their standing argument primarily on *In re Riverside Nursing Home*, 43 B.R. 682 (Bankr. S.D.N.Y. 1984), *Riverside* is readily distinguishable. In *Riverside*, a mortgagee whose only connection to the lease was a post-default assignment of rents was found to lack standing under Section 365(d)(2) because it had not "received an assignment of the lease." *Id*. at 685. Here, by contrast, the Receiver

---

[1] Capitalized terms used but not defined herein are used in the sense set forth in the Motion.

App.557

was appointed by the District Court under the Receiver Order with express authority to

"commence, prosecute, continue or defend actions at law or in equity (in its own name or

in the names of Whitehall [Trust] or Saucon [Trust])" to "protect or preserve the property,

... collect the rents, or ... evict or eject any tenants." ECF 65 at ¶ 6 (Case No. 24-cv-02627);

ECF 58 at ¶ 6 (Case No. 24-cv-02709). That is a direct, court-ordered grant of authority

to act *in the names of* the landlord-parties themselves — a posture *Riverside* did not

confront. *See Riverside*, 43 B.R. at 685 (providing that the "assignee of rent ... may not

exercise any of the rights of the landlord, such as removing the debtor from possession

for nonpayment of rents"). Moreover, *Riverside* did not address Section 105, derivative

standing, or the unique procedural posture of a landlord whose claims against its tenant

would otherwise go unenforced.

3.      Moreover, the Debtors ignore the numerous avenues under which this

Court may grant the relief sought in Lender and Receiver's Motion.

4.      *First*, the Bankruptcy Court possesses the inherent authority under the

Bankruptcy Code to grant the relief sought in the Motion if the Court deems such relief

necessary. *See* 11 U.S.C. § 105(a).

5.      Section 105 of the Bankruptcy Code provides that:

> The court may issue any order, process, or judgment that is
> necessary or appropriate to carry out the provisions of this
> title. No provision of this title providing for the raising of an
> issue by a party in interest shall be construed to preclude the
> court from, sua sponte, taking any action or making any
> determination necessary or appropriate to enforce or
> implement court orders or rules, or to prevent an abuse of
> process.

11 U.S.C. § 105(a).

2

App.558

6.    "This authority under § 105 has been interpreted to give bankruptcy courts broad discretion as to the types of remedies available. Therefore, the plain meaning of § 105(a) encompasses *any* type of order, whether, injunctive, compensative, or punitive, as long as it is necessary or appropriate to carry out the provisions of the Bankruptcy Code." *In re Phillips*, No. 4:23-bk-02682-MJC, 2025 WL 3165110, at *10 (Bankr. M.D. Pa. Nov. 12, 2025) (quotations and citation omitted); *accord In re Roberts*, 659 B.R. 271, 284 (Bankr. W.D. Pa. 2024) ("[B]ankruptcy courts have the statutory authority pursuant to 11 U.S.C. § 105(a) to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions' of the Bankruptcy Code.") (quoting *Law v. Siegel*, 571 U.S. 415, 420 (2014)).

7.    Pursuant to this authority, the Court has discretion to issue an order compelling the Manor Debtors to assume or reject their leases, to establish the cure amount, or to grant the Lender and Receiver relief from the automatic stay. As set forth in the Motion, this relief is necessary and appropriate to carry out the Bankruptcy Code. *See* 11 U.S.C. § 105(a); *Phillips*, 2025 WL 3165110, at *10.

8.    Thus, even if the Court were to agree with the Debtors that Lender and Receiver lack standing to bring this Motion, the Court may still grant the requested relief.

9.    *Second,* the Court can modify the stay pending appeal to allow Lender and Receiver to pursue this action pursuant to the Receiver Order. *See* ECF 65 (Case No. 24-cv-02627); ECF 58 (Case No. 24-cv-02709); *see also* ECF 56 at ¶ 62 (setting forth the Receiver's authority under the Receiver Order).

10.    With respect to the Receiver, the Debtors assert that "[w]hile the Receiver may have authority to take certain actions with respect to the Trusts pursuant to the Receiver Order, that order is presently stayed by these Chapter 11 cases[.]" ECF 87 at 9.

3

Accordingly, Debtors contend that "the Receiver ... lacks standing to seek the relief sought in the Motion." *Id.*

11. Debtors appear to be referring to the stay pending appeal issued by this Court on April 2, 2026 (ECF 67) during the pendency of the Debtors' appeal of this Court's order granting Lender's motion to dismiss the Trust Debtors' bankruptcy cases. This stay was intended to prevent the Foreclosure Actions from proceeding during the pendency of the Debtors' appeals.

12. Should the Court agree with Debtors that this stay also applies to stay the authority of the Receiver under the Receiver Order, Lender and Receiver request that this Court modify that stay pending appeal to allow Lender and Receiver to proceed with this Motion. Such a limited modification to the stay would not impact the stay as to the Foreclosure Actions. Rather, it would allow Lender and Receiver to pursue this action, which is necessary and appropriate for effectuating the goals of the Bankruptcy Code.

13. Further, this Court can grant Lender and Receiver derivative standing to the extent the Court concludes that they otherwise lack standing. Here, for reasons that are quite apparent, the Debtors have a familial relationship and are acting primarily to promote the Atiyehs' interest in retaining control over their businesses. As a result, they are – not surprisingly – failing to take action to enforce the Trust Debtors' rights. The Lender and Receiver are stepping in to protect those rights where the Trust Debtors are failing to do so.

14. Pursuant to their equitable powers, bankruptcy courts can confer derivative standing to creditors to bring actions "for the benefit of the estate when the debtor fails to do so in violation of its fiduciary duties." *In re Nat'l Forge Co.*, 326 B.R. 532, 542 (W.D. Pa. 2005) (citation omitted). "[T]he ability to confer derivative standing ... is a

straightforward application of bankruptcy courts' equitable powers." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003). "[D]erivative standing is a prudent way for bankruptcy courts to remedy lapses in a trustee's execution of its fiduciary duty." *Id.* at 572. Although *Cybergenics* arose in the avoidance-action context, its reasoning — that bankruptcy courts' equitable powers allow them to "remedy lapses in a trustee's execution of its fiduciary duty," *id.* — applies with equal force where, as here, the debtor has failed to enforce rent obligations against an affiliated tenant that are essential to a secured creditor's collateral.

15.    "[C]ourts have generally recognized derivative standing only where: (i) the creditor has alleged a colorable claim that would benefit the estate[;] (ii) the debtor has unjustifiably refused to pursue the claim itself; and (iii) the [movant] has obtained permission from the bankruptcy court to initiate the action on behalf of the estate." *Nat'l Forge Co.*, 326 B.R. at 543. "[D]erivative standing may be granted even if the creditor did not seek the court's permission to initiate the action where, after examining the creditor's conduct, the Court determines that such action will benefit the estate without usurping the trustee's powers." *In re Rosenblum*, 545 B.R. 846, 863 (Bankr. E.D. Pa. 2016).

16.    As to the first requirement, "a creditor's claims are colorable if they would survive a motion to dismiss." *Id.* at 863-64 (quotations and citation omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

17.    With regards to the second requirement, Courts look at (1) whether the debtor's decision not to pursue the claim was justified and (2) "whether granting derivative standing is necessary and beneficial to the fair and efficient resolution of th[e]

proceeding." *Rosenblum*, 545 B.R. at 871; *see also Nat'l Forge*, 326 B.R. at 549 ("Implicit in the Bankruptcy Court's grant of derivative standing is a finding that the Debtor's opposition to the filing ... was contrary to the best interests of the estate and, therefore, unjustified.").

18. Lender and Receiver are entitled to derivative standing here.

19. *First*, Lender and Receiver's claim to compel the Manor Debtors to assume or reject their leases is a colorable claim. As set forth in the Motion, the factors courts consider in deciding whether to compel debtors to assume or reject a contract all weigh in favor of compelling the Manor Debtors to assume or reject their leases here. Further, Lender and Receiver's claim in the alternative – for relief from the automatic stay – is colorable because the Manor Debtors' leases expired before the Debtors filed for bankruptcy, which is cause for relief from the automatic stay. *See In re Burch*, 401 B.R. 153, 157 (Bankr. E.D. Pa. 2008) ("If Movants are correct that Debtor's interest in the Lease has been properly terminated, then 'cause' exists under § 362(d)(1) to grant relief from the stay to allow Movants to exercise their state law remedies against Debtor."); *see also In re Johnson*, No. 15-00104-NPO, 2015WL 1508460, at * 6 (Bankr. D. Miss. Mar. 27, 2015) ("[C]ourt have held that a debtor's inability to assume a lease constitutes 'cause' for relief from the automatic stay under § 362(d)(1).") (collecting cases).

20. *Second*, the Trust Debtors' failure to pursue these claims against the Manor Debtors is unjustified. The Trust Debtors have presented no evidence as to why they have not attempted to (1) seek rent payments from the Manor Debtors pursuant to the pre-2023 Lease Agreements, (2) sign new and current lease agreements with the Manor Debtors in light of the expiration of the prior leases, or (3) pursue an eviction action

against the Manor Debtors in order to bring in a tenant who is able to pay rent to the Trust Debtors.[2]

21.    *Finally*, in ruling on the Motion, this Court can give Lender and Receiver "permission" to pursue "the action on behalf of the estate." *Nat'l Forge Co.*, 326 B.R. at 543.

22.    Notwithstanding the Debtors' Opposition, there are multiple avenues available to the Court to conclude that the Lender and Receiver have standing to bring the instant Motion.

## THIS COURT SHOULD COMPEL THE MANOR DEBTORS TO ASSUME OR REJECT THEIR LEASES

23.    As set forth in the Motion, the key factors that a Court must consider in deciding whether to compel a debtor to assume or reject their leases include: (1) "[t]he nature of the interests at stake," (2) "the balance of the hurt to the litigants," (3) "the good to be achieved," (4) "the safeguards afforded those litigants," and (5) "whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary." *Matter of Dunes Casino Hotel*, 63 B.R. 939, 949 (Bankr. D.N.J. 1986) (citation omitted).

---

[2] Indeed, this is precisely the of conflict of interest between the Trust Debtors and the Manor Debtors that the Lender identified in opposing the Debtors' joint employment of the Dilworth firm. *See* ECF 71. (Case No. 25-15241). The Trust Debtors and the Manor Debtors face a clear conflict – disqualifying one law firm from representing all four debtors as bankruptcy counsel – in how to respond to the instant Motion. The Trust Debtors, as landlords, clearly have an interest in collecting rent payments and having either a resolution of their leases with the Manor Debtors or an opportunity to bring in rent-paying tenants. Even if the Debtors and Dilworth did not previously have a conflict of interest – which Lender contends they did – they clearly do now, and the Court should reconsider its order authorizing the joint employment of the Dilworth firm.

24.    Generally, with respect to these factors, the Debtors argue that because they are Chapter 11 debtors and would like to reorganize, they should be permitted the opportunity to reorganize. *See* ECF 87 at 12-13, 17-18, 19-21, 25-26. They contend that because the Bankruptcy Code favors reorganization, the Debtors should be given ample time to attempt to reorganize, regardless of the likelihood of success of their reorganization. *See id.* This proves too much.

25.    Critically, the Debtors' authorities for deferring the assume/reject decision turn on a fact not present here: the debtor's continuing post-petition performance. *See In re Physician Health Corp.*, 262 B.R. 290, 294-95 (Bankr. D. Del. 2001) (denying motion to compel because debtor was "performing under the contract" and non-debtor party was "receiving precisely what it bargained for"); *see also In re Wheeling-Pittsburgh Steel Corp.*, 54 B.R. 385, 388 (Bankr. W.D. Pa. 1985) (same). Here, the opposite is true. The Manor Debtors have paid zero rent post-petition — they are not performing at all. This rationale for deferring the decision is therefore inapplicable.

26.    In the Motion, Lender and Receiver demonstrated why each of the factors courts consider in deciding whether to compel a debtor to assume or reject their leases weigh in favor of compelling the Manor Debtors to assume or reject their leases promptly. *See* ECF 56 at ¶¶ 65-108. In doing so, Lender and Receiver articulated why the Debtors are unlikely to be successful in their attempt to reorganize, including because they will not be able to pay the pre- and post-petition rents and amounts owed under the leases that are required as part of any plan or reorganization. *See id.* at ¶¶ 79-81, 92-93, 105-106.

27.    The Manor Debtors have not paid rent to the Trust Debtors since approximately February or March 2021. *Id.* at ¶¶ 67, 79-81. The Debtors continue to

accrue unpaid post-petition rent, yet, given the Debtors' current financial situation, there

is a high risk that these amounts will not be paid.

28.     Moreover, Lender has a lien on these rents,[3] thus, the Manor Debtors'

continued non-payment of rent harms Lender. *See id.* at ¶¶ 67, 82, 106. And the Debtors

will not be able to reorganize without actually paying the outstanding rent. An

intercompany setoff or writeoff would impair the Lender's liens and could not be

approved under the relevant provisions of Section 1129.

29.     In addition, in order to assume their Leases, either as ordered by this Court

or pursuant to their proposed plan of reorganization, the Manor Debtors must pay the

amount of pre-petition rent owed, and any post-petition rent that has accrued. *See* ECF

56 at ¶¶ 42-43. Again, it is unlikely that the Manor Debtors will be able to comply with

this requirement and pay the amounts owed because of their current financial situation.

This makes it highly improbable that the Debtors will be able to propose a successful plan

of reorganization. Moreover, any intercompany setoff or writeoff of the outstanding rents

could not be approved under Section 1129 of the Bankruptcy Code because of Lender's

security interest in the rents.

30.     On the other hand, if they reject their leases, the Debtors contend that the

unpaid rent will be an unsecured claim: "If the Debtors instead opt to reject the Leases,

the respective lessors are entitled to unsecured claims for breach of their respective

agreements (11 U.S.C. § 365(g)) but Movants would retain their security and other

---

[3] Contrary to Debtors' assertions, Lender will apply any amounts that it receives from the Debtors in accordance with the Receiver Order. Lender and Receiver's Motion does not "ask this Court to circumvent the priority order outlined by the District Court", ECF 87 at 28, and Lender has not indicated any intent that the Motion was contrary to the Receiver Order.

interests in the Debtors' assets, including the rent received by the Manor Debtors." ECF 87 at 21-22. This is wrong.

31.     If the Debtors reject their leases, the post-petition rent will be an administrative claim that must be paid in full to Lender because Lender has a lien on these rents. *See* ECF 56 at ¶ 41 ("Nonetheless, under 11 U.S.C. §§ 503(b) & 507(a)(2), the post-petition rent is an administrative expense of the bankruptcy estate. Under 11 U.S.C. § 1129(a)(9)(A), administrative expenses – such as the post-petition rent – have to be paid in full as part of a plan of reorganization in order for it to be confirmed.")

32.     The Third Circuit Court of Appeals has squarely held that landlords whose tenants occupy leased premises post-petition are entitled to administrative-expense treatment under Section 503(b)(1), even outside Section 365(d)(3). *See In re Goody's Family Clothing Inc.*, 610 F.3d 812, 818-20 (3d Cir. 2010) (post-petition occupancy of leased premises confers an "actual and necessary" benefit to the estate supporting § 503(b)(1) priority). Here, the Manor Debtors are occupying the Trust Debtors' properties and operating personal care homes on them — precisely the kind of beneficial occupancy that gives rise to an administrative-expense claim for fair rental value.

33.     But again, Debtors have no way to pay this post-petition rent, even as an administrative expense. And, because of Lender's security interest in the rents, any attempt to make this post-petition rent an intercompany setoff or writeoff will not be approved.

34.     Thus, regardless of whether the Debtors assume or reject their leases, they will be required to pay at least the accrued post-petition rents and obligations that are owed pursuant to their leases. *See id.* at ¶ 43.

35.    In spite of their clear inability to pay the amounts required in order to reorganize, Debtors contend that they "have a strong interest in successfully reorganizing so that they may continue operations to recover financially and to again become profitable businesses." ECF 87 at 12. However, Debtors have yet to explain how they will successfully reorganize when they are currently unable to pay their lease obligations, now or in the future.

36.    In addition to their current financial situation, the Debtors' poor management of their facilities and their properties poses a risk to the residents of the Manor Debtors' personal care homes. As set forth in the Patient Care Ombudsman's ("PCO") first report (the "PCO Report"), the properties are diminishing under the Debtors' continued operation and control. *See* PCO Report, ECF 280, No. 25-15241 (attached as Exhibit P). The PCO observed serious deficiencies impacting residential care and hygiene at both Whitehall Manor and Saucon Valley Manor. *See id.* For the Whitehall property, the PCO observed an "ongoing infestation of mice" and issues with refrigeration of food. *Id.* at 1-2. For the Saucon property, the PCO observed "ongoing concerns regarding kitchen and 2nd floor ceiling leak," lack of cleanliness in the kitchen, unrepaired holes in the ceiling and ceiling leaks, unrepaired heating coil leak, and a need to replace the heating coil. *See id.* at 3-7.

37.    Further, the Licensing Bureau actually revoked Saucon Valley Manor's certificate of compliance in light of these violations and issued them a First Provisional license that will expire on September 26, 2026. *See id.* at 8.

38.    With respect to these concerns, the Debtors contend that they "acknowledge the issues raised in the" PCO Report, that they have "addressed each concern," and that "[r]epairs are now complete." ECF 87 at 13-14. However, no evidence has been presented

11

App.567

to support these assertions. Debtors have not, for example, submitted any photographs showing that the repairs were made or submitted declarations verifying the steps Debtors contend they have taken to address the issues raised in the PCO Report. Without evidence, the Court should not grant any credence to the Debtors' assertions that they resolved these issues – many of which had been present and unaddressed for months (such as the holes in the ceiling and the ceiling leaks) – in just a matter of days.

39.    Finally, Debtors contend that "[Lender] has consistently pursued relief that only benefits itself, to the exclusion of all other parties in interest in these cases, and that hinders the Debtors' ability to reorganize." *Id.* at 15.

40.    But it is actually the Debtors who are hindering their own ability to reorganize. Instead of acting in the best interests of the Manor Debtors and the Trust Debtors respectively, the Debtors collectively are acting in the best interests of the Atiyah family, who own, operate, and control the properties. To facilitate this, Debtors have retained a single law firm – over the objection of Lender – to represent both the Trust Debtors and the Manor Debtors despite clear conflicts of interest necessitating different counsel for the Debtors.

41.    The Trust Debtors are property owners and landlords. It is in the Trust Debtors' best interest to collect rents from the Manor Debtors in order to pay their mortgages and other amounts owed to Lender. If the Manor Debtors are unable to pay rents, then, as their landlord, it is in the Trust Debtors' best interest to attempt to bring in new tenants who are able to pay rent. Although the Trust Debtors are currently not eligible for reorganization,[4] it follows that if they were, they would be interested in having

---

[4] This Court granted Lender's motion to dismiss the Trust Debtors' bankruptcy cases on March 20, 2026. *See* ECF 263; ECF 264.

App.568

tenants who could pay their rent in order to increase the Trust Debtors' chance of a successful reorganization.

42.     The Manor Debtors, as tenants and business operators, have a contrary interest: to pay the lowest rent possible in order to attempt to operate their businesses profitably.

43.     The interests of the Trusts and the Manor Debtors are not aligned, they are adverse, and the conflict is binary: (a) enforcing the leases benefits the Trust Debtors and destroys the Manor Debtors; or (b) excusing performance of the leases benefits the Manor Debtors and collapses the Trust Debtors.

44.     Further, not only is the Dilworth firm not seeking to enforce the Trust Debtors' rights and remedies, but the Dilworth firm is seeking to prevent both the Lender and the Receiver from enforcing (or requiring the enforcement of) the Trust Debtors' rights and remedies.

45.     The Dilworth firm's pursuit of the interests of the Manor Debtors and the Atiyehs over the interests of the Trust Debtors reflects its actual and impermissible conflict.

46.     As the interests of the Trust Debtors and the Manor Debtors are in direct conflict, and Dilworth has chosen to excuse the Manor Debtors' performance due under the Leases, while seeking to prevent the Lender and the Receiver from requiring such performance (which benefits the Trust Debtors), Dilworth can no longer represent all of the Debtors in the bankruptcy proceedings, including proposing a plan of reorganization.

### THE CURE AMOUNT FOR PRE-PETITION DEFAULTS UNDER THE MANOR DEBTORS' LEASES

47.    Lender directs the Court to the attached spreadsheets setting forth Lender's calculation of the pre-petition and post-petition amounts that are owed under the Manor Debtors' leases with the Trust Debtors. *See* Pre-Petition Rent Arrears Spreadsheet for Saucon (attached as Exhibit Q); Pre-Petition Rent Arrears Spreadsheet for Whitehall (attached as Exhibit R); Post-Petition Rent Arrears Spreadsheet (attached as Exhibit S). Lender relied on the rent amounts set forth in the pre-2023 Lease Agreements to calculate these amounts. *See* Ex. A to Motion; Ex. B to Motion.

48.    The rent amounts as stated in the leases may have been calculated to include mortgage insurance premiums, reserves, insurance, taxes, and maintenance, as the Debtors contend. However, in the leases, the rent amount is stated as a fixed amount. The amounts in the above-referenced exhibits are calculated in accordance with the rent as stated in the pre-2023 leases.

49.    If the Debtors disagree with the rent owed under the pre-2023 leases, they must provide evidence to demonstrate what the rent amount is. But the Debtors have not done so. They have presented no evidence to support the pre-petition amounts that they propose are due, nor have they provided any calculations demonstrating how they reached those amounts. Without evidence or an understanding as to how the Debtors reached their proposed amounts, the Court should not accept the Debtors' proposed pre-petition default amounts.

50.    Again, as set forth above, any amounts that Lender receives will be applied pursuant to, and in compliance with, the Receiver Order.

## RELIEF FROM THE AUTOMATIC STAY

51.     In their Opposition, Debtors argue that "[t]he Debtors' Leases are not 'expired' as the term has been interpreted for purposes of section 365." ECF 87 at 29. However, as explained in the Motion, both the Whitehall Lease and the Saucon Lease expired on August 31, 2023.

52.     Specifically, Debtors argue that

> parties' lessor-lessee relationships have not ended. To the contrary, the Trusts continue to allow the Debtors to occupy their properties, acting as they did prior and performing maintenance on the properties as needed…. Meanwhile, the Debtors operate their care homes on the Trust properties, alerting the Trusts of needed repairs on a regular basis. The parties continue in a course of performance that indicates their Leases have not terminated, though their stated terms have passed.

ECF 87 at 30.

53.     This argument does not demonstrate that the leases are "unexpired." Rather, it demonstrates Lender's point – that the Manor Debtors are holdover tenants who are operating their personal care homes on the Trust Debtors' properties without a valid lease – and without paying any rent – and have been doing so since the leases expired by their terms on August 31, 2023. *See* Ex. A to Motion; Ex. B to Motion; ECF 56 at ¶¶ 115-117.

54.     Debtors contend that their "interpretation is supported by case law." ECF 87 at 30. However, the cases upon which Debtors rely in an attempt to argue that their plainly expired leases are "unexpired" are not relevant and are distinguishable from the facts at issue here.

55.     *First*, in *Matter of Schnur Enterprises, Inc.*, 42 B.R. 202 (W.D. Pa. 1984), the lease at issues expired by its terms one day after the parties filed for bankruptcy. *Id.*

at 203 ("Lessor alleges that at the time of filing on March 30, 1984, Debtors were in possession of the subject real estate. However, the lease agreement expired by its terms on March 31, 1984."). The Lessor sought relief from the automatic stay to commence ejectment proceedings against the Debtors. *See id.*

56.   Although "Debtor failed to notify Lessor in writing of its intention to exercise its option to renew within ninety days prior to the expiration of the term" as required by the lease, the Court found evidence demonstrating that: (1) the Debtors advised the Lessor of their intent to extend the Lease, (2) the Debtors agreed to the Lessor's proposed terms for the lease extension, and (3) by engaging with Debtors about the lease extension after the ninety-day notice period had expired, the "Lessor waived technical compliance with the notice requirements" under the Lease. *Id.* at 204-05. Accordingly, the Court found that the Debtors had successfully exercised their option to renew the lease, meaning the lease was unexpired. *See id.* at 206.

57.   Here, the Whitehall Lease and the Saucon Lease expired more than two years before the Debtors filed for bankruptcy. That they continued operating as landlord and tenant without a valid lease does not somehow revive their expired leases, making them unexpired for purposes of the bankruptcy. Rather, it demonstrates that the Manor Debtors were holdover tenants operating their personal care homes on the Trust Debtors' properties without valid leases. Critically, the only instrument that arguably extended the Leases — the 2023 Lease Amendments — has been declared "NULL, VOID, and OF NO LEGAL EFFECT" by the District Court. Holdover occupancy alone — without more — is not waiver. It is default.

58.   *Second,* in *In re Good Works Housing LLC*, No. 25-12224 (DJB), --- BR ----, 2026 WL 710743 (Bankr. E.D. Pa. Mar. 13, 2026), the Court concluded that "the

16

App.572

ordinary meaning of 'unexpired' as used in § 365 of the Bankruptcy Code describes a lease of personal property whose demands and requirements are not yet satisfied, concluded, or completed. *Id.* at \*3. "[E]ven the technical meaning of 'unexpired' as used in § 365 of the Bankruptcy Code to describe a lease of personal property—consistent with the term 'executory contract'—is a lease where the obligations of the parties are not concluded or completed. Therefore, whether the Court uses the 'ordinary meaning' or the 'technical meaning,' the term unexpired must mean a lease which is not concluded." *Id.* at \*4.

59.    The lease at issue in *Good Works Housing* included language indicating the "Lease End": "The Lease called for 48 monthly payments of $3,604.41 per month, the last of which was due on July 12, 2025 (called in the Lease, the 'Lease End')." *Id.* at \*2.

60.    The Debtor in *Good Works Housing* argued that the lease was not "unexpired" because the "Lease End" had occurred; in other words, Debtor's position was that the lease was expired because the obligations under the lease were concluded. *Id.* at \*4. However, the Court did not agree.

61.    "Lease End was simply the date the last payment [under the lease] was due, but ... the Lease did not expire on that date. Rather ... the Lease contains several provisions that continue to obligate and bind the parties well after the Lease End." *Id.*. The Court reasoned that "'Lease End' is a term purely cabined to its usage in the Lease itself. Under the Lease, the term 'Lease End' was used to identify the date of the last regularly scheduled payment []. But Lease End did not mean 'Lease Concluded.' In fact, the parties contracted for an entire set of obligations which exist only upon the 'Lease End.'" *Id.* Accordingly, the Court concluded that the lease was "unexpired" for purposes of Section 365 of the Bankruptcy Code because there were requirements under the lease that were not yet satisfied or completed:

17

App.573

> By failing to purchase the Vehicle or return it, the Debtor had ongoing obligations under the Lease: an ongoing obligation to make monthly payments until purchase or surrender of the Vehicle. Admittedly, if at any time the Debtor had returned the Vehicle or tendered the full purchase price, the Lease would have concluded. Prior to such action, the Lease remains unexpired and capable of assumption or rejection by the Debtor.

*Id.* at *5.

62.    Here, by the express terms of the leases, and as explained in the Motion, the leases ended by their terms on August 31, 2023. As of that date, there were no outstanding demands, requirements, or obligations to be completed by either party. Rather, the Leases were "concluded." Unlike in *Good Works Housing*, where the lease by its express terms imposed ongoing purchase-or-return obligations after the last scheduled payment, nothing in the Whitehall or Saucon Leases required further performance after August 31, 2023. Every rent installment, every term provision, and every duty the Leases imposed came to a close on that date. If anything, *Good Works Housing* supports Lender's position: a "concluded" lease is an expired lease.

63.    Accordingly, under the definition of "unexpired" set forth in *Good Works Housing*, the Whitehall Lease and the Saucon Lease are not "unexpired" and thus are not capable of assumption or rejection under Section 365. *See Burch*, 401 B.R. at 157 ("Where a lease has expired at the time of filing, there is nothing for the debtor to assume, even if it can be established that adequate assurance [of performance] exists."); *In re Turner*, 326 B.R. 563, 578 (W.D. Pa. 2005) ("Since the lease expired, Turner holds no interest capable of assumption pursuant to 11 U.S.C. § 365(d)."); *contra Good Works Housing*, 2026 WL 710743, at *6 ("Since the Lease is unexpired, § 365 of the Bankruptcy Code

applies. The Debtor is entitled to assume or reject the Lease within the time that the Bankruptcy Code permits.")

64.    Because the leases are expired and the Manor Debtors are unable to assume or reject their leases, Lender and Receiver are entitled to relief from the automatic stay.

WHEREFORE, the Lender and Receiver respectfully request that this Court enter an appropriate order granting the Motion.

<div style="margin-left:40%">

Respectfully Submitted,

HANGLEY ARONCHICK SEGAL PUDLIN
& SCHILLER

</div>

Dated: April 17, 2026

<div style="margin-left:40%">

By: */s/ Matthew A. Hamermesh*
    Matthew A. Hamermesh
    Sara E. Smith
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
(215) 568-6200
mhamermesh@hangley.com
ssmith@hangley.com

BERGER LAW GROUP, P.C.
Phillip D. Berger
919 Conestoga Road, Building 3, Suite 114
Bryn Mawr, PA 19010
(610) 668-0800
Berger@BergerLawPC.com

*Attorneys for Secured Creditor Lehigh
Valley 1, LLC*

DUANE MORRIS LLP

By: */s/ Brett L. Messinger*
    Brett L. Messinger
30 S. 17th Street
Philadelphia, PA 19103
215-979-1508
blmessinger@duanemorris.com

*Attorneys for Receiver Duane Morris LLP,
by Erin Duffy, Esquire*

</div>

19

# EXHIBIT P

# OFFICE OF THE
# LONG-TERM CARE OMBUDSMAN

### EST. WITHIN THE PA DEPARTMENT OF AGING

April 1, 2026

**First 60-Day Patient Care Ombudsman Report**

Re:  Whitehall Manor Inc. and
       Saucon Manor, Inc.
       Case No. 25-15241
       (PMM)

As directed by the court, and pursuant to 11 U.S.C. § 333(a)(2), Fed. R. Bankr. P. 2007.2(c), the
following is my first 60-day report for the above-captioned case.

## Whitehall Manor Inc.

### General Information

Whitehall Manor offers personal care services in Lehigh County, Pennsylvania, under a regular
license by the PA Department of Human Services. The population they serve is primarily geriatric
and offers a specialized secure dementia unit. It is not part of a continuing care retirement
community.

The facility has a capacity of 130 beds, of which 114 were occupied as of 3/24/2026. This
includes a 20-bed secure dementia care unit, of which 19 were occupied.

The current occupancy rates appear consistent from facility census reports over the last year.

Local ombudsman records indicate that this census, based on the number of available beds, is
higher than other personal care facilities in the area.

Local ombudsmen conduct regular visits to the facility.

### Environmental Observations

Whitehall Manor has a 20-bed secure dementia unit with coded doors. An up-to-date activities
calendar is posted. Snacks are available for residents. The temperature is comfortable. However,
the facility has an ongoing infestation of mice. Ombudsman witnessed mice feces on boxes and

cans in the food pantry. Some bags of food in plastic have been gnawed through by mice. On 3/16/2026 visit, ombudsman observed one dead mouse lying on the pantry floor. Pantry had strong odor of dead mice.  Reported to newly appointed administrator, Jenn Atiyeh.

In a visit of 3/13/2026, the local ombudsman reported that call bells were not always answered promptly and staff do not wear visible name badges.

As of 2/19/2026, ombudsman observed temperatures log on refrigerator in secure dementia unit that has not been completed since November 2025. Upon opening the refrigerator, it contained nutritional supplement items in both freezer and refrigerator sections. Also noted that knobs are missing on the thermostats in the memory care unit.

**Staffing/Operations**

The Department of Human Services reports 155 daily staffing hours with 116 hours waking staff.

**Complaints/Concerns**

One (1) case has been instituted on behalf of residents since 11/4/2025.

Residents reported missing clothing.

**Regulatory Issues/Department of Human Services**

As a result of the Pennsylvania Department of Human Services, Bureau of Human Services Licensing review on 11/06/2025, 11/10/2025 of the above facility, we have determined that your submitted plan of correction is fully implemented. Continued compliance must be maintained. Plan of correction included:

- Record confidentiality
- FS Orientation 1st Day
- Staff training records
- Concerns with enabler bar not being covered
- Steam table was on and unattended in memory care unit
- Unlabeled and undated food in refrigerator/freezer
- Documentation of dietary change to mechanical soft not signed or dated
- Cigarette butts on ground in smoking area
- PRN cart unlocked, unattended and accessible to dinging room
- OTC medication did not have label with residents name
- Glucometer reading incorrectly recorded on resident record
- Missing strength of medication on the medication administration record
- Cognitive preadmission screening incomplete for secure dementia unite resident

Pennsylvania Department of Aging / Office of the Long-Term Care Ombudsman
555 Walnut Street, 5th Floor | Harrisburg, PA 17101 | (717) 783-8975 | LTC-Ombudsman@pa.gov

App.578

- Missing assessment and support plans for two residents

No recent Civil Money Penalties have been levied against the facility.


## Saucon Valley Manor I

### General Information

Saucon Valley Manor I offers personal care services in Northampton County, Pennsylvania, under a provisional license issued by the PA Department of Human Services. The population they serve is primarily geriatric and offers a specialized secure dementia unit. It is not part of a continuing care retirement community.

The facility has a capacity of 201 beds, of which 191 beds were occupied as of 3/30/2026.  This includes 100 bed secure dementia care beds. Ombudsman has an ongoing concern receiving proper census information during facility visits.

The current occupancy rates appear consistent from facility census reports over the last year.

Local ombudsman records indicate that this census, based on the number of available beds, is slightly higher than other personal care homes in the area.

Local ombudsmen conduct regular visits to the facility.

### Environmental Observations

Saucon Valley Manor has three (3 ) secured dementia units. An up-to-date activities calendar and menu are posted. Residents report snacks are not offered. Staff do not wear name badges consistently. Ombudsman notes ongoing concerns regarding kitchen area and 2nd floor ceiling leak.

In a visit of 3/30/2026, the local ombudsman reported kitchen overall filthy noting case of strawberries in produce cooler covered in mold.

On initial visit 2/19/2026, regional ombudsman noted kitchen area in need of a deep clean. Pre-wrapped plates of food sitting in various spots of kitchen. Unidentifiable food/substances were observed in a bowl. Dietary manager shared that the facility prepares meals for Saucon II and III (buildings share same property).

In a visit on 3/30/2026, resident raised concern that $CO_2$ for the soda machine are not being delivered so they cannot have soda. Kitchen staff stated that he is aware of the issue and stated they order them weekly, but it has not arrived yet.

App.579

Ombudsman noted ceiling leak on 2nd floor during initial 2/19/2026 visit. Administrator reported that residents do not use that room, however there were several residents participating in an activity in the area during the visit.



2nd Floor ceiling leak and buckets



Photo taken during 2/26/2026 visit located in front of resident room

Pennsylvania Department of Aging / Office of the Long-Term Care Ombudsman
555 Walnut Street, 5th Floor | Harrisburg, PA 17101 | (717) 783-8975 | LTC-Ombudsman@pa.gov

App.581



Photo taken 3/23/2026 2nd floor, water running down wall in hall

Pennsylvania Department of Aging / Office of the Long-Term Care Ombudsman
555 Walnut Street, 5th Floor | Harrisburg, PA 17101 | (717) 783-8975 | LTC-Ombudsman@pa.gov

App.582



Photo taken 3/23/2026 2nd floor memory unit, heating coil leak

In a visit on 3/18/2026, ombudsman was told that the heating coil hydraulic coil must be fabricated in updated New York as it is twelve (12) years old.

Ombudsman notes during initial visit on 2/19/2026 in stairwell B all three doors to each unit were propped open by fire extinguishers. Ombudsman asked Maintenance why this was being done. He stated in the wintertime he does this to prevent the fire water line from freezing. This was brought up to administrator upon exiting facility.

**Staffing/Operations**

The Department of Human Services reports 300 daily staffing hours with 225 hours waking staff.

**Complaints/Concerns**

Two (2) cases have been instituted on behalf of residents since 12/1/24.

On an ombudsman visit of 1/10/25, a resident reported that the food is sometimes cold, and they go without eating because of the food temperature.

**Regulatory Issues/Department of Human Services**

As a result of the Pennsylvania Department of Human Services, Bureau of Human Services Licensing's licensing inspections on December 3, 2025; December 4, 2025; February 4, 2026 of the above facility, the violations specified were found.

Based on violations with 55 Pa. Code Ch. 26000 (relating to Personal Care Homes), the Department hereby REVOKES certificate of compliance (LICENSE NO 205810) dated September 3, 2025 to September 3, 2026 and issues a FIRST PROVISIONAL license to operate the above facility. The FIRST PROVISIONAL license is being issued based on your acceptable plan to correct the violations as specified. Your FIRST PROVISIONAL license is valid from MARCH 27, 2026 to SEPTEMBER 27, 2026.

Description of violations:

- Residents' enabler bars were not securely attached to bed frame\
- Locking of poisonous materials
- Wi-Fi router installed on wall missing the cover and had motherboard exposed with battery pack hanging from the unit
- Snow covering sidewalks and paths
- Unlabeled, undated food items in refrigerator and freezer
- Standing freezer in main kitchen temperature was 28 degrees Fahrenheit
- Fire extinguisher in dementia unit missing the tag
- Approximately four (4) inches of snow blocking exit
- Medical evaluations for residents incomplete
- Medication mislabeled as PRN instead of standing order
- Rasp assessment not completed annually
- Medications discontinued remained in medication cart
- Missing directions to operate locking mechanism Floor D dementia unit elevator

We trust that the information included in this report is satisfactory to the Court.  We will continue to have the local ombudsman conduct weekly site visits with the facilities which have not yet been sold and meet with residents to ensure their quality of care and life continue to be positive.

For additional information or should you have any questions, please do not hesitate to contact the PA Office of the Long-Term Care Ombudsman at (717) 783-7096.

Sincerely,

*Margaret D Barajas*

Margaret Barajas
State Long-Term Care Ombudsman

Pennsylvania Department of Aging / Office of the Long-Term Care Ombudsman
555 Walnut Street, 5th Floor | Harrisburg, PA 17101 | (717) 783-8975 | LTC-Ombudsman@pa.gov

# EXHIBIT Q

### SAUCON PROPERTY — Rent Arrears Analysis

*Saucon Trust (Landlord) / Saucon Valley Manor, Inc. (Tenant)*
*Governing: Fourth Amend. (Nov 1, 2012) rent terms, as ratified by Fifth Amend. (July 1, 2018)*
*Sixth Amendment (Sept 21, 2023) — REJECTED / NULL AND VOID*

| KEY LEASE TERMS (Fourth/Fifth Amendment) | |
|---|---|
| **Annual Minimum Rent:** | **$1,705,421.00** |
| Monthly Rent ($1,705,421 ÷ 12): | **$142,118.42** |
| *Alternative: 105% of HUD costs (P&I + MIP + reserves + insurance + taxes)* | |
| *Rent is the GREATER of $1,705,421 or 105% of HUD costs* | |
| Arrears Period (assumed same as Whitehall): | March 1, 2021 through December 31, 2025 |

**MONTHLY ARREARS SCHEDULE — March 2021 through December 2025**

| Year | Months Unpaid | Monthly Rent | Annual Rent Due | Cumulative Arrears | Notes |
|---|---|---|---|---|---|
| 2021 | 10 | $142,118.42 | $1,421,184.17 | $1,421,184.17 | Mar–Dec 2021 (10 months) |
| 2022 | 12 | $142,118.42 | $1,705,421.00 | $3,126,605.17 | Full year |
| 2023 | 12 | $142,118.42 | $1,705,421.00 | $4,832,026.17 | Full year |
| 2024 | 12 | $142,118.42 | $1,705,421.00 | $6,537,447.17 | Full year |
| 2025 | 12 | $142,118.42 | $1,705,421.00 | $8,242,868.17 | Full year (through Dec 31, 2025) |

| | | |
|---|---|---|
| **TOTAL MONTHS UNPAID:** | 58 | |
| **GROSS BASE RENT ARREARS (minimum):** | | **$8,242,868.17** |

| CREDITS / OFFSETS | | | |
|---|---|---|---|
| **Less: Property Taxes Paid by SVM on behalf of Saucon Trust:** | | -$66,271.00 | Credit to tenant |
| **Total Credits:** | | -$66,271.00 | |

**NET AMOUNT DUE — SAUCON:**    **$8,176,597.17**

App.587

# EXHIBIT R

## WHITEHALL PROPERTY — Rent Arrears Analysis

*Whitehall Trust (Landlord) / Whitehall Manor, Inc. (Tenant)*
*Governing: Second Amendment (Jan 1, 2012) as ratified by Third Amendment (Aug 31, 2018)*
*Fourth Amendment (Sept 21, 2023) — REJECTED / NULL AND VOID*

| KEY LEASE TERMS (Second Amendment) | |
|---|---|
| **Annual Base Rent:** | **$1,668,000.00** |
| Monthly Rent (as actually paid — $1,668,000 ÷ 12): | **$139,000.00** |
| *Contractual Structure: $80,000/mo + $708,000 by Dec 31* | |
| *Actual Practice: Paid as $139,000/mo (confirmed by bank statements)* | |
| Monthly Mortgage Payment (M&T Realty Capital): | $115,766.68 |
| Last Rent Payment Received: | February 22, 2021 ($139,000 remote deposit) |
| Arrears Period: | March 1, 2021 through December 31, 2025 |

**MONTHLY ARREARS SCHEDULE — March 2021 through December 2025**

| Year | Months Unpaid | Monthly Rent | Annual Rent Due | Cumulative Arrears | Notes |
|---|---|---|---|---|---|
| 2021 | 10 | $139,000.00 | $1,390,000.00 | $1,390,000.00 | Mar–Dec 2021 (10 months) |
| 2022 | 12 | $139,000.00 | $1,668,000.00 | $3,058,000.00 | Full year |
| 2023 | 12 | $139,000.00 | $1,668,000.00 | $4,726,000.00 | Full year |
| 2024 | 12 | $139,000.00 | $1,668,000.00 | $6,394,000.00 | Full year |
| 2025 | 12 | $139,000.00 | $1,668,000.00 | $8,062,000.00 | Full year (through Dec 31, 2025) |

**TOTAL MONTHS UNPAID:**          58

**GROSS BASE RENT ARREARS:**                    **$8,062,000.00**

| CREDITS / OFFSETS | | |
|---|---|---|
| **Less: Property Taxes Paid by WMI on behalf of Whitehall Trust:** | **-$68,039.00** | Credit to tenant |
| **Total Credits:** | **-$68,039.00** | |

**NET AMOUNT DUE — WHITEHALL:**                    **$7,993,961.00**

# EXHIBIT S

## Whitehall Manor/ Saucon Valley Manor
## Case No. 25-15245

### Post-Petition Rent Accruals

| | | Whitehall Manor | | | Saucon Valley Manor | |
|---|---|---|---|---|---|---|
| | | Current Month Rent | Cumulative Rent | | Current Month Rent | Cumulative Rent |
| January 2026 | | $139,000.00 | $139,000.00 | | $142,118.42 | $142,118.42 |
| February 2026 | | $139,000.00 | $278,000.00 | | $142,118.42 | $284,236.84 |
| March 2026 | | $139,000.00 | $417,000.00 | | $142,118.42 | $426,355.26 |
| April 2026 | | $139,000.00 | $556,000.00 | | $142,118.42 | $568,473.68 |
| May 2026 | | $139,000.00 | $695,000.00 | | $142,118.42 | $710,592.10 |
| June 2026 | | $139,000.00 | $834,000.00 | | $142,118.42 | $852,710.52 |



PENGAD 800-631-6989

DEPOSITION EXHIBIT

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| WHITEHALL MANOR, INC., et al., | Case No. 25-15245 (PMM) |
| *Debtor.* | (Jointly Administered) |

### JOINT NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that Secured Creditor Lehigh Valley 1, LLC and Receiver Duane Morris LLP through Erin Duffy, Esquire ("Appellants") jointly appeal to the United States District Court for the Eastern District of Pennsylvania from the Order of Judge Patricia M. Mayer of the United States Bankruptcy Court for the Eastern District of Pennsylvania entered and docketed in this case on May 15, 2026p (the "Order," ECF No. 124, a copy of which is attached hereto as **Exhibit A**).

The Order being appealed is a final order that denied the Joint Motion of Appellants for entry of an order (1) compelling the Manor Debtors to assume or reject their Leases pursuant to 11 U.S.C. § 365(d)(2) promptly, (2) establishing the cure amount, and (3) in the alternative, for relief from the automatic stay (March 31, 2026, ECF No. 56). The Order is a final order because it conclusively resolves the Motion.

### NAMES OF ALL PARTIES

The parties to the order appealed from and the names and addresses of their attorneys are:

LENDER/APPELLANT:

Lehigh Valley 1, LLC
c/o Matthew A. Hamermesh, Esquire
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103

T: 215 568 6200
F: 215 568 0300
E: mhamermesh@hangley.com

c/o Phillip D. Berger
Berger Law Group, P.C.
919 Conestoga Road, Building 3, Suite 114
Bryn Mawr, PA 19010
T: (610) 668-0800
E: Berger@BergerLawPC.com


RECEIVER/APPELLANT:

Brett L. Messinger
Duane Morris LLP
30 S. 17th Street
Philadelphia, PA 19103
T: 215-979-1508
E: blmessinger@duanemorris.com


DEBTORS/APPELLEES:

Whitehall Trust, Saucon Trust
c/o Lawrence G. McMichael
Anne M. Aaronson
Michelle V. Lee
Dilworth Paxson LLP
1650 Market St., Suite 1200
Philadelphia, PA 19103
T: (215) 575-7000
F: (215) 575-7200
E: lmcmichael@dilworthlaw.com
E: aaaronson@dilworthlaw.com
E: mlee@dilworthlaw.com


UNITED STATES TRUSTEE:

Andrew R. Vara, United States Trustee for Regions 3 and 9
c/o Rachel Wolf
Trial Attorney Office of United States Trustee
One Newark Center, Suite 2100
Newark, NJ 07102
T: (973)645-3014
T: Rachel.Wolf@usdoj.gov

2

**APPELLATE FORUM**

This appeal is directed to the United States District Court for the Eastern District

of Pennsylvania.

|  |  |
|---|---|
| | HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER |
| Dated: May 20, 2026 | By: */s/ Matthew A. Hamermesh*     Matthew A. Hamermesh One Logan Square, 27th Floor Philadelphia, PA 19103-6933 (215) 568-6200 mhamermesh@hangley.com |

BERGER LAW GROUP, P.C.
Phillip D. Berger
919 Conestoga Road, Building 3, Suite 114
Bryn Mawr, PA 19010
(610) 668-0800
Berger@BergeLawPC.com

*Attorneys for Secured Creditor Lehigh
Valley 1, LLC*


*-and-*


DUANE MORRIS LLP

By: */s/ Brett L. Messinger*
     Brett L. Messinger
30 S. 17th Street
Philadelphia, PA 19103
215-979-1508
blmessinger@duanemorris.com

*Attorneys for Receiver Duane Morris LLP,
by Erin Duffy, Esquire*

3

App.594

UNITED STATES BANKRUPTCY COURT
DISTRICT OF EASTERN PENNSYLVANIA
READING DIVISION

IN RE:                              ) Case No. 25-15245-PMM
                                    ) (Jointly Administered)
                                    ) Chapter 11
                                    )
WHITEHALL MANOR, INC.,              ) The Gateway Building
                                    ) 201 Penn Street
            Debtors.               ) Reading, PA  19601
                                    )
                                    ) April 21, 2026
                                    ) 2:31 p.m.


    TRANSCRIPT OF MOTION FOR INTERIM AND FINAL ORDERS OF CASH
 COLLATERAL; MOTION TO EXTEND/LIMIT EXCLUSIVITY PERIOD FILED BY
   WHITEHALL MANOR, INC. (DOC 72); MOTION TO COMPEL THE MANOR
  DEBTORS TO ASSUME OR REJECT THEIR LEASES, (2) ESTABLISH THE
CURE AMOUNT AND (3) FOR RELIEF FROM THE AUTOMATIC STAY FILED BY
LEHIGH VALLEY 1, LLC, RECEIVER DUANE MORRIS LLP, BY ERIN DUFFY,
  ESQUIRE REPRESENTED BY MATTHEW A. HAMERMESH (DOCS 56 AND 61)
            BEFORE HONORABLE PATRICIA M. MAYER
            UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Dilworth Paxson LLP
                          By:  ANNE M. AARONSON, ESQ.
                               MICHELLE LEE, ESQ.
                          1650 Market Street, Suite 1200
                          Philadelphia, Pennsylvania 19103


Audio Operator:           Keith Borzillo

TRANSCRIPTION SERVICE:    TRANSCRIPTS PLUS, INC.
                          435 Riverview Circle
                          New Hope, Pennsylvania 18938
                          Telephone:  215-862-1115
                          e-mail CourtTranscripts@aol.com


        Proceedings recorded by electronic sound recording,
          transcript produced by transcription service.

App.595

2

APPEARANCES:
(continued)

For Creditor, Lehigh      Hangley Aronchick Segal Pudlin
Valley 1, LLC:            & Schiller
                         By:  MATTHEW A. HAMERMESH, ESQ.
                              SARA E. SMITH, ESQ.
                         One Logan Square, 27th Floor
                         Philadelphia, Pennsylvania 19103-6933

                         Berger Law Group, P.C.
                         By:  PHILLIP D. BERGER, ESQ.
                         919 Conestoga Road
                         Building 3, Suite 114
                         Bryn Mawr, Pennsylvania 19010

For Receiver, Duane      Duane Morris LLP
Morris LLP, by Erin      By:  BRETT L. MESSINGER, ESQ.
Duffy, Esq.:             30 South 17th Street
                         Philadelphia, PA 19103

APPEARANCES VIA ZOOM:

For U.S. Foods:          Cozen O'Connor
                         By: MARLA BENEDEK, ESQ.
                         1201 North Market Street
                         Suite 1001
                         Wilmington, DE 19801

                              - - -

App.596

3

<u>INDEX</u>

<u>DEBTORS' EXHIBITS</u>                                        <u>ID</u>   <u>EVID</u>

D-8  Saucon Trust: 2012 M&T Mortgage                          117   121
D-9  Saucon Trust: 2012 HUD Regulatory Agreement             117   121
D-23 Whitehall 2012 M&T Mortgage with Rider                   117   121
D-24 Whitehall 2012 HUD Regulatory Agreement                  117   121
D-53 March Monthly Op. Reports Saucon Manor                   115   121
D-54 March Monthly Op. Reports Whitehall Manor                115   121
D-55 Cash Collateral Budget 4/25/26-7/18/26                   115   121
D-56 Abraham Kapoor Atiyeh Declaration                        116   121
D-57 Saucon Trust Firm Commitment                             116   121
D-58 Whitehall Fiduciary Firm Commitment                      116   121

<u>CREDITOR'S EXHIBITS</u>

Lvx-46    Atiyeh–Supplemental Income & Loss, 2020            117   121
LVx-47    Atiyeh–Supplemental Income & Loss, 2020            117   121
LVx-48    Atiyeh–Supplemental Income & Loss, 2021            117   121
LVx-49    Atiyeh–Supplemental Income & Loss, 2021            117   121
LVx-50    Atiyeh–Supplemental Income & Loss, 2022            117   121
LVx-51    Atiyeh–Supplemental Income & Loss, 2023            117   121
LVx-52    Atiyeh–Supplemental Income & Loss, 2024            117   121

**TRANSCRIPTS PLUS, INC.**
**215-862-1115 ● CourtTranscripts@aol.com**

4

COURTROOM DEPUTY:  All rise.  The United States Bankruptcy Court for the Eastern District of Pennsylvania is now in session.  The Honorable Patricia Mayer presiding.

THE COURT:  Good afternoon.

MULTIPLE SPEAKERS:  Good afternoon, Your Honor.

THE COURT:  Okay.

COURTROOM DEPUTY:  Okay.  I'll call Matter 39, 40, and 41, Whitehall Manor, Inc.  Motion for interim and final orders of cash collateral; motion to compel; and motion to extend exclusivity.

THE COURT:  Okay.  Why don't we get everybody's appearances, and then we can get started?  There's a lot of people at the desks.

MS. AARONSON:  Good afternoon, Your Honor.  Anne Aaronson and Michelle Lee from Dilworth Paxson on behalf of the debtors.

THE COURT:  Okay.

MR. HAMERMESH:  Matthew Hamermesh and Sara Smith of Hangley Aronchick Segal Pudlin & Schiller for Lehigh Valley 1, LLC.

THE COURT:  Okay.

MR. BERGER:  Good afternoon, Your Honor.  Phillip Berger on behalf of Lehigh Valley 1, LLC.

MR. MESSINGER:  Brett Messinger of the law firm of Duane Morris on behalf of Duane Morris the Receiver, Duane

5

Morris, LLP through Erin Duffy, Esquire.

THE COURT:  Got it.  Okay.  All right.  I presume we're just going to take them in the order that they're in, unless you want a different order.

MS. AARONSON:  No, that's fine, Your Honor.  But Marla Benedek is on, and she's --

THE COURT:  Oh.

MS. AARONSON:  She's on Zoom today.

THE COURT:  Okay.

MS. BENEDEK:  Good afternoon, Your Honor.  Marla Benedek of Cozen O'Connor on behalf of creditor, U.S. Foods, Inc.  I have not filed a formal appearance in this case -- in these cases, and I was not aware of the motion to compel or any of the briefing, but became aware within the recent days.  And with Your Honor's permission, I would like to represent U.S. Foods' interest today in --

THE COURT:  Okay.

MS. BENEDEK:  Thank you.

THE COURT:  That's fine.

All right.  So if we want to go in order, we're going to start out with the cash collateral.

MS. AARONSON:  Okay.

THE COURT:  So --

MS. AARONSON:  Thank you, Your Honor.  Do you mind if I sit or --

6

THE COURT:  You can -- yeah, as long as I can hear you --

MS. AARONSON:  All right.

THE COURT:  -- and everybody can see you.

MS. AARONSON:  We have 15 minutes, so I'm going to blow through this.

THE COURT:  Yeah, you're on the clock.

(Laughter)

THE COURT:  You are on -- officially on the clock.

MS. AARONSON:  All right.  So similar to the last few hearings, the debtors are seeking authority to continue using cash collateral on the same terms for the fifth interim period.

Before the next hearing, we're anticipating having our plan filed in these cases.  The debtors have been operating within their cash collateral budget, providing weekly and monthly financial reports to the lender, making adequate protection payments, and escrowing the Good Shepherd rent.

On that note, I believe the receiver and the debtors were all -- were a little unclear on Your Honor's order on the rent.

THE COURT:  Okay.

MS. AARONSON:  Whether that just applied to the one-month prepetition that was demanded, or whether that includes post-petition rent, as well.

7

And then also how that rent is to be applied by the receiver, because the receiver is a custodian with those rents. Are they turning them over to Lehigh?  Since we're putting together a plan, we're trying to figure out what amounts are already going, which amounts are staying, and so -- and then the other implication of that would be, at the first day hearing, if Your Honor remembers, the debtors were instructed not to provide goods or services to affiliates or to others without being reimbursed.  And the Good Shepherd rent includes a portion for their housekeeping and their portion of the utilities.

So if that rent is going to the receiver, which is fine, we just wanted to put on the record that, as a result of that, the Manors would be providing the housekeeping and the utility services to Good Shepherd without being reimbursed.  So we didn't want an issue to come up down the road that somebody's saying, "Oh, we're not being reimbursed."

THE COURT:  I think that my order really only dealt with what was sitting in escrow, which I believe was the prepetition $25,000, or something.

MS. AARONSON:  Okay.

THE COURT:  Is that what it was?

MS. AARONSON:  That was -- yes.

THE COURT:  I presume that we're going to deal with the rest of it as part of your motion today for relief, or

8

something to that effect, I think.

MS. AARONSON:  Okay.

THE COURT:  But as I understood your initial motion, I think it was just about the escrow.

MS. AARONSON:  Okay.

THE COURT:  So that's what I was deciding.

MS. AARONSON:  That was already standing, as well, but we just wanted to --

THE COURT:  Okay.

MS. AARONSON:  -- clarify for purposes of the hearing.

So back to the cash collateral motion.  As we discussed at the last hearing with the fourth interim budget, the debtors at that time were projecting a loss over the 13-week period because they had budgeted the maximum possible amounts for attorneys' fees, the U.S. Trustee fees, and other things that were supposed to come up in May.

While there still is the third pay period in May, and the real estate taxes and water/utilities will be -- will also come due during that period -- the debtors had a great March. And so they're starting out April ahead of where they were expecting to be.  And because Dilworth's retention is still on appeal, and the Trusts were dismissed, and it's stayed as to the Trusts right now, Dilworth's fees are not going to become due during that 13-week period.  And the debtors had called the

9

U.S. Trustee's Office, and invoices won't be coming out.  So those will not be due until later weeks, so those have been moved out.

Due to the increase in income, and then those expenses moving out, the debtors are now not projecting a loss, and they'll remain positive for the whole 13-week period.  And --

THE COURT:  But won't they eventually have to pay that?  I mean, won't that -- I mean, I get that it disappears for now.

MS. AARONSON:  Right.

THE COURT:  It certainly comes back.

MS. AARONSON:  Right.

THE COURT:  And my concern, I think, is that you take it off the budget now, but if it's not sitting someplace ready to be able to be paid, then aren't we still in the same position?  It's just that we're pretending it's not there?

MS. AARONSON:  Not exactly, Your Honor.

THE COURT:  Okay.

MS. AARONSON:  Because, as I've said, we're planning to file a plan in the next 30 days.  And the fees are -- well, Dilworth's fees are administrative claims --

THE COURT:  Right.

MS. AARONSON:  -- to begin with, they can be paid in a plan.

10

As I've indicated in prior hearings, Mr. Atiyeh is going to put money into fund the plan.

THE COURT: Okay.

MS. AARONSON: So in some way, shape, or form, there will be money there to pay those fees.

THE COURT: Okay.

MS. AARONSON: And I'm sure we'll have some objections to them, and things will get pushed out to who knows what week. So that's --

THE COURT: Yeah.

MS. AARONSON: It's just for purposes of this interim period, none of that stuff is going to come due, and we don't anticipate a loss over the 13-week period. And this includes having undertaken the -- making the repairs for the damage that was suffered by the facilities over February. So I'm sure Your Honor has read the patient ombudsman's report. And those will be more issues for Thursday or later in this hearing, but all of those repairs have been undertaken and made. So the debtors do have the ability and have properly maintained and repaired their properties.

We -- as you may recall from the last hearing, as well, there were discussions regarding the accounts payable that were shown in the attachments to the operating reports, particularly with U.S. Foods and, I think, one of the utilities showing an account payable. And following that hearing, Mr.

11

Atiyeh, Jr., the son, and the bookkeeper went carefully through all of the invoices, and every payment that was made, and there are no open post-petition invoices for any vendor or service provider.

All of the indications on the attachments to the MORs are for prepetition amounts and also for post-petition invoices that aren't yet due.  U.S. Foods, for example, has a 45-day payment term.

So for invoices that were issued December 24th, they would be 45 days out as -- they wouldn't be paid, but they would be -- they wouldn't be due for 45 days.  So those were showing up on the MORs as unpaid invoices.

The 30 -- zero to 30 and 30 to 60, it largely included the post-petition invoices because they weren't yet due because it's a 45-day period.

So they -- we've confirmed that there are no outstanding vendor payments that are owed or service provider payments.  All employees are paid in full.  The adequate protection payments are being made.  The escrows are being made.  The debtors are complying with their budgets, providing their financial reports.

I do have to fall on my sword that I missed sending Mr. Hamermesh the March reconciliation that was due on the 10th.  I just missed the email when they sent it to me, so -- but I've since sent that to them.

12

Let's see.  As -- with respect to the debtors paying post-petition professional fees without Court authorization, I know this was brought up in Ms. Wolf's motion, but that does impact on the cash collateral, as well.

The payment that was reflected as being made to Dilworth was the Good Shepherd rent that was being escrowed.  So it wasn't a payment of professional fees.  It was a payment to Dilworth of the Good Shepherd rent.

The payment to Lukens was the retainer that was approved by the Court.  So there's -- there shouldn't be an issue there, although the debtors forgot to check the box on the front where it asked about payment of professional fees.  I think they forgot to check the "yes," but the payment itself was reflected in the MOR.

There were -- there was a small payment made to Hoegens, I think it was less than $3,000, and that was mistakenly made when the Court approved Hoegens' retention application.  The debtors thought that that also approved payment, and Hoegens is returning that.

Likewise, at the outset of the case, there were two small payments made to the debtors' contracted bookkeeper before the U.S. Trustee took the position that she was a professional, and those have also been returned.

So there have been no unapproved payments made to professionals in these cases.

13

We don't believe that MORs are misleading or erroneous in any way.  And we did include an affidavit for today with -- of Mr. Atiyeh attesting to all of these facts and the analysis of the payments confirming that all post-petition payments are made, and he's also available for cross, if anyone needs to do so.

The debtors have also had a few new residents move in, which has increased their income.

So as I said, we're not expecting any loss over this period.  The debtors have been providing all their goods and services, and paying for them post-petition as they come due without the need for DIP financing or any post-petition monies, which will allow them to conserve those for the plan when that's filed.

We don't believe there's any evidence of depreciation in value.  And on that note, I should mention we did get our valuations this morning.  So we're on our way for finalizing our plan to be filed.

Okay, that's about -- I think my 15 minutes is close to up.  But, Your Honor, we would urge the Court to allow the debtors to continue to use cash collateral for this next fifth interim period on the same terms as the prior four.

THE COURT:  And that period you're asking for through when?

MS. AARONSON:  Well, we were going to kind of discuss

14

that a little later, because with holidays and things coming up, and I know the Atiyehs have their daughter's graduation in Boston the week that this hearing would normally happen, and then I'm in Spain for a week.  So I was wondering if it would be possible to have the next period be, like, mid-June?

Also, it's my understanding from the Atiyehs that the patient care ombudsman was out on Wednesday, and is providing a supplemental report about 10 days from now, and they did confirm that everything was fine and taken care of.  So --

THE COURT:  Was out last Wednesday or was out -- or is coming -- coming?

MS. LEE:  Yesterday.

MS. AARONSON:  The 15th.

THE COURT:  Thank you.  Okay.

MS. AARONSON:  The 15th was the state that came out. And then yesterday, the ombudsman, who appears at -- she'll be on -- at the Thursday hearing, as well.  But she indicated that she was going to provide a supplemental report in around 10 days.

THE COURT:  Okay.  All right.

MR. HAMERMESH:  I --

THE COURT:  Yes?

MR. HAMERMESH:  Did you have a more specific -- I wasn't clear what date you were talking about having the next hearing.

15

MS. AARONSON:  Well, I'm in Spain until June 9th.  So anytime after the 9th, is good for me.

THE COURT:  Anytime after June 9th.  Okay.

MS. AARONSON:  I fly back on the 9th, so --

THE COURT:  All right.  Mr. Hamermesh, you're up.

MR. HAMERMESH:  Yes, thank you, Your Honor.

We had a brief evidentiary presentation I would want to put on, if I could do that.  And I had discussed with Ms. Aaronson and wanted to confirm, we had proposed to just incorporate the testimony and exhibits admitted at the prior hearings, if that's agreeable.

MS. AARONSON:  That's fine.  I'm sorry; yes.  From the prior hearings?  Yes.

THE COURT:  Okay.

MR. HAMERMESH:  All right.

THE COURT:  All right.

MR. HAMERMESH:  And, Your Honor, I think we covered this at prior hearings, but I just wanted to highlight the provisions.  I think we're plugged in, but not --

MALE SPEAKER:  (Indiscernible - not at microphone).

MR. HAMERMESH:  Yeah.

MALE SPEAKER:  Okay.

MR. HAMERMESH:  I just wanted to run through the relevant provisions of the leases on two issues.

THE COURT:  Sure.

16

MR. HAMERMESH: One, that, as we've discussed before, our position is that the leases are net leases under which the tenant, the Manors, the debtors here today, are obligated to pay things like taxes, maintenance, and insurance.

And then the other is the rental amounts due under the leases.

So for Whitehall Manor in the original lease, there are two relevant provisions, which you can see on the screen, 3.14 and 4.05, both of which say in various ways, the lessee agrees to pay as their additional rent things like mortgage insurance, liability insurance, other required insurance.

And then in Section 4.05, that the tenant is obligated to pay insurance, taxes, and maintenance.

And this was continued in subsequent amended versions of the lease. So here, the second amendment in 2012, Paragraph 4 says that other than as set forth in Sections 1 and 2, which are not pertinent here, there are no other changes to the original lease.

And there was a reference in that to the HUD addendum; this is a portion of the HUD addendum. It's a standard set of provisions that go with the lease, with a HUD insured lease, which essentially say the same thing. That if you look at Paragraph 5, 5A and 5D are essentially the same as the net lease provisions of the original lease. That the lessee is responsible, again, for taxes, insurance, etc.

17

And then, again, the third amendment, which I believe was in 2020 -- 2018, says, again, that all the same terms continue to apply. And it's the Saucon Manor has -- they're worded slightly differently, but essentially the same provisions. Paragraph 5 of the original lease says this is a net lease, and except as to the contrary as otherwise expressly herein provided, all costs of taxes, insurance, improvements, maintenance, repairs, alterations, etc., shall be at the sole cost and expense of the tenant.

And this was continued in various addendums, which has had various other provisions in it, but didn't change anything about the net lease provision. That's the second amendment.

And all of these are part of Exhibit LVx-1 and 2, which we've presented previously.

With regard to the amounts of rent due under the leases, the leases, we would submit, speak for themselves. They have amounts in them, that's what's due. And given that they're net leases, there's no credit that the tenant is entitled to for amounts they pay, such as taxes, insurance, and maintenance.

So under the -- so if you'll remember, Your Honor, we've talked about it before, there were amendments in 2023; the District Court entered an order invalidating those. What I'm going to show you is the operative amendments prior to

18

that, their provisions for the rent.

So here, you have for Whitehall Manor and Whitehall Trust, the second amendment, I believe, in 2012 provided for rent of $1,668,000 per year, which I believe comes out to $139,000 a month.

And as to Saucon Manor, you see here from Exhibit LVx-2, it's a rather long and complicated provision, but if you just read Paragraph A and Romanette 1, it's the greater of, and there are two different amounts, one of which is $1,705,421, due in 12 annual installments.

And there's another complicated formula, but it's the greater of whichever one -- of whichever of them is larger. So it's at least the 1,705,000, which is about $142,000 per month.

So -- and if you want to skip over to the last page. So here, Your Honor, this just shows what the post-petition rent is, the 139,000 and the $142,118.42.

And I just want to take -- keep those numbers in mind, it's about 140,000 a month for each of the properties, and look at the budgets the debtor has for the 13-week period. So 13 weeks is approximately three months.

(Pause/Off-the-record colloquy)

MR. HAMERMESH:  So, Your Honor, two things to note about this.  First of all, I don't think it's disputed that there is no money in here to pay rent.  That's not a question.

TRANSCRIPTS PLUS, INC.
215-862-1115 ● CourtTranscripts@aol.com

App.612

19

But if you look -- this is Whitehall Manor.  If you look, the initial beginning cash balance for the properties is 419,000 dollars and change, and the ending cash balance is predicted to be $533,000 at the end of this period, which is an increase in cash of 114,000.  So that's not even enough to cover one month's of rent, although I think the $533,000 would be enough to cover three months of rent.

But then in addition to that, as Your Honor pointed out, there's Dilworth's fees, which aren't addressed here.

So, Your Honor, I think this paints a picture of a debtor which, although they have a substantial amount of cash, aren't addressing the critical issues that are going to need to be dealt with in their bankruptcy case.

And we can look at Saucon Valley's, a similar position, beginning cash 599,000, and ending cash of six hundred and fifty-five, so it's an increase of 56,000.

Sara, can you put up the Saucon?

So that's even less of an increase, and still has to deal with the same issue with the rents and the Dilworth fees.

And debtors' response to this is that they'll pay it all in the plan.  But, Your Honor, that misses the point.  The point of thinking about things like adequate protection for creditors is against the possibility that the plan isn't going to work, which is not that unusual in the Chapter 11 case.

I'm here to protect my client's interest, obviously.

20

Their interest is put at serious risk. Essentially, what the debtors are proposing to do with the cash collateral here is place all the risk on the lenders and, frankly, the Dilworth firm also, that they're going to go through this, incur -- accrued substantial rent unpaid and substantial legal fees, with a significant risk that they're never going to be paid while taking care of all the other issues, primarily the Atiyehs' management of the properties.

The -- Ms. Aaronson mentioned that part of the plan is that Mr. Atiyeh is going to put in cash to fund the plan. For cash collateral purposes, that really only counts if that's something he's doing now. If he wants to put in cash to make sure the rent is paid or that the Dilworth firm -- Dilworth firm's fees are paid, he should do that. We're not required to wait for the possibility that a plan will be confirmed to cover that.

Your Honor, the other thing I just wanted to note briefly also was that under the current cash collateral order, there's an adequate protection payment which is due on the 13th of this month. It wasn't paid, I believe, until the 17th, which is a concern. I understand there's an explanation for that, but that's a problem also.

And for that reason, Your Honor, we object to the continued use of cash collateral on the terms that the debtors have proposed.

21

THE COURT:  Okay.  Did you want to -- I mean, you had, like, five minutes left.

MS. AARONSON:  Okay.

THE COURT:  So, did you want to respond?

MS. AARONSON:  Okay, just very briefly.  Your Honor, on that, the payment that was made on the 17th, that's because the debtor has that payment scheduled for the second check run of the month.

THE COURT:  Okay.

MS. AARONSON:  And this year -- this -- this month, the 13th was earlier in the week, and so it went out on the check run, but that was at the end of the month.  So that delayed it a little bit.

Your Honor, as I mentioned, we're going to file a plan in about -- within the next 30 days.  And we don't need the leases in the plan, so we'll discuss that a little bit, you know, in terms -- in -- in connection with the motion to compel.  But there's no reason to be calculating any lease payments now, and there's no reason to include them in the cash collateral budget.

Also, the cash collateral, we're using that for operations to preserve the going concern value of the debtors' pending plan confirmation.

We believe that the lenders are adequately protected.  We do have the valuations now.  They're a little bit higher,

22

so, you know, that's -- there's no depreciation in value at all.

The rent money, as we've discussed at prior hearings, there -- if you use the one month -- the first month of rent from the residents and pay it over to the rent that goes to the Trust, it doesn't mean the lenders get it right away anyway. So you're basically escrowing money that is needed for operations and would sink all four cases.

I wanted to let Ms. Lee touch on the initial part that dealt with the amounts under the lease, since we might have, like, three minutes left.

MS. LEE:  Yes, Your Honor, briefly.  The secured creditor is relying on some lease provisions that were drafted -- for example, for Saucon, that lease was drafted in 2006 before the HUD mortgage.  And pursuant to HUD, they had the landlord, which was the Trust, and the Manors, and the mortgage company, and HUD, all met together to determine what should the Manors' payments be.  And they put these in the later amendments of the leases.

So even though the -- even though the mortgage company or secured creditor keeps saying that these are net leases, they were not true net leases.  And you can see that, Your Honor -- if I may approach -- on the -- on the fifth amendment of the lease.  Right here, Your Honor, they amended the lease on Section 4.02A, which lists all the things that

23

were a part of this rental payment. That included principal and interest, it included mortgage insurance premium, which is no longer to be paid because once HUD sold these loans, there was no further guarantee by the Government or by HUD, so there's no more mortgage insurance premium.

There's also -- there's reserve replacement. That reserve placement [sic] was for all capital improvements that the Manors had to apply for, that the Trust had to apply for to HUD to pay.

And if you go here, you have the annual property insurance premiums that were also included as a part of the rent, but it was all -- all of these things related to the property insurance and taxes were all part of the rent here.

Because HUD is no longer involved, the only obligation that's left for the rent is the property -- the -- is the mortgage and the -- the mortgage principal and the mortgage interest.

The taxes are being paid by the Manors. The insurance is being paid by the Manors. The maintenance is being paid by the Manors. All these things are now under the Manors' payment and control, and that is what is in our cash collateral.

THE COURT: When this was amended -- the subsequent amendments that Mr. Hamermesh put up, so are you saying that those provisions were changed once HUD went away?

24

MS. LEE:  No, that's one of the problems here, is that no one can really figure out what is going on with the mortgage -- I mean with the rent payment because you have leases with these provisions that they -- that they are now relying on leases with these provisions that incorporated the HUD provisions, but HUD's no longer here.

So they're creating this big production over rent. We're saying rent is not an issue right now because we're going to address it in our plan.

But even if, how do you calculate it?  You can't include mortgage insurance premium.  You can't include insurance.  You can't include taxes.  These are all things that the Manors are paying for, not because of a net lease, but because that was what they were paying -- that was what the Trusts were paying at the -- during HUD.

So that is what's causing the problem of the rent calculation.  That's one of our main disputes, which is why we suggested a mediation on this, which was denied -- or rejected, I should say.  That is one of the problems here.

(Alarm sounding)

THE COURT:  I don't think time's up.

MS. AARONSON:  Time's up.

(Laughter)

MS. LEE:  And, Your Honor -- and, Your Honor, there are additional amendments that are all incorporating each

25

other. You have a second amendment with Saucon, for example, where the landlord said, no, we're going to be responsible for the maintenance and lawn care. We're going to be responsible for the taxes. They made these amendments to these leases that then kept going forward through the subsequent leases. So they're all incorporated.

And even though HUD's no longer here, the question then becomes, well, what do you do? How can you force the Manors to pay mortgage insurance premium -- mortgage insurance that's no longer required under any kind of regulations? It shouldn't be a windfall for the lender here. That's the problem with their argument, Your Honor.

THE COURT: Okay.

MR. HAMERMESH: Your Honor, may I be heard briefly?

THE COURT: Yes.

MR. HAMERMESH: Three things, Your Honor:

First of all, Ms. Aaronson said there's no depreciation. But our claim -- our secured claim consists of at least two things:

One, the value of the real property;

Plus, two, the rent. And the rent is increasing, but not being paid -- the rent accrual post-petition is increasing, but not being paid. And I guess that's not exactly depreciation, but it is making my client's situation worse.

Second of all, Your Honor, the lease provision that

26

Ms. Lee showed you is exactly the same one I showed you. And it says the rent is the greater of $142,000 a month or the complicated formula she was walking you through.

The leases speak for themselves. They say here is what the rent is. They may have reasons why it should be less, although they have not yet sat down and explained to me what they think it should be. But they do speak for themselves, and they're written documents, and we have things like the statute of frauds, which apply to leases.

And so we would submit that the rent is the 138,000 and the 142,000.

And for those reasons, Your Honor, we would ask that you not grant the cash collateral usage on the terms that have been so proposed.

MR. MESSINGER: Your Honor, may I have 92 seconds?

THE COURT: Sure.

(Laughter)

MR. MESSINGER: Okay.

THE COURT: I will mark that down. Go ahead; 91.

MR. MESSINGER: I -- and I wasn't going to really address anything, except they've brought up the Good Shepherd thing and --

THE COURT: Yes, I wanted --

MR. MESSINGER: -- also in regards to --

THE COURT: I wanted to go back to that.

27

MR. MESSINGER: Yeah.

MS. AARONSON: Yes.

THE COURT: Go ahead.

MR. MESSINGER: So when we look at your order and your very well-reasoned opinion, what you relied upon was the direction letter --

THE COURT: Right.

MR. MESSINGER: -- being sent prior to the time the petition was filed. So, therefore, once the direction letter was sent, it took the Good Shepherd stuff out of the bankruptcy estate.

THE COURT: Correct.

MR. MESSINGER: So we are having this argument. And one of the things I said is if we have a direction letter that seized the Good Shepherd rent, then how does it go back and invalidate that direction letter?

And by the way, there was also another comment just in regard to what is it that the Trust would actually pay. I actually have written to Ms. Lee asking -- going through the budgets in regard to sources, and really because they filed bankruptcy just at the time where we got a direction from the District Court to provide us certain information, we're still not -- we're not knowledgeable of what the Trust obligations are.

So in regard to what we do with the money, there are

28

expenses that can be paid from the Trust, but we also want to know what else, as the receiver appointed by the District Court, what other expenses they have.

I see this net lease, but I don't know what the administrative costs and all the other types of things that were being incurred by the Trust so that I know what to do with the Good Shepherd money. It's not just going to be turned over to the bank. We have an obligation to the property, as well, and we want to make sure that we can use that money for those obligations.

So it's the excess money that would go to the lender, not the initial payment.

THE COURT: Okay.

MR. HAMERMESH: And, Your Honor, just if I could. We have no objection to -- if the money is paid to the receiver, it being applied in accordance with the receivership order.

MR. MESSINGER: Yeah, that -- that's exactly what we would do is, the receivership order does give us -- we're not -- you know, we don't make decisions. We're directed by the receivership order. We have certain duties to the properties, and all of that, in regard to what the receiver's is. That's why we want to know -- and we never got the information. I still haven't got the information, even though I've asked Ms. Lee for it, is what are the monthly obligations for the Trusts? I'd expect to get that information.

29

But moreover, there -- there's sort of a hierarchy as with regard to how the receiver is supposed to apply those monies once they're received.  And there are -- there are outstanding costs associated with that receiver's order, including my attorney's fees, by the way, just to be straight with you.  But, you know, we're not going to favor them.  We want to know how to preserve the ownership's interest in the property pursuant to that receiver's order.

THE COURT:  Okay.  All right.  So my issue with cash collateral is this.  While I understand that the budget looks nice now, because some things were taken out, and it doesn't have a bunch of negative numbers all over the place; it's helpful.  But I am still concerned that, you know, we're looking at being in this since December, and rent, whatever it is, is not being paid.  And while I understand that the retainer -- or the retention agreement is still up in the air, obviously attorneys' fees are continuing to accrue.  And I don't see any wiggle room necessarily in the budget that would allow for that.

And so at this point, I feel like I've given the debtor the opportunity to try and show me that they have the ability to move forward with this, and I'm not sure that I am convinced that they're able to do that for a long period of time.

Having said that, I am also aware of your motion to

30

extend the exclusivity period, because I think your plan originally is due the 27th of this month.

MS. AARONSON:  Right.

THE COURT:  Yeah.  And if I were to deny that motion, and the plan were filed on 4/27, we wouldn't get to confirmation until probably the beginning of June, is my guess, because it would be at least a 30-day window.

MS. AARONSON:  Right.

THE COURT:  So we're talking about the same time frame.

So having said that, I think the only thing that I can do at this point is to allow cash collateral for the shortened period to get to confirmation.  So we're looking at a June -- like an early June date.  Because I know I haven't had you argue the exclusivity period yet, but I think that's the -- I think that's the most equitable way to deal with this, because I also understand that if I shut down cash collateral today, I shut down everything.  And I'm not necessarily willing to do that without more information about the value of the properties, etc.

And, yes, there are some adequate protection being paid, and I understand that it's not enough from your side.  I totally get that.

So what I'd like to do with cash collateral is to give you a limited order, which takes you through to the end of

31

May, which is really just, I guess, about a month at this point, and see where we are at that point, because I do think that we may be at confirmation at that point.

MR. HAMERMESH:  Your Honor --

THE COURT:  With the understanding that I would need to see what is going on with additional contributions from the principals.  Because right now, this budget has none of that. And I know that you're promising me that in the plan, Mr. Atiyeh is going to fund some expenses.  I don't have anything in front of me about that.  I don't have whether or not he has the ability to do that -- and I get that that is a confirmation issue.

But if right now, what we're relying on and saying, I'm pushing off the two fifty for counsel fees till later, is that the principal is going to come up with some money, I feel like I need to see some of that.

So if that means that I need you to look at the budget again and, at a minimum, give me some idea of what that contribution is going to look like, because I don't -- at this point, I'm not sure that I believe that these numbers are sufficient to keep this place going and to deal with all the expenses that exist.

So I will give you --

MR. HAMERMESH:  Your Honor --

THE COURT:  -- the time to work out what that looks

32

like, and to submit a new budget that shows some kind of escrow for the funds that are going to be coming due -- the expenses that are going to be coming due in the next, like, six weeks.

MS. LEE:  Our budget already has that.

THE COURT:  I --

MR. HAMERMESH:  Your Honor --

THE COURT:  Go ahead.

MR. HAMERMESH:  Sorry.  Just to be clear, when you're saying expenses that are going to come due, are you talking about --

THE COURT:  I'm talking about the -- I'm presuming that taxes are going to come due.  I'm presuming that --

MS. LEE:  That's all there.

THE COURT:  -- attorneys' fees are going to come due. Whether you want them to or not, they're going to come due, and they're fairly large numbers.

MS. AARONSON:  Right.

THE COURT:  So, I mean, unless you want to direct me to something in your budget, I don't see that escrowed anywhere.

MS. LEE:  Yeah, it's there.

MS. AARONSON:  Right, the taxes are in there, Your Honor.

MS. LEE:  And the -- and the --

THE COURT:  Okay.

33

MS. LEE:  And the Dilworth fees.

MS. AARONSON:  And the Dilworth fees.  They're spread out towards the end.  If you see that on the line item for professional fees, there's 25,000.  We don't know exactly what week they'll come due.  But starting, I think, the last four weeks of the budget --

MR. HAMERMESH:  Your Honor --

MS. AARONSON:  -- there's 25,000 in each week. Because we're not sure when they're going to be approved or due, so we've kind of had them building through that.  Let's see.  When does it start?  It starts June -- the week of June 6th.

MR. HAMERMESH:  Your Honor, are you including the rent in that?

THE COURT:  I am.  I am, because I do think that regardless of what that number is, which I don't know what it is yet.  No one has really -- other than your number, I haven't heard anything to the contrary.  It's going to come due, right? I mean, at some point in time, it's going to come due, and I don't know that there's any ability, at least from these budgets, to put that aside.

MS. AARONSON:  Well, with regard to the rent, though, Your Honor, the rent -- every component of the rent, other than mortgage, interest, and principal is being paid by the Manors right now.  The real estate taxes are in the real estate and

34

insurance, which is in the insurance, too.  There is no MIP anymore.

They're paying for the repairs and maintenance.  I mean, they just had a ton of them in February from the storms.

All -- everything that is a component of the rent is being paid by the Manors.  The only part that's not being paid is the mortgage, principal, and interest and --

THE COURT:  And you don't consider that a component of the rent?

MS. AARONSON:  Oh, no, it is.

THE COURT:  Oh, okay.

MS. AARONSON:  It is, but it's also the mortgage, interest, and principal that's going to be paid under the plan, and they're getting $70,000 of that every month with the two $35,000 adequate protection payments.

So -- and as I indicated before, we don't think we need the leases in the plan, and we're going to provide for payment under the Code for Lehigh.  And -- I mean, we're -- you know, and if we need to do a DIP with the principal, he's perfectly willing to do that.  We just figured that since they're operating at a profit all the way through when we're going to file a plan and obtain confirmation, we were kind of holding off on that money to fund the plan, rather than using it during the case.

But, you know, if Your Honor is going to grant use of

35

cash collateral through May 31st, then we'd be filing a DIP motion between now and then, just to make sure that we have sufficient cash and cash collateral approved through confirmation.

MR. HAMERMESH:  Your Honor, they keep talking about components of rent, but there aren't components.  There's an amount that's due, or at least that's the only evidence before the Court.

I guess if they wanted to escrow that amount, subject to resolving someday what the actual amount is owed, that would be fine.  But I think the only number before the Court is the hundred and thirty-eight or nine thousand, and the hundred and forty-two.  And I submit, Your Honor, that they should be -- have to escrow that starting immediately.

THE COURT:  Ms. Aaronson, did you want to respond to that?

(Pause/No audible response heard)

THE COURT:  So we're looking at May -- well, I guess at this point May and June would be after today.  It would be two months.  May and June --

MR. HAMERMESH:  Yes, Your Honor.

THE COURT:  -- essentially.

MR. HAMERMESH:  And, Your Honor, just to be clear, I think we raised an issue in the motion -- of the motion that's going to be heard next, about whether there is a lease at all.

36

We're obviously --

THE COURT:  We haven't gotten there yet.

MR. HAMERMESH:  -- reserving that.

THE COURT:  We're talking all around it, but we haven't gotten there yet.

MR. HAMERMESH:  Right.  Reserving our rights on that.

And then the other issue, Your Honor, is you talked about the confirmation timeline and that we vet it at confirmation hearing in early June.  And I'll confess it's been a while since I've been on either side of a confirmation proceeding, but I would have thought they have to file a disclosure statement, get that approved, which would be early June.  And then we would have a confirmation hearing --

THE COURT:  I was --

MR. HAMERMESH:  -- probably sometime in August --

THE COURT:  Well, if their --

MR. HAMERMESH:  -- unless there's a --

THE COURT:  -- exclusivity period is not extended --

MR. HAMERMESH:  Right.

THE COURT:  -- 4/27 is what we're looking at for a plan and a disclosure statement.

MR. HAMERMESH:  And they have 60 days.

THE COURT:  Then we'd set that for -- right.  So, okay.

MR. HAMERMESH:  Okay, maybe --

37

THE COURT: So, it's probably --

MR. HAMERMESH: Okay.

THE COURT: Yeah.

MR. HAMERMESH: But then we'd be hearing on the disclosure statement --

THE COURT: We would.

MR. HAMERMESH: -- in the period she's talking about -- they're talking about being unavailable.

THE COURT: We would. All right. What I want to do with cash collateral is this. For that limited time frame, which is from now through the end of May, I'd like to see a new budget that has the rent piece in it for each of the entities, which, at this moment, I have at one thirty-nine and one something -- one forty-something -- one forty-two. And that would mean, I would think, that there would need to be some kind of contribution from the principal in order to make that work, because I don't see how the numbers work without that.

MS. LEE: Your Honor --

THE COURT: Go ahead.

MS. LEE: Just briefly. The one issue with that is, again, is that a part of that rent is already being escrowed with the taxes and the Manors are paying for the insurance.

THE COURT: Well, if you escrow it and don't pay it yet --

MS. LEE: Right.

38

THE COURT: -- I'm fine, because at this point, that has to be resolved before we get to confirmation.

MS. LEE: Right.

THE COURT: Right? But right now, the only number I have are the numbers that they're giving me.

MS. LEE: Right.

THE COURT: And so what I'd like to see is that, at a minimum, we have that money sitting somewhere. And right now, I don't see it anywhere. So I'd like to see it in the budget. And if that means that, you know, it's just escrowed for the next two months, I'm fine with that, but I need to see the ability to at least pay it.

MS. LEE: Okay.

MR. HAMERMESH: And, Your Honor, I -- what do we mean -- what do you mean by escrow? Who would you expect to hold that?

THE COURT: I would probably expect the receiver to hold that.

MR. HAMERMESH: Okay. That's fine with us.

THE COURT: Are you okay with that?

MR. MESSINGER: Yes, Your Honor.

THE COURT: Okay. Because I think that that is realistically what we're going to have to haggle over later, is what that number really looks like --

MR. HAMERMESH: Absolutely, Your Honor.

39

THE COURT:  -- and where it's getting assigned.

All right.  Let me look at the schedule, because you told me that you have -- so if we do it through the end of May, then I'm -- and we're -- everybody's not around at the end of May.  Is that what I heard?

MR. HAMERMESH:  One moment, Your Honor.  There's one day I don't -- I think that's the middle of May is a problem for me, but the end of May, I think, is fine.

MS. AARONSON:  I have -- I'll be in Florida, but I can --

THE COURT:  Like, the 26th is a problem?

MS. AARONSON:  I think the 26th is okay.  Well, is that okay for --

MS. LEE:  Would it makes sense --

MS. AARONSON:  Yeah, okay.

MS. LEE:  -- to do it by Zoom?

MS. AARONSON:  They have a graduation, but it's a few days before that.

THE COURT:  Okay.

MR. HAMERMESH:  I'm sorry, Your Honor, I just -- I have a graduation also, but I think it's long before that.  I just can't find it on the calendar.

THE COURT:  Okay.

MR. HAMERMESH:  Oh yeah, that's the 19th, so the 26th would be fine for me.

40

THE COURT:  Okay.  I mean, I'm happy to do it by Zoom.

MS. AARONSON:  Yeah, let's do it by Zoom.

THE COURT:  To make it convenient for everybody who's traveling --

MS. AARONSON:  Traveling, yeah.

THE COURT:  -- or doing whatever they're doing.

MS. AARONSON:  That would be best, if Your Honor doesn't mind.

MR. HAMERMESH:  That's fine, Your Honor.

THE COURT:  Okay.  All right, so 5/26, we can do it at the same time, if you'd like, 2 o'clock, 2:30?

MS. AARONSON:  Sure.

MR. HAMERMESH:  That's fine.

THE COURT:  All right.  So we'll do 5/26 at 2.

In the interim, you'll get me a new budget, and a new order with the provisions requiring the rent to be escrowed by the receiver for the months of --

COURTROOM DEPUTY:  You have a 1 o'clock list that day.  Do you want it 2:30?

THE COURT:  Oh, 2:30, yeah.  I have a 1 o'clock list.  Sorry, 2:30 it is.

MS. AARONSON:  And just logistically, the debtors are allowed to use cash collateral until we get that budget and order entered, right?

41

THE COURT:  Yes.

MS. AARONSON:  Okay.

MR. HAMERMESH:  Well, we're --

MS. AARONSON:  I didn't want there to be a gap --

THE COURT:  When is rent usually due, the first of the month?

MR. HAMERMESH:  Yes.

THE COURT:  So it's --

MR. HAMERMESH:  But we're still in April.

THE COURT:  Yeah, so we are still in April.

MS. AARONSON:  For another week or two.

THE COURT:  I'm going to have it start as of May 1st. So it's really one month at this point until we get to the next hearing.

MS. AARONSON:  Right.

(Pause)

THE COURT:  Okay.  Let's move on to whatever's next, which my computer has decided not to tell me.

COURTROOM DEPUTY:  Number 40, motion to compel.

THE COURT:  Thank you.

All right.  Well, the next one is the exclusivity period or is -- why don't we do that next?  That probably makes sense, rather than the motion to compel.  Is that okay?

MS. AARONSON:  Yes.

THE COURT:  Can we do that next?

42

MS. AARONSON:  That's fine, Your Honor.

THE COURT:  Okay.  All right.  It's all yours.

MS. AARONSON:  Okay.  Thank you, Your Honor.

So with respect to the pleadings that were filed, the debtors agree that these are not uncomplicated cases -- or these are uncomplicated cases, despite the amount of litigation that they've been dealing with Lehigh from the outset of these cases.

As a result of that litigation, the debtors have had difficulty focusing on reorganization from the beginning of the cases, but nevertheless have negotiated with several of their creditors.  I know U.S. Foods, the attorney had to drop off at 3 so --

THE COURT:  Oh.

MS. AARONSON:  -- we missed her statement, but --

THE COURT:  Okay.

MS. AARONSON:  But in any event, despite all the litigation, we're well positioned to file a plan within the next 30 days.

Hearing what Your Honor has just ruled, I --

THE COURT:  Is there a reason that it can't be done by the 27th?

MS. AARONSON:  Well, we just got the valuation.  Mr. Atiyeh has the commitments on the financing, so it's largely drafting.

43

And so between now and -- we have the hearing on Thursday, and so it's just -- there's only so many hours in a day.  So that's kind of where we are.

And as for the progress of the cases, we were farther along on the plan until the Trust debtors were dismissed.  And so, you know, Paragraphs 1 and 14 of their objection kind of say it all.  There's, like, there's two or four.  So we've kind of had to pivot on which options remain available for the Manor debtors, because since the dismissal is kind of up in the air now, we don't know whether the Trusts are going to be in or out.  Should they be included in the plan?  Should they not be included in the plan?

But we think we've found a way --

THE COURT:  Well, that's not going to happen in 30 days, though, right?

MS. AARONSON:  Right, exactly.

THE COURT:  Okay.

MS. AARONSON:  So I think we've used the time since the dismissal to come up with a plan that doesn't require the Trust to be in or out.  We can deal with the Trust, the mortgages, and everything in a plan filed for the Manors.

So that's our plan, is to file one.  It's just now drafting the rest of that.

And so as I indicated, we received our valuation this morning.  We got the preliminary numbers on Friday, so we were

44

kind of working with those.

We have the universe of proofs of claim now to put together a plan.  We've been making all of the payments that are required post-petition, and we believe there's a strong likelihood of successful reorganization in these cases.  Actually, the dismissal of the Trusts kind of helps us in that regard of getting plan confirmation.

But in any event, we believe that we are well positioned to file a plan, and we have not -- we admittedly haven't discussed plan terms with Lehigh because they tend to object to everything that we ask for, including a settlement conference to discuss the amount of rent.

So we figured it would be better to get a plan on file first, and then discuss what's actually in front of them rather than the "what ifs," and the suppositions, and things of that nature.

So we've negotiated with tax creditors, we've negotiated with others, and kind of have a framework of a plan together.  So it's drafting it and putting together the disclosure statement, which, as I indicated, we believe would be filed within the next 30 days.

We don't anticipate needing a further extension to file a plan.  And, Your Honor, we believe that the short extension that we've asked for will not prejudiced Lehigh or any other creditor, especially if Your Honor is requiring us to

45

now escrow rent money, in addition to the adequate protection payments, while we're also paying the taxes, insurance, and all of the other components.

They're clearly -- the properties are being maintained. Their interests are being preserved by the payment of the taxes and insurance. And we believe that the short extension of the 45 days that we have asked for is a benefit to the estate to allow us to present a plan that protects all creditors, rather than the cases failing and Lehigh receiving all of the assets for itself.

THE COURT: Okay. And by 45 days, we're looking at the beginning of June?

MS. AARONSON: Yes.

THE COURT: I'm trying to see -- two, three, four --

MS. AARONSON: So it would be May, and then, like, the first week --

THE COURT: It would be the first week of June.

MS. AARONSON: -- week of June.

THE COURT: Okay, which -- okay. All right.

Mr. Hamermesh, did you want to --

MR. HAMERMESH: Ms. Smith is going to address it, Your Honor.

THE COURT: Yes.

MS. SMITH: Good afternoon, Your Honor.

So I think we've sort of touched on a couple of the

TRANSCRIPTS PLUS, INC.
215-862-1115 ● CourtTranscripts@aol.com

46

key reasons why Lehigh Valley objects to extending the exclusivity period. I think the first of which, which Ms. Aaronson just said, is these are not complicated cases. There's two debtors at issue that are filing a plan. There's two pieces of real estate. And we have a small universe of claims that a large number of them are Lehigh Valley, and receiver's mortgage and rent.

And, second, as, you know, we touched on with the cash collateral, the rent is an issue. There's been no payments of post-edition rent. If we extend to June, and then that pushes the solicitation period until August, that's another -- what is that -- four months of unpaid rent.

And so, yes, if we are able to see that the rent is being put into an escrow, that's helpful. But I think it's a continuous harm to Lehigh Valley that there's no rent paid, and then we're extending it for another four months.

And to Ms. Aaronson's point about the properties being well maintained -- and this, again, will come up again on Thursday, but the patient care ombudsman report pointed out a number of issues with the property that are not only just about property repair and maintenance of the actual buildings, but there's also issues raised with patients' medication, food, cleanliness of the kitchens, and things of that nature. And we haven't heard any evidence or, you know, heard any argument that those issues are being addressed by the debtors. And that

47

puts a huge risk to the residents themselves if those kinds of issues continue.

And as to the point about the attempts to negotiate with Lehigh, I don't -- we did not object to a settlement conference. I think our position was that it was just too soon to discuss the amount of rent. And outside of that one request, there's been no attempts to negotiate a resolution, or a settlement, or any of those terms with Lehigh.

So those are the key reasons why we would object to extending the exclusivity period.

THE COURT: Okay.

MS. AARONSON: Can I just have one minute to respond to some of that?

THE COURT: Yes.

MS. AARONSON: Okay. Your Honor, the two debtors is a recent event. So technically, we've only had about 30 days to deal with that issue.

The post-petition rent is not going to Lehigh. It's post-petition rent owed to the Trust. So it's not technically an issue for Lehigh, and there's no harm being incurred by Lehigh, whether the rent is paid to the Trust or remains with the Manors because Lehigh asserts a security interest in all of the assets of all of the debtors. So whether the Trusts hold the money or the Manors hold the money, it's irrelevant.

Regarding the issues in the patient care ombudsman

48

report, all of the issues, whether they deal with the condition of the property, whether they deal with the food, the kitchen, the mouse problem from propping the door open during the storms, all of those have been resolved.  We've submitted declarations in D-59 to D-63 for today's hearing, which we will get to more on the motion to compel, detailing every change that has been made, every repair that's been made.  They've doubled -- they always had a monthly extermination.  It's been doubled to every two weeks now since it's still winter.

The ombudsman has come out, has been perfectly fine with everything that they've implemented, and she'll be here on Thursday to discuss that, as well.

But the properties are being maintained.  And the debtors are perfectly capable of paying for and providing all of the services to the residents and to maintaining these properties.

So we believe that there is no harm to Lehigh with the short extension that we're asking for.

THE COURT:  All right.  Given where we are with the rents being escrowed -- and the 27th is Monday.  I will agree to extend it to the 19th of May, which is essentially 30 days, not 45, with the understanding obviously that the rent for May will have been escrowed by then, and that will be shortly before we come back for cash collateral, so it will be helpful to have some more information --

49

MS. AARONSON:  Thank you.

THE COURT:  -- by that time.

MS. AARONSON:  And, Your Honor, does that also extend the solicitation period by 30 days, as well?

THE COURT:  Yes.

MS. AARONSON:  Okay.

THE COURT:  Okay.  We can move on to the motion to compel, I think.

MS. LEE:  Your Honor, did you say rent was due May 1st?

THE COURT:  Yeah, it's due May 1st.

MS. AARONSON:  To escrow.  To escrow it by May 1st.

(Pause/Attorneys engaged in off-the-record colloquy)

THE COURT:  Are we good?  Are we ready?

MR. HAMERMESH:  I think on the exclusivity, we are, yes, Your Honor.

THE COURT:  Okay.  All right.  The floor is yours.

MR. HAMERMESH:  Thank you, Your Honor.

I'm happy to have this apply to my time for the motion.  There are two issues I just want to briefly mention on the cash collateral that occurred since we finished that.

THE COURT:  Which is a mess, yeah.

MR. HAMERMESH:  One is if money is going to the receiver, it seems to me there has to be some sort of modification of the stay pending appeal to allow for that.  But

50

I'm just flagging that as an issue we'll discuss and try to work out in the cash collateral order.

MR. MESSINGER:  Well, not really because --

MS. AARONSON:  Well --

THE COURT:  Does there?

MR. MESSINGER:  Because the --

THE COURT:  Because I don't think that that --

MR. MESSINGER:  Because the Trusts are no longer in bankruptcy.

THE COURT:  Correct.

MR. MESSINGER:  Right.

THE COURT:  And I --

MR. MESSINGER:  So it reinstates that order.

MR. HAMERMESH:  Okay.

THE COURT:  Yes.

MS. AARONSON:  Well, but that order is stayed, though.

MR. MESSINGER:  No, it's --

MR. HAMERMESH:  Well, let me --

MS. AARONSON:  The dismissal is stayed.

THE COURT:  The dismissal is stayed, but the -- the receiver is still --

MR. MESSINGER:  I can assure Your Honor, I am here for a reason.

THE COURT:  Yes.

51

MR. MESSINGER:  And the reason for it is Judge Henry appointed us --

THE COURT:  Right.

MR. MESSINGER:  -- as the receiver --

THE COURT:  And so I don't see that --

MR. MESSINGER:  Right.

THE COURT:  -- receiver order being affected by the stay pending appeal.

MR. MESSINGER:  Right.

MS. AARONSON:  Right.

MR. HAMERMESH:  Okay.

MS. AARONSON:  Oh, I agree with --

MR. HAMERMESH:  That's fine.

MS. AARONSON:  I thought --

THE COURT:  Right.

MR. HAMERMESH:  Okay.

MS. AARONSON:  I -- I misunderstood what you were talking --

THE COURT:  That's --

MR. MESSINGER:  Yeah, and as I said --

THE COURT:  That's what I -- is that not what you were --

MR. MESSINGER:  Yeah.

MR. HAMERMESH:  That was my concern.

THE COURT:  -- alluding to?

**TRANSCRIPTS PLUS, INC.**
**215-862-1115 ● CourtTranscripts@aol.com**

App.645

52

MR. HAMERMESH:  But if nobody thinks this -- else thinks it's an issue, then I'll move on.

MR. MESSINGER:  And I heard --

THE COURT:  Then you'll just stop talking, okay.

MR. MESSINGER:  And I heard some whispers over there. The rent is going to be held by the receiver, subject to further order.

THE COURT:  Correct.

MR. MESSINGER:  It's going to be in escrow.

MR. HAMERMESH:  Yeah.

MR. MESSINGER:  Okay.

THE COURT:  Correct.

MR. HAMERMESH:  Okay.

And then second of all, Your Honor, on the cash collateral, I'm assuming that the $35,000 adequate protection will continue to be paid, in addition to the escrow.

THE COURT:  Yes.

MR. HAMERMESH:  Okay; thank you.

THE COURT:  Yes.

MR. HAMERMESH:  On the motion to compel, I already went through, and I'm not going to go through again, the rent -- the net lease and rent provisions.  I have a calculation of the prepetition arrearage and the post-petition arrearage, which you saw already.

What I did want to go through briefly, Your Honor, is

53

the lease amendment provisions regard -- let me turn to the -- to the -- the provisions of the leases regarding what their term is.

THE COURT:  Okay.

MR. HAMERMESH:  Relevant to the motion for relief from the stay, and I think that's ready to go up on the screen.

So, Your Honor, under the Whitehall Manor/Whitehall Trust lease, the initial term of the lease when it was originally entered in 2008 was 10 years, until August 2018, with an option to extend it for three successive five-year terms on 180-day written notice.

In the second amendment in 2012 -- in the second amendment, Your Honor, it was extended to -- well, I guess that's the same as 2018.  Again, three successive five-year extensions on written notice.

And then in the third amendment, we have a provision which says that the tenant has exercised the privilege to extend the term for five years, such that the original termination date of August 31, 2018 is now agreed to be August 31, 2023.

And, Your Honor, the debtors did enter into amendments in 2023, which purported to extend the lease beyond that time period.  But, again, those are the amendments that the District Court invalidated in the December 19th order.

So the only provision for the Whitehall property that

TRANSCRIPTS PLUS, INC.
215-862-1115 ● CourtTranscripts@aol.com

App.647

54

we have is the third amendment extending the lease to August 2023.

Similarly for Saucon Valley, the original lease term was from 2006 to 2012. We'll come back to this in a minute, but there's a fairly standard events of default provision which says that the failure to pay any rent is a default, not surprisingly.

Then in the fifth amendment, which was entered into in 2018, that similarly extended the term of the lease through August 31, 2023, the extension beyond that provision is slightly different here. It says that it will automatically extend on the termination date for three periods of three years each, unless: one, a default by lessee occurs.

And, here, Your Honor, if you will recall, by 2023, no rent had been paid in, I think, almost two years, which was clearly a default.

So under this provision, the lease couldn't automatically extend. So there's clear evidence, Your Honor, that both of the leases terminated in August of 2023.

THE COURT: Okay.

MR. HAMERMESH: That was all the evidence I had. I'm happy to proceed with argument now, or do you want the debtors to have an opportunity to put on evidence? I'm happy to make my argument, and then they can do whatever they want.

THE COURT: That's fine.

55

MR. HAMERMESH:  Okay.

THE COURT:  Why don't you do that?

MR. HAMERMESH:  So, Your Honor, there are four issues I wanted to discuss:

First of all, the debtors raised the standing issue in the -- their response, and that's really only an issue because of the stay pending appeal.  Their position is that the stay pending appeal -- well, the position they took in the papers seemed to be that the stay pending appeal meant that the debtors are back in bankruptcy and, therefore, we don't have standing.  The receiver doesn't have standing to bring the motion under 365(d)(2).

I would note that the same argument doesn't apply to the motion for relief.  We would have standing to seek that.

I guess, doing this on the fly, I'm a little unclear then where we are -- end up on the issue of standing vis-à-vis the stay pending appeal.  If it just stays the foreclosure action, but doesn't reinstate the bankruptcy cases, I think the standing issue goes away.

Regardless of that, I think Your Honor, as we argued in our reply, can modify the stay to make that clear if you think it needs to be done, and we submit you should do that. Because there -- if -- there isn't any reason to -- for the stay pending appeal to prevent us from pursuing this motion.

We made an argument under Section 105 that allowing

56

us to pursue this would promote the goals of the Bankruptcy Code.

And, in addition, Your Honor, we think there's clear grounds for derivative standing here under the National Forge standard; the claim clearly is colorable. But I think even more important, Your Honor, you have the Trusts represented by Dilworth who are simply choosing to refuse to pursue this relief when there's clearly grounds for doing so.

As should be clear from the motion, we think that's not justified. And really, Your Honor, I would submit two things:

First of all, you have these trusts. They're really acting in the interest of the Atiyehs, who want to maintain control over in the personal care homes, not the interests of a landlord who wants to collect rent.

And, Your Honor, I would note also that this is a problem for the Dilworth firm. If Your Honor, as I'm sure Your Honor recalls, you allowed the firm to represent all the debtors, but noted that there might be a situation that could come up where there's a conflict between the debtors, which would prevent the Dilworth firm from continuing to represent them.

I would submit that this is precisely that situation. You have a conflict between the Trusts and the Manor debtors about whether to oppose or pursue the motion we've brought

57

today.  And I would submit that that prevents -- that, first of all, gives us derivatives standing to -- should give us derivative standing to pursue the motion, but also is an issue for the Dilworth firm.

On the grounds for relief to compel the debtors to assume or reject the lease, I think the key thing on this, Your Honor, is, again, the accrued but unpaid rent, which places all the risk on the lender.

Having them going forward, escrowing rent provides us some protection, but I still think -- submit, Your Honor, that setting the deadline for them to assume or reject the lease would be appropriate.

First of all, Your Honor, Lehigh Valley 1 clearly has a lien on the rent.  We cited a bunch of cases in our briefs.

I just want to mention briefly the Union Meeting Partners case from 1995 where the court said it stands to reason then that an undersecured creditor's secured claim increases as proceeds, product, offspring, rents, and profits accrue post-petition.

Now, this is a point that I made earlier, that our lien is protected, not only by the property, but the accrued rents.  And while the prepetition rents, if they reject the leases can do something else, which makes those an unsecured claim, we would only have a lien on the distributions on account of the unsecured claim.  The post-petition rents are

58

obviously an administrative claim, and we would have a lien on the full amount of those.

And, Your Honor, in addition, there's a high risk here that the rents won't be paid, the post-petition rents. I've gone through the question of whether the debtors are administratively insolvent.  They themselves say here in their opposition at Page 16 that, "The effect of enforcing the receiver's ability to collect rents from the Manor debtors would be the collapse of the debtors' operations and inability to reorganize."

So they're acknowledging that precisely the problem we're concerned about, and why we've brought this motion is the fear we should be facing and we should be concerned about.

Conversely, Your Honor, if they are in great financial shape, why can't they pay rents?

The debtors' response is that they'll reorganize and be able to service their obligations, including their rents. Again, as I said before, that's speculative.  Lots of Chapter 11 cases don't work out, and they're just putting the risk here all on the lender.

As I said before, any rent will be applied consistent with the receivership order.

There's an additional issue here, Your Honor, which Ms. Smith touched on in arguing the exclusivity motion, which is the ombudsman's report.  I'm -- I hope -- hopefully Your

59

Honor has had the chance to look at it. We'll have a hearing about it in detail on Thursday.

I don't want to waste your time going through it in detail here, and the debtors say they have addressed all of the specific problems here. But, Your Honor, I think the issue I want to focus on for the moment is that the problems cited in the ombudsman's report are specific problems, but they're indicative of a systemic problem in the maintenance of these properties.

And, again, if there is a problem, that's going to do two things:

One, it puts the debtors' license at risk; and

Two, it will create a concern among residents about -- or occupants about staying in the property, which puts their cash flow at risk.

And, again, Your Honor, at the end of the day, both of those are things that put my client at risk. My client is depending on there being a property, which is an occupied cash flow-producing business to fund a plan of reorganization, or if the plan doesn't work, a Chapter 7 Trustee sale, or a foreclosure sale. All of those depend on there being a functioning business there.

To be clear, we're not trying to destroy the personal care home. We're better off if the personal care home is operating, whether the debtors -- whether the Atiyehs can

60

continue to do that, or some other operator can come in and do that more profitably.

But the problems cited in the ombudsman's report are indicative of a systemic issue, the risk of which is placed entirely on my client.

And, again, Your Honor, this is a -- the conflict between the Manor debtors and the Trusts about this, first of all, I think is grounds for granting the motion. Because what they're really doing here, Your Honor, is promoting the Atiyehs' interest in maintaining control of these properties and the businesses the Manors debtors operate on them. But, again, it's an issue for the Dilworth firm that's purporting to represent all of them.

On the cure amounts, Your Honor -- if you could just put up the prepetition arrearages?

MS. SMITH: Yes.

MR. HAMERMESH: So we can have that.

As I said before, Your Honor, the -- our position is that the rents are 139,000 for Whitehall and 142,000 for -- actually, could you go back one second --

MS. SMITH: Yeah.

MR. HAMERMESH: -- to the post-petition, rent?

Your Honor, this is -- we looked at it before, it's our Exhibit LVx-92, which just shows a calculation of the current and accumulative rent for each property post-petition.

61

MS. AARONSON:  And, Your Honor, we would just like to object to this and the others.  I mean, this is a document they prepared with their numbers.  We do not agree that these are the rent amounts.  They keep saying this is the rent that's due, but it -- we don't agree with that, so --

MR. HAMERMESH:  So, Your Honor --

MS. AARONSON:  Just putting that on the record.

MR. HAMERMESH:  I understand they don't agree that the monthly amount is rent, but I don't think there's any dispute that the calculations on this are correct.  I -- I had Mr. Atiyeh, Jr. testify about this on Thursday.  I can --

MS. AARONSON:  Right.  And he testified that if you're just putting these numbers together, and adding these up; the math is correct.

MR. HAMERMESH:  Okay.  That's --

MS. AARONSON:  That's all he testified to.

MR. HAMERMESH:  That's all I'm asking the debtors to agree --

THE COURT:  Got it.

MS. AARONSON:  Right.

MR. HAMERMESH:  -- with today.

THE COURT:  Got it.

MS. AARONSON:  Correct.

MR. HAMERMESH:  Similarly, Your Honor, we have calculations of the post -- prepetition rent accrued, which is

62

our Exhibit LVx-94, approximately $8 million for the Whitehall property, and another $8 million for the Saucon property. Again --

MS. AARONSON:  Same objection.

MR. HAMERMESH:  -- Mr. Atiyeh, Jr. agreed that the calculations are correct, not necessarily that the --

MS. AARONSON:  Date.

MR. HAMERMESH:  -- the amount of rent stated is correct.

(Attorneys engaged in off-the-record colloquy)

MR. HAMERMESH:  Oh, sorry.  One of them is 90 -- the Whitehall property demonstrative of the prepetition rent arrears is LVx-94 and Saucon is LVx-93.

And we would submit, Your Honor, if you do -- we would ask you to find that those are the cure amounts owed if the debtors do choose to assume the leases.

On the relief from stay issue, the -- there really, I don't think, can be any dispute that the leases expire in 2023. That's what they did by their terms.  There were these purported extensions in the 2023 amendments, which I think were executed after the August 31, 2023 -- so after the leases had already expired.  But, again, the District Court invalidated those.

The debtors' argument is, well, notwithstanding that, they're unexpired leases because the Trusts have let the Manor

63

debtors continue to occupy the property.  But that's precisely our point.  They're holdovers.  The Trust debtors -- the Trusts have allowed them to continue to be holdovers, but they're still holdovers.  There's no unexpired lease.  There's nothing to assume or reject.

And under the clear case law, we're entitled to relief from the automatic stay, if that's the case.

The debtors cited a couple of cases from the -- from Pennsylvania Bankruptcy Courts in support of their argument, neither of which we think is relevant here.  The <u>Schnur Enterprises</u> case, where the lease hadn't expired before the bankruptcy was filed; not the case here.

And the recent <u>Good Works Housing</u> case from Judge Baker, where, first of all, it wasn't a real property lease.  And second of all, there were ongoing obligations after what was referred to as the lease end, which, again, is not the case here.

So for all those reasons, Your Honor, we ask that you either enter an order setting a deadline for the debtors to assume or reject the leases, and setting the cure amounts if they're going to assume them or, alternatively, grant us relief from the automatic stay to proceed if the leases have already expired.

THE COURT:  Okay.

MR. MESSINGER:  Your Honor --

64

THE COURT:  Did you want to be heard?

MR. MESSINGER:  Just 92 seconds again.

THE COURT:  I'll give you a --

MR. MESSINGER:  So --

MR. HAMERMESH:  I think we have 14 minutes left, Your Honor.

MR. MESSINGER:  So --

THE COURT:  I'll give you a whole, like, 120 seconds if you'd like.

MR. MESSINGER:  Thank you.  You're so generous, Your Honor.  Thank you.

I just want to kind of emphasize a couple of points, just from the receiver's point of view.  And that is the reason why the receiver was appointed was for a number of reasons.  And one of those reasons was there was an agreement from the Atiyehs in their loan documents that allowed, when they defaulted on their loan, to be appointed.  And why do we do that?  Because there is sort of this family relationship between the Trust and the Manors.  But once there's a default, and the agreement to appoint a receiver, which is exactly what Judge Henry does, we're no longer part of that family.

We have a separate obligation to make the Trust, over which we act as a receiver, to make sure their payments are made, and also to make sure that there's money coming in that it's entitled to.

65

So even though they're owned by the same family, they've now been separated by Judge Henry to the point where their concerns about how this is operating and all of that is different than what the receiver's new role is.  And that is to bring money into the Trust so that the obligations of those Trusts can be paid.  One of them is how the buildings are able to operate, but another one is also to the lender, should there be an access.  All set forth in the receiver's order.

So -- and then just in regard to the standing.  Why did we file a proof of claim?  We knew no one else would.  So that's why we filed the proof of claim on behalf of the Trust.

And so -- and then I hear things about people negotiating leases and all that.  There's only one person in the room that can actually negotiate the lease, and that's the receiver, because we have the ability to enter into new leases, cancel contracts, and all of that.

So I just want to make sure that everybody understands all the interactions here.  Is that the receiver is in charge of the Trust.  We've been appointed to do that.  We have duties as part of that.

But in regard to this inter-family thing, that doesn't exist anymore.  The Trust is now separate.  The family doesn't have an interest in how it's profitable, the receiver does.

THE COURT:  Okay; thank you.

66

Did you want to --

MS. AARONSON:  I wanted to briefly respond, and then Ms. Lee is going to, as well.

Your Honor, we believe that neither of the movants has standing here.  Neither is a party to the leases.

And while I understand the receiver's position in this, the receiver order is on appeal, for one point.  And --

THE COURT:  But I thought there wasn't a stay of that proceeding.

MS. AARONSON:  There's not a --

THE COURT:  Like, it may be on appeal, but if there isn't a stay pending that appeal, then where are we?

MS. AARONSON:  Right, but the filing of the bankruptcy stayed the receiver proceeding.  It stayed the foreclosure proceeding.

THE COURT:  Right, but the --

MS. AARONSON:  And then the --

THE COURT:  -- appointment of the receiver itself --

MS. AARONSON:  Is --

THE COURT:  -- happened --

MS. AARONSON:  Right.

THE COURT:  -- and exists --

MS. AARONSON:  Right.

THE COURT:  -- outside of the bankruptcy.

MS. AARONSON:  Right.

67

THE COURT: So I'm --

MS. AARONSON: But the receiver's authority to act on behalf of the debtors in bankruptcy, I don't think they have that authority.

And also, Your Honor's order staying the dismissal means the dismissal has not become effective yet. So technically, the Trusts are -- they're subject to dismissal, but they're effectively not dismissed at this point, pending appeal.

THE COURT: But why does that affect the receiver's standing with respect to assumption or rejection of leases? Why is the receiver not the person that has the authority to do that?

MS. AARONSON: Well, under 543, Your Honor, the receiver, when a bankruptcy case is filed, is obligated to turn over all property to the estate. The leases are property of the estate. So I'm not sure how the receiver has authority to act on behalf of the Trusts with respect to those leases. They're property of the estate. And the receiver is not the representative of the Trusts in bankruptcy.

THE COURT: And my understanding was that your position on appeal is the Trusts are operating as business trusts because prior to the filing, the receiver was collecting rents. The receiver had the ability to do that.

But now you seem to be saying, no, the receiver

68

doesn't have the ability to do that anymore, and doesn't have any standing now because of the stay pending appeal?

MS. AARONSON:  No, because of the bankruptcy filing. Prior to the bankruptcy filing, the receiver was acting on behalf of the Trust pursuant to the District Court's order.

But once the bankruptcy is filed, all of that discontinues.  Under 543, the receiver, as the custodian, has to turn over all the property of the estate to the debtors.  It doesn't have authority to collect a rent post-petition.  That's all property of the debtors' bankruptcy estate, and the debtors proceed in bankruptcy independent of the receiver.

Now if the bankruptcy cases get dismissed, then the foreclosure goes forward, the receiver takes all the actions they're permitted --

THE COURT:  So is the only person with standing to bring a motion to assume or reject the lease, under your view, I guess, the Atiyehs.

MS. AARONSON:  The parties to the leases.

THE COURT:  Which is Whitehall Trust.

MS. AARONSON:  Whitehall Fiduciary as Trustee for one trust, and then Whitehall Manor, and then Saucon Trust -- Saucon Trust's owners --

MS. LEE:  Saucon Trust --

MS. AARONSON:   -- Saucon Trust and Saucon Valley Manor under the Bankruptcy Code, because the Bankruptcy Code

69

specifically says only the parties to the lease have authority to compel assumption or rejection.

THE COURT:  And you don't believe that the receiver is a party to the lease?

MS. AARONSON:  No.

THE COURT:  Because of the bankruptcy filing?

MS. AARONSON:  Because of the bankruptcy filing.  And because they're not a party to the lease, they -- outside of the bankruptcy, I agree they would have the authority to act on behalf of the Trust, stand in the shoes of the Trust.

But once the bankruptcy was filed, I believe under 543, the receiver is obligated to turn over property of the estate, and the leases are property of the estate that are turned back over to the debtors.

MR. MESSINGER:  Your Honor, the bankruptcy has been dismissed.  The stay is to prevent Lehigh Valley to proceed with the foreclosure.

THE COURT:  Understood.

MR. MESSINGER:  It wasn't to trick everybody into thinking that -- something else.

So once the bankruptcy was dismissed, the receiver is back in place.  They can't, by your order of stay, proceed with the foreclosure.  I don't know how that's not clear to everybody.

MS. AARONSON:  I disagree -- I disagree with that,

70

Your Honor.

MR. MESSINGER:  Well, I know she may disagree because she's protecting -- she's trying to make an argument.  But how can, in the objective world, can you view that any other way?

MS. AARONSON:  Because the stay --

MR. MESSINGER:  It doesn't put them back in the bankruptcy.

MS. AARONSON:  The stay is the stay of the --

MR. MESSINGER:  They're not in bankruptcy.  You even went ahead and you re-designated a new case as the lead case.  You did that because they're not in bankruptcy anymore, but they're not going to be foreclosed until that appeal is ruled on.

THE COURT:  Correct.

MR. MESSINGER:  That's what the stay was.

MS. AARONSON:  And, Your Honor, you changed the name of the case before we received the stay pending appeal.  The stay is a stay of the dismissal order.  The stay is not a stay of the foreclosure proceeding.

MR. MESSINGER:  The --

MS. AARONSON:  So the stay that we've sought in the case is a stay of the effectiveness of the dismissal order pending appeal.

MR. MESSINGER:  Then -- then --

MS. AARONSON:  That's the only thing that makes

71

sense.

MR. MESSINGER:  Then why aren't they filing --

MS. AARONSON:  That's the order that's stayed pending appeal.

MR. MESSINGER:  Why aren't they filing budgets for the Trust?  Why aren't they doing all sorts of things that they would normally do for someone who's still in bankruptcy?

MS. AARONSON:  We --

MR. MESSINGER:  The reason is --

MS. AARONSON:  We are.

MR. MESSINGER:  -- is that would be inconsistent with what you did, which was dismiss the bankruptcy.

MS. AARONSON:  We are filing those things --

MS. LEE:  Right.

MS. AARONSON:  -- for the Trusts, because they're technically not dismissed because the order dismissing the cases is stayed pending appeal.

THE COURT:  Let me ask you then -- I mean, we'll stay on standing for a moment, because I need to delve the contours of this.  With respect to the motion for relief, you would agree that the receiver has standing?

MS. AARONSON:  To seek relief from the stay, yes.  I don't believe that they're standing to seek to displace the tenants of the Trust under the lease, because I think the Trust --

72

THE COURT:  I think once -- if -- if they were to get relief, then that happens someplace else.

MS. AARONSON:  Then what happens someplace else?

THE COURT:  If they get relief from the stay, presumably their enforcement of collection of rents happens outside of bankruptcy at that point, correct?

MS. AARONSON:  Correct.

THE COURT:  Okay.

MS. AARONSON:  But I think the relief that they're seeking in their motion is to evict the Manors --

THE COURT:  I don't think that's --

MS. AARONSON:  -- under the lease, and I don't think they have authority for that.  I don't think they have standing to do that.

THE COURT:  I don't think that happens here is my point.  I think the only decision that I make is whether or not they have relief from -- whether they have cause for relief from the stay, right?

MS. AARONSON:  Right.

THE COURT:  And cause would obviously be defined as not making payments.  Presumably that's the argument.

If relief were to be granted, any powers that the receiver has under his receiver order in District Court, he takes that to District Court.

MS. AARONSON:  Right.

TRANSCRIPTS PLUS, INC.
215-862-1115 ● CourtTranscripts@aol.com

App.666

73

THE COURT:  I'm no longer involved, so --

MS. AARONSON:  I would agree with that, Your Honor.

THE COURT:  So you can defend whatever actions he takes there.  I don't know that my -- I don't know that the order that I would enter, if I were to enter it for them today, would say anything about whether they could or could not evict the Manor debtors.  It would simply say that there was relief granted with respect to the stay, and then presumably the enforcement actions that the receiver takes are subject to whatever is going on in --

MS. AARONSON:  District Court.

THE COURT:  -- well, it's District Court.

MS. AARONSON:  Correct.

THE COURT:  Not State Court.

MS. AARONSON:  Right.

THE COURT:  I want to stay State Court, but --

MS. AARONSON:  I would agree with that, Your Honor, that --

THE COURT:  Right?

MS. AARONSON:  -- if you lifted the stay for the purpose of the receiver pursuing rents under the receiver order or pursuing rights under the receiver order, that's separate from what I thought was the relief requested in the motion for stay -- relief from the stay because under the motion, I was reading that as they were seeking relief to evict.  To effect

App.667

74

the -- essentially say that the leases are expired and evict the Manors from their operations.

And first of all, I don't believe that the leases are expired under Pennsylvania law. And the parties to the leases who have their bargained for rights have no intent to terminate the leases. They don't believe they're expired. And their intent was to extend them, clearly based on those -- the amended leases that were voided, but they were voided for other reasons, not for the term being extended. So clearly, the parties to the leases believe that they're in effect.

And Lehigh took the position that the Manors are just holdovers, they're not doing anything. Well, they're still paying the taxes, they're still paying the insurance, they're still paying the repairs, they're still maintaining the property. So they're not just holdover tenants doing nothing, they're performing under the leases.

So as between the parties to the leases and their bargained for rights, they're still in effect, and there's no basis for the Court to find that they're expired under Pennsylvania law.

We also don't believe there's any conflict at all. Lehigh raised that there's a conflict because the Trusts should be able to terminate the leases. Well, the Trusts don't want to terminate the leases. There's -- the debtors need each other to survive. They're working together towards

75

reorganization. Whether the Trusts are in or out, the goal is to reorganize these Manor debtors so that they can pay rent.

If the Manor debtors are evicted, there's never going to be a chance for the Trusts to receive rent. It's a red herring that Lehigh says they're going to put in a new operator and -- to operate the Manors. Any operator Lehigh is going to put in is not going to pay rent to the Trusts. Why would they pay rent to the Trusts that are unrelated to them, just so the Trusts can pay the mortgage that is held by Lehigh? They're going to starve the Trusts and take the property. The unsecured creditors lose. So I wonder what a committee would say in this case.

THE COURT: Okay.

Do you --

MS. AARONSON: And I think Ms. Lee --

THE COURT: Did you want to respond?

MS. AARONSON: Okay.

MR. MESSINGER: I --

THE COURT: I don't know if you wanted to respond quickly.

MR. MESSINGER: I -- just -- just quickly. Yes, eviction is one thing. But they could come and try to negotiate a fair market value lease, as well. We have the power to do that. So -- so it's not automatic if we were to get relief from the automatic stay.

76

They can come to us and try to work out a deal, too. Like, that's part of what it is. We don't want to see anybody just being thrown out. They're going to pay market rent or enter into some sort of relationship with that. I have the power to enter into that.

THE COURT: Okay. I'm sorry, you had --

MS. AARONSON: I think Ms. Lee might --

MS. LEE: Yes. I don't even know what's on the time clock anymore.

THE COURT: Me neither.

MS. LEE: So apologies.

MS. AARONSON: Oh, wait.

(Attorneys engaged in off-the-record colloquy)

MS. AARONSON: I did want to just address one more point that -- regarding the patient care ombudsman reports. This is not a systemic issue. For six months prepetition, as we saw at the last hearing, the receiver reports showed that the Manors were well maintained. They had one small leak mentioned in each of those reports. So these Manors were fine through the whole period prepetition.

If you remember, in the February -- at the February hearing, the patient care ombudsman came in and the condition was fine, the patients were all -- the residents were being cared for. There was one issue that she mentioned about the kitchen, but she said it was minor.

77

Obviously, none of these things existed through that whole period. Now in February, with the two storms, there's all these issues. So this is not a systemic problem.

And we have evidence in our exhibits -- we've put the depositions in, I think they're D-40 -- 50 -- 59 through 63 in our materials for today from the maintenance person, from two people from the kitchen, from Ms. Atiyeh. The ombudsman has been there. The ombudsman is going to submit another report in 10 days. Everything's been taken care of. This is not a systemic issue at all.

THE COURT: Okay.

MS. AARONSON: Now, sorry.

MR. ATIYEH: Your Honor, I need two (indiscernible - not at microphone).

THE COURT: No, not without your counsel.

MR. ATIYEH: Can I talk to my counselor for a minute? It's on a separate issue, but --

MS. AARONSON: Your Honor, Ms. Lee is going to address the --

THE COURT: Got it.

MS. LEE: My apologies, I can't get the computer to work.

THE COURT: That's okay.

(Pause)

MS. LEE: All right. Your Honor, to address the rent

78

situation here.  As I was expressing earlier, Your Honor, that the problem here is that everyone is looking at just the leases in an isolated state without considering the entirety of these leases.

And in the leases, there's language that specifically says that the HUD regulatory documents and the mortgage documents trump whatever is in these leases.  And when you go to those HUD documents, and those HUD regulatory agreements, and the mortgage documents, you will see the basis of what the lease payments are.

So, for example, here, I'm at -- apologies.  If I go to the firm commitment letter that was entered between Saucon and the -- and HUD and M&T Bank, when you go to there, and you go to the actual exhibits under "Special Conditions," and this is D-57, you'll see here "Operating Lease.  The operating lease between Saucon Trust and Saucon Valley Manor must be revised to conform to current HUD and lien requirements."  And that included the calculation by HUD of the rent, which was 1.5 times the annual of principal and interest, annual mortgage insurance premium, which is no longer required to be paid, annual deposit to reserve replacement, which I will address in a moment, annual property insurance, and annual property taxes. All those things are presently -- except for the mortgage insurance and premium, and except for the principal and interest premiums, all those other items are now being held --

79

handled directly by the Manors.

But that was the basis for the rent payment and calculation of 1.705 -- well, 1,705,471.  And this document controls anything that's in the lease agreements.

And if you no longer have HUD involved, there's no point in the mortgage payment of including mortgage insurance premium.

If you no longer have HUD involved, you then have the Manors directly paying all of these items.  So, for example, Your Honor, I'm going to go to Mr. Atiyeh's tax returns that the lender previously admitted, and I'm going to go to LVx-46 and 47.  Let's start with 47, actually.  You'll see here, this, Your Honor, is the 2020 Schedule E for Mr. Atiyeh with Whitehall Trust.  And you will see on this document, Your Honor, at Line 9, Insurance, $285,269.  You'll see the management fees.  You'll see the mortgage insurance premium. You'll see the taxes paid.  This is what was going on in 2020 before those amendments in 2023 after HUD was no longer involved.

So, as you can see here, Your Honor, all these things that were based of -- of the lease that they're saying is a net lease were actually paid and held in reserve by the Trust, by the bank, to then make distributions on the taxes, on insurance.

This is why your order today is basically a double

80

dip.  Because now, they're paying taxes, and they're paying rent that includes all the things that the Trusts were clearly paying for the decade-plus.

So, I'm going to go to -- and this is consistent with the other tax returns, but I'm going to go to one that was post to '23.  Do you have 23?  Number 51.

(Pause)

MS. LEE:  Either way, Your Honor, once -- as Anne pulled that up --

MS. AARONSON:  Which number is it?

MS. LEE:  LVx-51 is the 2023 --

MS. AARONSON:  No, but what number tab is it?

MS. LEE:  I'll just --

MS. AARONSON:  I'm not very good with exhibits.  LVx which?

MS. LEE:  LVx-51.

(Pause)

MS. LEE:  Well, Your Honor, I'll proffer that on Lvx-51 --

MS. AARONSON:  Oh, I found it.

MS. LEE:  -- you'll have that as an exhibit.  That will show that the taxes and insurance, and all those items that I just addressed are no longer paid by the Trusts, and are no longer listed on Schedule E.  That's because the Manors started paying those things.  So, there was a specific

81

performance here, Your Honor, that was now component.

And, again, as per the leases, and as per the HUD documents and mortgages, it specifically, again, states that the HUD documents is what controls.

And the same thing is in Exhibit D-58, which is the Whitehall firm commitment.  That, again, says the same thing.

And what HUD did, Your Honor, was they actually created rent schedules.  And per the HUD documents and per the other documents and, actually, per the leases, the Manors and the Trusts had no control over what that rent payment amount would be.  It was all created and established by HUD and what they determined would be the amounts necessary to make sure all the taxes and everything like that were covered.  And that is in the lease documents, as well.

And what would happen, Your Honor, is that if, for example, the Manors or the Trusts had to make improvements, they would have to then seek permission from HUD to do any of these things.  And this is the line here, "The leassee [sic] or trustee may seek reimbursement from the reserve -- replacement reserve funds."

Now let me break down what the replacement reserve fund was, because it took me a while to figure out what this is.  This, Your Honor, is what's established in the HUD regulatory agreements.  And what that is, is that the Trust had to put in a first initial payment amount.  That was a capital

82

contribution from Mr. Atiyeh on behalf of the Trusts of hundreds of thousands of dollars he put in there.

And then HUD did a walkthrough, and they determined that based on the functional life equivalent of, let's say, a floor, or a roof, or what have you, that going forward, they would then have to put this $10,000 into a reserve account each month to pay for any kind of structural or maintenance items.

And either the Trust or the Manors would then file applications with HUD for approval to repair, as a reimbursement to say, okay, we're now reimbursed to replace this roof, so now we want the money out of here.  If there was too much in there, then that could be refunded, or it would just be held for some kind of future capital issue.

And a perfect example of how it would be reduced -- and this was all regulated, not just by -- I mean, this is by HUD.  And the reason why is because it's all regulated by statute.  So this is not something that the debtors are just pulling up out of the air.  This is all statute regulated.  And it's the same thing with Section 8 housing and other things under these code sections.

And so what would happen is if it's too much, it would go as a surplus to Mr. Atiyeh.

If it was not enough, then HUD would do a walkthrough.  They would do audits each year, and they would say, you know what, we need more of a capital reserve.  It

83

could be zero, it could be 10,000, it could be 20,000, it could be nothing.

But you will hear what happened is that the reason why there's no way to truly calculate what would happen between '21 to the present, honestly, is because you can't calculate what that reserve would be because the Manors have been covering all the costs. And there's no one to go back and say, let's get this reserve fund back. They can't do that. They just -- they're just getting -- they replaced the whole ceiling of this facility that would have been structural that the Trust would have covered.

So when you take out these items, all you're left really is the mortgage and insurance. And this is what's also in the mortgage documents themselves.

And when you're looking at the mortgage payments -- I keep saying insurance, I'm sorry -- interest -- principal interest. And so when you're looking at that, you're looking at Saucon's payment of $69,578.58 a month. And you're looking at Whitehall, which is $69,844.95 a month. That's really what the rent payment is here, because there's no way -- and it doesn't even make sense to change the system that they have, because right now, you have the taxing authority who's participating with us in this bankruptcy. They had an agreement prepetition with the Manors for taxes. The debtors are escrowing the taxes. The Manors had been paying the

84

insurance. Is the receiver going to refund the insurance that they paid pro rata this year? I'm sure not.

I'm sure the receiver is not going to pro rate and repay back all the capital expenditures that they put in. There's no way to do that.

Going forward, maybe you can calculate this, like, I'm going to just say approximately $70,000 each. So if you look at that -- I have here for the last four months, if you go from January to May -- I'm sorry, January to April; I didn't include May. That's $278,314.32 for Saucon. And $279,379 post-petition rent for Whitehall.

Prepetition, considering those same two factors, mind you, there's a dispute over -- it's just rent, right? Not actual mortgage payment, because the mortgage is paid in full through some period in '23. If you're going to say mortgage -- if you're going to just say rent, I have a calculation of $3.77 million for June -- if you go from June 21st [sic] for Whitehall. And I have about -- approximately three hundred -- three -- three million seventy-five for Saucon if you go from June -- June, '21.

But, again, all the rest of those figures that the mortgage company is trying to collect for -- I'm sorry, secured lender is trying to collect for, is all uncollectible because it's all been already expended by my client.

So -- and then when it comes to the next issue, which

TRANSCRIPTS PLUS, INC.
215-862-1115 ● CourtTranscripts@aol.com

85

is the facilities, Ms. Aaronson -- or Anne actually addressed a lot of that.  We would incorporate all of the declarations, like she said, so that -- with that.

Let's see.  I will just make a note, I think that one thing that the receiver has established for us again today is what we've been saying from the beginning, that these Trusts were operating as a business.  He specifically said that he was trying to operate this for a profit, which is what the Trusts were doing.

And I would also just want to point out one thing is that the receiver's order of appeal is still stayed by the Court.  So if the receiver --

THE COURT:  The order of appointment?

MS. LEE:  Yes, to his appointment is still stayed.

THE COURT:  Why is it stayed?

MS. LEE:  It was stayed because of the bankruptcy filing.  So that is --

THE COURT:  His appointment was stayed by the bankruptcy filing?  Why?

MS. LEE:  No, his -- our -- our client's appeal of his appointment was stayed.  It was -- it was scheduled to be heard by the Third Circuit, our client's motion against the appointment.  That was stayed by the Third Circuit because of the bankruptcy appeal.  And so that's still stayed.

So that is one extra issue out there, is that if the

86

receiver can act, then our motion should go forward.  And that was ready for oral argument, I believe.  I think it was ready for --

MR. MESSINGER:  I have no idea what you're talking about.

MS. LEE:  Well, the Third Circuit --

MR. MESSINGER:  I know you're looking at me, but --

MS. LEE:  The Circuit [sic] appeal of you --

MR. MESSINGER:  Oh, that's -- what she means to say is the receiver's order is not stayed.  The appeal from --

MS. LEE:  Right.

MR. MESSINGER:  -- a grant of the receiver's order is stayed.

MS. LEE:  Right.

MR. MESSINGER:  I don't understand why that helps her; it actually hurts her.  But I'll let her make her argument.

MS. LEE:  No, I'm just -- it's just something to say, that that's been stayed.

THE COURT:  Help me with that.  Explain that to me again.  The receiver gets appointed.  There's an appointment order.

MS. LEE:  Right.

THE COURT:  Prior to the bankruptcy, that was appealed?

87

MS. LEE: Yes.

THE COURT: Right?

MS. LEE: Yes.

MR. MESSINGER: Yes. And now, the Third Circuit's not going to decide that appeal, which has no effect on the receiver's order, just as a matter of appellate procedure. And so you don't void the appointment order by taking an appeal that stayed by the bankruptcy. That's her argument.

THE COURT: Right. I presume that the -- the only stay we're talking about is the automatic stay. Right? There wasn't a stay of the appointment order pending that appeal, right?

MR. MESSINGER: Yeah, what happened, after the receiver's order --

THE COURT: That wasn't --

MR. MESSINGER: -- they were sanctioned, so the judge thought that maybe I had standing to file some stuff and all that type of stuff that was going on.

There is no stay of the appointment of the receiver's order. There is an automatic stay of the appeal taken from that order to the Third Circuit.

MS. LEE: Right.

THE COURT: Got it.

MS. LEE: And I think that the last evidentiary thing I have -- actually, no, I think I've been through all the

88

evidence here.

But I will also, Your Honor, just want to express that for the very same reasons that Your Honor previously denied the rental payments, it's still a residential unit and a residential property under 365. So I'm still not quite sure why we're here, because everyone seems to have kind of ignored that section, as well, which would stay rent.

And honestly, with the deadlines that Your Honor has imposed related to our plan, I don't see why all of this can't be postponed. I mean, I just don't see how it's a benefit to ultimately the residents here to really move forward and cause issues there, or even potentially have the issues of impacting these residents. And that's ultimately who everyone cares about.

And with the affidavits that we have, and with the PCO reports that are going to come out, that clearly ignored the fact that a lot of this stuff was rectified. And honestly, I mean, the fact that these -- that there's a provisional license, I'm still kind of baffled by. But evidently, this is a new thing or a new issue that -- well, no, I should say a new procedure that the State is doing.

But if you actually look at what the violations were for, they weren't for maintenance. It was for them having an unlocked closet, having an item available, a poisonous material under their guidelines, available to -- in a unit where all

89

units -- all -- all the residents are secured and can't move anyway.

I mean, I know that's not something to diminish, but, I mean, these were not -- not -- not as serious as what the ombudsman report is trying to say. And I think that having the pictures, and documentations, and the lack of the information showing that this was all addressed in that ombudsman report, I think that that -- that once Your Honor goes through our evidence on that matter will be helpful here.

And I think also, honestly, once the Trustee sees our information -- I know she's on vacation, but once she sees that, I think that she'll really reconsider her position on that.

That's it.

THE COURT: Okay. Thank you.

Any rebuttal?

MR. HAMERMESH: Your Honor, if I could briefly? On the standing issue, it sounds to me like Your Honor did not intend for the stay pending appeal to affect what we're doing here. And just to be clear on the timing, I think we filed this motion the day before the hearing on that.

So I would -- I would ask for, I guess, one of two things: Either Your Honor to make clear what you intended to do in the stay pending appeal order; or in an order, if you're inclined to grant our motion for either of them, to make clear

90

that whatever relief you're granting is an exception to the stay pending appeal.

The debtors insist that -- or the counsel for the Trusts insist -- counsel at the opposite table insists that the bank -- the debtors' trusts haven't been dismissed because of the stay. But I would note that the Trust debtors haven't filed monthly operating reports either for February or for March. So I think that's -- I'm not even sure what to say about that, but if the cases haven't been dismissed, they've had 20 days to do that, and haven't done anything about it.

Ms. Aaronson insisted that only the Trusts have standing to pursue this. But, again, this is precisely the conflict the Dilworth firm is facing. They're choosing to represent the interests of one set of clients, the Manor debtors, and really the Atiyehs, over what I would submit would be the objective reasonable position of any landlord.

Ms. Aaronson said that the debtors need each other to survive. Simply put, I don't think that's true, Your Honor. The Manors obviously need the Trusts, but the Trusts don't need the Manors. They need some tenant, but it doesn't have to be an entity controlled by the Atiyehs.

And I'm a little even more mystified by Ms. Aaronson's statement that a new operator would starve the Trusts. If the new operator comes in and enters into a lease, they're going to have to make lease payments. But I'm just --

91

I'm baffled by what else would happen. Or a new tenant, if they didn't pay the lease payments -- didn't make payments, would be evicted.

Ms. Aaronson referred to the receiver's reports that we think -- I think were a subject of the last hearing or the hearing before that, and acknowledged that they involved references to leaks and water damage at the property. But that's precisely the problem -- one of the problems that the ombudsman cited in the most recent report. So to the extent there's anything to think about with the receiver's reports from last year, they're indicative of an ongoing issue with leaks at the property, that fixing a particular leak doesn't seem to be a solution to.

And then Ms. Lee sort of just simply hand-waved away the issue of the provisional license. I have to confess, I don't know much about healthcare law and regulation of these sorts of entities, but the ombudsman certainly found that significant enough to discuss at length in her report.

Ms. Lee also talked at length about the -- again, about the amount of the rent. And I don't want to belabor the point, but I would submit, Your Honor, that what she -- everything she said is irrelevant for two reasons:

First of all, as we've seen repeatedly, the leases say what they say. She, again, showed you the same provision where it says here's what the rent is, it's the greater of X or

TRANSCRIPTS PLUS, INC.
215-862-1115 ● CourtTranscripts@aol.com

92

this complicated formula.

The current lease isn't subject to the HUD agreement because HUD is no longer involved. And, in fact, the debtors argued in the foreclosure action that the HUD documents were invalid or no longer valid because of the sale of the -- the sale of the loan papers by HUD.

Second of all, Your Honor, everything Ms. Lee had to say about the rent is irrelevant because the debtors haven't paid anything. Whether it's 140,000, or 70,000, or whatever, they haven't paid a cent. That's the problem.

She referred to their position, I think, saying that there's $3 million in prepetition rent arrears for each of the properties. That's the first I've heard of that amount. I haven't seen any support, so I can't even begin to agree with whether that's calculated correctly, whether -- let alone whether it's legally correct, and she didn't offer any detailed support for that today.

Finally, Your Honor, Ms. Lee referenced your decision on the 365(d)(4) issue and suggested that that's inconsistent with the relief we're seeking here. I would say it's entirely consistent, Your Honor. 365(d)(4) governs whether the Bankruptcy Code requires a debtor to immediately start paying rent in certain situations.

Completely separate from that, 365(d)(2) allows Your Honor to require the debtors to assume or reject a lease

93

by a certain time, completely separate from when 365(d)(4) requires.

So for all those reasons, again, Your Honor, I would ask you to enter one of the proposed orders subject to the modification we've discussed today, granting either -- compelling assumption or rejection of the leases or granting relief in the automatic stay.

And I'm happy to answer any questions you may have.

MS. AARONSON:  Your Honor, I just have a few points to make.  Okay, so under Section 543, Your Honor, the receiver's duties -- and with all due respect to the receiver, I know he's offering to discuss with us and --

MR. MESSINGER:  I usually call that the wind up before you insult me.

MS. AARONSON:  Well, we --

(Laughter)

MS. AARONSON:  We will be speaking with him, as well. But his duties, once the bankruptcy is filed, he has to cease collecting rent and selling assets.  He has to turn over property of the estate.  He has to submit an accounting.

And he's not authorized to further administer any of the assets unless authorized by the Bankruptcy Court.  And generally, that's for the limited purpose of preserving assets.

So I just wanted to point that out on the standing. It's not for the purpose of booting out the Manors or

TRANSCRIPTS PLUS, INC.
215-862-1115 ● CourtTranscripts@aol.com

App.687

94

terminating leases to which the parties to that lease are entitled to their bargained for rights unless they want to terminate or assume those leases.

Mr. Hamermesh mentioned a new operator coming in paying rent. I was referring to a new operator put in by Lehigh. Lehigh was intending to put in a related operator based on the prior testimony. And Lehigh -- Lehigh's own operator would have no incentive to pay rent. That was the point I was trying to make, because the rent would then go to their mortgage company. Why would they want to keep the Trusts involved? They would just starve the Trusts and just take the property in the foreclosure. Then they'd have the operations and the property.

Prematurely requiring the debtor to assume or reject the lease is going to harm unsecured creditors. There's no committee in this case. It would elevate the prepetition unpaid rent to an administrative claim.

And as I explained, the plan that we're intending to propose does not require the leases. So the debtors would be stuck with an administrative claim for the prepetition rent, and that's a detriment to the unsecured creditors. And that's the point I was trying to make, what would a committee say here? Because nobody is here representing the unsecured creditors' interests in this case.

The provisional license, Mr. Hamermesh mentioned that

95

the PCO discussed at link.  The PCO referenced it once.  The provisional license only applies to Saucon here, not Whitehall. And that is just where you have two violations -- it's in Ms. Atiyeh's declaration that we submitted.  It's two violations of the same code section.  It could be two different things.  Like the receiver report had the small leak, not a systemic problem. A small leak on the one, and a small leak on the other, but it's not the same leak.  They fixed it, and they had another one.

Similarly, in the provisional license, there was a bed rail that was loose on one visit.  And then the next visit they came, it was a different bed rail.  It was patient number six and patient number one.  So when they changed the beds, it loosened the bed rail.  They were both fixed, and now they have a process in place where someone goes through every single day and checks every bed rail to make sure it's not loose.

So it was not that they didn't fix something.  It's that there was a same code violation, the same section of the code violated on two separate visits.

And the poison that Ms. Lee mentioned, I just wanted to clarify because that sounds really bad.  It was a jar of lotion that was left in an unlocked cabinet.  So it wasn't like some toxic poisonous thing.

We do have the MORs for February and March.  We got them -- last week was tax week, so the financial stuff was

96

delayed by a couple of days.

So -- and the -- the $3 million that Ms. Lee referenced, that is the principal and interest on the mortgage, which is the only components of the rent that was not being paid. Mr. Hamermesh said there was no basis stated for that. Ms. Lee explained that that is the principal and interest of the mortgage payments prepetition --

MS. LEE: From June.

MS. AARONSON: -- from June --

MS. LEE: Of '21.

MS. AARONSON: -- of '21 until the petition date, because all the other components of the rent were paid.

Also, I wanted to mention that Ms. Benedek is back online, if she wanted to speak for U.S. Foods; I noticed.

MS. LEE: Right. Because I think something that's important that people are forgetting is that there are other unsecureds. So, Ms. Benedek?

THE COURT: Okay. Ms. Benedek, you're back.

MS. BENEDEK: I'm back, yes.

THE COURT: Did you have something to add?

MS. BENEDEK: Thank you, Your Honor. Yes, I do. And I apologize for having to hop off. I was in another hearing, but thank you for letting me rejoin.

I just wanted to -- to be here to talk about what -- what it has been like for U.S. Foods. And I wanted to report

97

that currently, the debtors are current on all amounts due to U.S. Foods. They've been incurring about $200,000 or so per month over the course of the cases, and they've been staying current. They have not been late on their payments to U.S. Foods.

Currently, they have about $165,890 that is -- that has been invoiced to them, but has not yet come due. Again, we don't have any concerns about this.

We did file two claims in this case. And in those claims we did reference that we hold -- we hold claims under the Perishable Agricultural Commodities Act, PACA. We have about $30,000 across the two debtors of PACA claims. And to the extent that secured creditors are seeking recoveries of any funds, we want to put on the record and make clear that those are -- those funds are subject to a statutory trust and are technically not property of the estate, but property belonging to U.S. Foods.

But we -- as soon as we heard about this motion to compel, and everything that was happening, we wanted to voice our position to the Court, and voice our support for the attempted reorganization here because we have had a productive relationship in this case.

THE COURT: Okay; thank you.

MR. HAMERMESH: Your Honor, if I may very briefly?

THE COURT: Yes, you may.

98

MR. HAMERMESH:  Thank you, Your Honor.

Counsel for U.S. Foods' statements, I think, prove our point.  U.S. Foods is providing services that obviously are necessary for operating the facilities.  But having a place to operate them is also necessary, and the debtors should pay for that, and we appreciate the order Your Honor intends to enter require an escrow of that.  But I think -- I don't think that resolves the issue entirely, which is why we're here on this motion.

Second of all, Ms. Aaronson keeps trying to explain the -- away the issues from the ombudsman's report and the receiver's report, but they just prove our point.  That there seems to be a systemic problem with leaks.  They keep fixing them, but then they keep happening.

And then I think there was a reference to the prepetition taxes having been paid.  I think there was an agreement under which the debtors started to pay them, but there is a -- $900,000, I think, still outstanding in prepetition taxes, which the debtors incurred, and never paid, and have to deal with, to the expense of my client in the bankruptcy case.

For those reasons, we'd, again, ask you to grant the motion.

THE COURT:  Okay.  In light of the fact that Thursday is the motion to dismiss, I don't want to make a decision today

99

on this issue because I think obviously it informs -- what's going to go on on Thursday will inform what essentially happens in this case.  So I'm going to take this under advisement while we sift through the dismissal motion before I can sort of turn this around.

So I see that you -- you seem to have a question on -- on -- on your mind.

MR. MESSINGER:  I do.  I know that you're going to take this under advisement and all of that.  I would just hope that you -- I just want to stress that we still have that Good Shepherd issue.

THE COURT:  So --

MR. MESSINGER:  It's not as big of enough issue to have all sorts of motion practice because we'll eat it up --

THE COURT:  Right.

MR. MESSINGER:  -- but maybe just clarify or review what you thought --

THE COURT:  So what --

MR. MESSINGER:  Yeah.

THE COURT:  What I understood the original motion to be was whether or not the escrow of the 25 grand was property of the estate, to which I said no it is not because you had constructive action prior to the filing.

MR. MESSINGER:  Right.

THE COURT:  So that's what I thought I was answering.

100

MR. MESSINGER:  You -- you answered --

THE COURT:  Okay.

MR. MESSINGER:  So -- so --

THE COURT:  That's what I thought, okay.

MR. MESSINGER:  So -- and you're right.  The issue raised in that -- in that motion, which I didn't participate in.

THE COURT:  Right.

MR. MESSINGER:  Because we're trying not to spend money.

THE COURT:  No, no, no, I get it.

MR. MESSINGER:  And -- but in -- so I then wrote to Ms. Lee and said, here's our account information so that you can follow the direction of the Court, and wired it over to us, and by the way, let Good Shepherd know that they're to continue to put money -- to pay it to us as though the bankruptcy never happened because we took that part of the -- that -- that asset out of the bankruptcy estate by the directive letter.

So the dispute that Ms. Lee and I have now is whether -- and I agree, the motion only dealt with the 25,000 and change.

THE COURT:  Right.

MR. MESSINGER:  But every month, there's a rent payment due.

THE COURT:  Okay.

101

MR. MESSINGER:  And because we took that rent payment out of the estate, I didn't think there'd be an issue.  But that once it's out, it's always out.  Because mindful of the fact that even in your opinion, you recognized that the direction letter came.  The bankruptcy was filed.  And then within a couple of days -- all this happened in a few days, the money came into my account.

Now, just to be clear, I followed the receiver's order regarding whether I had to return it to Ms. Lee; the parties worked that out.  You know, I notified her, you know?  And --

THE COURT:  Understood.

MR. MESSINGER:  And then once there was an agreement, we put it into Dilworth Paxson's trust account, and then your order requires it to come back over to us.

But the point still being is that was a post-petition payment, too.  You recognized that in your memorandum and opinion.

THE COURT:  Right.

MR. MESSINGER:  And then because we took it out of the estate by the direction letter -- we didn't withdraw the direction letter.  So -- so to me, it makes sense that the additional money should continue to come from Good Shepherd, goes into the receiver, the receiver uses it consistent with the receiver order.  But your order only dealt --

102

THE COURT:  Yeah.

MR. MESSINGER:  -- with the issue that was at hand.

THE COURT:  Right.

MR. MESSINGER:  It should have dealt with more, right?  But I --

THE COURT:  Right.

MR. MESSINGER:  -- you know --

THE COURT:  Right.

MR. MESSINGER:  We -- we --

THE COURT:  Understood.  So --

MR. MESSINGER:  Yeah.

MR. HAMERMESH:  If -- if I --

THE COURT:  I -- I take this as you asking me for a clarification going forward with post-petition, Good Shepherd rent.

MR. MESSINGER:  Right.  Because it was all post-petition, by the way.

THE COURT:  Well, only because it was going back and forth.

MR. MESSINGER:  Right.

THE COURT:  Right?

MR. MESSINGER:  Right, right.

THE COURT:  I mean, it wasn't --

MR. MESSINGER:  Right.

THE COURT:  -- due post-petition.

103

MR. MESSINGER:  Right.

THE COURT:  Correct.

MR. MESSINGER:  We got each other.

THE COURT:  Okay.

MR. MESSINGER:  We're good.

THE COURT:  Okay.

MR. HAMERMESH:  If I may, Your Honor?  Two things:

One, my position is if it's not property of the estate --

THE COURT:  Right.

MR. HAMERMESH:  -- it's not property of the estate. That applies both to the amounts that accrued prepetition and the amounts that accrued post-petition.

And, Your Honor, thinking back, we had a hearing on this in January.  And I -- if I recall correctly, the reason Your Honor directed additional briefing about it was because when -- maybe when I came to the hearing, I was thinking of it as both the amounts that had been paid already and going forward.

THE COURT:  Got it.

MR. HAMERMESH:  And the debtors were not thinking about it.

THE COURT:  Right.

MR. HAMERMESH:  So I thought that was -- I guess, that was my understanding --

104

THE COURT:  Okay.

MR. HAMERMESH:  -- after the hearing.  And -- so I took your opinion to be addressing both the amount that existed, the 25,000, and going forward.

THE COURT:  Yeah, I mean --

MR. HAMERMESH:  But that was not --

THE COURT:  I don't think, once it's out of the estate, it's to come back in.

MR. HAMERMESH:  Right.

THE COURT:  It hasn't come back in.  It's not property of the estate.

And so to the extent that that order needs to be clarified, let me make clear that the Good Shepherd rent is not property of the estate.  So it should continue to get paid, presumably to the receiver.  I think that's what it was prepetition, is that it went directly.

MR. MESSINGER:  It did.

THE COURT:  Okay.

MR. MESSINGER:  One time.  One time.

THE COURT:  Right.

MR. MESSINGER:  Yeah.

THE COURT:  So that should continue to happen.  I think -- I think at the time that it was filed, it was continuing to be escrowed.

MS. LEE:  It's --

105

THE COURT: Maybe?

MS. LEE: It's being escrowed. But, Your Honor, part of that rent pays for services provided by the Manor.

THE COURT: Well, then that needs to be disclosed to the receiver so that he can then deal with whatever expenses -- right? I mean, you're going to get the rent --

MR. MESSINGER: It --

THE COURT: -- but you must have to deal with whatever the expenses are.

MR. MESSINGER: Right. It's why I asked Ms. Lee to tell me what the obligations are of the Trusts.

THE COURT: Right.

MR. MESSINGER: The Trusts were ordered to do that by Judge Henry. Then they filed bankruptcy --

THE COURT: Okay.

MR. MESSINGER: -- and never provided the information.

THE COURT: Okay.

MR. MESSINGER: If they provide me the information by which I can do my duty, then fine. I look forward to getting that. Okay? But until I have that information -- and not only that, but, you know, part of -- and I don't want to disturb -- I have very little interest in the bankruptcy. I have an interest in doing my duty as the representative for the receiver.

App.699

106

But it would appear that since that's not part of the estate, when they submit their new budget, they're going to figure out how to pay for that stuff because now, that money is not part of what they can use.  It's just as simple as that.  And whether that requires more money to be put into the budget by the principals, I don't care about that.  I care that it's not part of the estate.  It comes to me.  Now they have to figure out what to do now that they're not going to have use of that money.

THE COURT:  Understood.

MS. LEE:  It's not listed in our cash collateral because we've been escrowing that.  But the expenses have been in our cash collateral --

THE COURT:  And these are expenses -- tell me about the expenses.  These are expenses that the Manor pays for Good Shepherd?

MS. LEE:  It -- it's --

THE COURT:  Is that what you're telling me?

MS. LEE:  The Manors provide housekeeping services, garbage services, utility services, and other items for --

THE COURT:  To Good Shepherd.

MS. LEE:  To Good Shepherd, because they're a -- they're a tenant --

THE COURT:  Okay.

MS. LEE:  -- of the Manors.

107

MR. MESSINGER:  Just further, they're an unapproved subtenant, which is one of the reasons before the bankruptcy we gave them notice of default under their lease, because they -- because they were required under their leases to get the approval before they entered into a sublease with Good Shepherd, and maybe unknown others.

MS. LEE:  That's not true --

MR. MESSINGER:  It --

MS. LEE:  I'm sorry.

MR. MESSINGER:  It is true.  There is a requirement in the Saucon Trust lease that the landlord, being the owner of the property, is to approve all subleases.  It's one of the events that I cited in the letter that I wrote to --

THE COURT:  Well, isn't the owner of the property the Trust?

MR. MESSINGER:  Yes.

THE COURT:  Okay.  So --

MR. MESSINGER:  But I step into their shoes as the receiver.

THE COURT:  Right, but did that happen before you?

MS. LEE:  Yes.

MR. MESSINGER:  Yes.  But --

THE COURT:  Right.

MR. MESSINGER:  But we go back, and I said, if you got approval from the Trust in regard to entering into the

TRANSCRIPTS PLUS, INC.
215-862-1115 ● CourtTranscripts@aol.com

App.701

108

sublease, provide me the approval. I'm not aware of it.

MS. LEE: It's a matter of --

MR. MESSINGER: If you haven't -- I know that they're all part of the same family, but there's still a contractual relationship as between the Trust and the Manors. The lease has to be abided by.

And then once the receiver is appointed, we're allowed to enforce the right under that lease. And one of the things I've asked, not Dilworth Paxson, but the attorneys that were representing the Manors before that, is that I sent them a notice of default and actually enumerated a number of things that I thought were in default. I said, if you're in compliance with those, just let us know. Show us that you had proof of it. But as far as I know, the Good Shepherd lease wasn't approved by the landlord.

MS. LEE: Your Honor, respectfully, that makes no sense because Good Shepherd was involved when HUD was involved. And HUD required any sub-leasee [sic] to have an addendum to even be able to sublet the place.

MR. MESSINGER: Right.

MS. LEE: So that -- that's recorded on -- that's literally recorded in the counties of the sublease, so I don't --

MR. MESSINGER: We're saying the same thing. There -- the sublease wasn't recorded. It wasn't approved by anybody.

TRANSCRIPTS PLUS, INC.
215-862-1115 ● CourtTranscripts@aol.com

App.702

109

The landlord -- like, I know that they are owned by the same people. But that's what the whole thing was is, you know, we then became aware that there was a sublease after they finally disclosed it to us, after they refused our request many, many times. And as soon as we did that, that's when we did the directive letter. We had no clue about Good Shepherd before that.

THE COURT: So let me ask you this. So the practical ramifications of what you're saying is that you are looking to, I suppose, reject the Good Shepherd lease and, as a result, you won't be getting rent anymore.

MR. MESSINGER: I am -- so far as Good Shepherd is providing a service --

THE COURT: Right.

MR. MESSINGER: -- and they are renting space, I'm happy for them to pay rent as a subtenant.

THE COURT: Okay.

MR. MESSINGER: But that has nothing to do with -- and things have changed, of course, since I sent that default letter.

THE COURT: Okay.

MR. MESSINGER: They're now in bankruptcy; I'm not looking to evict anybody at this point.

THE COURT: Okay.

MR. MESSINGER: That's what I said earlier in the

110

hearing. If the Manors wish to renegotiate a new lease, which in my view, they don't have one, or to alter or amend the one that's in existence, I'm the guy they got to talk to because I'm the receiver. And I have the power to enter into contracts for the leasing of the building. I have all that power. That's within the receiver's order.

THE COURT: Okay. I'm just talking about the limited Good Shepherd lease issue. So --

MR. MESSINGER: I have no intent to go them out.

THE COURT: So my -- my -- I guess my question is, you're going to be collecting the rent from Good Shepherd. But what you're telling me is that the debtor provides services as part of the lease to Good Shepherd, and those expenses are in your budget.

MS. AARONSON: They're --

MS. LEE: Yes.

MS. AARONSON: They're in the lease payment, too. Like, the lease payment is based on them reimbursing. That's why I mentioned at the beginning how the Manors aren't allowed to pay for shared services of affiliates and these other parties without being reimbursed. That was the agreement with the U.S. Trustee at the outset of the cases.

So I wanted to make it clear that if we're turning over the Good Shepherd rent, that's the reimbursement to the Manor for the services and the utilities that are being

111

provided to Good Shepherd.

And also -- I think he was talking about foreclosure counsel not providing information.  So I just wanted to make that clear, that wasn't us refusing to provide anything.

THE COURT:  Do we know how much -- do we know what that number is?

MS. AARONSON:  For?  For the shared amount?  The Atiyehs can figure that out.  It's whatever portion of the utility -- the space they occupy for the utilities.  And then housekeeping, trash -- we could calculate that portion.

And also, the lease is recorded.  The title search will bring that up, and we can provide them a copy of the title report that shows that the lease is recorded for that.  Even though I know he says he's not planning to kick out the physical therapist for the residents.

THE COURT:  Well, so -- right.  So my concern is that you're going to get all the money --

MR. MESSINGER:  Yeah.

THE COURT:  -- and perhaps part of that money is related to those services, so that's my concern --

MR. MESSINGER:  So --

THE COURT:  -- is, yes, I'm going to give you all of the money, but --

MR. MESSINGER:  Right.

THE COURT:  -- then what?

112

MR. MESSINGER:  So -- so the way I read the lease is they pay rent.  Right?  And what they're talking about, shared service, isn't -- I'm not sure -- and I'll go back and look at the sublease --

THE COURT:  As whether or not that's part of the rent.

MR. MESSINGER:  But -- but it's my understanding they pay a certain amount of rent.  That's all I want.

THE COURT:  Okay.

MR. MESSINGER:  And that there's some services that they provide as the sub-landlord to them.  And they're saying, well, now we're providing it without getting the rent.  That's what I see their concern being, but I may misunderstand that.  Do you follow what I mean?  Is -- is they have a lease agreement, right?  And let's not forget all along, the reason why I'm able to get the rent is from the receiver's order.  But the reason why I'm able to get the rent by the receiver's order is there's a security agreement that -- that they agreed to -- to allow them to grab that rent should they default on their -- on -- should the -- should the Trust default.  They entered into a separate security agreement that provides the security for everything.

THE COURT:  Understood.

MR. MESSINGER:  Yeah.

THE COURT:  Understood.

113

MS. AARONSON:  Perhaps we could meet with the receiver and discuss it because I know the --

THE COURT:  I think that would be really helpful because I --

MS. AARONSON:  Yeah, the lease does --

THE COURT:  I have no idea what the lease says.  I really have no idea.  I don't know if it breaks out any of this information --

MS. AARONSON:  It does.

THE COURT:  -- or whether it's just "this is the rent payment, and this is what you pay."

But I am concerned that as a result of that, if they're performing services for Good Shepherd that are valued at X, I don't know what I do with their budget as a result of that.

MR. MESSINGER:  Right.

MS. AARONSON:  Right.

THE COURT:  Right?  Because they're not getting reimbursed for it, but they -- they are doing it.

MR. MESSINGER:  Yeah, I'm --

THE COURT:  So I think the two of you need to talk.

MR. MESSINGER:  I will --

MS. AARONSON:  Right.

MR. MESSINGER:  I will talk to them.

THE COURT:  Okay.  Okay.

TRANSCRIPTS PLUS, INC.
215-862-1115 ● CourtTranscripts@aol.com

App.707

114

MS. AARONSON:  All right.

MR. MESSINGER:  Yeah.

THE COURT:  All right.  So --

MS. AARONSON:  And perhaps we can submit a proposed form of order that modifies the prior order?

THE COURT:  That was going to be my next question, is to -- I think we need to clarify the order, but I'd like you two to talk first with regard to this issue before I enter that order.

MR. MESSINGER:  Yeah.

THE COURT:  Because I want to make clear what money is being sent to whom for what, and whether or not there is some offset to it --

MR. MESSINGER:  Okay.

THE COURT:  -- because I don't know if there is.

MR. MESSINGER:  No, no, I get -- I get that.

THE COURT:  Okay.

MR. MESSINGER:  I get that.  And I'm happy to speak to them about that.

THE COURT:  Okay.  All right.  Is there anything else that we need to --

MR. HAMERMESH:  I think we're all set, Your Honor.

THE COURT:  -- talk about today?  Okay.

MS. LEE:  We have to enter our exhibits, Your Honor.

THE COURT:  Yes, you should do that.  Keith, are you

115

ready?

MR. MESSINGER:  And, by the way, I thought I'd come here and not say anything.

THE COURT:  Oh, no.

(Laughter)

THE COURT:  No, no, no.  We welcome that you come and say -- because it's been a lot.  So I get it.  I get it.  And I appreciate it actually.

So if you have your list of what exhibits -- I don't think -- did you use previous one?

MR. HAMERMESH:  I think all of those exhibits we talked about, we've already admitted.

THE COURT:  They're already -- okay.

MS. AARONSON:  Yeah.

THE COURT:  Okay.

MS. LEE:  Well, we have new exhibits from our prior -- our prior list, Your Honor.

THE COURT:  Okay.

MS. LEE:  We have D-53, which is the monthly operating reports for Saucon Manor;

D-54, March monthly operating reports for Whitehall Manor;

We have D-55, which is the cash collateral budget, April 25 to July 18;

We have D-56, which is the Abraham Kapoor Atiyeh

116

declaration;

We have D-57, which is the Saucon Trust Firm Commitment;

We have --

(Attorneys engaged in off-the-record colloquy)

MS. LEE:  We have -- am I at D-58?

THE COURT:  Yes, you're at 58.

MS. LEE:  D-58, which is Whitehall Fiduciary Firm Commitment;

I have D-59, which is the Nimita Kapoor-Atiyeh declaration;

D-61, which is David Ferraris's declaration;

D-62, which is Charles Lehmann's declaration;

D-63, which is Lascelles Williams's declaration;

D-64, which is a Docusign for declarations.

And then just for ease for -- if you have to go back, I will just say we have the -- secured creditors that I referenced was LVx-46, LVx-47, LVx-48, LVx-49, LVx-50, LVx-51. Those are all Abraham Atiyeh and Nimita Kapoor's Schedule Es for the years of '20 through '23.

And -- oh, I'm sorry, and LVx-52, which is for 2024, which was all previously submitted.

And just for ease, Your Honor, since it has a lot of exhibits, I will say that the focus of my motion compel was:

D-8, which was the Saucon Trust 2020 -- 2012 M&T

117

mortgage;

D-9, which was Saucon Trust 2012 HUD regulatory agreement;

D-23, which is Whitehall 2012 M&T mortgage with rider;

D-24, Whitehall 2012 HUD regulatory agreement; and

D-57, which was Saucon Trust Firm Commitment; and

D-58, Fiduciary -- Whitehall Fiduciary Firm Commitment; and

Obviously the tax returns that I went through, which was LVx-46 through 52.

THE COURT:  All right, so if I have this correct, I have D-53 through 64, D-8, 9, 23 and 24, right?  And then the LVX-46 through 52.

MS. LEE:  Yes.

THE COURT:  Is that right?  Okay.

MS. LEE:  Yes, I believe so.

THE COURT:  All right.

MR. HAMERMESH:  Your Honor --

THE COURT:  There are objections to that?

MR. HAMERMESH:  So, first of all, the HUD documents, which I think were D-57 and D-58, the firm commitment --

THE COURT:  Yes.

MR. HAMERMESH:  -- and there might have been one or two others.  I think, for the same reason I mentioned, I think

118

that Ms. Lee's whole discussion about the rent amount is irrelevant. We would object to those being admitted as irrelevant also.

And then on the declarations, Your Honor, I had prepared a nice little two-page set of notes on objections to the various things in the declarations. I -- I'm not sure it works, but I guess what I would suggest, Your Honor, because they're also going to be presented, I assume, for the hearing on Thursday, and it's a little unfair --

THE COURT: That's kind of how I looked at them.

MR. HAMERMESH: Right.

THE COURT: Because I wasn't really thinking that they were for today.

MR. HAMERMESH: Right. So -- so if -- what I'd suggest, Your Honor -- so one of my objections was, to the extent the declarations say anything about, "here's what the ombudsman then said after seeing all this wonderful stuff we did," that's hearsay.

I think there was a reference to that on the record today, so I would object to that as hearsay.

But other than that, I wouldn't object to accepting into evidence her -- counsel's characterization of those declarations without admitting the declarations themselves. And I'd suggest we leave the details of the declarations themselves for Thursday.

119

THE COURT:  And that's 59 through 64, that's the declarations?

MS. AARONSON:  Yes, and we have all of the witnesses available for cross, as well, so --

THE COURT:  Yeah, the way that I looked at it, and perhaps I'm looking at it incorrectly, but was that they were to substitute for direct.

MS. AARONSON:  Right.

MS. LEE:  Yes.

MS. AARONSON:  Because of the time limitations.

THE COURT:  Right.

MS. AARONSON:  That's why Mr. Ferraris is on the phone.

THE COURT:  Okay.  Okay.

MS. AARONSON:  Like, everybody's available for cross, so --

THE COURT:  That's what I thought.

MS. AARONSON:  Yeah.

THE COURT:  All right.  So, yes, so to the extent that we're using them for direct --

MS. AARONSON:  Right.

THE COURT:  -- presumably on Thursday, those objections can be raised then.

I won't admit them today, because I honestly don't think that they are really for today.

120

MS. AARONSON:  Mr. Atiyeh's affidavit, which is Number 56, was for cash collateral today.

THE COURT:  Right.

MS. AARONSON:  Largely.  But it touched on some of the other --

THE COURT:  Right.  But 59 through 64, I think, is everyone else.

MR. HAMERMESH:  Yeah, and I don't objections to 56.

THE COURT:  Yeah -- I'm sorry?

MR. HAMERMESH:  We don't have objections --

THE COURT:  Right.

MR. HAMERMESH:  -- to D-56.

THE COURT:  Okay.  Okay.

MS. LEE:  Well, the only reason why, Your Honor, those other declarations are relevant is because the lender, several times today, talked about the PTO [sic] report and the condition related --

THE COURT:  Right.  No, I --

MS. LEE:  -- to his motion to compel.

THE COURT:  I understand.  I, again, take that most of that is really aimed at --

MS. AARONSON:  Tomorrow.

THE COURT:  -- the motion to dismiss --

MS. LEE:  Right.

THE COURT:  -- more than it's aimed at your motion

121

for relief today.  I mean, I take what you're saying --

MS. AARONSON:  Right.

THE COURT:  But I don't know that we need the declarations for that.  So I'm not going to admit those for purposes of today, and we will deal with them on Thursday.

MS. AARONSON:  Okay.

THE COURT:  Because I think that's really where they need to be, rather than in the evidence for today.

MR. HAMERMESH:  I think that addresses our concern, Your Honor.

THE COURT:  Okay.

MR. HAMERMESH:  Thank you.

THE COURT:  There weren't any other ones, right?  Those were the only ones?

MR. HAMERMESH:  Yes, Your Honor.

THE COURT:  Okay.

(Debtors' Exhibits D-8, D-9, D-23, D-24 and D-53 through D-56 and Creditor's Exhibits LVx-46 through Lvx-52 in evidence)

THE COURT:  Okay, I think that's a wrap for today.

MR. MESSINGER:  Thank you, Your Honor.

THE COURT:  So, thank you, everyone.

MR. HAMERMESH:  Thank you, Your Honor.

MS. AARONSON:  Thank you, Your Honor.

THE COURT:  All right.

MR. HAMERMESH:  And we're done before 5.

122

THE COURT:  We are.  Look at that.  Just in time for traffic.

(Whereupon, at 4:53 p.m., the hearing was adjourned.)

CERTIFICATE OF TRANSCRIBER

I, KAREN HARTMANN, a certified Electronic Court Transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ *Karen Hartmann*

Karen Hartmann, AAERT CET  Date: April 27, 2026

TRANSCRIPTS PLUS, INC.

**Hearing Exhibit D-50**

**A – Weekly Reconciliations as of February 28, 2026**

#125541164v1

**Saucon Valley Manor Inc.**
**Operating Statement**
February 22 - 28, 2026

| | **Cash Basis** |
| --- | --- |
| | **Week of Feb 22, 26** |
| **Ordinary Income/Expense** | |
| **Income** | |
| **Rental Income** | |
| **Monthly Rental** | 141,295.08 |
| **Interest Income** | 0.79 |
| **Reimburse - Interco payroll** | 17,669.96 |
| **Reimbursement - R&M** | 2,440.00 |
| **Reimburse Food Prep/Delivery** | 30,614.27 |
| **Reimbursement - Housekeeping** | 7,129.04 |
| **Reimbursement - Direct Care** | 18,096.84 |
| **Total Income** | 217,245.98 |
| **Expense** | |
| **Facility Costs** | |
| **Electric** | 1,376.11 |
| **Total Facility Costs** | 1,376.11 |
| **Maintenance** | |
| **Repair & Maintenance** | |
| **Repair & Maintenance - Other** | 5,098.93 |
| **Total Repair & Maintenance** | 5,098.93 |
| **Total Maintenance** | 5,098.93 |
| **Dietary** | |
| **Food Costs** | 21,331.84 |
| **Total Food Costs** | 21,331.84 |
| **Total Dietary** | 21,331.84 |
| **Housekeeping** | |
| **Hskp. & Laundry Supplies** | 2,623.90 |
| **Total Housekeeping** | 2,623.90 |
| **Direct Care-Nursing** | |
| **Auto & Travel** | 405.53 |
| **D.C. Wages** | 2,589.39 |
| **Total Direct Care-Nursing** | 2,994.92 |
| **Marketing** | |
| **Advertising** | |
| **Advertising Referral Company** | 9,041.25 |
| **Events** | 700.00 |
| **Total Advertising** | 9,741.25 |
| **Total Marketing** | 9,741.25 |
| **Resident Refunds** | 10,345.54 |
| **Administration** | |
| **Adm. Wages** | 4,678.29 |
| **Bank Service Charges** | 528.24 |
| **Business insurance** | 6,957.84 |
| **Contract Labor** | 381.00 |

**Saucon Valley Manor Inc.**
**Operating Statement - Cash Collateral**
March 1 - 7, 2026

| **Ordinary Income/Expense** | |
| --- | --- |
| **Income** | 0.79 |
| **Monthly Rental** | 141,295.08 |
| **Intercompany disbursements** | 75,950.11 |
| **Reimbursement- employee health insurance** | 0.00 |
| **Total Income** | 217,245.98 |
| **Expenses:** | |
| DIETARY | 21,331.84 |
| REFUNDS | 10,345.54 |
| SUPPLIES | 2,623.90 |
| MAINTENANCE | 5,098.93 |
| UTILITIES | 3,607.66 |
| PAYROLL & BENEFITS (before reimbursement- employees) | 7,267.68 |
| OFFICE & MARKETING EXPENSES | 9,741.25 |
| REAL ESTATE TAXES & INSURANCE | 49,698.78 |
| EQUIPMENT | 0 |
| US TRUSTEE QUARTERLY FEES | 0 |
| DILWORTH PAXSON/Committee Counsel | 0 |
| Omni | 7,500.00 |
| ADEQUATE PROTECTION | 0 |
| LEGAL/PROFESSIONAL FEES | 3,750.00 |
| MANAGEMENT FEE | 20,625.79 |
| Miscellaneous | 1,431.51 |
| Total expenses | 143,022.88 |
| Net Income | 74,223.10 |

App.718

| | Week of Feb 22, 26 |
|---|---:|
| Employee Training | 42.00 |
| Health Insurance | 34,535.94 |
| Legal/Professional Fees | 3,750.00 |
| Management fee | 20,625.79 |
| Office Supplies | 74.74 |
| Omni | 7,500.00 |
| Telephone | 2,231.55 |
| Workers Compensation | 8,205.00 |
| Total Administration | 89,510.39 |
| Total Expense | 143,022.88 |
| Net Ordinary Income | 74,223.10 |
| Net Income | 74,223.10 |

App.719

**Saucon Valley Manor Inc.**
**Check Detail**
**February 22 - 28, 2026**

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Income | interco Transfer | Dietary | Refunds | Supplies | Maintance | Utilities | Payroll Benefits | Office Mktg | Real Estate Insurance | Equipment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Transfer** | | 02/27/2026 | | | **BB&T ESCROW** | | **-10,000.00** | | | | | | | | | | | |
| | | | | | Truist 15579 (12/18/24) | -10,000.00 | 10,000.00 | | | | | | | | | | | |
| | | | | | | -10,000.00 | 10,000.00 | | 10,000.00 | | | | | | | | | |
| **Check** | | 02/23/2026 | | | **Truist 15579 (12/18/24)** | | **-518.24** | | | | | | | | | | | |
| | | | | | Bank Service Charges | -518.24 | 518.24 | | | | | | | | | | | |
| TOTAL | | | | | | -518.24 | 518.24 | | | | | | | | | | | |
| **Check** | | 02/23/2026 | | | **Truist Reserve #5678** | | **-10.00** | | | | | | | | | | | |
| | | | | | Bank Service Charges | -10.00 | 10.00 | | | | | | | | | | | |
| TOTAL | | | | | | -10.00 | 10.00 | | | | | | | | | | | |
| **Bill Pmt -Check** | ACH | 02/27/2026 | Eastern Alliance Insurance Group | | **Truist 15579 (12/18/24)** | | **-8,205.00** | | | | | | | | | | | |
| Bill | 538083 | 02/02/2026 | | | Accrued W/C | -8,205.00 | 8,205.00 | | | | | | | | | | 8,205.00 | |
| TOTAL | | | | | | -8,205.00 | 8,205.00 | | | | | | | | | | | |
| **Bill Pmt -Check** | ACH | 02/27/2026 | Void | | **Truist 15579 (12/18/24)** | | **0.00** | | | | | | | | | | | |
| TOTAL | | | | | | 0.00 | 0.00 | | | | | | | | | | | |
| **Bill Pmt -Check** | ACH | 02/27/2026 | A Place for Mom | | **Truist 15579 (12/18/24)** | | **-5,295.00** | | | | | | | | | | | |
| Bill | REF919047 | 02/09/2026 | | | Advertising Referral Company | -5,295.00 | 5,295.00 | | | | | | | | | 5,295.00 | | |
| TOTAL | | | | | | -5,295.00 | 5,295.00 | | | | | | | | | | | |
| **Check** | debit | 02/23/2026 | Uber | | **Debit Card #7792** | | **-28.51** | | | | | | | | | | | |
| | | | | | Auto & Travel | -28.51 | 28.51 | | | | | | | | | | | |
| TOTAL | | | | | | -28.51 | 28.51 | | | | | | | | | | | |
| **Check** | debit | 02/23/2026 | Uber | | **Debit Card #7792** | | **-26.97** | | | | | | | | | | | |
| | | | | | Auto & Travel | -26.97 | 26.97 | | | | | | | | | | | |
| TOTAL | | | | | | -26.97 | 26.97 | | | | | | | | | | | |
| **Check** | debit | 02/23/2026 | Uber | | **Debit Card #7792** | | **-40.09** | | | | | | | | | | | |
| | | | | | Auto & Travel | -40.09 | 40.09 | | | | | | | | | | | |
| TOTAL | | | | | | -40.09 | 40.09 | | | | | | | | | | | |
| **Check** | debit | 02/23/2026 | Uber | | **Debit Card #7792** | | **-39.98** | | | | | | | | | | | |
| | | | | | Auto & Travel | -39.98 | 39.98 | | | | | | | | | | | |
| TOTAL | | | | | | -39.98 | 39.98 | | | | | | | | | | | |
| **Check** | debit | 02/23/2026 | Uber | | **Debit Card #7792** | | **-32.99** | | | | | | | | | | | |

App.720

| | Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | | Income | Transfer | Dietary | Refunds | Supplies | Maintance | Utilities | Benefits | Mktg | Insurance | Equipment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Auto & Travel | -32.99 | 32.99 | | | | | | | | | | | | |
| TOTAL | | | | | | | -32.99 | 32.99 | | | | | | | | | | | | |
| | Check | debit | 02/24/2026 | Uber | | Debit Card #7792 | | -39.98 | | | | | | | | | | | | |
| | | | | | | Auto & Travel | -39.98 | 39.98 | | | | | | | | | | | | |
| TOTAL | | | | | | | -39.98 | 39.98 | | | | | | | | | | | | |
| | Check | debit | 02/24/2026 | Uber | | Debit Card #7792 | | -24.98 | | | | | | | | | | | | |
| | | | | | | Auto & Travel | -24.98 | 24.98 | | | | | | | | | | | | |
| TOTAL | | | | | | | -24.98 | 24.98 | | | | | | | | | | | | |
| | Check | debit | 02/24/2026 | Uber | | Debit Card #7792 | | -43.97 | | | | | | | | | | | | |
| | | | | | | Auto & Travel | -43.97 | 43.97 | | | | | | | | | | | | |
| TOTAL | | | | | | | -43.97 | 43.97 | | | | | | | | | | | | |
| | Check | debit | 02/24/2026 | Uber | | Debit Card #7792 | | -36.98 | | | | | | | | | | | | |
| | | | | | | Auto & Travel | -36.98 | 36.98 | | | | | | | | | | | | |
| TOTAL | | | | | | | -36.98 | 36.98 | | | | | | | | | | | | |
| | Check | debit | 02/24/2026 | Uber | | Debit Card #7792 | | -27.99 | | | | | | | | | | | | |
| | | | | | | Auto & Travel | -27.99 | 27.99 | | | | | | | | | | | | |
| TOTAL | | | | | | | -27.99 | 27.99 | | | | | | | | | | | | |
| | Check | debit | 02/24/2026 | Uber | | Debit Card #7792 | | -29.89 | | | | | | | | | | | | |
| | | | | | | Auto & Travel | -29.89 | 29.89 | | | | | | | | | | | | |
| TOTAL | | | | | | | -29.89 | 29.89 | | | | | | | | | | | | |
| | Bill Pmt -Check | Debit | 02/25/2026 | Amazon | | Debit Card #7792 | | -74.74 | | | | | | | | | | | | |
| | Bill | | 02/25/2026 | | | Office Supplies | -74.74 | 74.74 | | | | | | | | | | | | |
| TOTAL | | | | | | | -74.74 | 74.74 | | | | | | | | | | | | |
| | Bill Pmt -Check | Debit | 02/26/2026 | Red Cross | | Debit Card #7792 | | -42.00 | | | | | | | | | | | | |
| | Bill | | 02/26/2026 | | | Employee Training | -42.00 | 42.00 | | | | | | | | | | | | |
| TOTAL | | | | | | | -42.00 | 42.00 | | | | | | | | | | | | |
| | Check | eft | 02/23/2026 | Uber | | Debit Card #7792 | | -33.20 | | | | | | | | | | | | |
| | | | | | | Auto & Travel | -33.20 | 33.20 | | | | | | | | | | | | |
| TOTAL | | | | | | | -33.20 | 33.20 | | | | | | | | | | | | |
| | Bill Pmt -Check | EFT | 02/24/2026 | Aramsco Inc. | | Debit Card #7792 | | -2,174.46 | | | | | | | | | | | | |
| | Bill | S7566878 | 02/24/2026 | | | Hskp. & Laundry Supplies | -2,174.46 | 2,174.46 | | | | | | | 2,174.46 | | | | | |
| TOTAL | | | | | | | -2,174.46 | 2,174.46 | | | | | | | | | | | | |
| | Check | TFR | 02/27/2026 | Saucon Valley Manor II | | Truist 15579 (12/18/24) | | -2,590.00 | | | | | | | | | | | | |

App.721

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Income | Transfer | Dietary | Refunds | Supplies | Maintance | Utilities | Benefits | Mktg | Insurance | Equipment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Monthly Rental | -2,590.00 | 2,590.00 | | | | | | | | | | | |
| TOTAL | | | | | | -2,590.00 | 2,590.00 | 2,590.00 | | | | | | | | | | |
| **Check** | **Trans** | **02/26/2026** | | | **Truist 15579 (12/18/24)** | | **-22,000.00** | | | | | | | | | | | |
| | | | | | BB&T ESCROW | -22,000.00 | 22,000.00 | | | | | | | | | | | |
| TOTAL | | | | | | -22,000.00 | 22,000.00 | | 22,000.00 | | | | | | | | | |
| **Bill Pmt -Check** | **ACH-2144** | **02/26/2026** | **Primo Brands** | | **Truist 15579 (12/18/24)** | | **-4,009.71** | | | | | | | | | | | |
| Bill | 26B0430798645 | 02/06/2026 | | | Food Costs | -4,009.71 | 4,009.71 | | | | | | | | | | | |
| TOTAL | | | | | | -4,009.71 | 4,009.71 | | | 4,009.71 | | | | | | | | |
| **Bill Pmt -Check** | **2151** | **02/25/2026** | **Whitehall Manor Inc.** | | **Truist 15579 (12/18/24)** | | **-6,359.31** | | | | | | | | | | | |
| Bill | interco payroll | 02/21/2026 | | | Adm. Wages | -4,678.29 | 4,678.29 | | | | | | | | | | | |
| | | | | | D.C. Wages | -1,681.02 | 1,681.02 | | | | | | | | | | | |
| TOTAL | | | | | | -6,359.31 | 6,359.31 | | | | | | | | 6,359.31 | | | |
| **Bill Pmt -Check** | **2152** | **02/25/2026** | **Parkland Manor** | | **Truist 15579 (12/18/24)** | | **-993.60** | | | | | | | | | | | |
| Bill | interco payroll | 02/21/2026 | | | D.C. Wages | -993.60 | 993.60 | | | | | | | | | | | |
| TOTAL | | | | | | -993.60 | 993.60 | | | | | | | | 993.60 | | | |
| **Bill Pmt -Check** | **2153** | **02/26/2026** | **Lukens & Wolf, LLC** | | **Truist 15579 (12/18/24)** | | **-3,750.00** | | | | | | | | | | | |
| Bill | Property Appraisal | 02/26/2026 | | | Legal/Professional Fees | -3,750.00 | 3,750.00 | | | | | | | | | | | |
| TOTAL | | | | | | -3,750.00 | 3,750.00 | | | | | | | | | | | |
| **Bill Pmt -Check** | **2154** | **02/26/2026** | **Matura Salon & Spa Management** | | **Truist 15579 (12/18/24)** | | **-381.00** | | | | | | | | | | | |
| Bill | 301432 | 02/20/2026 | | | Contract Labor | -381.00 | 381.00 | | | | | | | | | | | |
| TOTAL | | | | | | -381.00 | 381.00 | | | | | | | | | | | |
| **Bill Pmt -Check** | **2155** | **02/23/2026** | **Ballard, Raymond (rfd)** | | **Truist 15579 (12/18/24)** | | **-875.00** | | | | | | | | | | | |
| Bill | RFD Ray Ballard | 02/01/2026 | | | Resident Refund | -875.00 | 875.00 | | | | | | | | | | | |
| TOTAL | | | | | | -875.00 | 875.00 | | | | 875.00 | | | | | | | |
| **Bill Pmt -Check** | **2156** | **02/23/2026** | **Herbert, Sonya (rfd)** | | **Truist 15579 (12/18/24)** | | **-225.54** | | | | | | | | | | | |
| Bill | RFD Sonya Herbert | 02/01/2026 | | | Resident Refund | -225.54 | 225.54 | | | | | | | | | | | |
| TOTAL | | | | | | -225.54 | 225.54 | | | | 225.54 | | | | | | | |
| **Bill Pmt -Check** | **2157** | **02/23/2026** | **O'Donnell, Raymond (rfd)** | | **Truist 15579 (12/18/24)** | | **-1,800.00** | | | | | | | | | | | |
| Bill | RFD RaymondO'Donnell | 01/01/2026 | | | Resident Refund | -1,800.00 | 1,800.00 | | | | | | | | | | | |
| TOTAL | | | | | | -1,800.00 | 1,800.00 | | | | 1,800.00 | | | | | | | |
| **Bill Pmt -Check** | **2158** | **02/23/2026** | **Peffer, Doug (RFD)** | | **Truist 15579 (12/18/24)** | | **-560.56** | | | | | | | | | | | |
| Bill | RFD Doug Peffer | 02/01/2026 | | | Resident Refund | -196.56 | 196.56 | | | | | | | | | | | |
| | | | | | Resident Refund | -364.00 | 364.00 | | | | | | | | | | | |
| TOTAL | | | | | | -560.56 | 560.56 | | | | 560.56 | | | | | | | |

App.722

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Income | Transfer | Dietary | Refunds | Supplies | Maintance | Utilities | Benefits | Mktg | Insurance | Equipment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bill Pmt -Check** | **2159** | **02/23/2026** | **Queripel, Teri (rfd)** | | **Truist 15579 (12/18/24)** | | **-196.08** | | | | | | | | | | | |
| Bill | RFD-Terri Queripel | 02/01/2026 | | | Resident Refund | -11.10 | 28.08 | | | | | | | | | | | |
| | | | | | Resident Refund | -184.98 | 468.00 | | | | | | | | | | | |
| TOTAL | | | | | | -196.08 | 496.08 | | | | 196.08 | | | | | | | |
| **Bill Pmt -Check** | **2160** | **02/23/2026** | **Smith, David (rfd)** | | **Truist 15579 (12/18/24)** | | **-819.28** | | | | | | | | | | | |
| Bill | RFD David Smith | 02/01/2026 | | | Resident Refund | -287.28 | 287.28 | | | | | | | | | | | |
| | | | | | Resident Refund | -532.00 | 532.00 | | | | | | | | | | | |
| TOTAL | | | | | | -819.28 | 819.28 | | | | 819.28 | | | | | | | |
| **Bill Pmt -Check** | **2161** | **02/23/2026** | **takacs, Zoltan (rfd)** | | **Truist 15579 (12/18/24)** | | **-4,502.08** | | | | | | | | | | | |
| Bill | RFD Zoltan Takacs | 02/01/2026 | | | Resident Refund | -4,502.08 | 4,502.08 | | | | | | | | | | | |
| TOTAL | | | | | | -4,502.08 | 4,502.08 | | | | 4,502.08 | | | | | | | |
| **Bill Pmt -Check** | **2162** | **02/27/2026** | **Agentis Plumbing** | | **Truist 15579 (12/18/24)** | | **-844.00** | | | | | | | | | | | |
| Bill | 0000177120 | 02/01/2026 | | | Repair & Maintenance | -844.00 | 844.00 | | | | | | | | | | | |
| TOTAL | | | | | | -844.00 | 844.00 | | | | | | 844.00 | | | | | |
| **Bill Pmt -Check** | **2163** | **02/27/2026** | **Azar Towing** | | **Truist 15579 (12/18/24)** | | **-175.00** | | | | | | | | | | | |
| Bill | 12026 | 02/01/2026 | | | Repair & Maintenance | -175.00 | 175.00 | | | | | | | | | | | |
| TOTAL | | | | | | -175.00 | 175.00 | | | | | | 175.00 | | | | | |
| **Bill Pmt -Check** | **2164** | **02/27/2026** | **Ballonoff, Rob** | | **Truist 15579 (12/18/24)** | | **-250.00** | | | | | | | | | | | |
| Bill | 2 shows 2/14/26 | 02/14/2026 | | | Events | -250.00 | 250.00 | | | | | | | | | | | |
| TOTAL | | | | | | -250.00 | 250.00 | | | | | | | | | 250.00 | | |
| **Bill Pmt -Check** | **2165** | **02/27/2026** | **Void** | | **Truist 15579 (12/18/24)** | | **0.00** | | | | | | | | | | | |
| TOTAL | | | | | | 0.00 | 0.00 | | | | | | | | | | | |
| **Bill Pmt -Check** | **2166** | **02/27/2026** | **Void** | | **Truist 15579 (12/18/24)** | | **0.00** | | | | | | | | | | | |
| TOTAL | | | | | | 0.00 | 0.00 | | | | | | | | | | | |
| **Bill Pmt -Check** | **2167** | **02/27/2026** | **Global Sourcing Solutions** | | **Truist 15579 (12/18/24)** | | **-449.44** | | | | | | | | | | | |
| Bill | Quote 10543 | 02/26/2026 | | | Hskp. & Laundry Supplies | -449.44 | 449.44 | | | | | | | | | | | |
| TOTAL | | | | | | -449.44 | 449.44 | | | | | 449.44 | | | | | | |
| **Bill Pmt -Check** | **2168** | **02/27/2026** | **Void** | | **Truist 15579 (12/18/24)** | | **0.00** | | | | | | | | | | | |
| TOTAL | | | | | | 0.00 | 0.00 | | | | | | | | | | | |
| **Bill Pmt -Check** | **2169** | **02/27/2026** | **Void** | | **Truist 15579 (12/18/24)** | | **0.00** | | | | | | | | | | | |
| TOTAL | | | | | | 0.00 | 0.00 | | | | | | | | | | | |
| **Bill Pmt -Check** | **2170** | **02/27/2026** | **Keystone Insurers Group Inc** | | **Truist 15579 (12/18/24)** | | **-484.00** | | | | | | | | | | | |

App.723

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Income | Transfer | Dietary | Refunds | Supplies | Maintance | Utilities | Benefits | Mktg | Insurance | Equipment |
|------|-----|------|------|------|---------|-------------|-----------------|--------|----------|---------|---------|----------|-----------|-----------|----------|------|-----------|-----------|
| Bill | 00031092 | 12/01/2025 | | | Health Insurance | -484.00 | 484.00 | | | | | | | | | | | |
| TOTAL | | | | | | -484.00 | 484.00 | | | | | | | | | | 484.00 | |
| | | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2171** | **02/27/2026** | **Lehigh Valley Dairies** | | **Truist 15579 (12/18/24)** | | **-193.30** | | | | | | | | | | | |
| Bill | 9144228 | 02/11/2026 | | | Food Costs | -193.30 | 193.30 | | | | | | | | | | | |
| TOTAL | | | | | | -193.30 | 193.30 | | | 193.30 | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2172** | **02/27/2026** | **Phipany, Kris** | | **Truist 15579 (12/18/24)** | | **-300.00** | | | | | | | | | | | |
| Bill | entertainment 1/13/2 | 02/02/2026 | | | Events | -150.00 | 150.00 | | | | | | | | | | | |
| Bill | entertain 2/23 | 02/23/2026 | | | Events | -150.00 | 150.00 | | | | | | | | | | | |
| TOTAL | | | | | | -300.00 | 300.00 | | | | | | | | | 300.00 | | |
| | | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2173** | **02/27/2026** | **PPL (06696-53034)** | | **Truist 15579 (12/18/24)** | | **-1,015.17** | | | | | | | | | | | |
| Bill | 06696-53034 | 02/01/2026 | | | Electric | -1,015.17 | 1,015.17 | | | | | | | | | | | |
| TOTAL | | | | | | -1,015.17 | 1,015.17 | | | | | | | 1,015.17 | | | | |
| | | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2174** | **02/27/2026** | **PPL (14992-88024)** | | **Truist 15579 (12/18/24)** | | **-360.94** | | | | | | | | | | | |
| Bill | 14992-88024 | 02/01/2026 | | | Electric | -360.94 | 360.94 | | | | | | | | | | | |
| TOTAL | | | | | | -360.94 | 360.94 | | | | | | | 360.94 | | | | |
| | | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2175** | **02/27/2026** | **Travelers** | | **Truist 15579 (12/18/24)** | | **-6,957.84** | | | | | | | | | | | |
| Bill | 9306L6130 | 02/26/2026 | | | Accrued Insurance | -6,957.84 | 6,957.84 | | | | | | | | | | | |
| TOTAL | | | | | | -6,957.84 | 6,957.84 | | | | | | | | | | 6,957.84 | |
| | | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2176** | **02/27/2026** | **US Food Service, Inc.** | | **Truist 15579 (12/18/24)** | | **-17,128.83** | | | | | | | | | | | |
| Bill | 1739351 | 02/01/2026 | | | Food Costs | -11,788.94 | 11,788.94 | | | | | | | | | | | |
| Bill | 1910493 | 02/03/2026 | | | Food Costs | -5,339.89 | 5,339.89 | | | | | | | | | | | |
| TOTAL | | | | | | -17,128.83 | 17,128.83 | | | 17,128.83 | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2177** | **02/27/2026** | **Verizon (00004)** | | **Truist 15579 (12/18/24)** | | **-2,231.55** | | | | | | | | | | | |
| Bill | 6133712298 | 02/26/2026 | | | Telephone | -2,231.55 | 2,231.55 | | | | | | | | | | | |
| TOTAL | | | | | | -2,231.55 | 2,231.55 | | | | | | | 2,231.55 | | | | |
| | | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2178** | **02/27/2026** | **Woodward, Lorri  entertianment** | | **Truist 15579 (12/18/24)** | | **-150.00** | | | | | | | | | | | |
| Bill | entertain 1/29/26 | 02/02/2026 | | | Events | -150.00 | 150.00 | | | | | | | | | | | |
| TOTAL | | | | | | -150.00 | 150.00 | | | | | | | | | 150.00 | | |
| | | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2179** | **02/27/2026** | **Omni Agent Solutions, Inc.** | | **Truist 15579 (12/18/24)** | | **-7,500.00** | | | | | | | | | | | |
| Bill | 15101 | 02/26/2026 | | | Legal/Professional Fees | -7,500.00 | 14,259.17 | | | | | | | | | | | |
| TOTAL | | | | | | -7,500.00 | 14,259.17 | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2180** | **02/27/2026** | **Stone, Janet (rfd)** | | **Truist 15579 (12/18/24)** | | **-1,367.00** | | | | | | | | | | | |
| Bill | RFD Janet Stone | 02/27/2026 | | | Resident Refund | -1,342.00 | 1,342.00 | | | | | | | | | | | |
| | | | | | Resident Refund | -25.00 | 25.00 | | | | | | | | | | | |
| TOTAL | | | | | | -1,367.00 | 1,367.00 | | | | 1,367.00 | | | | | | | |

App.724

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount |
|---|---|---|---|---|---|---|---|
| **Bill Pmt -Check** | **2181** | **02/27/2026** | **CINTAS FIRE PROTECTION 636525** | | Truist 15579 (12/18/24) | | **-1,178.68** |
| Bill | 0F50741815 | 02/01/2026 | | | Repair & Maintenance | -1,178.68 | 1,178.68 |
| TOTAL | | | | | | -1,178.68 | 1,178.68 |
| **Bill Pmt -Check** | **2182** | **02/27/2026** | **Howard Refrgeration & A/C Co.** | | Truist 15579 (12/18/24) | | **-2,901.25** |
| Bill | 22122178 | 02/10/2026 | | | Repair & Maintenance | -710.00 | 710.00 |
| Bill | 22180544 | 02/17/2026 | | | Repair & Maintenance | -2,191.25 | 8,765.00 |
| TOTAL | | | | | | -2,901.25 | 9,475.00 |
| **Bill Pmt -Check** | **2183** | **02/27/2026** | **Premier Senior Placement** | | Truist 15579 (12/18/24) | | **-3,746.25** |
| Bill | 1059 James Sukeena | 02/27/2026 | | | Advertising Referral Company | -3,746.25 | 3,746.25 |
| TOTAL | | | | | | -3,746.25 | 3,746.25 |
| **Bill Pmt -Check** | **2184** | **02/27/2026** | **Capital Blue Cross (2026)** | | Truist 15579 (12/18/24) | | **-32,790.06** |
| Bill | 260470019597 | 03/01/2026 | | | Health Insurance-Employees | -6,102.67 | 6,102.67 |
| | | | | | Health Insurance | -2,064.50 | 2,064.50 |
| | | | | | Dental Insurance-Dietary | -3,096.75 | 3,096.75 |
| | | | | | Health Insurance | -1,913.39 | 1,913.39 |
| | | | | | Health Insurance | -2,064.50 | 2,064.50 |
| | | | | | Health Insurance | -17,548.25 | 17,548.25 |
| TOTAL | | | | | | -32,790.06 | 32,790.06 |
| **Bill Pmt -Check** | **2185** | **02/27/2026** | **Pennsylvania Venture Capital (Related Par** | | Truist 15579 (12/18/24) | | **-20,625.79** |
| Bill | mgmt fee | 02/27/2026 | | | Management fee | -20,625.79 | 20,625.79 |
| TOTAL | | | | | | -20,625.79 | 20,625.79 |
| **Bill Pmt -Check** | **2186** | **02/27/2026** | **United Concordia** | | Truist 15579 (12/18/24) | | **-1,261.88** |
| Bill | 214088089 | 03/01/2026 | | | Dental Insurance-Admin | -151.15 | 151.15 |
| | | | | | Dental Insurance-Activities | -71.66 | 71.66 |
| | | | | | Dental Insurance-Dietary | -179.15 | 179.15 |
| | | | | | Dental Insurance-Maintenance | -35.83 | 35.83 |
| | | | | | Dental Insurance-Direct Care | -824.09 | 824.09 |
| TOTAL | | | | | | -1,261.88 | 1,261.88 |

Category columns (right side):

| | Income | Transfer | Dietary | Refunds | Supplies | Maintance | Utilities | Benefits | Mktg | Insurance | Equipment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2181 | | | | | | 1,178.68 | | | | | |
| 2182 | | | | | | 2,901.25 | | | | | |
| 2183 | | | | | | | | | 3,746.25 | | |
| 2184 | | | | | | | | | | 32,790.06 | |
| 2186 | | | | | | | | | | 1,261.88 | |

agrees with check register   (177,698.11)

| | Income | Transfer | Dietary | Refunds | Supplies | Maintance | Utilities | Benefits | Mktg | Insurance | Equipment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2,590.00 | 32,000.00 | 21,331.84 | 10,345.54 | 2,623.90 | 5,098.93 | 3,607.66 | 7,352.91 | 9,741.25 | 49,698.78 | - |
| | | x | x | x | x | x | | x | x | | |

netted against income   2,590.00

payroll deposit netted against payroll   -85.23 (Benefits)   7,267.68   x

App.725

**Sauc**
**Chec**
**Februa**

| | US Trustee | Dilworth | Omni | Adequate Protection | Legal Prof | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|---|
| TOTAL | | | | | | | 518.24 |
| TOTAL | | | | | | | 10.00 |
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |
| TOTAL | | | | | | | 28.51 |
| TOTAL | | | | | | | 26.97 |
| TOTAL | | | | | | | 40.09 |
| TOTAL | | | | | | | 39.98 |

App.726

| | Trustee | Dilworth | Omni | Protection | Prof | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|---|
| TOTAL | | | | | | | 32.99 |
| TOTAL | | | | | | | 39.98 |
| TOTAL | | | | | | | 24.98 |
| TOTAL | | | | | | | 43.97 |
| TOTAL | | | | | | | 36.98 |
| TOTAL | | | | | | | 27.99 |
| TOTAL | | | | | | | 29.89 |
| TOTAL | | | | | | | 74.74 |
| TOTAL | | | | | | | 42.00 |
| TOTAL | | | | | | | 33.20 |
| TOTAL | | | | | | | |

App.727

| | Trustee | Dilworth | Omni | Protection | Prof | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|---|
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |
| TOTAL | | | | 3,750.00 | | | |
| TOTAL | | | | | 381.00 | | |
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |

App.728

| Trustee | Dilworth | Omni | Protection | Prof | Mgmt Fee | Misc |
|---------|----------|------|------------|------|----------|------|

TOTAL

TOTAL

TOTAL

TOTAL

TOTAL

TOTAL

TOTAL

TOTAL

TOTAL

TOTAL

TOTAL

App.729

| | Trustee | Dilworth | Omni | Protection | Prof | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|---|
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |
| TOTAL | | | | | | | |
| TOTAL | | 7,500.00 | | | | | |
| TOTAL | | | | | | | |

App.730

| | Trustee | Dilworth | Omni | Protection | Prof | Mgmt Fee | Misc | |
|---|---|---|---|---|---|---|---|---|
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | 20,625.79 | | |
| TOTAL | | | | | | | | |
| | - | - | 7,500.00 | - | 3,750.00 | 20,625.79 | 1,431.51 | 177,698.11 |
| | | x | | x | x | x | | |

App.731

**Saucon Valley Manor Inc.**
**Check register**
**As of February 28, 2026**

| Type | Date | Num | Name | Memo | Debit | Credit | Cash Basis Balance |
|------|------|-----|------|------|------:|-------:|-------:|
| **Debit Card #7792** | | | | | | | **5,350.41** |
| Check | 02/23/2026 | eft | Uber | Misc | | 33.20 | 5,317.21 |
| Check | 02/23/2026 | debit | Uber | Misc | | 28.51 | 5,288.70 |
| Check | 02/23/2026 | debit | Uber | Misc | | 26.97 | 5,261.73 |
| Check | 02/23/2026 | debit | Uber | Misc | | 40.09 | 5,221.64 |
| Check | 02/23/2026 | debit | Uber | Misc | | 39.98 | 5,181.66 |
| Check | 02/23/2026 | debit | Uber | Misc | | 32.99 | 5,148.67 |
| Bill Pmt -Check | 02/24/2026 | EFT | Aramsco Inc. | Supplies | | 2,174.46 | 2,974.21 |
| Check | 02/24/2026 | debit | Uber | Misc | | 39.98 | 2,934.23 |
| Check | 02/24/2026 | debit | Uber | Misc | | 24.98 | 2,909.25 |
| Check | 02/24/2026 | debit | Uber | Misc | | 43.97 | 2,865.28 |
| Check | 02/24/2026 | debit | Uber | Misc | | 36.98 | 2,828.30 |
| Check | 02/24/2026 | debit | Uber | Misc | | 27.99 | 2,800.31 |
| Check | 02/24/2026 | debit | Uber | Misc | | 29.89 | 2,770.42 |
| Bill Pmt -Check | 02/25/2026 | Debit | Amazon | Misc | | 74.74 | 2,695.68 |
| Bill Pmt -Check | 02/26/2026 | Debit | Red Cross | Misc | | 42.00 | 2,653.68 |
| Total Debit Card #7792 | | | | | 0.00 | 2,696.73 | 2,653.68 |
| **Truist 15579 (12/18/24)** | | | | | | | **402,813.45** |
| Deposit | 02/23/2026 | | | Income | 8,341.00 | | 411,154.45 |
| Bill Pmt -Check | 02/23/2026 | 2155 | Ballard, Raymond (rfd) | Refunds | | 875.00 | 410,279.45 |
| Bill Pmt -Check | 02/23/2026 | 2156 | Herbert, Sonya (rfd) | Refunds | | 225.54 | 410,053.91 |
| Bill Pmt -Check | 02/23/2026 | 2157 | O'Donnell, Raymond (rfd) | Refunds | | 1,800.00 | 408,253.91 |
| Bill Pmt -Check | 02/23/2026 | 2158 | Peffer, Doug (RFD) | Refunds | | 560.56 | 407,693.35 |
| Bill Pmt -Check | 02/23/2026 | 2159 | Queripel, Teri (rfd) | Refunds | | 196.08 | 407,497.27 |
| Bill Pmt -Check | 02/23/2026 | 2160 | Smith, David (rfd) | Refunds | | 819.28 | 406,677.99 |
| Bill Pmt -Check | 02/23/2026 | 2161 | takacs, Zoltan (rfd) | Refunds | | 4,502.08 | 402,175.91 |
| Deposit | 02/23/2026 | | | Income | 5,132.73 | | 407,308.64 |
| Check | 02/23/2026 | | | Misc | | 518.24 | 406,790.40 |
| Deposit | 02/24/2026 | | | Interco reimbursement | 29,810.54 | | 436,600.94 |
| Deposit | 02/24/2026 | | | Income | 4,190.75 | | 440,791.69 |
| Bill Pmt -Check | 02/25/2026 | 2151 | Whitehall Manor Inc. | Payroll & benefits | | 6,359.31 | 434,432.38 |
| Bill Pmt -Check | 02/25/2026 | 2152 | Parkland Manor | Payroll & benefits | | 993.60 | 433,438.78 |
| Deposit | 02/25/2026 | | | Income | 53,444.00 | | 489,472.78 |
| | | | | Income | 2,590.00 | | |
| Deposit | 02/25/2026 | | | Income | 3,465.00 | | 492,937.78 |
| Deposit | 02/25/2026 | | | Interco reimbursement | 19,014.57 | | 511,952.35 |
| Deposit | 02/25/2026 | | | Income | 4,046.80 | | 515,999.15 |
| Bill Pmt -Check | 02/26/2026 | ACH-2144 | Primo Brands | Dietary | | 4,009.71 | 511,989.44 |
| Bill Pmt -Check | 02/26/2026 | 2153 | Lukens & Wolf, LLC | Legal & Professional | | 3,750.00 | 508,239.44 |
| Bill Pmt -Check | 02/26/2026 | 2154 | Matura Salon & Spa Management | Misc | | 381.00 | 507,858.44 |
| Deposit | 02/26/2026 | | | Income | 5,295.00 | | 513,153.44 |
| Deposit | 02/26/2026 | | | Income | 9,810.23 | | 522,963.67 |
| Check | 02/26/2026 | Trans | | Interco transfer | | 22,000.00 | 500,963.67 |
| Bill Pmt -Check | 02/27/2026 | ACH | Eastern Alliance Insurance Group | Real estate taxes & insurance | | 8,205.00 | 492,758.67 |
| Bill Pmt -Check | 02/27/2026 | ACH | Void | | 0.00 | | 492,758.67 |
| Bill Pmt -Check | 02/27/2026 | 2162 | Agentis Plumbing | Repairs and maintenance | | 844.00 | 491,914.67 |
| Bill Pmt -Check | 02/27/2026 | 2163 | Azar Towing | Repairs and maintenance | | 175.00 | 491,739.67 |
| Bill Pmt -Check | 02/27/2026 | 2164 | Ballonoff, Rob | Office & Marketing | | 250.00 | 491,489.67 |
| Bill Pmt -Check | 02/27/2026 | 2165 | Void | | 0.00 | | 491,489.67 |
| Bill Pmt -Check | 02/27/2026 | 2166 | Void | | 0.00 | | 491,489.67 |
| Bill Pmt -Check | 02/27/2026 | 2167 | Global Sourcing Solutions | Supplies | | 449.44 | 491,040.23 |
| Bill Pmt -Check | 02/27/2026 | 2168 | Void | | 0.00 | | 491,040.23 |
| Bill Pmt -Check | 02/27/2026 | 2169 | Void | | 0.00 | | 491,040.23 |
| Bill Pmt -Check | 02/27/2026 | 2170 | Keystone Insurers Group Inc | Real estate taxes & insurance | | 484.00 | 490,556.23 |

App.732

**Saucon Valley Manor Inc.**
**Check register**
As of February 28, 2026

Cash Basis

| Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|
| Bill Pmt -Check | 02/27/2026 | 2171 | Lehigh Valley Dairies | Dietary | | 193.30 | 490,362.93 |
| Bill Pmt -Check | 02/27/2026 | 2172 | Phipany, Kris | Office & Marketing | | 300.00 | 490,062.93 |
| Bill Pmt -Check | 02/27/2026 | 2173 | PPL (06696-53034) | Utilities | | 1,015.17 | 489,047.76 |
| Bill Pmt -Check | 02/27/2026 | 2174 | PPL (14992-88024) | Utilities | | 360.94 | 488,686.82 |
| Bill Pmt -Check | 02/27/2026 | 2175 | Travelers | Supplies | | 6,957.84 | 481,728.98 |
| Bill Pmt -Check | 02/27/2026 | 2176 | US Food Service, Inc. | Dietary | | 17,128.83 | 464,600.15 |
| Bill Pmt -Check | 02/27/2026 | 2177 | Verizon (00004) | Utilities | | 2,231.55 | 462,368.60 |
| Bill Pmt -Check | 02/27/2026 | 2178 | Woodward, Lorri  entertainment | Office & Marketing | | 150.00 | 462,218.60 |
| Bill Pmt -Check | 02/27/2026 | 2179 | Omni Agent Solutions, Inc. | Omni | | 7,500.00 | 454,718.60 |
| Bill Pmt -Check | 02/27/2026 | 2180 | Stone, Janet (rfd) | Refunds | | 1,367.00 | 453,351.60 |
| Bill Pmt -Check | 02/27/2026 | 2181 | CINTAS FIRE PROTECTION 636525 | Repairs & maintenance | | 1,178.68 | 452,172.92 |
| Bill Pmt -Check | 02/27/2026 | 2182 | Howard Refrgeration & A/C Co. | Repairs & maintenance | | 2,901.25 | 449,271.67 |
| Bill Pmt -Check | 02/27/2026 | 2183 | Premier Senior Placement | Office & Marketing | | 3,746.25 | 445,525.42 |
| Bill Pmt -Check | 02/27/2026 | 2184 | Capital Blue Cross (2026) | Real estate taxes & insurance | | 32,790.06 | 412,735.36 |
| Bill Pmt -Check | 02/27/2026 | ACH | A Place for Mom | Office & Marketing | | 5,295.00 | 407,440.36 |
| Deposit | 02/27/2026 | | | Income | 20,926.00 | | 428,366.36 |
| Deposit | 02/27/2026 | | | Interco reimbursement | 27,125.00 | | 455,491.36 |
| Check | 02/27/2026 | TFR | Saucon Valley Manor II | Income | | 2,590.00 | 452,901.36 |
| Deposit | 02/27/2026 | | | Income | 10,395.00 | | 463,296.36 |
| Deposit | 02/27/2026 | | | Income | 16,248.57 | | 479,544.93 |
| Bill Pmt -Check | 02/27/2026 | 2185 | Pennsylvania Venture Capital (Related Par | Management fee | | 20,625.79 | 458,919.14 |
| Bill Pmt -Check | 02/27/2026 | 2186 | United Concordia | Real estate taxes & insurance | | 1,261.88 | 457,657.26 |
| Deposit | 02/27/2026 | | | Interco transfer | 10,000.00 | | 467,657.26 |
| Total Truist 15579 (12/18/24) | | | | | 229,835.19 | 164,991.38 | 467,657.26 |
| **Truist 14602 (PR) 12/23/24** | | | | | | | **29,683.48** |
| Deposit | 02/26/2026 | | | Payroll & benefits | 85.23 | | 29,768.71 |
| Total Truist 14602 (PR) 12/23/24 | | | | | 85.23 | 0.00 | 29,768.71 |
| **Truist Reserve #5678** | | | | | | | **2,069.16** |
| Check | 02/23/2026 | | | Misc | | 10.00 | 2,059.16 |
| Deposit | 02/27/2026 | | | Income- interest | 0.79 | | 2,059.95 |
| Total Truist Reserve #5678 | | | | | 0.79 | 10.00 | 2,059.95 |
| **TRUIST A/C# 52423 (8/1/22)fraud** | | | | | | | **1,701.23** |
| Total TRUIST A/C# 52423 (8/1/22)fraud | | | | | | | 1,701.23 |
| **BB&T ESCROW** | | | | | | | **24,811.00** |
| Check | 02/26/2026 | Trans | | interco transfer | 22,000.00 | | 46,811.00 |
| Deposit | 02/27/2026 | | | interco transfer | | 10,000.00 | 36,811.00 |
| Total BB&T ESCROW | | | | | 22,000.00 | 10,000.00 | 36,811.00 |
| **Petty Cash Fund** | | | | | | | **800.00** |
| Total Petty Cash Fund | | | | | | | 800.00 |
| **TOTAL** | | | | | **251,921.21** | **177,698.11** | **541,451.83** |

| | |
|---|---|
| transfer to Escrow account | (22,000.00) |
| transfer to Truist 15579 | (10,000.00) |
| interco transfer | (2,590.00) |
| Payroll deposit | (85.23) |
| Totsal Income | 217,245.98 |

App.733

**Whitehall Manor Inc**
**Operating Statement**
February 22 - 28, 2026

| | Cash Basis |
|---|---|
| | Week of Feb 22, 26 |
| **Ordinary Income/Expense** | |
| **Income** | |
| Monthly Rental | 111,859.45 |
| Interest Income | 0.44 |
| Reimburse - Interco Payroll | 24,879.72 |
| Reimburse - Food costs | 13,292.00 |
| Reimburse - Meal Prep | 2,900.00 |
| **Total Income** | 152,931.61 |
| **Expense** | |
| **Facility Costs** | |
| Electric | 7,961.62 |
| Sanitation | 1,546.35 |
| Gas | 8,272.56 |
| **Total Facility Costs** | 17,780.53 |
| **Maintenance** | |
| Repairs & maintenance | 1,175.70 |
| **Total Maintenance** | 1,175.70 |
| Activities - supplies | 150.00 |
| **Houskeeping** | |
| Housekeeping/Laundry Supplies | 1,956.07 |
| **Total Houskeeping** | 1,956.07 |
| **Dietary** | |
| Food/Grocery Costs | 14,739.28 |
| **Total Food/Grocery Costs** | 14,739.28 |
| **Direct Care** | |
| Auto/Travel | 55.29 |
| D C Wages | 500.40 |
| Nurse call system | 3,014.33 |
| Laboratory Services | 49.00 |
| Medical Supplies | 35.95 |
| **Total Direct Care** | 3,654.97 |
| **Marketing** | |
| Advertising | |
| Advertising - Referral Company | 10,701.00 |
| **Total Advertising** | 10,701.00 |
| **Total Marketing** | 10,701.00 |
| **Resident Refund** | 11,496.22 |
| **Administration** | |
| Admin Wages | 2,039.91 |
| Automobile Expense | 693.14 |
| Bank Service Charges | 361.54 |
| Contract Labor | 255.00 |
| Entertainment | 150.00 |
| Health-Dental insurance | 11,505.86 |
| Legal/Professional Fees | 3,750.00 |
| Business Insurance | 17,124.67 |
| Reimburse - Interco insurance | -13,343.36 |
| Management fees | 13,019.75 |

**Whitehall Manor Inc**
**Operating Statement - Cash Collateral**
March 1 - 7, 2026

| | |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | 0.44 |
| **Monthly Rental** | 111,859.45 |
| **Intercompany reimbursements** | 41,071.72 |
| **Reimbursement- employees health insurance** | 0.00 |
| **Total Income** | 152,931.61 |
| | |
| **Expense** | |
| DIETARY | 14,739.28 |
| SUPPLIES | 2,142.02 |
| REFUNDS | 11,496.22 |
| MAINTENANCE | 1,175.70 |
| UTILITIES | 19,144.25 |
| PAYROLL & BENEFITS (before reimbursement- employees) | 2,540.31 |
| OFFICE & MARKETING EXPENSES | 10,701.00 |
| REAL ESTATE TAXES & INSURANCE | 15,287.17 |
| EQUIPMENT | 3,014.33 |
| US TRUSTEE QUARTERLY FEES | 0 |
| DILWORTH PAXSON/Committee Counsel | 0 |
| Omni | 7,500.00 |
| ADEQUATE PROTECTION | 0 |
| LEGAL/PROFESSIONAL FEES | 3,750.00 |
| MANAGEMENT FEE | 13,019.75 |
| Miscellaneous | 1,995.87 |
| Total expenses | 106,505.90 |
| Net Income | 46,425.71 |

**Page 17 of 34**

App.734

**Whitehall Manor Inc**
**Operating Statement**
February 22 - 28, 2026

**Whitehall Manor Inc**
**Operating Statement - Cash Collateral**
March 1 - 7, 2026

**Cash Basis**

| | Week of Feb 22, 26 |
|---|---|
| Omni | 7,500.00 |
| Telephone | 1,363.72 |
| Training Classes | 42.00 |
| **Total Administration** | 44,462.23 |
| **Total Expense** | 106,116.00 |
| **Net Ordinary Income** | 46,815.61 |
| Other Income/Expense | |
| Other Expense | |
| Interest | 389.90 |
| **Total Other Expense** | 389.90 |
| **Net Other Income** | -389.90 |
| **Net Income** | **46,425.71** |

Page 18 of 34

App.735

**Whitehall Manor Inc**
**Operating Statement**
**February 22 - 28, 2026**

**Ordinary Income/Expense**
    **Income**
        **Monthly Rental**
        **Interest Income**
        **Reimburse - Interco Payroll**
        **Reimburse - Food costs**
        **Reimburse - Meal Prep**
    **Total Income**
    **Expense**
        **Facility Costs**
            **Electric**
            **Sanitation**
            **Gas**
        **Total Facility Costs**
        **Maintenance**
            **Repairs & maintenance**
        **Total Maintenance**
        **Activities - supplies**
        **Houskeeping**
            **Housekeeping/Laundry Supplies**
        **Total Houskeeping**
        **Dietary**
            **Food/Grocery Costs**
            **Total Food/Grocery Costs**
        **Direct Care**
            **Auto/Travel**
            **D C Wages**
            **Nurse call system**
            **Laboratory Services**
            **Medical Supplies**
        **Total Direct Care**
        **Marketing**
            **Advertising**
                **Advertising - Referral Company**
            **Total Advertising**
        **Total Marketing**
        **Resident Refund**
        **Administration**
            **Admin Wages**
            **Automobile Expense**
            **Bank Service Charges**
            **Contract Labor**
            **Entertainment**
            **Health-Dental insurance**
            **Legal/Professional Fees**
            **Business Insurance**
            **Reimburse - Interco insurance**
            **Management fees**

App.736

**Whitehall Manor Inc**
**Operating Statement**
February 22 - 28, 2026

Omni

Telephone

Training Classes

Total Administration

Total Expense

Net Ordinary Income

Other Income/Expense

Other Expense

Interest

Total Other Expense

Net Other Income

Net Income

App.737

**Whitehall Manor Inc**
**Check Detail**
**February 22 - 28, 2026**

| Type | Num | Date | Name | Account | Paid Amount | Original Amount | Income | interco transfer | Dietary | Supplies | Refunds | Maintenance | Utilities |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **General Journal** | | 02/24/2026 | **Miller, Carolyn** | **Truist #6454** | | **-2,440.00** | | | | | | | |
| | | | | Monthly Rental Income | -2,440.00 | 2,440.00 | | | | | | | |
| | | | | | -2,440.00 | 2,440.00 | 2,440.00 | | | | | | |
| **Check** | | 02/23/2026 | | **Truist Reserve #5651** | | **-10.00** | | | | | | | |
| | | | | Service Charge | -10.00 | 10.00 | | | | | | | |
| | | | | | -10.00 | 10.00 | | | | | | | |
| **Check** | | 02/23/2026 | | **WM_BB&T_Escrow 7012** | | **-5.00** | | | | | | | |
| | | | | Bank Service Charges | -5.00 | 5.00 | | | | | | | |
| | | | | | -5.00 | 5.00 | | | | | | | |
| **Check** | | 02/23/2026 | | | | **-344.29** | | | | | | | |
| | | | | Bank Service Charges | -344.29 | 344.29 | | | | | | | |
| | | | | | -344.29 | 344.29 | | | | | | | |
| **Bill Pmt -Check** | **ACH** | 02/27/2026 | **Insurance Premium Financing, Inc.** | **Truist #6454** | | **-9,594.88** | | | | | | | |
| Bill | 25WHTHA-25 | 02/01/2026 | | Accrued Insurance | -9,202.73 | 9,202.73 | | | | | | | |
| | | | | Bank Service Charges | -2.25 | 2.25 | | | | | | | |
| | | | | Interest | -389.90 | 389.90 | | | | | | | |
| TOTAL | | | | | -9,594.88 | 9,594.88 | | | | | | | |
| **Check** | **Debit** | 02/23/2026 | **Uber** | **Debit Card #7784** | | **-24.97** | | | | | | | |
| | | | | Auto/Travel | -24.97 | 24.97 | | | | | | | |
| TOTAL | | | | | -24.97 | 24.97 | | | | | | | |
| **Bill Pmt -Check** | **Debit** | 02/23/2026 | **Aramsco Inc.** | **Debit Card #7784** | | **-1,326.49** | | | | | | | |
| Bill | S7563471 | 02/20/2026 | | Housekeeping/Laundry Supplies | -1,326.49 | 1,326.49 | | | | | | | |
| TOTAL | | | | | -1,326.49 | 1,326.49 | | | | 1,326.49 | | | |
| **Check** | **Debit** | 02/24/2026 | **Uber** | **Debit Card #7784** | | **-30.32** | | | | | | | |
| | | | | Auto/Travel | -30.32 | 30.32 | | | | | | | |

App.738

**Whitehall Manor Inc**
**Check Detail**
**February 22 - 28, 2026**

| Type | Num | Date | Name | Account | Paid Amount | Original Amount | interco |
|---|---|---|---|---|---|---|---|
| TOTAL | | | | | -30.32 | 30.32 | |
| | | | | | | | |
| **Bill Pmt -Check** | **Debit** | **02/26/2026** | **American Red Cross** | **Debit Card #7784** | | **-42.00** | |
| Bill | | 02/26/2026 | | Training Classes | -42.00 | 42.00 | |
| TOTAL | | | | | -42.00 | 42.00 | |
| | | | | | | | |
| **Check** | **eft** | **02/28/2026** | **Balboa Capital** | **Truist #6454** | | **-3,014.33** | |
| | | | | Loan- Balboa Capital | -3,014.33 | 3,014.33 | |
| TOTAL | | | | | -3,014.33 | 3,014.33 | |
| | | | | | | | |
| **Bill Pmt -Check** | **48668** | **02/25/2026** | **Parkland Manor LLC.** | **Truist #6454** | | **-248.40** | |
| Bill | 4373 | 02/21/2026 | | D C Wages | -248.40 | 248.40 | |
| TOTAL | | | | | -248.40 | 248.40 | |
| | | | | | | | |
| **Bill Pmt -Check** | **48669** | **02/25/2026** | **Saucon Valley Manor** | **Truist #6454** | | **-2,291.91** | |
| Bill | 59484 | 02/21/2026 | | Admin Wages | -2,039.91 | 2,039.91 | |
| | | | | D C Wages | -252.00 | 252.00 | |
| TOTAL | | | | | -2,291.91 | 2,291.91 | |
| | | | | | | | |
| **Bill Pmt -Check** | **48670** | **02/26/2026** | **Lukens & Wolf, LLC** | **Truist #6454** | | **-3,750.00** | |
| Bill | Property Appraisal | 02/26/2026 | | Legal/Professional Fees | -3,750.00 | 3,750.00 | |
| TOTAL | | | | | -3,750.00 | 3,750.00 | |
| | | | | | | | |
| **Bill Pmt -Check** | **48671** | **02/26/2026** | **Matura Salon and Spa Management** | **Truist #6454** | | **-255.00** | |
| Bill | 301463 | 02/20/2026 | | Contract Labor | -255.00 | 255.00 | |
| TOTAL | | | | | -255.00 | 255.00 | |
| | | | | | | | |
| **Bill Pmt -Check** | **TFR** | **02/26/2026** | **Whitehall Manor** | | | **-13,000.00** | |
| | | | | WM_BB&T_Escrow 7012 | -13,000.00 | 13,000.00 | |
| | | | | | -13,000.00 | 13,000.00 | 13,000.00 |
| | | | | | | | |
| **Bill Pmt -Check** | **48672** | **02/27/2026** | **Brro's Auto Service** | **Truist #6454** | | **-693.14** | |
| Bill | 00012302 | 02/01/2026 | | Automobile Expense | -693.14 | 693.14 | |

App.739

**Whitehall Manor Inc**
**Check Detail**
February 22 - 28, 2026

| Type | Num | Date | Name | Account | Paid Amount | Original Amount | interco | |
|---|---|---|---|---|---|---|---|---|
| TOTAL | | | | | -693.14 | 693.14 | | |
| | | | | | | | | |
| **Bill Pmt -Check** | **48673** | **02/27/2026** | **Care Connect** | **Truist #6454** | | **-5,665.00** | | |
| Bill | 190-Lisa Piatt | 02/08/2026 | | Advertising - Referral Company | -5,665.00 | 5,665.00 | | |
| TOTAL | | | | | -5,665.00 | 5,665.00 | | |
| | | | | | | | | |
| **Bill Pmt -Check** | **48674** | **02/27/2026** | **Chrin Hauling, Inc.** | **Truist #6454** | | **-1,546.35** | | |
| Bill | 771791 / 129274 | 02/20/2026 | | Prepaid Expenses | -1,546.35 | 1,546.35 | | |
| TOTAL | | | | | -1,546.35 | 1,546.35 | | 1,546.35 |
| | | | | | | | | |
| **Bill Pmt -Check** | **48675** | **02/27/2026** | **Cintas** | **Truist #6454** | | **-629.58** | | |
| Bill | 4260071530 | 02/18/2026 | | Housekeeping/Laundry Supplies | -629.58 | 629.58 | | |
| TOTAL | | | | | -629.58 | 629.58 | 629.58 | |
| | | | | | | | | |
| **Bill Pmt -Check** | **48676** | **02/27/2026** | **Cintas Fire 636525** | **Truist #6454** | | **-388.86** | | |
| Bill | 0F50743896 | 02/20/2026 | | Repairs & maintenance | -388.86 | 388.86 | | |
| TOTAL | | | | | -388.86 | 388.86 | | 388.86 |
| | | | | | | | | |
| **Bill Pmt -Check** | **48677** | **02/27/2026** | **Clark Service Group** | **Truist #6454** | | **-536.63** | | |
| Bill | 0031050 | 02/06/2026 | | Repairs & maintenance | -536.63 | 536.63 | | |
| TOTAL | | | | | -536.63 | 536.63 | | 536.63 |
| | | | | | | | | |
| **Bill Pmt -Check** | **48678** | **02/27/2026** | **Clauser Terry (rfd)** | **Truist #6454** | | **-2,386.40** | | |
| Bill | RFD-Terry Clauser | 02/01/2026 | Clauser, Terry Rm A17 | Resident Refund | -1,980.00 | 1,980.00 | | |
| | | | Clauser, Terry Rm A17 | Resident Refund | -356.40 | 356.40 | | |
| | | | Clauser, Terry Rm A17 | Resident Refund | -50.00 | 50.00 | | |
| TOTAL | | | | | -2,386.40 | 2,386.40 | | 2,386.40 |
| | | | | | | | | |
| **Bill Pmt -Check** | **48679** | **02/27/2026** | **Edward Hauck (rfd)** | **Truist #6454** | | **-5,889.72** | | |
| Bill | RFD- Edward Hauck | 02/01/2026 | Edward Hauck | Resident Refund | -63.72 | 63.72 | | |
| | | | Edward Hauck | Resident Refund | -531.00 | 531.00 | | |
| | | | Edward Hauck | Resident Refund | -5,295.00 | 5,295.00 | | |
| TOTAL | | | | | -5,889.72 | 5,889.72 | | 5,889.72 |

App.740

**Whitehall Manor Inc**
**Check Detail**
**February 22 - 28, 2026**

| Type | Num | Date | Name | Account | Paid Amount | Original Amount | interco |
|---|---|---|---|---|---|---|---|
| **Bill Pmt -Check** | **48680** | **02/27/2026** | **Lorri Woodward** | **Truist #6454** | | **-150.00** | |
| Bill | 02.12.26 | 02/12/2026 | | Activities | -150.00 | 150.00 | |
| TOTAL | | | | | -150.00 | 150.00 | 150.00 |
| **Bill Pmt -Check** | **48681** | **02/27/2026** | **Oasis Senior Advisors** | **Truist #6454** | | **-5,036.00** | |
| Bill | 64261 Theresa Sauerz | 02/09/2026 | | Advertising - Referral Company | -5,036.00 | 5,036.00 | |
| TOTAL | | | | | -5,036.00 | 5,036.00 | |
| **Bill Pmt -Check** | **48682** | **02/27/2026** | **Patient First** | **Truist #6454** | | **-49.00** | |
| Bill | 10085572 | 02/01/2026 | | Laboratory Services | -49.00 | 49.00 | |
| TOTAL | | | | | -49.00 | 49.00 | |
| **Bill Pmt -Check** | **48683** | **02/27/2026** | **Pocono Mountain Dairies** | **Truist #6454** | | **-285.50** | |
| Bill | 1187598 | 02/14/2026 | | Food/Grocery Costs | -126.35 | 126.35 | |
| Bill | 1188464 | 02/21/2026 | | Food/Grocery Costs | -159.15 | 159.15 | |
| TOTAL | | | | | -285.50 | 285.50 | 285.50 |
| **Bill Pmt -Check** | **48684** | **02/27/2026** | **PPL (30890-01019)** | **Truist #6454** | | **-7,961.62** | |
| Bill | 30890-01019 | 02/12/2026 | | Electric | -7,961.62 | 7,961.62 | |
| TOTAL | | | | | -7,961.62 | 7,961.62 | 7,961.62 |
| **Bill Pmt -Check** | **48685** | **02/27/2026** | **Ramos, Roy** | **Truist #6454** | | **-150.00** | |
| Bill | 02.25.26 | 02/25/2026 | | Entertainment | -150.00 | 150.00 | |
| TOTAL | | | | | -150.00 | 150.00 | |
| **Bill Pmt -Check** | **48686** | **02/27/2026** | **UGI** | **Truist #6454** | | **-8,272.56** | |
| Bill | 421004644207 | 02/11/2026 | | Gas | -8,272.56 | 8,272.56 | |
| TOTAL | | | | | -8,272.56 | 8,272.56 | 8,272.56 |
| **Bill Pmt -Check** | **48687** | **02/27/2026** | **Verizon (00004)** | **Truist #6454** | | **-1,363.72** | |
| Bill | 6133712298 | 02/26/2026 | | Telephone | -1,363.72 | 1,363.72 | |
| TOTAL | | | | | -1,363.72 | 1,363.72 | 1,363.72 |

App.741

**Whitehall Manor Inc**
**Check Detail**
February 22 - 28, 2026

| Type | Num | Date | Name | Account | Paid Amount | Original Amount | interco |
|---|---|---|---|---|---|---|---|
| **Bill Pmt -Check** | **48688** | **02/27/2026** | **william Jack (rfd)** | **Truist #6454** | | **-490.22** | |
| | | | | | | | |
| Bill | RFD- William Jack | 02/01/2026 | Jack William Rm A7 | Resident Refund | -104.22 | 104.22 | |
| | | | Jack William Rm A7 | Resident Refund | -386.00 | 386.00 | |
| TOTAL | | | | | -490.22 | 490.22 | |
| | | | | | | | 490.22 |
| | | | | | | | |
| **Bill Pmt -Check** | **48689** | **02/27/2026** | **Zephyr Pharmacy** | **Truist #6454** | | **-35.95** | |
| | | | | | | | |
| Bill | 2.9.26-413 | 02/09/2026 | | Medical Supplies | -35.95 | 35.95 | |
| TOTAL | | | | | -35.95 | 35.95 | |
| | | | | | | | 35.95 |
| | | | | | | | |
| **Bill Pmt -Check** | **48690** | **02/27/2026** | **Joan Copio (rfd)** | **Truist #6454** | | **-1,793.48** | |
| | | | | | | | |
| Bill | RFD- Joan Copio | 02/19/2026 | Copio, Joan Rm B5 | Resident Refund | -240.48 | 240.48 | |
| | | | Copio, Joan Rm B5 | Resident Refund | -1,503.00 | 1,503.00 | |
| | | | Copio, Joan Rm B5 | Resident Refund | -50.00 | 50.00 | |
| TOTAL | | | | | -1,793.48 | 1,793.48 | |
| | | | | | | | 1,793.48 |
| | | | | | | | |
| **Bill Pmt -Check** | **48691** | **02/27/2026** | **Phyllis Vasilik (rfd)** | **Truist #6454** | | **-936.40** | |
| | | | | | | | |
| Bill | RFD-Vasillik Phyllis | 02/23/2026 | Vasilik, Phyllis Rm B22 | Resident Refund | -800.00 | 800.00 | |
| | | | Vasilik, Phyllis Rm B22 | Resident Refund | -86.40 | 86.40 | |
| | | | Vasilik, Phyllis Rm B22 | Resident Refund | -50.00 | 50.00 | |
| TOTAL | | | | | -936.40 | 936.40 | |
| | | | | | | | 936.40 |
| | | | | | | | |
| **Bill Pmt -Check** | **48692** | **02/27/2026** | **Travelers** | **Truist #6454** | | **-7,921.94** | |
| | | | | | | | |
| Bill | 9306L6130 | 02/26/2026 | | Insurance | -7,921.94 | 7,921.94 | |
| TOTAL | | | | | -7,921.94 | 7,921.94 | |
| | | | | | | | |
| **Bill Pmt -Check** | **48693** | **02/27/2026** | **Loikits Industrial Services** | **Truist #6454** | | **-250.21** | |
| | | | | | | | |
| Bill | 69977 | 12/29/2025 | | Repairs & maintenance | -246.51 | 246.51 | |
| Bill | 69977 | 02/01/2026 | | Repairs & maintenance | -3.70 | 3.70 | |
| TOTAL | | | | | -250.21 | 250.21 | |
| | | | | | | | 250.21 |
| | | | | | | | |
| **Bill Pmt -Check** | **48694** | **02/27/2026** | **Omni Agent Solutions, Inc.** | **Truist #6454** | | **-7,500.00** | |
| | | | | | | | |
| Bill | 15101 | 02/17/2026 | | Legal/Professional Fees | -7,500.00 | 14,259.16 | |
| TOTAL | | | | | -7,500.00 | 14,259.16 | |

App.742

**Whitehall Manor Inc**
**Check Detail**
**February 22 - 28, 2026**

| Type | Num | Date | Name | Account | Paid Amount | Original Amount | interco |
|---|---|---|---|---|---|---|---|
| **Bill Pmt -Check** | **48695** | **02/27/2026** | **US  Foodservice, Inc.** | **Truist #6454** | | **-14,453.78** | |
| | | | | | | | |
| Bill | 2047113 | 02/06/2026 | | Food/Grocery Costs | -356.05 | 356.05 | |
| Bill | 2047114 | 02/06/2026 | | Food/Grocery Costs | -1,475.69 | 1,475.69 | |
| Bill | 2047115 | 02/06/2026 | | Food/Grocery Costs | -140.43 | 140.43 | |
| Bill | 2047116 | 02/06/2026 | | Food/Grocery Costs | -2,525.50 | 2,525.50 | |
| Bill | 2047117 | 02/06/2026 | | Food/Grocery Costs | -1,029.97 | 1,029.97 | |
| Bill | 2047118 | 02/06/2026 | | Food/Grocery Costs | -333.63 | 333.63 | |
| Bill | 2072237 | 02/06/2026 | | Food/Grocery Costs | -62.74 | 62.74 | |
| Bill | 2176208 | 02/10/2026 | | Food/Grocery Costs | -2,159.02 | 2,159.02 | |
| Bill | 2176210 | 02/10/2026 | | Food/Grocery Costs | -746.85 | 746.85 | |
| Bill | 2176211 | 02/10/2026 | | Food/Grocery Costs | -2,341.16 | 2,341.16 | |
| Bill | 2176213 | 02/10/2026 | | Food/Grocery Costs | -240.64 | 240.64 | |
| Bill | 2176214 | 02/10/2026 | | Food/Grocery Costs | -155.64 | 155.64 | |
| Bill | 2184954 | 02/10/2026 | | Food/Grocery Costs | -167.73 | 167.73 | |
| Bill | 2287176 | 02/12/2026 | | Food/Grocery Costs | -93.30 | 93.30 | |
| Bill | 2710648 | 02/24/2026 | | Food/Grocery Costs | -201.63 | 201.63 | |
| Bill | 2705409 | 02/24/2026 | | Food/Grocery Costs | -2,187.51 | 2,187.51 | |
| Bill | 2705408 | 02/24/2026 | | Food/Grocery Costs | -236.29 | 236.29 | |
| TOTAL | | | | | -14,453.78 | 14,453.78 | 14,453.78 |
| | | | | | | | |
| **Bill Pmt -Check** | **48696** | **02/27/2026** | **Capital Blue Cross (2026)** | **Truist #6454** | | **-11,505.86** | |
| | | | | | | | |
| Bill | 260470019597 | 03/01/2026 | | Health insurance | -2,064.50 | 2,064.50 | |
| | | | | Health Insurance | -1,032.25 | 1,032.25 | |
| | | | | Health Insurance | -1,032.25 | 1,032.25 | |
| | | | | Health Insurance | -881.14 | 881.14 | |
| | | | | Health Insurance | -1,334.47 | 1,334.47 | |
| | | | | Health Insurance | -5,161.25 | 5,161.25 | |
| TOTAL | | | | | -11,505.86 | 11,505.86 | |
| | | | | | | | |
| **Bill Pmt -Check** | **48697** | **02/27/2026** | **Pennsylvania Venture Capital (Related Par** | **Truist #6454** | | **-13,019.75** | |
| | | | | | | | |
| Bill | mgmt fee | 02/27/2026 | | Management fees | -13,019.75 | 13,019.75 | |
| TOTAL | | | | | -13,019.75 | 13,019.75 | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (135,289.26) | | 2,440.00 | 13,000.00 | 14,739.28 | 2,142.02 | 11,496.22 | 1,175.70 | 19,144.25 |
| | | | | | | | x | | x | | x | | x | | x |

<span style="color:red">interco reimbursement netted against real estate/insurance</span>

<span style="color:red">netted against income</span>                2,440.00

App.743

**White**
**Che**
**Februa**

| | Payroll | Mktg Office | Taxes Insurance | Equip | US Trustee | Dilworth | Omni | AP | Legal | Mgmt | Misc |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | 10.00 |
| | | | | | | | | | | | 5.00 |
| | | | | | | | | | | | 344.29 |
| | | | 9,202.73 | | | | | | | | 392.15 |
| TOTAL | | | | | | | | | | | |
| | | | | | | | | | | | 24.97 |
| TOTAL | | | | | | | | | | | |
| TOTAL | | | | | | | | | | | |

App.744

**White**
**Chec**
**Februa**

|  | Mktg | Taxes |  |  |
|---|---|---|---|---|
| TOTAL |  |  |  | 30.32 |
| TOTAL |  |  |  | 42.00 |
| TOTAL |  | 3,014.33 |  |  |
| TOTAL | 248.40 |  |  |  |
| TOTAL | 2,291.91 |  |  |  |
| TOTAL |  |  | 3,750.00 |  |
| TOTAL |  |  | 255.00 |  |

App.745

**White**
**Chec**
**Februa**

| | Mktg | Taxes | | |
|---|---|---|---|---|
| TOTAL | | | | 693.14 |

| | | | |
|---|---|---|---|
| TOTAL | 5,665.00 | | |

TOTAL

TOTAL

TOTAL

TOTAL

TOTAL

TOTAL

App.746

**White**
**Chec**
**Februa**

| | Mktg | Taxes |
|---|---|---|
| TOTAL | | |
| TOTAL | 5,036.00 | |
| TOTAL | | 49.00 |
| TOTAL | | |
| TOTAL | | |
| TOTAL | | 150.00 |
| TOTAL | | |
| TOTAL | | |

App.747

**White**
**Che**
**Februa**

| | Mktg | Taxes |
|---|---|---|
| TOTAL | | |
| TOTAL | | |
| TOTAL | | |
| TOTAL | | |
| TOTAL | 7,921.94 | |
| TOTAL | | |
| TOTAL | | 7,500.00 |

App.748

**White**
**Chec**
**Februa**

|  | Mktg | Taxes |
|---|---|---|

TOTAL

TOTAL    11,505.86

TOTAL    13,019.75

| 2,540.31 | 10,701.00 | 28,630.53 | 3,014.33 |  | - | - | 7,500.00 |  | - | 3,750.00 | 13,019.75 | 1,995.87 |  | 135,289.26 |
| x | x |  | x |  |  |  | x |  |  | x | x | x |  |  |
|  |  | (13,343.36) |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  | 15,287.17 |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  | x |  |  |  |  |  |  |  |  |  |  |  |  |

App.749

**Whitehall Manor Inc**
**Check register**
**As of February 28, 2026**

**Cash Basis**

| Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|
| **Debit Card #7784** | | | | | | | **6,027.04** |
| Check | 02/23/2026 | Debit | Uber | Misc | | 24.97 | 6,002.07 |
| Bill Pmt -Check | 02/23/2026 | Debit | Aramsco Inc. | Supplies | | 1,326.49 | 4,675.58 |
| Check | 02/24/2026 | Debit | Uber | Misc | | 30.32 | 4,645.26 |
| Bill Pmt -Check | 02/27/2026 | Debit | American Red Cross | Misc | | 42.00 | 4,603.26 |
| Total Debit Card #7784 | | | | | 0.00 | 1,423.78 | 4,603.26 |
| **Truist Reserve #5651** | | | | | | | **1,159.52** |
| Check | 02/23/2026 | | | Misc | | 10.00 | 1,149.52 |
| Deposit | 02/27/2026 | | | Income | 0.44 | | 1,149.96 |
| Total Truist Reserve #5651 | | | | | 0.44 | 10.00 | 1,149.96 |
| **Truist #6454** | | | | | | | **328,931.17** |
| Deposit | 02/23/2026 | | | Income | 40,558.00 | | 369,489.17 |
| Check | 02/23/2026 | | | Misc | | 344.29 | 369,144.88 |
| Deposit | 02/24/2026 | | | Income- Interco | 21,399.29 | | 390,544.17 |
| Deposit | 02/24/2026 | | | Income | 3,054.00 | | 393,598.17 |
| General Journal | 02/24/2026 | StopPMT-C78 | Miller Carolyn Rm C78 | Income - Stop payment | | 2,440.00 | 391,158.17 |
| Bill Pmt -Check | 02/25/2026 | 48668 | Parkland Manor LLC. | Payroll | | 248.40 | 390,909.77 |
| Bill Pmt -Check | 02/25/2026 | 48669 | Saucon Valley Manor | Payroll | | 2,291.91 | 388,617.86 |
| Deposit | 02/25/2026 | | | Income- Interco | 25,509.79 | | 414,127.65 |
| Deposit | 02/25/2026 | | | Income | 20,626.00 | | 434,753.65 |
| Deposit | 02/25/2026 | | | Income | 10,914.00 | | 445,667.65 |
| Deposit | 02/25/2026 | | | Income | 4,321.00 | | 449,988.65 |
| Bill Pmt -Check | 02/26/2026 | 48670 | Lukens & Wolf, LLC | Legal | | 3,750.00 | 446,238.65 |
| Bill Pmt -Check | 02/26/2026 | 48671 | Matura Salon and Spa Management | Misc | | 255.00 | 445,983.65 |
| Deposit | 02/26/2026 | | | Income | 4,317.77 | | 450,301.42 |
| Bill Pmt -Check | 02/26/2026 | TFR | Whitehall Manor - ESCROW | WM_BB&T_Escrow 7012 | | 13,000.00 | 437,301.42 |
| Bill Pmt -Check | 02/27/2026 | ACH | Insurance Premium Financing, Inc. | Real estate taxes & insurance | | 9,594.88 | 427,706.54 |
| Bill Pmt -Check | 02/27/2026 | 48672 | Brro's Auto Service | Misc | | 693.14 | 427,013.40 |
| Bill Pmt -Check | 02/27/2026 | 48673 | Care Connect | Office & Marketing | | 5,665.00 | 421,348.40 |
| Bill Pmt -Check | 02/27/2026 | 48674 | Chrin Hauling, Inc. | Utilities | | 1,546.35 | 419,802.05 |
| Bill Pmt -Check | 02/27/2026 | 48675 | Cintas | Supplies | | 629.58 | 419,172.47 |
| Bill Pmt -Check | 02/27/2026 | 48676 | Cintas Fire 636525 | Repairs & maintenance | | 388.86 | 418,783.61 |
| Bill Pmt -Check | 02/27/2026 | 48677 | Clark Service Group | Repairs & maintenance | | 536.63 | 418,246.98 |
| Bill Pmt -Check | 02/27/2026 | 48678 | Clauser Terry (rfd) | Refunds | | 2,386.40 | 415,860.58 |
| Bill Pmt -Check | 02/27/2026 | 48679 | Edward Hauck (rfd) | Refunds | | 5,889.72 | 409,970.86 |
| Bill Pmt -Check | 02/27/2026 | 48680 | Lorri Woodward | Misc | | 150.00 | 409,820.86 |
| Bill Pmt -Check | 02/27/2026 | 48681 | Oasis Senior Advisors | Office & Marketing | | 5,036.00 | 404,784.86 |
| Bill Pmt -Check | 02/27/2026 | 48682 | Patient First | Misc | | 49.00 | 404,735.86 |
| Bill Pmt -Check | 02/27/2026 | 48683 | Pocono Mountain Dairies | Dietary | | 285.50 | 404,450.36 |
| Bill Pmt -Check | 02/27/2026 | 48684 | PPL (30890-01019) | Utilities | | 7,961.62 | 396,488.74 |
| Bill Pmt -Check | 02/27/2026 | 48685 | Ramos, Roy | MIsc | | 150.00 | 396,338.74 |
| Bill Pmt -Check | 02/27/2026 | 48686 | UGI | Utilities | | 8,272.56 | 388,066.18 |
| Bill Pmt -Check | 02/27/2026 | 48687 | Verizon (00004) | Utilities | | 1,363.72 | 386,702.46 |
| Bill Pmt -Check | 02/27/2026 | 48688 | william Jack (rfd) | Refunds | | 490.22 | 386,212.24 |
| Bill Pmt -Check | 02/27/2026 | 48689 | Zephyr Pharmacy | Supplies | | 35.95 | 386,176.29 |
| Bill Pmt -Check | 02/27/2026 | ACH | Void | | 0.00 | | 386,176.29 |
| Bill Pmt -Check | 02/27/2026 | 48690 | Joan Copio (rfd) | Refunds | | 1,793.48 | 384,382.81 |
| Bill Pmt -Check | 02/27/2026 | 48691 | Phyllis Vasilik (rfd) | Refunds | | 936.40 | 383,446.41 |

App.750

| Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|------|------|-----|------|------|-------|--------|---------|
| Bill Pmt -Check | 02/27/2026 | 48692 | Travelers | Real estate taxes & insurance | | 7,921.94 | 375,524.47 |
| Bill Pmt -Check | 02/27/2026 | 48693 | Loikits Industrial Services | Repairs & maintenance | | 250.21 | 375,274.26 |
| Bill Pmt -Check | 02/27/2026 | 48694 | Omni Agent Solutions, Inc. | Omni | | 7,500.00 | 367,774.26 |
| Bill Pmt -Check | 02/27/2026 | 48695 | US Foodservice, Inc. | Dietary | | 14,453.78 | 353,320.48 |
| Bill Pmt -Check | 02/27/2026 | 48696 | Capital Blue Cross (2026) | Real estate taxes & insurance | | 11,505.86 | 341,814.62 |
| Deposit | 02/27/2026 | | | Income -Interco | 7,506.00 | | 349,320.62 |
| Bill Pmt -Check | 02/27/2026 | 48697 | Pennsylvania Venture Capital (Related Par | Management fees | | 13,019.75 | 336,300.87 |
| Deposit | 02/27/2026 | | | Income | 3,057.68 | | 339,358.55 |
| Deposit | 02/27/2026 | | | Income | 27,451.00 | | 366,809.55 |
| Check | 02/28/2026 | eft | Balboa Capital | | | 3,014.33 | 363,795.22 |
| Total Truist #6454 | | | | | 168,714.53 | 133,850.48 | 363,795.22 |
| **Truist 15102 (PR) 12/23/24** | | | | | | | **6,979.75** |
| Total Truist 15102 (PR) 12/23/24 | | | | | | | 6,979.75 |
| **WM_BB&T_Escrow 7012** | | | | | | | **10,437.00** |
| Check | 02/23/2026 | eft | Truist | | | 5.00 | 10,432.00 |
| Bill | 02/26/2026 | TRF | Whitehall Manor - ESCROW | Transfer from Truist #6454 | 13,000.00 | | 23,432.00 |
| Total WM_BB&T_Escrow 7012 | | | | | 13,000.00 | 5.00 | 23,432.00 |
| **Cash on Hand** | | | | | | | **946.98** |
| Total Cash on Hand | | | | | | | 946.98 |
| **TOTAL** | | | | | **181,714.97** | **135,289.26** | **400,907.17** |

| | |
|---|---|
| transfer to escrow | (13,000.00) |
| returned check | -2,440.00 |
| reimburse for insurance | (13,343.36) |
| Total income | 152,931.61 |

App.751

**Hearing Exhibit D-50**

**B – Weekly Reconciliations as of March 7, 2026**

#125541164v1

**Saucon Valley Manor Inc.**
**Operating Statement - Original**
March 1 - 7, 2026

| | Cash Basis |
|---|---|
| | Week of Mar 1, 26 |
| **Ordinary Income/Expense** | |
| **Income** | |
| Monthly Rental | 527,673.80 |
| **Total Income** | 527,673.80 |
| **Expense** | |
| Facility Costs | |
| Sanitation | 2,527.59 |
| Electric | 11,565.11 |
| **Total Facility Costs** | 14,092.70 |
| Maintenance | |
| Maintenance:Maint. Wages | 7,474.93 |
| Workmans Compensation | 133.00 |
| Maintenance Payroll Taxes | 663.14 |
| Health Insurance | -391.98 |
| Maintenance Supplies | 595.69 |
| Repair & Maintenance | 3,715.04 |
| **Total Maintenance** | 12,189.82 |
| Activities | |
| Activities:Act.Wages | 9,710.42 |
| Activities Payroll Taxes | 989.06 |
| Health Insurance | -347.24 |
| Activities Supplies | 65.69 |
| **Total Activities** | 10,417.93 |
| Dietary | |
| Dietary Wages | 28,273.37 |
| Dietary Payroll Taxes | 3,301.41 |
| Health Insurance | -707.14 |
| Food Costs | |
| Icecream/Slushi | 1,267.86 |
| Food Costs - Other | 18,821.21 |
| **Total Food Costs** | 20,089.07 |
| **Total Dietary** | 50,956.71 |
| Housekeeping | |
| Houskeeping:Hkg. Wages | 19,610.92 |
| Hskg. Payroll Taxes | 2,412.25 |
| Health Insurance | -187.72 |
| Hskp. & Laundry Supplies | 6,280.72 |
| **Total Housekeeping** | 28,116.17 |
| Direct Care-Nursing | |
| Auto & Travel | 39.01 |
| Direct Care:D C Wages | 127,430.78 |
| D.C. Payroll Taxes | 14,139.19 |
| Health Insurance | -3,202.44 |
| Medical Supplies | 478.44 |
| **Total Direct Care-Nursing** | 138,884.98 |
| Administration | |
| Administration:Admin Wages | 21,341.01 |
| Adm. Payroll Taxes | 2,109.73 |

**Saucon Valley Manor Inc.**
**Operating Statement - Cash Collateral**
March 1 - 7, 2026

| | |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| **Monthly Rental** | 527,673.80 |
| **Reimbursement- employee health insurance** | 5,245.04 |
| **Total Income** | 532,918.84 |
| | |
| **Expenses:** | |
| DIETARY | 20,089.07 |
| SUPPLIES | 7,420.54 |
| REFUNDS | 0 |
| MAINTENANCE | 3,715.04 |
| UTILITIES | 16,566.34 |
| PAYROLL & BENEFITS (before reimbursement- employees) | 237,456.21 |
| OFFICE & MARKETING EXPENSES | 666.94 |
| REAL ESTATE TAXES & INSURANCE | 16,096.71 |
| EQUIPMENT | 0 |
| US TRUSTEE QUARTERLY FEES | 0 |
| DILWORTH PAXSON/Committee Counsel | 0 |
| Omni | 0 |
| ADEQUATE PROTECTION | 0 |
| LEGAL/PROFESSIONAL FEES | 0 |
| MANAGEMENT FEE | 0 |
| Miscellaneous | 4,397.95 |
| Total expenses | 306,408.80 |
| Net Income | 226,510.04 |

App.753

| | Week of Mar 1, 26 |
|---|---:|
| **Automobile Expense** | 496.13 |
| **Bank Service Charges** | 2.25 |
| **Computer/Software** | 300.00 |
| **Contract Labor** | 815.83 |
| **Health Insurance-Employees** | -408.52 |
| **Interest Expense** | 681.97 |
| **Liability Insurance** | 16,096.71 |
| **Office Supplies** | 666.94 |
| **Payroll Service Charge** | 1,929.76 |
| **Telephone** | 2,473.64 |
| **Total Administration** | 46,505.45 |
| **Total Expense** | 301,163.76 |
| **Net Income before other expenses** | 226,510.04 |
| | |
| **Other Expense** | |
| **Depreciation Expense** | 4,546.42 |
| **Total Other Expense** | 4,546.42 |
| **Net Other Income** | 4,546.42 |
| **Net Income** | **221,963.62** |

App.754

**Saucon Valley Manor Inc.**
**Check Detail**
**March 1 - 7, 2026**

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Income | Reimburse Employees | Dietary | Refunds | Supplies | Maintenance | Utilities | Payroll | Office Mtg | R/E taxes Insurance |
|------|-----|------|------|------|---------|------------:|----------------:|-------:|--------------------:|--------:|--------:|---------:|------------:|----------:|--------:|-----------:|--------------------:|
| General Journal | | 03/05/2026 | | | Truist 15579 (12/18/24) | | -4,757.00 | | | | | | | | | | |
| | | | | | Income- returned deposit | -4,757.00 | 4,757.00 | | | | | | | | | | |
| TOTAL | | | | | | -4,757.00 | 4,757.00 | 4,757.00 | | | | | | | | | |
| General Journal | PR SPECIAL | 03/06/2026 | | | Truist 14602 (PR) 12/23/24 | | -1,273.05 | | | | | | | | | | |
| | | | | | Payroll | -1,273.05 | 1,273.05 | | | | | | | | | | |
| TOTAL | 1,273.05 | | | | | -1,273.05 | 1,273.05 | | | | | | | | 1,273.05 | | |
| Check | debit | 03/01/2026 | Uber | | Debit Card #7792 | | -39.01 | | | | | | | | | | |
| | | | | | Auto & Travel | -39.01 | 39.01 | | | | | | | | | | |
| TOTAL | | | | | | -39.01 | 39.01 | | | | | | | | | | |
| Check | debit | 03/01/2026 | Amazon | | Debit Card #7792 | | -62.37 | | | | | | | | | | |
| | | | | | Medical Supplies | -62.37 | 62.37 | | | | | | | | | | |
| TOTAL | | | | | | -62.37 | 62.37 | | | | | 62.37 | | | | | |
| Check | debit | 03/02/2026 | Amazon | | Debit Card #7792 | | -174.90 | | | | | | | | | | |
| | | | | | Office Supplies | -174.90 | 174.90 | | | | | | | | | | |
| TOTAL | 174.90 | | | | | -174.90 | 174.90 | | | | | | | | | 174.90 | |
| Check | debit | 03/02/2026 | Amazon | | Debit Card #7792 | | -118.52 | | | | | | | | | | |
| | | | | | Medical Supplies | -31.23 | 31.23 | | | | | 31.23 | | | | | |
| | | | | | Office Supplies | -87.29 | 87.29 | | | | | | | | | 87.29 | |
| TOTAL | | | | | | -118.52 | 118.52 | | | | | | | | | | |
| Check | debit | 03/04/2026 | Amazon | | Debit Card #7792 | | -141.96 | | | | | | | | | | |
| | | | | | Medical Supplies | -141.96 | 141.96 | | | | | 141.96 | | | | | |
| TOTAL | | | | | | -141.96 | 141.96 | | | | | | | | | | |
| Check | debit | 03/04/2026 | Amazon | | Debit Card #7792 | | -91.73 | | | | | | | | | | |
| | | | | | Office Supplies | -91.73 | 91.73 | | | | | | | | | | |
| TOTAL | | | | | | -91.73 | 91.73 | | | | | | | | | 91.73 | |
| Check | debit | 03/04/2026 | Amazon | | Debit Card #7792 | | -805.36 | | | | | | | | | | |
| | | | | | Hskp. & Laundry Supplies | -805.36 | 805.36 | | | | | | | | | | |
| TOTAL | | | | | | -805.36 | 805.36 | | | | | 805.36 | | | | | |

App.755

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Income | Employees | Dietary | Refunds | Supplies | Maintenance | Utilities | Payroll | Mtg | Insurance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Check** | **debit** | **03/04/2026** | **Amazon** | | **Debit Card #7792** | | **-1,107.70** | | | | | | | | | | |
| | | | | | Hskp. & Laundry Supplies | -1,107.70 | 1,107.70 | | | | | | | | | | |
| TOTAL | | | | | | -1,107.70 | 1,107.70 | | | | | 1,107.70 | | | | | |
| **Check** | **debit** | **03/05/2026** | **Amazon** | | **Debit Card #7792** | | **-153.26** | | | | | | | | | | |
| | | | | | Office Supplies | -153.26 | 153.26 | | | | | | | | | | |
| TOTAL | | | | | | -153.26 | 153.26 | | | | | | | | | 153.26 | |
| **Check** | **TRR PR** | **03/04/2026** | | | **Truist 15579 (12/18/24)** | | **-234,403.06** | | | | | | | | | | |
| | | | | | Truist 14602 (PR) 12/23/24 | -234,403.06 | 234,403.06 | | | | | | | | | | |
| TOTAL | | | | | | -234,403.06 | 234,403.06 | | (5,245.04) | | | | | | 237,718.34 | | |
| **Bill Pmt -Check** | | **03/04/2026** | **Insurance Premium Financing** | | **Truist 15579 (12/18/24)** | | **-16,780.93** | | | | | | | | | | |
| | | | | | Insurance | -16,780.93 | 16,780.93 | | | | | | | | | | |
| TOTAL | | | | | | -16,780.93 | 16,780.93 | | | | | | | | | | 16,780.93 |
| **Bill Pmt -Check** | **1843** | **03/05/2026** | **Void** | | **Truist 15579 (12/18/24)** | | **0.00** | | | | | | | | | | |
| TOTAL | | | | | | 0.00 | 0.00 | | | | | | | | | | |
| **Bill Pmt -Check** | **2187** | **03/05/2026** | **Chrin Hauling, Inc.** | | **Truist 15579 (12/18/24)** | | **-2,527.59** | | | | | | | | | | |
| | Bill | 771802 / 129275 | 02/20/2026 | | Sanitation | -2,527.59 | 2,527.59 | | | | | | | | | | |
| TOTAL | | | | | | -2,527.59 | 2,527.59 | | | | | | 2,527.59 | | | | |
| **Bill Pmt -Check** | **2188** | **03/05/2026** | **Verizon (00004)** | | **Truist 15579 (12/18/24)** | | **-2,473.64** | | | | | | | | | | |
| | Bill | 6136214874 | 02/25/2026 | | Telephone | -2,473.64 | 2,473.64 | | | | | | | | | | |
| TOTAL | | | | | | -2,473.64 | 2,473.64 | | | | | | | 2,473.64 | | | |
| **Bill Pmt -Check** | **2189** | **03/05/2026** | **Absolute Shredding** | | **Truist 15579 (12/18/24)** | | **-104.00** | | | | | | | | | | |
| | Bill | 0414133 | 02/27/2026 | | Office Supplies | -104.00 | 104.00 | | | | | | | | | | |
| TOTAL | | | | | | -104.00 | 104.00 | | | | | | | | | 104.00 | |
| **Bill Pmt -Check** | **2190** | **03/05/2026** | **Agentis Plumbing** | | **Truist 15579 (12/18/24)** | | **-439.00** | | | | | | | | | | |
| | Bill | 0000178357 | 02/26/2026 | | Repair & Maintenance | -439.00 | 439.00 | | | | | | | | | | |
| TOTAL | | | | | | -439.00 | 439.00 | | | | | | 439.00 | | | | |
| **Bill Pmt -Check** | **2191** | **03/05/2026** | **Assad Younes** | | **Truist 15579 (12/18/24)** | | **-300.00** | | | | | | | | | | |
| | Bill | I1696 | 02/24/2026 | | Computer/Software | -300.00 | 300.00 | | | | | | | | | | |
| TOTAL | | | | | | -300.00 | 300.00 | | | | | | | | | | |
| **Bill Pmt -Check** | **2192** | **03/05/2026** | **Cintas** | | **Truist 15579 (12/18/24)** | | **-4,367.66** | | | | | | | | | | |

App.756

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Income | Employees | Dietary | Refunds | Supplies | Maintenance | Utilities | Payroll | Mtg | Insurance |
|------|-----|------|------|------|---------|------------|-----------------|--------|-----------|---------|---------|----------|-------------|-----------|---------|-----|-----------|
| Bill | 4257851365 | 02/01/2026 | | | Hskp. & Laundry Supplies | -465.94 | 465.94 | | | | | | | | | | |
| Bill | 4257074350 | 02/01/2026 | | | Hskp. & Laundry Supplies | -465.94 | 465.94 | | | | | | | | | | |
| Bill | 4256314437 | 02/01/2026 | | | Hskp. & Laundry Supplies | -496.46 | 496.46 | | | | | | | | | | |
| Bill | 4255560264 | 02/01/2026 | | | Hskp. & Laundry Supplies | -465.94 | 465.94 | | | | | | | | | | |
| Bill | 4254899305 | 02/01/2026 | | | Hskp. & Laundry Supplies | -465.94 | 465.94 | | | | | | | | | | |
| Bill | 4260068871 | 02/18/2026 | | | Hskp. & Laundry Supplies | -1,003.72 | 1,003.72 | | | | | | | | | | |
| Bill | 4260842526 | 02/26/2026 | | | Hskp. & Laundry Supplies | -1,003.72 | 1,003.72 | | | | | | | | | | |
| TOTAL | | | | | | -4,367.66 | 4,367.66 | | | | | 4,367.66 | | | | | |
| | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2193** | **03/05/2026** | **CINTAS FIRE PROTECTION 636525** | | **Truist 15579 (12/18/24)** | | **-2,441.04** | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Bill | 0F50741603 | 02/01/2026 | | | Repair & Maintenance | -2,441.04 | 2,441.04 | | | | | | | | | | |
| TOTAL | | | | | | -2,441.04 | 2,441.04 | | | | | | 2,441.04 | | | | |
| | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2194** | **03/05/2026** | **Gleco Paints Easton** | | **Truist 15579 (12/18/24)** | | **-595.69** | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Bill | 32796/3 | 02/25/2026 | | | Maintenance Supplies | -317.98 | 317.98 | | | | | | | | | | |
| Bill | 32841/3 | 03/03/2026 | | | Maintenance Supplies | -277.71 | 277.71 | | | | | | | | | | |
| TOTAL | | | | | | -595.69 | 595.69 | | | | | 595.69 | | | | | |
| | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2195** | **03/05/2026** | **Henry Yeska & Son, Inc.** | | **Truist 15579 (12/18/24)** | | **-835.00** | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Bill | GR203249627 | 03/01/2026 | | | Repair & Maintenance | -835.00 | 835.00 | | | | | | | | | | |
| TOTAL | | | | | | -835.00 | 835.00 | | | | | | 835.00 | | | | |
| | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2196** | **03/05/2026** | **Lehigh Valley Dairies** | | **Truist 15579 (12/18/24)** | | **-193.30** | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Bill | 9153778 | 02/18/2026 | | | Food Costs | -193.30 | 193.30 | | | | | | | | | | |
| TOTAL | | | | | | -193.30 | 193.30 | | | 193.30 | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2197** | **03/05/2026** | **Matura Salon & Spa Management** | | **Truist 15579 (12/18/24)** | | **-536.00** | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Bill | 302220 | 02/26/2026 | | | Contract Labor | -308.00 | 308.00 | | | | | | | | | | |
| Bill | 302448 | 02/27/2026 | | | Contract Labor | -228.00 | 228.00 | | | | | | | | | | |
| TOTAL | | | | | | -536.00 | 536.00 | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2198** | **03/05/2026** | **Patient First(WC)** | | **Truist 15579 (12/18/24)** | | **-133.00** | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Bill | 52*91454*7*1*1 | 02/01/2026 | | | Misc | -133.00 | 133.00 | | | | | | | | | | |
| TOTAL | | | | | | -133.00 | 133.00 | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2199** | **03/05/2026** | **PPL (99150-15047)** | | **Truist 15579 (12/18/24)** | | **-11,565.11** | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Bill | 99150-15047 | 02/01/2026 | | | Electric | -11,565.11 | 11,565.11 | | | | | | | | | | |
| TOTAL | | | | | | -11,565.11 | 11,565.11 | | | | | | | 11,565.11 | | | |
| | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2200** | **03/05/2026** | **US Food Service, Inc.** | | **Truist 15579 (12/18/24)** | | **-19,891.77** | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Bill | 2073097 | 02/06/2026 | | | Food Costs | -84.17 | 454.59 | | | | | | | | | | |
| Bill | 2086493 | 02/07/2026 | | | Food Costs | -542.34 | 542.34 | | | | | | | | | | |
| Bill | 2170796 | 02/10/2026 | | | Food Costs | -296.06 | 296.06 | | | | | | | | | | |

App.757

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Income | Employees | Dietary | Refunds | Supplies | Maintenance | Utilities | Payroll | Mtg | Insurance |
|------|-----|------|------|------|---------|-------------|-----------------|--------|-----------|---------|---------|----------|-------------|-----------|---------|-----|-----------|
| Bill | 2170797 | 02/10/2026 | | | Icecream/Slushi | -400.99 | 400.99 | | | | | | | | | | |
| Bill | 2170799 | 02/10/2026 | | | Food Costs | -439.15 | 439.15 | | | | | | | | | | |
| Bill | 2170800 | 02/10/2026 | | | Food Costs | -435.62 | 435.62 | | | | | | | | | | |
| Bill | 2170801 | 02/10/2026 | | | Food Costs | -845.40 | 5,495.66 | | | | | | | | | | |
| Bill | 2170802 | 02/10/2026 | | | Food Costs | -328.28 | 328.28 | | | | | | | | | | |
| Bill | 2262662 | 02/12/2026 | | | Icecream/Slushi | -462.05 | 462.05 | | | | | | | | | | |
| Bill | 2262663 | 02/12/2026 | | | Food Costs | -158.87 | 158.87 | | | | | | | | | | |
| Bill | 2262664 | 02/12/2026 | | | Food Costs | -239.36 | 239.36 | | | | | | | | | | |
| Bill | 2262666 | 02/12/2026 | | | Food Costs | -874.21 | 874.21 | | | | | | | | | | |
| Bill | 2262667 | 02/12/2026 | | | Food Costs | -561.11 | 561.11 | | | | | | | | | | |
| Bill | 2262668 | 02/12/2026 | | | Food Costs | -1,273.40 | 1,273.40 | | | | | | | | | | |
| Bill | 2262669 | 02/12/2026 | | | Food Costs | -224.23 | 224.23 | | | | | | | | | | |
| Bill | 2262671 | 02/12/2026 | | | Food Costs | -11,379.87 | 11,379.87 | | | | | | | | | | |
| Bill | 2341511 | 02/13/2026 | | | Food Costs | -290.81 | 290.81 | | | | | | | | | | |
| Bill | 2404042 | 02/16/2026 | | | Food Costs | -58.92 | 58.92 | | | | | | | | | | |
| Bill | 2443771 | 02/17/2026 | | | Icecream/Slushi | -404.82 | 404.82 | | | | | | | | | | |
| Bill | 2443773 | 02/17/2026 | | | Food Costs | -352.75 | 352.75 | | | | | | | | | | |
| Bill | 2453403 | 02/17/2026 | | | Food Costs | -239.36 | 239.36 | | | | | | | | | | |
| TOTAL | | | | | | -19,891.77 | 24,912.45 | | | 19,891.77 | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2201** | **03/05/2026** | **Zephyr Pharmacy** | | **Truist 15579 (12/18/24)** | | **-83.88** | | | | | | | | | | |
| Bill | 2.9.26-130 | 02/09/2026 | | | Medical Supplies | -83.88 | 83.88 | | | | | | | | | | |
| TOTAL | | | | | | -83.88 | 83.88 | | | | | 83.88 | | | | | |
| | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2202** | **03/05/2026** | **Matura Salon & Spa Management** | | **Truist 15579 (12/18/24)** | | **-220.00** | | | | | | | | | | |
| Bill | 302705 | 03/02/2026 | | | Contract Labor | -220.00 | 220.00 | | | | | | | | | | |
| TOTAL | | | | | | -220.00 | 220.00 | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2203** | **03/05/2026** | **Matura Salon & Spa Management** | | **Truist 15579 (12/18/24)** | | **-59.83** | | | | | | | | | | |
| Bill | 110001 | 02/01/2026 | | | Contract Labor | -59.83 | 59.83 | | | | | | | | | | |
| TOTAL | | | | | | -59.83 | 59.83 | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2205** | **03/05/2026** | **Judith Ann Maric (SVM petty cash)** | | **Truist 15579 (12/18/24)** | | **-780.58** | | | | | | | | | | |
| Bill | pct fund | 03/04/2026 | | | Automobile Expense | -458.77 | 458.77 | | | | | | | | | | |
| | | | | | Office Supplies | -55.76 | 55.76 | | | | | | | | | | 55.76 |
| | | | | | Food Costs | -4.00 | 4.00 | | | 4.00 | | | | | | | |
| | | | | | Automobile Expense | -37.36 | 37.36 | | | | | | | | | | |
| | | | | | Activities Supplies | -65.69 | 65.69 | | | | | 65.69 | | | | | |
| | | | | | Medical Supplies | -159.00 | 159.00 | | | | | 159.00 | | | | | |
| TOTAL | | | | | | -780.58 | 780.58 | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| **Deposit** | | **03/02/2026** | | | **Truist 15579 (12/18/24)** | | **1,535.18** | | | | | | | | | | |
| TOTAL  Bill | 110001 | 02/01/2026 | Void payroll check | | Payroll | 1,535.18 | -1,535.18 | | | | | | | | | | |
| | | | | | | 1,535.18 | -1,535.18 | | | | | | | | -1,535.18 | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | Total checks | -305,920.76 | | 4,757.00 | (5,245.04) | 20,089.07 | - | 7,420.54 | 3,715.04 | 16,566.34 | 237,456.21 | 666.94 | 16,780.93 |

App.758

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Income | Employees | Dietary | Refunds | Supplies | Maintenance | Utilities | Payroll | Mtg | Insurance |
|------|-----|------|------|------|---------|-------------|-----------------|--------|-----------|---------|---------|----------|-------------|-----------|---------|-----|-----------|
| | | | | | | | | x | x | x | | x | x | x | x | x | x |

App.759

**Sauc**
**Che**
March

| | Equipment | US Trustee | Dilworth | Omni | Adequate Protection | Legal Prof | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|---|---|
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | 39.01 |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |

App.760

| | Equipment | US Trustee | Dilworth | Omni | Protection | Prof | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|---|---|
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | 1,929.76 | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | 300.00 | | |

App.761

| Equipment | US Trustee | Dilworth | Omni | Protection | Prof | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|---|

TOTAL

TOTAL

TOTAL

TOTAL

TOTAL

TOTAL          536.00

TOTAL          133.00

TOTAL

App.762

| Equipment | US Trustee | Dilworth | Omni | Protection | Prof | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|---|

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL | | | | | | | | | |
| TOTAL | | | | | | | | | |
| TOTAL | | | | | | | | 220.00 | |
| TOTAL | | | | | | | | 59.83 | |
| | | | | | | | | 458.77 | |
| | | | | | | | | 37.36 | |
| TOTAL | | | | | | | | | |
| TOTAL | | | | | | | | | |
| | - | - | - | - | - | - | - | 3,713.73 | 305,920.76 |

App.763

Equipment     US Trustee     Dilworth     Omni     Protection     Prof     Mgmt Fee     Misc

x

App.764

**Saucon Valley Manor Inc.**
**Check register**
As of March 7, 2026

**Cash Basis**

| Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|
| **Debit Card #7792** | | | | | | | **2,653.68** |
| Check | 03/01/2026 | debit | Uber | Misc | | 39.01 | 2,614.67 |
| Check | 03/01/2026 | debit | Amazon | | | 62.37 | 2,552.30 |
| Check | 03/02/2026 | debit | Amazon | | | 174.90 | 2,377.40 |
| Check | 03/02/2026 | debit | Amazon | | | 118.52 | 2,258.88 |
| Check | 03/04/2026 | debit | Amazon | | | 141.96 | 2,116.92 |
| Check | 03/04/2026 | Transfer | | | 5,000.00 | | 7,116.92 |
| Check | 03/04/2026 | debit | Amazon | | | 91.73 | 7,025.19 |
| Check | 03/04/2026 | debit | Amazon | | | 805.36 | 6,219.83 |
| Check | 03/04/2026 | debit | Amazon | towels | | 1,107.70 | 5,112.13 |
| Check | 03/05/2026 | debit | Amazon | | | 153.26 | 4,958.87 |
| Total Debit Card #7792 | | | | | 5,000.00 | 2,694.81 | 4,958.87 |
| **Truist 15579 (12/18/24)** | | | | | | | **467,657.26** |
| Deposit | 03/02/2026 | | | Income | 44,479.00 | | 512,136.26 |
| Deposit | 03/02/2026 | | | Income | 31,166.24 | | 543,302.50 |
| Deposit | 03/02/2026 | | | Income | 91,785.00 | | 635,087.50 |
| Deposit | 03/02/2026 | | | Payroll- void check | 1,535.18 | | 636,622.68 |
| Deposit | 03/02/2026 | | | Income | 48,871.30 | | 685,493.98 |
| Deposit | 03/02/2026 | | | Income | 14,951.13 | | 700,445.11 |
| Deposit | 03/03/2026 | | | Income | 99,513.00 | | 799,958.11 |
| Deposit | 03/03/2026 | | | Income | 4,933.60 | | 804,891.71 |
| Check | 03/04/2026 | TRR PR | | PR TFR FUNDS FOR PR 3/6/26 | | 234,403.06 | 570,488.65 |
| Check | 03/04/2026 | Transfer | | Transfer to Debit Card | | 5,000.00 | 565,488.65 |
| Bill Pmt -Check | 03/04/2026 | ACH | Insurance Premium Financing | Real estate taxes/insurance | | 16,780.93 | 548,707.72 |
| Deposit | 03/04/2026 | | | Income | 4,451.03 | | 553,158.75 |
| Bill Pmt -Check | 03/05/2026 | 2187 | Chrin Hauling, Inc. | Utilities | | 2,527.59 | 550,631.16 |
| Bill Pmt -Check | 03/05/2026 | 2188 | Verizon (00004) | Utilities | | 2,473.64 | 548,157.52 |
| Bill Pmt -Check | 03/05/2026 | 2189 | Absolute Shredding | Office/Marketing | | 104.00 | 548,053.52 |
| Bill Pmt -Check | 03/05/2026 | 2190 | Agentis Plumbing | Maintenance | | 439.00 | 547,614.52 |
| Bill Pmt -Check | 03/05/2026 | 2191 | Assad Younes | Misc | | 300.00 | 547,314.52 |
| Bill Pmt -Check | 03/05/2026 | 2192 | Cintas | Supplies | | 4,367.66 | 542,946.86 |
| Bill Pmt -Check | 03/05/2026 | 2193 | CINTAS FIRE PROTECTION 636525 | Maintenance | | 2,441.04 | 540,505.82 |
| Bill Pmt -Check | 03/05/2026 | 2194 | Gleco Paints Easton | Supplies | | 595.69 | 539,910.13 |
| Bill Pmt -Check | 03/05/2026 | 2195 | Henry Yeska & Son, Inc. | Maintenance | | 835.00 | 539,075.13 |
| Bill Pmt -Check | 03/05/2026 | | Void | | 0.00 | | 539,075.13 |
| Bill Pmt -Check | 03/05/2026 | 2196 | Lehigh Valley Dairies | Dietary | | 193.30 | 538,881.83 |
| Bill Pmt -Check | 03/05/2026 | 2197 | Matura Salon & Spa Management | Misc | | 536.00 | 538,345.83 |
| Bill Pmt -Check | 03/05/2026 | 2198 | Patient First(WC) | Misc | | 133.00 | 538,212.83 |
| Bill Pmt -Check | 03/05/2026 | 1843 | Void | - | 0.00 | | 538,212.83 |
| Bill Pmt -Check | 03/05/2026 | 2199 | PPL (99150-15047) | Utilities | | 11,565.11 | 526,647.72 |
| Bill Pmt -Check | 03/05/2026 | | Void | | 0.00 | | 526,647.72 |
| Bill Pmt -Check | 03/05/2026 | 2200 | US Food Service, Inc. | Dietary | | 19,891.77 | 506,755.95 |
| Bill Pmt -Check | 03/05/2026 | 2201 | Zephyr Pharmacy | Supplies | | 83.88 | 506,672.07 |
| Bill Pmt -Check | 03/05/2026 | 2202 | Matura Salon & Spa Management | Misc | | 220.00 | 506,452.07 |
| Bill Pmt -Check | 03/05/2026 | 2203 | Matura Salon & Spa Management | Misc | | 59.83 | 506,392.24 |
| Bill Pmt -Check | 03/05/2026 | 2205 | Judith Ann Maric (SVM petty cash) | Various | | 780.58 | 505,611.66 |
| General Journal | 03/05/2026 | | | returned deposit | | 4,757.00 | 500,854.66 |
| Deposit | 03/05/2026 | | | Income | 42,110.50 | | 542,965.16 |

App.765

| Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|
| Deposit | 03/05/2026 | | | Income | 44,312.83 | | 587,277.99 |
| Deposit | 03/06/2026 | | | Income | 3,332.05 | | 590,610.04 |
| Deposit | 03/06/2026 | | | Income | 13,854.00 | | 604,464.04 |
| Deposit | 03/06/2026 | | | Income | 68,613.07 | | 673,077.11 |
| Deposit | 03/06/2026 | | | Income | 20,058.05 | | 693,135.16 |
| Total Truist 15579 (12/18/24) | | | | | 533,965.98 | 308,488.08 | 693,135.16 |
| **Truist 14602 (PR) 12/23/24** | | | | | | | **29,768.71** |
| Check | 03/04/2026 | TRR PR | | PR TFR FUNDS FOR PR 3/6/26 | 234,403.06 | | 264,171.77 |
| General Journal | 03/06/2026 | PR 3/6/26 | | PR P/E 2/28/26 pd 3/6/26 | | 234,403.06 | 29,768.71 |
| General Journal | 03/06/2026 | PR SPECIAL | | PR P/E special run 3/6/26 | | 1,273.05 | 28,495.66 |
| Total Truist 14602 (PR) 12/23/24 | | | | | 234,403.06 | 235,676.11 | 28,495.66 |
| **Truist Reserve #5678** | | | | | | | **2,059.95** |
| Total Truist Reserve #5678 | | | | | | | 2,059.95 |
| **TRUIST A/C# 52423 (8/1/22)fraud** | | | | | | | **1,701.23** |
| Total TRUIST A/C# 52423 (8/1/22)fraud | | | | | | | 1,701.23 |
| **BB&T ESCROW** | | | | | | | **36,811.00** |
| Total BB&T ESCROW | | | | | | | 36,811.00 |
| **Petty Cash Fund** | | | | | | | **800.00** |
| Total Petty Cash Fund | | | | | | | 800.00 |
| **TOTAL** | | | | | **773,369.04** | **546,859.00** | **767,961.87** |

| | | |
|---|---|---|
| Deduct debit card transfer 3-4-26 | (5,000.00) | |
| Deduct payroll transfer 3-4-26 | -234,403.06 | |
| Void payroll check- netted against payroll | -1,535.18 | |
| agrees - check detail report | 305,920.76 | |

App.766

**Whitehall Manor Inc**
**Operating Statement - Original**
March 1 - 7, 2026

| | Cash Basis<br>Mar 1 - 8, 26 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Monthly Rental | 225,683.41 |
| **Total Income** | 225,683.41 |
| **Expense** | |
| **Facility Costs** | |
| Rent other | 525.00 |
| Sanitation | 416.25 |
| **Total Facility Costs** | 941.25 |
| **Maintenance** | |
| Maintenance:Maint. Wages | 2,038.57 |
| Maint. Payroll taxes | 208.68 |
| Health Insurance | -138.54 |
| Dental Insurance | 35.83 |
| Repairs & maintenance | 469.32 |
| **Total Maintenance** | 2,613.86 |
| **Activities** | |
| Activities:Act.Wages | 2,184.35 |
| Act. Payroll taxes | 272.20 |
| Supplies | 81.01 |
| **Total Activities** | 2,537.56 |
| **Houskeeping** | |
| Houskeeping:Hkg. Wages | 7,904.67 |
| Hkg. Payroll taxes | 964.49 |
| Health Insurance | -204.26 |
| Dental Insurance | 35.83 |
| Housekeeping/Laundry Supplies | 1,340.59 |
| **Total Houskeeping** | 10,041.32 |
| **Dietary** | |
| Dietary:Dietary Wages | 18,511.81 |
| Dietary Payroll taxes | 2,284.29 |
| Health Insurance | -187.72 |
| Food/Grocery Costs | 13,869.05 |
| Supplies | 951.86 |
| **Total Dietary** | 35,429.29 |
| **Direct Care** | |
| Auto/Travel | 30.98 |
| Direct Care:D C Wages | 64,993.88 |
| D C Payroll taxes | 7,276.69 |
| Health Insurance | -845.16 |
| Dental Insurance | 322.47 |
| Laboratory Services | 525.00 |
| Medical Supplies | 526.41 |
| **Total Direct Care** | 72,830.27 |
| **Marketing** | |
| Marketing:Mktg.Wages | 1,923.08 |
| Mktg.Payroll Taxes | 213.74 |
| Health Insurance | -204.26 |

**Whitehall Manor Inc**
**Operating Statement - Cash Collateral**
March 1 - 7, 2026

| | |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| **Monthly Rental** | 225,683.41 |
| **Reimbursement- employees health insurance** | 1,993.42 |
| **Total Income** | 227,676.83 |
| | |
| **Expense** | |
| DIETARY | 13,869.05 |
| SUPPLIES | 2,899.87 |
| REFUNDS | 0 |
| MAINTENANCE | 469.32 |
| UTILITIES | 416.25 |
| PAYROLL & BENEFITS (before reimbursement- employees) | 122,945.52 |
| OFFICE & MARKETING EXPENSES | 0 |
| REAL ESTATE TAXES & INSURANCE | 501.62 |
| EQUIPMENT | 0 |
| US TRUSTEE QUARTERLY FEES | 0 |
| DILWORTH PAXSON/Committee Counsel | 0 |
| Omni | 0 |
| ADEQUATE PROTECTION | 0 |
| LEGAL/PROFESSIONAL FEES | 0 |
| MANAGEMENT FEE | 0 |
| Miscellaneous | 2,745.87 |
| Total expenses | 143,847.50 |
| Net Income | 83,829.33 |

App.767

| | Mar 1 - 8, 26 |
|---|---|
| **Dental Insurance** | 35.83 |
| **Total Marketing** | 1,968.39 |
| **Administration** | |
| **Computer Repairs/Software** | 300.00 |
| **Administration:Admin Wages** | 12,847.15 |
| **Admin Payroll Taxes** | 1,321.92 |
| **Health insurance** | -413.48 |
| **Dental Insurance** | 71.66 |
| **Bank Service Charges** | 5.00 |
| **Contract Labor** | 258.00 |
| **Payroll service fees** | 1,101.89 |
| **Total Administration** | 15,492.14 |
| **Total Expense** | 141,854.08 |
| | -141,854.08 |
| **Net Income before other income/expenses** | 83,829.33 |
| | |
| **Net Ordinary Income** | |
| **Other Income/Expense** | |
| **Other Expense** | |
| **Depreciation Expense** | 7,373.52 |
| **Total Other Expense** | 7,373.52 |
| **Net Other Income** | -7,373.52 |
| **Net Income** | $ 76,455.81 |

App.768

**Whitehall Manor Inc**
**Operating Statement - Original**
March 1 - 7, 2026

**Ordinary Income/Expense**

    **Income**

        **Monthly Rental**

    **Total Income**

    **Expense**

        **Facility Costs**

            **Rent other**

            **Sanitation**

        **Total Facility Costs**

        **Maintenance**

            **Maintenance:Maint. Wages**

            **Maint. Payroll taxes**

            **Health Insurance**

            **Dental Insurance**

            **Repairs & maintenance**

        **Total Maintenance**

        **Activities**

            **Activities:Act.Wages**

            **Act. Payroll taxes**

            **Supplies**

        **Total Activities**

        **Houskeeping**

            **Houskeeping:Hkg. Wages**

            **Hkg. Payroll taxes**

            **Health Insurance**

            **Dental Insurance**

            **Housekeeping/Laundry Supplies**

        **Total Houskeeping**

        **Dietary**

            **Dietary:Dietary Wages**

            **Dietary Payroll taxes**

            **Health Insurance**

            **Food/Grocery Costs**

            **Supplies**

        **Total Dietary**

        **Direct Care**

            **Auto/Travel**

            **Direct Care:D C Wages**

            **D C Payroll taxes**

            **Health Insurance**

            **Dental Insurance**

            **Laboratory Services**

            **Medical Supplies**

        **Total Direct Care**

        **Marketing**

            **Marketing:Mktg.Wages**

            **Mktg.Payroll Taxes**

            **Health Insurance**

App.769

**Dental Insurance**

**Total Marketing**

**Administration**

     **Computer Repairs/Software**

     **Administration:Admin Wages**

     **Admin Payroll Taxes**

     **Health insurance**

     **Dental Insurance**

     **Bank Service Charges**

     **Contract Labor**

     **Payroll service fees**

**Total Administration**

**Total Expense**

**Net Income before other income/expenses**

**Net Ordinary Income**

**Other Income/Expense**

  **Other Expense**

     **Depreciation Expense**

  **Total Other Expense**

**Net Other Income**

**Net Income**

App.770

**Whitehall Manor Inc**
**Check Detail**

**March 1 - 9, 2026**

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Reimburse Employees | Dietary | Supplies | Refunds | Maintenance | Utilities | Payroll Benefits | Office Mktg | Real Estate taxes Insurance | Equipment | US Trustee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Check | debit | 03/01/2026 | Uber | | Debit Card #7784 | | -30.98 | | | | | | | | | | | |
| | | | | | Auto/Travel | -30.98 | 30.98 | | | | | | | | | | | |
| TOTAL | | | | | | -30.98 | 30.98 | | | | | | | | | | | |
| Check | debit | 03/05/2026 | Amazon | | Debit Card #7784 | | -53.27 | | | | | | | | | | | |
| | | | | | Medical Supplies | -53.27 | 53.27 | | | | | | | | | | | |
| TOTAL | | | | | | -53.27 | 53.27 | | | 53.27 | | | | | | | | |
| Check | debit | 03/06/2026 | Securitas Healthcare | | Debit Card #7784 | | -473.14 | | | | | | | | | | | |
| | | | | | Medical Supplies | -473.14 | 473.14 | | | | | | | | | | | |
| TOTAL | | | | | | -473.14 | 473.14 | | | 473.14 | | | | | | | | |
| Check | eft | 03/01/2026 | Truist | | WM_BB&T_Escrow 7012 | | -5.00 | | | | | | | | | | | |
| | | | | | Bank Service Charges | -5.00 | 5.00 | | | | | | | | | | | |
| TOTAL | | | | | | -5.00 | 5.00 | | | | | | | | | | | |
| Check | PR TFR | 03/04/2026 | | | Truist #6454 | | -122,053.99 | | | | | | | | | | | |
| | | | | | Truist 15102 (PR) 12/23/24 | -122,053.99 | 122,053.99 | | | | | | | | | | | |
| TOTAL | | | | | | -122,053.99 | 122,053.99 | (1,993.42) | | | | | | 122,945.52 | | | | |
| Bill Pmt -Check | 48698 | 03/02/2026 | United Concordia | | Truist #6454 | | -501.62 | | | | | | | | | | | |
| Bill | 214088089 | 03/01/2026 | | | Admin - Dental Insurance | -71.66 | 71.66 | | | | | | | | | | | |
| | | | | | Housekeeping - Dental Insurance | -35.83 | 35.83 | | | | | | | | | | | |
| | | | | | Dental Insurance | -35.83 | 35.83 | | | | | | | | | | | |
| | | | | | Direct Care - Dental Insurance | -322.47 | 322.47 | | | | | | | | | | | |
| | | | | | Marketing - Dental Insurance | -35.83 | 35.83 | | | | | | | | | | | |
| TOTAL | | | | | | -501.62 | 501.62 | | | | | | | | | 501.62 | | |
| Bill Pmt -Check | 48699 | 03/02/2026 | Void | | Truist #6454 | | 0.00 | | | | | | | | | | | |
| TOTAL | | | | | | 0.00 | 0.00 | | | | | | | | | | | |
| Bill Pmt -Check | 48700 | 03/05/2026 | Assad Younes | | Truist #6454 | | -300.00 | | | | | | | | | | | |
| Bill | I1696 | 02/24/2026 | | | Computer Repairs/Software | -300.00 | 300.00 | | | | | | | | | | | |
| TOTAL | | | | | | -300.00 | 300.00 | | | | | | | | | | | |
| Bill Pmt -Check | 48701 | 03/05/2026 | Chrin Hauling, Inc. | | Truist #6454 | | -416.25 | | | | | | | | | | | |

App.771

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Employees | Dietary | Supplies | Refunds | Maintenance | Utilities | Benefits | Mktg | Insurance | Equipment | US Trustee |
|------|-----|------|------|------|---------|-------------|-----------------|-----------|---------|----------|---------|-------------|-----------|----------|------|-----------|-----------|-----------|
| Bill | 775014 / 130334 | 03/01/2026 | | | Sanitation | -416.25 | 416.25 | | | | | | | | | | | |
| TOTAL | | | | | | -416.25 | 416.25 | | | | | | 416.25 | | | | | |
| **Bill Pmt -Check** | **48702** | **03/05/2026** | **Cintas** | | **Truist #6454** | | **-1,340.59** | | | | | | | | | | | |
| Bill | 4260848267 | 02/26/2026 | | | Housekeeping/Laundry Supplies | -1,340.59 | 1,340.59 | | | | | | | | | | | |
| TOTAL | | | | | | -1,340.59 | 1,340.59 | | | 1,340.59 | | | | | | | | |
| **Bill Pmt -Check** | **48703** | **03/05/2026** | **Coombs Rentals** | | **Truist #6454** | | **-525.00** | | | | | | | | | | | |
| Bill | 2026 RENT JAN | 01/01/2026 | | | Rent other | -175.00 | 175.00 | | | | | | | | | | | |
| Bill | FEB 2026 | 02/01/2026 | | | Rent other | -175.00 | 175.00 | | | | | | | | | | | |
| Bill | March 2026 rent | 03/01/2026 | | | Rent other | -175.00 | 175.00 | | | | | | | | | | | |
| TOTAL | | | | | | -525.00 | 525.00 | | | | | | | | | | | |
| **Bill Pmt -Check** | **48704** | **03/05/2026** | **Loikits Industrial Services** | | **Truist #6454** | | **-469.32** | | | | | | | | | | | |
| Bill | 70365 | 02/26/2026 | | | Repairs & maintenance | -469.32 | 469.32 | | | | | | | | | | | |
| TOTAL | | | | | | -469.32 | 469.32 | | | | | 469.32 | | | | | | |
| **Bill Pmt -Check** | **48705** | **03/05/2026** | **Matura Salon and Spa Management** | | **Truist #6454** | | **-258.00** | | | | | | | | | | | |
| Bill | 302465 | 02/27/2026 | | | Contract Labor | -258.00 | 258.00 | | | | | | | | | | | |
| TOTAL | | | | | | -258.00 | 258.00 | | | | | | | | | | | |
| **Bill Pmt -Check** | **48706** | **03/05/2026** | **Patient First** | | **Truist #6454** | | **-525.00** | | | | | | | | | | | |
| Bill | 39*110031*2*1 | 02/27/2026 | | | Laboratory Services | -525.00 | 525.00 | | | | | | | | | | | |
| TOTAL | | | | | | -525.00 | 525.00 | | | | | | | | | | | |
| **Bill Pmt -Check** | **48707** | **03/05/2026** | **Pocono Mountain Dairies** | | **Truist #6454** | | **-198.51** | | | | | | | | | | | |
| Bill | 1189332 | 02/28/2026 | | | Food/Grocery Costs | -198.51 | 198.51 | | | | | | | | | | | |
| TOTAL | | | | | | -198.51 | 198.51 | | 198.51 | | | | | | | | | |
| **Bill Pmt -Check** | **48708** | **03/05/2026** | **US Foodservice, Inc.** | | **Truist #6454** | | **-14,622.40** | | | | | | | | | | | |
| Bill | 2006689 | 02/05/2026 | | | Food/Grocery Costs | -1,816.67 | 1,816.67 | | | | | | | | | | | |
| Bill | 2006690 | 02/05/2026 | | | Food/Grocery Costs | -333.63 | 333.63 | | | | | | | | | | | |
| Bill | 2081244 | 02/06/2026 | | | Supplies | -24.89 | 24.89 | | | | | | | | | | | |
| Bill | 2244783 | 02/11/2026 | | | Supplies | -19.07 | 19.07 | | | | | | | | | | | |
| Bill | 2443863 | 02/17/2026 | | | Food/Grocery Costs | -1,904.67 | 1,904.67 | | | | | | | | | | | |
| Bill | 2443864 | 02/17/2026 | | | Food/Grocery Costs | -812.74 | 812.74 | | | | | | | | | | | |
| Bill | 2443866 | 02/17/2026 | | | Food/Grocery Costs | -1,942.44 | 1,942.44 | | | | | | | | | | | |
| Bill | 2443867 | 02/17/2026 | | | Food/Grocery Costs | -296.78 | 296.78 | | | | | | | | | | | |
| Bill | 2443869 | 02/17/2026 | | | Food/Grocery Costs | -38.50 | 38.50 | | | | | | | | | | | |
| Bill | 2443870 | 02/17/2026 | | | Food/Grocery Costs | -150.38 | 150.38 | | | | | | | | | | | |
| Bill | 2443868 | 02/17/2026 | | | Supplies | -558.83 | 558.83 | | | | | | | | | | | |
| Bill | 2589475 | 02/20/2026 | | | Food/Grocery Costs | -2,531.26 | 2,531.26 | | | | | | | | | | | |
| Bill | 2589476 | 02/20/2026 | | | Food/Grocery Costs | -1,170.66 | 1,170.66 | | | | | | | | | | | |
| Bill | 2589477 | 02/20/2026 | | | Food/Grocery Costs | -2,158.27 | 2,158.27 | | | | | | | | | | | |

App.772

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Employees | Dietary | Supplies | Refunds | Maintenance | Utilities | Benefits | Mktg | Insurance | Equipment | US Trustee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bill | 2589478 | 02/20/2026 | | | Food/Grocery Costs | -404.61 | 404.61 | | | | | | | | | | | |
| Bill | 2589480 | 02/20/2026 | | | Food/Grocery Costs | -109.93 | 109.93 | | | | | | | | | | | |
| Bill | 2589479 | 02/20/2026 | | | Supplies | -206.84 | 206.84 | | | | | | | | | | | |
| Bill | 2668892 | 02/23/2026 | | | Supplies | -142.23 | 142.23 | | | | | | | | | | | |
| TOTAL | | | | | | -14,622.40 | 14,622.40 | | 13,670.54 | 951.86 | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| Bill Pmt -Check | 48709 | 03/05/2026 | Blickley, Kelly | | Truist #6454 | | -81.01 | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| Bill | Act PC fnd Feb 2026 | 03/05/2026 | | | Supplies | -81.01 | 81.01 | | | | | | | | | | | |
| TOTAL | | | | | | -81.01 | 81.01 | | | 81.01 | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | Total checks | -141,854.08 | | (1,993.42) | 13,869.05 | 2,899.87 | - | 469.32 | 416.25 | 122,945.52 | - | 501.62 | - | - |
| | | | | | | | | x | x | | x | x | x | | x | | |

App.773

**White**
**Chec**

**March**

| | Dilworth | Omni | Adequate Protection | Legal Professional | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|
| | | | | | | 30.98 |
| TOTAL | | | | | | |
| TOTAL | | | | | | |
| TOTAL | | | | | | |
| TOTAL | | | | | | 5.00 |
| TOTAL | | | | | | 1,101.89 |
| TOTAL | | | | | | |
| TOTAL | | | | | | |
| TOTAL | | | | | | 300.00 |

App.774

| | Dilworth | Omni | Protection | Professional | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|
| TOTAL | | | | | | |
| TOTAL | | | | | | |
| TOTAL | | | | | | 525.00 |
| TOTAL | | | | | | |
| TOTAL | | | | | | 258.00 |
| TOTAL | | | | | | 525.00 |
| TOTAL | | | | | | |

App.775

| Dilworth | Omni | Protection | Professional | Mgmt Fee | Misc | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| TOTAL | | | | | | | |
| | | | | | | | |
| TOTAL | | | | | | | |
| - | - | - | - | - | 2,745.87 | - | 141,854.08 |
| | | | | | x | | |

App.776

**Whitehall Manor Inc**
**Check register**
As of March 7, 2026

Cash Basis

| | Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|
| **Debit Card #7784** | | | | | | | | **4,603.26** |
| | Check | 03/01/2026 | debit | Uber | Misc | | 30.98 | 4,572.28 |
| | Check | 03/05/2026 | debit | Amazon | Supplies | | 53.27 | 4,519.01 |
| | Check | 03/06/2026 | debit | Securitas Healthcare | Supplies | | 473.14 | 4,045.87 |
| Total Debit Card #7784 | | | | | | 0.00 | 557.39 | 4,045.87 |
| **Truist Reserve #5651** | | | | | | | | **1,149.96** |
| Total Truist Reserve #5651 | | | | | | | | 1,149.96 |
| **Truist #6454** | | | | | | | | **363,795.22** |
| | Bill Pmt -Check | 03/02/2026 | 48698 | United Concordia | Real estate taxes & insurance | | 501.62 | 363,293.60 |
| | Bill Pmt -Check | 03/02/2026 | 48699 | Void | | 0.00 | | 363,293.60 |
| | Deposit | 03/02/2026 | | | Deposit | 95,064.00 | | 458,357.60 |
| | Deposit | 03/02/2026 | | | ECP c/c | 7,136.42 | | 465,494.02 |
| | Deposit | 03/02/2026 | | | Deposit | 15,388.00 | | 480,882.02 |
| | Deposit | 03/02/2026 | | | Deposit | 17,228.00 | | 498,110.02 |
| | Deposit | 03/03/2026 | | | Deposit | 84,875.00 | | 582,985.02 |
| | Deposit | 03/03/2026 | | | Deposit | 33,853.00 | | 616,838.02 |
| | Deposit | 03/03/2026 | | | ECP c/c | 4,587.77 | | 621,425.79 |
| | Check | 03/04/2026 | PR TFR | | Payroll | | 122,053.99 | 499,371.80 |
| | Deposit | 03/05/2026 | | | Deposit | 23,068.00 | | 522,439.80 |
| | Bill Pmt -Check | 03/05/2026 | 48700 | Assad Younes | Misc | | 300.00 | 522,139.80 |
| | Bill Pmt -Check | 03/05/2026 | 48701 | Chrin Hauling, Inc. | Utilities | | 416.25 | 521,723.55 |
| | Bill Pmt -Check | 03/05/2026 | 48702 | Cintas | Supplies | | 1,340.59 | 520,382.96 |
| | Bill Pmt -Check | 03/05/2026 | 48703 | Coombs Rentals | Misc | | 525.00 | 519,857.96 |
| | Bill Pmt -Check | 03/05/2026 | | Void | | 0.00 | | 519,857.96 |
| | Bill Pmt -Check | 03/05/2026 | 48704 | Loikits Industrial Services | Maintenance | | 469.32 | 519,388.64 |
| | Bill Pmt -Check | 03/05/2026 | 48705 | Matura Salon and Spa Management | Misc | | 258.00 | 519,130.64 |
| | Bill Pmt -Check | 03/05/2026 | | Void | | 0.00 | | 519,130.64 |
| | Bill Pmt -Check | 03/05/2026 | 48706 | Patient First | Misc | | 525.00 | 518,605.64 |
| | Bill Pmt -Check | 03/05/2026 | 48707 | Pocono Mountain Dairies | Dietary | | 198.51 | 518,407.13 |
| | Bill Pmt -Check | 03/05/2026 | | Void | | 0.00 | | 518,407.13 |
| | Bill Pmt -Check | 03/05/2026 | | Void | | 0.00 | | 518,407.13 |
| | Bill Pmt -Check | 03/05/2026 | 48708 | US Foodservice, Inc. | Dietary/supplies | | 14,622.40 | 503,784.73 |
| | Bill Pmt -Check | 03/05/2026 | 48709 | Blickley, Kelly | Supplies | | 81.01 | 503,703.72 |
| | Deposit | 03/05/2026 | | | ECP c/c | 9,121.64 | | 512,825.36 |
| | Deposit | 03/06/2026 | | | Deposit | 37,834.00 | | 550,659.36 |
| | Deposit | 03/06/2026 | | | ECP c/c | 24,898.58 | | 575,557.94 |
| Total Truist #6454 | | | | | | 353,054.41 | 141,291.69 | 575,557.94 |
| **Truist 15102 (PR) 12/23/24** | | | | | | | | **6,979.75** |
| | Check | 03/04/2026 | PR TFR | | PR TFR FOR 3/6/26 | 122,053.99 | | 129,033.74 |
| | General Journal | 03/06/2026 | PR 3/6/26 | | PR PE 2/28/26 PD 3/6/26 | | 122,053.99 | 6,979.75 |
| Total Truist 15102 (PR) 12/23/24 | | | | | | 122,053.99 | 122,053.99 | 6,979.75 |
| **WM_BB&T_Escrow 7012** | | | | | | | | **23,432.00** |
| | Check | 03/01/2026 | eft | Truist | | | 5.00 | 23,427.00 |
| Total WM_BB&T_Escrow 7012 | | | | | | 0.00 | 5.00 | 23,427.00 |
| **Cash on Hand** | | | | | | | | **946.98** |
| Total Cash on Hand | | | | | | | | 946.98 |
| **TOTAL** | | | | | | 475,108.40 | 263,908.07 | 612,107.50 |
| | | | | | Deduct payroll transfer 3-4-26 | | -122,053.99 | |
| | | | | | agrees - check detail report | | 141,854.08 | |

App.777

**Hearing Exhibit D-50**

**C – Weekly Reconciliations as of March 14, 2026**

#125541164v1

**Whitehall Manor Inc**
**Operating Statement**
March 8 - 14, 2026

**Cash Basis**

**Week of Mar 8, 26**

| | |
|---|---:|
| **Ordinary Income/Expense** | |
| **Income** | |
| **Rental Income** | |
| **Monthly Rental** | 124,848.00 |
| **Expense** | |
| **Facility Costs** | |
| **Adequate Protection** | 35,000.00 |
| **CABLE** | 1,279.33 |
| **Electric** | 15,513.81 |
| **Total Facility Costs** | 51,793.14 |
| **Maintenance** | |
| **Repairs & maintenance** | 716.95 |
| **Total Maintenance** | 716.95 |
| **Activities** | |
| **Events** | 150.00 |
| **Supplies** | 190.17 |
| **Total Activities** | 340.17 |
| **Houskeeping** | |
| **Housekeeping/Laundry Supplies** | 2,085.92 |
| **Total Houskeeping** | 2,085.92 |
| **Dietary** | |
| **Food/Grocery Costs** | 14,835.07 |
| **Supplies** | 1,303.69 |
| **Total Dietary** | 16,138.76 |
| **Direct Care** | |
| **Auto/Travel** | 23.93 |
| **Laboratory Services** | 211.00 |
| **Medical Supplies** | 1,386.15 |
| **Total Direct Care** | 1,621.08 |
| **Marketing** | |
| **Advertising** | |
| **Advertising - Referral Company** | 3,195.00 |
| **Total Advertising** | 3,195.00 |
| **Total Marketing** | 3,195.00 |
| **Administration** | |
| **Automobile Expense** | 299.56 |
| **Contract Labor** | 348.00 |
| **Employee Disability Insurance** | 242.00 |
| **Insurance** | 7,170.00 |
| **Licenses and Permits** | 1,420.25 |
| **Office Supplies** | 640.96 |
| **Telephone** | 1,511.67 |
| **Total Administration** | 11,632.44 |
| **Total Expense** | 87,523.46 |
| **Net Ordinary Income** | 37,324.54 |
| **Net Income** | **37,324.54** |

Whitehall Manor Inc

Operating Statement - Cash Collateral

March 8 - 14, 2026

| | |
|---|---:|
| Ordinary Income/Expense | |
| Income | |
| Monthly Rental | 124,848.00 |
| | |
| Expense | |
| DIETARY | 16,138.76 |
| SUPPLIES | 3,662.24 |
| REFUNDS | - |
| MAINTENANCE | 716.95 |
| UTILITIES | 18,304.81 |
| PAYROLL & BENEFITS (before reimbursement- employees) | - |
| OFFICE & MARKETING EXPENSES | 3,345.00 |
| REAL ESTATE TAXES & INSURANCE | 7,412.00 |
| EQUIPMENT | - |
| US TRUSTEE QUARTERLY FEES | - |
| DILWORTH PAXSON/Committee Counsel | - |
| Omni | - |
| ADEQUATE PROTECTION | 35,000.00 |
| LEGAL/PROFESSIONAL FEES | - |
| MANAGEMENT FEE | - |
| Miscellaneous | 2,943.70 |
| Total expenses | 87,523.46 |
| Net Income | 37,324.54 |

**Page 1 of 21**

App.779

**Whitehall Manor Inc**
**Check Detail**
**March 8 - 14, 2026**

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Income | Dietary | Supplies | Refunds | Maintenance | Utilities | Payroll | Office Marketing | R/E taxes Insurance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bill Pmt -Check | ACH | 03/09/2026 | ICW Group | | Truist #6454 | | -7,170.00 | | | | | | | | | |
| Bill | 610376902 | 03/09/2026 | | | R/E taxes & insurance | -7,170.00 | 7,170.00 | | | | | | | | | |
| TOTAL | | | | | | -7,170.00 | 7,170.00 | | | | | | | | | 7,170.00 |
| Bill Pmt -Check | ACH | 03/13/2026 | A Place for Mom, Inc. | | Truist #6454 | | -3,195.00 | | | | | | | | | |
| Bill | 917896 beverly wiley | 03/01/2026 | | | Office/Mktg | -3,195.00 | 3,195.00 | | | | | | | | | |
| TOTAL | | | | | | -3,195.00 | 3,195.00 | | | | | | | | 3,195.00 | |
| Bill Pmt -Check | ACH | 03/13/2026 | Haddon, Eva (tfr) | | Truist #6454 | | -6,294.00 | | | | | | | | | |
| Bill | TFR Eva Haddon | 03/13/2026 | | | Income - interco transfer | -6,294.00 | 6,294.00 | | | | | | | | | |
| TOTAL | | | | | | -6,294.00 | 6,294.00 | 6,294.00 | | | | | | | | |
| Check | debit | 03/09/2026 | Amazon | | Debit Card #7784 | | -6.03 | | | | | | | | | |
| | | | | | Supplies | -6.03 | 6.03 | | | | | | | | | |
| TOTAL | | | | | | -6.03 | 6.03 | | | 6.03 | | | | | | |
| Check | debit | 03/10/2026 | Uber | | Debit Card #7784 | | -23.93 | | | | | | | | | |
| | | | | | Misc | -23.93 | 23.93 | | | | | | | | | |
| TOTAL | | | | | | -23.93 | 23.93 | | | | | | | | | |
| Check | debit | 03/12/2026 | Staples | | Debit Card #7784 | | -53.88 | | | | | | | | | |
| | | | | | Misc | -53.88 | 53.88 | | | | | | | | | |
| TOTAL | | | | | | -53.88 | 53.88 | | | | | | | | | |
| Check | debit | 03/12/2026 | Amazon | | Debit Card #7784 | | -130.13 | | | | | | | | | |
| | | | | | Supplies | -130.13 | 130.13 | | | | | | | | | |
| TOTAL | | | | | | -130.13 | 130.13 | | | 130.13 | | | | | | |
| Check | debit | 03/13/2026 | Staples | | Debit Card #7784 | | -100.65 | | | | | | | | | |
| | | | | | Misc | -100.65 | 100.65 | | | | | | | | | |
| TOTAL | | | | | | -100.65 | 100.65 | | | | | | | | | |
| Check | debit | 03/13/2026 | Staples | | Debit Card #7784 | | -486.43 | | | | | | | | | |
| | | | | | Misc | -486.43 | 486.43 | | | | | | | | | |
| TOTAL | | | | | | -486.43 | 486.43 | | | | | | | | | |
| Bill Pmt -Check | Debit | 03/09/2026 | Aramsco Inc. | | Debit Card #7784 | | -1,321.59 | | | | | | | | | |
| Bill | S7589805 | 03/09/2026 | | | Supplies | -1,321.59 | 1,321.59 | | | | | | | | | |
| TOTAL | | | | | | -1,321.59 | 1,321.59 | | | 1,321.59 | | | | | | |

App.780

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Office | R/E taxes |
|---|---|---|---|---|---|---|---|---|---|
| **Bill Pmt -Check** | **48710** | **03/09/2026** | **Matura Salon and Spa Management** | | **Truist #6454** | | **-348.00** | | |
| Bill | 303314 | 03/05/2026 | | | Misc | -114.00 | 114.00 | | |
| Bill | 303602 | 03/06/2026 | | | Misc | -234.00 | 234.00 | | |
| TOTAL | | | | | | -348.00 | 348.00 | | |
| **Bill Pmt -Check** | **48711** | **03/11/2026** | **Blickley, Kelly** | | **Truist #6454** | | **-190.17** | | |
| Bill | Act PC fnd Feb 2026 | 03/09/2026 | | | Supplies | -190.17 | 190.17 | | |
| TOTAL | | | | | | -190.17 | 190.17 | 190.17 | |
| **Bill Pmt -Check** | **48712** | **03/11/2026** | **Brro's Auto Service** | | **Truist #6454** | | **-299.56** | | |
| Bill | 00012577 | 03/09/2026 | | | Misc | -299.56 | 299.56 | | |
| TOTAL | | | | | | -299.56 | 299.56 | | |
| **Bill Pmt -Check** | **48713** | **03/11/2026** | **Cintas** | | **Truist #6454** | | **-634.20** | | |
| Bill | 4261622697 | 03/04/2026 | | | Supplies | -634.20 | 634.20 | | |
| TOTAL | | | | | | -634.20 | 634.20 | 634.20 | |
| **Bill Pmt -Check** | **48714** | **03/11/2026** | **Commonwealth of PA (B)** | | **Truist #6454** | | **-320.25** | | |
| Bill | 1268055 | 02/28/2026 | | | Misc | -320.25 | 320.25 | | |
| TOTAL | | | | | | -320.25 | 320.25 | | |
| **Bill Pmt -Check** | **48715** | **03/11/2026** | **Keystone Insurers Group Inc** | | **Truist #6454** | | **-242.00** | | |
| Bill | 00032670 | 03/01/2026 | | | R/E taxes/insurance | -242.00 | 242.00 | | |
| TOTAL | | | | | | -242.00 | 242.00 | | 242.00 |
| **Bill Pmt -Check** | **48716** | **03/11/2026** | **Patient First** | | **Truist #6454** | | **-211.00** | | |
| Bill | 39*110031*2*1 | 03/02/2026 | | | Misc | -211.00 | 211.00 | | |
| TOTAL | | | | | | -211.00 | 211.00 | | |
| **Bill Pmt -Check** | **48717** | **03/11/2026** | **PPL (30890-01019)** | | **Truist #6454** | | **-15,513.81** | | |
| Bill | 30890-01019 | 02/11/2026 | | | Utilities | -15,513.81 | 15,513.81 | | |
| TOTAL | | | | | | -15,513.81 | 15,513.81 | 15,513.81 | |
| **Bill Pmt -Check** | **48718** | **03/11/2026** | **Securitas Healthcare** | | **Truist #6454** | | **-1,380.12** | | |
| Bill | 80035503 | 03/06/2026 | | | Supplies | -1,380.12 | 1,380.12 | | |
| TOTAL | | | | | | -1,380.12 | 1,380.12 | 1,380.12 | |
| **Bill Pmt -Check** | **48719** | **03/11/2026** | **Trane U.S. Inc. (Whitehall)** | | **Truist #6454** | | **-716.95** | | |
| Bill | 20800565 | 03/01/2026 | | | Maintenance | -716.95 | 716.95 | | |
| TOTAL | | | | | | -716.95 | 716.95 | 716.95 | |
| **Bill Pmt -Check** | **48720** | **03/11/2026** | **US Foodservice, Inc.** | | **Truist #6454** | | **-16,138.76** | | |
| Bill | 2047112 | 02/06/2026 | | | Dietary | -625.56 | 625.56 | | |
| Bill | 2176212 | 02/10/2026 | | | Dietary | -392.60 | 392.60 | | |

App.781

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | | | Office | R/E taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bill | 2705410 | 02/24/2026 | | | Dietary | -263.98 | 263.98 | | | | |
| Bill | 2705407 | 02/24/2026 | | | Dietary | -3,052.10 | 3,052.10 | | | | |
| Bill | 2843652 | 02/27/2026 | | | Dietary | -188.01 | 188.01 | | | | |
| Bill | 2843653 | 02/27/2026 | | | Dietary | -2,283.96 | 2,283.96 | | | | |
| Bill | 2843654 | 02/27/2026 | | | Dietary | -842.80 | 842.80 | | | | |
| Bill | 2843656 | 02/27/2026 | | | Dietary | -2,431.59 | 2,431.59 | | | | |
| Bill | 2843657 | 02/27/2026 | | | Dietary | -245.33 | 245.33 | | | | |
| Bill | 2843658 | 02/27/2026 | | | Dietary | -215.92 | 215.92 | | | | |
| Bill | 2843659 | 02/27/2026 | | | Dietary | -168.91 | 168.91 | | | | |
| Bill | 15828 | 03/03/2026 | | | Dietary | -1,906.31 | 1,906.31 | | | | |
| Bill | 15829 | 03/03/2026 | | | Dietary | -687.25 | 687.25 | | | | |
| Bill | 15830 | 03/03/2026 | | | Dietary | -185.04 | 185.04 | | | | |
| Bill | 15831 | 03/03/2026 | | | Dietary | -142.38 | 142.38 | | | | |
| Bill | 15833 | 03/03/2026 | | | Dietary | -2,083.10 | 2,083.10 | | | | |
| Bill | 15834 | 03/03/2026 | | | Dietary | -66.78 | 66.78 | | | | |
| Bill | 149376 | 03/05/2026 | | | Dietary | -21.55 | 21.55 | | | | |
| Bill | 172040 | 03/06/2026 | | | Dietary | -274.61 | 274.61 | | | | |
| Bill | 172042 | 03/06/2026 | | | Dietary | -60.98 | 60.98 | | | | |
| TOTAL | | | | | | -16,138.76 | 16,138.76 | 16,138.76 | | | |
| | | | | | | | | | | | |
| **Bill Pmt -Check** | **48721** | **03/11/2026** | **Verizon (00004)** | | **Truist #6454** | | **-1,511.67** | | | | |
| Bill | 6136214874 | 02/25/2026 | | | Utilities | -1,511.67 | 1,511.67 | | | | |
| TOTAL | | | | | | -1,511.67 | 1,511.67 | | 1,511.67 | | |
| | | | | | | | | | | | |
| **Bill Pmt -Check** | **48722** | **03/11/2026** | **Walker, Stephen** | | **Truist #6454** | | **-150.00** | | | | |
| Bill | 3.10.26 | 03/10/2026 | | | Office/Mktg | -150.00 | 150.00 | | | | |
| TOTAL | | | | | | -150.00 | 150.00 | | 150.00 | | |
| | | | | | | | | | | | |
| **Bill Pmt -Check** | **48723** | **03/11/2026** | **Whitehall Township - Annual Inspection** | | **Truist #6454** | | **-1,100.00** | | | | |
| Bill | Annual Inspection | 03/02/2026 | | | Misc | -1,100.00 | 1,100.00 | | | | |
| TOTAL | | | | | | -1,100.00 | 1,100.00 | | | | |
| | | | | | | | | | | | |
| **Bill Pmt -Check** | **48724** | **03/12/2026** | **Lehigh Valley 1 LLC** | | **Truist #6454** | | **-35,000.00** | | | | |
| Bill | Adequate Protection | 03/12/2026 | | | Adequate Protection | -35,000.00 | 35,000.00 | | | | |
| TOTAL | | | | | | -35,000.00 | 35,000.00 | | | | |
| | | | | | | | | | | | |
| **Bill Pmt -Check** | **48725** | **03/12/2026** | **RCN (fac cable serv)4201-0455542-01** | | **Truist #6454** | | **-429.33** | | | | |
| Bill | 4201-0455542-01 | 03/02/2026 | | | Utilities | -429.33 | 429.33 | | | | |
| TOTAL | | | | | | -429.33 | 429.33 | | 429.33 | | |
| | | | | | | | | | | | |
| **Bill Pmt -Check** | **48726** | **03/12/2026** | **RCN (4201-0740226-01) IP circuit 100mg** | | **Truist #6454** | | **-850.00** | | | | |
| Bill | 4201-0740226-01 | 03/02/2026 | | | Utilities | -750.00 | 750.00 | | | | |
| Bill | 4201-0740226-01 | 03/02/2026 | | | Utilities | -100.00 | 100.00 | | | | |
| TOTAL | | | | | | -850.00 | 850.00 | | 850.00 | | |

| | | | | Total checks | -93,817.46 | | 6,294.00 netted against income | 16,138.76 | 3,662.24 | - | 716.95 | 18,304.81 | - | 3,345.00 | 7,412.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | | Office | R/E taxes |
|------|-----|------|------|------|---------|-------------|-----------------|---|--------|-----------|
| | | | | | Less: returned deposit netted against income | 6,294.00 | | | | |
| | | | | | adjusted cash disbursements | -87,523.46 | | | | |

App.783

**White**
**Chec**
**March**

| | Equipment | US Trustee | Dilworth | Omni | Adequate Protection | Legal Prof Fees | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|---|---|
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | 23.93 |
| TOTAL | | | | | | | | 53.88 |
| TOTAL | | | | | | | | |
| TOTAL | | | | | | | | 100.65 |
| TOTAL | | | | | | | | 486.43 |
| TOTAL | | | | | | | | |

App.784

Adequate      Legal

| | Adequate | Legal |
|---|---|---|
| TOTAL | 348.00 | |
| TOTAL | | |
| TOTAL | 299.56 | |
| TOTAL | | |
| TOTAL | 320.25 | |
| TOTAL | | |
| TOTAL | 211.00 | |
| TOTAL | | |
| TOTAL | | |
| TOTAL | | |

App.785

Adequate        Legal

TOTAL

TOTAL

TOTAL

TOTAL                                                          1,100.00

TOTAL                                      35,000.00

TOTAL

TOTAL

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| - | - | - | - | 35,000.00 | - | - | 2,943.70 | 87,523.46 |

agrees to 13 week

App.786

Adequate     Legal

App.787

**Whitehall Manor Inc**
**Check register**
**As of March 14, 2026**

| Type | Date | Num | Adj | Name | Memo | Debit | Credit | Original Amount | Cash Basis Balance |
|------|------|-----|-----|------|------|-------|--------|-----------------|--------------------|
| **Debit Card #7784** | | | | | | | | | **4,045.87** |
| Bill Pmt -Check | 03/09/2026 | Debit | | Aramsco Inc. | Supplies | | 1,321.59 | -1,321.59 | 2,724.28 |
| Check | 03/09/2026 | debit | | Amazon | Supplies | | 6.03 | -6.03 | 2,718.25 |
| Check | 03/10/2026 | debit | | Uber | Misc | | 23.93 | -23.93 | 2,694.32 |
| Check | 03/12/2026 | debit | | Staples | Misc | | 53.88 | -53.88 | 2,640.44 |
| Check | 03/12/2026 | debit | | Amazon | Supplies | | 130.13 | -130.13 | 2,510.31 |
| Check | 03/13/2026 | debit | | Staples | MIsc | | 100.65 | -100.65 | 2,377.24 |
| Check | 03/13/2026 | debit | | Staples | Misc | | 486.43 | -486.43 | 1,890.81 |
| Total Debit Card #7784 | | | | | | 0.00 | 2,122.64 | | 1,890.81 |
| **Truist Reserve #5651** | | | | | | | | | **1,149.96** |
| Total Truist Reserve #5651 | | | | | | | | | 1,149.96 |
| **Truist #6454** | | | | | | | | | **448,186.94** |
| Bill Pmt -Check | 03/09/2026 | 48710 | | Matura Salon and Spa Management | Misc | | 348.00 | -348.00 | 447,838.94 |
| Bill Pmt -Check | 03/09/2026 | ACH | | ICW Group | Insurance | | 7,170.00 | -7,170.00 | 440,668.94 |
| Deposit | 03/09/2026 | | | | Deposit | 10,140.00 | | 10,140.00 | 450,808.94 |
| Deposit | 03/10/2026 | | | | Deposit | 75,112.00 | | 75,112.00 | 525,920.94 |
| Deposit | 03/10/2026 | | | | Deposit | 4,770.00 | | 4,770.00 | 530,690.94 |
| Deposit | 03/11/2026 | | | | Deposit | 6,552.00 | | 6,552.00 | 537,242.94 |
| Bill Pmt -Check | 03/11/2026 | 48711 | | Blickley, Kelly | Supplies | | 190.17 | -190.17 | 537,052.77 |
| Bill Pmt -Check | 03/11/2026 | 48712 | | Brro's Auto Service | Misc | | 299.56 | -299.56 | 536,753.21 |
| Bill Pmt -Check | 03/11/2026 | 48713 | | Cintas | Supplies | | 634.20 | -634.20 | 536,119.01 |
| Bill Pmt -Check | 03/11/2026 | 48714 | | Commonwealth of PA (B) | Misc | | 320.25 | -320.25 | 535,798.76 |
| Bill Pmt -Check | 03/11/2026 | 48715 | | Keystone Insurers Group Inc | R/E taxe & insurance | | 242.00 | -242.00 | 535,556.76 |
| Bill Pmt -Check | 03/11/2026 | 48716 | | Patient First | Misc | | 211.00 | -211.00 | 535,345.76 |
| Bill Pmt -Check | 03/11/2026 | 48717 | | PPL (30890-01019) | Utilities | | 15,513.81 | -15,513.81 | 519,831.95 |
| Bill Pmt -Check | 03/11/2026 | 48718 | | Securitas Healthcare | Supplies | | 1,380.12 | -1,380.12 | 518,451.83 |
| Bill Pmt -Check | 03/11/2026 | 48719 | | Trane U.S. Inc. (Whitehall) | Maintenance | | 716.95 | -716.95 | 517,734.88 |
| Bill Pmt -Check | 03/11/2026 | 48720 | | US  Foodservice, Inc. | Dietary | | 16,138.76 | -16,138.76 | 501,596.12 |
| Bill Pmt -Check | 03/11/2026 | 48721 | | Verizon (00004) | Utilities | | 1,511.67 | -1,511.67 | 500,084.45 |
| Bill Pmt -Check | 03/11/2026 | 48722 | | Walker, Stephen | Office/Mktg | | 150.00 | -150.00 | 499,934.45 |
| Bill Pmt -Check | 03/11/2026 | 48723 | | Whitehall Township - Annual Inspection | Misc | | 1,100.00 | -1,100.00 | 498,834.45 |
| Bill Pmt -Check | 03/12/2026 | 48724 | | Lehigh Valley 1 LLC | Adequate Protection Payment for Loan # | | 35,000.00 | -35,000.00 | 463,834.45 |
| Bill Pmt -Check | 03/12/2026 | 48725 | | RCN (fac cable serv)4201-0455542-01 | Utilities | | 429.33 | -429.33 | 463,405.12 |
| Bill Pmt -Check | 03/12/2026 | 48726 | | RCN (4201-0740226-01) IP circuit 100mg | Utilities | | 850.00 | -850.00 | 462,555.12 |
| Deposit | 03/12/2026 | | | | Deposit | 34,568.00 | | 34,568.00 | 497,123.12 |
| Bill Pmt -Check | 03/13/2026 | ACH | | A Place for Mom, Inc. | Office/Mktg | | 3,195.00 | -3,195.00 | 493,928.12 |
| Bill Pmt -Check | 03/13/2026 | ACH | | Haddon, Eva (tfr) | Income- TFR funds to SV1 as of 2/23/26 | | 6,294.00 | -6,294.00 | 487,634.12 |
| Total Truist #6454 | | | | | | 131,142.00 | 91,694.82 | | 487,634.12 |
| **Truist 15102 (PR) 12/23/24** | | | | | | | | | **6,979.75** |
| Total Truist 15102 (PR) 12/23/24 | | | | | | | | | 6,979.75 |
| **WM_BB&T_Escrow 7012** | | | | | | | | | **23,427.00** |
| Total WM_BB&T_Escrow 7012 | | | | | | | | | 23,427.00 |
| **Cash on Hand** | | | | | | | | | **946.98** |
| Total Cash on Hand | | | | | | | | | 946.98 |
| **TOTAL** | | | | | | 131,142.00 | 93,817.46 | | 522,028.62 |

|  |  |  |
|---|---|---|
| Income- TFR funds to SV1 as of 2/23/26 | (6,294.00) | (6,294.00) |
| Adjusted cash receipts | $ 124,848.00 | $    87,523.46 |

App.788

**Saucon Valley Manor Inc.**
**Operating Statement**
March 8 - 14, 2026

| | Cash Basis |
|---|---|
| | **Week of Mar 8, 26** |
| **Ordinary Income/Expense** | |
| **Income** | |
| **Rental Income** | |
| **Monthly Rental** | 164,778.44 |
| **Facility Costs** | |
| **Electric** | 2,923.65 |
| **Gas** | 15,321.71 |
| **Sanitation** | 672.68 |
| **Total Facility Costs** | 18,918.04 |
| **Maintenance** | |
| **Repair & Maintenance** | 3,659.03 |
| **Total Maintenance** | 3,659.03 |
| **Dietary** | |
| **Food Costs** | |
| **Icecream/Slushi** | 1,406.97 |
| **Food Costs - Other** | 15,096.11 |
| **Total Food Costs** | 16,503.08 |
| **Total Dietary** | 16,503.08 |
| **Housekeeping** | |
| **Hskp. & Laundry Supplies** | 4,204.73 |
| **Total Housekeeping** | 4,204.73 |
| **Direct Care-Nursing** | |
| **Auto & Travel** | 30.93 |
| **Medical Supplies** | 2.14 |
| **Direct Care-Nursing - Other** | 486.00 |
| **Total Direct Care-Nursing** | 519.07 |
| **Resident Refund** | 1,180.72 |
| **Marketing** | |
| **Health Insurance** | 484.00 |
| **Advertising** | |
| **Advertising Referral Company** | 10,935.25 |
| **Advertising - Other** | 850.00 |
| **Total Advertising** | 11,785.25 |
| **Total Marketing** | 12,269.25 |
| **Administration** | |
| **Adequate Protection** | 35,000.00 |
| **Automobile Expense** | 476.30 |
| **Contract Labor** | 710.00 |
| **Dues and Subscriptions** | 60.00 |
| **Licenses and Permits** | 619.83 |
| **Postage and Delivery** | 550.15 |
| **Total Administration** | 37,416.28 |
| **Total Expense** | 94,670.20 |
| **Net Ordinary Income** | 70,108.24 |
| **Net Income** | **70,108.24** |

Saucon Valley Manor Inc.

Operating Statement - Cash Collateral
March 8 - 14, 2026

| | |
|---|---|
| Ordinary Income/Expense | |
| Income | |
| Monthly Rental | 164,778.44 |
| Expenses: | |
| DIETARY | 16,503.08 |
| REFUNDS | 1,180.72 |
| SUPPLIES | 4,206.87 |
| MAINTENANCE | 3,659.03 |
| UTILITIES | 18,918.04 |
| PAYROLL & BENEFITS | 0.00 |
| OFFICE & MARKETING EXPENSES | 11,785.25 |
| REAL ESTATE TAXES & INSURANCE | 484.00 |
| EQUIPMENT | 0 |
| US TRUSTEE QUARTERLY FEES | 0.00 |
| DILWORTH PAXSON/Committee Counsel | 0.00 |
| Omni | 0.00 |
| ADEQUATE PROTECTION | 35,000.00 |
| LEGAL/PROFESSIONAL FEES | 0.00 |
| MANAGEMENT FEE | 0.00 |
| Miscellaneous | 2,933.21 |
| Total expenses | 94,670.20 |
| Net Income | 70,108.24 |

App.789

**Saucon Valley Manor Inc.**
**Check Detail**
March 8 - 14, 2026

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Interco Transfer | Income | Dietary | Refunds | Supplies |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Check** | **debit** | **03/10/2026** | Uber | | **Debit Card #7792** | | **-30.93** | | | | | |
| | | | | | Auto & Travel | -30.93 | 30.93 | | | | | |
| TOTAL | | | | | | -30.93 | 30.93 | | | | | |
| **General Journal** | **Returned deposit** | **03/10/2026** | | | **Truist 15579 (12/18/24)** | | **-3,954.00** | | | | | |
| | | | | | Income | -3,954.00 | 3,954.00 | | | | | |
| | | | | | | -3,954.00 | 3,954.00 | | 3,954.00 | | | |
| **Bill Pmt -Check** | **Debit** | **03/09/2026** | Aramsco Inc. | | **Debit Card #7792** | | **-4,204.73** | | | | | |
| Bill | S7590101 | 03/09/2026 | | | Hskp. & Laundry Supplies | -4,204.73 | 4,204.73 | | | | | |
| TOTAL | | | | | | -4,204.73 | 4,204.73 | | | | | 4,204.73 |
| **Bill Pmt -Check** | **Debit** | **03/10/2026** | PennDOT | | **Debit Card #7792** | | **-48.00** | | | | | |
| Bill | KGJ6170 | 03/10/2026 | | | Automobile Expense | -48.00 | 48.00 | | | | | |
| TOTAL | | | | | | -48.00 | 48.00 | | | | | |
| **Bill Pmt -Check** | **Debit** | **03/12/2026** | PennDOT | | **Debit Card #7792** | | **-423.00** | | | | | |
| Bill | ZNJ3653 | 03/12/2026 | | | Automobile Expense | -423.00 | 423.00 | | | | | |
| TOTAL | | | | | | -423.00 | 423.00 | | | | | |
| **Transfer** | **TFR** | **03/09/2026** | | | **Truist 15579 (12/18/24)** | | **-5,000.00** | | | | | |
| | | | | | Debit Card #7792 | -5,000.00 | 5,000.00 | | | | | |
| TOTAL | | | | | | -5,000.00 | 5,000.00 | 5,000.00 | | | | |
| **Bill Pmt -Check** | **2206** | **03/09/2026** | Matura Salon & Spa Management | | **Truist 15579 (12/18/24)** | | **-446.00** | | | | | |
| Bill | 303235 | 03/05/2026 | | | Contract Labor | -159.00 | 159.00 | | | | | |
| Bill | 303574 | 03/06/2026 | | | Contract Labor | -287.00 | 287.00 | | | | | |
| TOTAL | | | | | | -446.00 | 446.00 | | | | | |
| **Bill Pmt -Check** | **2207** | **03/10/2026** | Borough of Hellertown | | **Truist 15579 (12/18/24)** | | **-60.00** | | | | | |
| Bill | License C-2660..3 | 03/05/2026 | | | Dues and Subscriptions | -60.00 | 60.00 | | | | | |
| TOTAL | | | | | | -60.00 | 60.00 | | | | | |
| **Bill Pmt -Check** | **2208** | **03/10/2026** | Smith, David (rfd) | | **Truist 15579 (12/18/24)** | | **-1,180.72** | | | | | |
| Bill | RFD additional | 03/11/2026 | | | Resident Refund | -1,180.72 | 1,180.72 | | | | | |
| TOTAL | | | | | | -1,180.72 | 1,180.72 | | | | 1,180.72 | |
| **Bill Pmt -Check** | **2209** | **03/12/2026** | Adams Outdoor Advertising | | **Truist 15579 (12/18/24)** | | **-850.00** | | | | | |
| Bill | 09101249 | 02/02/2026 | | | Advertising | -850.00 | 850.00 | | | | | |
| TOTAL | | | | | | -850.00 | 850.00 | | | | | |

App.790

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Transfer | Income | Dietary | Refunds | Supplies |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bill Pmt -Check** | **2210** | **03/12/2026** | **Britts Tire LTD** | | **Truist 15579 (12/18/24)** | | **-5.30** | | | | | |
| Bill | 9160 | 02/28/2026 | | | Automobile Expense | -5.30 | 5.30 | | | | | |
| TOTAL | | | | | | -5.30 | 5.30 | | | | | |
| **Bill Pmt -Check** | **2211** | **03/12/2026** | **Commonwealth of PA (B)** | | **Truist 15579 (12/18/24)** | | **-619.83** | | | | | |
| Bill | 1268705 | 02/28/2026 | | | Licenses and Permits | -619.83 | 619.83 | | | | | |
| TOTAL | | | | | | -619.83 | 619.83 | | | | | |
| **Bill Pmt -Check** | **2212** | **03/12/2026** | **Void** | | **Truist 15579 (12/18/24)** | | **0.00** | | | | | |
| TOTAL | | | | | | 0.00 | 0.00 | | | | | |
| **Bill Pmt -Check** | **2213** | **03/12/2026** | **Keystone Insurers Group Inc** | | **Truist 15579 (12/18/24)** | | **-484.00** | | | | | |
| Bill | 00032666 | 03/01/2026 | | | Health Insurance | -484.00 | 484.00 | | | | | |
| TOTAL | | | | | | -484.00 | 484.00 | | | | | |
| **Bill Pmt -Check** | **2214** | **03/12/2026** | **Lehigh Valley 1 LLC** | | **Truist 15579 (12/18/24)** | | **-35,000.00** | | | | | |
| Bill | Adequate Protection | 03/12/2026 | | | Adequate Protection | -35,000.00 | 35,000.00 | | | | | |
| TOTAL | | | | | | -35,000.00 | 35,000.00 | | | | | |
| **Bill Pmt -Check** | **2215** | **03/12/2026** | **Lehigh Valley Dairies** | | **Truist 15579 (12/18/24)** | | **-193.30** | | | | | |
| Bill | 9163366 | 02/25/2026 | | | Food Costs | -193.30 | 193.30 | | | | | |
| TOTAL | | | | | | -193.30 | 193.30 | | | 193.30 | | |
| **Bill Pmt -Check** | **2216** | **03/12/2026** | **Matura Salon & Spa Management** | | **Truist 15579 (12/18/24)** | | **-264.00** | | | | | |
| Bill | 303747 | 03/09/2026 | | | Contract Labor | -264.00 | 264.00 | | | | | |
| TOTAL | | | | | | -264.00 | 264.00 | | | | | |
| **Bill Pmt -Check** | **2217** | **03/12/2026** | **Patient First** | | **Truist 15579 (12/18/24)** | | **-486.00** | | | | | |
| Bill | 10086480 | 03/01/2026 | | | Direct Care-Nursing | -486.00 | 486.00 | | | | | |
| TOTAL | | | | | | -486.00 | 486.00 | | | | | |
| **Bill Pmt -Check** | **2218** | **03/12/2026** | **Pitney Bowes (Lease)** | | **Truist 15579 (12/18/24)** | | **-550.15** | | | | | |
| Bill | 3322111879 | 02/20/2026 | | | Postage and Delivery | -550.15 | 550.15 | | | | | |
| TOTAL | | | | | | -550.15 | 550.15 | | | | | |
| **Bill Pmt -Check** | **2219** | **03/12/2026** | **PPL (06696-53034)** | | **Truist 15579 (12/18/24)** | | **-2,184.05** | | | | | |
| Bill | 06696-53034 | 02/20/2026 | | | Electric | -2,184.05 | 2,184.05 | | | | | |
| TOTAL | | | | | | -2,184.05 | 2,184.05 | | | | | |
| **Bill Pmt -Check** | **2220** | **03/12/2026** | **PPL (14992-88024)** | | **Truist 15579 (12/18/24)** | | **-739.60** | | | | | |
| Bill | 14992-88024 | 02/20/2026 | | | Electric | -739.60 | 739.60 | | | | | |
| TOTAL | | | | | | -739.60 | 739.60 | | | | | |

App.791

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Transfer | Income | Dietary | Refunds | Supplies |
|------|-----|------|------|------|---------|------------:|----------------:|----------|--------|---------|---------|----------|
| **Bill Pmt -Check** | **2221** | **03/12/2026** | **Premier Senior Placement** | | **Truist 15579 (12/18/24)** | | **-10,935.25** | | | | | |
| Bill | 1043 Cynthia Daubert | 02/07/2026 | | | Advertising Referral Company | -2,921.50 | 2,921.50 | | | | | |
| Bill | 1044 John Moyer | 02/10/2026 | | | Advertising Referral Company | -3,371.25 | 3,371.25 | | | | | |
| Bill | 1050 Lacombe | 02/12/2026 | | | Advertising Referral Company | -4,642.50 | 4,642.50 | | | | | |
| TOTAL | | | | | | -10,935.25 | 10,935.25 | | | | | |
| **Bill Pmt -Check** | **2222** | **03/12/2026** | **Securitas Healthcare LLC** | | **Truist 15579 (12/18/24)** | | **-2.14** | | | | | |
| Bill | 80035187 | 03/03/2026 | | | Medical Supplies | -2.14 | 2.14 | | | | | |
| TOTAL | | | | | | -2.14 | 2.14 | | | | | 2.14 |
| **Bill Pmt -Check** | **2223** | **03/12/2026** | **Super Heat Inc** | | **Truist 15579 (12/18/24)** | | **-2,761.02** | | | | | |
| Bill | 126961 | 03/08/2026 | | | Repair & Maintenance | -875.90 | 875.90 | | | | | |
| Bill | 126962 | 03/08/2026 | | | Repair & Maintenance | -1,257.93 | 1,257.93 | | | | | |
| Bill | 126963 | 03/08/2026 | | | Repair & Maintenance | -627.19 | 627.19 | | | | | |
| TOTAL | | | | | | -2,761.02 | 2,761.02 | | | | | |
| **Bill Pmt -Check** | **2224** | **03/12/2026** | **UGI (7861)** | | **Truist 15579 (12/18/24)** | | **-1,272.71** | | | | | |
| Bill | 421004647861 | 02/20/2026 | | | Gas | -1,272.71 | 1,272.71 | | | | | |
| TOTAL | | | | | | -1,272.71 | 1,272.71 | | | | | |
| **Bill Pmt -Check** | **2225** | **03/12/2026** | **UGI (7879)** | | **Truist 15579 (12/18/24)** | | **-14,049.00** | | | | | |
| Bill | 421004647879 | 02/20/2026 | | | Gas | -14,049.00 | 14,049.00 | | | | | |
| TOTAL | | | | | | -14,049.00 | 14,049.00 | | | | | |
| **Bill Pmt -Check** | **2226** | **03/12/2026** | **US Food Service, Inc.** | | **Truist 15579 (12/18/24)** | | **-16,309.78** | | | | | |
| Bill | 2443774 | 02/17/2026 | | | Icecream/Slushi | -601.23 | 601.23 | | | | | |
| Bill | 2443775 | 02/17/2026 | | | Food Costs | -4,831.83 | 4,831.83 | | | | | |
| Bill | 2530342 | 02/19/2026 | | | Icecream/Slushi | -428.48 | 428.48 | | | | | |
| Bill | 2530344 | 02/19/2026 | | | Food Costs | -812.28 | 812.28 | | | | | |
| Bill | 2530345 | 02/19/2026 | | | Food Costs | -957.88 | 957.88 | | | | | |
| Bill | 2530346 | 02/19/2026 | | | Food Costs | -64.14 | 64.14 | | | | | |
| Bill | 2530347 | 02/19/2026 | | | Food Costs | -955.29 | 955.29 | | | | | |
| Bill | 2530348 | 02/19/2026 | | | Food Costs | -142.56 | 142.56 | | | | | |
| Bill | 2530349 | 02/19/2026 | | | Food Costs | -255.38 | 255.38 | | | | | |
| Bill | 2608334 | 02/20/2026 | | | Food Costs | -540.13 | 540.13 | | | | | |
| Bill | 2709269 | 02/24/2026 | | | Food Costs | -51.27 | 51.27 | | | | | |
| Bill | 2709270 | 02/24/2026 | | | Icecream/Slushi | -377.26 | 377.26 | | | | | |
| Bill | 2709273 | 02/24/2026 | | | Food Costs | -372.98 | 372.98 | | | | | |
| Bill | 2709274 | 02/24/2026 | | | Food Costs | -5,368.67 | 5,368.67 | | | | | |
| Bill | 2709275 | 02/24/2026 | | | Food Costs | -550.40 | 550.40 | | | | | |
| TOTAL | | | | | | -16,309.78 | 16,309.78 | | | | 16,309.78 | |
| **Bill Pmt -Check** | **2227** | **03/12/2026** | **Advanced Door Service** | | **Truist 15579 (12/18/24)** | | **-898.01** | | | | | |
| Bill | 340246933 | 02/11/2026 | | | Repair & Maintenance | -898.01 | 898.01 | | | | | |
| TOTAL | | | | | | -898.01 | 898.01 | | | | | |
| **Bill Pmt -Check** | **2228** | **03/12/2026** | **Chrin Hauling, Inc.** | | **Truist 15579 (12/18/24)** | | **-452.68** | | | | | |

App.792

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Transfer | Income | Dietary | Refunds | Supplies |
|------|-----|------|------|------|---------|-------------|-----------------|----------|--------|---------|---------|----------|
| Bill | 772122 / 130333 | 03/01/2026 | | | Sanitation | -452.68 | 452.68 | | | | | |
| TOTAL | | | | | | -452.68 | 452.68 | | | | | |
| **Bill Pmt -Check** | **2229** | **03/12/2026** | **Elk Transporation Inc.** | | **Truist 15579 (12/18/24)** | | **-220.00** | | | | | |
| Bill | 34559 | 02/20/2026 | | | Sanitation | -220.00 | 220.00 | | | | | |
| TOTAL | | | | | | -220.00 | 220.00 | | | | | |

| | Paid Amount | | Transfer | Income | Dietary | Refunds | Supplies |
|--|-------------|--|----------|--------|---------|---------|----------|
| Total checks | (103,624.20) | | 5,000.00 | 3,954.00 | 16,503.08 | 1,180.72 | 4,206.87 |
| Less: interco transfer | 5,000.00 | | | | | | |
| returned deposit nettted | | | | | | | |
| against income | 3,954.00 | | | | | | |
| adjust cash disbursements | (94,670.20) | | | | | | |

App.793

**Sauc**
**Che**
**March**

| | Maintenance | Utilities | Payroll | Office Mktg | R/E Taxes Insurance | Equipment | US Trustee | Dilwoth | Omni | Adequate Protection | Legal Prof Fees | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | 30.93 |
| TOTAL | | | | | | | | | | | | | |
| TOTAL | | | | | | | | | | | | | |
| TOTAL | | | | | | | | | | | | | 48.00 |
| TOTAL | | | | | | | | | | | | | 423.00 |
| TOTAL | | | | | | | | | | | | | |
| TOTAL | | | | | | | | | | | | | 446.00 |
| TOTAL | | | | | | | | | | | | | 60.00 |
| TOTAL | | | | | | | | | | | | | |
| TOTAL | | | 850.00 | | | | | | | | | | |

App.794

| | Maintenance | Utilities | Payroll | Mktg | Insurance | Equipment | US Trustee | Dilwoth | Omni | Protection | Prof Fees | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | | | | | | | | | | | | | 5.30 |
| TOTAL | | | | | | | | | | | | | 619.83 |
| TOTAL | | | | | | | | | | | | | |
| TOTAL | | | | | 484.00 | | | | | | | | |
| TOTAL | | | | | | | | 35,000.00 | | | | | |
| TOTAL | | | | | | | | | | | | | |
| TOTAL | | | | | | | | | | | | | 264.00 |
| TOTAL | | | | | | | | | | | | | 486.00 |
| TOTAL | | | | | | | | | | | | | 550.15 |
| TOTAL | | 2,184.05 | | | | | | | | | | | |
| TOTAL | | 739.60 | | | | | | | | | | | |

App.795

| Maintenance | Utilities | Payroll | Mktg | Insurance | Equipment | US Trustee | Dilwoth | Omni | Protection | Prof Fees | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | | | 10,935.25 | | | | | | | | | |
| TOTAL | | | | | | | | | | | | |
| TOTAL | 2,761.02 | | | | | | | | | | | |
| TOTAL | | 1,272.71 | | | | | | | | | | |
| TOTAL | | 14,049.00 | | | | | | | | | | |
| TOTAL | | | | | | | | | | | | |
| TOTAL | 898.01 | | | | | | | | | | | |

App.796

| Maintenance | Utilities | Payroll | Mktg | Insurance | Equipment | US Trustee | Dilwoth | Omni | Protection | Prof Fees | Mgmt Fee | Misc | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| TOTAL | 452.68 | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| TOTAL | 220.00 | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| 3,659.03 | 18,918.04 | - | 11,785.25 | 484.00 | - | - | - | - | 35,000.00 | - | - | 2,933.21 | 94,670.20 |

App.797

**Saucon Valley Manor Inc.**
**Check register**
As of March 14, 2026

Cash Basis

| Type | Date | Num | Adj | Name | Memo | Debit | Credit | Original Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| **Debit Card #7792** | | | | | | | | | **4,958.87** |
| Bill Pmt -Check | 03/09/2026 | Debit | | Aramsco Inc. | Supplies | | 4,204.73 | -4,204.73 | 754.14 |
| Transfer | 03/09/2026 | TFR | | | TFR FDS | 5,000.00 | | 5,000.00 | 5,754.14 |
| Bill Pmt -Check | 03/10/2026 | Debit | | PennDOT | Misc | | 48.00 | -48.00 | 5,706.14 |
| Check | 03/10/2026 | debit | | Uber | Misc | | 30.93 | -30.93 | 5,675.21 |
| Bill Pmt -Check | 03/12/2026 | Debit | | PennDOT | Misc | | 423.00 | -423.00 | 5,252.21 |
| Total Debit Card #7792 | | | | | | 5,000.00 | 4,706.66 | | 5,252.21 |
| **Truist 15579 (12/18/24)** | | | | | | | | | **697,892.16** |
| Bill Pmt -Check | 03/09/2026 | 2206 | | Matura Salon & Spa Management | Misc | | 446.00 | -446.00 | 697,446.16 |
| Deposit | 03/09/2026 | | | | Income | 27,232.44 | | 32,499.40 | 724,678.60 |
| Deposit | 03/09/2026 | | | | Good Shepard - rent | 5,266.96 | | | 729,945.56 |
| Transfer | 03/09/2026 | TFR | | | TFR FDS. to DEBIT CARD 7792 by Abe K Atiyeh | | 5,000.00 | -5,000.00 | 724,945.56 |
| Deposit | 03/09/2026 | | | | Income | 8,383.31 | | 8,383.31 | 733,328.87 |
| Bill Pmt -Check | 03/10/2026 | 2207 | | Borough of Hellertown | MIsc | | 60.00 | -60.00 | 733,268.87 |
| Bill Pmt -Check | 03/10/2026 | 2208 | | Smith, David (rfd) | Refunds | | 1,180.72 | -1,180.72 | 732,088.15 |
| General Journal | 03/10/2026 | | | | Income - returned deposit | | 3,954.00 | -3,954.00 | 728,134.15 |
| Deposit | 03/10/2026 | | | | Income | 3,442.00 | | 3,442.00 | 731,576.15 |
| Deposit | 03/10/2026 | | | | Income | 4,278.35 | | 4,278.35 | 735,854.50 |
| Deposit | 03/11/2026 | | | | Income | 68,927.00 | | 68,927.00 | 804,781.50 |
| Deposit | 03/11/2026 | | | | Income | 4,565.00 | | 4,565.00 | 809,346.50 |
| Deposit | 03/11/2026 | | | | Income | 10,424.15 | | 10,424.15 | 819,770.65 |
| Bill Pmt -Check | 03/12/2026 | 2209 | | Adams Outdoor Advertising | Office/Mktg | | 850.00 | -850.00 | 818,920.65 |
| Bill Pmt -Check | 03/12/2026 | 2210 | | Britts Tire LTD | Misc | | 5.30 | -5.30 | 818,915.35 |
| Bill Pmt -Check | 03/12/2026 | 2211 | | Commonwealth of PA (B) | MIsc | | 619.83 | -619.83 | 818,295.52 |
| Bill Pmt -Check | 03/12/2026 | 2213 | | Keystone Insurers Group Inc | Real estate taxes/insurance | | 484.00 | -484.00 | 817,811.52 |
| Bill Pmt -Check | 03/12/2026 | 2214 | | Lehigh Valley 1 LLC | Adequate Protection Payment for Loan # | | 35,000.00 | -35,000.00 | 782,811.52 |
| Bill Pmt -Check | 03/12/2026 | 2215 | | Lehigh Valley Dairies | Dietary | | 193.30 | -193.30 | 782,618.22 |
| Bill Pmt -Check | 03/12/2026 | 2216 | | Matura Salon & Spa Management | Misc | | 264.00 | -264.00 | 782,354.22 |
| Bill Pmt -Check | 03/12/2026 | 2217 | | Patient First | Misc | | 486.00 | -486.00 | 781,868.22 |
| Bill Pmt -Check | 03/12/2026 | 2218 | | Pitney Bowes (Lease) | Misc | | 550.15 | -550.15 | 781,318.07 |
| Bill Pmt -Check | 03/12/2026 | 2219 | | PPL (06696-53034) | Utilities | | 2,184.05 | -2,184.05 | 779,134.02 |
| Bill Pmt -Check | 03/12/2026 | 2220 | | PPL (14992-88024) | Utilities | | 739.60 | -739.60 | 778,394.42 |
| Bill Pmt -Check | 03/12/2026 | 2221 | | Premier Senior Placement | Office/Mktg | | 10,935.25 | -10,935.25 | 767,459.17 |
| Bill Pmt -Check | 03/12/2026 | 2222 | | Securitas Healthcare LLC | Supplies | | 2.14 | -2.14 | 767,457.03 |
| Bill Pmt -Check | 03/12/2026 | 2223 | | Super Heat Inc | Maintenance | | 2,761.02 | -2,761.02 | 764,696.01 |
| Bill Pmt -Check | 03/12/2026 | 2224 | | UGI (7861) | Utilities | | 1,272.71 | -1,272.71 | 763,423.30 |
| Bill Pmt -Check | 03/12/2026 | 2225 | | UGI (7879) | Utilities | | 14,049.00 | -14,049.00 | 749,374.30 |
| Bill Pmt -Check | 03/12/2026 | 2226 | | US Food Service, Inc. | Dietary | | 16,309.78 | -16,309.78 | 733,064.52 |
| Bill Pmt -Check | 03/12/2026 | 2227 | | Advanced Door Service | Maintenance | | 898.01 | -898.01 | 732,166.51 |
| Bill Pmt -Check | 03/12/2026 | 2228 | | Chrin Hauling, Inc. | Utilities | | 452.68 | -452.68 | 731,713.83 |
| Deposit | 03/12/2026 | | | | Income | 1,975.00 | | 1,975.00 | 733,688.83 |
| Deposit | 03/12/2026 | | | | Income | 19,003.00 | | | 752,691.83 |
| Bill Pmt -Check | 03/12/2026 | 2229 | | Elk Transporation Inc. | Utilities | | 220.00 | -220.00 | 752,471.83 |
| Deposit | 03/13/2026 | | | | Income | 6,294.00 | | 6,294.00 | 758,765.83 |
| Deposit | 03/13/2026 | | | | Income | 14,208.19 | | 14,208.19 | 772,974.02 |
| Total Truist 15579 (12/18/24) | | | | | | 173,999.40 | 98,917.54 | | 772,974.02 |
| **Truist 14602 (PR) 12/23/24** | | | | | | | | | **28,495.66** |
| Total Truist 14602 (PR) 12/23/24 | | | | | deduct returned deposit | -3,954.00 | | | 28,495.66 |

App.798

| Type | Date | Num | Adj | Name | Memo | Debit | Credit | Original Amount | Balance |
|------|------|-----|-----|------|------|-------|--------|-----------------|---------|
| **Truist Reserve #5678** | | | | | deduct- Good Shepard rent | -5,266.96 | | | **2,059.95** |
| Total Truist Reserve #5678 | | | | | Adjusted cash receipts | 164,778.44 | | | 2,059.95 |
| **TRUIST A/C# 52423 (8/1/22)fraud** | | | | | | | | | **1,701.23** |
| Total TRUIST A/C# 52423 (8/1/22)fraud | | | | | | | | | 1,701.23 |
| **BB&T ESCROW** | | | | | | | | | **36,811.00** |
| Total BB&T ESCROW | | | | | | | | | 36,811.00 |
| **Petty Cash Fund** | | | | | | | | | **800.00** |
| Total Petty Cash Fund | | | | | | | | | 800.00 |
| **TOTAL** | | | | | | 178,999.40 | 103,624.20 | | 848,094.07 |

| | | |
|---|---|---|
| transfer to debit card | | (5,000.00) |
| return deposit netted against income | | (3,954.00) |
| Adjust cash disbursements | | 94,670.20 |

**Hearing Exhibit D-50**

**D – Weekly Reconciliations as of March 21, 2026**

#125541164v1

App.800

**Whitehall Manor Inc**
**Check register**
As of March 21, 2026

Cash Basis

| | Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|
| **Debit Card #7784** | | | | | | | | **1,923.23** |
| | Bill Pmt -Check | 03/16/2026 | Debit | Fine Wine & Good Spirits | Supplies | | 32.42 | 1,890.81 |
| | Check | 03/18/2026 | | Amazon | Misc | | 11.99 | 1,878.82 |
| | Check | 03/18/2026 | 1 | Amazon | Supplies | | 55.10 | 1,823.72 |
| | Check | 03/18/2026 | 2 | Amazon | Supplies | | 32.54 | 1,791.18 |
| | Check | 03/18/2026 | 3 | Uber | Misc | | 8.13 | 1,783.05 |
| | Check | 03/18/2026 | 4 | Uber | Misc | | 28.96 | 1,754.09 |
| | Check | 03/18/2026 | 5 | Aramsco Inc. | Supplies | | 1,414.99 | 339.10 |
| | Transfer | 03/18/2026 | | | Funds Transfer | 5,000.00 | | 5,339.10 |
| Total Debit Card #7784 | | | | | | 5,000.00 | 1,584.13 | 5,339.10 |
| **Truist Reserve #5651** | | | | | | | | **1,149.96** |
| | Transfer | 03/18/2026 | | | Funds Transfer | 23,000.00 | | 24,149.96 |
| Total Truist Reserve #5651 | | | | | | 23,000.00 | 0.00 | 24,149.96 |
| **Truist #6454** | | | | | | | | **615,005.12** |
| | Bill Pmt -Check | 03/16/2026 | ACH | A Place for Mom | Office.Mktg | | 3,195.00 | 611,810.12 |
| | Check | 03/17/2026 | ACH TFR | | PAYROLL TRANSFER FOR 3/20/26 | | 121,053.55 | 490,756.57 |
| | Deposit | 03/17/2026 | | | Income | 3,614.00 | | 494,370.57 |
| | Bill Pmt -Check | 03/18/2026 | 48727 | Cintas | Supplies | | 634.20 | 493,736.37 |
| | Bill Pmt -Check | 03/18/2026 | 48728 | Dilworth Paxson LLP | Income - rent from Good Shephard returned | | 4,729.00 | 489,007.37 |
| | Bill Pmt -Check | 03/18/2026 | 48729 | Eberts, Debora | Misc | | 43.00 | 488,964.37 |
| | Bill Pmt -Check | 03/18/2026 | 48730 | Void | | | 0.00 | 488,964.37 |
| | Bill Pmt -Check | 03/18/2026 | 48731 | Pitney Bowes Bank INC Purchase Power | Misc | | 46.06 | 488,918.31 |
| | Bill Pmt -Check | 03/18/2026 | 48732 | Service Electric Cable TV | Utilities | | 883.85 | 488,034.46 |
| | Bill Pmt -Check | 03/18/2026 | 48733 | The Old Yellow Company | Maintenance | | 84.00 | 487,950.46 |
| | Bill Pmt -Check | 03/18/2026 | 48734 | US Foodservice, Inc. | Dietary | | 16,409.00 | 471,541.46 |
| | Bill Pmt -Check | 03/18/2026 | 48735 | NBMA (599200) | Utilities | | 2,250.00 | 469,291.46 |
| | Bill Pmt -Check | 03/18/2026 | 48736 | NBMA (599300) | Utilities | | 720.00 | 468,571.46 |
| | Bill Pmt -Check | 03/18/2026 | 48737 | NBMA (599250) | Utilities | | 17.25 | 468,554.21 |
| | Bill Pmt -Check | 03/18/2026 | 48738 | Matura Salon and Spa Management | Misc | | 216.00 | 468,338.21 |
| | Bill Pmt -Check | 03/18/2026 | 48739 | Void | | 0.00 | | 468,338.21 |
| | Transfer | 03/18/2026 | | | Funds Transfer | | 5,000.00 | 463,338.21 |
| | Bill Pmt -Check | 03/18/2026 | 48740 | Premier Senior Placement | Office/Mktg | | 2,996.25 | 460,341.96 |
| | Deposit | 03/19/2026 | | | Income | 10,885.00 | | 471,226.96 |
| | Wire | 03/20/2026 | ACH | Coke Cola | Dietary | | 2,000.00 | 469,226.96 |
| | Deposit | 03/20/2026 | | | Income | 4,396.13 | | 473,623.09 |
| Total Truist #6454 | | | | | | 18,895.13 | 160,277.16 | 473,623.09 |
| **Truist 15102 (PR) 12/23/24** | | | | | | | | **6,979.75** |
| | Check | 03/17/2026 | ACH TFR | | PAYROLL TRANSFER FOR 3/20/26 | 121,053.55 | | 128,033.30 |
| | General Journal | 03/20/2026 | PR 3/20/26 | | PR PE 3/14/26 pd 3/20/26 | | 121,053.55 | 6,979.75 |
| Total Truist 15102 (PR) 12/23/24 | | | | | | 121,053.55 | 121,053.55 | 6,979.75 |
| **WM_BB&T_Escrow 7012** | | | | | | | | **23,427.00** |
| | Transfer | 03/18/2026 | | | Funds Transfer | | 23,000.00 | 427.00 |
| Total WM_BB&T_Escrow 7012 | | | | | | 0.00 | 23,000.00 | 427.00 |
| **Cash on Hand** | | | | | | | | **946.98** |
| Total Cash on Hand | | | | | | | | 946.98 |
| **TOTAL** | | | | | | **167,948.68** | **305,914.84** | **511,465.88** |

Deduct payroll transfer 3-20-26        -121,053.55

agrees with check detail report        184,861.29

App.801

**Whitehall Manor Inc**
**Check Detail**
March 15 - 21, 2026

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Income | Income Reimburse-employees | Interco Transfers | Dietary | Supplies | Refunds | Maintenance | Utilities | Payroll Benefits |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ACH** | | 03/16/2026 | **A Place for Mom** | | **Truist #6454** | | **-3,195.00** | | | | | | | | | |
| | | | | | Advertising - Referral Company | -3,195.00 | 3,195.00 | | | | | | | | | |
| TOTAL | | | | | | -3,195.00 | 3,195.00 | | | | | | | | | |
| **Check** | | 03/18/2026 | **Amazon** | | **Debit Card #7784** | | **-11.99** | | | | | | | | | |
| | | | | | Office Supplies | -11.99 | 11.99 | | | | | | | | | |
| TOTAL | | | | | | -11.99 | 11.99 | | | | | | | | | |
| **Transfer** | | 03/18/2026 | | | **Truist #6454** | | **-5,000.00** | | | | | | | | | |
| | | | | | Debit Card #7784 | -5,000.00 | 5,000.00 | | | | | | | | | |
| TOTAL | | | | | | -5,000.00 | 5,000.00 | | | 5,000.00 | | | | | | |
| **Transfer** | | 03/18/2026 | | | **WM_BB&T_Escrow 7012** | | **-23,000.00** | | | | | | | | | |
| | | | | | Truist Reserve #5651 | -23,000.00 | 23,000.00 | | | | | | | | | |
| TOTAL | | | | | | -23,000.00 | 23,000.00 | | | 23,000.00 | | | | | | |
| **Check** | **ACH TFR** | 03/17/2026 | | | **Truist #6454** | | **-121,053.55** | | | | | | | | | |
| | | | | | Truist 15102 (PR) 12/23/24 | -121,053.55 | 121,053.55 | | | | | | | | | |
| TOTAL | | | | | | -121,053.55 | 121,053.55 | | (1,993.42) | | | | | | | 122,952.47 |
| **Bill Pmt -Check** | **Debit** | 03/16/2026 | **Fine Wine & Good Spirits** | | **Debit Card #7784** | | **-32.42** | | | | | | | | | |
| Bill | Trans #4753 | 03/13/2026 | | | Supplies | -32.42 | 32.42 | | | | | | | | | |
| TOTAL | | | | | | -32.42 | 32.42 | | | | | 32.42 | | | | |
| **Check** | **1** | 03/18/2026 | **Amazon** | | **Debit Card #7784** | | **-55.10** | | | | | | | | | |
| | | | | | Medical Supplies | -55.10 | 55.10 | | | | | | | | | |
| TOTAL | | | | | | -55.10 | 55.10 | | | | | 55.10 | | | | |
| **Check** | **2** | 03/18/2026 | **Amazon** | | **Debit Card #7784** | | **-32.54** | | | | | | | | | |
| | | | | | Medical Supplies | -32.54 | 32.54 | | | | | | | | | |
| TOTAL | | | | | | -32.54 | 32.54 | | | | | 32.54 | | | | |
| **Check** | **3** | 03/18/2026 | **Uber** | | **Debit Card #7784** | | **-8.13** | | | | | | | | | |
| | | | | | Auto/Travel | -8.13 | 8.13 | | | | | | | | | |
| TOTAL | | | | | | -8.13 | 8.13 | | | | | | | | | |
| **Check** | **4** | 03/18/2026 | **Uber** | | **Debit Card #7784** | | **-28.96** | | | | | | | | | |

App.802

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Income | Reimburse-employees | Transfers | Dietary | Supplies | Refunds | Maintenance | Utilities | Benefits |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Auto/Travel | -28.96 | 28.96 | | | | | | | | | |
| TOTAL | | | | | | -28.96 | 28.96 | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| Check | 5 | 03/18/2026 | Aramsco Inc. | | Debit Card #7784 | | -1,414.99 | | | | | | | | | |
| | | | | | Housekeeping/Laundry Supplies | -1,414.99 | 1,414.99 | | | | | | | | | |
| TOTAL | | | | | | -1,414.99 | 1,414.99 | | | | | 1,414.99 | | | | |
| | | | | | | | | | | | | | | | | |
| Bill Pmt -Check | 48727 | 03/18/2026 | Cintas | | Truist #6454 | | -634.20 | | | | | | | | | |
| Bill | 4262368191 | 03/11/2026 | | | Housekeeping/Laundry Supplies | -634.20 | 634.20 | | | | | | | | | |
| TOTAL | | | | | | -634.20 | 634.20 | | | | | 634.20 | | | | |
| | | | | | | | | | | | | | | | | |
| Bill Pmt -Check | 48728 | 03/18/2026 | Dilworth Paxson LLP | | Truist #6454 | | -4,729.00 | | | | | | | | | |
| Bill | Good Shephard | 03/09/2026 | | | Income- return rent paid | -4,729.00 | 4,729.00 | | | | | | | | | |
| TOTAL | | | | | | -4,729.00 | 4,729.00 | 4,729.00 | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| Bill Pmt -Check | 48729 | 03/18/2026 | Eberts, Debora | | Truist #6454 | | -43.00 | | | | | | | | | |
| Bill | Gas | 03/14/2026 | | | Fuel-gas | -43.00 | 43.00 | | | | | | | | | |
| TOTAL | | | | | | -43.00 | 43.00 | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| Bill Pmt -Check | 48730 | 03/18/2026 | Void | | | | 0.00 | | | | | | | | | |
| TOTAL | | | | | | 0.00 | 0.00 | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| Bill Pmt -Check | 48731 | 03/18/2026 | Pitney Bowes Bank INC Purchase Power | | Truist #6454 | | -46.06 | | | | | | | | | |
| Bill | 8000-9090-0998-4084 | 03/06/2026 | | | Postage and Delivery | -46.06 | 46.06 | | | | | | | | | |
| TOTAL | | | | | | -46.06 | 46.06 | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| Bill Pmt -Check | 48732 | 03/18/2026 | Service Electric Cable TV | | Truist #6454 | | -883.85 | | | | | | | | | |
| Bill | 0738096711 | 03/01/2026 | | | Telephone | -883.85 | 883.85 | | | | | | | | | |
| TOTAL | | | | | | -883.85 | 883.85 | | | | | | | | 883.85 | |
| | | | | | | | | | | | | | | | | |
| Bill Pmt -Check | 48733 | 03/18/2026 | The Old Yellow Company | | Truist #6454 | | -84.00 | | | | | | | | | |
| Bill | 60308 | 03/13/2026 | | | Repairs & maintenance | -84.00 | 84.00 | | | | | | | | | |
| TOTAL | | | | | | -84.00 | 84.00 | | | | | | | 84.00 | | |
| | | | | | | | | | | | | | | | | |
| Bill Pmt -Check | 48734 | 03/18/2026 | US Foodservice, Inc. | | Truist #6454 | | -16,409.00 | | | | | | | | | |
| Bill | 2843655 | 03/01/2026 | | | Supplies | -211.92 | 231.15 | | | | | | | | | |
| Bill | 15832 | 03/03/2026 | | | Supplies | -632.71 | 632.71 | | | | | | | | | |
| Bill | 172037 | 03/06/2026 | | | Food/Grocery Costs | -2,100.57 | 2,127.26 | | | | | | | | | |
| Bill | 172038 | 03/06/2026 | | | Food/Grocery Costs | -909.54 | 909.54 | | | | | | | | | |
| Bill | 172039 | 03/06/2026 | | | Food/Grocery Costs | -2,555.32 | 2,555.32 | | | | | | | | | |
| Bill | 172041 | 03/06/2026 | | | Supplies | -323.40 | 323.40 | | | | | | | | | |
| Bill | 288322 | 03/10/2026 | | | Food/Grocery Costs | -2,465.88 | 2,465.88 | | | | | | | | | |

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Income | Reimburse-employees | Transfers | Dietary | Supplies | Refunds | Maintenance | Utilities | Benefits |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bill | 288323 | 03/10/2026 | | | Food/Grocery Costs | -852.01 | 852.01 | | | | | | | | | |
| Bill | 288324 | 03/10/2026 | | | Food/Grocery Costs | -1,891.97 | 1,891.97 | | | | | | | | | |
| Bill | 288326 | 03/10/2026 | | | Food/Grocery Costs | -240.01 | 240.01 | | | | | | | | | |
| Bill | 288327 | 03/10/2026 | | | Food/Grocery Costs | -292.76 | 292.76 | | | | | | | | | |
| Bill | 288325 | 03/10/2026 | | | Supplies | -193.35 | 193.35 | | | | | | | | | |
| Bill | 442612 | 03/13/2026 | | | Food/Grocery Costs | -2,265.96 | 2,265.96 | | | | | | | | | |
| Bill | 442613 | 03/13/2026 | | | Food/Grocery Costs | -980.26 | 980.26 | | | | | | | | | |
| Bill | 442616 | 03/13/2026 | | | Food/Grocery Costs | -236.29 | 236.29 | | | | | | | | | |
| Bill | 442615 | 03/13/2026 | | | Supplies | -257.05 | 257.05 | | | | | | | | | |
| TOTAL | | | | | | -16,409.00 | 16,454.92 | | | | 16,409.00 | | | | | |
| | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **48735** | **03/18/2026** | **NBMA  (599200)** | | **Truist #6454** | | **-2,250.00** | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| Bill | 599200 | 03/02/2026 | | | Water/Sewer | -2,250.00 | 2,250.00 | | | | | | | | | |
| TOTAL | | | | | | -2,250.00 | 2,250.00 | | | | | | | | 2,250.00 | |
| | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **48736** | **03/18/2026** | **NBMA  (599300)** | | **Truist #6454** | | **-720.00** | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| Bill | 599300 | 03/02/2026 | | | Water/Sewer | -720.00 | 720.00 | | | | | | | | | |
| TOTAL | | | | | | -720.00 | 720.00 | | | | | | | | 720.00 | |
| | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **48737** | **03/18/2026** | **NBMA (599250)** | | **Truist #6454** | | **-17.25** | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| Bill | 599250 | 03/02/2026 | | | Water/Sewer | -17.25 | 17.25 | | | | | | | | | |
| TOTAL | | | | | | -17.25 | 17.25 | | | | | | | | 17.25 | |
| | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **48738** | **03/18/2026** | **Matura Salon and Spa Management** | | **Truist #6454** | | **-216.00** | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| Bill | 304639 | 03/13/2026 | | | Contract Labor | -216.00 | 216.00 | | | | | | | | | |
| TOTAL | | | | | | -216.00 | 216.00 | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **48739** | **03/18/2026** | **Void** | | | | **0.00** | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| TOTAL | | | | | | 0.00 | 0.00 | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **48740** | **03/18/2026** | **Premier Senior Placement** | | **Truist #6454** | | **-2,996.25** | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| Bill | 1054 Donald Sweda | 02/27/2026 | | | Advertising - Referral Company | -2,996.25 | 2,996.25 | | | | | | | | | |
| TOTAL | | | | | | -2,996.25 | 2,996.25 | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| **Wire** | **ACH** | **03/20/2026** | **Coca Cola** | | **Truist #6454** | | **-2,000.00** | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | Dietary | -2,000.00 | 2,000.00 | | | | | | | | | |
| TOTAL | | | | | | -2,000.00 | 2,000.00 | | | | 2,000.00 | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | Total checks | -184,861.29 | | 4,729.00 | (1,993.42) | 28,000.00 | 18,409.00 | 2,169.25 | - | 84.00 | 3,871.10 | 122,952.47 |

**White**
**Chec**
**March**

| | Office Mktg | Real Estate taxes Insurance | Equipment | US Trustee | Dilworth | Omni | Adequate Protection | Legal Professional | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | 3,195.00 | | | | | | | | | |
| TOTAL | | | | | | | | | | 11.99 |
| TOTAL | | | | | | | | | | |
| TOTAL | | | | | | | | | | |
| TOTAL | | | | | | | | | | 94.5 |
| TOTAL | | | | | | | | | | |
| TOTAL | | | | | | | | | | |
| TOTAL | | | | | | | | | | |
| TOTAL | | | | | | | | | | 8.13 |

App.805

| | Mktg | Insurance | Equipment | US Trustee | Dilworth | Omni | Protection | Professional | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | | | | | | | | | | 28.96 |
| TOTAL | | | | | | | | | | |
| TOTAL | | | | | | | | | | |
| TOTAL | | | | | | | | | | |
| TOTAL | | | | | | | | | | 43.00 |
| TOTAL | | | | | | | | | | |
| TOTAL | | | | | | | | | | 46.06 |
| TOTAL | | | | | | | | | | |
| TOTAL | | | | | | | | | | |

App.806

| | Mktg | Insurance | Equipment | US Trustee | Dilworth | Omni | Protection | Professional | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | | | | | | | | | | |
| TOTAL | | | | | | | | | | |
| TOTAL | | | | | | | | | | |
| TOTAL | | | | | | | | | | |
| TOTAL | | | | | | | | | | 216.00 |
| TOTAL | | | | | | | | | | |
| TOTAL | 2,996.25 | | | | | | | | | |
| TOTAL | | | | | | | | | | |
| | 6,191.25 | - | - | - | - | - | - | - | - | 448.64 | 184,861.29 |

App.807

**Whitehall Manor Inc**
**Operating Statement**
March 15 - 21, 2026

| | **Cash Basis** |
|---|---|
| | **Week of Mar 15, 26** |

| | |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| **Rental Income** | 18,895.13 |
| **Good Shepard rent returned** | -4,729.00 |
| **Reimburse-employees health** | 1,993.42 |
| **Total Income** | 16,159.55 |
| | 16,159.55 |
| | |
| **Expense** | |
| **Facility Costs** | |
| **Water/Sewer** | 2,987.25 |
| **Total Facility Costs** | 2,987.25 |
| **Maintenance** | |
| **Maint. Wages** | 2,105.09 |
| **Maint. Payroll taxes** | 150.45 |
| **Repairs & maintenance** | 84.00 |
| **Total Maintenance** | 2,339.54 |
| **Activities** | |
| **Act.Wages** | 2,601.56 |
| **Act. Payroll taxes** | 317.16 |
| **Activities supplies** | 32.42 |
| **Total Activities** | 2,951.14 |
| **Houskeeping** | |
| **Hkg. Wages** | 8,370.71 |
| **Hkg. Payroll taxes** | 1,015.61 |
| **Housekeeping/Laundry Supplies** | 2,049.19 |
| **Total Houskeeping** | 11,435.51 |
| **Dietary** | |
| **Dietary Wages** | 17,558.48 |
| **Dietary Payroll taxes** | 2,131.55 |
| **Food/Grocery Costs** | 16,790.57 |
| **Supplies** | 1,618.43 |
| **Total Dietary** | 38,099.03 |
| **Direct Care** | |
| **Auto/Travel** | 37.09 |
| **D C Wages** | 65,292.18 |
| **D C Payroll taxes** | 6,791.33 |
| **Medical Supplies** | 87.64 |
| **Total Direct Care** | 72,208.24 |
| **Marketing** | |
| **Mktg.Wages** | 3,056.12 |
| **Mktg.Payroll Taxes** | 234.54 |
| **Advertising** | |
| **Advertising - Referral Company** | 6,191.25 |
| **Total Advertising** | 6,191.25 |
| **Total Marketing** | 9,481.91 |
| **Administration** | |
| **Admin Wages** | 12,124.62 |
| **Admin Payroll Taxes** | 1,203.07 |

Whitehall Manor Inc

Operating Statement - Cash Collateral
March 15 - 21, 2026

| | |
|---|---|
| Ordinary Income/Expense | |
| Income | |
| Monthly Rental | 16,159.55 |
| | |
| Expense | |
| DIETARY | 18,409.00 |
| SUPPLIES | 2,169.25 |
| REFUNDS | - |
| MAINTENANCE | 84.00 |
| UTILITIES | 3,871.10 |
| PAYROLL & BENEFITS (before reimbursement- employees) | 122,952.47 |
| OFFICE & MARKETING EXPENSES | 6,191.25 |
| REAL ESTATE TAXES & INSURANCE | - |
| EQUIPMENT | - |
| US TRUSTEE QUARTERLY FEES | - |
| DILWORTH PAXSON/Committee Counsel | - |
| Omni | - |
| ADEQUATE PROTECTION | - |
| LEGAL/PROFESSIONAL FEES | - |
| MANAGEMENT FEE | - |
| Miscellaneous | 448.64 |
| Total expenses | 154,125.71 |
| Net Income(Loss) | (137,966.16) |

App.808

| | Week of Mar 15, 26 |
|---|---|
| **Contract Labor** | 216.00 |
| **Fuel-gas** | 43.00 |
| **Office Supplies** | 11.99 |
| **Payroll service fees** | 94.50 |
| **Postage and Delivery** | 46.06 |
| **Telephone** | 883.85 |
| **Total Administration** | 14,623.09 |
| **Total Expense** | 154,125.71 |
| **Net Ordinary Income** | -137,966.16 |
| **Net Income** | **-137,966.16** |

App.809

**Saucon Valley Manor Inc.**
**Check register**
As of March 21, 2026

| | Type | Date | Num | Name | Memo | Debit | Credit | Cash Basis Balance |
|---|---|---|---|---|---|---|---|---|
| **Debit Card #7792** | | | | | | | | **5,252.21** |
| | Check | 03/16/2026 | debit | Uber | Misc | | 34.97 | 5,217.24 |
| Total Debit Card #7792 | | | | | | 0.00 | 34.97 | 5,217.24 |
| **Truist 15579 (12/18/24)** | | | | | | | | **768,217.02** |
| | Deposit | 03/16/2026 | | | Income | 4,425.00 | | 772,642.02 |
| | Bill Pmt -Check | 03/16/2026 | ACH | Eastern Alliance Insurance Group | Insurance | | 8,205.00 | 764,437.02 |
| | Check | 03/17/2026 | ACH TFR | | PAYROLL TRANSFER FOR 3/20/26 | | 236,000.00 | 528,437.02 |
| | Deposit | 03/17/2026 | | | Income | 9,323.48 | | 537,760.50 |
| | Deposit | 03/18/2026 | | | Income | 18,812.00 | | 556,572.50 |
| | Bill Pmt -Check | 03/18/2026 | 2230 | Cintas | Supplies | | 1,003.72 | 555,568.78 |
| | Bill Pmt -Check | 03/18/2026 | 2231 | Dilworth Paxton LLP | Rent from Good Shepherd returned | | 5,266.96 | 550,301.82 |
| | Bill Pmt -Check | 03/18/2026 | 2232 | Henry Yeska & Son, Inc. | Maintenance | | 900.00 | 549,401.82 |
| | Bill Pmt -Check | 03/18/2026 | 2233 | Johnstone Supply | Supplies | | 1,360.01 | 548,041.81 |
| | Bill Pmt -Check | 03/18/2026 | 2234 | Lehigh Valley Dairies | Dietary | | 90.42 | 547,951.39 |
| | Bill Pmt -Check | 03/18/2026 | 2235 | Loikits Industrial Services | Maintenance | | 229.18 | 547,722.21 |
| | Bill Pmt -Check | 03/18/2026 | 2236 | R Kudera Construction | Maintenance | | 1,412.00 | 546,310.21 |
| | Bill Pmt -Check | 03/18/2026 | 2237 | Reliant Pest Control, LLC | Maintenance | | 344.50 | 545,965.71 |
| | Bill Pmt -Check | 03/18/2026 | 2238 | US Food Service, Inc. | Dietary | | 23,784.27 | 522,181.44 |
| | Bill Pmt -Check | 03/18/2026 | 2239 | Agentis Plumbing | Maintenance | | 1,604.00 | 520,577.44 |
| | Bill Pmt -Check | 03/18/2026 | 2240 | Cintas | Supplies | | 1,003.72 | 519,573.72 |
| | Bill Pmt -Check | 03/18/2026 | 2241 | Select Sales, Inc. | Office/Mktg | | 733.17 | 518,840.55 |
| | Bill Pmt -Check | 03/18/2026 | 2242 | F. W. Webb Company | Supplies | | 587.28 | 518,253.27 |
| | Bill Pmt -Check | 03/18/2026 | 2243 | Matura Salon & Spa Management | Misc | | 922.00 | 517,331.27 |
| | Bill Pmt -Check | 03/18/2026 | 2244 | Phipany, Kris | Misc | | 150.00 | 517,181.27 |
| | Bill Pmt -Check | 03/18/2026 | 2245 | Woodward, Lorri | Misc | | 150.00 | 517,031.27 |
| | Deposit | 03/18/2026 | | | Income | 37,193.00 | | 554,224.27 |
| | Deposit | 03/19/2026 | | | Income | 7,748.18 | | 561,972.45 |
| | Deposit | 03/19/2026 | | | Income | 7,129.00 | | 569,101.45 |
| | Bill Pmt -Check | 03/20/2026 | ACH | A Place for Mom | Office/Mktg | | 4,395.00 | 564,706.45 |
| | Check | 03/20/2026 | Wire | Coca-Cola Bottling Co.of The Lehigh Valle | Dietary | | 2,500.00 | 562,206.45 |
| | Deposit | 03/20/2026 | | | Income | 5,295.00 | | 567,501.45 |
| | Deposit | 03/20/2026 | | | Income | 5,344.50 | | 572,845.95 |
| Total Truist 15579 (12/18/24) | | | | | | 95,270.16 | 290,641.23 | 572,845.95 |
| **Truist 14602 (PR) 12/23/24** | | | | | | | | **28,495.66** |
| | Check | 03/17/2026 | ACH TFR | | PR TFR FOR 3/26/26 $236591.15 | 236,000.00 | | 264,495.66 |
| | General Journal | 03/20/2026 | PR 3/20/26 | | PR P/E 3/14/26 PD 3/20/26 | | 236,591.15 | 27,904.51 |
| Total Truist 14602 (PR) 12/23/24 | | | | | | 236,000.00 | 236,591.15 | 27,904.51 |
| **Truist Reserve #5678** | | | | | | | | **2,059.95** |
| | Transfer | 03/18/2026 | | | Funds Transfer | 34,000.00 | | 36,059.95 |
| Total Truist Reserve #5678 | | | | | | 34,000.00 | 0.00 | 36,059.95 |
| **TRUIST A/C# 52423 (8/1/22)fraud** | | | | | | | | **1,701.23** |
| Total TRUIST A/C# 52423 (8/1/22)fraud | | | | | | | | 1,701.23 |
| **BB&T ESCROW** | | | | | | | | **36,811.00** |
| | Transfer | 03/18/2026 | | | Funds Transfer | | 34,000.00 | 2,811.00 |
| Total BB&T ESCROW | | | | | | 0.00 | 34,000.00 | 2,811.00 |
| **Petty Cash Fund** | | | | | | | | **800.00** |
| Total Petty Cash Fund | | | | | | | | 800.00 |
| **TOTAL** | | | | | | 365,270.16 | 561,267.35 | 647,339.88 |

|  | |
|---|---|
| Deduct payroll transfer 3-20-26 | -236,591.15 |
| agrees to check detail report | 324,676.20 |

App.810

**Saucon Valley Manor Inc.**
**Check Detail**
March 15 - 21, 2026

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Interco Transfer | Income | Dietary | Refunds | Supplies | Maintenance | Utilities | Payroll | Office Mktg | R/E Taxes Insurance | Equipment | US Trustee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Transfer** | | **03/18/2026** | | | **BB&T ESCROW** | | **-34,000.00** | | | | | | | | | | | | |
| | | | | | Truist Reserve #5678 | -34,000.00 | 34,000.00 | | | | | | | | | | | | |
| TOTAL | | | | | | -34,000.00 | 34,000.00 | 34,000.00 | | | | | | | | | | | |
| **Bill Pmt -Check** | **ACH** | **03/16/2026** | **Eastern Alliance Insurance Group** | | **Truist 15579 (12/18/24)** | | **-8,205.00** | | | | | | | | | | | | |
| Bill | 542935 | 03/16/2026 | | | Insurance | -8,205.00 | 8,205.00 | | | | | | | | | | | | |
| TOTAL | | | | | | -8,205.00 | 8,205.00 | | | | | | | | | | 8,205.00 | | |
| **Bill Pmt -Check** | **ACH** | **03/20/2026** | **A Place for Mom** | | **Truist 15579 (12/18/24)** | | **-4,395.00** | | | | | | | | | | | | |
| Bill | 920792 daniel boyle | 03/01/2026 | | | Advertising Referral Company | -4,395.00 | 4,395.00 | | | | | | | | | | | | |
| TOTAL | | | | | | -4,395.00 | 4,395.00 | | | | | | | | | 4,395.00 | | | |
| **Check** | **ACH TFR** | **03/17/2026** | | | **Truist 15579 (12/18/24)** | | **-236,000.00** | | | | | | | | | | | | |
| | | | | | Truist 14602 (PR) 12/23/24 | -236,000.00 | 236,000.00 | | | | | | | | | | | | |
| TOTAL | | | | | | -236,000.00 | 236,000.00 | (4,853.06) | | | | | | | 240,764.56 | | | | |
| **Check** | **debit** | **03/16/2026** | **Uber** | | **Debit Card #7792** | | **-34.97** | | | | | | | | | | | | |
| | | | | | Auto & Travel | -34.97 | 34.97 | | | | | | | | | | | | |
| TOTAL | | | | | | -34.97 | 34.97 | | | | | | | | | | | | |
| **Check** | **Wire** | **03/20/2026** | **Coca-Cola Bottling Co.of The Lehigh Valle** | | **Truist 15579 (12/18/24)** | | **-2,500.00** | | | | | | | | | | | | |
| | | | | | Dietary | -2,500.00 | 2,500.00 | | | | | | | | | | | | |
| TOTAL | | | | | | -2,500.00 | 2,500.00 | | | 2,500.00 | | | | | | | | | |
| **Bill Pmt -Check** | **2230** | **03/18/2026** | **Cintas** | | **Truist 15579 (12/18/24)** | | **-1,003.72** | | | | | | | | | | | | |
| Bill | 4262363175 | 03/11/2026 | | | Hskp. & Laundry Supplies | -1,003.72 | 1,003.72 | | | | | | | | | | | | |
| TOTAL | | | | | | -1,003.72 | 1,003.72 | | | | | 1,003.72 | | | | | | | |
| **Bill Pmt -Check** | **2231** | **03/18/2026** | **Dilworth Paxton LLP** | | **Truist 15579 (12/18/24)** | | **-5,266.96** | | | | | | | | | | | | |
| Bill | Good Shephard | 03/09/2026 | | | Rental Income | -5,266.96 | 5,266.96 | | | | | | | | | | | | |
| TOTAL | | | | | | -5,266.96 | 5,266.96 | | 5,266.96 | | | | | | | | | | |
| **Bill Pmt -Check** | **2232** | **03/18/2026** | **Henry Yeska & Son, Inc.** | | **Truist 15579 (12/18/24)** | | **-900.00** | | | | | | | | | | | | |
| Bill | D2032498125 | 03/12/2026 | | | Repair & Maintenance | -900.00 | 900.00 | | | | | | | | | | | | |
| TOTAL | | | | | | -900.00 | 900.00 | | | | | | 900.00 | | | | | | |
| **Bill Pmt -Check** | **2233** | **03/18/2026** | **Johnstone Supply** | | **Truist 15579 (12/18/24)** | | **-1,360.01** | | | | | | | | | | | | |
| Bill | 1255151 | 03/09/2026 | | | Maintenance Supplies | -1,360.01 | 1,360.01 | | | | | | | | | | | | |
| TOTAL | | | | | | -1,360.01 | 1,360.01 | | | | | 1,360.01 | | | | | | | |
| **Bill Pmt -Check** | **2234** | **03/18/2026** | **Lehigh Valley Dairies** | | **Truist 15579 (12/18/24)** | | **-90.42** | | | | | | | | | | | | |

App.811

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Transfer | Income | Dietary | Refunds | Supplies | Maintenance | Utilities | Payroll | Mktg | Insurance | Equipment | US Trustee |
|------|-----|------|------|------|---------|-------------|-----------------|----------|--------|---------|---------|----------|-------------|-----------|---------|------|-----------|-----------|-----------|
| Bill | 9172728 | 03/04/2026 | | | Food Costs | -90.42 | 90.42 | | | | | | | | | | | | |
| TOTAL | | | | | | -90.42 | 90.42 | | | 90.42 | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2235** | **03/18/2026** | **Loikits Industrial Services** | | **Truist 15579 (12/18/24)** | | **-229.18** | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| Bill | 70486 | 03/11/2026 | | | Repair & Maintenance | -229.18 | 229.18 | | | | | | | | | | | | |
| TOTAL | | | | | | -229.18 | 229.18 | | | | | | 229.18 | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2236** | **03/18/2026** | **R Kudera Construction** | | **Truist 15579 (12/18/24)** | | **-1,412.00** | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| Bill | 2535 | 03/13/2026 | | | Repair & Maintenance | -980.00 | 980.00 | | | | | | | | | | | | |
| Bill | 2537 | 03/16/2026 | | | Repair & Maintenance | -432.00 | 432.00 | | | | | | | | | | | | |
| TOTAL | | | | | | -1,412.00 | 1,412.00 | | | | | | 1,412.00 | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2237** | **03/18/2026** | **Reliant Pest Control, LLC** | | **Truist 15579 (12/18/24)** | | **-344.50** | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| Bill | 201046 | 03/01/2026 | | | Maintenance | -344.50 | 344.50 | | | | | | | | | | | | |
| TOTAL | | | | | | -344.50 | 344.50 | | | | | | 344.50 | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2238** | **03/18/2026** | **US Food Service, Inc.** | | **Truist 15579 (12/18/24)** | | **-23,784.27** | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| Bill | 2443776 | 03/01/2026 | | | Food Costs | -108.54 | 108.54 | | | | | | | | | | | | |
| Bill | 2530350 | 03/01/2026 | | | Food Costs | -10,959.92 | 10,959.92 | | | | | | | | | | | | |
| Bill | 2800225 | 03/01/2026 | | | Food Costs | -1,240.82 | 1,240.82 | | | | | | | | | | | | |
| Bill | 2801544 | 03/01/2026 | | | Food Costs | -258.99 | 258.99 | | | | | | | | | | | | |
| Bill | 2801545 | 03/01/2026 | | | Food Costs | -266.27 | 266.27 | | | | | | | | | | | | |
| Bill | 2801546 | 03/01/2026 | | | Food Costs | -1,303.72 | 1,303.72 | | | | | | | | | | | | |
| Bill | 2801547 | 03/01/2026 | | | Food Costs | -127.50 | 127.50 | | | | | | | | | | | | |
| Bill | 2801548 | 03/01/2026 | | | Icecream/Slushi | -344.16 | 344.16 | | | | | | | | | | | | |
| Bill | 2801550 | 03/01/2026 | | | Food Costs | -954.43 | 954.43 | | | | | | | | | | | | |
| Bill | 2877495 | 03/01/2026 | | | Food Costs | -59.10 | 59.10 | | | | | | | | | | | | |
| Bill | 2170798 | 03/01/2026 | | | Supplies | -675.66 | 675.66 | | | | | | | | | | | | |
| Bill | 2244784 | 03/01/2026 | | | Supplies | -95.36 | 95.36 | | | | | | | | | | | | |
| Bill | 2262665 | 03/01/2026 | | | Supplies | -664.22 | 664.22 | | | | | | | | | | | | |
| Bill | 2262672 | 03/01/2026 | | | Supplies | -31.88 | 31.88 | | | | | | | | | | | | |
| Bill | 2350543 | 03/01/2026 | | | Supplies | -32.51 | 32.51 | | | | | | | | | | | | |
| Bill | 2410486 | 03/01/2026 | | | Supplies | -73.43 | 73.43 | | | | | | | | | | | | |
| Bill | 2443772 | 03/01/2026 | | | Supplies | -459.25 | 459.25 | | | | | | | | | | | | |
| Bill | 2513244 | 03/01/2026 | | | Supplies | -155.50 | 155.50 | | | | | | | | | | | | |
| Bill | 2530343 | 03/01/2026 | | | Supplies | -1,094.60 | 1,094.60 | | | | | | | | | | | | |
| Bill | 2616892 | 03/01/2026 | | | Supplies | -48.95 | 48.95 | | | | | | | | | | | | |
| Bill | 2616893 | 03/01/2026 | | | Supplies | -118.20 | 118.20 | | | | | | | | | | | | |
| Bill | 2877481 | 03/01/2026 | | | Supplies | -41.64 | 41.64 | | | | | | | | | | | | |
| Bill | 2877482 | 03/01/2026 | | | Supplies | -51.40 | 51.40 | | | | | | | | | | | | |
| Bill | 23858 | 03/03/2026 | | | Food Costs | -117.48 | 117.48 | | | | | | | | | | | | |
| Bill | 23862 | 03/03/2026 | | | Food Costs | -419.20 | 419.20 | | | | | | | | | | | | |
| Bill | 23863 | 03/03/2026 | | | Food Costs | -67.51 | 67.51 | | | | | | | | | | | | |
| Bill | 23864 | 03/03/2026 | | | Icecream/Slushi | -399.88 | 399.88 | | | | | | | | | | | | |
| Bill | 23865 | 03/03/2026 | | | Food Costs | -672.54 | 672.54 | | | | | | | | | | | | |
| Bill | 23866 | 03/03/2026 | | | Food Costs | -813.42 | 813.42 | | | | | | | | | | | | |
| Bill | 35176 | 03/03/2026 | | | Icecream/Slushi | -132.06 | 132.06 | | | | | | | | | | | | |
| Bill | 114444 | 03/05/2026 | | | Icecream/Slushi | -363.56 | 363.56 | | | | | | | | | | | | |
| Bill | 114445 | 03/05/2026 | | | Food Costs | -394.19 | 394.19 | | | | | | | | | | | | |
| Bill | 114449 | 03/05/2026 | | | Food Costs | -221.53 | 221.53 | | | | | | | | | | | | |
| Bill | 203363 | 03/06/2026 | | | Supplies | -101.14 | 101.14 | | | | | | | | | | | | |

App.812

| Type | Num | Date | Name | Item | Account | Paid Amount | Original Amount | Transfer | Income | Dietary | Refunds | Supplies | Maintenance | Utilities | Payroll | Mktg | Insurance | Equipment | US Trustee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bill | 350675 | 03/11/2026 | | | Icecream/Slushi | -283.30 | 283.30 | | | | | | | | | | | | |
| Bill | 390127 | 03/12/2026 | | | Icecream/Slushi | -324.00 | 324.00 | | | | | | | | | | | | |
| Bill | 390134 | 03/12/2026 | | | Food Costs | -78.51 | 78.51 | | | | | | | | | | | | |
| Bill | 421025 | 03/12/2026 | | | Supplies | -188.23 | 188.23 | | | | | | | | | | | | |
| Bill | 476104 | 03/13/2026 | | | Supplies | -41.67 | 41.67 | | | | | | | | | | | | |
| TOTAL | | | | | | -23,784.27 | 23,784.27 | | | 23,784.27 | | | | | | | | | |
| **Bill Pmt -Check** | **2239** | **03/18/2026** | **Agentis Plumbing** | | **Truist 15579 (12/18/24)** | | **-1,604.00** | | | | | | | | | | | | |
| Bill | 0000178251 | 02/26/2026 | | | Repair & Maintenance | -1,604.00 | 1,604.00 | | | | | | | | | | | | |
| TOTAL | | | | | | -1,604.00 | 1,604.00 | | | | | | 1,604.00 | | | | | | |
| **Bill Pmt -Check** | **2240** | **03/18/2026** | **Cintas** | | **Truist 15579 (12/18/24)** | | **-1,003.72** | | | | | | | | | | | | |
| Bill | 4261621231 | 03/04/2026 | | | Hskp. & Laundry Supplies | -1,003.72 | 1,003.72 | | | | | | | | | | | | |
| TOTAL | | | | | | -1,003.72 | 1,003.72 | | | | | 1,003.72 | | | | | | | |
| **Bill Pmt -Check** | **2241** | **03/18/2026** | **Select Sales, Inc.** | | **Truist 15579 (12/18/24)** | | **-733.17** | | | | | | | | | | | | |
| Bill | 17683 | 03/03/2026 | | | Office Supplies | -733.17 | 733.17 | | | | | | | | | | | | |
| TOTAL | | | | | | -733.17 | 733.17 | | | | | | | | | 733.17 | | | |
| **Bill Pmt -Check** | **2242** | **03/18/2026** | **F. W. Webb Company** | | **Truist 15579 (12/18/24)** | | **-587.28** | | | | | | | | | | | | |
| Bill | 94830698 | 03/04/2026 | | | Maintenance Supplies | -587.28 | 587.28 | | | | | | | | | | | | |
| TOTAL | | | | | | -587.28 | 587.28 | | | | | 587.28 | | | | | | | |
| **Bill Pmt -Check** | **2243** | **03/18/2026** | **Matura Salon & Spa Management** | | **Truist 15579 (12/18/24)** | | **-922.00** | | | | | | | | | | | | |
| Bill | 304361 | 03/12/2026 | | | Contract Labor | -272.00 | 272.00 | | | | | | | | | | | | |
| Bill | 304632 | 03/13/2026 | | | Contract Labor | -364.00 | 364.00 | | | | | | | | | | | | |
| Bill | 304980 | 03/16/2026 | | | Contract Labor | -286.00 | 286.00 | | | | | | | | | | | | |
| TOTAL | | | | | | -922.00 | 922.00 | | | | | | | | | | | | |
| **Bill Pmt -Check** | **2244** | **03/18/2026** | **Phipany, Kris** | | **Truist 15579 (12/18/24)** | | **-150.00** | | | | | | | | | | | | |
| Bill | entertainment 3/13 | 03/13/2026 | | | Events | -150.00 | 150.00 | | | | | | | | | | | | |
| TOTAL | | | | | | -150.00 | 150.00 | | | | | | | | | 150.00 | | | |
| **Bill Pmt -Check** | **2245** | **03/18/2026** | **Woodward, Lorri** | | **Truist 15579 (12/18/24)** | | **-150.00** | | | | | | | | | | | | |
| Bill | entertainment 3/11 | 03/11/2026 | | | Events | -150.00 | 150.00 | | | | | | | | | | | | |
| TOTAL | | | | | | -150.00 | 150.00 | | | | | | | | | 150.00 | | | |
| | | | | | Total checks | (324,676.20) | | 34,000.00 | 413.90 | 26,374.69 | - | 3,954.73 | 4,489.68 | - | 240,764.56 | 5,428.17 | 8,205.00 | - | - |

App.813

**Sauc**
**Chec**
**March**

| | Dilwoth | Omni | Adequate Protection | Legal Prof Fees | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|
| TOTAL | | | | | | |
| TOTAL | | | | | | |
| TOTAL | | | | | | |
| TOTAL | | | | | | 88.50 |
| TOTAL | | | | | | 34.97 |
| TOTAL | | | | | | |
| TOTAL | | | | | | |
| TOTAL | | | | | | |
| TOTAL | | | | | | |
| TOTAL | | | | | | |

App.814

| | Dilwoth | Omni | Protection | Prof Fees | Mgmt Fee | Misc |
|---|---|---|---|---|---|---|
| TOTAL | | | | | | |
| TOTAL | | | | | | |
| TOTAL | | | | | | |
| TOTAL | | | | | | |

App.815

| Dilwoth | Omni | Protection | Prof Fees | Mgmt Fee | Misc | |
|---|---|---|---|---|---|---|
| TOTAL | | | | | | |
| TOTAL | | | | | | |
| TOTAL | | | | | | |
| TOTAL | | | | | | |
| TOTAL | | | | | | |
| TOTAL | | | | | 922.00 | |
| TOTAL | | | | | | |
| TOTAL | | | | | | |
| - | - | - | - | - | 1,045.47 | 324,676.20 |

App.816

**Saucon Valley Manor Inc.**
**Operating Statement**
**March 15 - 21, 2026**

Saucon Valley Manor Inc.

Operating Statement - Cash Collateral

March 15 - 21, 2026

| | **Cash Basis** |
|---|---|
| | **Week of Mar 15, 26** |

| | | | |
|---|---|---|---|
| **Ordinary Income/Expense** | | | |
| **Income** | | | |
| Rental Income | 95,270.16 | Ordinary Income/Expense | |
| Good Shepard rent returned | -5,266.96 | Income | |
| Reimburse-employees health | 4,853.06 | Monthly Rental | 94,856.26 |
| **Total Income** | 94,856.26 | | |
| **Expense** | | Expenses: | |
| Maintenance | | DIETARY | 23,874.69 |
| Maintenance Wages | 6,704.90 | REFUNDS | 0.00 |
| Maintenance Payroll Taxes | 566.85 | SUPPLIES | 3,954.73 |
| Maintenance Supplies | 1,947.29 | MAINTENANCE | 4,489.68 |
| Repair & Maintenance | 4,145.18 | UTILITIES | 0.00 |
| Maintenance - Other | 344.50 | PAYROLL & BENEFITS | 241,355.71 |
| **Total Maintenance** | 13,708.72 | OFFICE & MARKETING EXPENSES | 5,428.17 |
| Activities | | REAL ESTATE TAXES & INSURANCE | 0 |
| Activities Wages | 10,964.39 | EQUIPMENT | 0 |
| Activities Payroll Taxes | 1,031.03 | US TRUSTEE QUARTERLY FEES | 0.00 |
| Events | 300.00 | DILWORTH PAXSON/Committee Counsel | 0.00 |
| **Total Activities** | 12,295.42 | Omni | 0.00 |
| Dietary | | ADEQUATE PROTECTION | 0.00 |
| Dietary Wages | 25,672.71 | LEGAL/PROFESSIONAL FEES | 0.00 |
| Dietary Payroll Taxes | 2,751.37 | MANAGEMENT FEE | 0.00 |
| Food Costs | | Miscellaneous | 1,045.47 |
| Icecream/Slushi | 1,846.96 | Total expenses | 280,148.45 |
| Food Costs - Other | 18,154.09 | Net Income (Loss) | -185,292.19 |
| **Total Food Costs** | 20,001.05 | | |
| Supplies | 3,873.64 | | |
| **Total Dietary** | 52,298.77 | | |
| Housekeeping | | | |
| Housekeeping Wages | 19,875.49 | | |
| Hskg. Payroll Taxes | 2,421.58 | | |
| Hskp. & Laundry Supplies | 2,007.44 | | |
| **Total Housekeeping** | 24,304.51 | | |
| Direct Care-Nursing | | | |
| Auto & Travel | 34.97 | | |
| D.C. Wages | 134,370.92 | | |
| D.C. Payroll Taxes | 13,746.78 | | |
| **Total Direct Care-Nursing** | 148,152.67 | | |
| Marketing | | | |
| Advertising | | | |
| Advertising Referral Company | 4,395.00 | | |
| **Total Advertising** | 4,395.00 | | |
| **Total Marketing** | 4,395.00 | | |
| Administration | | | |
| Adm. Wages | 21,308.13 | | |
| Adm. Payroll Taxes | 1,941.56 | | |
| Contract Labor | 922.00 | | |
| Office Supplies | 733.17 | | |

App.817

| | Week of Mar 15, 26 |
|---|---:|
| **Payroll Service Charge** | 88.50 |
| **Total Administration** | 24,993.36 |
| **Total Expense** | 280,148.45 |
| **Net Ordinary Income** | -185,292.19 |
| **Net Income** | **-185,292.19** |

App.818

**Hearing Exhibit D-51**

**A - Cash Collateral Budget from First Interim Order Docket No. 81**
**Case No. 25-15241**

#125540038v1

App.820

4:36 PM
12/12/14
Accrual Basis

**Saucon Valley Manor**
**Profit Loss**

CASH RECEIPTS & DISBURSEMENTS          13
WEEKS FORECAST

| | Week of Jan 3, 26 | Week of Jan 10, 26 | Week of Jan 17, 26 | Week of Jan 24, 26 | Week of Jan 31, 26 | Week of Feb 7, 26 | Week of Feb 14, 26 | Week of Feb 21, 26 |
|---|---|---|---|---|---|---|---|---|
| **Cash Beginning Balance** | 3,000.00 | 8,086.50 | 26,378.61 | 44,825.73 | 62,741.62 | -2,342.49 | 18,051.94 | 38,475.42 |
| INCOME (allocated evenly per week; usual | 88,415.74 | 206,159.14 | 206,314.15 | 206,314.15 | 206,314.15 | 228,390.19 | 228,419.24 | 228,419.24 |
| **Disbursements** | -83,329.24 | -187,867.03 | -187,867.03 | -188,398.26 | -271,398.26 | -207,995.76 | -207,995.76 | -207,995.76 |
| **Ending Cash Balance** | 8,086.50 | 26,378.61 | 44,825.73 | 62,741.62 | -2,342.49 | 18,051.94 | 38,475.42 | 58,898.90 |
| | | | | | | | | |
| **Expense** | | | | | | | | |
| DIETARY | 7,591.62 | 17,716.72 | 17,716.72 | 17,716.72 | 17,716.72 | 19,614.91 | 19,614.91 | 19,614.91 |
| SUPPLIES | 2,235.12 | 5,218.29 | 5,218.29 | 5,218.29 | 5,218.29 | 5,777.31 | 5,777.31 | 5,777.31 |
| MAINTENANCE | 4,958.03 | 4,958.03 | 4,958.03 | 5,489.26 | 5,489.26 | 5,489.26 | 5,489.26 | 5,489.26 |
| UTILITIES | 4,413.82 | 10,303.43 | 10,303.43 | 10,303.43 | 10,303.43 | 11,407.27 | 11,407.27 | 11,407.27 |
| PAYROLL & BENEFITS | 51,104.08 | 119,258.09 | 119,258.09 | 119,258.09 | 119,258.09 | 132,035.82 | 132,035.82 | 132,035.82 |
| OFFICE & MARKETING EXPENSES | 2,750.16 | 6,418.65 | 6,418.65 | 6,418.65 | 6,418.65 | 7,106.61 | 7,106.61 | 7,106.61 |
| REAL ESTATE TAXES & INSURANCE | 3,669.12 | 8,563.23 | 8,563.23 | 8,563.23 | 8,563.23 | 9,480.73 | 9,480.73 | 9,480.73 |
| EQUIPMENT | 394.57 | 921.76 | 921.76 | 921.76 | 921.76 | 1,020.53 | 1,020.53 | 1,020.53 |
| MANAGEMENT FEES | 4,213.67 | 9,832.69 | 9,832.69 | 9,832.69 | 9,832.69 | 10,886.19 | 10,886.19 | 10,886.19 |
| US TRUSTEE QUARTERLY FEES | | | | | 500.00 | | | |
| DILWORTH PAXSON/Committee Counsel | | | | | 75,000.00 | | | |
| Omni | | | | | 7,500.00 | | | |
| LEGAL/PROFESSIONAL FEES | 775.95 | 1,810.55 | 1,810.55 | 1,810.55 | 1,810.55 | 2,004.52 | 2,004.52 | 2,004.52 |
| CLEANING | 1,223.10 | 2,865.59 | 2,865.59 | 2,865.59 | 2,865.59 | 3,172.61 | 3,172.61 | 3,172.61 |
| **Total Expense** | 83,329.24 | 187,867.03 | 187,867.03 | 188,398.26 | 271,398.26 | 207,995.76 | 207,995.76 | 207,995.76 |

App.821

4:36 PM
12/12/14
Accrual Basis

**Saucon Valley Manor**
**Profit Loss**

CASH RECEIPTS & DISBURSEMENTS          13
WEEKS FORECAST

|  | Week of Feb 28, 26 | Week of Mar 7, 26 | Week of Mar 14, 26 | Week of Mar 21 26 | Week of Mar 28 26 | TOTAL |
|---|---|---|---|---|---|---|
| **Cash Beginning Balance** | 58,898.90 | -3,177.62 | 17,245.86 | 37,669.34 | 61,831.59 | 3,493.84 |
| INCOME  (allocated evenly per week; usual | 228,419.24 | 228,419.24 | 228,419.24 | 228,419.24 | 228,419.24 | 2,740,842.20 |
| **Disbursements** | -290,495.76 | -207,995.76 | -207,995.76 | -204,256.99 | -286,756.99 | -2,740,348.36 |
| **Ending Cash Balance** | -3,177.62 | 17,245.86 | 37,669.34 | 61,831.59 | 3,493.84 | 3,987.68 |
|  |  |  |  |  |  |  |
| **Expense** |  |  |  |  |  |  |
| DIETARY | 19,614.91 | 19,614.91 | 19,614.91 | 15,876.14 | 15,876.14 | 227,900.24 |
| SUPPLIES | 5,777.31 | 5,777.31 | 5,777.31 | 5,777.31 | 5,777.31 | 69,326.76 |
| MAINTENANCE | 5,489.26 | 5,489.26 | 5,489.26 | 5,489.26 | 5,489.26 | 135,636.67 |
| UTILITIES | 11,407.27 | 11,407.27 | 11,407.27 | 11,407.27 | 11,407.27 | 136,885.70 |
| PAYROLL & BENEFITS | 132,035.82 | 132,035.82 | 132,035.82 | 132,035.82 | 132,035.82 | 1,584,423.00 |
| OFFICE & MARKETING EXPENSES | 7,106.61 | 7,106.61 | 7,106.61 | 7,106.61 | 7,106.61 | 85,277.64 |
| REAL ESTATE TAXES & INSURANCE | 9,480.73 | 9,480.73 | 9,480.73 | 9,480.73 | 9,480.73 | 113,767.88 |
| EQUIPMENT | 1,020.53 | 1,020.53 | 1,020.53 | 1,020.53 | 1,020.53 | 12,245.85 |
| MANAGEMENT FEES | 10,886.19 | 10,886.19 | 10,886.19 | 10,886.19 | 10,886.19 | 130,633.95 |
| US TRUSTEE QUARTERLY FEES |  |  |  |  |  | 500.00 |
| DILWORTH PAXSON/Committee Counsel | 75,000.00 |  |  |  | 75,000.00 | 225,000.00 |
| Omni | 7,500.00 |  |  |  | 7,500.00 | 22,500.00 |
| LEGAL/PROFESSIONAL FEES | 2,004.52 | 2,004.52 | 2,004.52 | 2,004.52 | 2,004.52 | 59,359.86 |
| CLEANING | 3,172.61 | 3,172.61 | 3,172.61 | 3,172.61 | 3,172.61 | 38,066.34 |
| **Total Expense** | 290,495.76 | 207,995.76 | 207,995.76 | 204,256.99 | 286,756.99 | 2,841,523.89 |

Case 5:26-cv-03491-CH   Document 5-1   Filed 06/12/26   Page 827 of 897

Case 25-15241-pmm   Doc 81   Filed 01/08/26   Entered 01/08/26 14:38:41   Desc Main Document   Page 12 of 13

App.822

4:36 PM
12/12/14
Accrual Basis

**Whitehall Manor**
**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS 13 WEEKS FORECAST | Week of Jan 3, 26 | Week of Jan 10, 26 | Week of Jan 17, 26 | Week of Jan 24, 26 | Week of Jan 31, 26 | Week of Feb 7, 26 | Week of Feb 14, 26 | Week of Feb 21, 26 |
|---|---|---|---|---|---|---|---|---|
| Cash Beginning Balance | 3,000.00 | 11,702.35 | 31,964.59 | 52,226.83 | 72,416.13 | 9,605.43 | 34,127.16 | 58,648.71 |
| INCOME | 53,998.52 | 126,001.26 | 126,001.26 | 126,001.26 | 126,001.26 | 143,081.19 | 143,081.19 | 143,081.19 |
| Disbursements | -45,296.17 | -105,739.02 | -105,739.02 | -105,811.96 | -188,811.96 | -118,559.46 | -118,559.64 | -118,559.82 |
| Ending Cash Balance | 11,702.35 | 31,964.59 | 52,226.83 | 72,416.13 | 9,605.43 | 34,127.16 | 58,648.71 | 83,170.08 |
| | | | | | | | | |
| Expense | | | | | | | | |
| DIETARY | 3,378.80 | 7,883.61 | 7,883.61 | 7,883.61 | 7,883.61 | 8,977.30 | 8,977.31 | 8,977.31 |
| SUPPLIES | 734.74 | 1,717.56 | 1,717.56 | 1,717.56 | 1,717.56 | 1,901.48 | 1,901.48 | 1,901.48 |
| MAINTENANCE | 629.39 | 1,469.72 | 1,469.72 | 1,469.72 | 1,469.72 | 1,627.15 | 1,627.15 | 1,627.15 |
| UTILITIES | 2,660.91 | 6,214.88 | 6,214.88 | 6,214.88 | 6,214.88 | 6,880.79 | 6,880.79 | 6,880.79 |
| PAYROLL & BENEFITS | 26,906.80 | 62,800.01 | 62,800.01 | 62,800.01 | 62,800.01 | 70,591.89 | 70,591.91 | 70,592.09 |
| OFFICE & MARKETING EXPENSES | 2,126.01 | 4,964.12 | 4,964.12 | 4,964.12 | 4,964.12 | 5,496.05 | 5,496.05 | 5,496.05 |
| REAL ESTATE TAXES & INSURANCE | 2,729.59 | 6,372.09 | 6,372.09 | 6,372.09 | 6,372.09 | 7,054.88 | 7,054.88 | 7,054.88 |
| EQUIPMENT | 291.72 | 680.68 | 680.68 | 753.62 | 753.62 | 753.62 | 753.62 | 753.62 |
| MANAGEMENT FEES | 2,646.70 | 6,175.75 | 6,175.75 | 6,175.75 | 6,175.75 | 7,016.30 | 7,016.45 | 7,016.45 |
| US TRUSTEE QUARTERLY FEES | | | | | 500.00 | | | |
| DILWORTH PAXSON/Committee Counsel | | | | | 75,000.00 | | | |
| Omni | | | | | 7,500.00 | | | |
| LEGAL/PROFESSIONAL FEES | 1,569.45 | 3,662.82 | 3,662.82 | 3,662.82 | 3,662.82 | 4,055.31 | 4,055.31 | 4,055.31 |
| Cleaning | 1,622.06 | 3,797.78 | 3,797.78 | 3,797.78 | 3,797.78 | 4,204.69 | 4,204.69 | 4,204.69 |
| Total Expense | 45,296.17 | 105,739.02 | 105,739.02 | 105,811.96 | 188,811.96 | 118,559.46 | 118,559.64 | 118,559.82 |

Page 1 of 2

4:36 PM
12/12/14
Accrual Basis

**Whitehall Manor**
**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS     13<br>WEEKS FORECAST | Week of Feb 28, 26 | Week of Mar 7, 26 | Week of Mar 14, 26 | Week of Mar 21 26 | Week of Mar 28 26 | TOTAL |
|---|---|---|---|---|---|---|
| Cash Beginning Balance | 83,170.08 | 25,191.45 | 51,801.82 | 78,412.01 | 105,022.20 | 49,132.38 |
| INCOME | 143,081.19 | 146,660.92 | 146,660.92 | 146,660.92 | 146,660.92 | 1,716,972.00 |
| Disbursements | -201,059.82 | -120,050.55 | -120,050.73 | -120,050.73 | -202,550.74 | -1,670,839.62 |
| Ending Cash Balance | 25,191.45 | 51,801.82 | 78,412.01 | 105,022.20 | 49,132.38 | 95,264.76 |
| | | | | | | |
| Expense | | | | | | |
| DIETARY | 8,977.31 | 9,226.33 | 9,226.31 | 9,226.31 | 9,226.31 | 107,727.73 |
| SUPPLIES | 1,901.48 | 1,901.48 | 1,901.48 | 1,901.48 | 1,901.48 | 22,816.82 |
| MAINTENANCE | 1,627.15 | 1,627.15 | 1,627.15 | 1,627.15 | 1,627.15 | 19,525.47 |
| UTILITIES | 6,880.79 | 6,880.79 | 6,880.79 | 6,880.79 | 6,880.79 | 82,566.75 |
| PAYROLL & BENEFITS | 70,592.09 | 71,654.97 | 71,655.01 | 71,655.01 | 71,655.01 | 847,094.82 |
| OFFICE & MARKETING EXPENSES | 5,496.05 | 5,496.05 | 5,496.05 | 5,496.05 | 5,496.05 | 65,950.89 |
| REAL ESTATE TAXES & INSURANCE | 7,054.88 | 7,054.88 | 7,054.88 | 7,054.88 | 7,054.89 | 84,657.00 |
| EQUIPMENT | 753.62 | 753.62 | 753.62 | 753.62 | 753.62 | 9,189.28 |
| MANAGEMENT FEES | 7,016.45 | 7,195.28 | 7,195.44 | 7,195.44 | 7,195.44 | 84,196.95 |
| US TRUSTEE QUARTERLY FEES | | | | | | |
| DILWORTH PAXSON/Committee Counse | 75,000.00 | | | | 75,000.00 | 225,000.00 |
| Omni | 7,500.00 | | | | 7,500.00 | 22,500.00 |
| LEGAL/PROFESSIONAL FEES | 4,055.31 | 4,055.31 | 4,055.31 | 4,055.31 | 4,055.31 | 48,663.21 |
| Cleaning | 4,204.69 | 4,204.69 | 4,204.69 | 4,204.69 | 4,204.69 | 50,450.70 |
| Total Expense | 201,059.82 | 120,050.55 | 120,050.73 | 120,050.73 | 202,550.74 | 1,670,339.62 |

**Hearing Exhibit D-51**

**B - Cash Collateral Budget from Second Interim Order Docket No. 189
Case No. 25-15241**

#125540038v1

App.824

4:36 PM
12/12/14
Accrual Basis

**Saucon Valley Manor**
**Profit Loss**

Case 5:26-cv-03491-CH    Document 5-1    Filed 06/12/26    Page 830 of 897

App.825

| CASH RECEIPTS & DISBURSEMENTS<br>FORECAST | 13 WEEKS | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Week of Jan 31, 26 | Week of Feb 7, 26 | Week of Feb 14, 26 | Week of Feb 21, 26 | Week of Feb 28, 26 | Week of Mar 7, 26 | Week of Mar 14, 26 | Week of Mar 21 26   W |
| Cash Beginning Balance | 306,477.00 | 251,096.03 | 362,251.37 | 392,251.37 | 201,926.71 | 282,940.83 | 375,311.17 | 406,111.17 |
| INCOME | 65,450.00 | 413,835.00 | 125,000.00 | 101,000.00 | 240,000.00 | 410,000.00 | 125,000.00 | 101,000.00 |
| Intercompany reimbursements | 15,120.00 | 0.00 | 0.00 | 0.00 | 15,120.00 | 0.00 | 0.00 | 0.00 |
| Intercompany reimbursements- employees | 15,700.00 | 4,525.84 | 0.00 | 4,525.84 | 11,500.00 | 4,525.84 | 0.00 | 4,525.84 |
| Disbursements | -151,650.97 | -307,205.50 | -95,000.00 | -295,850.50 | -185,605.88 | -322,155.50 | -94,200.00 | -298,250.50 |
| Ending Cash Balance | 251,096.03 | 362,251.37 | 392,251.37 | 201,926.71 | 282,940.83 | 375,311.17 | 406,111.17 | 213,386.51 |
| | | | | | | | | |
| Expense | | | | | | | | |
| DIETARY | 3,000.00 | 21,850.50 | 17,500.00 | 18,700.50 | 20,725.00 | 21,100.50 | 17,500.00 | 21,100.50 |
| REFUNDS | 38,250.00 | 0.00 | 0.00 | 0.00 | 38,250.00 | 0.00 | 0.00 | 0.00 |
| SUPPLIES | 6,000.00 | 11,000.00 | 0.00 | 11,000.00 | 0.00 | 11,000.00 | 0.00 | 11,000.00 |
| MAINTENANCE | 1,000.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 |
| UTILITIES | 33,700.00 | 0.00 | 23,250.00 | 0.00 | 4,000.00 | 15,000.00 | 23,250.00 | 0.00 |
| PAYROLL & BENEFITS | 2,450.97 | 252,500.00 | 0.00 | 252,500.00 | 0.00 | 252,500.00 | 0.00 | 252,500.00 |
| OFFICE & MARKETING EXPENSES | 8,150.00 | 6,150.00 | 6,150.00 | 6,150.00 | 10,750.00 | 6,150.00 | 6,150.00 | 6,150.00 |
| REAL ESTATE TAXES & INSURANCE | 44,700.00 | 8,205.00 | 0.00 | 0.00 | 64,700.00 | 8,205.00 | 0.00 | 0.00 |
| EQUIPMENT | 0.00 | 0.00 | 0.00 | 0.00 | 4,085.00 | 0.00 | 0.00 | 0.00 |
| US TRUSTEE QUARTERLY FEES | 500.00 | 0.00 | 1,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| DILWORTH PAXSON/Committee Counsel | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Omni | 7,500.00 | 0.00 | 0.00 | 0.00 | 7,500.00 | 0.00 | 0.00 | 0.00 |
| ADEQUATE PROTECTION | 0.00 | 0.00 | 35,000.00 | 0.00 | 0.00 | 0.00 | 35,000.00 | 0.00 |
| LEGAL/PROFESSIONAL FEES | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 7,500.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| MANAGEMENT FEE | 0.00 | 0.00 | 0.00 | 0.00 | 21,995.88 | 0.00 | 0.00 | 0.00 |
| MISCELLANEOUS | 4,400.00 | 2,000.00 | 6,600.00 | 2,000.00 | 2,600.00 | 2,700.00 | 6,800.00 | 2,000.00 |
| Total Expense | 151,650.97 | 307,205.50 | 95,000.00 | 295,850.50 | 185,605.88 | 322,155.50 | 94,200.00 | 298,250.50 |

4:36 PM
12/12/14
Accrual Basis

Saucon Valley Manor
Profit Loss

| CASH RECEIPTS & DISBURSEMENTS FORECAST | 13 WEEKS | | | | | |
|---|---|---|---|---|---|---|
| | Week of Mar 28 26 | Week of Apr 4 26 | Week of Apr 11 26 | Week of Apr 18 26 | Week of Apr 25 26 | TOTAL |
| Cash Beginning Balance | 213,386.51 | 295,296.51 | 384,816.01 | 456,166.01 | 227,590.51 | 230,500.51 |
| INCOME | 244,000.00 | 410,000.00 | 125,000.00 | 100,000.00 | 245,000.00 | 2,705,285.00 |
| Intercompany reimbursements | 15,120.00 | 0.00 | 0.00 | 0.00 | 15,120.00 | 60,480.00 |
| Intercompany reimbursements- employees | 11,500.00 | 4,525.00 | 0.00 | 4,525.00 | 11,500.00 | 77,353.36 |
| Disbursements | -188,710.00 | -325,005.50 | -53,650.00 | -333,100.50 | -268,710.00 | -2,919,094.85 |
| Ending Cash Balance | 295,296.51 | 384,816.01 | 456,166.01 | 227,590.51 | 230,500.51 | 154,524.02 |
| | | | | | | |
| Expense | | | | | | |
| DIETARY | 18,325.00 | 18,700.50 | 17,500.00 | 21,100.50 | 18,325.00 | 235,428.00 |
| REFUNDS | 38,250.00 | 0.00 | 0.00 | 0.00 | 35,000.00 | 149,750.00 |
| SUPPLIES | 0.00 | 11,000.00 | 0.00 | 11,000.00 | 0.00 | 72,000.00 |
| MAINTENANCE | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 43,000.00 |
| UTILITIES | 14,000.00 | 18,000.00 | 20,250.00 | 0.00 | 24,000.00 | 175,450.00 |
| PAYROLL & BENEFITS | 0.00 | 252,500.00 | 0.00 | 252,500.00 | 0.00 | 1,517,450.97 |
| OFFICE & MARKETING EXPENSES | 11,750.00 | 6,000.00 | 6,000.00 | 6,000.00 | 10,600.00 | 96,150.00 |
| REAL ESTATE TAXES & INSURANCE | 64,700.00 | 8,205.00 | 0.00 | 0.00 | 64,700.00 | 263,415.00 |
| EQUIPMENT | 4,085.00 | 0.00 | 0.00 | 0.00 | 4,085.00 | 12,255.00 |
| US TRUSTEE QUARTERLY FEES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,500.00 |
| DILWORTH PAXSON/Committee Counsel | 0.00 | 0.00 | 0.00 | 0.00 | 75,000.00 | 75,000.00 |
| Omni | 7,500.00 | 0.00 | 0.00 | 0.00 | 7,500.00 | 30,000.00 |
| ADEQUATE PROTECTION | 0.00 | 0.00 | 0.00 | 35,000.00 | 0.00 | 105,000.00 |
| LEGAL/PROFESSIONAL FEES | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 31,500.00 |
| MANAGEMENT FEE | 22,000.00 | 0.00 | 0.00 | 0.00 | 22,000.00 | 65,995.88 |
| MISCELLANEOUS | 2,600.00 | 5,100.00 | 4,400.00 | 2,000.00 | 2,000.00 | 45,200.00 |
| Total Expense | 188,710.00 | 325,005.50 | 53,650.00 | 333,100.50 | 268,710.00 | 2,919,094.85 |

App.826

Page 2 of 2

4:36 PM
12/12/14
Accrual Basis

Case 25-15241-pmm    Doc 189    Filed 02/05/26    Entered 02/05/26 12:27:06    Desc Main
Whitehall Manor
Document      Page 11 of 12

**CASH RECEIPTS & DISBURSEMENTS FORECAST** 13 WEEKS

| | Week of Jan 31, 26 | Week of Feb 7, 26 | Week of Feb 14, 26 | Week of Feb 21, 26 | Week of Feb 28, 26 | Week of Mar 7, 26 | Week of Mar 14, 26 | Week of Mar 21 26 W |
|---|---|---|---|---|---|---|---|---|
| Cash Beginning Balance | 192,483.00 | 226,172.27 | 255,094.27 | 300,144.27 | 156,644.27 | 244,194.97 | 278,494.97 | 320,644.97 |
| INCOME | 126,001.26 | 199,872.00 | 137,000.00 | 44,000.00 | 204,500.00 | 204,500.00 | 137,000.00 | 44,000.00 |
| Intercompany reimbursements | 20,324.78 | 0.00 | 0.00 | 0.00 | 6,850.00 | 0.00 | 0.00 | 0.00 |
| Intercompany reimbursements- employees | 6,300.00 | 6,300.00 | 0.00 | 6,300.00 | 0.00 | 6,300.00 | 0.00 | 6,300.00 |
| Disbursements | -118,936.77 | -177,250.00 | -91,950.00 | -193,800.00 | -123,799.30 | -176,500.00 | -94,850.00 | -190,500.00 |
| Ending Cash Balance | 226,172.27 | 255,094.27 | 300,144.27 | 156,644.27 | 244,194.97 | 278,494.97 | 320,644.97 | 180,444.97 |
| | | | | | | | | |
| Expense | | | | | | | | |
| DIETARY | 12,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 |
| SUPPLIES | 0.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 |
| REFUNDS | 17,000.00 | 0.00 | 0.00 | 0.00 | 12,000.00 | 0.00 | 0.00 | 0.00 |
| MAINTENANCE | 1,000.00 | 0.00 | 0.00 | 0.00 | 4,000.00 | 0.00 | 0.00 | 0.00 |
| UTILITIES | 1,500.00 | 0.00 | 16,300.00 | 15,500.00 | 2,800.00 | 0.00 | 17,800.00 | 14,000.00 |
| PAYROLL & BENEFITS | 846.77 | 146,000.00 | 0.00 | 0.00 | 146,000.00 | 0.00 | 146,000.00 | 0.00 | 146,000.00 |
| OFFICE & MARKETING EXPENSES | 6,500.00 | 5,750.00 | 5,750.00 | 5,750.00 | 5,750.00 | 5,000.00 | 7,000.00 | 5,000.00 |
| REAL ESTATE TAXES & INSURANCE | 49,700.00 | 0.00 | 6,600.00 | 0.00 | 40,500.00 | 0.00 | 6,600.00 | 0.00 |
| EQUIPMENT | 3,015.00 | 0.00 | 0.00 | 0.00 | 3,015.00 | 0.00 | 0.00 | 0.00 |
| US TRUSTEE QUARTERLY FEES | 500.00 | 0.00 | 1,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| DILWORTH PAXSON/Committee Counsel | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Omni | 7,500.00 | 0.00 | 0.00 | 0.00 | 7,500.00 | 0.00 | 0.00 | 0.00 |
| ADEQUATE PROTECTION | 0.00 | 0.00 | 35,000.00 | 0.00 | 0.00 | 0.00 | 35,000.00 | 0.00 |
| LEGAL/PROFESSIONAL FEES | 5,000.00 | 2,500.00 | 2,500.00 | 2,500.00 | 10,000.00 | 2,500.00 | 2,500.00 | 2,500.00 |
| MANAGEMENT FEE | 0.00 | 0.00 | 0.00 | 0.00 | 14,634.30 | 0.00 | 0.00 | 0.00 |
| Miscellaneous | 14,375.00 | 4,500.00 | 6,300.00 | 5,550.00 | 5,100.00 | 4,500.00 | 7,450.00 | 4,500.00 |
| Total Expense | 118,936.77 | 177,250.00 | 91,950.00 | 193,800.00 | 123,799.30 | 176,500.00 | 94,850.00 | 190,500.00 |

App.827

Whitehall Manor

4:36 PM
12/12/14
Accrual Basis

| CASH RECEIPTS & DISBURSEMENTS FORECAST | 13 WEEKS | | | | | |
|---|---|---|---|---|---|---|
| | Week of Mar 28 26 | Week of Apr 4 26 | Week of Apr 11 26 | Week of Apr 18 26 | Week of Apr 25 26 | TOTAL |
| Cash Beginning Balance | 180,444.97 | 260,644.10 | 294,944.10 | 374,094.10 | 198,894.10 | 219,579.10 |
| INCOME | 204,500.00 | 204,500.00 | 137,000.00 | 44,000.00 | 204,500.00 | 1,733,375.56 |
| Intercompany reimbursements | 6,850.00 | 0.00 | 0.00 | 0.00 | 6,850.00 | 40,874.78 |
| Intercompany reimbursements- employees | 0.00 | 6,300.00 | 0.00 | 6,300.00 | 0.00 | 44,100.00 |
| Disbursements | -131,150.87 | -176,500.00 | -57,850.00 | -225,500.00 | -190,665.00 | -1,949,251.94 |
| Ending Cash Balance | 260,644.10 | 294,944.10 | 374,094.10 | 198,894.10 | 219,579.10 | 88,677.50 |
| | | | | | | |
| Expense | | | | | | |
| DIETARY | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 192,000.00 |
| SUPPLIES | 12,065.60 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 50,565.60 |
| REFUNDS | 12,000.00 | 0.00 | 0.00 | 0.00 | 12,000.00 | 53,000.00 |
| MAINTENANCE | 4,000.00 | 0.00 | 0.00 | 0.00 | 4,000.00 | 13,000.00 |
| UTILITIES | 9,720.27 | 0.00 | 17,800.00 | 14,000.00 | 2,800.00 | 112,220.27 |
| PAYROLL & BENEFITS | 0.00 | 146,000.00 | 0.00 | 146,000.00 | 0.00 | 876,846.77 |
| OFFICE & MARKETING EXPENSES | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 71,500.00 |
| REAL ESTATE TAXES & INSURANCE | 40,500.00 | 0.00 | 6,600.00 | 0.00 | 40,500.00 | 191,000.00 |
| EQUIPMENT | 3,015.00 | 0.00 | 0.00 | 0.00 | 3,015.00 | 12,060.00 |
| US TRUSTEE QUARTERLY FEES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,500.00 |
| DILWORTH PAXSON/Committee Counsel | 0.00 | 0.00 | 0.00 | 0.00 | 75,000.00 | 75,000.00 |
| Omni | 7,500.00 | 0.00 | 0.00 | 0.00 | 7,500.00 | 30,000.00 |
| ADEQUATE PROTECTION | 0.00 | 0.00 | 0.00 | 35,000.00 | 0.00 | 105,000.00 |
| LEGAL/PROFESSIONAL FEES | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 42,500.00 |
| MANAGEMENT FEE | 14,750.00 | 0.00 | 0.00 | 0.00 | 14,750.00 | 44,134.30 |
| Miscellaneous | 5,100.00 | 4,500.00 | 7,450.00 | 4,500.00 | 5,100.00 | 78,925.00 |
| Total Expense | 131,150.87 | 176,500.00 | 57,850.00 | 225,500.00 | 190,665.00 | 1,949,251.94 |

App.828

**Hearing Exhibit D-51**

**C - Cash Collateral Budget from Third Interim Order Docket No. 246
Case No. 25-15241**

#125540038v1

App.829

4:36 PM
12/12/14
Accrual Basis

**Saucon Valley Manor**
**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS 13 WEEKS FORECAST | Week of Feb 28, 26 | Week of Mar 7, 26 | Week of Mar 14, 26 | Week of Mar 21 26 | Week of Mar 28 26 | Week of Apr 4 26 | Week of Apr 11 26 | Week of Apr 18 26 |
|---|---|---|---|---|---|---|---|---|
| Cash Beginning Balance | 505,228.65 | 582,242.77 | 667,413.11 | 716,713.11 | 491,788.45 | 585,098.45 | 667,267.95 | 756,967.95 |
| INCOME | 240,000.00 | 410,000.00 | 150,000.00 | 76,000.00 | 244,000.00 | 410,000.00 | 150,000.00 | 75,000.00 |
| Intercompany reimbursements | 15,120.00 | 0.00 | 0.00 | 0.00 | 15,120.00 | 0.00 | 0.00 | 0.00 |
| Intercompany reimbursements- employees | 11,500.00 | 325.84 | 0.00 | 325.84 | 28,300.00 | 325.00 | 0.00 | 325.00 |
| Disbursements | 189,605.88 | 325,155.50 | 100,700.00 | 301,250.50 | 194,110.00 | 328,155.50 | 60,300.00 | 338,650.50 |
| Ending Cash Balance | 582,242.77 | 667,413.11 | 716,713.11 | 491,788.45 | 585,098.45 ### | 667,267.95 | 756,967.95 | 493,642.45 |
| | | | | | | | | |
| Expense | | | | | | | | |
| DIETARY | 20,725.00 | 21,100.50 | 17,500.00 | 21,100.50 | 18,325.00 | 18,700.50 | 17,500.00 | 21,100.50 |
| REFUNDS | 38,250.00 | 0.00 | 0.00 | 0.00 | 38,250.00 | 0.00 | 0.00 | 0.00 |
| SUPPLIES | 0.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 |
| MAINTENANCE | 3,500.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 |
| UTILITIES | 4,000.00 | 15,000.00 | 23,250.00 | 0.00 | 14,000.00 | 18,000.00 | 20,250.00 | 0.00 |
| PAYROLL & BENEFITS | 0.00 | 260,000.00 | 0.00 | 260,000.00 | 0.00 | 260,000.00 | 0.00 | 260,000.00 |
| OFFICE & MARKETING EXPENSES | 10,750.00 | 6,650.00 | 6,650.00 | 6,650.00 | 9,650.00 | 6,650.00 | 6,650.00 | 6,650.00 |
| REAL ESTATE TAXES & INSURANCE | 64,700.00 | 8,205.00 | 0.00 | 0.00 | 66,200.00 | 8,205.00 | 0.00 | 0.00 |
| EQUIPMENT | 4,085.00 | 0.00 | 0.00 | 0.00 | 4,085.00 | 0.00 | 0.00 | 0.00 |
| US TRUSTEE QUARTERLY FEES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| DILWORTH PAXSON/Committee Counsel | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Omni | 7,500.00 | 0.00 | 0.00 | 0.00 | 7,500.00 | 0.00 | 0.00 | 0.00 |
| ADEQUATE PROTECTION | 0.00 | 0.00 | 35,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 35,000.00 |
| LEGAL/PROFESSIONAL FEES | 7,500.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| MANAGEMENT FEE | 21,995.88 | 0.00 | 0.00 | 0.00 | 22,000.00 | 0.00 | 0.00 | 0.00 |
| MISCELLANEOUS | 6,600.00 | 2,700.00 | 6,800.00 | 2,000.00 | 2,600.00 | 5,100.00 | 4,400.00 | 4,400.00 |
| Total Expense | 189,605.88 | 325,155.50 | 100,700.00 | 301,250.50 | 194,110.00 | 328,155.50 | 60,300.00 | 338,650.50 |

App.830

Case 25-15241-pmm    Doc 246    Filed 02/26/26    Entered 02/26/26 13:46:25    Desc Main
Document      Page 11 of 13

4:36 PM
12/12/14
Accrual Basis

**Saucon Valley Manor**
**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS          13 WEEKS FORECAST | Week of Apr 25 26 | Week of May 2 26 | Week of May 9 26 | Week of May 16 26 | Week of May 23 26 | TOTAL |
|---|---|---|---|---|---|---|
| Cash Beginning Balance | 493,642.45 | 513,052.45 | 595,221.95 | 689,921.95 | 426,596.45 | 556,506.45 |
| INCOME | 245,000.00 | 410,000.00 | 151,000.00 | 75,000.00 | 244,000.00 | 2,880,000.00 |
| Intercompany reimbursements | 15,120.00 | 0.00 | 0.00 | 0.00 | 15,120.00 | 60,480.00 |
| Intercompany reimbursements- employees | 28,300.00 | 325.00 | 0.00 | 325.00 | 28,300.00 | 98,351.68 |
| Disbursements | 269,010.00 | 328,155.50 | 56,300.00 | 338,650.50 | 157,510.00 | 2,987,553.88 |
| Ending Cash Balance | 513,052.45 | 595,221.95 | 689,921.95 | 426,596.45 | 556,506.45 | 607,784.25 |
| | | | | | | |
| Expense | | | | | | |
| DIETARY | 18,325.00 | 18,700.50 | 17,500.00 | 21,100.50 | 18,325.00 | 250,003.00 |
| REFUNDS | 38,250.00 | 0.00 | 0.00 | 0.00 | 38,250.00 | 153,000.00 |
| SUPPLIES | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 66,000.00 |
| MAINTENANCE | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 51,500.00 |
| UTILITIES | 14,000.00 | 18,000.00 | 16,250.00 | 0.00 | 0.00 | 142,750.00 |
| PAYROLL & BENEFITS | 0.00 | 260,000.00 | 0.00 | 260,000.00 | 0.00 | 1,560,000.00 |
| OFFICE & MARKETING EXPENSES | 9,650.00 | 6,650.00 | 6,650.00 | 6,650.00 | 9,650.00 | 99,550.00 |
| REAL ESTATE TAXES & INSURANCE | 66,200.00 | 8,205.00 | 0.00 | 0.00 | 66,200.00 | 287,915.00 |
| EQUIPMENT | 4,085.00 | 0.00 | 0.00 | 0.00 | 4,085.00 | 16,340.00 |
| US TRUSTEE QUARTERLY FEES | 500.00 | 0.00 | 0.00 | 0.00 | 0.00 | 500.00 |
| DILWORTH PAXSON/Committee Counsel | 75,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 75,000.00 |
| Omni | 7,500.00 | 0.00 | 0.00 | 0.00 | 7,500.00 | 30,000.00 |
| ADEQUATE PROTECTION | 0.00 | 0.00 | 0.00 | 35,000.00 | 0.00 | 105,000.00 |
| LEGAL/PROFESSIONAL FEES | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 31,500.00 |
| MANAGEMENT FEE | 22,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 65,995.88 |
| MISCELLANEOUS | 2,000.00 | 5,100.00 | 4,400.00 | 4,400.00 | 2,000.00 | 52,500.00 |
| Total Expense | 269,010.00 | 328,155.50 | 56,300.00 | 338,650.50 | 157,510.00 | 2,987,553.88 |

App.831

4:36 PM
12/12/14
Accrual Basis

**Whitehall Manor**
**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS FORECAST | 13 WEEKS | Week of Feb 28, 26 | Week of Mar 7, 26 | Week of Mar 14, 26 | Week of Mar 21 26 | Week of Mar 28 26 | Week of Apr 4 26 | Week of Apr 11 26 | Week of Apr 18 26 |
|---|---|---|---|---|---|---|---|---|---|
| Cash Beginning Balance | | 156,644.27 | 242,994.97 | 241,773.97 | 288,573.97 | 146,073.97 | 254,458.97 | 258,238.97 | 345,038.97 |
| INCOME | | 204,500.00 | 179,500.00 | 137,000.00 | 44,000.00 | 209,500.00 | 184,500.00 | 142,000.00 | 44,000.00 |
| Intercompany reimbursements | | 6,850.00 | 0.00 | 0.00 | 0.00 | 6,850.00 | 0.00 | 0.00 | 0.00 |
| Intercompany reimbursements- employees | | 0.00 | 0.00 | 0.00 | 0.00 | 20,000.00 | 0.00 | 0.00 | 0.00 |
| Disbursements | | 124,999.30 | 180,721.00 | 90,200.00 | 186,500.00 | 127,965.00 | 180,720.00 | 55,200.00 | 221,500.00 |
| Ending Cash Balance | | 242,994.97 | 241,773.97 | 288,573.97 | 146,073.97 | 254,458.97 | 258,238.97 | 345,038.97 | 167,538.97 |
| | | | | | | | | | |
| Expense | | | | | | | | | |
| DIETARY | | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 |
| SUPPLIES | | 3,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 |
| REFUNDS | | 12,000.00 | 0.00 | 0.00 | 0.00 | 12,000.00 | 0.00 | 0.00 | 0.00 |
| MAINTENANCE | | 4,000.00 | 0.00 | 2,500.00 | 0.00 | 2,500.00 | 0.00 | 2,500.00 | 0.00 |
| UTILITIES | | 2,800.00 | 0.00 | 18,300.00 | 14,000.00 | 2,800.00 | 0.00 | 18,300.00 | 14,000.00 |
| PAYROLL & BENEFITS | | 0.00 | 140,000.00 | 0.00 | 140,000.00 | 7,200.00 | 140,000.00 | 0.00 | 140,000.00 |
| OFFICE & MARKETING EXPENSES | | 5,750.00 | 5,000.00 | 5,000.00 | 5,000.00 | 8,500.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| REAL ESTATE TAXES & INSURANCE | | 40,500.00 | 7,171.00 | 0.00 | 0.00 | 41,500.00 | 7,170.00 | 0.00 | 0.00 |
| EQUIPMENT | | 3,015.00 | 0.00 | 0.00 | 0.00 | 3,015.00 | 0.00 | 0.00 | 0.00 |
| US TRUSTEE QUARTERLY FEES | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| DILWORTH PAXSON/Committee Counsel | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Omni | | 7,500.00 | 0.00 | 0.00 | 0.00 | 7,500.00 | 0.00 | 0.00 | 0.00 |
| ADEQUATE PROTECTION | | 0.00 | 0.00 | 35,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 35,000.00 |
| LEGAL/PROFESSIONAL FEES | | 10,000.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 |
| MANAGEMENT FEE | | 14,634.30 | 0.00 | 0.00 | 0.00 | 14,250.00 | 0.00 | 0.00 | 0.00 |
| Miscellaneous | | 6,300.00 | 5,550.00 | 6,400.00 | 4,500.00 | 5,700.00 | 5,550.00 | 6,400.00 | 4,500.00 |
| Total Expense | | 124,999.30 | 180,721.00 | 90,200.00 | 186,500.00 | 127,965.00 | 180,720.00 | 55,200.00 | 221,500.00 |

App.832

Case 25-15241-pmm    Doc 246    Filed 02/26/26    Entered 02/26/26 13:46:25    Desc Main
Document    Page 13 of 13

4:36 PM
12/12/14
Accrual Basis

**Whitehall Manor**
**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS FORECAST | 13 WEEKS | Week of Apr 25 26 | Week of May 2 26 | Week of May 9 26 | Week of May 16 26 | Week of May 23 26 | TOTAL |
|---|---|---|---|---|---|---|---|
| Cash Beginning Balance | | 167,538.97 | 200,673.97 | 344,453.97 | 307,553.97 | 258,753.97 | 227,138.97 |
| INCOME | | 209,500.00 | 184,500.00 | 147,000.00 | 44,000.00 | 209,500.00 | 1,939,500.00 |
| Intercompany reimbursements | | 6,850.00 | 0.00 | 0.00 | 0.00 | 6,850.00 | 27,400.00 |
| Intercompany reimbursements- employees | | 20,000.00 | 0.00 | 0.00 | 0.00 | 20,000.00 | 60,000.00 |
| Disbursements | | 203,215.00 | 40,720.00 | 183,900.00 | 92,800.00 | 267,965.00 | 1,956,405.30 |
| Ending Cash Balance | | 200,673.97 | 344,453.97 | 307,553.97 | 258,753.97 | 227,138.97 | 297,633.67 |
| | | | | | | | |
| Expense | | | | | | | |
| DIETARY | | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 195,000.00 |
| SUPPLIES | | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 69,500.00 |
| REFUNDS | | 12,000.00 | 0.00 | 0.00 | 0.00 | 12,000.00 | 48,000.00 |
| MAINTENANCE | | 2,500.00 | 0.00 | 2,500.00 | 0.00 | 2,500.00 | 19,000.00 |
| UTILITIES | | 2,800.00 | 0.00 | 7,000.00 | 25,300.00 | 2,800.00 | 108,100.00 |
| PAYROLL & BENEFITS | | 7,200.00 | 0.00 | 140,000.00 | 0.00 | 147,200.00 | 861,600.00 |
| OFFICE & MARKETING EXPENSES | | 8,500.00 | 5,000.00 | 5,000.00 | 5,000.00 | 8,500.00 | 76,250.00 |
| REAL ESTATE TAXES & INSURANCE | | 41,500.00 | 7,170.00 | 0.00 | 0.00 | 41,500.00 | 186,511.00 |
| EQUIPMENT | | 3,015.00 | 0.00 | 0.00 | 0.00 | 3,015.00 | 12,060.00 |
| US TRUSTEE QUARTERLY FEES | | 500.00 | 0.00 | 0.00 | 0.00 | 0.00 | 500.00 |
| DILWORTH PAXSON/Committee Counsel | | 75,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 75,000.00 |
| Omni | | 7,500.00 | 0.00 | 0.00 | 0.00 | 7,500.00 | 30,000.00 |
| ADEQUATE PROTECTION | | 0.00 | 0.00 | 0.00 | 35,000.00 | 0.00 | 105,000.00 |
| LEGAL/PROFESSIONAL FEES | | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 40,000.00 |
| MANAGEMENT FEE | | 14,000.00 | 0.00 | 0.00 | 0.00 | 14,250.00 | 57,134.30 |
| Miscellaneous | | 5,700.00 | 5,550.00 | 6,400.00 | 4,500.00 | 5,700.00 | 72,750.00 |
| Total Expense | | 203,215.00 | 40,720.00 | 183,900.00 | 92,800.00 | 267,965.00 | 1,956,405.30 |

Page 4 of 4

App.833

**Hearing Exhibit D-51**

**D - Cash Collateral Budget from Fourth Interim Order Docket No. 53**
**Case No. 25-15245**

#125540038v1

App.834

App.835

**Saucon Valley Manor Inc.**
**Operating Statement- Projection**
Dated Noted
budgeted amounts

Cash Basis



| | 3/28/2026 | 4/4/2026 | 4/11/2026 | 4/18/2026 | 4/25/2026 | 5/2/2026 | 5/9/2026 | 5/16/2026 | 5/23/2026 | 5/30/2026 | 6/6/2026 | 6/13/2026 | 6/20/2026 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 885,000.00 | | | | | 890,000.00 | | | 647,000.00 | |
| Total Income- Resident & GS | 244,000.00 | 410,000.00 | 150,000.00 | 80,000.00 | 245,000.00 | 410,000.00 | 85,000.00 | 75,000.00 | 75,000.00 | 245,000.00 | 410,000.00 | 155,000.00 | 82,000.00 | 2,666,000.00 |
| Reimburse Food Prep/Delivery | 14,000.00 | | | | 14,000.00 | | | | | 14,000.00 | | | - | 42,000.00 |
| Reimbursement - R&M | 1,120.00 | | | | 1,120.00 | | | | | 1,120.00 | | | - | 3,360.00 |
| | 15,120.00 | - | - | - | 15,120.00 | - | - | - | - | 15,120.00 | - | - | - | 2,711,360.00 |
| Reimbursement payroll charges-others | 16,800.00 | | | | 16,800.00 | | | | 16,800.00 | | | | - | 50,400.00 |
| Reimbursement - Direct Care | 8,250.00 | | | | 8,250.00 | | | | 8,250.00 | | | | - | 24,750.00 |
| Reimbursement - Housekeeping | 3,250.00 | | | | 3,250.00 | | | | 3,250.00 | | | | - | 9,750.00 |
| Dental Insurance-Direct Care | | 5,600.00 | | 5,600.00 | | 5,600.00 | | 5,600.00 | | 5,600.00 | | 5,600.00 | - | 33,600.00 |
| Dental Insurance-Maintenance | | | | | | | | | | | | | | 0.00 |
| Dental Insurance-Activities | | | | | | | | | | | | | | 0.00 |
| Dental Insurance-Admin | | | | | | | | | | | | | | 0.00 |
| | 28,300.00 | 5,600.00 | - | 5,600.00 | 28,300.00 | 5,600.00 | - | 5,600.00 | 28,300.00 | 5,600.00 | - | 5,600.00 | - | 118,500.00 |
| | 287,420.00 | 404,400.00 | 150,000.00 | 74,400.00 | 288,420.00 | 415,600.00 | 85,000.00 | 80,600.00 | 103,300.00 | 265,720.00 | 410,000.00 | 160,600.00 | 82,000.00 | 2,829,860.00 |
| **Dietary** | | | | | | | | | | | | | | |
| Activites Food | | | | | | | | | | | | | | 0.00 |
| Icecream/Slushi | - | | | | | | | | | | | | | 0.00 |
| Food Costs - Other | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 260,000.00 |
| Supplies | | | | | | | | | | | | | | 0.00 |
| **Total Dietary** | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 260,000.00 |
| **Refunds** | 25,000.00 | | | | 20,000.00 | | | | 25,000.00 | | | | - | 70,000.00 |
| | | | | | | | | | | | | | | 0.00 |
| | | | | | | | | | | | | | | 0.00 |
| **Supplies** | | | | | | | | | | | | | | 0.00 |
| Hskp. & Laundry Supplies | | | | | | | | | | | | | | 0.00 |
| Medical Supplies | | | | | | | | | | | | | | 0.00 |
| Activities Supplies | | | | | | | | | | | | | | 0.00 |
| Maintenance Supplies | | | | | | | | | | | | | | 0.00 |
| Supplies | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 78,000.00 |
| | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 78,000.00 |
| **Maintenance** | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 78,000.00 |
| **Utilities** | | | | | | | | | | | | | | - |
| Cable TV | - | | 6,250.00 | | | 6,250.00 | | | | | 6,250.00 | | | 18,750.00 |
| Electric | - | 15,000.00 | | | 15,000.00 | | | | | | 16,500.00 | | | 46,500.00 |
| Gas | | | 15,000.00 | | | | 10,000.00 | | | | 10,000.00 | | | 35,000.00 |
| Sanitation | | 3,000.00 | | | | 3,000.00 | | | | | 3,000.00 | | | 9,000.00 |
| Water/Sewer | | | | | 30,000.00 | | | | | | | | | 30,000.00 |
| Telephone | 4,000.00 | | | 4,000.00 | | | | 3,500.00 | | | | 3,500.00 | | 15,000.00 |
| | 4,000.00 | 18,000.00 | 21,250.00 | 4,000.00 | 30,000.00 | 18,000.00 | 16,250.00 | 3,500.00 | 0.00 | 3,000.00 | 32,750.00 | 3,500.00 | 0.00 | 154,250.00 |

Page 1 of 3

Case 25-15245-pmm    Doc 53    Filed 03/30/26    Entered 03/30/26 08:28:47    Desc Main Document    Page 10 of 13

Page 2 of 3

| | 3/28/2026 | 4/4/2026 | 4/11/2026 | 4/18/2026 | 4/25/2026 | 5/2/2026 | 5/9/2026 | 5/16/2026 | 5/23/2026 | 5/30/2026 | 6/6/2026 | 6/13/2026 | 6/20/2026 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Payroll & Benefits** | | | | | | | | | | | | | | |
| Total payroll & benefits | | 242,000.00 | | 242,000.00 | | 242,000.00 | | 242,000.00 | | 242,000.00 | | 242,000.00 | | 1,452,000.00 |
| Interco payroll charges | | | | | 10,000.00 | | | | | 10,000.00 | | | | 20,000.00 |
| | 0.00 | 242,000.00 | | 242,000.00 | 10,000.00 | 242,000.00 | 0.00 | 242,000.00 | 0.00 | 252,000.00 | 0.00 | 242,000.00 | 0.00 | 1,472,000.00 |
| **Office & Marketing** | | | | | | | | | | | | | | |
| Office Supplies | 1,000.00 | | | | 1,000.00 | | | | 1,000.00 | | | | | 3,000.00 |
| Advertising Referral Company | | 6,000.00 | 6,000.00 | 6,000.00 | | 6,000.00 | 6,000.00 | 6,000.00 | | 6,000.00 | 6,000.00 | 6,000.00 | | 54,000.00 |
| Advertising - Other | 2,500.00 | | | | 2,500.00 | | | | 2,500.00 | | | 500.00 | 2,500.00 | 10,500.00 |
| Events | 6,150.00 | 650.00 | 650.00 | 650.00 | 6,150.00 | 650.00 | 650.00 | 650.00 | 6,150.00 | 650.00 | 650.00 | | 7,150.00 | 30,800.00 |
| | 9,650.00 | 6,650.00 | 6,650.00 | 6,650.00 | 9,650.00 | 6,650.00 | 6,650.00 | 6,650.00 | 9,650.00 | 6,650.00 | 6,650.00 | 6,500.00 | 9,650.00 | 98,300.00 |
| **Real Estate Taxes & Insurance** | | | | | | | | | | | | | | |
| Property taxes | 5,000.00 | 16,000.00 | | | | | | | 5,000.00 | 16,000.00 | | | | 42,000.00 |
| Insurance - Auto | - | | | | | | | | | | | | | 0.00 |
| Liability Insurance | 22,500.00 | 16,000.00 | | | 6,500.00 | 16,000.00 | | | 6,500.00 | | 16,000.00 | | | 83,500.00 |
| Health & dental Insurance | 35,000.00 | | | | 35,000.00 | | | | 35,000.00 | | | | | 105,000.00 |
| W/C Insurance | 8,205.00 | | | | | 8,205.00 | | | | | 8,205.00 | | | 24,615.00 |
| | 62,500.00 | 40,205.00 | - | - | 41,500.00 | 24,205.00 | - | - | 46,500.00 | 16,000.00 | 24,205.00 | - | - | 255,115.00 |
| **Rent - Building and Equipment** | | | | | | | | | | | | | | |
| Nurse call system | | | | | | | | | | | | | | 0.00 |
| **US Trustee** | | | | 24,000.00 | 500.00 | | | | | | | | | 24,500.00 |
| **Legal/Professional Fees** | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 26,000.00 |
| **Adequate Protection** | | | | 35,000.00 | | | | 35,000.00 | | | | 35,000.00 | | 105,000.00 |
| **Dilworth** | | | | | 250,000.00 | | | | | | 50,000.00 | | | 300,000.00 |
| **Omni** | 7,500.00 | | | | 7,500.00 | | | | 7,500.00 | | | 7,500.00 | | 30,000.00 |
| **Management Fee** | | 22,000.00 | | | | 22,125.00 | | | | | 22,250.00 | | | 66,375.00 |
| **Miscellaneous** | | | | | | | | | | | | | | |
| Patient First | 600.00 | | 600.00 | | | | 600.00 | | | | 600.00 | | 600.00 | 3,000.00 |
| **Miscellaneous** | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 26,000.00 |
| Auto & Travel | | | | | | | | | | | | | | 0.00 |
| Automobile Expense | | | | | | | | | | | | | | 0.00 |
| Bank Service Charges | | | | | | | | | | | | | | 0.00 |
| Computer/Software | | | | | | | | | | | | | | 0.00 |
| Contract Labor | | | | | | | | | | | | | | 0.00 |
| Donations/Contributions | | | | | | | | | | | | | | 0.00 |
| Dues and Subscriptions | | | | | | | | | | | | | | 0.00 |
| Employee Background Checks | | | | | | | | | | | | | | 0.00 |
| Employee Training | | | | | | | | | | | | | | 0.00 |
| Licenses and Permits | | | | | | | | | | | | | | 0.00 |
| Postage and Delivery | | | | | | | | | | | | | | 0.00 |
| ECP | | | 1,800.00 | | | | 1,800.00 | | | | 1,800.00 | | | 5,400.00 |
| Payroll Service Charge | - | 2,400.00 | | 2,400.00 | | 2,400.00 | | | | | 2,400.00 | | | 9,600.00 |

App.836

| | 3/28/2026 | 4/4/2026 | 4/11/2026 | 4/18/2026 | 4/25/2026 | 5/2/2026 | 5/9/2026 | 5/16/2026 | 5/23/2026 | 5/30/2026 | 6/6/2026 | 6/13/2026 | 6/20/2026 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 700.00 | | | | 700.00 | | | | | 700.00 | | | 2,100.00 |
| Interest Expense | 2,600.00 | 5,100.00 | 4,400.00 | 4,400.00 | 2,000.00 | 5,100.00 | 4,400.00 | 2,000.00 | 2,000.00 | 2,000.00 | 7,500.00 | 2,000.00 | 2,600.00 | 46,100.00 |
| Total | 145,250.00 | 367,955.00 | 66,300.00 | 350,050.00 | 405,150.00 | 352,080.00 | 61,300.00 | 323,150.00 | 124,650.00 | 313,650.00 | 177,355.00 | 330,500.00 | 46,250.00 | 3,063,640.00 |

2,829,860.00
3,063,640.00
(233,780.00)

App.837

Case 25-15245-pmm   Doc 53   Filed 03/30/26   Entered 03/30/26 08:28:47   Desc Main
Document   Page 12 of 13

App.838

**Whitehall Manor Inc**
**Operating Statement- Projection**
Dates Noted



| budgeted amounts | 570,000.00 | | | | 585,000.00 | | | | | 585,000.00 | | | 438,750.00 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/28/2026 | 4/4/2026 | 4/11/2026 | 4/18/2026 | 4/25/2026 | 5/2/2026 | 5/9/2026 | 5/16/2026 | 5/23/2026 | 5/30/2026 | 6/6/2026 | 6/13/2026 | 6/20/2026 | Total | |
| Income | 209,500.00 | 184,500.00 | 95,500.00 | 95,500.00 | 209,500.00 | 184,500.00 | 63,667.00 | 63,667.00 | 63,666.00 | 209,500.00 | 114,625.00 | 114,625.00 | 133,500.00 | 1,742,250.00 | |
| Reimburse for payroll | 13,000.00 | | | | 13,000.00 | | | | 13,000.00 | | | | | 39,000.00 | |
| Reimburse- Food Costs | | 5,600.00 | | | | 5,600.00 | | | | 5,600.00 | | | | 16,800.00 | |
| Reimbursement Meal Preparation | | 1,250.00 | | | | 1,250.00 | | | | 1,250.00 | | | | 3,750.00 | 1,801,800.00 |
| **Dietary** | | | | | | | | | | | | | | - | |
| Activites Food | | | | | | | | | | | | | | | |
| Food/Grocery Costs - Other | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 195,000.00 | |
| Supplies | | | | | | | | | | | | | | | |
| Ice Cream Soda | | | | | | | | | | | | | | - | |
| | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 195,000.00 | |
| **Supplies** | | | | | | | | | | | | | | | |
| Activites Supplies | - | | | | | | | | | | | | | - | |
| Housekeeping/Laundry Supplies | | | | | | | | | | | | | | - | |
| Supplies | | | | | | | | | | | | | | - | |
| Medical Supplies | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 71,500.00 | |
| | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 71,500.00 | |
| Refunds | 12,000.00 | | | | 12,000.00 | | | | | 12,000.00 | | | | 36,000.00 | |
| **Maintenance** | | | | | | | | | | | | | | | |
| Repairs & maintenance | 2,500.00 | | 2,500.00 | | 2,500.00 | | 2,500.00 | | 2,500.00 | | 2,500.00 | | 2,500.00 | 17,500.00 | |
| | 2,500.00 | - | 2,500.00 | - | 2,500.00 | - | 2,500.00 | - | 2,500.00 | - | 2,500.00 | - | 2,500.00 | 17,500.00 | |
| **Utilities** | | | | | | | | | | | | | | | |
| CABLE | | | 3,300.00 | | | | 3,300.00 | | | | 3,300.00 | | | 9,900.00 | |
| Electric | 1,500.00 | 15,500.00 | | | 15,500.00 | | | | | 15,500.00 | | | 48,000.00 | |
| Gas | | | 8,000.00 | | | | 8,000.00 | | | | 8,000.00 | | | 24,000.00 | |
| Sanitation | | | 2,000.00 | | | 2,000.00 | | | 2,000.00 | | | | 6,000.00 | |
| Water/Sewer | | | 5,000.00 | | | 5,000.00 | | | | 5,000.00 | | | 15,000.00 | |
| Telephone | 2,800.00 | | | | 2,800.00 | | | | 2,800.00 | | | | 2,800.00 | 11,200.00 | |
| | 4,300.00 | 15,500.00 | 18,300.00 | - | 2,800.00 | 15,500.00 | 7,000.00 | 11,300.00 | 2,800.00 | 2,000.00 | 31,800.00 | - | 2,800.00 | 114,100.00 | |
| **Payroll and Benefits** | | | | | | | | | | | | | | - | |
| Total Payroll & Ben | | | | | | | | | | | | | | | |
| interco payroll | 6,500.00 | | | | 6,500.00 | | | | 6,500.00 | | | | | 19,500.00 | |
| Maint. Wages | | 135,000.00 | - | 135,000.00 | - | 135,000.00 | | 135,000.00 | | 135,000.00 | | 135,000.00 | | 810,000.00 | |
| Maint. Payroll taxes | | | | | | | | | | | | | | - | |
| Health Insurance | | (1,993.42) | | (1,993.42) | | (1,993.42) | | (1,993.42) | | (1,993.42) | | (1,993.42) | | (11,960.53) | |
| | 6,500.00 | 133,006.58 | | 133,006.58 | 6,500.00 | 133,006.58 | - | 133,006.58 | 6,500.00 | 133,006.58 | - | 133,006.58 | - | 817,539.47 | |
| **Office & Marketing** | | | | | | | | | | | | | | | |
| Activities Events | | | | | | | | | | | | | | - | |
| Advertising - Referral Company | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 65,000.00 | |
| Advertising - Other | 3,500.00 | | | | 3,500.00 | | | | 3,500.00 | | | | 3,500.00 | 14,000.00 | |
| | 8,500.00 | 5,000.00 | 5,000.00 | 5,000.00 | 8,500.00 | 5,000.00 | 5,000.00 | 5,000.00 | 8,500.00 | 5,000.00 | 5,000.00 | 5,000.00 | 8,500.00 | 79,000.00 | |
| **Real Estate Taxes & Insurance** | | | | | | | | | | | | | | | |
| Property Taxes | | | | | 4,700.00 | | | | 11,200.00 | | | | | 15,900.00 | |
| Insurance- reimbursed interco | | | | | | | | | | | | | | - | |
| Insurance | 20,000.00 | | | | 20,000.00 | | | | 20,000.00 | | | | | 60,000.00 | |

App.839

| | 3/28/2026 | 4/4/2026 | 4/11/2026 | 4/18/2026 | 4/25/2026 | 5/2/2026 | 5/9/2026 | 5/16/2026 | 5/23/2026 | 5/30/2026 | 6/6/2026 | 6/13/2026 | 6/20/2026 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Health & dental insurance | 12,000.00 | | | | 12,000.00 | | | | 12,000.00 | | | | | 36,000.00 |
| Workers comp | - | 7,170.00 | | | | 7,170.00 | | | | 7,170.00 | | | | 21,510.00 |
| | 32,000.00 | 7,170.00 | - | - | 36,700.00 | 7,170.00 | - | - | 43,200.00 | 7,170.00 | - | - | - | 133,410.00 |
| **Rent - Building & Equipment** | | | | | | | | | | | | | | |
| Nurse call system | 3,015.00 | | | | 3,015.00 | | | | 3,015.00 | | | | | 9,045.00 |
| **US Trustee Fees** | - | - | - | 12,000.00 | 500.00 | | | | | | | | | 12,500.00 |
| **Dilworth** | | | | | 250,000.00 | | | | | | 50,000.00 | | | 300,000.00 |
| **Omni** | 7,500.00 | - | - | - | 7,500.00 | - | - | | | 7,500.00 | | | | 22,500.00 |
| **Adequate Protection** | | | | 35,000.00 | | | | 35,000.00 | | | | | | 70,000.00 |
| **Legal/Professional Fees** | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 32,500.00 |
| **Management Fee** | | 14,250.00 | | | | 14,625.00 | | | | | 14,625.00 | | | 43,500.00 |
| Miscellaneous- Contract Labor | | | | | | | | | | | | | | |
| Total Misc | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 58,500.00 |
| Patient First | 600.00 | | 600.00 | | 600.00 | | 600.00 | | 600.00 | | 600.00 | | 600.00 | 4,200.00 |
| **Rent** | | | | | | | | | | | | | | |
| Auto/Travel | | | | | | | | | | | | | | - |
| Computer Repairs/Software | | | | | | | | | | | | | | - |
| Automobile Expense | | | | | | | | | | | | | | - |
| Background Checks | | | | | | | | | | | | | | - |
| Bank Service Charges | | | | | | | | | | | | | | - |
| Dues and Subscriptions | | | | | | | | | | | | | | - |
| Entertainment | | | | | | | | | | | | | | - |
| Fuel-gas | | | | | | | | | | | | | | - |
| Licenses and Permits | | | | | | | | | | | | | | - |
| Office Supplies | | | | | | | | | | | | | | - |
| ECP | 600.00 | 1,050.00 | | | 600.00 | 1,050.00 | | | 600.00 | 1,050.00 | | | | 4,950.00 |
| Payroll service fees | | | 1,300.00 | | | | 1,300.00 | | 1,300.00 | | 1,300.00 | | | 5,200.00 |
| Postage and Delivery | | | | | | | | | | | | | | - |
| Training Classes | | | | | | | | | | | | | | - |
| Interest | 400.00 | | | | 400.00 | | | | | 400.00 | | | | 1,200.00 |
| | 6,100.00 | 5,550.00 | 6,400.00 | 4,500.00 | 6,100.00 | 5,550.00 | 6,400.00 | 4,500.00 | 7,000.00 | 5,950.00 | 6,400.00 | 4,500.00 | 5,100.00 | 74,050.00 |
| Total expenses | 105,415.00 | 203,476.58 | 55,200.00 | 212,506.58 | 359,115.00 | 203,851.58 | 43,900.00 | 211,806.58 | 96,515.00 | 195,626.58 | 133,325.00 | 165,506.58 | 41,900.00 | 2,028,144.47 |

| | |
|---|---|
| income | 1,801,800.00 |
| exp | (2,028,144.47) |
| | (226,344.47) |

Page 2 of 2

| Monthly Census | SVM | Whitehall |
|----------------|-----|-----------|
| Dec 2025 | 197 | 120 |
| Jan | 190 | 131 |
| Feb | 194 | 132 |
| Mar | 196 | 133 |
| April | | |
| May | | |
| June | | |
| July | | |
| Aug | | |
| Sept | | |
| Oct | | |
| Nov | | |
| Dec | | |

D-52

**4:36 PM**
**12/12/14**
**Accrual Basis**

**Saucon Valley Manor**
**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS          13 WEEKS FORECAST | Week of Apr 25 26 | Week of May 2 26 | Week of May 9 26 | Week of May 16 26 | Week of May 23 26 | Week of May 30 26 | Week of June 6 26 | Week of June 13 26 | Week of June 20 26 |
|---|---|---|---|---|---|---|---|---|---|
| **Cash Beginning Balance** | 599,402.21 | 729,904.21 | 701,924.21 | 804,124.21 | 584,574.21 | 542,924.21 | 524,904.21 | 677,924.21 | 511,374.21 |
| **INCOME** | 245,000.00 | 300,000.00 | 175,000.00 | 95,000.00 | 80,000.00 | 245,000.00 | 300,000.00 | 180,000.00 | 125,000.00 |
| **Intercompany reimbursements** | 15,120.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,120.00 | 0.00 | 0.00 | 0.00 |
| **Intercompany reimbursements- employees** | 24,000.00 | 5,600.00 | 0.00 | 5,600.00 | 0.00 | 29,600.00 | 0.00 | 5,600.00 | 0.00 |
| **Disbursements** | 153,618.00 | 333,580.00 | 72,800.00 | 320,150.00 | 121,650.00 | 307,740.00 | 146,980.00 | 352,150.00 | 64,650.00 |
| **Ending Cash Balance** | 729,904.21 | 701,924.21 | 804,124.21 | 584,574.21 | 542,924.21 | 524,904.21 | 677,924.21 | 511,374.21 | 571,724.21 |
| | | | | | | | | | |
| **Expense** | | | | | | | | | |
| **DIETARY** | 20,000.00 | 22,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 |
| **REFUNDS** | 25,000.00 | 0.00 | 0.00 | 0.00 | 25,000.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **SUPPLIES** | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 |
| **MAINTENANCE** | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 |
| **UTILITIES** | 27,768.00 | 3,000.00 | 31,250.00 | 3,500.00 | 0.00 | 3,000.00 | 31,250.00 | 3,500.00 | 0.00 |
| **PAYROLL & BENEFITS** | 9,200.00 | 240,000.00 | 0.00 | 240,000.00 | 0.00 | 249,200.00 | 0.00 | 240,000.00 | 0.00 |
| **OFFICE & MARKETING EXPENSES** | 9,650.00 | 6,650.00 | 6,650.00 | 9,150.00 | 10,150.00 | 6,650.00 | 6,150.00 | 8,650.00 | 7,150.00 |
| **REAL ESTATE TAXES & INSURANCE** | 41,500.00 | 24,205.00 | 0.00 | 0.00 | 46,500.00 | 15,890.00 | 24,205.00 | 0.00 | 0.00 |
| **EQUIPMENT** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **US TRUSTEE QUARTERLY FEES** | 500.00 | 0.00 | 0.00 | 0.00 | 0.00 | 500.00 | 0.00 | 0.00 | 0.00 |
| **LEGAL/PROFESSIONAL FEES** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **ADEQUATE PROTECTION** | 0.00 | 0.00 | 0.00 | 35,000.00 | 0.00 | 0.00 | 0.00 | 35,000.00 | 0.00 |
| **DILWORTH PAXSON/Committee Counsel** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 25,000.00 | 25,000.00 | 25,000.00 |
| **Omni** | 7,500.00 | 0.00 | 0.00 | 0.00 | 7,500.00 | 0.00 | 0.00 | 7,500.00 | 0.00 |
| **MANAGEMENT FEE** | 0.00 | 22,125.00 | 0.00 | 0.00 | 0.00 | 0.00 | 22,375.00 | 0.00 | 0.00 |
| **MISCELLANEOUS** | 2,000.00 | 5,100.00 | 4,400.00 | 2,000.00 | 2,000.00 | 2,000.00 | 7,500.00 | 2,000.00 | 2,000.00 |
| **Total Expense** | 153,618.00 | 333,580.00 | 72,800.00 | 320,150.00 | 121,650.00 | 307,740.00 | 146,980.00 | 352,150.00 | 64,650.00 |

**D-55**

Page 1 of 4

App.841

**4:36 PM**
**12/12/14**
**Accrual Basis**

**Saucon Valley Manor**
**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS       13 WEEKS FORECAST | Week of June 27 26 | Week of July 4 26 | Week of July 11 26 | Week of July 18 26 | TOTAL |
|---|---|---|---|---|---|
| **Cash Beginning Balance** | 571,724.21 | 542,674.21 | 714,789.21 | 462,939.21 | 655,289.21 |
| **INCOME** | 295,000.00 | 300,000.00 | 125,000.00 | 250,000.00 | 2,715,000.00 |
| Intercompany reimbursements | 0.00 | 15,120.00 | 0.00 | 0.00 | 45,360.00 |
| Intercompany reimbursements- employees | 5,600.00 | 24,000.00 | 5,600.00 | 0.00 | 105,600.00 |
| Disbursements | 329,650.00 | 167,005.00 | 382,450.00 | 57,650.00 | 2,810,073.00 |
| **Ending Cash Balance** | 542,674.21 | 714,789.21 | 462,939.21 | 655,289.21 | 711,176.21 |
| | | | | | |
| **Expense** | | | | | |
| DIETARY | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 262,000.00 |
| REFUNDS | 20,000.00 | 0.00 | 0.00 | 0.00 | 70,000.00 |
| SUPPLIES | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 78,000.00 |
| MAINTENANCE | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 58,500.00 |
| UTILITIES | 3,000.00 | 30,750.00 | 3,500.00 | 0.00 | 140,518.00 |
| PAYROLL & BENEFITS | 240,000.00 | 9,200.00 | 240,000.00 | 0.00 | 1,467,600.00 |
| OFFICE & MARKETING EXPENSES | 9,150.00 | 6,150.00 | 9,650.00 | 150.00 | 95,950.00 |
| REAL ESTATE TAXES & INSURANCE | 0.00 | 59,205.00 | 5,000.00 | 0.00 | 216,505.00 |
| EQUIPMENT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| US TRUSTEE QUARTERLY FEES | 0.00 | 500.00 | 0.00 | 0.00 | 1,500.00 |
| LEGAL/PROFESSIONAL FEES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ADEQUATE PROTECTION | 0.00 | 0.00 | 35,000.00 | 0.00 | 105,000.00 |
| DILWORTH PAXSON/Committee Counsel | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 175,000.00 |
| Omni | 0.00 | 0.00 | 7,500.00 | 0.00 | 30,000.00 |
| MANAGEMENT FEE | 0.00 | 0.00 | 22,500.00 | 0.00 | 67,000.00 |
| MISCELLANEOUS | 2,000.00 | 5,700.00 | 3,800.00 | 2,000.00 | 42,500.00 |
| **Total Expense** | 329,650.00 | 167,005.00 | 382,450.00 | 57,650.00 | 2,810,073.00 |

App.842

**4:36 PM**
**12/12/14**
**Accrual Basis**

**Whitehall Manor**
**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS      13 WEEKS<br>FORECAST | Week of Apr 25 26 | Week of May 2 26 | Week of May 9 26 | Week of May 16 26 | Week of May 23 26 | Week of May 30 26 | Week of June 6 26 | Week of June 13 26 |
|---|---|---|---|---|---|---|---|---|
| **Cash Beginning Balance** | 419,281.76 | 539,866.76 | 536,047.18 | 582,314.18 | 457,321.60 | 444,472.60 | 462,296.03 | 541,346.03 |
| **INCOME** | 219,500.00 | 184,500.00 | 86,167.00 | 86,167.00 | 63,666.00 | 209,500.00 | 184,500.00 | 120,500.00 |
| Intercompany reimbursements | 0.00 | 6,850.00 | 0.00 | 0.00 | 0.00 | 6,850.00 | 0.00 | 0.00 |
| Intercompany reimbursements- employees | 13,000.00 | 0.00 | 0.00 | 0.00 | 13,000.00 | 0.00 | 0.00 | 0.00 |
| **Disbursements** | 111,915.00 | 195,169.58 | 39,900.00 | 211,159.58 | 89,515.00 | 198,526.58 | 105,450.00 | 218,084.58 |
| **Ending Cash Balance** | 539,866.76 | 536,047.18 | 582,314.18 | 457,321.60 | 444,472.60 | 462,296.03 | 541,346.03 | 443,761.45 |
| | | | | | | | | |
| **Expense** | | | | | | | | |
| **DIETARY** | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 |
| **SUPPLIES** | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 |
| **REFUNDS** | 12,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 12,000.00 | 0.00 | 0.00 |
| **MAINTENANCE** | 2,500.00 | 0.00 | 2,500.00 | 0.00 | 2,500.00 | 0.00 | 2,500.00 | 0.00 |
| **UTILITIES** | 9,600.00 | 15,500.00 | 7,000.00 | 18,075.00 | 2,800.00 | 2,000.00 | 31,800.00 | 0.00 |
| **PAYROLL & BENEFITS** | 6,500.00 | 128,006.58 | 0.00 | 128,006.58 | 0.00 | 134,406.58 | 0.00 | 128,006.58 |
| **OFFICE & MARKETING EXPENSES** | 8,500.00 | 5,000.00 | 5,000.00 | 6,578.00 | 13,500.00 | 10,000.00 | 5,000.00 | 6,578.00 |
| **REAL ESTATE TAXES & INSURANCE** | 36,700.00 | 7,170.00 | 0.00 | 0.00 | 41,700.00 | 7,170.00 | 0.00 | 0.00 |
| **EQUIPMENT** | 3,015.00 | 0.00 | 0.00 | 0.00 | 3,015.00 | 0.00 | 0.00 | 0.00 |
| **US TRUSTEE QUARTERLY FEES** | 500.00 | 0.00 | 0.00 | 0.00 | 0.00 | 500.00 | 0.00 | 0.00 |
| **DILWORTH PAXSON/Committee Counsel** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 25,000.00 | 25,000.00 |
| **Omni** | 7,500.00 | 0.00 | 0.00 | 0.00 | 0.00 | 7,500.00 | 0.00 | 0.00 |
| **ADEQUATE PROTECTION** | 0.00 | 0.00 | 0.00 | 35,000.00 | 0.00 | 0.00 | 0.00 | 35,000.00 |
| **LEGAL/PROFESSIONAL FEES** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **MANAGEMENT FEE** | 0.00 | 14,943.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,750.00 | 0.00 |
| **Miscellaneous** | 4,600.00 | 4,050.00 | 4,900.00 | 3,000.00 | 5,500.00 | 4,450.00 | 4,900.00 | 3,000.00 |
| **Total Expense** | 111,915.00 | 195,169.58 | 39,900.00 | 211,159.58 | 89,515.00 | 198,526.58 | 105,450.00 | 218,084.58 |

Page 3 of 4

**4:36 PM**
**12/12/14**
**Accrual Basis**

**Whitehall Manor**
**Profit Loss**

| CASH RECEIPTS & DISBURSEMENTS        13 WEEKS FORECAST | Week of June 20 26 | Week of June 27 26 | Week of July 4 26 | Week of July 11 26 | Week of July 18 26 | TOTAL |
|---|---|---|---|---|---|---|
| **Cash Beginning Balance** | 443,761.45 | 501,361.45 | 472,769.87 | 574,819.87 | 497,938.29 | 533,460.29 |
| **INCOME** | 120,500.00 | 209,500.00 | 184,500.00 | 120,500.00 | 135,000.00 | 1,924,500.00 |
| **Intercompany reimbursements** | 0.00 | 0.00 | 6,850.00 | 0.00 | 0.00 | 20,550.00 |
| **Intercompany reimbursements- employees** | 0.00 | 13,000.00 | 0.00 | 0.00 | 0.00 | 39,000.00 |
| **Disbursements** | 62,900.00 | 251,091.58 | 89,300.00 | 197,381.58 | 99,478.00 | 1,869,871.47 |
| **Ending Cash Balance** | 501,361.45 | 472,769.87 | 574,819.87 | 497,938.29 | 533,460.29 | 647,638.81 |
| | | | | | | |
| **Expense** | | | | | | |
| **DIETARY** | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 195,000.00 |
| **SUPPLIES** | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 71,500.00 |
| **REFUNDS** | 0.00 | 12,000.00 | 0.00 | 0.00 | 0.00 | 36,000.00 |
| **MAINTENANCE** | 2,500.00 | 0.00 | 2,500.00 | 0.00 | 2,500.00 | 17,500.00 |
| **UTILITIES** | 2,800.00 | 7,000.00 | 26,800.00 | 0.00 | 2,800.00 | 126,175.00 |
| **PAYROLL & BENEFITS** | 0.00 | 128,006.58 | 6,400.00 | 128,006.58 | 0.00 | 787,339.47 |
| **OFFICE & MARKETING EXPENSES** | 8,500.00 | 5,000.00 | 5,000.00 | 5,000.00 | 10,078.00 | 93,734.00 |
| **REAL ESTATE TAXES & INSURANCE** | 0.00 | 39,170.00 | 0.00 | 0.00 | 0.00 | 131,910.00 |
| **EQUIPMENT** | 0.00 | 3,015.00 | 0.00 | 0.00 | 0.00 | 9,045.00 |
| **US TRUSTEE QUARTERLY FEES** | 0.00 | 500.00 | 0.00 | 0.00 | 0.00 | 1,500.00 |
| **DILWORTH PAXSON/Committee Counsel** | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 175,000.00 |
| **Omni** | 0.00 | 7,500.00 | 0.00 | 0.00 | 0.00 | 22,500.00 |
| **ADEQUATE PROTECTION** | 0.00 | 0.00 | 0.00 | 0.00 | 35,000.00 | 105,000.00 |
| **LEGAL/PROFESSIONAL FEES** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **MANAGEMENT FEE** | 0.00 | 0.00 | 0.00 | 15,875.00 | 0.00 | 46,568.00 |
| **Miscellaneous** | 3,600.00 | 3,400.00 | 3,100.00 | 3,000.00 | 3,600.00 | 51,100.00 |
| **Total Expense** | 62,900.00 | 251,091.58 | 89,300.00 | 197,381.58 | 99,478.00 | 1,869,871.47 |

UNITED            STATES            BANKRUPTCY            COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| Whitehall Manor, Inc., et al., | : | Case No. 25-15245 (PMM) |
|  | : |  |
| *Debtors.* | : | Jointly Administered[1] |
|  | : |  |

**DECLARATION OF ABRAHAM KAPOOR ATIYEH IN SUPPORT OF: (I) DEBTORS' RESPONSE TO SECURED CREDITOR LEHIGH VALLEY 1, LLC'S FIFTH OBJECTION TO DEBTORS' CASH COLLATERAL MOTION; (II) DEBTORS' OBJECTION TO SECURED CREDITOR LEHIGH VALLEY 1, LLC'S AND RECEIVER'S JOINT MOTION TO (1) COMPEL THE MANOR DEBTORS TO ASSUME OR REJECT THEIR LEASES, (2) ESTABLISH THE CURE AMOUNT AND (3) FOR RELIEF FROM THE AUTOMATIC STAY; AND (III) DEBTORS' OBJECTION TO THE MOTION OF THE UNITED STATES TRUSTEE FOR ENTRY OF AN ORDER DISMISSING THE CASES OR IN THE ALTERNATIVE, DIRECTING THE APPOINTMENT OF A TRUSTEE**

Abraham Kapoor Atiyeh declares and states as follows:

1. I am Financial Manager for Whitehall Manor and Saucon Valley Manor and I provide services to the Debtors through Pennsylvania Venture Capital, Inc., which is the Debtors' management company. I am employed by Valley Realty Holdings, Limited. I make this affidavit on personal knowledge, the source of which is the scope of my services as they relate to the Debtors' business operations. If called to testify in this matter, I would testify to the matters set forth herein.

---

[1] The Debtors and debtors-in-possession in these Chapter 11 Cases and the last four digits of their respective taxpayer identification numbers are as follows: (i) Whitehall Trust (4229); (ii) Saucon Trust (4229); (iii) Whitehall Manor, Inc. (5606); and (iv) Saucon Valley Manor, Inc. (2894). The Debtors' mailing address is 1177 6th Street, Whitehall, PA 18052. The Memorandum Opinion and Order Granting Motion to Dismiss [the "Dismissal Order," D.I. 263, 264], entered on March 20, 2026, dismissed the cases of debtor Whitehall Trust, Case No. 25-15241-PMM, and debtor Saucon Trust, Case No. 25-15243-PMM. Prior to the Dismissal Order, the docket of Debtor Whitehall Trust, Case No. 25-15241-PMM, served as the main docket for the jointly-administered bankruptcies.

2.    Since the Petition Date, I, along with the Debtors' bookkeepers and others, have worked together to prepare the Debtors' various financial reports for submission to the Bankruptcy Court and as requested within the scope of these Bankruptcy Cases.

3.    In that capacity, I oversee the collection of receivables and payment of expenses and their scheduling within the Debtors' budget and work with the reviewing bookkeeper in the preparation of the 13-week cash collateral budgets, weekly and monthly reconciliation of actual versus budgeted income and expenses and the Debtors' Monthly Operating Reports.

4.    We work together to ensure that the final financial reporting is accurate to the best of our knowledge and submit those reports to Debtors' counsel.

5.    I also approve payment of expenses on behalf of the Debtors, cross-checking those payments with the applicable cash collateral budget and within my understanding of the limitations for payments.  I also work with others to collect accounts receivable for Whitehall Manor, Inc. and Saucon Valley Manor, Inc (the "Manors").

6.    As I testified at the April 1, 2026 hearing in the Debtors' bankruptcy cases, the Debtors are paying their obligations incurred since December 26, 2025 as they come due, including all payments to employees, vendors and service providers, with occasional minor delays due to time of receipt of invoices, but the fees and expenses of those who need Court approvals and certain related party charges are not being paid currently, per directions received from Debtors' counsel and the Bankruptcy Court relating to those expenses.  It is my understanding that amounts that were owed before December 26, 2025, amounts owed to Lehigh Valley 1 LLC ("Lehigh Valley") other than $35,000 per month, and rent to the associated Trust landlords are matters to be addressed as part of a Chapter 11 plan and are not to be paid prior to a plan being approved.

App.846

7.     Since the bankruptcy cases were filed, both Manors have operated at a profit and for all of 2026 thus far, the cash balances of the Manors have been increasing, even after sending the Good Shepherd rent money to the Dilworth Attorney Trust Account.

8.     At the April 1, 2026 hearing in the Debtors' bankruptcy cases, I was questioned about information in the Debtors' Monthly Operating Reports that showed accounts payable aging for U.S. Foods and a utility provider.  I stated my belief that those amounts were for obligations owed prior to December 26, 2025 because I knew that all amounts since that date were being paid in the normal course, but I agreed to confirm this subsequent to the hearing.

9.     Since the April 1, 2026 hearing, I and the Debtors' bookkeeper carefully reviewed invoices and payments to U.S. Foods, utility providers and others where there was an account payable listed in the Monthly Operating Reports and confirmed that the account payable amounts are included for prepetition obligations.

10.     The Debtors' payment terms with U.S. Foods are 45 days from date of invoice. Those invoices are usually paid long before the end of the payment term, many are paid within 10 days.  Within the allowed terms for payment, if a month-end occurs an account payable will be shown as then existing because the payment is not yet due.

11.     Utilities are regularly paid within terms post-petition.

12.     None of the Debtors' vendors or service providers has advised me that they are not being paid timely for invoices rendered for services or product provided after December 26, 2025.

13.     Since February, I have calendared adequate protection payments of $35,000 each from Whitehall Manor and from Saucon Valley Manor to Lehigh to ensure those payments are made.  For the month of April, due to the weekly check cycle occurring after the 13th day of the

852825_1
#125587947v2

App.847

month, the payment for April was a few days late; therefore, I arranged for that payment to be expedited via wire transfer and have moved future payments ahead to ensure they are included in the weekly check cycle preceding the 13th day of each month.

14.    I have not encountered a situation since December 26, 2025 where a bill has come due for services or products provided after the bankruptcy filing and the responsible Debtor did not have sufficient funds to pay the bill.

15.    The Debtors' expenses are not the same each week or month; therefore, I and the Debtors' bookkeeper and accountant, as needed, calculate anticipated expenses by reviewing historic expense data as well as upcoming expenses that are known, such as quarterly tax payments, pay periods and similar regular expenditures, to best estimate the week on which each expense will be paid and the amount that will be payable.

16.    Similarly, while the Debtors' income is largely derived from residency  payments received from the Debtors' residents, rent from the physical therapist [which is currently required to be paid to the Attorney trust account] and intercompany receivables, the timing of that income varies throughout each month and the amount fluctuates based on the number of residents at each facility each month, including whether any new residents arrive or current residents unfortunately relocate or pass away, entitling them and their families to refunds for prior payments.

17.    Historically, the largest portion of income is received by each Manor approximately two weeks after Residents are billed for their monthly rent (which is on a calendar month basis). The Manors do have certain receivables outstanding for Resident rental payments and are working with those Residents.  Several are in the process of selling their personal homes and will use the proceeds to fund their rent obligations at the Manors, while others are on payment plans

852825_1
#125587947v2

App.848

to cure prior rent arrears.  I and my family have elected to work with these Residents and their families regarding these receivables rather than evict these Residents.

18.    Intercompany receivables for shared services and personnel are estimated in the cash collateral budget on a monthly basis.  I provide the Debtors' bookkeeper with the underlying information about how much time each shared employee spent at each facility, the food service allocation and allocation of other expenses.  The Debtors' bookkeeper reviews the calculations and reconciles the amounts owed by each facility to another and generates invoices that are paid during the last week of the month following the month in which services were provided..  For the month of March 2026, I had budgeted the intercompany reconciliations for the period ending February 28, 2026 to be paid during the week of March 28, 2026.

19.    During my deposition on April 16, 2026, counsel for Lehigh asked me why the monthly income relating to intercompany reconciliations showed $0.00 rather than the budgeted amount.  I assured counsel that I personally had prepared the checks for those obligations and would find out why they were not reflected in the weekly financial report for that week.  Immediately following my deposition, I reached out to the person in charge of banking and was advised that the issued check was erroneously not deposited when expected This income will be reflected in the upcoming weekly and monthly reports as usual, and I have discussed with the appropriate person procedures to assure that checks are timely deposited.

20.    Because of the fluctuation in the amount and timing of income and expenses from week to week, it is difficult to predict exact income and expenses by week and unanticipated expenses also arise, including the additional maintenance and repair costs incurred in February and March due to the damage that the Manor buildings incurred from two major snow storms.

852825_1
#125587947v2

App.849

21.    Based on our best information and assumptions used for projections of income and expenses for each week, some weeks will show a budgeted cash loss, while others will show a cash gain, but overall the Debtors have been performing increasingly well financially since December 26, 2025 and have been profitable month to month.  In fact, March 2026 was the best month financially since the Debtors' bankruptcy cases were filed and will allow the Debtors to start this next 13-week period in a stronger position than originally anticipated in the prior budget that was approved by the court.  In fact, due to the increased profitability and adjustments made to account for updated timing with respect to certain anticipated expenses, both Manors are now projected to remain cash positive over the 13-week budget.

22.    With respect to bankruptcy expenses over the fifth 13-week budget, Debtors' counsel instructed me to move payments to Dilworth Paxson to later payment periods due to the anticipated schedule for their filing and approval. Payment to the Office of the United States Trustee t had been budgeted for mid-April and were unable to be made due to the requirements of invoices needed from the United States Trustee for such on-line payment. We will be revising the schedule following further communication with the Trustee's office.

23.    Based on my and the Debtors' bookkeeper's review of the Debtors' current financial position and upcoming expenses, I believe that the Debtors will continue to operate profitably and be able to have sufficient cash to pay the  extra employee pay period that occurs in May (3 bi-weekly paydays instead of the usual 2 per month) as well as upcoming quarterly expenses.

24.    I was informed by Debtors' counsel that the U.S. Trustee was questioning some payments made over the past few months to lawyers and the Debtors' bookkeeper and I reviewed the Debtors' records regarding those payments.

852825_1
#125587947v2

App.850

25.    At the beginning of the Debtors' bankruptcy cases, the Debtors made two payments to their contracted bookkeeper, not realizing that the U.S. Trustee considered her to be a professional that required court approval to be paid.  Once we learned that the bookkeeper could not be paid until approved, the bookkeeper voluntarily returned those payments to the Debtors.

26.    The payment to Dilworth Paxson that is shown in the February monthly operating report is the rent received from Good Shephard.  I was told to send that money to Dilworth Paxson for it to hold in its Trust Account, because the Court had to decide whether the Receiver or the Debtors were entitled to the funds.  The Debtors have made no other payments to Dilworth Paxson. That payment was a payment to its trust account and not to the general firm.

27.    I did pay one invoice of Hoegens & Associates, the law firm that the Debtors are using for a tax appeal.  When the court approved Hoegens & Associates' retention, I mistakenly believed that the approval also meant that the Debtors could make payments to them.

28.    The payments that were made to Lukens & Wolf for appraisal services were the retainer that the Court approved in February.  Although the payment was made as authorized, I didn't notice that the box on the Monthly Operating Reports for payment of professionals was not checked since no payments for professionals had been made in prior months.  Amended reports will be filed to fix this error.

I declare under penalty of perjury that the above statements are true and correct.

Dated: April 19, 2026                              By: ____/s/ Abraham K. Atiyeh
                                                   Abraham Kapoor Atiyeh
                                                   Financial Manager

852825_1
#125587947v2

App.851



OFFICE OF
HEALTHCARE PROGRAMS

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-8000

January 17, 2012

Ms. Sandra DeFelice
Vice President – Deputy Chief
  FHA Underwriter
M&T Realty Capital Corporation
25 S. Charles Street, 22nd Floor
Baltimore, MD 21201

Dear Ms. DeFelice:

SUBJECT:   Amendment No. 3 to Firm Commitment Issued November 22, 2011
           Project Name:  Whitehall Manor Senior Living
           Project No: 034-22084
           Mortgagor:  Whitehall Fiduciary LLC, As Trustee of Whitehall Trust

        This is to clarify  Special Condition #1 of the Firm Commitment issued on November 22, 2011, Amendment #1 issued December 19, 2011, and Amendment #2 issued January 10, 2012, for the subject property.  Based on Amendment #2 issued January 10, 2012, the Term of the Mortgage, on page 1, paragraph 1, was reduced to from 31 years 30 years.  The paragraph is changed to read, "The maturity and final payment date shall be 29 years and 11 months following the due date of the first payment to principal."

        As such, Firm Commitment is amended as follows:

        Special Condition #1 (page 5) is revised to read, "…The final maturity date shall be **2/1/2042.**"

        All other terms and agreements set forth in the Firm Commitment issued on issued on November 22, 2011, Amendment #1 issued December 19, 2011, and Amendment #2 issued January 10, 2012, remain in effect.

        If you have any questions, please contact Tarrie Eckhart, Closing Coordinator, Office of Healthcare Programs at (206) 220-6460, or by email at Tarrie.Eckhart@hud.gov.

                                Sincerely,

                                Roger A. Lewis
                                National Director, Section 232 Production
                                Office of Healthcare Programs

Cc:  Christine Chandler, M&T Realty Capital Corporation

App.852



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-8000

OFFICE OF
·HEALTHCARE PROGRAMS

January 10, 2012

Ms. Sandra DeFelice
Vice President – Deputy Chief
 FHA Underwriter
M&T Realty Capital Corporation
25 S. Charles Street, 22nd Floor
Baltimore, MD 21201

Dear Ms. DeFelice:

SUBJECT:     Amendment No. 2 to Firm Commitment Issued November 22, 2011
              Project Name:  Whitehall Manor Senior Living
              Project No:  034-22084
              Mortgagor:  Whitehall Fiduciary LLC, As Trustee of Whitehall Trust

       This is in response to your letter dated December 28, 2011, requesting an amendment to the Firm Commitment issued on November 22, 2011, and Amendment #1 issued December 19, 2011, for the subject property.  Based on the information provided in your letter, the Firm Commitment is amended as follows:

1.   The Interest Rate on page 1, paragraph 1, is reduced from 4.00% to **3.38%** as noted in Amendment #1 issued December 19, 2011.  The correct Monthly Payment of Principal and Interest on page 1, paragraph 1 is reduced from $74,123.43 to **$69,844.95 (not $68,546.93 as noted in Amendment #1)** to reflect the changes in the Interest Rate.

2.   The Term of the Mortgage, on page 1, paragraph 1, is reduced to from 31 years 30 years.  The paragraph is changed to read, "The maturity and final payment date shall be 29 years and 11 months following the due date of the first payment to principal."

       A revised form HUD-92264A is attached and reflects the changes noted above.

       All other terms and agreements set forth in the Firm Commitment issued on issued on November 22, 2011, and Amendment #1 issued December 19, 2011, remain in effect.

       If you have any questions, please contact Tarrie Eckhart, Closing Coordinator, Office of Healthcare Programs at (206) 220-6460, or by email at Tarrie.Eckhart@hud.gov.

                            Sincerely,

                            Roger A. Lewis
                            National Director, Section 232 Production
                            Office of Healthcare Programs

Attachment – form HUD 92264A
Cc:  Christine Chandler, M&T Realty Capital Corporation

# Supplement to Project Analysis

**U.S. Department of Housing and Urban Development**
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0029
(exp. 10/31/2012)

Section or Title Number __232/223(a)(7)__

☐ Valuation Trial    ☐ Conditional    ☑ Firm    **See last page for Public Reporting burden statement before completing this form**

**Privacy Act Notice:** The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

| Name of Mortgagor (Borrower) | Project Number |
|---|---|
| Whitehall Fiduciary, LLC, As Trustee of Whitehall Trust | 034-22084 |

Name of Project
**Whitehall Manor Senior Living**

Location of Project (street, city & state)
**Whitehall PA**

## Type of Borrower

☑ Private    ☑ Profit    ☐ Public    ☐ Nonprofit    ☐ State or Federal Instrumentality, etc.

☐ Management Coop.    ☐ Sales Coop.    ☐ Investor-Sponsor    ☐ Builder-Seller    ☐ Limited Distribution

## Type of Project

☐ Rental Housing    ☐ Mobile Home Court    ☐ Board and Care    ☐ New Construction    ☐ Non-Elevator
☐ Cooperative    ☐ Nursing Home    ☐ Single Rm. Occupancy    ☐ Rehabilitation    ☑ Elevator
☐ Condominium    ☐ Intermediate Care Facility    ☐ Redevelopment    ☐ Existing
☐ Capital Advance 202/811    ☐ Housing for the Elderly    ☐ Supplement Loan    ☐ _____

## I. Determination of Maximum Insurable Mortgage

| Criteria | | | | column 1 | column 2 | column 3 |
|---|---|---|---|---|---|---|
| 1. Mortgage or Loan Amount Requested in Application | | | | | | $ _____ |
| 2. Reserved | | | | | | $ 15,788,700.0 |
| 3. Amount Based on Value or Replacement Cost | | | | | | |
| a. Value (Replacement Cost) in Fee Simple | $ _____ X ___ % | | | | $ 0.00 | |
| b. (1) Value of Leased Fee | $ _____ | | | | | |
| (2) Grant/Loan funds attributable to R. C. Items | $ _____ | | | | | |
| (3) Excess Unusual Land Improvement | $ _____ | | | | | |
| (4) Cost Containment Mortgage Deduction | $ _____ | | | | | |
| (5) Total lines (1) to (4) | $ 0.00 X ___ % $ 0.00 | | | | | |
| c. Unpaid Balance of Special Assessment | $ _____ | | | | | |
| d. Total line b plus line c | | | | | $ 0.00 | |
| e. Line a minus line d | | | | | | $ 0.00 |
| 4. Amount Based on Limitations Per Family Unit | | | | | | |
| a. Number of no Bedroom Units | ___ X $ ___ $ 0.00 | | | | | |
| Number of one Bedroom Units | ___ X $ ___ $ 0.00 | | | | | |
| Number of two Bedroom Units | ___ X $ ___ $ 0.00 | | | | | |
| Number of three Bedroom Units | ___ X $ ___ $ 0.00 | | | | | |
| Number of four or more Bedroom Units | ___ X $ ___ $ 0.00 | | | | | |
| b. Cost Not Attributable to Dwelling Use | $ ___ X ___ % $ 0.00 | | | | | |
| c. Warranted Price of Land | $ ___ X ___ % $ 0.00 | | | | | |
| d. Total lines a through c | | | | | $ 0.00 | |
| e. Total Number of Spaces | ___ X $ ___ | | | | $ 0.00 | |
| f. Sum: Value of Leased Fee and Unpaid Balance of Special Assessment(s) | | | | | | $ _____ |
| g. Line d or line e, whichever is applicable, minus line f | | | | | | $ _____ |
| 5. Amount Based on Debt Service Ratio | | | | | | |
| a. Mortgage Interest Rate | | | | 3.38 % | | |
| b. Mortgage Insurance Premium Rate | | | | 0.50 % | | |
| c. Initial Curtail Rate | | | | 1.93 % | | |
| d. Sum of Above Rates | | | | | 5.81 % | |
| e. Net Income | $ 1,961,271. X 90.00 % | | | | $ 1,765,143.90 | |
| f. Annual Ground Rent $ ___ + Annual Spec. Assmt. $ ___ | | | | | $ 0.00 | |
| g. Line e minus line f | | | | | $ 1,765,143.90 | |
| h. Line g divided by line d | | | | | | $ 30,389,100.0 |
| i. Annual Tax Abatement Savings $ ___ divided by ___ % | | | | | | $ _____ |
| j. Line h plus line i | | | | | | $ 30,389,100.0 |

Previous editions are obsolete    Page 1 of 4    form HUD-92264-A (03/2010)
ref Handbooks 4480.1 & 4470.1

**I.  Determination of Maximum Insurable Mortgage** (cont.)

| Criteria | | column 1 | column 2 | column 3 |
|---|---|---|---|---|

**6. Amount Based on Estimated Cost of Rehabilitation Plus**
(i) "As Is" Value, or  (ii) Acquisition Cost,
or (iii) Existing Mortgage Indebtedness Against the Property Before Rehabilitation:

| | | column 1 | column 2 | column 3 |
|---|---|---|---|---|
| a. | Total Estimated Development Cost | $ _____ | | |
| b. | Estimated Cost of Off-Site Construction | $ _____ | | |
| c. | Sum of lines a & b | | $ 0.00 | |
| d. | Grant/Loan funds attributable to R. C. items | $ _____ | | |
| e. | Line c minus line d | | $ _____ | |
| f. | "As Is" Value of Prop. Before Rehab.  $ _____ X _____ % | $ _____ | | |
| g. | Existing Mortgage Indebtedness (Property Owned)  or Purchase Price of Property (to be Acquired) | $ _____ | | |
| h. | Line e plus line f  or line g, whichever is less | | $ _____ | |
| i. | Line h   X _____ % | | | $ _____ |

**7. Amount Based on Borrower's Total Cost of Acquisition Section 223(f)**

| | | column 1 | column 2 | column 3 |
|---|---|---|---|---|
| a. | Purchase Price of Project | $ _____ | | |
| b. | Repairs and Improvements, if any | $ _____ | | |
| c. | Other fees | $ _____ | | |
| d. | Loan Closing Charges * | $ _____ | | |
| e. | Sum of lines a through d | | $ 0.00 | |
| f. | Enter the Sum of any Grant/Loan and Reserves for Replacement and Major Movable Equipment to be purchased as an asset of the project | | $ _____ | |
| g. | Line e minus line f | | $ _____ | |
| h. | Line g   X _____ % | | | $ _____ |

**8. Amount Based on Sum of Unit Mortgage Amounts** — $ _____

**9. Amount Based on Estimated Cost to Borrower**

| | | column 1 | column 2 | column 3 |
|---|---|---|---|---|
| a. | Total Estimated Cost  (Exclusive of Site and Required Construction Off the Site) | $ _____ | | |
| b. | Purchase Price of Site | $ _____ | | |
| c. | Total Cost of Clearing Site, if any | $ _____ | | |
| d. | Expense of Relocating Occupants, if any | $ _____ | | |
| e. | Cost of Off-Site Construction, if any | $ _____ | | |
| f. | Sum of line a through line e | | $ 0.00 | |
| g. | Line f   X _____ % | | | $ _____ |

**10. Amount Based on Existing Indebtedness, Repairs, and Loan Closing Charges Section 223(f)**

| | | column 1 | column 2 | column 3 |
|---|---|---|---|---|
| a. | Total Existing Indebtedness | $ 16,432,592.0 | | |
| b. | Required Repairs | $ _____ | | |
| c. | Other Fees | $ 41,500.00 | | |
| d. | Loan Closing Charges * | $ 712,232.00 | | |
| e. | Sum of line a through line d | | $ 17,186,324 | |
| f. | Enter the Sum of any Grant/Loan and Reserves for Replacement and Major Movable Equipment on Deposit | | $ 519,902.00 | |
| g. | Line e minus line f | | $ 16,666,422.( | |
| h. | 80% of Value  $ _____ X80% | | $ _____ | |
| i. | Greater of line g or line h | | | $ 16,666,400.( |

**11. Amount Based on Deduction of Grant(s), Loan(s), Tax Credit(s) and Gift(s) for Mortgageable items:**

| | | |
|---|---|---|
| a. | 100% Project (Replacement) Cost * | $ _____ |
| b. | (1) Grants/loans/gifts | $ _____ |
| | (2) Tax Credits | $ _____ |
| | (3) Value of Leased Fee | $ _____ |
| | (4) Excess Unusual Land Improvement Cost | $ _____ |
| | (5) Cost Containment Mtge Deduction | $ _____ |
| | (6) Unpaid Balance of Special Assessment | $ _____ |
| | (7) Sum of Lines (1) through (6) | $ 0.00 |
| c. | Line a. minus line b. (7) | $ _____ |

\* Project Cost applies to Criteria 7 and 10 under Section 223 (f) and applications pursuant to 223(f).  Project Replacement Cost applies to Section 221 (d) and other Sections of the Act mortgages limited by Replacement Cost.

\* Attach format for computing loan closing charges.

**Maximum Insurable Mortgage** (Lowest of the Foregoing Criteria)  $ 15,788,700.0(

App.855

## II. Total Requirements for Settlement

### Part A

| | | | |
|---|---|---|---|
| **1. Fees Not to be Paid in Cash** | | | |
| a. BSPRA/SPRA | | $ | |
| b. Builder's Profit | | $ | |
| c. Other | | $ | |
| Total (enter in part B on line 5) | | $ | 0.00 |
| **2. Commitment, Mktg., Fees and Discounts and Escrows** | | | |
| a. Fees | GNMA | $ | |
| | Other | $ | |
| b. Discounts | Permanent Loan | $ | |
| | Construction Loan | $ | |
| c. Escrows | Debt Service Reserve (Board & Care) | $ | |
| | Other | $ | |
| Total (enter in part B on line 9) | | $ | 0.00 |
| **3. Working Capital** | | | |
| a. Working Capital | | $ | |
| b. Minimum Capital Investment (Sec. 202 & Sec. 811) | | $ | |
| c. Non-Realty Items Not Included in Mortgage | | $ | |
| Total (enter in part B on line 10) | | $ | 0.00 |

### Part B

| | | | |
|---|---|---|---|
| 1. a. Development Cost | | $ 16,656,293. | |
| b. Adjustment for Contracted Amounts in Excess of form HUD-92264 Estimates | | | |
| (1) Construction Contract | $ | | |
| (2) Architect's Contract | $ | | |
| (3) Other | $ | | |
| c. Total of lines a & b | | | $ 16,656,293. |
| 2. Land Indebtedness (or Cash Required for Land Acquisition) | | | $ |
| 3. Subtotal (lines 1c + 2) | | | $ 16,656,293. |
| 4. a. Mortgage Amount | | $ 15,788,700. | |
| b. Grant/Loan | | $ | |
| 5. Fees Not to be Paid in Cash | | $ | |
| 6. Subtotal (lines 4a + 4b + 5) | | | $ 15,788,700. |
| 7. Cash Investment Required (line 3 minus line 6) | | | $ 867,593.00 |
| 8. Initial Operating Deficit * | | | $ |
| 9. Commitment, Marketing Fees, Discounts and Escrows | | | $ |
| 10. Working Capital | | | $ |
| 11. Offsite Construction and Demolition Costs ($ + $ ) | | | $ 0.00 |
| 12. Total Estimated Cash Requirement (sum of lines 7 + 8 + 9 + 10 + 11) | | | $ 867,593.00 |
| Front Money Escrow, If Any, (subtract line 6 from line 1) | | | $ |

\* Note: for Section 223(f) cases, attach the format for computing the operating deficit.

## III. Source of Funds to Meet Cash Requirements

| Source | Funds Available |
|---|---|
| Borrower cash | $ 867,593.00 |
| | $ |
| | $ |
| | $ |
| | $ |
| **Total Available Cash for Project** | $ 867,593.00 |

## IV. Recommendations, Requirements and Remarks

☑ Recommend Approval; Subject to Conditions Stated Below, If Any
☐ Recommend Rejection for Reasons Stated Below (if more space is needed, continue on page 4).

See Narrative for Firm Conditions

Signature of the Mortgage Credit Examiner

X _____

Date 12/28/2011

Previous editions are obsolete

Patil Berry 1/10/2012

Page 3 of 4

form HUD-92264-A (03/2010)
ref Handbooks 4480.1 & 4470.1

**Remarks:**

Format to Compute Fees:

| | | |
|---|---|---|
| Mortgage Amount:  232/223(a)(7) | | $15,788,700 |
| Existing Indebtedness | $15,357,562 | |
| Prepayment Penalty | $ 1,075,029 | |
| Required Non-Critical Repairs | $ 0 | |
| Required Critical Repairs | $ 0 | |
| Replacement Reserve (Realty/Non-Realty) | $519,902 | |
| Other Fees | | |
| Legal & Organizational | $9,500 | |
| Title & Recording | $32,000 | |
| Inspection Fee | $0 | |
| Third Party Reports | | |
| Appraisal | $0 | |
| Seismic | $0 | |
| PCNA | $0 | |
| Phase I Env. | $0 | |
| | | Fees based upon MIM |
| Loan Closing Charges | | |
| Financing Fee (.504%) | $83,999 | $79,575 |
| Placement Fee (0.0%) | $0 | |
| MIP (.5%) | $83,332 | $78,944 |
| HUD Exam Fee (.30%) | $25,000 | $23,683 |
| Less Existing Reserves | $(519,902) | |
| Less Repairs Paid from Current Reserves | $16,666,422 | $16,656,293 |

Public Reporting Burden for this project analysis is estimated to average 8 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of Information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collecton displays a valid OMB control number.

This information is being collected under Public Law 101-625 which requires the Department of to implement a system for mortgage insurance for mortgages insured under Sections 207,221,223,232, or 241 of the National Housing Act. The information will be used by HUD to approve rents, property appraisals, and mortgage amounts, and to execute a firm commitment. Confidentiality to respondents is ensured if it would result in competitive harm in accord with the Freedom of Information Act (FOIA) provisions or if it could impact on the ability of the Department's mission to provide housing units under the various Sections of the Housing legislation.



OFFICE OF
HEALTHCARE PROGRAMS

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-8000

December 19, 2011

Ms. Sandra DeFelice
Vice President – Deputy Chief
  FHA Underwriter
M&T Realty Capital Corporation
25 S. Charles Street, 22nd Floor
Baltimore, MD 21201

Dear Ms. DeFelice:

SUBJECT:    Amendment No. 1 to Firm Commitment Issued November 22, 2011
             Project Name:  Whitehall Manor Senior Living
             Project No:  034-22084
             Mortgagor:  Whitehall Fiduciary LLC, As Trustee of Whitehall Trust

      This is in response to your letter dated December 16, 2011, requesting an amendment to the Firm Commitment issued on November 22, 2011, for the subject property.  Based on the information provided in your letter, the Firm Commitment is amended as follows:

1. The Interest Rate on page 1, paragraph 1 is reduced from 4.00% to **3.38%.**

2. The Monthly Payment of Principal and Interest on page 1, paragraph 1 is reduced from $74,123.43 to **$68,546.93** to reflect the changes noted above.

      A revised form HUD-92264A is attached and reflects the changes noted above.

      All other terms and agreements set forth in the Firm Commitment issued on issued on November 22, 2011, remain in effect.

      If you have any questions, please contact Tarrie Eckhart, Closing Coordinator, Office of Healthcare Programs at (206) 220-6460, or by email at Tarrie.Eckhart@hud.gov.

                   Sincerely,

                   Roger A. Lewis
                   National Director, Section 232 Development
                   Office of Healthcare Programs

Attachment – form HUD 92264A

Cc:  Christine Chandler, M&T Realty Capital Corporation

# Supplement to
# Project Analysis

**U.S. Department of Housing and Urban Development**
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0029
(exp. 10/31/2012)

Section or Title Number  232/223(a)(7)

☐ Valuation Trial    ☐ Conditional    ☑ Firm    **See last page for Public Reporting burden statement before completing this form**

**Privacy Act Notice:** The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

Name of Mortgagor (Borrower)
Whitehall Fiduciary, LLC, As Trustee of Whitehall Trust

Project Number
034-22084

Name of Project
Whitehall Manor Senior Living

Location of Project  (street, city & state)
Whitehall PA

## Type of Borrower

☑ Private    ☑ Profit    ☐ Public    ☐ Nonprofit    ☐ State or Federal Instrumentality, etc.

☐ Management Coop.    ☐ Sales Coop.    ☐ Investor-Sponsor    ☐ Builder-Seller    ☐ Limited Distribution

## Type of Project

☐ Rental Housing    ☐ Mobile Home Court    ☐ Board and Care    ☐ New Construction    ☐ Non-Elevator
☐ Cooperative    ☐ Nursing Home    ☐ Single Rm. Occupancy    ☐ Rehabilitation    ☑ Elevator
☐ Condominium    ☐ Intermediate Care Facility    ☐ Redevelopment    ☐ Existing
☐ Capital Advance  202/811    ☐ Housing for the Elderly    ☐ Supplement Loan    ☐ _____

## I. Determination of Maximum Insurable Mortgage

| Criteria | column 1 | | column 2 | column 3 |
|---|---|---|---|---|
| 1. Mortgage or Loan Amount Requested In Application | | | | $ _____ |
| 2. Reserved | | | | $ 15,788,700.0 |
| 3. Amount Based on Value or Replacement Cost | | | | |
| a. Value (Replacement Cost) in Fee Simple | $ _____ x ___ % | | $ _____ 0.00 | |
| b. (1) Value of Leased Fee | $ _____ | | | |
| (2) Grant/Loan funds attributable to R. C. items | $ _____ | | | |
| (3) Excess Unusual Land Improvement | $ _____ | | | |
| (4) Cost Containment Mortgage Deduction | $ _____ | | | |
| (5) Total lines (1) to (4) | $ _____ 0.00 x ___ % | $ _____ 0.00 | | |
| c. Unpaid Balance of Special Assessment | | $ _____ | | |
| d. Total line b plus line c | | | $ _____ 0.00 | |
| e. Line a minus line d | | | | $ _____ 0.00 |
| 4. Amount Based on Limitations Per Family Unit | | | | |
| a. Number of no Bedroom Units | ___ X $ _____ | $ _____ 0.00 | | |
| Number of one Bedroom Units | ___ X $ _____ | $ _____ 0.00 | | |
| Number of two Bedroom Units | ___ X $ _____ | $ _____ 0.00 | | |
| Number of three Bedroom Units | ___ X $ _____ | $ _____ 0.00 | | |
| Number of four or more Bedroom Units | ___ X $ _____ | $ _____ 0.00 | | |
| b. Cost Not Attributable to Dwelling Use | $ ___ X _____ % | $ _____ 0.00 | | |
| c. Warranted Price of Land | $ ___ X _____ % | $ _____ 0.00 | | |
| d. Total lines a through c | | | $ _____ 0.00 | |
| e. Total Number of Spaces | ___ X $ _____ | | $ _____ 0.00 | |
| f. Sum: Value of Leased Fee and Unpaid Balance of Special Assessment(s) | | | _____ | $ _____ |
| g. Line d or line e, whichever is applicable, minus line f | | | | $ _____ |
| 5. Amount Based on Debt Service Ratio | | | | |
| a. Mortgage Interest Rate | | 3.38 % | | |
| b. Mortgage Insurance Premium Rate | | 0.50 % | | |
| c. Initial Curtail Rate | | 1.83 % | | |
| d. Sum of Above Rates | | | 5.71 % | |
| e. Net Income | $ 1,961,271. x 90.00 % | | $ 1,765,143.90 | |
| f. Annual Ground Rent $ _____ + Annual Spec. Assmt. $ _____ | | | $ _____ 0.00 | |
| g. Line e minus line f | | | $ 1,765,143.90 | |
| h. Line g divided by line d | | | | $ 30,914,100.0 |
| i. Annual Tax Abatement  Savings $ _____ divided by _____ % | | | | $ _____ |
| j. Line h plus line i | | | | $ 30,914,100.0 |

Previous editions are obsolete

form **HUD-92264-A** (03/2010)
ref Handbooks 4480.1 & 4470.1

App.859

**I. Determination of Maximum Insurable Mortgage** (cont.)

**Criteria**

|  | | column 1 | column 2 | column 3 |
|---|---|---|---|---|

**6. Amount Based on Estimated Cost of Rehabilitation Plus**
(i) "As Is" Value, **or** (ii) Acquisition Cost,
**or** (iii) Existing Mortgage Indebtedness Against the Property Before Rehabilitation:

| | column 1 | column 2 | column 3 |
|---|---|---|---|
| a. Total Estimated Development Cost | $ _____ | | |
| b. Estimated Cost of Off-Site Construction | $ _____ | | |
| c. Sum of lines a & b | | $ 0.00 | |
| d. Grant/Loan funds attributable to R. C. items | $ _____ | | |
| e. Line c minus line d | | $ _____ | |
| f. "As Is" Value of Prop. Before Rehab.  $ _____ X _____ % | $ _____ | | |
| g. Existing Mortgage Indebtedness (Property Owned) **or** Purchase Price of Property (to be Acquired) | $ _____ | | |
| h. Line e plus line f **or** line g, whichever is less | | $ _____ | |
| i. Line h  X _____ % | | | $ _____ |

**7. Amount Based on Borrower's Total Cost of Acquisition Section 223(f)**

| | column 1 | column 2 | column 3 |
|---|---|---|---|
| a. Purchase Price of Project | $ _____ | | |
| b. Repairs and Improvements, if any | $ _____ | | |
| c. Other fees | $ _____ | | |
| d. Loan Closing Charges * | $ _____ | | |
| e. Sum of lines a through d | | $ 0.00 | |
| f. Enter the Sum of any Grant/Loan and Reserves for Replacement and Major Movable Equipment to be purchased as an asset of the project | $ _____ | | |
| g. Line e minus line f | | $ _____ | |
| h. Line g  X _____ % | | | $ _____ |

**8. Amount Based on Sum of Unit Mortgage Amounts**

| | column 3 |
|---|---|
| | $ _____ |

**9. Amount Based on Estimated Cost to Borrower**

| | column 1 | column 2 | column 3 |
|---|---|---|---|
| a. Total Estimated Cost (Exclusive of Site and Required Construction Off the Site) | $ _____ | | |
| b. Purchase Price of Site | $ _____ | | |
| c. Total Cost of Clearing Site, if any | $ _____ | | |
| d. Expense of Relocating Occupants, if any | $ _____ | | |
| e. Cost of Off-Site Construction, if any | $ _____ | | |
| f. Sum of line a through line e | | $ 0.00 | |
| g. Line f  X _____ % | | | $ _____ |

**10. Amount Based on Existing Indebtedness, Repairs, and Loan Closing Charges Section 223(f)**

| | column 1 | column 2 | column 3 |
|---|---|---|---|
| a. Total Existing Indebtedness | $ 16,432,592.0 | | |
| b. Required Repairs | $ _____ | | |
| c. Other Fees | $ 41,500.00 | | |
| d. Loan Closing Charges * | $ 712,232.00 | | |
| e. Sum of line a through line d | | $ 17,186,324 | |
| f. Enter the Sum of any Grant/Loan and Reserves for Replacement and Major Movable Equipment on Deposit | | $ 519,902.00 | |
| g. Line e minus line f | | $ 16,666,422.( | |
| h. 80% of Value  $ _____ X80% | | $ _____ | |
| i. Greater of line g or line h | | | $ 16,666,400.( |

**11. Amount Based on Deduction of Grant(s), Loan(s), Tax Credit(s) and Gift(s) for Mortgageable items:**

| | | |
|---|---|---|
| a. 100% Project (Replacement) Cost * | $ _____ | |
| b. (1) Grants/loans/gifts | $ _____ | |
| (2) Tax Credits | $ _____ | |
| (3) Value of Leased Fee | $ _____ | |
| (4) Excess Unusual Land Improvement Cost | $ _____ | |
| (5) Cost Containment Mtge Deduction | $ _____ | |
| (6) Unpaid Balance of Special Assessment | $ _____ | |
| (7) Sum of Lines (1) through (6) | | $ 0.00 |
| c. Line a. minus line b. (7) | | $ _____ |

\* Project Cost applies to Criteria 7 and 10 under Section 223 (f) and applications pursuant to 223(f). Project Replacement Cost applies to Section 221 (d) and other Sections of the Act mortgages limited by Replacement Cost.

\* Attach format for computing loan closing charges.

**Maximum Insurable Mortgage** (Lowest of the Foregoing Criteria)    $ 15,788,700.00

App.860

## II. Total Requirements for Settlement

**Part A**

### 1. Fees Not to be Paid in Cash

| | | |
|---|---|---|
| a. BSPRA/SPRA | $ | |
| b. Builder's Profit | $ | |
| c. Other | $ | |
| **Total** (enter in part B on line 5) | $ | 0.00 |

### 2. Commitment, Mktg., Fees and Discounts and Escrows

| | | | |
|---|---|---|---|
| a. Fees | GNMA | $ | |
| | Other | $ | |
| b. Discounts | Permanent Loan | $ | |
| | Construction Loan | $ | |
| c. Escrows | Debt Service Reserve (Board & Care) | $ | |
| | Other | $ | |
| **Total** (enter in part B on line 9) | | $ | 0.00 |

### 3. Working Capital

| | | |
|---|---|---|
| a. Working Capital | $ | |
| b. Minimum Capital Investment (Sec. 202 & Sec. 811) | $ | |
| c. Non-Realty Items Not Included in Mortgage | $ | |
| **Total** (enter in part B on line 10) | $ | 0.00 |

**Part B**

| | | | |
|---|---|---|---|
| 1. a. Development Cost | $ 16,656,293. | | |
| b. Adjustment for Contracted Amounts in Excess of form HUD-92264 Estimates | | | |
| (1) Construction Contract | $ | | |
| (2) Architect's Contract | $ | | |
| (3) Other | $ | | |
| c. Total of lines a & b | | $ | 16,656,293. |
| 2. Land Indebtedness (or Cash Required for Land Acquisition) | | $ | |
| 3. Subtotal (lines 1c + 2) | | $ | 16,656,293. |
| 4. a. Mortgage Amount | $ 15,788,700. | | |
| b. Grant/Loan | $ | | |
| 5. Fees Not to be Paid in Cash | $ | | |
| 6. Subtotal (lines 4a + 4b + 5) | | $ | 15,788,700. |
| 7. Cash Investment Required (line 3 minus line 6) | | $ | 867,593.00 |
| 8. Initial Operating Deficit * | | $ | |
| 9. Commitment, Marketing Fees, Discounts and Escrows | | $ | |
| 10. Working Capital | | $ | |
| 11. Offsite Construction and Demolition Costs ($ _____ + $ _____ ) | | $ | 0.00 |
| 12. Total Estimated Cash Requirement (sum of lines 7 + 8 + 9 + 10 + 11) | | $ | 867,593.00 |
| Front Money Escrow, If Any, (subtract line 6 from line 1) | | $ | |

\* **Note:** for Section 223(f) cases, attach the format for computing the operating deficit.

## III. Source of Funds to Meet Cash Requirements

| Source | Funds Available |
|---|---|
| Borrower cash | $ 867,593.00 |
| | $ |
| | $ |
| | $ |
| | $ |
| **Total Available Cash for Project** | $ 867,593.00 |

## IV. Recommendations, Requirements and Remarks

☑ Recommend Approval; Subject to Conditions Stated Below, If Any
☐ Recommend Rejection for Reasons Stated Below (if more space is needed, continue on page 4).

See Narrative for Firm Conditions

_Signature of the Mortgage Credit Examiner_

x _____

Date 12/16/2011

**Remarks:**

Format to Compute Fees:

| | | |
|---|---|---|
| Mortgage Amount:  232/223(a)(7) | | $15,788,700 |
| Existing Indebtedness | $15,357,562 | |
| Prepayment Penalty | $ 1,075,029 | |
| Required Non-Critical Repairs | $ 0 | |
| Required Critical Repairs | $ 0 | |
| Replacement Reserve (Realty/Non-Realty) | $519,902 | |

Other Fees

| | | |
|---|---|---|
| Legal & Organizational | $9,500 | |
| Title & Recording | $32,000 | |
| Inspection Fee | $0 | |

Third Party Reports

| | | |
|---|---|---|
| Appraisal | $0 | |
| Seismic | $0 | |
| PCNA | $0 | |
| Phase I Env. | $0 | |

| | | Fees based upon MIM |
|---|---|---|
| **Loan Closing Charges** | | |
| Financing Fee (.504%) | $83,999 | $79,575 |
| Placement Fee (0.0%) | $0 | |
| MIP (.5%) | $83,332 | $79,944 |
| HUD Exam Fee (.30%) | $25,000 | $23,683 |
| Less Existing Reserves | $(519,902) | |
| Less Repairs Paid from Current Reserves | $16,666,422 | $16,656,293 |

Public Reporting Burden for this project analysis is estimated to average 8 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collecton displays a valid OMB control number.

This information is being collected under Public Law 101-625 which requires the Department of to implement a system for mortgage insurance for mortgages insured under Sections 207,221,223,232, or 241 of the National Housing Act. The information will be used by HUD to approve rents, property appraisals, and mortgage amounts, and to execute a firm commitment. Confidentiality to respondents is ensured if it would result in competitive harm in accord with the Freedom of Information Act (FOIA) provisions or if it could impact on the ability of the Department's mission to provide housing units under the various Sections of the Housing legislation.



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-8000

OFFICE OF HOUSING

NOV 2 2 2011

Enclosed you will find the Firm Commitment signed by HUD for your recently submitted Section 223(a)(7) application under the Section 232 Lean Program. In order to facilitate the process toward closing the loan, please sign the Firm Commitment and return it to the HUD Underwriter with whom you worked on this transaction. We would appreciate your return of the signed Firm Commitment within 7 days of receipt.

Upon the return of your Firm Commitment, you will be assigned a HUD Closing Coordinator to be the point of contact for closing the 223(a)(7) loan. The Closing Coordinator will coordinate the closing and timeframe with all parties, including the HUD Attorney and the Office of Insured Health Care Facilities. If you prepare a Request to Amend the Firm Commitment, please provide all of your amendments under one request in an effort to expedite processing of your request. If at all possible, please submit your Request to Amend the Firm Commitment within 30 days of signing the Firm Commitment to the assigned Closing Coordinator.

If you have questions about the documents you have received, please do not hesitate to contact Belinda Clark at (202) 402-4031 or at Belinda.L.Clark@hud.gov . We appreciate working with you and thank you for your assistance.

*HUD's mission is to increase homeownership, support community development and increase access to affordable housing free from discrimination.*

www.hud.gov          espanol.hud.gov

Revised 2/2/09

**U.S. Department of Housing and Urban Development**
**Federal Housing Commissioner**
**Office of Healthcare Programs**
**Commitment to Insure**
*Section 232 Pursuant to Section 223(a)(7)*

|  |  |
|---|---|
| | FHA Project No.: **034-22084** |
| | Project Name: Whitehall Manor Senior Living |
| | Project Address: 1177 Sixth Street |
| | Whitehall, PA 18052 |

| | |
|---|---|
| M&T Realty Capital Corporation | Whitehall Fiduciary, LLC, As Trustee of Whitehall Trust |
| (Mortgagee) | (Name of Mortgagor) |
| 25 South Charles Street | 1177 Sixth Street |
| (Address) | (Address) |
| Baltimore, MD 21201 | Whitehall, PA 18052 |
| (City, State, & Zip Code) | (City, State, & Zip Code) |

We understand that you, as Mortgagee, have agreed to make a loan to Whitehall Fiduciary, LLC, As Trustee of Whitehall Trust, (hereafter called the "Mortgagor"), in an amount not exceeding the sum of Fifteen Million, Seven Hundred Eighty Eight Thousand, Seven Hundred Dollars ($15,788,700.00) (to be secured by a credit instrument and security instrument (hereafter jointly called the "Mortgage") covering real property with existing building(s) thereon identified above (hereinafter called the "Project"), as shown on the legal description of the property attached hereto and marked **Exhibit A.**

It is your intention to present the said Mortgage to the Federal Housing Commissioner acting herein on behalf of the Secretary of Housing and Urban Development (the "Secretary") for mortgage insurance under the provisions of Section 232, pursuant to Section 223(a)(7) of the National Housing Act (the "NHA"), and the Regulations thereunder now in effect (the "Regulations").

The Secretary hereby agrees to insure said Mortgage under the provisions of the NHA and the Regulations upon the following conditions:

1. The Mortgage shall bear interest at the rate of 4.00 percent per annum payable on the first day of each month on the outstanding balance of principal. The first payment to principal (commencement of amortization) shall be due on the first day of the second month following the date of endorsement of the Mortgage for insurance (the "Endorsement"). The Mortgage shall be payable on a level annuity basis by monthly payments of principal and interest in the amount of $74,123.43. The maturity and final payment date shall be 30 years and 11 months following the due date of the first payment to principal. Note: Any change in the interest rate will require reprocessing of the Mortgage insurance application and amendment of this Commitment prior to Endorsement.

- 1 -

2.  The credit instrument and the security instrument to be insured shall be in the forms prescribed by the Secretary for use in connection with loans insured under Section 232, pursuant to Section 223(a)(7), of the NHA in the locality in which the property is situated. The endorsement panel in the credit instrument shall include language in the form prescribed by the Secretary in order to comply with Section 223(a)(7)(A)(iv) of the NHA. In addition, the Mortgagor (and, if applicable, the lessee/operator of the Project) shall provide a security agreement, UCC financing statements, and deposit account control agreement(s) granting a first lien security interest in such tangible and intangible personal property related to the Project in favor of the Mortgagee as may be required by the Secretary (subject only to liens for taxes and assessments which are not delinquent and such other liens, as with an accounts receivable financing transaction, as may be approved by the Secretary).

3.  Prior to Endorsement, the Mortgagor shall present to the Secretary a title policy in conformity with the Regulations which shall show that title to the property (or, if approved by the Secretary, a leasehold estate therein) on the date of Endorsement is vested in the Mortgagor free of all exceptions to title (either junior or prior to said Mortgage) except said Mortgage and such other exceptions to title as are specifically determined to be acceptable by the Secretary. Said title policy shall (a) by its terms inure to the benefit of the Mortgagee and/or the Secretary of Housing and Urban Development, as their interests may appear and (b) unless otherwise approved by the Secretary, be on the ALTA Loan Policy 2006 Form and include ALTA Form 8.1-06, 9-06 (or 9.3-06), ALTA 17-06 and ALTA 22-06 endorsements and an endorsement deleting the arbitration clause. The Mortgagor shall also furnish satisfactory proof that there exist no unpaid obligations contracted in connection with the Mortgage transaction, the purchase of the Project or refinancing of existing indebtedness, or the completion of any repairs, except such obligations as may be approved by the Secretary. If required by the Secretary, prior to Endorsement the Mortgagor shall present to the Secretary a survey of the Project in form and substance satisfactory to the Secretary.

4.  The Mortgagor must possess the powers necessary for operating the Project and meeting all the requirements of the Secretary for insurance of the Mortgage. Prior to Endorsement, there shall be delivered with the Secretary and the Mortgagee (a) copies of ownership entity documentation that complies with applicable requirements of the Secretary, including a copy of the instrument under which the Mortgagor entity is created (unless the Mortgagor is an individual), together with copies of all instruments or agreements necessary under the laws of the applicable jurisdiction to authorize execution of the Mortgage and the other closing documents, and (b) a Regulatory Agreement in the form prescribed by the Secretary for use in connection with loans insured under the Section 232, pursuant to Section 223(a)(7), of the NHA (the "Regulatory Agreement"). Such Regulatory Agreement shall provide, among other things, for the establishment of a Reserve Fund for Replacements (the "Reserve Fund for Replacements") under the control of the Mortgagee by payment of $96,900.00 per annum, to be accumulated monthly at the rate of $8,075.00 per month (rounded to the nearest dollar), commencing on the date of the first payment to principal as established in the Mortgage unless a later date is agreed upon with the Secretary. In addition to the per annum amount required to be accumulated monthly under the control of the Mortgagee for the Reserve Fund for Replacements: (a) the existing balance in the reserve for replacements with respect to the Project shall be transferred to the Reserve for Replacements and (b) there shall be an additional deposit in the amount of not less than $0.00 made to the Reserve Fund

-2-

for Replacements by the Mortgagor at the time of Endorsement. Attached hereto as Exhibit C is the Reserve for Replacement Funding Schedule which supports the per annum and initial deposits to the Replacement Reserve account.

The amount of the annual deposits to the Reserve Fund for Replacements shall be subject to change in accordance with the requirements of the Secretary. In connection therewith, the Mortgagee shall obtain a new Project Capital Needs Assessment ("PCNA") for the Secretary to evaluate on or before October 1, 2018 and a new PCNA will be provided every ten years thereafter. The cost of each such PCNA may be paid from the Reserve Fund for Replacements. The Request for Endorsement of Credit Instrument to be delivered prior to Endorsement and the Regulatory Agreement each shall include a statement confirming the requirement for such periodic PCNA reports.

5.  Upon Endorsement of the Mortgage, it must be current with respect to all payments required to be made by its terms, including all deposits required to be made with the Mortgagee for mortgage insurance premiums, fire, and other property insurance premiums, ground rents, water rates, taxes, and other assessments and there shall be in full force and effect fire and other property insurance as required by the Mortgage. At or after Endorsement, established escrow accounts, including those for taxes and insurance, shall be transferred to the control of the new Mortgagee, if applicable, and remain with the Project to the extent necessary to fund escrows required by the Mortgage.

6.  Upon Endorsement, the Mortgagee shall pay to the Secretary, in advance, a mortgage insurance premium equal to 0.50 percent of the principal amount of the Mortgage to cover the first mortgage insurance premium and shall continue to make payments thereafter as required by the aforesaid Regulations.

7.  The Mortgagor, lessee/operator and/or management agent, as applicable, shall maintain professional liability insurance in accordance with the requirements established by the Secretary. The Mortgagor shall annually provide to the Secretary a certification of compliance with the Secretary's professional liability insurance requirements. The Regulatory Agreement executed by the Mortgagor must require compliance with these requirements.

8.  This Commitment shall terminate 90 days from the date hereof unless renewed or extended by the Secretary. Upon expiration, all rights and obligations of the respective parties shall cease. Prior to any renewal or extension of this Commitment, the Secretary may, at his/her option, reexamine the Commitment to determine whether it shall be extended in the same amount, or shall be amended to include a lesser amount.

9.  A request for the reopening of this Commitment within 90 days of its termination must be accompanied by the reopening fee prescribed by the Regulations.

10. It is a condition of this Commitment that any change in ownership upon which this Commitment was predicated must be indicated in writing by the Mortgagor and such request must be approved in writing by the Secretary. Any principals of the Mortgagor or lessee/operator which are added prior to Endorsement and which were not disclosed in the mortgage insurance application shall be subject to the Secretary's credit review and previous

- 3 -

participation clearance before Endorsement.

11. If the Project is subject to an operating lease, such lease must (a) incorporate subordination language approved by the Secretary, (b) provide for lease payments sufficient to cover monthly principal and interest payments under the Mortgage, escrows required under the Mortgage and deposits to the Reserve Fund for Replacements required by the Regulatory Agreement, and (c) otherwise comply with applicable requirements of the Secretary. In addition, the lessee/operator must execute and deliver an Operator Regulatory Agreement in the form specified by the Secretary.

12. Any accounts receivable financing obtained by the Mortgagor or lessee/operator or management agent, as applicable, with respect to the Project will be subject to approval by the Secretary and the Mortgagee.

13. All financing arrangements (other than the Mortgage and any other mortgage insured by the Secretary), including repayment obligations and other secondary financing, and occupancy restrictions must be fully disclosed to, and approved by, the Secretary and must comply with the Secretary's requirements applicable to loans insured under the Section of the NHA applicable to the Mortgage.

14. This Commitment is conditioned upon and shall not be enforceable against the Secretary until and unless all conditions to Endorsement stated herein have been satisfied or waived by the Secretary.

15. The principal amount of the Mortgage shall not exceed the cost of refinancing as reflected on the loan closing statement delivered at Endorsement and approved by the Secretary. In the event that the principal amount of the Mortgage exceeds the cost of refinancing, the initial deposit to the Reserve Fund for Replacements shall be increased by the amount of such excess (provided, however, that at the option of the Mortgagor, some or all of such excess may be eliminated by a reduction in the amount of the Mortgage rather than an increase in the deposit to the Reserve Fund for Replacements).

16. At or after Endorsement, the Mortgagee may submit a request, on behalf of the Mortgagor, for the refund of application fee available under the Expedited Processing Instructions in Notice H93-89. The request may be for an amount not to exceed $23,683.05 (based on the difference between the application fee paid and one-half of the application fee earned on the Project). This refund may not be applied as a credit to the mortgage insurance premium due at Endorsement.

17. This Commitment is subject to the conclusions stated on the attached form HUD-92264A, Supplement to Project Analysis.

18. This Commitment is

    ☒ · Subject to Special Conditions, numbered 1 through 5, which are stated below and are made a part hereof.

    ☐ · Not subject to any Special Conditions.

- 4 -

App.867

**SPECIAL CONDITIONS:**

1. As submitted by the lender, there will be no loan term extension. The final maturity date shall be <u>12/01/2042</u>. This may require the principal and interest payment of $<u>74,123.43</u> listed on the Firm Commitment to be adjusted accordingly with the submission of an amendment to the Firm.

2. Prior to closing, the operating lease must be amended to reflect a lease payment of $1,668,000.

3. The Legal Punch List provides an assessment of the title policy, license, operating lease, survey and organizational documents. All comments in the Legal Punch List must be satisfied and approved by HUD Legal prior to closing.

4. Prior to closing, all Department Enforcement Center (DEC) findings pertaining to the review of the Annual Financial Statements must be resolved to the satisfaction of the DEC and OHP.

5. All documentation shall identify the mortgagor entity as Whitehall Fiduciary, LLC, As Trustee of Whitehall Trust.

Attached to this Commitment is a form closing checklist identifying documents required for loans insured under Section 232, pursuant to Section 223(a)(7), of the NHA. If there are any inconsistencies between the attached closing checklist and this Commitment, this Commitment controls. Draft closing documents conforming to the terms of this Commitment must be submitted not less than 10 days prior to Endorsement. This Commitment and exhibits referred to herein, together with the applicable Regulations, constitute the entire agreement among the parties, and acceptance of the terms hereof is evidenced by the signature of the Mortgagor and Mortgagee upon the lines provided below. Please return one original of this Commitment, signed by the Mortgagee and Mortgagor, to the OHP Underwriter within 10 business days of the date of the Secretary's execution of this Commitment.

SECRETARY OF HOUSING AND URBAN DEVELOPMENT
BY: FEDERAL HOUSING COMMISSIONER

By: _William Hammers_      Date: _11-22-2011_
  Authorized Agent

- 5 -

Attachments:
- Exhibit A: Legal Description
- Exhibit B: Critical and Non-Critical Repairs List, if applicable
- Exhibit C: Revised Replacement Reserve Schedule, if applicable
- Form HUD-92264-A
- Additional Special Conditions, if applicable
- Closing Checklists

The above Commitment to Insure, including Special Conditions (if applicable), is hereby accepted by the undersigned, and we hereby agree to be bound by the terms hereof.

MORTGAGOR:

Whitehall Fiduciary, LLC, As
Trustee of Whitehall Trust

Date: 11/23/2011

By:

Name: Abraham R. Atiyeh

Title: Manager

MORTGAGEE:

M&T Realty Capital Corporation

Date: 11/25/2011

By:

Name: Sandra DeFelice

Title: Vice President, Deputy Chief Underwriter

- 6 -

App.869

## Loan Policy of Title Insurance

### SCHEDULE A CONTINUED

Schedule A, Page 2, Policy No. :   PA0636-81-42-56518-691-  2011.8130738-83583125

UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.

PARCEL ID NO. 5498 9378 8632-1

Together with an undivided interest of 50% of, in and to the Common Elements of the said WHITEHALL MANOR CONDOMINIUM.

ALTA Loan Policy
Schedule A Continued  (as modified by TIRBOP) 6/17/06
Form

# Supplement to Project Analysis

Section or Title Number  232/223(a)(7)

☐ Valuation Trial    ☐ Conditional    ☑ Firm

**U.S. Department of Housing and Urban Development**
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0029
(exp. 10/31/2012)

See last page for Public Reporting burden statement before completing this form

**Privacy Act Notice:** The United States Department of Housing and Urban Development, Federal Housing Administration, is authorized to solicit the information requested in the form by virtue of Title 12, United States Code, Section 1701 et seq., and regulations promulgated thereunder at Title 12, Code of Federal Regulations. While no assurance of confidentiality is pledged to respondents, HUD generally discloses this data only in response to a Freedom of Information Act request.

| Name of Mortgagor (Borrower) Whitehall Fiduciary, LLC, As Trustee of Whitehall Trust | Project Number 034-22084 |
|---|---|

Name of Project
Whitehall Manor Senior Living

Location of Project  (street, city & state)
Whitehall PA

## Type of Borrower

☑ Private    ☑ Profit    ☐ Public    ☐ Nonprofit    ☐ State or Federal Instrumentality, etc.

☐ Management Coop.    ☐ Sales Coop.    ☐ Investor-Sponsor    ☐ Builder-Seller    ☐ Limited Distribution

## Type of Project

☐ Rental Housing    ☐ Mobile Home Court    ☐ Board and Care    ☐ New Construction    ☐ Non-Elevator
☐ Cooperative    ☐ Nursing Home    ☐ Single Rm. Occupancy    ☐ Rehabilitation    ☑ Elevator
☐ Condominium    ☐ Intermediate Care Facility   ☑ Assisted Living    ☐ Redevelopment    ☐ Existing
☐ Capital Advance  202/811    ☐ Housing for the Elderly    ☐ Supplement Loan    ☐ _____

## I. Determination of Maximum Insurable Mortgage

| Criteria | | | | column 1 | column 2 | column 3 |
|---|---|---|---|---|---|---|
| 1. Mortgage or Loan Amount Requested in Application | | | | | | $ _____ |
| 2. Reserved | | | | | | $ 15,788,700.0 |
| 3. Amount Based on Value or Replacement Cost | | | | | | |
| a.  Value (Replacement Cost) in Fee Simple | $ _____ X ____ % | | | | $ ____ 0.00 | |
| b.  (1) Value of Leased Fee | $ _____ | | | | | |
| (2) Grant/Loan funds attributable to R. C. Items | $ _____ | | | | | |
| (3) Excess Unusual Land Improvement | $ _____ | | | | | |
| (4) Cost Containment Mortgage Deduction | $ _____ | | | | | |
| (5) Total  lines (1) to (4) | $ ____ 0.00 X ____ % $ ____ 0.00 | | | | | |
| c.  Unpaid Balance of Special Assessment | | | | $ _____ | | |
| d.  Total line b plus line c | | | | | $ ____ 0.00 | |
| e.  Line a minus line d | | | | | | $ ____ 0.00 |
| 4. Amount Based on Limitations Per Family Unit | | | | | | |
| a.  Number of no Bedroom Units | ____ X $ _____ | | $ ____ 0.00 | | | |
| Number of one Bedroom Units | ____ X $ _____ | | $ ____ 0.00 | | | |
| Number of two Bedroom Units | ____ X $ _____ | | $ ____ 0.00 | | | |
| Number of three Bedroom Units | ____ X $ _____ | | $ ____ 0.00 | | | |
| Number of four or more Bedroom Units | ____ X $ _____ | | $ ____ 0.00 | | | |
| b.  Cost Not Attributable to Dwelling Use | $ ____ X ____ % $ ____ 0.00 | | | | | |
| c.  Warranted Price of Land | $ ____ X ____ % $ ____ 0.00 | | | | | |
| d.  Total lines a through c | | | | | $ ____ 0.00 | |
| e.  Total Number of Spaces | ____ X $ _____ | | | | $ ____ 0.00 | |
| f.  Sum: Value of Leased Fee and Unpaid Balance of Special Assessment(s) | | | | | _____ | $ _____ |
| g.  Line d or line e, whichever is applicable, minus line f | | | | | | $ _____ |
| 5. Amount Based on Debt Service Ratio | | | | | | |
| a.  Mortgage Interest Rate | | | | 4.00 % | | |
| b.  Mortgage Insurance Premium Rate | | | | 0.50 % | | |
| c.  Initial Curtail Rate | | | | 1.63 % | | |
| d.  Sum of Above Rates | | | | | 6.13 % | |
| e.  Net Income | $ 1,961,271. X 90.00 % | | | | $ 1,765,143.90 | |
| f.  Annual Ground Rent  $ _____ + Annual Spec. Assmt. $ _____ | | | | | $ ____ 0.00 | |
| g.  Line e minus line f | | | | | $ 1,765,143.90 | |
| h.  Line g divided by line d | | | | | | $ 28,778,000.( |
| i.  Annual Tax Abatement  Savings $ _____ divided by ____ % | | | | | | $ _____ |
| j.  Line h plus line i | | | | | | $ 28,778,000.( |

| Previous editions are obsolete | Page 1 of 4 | form HUD-92264-A (03/2010) ref Handbooks 4480.1 & 4470.1 |
|---|---|---|

**I. Determination of Maximum Insurable Mortgage** (cont.)

| Criteria | column 1 | column 2 | column 3 |
|---|---|---|---|
| 6. Amount Based on Estimated Cost of Rehabilitation Plus (i) "As Is" Value, or (ii) Acquisition Cost, or (iii) Existing Mortgage Indebtedness Against the Property Before Rehabilitation: | | | |
| a. Total Estimated Development Cost | $ _____ | | |
| b. Estimated Cost of Off-Site Construction | $ _____ | | |
| c. Sum of lines a & b | | $ 0.00 | |
| d. Grant/Loan funds attributable to R. C. Items | $ _____ | | |
| e. Line c minus line d | | $ _____ | |
| f. "As Is" Value of Prop. Before Rehab.  $ _____ X _____ % | $ _____ | | |
| g. Existing Mortgage Indebtedness (Property Owned) or Purchase Price of Property (to be Acquired) $ _____ | | | |
| h. Line e plus line f  or line g, whichever is less | | $ _____ | |
| i. Line h  X _____ % | | | $ _____ |
| **7. Amount Based on Borrower's Total Cost of Acquisition Section 223(f)** | | | |
| a. Purchase Price of Project | $ _____ | | |
| b. Repairs and Improvements, if any | $ _____ | | |
| c. Other fees | $ _____ | | |
| d. Loan Closing Charges * | $ _____ | | |
| e. Sum of lines a through d | | $ 0.00 | |
| f. Enter the Sum of any Grant/Loan and Reserves for Replacement and Major Movable Equipment to be purchased as an asset of the project | | $ _____ | |
| g. Line e minus line f | | $ _____ | |
| h. Line g  X _____ % | | | $ _____ |
| **8. Amount Based on Sum of Unit Mortgage Amounts** | | | $ _____ |
| **9. Amount Based on Estimated Cost to Borrower** | | | |
| a. Total Estimated Cost (Exclusive of Site and Required Construction Off the Site) | $ _____ | | |
| b. Purchase Price of Site | $ _____ | | |
| c. Total Cost of Clearing Site, if any | $ _____ | | |
| d. Expense of Relocating Occupants, if any | $ _____ | | |
| e. Cost of Off-Site Construction, if any | $ _____ | | |
| f. Sum of line a through line e | | $ 0.00 | |
| g. Line f  X _____ % | | | $ _____ |
| **10. Amount Based on Existing Indebtedness, Repairs, and Loan Closing Charges Section 223(f)** | | | |
| a. Total Existing Indebtedness | $ 16,432,592.0 | | |
| b. Required Repairs | $ _____ | | |
| c. Other Fees | $ 41,500.00 | | |
| d. Loan Closing Charges * | $ 712,232.00 | | |
| e. Sum of line a through line d | | $ 17,186,324 | |
| f. Enter the Sum of any Grant/Loan and Reserves for Replacement and Major Movable Equipment on Deposit | | $ 519,902.00 | |
| g. Line e minus line f | | $ 16,666,422.0 | |
| h. 80% of Value  $ _____ X80% | | $ _____ | |
| i. Greater of line g or line h | | | $ 16,666,400.0 |

**11. Amount Based on Deduction of Grant(s), Loan(s), Tax Credit(s) and Gift(s) for Mortgageable items:**

| | | |
|---|---|---|
| a. 100% Project (Replacement) Cost * | $ _____ | |
| b. (1) Grants/loans/gifts | $ _____ | |
| (2) Tax Credits | $ _____ | |
| (3) Value of Leased Fee | $ _____ | |
| (4) Excess Unusual Land Improvement Cost | $ _____ | |
| (5) Cost Containment Mtge Deduction | $ _____ | |
| (6) Unpaid Balance of Special Assessment | $ _____ | |
| (7) Sum of Lines (1) through (6) | | $ 0.00 |
| c. Line a. minus line b. (7) | | $ _____ |

\* Project Cost applies to Criteria 7 and 10 under Section 223 (f) and applications pursuant to 223(f). Project Replacement Cost applies to Section 221 (d) and other Sections of the Act mortgages limited by Replacement Cost.

\* Attach format for computing loan closing charges.

| Maximum Insurable Mortgage (Lowest of the Foregoing Criteria) | $ 15,788,700.00 |
|---|---|

## II. Total Requirements for Settlement

| Part A | | | | Part B | | | | |
|---|---|---|---|---|---|---|---|---|
| 1. Fees Not to be Paid in Cash | | | | 1. a. Development Cost | | $ 16,656,293. | | |
| a. BSPRA/SPRA | | $ | | b. Adjustment for Contracted Amounts In Excess of form HUD-92264 Estimates | | | | |
| b. Builder's Profit | | $ | | (1) Construction Contract | | $ | | |
| c. Other | | $ | | (2) Architect's Contract | | $ | | |
| Total (enter in part B on line 5) | | $ 0.00 | | (3) Other | | $ | | |
| 2. Commitment, Mktg., Fees and Discounts and Escrows | | | | c. Total of lines a & b | | | $ | 16,656,293. |
| a. Fees | GNMA | $ | | 2. Land Indebtedness (or Cash Required for Land Acquisition) | | | $ | |
| | Other | $ | | 3. Subtotal (lines 1c + 2) | | | $ | 16,656,293. |
| b. Discounts | Permanent Loan | $ | | 4. a. Mortgage Amount | | $ 15,788,700. | | |
| | Construction Loan | $ | | b. Grant/Loan | | $ | | |
| c. Escrows | Debt Service Reserve (Board & Care) | $ | | 5. Fees Not to be Paid in Cash | | $ | | |
| | Other | $ | | 6. Subtotal (lines 4a + 4b + 5) | | | $ | 15,788,700. |
| Total (enter in part B on line 9) | | $ 0.00 | | 7. Cash Investment Required (line 3 minus line 6) | | | $ | 867,593.00 |
| 3. Working Capital | | | | 8. Initial Operating Deficit * | | | $ | |
| a. Working Capital | | $ | | 9. Commitment, Marketing Fees, Discounts and Escrows | | | $ | |
| b. Minimum Capital Investment (Sec. 202 & Sec. 811) | | $ | | 10. Working Capital | | | $ | |
| c. Non-Realty Items Not Included in Mortgage | | $ | | 11. Offsite Construction and Demolition Costs | | | | |
| Total (enter in part B on line 10) | | $ 0.00 | | ($        + $        ) | | | $ | 0.00 |
| | | | | 12. Total Estimated Cash Requirement (sum of lines 7 + 8 + 9 + 10 + 11) | | | $ | 867,593.00 |
| | | | | Front Money Escrow, If Any, (subtract line 6 from line 1) | | | $ | |

* Note: for Section 223(f) cases, attach the format for computing the operating deficit.

## III. Source of Funds to Meet Cash Requirements

| Source | Funds Available |
|---|---|
| Borrower cash | $ 867,593.00 |
| | $ |
| | $ |
| | $ |
| | $ |
| **Total Available Cash for Project** | $ 867,593.00 |

## IV. Recommendations, Requirements and Remarks

☑ Recommend Approval; Subject to Conditions Stated Below, If Any
☐ Recommend Rejection for Reasons Stated Below (if more space is needed, continue on page 4).

See Narrative for Firm Conditions

_William J. Lammers_ (signature)        11-22-2011

William J. Lammers
Supervisory Health Systems Advisor
█████████ Section 232 Program

Signature of the Mortgage Credit Examiner

X _____ 11/8/2011        Date

**Remarks:**

Format to Compute Fees:

| | | |
|---|---|---|
| Mortgage Amount:   232/223(a)(7) | | $15,788,700 |
| Existing Indebtedness | $15,357,562 | |
| Prepayment Penalty | $ 1,075,029 | |
| Required Non-Critical Repairs | $ 0 | |
| Required Critical Repairs | $ 0 | |
| | | |
| Replacement Reserve (Realty/Non-Realty) | $519,902 | |
| Other Fees | | |
| Legal & Organizational | $9,500 | |
| Title & Recording | $32,000 | |
| Inspection Fee | $0 | |
| | | |
| Third Party Reports | | |
| Appraisal | $0 | |
| Seismic | $0 | |
| PCNA | $0 | |
| Phase I Env. | $0 | |
| | | Fees based upon MIM |
| Loan Closing Charges | | |
| Financing Fee (.504%) | $83,999 | $79,575 |
| Placement Fee (0.0%) | $0 | |
| MIP (.5%) | $83,332 | $79,944 |
| HUD Exam Fee (.30%) | $25,000 | $23,683 |
| Less Existing Reserves | $(519,902) | |
| | | |
| Less Repairs Paid from Current Reserves | $16,666,422 | $16,656,293 |

Public Reporting Burden for this project analysis is estimated to average 8 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collecton displays a valid OMB control number.

's information is being collected under Public Law 101-625 which requires the Department of to implement a system for mortgage insurance for rtgages insured under Sections 207,221,223,232, or 241 of the National Housing Act. The information will be used by HUD to approve rents, property appraisals, and mortgage amounts, and to execute a firm commitment.   Confidentiality to respondents is ensured if it would result in competitive harm in accord with the Freedom of Information Act (FOIA) provisions  or if it could impact on the ability of the Department's mission to provide housing units under the various Sections of the Housing legislation.

## ATTACHMENT TO FORM HUD-92264-A
(Office of Healthcare Programs--Section 232)

| Name of Mortgagor: | Whitehall Fiduciary, LLC. As Trustee of Whitehall Trust | Program Section No: | 232/(a)(7) |
|---|---|---|---|
| Name of Project: | Whitehall Manor Senior Living | Project No: 034-22084 | |

Additional Criteria for Determination of Maximum Insurable Mortgage (Section I of HUD-92264-A)

**12. Amount Based on Replacement Cost (applicable to New Construction, Substantial Rehabilitation, 241(a), Blended Rate)**

| | | | | | | |
|---|---|---|---|---|---|---|
| a. Replacement Cost in Fee Simple | $0 | x | | 90% | | $0 |
| b (1) Value of Leased Fee | $0 | | | | | |
| (2) Grant/Loan funds attributable to R.C. items | $0 | | | | | |
| (3) Excess Unusual Land Improvement | $0 | | | | | |
| (4) Total lines (1) to (3) | $0 | x | | 90% | $0 | |
| c. Unpaid Balance of Special Assessment | | | | | $0 | |
| d Total line b plus line c | | | | | | $0 |
| e. Line a minus line d | | | | | | | $0 |

**13. Amount Based on LEAN Required Debt Service Coverage (as applicable)**

| | | | | | | |
|---|---|---|---|---|---|---|
| a. Mortgage Interest Rate | | | | | 4.0% | |
| b. Mortgage Insurance Premium Rate | | | | | 0.5% | |
| c. Initial Curtail Rate | Loan term (years) | | 31 | | 1.633657% | |
| d. Sum of Above Rates | | | | | | 6.133657% |
| e. Net Income | $1,961,271 | ÷ | | 1.11 | | $1,765,161 |
| f. Annual Ground Rent + Annual Special Assessment | $0 | + | | $0 | | $0 |
| g. Line e minus line f | | + | | | | $1,765,161 |
| h. Line g divided by line d | | | | | | $28,778,287 |
| i. Annual Tax Abatement Savings | $0 | ÷ | | 1.45 | | $0 |
| j Line h plus line i | | + | | | | $28,778,287 |

**14. Amount Based on LEAN Required Loan to Value (as applicable)**

| | | | | | | |
|---|---|---|---|---|---|---|
| a. Value in Fee Simple | $0 | | | 0% | | $0 |
| b. Value of Leased Fee | $0 | x | | 0% | $0 | |
| c. Unpaid Balance of Special Assessment | | x | | | $0 | |
| d. Total line b plus line c | | | | | $0 | |
| e. Line a minus line d | | | | | | $0 |

| | Yes | No | |
|---|---|---|---|
| Criteria 13: Standard LEAN Percentage Utilized | ☑ | ☐ | If "No", Mitigation required in Lender Narrative |
| Criteria 14: Standard LEAN Percentage Utilized | ☑ | ☐ | If "No", Mitigation required in Lender Narrative |

**Effective Date : 09/01/2010**

## U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
## SECTION 232/223(a)(7) LEAN PROGRAM
## HUD ATTORNEY CLOSING CHECKLIST

Project Name: <u>Whitehall Manor Senior Living</u>

Project Location: <u>Whitehall, Pennsylvania</u>

FHA Project Number: <u>034-22084</u>

**Please fill out this form and place in front of the draft closing documents before sending.**
**Tab all closing documents according to the numbers indicated below.**

The HUD Closing Attorney will obtain TWO copies of the following documents:

___ 1. a. ALTA Title Insurance Loan Policy
___    b. Copies of all exception documents

___ 2. Nursing Home/Assisted Living Facility/Board & Care License, as applicable

___ 3. a. Operator's Estoppel Certificate (with Lease attached), if applicable
___    b. Recorded Memorandum of Lease, if applicable
___    c. Recorded Subordination, Non-Disturbance and Attornment Agreement, if applicable

___ 4. Survey (if required must be dated within 120 days of closing)

___ 5. Organizational Documents of Mortgagor:
      Incumbency Certificate with the following Exhibits (as applicable):
      ___ a. Corporate Mortgagor
            (i)    Articles of Incorporation
            (ii)   Bylaws
            (iii)  Authorizing Resolutions
            (iv)   Certificate of Good Standing (dated within 30 days of closing)
            (v)    Certificate of Foreign Qualification, if applicable (dated within 30 days of closing)
      ___ b. Partnership Mortgagor
            (i)    Partnership Agreement
            (ii)   Certificate of Partnership
            (iii)  Authorizing Resolutions
            (iv)   Certificate of Existence (dated within 30 days of closing)
            (v)    Certificate of Foreign Qualification, if applicable (dated within 30 days of closing)
      ___ c. Limited Liability Company Mortgagor
            (i)    Articles of Organization

      (ii)     Operating Agreement
      (iii)    Authorizing Resolutions
      (iv)    Certificate of Continued Existence (dated within 30 days of closing)
      (v)     Certificate of Foreign Qualification, if applicable (dated within 30 days of closing)

\_\_\_ d. Trust Mortgagor
      (i)     Trust Agreement
      (ii)    Authorizing Resolutions

\_\_ 6. Organizational Documents of Entities included in Mortgagor signature block, if applicable (same as No. 5 above)

\_\_ 7. Organizational Documents of Operator, if applicable (same as No. 5 above)

\_\_ 8. Organizational Documents of Entities included in Operator signature block, if applicable (same as No. 5 above)

\_\_ 9. a. Accounts Receivable Financing Documents (itemized in separate checklist)
\_\_    b. HUD Approval

\_\_ 10. Ground Lease (with Ground Lessor's Estoppel Certificate), if applicable

\_\_ 11. Secondary Financing Documents, if applicable

\_\_ 12. a. Commercial Space Leases (with Tenant Estoppel Certificates)
\_\_     b. Subordination, Non-Disturbance and Attornment Agreements (for non-identity of interest leases only)

\_\_ 13. Organizational Documents of Management Agent, if applicable (same as No. 5 above)

\_\_ 14. Master Lease & SNDA (if applicable)

\_\_ 15. a. Executed FHA Firm Commitment
\_\_     b. Executed Amendments, if any
\_\_     c. Executed Assignment, if any

\_\_ 16. Mortgage/Deed of Trust/Security Deed

\_\_ 17. Owner Regulatory Agreement (HUD-92466 or HUD-92466e, with LEAN Rider)

\_\_ 18. Operator Regulatory Agreement (HUD-92466-NHL, with LEAN Rider), if applicable

\_\_ 19. a. Security Agreement (Mortgagor)
\_\_     b. Financing Statement (County)
\_\_     c. Financing Statement (State)
\_\_     d. State UCC Search Report

-2-

App.877

___ 20. a.  Operator Security Agreement, if applicable ·
___     b.  Financing Statement (County), if applicable
___     c.  Financing Statement (State), if applicable
___     d.  State UCC Search Report, if applicable

___ 21. a. Deposit Account Control Agreement (DACA)
___     b. Deposit Account Instructions Service Agreement (DAISA)

___ 22. Mortgagor's Attorney's Opinion with Exhibits
        Exhibit A—legal description
        Exhibit B—Mortgagor Certification
        Exhibit C—Good Standing Certificate/Certificate of Existence (for Mortgagor and each
            entity included in Mortgagor signature block)

___ 23. Operator's Attorney's Opinion with Exhibits, if applicable
        Exhibit A—legal description
        Exhibit B—Operator Certification
        Exhibit C—Good Standing Certificate/Certificate of Existence (for Operator and each
            entity in Operator signature block)

___ 24. Repair Escrow Agreement, if applicable

___ 25. Mortgagor's Critical Repairs Certificate, if applicable

___ 26. Inspection fee check, if applicable (Please identify project number on check or check
        stub.)

___ 27. Mortgage Insurance Premium (MIP) check  (Please identify project number on check or
        check stub.)

___ 28. Attendance List, if applicable

___ 29. Closing Statement

___ 30. Cost Certification *(Not required)*

___ 31. Request for Endorsement of Credit Instrument, Certificates of Mortgagee and Mortgagor
        (Form FHA-2455, as modified for LEAN Program)

___ 32. Mortgage Note/Deed of Trust Note/Security Deed Note

___ 33. All Special Conditions of Firm Commitment
___     a. _____
___     b. _____
___     c. _____

-3-

App.878

Date Modified: 03/16/2011

## U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
### SECTION 232/223(a)(7) LEAN PROGRAM
### <u>CLOSING COORDINATOR</u>
### CLOSING CHECKLIST

Project Name: <u>Whitehall Manor Senior Living</u>

Project Location: <u>Whitehall, Pennsylvania</u>

FHA Project Number: <u>034-22084</u>

**<u>Please fill out this form and place in front of the draft closing documents before sending.</u>**
**<u>Tab all closing documents according to the numbers indicated below.</u>**

The HUD Closing Coordinator will obtain ONE copy of all closing documents.

\_\_ 1.  a.  Executed FHA Firm Commitment
\_\_     b.  Executed Amendments, if any
\_\_     c.  Executed Assignment, if any

\_\_ 2.  Mortgage/Deed of Trust/Security Deed

\_\_ 3.  Owner Regulatory Agreement (HUD-92466 or HUD-92466e, with LEAN Rider)

\_\_ 4.  Operator Regulatory Agreement (HUD-92466-NHL, with LEAN Rider)

\_\_ 5.  Repair Escrow Agreement, if applicable

\_\_ 6.  a.  Owner's Certification re:  Completion of Critical Repairs
\_\_     b.  Photographs
\_\_     c.  Invoices

\_\_ 7.  a.  Draft Loan Closing Statement
\_\_     b.  Invoices

\_\_ 8.  Request for Endorsement of Credit Instrument, Certificates of Mortgagee and Mortgagor
       (Form FHA-2455, as modified for LEAN Program)

\_\_ 9.  Mortgage Note/Deed of Trust Note/Security Deed Note

___ 10. All Special Conditions of Firm Commitment

___      a. _____

___      b. _____

___      c. _____

___ 11. Current Facility License

___ 12. Certificate(s) of Professional Liability Insurance and Fidelity Bond Coverage

## POSSIBLE ADDITIONS

___ 13. Escrow Agreements for Operating Deficits, Relocation Costs, etc., per Firm Commitment

___ 14. a.   Accounts Receivable Financing Documents (itemized in separate checklist)

___       b.   HUD Approval

___ 15. Secondary Financing Documents

-2-

```
                    UNITED STATES BANKRUPTCY COURT
              FOR THE EASTERN DISTRICT OF PENNSYLVANIA


                                   . Chapter 11
IN RE:                             .
                                   . (Jointly Administered)
WHITEHALL MANOR, INC.,             .
                                   . Case No. 25-15245-pmm
                                   .
                                   . 201 Penn Street
                                   . Reading, Pennsylvania 19601
                        Debtors.   .
. . . . . . . . . . . . . . . . .  . Wednesday, April 1, 2026


                  TRANSCRIPT OF VIDEO HEARING RE:
     EMERGENCY MOTION FOR STAY AND EXPEDITED CONSIDERATION
              [Filed:  3/23/2026l D.I. 30]
        BEFORE THE HONORABLE PATRICIA M. MAYER
              U.S. BANKRUPTCY COURT JUDGE


APPEARANCES VIA ZOOM:

For the Debtors:          Anne M. Aaronson, Esq.
                          Michelle V. Lee, Esq.
                          DILWORTH PAXSON, LLP
                          1650 Market Street, Suite 1200
                          Philadelphia, Pennsylvania 19103

For the U.S. Trustee:     Rachel Wolf, Esq.
                          OFFICE OF THE U.S. TRUSTEE
                          1650 Market Street, Suite 1200
                          Philadelphia, Pennsylvania 19103




(Appearances Continued)

Audio Operator:           Electronically Recorded
                          by Keith R. Borzillo, ESR

Transcription Company:    RedDoor Legal Services, LLC
                          44 Valley Forge Road
                          Bordentown, N.J. 08505
                          (973)985-3668
                          www.reddoorlegalservices.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

App.881

APPEARANCES VIA ZOOM:   (Continued)

For Lehigh Valley 1,
LLC:                            Matthew A. Hamermesh, Esq.
                                HANGLEY, ARONCHICK, SEGAL, PUDLIN
                                 & SCHILLER
                                One Logan Square, 27th Floor
                                Philadelphia, Pennsylvania 19103

                                Philip D. Berger, Esq.
                                Matthew R. Kaufmann, Esq.
                                BERGER LAW GROUP, PC
                                919 Conestoga Road
                                Building 3, Suite 114
                                Bryn Mawr, Pennsylvania 19010

Also Appearing:                 Abraham Richard Atiyeh
                                WHITEHALL/SAUCON ENTITIES

                                Nimita Kapoor-Atiyeh
                                WHITEHALL/SAUCON ENTITIES

3

INDEX

PAGE

OPENING ARGUMENT BY MS. AARONSON                        6

OPENING ARGUMENT BY MR. HAMERMESH                       16

CLOSING ARGUMENT BY MS. AARONSON                        252

CLOSING ARGUMENT BY HAMERMESH                           255

COURT DECISION                              (Under Advisement)

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE DEBTORS | | | | |
| ABRAHAM RICHARD ATIYEH | 22 | 35 | 65 | 68 |
| ABRAHAM ATIYEH, JR. | 72 | 85 | 95 | 96 |
| NIMITA KAPOOR-ATIYEH | 96 | 112 | 129 | 131 |
| FOR LEHIGH VALLEY 1, LLC | | | | |
| ELONNA ASHUROVA | 136 | 164 | 181 | 186 |
| WILLIAM DAUGHERTY | 188 | 214 | 238,244 | 242 |

| EXHIBIT | | EVID. |
|---|---|---|
| D-44 | February 2026 MOR - Saucon | 249 |
| D-45 | February 2026 MOR - Whitehall | 249 |
| D-46 | January 2026 MOR - Saucon | 249 |
| D-47 | January 2026 MOR - Whitehall | 249 |
| D-48 | December 2025 MOR - Saucon | 249 |
| D-49 | December 2025 MOR - Whitehall | 249 |
| D-51 | Cash Collateral Budgets | 249 |

(Continued)

App.883

4

INDEX
(Continued)

EXHIBIT (Continued)                                          EVID.

LVX-68    Thirteen-Week Budget - Saucon              249
LVX-69    Thirteen-Week Budget - Whitehall           249
LVX-72    5/2/25 Memorandum Opinion                  249
LVX-73    Proof of Claim Number 1                    249
LVX-74    Proof of Claim Number 5                    249
LVX-75    Proof of Claim Number 6                    249
LVX-76    Proof of Claim Number 3                    249
LVX-77    Proof of Claim Number 7                    249
LVX-78    Proof of Claim Number 13                   249
LVX-81    6/9/25 First Receiver Report/Summary       249
LVX-82    10/2/25 Fourth Receiver Report/Summary     249

26

the intention to close down and liquidate?

A   No.  We intend to reorganize.  We're in good shape and we -- and we can -- we can afford to pay rent and also pay debt.  We're in that -- we're in that  good position right now, we are.

Q   Okay.  And during the bankruptcy cases, have any of the debtors obtained any financing from a bank or any other source to help with operations during the bankruptcy case?

A   No, ma'am.  We're operationally healthy.  We can pay all our expenses right now and we're in good shape.  We didn't have to borrow no money at all.

Q   Okay.  And this includes the payment of the $35,000 per month from each manor to Lehigh Valley that was ordered as adequate protection?

A   Yes, ma'am, plus all the other expenses that are part of the bankruptcy.  We've been paying them all.

Q   Do you know whether the debtors intend to pay their debt to Lehigh Valley in the bankruptcy plan?

A   Yes, we do.

Q   Do you know how much they intend to pay Lehigh Valley?

A   Well, we're waiting to see what we could afford to pay, first of all, and what Bankruptcy Courts approve, but it's also part of the value.  We want to be able to look at operations and see what it -- what debt it could afford to pay and then how much money it could afford to pay the

creditors what we owe and put a good financial plan together that we can -- that everybody is going to get paid.  Our intent is to pay the bank and -- and -- and move forward.

Q    Are you doing anything to have the value of the real estate determined?

A    Yes.  We hired an appraiser to do a value on the current appraisal -- I mean, of the current -- both products -- both projects.  Yes.  We've hired an appraiser.  That's supposed to be done in the next week or two to have the opinion of value and also look at our income and our cash flow to say what -- what the properties could -- could support.

Q    What would happen if the manor debtors paid rent to the trust right now?

A    Right now, there is not enough cash flow, net cash flow, to -- it would -- it would -- it would -- there wouldn't be enough money to make payroll and cover expenses if we had to pay additional, right now.

But in the plan, you know, in the next month or two, and we eliminate a lot of bankruptcy expenses, there would be money in there to pay rent, so would be a tradeoff of -- of what's going on through bankruptcy right now, all gets subtracted out of the operating account expenses.  And then we would add back rent in the -- we -- and the rent, in turn, would be covering mortgage.

So I've -- it -- I've analyzed that the -- you know, all

28

the bankruptcy expenses are substantial, it's -- and it's expensive. So the tradeoff would be eliminate all the bankruptcy expenses and the -- and the ability to pay rent is there. In addition to the 35,000 we're paying right now, we would add more -- the expenses to that, and there's enough money in there that can -- that can be, you know reasonably paid.

Q    And what would happen if you couldn't pay staff or if you couldn't provide the services because you were paying rent; what would happen to the residents?

A    Oh, wow. All the residents would move out and go to our 20 competitors that are all over the place, and -- and our staff would all quit and leave and go to our competitors. It's -- you know, it's a tough market up here in Lehigh Valley, there's 20 to 30 assisted living facilities that are competing for customers and competing for staff.

Q    And would --

A    And --

Q    Would the residents be entitled to refunds if they left?

A    Oh, my god, yeah. They would all get their -- they would all want the refunds back, they would move.

It would be negative publicity for -- for Saucon Valley Manor and Whitehall Manor. Nobody would be able to place -- come back to that place in two years. They whole -- having a vacant building and a negative image is -- it would be very

49

A    The current lease -- the old leases, yes.

Q    Okay.  So if we're now in month four of the bankruptcy, if I'm doing my math right, there's well over $500,000 of unpaid rent due from each of the manors to the respective debtors.  Is that right?

A    Can I explain the rent, the current -- or the one thirty rent, what -- what you're missing in that?  Am I allowed to explain?

Q    No.  You can answer yes or no.

A    Repeat the question then.

Q    Am I correct that there is now, for each of the debtors -- each of the manors, more than $500,000 in unpaid rent accrued since the petition date, owed to the respective trusts?

A    Yes.

Q    Okay.  And that's continuing to accrue at the same rate until the end of the bankruptcy, right?

A    Yes.

Q    Okay.  And would you agree that, if the debtors haven't -- didn't pay rent since 2021 -- I'm not going to quibble about precise numbers, but there's several million dollars of accrued pre-petition rent that the debtor -- the manor debtors currently owe to the trusts.  Is that right?

A    Yes.

Q    Okay.  Do you -- when you've considered a -- how to put

50

together a plan of reorganization, do you think the manor debtors will be able to pay several million dollars of accrued pre-petition rent as part of a reorganization and assuming the leases?

A    Yes.

Q    Okay.  But they can't do that now, correct?

A    Well, now we're in bankruptcy.  But in our plan, we expect -- we -- we plan to pay back rent, yes.

Q    Now you said in your direct testimony that the debtors intend to pay the debt to the lender, right?

A    Yes.

Q    Okay.  But when you say that, you're not saying that the debtors intend to pay the accrued -- or unpaid principal and accrued interest that's due on the notes that are part of the loan, correct?

A    We do intend to pay whatever the Courts allow us to pay.  We -- and we -- if it's the full amount that's accrued and owed and the Courts say that, then we would pay that.

Q    Okay.  And isn't it -- am I correct that the total for the two properties is something like $33 million?

A    Yes.

Q    Okay.  So, if that's what the Courts require you to pay, you're going to pay that.

A    Yes.

Q    Okay.  You said before that the debtors have net cash

51

flow currently, but it's not -- they're not able to pay rent because of the costs associated with the bankruptcy.  Is that right?

A    Yes.

Q    So is it fair to say that, in fact, filing the bankruptcies is what's prevented the manors from paying rent currently?

A    Repeat the question, please.

Q    So you said before that the debtors, the manor debtors, have cash flow, but because they have to pay the expenses of a bankruptcy, they can't pay rent.  Is that what you said before?

A    They can't pay the full amount of the rent.  They could pay rent, yes.

Q    Okay.  They haven't been paying anything though, right?

A    No.

Q    Okay.  So the fact that they need to pay the costs of the bankruptcy is currently preventing them from paying rent, the full rent.  Is that right?

            MS. AARONSON:  Objection.  That's not what he said.

            MR. HAMERMESH:  I know it's not what he said, but it follows from it, and I'm trying to ask what --

            THE WITNESS:  Well, repeat the question.

            MR. HAMERMESH:  Yes.

BY MR. HAMERMESH:

52

Q   So the debtors' need to pay the expenses of the bankruptcy is currently preventing them from paying the full rent, correct?

A   No.

Q   No?  Okay.

Now you talked before about your concern that, if the foreclosure action proceeds, that residents might leave.  Is that right?

A   Yes.

Q   All right.  Now the foreclosure action is currently pending, it's still out there, right?

A   Yes.

Q   It's just been stayed by the bankruptcy so far, right?

A   Yes.

Q   Okay.  Now your concern -- it's your concern that -- or your -- are you worried that residents will leave because they'll be concerned about whether the operator will continue to operate the property?

A   Yes.

Q   Okay.  So one way to resolve that -- am I right?  Would be to find a different operator who could operate the properties and take care of the residents.  Is that right?

A   Repeat the question.

Q   One way to address a concern the residents might have about who's going to operate the property would be to bring

53

in a different operator, with the agreement of the lender and the receiver, who could operate the properties, correct?

A    No.

Q    That wouldn't address their concerns if there's a different operator?

A    No.

Q    Okay.  You think the residents are purely dedicated to having your companies operate the properties; and, otherwise, if it's not you, they're going to leave?

A    Yes.

Q    Okay.

A    A good majority of them will, but a percentage of the people there are because of the Atiyeh family, our reputation, my wife running the facility, my family operating it.

We -- I was born and raised in Lehigh Valley for 60 years here, and everybody knows us.  It's a family-run business.  And we take care of people like they are our family.

Bringing in a different operator in there is -- is a matter of -- once the building's vacant, a foreclosure action will notify the people that are living there that the building's being foreclosed on, meaning they're not safe in their units anymore, meaning they're going to relocate and they're not going to pay the exist -- the current rent they