**Exhibit C**
Debtors' Joint Motion Pursuant to 11 U.S.C. § 363 for
Entry of an Order Authorizing the Debtors to
Enter into and Perform Under Use and Occupancy Agreements
(Filed July 10, 2026)

Part 2

# EXHIBIT F

**Redline Comparison**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>Whitehall Manor, et al.,[1]<br><br>                     Debtors. | Chapter 11<br><br>Case No. 25-15245 (PMM)<br><br>Jointly Administered |

**AMENDED[2] JOINT MOTION PURSUANT TO 11 U.S.C. § 363 FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER USE AND OCCUPANCY AGREEMENTS**

Debtors Whitehall Manor, Inc. and Saucon Valley Manor, Inc. (together, the "Manor Debtors") and Debtors Whitehall Trust for Senior Care (f/k/a Whitehall Trust and herein, "Whitehall Trust") and Saucon Trust (together with Whitehall Trust, the "Trusts" and together with the Manor Debtors, the "Debtors"), hereby ~~jointly move~~amend their initial *Joint Motion Pursuant to 11 U.S.C. § 363 for Entry of an Order Authorizing the Debtors to Enter Into and Perform Under Use and Occupancy Agreement* [ECF 182] (the "Initial U&O Motion"), moving this Court for authorization permitting (x) Debtors Whitehall Manor, Inc. and Whitehall Trust to enter into and perform under that certain Use and Occupancy Agreement, a copy of which is attached as **Exhibit A** (the "Whitehall U&O Agreement") and (y) Debtors Saucon Valley Manor, Inc. and Saucon Trust to enter into and perform under that certain Use and Occupancy Agreement, a copy of which is attached as **Exhibit B** (the "Saucon U&O Agreement" and together with the

---

[1] The Debtors in these chapter 11 cases are: (i) Whitehall Manor, Inc (5606); and (ii) Saucon Valley Manor, Inc. (2894). On March 19, 2026, this Court entered an order [ECF 25] granting the motion to dismiss Whitehall Trust and Saucon Trust as debtors in these jointly administered chapter 11 cases. Pursuant to an order of this Court dated April 2, 2026 [ECF 67], the dismissals of the Trusts have been stayed pending appeal and the Trusts remain debtors in these jointly administered cases.

[2] The Debtors file this Amended Motion as contemplated by the *Debtors' Joint Motion to Modify Adequate Protection Pending Confirmation of a Chapter 11 Plan* [ECF 206] (the "AP Modification Motion"). Attached to this amended motion as **Exhibit F** is a redline comparison of the filed motion versus this amended motion, including all exhibits.

Whitehall U&O Agreement, the "<u>Agreements</u>"), and, in connection therewith, to use property of the estate, including cash collateral.[3]  The Trusts further seek the entry of an order, substantially in the form attached hereto as **<u>Exhibit C</u>** (the "<u>Proposed Order</u>") In support of this <u>amended motion (the "Amended Motion"),</u> the Debtors respectfully state as follows:

<u>**JURISDICTION AND VENUE**</u>

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are section 363 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

<u>**BACKGROUND**</u>

4.      On December 26, 2025 (the "<u>Petition Date</u>"), each of the Debtors filed a petition for relief under Chapter 11 of title 11 of the Bankruptcy Code.

5.      The Debtors are operating their businesses and managing their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      No official committee of unsecured creditors has been appointed in these chapter 11 cases.

7.      On March 19, 2026, this Court dismissed the chapter 11 cases filed by Debtors Whitehall Trust and Saucon Trust.  [ECF 264] This Court entered an order on April 2, 2026,

---

[3] Prior to filing this Amended Motion, counsel to the Trusts advised counsel to Lehigh Valley 1, LLC of the Trusts' intention to file, as contemplated by the AP Modification Motion (as defined herein).  Thereafter, LV1 filed *Secured Creditor Lehigh Valley 1, LLC's Objection to Joint Motion Pursuant to 11 U.S.C. § 363 for Entry of an Order Authorizing the Debtors to Enter Into and Perform Under Use and Occupancy Agreements* [ECF 215] (the "LV1 Objection"), objecting to the Initial U&O Motion.  The Debtors intend to treat the LV1 Objection as an objection to this Amended Motion and will reply in due course.

staying the effectiveness of the dismissal order pending appeal.  [ECF 274] The Trusts are awaiting a decision by the Third Circuit Court of Appeals whether it will authorize a direct appeal of the dismissal order. The Trusts intend to seek expedited consideration of the appeal once the direct appeal is authorized.  If not authorized, the Trusts will move as expeditiously as possible in the District Court to resolve the Dismissal Order Appeal, seeking further expedited appellate review by the Third Circuit Court of Appeals, if necessary.   The Trusts are also appealing the disqualification of their prior bankruptcy counsel by the District Court.

8.        On May 15, 2026, the Debtors filed their Plan and Disclosure Statement.  [ECF 127] Because the proposed plan contemplates alternative treatment depending on whether the Trusts remain debtors, the Trusts continue to have a direct and substantial interest in the administration of these chapter 11 cases and in the outcome of the pending appeals.

9.        The factual background relating to the Debtors' commencement of these Chapter 11 Cases is set forth in detail in the First Day Declaration filed on the Petition Date and incorporated herein by reference.  [ECF 25]

## THE DEBTORS' OPERATIONS AND THE USE AND OPERATING AGREEMENTS

10.        Whitehall Manor, Inc. ("Whitehall") and Saucon Valley Manor, Inc. ("SVM," and, together with Whitehall, the "Manors") are Pennsylvania S-corporations.  Through their missions, the Manors operate award winning senior living facilities at properties owned by the Trusts.  Real property located at 1177 Sixth Street, Whitehall Township, PA is held in trust by Whitehall Trust and real property located at 1050 Main Street, Hellertown, PA is held in trust by Saucon Trust. Whitehall and SVM operate their Manors at those locations.

11.        The Trusts have historically owned and maintained their respective parcels of real property and maintained that they were business trusts. They were not formally registered as Pennsylvania Business Trusts until post-petition. Whitehall Trust is registered as Domestic

3

Business Trust ID 0015255713[24] and Saucon Trust as Domestic Business Trust ID 0015237229.

This Court has determined that the trusts are not business trusts for purposes of the Bankruptcy

Code.

12.    Historically, the Trusts leased the properties to Whitehall and SVM, respectively,

pursuant to (i) that certain Lease Agreement, dated and effective as of August 14, 2008 (as amended,

modified, or supplemented from time to time, the "Whitehall Lease") and (ii) that certain Lease

Agreement, dated and effective as of August 14, 2008 (as amended, modified, or supplemented from

time to time, the "Saucon Lease" and together with the Whitehall Lease, the "Leases").

13.    By order dated May 15, 2026, the Bankruptcy Court declined to compel the

Manors, in their capacities as Debtors, to assume or reject the Leases, determining among other

things that the Leases had expired by their terms.  *See Order Denying Motion to Compel the Manor*

*Debtors to Assume or Reject Their Leases, (2) Establish the Cure Amount and (3) For Relief from*

*the Automatic Stay* [ECF 124].

14.    The Manors continue to use and occupy the properties while these chapter 11 cases

and their appeals are pending.

15.    During these chapter 11 cases, the Debtors had their property and assets valued by

Lukens & Wolf, an affiliate of Valbridge Property Advisors ("Lukens") and also had fair market

rent determined.   Copies of the appraisals, together with supplemental letters specifically

addressing, *inter alia*, market rent (together, the "Appraisals"), are attached hereto as Exhibits D

and E.[5]   According to Lukens' analysis of the fair market rental value of the Trusts' facilities,

---

[24] Whitehall Trust was renamed "Whitehall Trust for Senior Care" to satisfy the Commonwealth of Pennsylvania's requirement that a name must be sufficiently distinguishable from other entities on record.

[5] The appraisals attached to the Initial U&O Motion, dated April 20, 2026, have been slightly revised and reissued since the filing of the Initial U&O Motion.  The attached Appraisals, dated June 12, 2026, have been revised to reflect (i) a valuation date as of the Petition Date and (ii) an updated "Documents Considered" section, which now includes the Lender's 2023 third-party appraisals for each report.

annual rent should be $331,500.00 for Whitehall Trust's facility and $419,250.00 for Saucon Trust's facility, significantly lower than the rent stated in the most recent but now expired lease amendments between the Debtors.  Thus, the monthly rent for Whitehall would be $27,625.00 and monthly rent for Saucon would be $34,937.50.

16. On or about May 22, 2026, Whitehall and the Whitehall Trust informally agreed that Whitehall would pay use and occupancy charges of $69,578.58 to Whitehall Trust (the "Whitehall Monthly U&O Charges"), and Saucon and the Saucon Trust informally agreed that Saucon would pay use and occupancy charges of $69,844.85 to Saucon Trust (the "Saucon Monthly U&O Charges").  These amounts coincide with the monthly debt service due and owing to Lehigh Valley 1, LLC (the "Lender"), the Debtors' secured lender.

16.        17. The Debtors' assets, including the properties and the Debtors' cash, constitute collateral securing the Debtors' obligations owing to Lehigh Valley 1, LLC (the "Lender"), the Debtors' secured lender.

17.        18. On February 5, 2026, the Court ordered Debtor Whitehall Manor to pay $35,000 per month to Lender as additional adequate protection of its interests and ordered Debtor Saucon Valley Manor to pay $35,000 per month to Lender as additional adequate protection.  *See Second Interim Order Authorizing the Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for such use and Prescribing the Form and Manner of Notice and Setting the Time for a Final Hearing* [ECF 189].

18.        19. On April 23, 2026, the Court ordered Debtor Whitehall Manor to pay $139,000.00 by May 1, 2026 and Debtor Saucon Valley Manor to pay $142,118.42 by May 1, 2026 into escrow with the Receiver appointed in the prepetition foreclosure action pending further order of the Court, which the Debtors escrowed with the Receiver on or about April 29, 2026. *See*

5

*Fifth Interim Order (A) Authorizing the Debtors to Use Cash Collateral of Existing Secured Party*

*and Granting Adequate Protection for Such Use and (B) Prescribing the Form and Manner of*

*Notice and Setting the Time for a Final Hearing* [ECF 120].

19.     20. On May 26, 2026, the Court modified its prior adequate protection order of

April 23, 2026 to require Whitehall to pay $69,844.85 in addition to the $35,000 monthly payments

referenced in paragraph 16 hereof to Lehigh for a total of $104,844.95, and SVM to pay $69,578.58

in addition to the $35,000 monthly payments referenced in paragraph 16 hereof to Lehigh for a

total of $104,578.58. The Court also discontinued the escrow of rent with the Receiver and directed

the Receiver to turn over the rent escrowed by the Debtors for May 1, 2026 to the Lender. *See*

*Sixth Interim Order (A) Authorizing the Debtors to Use Cash Collateral of Existing Secured Party*

*and Granting Adequate Protection for Such Use and (B) Prescribing the Form and Manner of*

*Notice and Setting the Time for a Final Hearing* [ECF 168] (the "May 26 Order"). ┤

20.     On or about May 22, 2026, Whitehall and the Whitehall Trust informally agreed

that Whitehall would pay use and occupancy charges of $69,578.58 to Whitehall Trust, and Saucon

and the Saucon Trust informally agreed that Saucon would pay use and occupancy charges of

$69,844.85 to Saucon Trust (the "Initial Proposed Monthly U&O Charges"), which amounts

coincide with the monthly debt service due and owing to the Lender.

21.     On June 9, 2026, the Debtors filed the Initial U&O Motion.

22.     Following additional discussions, on or about July 1, 2026, Whitehall and the

Whitehall Trust informally agreed that Whitehall would pay use and occupancy charges of

$27,625.00 to Whitehall Trust (the "Whitehall Monthly U&O Charges"), and Saucon and the

Saucon Trust informally agreed that Saucon would pay use and occupancy charges of $34,937.50

to Saucon Trust (the "Saucon Monthly U&O Charges"). These amounts are consistent with the

6

monthly market rent set forth in the Appraisals, and are anticipated to be paid to the Lender along with proposed, modified monthly adequate protection payments of $41,953.58 for Whitehall Manor and Whitehall Trust, and $34,907.35 for Saucon Valley Manor and Saucon Trust, all as detailed *infra*.  The total proposed to be paid to the Lender on a monthly basis remains equal to the aggregate Initial Proposed Monthly U&O Charges, as well as the amount ordered by this Court pursuant to the May 26 Order.

23.     On July 2, 2026, the Debtors filed a motion to modify the adequate protection of the Lender's interests.  *See generally*, AP Modification Motion.  As detailed in the AP Modification Motion, Whitehall Manor and Whitehall Trust seek to modify their adequate protection payment to be $41,953.58 and Saucon Valley Manor and Saucon Trust seek to modify their adequate protection to be $34,907.35, plus the continuing financial reporting and payment of post-petition taxes, insurance, repairs and maintenance by the Manor Debtors.

**RELIEF REQUESTED**

24.     ~~21.~~ By this Application, the Debtors seek authority to enter into and perform under the Use and Occupancy Agreements as further set forth herein.  While the nature of the relief here may fall within the ordinary course of business pursuant to Bankruptcy Code section 363(c)(1), in an abundance of caution, to the extent the proposed use, and the corresponding Use and Occupancy Agreements, are determined to be outside the ordinary course of business, the Debtors seek authority pursuant to Bankruptcy Code section 363(b)(1).  **The Debtors' use of cash collateral and adequate protection ~~will be~~is addressed in ~~a separate motion~~the AP Modification Motion.**

## BASES FOR RELIEF REQUESTED

### A. Use of Property of the Estate Under Section 363

25. 22. Section 363 of the Bankruptcy Code governs the use, sale, or lease of property of the estate. Pursuant to 11 U.S.C. § 363(c)(1), a debtor-in-possession may use property of the estate in the ordinary course of business without notice or a hearing. Pursuant to 11 U.S.C. § 363(b)(1), the debtor, after notice and a hearing, may use property of the estate other than in the ordinary course of business. Transactions outside the ordinary course of business require Bankruptcy Court approval and are evaluated under the business judgment standard, which requires a showing of a sound business justification. *See*, *e.g.*, *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999); *see also Johns-Manville Corp*., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("The § 363 mandate necessarily includes the concomitant discretion to exercise reasonable judgment in ordinary business matters."); *In re Phoenix Steel Corp.,* 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring "good business reason" for use under section 363(b) of the Bankruptcy Code). This standard prohibits other parties from second-guessing the debtor's business judgment if the debtor has shown that the proposed use will benefit the debtor's estate. Where section 363(b) approval is required, courts generally defer to a debtor's business judgment when the debtor articulates a sound business purpose and demonstrates that the proposed transaction is in the best interests of the estate. *See In re Tower Air, Inc*., 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near Herculean task."); *In re Johns-Manville Corp*., 60 B.R. at 616 ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

26. 23. Here, while relief may be appropriate under section 363(c)(1), given the posture of these cases and in an abundance of caution, the Debtors seek this Court's authorization pursuant

8

to Bankruptcy Code section 363(b)(1).  As set forth above, Lukens' analyses of the fair market rental value of the Trusts' facilities suggest that annual rent should be $331,500.00 for Whitehall Trust's facility and $419,250.00 for Saucon Trust's facility, making the monthly rental for Whitehall $27,625.00 and Saucon $34,937.50, according to the Appraisals.[36]

27.    24. The proposed Whitehall Monthly U&O Charges are $69,578.58 27,625.00 and the proposed Saucon Monthly U&O Charges are $69,844.85.  While greater than 34,937.50.  These amounts are fair and reasonable given that they comport with the fair market rent as determined by the Appraisals, these amounts coincide with the monthly debt service due and are in addition to the proposed, modified adequate protection payments to the Lender.  In the aggregate, the proposed Monthly U&O Charges and adequate protection payments are above the fair market value of rent, serve as additional adequate protection for the Trusts and the Lenders, allow the payment of the full monthly contractual debt service to the Lender, and the additional adequate protection ordered by this Court pursuant to the May 26 Order benefit the Trusts as the payments may reduce the Lender's secured claim. Given the interests of all of the Debtors in preserving the status quo pending the resolution of these chapter 11 cases (including the appeals), including the avoidance of potentially catastrophic business disruptions and the attendant loss of value, the Debtors each believe that the proposed Monthly U&O Charges are reasonable and balance the interests of the Debtors, their estates, and the parties in these cases, and that their business judgment is entitled to deference.  *See In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (courts defer to a trustee's judgment where there is a legitimate business justification); *LaSalle Nat'l Bank v.*

---

[36] For the month of May, pursuant to the leases previously governing the Manors' tenancies, this Court ordered Debtor Whitehall Manor to pay rent totaling $139,000.00 by May 1, 2026 and Debtor Saucon Valley Manor to pay rent totaling $142,118.42 by May 1, 2026.  The Manors made those payments into escrow, and they have been turned over to the Secured Lender.

9

*Perelman*, 82 F. Supp. 2d 279, 292 (D. Del. 2000) (recognizing that chapter 11 fiduciaries have broad latitude to balance competing interests in making decisions in the best interests of the estate).

**B.  Use of Cash Collateral and Adequate Protection**

28.    ~~25.~~ Bankruptcy Code section 363(c)(2) provides that a debtor may not use cash collateral unless each entity with an interest consents or the Court authorizes such use after notice and a hearing.  Pursuant to Code section 363(e), the Court shall prohibit or condition such use as necessary to provide adequate protection to any entity with an interest in such property.  Under Bankruptcy Code section 361, adequate protection may be provided by periodic cash payments, replacement liens, or other relief sufficient to protect against any diminution in value of a secured creditor's interest.  *See In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (adequate protection is intended to safeguard a secured creditor from a decrease in the value of its collateral during the bankruptcy case); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988) (adequate protection protects a secured creditor against diminution in the value of its collateral).

29.    ~~26.~~ Here, the Court has previously determined that Lender is entitled to adequate protection, and has modified that protection from time to time. *See*, *e.g.*, May 26 Order, ¶¶ H-J, noting the ordering of payments totaling (i) $70,000 per month for February through April 2026; (ii) $281,118.42 for May 2026; and (iii) $209,423.43 for June 2026.  The ~~Debtors will address~~ sum of the proposed Monthly U&O Charges and the proposed modified adequate protection payments is consistent with the total amount due to the Lender on a monthly basis.  The Debtors have separately addressed the adequate protection issue and use of cash collateral in ~~a separate motion that will demonstrate that the proposed Monthly U&O Occupancy Payments are all that should be required. The Debtors will demonstrate that (a) the aggregate value of the Lender's collateral is~~

not diminishing and has in fact appreciated during the Chapter 11 cases, (b) that the value of the Lender's collateral has always been less than the amount of the Lender's claim, (c) that Lender's exposure has been reduced by the above described payments, all of which have been made by the Debtors in accordance with the Court's orders. Section 363(e) requires protection that is "adequate" but not more than is necessary to protect against a diminution in value. the AP Modification Motion.[7]

## NOTICE

30. 27. Notice of this Amended Motion has been or will be given to (a) the Office of the United States Trustee for the Eastern District of Pennsylvania; (b) the Commonwealth of Pennsylvania Department of Revenue; (c) all local taxing authorities; (d) the Internal Revenue Service; (e) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed by the Debtors pursuant to Bankruptcy Rule 1007(d); (f) the Secured Lender; (g) the banks in which the Debtors maintain their bank accounts; and (h) all parties who, as of the filing of this Amended Motion, have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  The Trusts submit that, in light of the nature of the relief requested, no other or further notice need be given.

---

[7] Among other things, the Debtors have demonstrated that the proposed Monthly U&O Charges are all that should be required. The Debtors also demonstrated that (a) the aggregate value of the Lender's collateral is not diminishing and has in fact appreciated during the Chapter 11 cases, (b) that the value of the Lender's collateral has always been less than the amount of the Lender's claim, (c) that Lender's exposure has been reduced by the above described payments, all of which have been made by the Debtors in accordance with the Court's orders. Section 363(e) requires protection that is "adequate" but not more than is necessary to protect against a diminution in value.  *See* AP Modification Motion, at 13-24.

## <u>NO PRIOR REQUEST</u>

<u>31.</u>    ~~28. No~~<u>Other than the Initial U&O Motion, no</u> prior motion for the relief requested herein has been made to this or any other Court.

**WHEREFORE**, the Debtors respectfully request that the Court enter an Order, substantially in the form submitted herewith, granting (i)(x) Debtors Whitehall Manor, Inc. and Whitehall Trust to enter into and perform under the Whitehall U&O Agreement and (y) Debtors Saucon Valley Manor, Inc. and Saucon Trust to enter into and perform under the Saucon U&O Agreement; (ii) in connection therewith, to use property of the estate, including cash collateral; and (iii) granting such other relief as may be just and proper.

Dated: ~~June 9~~ <u>July 10</u>, 2026 _____Respectfully submitted,

**ROBINSON & COLE LLP**

<u>/s/ *Rachel Jaffe Mauceri*</u>
Rachel Jaffe Mauceri
Natalie D. Ramsey
1650 Market Street, Suite 3030
Philadelphia, PA 19103
Tel.: (215) 398-0600
Email: nramsey@rc.com
　　　　rmauceri@rc.com

*~~Proposed~~ Counsel to Saucon Trust and Whitehall Trust*

**DILWORTH PAXSON LLP**

<u>/s/ *Michelle V. Lee*</u>
Lawrence G. McMichael
Anne M. Aaronson
Michelle V. Lee
1650 Market Street, Suite 1200
Philadelphia, PA 19103
Tel.: (215) 575-5000
Email: lmcmichael@dilworthlaw.com
　　　　aaronson@dilworthlaw.com
　　　　mlee@dilworthlaw.com

# EXHIBIT A

**Proposed Whitehall U&O Agreement**

Draft – ~~6.9.2026~~7.9.2026

## <u>USE AND OCCUPANCY AGREEMENT</u>

This **USE AND OCCUPANCY AGREEMENT** (this "<u>Agreement</u>") is made as of ~~June~~July \_\_\_, 2026, by and between **WHITEHALL TRUST**, a Pennsylvania trust, now registered as a business trust under the name of Whitehall Trust for Senior Care (the "<u>Licensor</u>"), having its principal office at 1177 Sixth Street, Whitehall, PA 18052, by and through its Trustee, Whitehall Fiduciary LLC u/t/a dated August 1, 2007, and **WHITEHALL MANOR, INC.**, a Pennsylvania corporation (the "<u>Licensee</u>" and together with Licensor, the "<u>Parties</u>"), having its principal office at 1177 Sixth Street, Whitehall, PA 18052.

## **WITNESSETH**

WHEREAS,  the Parties are parties to that certain Lease Agreement, dated and effective as of August 14, 2008 (as amended, modified, or supplemented from time to time, the "<u>Whitehall Lease</u>"), pursuant to which Licensor historically leased to Licensee the Leased Premises (as defined therein and as set forth on Exhibit A hereto) comprising the real property and improvements thereon situate on Unit 1 of Whitehall Manor Condominium (the "<u>Property</u>"); and

WHEREAS, the Whitehall Lease is incorporated herein by reference, and all capitalized terms used herein without definition shall have the meanings assigned thereto in the Whitehall Lease;

WHEREAS, on December 26, 2025, each of the Parties filed a petition (together, the "<u>Chapter 11 Cases</u>" for protection under chapter 11 of title 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") before the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "<u>Bankruptcy Court</u>");

WHEREAS, by order dated May 15, 2026 [ECF 124], the Bankruptcy Court declined to compel the Licensor, in its capacity as debtor, to assume or reject the Whitehall Lease, determining among other things that the Whitehall Lease had expired by its terms;

WHEREAS, Licensee desires to continue to use and occupy the Property and the improvements thereon, the "<u>Improvements</u>"), and the land area appurtenant thereto located at the Property as more particularly described in the Whitehall Lease (collectively, the "<u>Licensed Premises</u>"); and

WHEREAS, Licensor believes that its best interests are for Licensee to continue use and occupancy of the Licensed Premises under the terms of this Agreement; and

WHEREAS, Licensor has agreed that Licensee shall have the right to use the Licensed Premises as a licensee on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Licensor and Licensee hereby agree as follows:

1.      OCCUPANCY – The Licensed Premises to be occupied by Licensee shall consist of the Improvements and land area identified in the Whitehall Lease (as such area may be adjusted from time to time by mutual agreement of the parties). Licensee shall be permitted to use the Licensed Premises for uses consistent with the Whitehall Lease. Notwithstanding anything herein contained to the contrary, Licensee's use and occupancy of the Licensed Premises shall be as a tenant at sufferance and under no circumstances shall such use and occupation establish a tenancy at will or a tenancy for term. No expenditure or cost incurred by Licensee in connection with the Licensed Premises or the Property shall give rise to any right to a tenancy or claim of any kind against Licensor.

2.      TERM – The term of this Agreement the ("Term") commences on the later of (x) the date the Bankruptcy Court enters an order authorizing the entry into this Agreement, and (y) each of the Parties executes and delivers a copy hereof (the "Effective Date") and continues until the earliest of (i) the entry by the Parties into a subsequent lease or extension of the Whitehall Lease, (ii) a Termination of this Agreement in accordance with Section 3 below, or (iii) such other date as the Bankruptcy Court may determine.

3.      TERMINATION – Licensor hereby reserves the right (a) to terminate this Agreement in its sole and absolute discretion upon not less than thirty (30) days' prior written notice; and (b) to terminate this Agreement immediately upon written or oral notice in the event that Licensee is in violation of this Agreement. Licensee shall have the right (x) to terminate this Agreement in its sole and absolute discretion upon not less than thirty (30) days' prior written notice; and (y) to terminate this Agreement immediately upon written or oral notice in the event that Licensor is in violation of this Agreement. In the event of such termination in either case, this Agreement shall be null and void and of further force and effect, except for those provisions that, by their express terms, survive such termination. Licensor acknowledges that Pennsylvania law and the regulations regarding the Use may impose longer obligations regarding persons granted residency and care agreements by Licensee.

4.      FEES – Licensee shall pay a monthly fee of $~~69,855.85~~ 27,625.00 for the use and occupancy of the Licensed Premises under this Agreement. Notwithstanding the foregoing, and as further set forth in sections 9 and 10 hereof, Licensee is responsible for all expenses associated with its use and operation of the Licensed Premises including, but not limited to, permits, licenses, utilities (including, without limitation water, sewer, telecommunications, and electrical utilities and charges, if any, due as of the Effective Date), real property taxes, maintenance, landscaping, snow removal and repairs. Neither party warrants the sufficiency of the conditions of the Licensed Premises. There is no obligation hereunder to pay for any prior use or occupancy, nor is there a credit for past payment – other than real estate taxes prepaid.

5.      NO DISTURBANCE OR ILLEGAL USE/CARE – Neither Licensee nor their invitees, visitors, guests, agents, or servants shall make or suffer any unlawful, noisy, or otherwise offensive use of the Licensed Premises, nor commit or permit any nuisance to exist thereon. Licensee shall not make any alterations or additions to the Licensed Premises. Licensor shall not disturb the persons residing at the Licensed Premises at all times while Licensee is in control of the Licensed Premises, and shall assure that anyone entering by, for or regarding Licensor shall

Use and Occupancy Agreement - Whitehall                          -2-

comply with the requirements and regulations under HIPAA and all other laws regarding medical records, patients, care and other privacy law..

6.      INDEMNITY – Licensee agrees to indemnify and save Licensor (and its members, managers, employees, and affiliates) harmless from and against any and all injuries, loss, cost, expense, or damage of whatever nature caused by or resulting from or claimed to have been caused by or to have resulted from any acts, omissions or negligence of Licensee or anyone claiming under Licensee occurring upon or about the Licensed Premises or the Property during the term of Licensee control of the Licensed Premises pursuant to this Agreement. This section shall survive termination of this Agreement.

7.      LICENSOR'S RIGHT TO ENTER – Licensor and Licensor's employees, agents, contractors, and invitees shall have the right of entry only upon giving not less than  three (3) business days notice to Licensee and agreement not to take pictures of residents or record or otherwise take away any personally identifiable information or medical conditions or other personal information about a resident or employee and to not disclose any information as to identity, type of care or personal information of any resident.

8.      NO ASSIGNMENT – Licensee shall not assign, pledge, or in any other way encumber or transfer its rights under this Agreement, in whole or in part.

9.      INSURANCE – Licensee acknowledges that it is responsible for obtaining and continually maintaining, for so long as this Agreement is in effect, its own liability insurance, or similar insurance, insurance on its personal property located at the Licensed Premises, and all other required insurances in accordance with the requirements set forth in the Whitehall Lease (including without limitation sections 3.13 and 3.14 thereof), to the extent applicable, and shall provide evidence of general liability insurance naming Licensor and any lender or affiliate of Licensor as additional insured as to general liability, only.

10.      OTHER AMOUNTS PAYABLE – Licensee acknowledges that it is responsible for paying all other applicable amounts set forth in the Whitehall Lease, including without limitation in sections 3.14 and 4.05 thereof, when due or which may be charged to Licensor in connection with the Leased Premises and treat such payments as Operating Expenses (as defined in the Whitehall Lease) provided, however, the foregoing shall not require payment of FHA mortgage insurance or other insurance required under HUD Requirements, each as defined in the Whitehall Lease; and nothing herein shall compel payment or creation of a Reserve Fund, Impound or other capital cost fund or for advance deposits for any insurances or repairs or maintenance.

11.      DELIVERY OF PREMISES/CASUALTY – If at any time during the Term of this Agreement, for any reason the Licensed Premises is taken by eminent domain or other means or suffers damage due to fire or other casualty that renders the property unusable for Licensee's purposes or unusable in accordance with any state or local law, regulation, or ordinance or similar circumstance, Licensee acknowledges that Licensor has no obligation to provide any form or sort of relocation assistance to Licensee.

12.      ENFORCEMENT – All costs and expenses, including without limitation, reasonable attorneys' fees, incurred by or on behalf of Licensor in enforcing its rights hereunder

which are caused by any breach by Licensee of its obligations hereunder shall be paid by Licensee upon demand by Licensor.

13.    <u>BANKRUPTCY COURT JURISDICTION</u> – Notwithstanding anything to the contrary herein, the effectiveness of this Agreement shall be subject to the prior approval of the Bankruptcy Court, and subject to its ongoing jurisdiction and the further orders thereof pending the resolution of the Chapter 11 Cases.

13.    <u>NOTICES</u> – All notices shall be deemed to have been given when sent via electronic mail, provided that a copy of such notice, substantially contemporaneously therewith, shall be deposited with the U.S. Postal Service by certified mail, postage prepaid, return receipt requested, or when deposited with a recognized overnight courier service, addressed to the parties at the address set forth in the preamble of this Agreement.

14.    <u>RELOCATION ACT DISCLAIMER AND WAIVER</u> – Licensee acknowledges and agrees all of Licensee's rights hereunder, including, without limitation, the use and occupancy of the Licensed Premises, shall not give rise to and hereby waives any and all claims for compensation or benefits to facilitate relocation from the Licensed Premises and to another location under local, state, and federal law, including, without limitation, the federal Uniform Relocation Act, 42 U.S.C. 4610 et seq., as amended, and the regulations promulgated thereunder.

15.    <u>GENERAL</u> – This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and shall not be amended, modified, or otherwise altered except in a writing executed by both Licensor and Licensee. If two (2) or more persons are named herein as Licensee, their obligations hereunder shall be joint and several. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania. This Agreement may be (a) executed in any number of original counterparts, all of which shall evidence only one agreement, and only one of which need be produced for any purpose; and (b) executed and delivered by telecopy, facsimile, or electronic file (such as pdf of the executed document) attached to electronic mail. The parties hereto intend to be bound by such signatures and delivery, and are aware that the other party will rely on the same and waive any enforcement of this Agreement based on such form of signature or delivery.

16.    <u>LIABILITY</u> - The liability of each Party is limited to its rights in and to the Licensed Premises, and there is no personal liability of any officer, manager, director, receiver, trustee or affiliates of any of the Parties.

[SIGNATURES ON FOLLOWING PAGE]

Use and Occupancy Agreement - Whitehall                    -4-

EXECUTED by Licensor and Licensee as a sealed instrument as of the date hereof.

LICENSOR:

**WHITEHALL TRUST**, a Pennsylvania trust
**[now known as Whitehall Trust for Senior Care]**
 **By Whitehall Fiduciary, LLC**, as Trustee u/t/a
dated August 1, 2007

By: _____
Name:
Title:

LICENSEE:

**WHITEHALL MANOR, INC.**
a Pennsylvania corporation

By: _____
Name:
Title:

## EXHIBIT A

UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Record of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.

PARCEL ID NO. 5498 9378 8632-1

# EXHIBIT B

**Proposed Saucon U&O Agreement**

Draft – ~~6.9.2026~~7.9.2026

## USE AND OCCUPANCY AGREEMENT

This **USE AND OCCUPANCY AGREEMENT** (this "Agreement") is made as of ~~June~~July ___, 2026, by and between **SAUCON TRUST**, a Pennsylvania trust, now registered as a Pennsylvania business trust (the "Licensor"), having its principal office at 1177 Sixth Street, Whitehall, PA 18052, by and through its Trustee, Saucon Management LLC, and **SAUCON VALLEY MANOR, INC.**, a Pennsylvania corporation (the "Licensee" and together with Licensor, the "Parties"), having its principal office at 1177 Sixth Street, Whitehall, PA 18052.

## WITNESSETH

WHEREAS, the Parties are parties to that certain Lease Agreement, dated and effective as of January 1, 2006 (as amended, modified, or supplemented from time to time, the "Saucon Valley Lease"), pursuant to which Licensor historically leased to Licensee the Leased Premises (as defined therein and as set forth on Exhibit A hereto) comprising the real property and improvements thereon situate at Unit 1 of Saucon Valley Manor Condominium (the "Property"); and

WHEREAS, the Saucon Lease is incorporated herein by reference, and all capitalized terms used herein without definition shall have the meanings assigned thereto in the Saucon Lease;

WHEREAS, on December 26, 2025, each of the Parties filed a petition (together, the "Chapter 11 Cases" for protection under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") before the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court");

WHEREAS, by order dated May 15, 2026 [ECF 124], the Bankruptcy Court declined to compel the Licensor, in its capacity as debtor, to assume or reject the Saucon Lease, determining among other things that the Saucon Lease had expired by its terms;

WHEREAS, Licensee desires to continue to use and occupy the Property and the improvements thereon, the "Improvements"), and the land area appurtenant thereto located at the Property as more particularly described in the Saucon Lease (collectively, the "Licensed Premises"); and

WHEREAS, Licensor believes that its best interests are for Licensee to continue use and occupancy of the Licensed Premises under the terms of this Agreement; and

WHEREAS, Licensor has agreed that Licensee shall have the right to use the Licensed Premises as a licensee on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Licensor and Licensee hereby agree as follows:

1.        <u>OCCUPANCY</u> – The Licensed Premises to be occupied by Licensee shall consist of the Improvements and land area identified in the Saucon Lease (as such area may be adjusted from time to time by mutual agreement of the parties). Licensee shall be permitted to use the Licensed Premises for uses consistent with the Saucon Lease. Notwithstanding anything herein contained to the contrary, Licensee's use and occupancy of the Licensed Premises shall be as a tenant at sufferance and under no circumstances shall such use and occupation establish a tenancy at will or a tenancy for term. No expenditure or cost incurred by Licensee in connection with the Licensed Premises or the Property shall give rise to any right to a tenancy or claim of any kind against Licensor.

2.        <u>TERM</u> – The term of this Agreement the ("<u>Term</u>") commences on the later of (x) the date the Bankruptcy Court enters an order authorizing the entry into this Agreement, and (y) each of the Parties executes and delivers a copy hereof (the "<u>Effective Date</u>") and continues until the earliest of (i) the entry by the Parties into a subsequent lease or extension of the Saucon Lease, (ii) a Termination of this Agreement in accordance with Section 3 below, or (iii) such other date as the Bankruptcy Court may determine.

3.        <u>TERMINATION</u> – Licensor hereby reserves the right (a) to terminate this Agreement in its sole and absolute discretion upon not less than thirty (30) days' prior written notice; and (b) to terminate this Agreement immediately upon written or oral notice in the event that Licensee is in violation of this Agreement. Licensee shall have the right (x) to terminate this Agreement in its sole and absolute discretion upon not less than thirty (30) days' prior written notice; and (y) to terminate this Agreement immediately upon written or oral notice in the event that Licensor is in violation of this Agreement. In the event of such termination in either case, this Agreement shall be null and void and of further force and effect, except for those provisions that, by their express terms, survive such termination. Licensor acknowledges that Pennsylvania law and the regulations regarding the Use may impose longer obligations regarding persons granted residency and care agreements by Licensee.

4.        <u>FEES</u> – Licensee shall pay a monthly fee of $~~69,578.58~~ 34,937.50 for the use and occupancy of the Licensed Premises under this Agreement. Notwithstanding the foregoing, and as further set forth in sections 9 and 10 hereof, Licensee is responsible for all expenses associated with its use and operation of the Licensed Premises including, but not limited to, permits, licenses, utilities (including, without limitation water, sewer, telecommunications, and electrical utilities and charges, if any, due as of the Effective Date), real property taxes, maintenance, landscaping, snow removal and repairs. Neither party warrants the sufficiency of the conditions of the Licensed Premises. There is no obligation hereunder to pay for any prior use or occupancy, nor is there a credit for past payment – other than real estate taxes prepaid.

5.        <u>NO DISTURBANCE OR ILLEGAL USE/CARE</u> – Neither Licensee nor their invitees, visitors, guests, agents, or servants shall make or suffer any unlawful, noisy, or otherwise offensive use of the Licensed Premises, nor commit or permit any nuisance to exist thereon. Licensee shall not make any alterations or additions to the Licensed Premises. Licensor shall not disturb the persons residing at the Licensed Premises at all times while Licensee is in control of the Licensed Premises, and shall assure that anyone entering by, for or regarding Licensor shall

comply with the requirements and regulations under HIPAA and all other laws regarding medical records, patients, care and other privacy law..

6.    <u>INDEMNITY</u> – Licensee agrees to indemnify and save Licensor (and its members, managers, employees, and affiliates) harmless from and against any and all injuries, loss, cost, expense, or damage of whatever nature caused by or resulting from or claimed to have been caused by or to have resulted from any acts, omissions or negligence of Licensee or anyone claiming under Licensee occurring upon or about the Licensed Premises or the Property during the term of Licensee control of the Licensed Premises pursuant to this Agreement. This section shall survive termination of this Agreement.

7.    <u>LICENSOR'S RIGHT TO ENTER</u> – Licensor and Licensor's employees, agents, contractors, and invitees shall have the right of entry only upon giving not less than  three (3) business days notice to Licensee and agreement not to take pictures of residents or record or otherwise take away any personally identifiable information or medical conditions or other personal information about a resident or employee and to not disclose any information as to identity, type of care or personal information of any resident.

8.    <u>NO  ASSIGNMENT</u> – Licensee shall not assign, pledge, or in any other way encumber or transfer its rights under this Agreement, in whole or in part.

9.    <u>INSURANCE</u> – Licensee acknowledges that it is responsible for obtaining and continually maintaining, for so long as this Agreement is in effect, its own liability insurance, or similar insurance, insurance on its personal property located at the Licensed Premises, and all other required insurances in accordance with the requirements set forth in the Saucon Lease (including without limitation section 7 thereof), to the extent applicable, and shall provide evidence of general liability insurance naming Licensor and any lender or affiliate of Licensor as additional insured as to general liability, only.

10.    <u>OTHER AMOUNTS PAYABLE</u> – Licensee acknowledges that it is responsible for paying all other applicable amounts set forth in the Saucon Lease, including without limitation in sections 5 and 6 thereof, when due or which may be charged to Licensor in connection with the Leased Premises and treat such payments as Operating Expenses (as defined in the Saucon Lease) provided, however, the foregoing shall not require payment of FHA mortgage insurance or other insurance required under HUD Requirements, each as defined in the Saucon Lease; and nothing herein shall compel payment or creation of a Reserve Fund, Impound or other capital cost fund or for advance deposits for any insurances or repairs or maintenance.

11.    <u>DELIVERY OF PREMISES/CASUALTY</u> – If at any time during the Term of this Agreement, for any reason the Licensed Premises is taken by eminent domain or other means or suffers damage due to fire or other casualty that renders the property unusable for Licensee's purposes or unusable in accordance with any state or local law, regulation, or ordinance or similar circumstance, Licensee acknowledges that Licensor has no obligation to provide any form or sort of relocation assistance to Licensee.

12.    <u>ENFORCEMENT</u> – All costs and expenses, including without limitation, reasonable attorneys' fees, incurred by or on behalf of Licensor in enforcing its rights hereunder

which are caused by any breach by Licensee of its obligations hereunder shall be paid by Licensee upon demand by Licensor.

13.    <u>BANKRUPTCY COURT JURISDICTION</u> – Notwithstanding anything to the contrary herein, the effectiveness of this Agreement shall be subject to the prior approval of the Bankruptcy Court, and subject to its ongoing jurisdiction and the further orders thereof pending the resolution of the Chapter 11 Cases.

13.    <u>NOTICES</u> – All notices shall be deemed to have been given when sent via electronic mail, provided that a copy of such notice, substantially contemporaneously therewith, shall be deposited with the U.S. Postal Service by certified mail, postage prepaid, return receipt requested, or when deposited with a recognized overnight courier service, addressed to the parties at the address set forth in the preamble of this Agreement.

14.    <u>RELOCATION ACT DISCLAIMER AND WAIVER</u> – Licensee acknowledges and agrees all of Licensee's rights hereunder, including, without limitation, the use and occupancy of the Licensed Premises, shall not give rise to and hereby waives any and all claims for compensation or benefits to facilitate relocation from the Licensed Premises and to another location under local, state, and federal law, including, without limitation, the federal Uniform Relocation Act, 42 U.S.C. 4610 et seq., as amended, and the regulations promulgated thereunder.

15.    <u>GENERAL</u> – This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and shall not be amended, modified, or otherwise altered except in a writing executed by both Licensor and Licensee. If two (2) or more persons are named herein as Licensee, their obligations hereunder shall be joint and several. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania. This Agreement may be (a) executed in any number of original counterparts, all of which shall evidence only one agreement, and only one of which need be produced for any purpose; and (b) executed and delivered by telecopy, facsimile, or electronic file (such as pdf of the executed document) attached to electronic mail. The parties hereto intend to be bound by such signatures and delivery, and are aware that the other party will rely on the same and waive any enforcement of this Agreement based on such form of signature or delivery.

16.    <u>LIABILITY</u> - The liability of each Party is limited to its rights in and to the Licensed Premises, and there is no personal liability of any officer, manager, director, receiver, trustee or affiliates of any of the Parties.

[SIGNATURES ON FOLLOWING PAGE]

EXECUTED by Licensor and Licensee as a sealed instrument as of the date hereof.

LICENSOR:

**SAUCON TRUST**, a Pennsylvania trust
 **By Saucon Management LLC**

By: _____
Name:
Title:

LICENSEE:

**SAUCON VALLEY MANOR, INC.**
a Pennsylvania corporation

By: _____
Name:
Title:

<u>EXHIBIT A</u>

UNIT 1 OF SAUCON VALLEY MANOR CONDOMINIUM, according to the Saucon Valley Manor Condominium Declaration Plan.

TAX PARCEL NO. Q7SW2A-1-3-0715

## **EXHIBIT C**

## **Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 11 |
| Whitehall Manor, et al., | Case No. 25-15245 (PMM) |
| Debtors. | Jointly Administered |

**ORDER PURSUANT TO 11 U.S.C. § 363 FOR ENTRY OF AN ORDER AUTHORIZING
THE DEBTORS TO ENTER INTO AND PERFORM UNDER
USE AND OCCUPANCY AGREEMENTS**

Upon the joint motion (as amended, the "Motion")[7] of the Debtors, for entry of an order

(this "Order") pursuant to Section 363 of title 11 of the United States Bankruptcy Code (the

"Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") ~~t for authorization permitting~~ authorizing (i)(x) Debtors Whitehall

Manor, Inc. and Whitehall Trust for Senior Care (f/k/a Whitehall Trust and herein, "Whitehall

Trust") to enter into and perform under the Whitehall U&O Agreement and (y) Debtors

Saucon Valley Manor, Inc. and Saucon Trust (together with Whitehall Trust, the "Trusts") to

enter into and perform under that certain Saucon U&O Agreement, and (ii) in connection

therewith, to use property of the estate, including cash collateral; and it appearing that the

Court has jurisdiction to consider the Motion; and the Court being satisfied, based upon the

representations made in the Motion that the relief sought in the Motion is necessary and in the

best interest of the Trusts and their estates, and that the terms of the U&O Agreements are

reasonable and within the Debtors' business judgment, and that the legal and factual bases set

forth in the Motion establish just cause for the relief granted herein; and it appearing that the

---

[7] Capitalized terms used in this Order without definitions have the meanings assigned to them in the *Amended Joint Motion Pursuant To 11 U.S.C. § 363 for Entry of an Order Authorizing the Debtors to Enter Into and Perform Under Use and Occupancy Agreements.*

notice of the Motion having been properly given and such notice being adequate for the entry

of this Order; and it appearing that no other notice is required; **[**and it appearing that the

proposed Monthly U&O Payments will adequately protect the Secured Lender's interest in its

collateral and prevent diminution in value;**]** and upon the record of the hearing on the Motion

and any objections thereto having been withdrawn or overruled; and after due deliberation

and sufficient cause appearing therefor,

       IT IS HEREBY ORDERED THAT:

       1.     The Motion is granted as set forth herein.

       2.     Pursuant to section 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004, the Debtors are authorized to enter into and to perform under the U&O Agreements, and authorized and empowered to take all actions necessary to implement the relief granted in this Order.

       3.     Notwithstanding anything to the contrary in Bankruptcy Rule 6004 or any other applicable Bankruptcy Rule or Code Section, this Order shall be effective upon the entry thereof.

       4.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated:                                   BY THE COURT:

                                      _____

                                      Honorable Patricia M. Mayer
                                      United States Bankruptcy Judge

# EXHIBIT D

## Updated Whitehall Appraisal



# Appraisal Report

Whitehall Manor Senior Living
1177 6th Street
Whitehall, Pennsylvania 18052

Report Date: ~~April 20~~ June 12, 2026



FOR:

Mr. Abraham Atiyeh 1177 6th Street
Whitehall, PA 18052

**Valbridge Property Advisors | Philadelphia**

900 W. Valley Road, Suite 503
Wayne, PA 19087
215-545-1900 phone
215-545-8548 fax
*valbridge.com*

**D-79**

Valbridge File Number:
PA02-26-0049-000



900 W. Valley Road, Suite 503
Wayne, PA 19087
215-545-1900 phone
215-545-8548 fax
valbridge.com

April 20June 12, 2026

Mr. Abraham Atiyeh 1177
6th Street
Whitehall, PA 18052

RE:     Appraisal Report
        Whitehall Manor Senior Living
        1177 6th Street
        Whitehall, Pennsylvania  18052

Dear Mr. Atiyeh:

In accordance with your request, an appraisal of the above referenced property was performed. This appraisal report sets forth the pertinent data gathered, the techniques employed, and the reasoning leading to the value opinions. This letter of transmittal does not constitute an appraisal report and the rationale behind the value opinions reported cannot be adequately understood without the accompanying appraisal report.

The subject property, as referenced above, is located at 1177 6th Street, Whitehall, Pennsylvania and is further identified as tax parcel number 549893788632-2. The subject is Unit 1 of the Whitehall Manor Condominium. Whitehall Manor Condominium includes seven units plus common area which total 5.24 acres. The subject includes 2.434 acres of land improved with an assisted living facility

The analyses, opinions, and conclusions were developed, and this report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation; the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute; and the requirements of our client.

The client in this assignment is Mr. Abraham Atiyeh and the intended users of this report are Mr. Abraham Atiyeh and his legal counsel. The intended use is for bankruptcy proceedings. The value opinions reported herein are subject to the definitions, assumptions, limiting conditions, and certifications contained in this report.

© 2026 VALBRIDGE PROPERTY ADVISORS | PHILADELPHIA



The findings and conclusions are further contingent upon the following extraordinary assumptions and/or hypothetical conditions, the use of which might have affected the assignment results:

## Extraordinary Assumptions:

- ~~None~~This appraisal contains retrospective values. Our valuation date is December 26, 2025. We inspected the property on March 17, 2026. We assume the condition of the property as of the effective date was similar to the condition observed during our inspection.

## Hypothetical Conditions:

- None

The value conclusions are based on the analysis in the following report and presented in the following table:

### Value Conclusions

| Component | Going Concern | Real Estate Only |
|---|---|---|
| Value Type | Market Value | Market Value |
| Real Property Interest | Fee Simple | Fee Simple |
| Effective Date of Value | ~~March 17~~December 26, ~~2026~~2025 | ~~March 17~~December 26, ~~2026~~2025 |
| **Value Conclusion** | **$6,900,000** | **$5,100,000** |
| | **$53,077 per unit** | **$39,231 per unit** |

Respectfully submitted,
Valbridge Property Advisors | Philadelphia

David Koczirka, MAI Senior
Appraiser
PA Certified General Real Estate Appraiser
Certification No.: GA004457
License Expires: June 30, 2027

Richard F. Wolf, MAI, SRA, AI-GRS, CRE
Senior Managing Director
PA Certified General Real Estate Appraiser
Certification No.: GA-001514-L
License Expires: June 30, 2027



# Table of Contents

Cover Page

Letter of Transmittal

Table of Contents .................................................................................................. 4

Summary of Salient Facts ...................................................................................... 5

Aerial and Front Views .......................................................................................... 6

Location Map ......................................................................................................... 7

Introduction .......................................................................................................... 8

Scope of Work ................................................................................................ ~~10~~11

Regional and Market Area Analysis ............................................................... ~~12~~14

City and Neighborhood Analysis ................................................................... ~~15~~17

Site Description .............................................................................................. ~~18~~20

Improvements Description ............................................................................. ~~23~~25

Subject Photographs ...................................................................................... ~~28~~30

Assessment and Tax Data .............................................................................. ~~36~~38

Market Analysis ................................................................................................... 39

Highest and Best Use Analysis ..................................................................... ~~106~~108

Income Capitalization Approach ................................................................... ~~107~~109

Sales Comparison Approach .......................................................................... ~~116~~118

Reconciliation ............................................................................................... ~~127~~129

Liquidation Value and Market Rent ................................................................... 130

General Assumptions and Limiting Conditions ............................................. ~~128~~135

Certification – David Koczirka, MAI .............................................................. ~~133~~140

Certification – Richard F. Wolf, MAI, SRA, AI-GRS, CRE .............................. ~~134~~141

Addenda ........................................................................................................ ~~135~~142

    Copy of Roof Replacement Cost Estimate ............................................... 143

    Glossary ................................................................................................... 147

    Qualifications of David Koczirka, MAI ..................................................... 154

    Qualifications of Richard F. Wolf, MAI, SRA, AI-GRS, CRE ...................... 155



# Summary of Salient Facts

### Property Identification

| | |
|---|---|
| Property Name | Whitehall Manor Senior Living |
| Property Address | 1177 6th Street |
| | Whitehall, Lehigh County, Pennsylvania 18052 |
| Latitude & Longitude | 40.640012, -75.475734 |
| Census Tract | 6931.02 |
| Tax Parcel Number | 549893788632-2 |
| Property Owner | Whitehall Fiduciary LLC Trustee |

### Site

| | |
|---|---|
| Zoning | High Density Residential (R-5) |
| FEMA Flood Map No. | 42077C0163F |
| Flood Zone | Zone X - Outside 100 and 500 year floodplains |
| Gross Land Area | 2.434 acres |

### Existing Improvements

| | |
|---|---|
| Property Use | Senior Housing |
| Gross Building Area (GBA) | 116,394 sf |
| Number of Units | 130 |
| IL Beds | 21 |
| AL Beds | 91 |
| MC Beds | 18 |
| Total Number of Licensed Beds | 130 |
| Number of Buildings | 1 |
| Year Built | 1951 |
| Year Renovated to Current Use | 1998 |
| Condition | Average |
| Surface Parking | 100 spaces |

### Valuation Opinions

| | |
|---|---|
| Highest & Best Use - As Improved | Continued use as an assisted living facility |
| Reasonable Exposure Time | 6-12 months |
| Reasonable Marketing Time | 6-12 months |

## Value Indications

| Approach to Value | Going Concern | Real Estate Only |
|---|---|---|
| Cost | Not Developed | Not Developed |
| Sales Comparison | Not Developed | $5,200,000 |
| Income Capitalization | | |
| Direct Capitalization | $6,900,000 | $5,100,000 |

## Value Conclusions

| Component | Going Concern | Real Estate Only |
|---|---|---|
| Value Type | Market Value | Market Value |
| Real Property Interest | Fee Simple | Fee Simple |
| Effective Date of Value | March 17December 26, 20262025 | March 17December 26, 20262025 |
| **Value Conclusion** | **$6,900,000** | **$5,100,000** |
| | **$53,077 per unit** | **$39,231 per unit** |



# Aerial and Front Views

## AERIAL VIEW (LARGER CONDOMINIUM AREA)



## FRONT VIEW



# Location Map





# Introduction

### Client and Intended Users of the Appraisal

The client in this assignment is Mr. Abraham Atiyeh and the intended users of this report are Mr. Abraham Atiyeh and his legal counsel.

### Intended Use of the Appraisal

The intended use of this report is for bankruptcy proceedings.

### Real Estate Identification

The subject property is located at 1177 6th Street, Whitehall, Lehigh County, Pennsylvania 18052. The subject property is further identified by the tax parcel number 549893788632-2.

### Legal Description

The subject was identified via county records and the Declaration of Condominium of Whitehall Manor Condominium.

### Use of Real Estate as of the Effective Date of Value

As of the ~~current~~retrospective date of value, the subject was an assisted living facility.

### Use of Real Estate as Reflected in this Appraisal

The ~~current~~retrospective opinions of value for the subject property reflect use as an assisted living facility.

### Ownership of the Property

According to the deed and assessment record, title to the subject property is vested in Whitehall Fiduciary LLC Trustee.

### History of the Property

Ownership of the subject property has not changed within the past three years.

#### Active Listing/Offer/Contract

To the best of our knowledge, the subject property was not being marketed for sale and there were no unsolicited offers or pending contracts for sale.

### Type and Definition of Value

The appraisal problem is to develop an opinion of the market value of the subject property. Market value is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale with the buyer and seller each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- *buyer and seller are typically motivated;*

- *both parties are well informed or well advised, and acting in what they consider their own best interest;*

- *a reasonable time is allowed for exposure in the open market;*



- *payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and*

- *the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale[1]*

This assignment also includes development of Market Rent and Liquidation Value conclusions as of the same effective date.

According to the Appraisal of Real Estate 15th Edition published by the Appraisal Institute, the definition of liquidation value is:

Liquidation Value
The most probable price that a specified interest in property should bring under the following conditions:
1. Consummation of a sale within a short time period.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and the seller are acting prudently and knowledgeably.
4. The seller is under extreme compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. A normal marketing effort is not possible due to the brief exposure time.
8. Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

According to the Appraisal of Real Estate 15th Edition published by the Appraisal Institute, the definition of market rent is:

Market Rent
The most probable rent that a property should bring in a competitive and open market, reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (Tis).

Please refer to the Glossary in the Addenda section for additional definitions of terms used in this report.

---

[1] *FIRREA Code of Federal Regulations, Title 12,  Part 34 Subpart C - 34.42, 1990; also Interagency Appraisal and Evaluation Guidelines, Federal Register / Vol.75, No. 237, 2010*

## Valuation Scenarios, Property Rights Appraised, and Effective Dates of Value
Opinions of value for the subject property were developed under the following valuation scenarios:

| Valuation Scenario | Effective Date of Value |
| --- | --- |



| | |
|---|---|
| Retrospective Going Concern Market Value of the Fee Simple Interest | ~~March 17, 2026~~ |
| December 26, 2025 Retrospective Real Estate Only Market Value of the Fee Simple Interest | ~~March 17, 2026~~ |
| December 26, 2025 Retrospective Liquidation Value of the Fee Simple Interest | December 26, 2025 |
| Retrospective Market Rent | December 26, 2025 |

## Date of Report

The date of this report is ~~April 20~~June 12, 2026.

## Assumptions and Conditions of the Appraisal

This appraisal assignment and the opinions reported herein are subject to the General Assumptions and Limiting Conditions contained in the report and the following extraordinary assumptions and/or hypothetical conditions, the use of which might have affected the assignment results.

Extraordinary Assumptions

- ~~None~~This appraisal contains retrospective values. Our valuation date is December 26, 2025. We inspected the property on March 17, 2026. We assume the condition of the property as of the effective date was similar to the condition observed during our inspection.

Hypothetical Conditions

- None

---

[1] ~~FIRREA Code of Federal Regulations, Title 12, Part 34 Subpart C - 34.42, 1990; also Interagency Appraisal and Evaluation Guidelines, Federal Register / Vol.75, No. 237, 2010~~



# Scope of Work

The elements addressed in the Scope of Work are (1) the extent to which the subject property is identified, (2) the extent to which the subject property is inspected, (3) the type and extent of data researched, (4) the type and extent of analysis applied, (5) the type of appraisal report prepared, and
(6) the inclusion or exclusion of items of non-realty in the development of the value opinion. These items are discussed as below.

## Extent to Which the Property Was Identified

The three components of the property identification are summarized as follows:

- <u>Legal Characteristics</u> - The subject was legally identified via deed and assessment record.

- <u>Economic Characteristics</u> - The subject property economic characteristics were identified via documents provided by ownership and comparison to other properties with similar economic characteristics.

- <u>Physical Characteristics</u> - The subject property physical characteristics were identified via inspection.

## Extent to Which the Property Was Inspected

An appraisal inspection of the subject property was completed on March 17, 2026. The improvements were not measured during the course of the inspection.

## Type and Extent of Data Researched

The following data was researched and analyzed: (1) market area data, (2) property-specific market data, (3) zoning and land-use data, and (4) current data on comparable listings and transactions.

## Documents Considered



| Source File | Document Name / Actual Title | Date | Prepared By / Author |
|---|---|---|---|
| 1177 6th Street.3 - Appraisal.pdf Whitehall Manor | Real Property Appraisal Report - Senior Living, Unit 1 | September 1, 2025 | Linda L. Dietrick, CCIM; Dietrick Group, LLC |
| 23',24',25' Census.pdf Summary and | Whitehall Manor 2023/2024/2025 Census Residents as of 12/31/2023, 11/30/2024, 12/31/2025 ; PDF created 03/20/2026 | | Not stated |
| 24-25 CNA GL PL.PDF | Aging Services Healthcare Primary Policy | Policy period 10/01/2024 to 10/01/2025 | CNA; producer: Keystone Risk Managers LLC |



| File | Description | Date | Source |
|---|---|---|---|
| 24-25 Property_Mtgee LP NI Corrections.PDF Mortgage Holder / | Travelers Change Endorsement - Loss Payable Corrections | Issue date 10/29/2024; effective 10/01/2024 | Travelers Property Casualty Company of America; The Yurconic Agency |
| 24-25 Property.PDF | Travelers Commercial Property policy period 10/01/2024 to 10/01/2025 | Issue date 10/04/2024 | Travelers Property Casualty Company of America; The Yurconic Agency |
| 25-26 Property .PDF | Travelers Commercial Property policy period 10/01/2025 to 10/01/2026 | Issue date 10/16/2025 | Travelers Property Casualty Company of America; The Yurconic Agency |
| A1 2026 Whitehall Manor 1st Floor Plan.pdf Plan drawing/job info references | Whitehall Manor - First Floor 08/19/2025 metadata; | | Gouck Architects; Stewart J. Gouck, Registered Architect / Gouck Architects; Stewart J. Gouck, Registered Architect |
| A2 2026 Whitehall Manor 2nd Floor Plan.pdf Plan metadata created | Whitehall Manor - Second Floor 01/25/2011 shown in title block; | 2025 07/16/2025 | |
| A3 2026 Whitehall Manor Garden Level Plan.pdf Basement Floor | Whitehall Manor - Garden Level / Plan | 07/16/2025 | Gouck Architects; Stewart J. Gouck, Registered Architect |
| Add PMN Blds.PDF | Travelers Change Endorsement - Add PMN Buildings | Issue date 12/18/2024; effective 12/26/2024 | Travelers Property Casualty Company of America; The Yurconic Agency |
| LVx-18.pdf | HealthTrust Real Estate Appraisal - Whitehall Manor | June 19, 2023 | HealthTrust |
| Manors Statement of Values - signed.pdf | Statement of Values - Whitehall Manor, Inc. | 10/07/2024 | The Yurconic Agency / Travelers Indemnity Co. of America |
| PLC Endorsement effective 12-12-24.pdf | CNA Aging Services Healthcare Primary policy period 10/01/2024 to 10/01/2025; endorsement effective 12/12/2024 | Change Endorsement | CNA; producer: Keystone Risk Managers LLC |
| SVM Tax Depreciation 2025.pdf 2025 - | Depreciation and Amortization Report Saucon Valley Manor, Inc. | 2025 tax year; PDF created 01/16/2026 | Not stated |
| Selective Loss Run.pdf | Selective Claim Inquiry Service - Loss Run | Losses as of 06/04/2025 / PDF created 06/04/2025 | Selective |
| Travelers Loss Run.pdf | Travelers Detail Loss Report - Whitehall Manor, Inc. | Run date 06/04/2025; losses as of 06/02/2025 | Travelers / Loss Reports |
| WHM Census 3-27-2026_Redacted.pdf | Whitehall Manor Census Report - Alphabetical | 03/26/2026 | Not stated |
| WHM Independent Living 11-18-2025(1).pdf | Whitehall Manor Independent Living Rate Sheet | 11/18/2025 | Whitehall Manor / Manorsofthevalley.com |
| WHM rate sheet 11-18-25(1).pdf Care Plus / | Whitehall Manor Personal Care / Memory Care Rate Sheet | 11/18/2025 | Whitehall Manor / |
| Whitehall Manor Federal Tax Depreciation 2025.pdf 2025 - | Depreciation and Amortization Report Whitehall Manor, Inc. | Manorsofthevalley.com 2025 tax year; PDF created 01/16/2026 | Not stated |
| Whitehall Manor Inc PLC 25-26.PDF | Aging Services Healthcare Primary Policy | Policy period 10/01/2025 to 10/01/2026 | CNA; producer: KAI Strategic Insurance Partners LLC |
| Whitehall Manor Letter Reroof Required.pdf Reroofing | Whitehall Manor Phase 1 & 2 Rubber Letter | March 17, 2026 | Eugene Berg, Jr., AIA; Gouck Architects |
| Whitehall Manor Phase 1 & 2 Rubber Reroof Cost Estimate.pdf | Whitehall Manor Phase 1 & 2 Reroof Cost Estimate | March 17, 2026 | Gouck A |
| Whitehall Manor_Rate Sheet.pdf Care Plus / | Whitehall Manor Personal Care / Memory Care Rate Sheet | 11/18/2025 | Whitehall Manor / |
| Whitehall Trust Leases_Combined.pdf Inc. and | Lease Agreement - Whitehall Manor, Whitehall Manor, Inc. | Manorsofthevalley.com August 26, 1998; filed 07/10/2025 as court exhibit | Not stated |
| Whitehall Trust book depreciation 2025.pdf | Whitehall Trust - Lead Schedule by | Whitehall Trust book depreciation 2025.pdf | Whitehall Trust - Lead Schedule by |



| Category printed | For 12 months ended 12/31/2025; | | Not stated |
|---|---|---|---|
| | 01/16/2026 | | |
| Whitehall manor TAx Return 2022.pdf 2022 U.S. | Form 1120-S - Whitehall Manor, Inc. Income Tax Return | 07/27/2023 signature/preparer date; 2022 tax year | Raymond P. Minich; R.P. Minich P.C. |
| Whitehall manor Tax Return 2023.pdf | Form 1120-S - Whitehall Manor, Inc. Income Tax Return | 07/16/2024 signature/preparer authorization; 2023 tax year | R.P. Minich P.C. |
| Whitehall manor Tax Return 2024.pdf 2024 U.S. | Form 1120-S - Whitehall Manor, Inc. Income Tax Return | 08/11/2025 signature/preparer date; 2024 tax year | Raymond P. Minich; R.P. Minich P.C. |
| Whitehall_Condos_(1).pdf Whitehall Manor | Declaration of Condominium of Condominium | August 8, 2006 | Joel R. Wiener, Esq.; Wiener and Wiener LLP |
| Whitehall_Saucon Manors_ 2023-2025 Operating Statements.xlsx | Whitehall Manor and Saucon Valley Manor - 2023- 2025 Operating Statements | Workbook created 03/13/2026; modified 03/13/2026 | Andrea Sawarynski |
| Whtehall Manor Inc - deprec schedule.pdf | Whitehall Manor Inc - Depreciation Schedule by G/L Account Number | For 12 months ended 12/31/2025; printed 02/11/2026 | Not stated |
| | | For 12 months ended 12/31/2025; printed 01/16/2026 | Not stated |
| Whtehall Manor Inc Book Depreciation 2025.pdf | Whitehall Manor Inc. - Depreciation Schedule by G/L Account Number | | |

## Type and Extent of Analysis Applied (Valuation Methodology)

Surrounding land use trends, the condition of any improvements, demand for the subject property, and relevant legal limitations were observed in the process of concluding a highest and best use for the subject property. The subject property was then valued based on the highest and best use conclusion.

Appraisers develop an opinion of property value with specific appraisal procedures that reflect three distinct methods of data analysis: the cost approach, sales comparison approach, and income capitalization approach. One or more of these approaches are used in all ~~estimations~~estimates of value.

*[Link-to-previous setting changed from off in original to on in modified.]*

- <u>Cost Approach</u> - In the cost approach, the value indication reflects the sum of current depreciated replacement or reproduction cost, land value, and an appropriate entrepreneurial incentive or profit.

- <u>Sales Comparison Approach</u> - In the sales comparison approach, value is indicated by recent sales and/or listings of comparable properties in the market, with the appraiser analyzing the impact of material differences in both economic and physical elements between the subject and the comparables.

- <u>Income Capitalization Approach</u> - In the income capitalization approach, value is indicated by the capitalization of anticipated future income. There are two types of capitalization: direct capitalization and yield capitalization, more commonly known as discounted cash flow (DCF) analysis.

All these approaches to value were considered. The availability of data and applicability of each approach to value within the context of the characteristics of the subject property, along with the needs and requirements of the client, were assessed. Based on this assessment, the Sales Comparison and Income Capitalization Approaches were developed. The Cost Approach was not developed because it is rarely employed for properties like the subject. The exclusion of this approach does not weaken the validity of the appraisal conclusions. The specific methods and analysis of each approach are further discussed in the respective valuation sections.

## Appraisal Conformity and Report Type

The analyses, opinions, and conclusions were developed and this report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation; the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute; and the requirements of our client. This is an Appraisal Report as defined by the Uniform Standards of Professional Appraisal Practice under Standards Rule 2-2a.

## Personal Property/FF&E

The subject property includes personal property generally identified as furniture, fixtures, and equipment (FF&E). The impact of this property component is analyzed later in this report.

*[Link-to-previous setting changed from off in original to on in modified.]*



# Regional and Market Area Analysis

**REGIONAL MAP**



## Overview

The subject is located in Whitehall, in Lehigh County. It is part of the Allentown-Bethlehem-Easton MSA. The area is also referred to as the Lehigh Valley Region. This area is comprised of Carbon, Lehigh, and Northampton Counties. Furthermore, the area is also included in the New York-Newark, NY-NJ- CT-PA Combined Statistical Area (CSA) consisting of the Lehigh Valley, the Monroe County/East Stroudsburg, PA MSA, and several other metropolitan areas of New Jersey and New York.

## Transportation

Major transportation routes in the larger area ~~includes Incertitude~~include Interstate 476 (The Pennsylvania Turnpike) Interstate 78, Routes 309, 222, 100, and 145.

## Population

**Population**

| Area | Census Population (2020) | Current Population (2025) | Compound Annual Δ 2020 - 2025 | Projected Population (2030) | Compound Annual Δ 2025 - 2030 |
|---|---|---|---|---|---|
| United States | 331,449,520 | 335,707,897 | 0.26% | 343,238,675 | 0.44% |
| Pennsylvania | 13,002,700 | 13,074,028 | 0.11% | 13,138,831 | 0.10% |
| Allentown-Bethlehem-Easton, PA-NJ (MSA) | 861,889 | 880,179 | 0.42% | 890,426 | 0.23% |
| Lehigh County | 374,557 | 381,807 | 0.38% | 387,397 | 0.29% |
| Whitehall Township | 29,173 | 29,143 | -0.02% | 29,157 | 0.01% |

*Source: ESRI (ArcGIS)*



## Employment

Lehigh County's employment data highlights the ~~regions~~region's strong ties to manufacturing and health care. The largest employers in Lehigh Valley include the Lehigh Valley Hospital and Health Network and St. Luke's Hospital and Health Network.



*Employment by Industry for Lehigh County  -  Source: ESRI (ArcGIS)*

## Unemployment

The following table exhibits current and past unemployment rates as obtained from the Bureau of Labor Statistics.

**Unemployment Rates**

| Area | YE 2020 | YE 2021 | YE 2022 | YE 2023 | YE 2024 | 2025[1] |
|---|---|---|---|---|---|---|
| United States | 8.1% | 5.3% | 3.6% | 3.6% | 4.0% | 4.3% |
| Pennsylvania | 8.8% | 5.9% | 4.2% | 3.7% | 3.8% | 4.3% |
| Allentown-Bethlehem-Easton, PA-NJ (MSA) | 9.1% | 6.1% | 4.2% | 4.0% | 3.9% | 3.9% |
| Lehigh County | 9.6% | 6.5% | 4.3% | 4.1% | 3.9% | 3.9% |

*Source: www.bls.gov*　　　　　　　　　　　*data not seasonally adjusted;　[1]Annual - most recent for US, others lag by 1-2 mos.)*

## Median Household Income

Total median household income for the region is presented in the following table.

**Income**

| Area | 2025 Median HH Income | 2025 Average HH Income | 2025 Per Capita Income |
|---|---|---|---|
| United States | $72,233 | $104,831 | $41,000 |
| Pennsylvania | $77,579 | $107,937 | $43,706 |
| Allentown-Bethlehem-Easton, PA-NJ (MSA) | $84,249 | $112,625 | $44,158 |
| Lehigh County | $80,595 | $111,371 | $42,929 |
| Whitehall  Township | $75,437 | $95,938 | $38,221 |

*Source: ESRI (ArcGIS)*

## Conclusions

The subject's location in the Allentown-Bethlehem-Easton MSA provides a diverse demographic and a healthy economic environment, as well as providing accessibility throughout Pennsylvania and other significant economic areas throughout the Northeast and Mid-Atlantic regions. The region offers a positive environment for residents and businesses. Unemployment has declined and the continuous development and population growth throughout the MSA indicates there is interest in living and working in the Lehigh Valley. The total population in the Allentown-Bethlehem-Easton MSA has increased slightly and is projected to continue to increase slightly in the future.



# City and Neighborhood Analysis

**NEIGHBORHOOD MAP**



## Overview

The subject is located in Whitehall Township, which is just north of the City of Allentown. Since the 1800's, Allentown was an industrial city, however a decrease in manufacturing caused many companies to shut down. The city experienced a period of decline with rising vacancy rates, increased blight, and economic instability. A more recent push towards revitalization by public and private organizations has led to the creation of government incentives that attempt to promote economic activity. The expected economic boom aims to fulfill the goal of turning the City of Allentown into an active urban core again by improving the physical characteristics and attracting new businesses and residents to the area.

The neighborhood is bounded by Northampton County to the north, Hanover Township to the east, City of Allentown to the south, and South Whitehall Township to the west.

## Demographics

The following table depicts the area demographics in Whitehall within a one-, three-, and five-mile radius from the subject.

**Neighborhood Demographics**

**Valbridge**
PROPERTY ADVISORS

WHITEHALL MANOR SENIOR LIVING

| Radius (Miles) | 1 Mile | 3 Mile | 5 Mile |
|---|---|---|---|
| Trade Area (Sq. Mi.) | 3.14 | 28.27 | 78.54 |
| Trade Density (Pop/Sq. Mi.) | 3,161 | 4,575 | 3,154 |
| **Population** | | | |
| Census Population (2010) | 8,906 | 115,349 | 225,708 |
| Census Population (2020) | 9,731 | 123,444 | 239,497 |
| Current Population (2025) | 9,621 | 125,469 | 242,686 |
| Projected Population (2030) | 9,605 | 128,156 | 246,021 |
| *Compound Annual Growth* | | | |
| 2010 - 2020 | 0.9% | 0.7% | 0.6% |
| 2020 - 2025 | -0.2% | 0.3% | 0.3% |
| 2025 - 2030 | 0.0% | 0.4% | 0.3% |
| **Households** | | | |
| Census Households (2010) | 3,884 | 43,377 | 86,640 |
| Census Households (2020) | 3,959 | 46,136 | 91,372 |
| Current Households (2025) | 3,929 | 47,564 | 93,219 |
| Projected Households (2030) | 3,935 | 48,803 | 94,880 |
| *Compound Annual Growth* | | | |
| 2010 - 2020 | 0.2% | 0.6% | 0.5% |
| 2020 - 2025 | -0.2% | 0.6% | 0.4% |
| 2025 - 2030 | 0.0% | 0.5% | 0.4% |
| Average Household Size (2025) | 2.44 | 2.60 | 2.54 |

*Source: ESRI (ArcGIS)*   *(Lat: 40.640012, Lon: -75.475734)*

## Neighborhood Demographics (cont.)

| Radius (Miles) | 1 Mile | 3 Mile | 5 Mile |
|---|---|---|---|
| Trade Area (Sq. Mi.) | 3.14 | 28.27 | 78.54 |
| Trade Density (Pop/Sq. Mi.) | 3,161 | 4,575 | 3,154 |
| **2025 Housing Units** | | | |
| Median Home Value | $269,389 | $250,385 | $290,164 |
| Median Year Built | 1955 | 1952 | 1958 |
| Total Housing Units | 4,087 | 50,408 | 98,031 |
| Owner-Occupied Housing % | 61.0% | 45.7% | 54.1% |
| Renter-Occupied Housing % | 35.2% | 48.7% | 40.9% |
| Vacant Housing % | 3.9% | 5.6% | 4.9% |
| **2025 Employment** | | | |
| Total Establishments | 632 | 4,712 | 8,237 |
| Total Employees | 7,049 | 59,202 | 124,853 |
| Average Commute Time | n/a | n/a | n/a |
| % College Graduates | 23.9% | 22.1% | 28.3% |
| **2025 Income Summary** | | | |
| Median Household Income | $61,576 | $60,152 | $67,842 |
| Average Household Income | $87,032 | $79,295 | $90,183 |
| Avg Spending/Household | $24,610 | $22,170 | $25,275 |
| Per Capita Income | $35,342 | $30,175 | $34,794 |

*Source: ESRI (ArcGIS)*   *(Lat: 40.640012, Lon:   -75.475734)*



The population is 125,469 within a three-mile radius of the subject property with a projected annual growth rate of 0.4%. There were 50,408 housing units within the three-mile radius. Most housing is owner-occupied. Property values in the area were increasing.

The median household income was $60,152 within a three-mile radius of the subject property. The median household income figures suggest residents were within the lower to middle income brackets.

## Adjacent Land Uses

| | |
|---|---|
| North: | Residential |
| South: | Residential |
| East: | Industrial |
| West: | Residential |

## Analysis and Conclusions

This area offers easy access to linkages, shopping, employment opportunities, nearby parks and amenities. Overall, the subject neighborhood is in the stable stage of its life cycle.



# Site Description

## Site Characteristics

| | |
|---|---|
| Gross Land Area: | 2.434 Acres |
| Shape: | Generally rectangular |
| Topography: | Gently sloping |
| Drainage: | Assumed adequate |
| Grade: | Slightly above street grade |
| Utilities: | Public water, public sewer, natural gas, electricity |
| Interior or Corner: | Double Corner |

## Street Frontage / Access

| Frontage Road | Primary | Secondary | Tertiary |
|---|---|---|---|
| Street Name: | 6th Street | W. Union Street | 5th Street |
| Street Type: | Two lane road with two parking lanes | Two lane road with two parking lanes | No outlet one lane road |
| Frontage (Linear Ft.): | 794.00 | 319.00 | 756.00 |

## Flood Zone Data

| | |
|---|---|
| Flood Map Panel/Number: | 42077C0163F |
| Flood Map Date: | 07-16-2004 |
| Flood Zone: | Zone X - Outside 100 and 500 year floodplains |

## Other Site Conditions

| | |
|---|---|
| Easements/Encroachments: | Typical utility easements are assumed |

## Site Ratings

| | |
|---|---|
| Access: | Average |
| Visibility: | Good |

## Zoning Designation

| | |
|---|---|
| Zoning Jurisdiction: | Whitehall Township |
| Zoning Classification: | R-5, High Density Residential |
| Permitted Uses: | Uses permitted by right include apartments, agriculture, cemeteries, churches, conservation areas, fish and wildlife refuges, forestry, municipal uses, nature preserves, schools, residential single-family, and adaptive reuse for affordable housing and multifamily housing. |
| Zoning Comments: | The subject's current use as an assisted living facility is a legally non-conforming use. |

## Analysis/Comments on Site

The subject site is adequate for a variety of permitted uses.

### CONDOMINIUM DECLARATION PLAN



**TAX PLAT (LARGER CONDOMINIUM)**



Subject Building

**FLOOD MAP**





**ZONING MAP**





# Improvements Description

The subject is Unit 1 of the Whitehall Manor Condominium. Whitehall Manor Condominium includes seven units plus common area which total 5.24 acres. The subject includes 2.434 acres of land improved with an assisted living facility.

## Improvement Characteristics

| | |
|---|---|
| Property Type: | Senior Housing |
| Property Subtype: | Assisted Living Residences |
| Gross Building Area (GBA): | 116,394 SF (based on Building Plans) |

## Ratios & Parking

| | |
|---|---|
| Land-to-Building Ratio: | 0.91 to 1 (Land/GBA) |
| Floor Area Ratio (FAR): | 1.10 (based on GBA) |
| Parking Spaces: | 100 – Dedicated to subject building only |
| Parking Ratio: | 0.86 (per 1,000 sf of GBA) |

## Age / Life

| | |
|---|---|
| Year Built: | 1951 |
| Renovated/Yr. Renovated: | 1998 |
| Condition: | Average |
| Actual Age: | 75 years |

## Structural Characteristics

| | |
|---|---|
| Foundation: | Reinforced concrete |
| Building Frame: | Steel and concrete |
| Exterior Walls: | Brick veneer |
| Roof Material: | Rubber membrane |

## Interior Characteristics

| | |
|---|---|
| Floors: | Ceramic tile and vinyl composition tile, carpeting |
| Walls: | Painted drywall |
| Ceilings: | Acoustical tile and painted drywall |
| Lighting: | Fluorescent |

## Mechanical Systems

| | |
|---|---|
| Electrical: | 1,600 amps, 480y/277v, 3 phase 4 wire |
| Heating: | Gas-fired, roof-mounted package units and mini-split electric through-wall heat pumps |
| Air Conditioning: | PTAC units in the living units and roof package units for the common areas |
| Fire Protection/Sprinklers: | Smoke detectors, fire alarm systems / Wet system |

Number of Elevators:                2

## Analysis/Comments on Improvements

The subject was constructed in 1951 as an industrial building and was converted into an assisted living facility in 1998. The property is licensed for 130 beds and has 130 units according to the building plans. The unit mix includes three one-bedroom units and 127 studios. The building includes two stories above grade and a basement level partially below grade. There is a central lobby area with a reception desk, dining rooms, lounges, resident units, and outdoor patios. The personal care units include kitchenettes with cabinetry, a sink, and a refrigerator. The memory care units do not include kitchenettes. All resident units include a private bathroom equipped with a walk-in shower, toilet, and sink. The basement includes storage rooms, offices, conference area, and laundry facilities. A portion of the roof reportedly needs to be replaced. A cost estimate of $716,232 was provided by ownership for roof replacement. Overall, the building is in average condition.



**BUILDING PLANS (FIRST FLOOR)**

**BUILDING PLANS (SECOND FLOOR)**



## BUILDING PLANS (GARDEN LEVEL)

# Subject Photographs



Hallway



Lounge



Dining Area



Dining Area



Lounge



Patio



Lower Level Dining Area



Lower Level Office Finishes



Unit Finishes



Unit Finishes



Unit Finishes



Unit Finishes



Unit Finishes



Unit Finishes



Unit Finishes



Unit Finishes



# Assessment and Tax Data

## Assessed Values and Property Taxes

The subject property's assessed values, assessment to value ratio, implied market value, applicable tax rates, and total tax expense are presented in the following table:

**Ad Valorem Tax Schedule**

**Tax Parcel Number: 549893788632-2**

| Lehigh County Year | Actual 2025 | Actual 2026 |
|---|---|---|
| **Assessed Value** | | |
| Land: | $1,280,000 | $1,280,000 |
| Improvements: | $3,808,000 | $3,808,000 |
| Total: | $5,088,000 | $5,088,000 |
| Per Square Foot: | $54.93 | $54.93 |
| **Assessment Ratio** | 53.19% | 49.50% |
| **Implied Market Value** | | |
| Land: | $2,406,467 | $2,585,859 |
| Improvements: | $7,159,240 | $7,692,929 |
| Total: | $9,565,707 | $10,278,788 |
| *% Change:* | | 7.5% |
| **Tax Rate per $1,000** | $29.319800 | $31.217500 |
| *% Change:* | | 6.5% |

| | Actual 2025 | Actual 2026 |
|---|---|---|
| **Tax Expense** | | |
| Total: | $149,179 | $158,835 |
| Per Unit: | $1,147.53 | $1,221.80 |

## Conclusions

Our opinion of value is significantly lower than the implied market value. An appeal of the assessment is recommended.



# Market Analysis

## Senior Housing Market Analysis

Below is the Senior Housing Market Outlook Report by NIC Map produced in 2025:







Senior Housing Market Outlook

## Executive Summary

### Polycrisis Resilience:

From 2020 to 2023, the senior housing industry has successfully weathered significant challenges, highlighting its resilience. These challenges included a series of pandemic-induced shocks: an occupancy and labor crisis due to COVID, followed by suppressed capital markets resulting from a rapid rise in the Federal Funds rate to battle inflation. While these difficulties put significant stress on the industry, the senior housing industry weathered these storms, a testament to its resilience and need-based value proposition.

### Recovery Indicators:

Post-COVID, supply and demand metrics recovered at a rapid pace. Entering 2024, occupancy and aggregate employment are within 1-2% of pre-COVID levels, and the capital markets show signs of life as the Fed telegraphs a coming rate-cutting cycle. Employment levels exceed pre-COVID levels, further underlining a recovery phase that is expected to continue. Within the industry, rents are rising while operating expenses and inflation are moderating, leading to expanding profit margins.

### Unprecedented Demand Growth:

Finally, explosive demand growth driven by the aging population presents a generational opportunity for industry stakeholders. Currently, growth of the population aged 80+ (the first Boomers turn 80 in 2025) significantly exceeds the growth of housing inventory. Additionally, senior housing continues to see historic absorption rates (that is, the net change in occupied units continues to rise), surpassing pre-COVID levels. In the first quarter of 2024, the absorption rate increased by 40% compared to 2023, which was a historic number in its own right.

ılılılı NIC MAP

© 2025 NIC MAP®    3

---





## Record Absorption



Source: NIC MAP® Data, powered by NIC MAP®, All Data from Primary and Secondary Markets.

**In 2023, absorption rates doubled any pre-pandemic four-quarter period, indicating robust demand.** Absorption surged to historic levels and points to both occupancy recovery and future investment potential.

Rapid occupancy recovery is underway as the pandemic recedes into the distance. Sequential occupancy growth and net absorption are both growing at historic levels. This historic demand growth is occurring even before the aging wave kicks into full gear in the coming years.

 NIC MAP

© 2025 NIC MAP®    5



## Historic Absorption Growth Continues in 1Q24, up 40% Year-Over-Year



# 40%↑

**A continuing trend of unprecedented absorption growth.**

First-quarter absorption in 2024 is up 40% year-over-year, marking the highest first-quarter reading in NIC MAP history. However, this is merely a continuation from last year, where the first quarter of 2023 also saw historic absorption growth.

Note that as a rule, first quarter absorption rates are lower than other quarters due to seasonal factors, making year-over-year comparisons more informative than quarter-over-quarter comparisons.

Source: NIC MAP® Data, powered by NIC MAP®, Primary and Secondary Markets.

 NIC MAP

© 2025 NIC MAP®    6



## 80+ Population Growth Materially Exceeds Inventory Growth

Senior Housing Returns to a Favorable Balance between Resident Growth and Inventory Growth.



Senior housing fundamentals largely depend on the relationship between the 80+ population and the supply of senior housing stock. For most of the past decade, supply growth (senior housing inventory) exceeded demand growth (80+ population), leading to gradually declining occupancy rates.

However, beginning in 2022, this relationship inverted, with the 80+ population exceeding inventory growth. By 2023, 80+ population growth began to materially outpace supply. As a result, there is a growing gap between supply and demand growth, which will continue over the coming years unless senior housing development rapidly increases. In the meantime, the growing gap will likely materially lift senior housing occupancies, as inventory growth lags well behind demand growth.



Senior Housing Inventory Growth vs. 80+ Population Growth

Source: NIC MAP® Data, powered by NIC MAP®, Primary and Secondary Markets; OECD.

 NIC MAP

© 2025 NIC MAP®    7



## Customer Adoption Levels Return to Pre-Pandemic Highs

### 80+ Penetration Rates Recover and Data Shows Aging Growth Now Driving Absorption

The 80+ occupied unit penetration rate is calculated by dividing the number of occupied senior housing units by the 80+ population. The 80+ occupied unit penetration rate provides a clear indicator of changes in overall senior housing product adoption, adjusting for changes in both population and inventory. Across the 2010s, the penetration rate slowly increased, reaching an all-time high on the eve of the pandemic.

Driven by COVID admissions bans and the lack of an effective vaccine, the penetration rate shed six years' worth of gains in one year, bottoming out in 1Q21. With the introduction of the vaccines and a lifting of admissions bans, the penetration rate returned to its all-time high by late 2022, suggesting a full recovery from the COVID shock.

As the penetration rate has recovered from its COVID decline, the data suggests that the historic absorption seen in 2023 and 1Q24 is driven by the surging growth of the 80+ population, and not merely a continuation of the COVID recovery.



80+ Occupied Unit Penetration Rate: Total Occupied Senior Housing Units / 80+ Population

Source: NIC MAP® Data, powered by NIC MAP®, All (2010-2014) and Primary and Secondary Markets (2015 forward); Census Bureau.

 NIC MAP

© 2025 NIC MAP®          8



# Rent Growth Remains Strong as Wage Growth and Inflation Moderate

## Rent and Occupancy Growth Drive Senior Housing Margin Expansion



In the decade prior to the pandemic, senior housing rent growth largely tracked the weighted average of wage growth and non-wage expense growth. During the pandemic, occupancy fell while wages and inflation soared. To recover and compensate, operators limited rent increases below expense growth, compressing margins while the industry worked to regain occupancy.

However, as inflation trends downward, rents are beginning to exceed expense growth, combining with improving occupancy to rebuild the industry's margin profile. This trend appears set to continue for the foreseeable future, as demand growth will continue to significantly outstrip supply growth.

As a result, senior housing margins are likely to continue to expand.

Source: NIC MAP® Data, powered by NIC MAP®; BLS; Inflation via FRED.

 NIC MAP

© 2025 NIC MAP®     9



## Staffing and Occupancy Recovery

**Staffing and Occupancy Recover to Near Pre-Pandemic Levels as Labor Markets Normalize**

Robust labor availability is a key driver of operational performance, service quality, and affordability. The COVID pandemic caused senior housing occupancy to decline while simultaneously reducing the pool of available workers. This led to significant upward pressure on wages and required the use of expensive agency staffing. Recently, both staffing levels and overall occupancy recovered to near pre-pandemic levels as labor markets have normalized. In fact, today, aggregate industry staffing is 5% above pre-pandemic levels. This employment rebound alleviated upward pressure on wages and significantly reduced the use of agency staffing, again improving the industry's overall margin profile.



Sources: NIC MAP® Data, powered by NIC MAP®, All Markets; BLS.

Improved staffing levels enhance operational efficiency and service quality overall for residents. As the next generation enters senior housing, there is an increased focus on service quality as a key factor in decision criteria.

 NIC MAP

© 2025 NIC MAP®    10



## Public Operating Portfolios Show Declining OpEx PPD, Expanding Margins

Senior Housing REIT RIDEA Portfolios Show Slowing OpEx Growth, Accelerating Margin Expansion



Source: WellTower and Ventas Quarterly Supplementals via EDGAR.

Public REIT operating portfolios provide real-time, diversified insight into changing operating expense and margin profile trends. Recent filings by the industry's major operating portfolios show moderating expense growth and margin expansion, as the combination of growing occupancy and favorable rent/expense growth trends drives margins upward.



**Public portfolios provide diversified, timely insight into industry trends.**

NIC MAP                                                      © 2025 NIC MAP®    11



## Margins Expanding Across Stabilized Portfolios



**Expanding margins are the clearest sign of strong fundamentals in the senior housing industry. The permanent financing market is showing strong margin growth.**

Financial filings by agency-financed senior housing properties provide a window into EBITDAR margin trends across the country. While soaring wage growth led to increased operating expenses and declining margins through 2021 and 2022, in 2023 that trend reversed, with margins expanding and operating expenses declining across the board. This margin expansion is likely to continue as demand growth outstrips supply growth for the foreseeable future.



Source: Preliminary Analysis of Agency Financed Properties Completed by NIC MAP®

 NIC MAP

© 2025 NIC MAP®    12



## Supply Growth Slowing While Absorption Surges

Senior Housing Construction Starts Fall to Near NIC MAP Historical Lows



Senior Housing Construction Starts (as % of Inventory)

Source: NIC MAP® Data, powered by NIC MAP®, Primary and Secondary Markets.

Despite historic absorption and occupancy growth and exploding near-term demand growth, high interest rates and limited capital availability are driving senior housing construction starts to near all-time lows. In fact, senior housing construction starts are nearing lows not seen since the depths of the Great Recession in 2008.

**What does this mean?**

With multi-year pre-development and construction timelines, the current level of construction starts means that supply growth will likely remain depressed for years to come. At the same time, the growth of the senior housing consumer base will grow dramatically as the first of the boomers turn 80 in 2025. As a result, the sector will see significant supply and demand imbalances and a favorable environment for both new development and for existing owners of senior housing properties.

 NIC MAP

© 2025 NIC MAP®    13



## Senior Housing Demand Growth Is Durable and Long Lasting

80+ Population Undertakes Historically Unparalleled Expansion Over Next 25 Years

**Demographics show promise for substantial future growth.**

The aging of the Baby Boomer generation is an unprecedented demographic megatrend. In the history of the US, the aging population has never grown so fast or so large. The explosive growth of the 80+ population will require the senior housing industry to rapidly expand for decades to come.

The 80+ population is projected to grow significantly over the next 25 years, which will drive corresponding growth in the senior housing sector. This rising tide provides a fertile environment for investment activity. Near term prospects are very positive as limited supply, limited pace of supply growth, and the spike of 80+ consumers place significant upward pressure on industry occupancy.



80+ Demographic Growth Rates | Census Bureau Projections 2025 – 2050

 NIC MAP

© 2025 NIC MAP®    14



## Public Markets Have Recognized the Opportunity

### Risk Free Rate Doubled, Yet Basket of Direct NOI-Exposure SH Public Equities Exceed 2019 Valuations

The performance of senior housing public equities is a direct barometer of investor confidence in the senior housing sector. Public market valuations of senior housing equities exceed pre-2019 levels despite higher risk-free rates. The performance of senior housing public equities is a direct barometer of investor confidence in the senior housing sector. In addition, current REIT dividend yields are well below the 10Y UST, suggesting that investors see opportunities for significant capital appreciation in the near future.



Source: Microsoft Stock Price Data; Quarterly Filings (Share Count), FRED (EFFR).



The performance of senior housing public equities reflects investor confidence in the senior housing sector and could attract more capital to the sector.

 NIC MAP

© 2025 NIC MAP®    15



Surging Fundamentals                                                      Senior Housing Market Outlook

## Pending Growth Surge in Senior Housing

In 2023, senior housing saw absorption growth twice that of any non-pandemic period in NIC MAP history.

Simultaneously, the excess supply growth trend of the past decade reversed, falling well below surging demand growth of 80+ consumers.

Burgeoning demand, depressed supply growth, increasing rent growth, and declining expense growth are driving surging fundamentals as the aging wave begins to break.

The senior housing sector is seeing historic absorption growth, as the first ripples of the aging wave wash ashore. This unprecedented demand expansion, combined with flattening supply growth, will drive occupancy growth at the same time that the post-pandemic normalization of the labor market drives favorable rent/expense growth dynamics. Collectively, these forces should drive material improvements in industry financial health indicators, right as the aging wave begins to break in earnest.

NIC MAP                                                          © 2025 NIC MAP®    16







Investment Activity

## Rate Hikes Triggered a Banking Crisis of Underappreciated Proportions

Bank Failures in 2023, in Terms of Total Assets, Exceed Those in 2008

Recent bank failures in 2023 exceeded those in 2008 in terms of total assets, impacting commercial real estate lending.





U.S. bank failures in each year, adjusted for inflation

$94 billion 24 other banks

$432 billion → Washington Mutual Bank

$110 billion → Signature Bank

$209 billion → Silicon Valley Bank

$213 billion → First Republic Bank

Source: New York Times

NIC MAP

© 2025 NIC MAP®    18



Investment Activity



## Bank Failures Led to a Pull Back in Commercial Real Estate Lending

CRE Lending Pulled Back Significantly Due to Banking Conditions and Office Sector Challenges

Bank failures led to a significant pullback in commercial real estate lending, including to the senior housing industry.

**However**, debt markets, though depressed, continue to function. Agency lending continued, and as of June 2024, nearly a quarter of banks report increases in their commercial real estate lending volumes.

Banking Conditions Survey – CRE Loan Volume

Source: Federal Reserve Bank of Dallas; Banking Conditions Survey.

NIC MAP

© 2025 NIC MAP®    19



## Credit Tightening Slowed Senior Housing Transaction and Construction

Transaction Volume Down 40%+ in 2022 and 2023;
Construction Activity Slips to 0.2% of Inventory

Credit tightening led to a significant reduction in senior housing transaction volume and caused a marked deceleration in construction activity.

Because of the pullback in the banking sector, capital sourcing and capital stack construction requires a more robust and thoughtful approach. For those who can accomplish this, deals are still getting done.





Source: NIC MAP® Data, powered by NIC MAP®. Transactions are National; Starts are Primary and Secondary Markets.



© 2025 NIC MAP®    20



Investment Activity

## As a Result, Supply Growth Slowed Despite Surging Absorption

Senior Housing Construction Starts Fall Even as Occupied Units Grow for 11 Consecutive Quarters



Senior housing construction starts are approaching 21st-century lows despite historic absorption rates. The disconnect between surging demand and falling supply growth highlights the impact of the dislocation in the credit markets.

**As demand growth accelerates, there is a pressing need for new senior housing development. Sponsors that meet this demand are likely to find themselves in an excellent position.**

Source: NIC MAP® Data, powered by NIC MAP®, Primary and Secondary Markets.

NIC MAP

© 2025 NIC MAP®    21













## The 21st Century's Great Economic Shocks Affirm the Durability of Demand

Senior Housing's GFC Performance and Rapid Return to Pre-COVID Penetration Highlight Need-Based Dynamics



The sector's performance during the major economic shocks of the 21st century demonstrates the durability of demand for senior housing. The sector outperformed during the Great Recession, despite a crippled housing market, the primary source of funds for senior housing residents. A decade later, the industry persevered through a global health pandemic. Despite the uniquely adverse impacts on the senior housing sector, the industry rapidly returned to pre-COVID penetration rates soon after the introduction of effective vaccines and the lifting of admissions bans. The performance of senior housing through adversity underscores the inelasticity of demand and highlights the extent to which the coming aging wave will continue to drive the fundamentals of senior housing growth.





"Indeed, during the Great Recession, returns for seniors housing, as measured by NCREIF, were less volatile and suffered an outright decline of 6.7 percent over the course of only two quarters versus returns on apartments, which declined 24 percent over the course of seven quarters." — Beth Burnham Mace, "Seniors Housing Stacks Up", CIRE Magazine.

"80+ Occupied Unit Penetration Rate" is Occupied Senior Housing Units / 80+ Population in NIC MAP Primary & Secondary Markets.

Source: NIC MAP® Data, powered by NIC MAP®; Census Bureau; NIC, NCREIF.

 NIC MAP

© 2025 NIC MAP®    24



## May Need Historic Near-Term Inventory Growth to Keep Pace with Demand

Must Develop at Nearly 2x the Maximum Pace and More Than 3.5x Current Pace For 90% Occupancy in 2030



The aging wave will begin to break in earnest in the back half of the 2020s. To keep pace, the industry will need historic near-term inventory growth. However, inventory growth is currently at near record lows. In fact, at current penetration rates, the industry will need to develop at nearly double its historical maximum development pace just to maintain 90% occupancy by 2030. At the current development pace, a significant supply gap will emerge by the end of the decade.

Source: NIC MAP® Data, powered by NIC MAP®; Census Bureau.

 NIC MAP

© 2025 NIC MAP®    25







At current penetration rates, projections suggest that the industry could return to 90% occupancy as soon as 2026, and occupancy will continue to expand after that. In fact, without further investments in development, the current development pace will result in a $275 billion supply gap by 2030.

Surging demand and suppressed supply growth are creating favorable conditions for both acquisition and new development.









## Can Senior Housing Occupancy Catch Multifamily and Industrial?

Based on 4Q2023 80+ Growth, Occupied Penetration, and Development, the Answer May Be Yes

**Senior housing occupancy could potentially match that of multifamily and industrial sectors.**

Based on the combination of the current penetration rate, projected 80+ population growth, and current development rates, projections show tremendous upside for senior housing occupancy. For this reason, senior housing routinely ranks as an asset class with top-tier return prospects across the commercial real estate vertical.



Source: NIC MAP® Data, powered by NIC MAP®; Census Bureau, Apartments.com, NAREIT.



 NIC MAP

© 2025 NIC MAP®    28



# Rapidly Aging Existing Stock Will Drive Incremental Inventory Needs

Functional Obsolesce Will Reduce the Effective Existing Inventory in the Coming Years

Nearly half of current senior housing stock opened before the year 2000. In the nearly twenty-five years since, senior housing customer preferences, profiles, and operating costs have changed substantially. Consequently, the rapidly aging existing stock will drive functional obsolescence and reduce effective inventory, further increasing demand for new supply. This will put even more pressure on the industry to expand to meet the demands of a rapidly aging population.



Senior Housing Distribution by Age of Units | All Markets | 1Q2020 and 4Q2023

Source: NIC MAP® Data, powered by NIC MAP®.

 NIC MAP

© 2025 NIC MAP®    29



# What Could Drive Penetration Rate Expansion?

Growing Customer Base Is Materially Wealthier than Generations Before



$75^+$

Affordability is a key question governing the senior housing industry's ability to effectively meet the needs of a rapidly aging population. Fortunately, a look at the overall financial health of 65+ and 75+ households suggests that affordability will increase, rather than decrease, in the coming years.

> **Median senior household net worth and income have increased at rates far greater than senior housing rents over the past decade, suggesting that affordability is expanding. This could further increase penetration rates.**



© 2025 NIC MAP®    30



## Affordability at All Time High?

Ratio Between Median Senior Household Purchasing
Power and Senior Housing Rents Increasing

Residents typically pay for senior housing by first using monthly income, such as Social Security or pensions, and then cover any shortfall by spending down their net worth – often from the sale of their former home. Thus, a useful indicator of affordability is to look at the number of years of senior housing that net worth can afford after subtracting monthly income from the monthly senior housing rent.

Using that measure, the ratio between household purchasing power and senior housing rents is at an all-time high. The delta between these two factors further suggests that the next generation will enjoy greater affordability than the preceding generations, which could expand penetration rates.



*Income Adjusted Spend Down Years = Median Net Worth / [Median Income – CPI Adjusted SH Annual Rent].
Directional Indicator of Years *Net* Worth Can Fund The Difference Between SH Rent & HH Income.

Source: Claritas; NIC MAP® Data, powered by NIC MAP®. Rents based on Primary and Secondary Market Aggregate, CPI-U via FRED.

 NIC MAP

© 2025 NIC MAP®    31



## The Wealthiest Cohorts of 75+ Households Are Set to Grow the Fastest

Private Pay SH's Typical Resident Cohorts ($35k+ and $50k+) Growing at 1.4x and 1.6× 75+ Growth Rate



In addition, the wealthiest cohorts of 75+ households are projected to grow significantly faster than the overall 75+ population. The private pay senior housing industry typically defines prospective residents as having incomes above $35k or $50k per year. We see that 75+ cohorts with incomes of $35k+ and $50k+ are growing at 1.4x and 1.6x the rate of the overall 75+ population, respectively. The rapid growth of high-income households supports the further expansion of the private pay senior housing market.





## An Awe-Inspiring Challenge Faces the Senior Housing Industry

Industry May Need to Deliver 1.9x More Units Per Year Than Historical Maximum for Next 20 Years

The aging wave presents the senior housing industry with a challenge of historic proportions: develop at an unprecedented pace to meet unprecedented demand. To grow supply to levels needed to maintain 90% occupancy at current penetration rates, the industry needs to develop at nearly twice its maximum historical development pace each year for the next two decades.

The challenge is made more pronounced by the currently depressed pace of development, which is at roughly one quarter of the pace needed just to maintain current penetration rates. Addressing this issue requires historic investment across all segments of the industry and create unique and unprecedented investment opportunities.





Units Needed to Maintain 90% Occupancy

Source: NIC MAP® Data, powered by NIC MAP®; Census Bureau.

 NIC MAP

© 2025 NIC MAP®    33



## Huge Investment Gap in New Inventory to Maintain 90% Occupancy

Cumulative Development Cost at $500k/Unit at More Than $1 Trillion by 2041





> $1T

At current 80+ penetration rates, the senior housing industry needs to develop more than $1 trillion in new inventory by the early 2040s. The current development pace is on track to yield a supply gap of approximately $800 billion. The significant investment gap in new inventory highlights the pressing need for an all-of-industry effort to meet the future housing needs of the aging population. Meeting this investment gap requires a substantial increase in the capital allocated to the sector and creates a generational investment opportunity along the way.

Source: NIC MAP® Data, powered by NIC MAP®; Census Bureau.

 NIC MAP

© 2025 NIC MAP®    34







Below is the Market Trends & Investor Survey – Senior Living & Care by Cushman and Wakefield produced in the first half of 2025:











IN THIS REPORT

01 Market Highlights

02 Property Markets Fundamentals

03 Capital Markets Fundamentals

04 Valuation Index

05 Investor Survey Results

Photo provided by Watermark Retirement Communities





Photo provided by Thrive Senior Living

# 01
# SENIOR LIVING & CARE MARKET HIGHLIGHTS

## MARKET HIGHLIGHTS

- U.S. senior living property market fundamentals continue to strengthen. Stabilized occupancy trended upward for the seventeenth consecutive quarter, surpassing 89% overall, with secondary markets reaching 90% occupancy, a level not obtained since 2017.

- The number of occupied units reached a new all-time-high in Q1 2025 with net absorption outpacing supply growth by 2.5 to 1, as inventory growth remains near historic lows.

- Annual rent growth, though tapered from prior quarters, has remained intact, averaging 3.9% in Q1 2025, a dip that is likely seasonal as the sector emerges from winter months. This outsized occupancy and rent growth has helped counterbalance short-term turbulence in the broader capital markets.

- Secular tailwinds are stronger than ever. To meet market demand at peak levels, supply growth must increase by 35,000 to 45,000 units per year, beginning today. For context, the highest number of units delivered in a year was 34,000 with less than 10,000 units delivered over the trailing 12-month period, with construction starts dipping to a new low.

- Affordability remains broadly unsolved, though new design trends are emerging. With the number of middle-income seniors projected to double by 2029, over half of this segment will not have adequate finances to afford conventional senior living and care.

- Active Adult communities continues to gain momentum in the market, achieving favorable rent growth indications that are consistent with conventional senior living, with operating expenses and debt underwriting that is more consistent with conventional multifamily.

- Valuations remain highly stratified and dependent on specific market segments. While active adult capitalization rates nearly mirror conventional multifamily, stand-alone independent living is trading at year 1 capitalization rates in the low 6's. Senior living communities that contain independent, assisted and memory care have a low water mark (cap rate) of approximately 6-6.5% with averages about 50-75bps higher. Assisted living with memory care are achieving a low water mark in the mid to high 6's and averages are falling in the 7.0-8.0% range.

- Of the 75+ senior living & care professionals who participated in Cushman & Wakefield's investor survey, 53% of participants expect capitalization rates to have peaked and to remain level through the remainder of the year. Conversely, 33% of respondents expect to see a decrease in capitalization rates in H2 2025.

- Interest rate levels remain the top concern as it relates to market valuations. Concerns over debt market liquidity subsides as more lenders return to the market. The most significant change from H1 2024 is the increased concerns over labor shortages and inflationary costs, as the industry aims to expand.

- In 2023, the amount of troubled loans reached the highest levels since the great financial crisis. Since that time, lenders have worked to resolve an estimated $65.8 billion in senior living debt.

- The percentage of distressed sales was reported at 2.77% of total transaction volume YTD in 2025, falling well below market expectations targeting distressed opportunities, resulting in a shift back to core and core-plus strategies, as noted by a combined 49% of survey participants.

- Basis point spreads between the going-in capitalization rate and terminal or exit capitalization rate have widened signaling that market participants are underwriting "higher-for-longer" as it relates to interest rates.





02
PROPERTY MARKETS
FUNDAMENTALS





# PROPERTY MARKETS

Property markets are performing stronger than ever





Source: Cushman & Wakefield. NICMAP, Q2025

- U.S. senior living property market fundamentals continue to strengthen. Stabilized occupancy trended upward for the seventeenth consecutive quarter, surpassing 89% overall, with secondary markets reaching 90% occupancy, a level not obtained since 2017.

- The number of occupied units reached a new all-time-high in Q2025 with net absorption outpacing supply growth by 2.5 to 1, as inventory growth remains near historic lows.

- Annual rent growth, thought tapered from prior quarters, has remained intact, averaging 3.9% in Q2025, a dip that is likely seasonal as the sector emerges from winter months.

- Active adult rental properties, an emerging segment and hybrid between multifamily and traditional senior living, reached an average occupancy of 95.6% occupancy, with rental growth surpassing 5% in Q2025.

- The slowing residential housing market does raise some concern for the more lifestyle focused properties and should be monitored accordingly.



# PROPERTY MARKETS

Construction starts reach a new all-time low





Source: Cushman & Wakefield, NICMAP, Q2025

- Cushman & Wakefield expects continued improvement in stabilized occupancy levels and rent growth as net demand from the aging U.S. population continues to mount and construction starts dip to a new all-time low.

- After turning positive in Q2 2021, net absorption surged to all time highs in primary and secondary markets. While net absorption did taper in Q2025, the YoY increase from Q2024 is nearly 22%, indicating the lag is seasonal.

- Stabilized occupancy trended upward at the fastest rate recorded for IL, AL and MC with the number of occupied units reaching a new all-time high in Q2025.

- Conversely, construction starts have subsided to levels not experienced since the Great Financial Crisis. This reduction in projected supply growth, coupled with the increase in consumer demand, will be critical in the sectors ability to offset the increased operating expenses caused by labor shortages and rising insurance premiums plaguing the sector.



# PROPERTY MARKETS

Submarket trends continue to strengthen as new supply is absorbed



- The Northeast region remains the strongest performer with stabilized occupancy nearing 91% and annual rent growth nearing 3.5%. While the Mid-Atlantic region is also achieving favorable occupancy and rent growth, construction levels remain elevated as a percentage of supply.

- Markets with high occupancy and low construction vs. inventory will experience the greatest rent growth and include Boston, Baltimore, Tampa, Portland and Phoenix. Some Midwest markets including Chicago, Minneapolis and Cleveland are also poised for favorable occupancy and rent growth.

- Markets such as San Jose, Washington DC, Denver, NYC and Atlanta all have significant construction relative to supply and will likely experience some downward pressure as this supply comes online, notwithstanding migration trends.

Source: Cushman & Wakefield, NICMAP, Q2025



# PROPERTY MARKETS

Labor shortages & construction costs remain elevated





- Construction employment has only recently surpassed pre-GFC levels of employment, hence little reduction in this cost component is expected.

- Reduced immigration could add upward pressure to labor costs if the labor market remains resilient. Further, as workers age out of the workforce, the shortage of construction workers is likely to persist.

- Cost pressures began to ease in 2024 and remained relatively level in Q2025, still well above pre-pandemic levels.

- The recent tariffs are expected to drive up construction material costs by an estimated 5-7% in 2025, according to Cushman & Wakefield Insights.

- These dynamics will slow new development, benefiting existing assets as the supply pipeline continues to contract.

Source: U.S. Bureau of Labor Statistics; Cushman & Wakefield



# PROPERTY MARKETS

Senior living long-term demand outlook points to massive shortage in supply



- After weathering a period oversupply, secular tailwinds are stronger than ever. To meet market demand at peak levels, supply growth must increase by 35,000 to 45,000 units per year, beginning today. For context, the highest number of units delivered in a year was 34,000 with less than 10,000 units delivered over the trailing 12-month period.

- According to NIC, an additional 2.2 million adults age 65+ will enter the rental market over the next decade, offering a prime opportunity for Active Adult properties, a sub-segment within senior living that offers significant opportunity to fill the demand gap and, potentially, affordability challenges faced by the more traditional senior living and care operating model.

- Affordability remains broadly unsolved, though new design trends are emerging. With the number of middle-income seniors projected to double by 2029, over half of this segment will not have adequate finances to afford conventional senior living and care.

Source: Cushman & Wakefield





03
# CAPITAL MARKETS FUNDAMENTALS



## CAPITAL MARKETS

Quarterly transaction volume (millions)





Source: NICMAP, Q2025; Cushman & Wakefield

- Senior living transaction volume reached the highest post-pandemic levels in the second half of 2024, marking a year-over-year increase of nearly 70%, as dry powder emerged from the sideline and debt liquidity cautiously returned to the sector.

- While the Federal Reserve did move to cut the Federal Funds rate in September 2024, the reduction was above market expectations. As of April 23, markets are now favoring three cuts despite market-based measures indicating that tariffs will be inflationary in the immediate term, resulting in continued market uncertainty.

- With NCREIF ODCE funds reporting an increase in fund allocations to alternative real estate sectors and debt markets becoming more liquid, positive investment activity, with notable entity level portfolios already taking place.

- Nursing care transaction volume also posted year-over-year increase, though slightly more modest at 27%, a positive sign for valuations. Regulatory uncertainty and ongoing staffing concerns will likely keep transaction volume at more moderate levels though the second half of 2025.



## CAPITAL MARKETS

Price per unit valuation trends (thousands)





- Apartments — Senior Living — Nursing Care

Source: NICMAP, Q2025; Real Capital Analytics; Cushman & Wakefield

- According to the National Investment Center for the Seniors Housing and Care Industry (NIC), the average transaction price per unit increased by 46% year-over-year in the first quarter of 2025, another sign that valuations are beginning to turn.

- This increase in average price per unit highlights investors shift back to core investment strategies, as buyer vs. seller expectations of well operated properties realign.

- Senior living pricing, however, remains below peak levels, with a significant spread from multifamily pricing (a leading indicator), suggesting valuations should continue to tick upwards.

- Cushman & Wakefield is once again conducting valuations with per unit indications surpassing $750,000 per unit, along with notable portfolio transactions.

- Skilled nursing pricing increased by 18% YoY after dipping to a six-year low, as volatility and uncertainty tapers investment activity.



## CAPITAL MARKETS

Capitalization rates vs. 10-year treasury (basis points)





Source: Real Capital Analytics; Cushman & Wakefield

- Over the past 10 years, the senior living sector has averaged 426 bps spread between the 10Y and capitalization rates, with apartments averaging 288 bps—a 138 bp difference. The current spread at 250 bps, the widest spread between multifamily and senior living pricing in over a decade.

- Interest rates remain volatile, with the 10-year Treasury fluctuating significantly. Despite daily moments, our base case is that the 10-year Treasury yield will generally hover in the 4-4.5% range, consistent with long-run equilibrium.

- While credit and risk spreads may widen in the short term due to uncertainty, the fundamentals for a gradual recovery in debt and capital markets remain strong. Risk-off attitudes will drive demand for assets with stable income, with such deals continuing to draw selective interest from opportunistic investors as the recovery progresses which will help bring capitalization rate spreads closer to the strike zone.

- With spreads for senior living pricing returning to historical norms, more capital is expected to return from the sidelines in a meaningful way.



# CAPITAL MARKETS

Evolving investor landscape & investment strategies

## Buyer Composition



## Capital Flows (Millions)



- Private capital investors stepped in as the primary buyer for senior living properties in 2023 and 2024, representing 50% to 60% of investment, mostly seeking opportunistic investment strategies.
- REITs returned to the market in the second half of 2024 a trend that continued into 2025, despite the public market volatility. Institutional investment activity remains below historical levels, sitting on dry powder, for more certain market conditions.

- CRE fund flows may fluctuate as portfolios adjust to the near-term denominator effect. However, in the long term, CRE's diversification and inflation-hedging benefits will sustain capital flows and maintain its role in institutional and private portfolios.
- Investors are expected to focus more on resiliency and key drivers of income growth over time, a viewpoint that favors the senior living sector.

Source: RCA; Cushman & Wakefield



## CAPITAL MARKETS

Senior living debt maturities remain a focal point (billions)



Source: Real Capital Analytics; Cushman & Wakefield



- Senior living loan maturities, set to exceed $18 billion within the next 24 months, with $8.3 billion in senior living loans set to mature this year and projected to peak in 2027 after accounting for term extensions.

- These loan maturities have been identified by investors as an opportunistic opportunity to acquire newer and well-located properties as significant discounts to replacement cost, with funds raised in accordance.

- Favorable property market fundamentals and positive operating trends have helped to mitigate the level of loan defaults with lenders opting to work with their borrowers vs. default proceedings.

- With a significant amount of loan maturities still ahead, concern of additional valuation decreases due to debt market distress does still exist, yet investors are broadly pivoting back to more core investment strategies as this concern continues to subside, and valuations tick upward.

- Markets with the highest levels of loan maturities scheduled within the forward-looking three-year period include Seattle, Phoenix, Atlanta, Dallas and Chicago.



## CAPITAL MARKETS

Troubled loans remain below prior recessionary levels (billions)





Source: Real Capital Analytics, Cushman & Wakefield Research, Data through March 31, 2025

- In 2023, the amount of troubled loans reached the highest levels since the great financial crisis. Since that time, lenders have worked to resolve an estimated $65.8 billion in senior living debt.

- The percentage of distressed sales has elevated from a 0.57% low in 2020 to 2.77% of total transaction volume YTD in 2025. However, this amount remains well below the 39% peak that was reached during the GFC (2009).

- The total dollar amount of troubled loans remain below prior recessionary levels as lenders work with borrowers of well performing properties to resolve outstanding issues, primarily driven by improving property market fundamentals.

- Despite the wave of loan maturities, debt liquidity is returning to the market, with Q2025 trailing four-quarter loan volume up 78% YoY, with the majority executed in Q4 2024 and Q2025.

- Of the total trailing four-quarter senior living loan volume, 12% was for construction with nearly 22% being for acquisitions, and the balance, at 66% of new loans, being for refinancings, indicating a 36% YoY increase in refinancing activity.

© 2026 VALBRIDGE PROPERTY ADVISORS | PHILADELPHIA





04

# SENIOR LIVING & CARE VALUATION INDICES





# SENIOR LIVING & CARE VALUATION INDICES



H1 2025

- The Cushman & Wakefield valuation index represents an aggregation of mark-to-market valuation conclusions from nearly 2,000 properties throughout the U.S., that were valued within the past twelve months.

- The aggregate market value of this proprietary dataset totals approximately $30 billion, or 6.25% of the total estimated market capitalization of $480 billion of institutional seniors housing & care supply.

| Stand Alone Active Adult | Lower Decile | Lower Quartile | Average | Upper Quartile | Upper Decile |
|---|---|---|---|---|---|
| Stabilized Occupancy (%) | 86 | 89 | 94 | 96 | 97 |
| Effective Monthly Rent per Revenue Unit ($) | 1,132 | 1,971 | 2,245 | 2,696 | 3,266 |
| Expense Ratio (%) | 53 | 46 | 41 | 39 | 36 |
| Capitalization Rate (%) | 6.45 | 6.3 | 5.15 | 4.75 | 4.5 |
| Stabilized Market Value per Revenue Unit ($) | 102,235 | 178,858 | 298,542 | 398,222 | 501,699 |

| Majority Independent Living | Lower Decile | Lower Quartile | Average | Upper Quartile | Upper Decile |
|---|---|---|---|---|---|
| Stabilized Occupancy (%) | 86 | 89 | 92 | 93 | 96 |
| Effective Monthly Rent per Revenue Unit ($) | 2,523 | 3,221 | 3,954 | 4,958 | 6,381 |
| Expense Ratio (%) | 76 | 69 | 66 | 60 | 58 |
| Capitalization Rate (%) | 7.9 | 7.2 | 6.5 | 6.3 | 5.9 |
| Stabilized Market Value per Revenue Unit ($) | 86,870 | 162,924 | 299,422 | 388,225 | 522,234 |

Source: Cushman & Wakefield Valuation Index (H12025)

# SENIOR LIVING & CARE VALUATION INDICES



H1 2025

| Majority Assisted Living | Lower Decile | Lower Quartile | Average | Upper Quartile | Upper Decile |
|---|---|---|---|---|---|
| Stabilized Occupancy (%) | 86 | 89 | 93 | 93 | 95 |
| Effective Monthly Rent per Revenue Unit ($) | 3,124 | 3,784 | 5,275 | 6,157 | 7,898 |
| Expense Ratio (%) | 80 | 78 | 71 | 69 | 62 |
| Capitalization Rate (%) | 8.4 | 7.9 | 7.1 | 6.5 | 6.0 |
| Stabilized Market Value per Revenue Unit ($) | 89,061 | 132,211 | 286,385 | 354,125 | 572,523 |

| Stand Alone Memory Care | Lower Decile | Lower Quartile | Average | Upper Quartile | Upper Decile |
|---|---|---|---|---|---|
| Stabilized Occupancy (%) | 81 | 84 | 89 | 90 | 90 |
| Effective Monthly Rent per Revenue Unit ($) | 3,201 | 3,714 | 4,722 | 5,279 | 6,289 |
| Expense Ratio (%) | 82 | 78 | 75 | 61 | 55 |
| Capitalization Rate (%) | 9.1 | 8.7 | 8.6 | 8.1 | 7.75 |
| Stabilized Market Value per Revenue Unit ($) | 89,672 | 121,465 | 181,697 | 241,572 | 345,357 |

| Majority Nursing Care | Lower Decile | Lower Quartile | Average | Upper Quartile | Upper Decile |
|---|---|---|---|---|---|
| Stabilized Occupancy (%) | 73 | 80 | 88 | 90 | 92 |
| Effective Daily Rate per Revenue Unit ($) | 143 | 162 | 251 | 288 | 372 |
| Expense Ratio (%) | 81 | 83 | 86 | 90 | 93 |
| Capitalization Rate (%) | 14.7 | 13.9 | 13.4 | 12.2 | 10.75 |
| Stabilized Market Value per Revenue Unit ($) | 36,222 | 67,214 | 121,211 | 145,964 | 169,913 |

Source: Cushman & Wakefield Valuation Index (H12025)





# SENIOR LIVING & CARE VALUATION INDICES

## H1 2025 Same Store Analysis



- Same store operating and valuation data were extracted from properties Cushman & Wakefield values annually. This data provides a unique insight into actual year-over-year changes in market valuation assumptions.

- Cushman & Wakefield's same-store indices suggest a decrease in capitalization rates of 25 bps over Q2 2024, with valuations turning upward for investment Class A and B properties, by 4% and 6%, respectively.

- After a nearly 20% peak-to-trough decline, valuations have likely reached the floor and will continue to trend in a positive direction, as property markets continue to strengthen and capital markets stabilize.

- The residential housing market, debt liquidity and still looming wave of loan maturities remain a red flag for investors and are all critical for the continued growth in market valuations for the sector.

Source: Cushman & Wakefield Valuation Index (H12025)

## 05
# INVESTOR SURVEY RESULTS



Case 25-15245-pmb-08491 Doc 2166 Document 14/40/26 Filed 07/13/26 Entered 07/10/26 20:16:49 42 Desc
Exhibit F    Page 124 of 418

WHITEHALL MANOR SENIOR LIVING
MARKET ANALYSIS



# SENIOR LIVING & CARE INVESTOR SURVEY RESULTS



H1 2025 survey results from over 75 of the industry's most influential leaders

**Primary Markets**

| Capitalization Rates (%) | Investment Class A | | | Investment Class B | | | Investment Class C | | |
|---|---|---|---|---|---|---|---|---|---|
| | Low | High | Average | Low | High | Average | Low | High | Average |
| Active Adult | 4.5 | 6.3 | 5.2 | 5.0 | 6.5 | 5.8 | 5.5 | 7.3 | 6.6 |
| Majority Independent Living | 5.5 | 7.0 | 6.2 | 6.0 | 8.0 | 7.0 | 6.8 | 9.0 | 7.6 |
| Majority Assisted Living | 6.5 | 7.5 | 6.8 | 7.0 | 8.5 | 7.6 | 7.3 | 10.0 | 8.5 |
| Stand Alone Memory Care | 7.5 | 9.5 | 8.5 | 7.5 | 10.0 | 9.1 | 8.5 | 11.0 | 9.9 |
| Nursing Home | 9.5 | 12.8 | 11.9 | 11.0 | 13.5 | 12.6 | 12.5 | 14.5 | 14.0 |
| CCRC/ LPC | 6.0 | 8.5 | 7.4 | 6.5 | 9.0 | 8.2 | 7.5 | 11.0 | 9.0 |

**Secondary Markets**

| Capitalization Rates (%) | Investment Class A | | | Investment Class B | | | Investment Class C | | |
|---|---|---|---|---|---|---|---|---|---|
| | Low | High | Average | Low | High | Average | Low | High | Average |
| Active Adult | 5.0 | 6.5 | 5.9 | 5.3 | 7.5 | 6.5 | 6.0 | 8.0 | 7.1 |
| Majority Independent Living | 6.0 | 7.5 | 6.7 | 6.5 | 8.0 | 7.4 | 7.0 | 9.5 | 8.1 |
| Majority Assisted Living | 6.8 | 8.0 | 7.3 | 7.5 | 9.0 | 7.9 | 8.0 | 10.5 | 8.8 |
| Stand Alone Memory Care | 7.5 | 10.5 | 8.8 | 8.0 | 10.5 | 9.4 | 9.0 | 11.5 | 10.1 |
| Nursing Home | 11.0 | 13.5 | 12.6 | 11.5 | 14.5 | 13.8 | 12.5 | 15.5 | 15.5 |
| CCRC/ LPC | 7.0 | 10.0 | 8.3 | 8.0 | 10.5 | 9.0 | 8.5 | 12.0 | 9.5 |

**Average Spreads by Location (Bps)**

| Investment Class | Primary Market Locations | | | Secondary Market Locations | | | Locational Spreads Primary vs. Secondary | | |
|---|---|---|---|---|---|---|---|---|---|
| | A - B | B - C | A - C | A - B | B - C | A - C | A | B | C |
| Active Adult | 52.0 | 83.0 | 135.0 | 55.0 | 57.0 | 112.0 | 70.0 | 73.0 | 47.0 |
| Majority Independent Living | 79.8 | 63.2 | 143.0 | 69.7 | 72.3 | 142.1 | 52.6 | 42.5 | 51.7 |
| Majority Assisted Living | 72.0 | 96.0 | 168.0 | 67.5 | 82.5 | 150.0 | 42.0 | 37.5 | 24.0 |
| Stand Alone Memory Care | 59.9 | 77.1 | 137.0 | 64.2 | 64.9 | 129.1 | 29.3 | 33.5 | 21.4 |
| Nursing Home | 69.1 | 136.9 | 206.0 | 121.9 | 166.9 | 288.8 | 66.3 | 119.0 | 149.0 |
| CCRC/ LPC | 86.0 | 80.6 | 166.6 | 75.0 | 50.0 | 125.0 | 88.0 | 77.0 | 46.4 |

Source: Cushman & Wakefield Investor Survey (H1 2025)



















# LOOKING FORWARD

According to the Chinese zodiac, 2025 is the year of the wood snake, which symbolizes wisdom, creativity, and growth. The wood element emphasizing renewal and transformation, while encouraging growth and expansion. This sign indicates significant opportunities and a focus on strategic thinking throughout the year, an appropriate parallel for the state of the senior living & care sector. Trends and innovations in the senior living sector continue to accelerate, such as technology, infrastructure, and design components. From a valuation standpoint, it does appear that the market is at or near the bottom. In the years ahead, renewed interest from investors and lenders is expected due to the softening of some of the more core asset classes while senior living operating performance continues to show stable growth, once again highlighting the sector's resiliency.

As various crosscurrents between strong property market fundamentals for the sector and a choppy capital markets environment begin to normalize, investor sentiment is seemingly gaining optimism as investment strategies continue to evolve. Operators continue to grapple with labor challenges as occupancy and rental growth remains on a positive trajectory. There is also a continued focus on creating scale through size and strategic service delivery partnerships to help drive operating margins, a key component to the industries ability to meet future demand expectations.

Amid ongoing capital markets dislocation and uncertainty surrounding the tariffs, investors are resetting their strategies as they look to opportunistically deploy capital. While transactions involving properties with distressed capital stacks have ticked upward, the velocity of transaction activity anticipated from $18 billion of loan maturities within the next 24 months has yet to significantly impact market transactions as previously expected. Though elevated activity may still be in the immediate future, a level that will statistically depress valuations is not likely.

Increased transaction activity is expected during the second half of 2025. Debt is becoming more available as lenders more programmatically open their balance sheets and debt becomes less expensive, albeit still selective. In addition to the lower overall debt costs, this contraction in base rates helps the financial engineering of deals by restoring some neutral or positive leverage conditions for fixed-rate product relative to cap rates. These improvements in the debt markets may also help move the mountain of dry powder ($382 billion globally) off the sidelines, signaling the cusp of the next growth cycle as the strong performance of the senior living sector continues to capture the attention of investors.

Photo provided by Watermark Retirement Communities



Source: Cushman & Wakefield









Below is the NIC MAP 3Q25 Market Fundamentals Report.

## NIC MAP — 3Q25 Market Fundamentals

| NIC MAP | Senior Housing | | | Nursing Care |
| --- | --- | --- | --- | --- |
| | Overall | Majority IL | Majority AL | Majority NC |
| Source: NIC MAP® | Market Fundamentals 3Q25 | | | |
| Occupancy | 88.7% | 90.2% | 87.2% | 86.3% |
| Annual Rent Growth | 4.3% | 4.2% | 4.4% | 5.2% |
| Annual Absorption | 3.5% | 3.4% | 3.5% | 1.4% |
| Annual Inventory Growth | 0.7% | 0.7% | 0.7% | -0.7% |
| Construction vs. Inventory | 2.4% | 2.4% | 2.5% | 0.2% |
| Rolling 4-Quarter Starts vs. Inventory | 0.9% | 1.2% | 0.7% | 0.0% |
| | Capital Markets 2Q25 | | | |
| Transaction Volume (millions) | $3,837.2 | | | $1,684.7 |
| Rolling 4-Quarter Price Per Unit | $154,237 | | | $91,341 |
| Rolling 4-Quarter Cap Rate | Protected | | | Protected |



Occupancy by Property Type
NIC MAP | Primary Markets

— Majority IL
— Majority AL
— Majority NC

*Overall Senior Housing combines Majority IL and Majority AL Properties

Source: NIC MAP DATA

Data for the Market Fundamentals is representative of the Top 31 Primary metropolitan markets.

Data for the Capital Markets is representative of all U.S. property transaction of at least $2.5 million.

## Key Findings

- Senior housing occupancy for the third quarter of 2025 was 88.7%, up 70 basis points from the previous quarter.
- Independent living properties' average occupancy grew by 50 basis points to 90.2% in the third quarter.
- In the third quarter of 2025, assisted living properties' average occupancy was 87.2% - an increase of 90 basis points.
- The average occupancy for nursing care properties stayed the same for the third quarter at 86.3%, unchanged from the prior quarter.

## About NIC MAP:

NIC MAP believes data drives outcomes. We provide purpose-built data exclusively for senior housing, offering relevant, market-specific insights you won't find anywhere else, and we're empowering the senior housing industry to stay nimble and achieve optimal results. Our platform supports robust decision-making with real-time access to occupancy rates, transaction details, and construction project tracking, enabling industry leaders -- including the top senior housing operators, largest government agencies and major investors -- to navigate market complexities and capitalize on investment opportunities effectively. For more information, visit www.nicmap.com.

Copyright 2025 NIC MAP, LLC. All rights reserved.
Data believed to be accurate but not guaranteed; subject to future revision. This report is a part of the NIC MAP Data. Distribution of this report without prior written consent or licence by NIC MAP is prohibited. Subject to the Terms of Use. For license information please contact NIC MAP at (844) 668-3282.

## Conclusions

The senior housing sector has demonstrated resilience and strong performance amid post-pandemic recovery and economic challenges. According to the Cushman & Wakefield report for H1 2025, property market fundamentals are strong, with stabilized occupancy exceeding 89%—marking 17 consecutive



quarters of growth—and secondary markets hitting 90%, a level unseen since 2017. Net absorption has outpaced supply growth by 2.5 to 1, driving record occupied units, while annual rent growth holds at 3.9%, offsetting seasonal dips. The NIC MAP Vision report reiterates this, highlighting absorption rates that doubled pre-pandemic levels in 2023 and surged 40% year-over-year in Q1 2024, pushing occupancy and employment near or above pre-COVID benchmarks.

The industry has an optimistic outlook driven by increasing demand, with the baby boomer cohort turning 80 in 2025. Cushman & Wakefield projects a need for 35,000-45,000 new units annually to meet peak demand, far exceeding recent deliveries under 10,000. Increased transaction activity is anticipated in H2 2025 as debt becomes more accessible. Overall, the sector is positioned for growth and has a positive outlook.



# Highest and Best Use Analysis

The Highest and Best Use of a property is the physically possible, legally permissible and financially feasible use which results in the highest value. An opinion of the highest and best use results from consideration of the criteria noted above under the market conditions or likely conditions as of the effective date of value. Implied in the definition is that the determination of highest and best use results from the judgment and analytical skills of the appraiser; that is, that the use determined from analysis represents an opinion, not necessarily a fact to be found. In appraisal practice, the concept of highest and best use represents the premise upon which value is based.

While improved properties may have a highest and best use that is different than the existing use, the existing use will generally continue until land value exceeds the value of the property at its existing use plus demolition costs. It is not always necessary to determine the highest and best use of an improved property both As If Vacant and As Improved. In many cases the determination of whether the value as improved exceeds the site value is straightforward and does not require an opinion of market value of the site. In this instance the value as improved significantly exceeds any reasonable expectation of value of the site only. Thus the following analysis is limited to the highest and best use as improved.

## Analysis of Highest and Best Use as Improved

In determining the highest and best use of the property as improved, we consider three possibilities for the property: 1) continuation of the existing use with or without modification to improvements, 2) a change in use, or 3) demolition and redevelopment of the land.

### Continuation of Existing Use

Continuation of the existing use meets the tests for physical possibility, legal permissibility and financial feasibility. Market demand for such properties will continue to provide economic support for the existing use for the foreseeable future.

The improvements are in average condition and a new roof is needed ~~at this time~~ in order to maintain economic viability.

### Change in Use

Conversion of the improvements meets the tests for physical possibility and legal permissibility. Conversion of the existing improvements into apartments is the most likely alternative use. However, the overall functionality/design of the building for apartments would be limited due to the size and layout of the rooms. Therefore, a change in use is unlikely to be maximally productive.

### Demolition

The total of demolition costs and our opinion of market value exceeds any reasonable value of the underlying land.

## Conclusion Of Highest And Best Use As Improved

The highest and best use of the subject property, as improved, is continued use as an assisted living facility.

## Most Probable Buyer

As of the date of value, the most probable buyer of the subject property is a senior housing operator.



# Income Capitalization Approach

## Methodology

The Income Capitalization Approach is developed by converting anticipated future income into a present value by a capitalization process. There are two types of capitalization: direct capitalization and yield capitalization, more commonly known as discounted cash flow (DCF) analysis.

Income-producing properties, by nature, are developed and purchased for investment purposes, where earning power, including an income stream and return of investment, are the most critical elements affecting value. The forecast of income and selection of appropriate rates are therefore important aspects of the valuation process. The process of developing the income approach consists of the following analyses: Income, Vacancy, Expense, and Rate Analysis.

## Application of Methodology

Given the nature of the property being appraised, the direct capitalization method was used to develop a value indication.

## Income Analysis

The income analysis involves a review of the existing subject leases and comparison to market rent levels, as well as additional income sources and expense recoveries. The sum of all income results in potential gross income (PGI).

### Subject Rent Analysis

The subject consists of 21 independent living (IL) units, 91 assisted living (AL) units, and 18 memory care (MC) units. Ownership provided a rent roll as of March 26, 2026, which states an IL average monthly rent of $2,589, an AL monthly average rent of $4,062 and an MC monthly average rent of
$5,771. We surveyed the competition in the area and gathered asking monthly rents from each competitor, which are summarized in the chart below:

**Competition and Rent Analysis (Survey Conducted April 2026)**

| Competition and Rent Analysis | | | | |
|---|---|---|---|---|
| Facility Name | Distance from Subject | IL - Average Rent Per Bed | AL - Average Asking Rent Per | MC - Average Asking Rent Per Bed |
| Atria Bethlehem | 7 miles | $4,300 | $5,472 | $7,250 |
| Country Meadows of Allentown | 7 miles | $3,730 | $5,657 | $7,899 |
| Country Meadows of Bethlehem | 8 miles | $3,042 | $4,871 | $8,055 |
| Bethlehem Manor Senior Living | 7 miles | $3,648 | $4,374 | $5,316 |
| Atrium of Allentown | 6 miles | N/A | $5,200 | $7,000 |
| Abode Care of Allentown | 6 miles | N/A | $4,300 | $6,500 |
| Rittenhouse Village at Lehigh Valley | 6 miles | $3,700 | $5,200 | $7,075 |
| The Vero at Bethlehem | 8 miles | N/A | $5,722 | $7,440 |
| Moravian Village of Bethlehem | 7 miles | $4,250 | $3,800 | $6,250 |
| The Birches of Lehigh Valley | 11 miles | N/A | $5,745 | $6,750 |
| **Minimum** | | **$3,042** | **$3,800** | **$5,316** |
| **Maximum** | | **$4,300** | **$5,745** | **$8,055** |
| **Average** | | **$3,778** | **$5,034** | **$6,954** |



The chart above indicates an average monthly rent per bed of $3,778 for IL, $5,034 for AL, and $6,954 for MC. Next, we reviewed the current asking monthly rental rates for the subject. After analyzing the preceding data, we conclude that the subject's existing rental rates are below market. Ownership has begun to increase their rental rates, as evidenced by their current rental rates as shown in the table below. Our rent projections for year 1 of this analysis are summarized in the chart below:

**Projected Monthly Rental Income**

| Category | Total Beds | Private Beds | Shared Beds | March 26, 2026 Actual (Average) | Asking Average Rent Per Private Bed | Asking Rent Per Shared Bed | Projected Per Private Bed | Projected Per Shared | Projected Per Bed | Units | Projected Per Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Rental Income - IL | 21 | 21 | 0 | $2,589 | $3,220 | N/A | $3,225 | N/A | $3,225 | 21 | $3,225 |
| Rental Income - AL | 91 | 80 | 11 | $4,062 | $5,658 | $4,912 | $5,000 | $4,000 | $5,000 | 91 | $5,000 |
| Rental Income - MC | 18 | 16 | 2 | $5,771 | $6,295 | $5,295 | $6,000 | $5,000 | $6,000 | 18 | $6,000 |

Here we note that the subject is licensed for 130 beds and there are 130 units according to the building plans. Our rent projection assumes all units will be utilized as private rooms.

Other Income

This category includes income from a variety of sources, including but not limited to additional resident services, community fees, pet fees, late fees, salon and spa, resident purchases, personal laundry, pendant fees, and leased space fees. The following table presents the subject historical data used to estimate other income for the subject property and the stabilized estimate:

**Other Income**

| Income Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $1,497.02 | 3.5% |
| Subject Actual - 12/2024 | $915.58 | 2.2% |
| Subject Actual - 12/2025 | $970.06 | 2.1% |
| *Subject Average* | *$1,127.55* | *2.6%* |
| *Stabilized Estimate:* | *$1,125.00* | *2.2%* |

## Vacancy/Collection Loss

The subject property had an occupancy rate of 98% in 2023, 80% in 2024, and 99% in 2025. After taking into consideration the increase in rent rates, we have estimated a stabilized occupancy rate of 89% based on the subject's historical data as well as the assisted living market information previously shown in the market analysis section of this report.

Given the subject's location and the market data presented, a stabilized vacancy of 11.0% was estimated. In addition, a collection loss of 1.0% was applied. As a result of the preceding information, we project that the subject property will be stabilized in year 1 of this analysis.

## Expense Analysis

Subject Expense History

The subject operating history was reviewed to estimate subject expenses and is presented in the following table:

**Subject Operating Statements**

| Statement Type | Actual | Actual | Actual |
|---|---|---|---|

WHITEHALL MANOR SENIOR LIVING

**Valbridge**
PROPERTY ADVISORS

| 12 Month Period Ending | December-23 | | | December-24 | | | December-25 | | |
|---|---|---|---|---|---|---|---|---|---|
| Occupancy | 98% | | | 80% | | | 99% | | |
| **Revenue** | Amount | Per Unit | % of EGI | Amount | Per Unit | % of EGI | Amount | Per Unit | % of EGI |
| Rental Income | $5,298,081 | $40,754 | 96.5% | $5,221,883 | $40,168 | 97.8% | $5,870,200 | $45,155 | 97.9% |
| Other Income | $194,612 | $1,497 | 3.5% | $119,025 | $916 | 2.2% | $126,108 | $970 | 2.1% |
| **Effective Gross Income** | **$5,492,693** | **$42,251** | 100.0% | **$5,340,908** | **$41,084** | 100.0% | **$5,996,308** | **$46,125** | 100.0% |
| **Operating Expenses** | | | | | | | | | |
| Real Estate Taxes | $101,111 | $778 | 1.8% | $58,687 | $451 | 1.1% | $0 | $0 | 0.0% |
| Property Insurance | $248,995 | $1,915 | 4.5% | $135,811 | $1,045 | 2.5% | $144,033 | $1,108 | 2.4% |
| Management Fees | $267,530 | $2,058 | 4.9% | $261,188 | $2,009 | 4.9% | $268,091 | $2,062 | 4.5% |
| Administrative | $825,477 | $6,350 | 15.0% | $807,109 | $6,209 | 15.1% | $1,035,405 | $7,965 | 17.3% |
| Utilities | $223,063 | $1,716 | 4.1% | $238,003 | $1,831 | 4.5% | $246,220 | $1,894 | 4.1% |
| Repairs & Maintenance | $260,227 | $2,002 | 4.7% | $230,317 | $1,772 | 4.3% | $229,786 | $1,768 | 3.8% |
| Cleaning & Janitorial | $286,995 | $2,208 | 5.2% | $334,014 | $2,569 | 6.3% | $330,962 | $2,546 | 5.5% |
| Marketing | $363,933 | $2,799 | 6.6% | $389,675 | $2,998 | 7.3% | $544,791 | $4,191 | 9.1% |
| Nursing | $1,442,418 | $11,096 | 26.3% | $1,577,611 | $12,135 | 29.5% | $1,747,391 | $13,441 | 29.1% |
| Dietary | $784,646 | $6,036 | 14.3% | $927,919 | $7,138 | 17.4% | $997,280 | $7,671 | 16.6% |
| Activities | $97,862 | $753 | 1.8% | $147,235 | $1,133 | 2.8% | $67,816 | $522 | 1.1% |
| **Total Operating Expenses** | **$4,902,257** | **$37,710** | 89.3% | **$5,107,569** | **$39,289** | 95.6% | **$5,611,775** | **$43,168** | 93.6% |
| **Net Operating Income** | **$590,436** | **$4,542** | 10.7% | **$233,339** | **$1,795** | 4.4% | **$384,533** | **$2,958** | 6.4% |

Operating Expenses Real

Estate Taxes

In the Assessment and Tax Data section of this report, we estimated a tax expense of $158,835 or $1,221.80 per ~~square foot~~unit in year 1 ~~of the discounted cash flow~~.

Property Insurance

The following table presents the subject historical expense data used to estimate property insurance expense for the subject property and the stabilized estimate:

**Property Insurance**

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $1,915.35 | 4.5% |
| Subject Actual - 12/2024 | $1,044.70 | 2.5% |
| Subject Actual - 12/2025 | $1,107.95 | 2.4% |
| *Indicator Average* | *$1,356.00* | *3.2%* |
| *Stabilized Estimate:* | *$1,150.00* | *2.2%* |

Management Fees

The following table presents the subject historical expense data used to estimate management fees for the subject property and the stabilized estimate:

**Management Fees**

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $2,057.92 | 4.9% |
| Subject Actual - 12/2024 | $2,009.14 | 4.9% |
| Subject Actual - 12/2025 | $2,062.24 | 4.5% |

WHITEHALL MANOR SENIOR LIVING

| | | |
|---|---|---|
| Indicator Average | $2,043.10 | 4.7% |
| Stabilized Estimate: | $~~2,610.11~~2,611.21 | 5.0% |

### Administrative

The following table presents the subject historical expense data used to estimate administrative expense for the subject property and the stabilized estimate:

**Administrative**

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $6,349.82 | 15.0% |
| Subject Actual - 12/2024 | $6,208.53 | 15.1% |
| Subject Actual - 12/2025 | $7,964.65 | 17.3% |
| Indicator Average | $6,841.00 | 15.8% |
| Stabilized Estimate: | $8,250.00 | 15.8% |

Here we note our projected income anticipates significant turnover due to rate increases. This expense will continue to exceed historic average due to more aggressive pricing.

### Utilities

The following table presents the subject historical expense data used to estimate utilities expense for the subject property and the stabilized estimate:

**Utilities**

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $1,715.87 | 4.1% |
| Subject Actual - 12/2024 | $1,830.79 | 4.5% |
| Subject Actual - 12/2025 | $1,894.00 | 4.1% |
| Indicator Average | $1,813.55 | 4.2% |
| Stabilized Estimate: | $2,000.00 | 3.8% |

**Utilities**

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $1,715.87 | 4.1% |
| Subject Actual - 12/2024 | $1,830.79 | 4.5% |
| Subject Actual - 12/2025 | $1,894.00 | 4.1% |
| Indicator Average | $1,813.55 | 4.2% |
| Stabilized Estimate: | $2,000.00 | 3.8% |

### Repairs & Maintenance

The following table presents the subject historical expense data used to estimate repairs and maintenance expense for the subject property and the stabilized estimate:

**Repairs & Maintenance**

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $2,001.75 | 4.7% |
| Subject Actual - 12/2024 | $1,771.67 | 4.3% |
| Subject Actual - 12/2025 | $1,767.58 | 3.8% |
| *Indicator Average* | *$1,847.00* | *4.3%* |
| *Stabilized Estimate:* | *$1,850.00* | *3.5%* |

## Cleaning & Janitorial

The following table presents the subject historical expense data used to estimate cleaning and janitorial expense for the subject property and the stabilized estimate:

| Cleaning & Janitorial | | |
|---|---|---|
| Expense Source | Per Unit | % of EGI |
| Subject Actual - 12/2023 | $2,207.65 | 5.2% |
| Subject Actual - 12/2024 | $2,569.34 | 6.3% |
| Subject Actual - 12/2025 | $2,545.86 | 5.5% |
| *Indicator Average* | *$2,440.95* | *5.7%* |
| *Stabilized Estimate:* | *$2,550.00* | *4.9%* |

## Marketing

The following table presents the subject historical expense data used to estimate leasing expenses for the subject property and the stabilized estimate:

| Marketing | | |
|---|---|---|
| Expense Source | Per Unit | % of EGI |
| Subject Actual - 12/2023 | $2,799.48 | 6.6% |
| Subject Actual - 12/2024 | $2,997.50 | 7.3% |
| Subject Actual - 12/2025 | $4,190.70 | 9.1% |
| *Indicator Average* | *$3,329.23* | *7.7%* |
| *Stabilized Estimate:* | *$4,200.00* | *8.0%* |

Here we note a more aggressive pricing model will require more marketing to maintain occupancy at market rates.

## Nursing

The following table presents the subject historical expense data used to estimate nursing/recreation expenses for the subject property and the stabilized estimate:

| Nursing | | |
|---|---|---|
| Expense Source | Per Unit | % of EGI |
| Subject Actual - 12/2023 | $11,095.52 | 26.3% |
| Subject Actual - 12/2024 | $12,135.47 | 29.5% |

**Valbridge**
PROPERTY ADVISORS

| | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2025 | $13,441.47 | 29.1% |
| *Indicator Average* | *$12,224.15* | *28.3%* |
| *Stabilized Estimate:* | *$14,500.00* | *27.8%* |

## Dietary

The following table presents the subject historical expense data used to estimate dietary expense for the subject property and the stabilized estimate:

### Dietary

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $6,035.74 | 14.3% |
| Subject Actual - 12/2024 | $7,137.84 | 17.4% |
| Subject Actual - 12/2025 | $7,671.38 | 16.6% |
| *Indicator Average* | *$6,948.32* | *16.1%* |
| *Stabilized Estimate:* | *$8,000.00* | *15.3%* |

## Activities

The following table presents the subject historical expense data used to estimate activities expense for the subject property and the stabilized estimate:

### Activities

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $752.78 | 1.8% |
| Subject Actual - 12/2024 | $1,132.58 | 2.8% |
| Subject Actual - 12/2025 | $521.66 | 1.1% |
| *Indicator Average* | *$802.34* | *1.9%* |
| *Stabilized Estimate:* | *$800.00* | *1.5%* |

## Replacement Reserves

We estimated a replacement reserve cost of $400 per unit, or $52,000 per year.

## Net Operating Income (NOI) Calculation

The subject year 1 net operating income calculation is presented in the following table:

### Year 1 Net Operating Income Schedule

| Category | Units | | Per Unit | | Total | % of EGI |
|---|---|---|---|---|---|---|
| **Potential Rental Income** | | | | | | |
| Rental Income - Independent Living | 21 | x | $38,700.00 | = | $812,700 | 12.0% |
| Rental Income - Personal Care | 91 | x | $60,000.00 | = | $5,460,000 | 80.4% |
| Rental Income - Memory Care | 18 | x | $72,000.00 | = | $1,296,000 | 19.1% |
| **Total Potential Rental Income** | **130** | **x** | **$58,220.77** | **=** | **$7,568,700** | **111.5%** |
| | | | | | | |
| **Potential Gross Non-Rental Income** | | | | | | |
| Other Income | | | $1,125.00 | | $146,250 | 2.2% |
| **Plus: Total Potential Gross Non-Rental Income** | | | **$1,125.00** | | **$146,250** | **2.2%** |
| | | | | | | |
| **Potential Gross Income (PGI)** | | | **$59,345.77** | | **$7,714,950** | **113.6%** |
| | | | | | | |
| Less: Vacancy & Collection Loss     @ | 12.0% | | $7,121.49 | | $925,794 | 13.6% |

| | | | |
|---|---|---|---|
| **Effective Gross Income (EGI)** | **$52,224.28** | **$6,789,156** | **100.0%** |
| **Non-Reimbursable Expenses** | | | |
| Real Estate Taxes | $1,221.80 | $158,835 | 2.3% |
| Property Insurance | $1,150.00 | $149,500 | 2.2% |
| Management Fees | $2,611.22 | $339,458 | 5.0% |
| Administrative | $8,250.00 | $1,072,500 | 15.8% |
| Utilities | $2,000.00 | $260,000 | 3.8% |
| Repairs & Maintenance | $1,850.00 | $240,500 | 3.5% |
| Cleaning & Janitorial | $2,550.00 | $331,500 | 4.9% |
| Marketing | $4,200.00 | $546,000 | 8.0% |
| Nursing | $14,500.00 | $1,885,000 | 27.8% |
| Dietary | $8,000.00 | $1,040,000 | 15.3% |
| Activities | $800.00 | $104,000 | 1.5% |
| Replacement Reserves | $400.00 | $52,000 | 0.8% |
| **Total Non-Reimbursable Expenses** | **$47,533.02** | **$6,179,293** | **91.0%** |
| **Less: Total Operating Expenses** | **$47,533.02** | **$6,179,293** | **91.0%** |
| **Year 1 Net Operating Income (NOI)** | **$4,691.25** | **$609,863** | **9.0%** |

## Direct Capitalization Analysis

The Income Capitalization Approach to value is based on the premise that a direct relationship exists between the value of a property and the stabilized level of net income it is capable of generating. Direct capitalization is the process of converting a stabilized income stream into an estimate of value and is obtained by applying an overall capitalization rate (OAR) to the net operating income (NOI) before debt service. The direct capitalization rate is the ratio between a single year's net operating income expectancy and the total property price or value.

## Overall Capitalization Rate (OAR)

Investor surveys were used to estimate an appropriate overall capitalization rate for the subject property.

## Investor Surveys

The overall capitalization rates published by investor surveys are presented in the following table:

**Investor Surveys - Overall Capitalization Rates**

| Survey | Date | Range | to | Range | Average |
|---|---|---|---|---|---|
| BBG Senior Housing Investor Survey - AL | Fall 2025 | 6.00% | to | 9.00% | 7.73% |
| CBRE US Senior Housing & Care Investor Survey - AL | H2 2025 | 6.00% | to | 9.00% | 7.80% |
| Cushman and Wakefield Investor Survey - Majority AL | H1 2026 | 6.80% | to | 8.50% | 7.60% |
| CBRE US Senior Housing & Care Investor Survey - IL | H2 2025 | 5.00% | to | 8.00% | 7.10% |
| BBG Senior Housing Investor Survey - IL | H2 2025 | 5.00% | to | 8.00% | 6.88% |
| CBRE US Senior Housing & Care Investor Survey - MC | Fall 2025 | 6.00% | to | 11.00% | 9.30% |
| BBG Senior Housing Investor Survey - MC | Fall 2025 | 7.50% | to | 11.50% | 9.45% |
| **Average** | | **5.926.04%** | **to** | **9.299.42%** | **7.988.04%** |

## Overall Capitalization Rate Conclusion

We estimated a capitalization rate of 8.00% for the subject. This takes into consideration the fact that ownership needs to significantly raise the rental rates at the facility, which increases the risk of higher vacancy.

## Deferred Maintenance



As previously mentioned, the subject property is in need of a new roof. A cost estimate of $716,232 was provided by ownership for roof replacement. This amount was deducted from the preliminary going concern value indication.

### Furniture Fixtures and Equipment (FF&E)

Senior Housing Facilities typically have a significant portion of their value allocated to FF&E in place and intangible business value. In order to derive the retrospective as is fee simple market value of the real estate, we have separated the value of the FF&E and business component from the value of the overall going concern.

According to the CBRE Seniors Housing Development Costs Report dated September 14, 2022, the FF&E cost per room for senior housing properties ranges from $7,000 to $11,600 with an average of $9,700 per room.

The depreciated book value of the FF&E was reviewed. According to the book value, much of the subject's FF&E is fully depreciated. We considered the data from the CBRE Seniors Housing Development Costs Report as well as the subject's depreciated book value report. Based on the furniture fixtures and equipment observed during our inspection, we estimate an FF&E depreciated value of $5,000 per room or $650,000 for the subject.

### Business Value

Given the locational, physical, and operating characteristics of the property discussed in the appraisal, an allocation of 15% of the going concern is typical for properties like the subject. This reflects the value of staff-in-place, contracts, goodwill, etc. The allocation of 15% was applied to the preliminary going concern shown in the table below.

## Direct Capitalization Conclusion

The direct capitalization technique calculation and conclusion is presented in the following table:

| Direct Capitalization Technique Value Indication | | |
| --- | --- | --- |
| Stabilized Net Operating Income (NOI) | | $609,863 |
| Divided by Overall Capitalization Rate | ÷ | 8.00% |
| **Preliminary Going Concern** | | **$7,623,288** |
| Less Deferred Maintenance: | | $716,232 |
| **Going Concern** | (Rounded) | **$6,900,000** |
| Less FF&E: | | $650,000 |
| Less Business Value: | | $1,143,493 |
| **As Is Fee Simple Market Value Indication (Real Estate Only)** | (Rounded) | **$5,100,000** |



# Sales Comparison Approach

## Methodology

The sales comparison approach develops an indication of market value by analyzing closed sales, listings, or pending sales of properties similar to the subject, focusing on the difference between the subject and the comparables using all appropriate elements of comparison. This approach is based on principles of supply and demand, balance, externalities, and substitution, or the premise that a buyer would pay no more for a specific property than the cost of obtaining a property with the same quality, utility, and perceived benefits of ownership.

## Unit of Comparison

The unit of comparison selected depends on the appraisal problem and nature of the property and is intended to explain or mirror market behavior. The primary unit of comparison in the market and applied in this analysis is price per unit.

## Elements of Comparison

Elements of comparison are the characteristics or attributes of properties and transactions that cause the prices of real estate to vary. The primary elements of comparison considered in sales comparison analysis are as follows: (1) real property rights conveyed, (2) financing terms, (3) conditions of sale, (4) expenditures made immediately after purchase, (5) market conditions, (6) location, (7) physical characteristics, (8) economic characteristics, (9) legal characteristics, and (10) non-real components of value.

## Comparable Sales Data

The market was studied to identify sales and listings of comparable properties with a focus on those that appeal to the most probable buyer of the subject property. These properties typically attract similar occupants based on location and appeal and have similar risk profiles. Of these transactions, sufficient sales data was available for the following sale comparables, which were analyzed to estimate a unit value for the subject property. The following table summarizes the sale comparables utilized and a map illustrating the location of each in relation to the subject property follows. Details of each comparable follow the location map.

**Improved Sales Summary**

| Comp. No. | Date of Sale | Property Name | Location | | Year Built | No. of Units | Unadjusted Sale Price | per Unit |
|---|---|---|---|---|---|---|---|---|
| 1 | June-24 | Curaliving at East Norriton | 2101 New Hope Street | Norristown, Pennsylvania | 1988 | 114 | $5,564,000 | $48,807.02 |
| 2 | October-24 | Mount Vernon of South Park | 1400 Riggs Road | South Park Township, Pennsylvania | 1994 | 66 | $1,300,000 | $19,696.97 |
| 3 | October-24 | Amoroso Wellness at York | 2830 Carol Road | York, Pennsylvania | 1987 | 104 | $7,000,000 | $67,307.69 |
| 4 | July-25 | Franklin Court Senior Living | 1660 Park Avenue | Quakertown, Pennsylvania | 1988 | 89 | $5,650,000 | $63,483.15 |

**COMPARABLE SALES MAP**

WHITEHALL MANOR SENIOR LIVING



## SALE COMPARABLE 1

### Property Identification

| | |
|---|---|
| **City County State Zip** | Norristown, Montgomery County, Pennsylvania 19401 |
| **MSA** | Philadelphia, PA-NJ |
| **Tax ID** | 33-00-05938-005 |
| **VPA Property/Sale ID** | 10985839/1842686 |

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | 06-27-2024 |
| **Grantor/Seller** | AB East Norriton Owner, LLC |
| **Grantee/Buyer** | Brandywine PA Healthcare Realty, LLC |
| **Deed Book/Page** | 6368-2344 |
| **Property Rights** | Fee Simple |
| **Financing** | Cash to seller |
| **Conditions of Sale** | Typical |
| **Sales Price** | $5,564,000 |

### Units of Comparison

**Price PSF of GBA** $100.22 **Adj. Price per Unit** $48,807 **Adj. Price per Bed** $22,710



**Pr**...01 New Hope St

### Property Description
**Property Type**

| | |
|---|---|
| **No. of Units** | 114 |
| **No. of Beds** | 245 |
| **No. of Lots** | 1 |
| **Year Built** | 1988 |
| **Building Condition** | Average |
| **Number of Stories** | 3 |
| **Pkg/1,000 SF GBA** | 0.99 |
| **Land/LtB Ratio** | 5.270 Acres / 4.13:1 **Flood H** |

### Verification

| | |
|---|---|
| **Confirmation Source** | Deed, Public Record, Articles |

### Remarks

Sale of an assisted

**Valbridge**
PROPERTY ADVISORS

## SALE COMPARABLE 2



| Property Identification | | Pr... 1400 Rigg |
|---|---|---|
| **City County State Zip** | South Park Township, Allegheny | |
| | County, Pennsylvania 15129 | |
| **MSA** | Pittsburgh | |
| **Tax ID** | 884-S-225 and 884-R-54 | |
| **VPA Property/Sale ID** | 1182111/1764084 | |

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | 10-15-2024 |
| **Grantor/Seller** | PA Healthcare Holdings, LLC |
| **Grantee/Buyer** | KSSB |
| Holdings, LLC **Deed Book/Page** | |
| 19842/411 **Property Rights** | Fee |
| Simple | |
| **Financing** | Cash to seller |
| **Conditions of Sale** | Typical |
| **Sales Price** | $1,300,000 |

### Units of Comparison

| | |
|---|---|
| **Price PSF of GBA** | $32.50 **Adj. Price per** |
| **Unit** | $19,697 **Adj. Price per** |
| **Bed** | $11,818 |

### Property Description

|  |  | **Property Type** |
|---|---|---|
| **No. of Units** | 66 | |
| **No. of Beds** | 110 | |
| **No. of Lots** | 2 | |
| **Year Built** | 1994 | |

| **Building Condition** | Average |
|---|---|
| **Number of Stories** | 1 |
| **Pkg/1,000 SF GBA** | 1.38 |
| **Land/LtB Ratio** | 29.600 Acres / 32.23:1 |
| **Flood Hazard Zone** | Zone X |
| **Zoning Code** | R1 |

### Verification

| **Confirmation Source** | Lender, Public Record, Deed |
|---|---|

### Remarks

Sale of a vacant a...

## SALE COMPARABLE 3

### Property Identification

| | | Pr... 830 Carol Road |
|---|---|---|
| **City County State Zip** | York, York County, | |
| | Pennsylvania 17402 | |
| **MSA** | York | |
| **Tax ID** | 46-000-IJ-0017.00-00000 | |
| **VPA Property/Sale ID** | 11572751/1842728 | |

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | 10-16-2024 |
| **Grantor/Seller** | 2830 Carol Propco LLC |
| **Grantee/Buyer** | 2830 Carol |
| RE, LLC **Deed Book/Page** | 2024041464 |
| **Property Rights** | Fee Simple |
| **Financing** | Cash to seller |
| **Conditions of Sale** | Typical |
| **Sales Price** | $7,000,000 |

### Units of Comparison

### Property Description

|  |  | **Property Type** |
|---|---|---|
| **No. of Units** | 104 | |
| **No. of Beds** | 125 | |

**Unit** $67,308 **Adj. Price per Bed**    $56,000

| | |
|---|---|
| **No. of Lots** | |
| **Year Built** | 1987 |
| **Building Condition** | Average |
| **Number of Stories** | 2 |
| **Pkg/1,000 SF GBA** | 2.51 |
| **Land/LtB Ratio** | 5.000 Acres / 6.08:1 |
| **Flood Hazard Zone** | Zone X - Outside 100 and 500 year floodplains |
| **Zoning Code** | ID |

### Verification

| | |
|---|---|
| **Confirmation Source** | Deed, Public Record, CoStar |

### Remarks

Sale of an assisted

## SALE COMPARABLE 4

1660 Park

### Property Identification

| | |
|---|---|
| **City County State Zip** | Quakertown, Bucks County, Pennsylvania 18951 |
| **MSA** | Philadelphia, PA-NJ |
| **Tax ID** | 35-003-031 |
| **VPA Property/Sale ID** | 11572746/1842725 |

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | 07-01-2025 |
| **Grantor/Seller** | Liberty Court Associates |
| **Grantee/Buyer** | Quakertown Propco LLC |
| **Deed Book/Page** | 2025029010 |
| **Property Rights** | Fee Simple |
| **Financing** | Cash to seller |
| **Conditions of Sale** | Typical |
| **Sales Price** | $5,650,000 |

### Units of Comparison

**Price PSF of GBA**    $246.19   **Adj. Price per Unit**  $63,483   **Adj. Price per Bed**    $34,036



### Property Description

| | |
|---|---|
| **Property Type** | Assisted Living Residences |
| **Gross Building SF** | 22,950 |
| **No. of Units** | 89 |
| **No. of Beds** | 166 |
| **No. of Lots** | |
| **Year Built** | 1988 |
| **Building Condition** | Average |
| **Number of Stories** | 2 |
| **Pkg/1,000 SF GBA** | 1.87 |
| **Land/LtB Ratio** | 1.970 Acres / 3.74:1 |
| **Flood Hazard Zone** | Zone X - Outside 100 and 500 year floodplains |
| **Zoning Code** | HR |

### Verification

| | |
|---|---|
| **Confirmation Source** | Deed, Articles, Public Record |

© 2026 VALBRIDGE PROPERTY ADVISORS | PHILADELPHIA

**Remarks**                                                                                    Sale of an assisted

## Sales Comparison Analysis

When necessary, adjustments were made for differences in various elements of comparison, including property rights conveyed, financing terms, conditions of sale, expenditures made immediately after purchase, market conditions, location, and other physical characteristics. If the element in comparison is considered superior to that of the subject, a negative adjustment was applied. Conversely, a positive adjustment was applied if inferior. A summary of the elements of comparison follows.

## Transaction Adjustments

Transaction adjustments include: (1) real property rights conveyed, (2) financing terms, (3) conditions of sale, and (4) expenditures made immediately after purchase. These items, which are applied prior to the market conditions and property adjustments, are discussed as follows:

### Real Property Rights Conveyed

Real property rights conveyed influence sales prices and must be considered when analyzing a sale comparable. The property rights appraised reflect the fee simple interest. All of the sale comparables conveyed the same interest; therefore, no adjustments were required.

### Financing Terms

The transaction price of one property may differ from that of an identical property due to different financial arrangements. Sales involving financing terms that are not at or near market terms require adjustments for cash equivalency to reflect typical market terms. A cash equivalency procedure discounts the atypical mortgage terms to provide an indication of value at cash equivalent terms. All of the comparable sales involved typical market terms by which the sellers received cash or its equivalent and the buyers paid cash or tendered typical down payments and obtained conventional financing at market terms for the balance. Therefore, no adjustments for this category were required.

### Conditions of Sale

Atypical conditions of sale may result in a price that is higher or lower than a normal transaction. Such atypical conditions of sale often occur in conjunction with sales between related parties or those in which one of the parties is atypically motivated to complete the transaction. Additionally, a downward adjustment may be applied to a listing price, which usually reflects the upper limit of value. The sale comparables do not indicate any condition of sale adjustments were warranted for atypical conditions or for-sale listings.

### Expenditures Made Immediately After Purchase

A knowledgeable buyer considers expenditures required upon purchase of a property, as these costs affect the price the buyer agrees to pay. Such expenditures may include: costs to cure deferred maintenance, costs to demolish and remove any portion of the improvements, costs to petition for a zoning change, costs to remediate environmental contamination and/or costs to occupy or stabilize the property. The relevant figure is not the actual cost incurred, but the cost anticipated by both the buyer and seller. The parties to the sale comparables did not anticipate expenditures immediately after purchase; no adjustments were required.

## Market Conditions Adjustment

Market conditions change over time because of inflation, deflation, fluctuations in supply and demand, or other factors. Changing market conditions may create a need for adjustment to comparable sale transactions completed during periods of dissimilar market conditions.

Discussions with market participants and a review of market data indicated overall market conditions for



senior housing properties have been improving since COVID-19, with recent transactions confirming this trend. Occupancy rates and rental rates have consistently increased since the decline in the market due to COVID-19 as illustrated in the market analysis section of this report. Therefore, an annual adjustment factor of 2.00% was applied to each comparable to account for changes in market conditions.

## Property Adjustments

Property adjustments are usually expressed quantitatively as percentages or dollar amounts that reflect the differences in value attributable to the various characteristics of the property. In some instances, however, qualitative adjustments are used. These adjustments are based on locational and physical characteristics and are applied after the application of transaction and market conditions adjustments. The reasoning for the adjustments applied to each comparable follow.

### Location

Location adjustments may be required when the locational characteristics of a comparable are different from those of the subject. These characteristics can include general neighborhood characteristics, freeway accessibility, street exposure, corner- versus interior-lot location, neighboring properties, view amenities, and other factors.

We also took into consideration the surrounding population and median household incomes of the comparables compared to the subject.

Sales 1 and 4 are located in superior locations than the subject and required downward adjustments. Sales 2 and 3 are located in inferior locations than the subject and required upward adjustments.

### Size

The size adjustment addresses variance in the units of the comparables and that of the subject, as a larger building typically commands a lower sale price per unit than a smaller building. This inverse relationship is due, in part, to the principle of "economies of scale."

The subject property consists of 130 units, while the sales range in size from 66 to 114 units and required adjustments.

### Age/Condition

All else being equal, older properties typically command a lower price per unit than newer properties. However, although a property may be older than another property, the effective age may be similar to a newer property with no adjustment warranted. This may be due to the older property being well maintained or a recent renovation. The adjustments to the comparables were based on effective age rather than actual age, which takes the remaining economic life estimate into consideration.

The subject is of older original construction relative to the comparable sales and requires a new roof. Downward adjustments were warranted for all comparables.

### Parking Ratio

Parking ratios impact market appeal to potential users. Higher ratios improve the functional utility of assisting living facilities like the subject.

Adjustments were made to comparables with material differences in parking ratios compared to the subject.

### Services / Room Types

The subject offers independent living, personal care, and memory care services. Room types include



private and shared studio and one-bedroom units. The subject's unit mix includes three one-bedroom units and 127 studios.  We analyzed the subject's services, mix of private and shared units, and types of units and compared them to the comparables.

Personal care and memory care services generate more revenue than independent living, which is often offset by higher expenses due to higher care needs. Private rooms are more desirable and result in higher occupancy rates but typically result in less revenue per unit than shared rooms. Lastly, two- bedroom units generate more revenue than one-bedroom units, and one-bedroom units generate more revenue than studios.

Sale 1 offers private and shared personal care and memory care services with studios, one-bedroom, and two-bedroom units.
Sale 2 offers private and shared personal care and memory care services with studios, one-bedroom, and two-bedroom units available.
Sale 3 offers private and shared personal care and memory care services with studio and one-bedroom options available.
Sale 4 offers personal care and memory care services with private and shared one-bedroom and two-bedroom options.

All comparables were considered superior and required downward adjustments.

Operating Status
Sales 1, 3, and 4 were operating at the time of sales. No adjustments were required. Sale 2 was vacant at the time of sale. An upward adjustment was required.

## Summary of Adjustments
A summary of the adjustments made to the sale comparables is presented in the following adjustment grid:

### COMPARABLE SALES ADJUSTMENT GRID

| | Subject | Sale # 1 | Sale # 2 | Sale # 3 | Sale # 4 |
|---|---|---|---|---|---|
| Sale ID | | 1842686 | 1764084 | 1842728 | 1842725 |
| Date of Value & Sale | | June-24 | October-24 | October-24 | July-25 |
| Property Name | | Curaliving at | Mount Vernon | Amoroso | Franklin Court |
| Senior Living | | East Norriton | of South Park | Wellness at York | Senior Living |
| Gross Building Area | | 55,519 | 40,000 | 35,812 | 22,950 |
| Number of Units | | 114 | 66 | 104 | 89 |
| Land Area (acres) | | 5.2700 | 29.6000 | 5.0000 | 1.9700 |
| Unadjusted Sales Price | | $5,564,000 | $1,300,000 | $7,000,000 | $5,650,000 |
| **Unadjusted Sales Price per Unit** | | **$48,807** | **$19,697** | **$67,308** | **$63,483** |
| **Transactional Adjustments** | | | | | |
| ~~Transactional Adjustments~~ Property Rights Conveyed | | *Fee Simple* | *Fee Simple* | *Fee Simple* | *Fee Simple* |
| **Financing Terms** | | *Cash to seller* | *Cash to seller* | *Cash to seller* | *Cash to seller* |
| **Conditions of Sale** | | *Typical* | *Typical* | *Typical* | *Typical* |
| ~~Expenditures after Sale~~ Adjustment | | - | - | - | - |
| ~~Market Conditions Adjustments~~**Expenditures** | | | | | |

WHITEHALL MANOR SENIOR LIVING

after Sale

| | | 2101 New Hope Street Norristown, Pennsylvania | 1400 Riggs Road South Park Township, Pennsylvania | 2830 Carol Road York, Pennsylvania | 1660 Park Avenue Quakertown, Pennsylvania |
|---|---|---|---|---|---|
| Elapsed Time from Date of Value | | 1.72 years | 1.42 years | 1.42 years | 0.71 years |
| Market Trend Through | March-26 | 3.4% | 2.8% | 2.8% | 1.4% |
| Analyzed Sales Price | | $50,487 | $20,256 | $69,214 | $64,384 |
| Property Adjustments | | | | | |
| Location | 1177 6th Street Whitehall, Pennsylvania | | | | |
| Relative Comparison | | Superior | Inferior | Inferior | Superior |

Adjustment

**Market Conditions Adjustments**

| | | 2101 New Hope Street Norristown, Pennsylvania | 1400 Riggs Road South Park Township, Pennsylvania | 2830 Carol Road York, Pennsylvania | 1660 Park Avenue Quakertown, Pennsylvania |
|---|---|---|---|---|---|
| Elapsed Time from Date of Value | | 1.50 years | 1.20 years | 1.19 years | 0.49 years |
| Market Trend Through | December-25 | 3.0% | 2.4% | 2.4% | 1.0% |
| Analyzed Sales Price | | $50,270 | $20,169 | $68,916 | $64,102 |
| Property Adjustments | | | | | |
| Location | 1177 6th Street Whitehall, Pennsylvania | | | | |
| Relative Comparison | | Superior | Inferior | Inferior | Superior |
| Size | 130 units | 114 units | 66 units | 104 units | 89 units |
| Relative Comparison | Superior | Superior | Superior | Superior | |
| Age/Condition Year Built | 1951 - Renovated 1998 | | 1988 - Renovated 2022 | 1994 | 1987 |
| Condition | Average | Average | Average | Average | Average |



WHITEHALL MANOR SENIOR LIVING

| | | | | | |
|---|---|---|---|---|---|
| Relative Comparison | | Superior | Superior | Superior | Superior |
| **Parking Ratio** | 0.86 per 1,000 | 0.99 per 1,000 | 1.41 per 1,000 | 2.51 per 1,000 | 1.87 per 1,000 |
| Relative Comparison | | Similar | Superior | Superior | Superior |
| **Services / Room Types** | | *Superior* | *Superior* | *Superior* | *Superior* |
| Relative Comparison | | Superior | Superior | Superior | Superior |
| **Operating Status** | *Operating* | *Operating* | *Vacant* | *Operating* | *Operating* |
| Relative Comparison | | Similar | Inferior | Similar | Similar |
| **Overall Net Relative Comparison** | | **Superior** | **Inferior** | **Superior** | **Superior** |



WHITEHALL MANOR SENIOR LIVING

## Sales Comparison Approach Value Indication

The comparables were adjusted based on pertinent elements of comparison. We considered a ranking analysis, which is a qualitative technique for analyzing comparable sales where comparable sales are ranked in descending or ascending order of desirability, and each is analyzed to determine its position relative to the subject. The chart below includes our concluded price per ~~guestroom~~unit for the subject and illustrates where the subject ranks amongst the comparable sales on an analyzed price per ~~guestroom~~unit basis.

**Ranking Analysis**

| Comp # | Property Name | Address | Analyzed Price Per Unit |
|---|---|---|---|
| 2 | Mount Vernon of South Park | 1400 Riggs Road, South Park | $~~20,256~~20,169 |
| | Subject Conclusion | | $40,000 |
| 1 | Curaliving at East Norriton | 2101 New Hope Street, Norristown | $~~50,487~~50,270 |
| 4 | Franklin Court Senior Living | 1660 Park Avenue, ~~York~~Quakertown | $~~64,384~~64,102 |
| 3 | Amoroso Wellness at York | 2830 Carol Road, York | $~~69,214~~68,916 |

The sales comparison approach conclusion is presented in the following table:

| **Improved Sales Comparison Approach Value Indication** | | | | |
|---|---|---|---|---|
| Reasonable Adjusted Comparable Range | | | | |
| 130 units | x | $35,000 | = | $4,550,000 |
| 130 units | x | $45,000 | = | $5,850,000 |
| **As Is Fee Simple Market Value Indication (Real Estate Only)** | | | | |
| 130 units | x | **$40,000** | = | **$5,200,000** |

It should be noted that all sales represented real estate only and did not include FF&E and business value. Therefore, our value indication via the Sales Comparison Approach represents real estate only for the subject property.



# Reconciliation

## Summary of Value Indications

The indicated values from the approaches used and our concluded market values for the subject property are summarized in the following table.

**Value Indications**

| Value Indications | | |
|---|---|---|
| **Approach to Value** | **Going Concern** | **Real Estate Only** |
| Cost | Not Developed | Not Developed |
| Sales Comparison | Not Developed | $5,200,000 |
| Income Capitalization Direct Capitalization | $6,900,000 | $5,100,000 |

**Value Conclusions**

| Component | Going Concern | Real Estate Only |
|---|---|---|
| Value Type | Market Value | Market Value |
| Real Property Interest | Fee Simple | Fee Simple |
| Effective Date of Value | ~~March 17~~December 26, ~~2026~~2025 | ~~March 17~~December 26, ~~2026~~2025 |
| **Value Conclusion** | **$6,900,000** | **$5,100,000** |
| | **$53,077 per unit** | **$39,231 per unit** |

The reliability and relevance of each value indication was considered based upon the quality of the data and applicability of the assumptions underlying each approach to reach a final opinion of value. Given the availability and reliability of data within the Income Approach, this approach was relied upon to reconcile final value conclusions. Furthermore, senior housing properties such as the subject property are typically purchased by senior housing operators, who primarily rely upon the methods employed by the Income Approach. The Sales Comparison Approach was developed as a check of reasonableness.

The findings and conclusions are further contingent upon the following extraordinary assumptions and/or hypothetical conditions, the use of which might have affected the assignment results:

## Extraordinary Assumptions:

- ~~None~~This appraisal contains retrospective values. Our valuation date is December 26, 2025. We inspected the property on March 17, 2026. We assume the condition of the property as of the effective date was similar to the condition observed during our inspection.

## Hypothetical Conditions:

- None

## Exposure Time and Marketing Period

Based on statistical information about days on market, escrow length, and marketing times gathered through national investor surveys, sales verification, and interviews of market participants, marketing and exposure time estimates of 6-12 months and 6-12 months, respectively, are considered reasonable and

Case 25-15245-cmb Doc 216 Document 14-10/26 Filed 07/10/26 Page 154 of 418 Entered 07/10/26 15:49:42 Desc
Exhibit F    Page 154 of 418

WHITEHALL MANOR SENIOR LIVING
RECONCILIATION

appropriate for the subject property.



# Liquidation Value and Market Rent

According to the Appraisal of Real Estate 15th Edition published by the Appraisal Institute, the definition of liquidation value is:

The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a short time period.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and the seller are acting prudently and knowledgeably.
4. The seller is under extreme compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. A normal marketing effort is not possible due to the brief exposure time.
8. Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This report analyzes market evidence relating to liquidation sales of assisted living (AL) facilities and comparable senior housing assets. The analysis incorporates both current market research and transaction evidence derived from CoStar sales data.

CoStar Liquidation/Distressed Sale Evidence
The following liquidation sales were identified through CoStar transaction data. Discounts were measured between prior market transaction pricing and subsequent liquidation or distressed sale pricing.

**Liquidation/Distressed Sales Analysis**

| Comp # | Address | Market Sale Date | Market Sale Amount | Liquidation/Distressed Sale Date | Liquidation/Distressed Sale Amount | Days on Market as Distressed Sale | % Discount |
|---|---|---|---|---|---|---|---|
| 1 | 6333 Langston Avenue, New Port Richey, FL | July 11, 2023 | $2,000,000 | January 7, 2026 | $1,399,000 | 278 | 30.1% |
| 2 | 73685 Catalina Way, Palm Desert, CA | January 18, 2022 | $7,071,053 | August 21, 2025 | $4,910,000 | 70 | 30.6% |
| 3 | 1358 Manchester Drive, Conyers, GA | November 5, 2024 | $1,650,000 | August 13, 2025 | $1,500,000 | 201 | 9.1% |
| 4 | 601 E. Lake Street, Chisholm, MN | April 15, 2020 | $1,925,000 | October 3, 2023 | $1,700,000 | Unknown | 11.7% |
| 5 | 27601 Westchester Parkway, Westlake, OH | January 25, 2019 | $6,136,341 | February 26, 2025 | $1,300,000 | 45 | 78.8% |

| | |
|---|---|
| Min | 9.1% |
| Max | 78.8% |
| Median | 30.1% |
| Mean | 32.0% |

The CoStar dataset indicates a mean discount of 32.0%, with a median discount of 30.1%.

It should be noted that the assisted living occupancy rates started to drop in early 2020 and hit their low in late 2020 early 2021 due to COVID-19 before they started to recover. The chart below illustrates the occupancy rates over the timeframe. The market conditions as of the market sale and as of the liquidation/distressed sale for each comparable were considered.



(Added)y by Property Type
NIC MAP | Primary Markets

Majority IL
Majority AL
Majority NC

Current Market Research and Industry Evidence
Recent market evidence from NIC (National Investment Center), CBRE Senior Housing Investor Surveys, and distressed senior housing transactions indicate continuing liquidity pressure within the senior housing sector.

The CBRE U.S. Senior Housing & Care Investor Survey H2 2025 identified stabilized assisted living capitalization rates near 7.8% in 2025, while distressed or turnaround assets frequently trade at capitalization rates ranging from approximately 10.5% to 12.0% with an average time on market of 90-180 days. This capitalization rate expansion implies valuation discounts generally ranging from approximately 25.7% to 35.0% with an average of 30.4%.

According to a Senior Housing News article dated November 10, 2025, a Wall Street Journal analysis found that Blackstone acquired 39 senior housing properties for around $755 million between 2022 and 2025 and later sold those same properties for about $536 million, representing a 29.0% discount from the original purchase price. Based on the pace of the dispositions, the average days on market per Blackstone property was approximately 150-180 days.

Comparison of Indicators





The CoStar-derived mean discount of 32.0% and the web-derived market evidence indicating approximately 29.7% were each given equal consideration. This results in a discount of approximately 30.9%.

Conclusions – Liquidation Value
Based upon the combined evidence from CoStar liquidation sale transactions, senior housing market research, and capitalization rate analysis, a supportable distressed sale discount for an assisted living facility like the subject marketed under a 90-day exposure period is estimated at approximately 30.9% below stabilized market value.

A reasonable appraisal conclusion would therefore support a liquidation or distressed sale adjustment in the range of approximately 25.0% to 35.0%, with 30.0% representing the most supportable indication.

We concluded a market going concern value of $6,900,000 as of December 26, 2025. Applying the 30.0% discount results in a liquidation value conclusion of $4,830,000, which we have rounded to $4,850,000.

We concluded a market real estate only value of $5,100,000 as of December 26, 2025. Applying the 30.0% discount results in a liquidation value conclusion of $3,570,000, which we have rounded to $3,550,000.

Our liquidation value conclusions are summarized in the chart below:

### Liquidation Value Conclusions

| Component | Going Concern | Real Estate Only |
|---|---|---|
| Value Type | Liquidation Value | Liquidation Value |
| Real Property Interest | Fee Simple | Fee Simple |
| Effective Date of Value | December 26, 2025 | December 26, 2025 |
| **Value Conclusions** | **$4,850,000** | **$3,550,000** |
| | **$37,308 per unit** | **$27,308 per unit** |

## Market Rent
According to the Appraisal of Real Estate 15th Edition published by the Appraisal Institute, the definition of

market rent is:

The most probable rent that a property should bring in a competitive and open market, reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (Tis).

The following summarizes the market rent analysis for the subject property, concluding a rent indication for the real estate only. The analysis applies the direct capitalization technique, utilizing the subject property's stabilized net operating income (NOI) and concluded overall capitalization rate. Market evidence from senior housing REIT transactions and lease agreements is incorporated to support lease type, term, and escalator conclusions.

Senior Housing Market Lease Analysis

In order to support our market rent conclusions, we gathered leases to determine the appropriate lease type and term for assisted living facilities like the subject. Our findings are below:

| (Added graphics) | | Renewal Options | Escalator | Notes |
|---|---|---|---|---|
| LTC Properties / Senior Lifestyle (2015) | 15 years | Not disclosed | 2.6%/yr | 13 AL properties, 500 units; NNN; $5.1M initial rent |
| LTC Properties / Veritas InCare (2015) | 10 years | Not disclosed | 2.5%/yr | 7 AL properties, Texas; $1.5M initial rent |
| LTC Properties / AL & MC Acquisition (2020) | 10 years | 4 × 5-year | 2.0%/yr (yr 2+) | 156 AL/MC units; NNN; 7.4% initial cash yield |
| Omega Healthcare / CommuniCare (SEC 8-K, 2005) | 10 years | 2 × 10-year | Annual (ND) | $11.6M annualized rent; AL/SNF portfolio |
| Omega Healthcare / Multiple (SEC 8-K, 2023) | Not specified | Standard | 2.0%–2.5%/yr | Initial yields 8.0%–10.2%; consistent escalator structure |
| Welltower / NNN Portfolio (SEC 8-K, 2017) | ~20 years | Corporate guarantee | 3.0%/yr | Master lease at 7.5% initial yield; expires 2037 |
| Welltower / UK Portfolio (Oct 2025) | Not specified | Coverage reset q5 | 3.5%/yr | 152 NNN communities; rent reset at Welltower's election every 5 yrs |
| Ventas / Brookdale (Master Lease, exp. 2025) | Long-term | 2 × 10-year | 3.0%/yr | 120 communities; $113.6M/yr; renewal at greater of escalated or FMR (cap +10%/yr) |
| NHP / Emeritus (Essington AL, 2004) | ~15 years | 3 × 5-year | CPI-linked | Absolute NNN; renewal rent reset to FMR; SEC-filed |
| Assisted 4 Living (SEC Form 8-K, 2021) | ~11 years (2019–2030) | 2 × 5-year | Annual (ND) | Absolute NNN; renewal at greater of escalated or FMR (capped +10%/yr) |
| CareTrust REIT / Ensign, Eduro, WLC (SEC XBRL, 2022) | 11–12 years | 2 × 5-year | Annual (fixed) | Amended NNN master leases; AL/SNF campuses |
| Spirit Finance / Senior Care (LawInsider) | 15–20 years | 2 × 10-year | Fixed annual | Multiple senior care master leases; 15- and 20-yr initial terms documented |

Given the data above as well as the characteristics of the subject property, we conclude the market lease type to be absolute net (NNN), a lease term of 10 years with two 5-year options, and 2.0% annual rental escalations.

Capitalization Rate Applied

We concluded a capitalization rate of 8.0% for the going concern. In order to determine an appropriate

capitalization rate for the real estate only, we considered the risk associated with adding a 10-year absolute net lease to the property and removing the business and FF&E from the property.

According to data published on December 28, 2022 by Greystone, a national commercial real estate lending and advisory firm, skilled nursing facilities provide useful data for understanding the relationship between going concern and leased-fee capitalization rates in the healthcare real estate sector. Greystone has noted that skilled nursing going concern capitalization rates are generally around 12.5%, while similar skilled nursing properties with net leases have capitalization rates of approximately 10.0%. This implies a going concern-to-leased-fee compression of approximately 200 to 250 basis points.

While assisted living facilities carry a different operational and regulatory profile than skilled nursing, this spread is a useful benchmark when transitioning from a going concern valuation premise to a leased-fee real property valuation supported by a long-term absolute net lease. Applied to the subject's going concern capitalization rate of 8.0%, a compression of 100 to 200 basis points is reasonable, reflecting the subject's assisted living use, the executed 10-year absolute net lease with 2.0% annual escalations and two 5-year renewal options. It also reflects the inherent re-tenanting and specialty-use risks associated with the absence of business and FF&E value. This supports a leased-fee real property capitalization rate conclusion in the range of 6.0% to 7.0%.

As a result, we concluded a capitalization rate of 6.50% for the real estate only which has been utilized to determine market rent of the real estate of the subject.

The formula applied to calculate the market rent under an absolute net lease is market rent = real estate only value multiplied by the capitalization rate. Our calculation and conclusion is shown in the table below:

| Market Rent Conclusion | | | |
|---|---|---|---|
| Component | Real Estate Only | Capitalization Rate | Real Estate Only |
| Value Type | Market Value | | Market Rent |
| Effective Date of Value | December 26, 2025 | | December 26, 2025 |
| Conclusion | $5,100,000  x | 6.50%  = | **$331,500 annual rent** |



# General Assumptions and Limiting Conditions

This appraisal is subject to the following general assumptions and limiting conditions:

1.      The legal description – if furnished to us – is assumed to be correct.

2.      No responsibility is assumed for legal matters, questions of survey or title, soil or subsoil conditions, engineering, availability or capacity of utilities, or other similar technical matters. The appraisal does not constitute a survey of the property appraised. All existing liens and encumbrances have been disregarded and the property is appraised as though free and clear, under responsible ownership and competent management unless otherwise noted.

3.      Unless otherwise noted, the appraisal will value the property as though free of contamination. Valbridge Property Advisors | Philadelphia will conduct no hazardous materials or contamination inspection of any kind. It is recommended that the client hire an expert if the presence of hazardous materials or contamination poses any concern.

4.      The stamps and/or consideration placed on deeds used to indicate sales are in correct relationship to the actual dollar amount of the transaction.

5.      Unless otherwise noted, it is assumed there are no encroachments, zoning violations or restrictions existing in the subject property.

6.      The appraiser is not required to give testimony or attendance in court by reason of this appraisal, unless previous arrangements have been made.

7.      Unless expressly specified in the engagement letter, the fee for this appraisal does not include the attendance or giving of testimony by Appraiser at any court, regulatory or other proceedings, or any conferences or other work in preparation for such proceeding. If any partner or employee of Valbridge Property Advisors | Philadelphia is asked or required to appear and/or testify at any deposition, trial, or other proceeding about the preparation, conclusions or any other aspect of this assignment, client shall compensate Appraiser for the time spent by the partner or employee in appearing and/or testifying and in preparing to testify according to the Appraiser's then current hourly rate plus reimbursement of expenses.

8.      The values for land and/or improvements, as contained in this report, are constituent parts of the total value reported and neither is (or are) to be used in making a summation appraisal of a combination of values created by another appraiser. Either is invalidated if so used.

9.      The dates of value to which the opinions expressed in this report apply are set forth in this report. We assume no responsibility for economic or physical factors occurring at some point at a later date, which may affect the opinions stated herein. The forecasts, projections, or operating estimates contained herein are based on current market conditions and anticipated short-term supply and demand factors and are subject to change with future conditions. Appraiser is not responsible for determining whether the date of value requested by Client is appropriate for Client's intended use.

10.     The sketches, maps, plats and exhibits in this report are included to assist the reader in visualizing the property. The appraiser has made no survey of the property and assumed no responsibility in connection with such matters.

11.     The information, estimates and opinions, which were obtained from sources outside of this office, are considered reliable. However, no liability for them can be assumed by the appraiser.

12.     Possession of this report, or a copy thereof, does not carry with it the right of publication. Neither all, nor any part of the content of the report, or copy thereof (including conclusions as to property value, the identity of the appraisers, professional designations, reference to any professional appraisal organization or the firm with which the appraisers are connected), shall be disseminated



to the public through advertising, public relations, news, sales, or other media without prior written consent and approval.

13. No claim is intended to be expressed for matters of expertise that would require specialized investigation or knowledge beyond that ordinarily employed by real estate appraisers. We claim no expertise in areas such as, but not limited to, legal, survey, structural, environmental, pest control, mechanical, etc.

14. This appraisal was prepared for the sole and exclusive use of the client for the function outlined herein. Any party who is not the client or intended user identified in the appraisal or engagement letter is not entitled to rely upon the contents of the appraisal without express written consent of Valbridge Property Advisors | Philadelphia and Client. The Client shall not include partners, affiliates, or relatives of the party addressed herein. The appraiser assumes no obligation, liability or accountability to any third party.

15. Distribution of this report is at the sole discretion of the client, but third-parties not listed as an intended user on the face of the appraisal or the engagement letter may not rely upon the contents of the appraisal. In no event shall client give a third-party a partial copy of the appraisal report. We will make no distribution of the report without the specific direction of the client.

16. This appraisal shall be used only for the function outlined herein, unless expressly authorized by Valbridge Property Advisors | Philadelphia.

17. This appraisal shall be considered in its entirety. No part thereof shall be used separately or out of context.

18. Unless otherwise noted in the body of this report, this appraisal assumes that the subject property does not fall within the areas where mandatory flood insurance is effective. Unless otherwise noted, we have not completed nor have we contracted to have completed an investigation to identify and/or quantify the presence of non-tidal wetland conditions on the subject property. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

19. The flood maps are not site specific. We are not qualified to confirm the location of the subject property in relation to flood hazard areas based on the FEMA Flood Insurance Rate Maps or other surveying techniques. It is recommended that the client obtain a confirmation of the subject property's flood zone classification from a licensed surveyor.

20. If the appraisal is for mortgage loan purposes 1) we assume satisfactory completion of improvements if construction is not complete, 2) no consideration has been given for rent loss during rent-up unless noted in the body of this report, and 3) occupancy at levels consistent with our "Income and Expense Projection" are anticipated.

21. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover them.

22. Our inspection included an observation of the land and improvements thereon only. It was not possible to observe conditions beneath the soil or hidden structural components within the improvements. We inspected the buildings involved, and reported damage (if any) by termites, dry rot, wet rot, or other infestations as a matter of information, and no guarantee of the amount or degree of damage (if any) is implied. Condition of heating, cooling, ventilation, electrical and plumbing equipment is considered to be commensurate with the condition of the balance of the improvements unless otherwise stated. Should the client have concerns in these areas, it is the client's responsibility to order the appropriate inspections. The appraiser does not have the skill or expertise to make such inspections and assumes no responsibility for these items.

23. This appraisal does not guarantee compliance with building code and life safety code requirements of the local jurisdiction. It is assumed that all required licenses, consents, certificates of occupancy



or other legislative or administrative authority from any local, state or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value conclusion contained in this report is based unless specifically stated to the contrary.

24. When possible, we have relied upon building measurements provided by the client, owner, or associated agents of these parties. In the absence of a detailed rent roll, reliable public records, or "as-built" plans provided to us, we have relied upon our own measurements of the subject improvements. We follow typical appraisal industry methods; however, we recognize that some factors may limit our ability to obtain accurate measurements including, but not limited to, property access on the day of inspection, basements, fenced/gated areas, grade elevations, greenery/shrubbery, uneven surfaces, multiple story structures, obtuse or acute wall angles, immobile obstructions, etc. Professional building area measurements of the quality, level of detail, or accuracy of professional measurement services are beyond the scope of this appraisal assignment.

25. We have attempted to reconcile sources of data discovered or provided during the appraisal process, including assessment department data. Ultimately, the measurements that are deemed by us to be the most accurate and/or reliable are used within this report. While the measurements and any accompanying sketches are considered to be reasonably accurate and reliable, we cannot guarantee their accuracy. Should the client desire more precise measurement, they are urged to retain the measurement services of a qualified professional (space planner, architect or building engineer) as an alternative source. If this alternative measurement source reflects or reveals substantial differences with the measurements used within the report, upon request of the client, the appraiser will submit a revised report for an additional fee.

26. In the absence of being provided with a detailed land survey, we have used assessment department data to ascertain the physical dimensions and acreage of the property. Should a survey prove this information to be inaccurate, upon request of the client, the appraiser will submit a revised report for an additional fee.

27. If only preliminary plans and specifications were available for use in the preparation of this appraisal, and a review of the final plans and specifications reveals substantial differences upon request of the client the appraiser will submit a revised report for an additional fee.

28. Unless otherwise stated in this report, the value conclusion is predicated on the assumption that the property is free of contamination, environmental impairment or hazardous materials. Unless otherwise stated, the existence of hazardous material was not observed by the appraiser and the appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation or other potentially hazardous materials may affect the value of the property. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required for discovery. The client is urged to retain an expert in this field, if desired.

29. The Americans with Disabilities Act ("ADA") became effective January 26, 1992. We have not made a specific compliance survey of the property to determine if it is in conformity with the various requirements of the ADA. It is possible that a compliance survey of the property, together with an analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this could have a negative effect on the value of the property. Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in developing an opinion of value.

30. This appraisal applies to the land and building improvements only. The value of trade fixtures, furnishings, and other equipment, or subsurface rights (minerals, gas, and oil) were not considered in this appraisal unless specifically stated to the contrary.



31.   No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated, unless specifically stated to the contrary.

32.   Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute prediction of future operating results. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance.

33.   Any estimate of insurable value, if included within the scope of work and presented herein, is based upon figures developed consistent with industry practices. However, actual local and regional construction costs may vary significantly from our estimate and individual insurance policies and underwriters have varied specifications, exclusions, and non-insurable items. As such, we strongly recommend that the Client obtain estimates from professionals experienced in establishing insurance coverage. This analysis should not be relied upon to determine insurance coverage and we make no warranties regarding the accuracy of this estimate.

34.   The data gathered in the course of this assignment (except data furnished by the Client) shall remain the property of the Appraiser. The appraiser will not violate the confidential nature of the appraiser-client relationship by improperly disclosing any confidential information furnished to the appraiser. Notwithstanding the foregoing, the Appraiser is authorized by the client to disclose all or any portion of the appraisal and related appraisal data to appropriate representatives of the Appraisal Institute if such disclosure is required to enable the appraiser to comply with the Bylaws and Regulations of such Institute now or hereafter in effect.

35.   You and Valbridge Property Advisors | Philadelphia both agree that any dispute over matters in excess of $5,000 will be submitted for resolution by arbitration. This includes fee disputes and any claim of malpractice. The arbitrator shall be mutually selected. If Valbridge Property Advisors | Philadelphia and the client cannot agree on the arbitrator, the presiding head of the Local County Mediation & Arbitration panel shall select the arbitrator. Such arbitration shall be binding and final. In agreeing to arbitration, we both acknowledge that, by agreeing to binding arbitration, each of us is giving up the right to have the dispute decided in a court of law before a judge or jury. In the event that the client, or any other party, makes a claim against Valbridge Property Advisors | Philadelphia or any of its employees in connections with or in any way relating to this assignment, the maximum damages recoverable by such claimant shall be the amount actually received by Valbridge Property Advisors | Philadelphia for this assignment, and under no circumstances shall any claim for consequential damages be made.

36.   Valbridge Property Advisors | Philadelphia shall have no obligation, liability, or accountability to any third party. Any party who is not the "client" or intended user identified on the face of the appraisal or in the engagement letter is not entitled to rely upon the contents of the appraisal without the express written consent of Valbridge Property Advisors | Philadelphia. "Client" shall not include partners, affiliates, or relatives of the party named in the engagement letter. Client shall hold Valbridge Property Advisors | Philadelphia and its employees harmless in the event of any lawsuit brought by any third party, lender, partner, or part-owner in any form of ownership or any other party as a result of this assignment. The client also agrees that in case of lawsuit arising from or in any way involving these appraisal services, client will hold Valbridge Property Advisors | Philadelphia harmless from and against any liability, loss, cost, or expense incurred or suffered by Valbridge Property Advisors | Philadelphia in such action, regardless of its outcome.

37.   The Valbridge Property Advisors office responsible for the preparation of this report is independently owned and operated by Lukens and Wolf LLC. Neither Valbridge Property Advisors, Inc., nor any of its affiliates has been engaged to provide this report. Valbridge Property Advisors, Inc. does not provide valuation services, and has taken no part in the preparation of this report.

38.   If any claim is filed against any of Valbridge Property Advisors, Inc., a Florida Corporation, its

affiliates, officers or employees, or the firm providing this report, in connection with, or in any way arising out of, or relating to, this report, or the engagement of the firm providing this report, then (1) under no circumstances shall such claimant be entitled to consequential, special or other damages, except only for direct compensatory damages, and (2) the maximum amount of such compensatory damages recoverable by such claimant shall be the amount actually received by the firm engaged to provide this report.

39.   This report and any associated work files may be subject to evaluation by Valbridge Property Advisors, Inc., or its affiliates, for quality control purposes.

40.   Acceptance and/or use of this appraisal report constitutes acceptance of the foregoing general assumptions and limiting conditions.

## Certification – David Koczirka, MAI

I certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. The undersigned has ~~not~~ performed any services regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. A report for this property was delivered April 20, 2026 and a supplemental letter delivered May 18, 2026.

5. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

9. David Koczirka has personally inspected the subject property.

10. No one provided significant real property appraisal assistance to the person signing this certification, unless otherwise noted.

11. The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13. As of the date of this report, the undersigned has completed the continuing education program for Designated Members of the Appraisal Institute.

David Koczirka, MAI
Senior Appraiser
PA Certified General Real Estate Appraiser
Certification No.: GA004457
License Expires: June 30, 2027



# Certification – Richard F. Wolf, MAI, SRA, AI-GRS, CRE

I certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. The undersigned has not performed any services regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. A report for this property was delivered April 20, 2026 and a supplemental letter delivered May 18, 2026.

5. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

9. Richard F. Wolf has personally inspected the subject property.

10. No one provided significant real property appraisal assistance to the person signing this certification, unless otherwise noted.

11. The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13. As of the date of this report, the undersigned has completed the continuing education program for Designated Members of the Appraisal Institute.

Richard F. Wolf, MAI, SRA, AI-GRS, CRE
Senior Managing Director
PA Certified General Real Estate Appraiser
Certification No.: GA-001514-L
License Expires: June 30, 2027



# Addenda

Copy of Roof Replacement Cost Estimate Glossary

Qualifications

- David Koczirka, MAI - Senior Appraiser

- Richard F. Wolf, MAI, SRA, AI-GRS, CRE - Senior Managing Director

Information on Valbridge Property Advisors

Office Locations

## Copy of Roof Replacement Cost Estimate





Stewart J. Gouck, AIA
Registered    Architect

Mr. Abraham Atiy    eh
Whitehall Manor
1177 Sixth Street
Whitehall, PA 18052

March 17, 2026

RE: Whitehall Manor Phase 1 & 2 Rubber Reroofing

Abe,

The rubber roofs at Whitehall Manor Phase 1 & 2 are alligator-cracked and
pinholed, seams and details are delaminating, the roofs are leaking, and these
roofs have reached the end of their life.

We recommend a complete tear-off and replacement of the Phase 1 & Phase 2
rubber roofs.


Best Regards,



Eugene Berg, Jr., AIA
Registered Architect
Gouck Architects
1304 Hamilton Street
Allentown, PA 18102



1304 Hamilton Street
Allentown PA 18102
610.439.8818
gouckarch@prodigy.net

---





Stewart J. Gouck, AIA
Registered    Architect

**Whitehall Manor Phase 1 & 2 Reroof Cost Estimate**
**1177 Sixth Street**
**Whitehall, PA 18052**
**as of March 17, 2026**

**General Notes:**

($2/SF tear-off & disposal + $3/SF ½" Carlisle SecurShield HD High Density Polyisocyanurate Cover Board + $7/SF fully adhered .060" EPDM rubber = $12/SF total)

Note: Building is already insulated with 10" R-30 fiberglass batt insulation laid on top of the Chicago Grid suspended drywall, so thicker insulation is not necessary at the roof

**Phase 1 Barrel Vaulted Roof:**

Tear-Off & Disposal, ½" SecurShield HD Polyiso, Fully Adhered .060 EPDM:
(83.75' arch length)(258.58' long) = 21656 SFx $12/SF =                    $259,872

Phase 1 Parapet Rubber Wrap:
(500 sf)(2 arch-end parapets)($12/SF)=                    $12,000

Phase 1 Roof Drains:
(13 Roof Drains)($1000/drain)=                    $13,000

Phase 1 Replace Termination Bar at 6th Street & Parapet Ends
262' north elev. + 94' east elev + 94' west elev
(450 lin. ft)($10/lin. ft term bar)=                    $4,500

Replace Metal Coping along courtyard
(190 lin. ft.)($20/lin ft coping)=                    $3,800

HVAC Curbs:
(1 HVAC Unit Curb - Reflash w/ rubber, boots)($2,500)=                    $2,500

Condensing Units:
(Lift 8 condensing units & reset on rubber walk pads, boots)($800)= $6,400

1304 Hamilton Street
Allentown PA 18102
610.439.8818
gouckarch@prodigy.net



## Florida Room Roof Tear-off & .060 Adhered EPDM on ½" SecurShield HD:

| | |
|---|---|
| Tear-Off & Disposal, ½" SecurShield HD Polyiso, Fully Adhered .060 EPDM:<br>(30' sloped edge)(35' deep)=1050 SFx$12/SF = | $12,600 |
| Replace Termination Bars at full perimeter:<br>(130 lin. ft)($10/lin. ft term bar)= | $1,300 |
| (Lift & Reflash 2 skylights)($2,000 each)= | $4,000 |

## East Dining Room Roof:

| | |
|---|---|
| Tear-off & .060 Adhered EPDM, ½" SecurShield HD:<br>(25')(33.5')= 838 SFx $12/SF= | $10,056 |
| Replace Termination Bars:<br>(92 lin. ft.)($10/lin. ft. term bar)= | $920 |
| Replace Metal Coping Along Courtyard:<br>(25 lin. ft.)($20/lin ft coping)= | $500 |
| HVAC Curbs:<br>(1 HVAC Unit Curb - Reflash w/ rubber, boots)($2,500)= | $2,500 |
| Roof Drains:<br>(2 Roof Drains)($1000/drain)= | $2,000 |

## Phase 2 Barrel Vaulted Roof:

| | |
|---|---|
| Tear-Off & Disposal, ½" SecurShield HD Polyiso, Fully Adhered .060 EPDM:<br>(83.75' arch length)(258.58' long) = 21656 SFx $12/SF = | $259,872 |
| Phase 2 Parapet Rubber Wrap:<br>(500 sf)(2 arch-end parapets)($12/SF)= | $12,000 |
| Phase 2 Roof Drains:<br>(10 Roof Drains)($1000/drain)= | $10,000 |
| HVAC Curbs & Kitchen Exhaust Fan Curbs:<br>(6 HVAC Unit / Exhaust Curbs - Reflash w/ rubber, boots)($2,500)= | $15,000 |
| (Lift & Reflash 5 skylights)($2,000 each)= | $10,000 |

| | |
|---|---|
| Phase 1 Replace Termination Bar Against Phase 3 & Parapet Ends<br>262' phase 3 edge. + 94' east elev + 94' west elev<br>(450 lin. ft)($10/lin. ft term bar)= | $4,500 |
| Replace Metal Coping along courtyard<br>(190 lin. ft.)($20/lin ft coping)= | +$3,800 |
| Total Cost:<br>10% Contingency for additional penetrations, deck rot & details | $651,120<br>+$ 65,112 |
| **Grand Total Phase 1 & 2 Rubber Reroof Cost:** | $716,232 |

## Glossary



Definitions are taken from The Dictionary of Real Estate Appraisal, 7th Edition (Dictionary), the Uniform Standards of Professional Appraisal Practice (USPAP), and Building Owners and Managers Association International (BOMA).

### Absolute Net Lease

A lease in which the tenant pays all expenses including structural maintenance, building reserves, and management; often a long-term lease to a credit tenant. (Dictionary)

### Amortization

The process of retiring a debt or recovering a capital investment, typically through scheduled, systematic repayment of the principal; a program of periodic contributions to a sinking fund or debt retirement fund. (Dictionary)

### As Is Market Value

The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. (Interagency Appraisal and Evaluation Guidelines) Note that the use of the "as is" phrase is specific to appraisal regulations pursuant to FIRREA applying to appraisals prepared for regulated lenders in the United States. The concept of an "as is" value is not included in the Standards of Valuation Practice of the Appraisal Institute, Uniform Standards of Professional Appraisal Practice, or International Valuation Standards. (Dictionary)

### Base Rent

The minimum rent stipulated in a lease. (Dictionary)

### Base Year

The year on which escalation clauses in a lease are based. (Dictionary)

### Building Common Area

In office buildings, the areas of the building that provide services to building tenants but that are not included in the office area or store area of any specific tenant. These areas may include, but shall not be limited to, main and auxiliary lobbies, atrium spaces at the level of the finished floor, concierge areas or security desks, conference rooms, lounges or vending areas, food service facilities, health or fitness centers, daycare facilities, locker or shower facilities, mail rooms, fire control rooms, fully enclosed courtyards outside the exterior walls, and building core and service areas such as fully enclosed mechanical or equipment rooms. Specifically excluded from building common area are floor common areas, parking space, portions of loading docks outside the building line, and major vertical penetrations. (BOMA)

### Building Rentable Area

The sum of all floor rentable areas. Floor rentable area is the result of subtracting from the gross measured area of a floor the major vertical penetrations on that same floor. It is generally fixed for the life of the building and is rarely affected by changes in corridor size or configuration. (BOMA)

### Bulk Value

The value of multiple units, subdivided plots, or properties in a portfolio as though sold together in a single transaction. (Dictionary)

### Certificate of Occupancy (COO)

A formal written acknowledgment by an appropriate unit of local government that a new construction or renovation project is at the stage where it meets applicable health and safety codes and is ready for commercial or residential occupancy. (Dictionary)

### Common Area Maintenance (CAM)

The expense of operating and maintaining common areas; may or may not include management charges and usually does not include capital expenditures on tenant improvements or other improvements to the property. (Dictionary)

The amount of money charged to tenants for their shares of maintaining a [shopping] center's common area. The charge that a tenant pays for shared services and facilities such as electricity, security, and maintenance of parking lots. Items charged to common area maintenance may include cleaning services, parking lot sweeping and maintenance, snow removal, security, [amenities,] and upkeep. (ICSC – International Council of Shopping Centers, 4th Ed.)

### Condominium

An attached, detached, or stacked unit within or attached to a structure with common areas that are held as tenants in common (an undivided interest) with other owners in the project. The units can be residential, commercial, industrial, or parking spaces or boat docks. These units are commonly defined by state laws in their locations. Because units can be stacked on top of other units, these units can be defined both vertically and horizontally. (Dictionary)

### Conservation Easement

An interest in real estate restricting future land



use to preservation, conservation, wildlife habitat, or some combination of those uses. A conservation easement may



permit farming, timber harvesting, or other uses of a rural nature as well as some types of conservation-oriented development to continue, subject to the easement. (Dictionary)

## Contributory Value

A type of value that reflects the amount a property or component of a property contributes to the value of another asset or to the property as a whole.

The change in the value of a property as a whole, whether positive or negative, resulting from the addition or deletion of a property component. Also called deprival value in some countries. (Dictionary)

## Debt Coverage Ratio (DCR)

The ratio of net operating income to annual debt service (DCR = NOI$\div$I$_m$), which measures the relative ability of a property to meet its debt service out of net operating income; also called *debt service coverage ratio (DSCR)*. A larger *DCR* typically indicates a greater ability for a property to withstand a reduction of income, providing an improved safety margin for a lender. (Dictionary)

## Deed Restriction

A provision written into a deed that limits the use of land. Deed restrictions usually remain in effect when title passes to subsequent owners. (Dictionary)

## Depreciation

In appraisal, a loss in property value from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the value of the improvement on the same date.

In accounting, an allocation of the original cost of an asset, amortizing the cost over the asset's life; calculated using a variety of standard techniques. (Dictionary)

## Disposition Value

The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a specified time, which is shorter than the typical exposure time for such a property in that market.

2. The property is subjected to market conditions prevailing as of the date of valuation;

3. Both the buyer and seller are acting prudently and knowledgeably;

4. The seller is under compulsion to sell;

5. The buyer is typically motivated;

6. Both parties are acting in what they consider to be their best interests;

7. An adequate marketing effort will be made during the exposure time;

8. Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto; and

9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms. (Dictionary)

## Double Net (Net Net) Lease

An alternative term for a type of net lease. In some markets, a net net lease is defined as a lease in which the tenant is responsible to pay both property taxes and premiums for insuring the building(s). (Valbridge)

(The market definition of a double net lease varies depending on the market)

## Easement

The right to use another's land for a stated purpose. (Dictionary)

## EIFS

Exterior Insulation Finishing System. This is a type of exterior wall cladding system. Sometimes referred to as dry-vit.

## Effective Date

1. The date on which the appraisal opinion applies. (SVP)
2. The date to which an appraiser's analyses, opinions, and conclusions apply; also referred to as date of value. (USPAP, 2020-2021 ed.)
3. The date that a lease goes into effect. (Dictionary)

## Effective Gross Income (EGI)

The anticipated income from all operations of the real estate after an allowance is made for vacancy and collection losses and an addition is made for any other income. (Dictionary)

## Effective Rent

Total base rent, or minimum rent stipulated in a lease, over the specified lease term minus rent concessions; the rent that is effectively paid by a tenant net of financial concessions provided by a landlord. (TIs). (Dictionary)

## EPDM

Ethylene Propylene Diene Monomer Rubber. A type of synthetic rubber typically used for roof coverings.

### Escalation Clause

A clause in an agreement that provides for the adjustment of a price or rent based on some event or

index. e.g., a provision to increase rent if operating expenses increase; also called *escalator clause, expense recovery clause or stop clause*. (Dictionary)

### Estoppel Certificate

A signed statement by a party (such as a tenant or a mortgagee) certifying, for another's benefit, that certain facts are correct, such as that a lease exists, that there are no defaults, and that rent is paid to a certain date. (Black's) In real estate, a buyer of rental property typically requests estoppel certificates from existing tenants. Sometimes referred to as an *estoppel letter*. (Dictionary)

### Excess Land

Land that is not needed to serve or support the existing use. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land has the potential to be sold separately and is valued separately. (Dictionary)

### Excess Rent

The amount by which contract rent exceeds market rent at the time of the appraisal; created by a lease favorable to the landlord (lessor) and may reflect unusual management, unknowledgeable or unusually motivated parties, a lease execution in an earlier, stronger rental market, or an agreement of the parties. (Dictionary)

### Expense Stop

A clause in a lease that limits the landlord's expense obligation, which results in the lessee paying operating expenses above a stated level or amount. (Dictionary)

### Exposure Time

1. The time a property remains on the market.
2. An opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. (USPAP, 2020-2021 ed.)

### Extraordinary Assumption

An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

**Comment:** Uncertain information might include physical, legal, or economic characteristics of the subject property; or conditions external to the property, such as market conditions or trends; or the integrity of data used in an analysis. (USPAP)

### Fee Simple Estate

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the

governmental powers of taxation, eminent domain, police power, and escheat. (Dictionary)

## Floor Common Area

In an office building, the areas on a floor such as washrooms, janitorial closets, electrical rooms, telephone rooms, mechanical rooms, elevator lobbies, and public corridors which are available primarily for the use of tenants on that floor. In essence, floor common area represents all of the area on the floor that is common to that respective floor with the exception of those areas that penetrate through the floor, such as the elevator shaft and stairwell. The significant point to be made is that floor common area is not part of the tenant's usable area. (BOMA)

## Full Service (Gross) Lease

A lease in which the landlord receives stipulated rent and is obligated to pay all of the property's operating and fixed expenses; also called a *full service lease*. (Dictionary)

## Furniture, Fixtures, and Equipment (FF&E)

Business trade fixtures and personal property, exclusive of inventory. (Dictionary)

## Going-Concern Value

An outdated label for the market value of all the tangible and intangible assets of an established and operating business with an indefinite life, as if sold in aggregate; more accurately termed the *market value of the going concern* or *market value of the total assets of the business*. (Dictionary)

## Gross Building Area (GBA)

1. Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above-grade area. This includes mezzanines and basements if and when typically included in the market area of the type of property involved.
2. Gross leasable area plus all common areas.
3. For residential space, the total area of all floor levels measured from the exterior of the walls and including the superstructure and substructure basement; typically does not include garage space. (Dictionary)

## Gross Measured Area

The total area of a building enclosed by the dominant portion (the portion of the inside finished surface of the permanent outer building wall which is 50 percent or more of the vertical floor-to-ceiling dimension, at the given point being measured as one moves horizontally along the wall), excluding parking areas and loading docks (or portions of same) outside the building line. It is generally not used for leasing purposes and is calculated on a floor by floor basis. (BOMA)

## Gross Up Method

A method of calculating variable operating expenses in income-producing properties when less than 100% occupancy is assumed. Expenses reimbursed based on the amount of occupied space, rather than on the total building area, are described as "grossed up." (Dictionary)

## Gross Sellout Value (Sum of the Retail Values)

The sum of the separate and distinct market value opinions for each of the units in a condominium, subdivision development, or portfolio of properties, as of the date of valuation. The aggregate of retail values does not represent the value of all the units as though sold together in a single transaction; it is simply the total of the individual market value conclusions. An appraisal has an effective date, but summing the sale prices of multiple units over an extended period of time will not be the value on that one day unless the prices are discounted to make the value equivalent to what another developer or investor would pay for the bulk purchase of the units. Also called the *aggregate of the retail values, aggregate retail selling price or sum of the retail values*. (Dictionary)

## Ground Lease

A lease that grants the right to use and occupy land. Improvements made by the ground lessee typically revert to the ground lessor at the end of the lease term. (Dictionary)

## Ground Rent

The rent paid for the right to use and occupy land according to the terms of a ground lease; the portion of the total rent allocated to the underlying land. (Dictionary)

## HVAC

Heating, ventilation, air conditioning (HVAC) system. A unit that regulates the temperature and distribution of heat and fresh air throughout a building. (Dictionary)

## Highest and Best Use

1. The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.
2. The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use of for some alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price



that it would be willing to bid. (IVS)

3.  [The] highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future. (Uniform

Appraisal Standards for Federal Land Acquisitions) (Dictionary)

### Hypothetical Condition

1.  A condition that is presumed to be true when it is known to be false. (SVP)
2.  A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

**Comment:** Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP)

### Insurable Value (Replacement Cost for Insurance Purposes)

The estimated cost, at current prices as of the effective date of valuation, of a substitute for the building being valued, using modern materials and current standards, design, and layout for insurance coverage purposes guaranteeing that damaged property is replaced with new property (i.e., depreciation is not deducted). (Dictionary)

### Investment Value

1.  The value of a property to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market. (Dictionary)
2.  The value of an asset to the owner or a prospective owner given individual investment or operational objectives (may also be known as worth). (IVS)

### Just Compensation

In condemnation, the amount of loss for which a property owner is compensated when his or her property is taken. Just compensation should put the owner in as good a position pecuniarily as he or she would have been if the property had not been taken. (Dictionary)

### Leased Fee Interest

The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. (Dictionary)

### Leasehold Interest (Leasehold Estate)

The right held by the lessee to use and occupy real

estate for a stated term and under the conditions specified in the lease. (Dictionary)

See also Positive Leasehold and Negative Leasehold.

### Lessee (Tenant)
One who has the right to occupancy and use of the property of another for a period of time according to a lease agreement. (Dictionary)

### Lessor (Landlord)
One who conveys the rights of occupancy and use to others under a lease agreement. (Dictionary)

### Liquidation Value
The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a short time period.

2. The property is subjected to market conditions prevailing as of the date of valuation.

3. Both the buyer and seller are acting prudently and knowledgeably.

4. The seller is under extreme compulsion to sell.

5. The buyer is typically motivated.

6. Both parties are acting in what they consider to be their best interests.

7. A normal marketing effort is not possible due to the brief exposure time.

8. Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto.

9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (Dictionary)

### Loan to Value Ratio (LTV)
The ratio between a mortgage loan and the value of the property pledged as security, usually expressed as a percentage. (Dictionary)

### Major Vertical Penetrations
Stairs, elevator shafts, flues, pipe shafts, vertical ducts, and the like, and their enclosing walls. Atria, lightwells and similar penetrations above the finished floor are included in this definition. Not included, however, are vertical penetrations built for the private use of a tenant occupying office areas on more than one floor. Structural columns, openings for vertical electric cable or telephone distribution, and openings for plumbing lines are not considered to be major vertical penetrations. (BOMA)

### Market Rent
The most probable rent that a property should bring in a competitive and open market under all the

conditions requisite to a fair lease transaction, the lessee and the lessor each acting prudently and knowledgeably, and



assuming the rent is not affected by undue stimulus. Implicit in this definition is the execution of a lease as of a specified date under conditions whereby:

1. Lessee and lessor are typically motivated;
2. Both parties are well informed or well advised, and acting in what they consider their best interests;
3. Payment is made in terms of cash or in terms of financial arrangements comparable thereto; and
4. The rent reflects specified terms and conditions, such as permitted uses, use restrictions, expense obligations, duration, concessions, rental adjustments and revaluations, renewal and purchase options, and tenant improvements (TIs). (Appraisal Institute)

## Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States: The most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;

2. Both parties are well informed or well advised, and acting in what they consider their own best interests;

3. A reasonable time is allowed for exposure in the open market;

4. Payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and

5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (Dictionary; 12 C.F.R. Part 34.42(g); 55 Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992; 59 Federal Register 29499, June 7, 1994)

## Marketing Time

An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. (Advisory Opinion 7 of the Appraisal Standards Board of the Appraisal Foundation)



## Master Lease

1. A lease in which a part or the entire property is leased to a single entity (the master lessee) in return for a stipulated rent. The master lessee then subleases the property to multiple tenants.
2. The first lease in a sandwich lease. (Dictionary)

## Modified Gross Lease

A lease in which the landlord receives stipulated rent and is obligated to pay some, but not all, of the property's operating and fixed expenses. Since assignment of expenses varies among modified gross leases, expense responsibility must always be specified. In some markets, a modified gross lease may be called a *double net lease, net net lease, partial net lease, or semi-gross le*ase. (Dictionary)

## Negative Leasehold

A lease situation in which the market rent is less than the contract rent. (Dictionary)

## Operating Expense Ratio

The ratio of total operating expenses to effective gross income (*TOE/EGI*); the complement of the net income ratio, i.e., *OER = 1 − NIR* (Dictionary)

## Option

A legal contract, typically purchased for a stated consideration, that permits but does not require the holder of the option (known as the *optionee*) to buy, sell, or lease real estate for a stipulated period of time in accordance with specified terms; a unilateral right to exercise a privilege. (Dictionary)

## Partial Interest

Divided or undivided rights in real estate that represent less than the whole, i.e., a fractional interest such as a tenancy in common or easement. (Dictionary)

## Pass Through

A tenant's portion of operating expenses that may be composed of common area maintenance (CAM), real property taxes, property insurance, and any other expenses determined in the lease agreement to be paid by the tenant. (Dictionary)

## Percentage Lease

A lease in which the rent or some portion of the rent represents a specified percentage of the volume of business, productivity, or use achieved by the tenant. (Dictionary)

## Positive Leasehold

A lease situation in which the market rent is greater than the contract rent. (Dictionary)

## Potential Gross Income (PGI)

The total income attributable to property at full occupancy before vacancy and operating expenses are deducted. (Dictionary)

## Prospective Opinion of Value

A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy. (Dictionary)

## Replacement Cost

The estimated cost to construct, at current prices as of a specific date, a substitute for a building or other improvements, using modern materials and current standards, design, and layout. (Dictionary)

## Reproduction Cost

The estimated cost to construct, at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship and embodying all of the deficiencies, superadequacies, and obsolescence of the subject building. (Dictionary)

## Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term *retrospective* does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion." (Dictionary)

## Sandwich Leasehold Estate

The interest held by the sandwich leaseholder when the property is subleased to another party; a type of leasehold estate. (Dictionary)

## Sublease

An agreement in which the lessee in a prior lease conveys the right of use and occupancy of a property to another, the sublessee, for a specific period of time, which may or may not be coterminous with the underlying lease term. (Dictionary)

## Subordination

A contractual arrangement in which a party with a claim to certain assets agrees to make that claim junior, or subordinate, to the claims of another party. (Dictionary)



### Surplus Land

Land that is not currently needed to support the existing use but cannot be separated from the property and sold off for another use. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel. (Dictionary)

### TPO

Thermoplastic polyolefin, a resilient synthetic roof covering.

### Triple Net (Net Net Net) Lease

An alternative term for a type of net lease. In some markets, a net net net lease is defined as a lease in which the tenant assumes all expenses (fixed and variable) of operating a property except that the landlord is responsible for structural maintenance, building reserves, and management; also called *NNN lease, net net net lease, or fully net lease*. (Dictionary)

(The market definition of a triple net lease varies; in some cases tenants pay for items such as roof repairs, parking lot repairs, and other similar items.)

### Usable Area

The measured area of an office area, store area, or building common area on a floor. The total of all the usable areas for a floor shall equal floor usable area of that same floor. (BOMA)

### Value-in-Use

1.  The amount determined by discounting the future cash flows (including the ultimate proceeds of disposal) expected to be derived from the use of an asset at an appropriate rate that allows for the risk of the activities concerned. (FASB Accounting Standards Codification, Master Glossary)
2.  Formerly used in valuation practice as a synonym for *contributory value* or *use value*. (Dictionary)

### VTAB (Value of the Total Assets of a Business) The

total amount that the real property, tangible personal property, and intangible property assets of a business would sell for in an asset-based transaction. (Dictionary)

## Qualifications of David Koczirka, MAI Senior Appraiser

Valbridge Property Advisors | Philadelphia

*Independent Valuations for a Variable World*

### State Certifications
PA State Certified Appraiser License No. GA004457

PA Real Estate Salesperson License No. RS318425

### Education
M.B.A. – West Chester University

B.A. in Economics



– Villanova University

Contact Details dkoczirka@valbridge.com
215-545-1900 (main)
484-965-9590 (direct)

Valbridge Property Advisors | Philadelphia
900 W. Valley Road, Suite 503
Wayne, PA 19087 www.valbridge.com

Membership/Affiliations:
Member: Appraisal Institute – MAI
Designation Philadelphia Metro
Chapter of the Appraisal Institute

Appraisal Institute & Related Courses:
Advanced Concepts and Case Studies
Advanced Market Analysis and
Highest and Best Use Advanced
Income Capitalization
Quantitative Analysis
General Appraiser Report Writing
and Case Studies General Appraiser
Income Approach (Parts 1 & 2)
General Appraiser Site Valuation and
Cost Approach General Appraiser
Sales Comparison Approach
General Appraiser Market Analysis and
Highest and Best Use Real Estate Finance,
Statistics, and Valuation Modeling
Basic
Appraisal
Procedure
s Basic
Appraisal
Principles
National
USPAP
PA State Laws and Regulations

Experience:
**Senior Appraiser**
Valbridge Property Advisors|Philadelphia (August 2019 to Present)

**Real Estate Appraiser Trainee**
Valbridge Property Advisors|Philadelphia (July 2016 to August 2019)

**PA Real Estate Salesperson**
Reaves C Lukens Jr. Co. Inc. (January 2019 to Present) BHHS Fox and Roach (September 2011 to January 2019)

**Operations Associate- Commercial Real Estate**
M&T Bank (October 2014 to July 2016)

Valuation Assignments Include:
A wide range of commercial properties including multi-family, industrial, office, retail, hotel, railroad, senior housing, residential



subdivision, manufactured housing, and land valuation assignments.



## Qualifications of Richard F. Wolf, MAI, SRA, AI-GRS, CRE
## Senior Managing Director
Valbridge Property Advisors | Philadelphia

*Independent Valuations for a Variable World*

### State Certifications
PA State Certified Appraiser GA-001514-L – 2/97
NJ State Certified Appraiser 42RG00206200 – 7/06
DE State Certified Appraiser X1-0000346 – 6/02
NY State Certified Appraiser 46000054261

### License
PA Real Estate Salesperson License NS-131771-A – 8/87-2025
PA Real Estate Instructor RI006507 - 3/15
PA Real Estate Brokers License RB070154 & RM426032 -3/2025

### Education
Villanova University
B.S., Business Administration -1983

### Additional Background
Former Chairman of Skippack Township Planning Commission Former Member of Central Perkiomen Valley Regional Planning Commission
Former Member of Skippack Township Open Space Committee Former owner/operator of an equestrian facility which boards 50 horses, employs 5 instructors, servicing 1,200 students and contains a 2,000 square foot retail store.

### Contact Details
rwolf@valbridge.com 215-545-1900 (main)
215-545-1903 (direct) Valbridge Property Advisors | Philadelphia
900 W. Valley Road Suite 503
Wayne, PA 19087 www.valbridge.com

### Membership/Affiliations:
Member: Appraisal Institute - MAI Designation – Certificate No. 12292
– January 2005
SRA & AI-GRS - 2019
Chapter President – 2010
Chapter Education Chair 2011- 2017
Regional Director 2018 – 2022
Audit Member of National Board of Directors 2023-Current
Member of Counselors of Real Estate – CRE Designation – Certificate No. 12475 – November 2006

### Experience:
**Senior Managing Director**
Valbridge Property Advisors | Lukens & Wolf LLC (2013-Present)

**Principal**
Lukens & Wolf LLC (2011-2013)

**Real Estate Appraiser**
Reaves C. Lukens Company (1997-2011)

**Investment Advisor**
Vanguard Group (1992-1997)

**Real Estate Appraiser**
Donald J. Reape, MAI, SREA & Associates (1995-1997)

**Independent Contractor**
Dowling & Associates (1994-1997)

**Scope of Appraisal and Counseling Activity**
Experience in a wide range of property types including: multi-family, industrial, office, retail and land in Greater Delaware Valley. Particular concentration in mining operations and land development analysis. Also experience with nursing homes, continuing care retirement communities (CCRC), farm/equestrian facilities, apartment complexes, hotels, and industrial/R & D facilities.

# Court Testimony

Bucks County, Pennsylvania - Board of Appeals (Tax Appeals)
Bucks County, Pennsylvania – Court of Common Pleas (Condemnation)
Bucks County, Pennsylvania - Divorce Proceeding (Appearance) Camden
County, District of New Jersey – Federal Court (Bankruptcy) Camden
County, New Jersey – Superior Court (Condemnation)
Chester County Pennsylvania – Court of Common Pleas (Tax Appeals)
Chester County, Pennsylvania - Board of Appeals (Tax Appeals) Chester
County, Pennsylvania - Board of Appeals (Tax Appeals) Chester County,
Pennsylvania - Board of View (Condemnation)
Chester County, Pennsylvania – Court of Common Pleas (Damage case)
Chester County, Pennsylvania - Court of Common Pleas (Environmental Damages)
Chester County, Pennsylvania – Court of Common Pleas (Land Development) Delaware
County, Pennsylvania - Board of Appeals (Tax Appeals)
Delaware County, Pennsylvania – Court of Common Pleas (Tax Appeal)
Lancaster County, Pennsylvania – Board of View (Condemnation) Lancaster
County, Pennsylvania – Court of Common Pleas (Tax Appeal) Montgomery
County, Pennsylvania - Board of Appeals (Tax Appeals)
Montgomery County, Pennsylvania – Court of Common Pleas (Condemnation)
Montgomery County, Pennsylvania – Court of Common Pleas (Tax Appeals)
Northampton County, Pennsylvania -Board of Appeals (Tax Appeals)
Northumberland County, Central District of Pennsylvania – Federal Court (Bankruptcy) Pennsylvania
Department of Revenue – Harrisburg (Transfer Tax case)
Philadelphia County, Pennsylvania – Board of Revision of Taxes
Philadelphia County, Pennsylvania -- Court of Common Pleas Willistown
Township - Chester County Zoning Board (Building Right) York County,
Pennsylvania – Court of Common Pleas (Board of View)

## Teaching / Education

Appraisal Institute 2015 Real Estate Trends
Appraisal Institute 2016 Real Estate Trends
Appraisal Institute 2017 Real Estate Trends
Counselors of Real Estate 2017 Real Estate Symposium
Pennsylvania Bar Institute August 2016 "A Lawyer's Guide to Appraisals and Appraisers"

# Partial List of Client

**PARTIAL LIST OF CLIENTS**

| BANKS AND SAVINGS & LOANS | DEVELOPERS AND INVESTORS |
|---|---|
| TD Bank | Acorn Development Corporation |
| Republic Bank | C & M Builders |
| First Niagara | Dewey Commercial |
| Crusader Bank | Westrum Development Co. |
| PNC Bank | Toll Brothers, Inc. |
| The Bryn Mawr Trust Company | Heritage Homes Group |
| The Glenmede Trust Company | Hovnanian |

| PRIVATE SECTOR | LAW FIRMS |
|---|---|
| Better Materials, Inc. | Ballard, Spahr, LLP |
| Chester County Airport Authority | Dechert LLP |
| Clemens Markets | Duane Morris LLP |
| Delancey Investment Corp. | Eastburn and Gray, PC |
| Hanson Aggregates, PLC | Fox Rothschild LLP |
| Highway Materials | High Swartz LLP |
| Pennsylvania Hospital | Lamb McErlane, PC |
| SAP America | Mette, Evans & Woodside |
| SmithKline Beecham | Montgomery McCracken Walker & Rhodes, LLP |
| Waste Management, Inc. | Riley, Riper, Hollin & Colagreco, Attorneys at Law |
| The DePaul Group | Sprague and Sprague |
| Main Line Health Wisler Pearlstine, LLP | |

**EDUCATIONAL AND GOVERNMENTAL**

Abington School District Archdiocese

Pennsylvania Presbytery of
Philadelphia Swarthmore College
University of Pennsylvania

## Educational Background

**APPRAISAL INSTITUTE -** Courses / Seminars successfully completed:

   Counselors of Real Estate – Real Estate Symposium 2017
   Appraisal Institute – Real Estate Trends Seminar 2017
   Appraisal Institute – NJ Regulations 2017
   Appraisal Institute – USPAP 2017 Appraisal
   Institute – PA Regulations 2017
   Appraisal Institute – Real Estate Trends Seminar 2016
   Appraisal Institute – DE Regulations 2016
   Appraisal Institute – Real Estate Trends Seminar 2015
   Appraisal Institute – Supervisory / Trainee 2015 Appraisal
   Institute – USPAP 2014
   Appraisal Institute – Review Theory – General 2014
   Appraisal Institute - Fundamentals of Separating Real Property,
                Personal Property and Intangible Business Assets, 2012
   Appraisal Institute - Business Practices and Ethics, 2010
   Appraisal Institute - Consumer Protection in the Appraisal Industry, 2010 Appraisal
   Institute - Real Estate Finance, Value and Investment Performance, 2010 Appraisal
   Institute - Legislative, Regulatory and Judicial Update, 2009
   Appraisal Institute - Delaware State Regulations, 2009
   Appraisal Institute - Appraising Distressed Commercial Real Estate, 2009 Appraisal
   Institute - PA State Regulations, 2009
   Appraisal Institute - 7 Hour National USPAP Update Course, 2009 Appraisal
   Institute - Valuation of Conservation Easements, 2008 Appraisal Institute -
   Evaluating Commercial Construction, 2008 Appraisal Institute - Leadership
   Development & Advisory Council, 2008 Appraisal Institute - Delaware State
   Regulations, 2007
   Appraisal Institute - Leadership Development Advisory Council, 2007
   Appraisal Institute - 7 Hour National USPAP Update Course, 2007 Appraisal
   Institute - RECGA Conference, 2006
   Appraisal Institute - Contemporary Legal & Appraisal Issues Involving Eminent Domain, 2006 Appraisal
   Institute - Pennsylvania Appraisal Statues, Regs, Bd. Policies, 2006
   Appraisal Institute - Market Analysis & Using the Site to Do Business, 2005 Appraisal
   Institute - The Latest Trends in Hotel Valuation and Market Studies, 2005 Appraisal
   Institute - Maximizing the Value of an Appraisal Practice, 2005
   Appraisal Institute - Attacking and Defending an Appraisal in Litigation, 2005
   Appraisal Institute - Subdivision Valuation, 2005
   Appraisal Institute - Real Estate Finance, 2004
   Appraisal Institute - Standards of Professional Practice A and B, 2001 Appraisal
   Institute - Advanced Applications, 1998
   Appraisal Institute - Sales Comparison & Cost Approaches, 1998
   Appraisal Institute - Highest and Best Use, 1997
   Appraisal Institute - Advanced Income Capitalization, 1996
   Appraisal Institute - Basic Income Capitalization, 1993 Appraisal
   Institute - Intro to Appraising Real Property, 1987

**Real Estate Courses taken and successfully completed**

   Schlicher Kratz Institute - Real Estate Investment, 2001 Polley
   Associates - Contemporary Legal Issues, 2000 Polley
   Associates - Using Technology, 2000
   Polley Associates - Ethics (Let's Get It Right), 1996
   Polley Associates - Appraisal Applications, 1995
   Polley Associates - Standards of Practices & Ethics, 1994

# Valbridge
## PROPERTY ADVISORS

## FAST FACTS

- Valbndge specializes In appraising all types of real property.

- Valbrldge provides Independent valuation services. We are NOT owned by a brokerage firm or

- Every Valbndge office b overseen by a Senior Nlanaglng Director who holds the MAI designation of the Apgra at institute.

- Valbrldge b ewned by local offices.

- Valbrldge welcomes slngle-Ixoperty esslgnmena as well as ponfole, mule-market nrid other bu4c-property engagemen\s.

**Valbridge Property Advisors, Inc.**
Phone: 888.981.2029
valbridge.com

 

**ALABAMA**
26241 Equity Dr., Ste. 101
Daphne, AL 36526

(251) 929-9090

4245 Balmoral Dr. SW, Unit 4201

Huntsvllle, AL 35801
(256) 210-1555

4732 Woodmere Blvd.



3160 Crow Canyon
Pl. San Ramon, CA
94583          (925)
327-1660

17822 17'^ St., Ste. 211
Tustin, CA 92780
(714) 449&852

1530 The Alameda, Ste. 100
San Jose, CA 95126
(408) 279-1520

**COLORADO**
5345 Arapahoe Ave., Ste. 6
Boulder, CO 80303
(303) 867-1935

**FLORIDA**
301 Almeria Ave., Ste. 350
Coral Gables, FL 33134
(305) 639-8029

3780 Bums Rd., Ste. 4
Palm Beach Gardens, FL
33410
(561) 833-5331

**IDAFiO**
3910 S. Yellowstone Hwy., Ste. BS
Iclaho Falls, ID 83402
(208) 534-5505

1875 N. Lakewood Dr., Ste. 100
Coeur dAlene, ID 83814
(208) 292-2965

**INDIANA**
6801 Lake Plazs Dr., Ste. C-301
Indianapolis, IN 46220
(317} 687-2747

**KANSAS**
10990 Oulvlra Ref., Ste. 100
Overland Park, KS 66210 (913)
451-1451

**KEMTUCKY**
1890 Star Shoot Pkwy.
Lexington, KY 4O5O9
(502) 585-3651

9401 WIlliamsburg Plaza, Ste. 2O4
Louisville, KY 40222
(502) 585-3651

**MARYLAND**
2709 Hanson Ave., Ste. T2
Baltimore, MD 21209
(443) 333-5525

**MA55ACf-iiJSETT5**
31 Washington SL, Ste. 4
Wellesley, MA 02481
(781) 790-5645

(313) 986-3313

2127 University Park
Dr. Okemos, MI
48864
(517} 336-0001

**IyiiuuESOTA**
1515 Central Pkwy., Ste. 120
Eagan, MN 55121
(651) 370-1475

**uississiwi**
1010 Ford St.
Gulfport, MS 39507
(228) 604-1900

**224AvaonCr**
Brandon, MS 39047
(601) 853-0736

501 Highway 12 W., Ste. 150-M
Starkvllle, MS 39759
(662) 617-2350

**MISSOURI**
1118 Hampton Ave., Ste. 208
St. Louis, MO 63139
(314) 255-1323

**NEW M5iXKO**
7301 Indlan School Rd. NE, Ste. A
Albuquerque, NM 87110
(505) 884-4721

**MOUTH CAROLINA**
S9SO Fairvlew Rd.,
Ste. 405 Charlotte,
NC 28210
(704) 376-5400

**CORPORATE OFFICE**
1250 Falrmont Avenue, Mount Pleasant, SC 29464 I Phone:
(239) 325-8234 I Fax: (239) 325-B356
*Each Volbridge office is Independently owned and opeiofied.*

**valbrIdge.com**

*rev. 010726*



118 Broadway N., Ste. 509
Fargo, ND 58091
(701) 289-1676

**OHIO**
8298 Clough Pike, Ste. 1
Cincinnati, OH 45244
(513) 785-0820

**OKLAHOMA**
6666 S. Sheridan Rd., Ste. 104
Tulsa, OK 74133
(918) 712-9992

3121 Ouail Springs Pkwy., Ste. 1S0
Oklahoma City, OK 73134
(405) 603-1553

**PENNSYLVANIA**
900 West Valley Rd., Ste. 503 Wayne, PA 19O87
(215) 545-1900

4701 Baptist Rd., Pte. 304
Pittsburgh, PA 15227
(412) 881-6080

**SOUTI i CAROLINA**
1250 Fairmont Ave.
Mt. Pleasant, SC 29464
(843) 8841266

11 Cleveland Ct.
Greenvllle, SC 29607

29902
(843) 8841266

3500 Rlnggold Rd., Ste. 3
Chattanooga, TN 37412
(423) 206-2677

213 Fox Rd.
Knoxvllle, TN 37922
(865) 522-2424

756 Ridge Lake Blvd., Ste. 225
Memphis, TN 38120
(901) 7S3&977

**TEXAS**
901 Mopac Expy. S., Bldg. 1, Ste. 300
Austin, TX 78746
(737) 242-8585

10210 North Central Expy., Ste. 115
Dallas, TX 75231
(214) 44&1611

974 Campbell Rd., Ste. 204
Houston, TX 77024
(713) 467-5858

273181st St.
Lubbock, TX 79423
(806) 744-1188

9901 IH-10 West, Ste. 1035
San Antonio, TX 7823O
(210) 227-6229

**UTAH**
527 E. Pioneer Rd., Ste. 24O
Draper, UT 84020
(801) 262-3388

20 North Main St.
St. George, UT 84770
(435) 773-6300

321 N. County Blvd., Ste. D
American Fork, UT 84003 (801) 492-0000



Beaufort, SC

656 Independence Pkwy., Ste. 220
Chesapeake, VA 23320
{7S7} 410-1222

1231 Alverser Dr.
Midlothian, VA 23113
(757) 345-0010

51O7 Center SL, Ste. 2B
WIlliamsburg, VA 23188
(7S7} 345-OO1O

**WASHiMGTObi**

8378 W. Grandrldge Blvd., Ste. 110-D
Kennewick, WA 99336
(5O9) 221-1540

324 N. Mullan Rd.
Spokane Valley, WA 99206
(509) 747-0999

**W!SCONSIN**

1266O W. North Ave. Brookfield,
WI 53005
(262) 782-7990





150 S. Warner Road, Suite 440
King of Prussia, PA 19406087
215-545-1900 phone
215-545-8548 fax
valbridge.com

May 18, 2026
Mr. Abraham Atiyeh
1177 6th Street
Whitehall, PA 18052
RE:    Supplemental Letter – Liquidation Value and Market Rent
       Whitehall Manor Senior Living
       1177 6th Street
       Whitehall, Pennsylvania 18052

Dear Mr. Atiyeh:

On April 20, 2026, we published an appraisal report on the above referenced property. That report is hereby incorporated into this supplemental letter, which expresses our opinion of market rent and a liquidation value for the property.

Our analysis and conclusions are shown on the following pages.
Respectfully submitted,
Valbridge Property Advisors | Philadelphia
(Del)                                           (Del)

David Koczirka, MAI Senior                      Richard F. Wolf, MAI, SRA, AI-GRS, CRE
Appraiser                                       Senior Managing Director
PA Certified General Real Estate Appraiser      PA Certified General Real Estate Appraiser
Certification No.: GA004457                      Certification No.: GA-001514-L
License Expires: June 30, 2027                   License Expires: June 30, 2027

Case 25-15245-pmb Doc 216 Document Filed 07/10/26 Entered 07/10/26 20:16:49 Desc

1177 6TH STREET

# Liquidation Value and Market Rent

Valbridge Property Advisors (VPA) completed an appraisal report on April 20, 2026, which included a market going concern value conclusion and real estate only value conclusion. This letter includes an opinion of the orderly liquidation value and market rent for the subject property.

## Liquidation Value

According to the Appraisal of Real Estate 15th Edition published by the Appraisal Institute, the definition of liquidation value is:

The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a short time period.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and the seller are acting prudently and knowledgeably.
4. The seller is under extreme compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. A normal marketing effort is not possible due to the brief exposure time.
8. Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This report analyzes market evidence relating to liquidation sales of assisted living (AL) facilities and comparable senior housing assets. The analysis incorporates both current market research and transaction evidence derived from CoStar sales data.

## CoStar Liquidation/Distressed Sale Evidence

The following liquidation sales were identified through CoStar transaction data. Discounts were measured between prior market transaction pricing and subsequent liquidation or distressed sale pricing.

**Liquidation/Distressed Sales Analysis**

| Comp # | Address | Market Sale Date | Market Sale Amount | Liquidation/Distressed Sale Date | Liquidation/Distressed Sale Amount | Days on Market as Distressed Sale | % Discount |
|---|---|---|---|---|---|---|---|
| 1 | 6333 Langston Avenue, New Port Richey, FL | July 11, 2023 | $2,000,000 | January 7, 2026 | $1,399,000 | 278 | 30.1% |
| 2 | 73685 Catalina Way, Palm Desert, CA | January 18, 2022 | $7,071,053 | August 21, 2025 | $4,910,000 | 70 | 30.6% |
| 3 | 1358 Manchester Drive, Conyers, GA | November 5, 2024 | $1,650,000 | August 13, 2025 | $1,500,000 | 201 | 9.1% |
| 5 | 601 E. Lake Street, Chisholm, MN | April 15, 2020 | $1,925,000 | October 3, 2023 | $1,700,000 | Unknown | 11.7% |
| 6 | 27601 Westchester Parkway, Westlake, OH | January 25, 2019 | $6,136,341 | February 26, 2025 | $1,300,000 | 45 | 78.8% |

| | |
|---|---|
| Min | 9.1% |
| Max | 78.8% |
| Median | 30.1% |
| Mean | 32.0% |

The CoStar dataset indicates a mean discount of 32.0%, with a median discount of 30.1%.
It should be noted that the assisted living occupancy rates started to drop in early 2020 and hit their low in late 2020 early 2021 due to COVID-19 before they started to recover. The chart below illustrates

the occupancy rates over the timeframe. The market conditions as of the market sale and as of the liquidation/distressed sale for each comparable were considered.



(Deleted) by Property Type
NIC MAP | Primary Markets

Current Market Research and Industry Evidence

Recent market evidence from NIC (National Investment Center), CBRE Senior Housing Investor Surveys, and distressed senior housing transactions indicate continuing liquidity pressure within the senior housing sector.

The CBRE U.S. Senior Housing & Care Investor Survey H2 2025 identified stabilized assisted living capitalization rates near 7.8% in 2025, while distressed or turnaround assets frequently trade at capitalization rates ranging from approximately 10.5% to 12.0% with an average time on market of 90-180 days. This capitalization rate expansion implies valuation discounts generally ranging from approximately 25.7% to 35.0% with an average of 30.4%.

According to a Senior Housing News article dated November 10, 2025, a Wall Street Journal analysis found that Blackstone acquired 39 senior housing properties for around $755 million between 2022 and 2025 and later sold those same properties for about $536 million, representing a 29.0% discount from the original purchase price. Based on the pace of the dispositions, the average days on market per Blackston property was approximately 150-180 days.

Comparison of Indicators



Comparison of Distressed Sale Discount Indicators

(Deleted)

The CoStar-derived mean discount of 32.0% and the web-derived market evidence indicating approximately 29.7% were each given equal consideration. This results in a discount of approximately 30.9%.

Conclusions – Liquidation Value
Based upon the combined evidence from CoStar liquidation sale transactions, senior housing market research, and capitalization rate analysis, a supportable distressed sale discount for an assisted living facility like the subject marketed under a 90-day exposure period is estimated at approximately 30.9% below stabilized market value.

A reasonable appraisal conclusion would therefore support a liquidation or distressed sale adjustment in the range of approximately 25.0% to 35.0%, with 30.0% representing the most supportable indication.

We concluded a market going concern value of $6,900,000 as of March 17, 2026 in our appraisal report dated April 20, 2026. Applying the 30.0% discount results in a liquidation value conclusion of $4,830,000, which we have rounded to $4,850,000.

We concluded a market real estate only value of $5,100,000 as of March 17, 2026 in our appraisal report dated April 20, 2026. Applying the 30.0% discount results in a liquidation value conclusion of $3,570,000, which we have rounded to $3,550,000.

Our liquidation value conclusions are summarized in the chart below:

**Liquidation Value Conclusions**

| Component | Going Concern | Real Estate Only |
|---|---|---|
| Value Type | Liquidation Value | Liquidation Value |
| Real Property Interest | Fee Simple | Fee Simple |
| Effective Date of Value | March 17, 2026 | March 17, 2026 |
| **Value Conclusions** | **$4,850,000** | **$3,550,000** |
| | **$37,308 per unit** | **$27,308 per unit** |

Market Rent
According to the Appraisal of Real Estate 15th Edition published by the Appraisal Institute, the definition of market rent is:

The most probable rent that a property should bring in a competitive and open market, reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (Tis).

The following summarizes the market rent analysis for the subject property, concluding a rent indication for the real estate only. The analysis applies the direct capitalization technique, utilizing the subject

1177 6TH STREET

property's stabilized net operating income (NOI) and concluded overall capitalization rate from our appraisal report dated April 20, 2026. Market evidence from senior housing REIT transactions and lease agreements is incorporated to support lease type, term, and escalator conclusions.

Senior Housing Market Lease Analysis

In order to support our market rent conclusions, we gathered leases to determine the appropriate lease type and term for assisted living facilities like the subject. Our findings are below:

| (Deleted graphics) | | Renewal Options | Escalator | Notes |
|---|---|---|---|---|
| LTC Properties / Senior Lifestyle (2015) | 15 years | Not disclosed | 2.6%/yr | 13 AL properties, 500 units; NNN; $5.1M initial rent |
| LTC Properties / Veritas InCare (2015) | 10 years | Not disclosed | 2.5%/yr | 7 AL properties, Texas; $1.5M initial rent |
| LTC Properties / AL & MC Acquisition (2020) | 10 years | 4 × 5-year | 2.0%/yr (yr 2+) | 156 AL/MC units; NNN; 7.4% initial cash yield |
| Omega Healthcare / CommuniCare (SEC 8-K, 2005) | 10 years | 2 × 10-year | Annual (ND) | $11.6M annualized rent; AL/SNF portfolio |
| Omega Healthcare / Multiple (SEC 8-K, 2023) | Not specified | Standard | 2.0%–2.5%/yr | Initial yields 8.0%–10.2%; consistent escalator structure |
| Welltower / NNN Portfolio (SEC 8-K, 2017) | ~20 years | Corporate guarantee | 3.0%/yr | Master lease at 7.5% initial yield; expires 2037 |
| Welltower / UK Portfolio (Oct 2025) | Not specified | Coverage reset q5 | 3.5%/yr | 152 NNN communities; rent reset at Welltower's election every 5 yrs |
| Ventas / Brookdale (Master Lease, exp. 2025) | Long-term | 2 × 10-year | 3.0%/yr | 120 communities; $113.6M/yr; renewal at greater of escalated or FMR (cap +10%/yr) |
| NHP / Emeritus (Essington AL, 2004) | ~15 years | 3 × 5-year | CPI-linked | Absolute NNN; renewal rent reset to FMR; SEC-filed |
| Assisted 4 Living (SEC Form 8-K, 2021) | ~11 years (2019–2030) | 2 × 5-year | Annual (ND) | Absolute NNN; renewal at greater of escalated or FMR (capped +10%/yr) |
| CareTrust REIT / Ensign, Eduro, WLC (SEC XBRL, 2022) | 11–12 years | 2 × 5-year | Annual (fixed) | Amended NNN master leases; AL/SNF campuses |
| Spirit Finance / Senior Care (LawInsider) | 15–20 years | 2 × 10-year | Fixed annual | Multiple senior care master leases; 15- and 20-yr initial terms documented |

Given the data above as well as the characteristics of the subject property explained in our appraisal report dated April 20, 2026, we conclude the market lease type to be absolute net (NNN), a lease term of 10 years with two 5-year options, and 2.0% annual rental escalations.

Capitalization Rate Applied

We concluded a capitalization rate of 8.0% for the going concern. In order to determine an appropriate capitalization rate for the real estate only, we considered the risk associated with adding a 10-year absolute net lease to the property and removing the business and FF&E from the property.

According to data published on December 28, 2022 by Greystone, a national commercial real estate lending and advisory firm, skilled nursing facilities provide useful data for understanding the relationship between going concern and leased-fee capitalization rates in the healthcare real estate sector. Greystone has noted that skilled nursing going concern capitalization rates are generally around 12.5%, while similar skilled nursing properties with net leases have capitalization rates of approximately 10.0%. This implies a

going concern-to-leased-fee compression of approximately 200 to 250 basis points.

While assisted living facilities carry a different operational and regulatory profile than skilled nursing, this spread is a useful benchmark when transitioning from a going concern valuation premise to a leased-fee real property valuation supported by a long-term absolute net lease. Applied to the subject's going concern capitalization rate of 8.0%, a compression of 100 to 200 basis points is reasonable, reflecting the subject's assisted living use, the executed 10-year absolute net lease with 2.0% annual escalations and two 5-year renewal options. It also reflects the inherent re-tenanting and specialty-use risks associated with the absence of business and FF&E value. This supports a leased-fee real property capitalization rate conclusion in the range of 6.0% to 7.0%.

As a result, we concluded a capitalization rate of 6.50% for the real estate only which has been utilized to determine market rent of the real estate of the subject.

The formula applied to calculate the market rent under an absolute net lease is market rent = real estate only value multiplied by the capitalization rate. Our calculation and conclusion is shown in the table below:

| Market Rent Conclusion | | | |
| --- | --- | --- | --- |
| Component | Real Estate Only | Capitalization Rate | Real Estate Only |
| Value Type | Market Value | | Market Rent |
| Effective Date of Value | March 17, 2026 | | March 17, 2026 |
| Conclusion | $5,100,000  x | 6.50%  = | $331,500 annual rent |

# Certification – David Koczirka, MAI

I certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. The undersigned has performed any services regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

9. David Koczirka has personally inspected the subject property.

10. No one provided significant real property appraisal assistance to the person signing this certification, unless otherwise noted.



11. The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13. As of the date of this report, the undersigned has completed the continuing education program for Designated Members of the Appraisal Institute.

(Del)

David Koczirka, MAI
Senior Appraiser
PA Certified General Real Estate Appraiser
Certification No.: GA004457
License Expires: June 30, 2027

# Certification – Richard F. Wolf, MAI, SRA, AI-GRS, CRE

I certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. The undersigned has performed services regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

9. Richard F. Wolf has personally inspected the subject property.

10. No one provided significant real property appraisal assistance to the person signing this certification, unless otherwise noted.

11. The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13. As of the date of this report, the undersigned has completed the continuing education program for Designated Members of the Appraisal Institute.

(Del)

Richard F. Wolf, MAI, SRA, AI-GRS, CRE
Senior Managing Director
PA Certified General Real Estate Appraiser
Certification No.: GA-001514-L
License Expires: June 30, 2027

# Addenda

Qualifications
- David Koczirka, MAI – Senior Appraiser
- Richard F. Wolf, MAI, SRA, AI-GRS, CRE – Senior Managing Director

## Qualifications of David Koczirka, MAI

Senior Appraiser
Valbridge Property Advisors | Philadelphia
*Independent Valuations for a Variable World*

### State Certifications
PA State Certified Appraiser License No. GA004457
PA Real Estate Salesperson License No. RS318425

### Education
M.B.A. – West Chester University
B.A. in Economics – Villanova University

Contact Details dkoczirka@valbridge.com
215-545-1900 (main)
484-965-9590 (direct)
Valbridge Property Advisors | Philadelphia
900 W. Valley Road, Suite 503
Wayne, PA 19087 www.valbridge.com

Membership/Affiliations:
Member: Appraisal Institute – MAI Designation Philadelphia Metro Chapter of the Appraisal Institute

Appraisal Institute & Related Courses:
Advanced Concepts and Case Studies
Advanced Market Analysis and Highest and Best Use Advanced Income Capitalization
Quantitative Analysis
General Appraiser Report Writing and Case Studies General Appraiser Income Approach (Parts 1 & 2)
General Appraiser Site Valuation and Cost Approach General Appraiser Sales Comparison Approach
General Appraiser Market Analysis and Highest and Best Use Real Estate Finance, Statistics, and Valuation Modeling Basic
Appraisal Procedures Basic



Appraisal
Principles
National
USPAP
PA State Laws and Regulations

Experience:
**Senior Appraiser**
Valbridge Property Advisors|Philadelphia (August 2019 to Present)
**Real Estate Appraiser Trainee**
Valbridge Property Advisors|Philadelphia (July 2016 to August 2019)
**PA Real Estate Salesperson**
Reaves C Lukens Jr. Co. Inc. (January 2019 to Present) BHHS Fox and Roach (September 2011 to January 2019)
**Operations Associate- Commercial Real Estate**
M&T Bank (October 2014 to July 2016)

Valuation Assignments Include:
A wide range of commercial properties including multi-family, industrial, office, retail, hotel, railroad, senior housing, residential subdivision, manufactured housing, and land valuation assignments.

## Qualifications of Richard F. Wolf, MAI, SRA, AI-GRS, CRE

Senior Managing Director

Valbridge Property Advisors | Philadelphia
*Independent Valuations for a Variable World*

### State Certifications

PA State Certified Appraiser GA-001514-L – 2/97
NJ State Certified Appraiser 42RG00206200 – 7/06
DE State Certified Appraiser X1-0000346 – 6/02
NY State Certified Appraiser 46000054261

### License

PA Real Estate Salesperson License NS-131771-A – 8/87-2025
PA Real Estate Instructor RI006507 - 3/15
PA Real Estate Brokers License RB070154 & RM426032 - 3/2025

### Education

Villanova University
B.S., Business Administration -1983

### Additional Background

Former Chairman of Skippack Township Planning Commission Former Member of Central Perkiomen Valley Regional Planning Commission
Former Member of Skippack Township Open Space Committee Former owner/operator of an equestrian facility which boards 50 horses, employs 5 instructors, servicing 1,200 students and contains a 2,000 square foot retail store.

### Contact Details

rwolf@valbridge.com 215-545-1900 (main)
215-545-1903 (direct) Valbridge Property Advisors | Philadelphia
900 W. Valley Road Suite 503
Wayne, PA 19087 www.valbridge.com

### Membership/Affiliations:

Member: Appraisal Institute - MAI Designation – Certificate No. 12292 – January 2005
SRA & AI-GRS - 2019
Chapter President – 2010
Chapter Education Chair 2011- 2017
Regional Director 2018 – 2022
Audit Member of National Board of Directors 2023-Current
Member of Counselors of Real Estate – CRE Designation – Certificate No. 12475 – November 2006

### Experience:

**Senior Managing Director**
Valbridge Property Advisors | Lukens & Wolf LLC (2013-Present)

**Principal**
Lukens & Wolf LLC (2011-2013)

**Real Estate Appraiser**
Reaves C. Lukens Company (1997-2011)
**Investment Advisor**
Vanguard Group (1992-1997)

**Real Estate Appraiser**
Donald J. Reape, MAI, SREA & Associates (1995-1997)

**Independent Contractor**
Dowling & Associates (1994-1997)
**Scope of Appraisal and Counseling Activity**
Experience in a wide range of property types including: multi-family, industrial, office, retail and land in Greater Delaware Valley. Particular concentration in mining operations and land development analysis. Also experience with nursing homes, continuing care retirement communities (CCRC), farm/equestrian facilities, apartment complexes, hotels, and industrial/R & D facilities.

## Court Testimony

Bucks County, Pennsylvania - Board of Appeals (Tax Appeals)

Bucks County, Pennsylvania — Court of Common pleas (Condemnation)

Bucks County, Pennsylvania — Divorce Proceeding (Appearance)

Camden County — District of New Jersey — Federal Court (Bankrupt...

1177 6TH STREET

te y) Camden County - New Jersey - Superior Court (Condemnation) Che

ster County Pennsylvania - Court of Common Pleas (Tax Appeals) Ches

ter County - Pennsylvania - Board of Appeals (Tax Appeals) Chester C

1177 6TH STREET

ounty, Pennsylvania – Board of Appeals (Tax Appeals) Chester Count

y, Pennsylvania – Board of View (Condemnation)

Chester County, Pennsylvania – Court of Common Pleas (Damage case)

Chester County

r Pennsylvania – Court of Common Pleas (Environmental Damages) Che

1177 6TH STREET

1177 6TH STREET

an easter County, Pennsylvania – Board of View (Condemnation) Lane

aster County, Pennsylvania – Court of Common pleas (Tax Appeal) Mon

tgomery County, Pennsylvania – Board of Appeals (Tax Appeals) Mont

© 2026 VALBRIDGE PROPERTY ADVISORS | PHILADELPHIA

gomery County, Pennsylvania - Court of Common pleas (Condemnation

) Montgomery County, Pennsylvania - Court of Common pleas (Tax Appe

als) Northampton County, Pennsylvania - Board of Appeals (Tax Appe

1177 6TH STREET

als) Northumberland County rCentral District of Pennsylvania fe

deral Court (Bankruptcy) Pennsylvania Department of Revenue - Har

risburg (Transfer Tax case) Philadelphia County rPennsylvania - B

oard of Revision of Taxes Philadelphia County, Pennsylvania -- Cou rt of Common Pleas Willistown Township - Chester County Zoning Boar d (Building Right) York County, Pennsylvania - Court of Common Plea

© 2026 VALBRIDGE PROPERTY ADVISORS | PHILADELPHIA

s
(Board of View)

Teaching / Education

Appraisal Institute 2015 Real Estate Trends Ap

fais al Institute 2016 Real Estate Trends Appraisal Institute 2017

Real Estate Trends

Counselors of Real Estate 2017 Real Estate Symposium
Pennsylvania Bar Institute August 2016 "A Lawyer's Guide to Appraisals and Appraisers"

## Partial List of Client

**PARTIAL LIST OF CLIENTS**

**BANKS AND SAVINGS & LOANS**

TD Bank
Republic Bank
First Niagara
Crusader Bank
PNC Bank
The Bryn Mawr Trust Company
The Glenmede Trust Company

**PRIVATE SECTOR**

Better Materials, Inc.
Chester County Airport Authority
Clemens Markets
Delancey Investment Corp.
Hanson Aggregates, PLC
Highway Materials
Pennsylvania Hospital
SAP America
SmithKline Beecham
Waste Management, Inc.

The PAGE 19

## EDUCATIONAL AND GOVERNMENTAL

Abington School District Archdiocese of Philadelphia

Default Group

Philadelphia Archdiocese of Camden Montgomery County r Pennsylvania p e n s

Sprague and Sprague Main Line Health Wisler Pearlstine, LLP

by tery of Philadelphia Swarthmore College

University of Pennsylvania

### Educational Background

A **PPRAISAL INSTITU**

1177 6TH STREET

TE_Courses/Seminars successfully completed: Counselors of Real

Estate_Real Estate Symposium 2017 Appraisal Institute_Real Esta

te Trends Seminar 2017 Appraisal Institute_NJ Regulations 2017 Ap

PAGE 21

1177 6TH STREET

teTrendsSeminar2015AppraisalInstitute – Supervisory/Trainee

2015 Appraisal Institute – USPAP 2014

Appraisal Institute – Review Theory – General 2014
Appraisal Institute – Fundamentals of Separating Real Property, personal Property an

dIntangible Business Assets – 2012 Appraisal Institute – Business

1177 6TH STREET

Practices and Ethics, 2010 Appraisal Institute - Consumer Prot...

...oint in the Appraisal Industry, 2010 Appraisal Institute - Real Esta...

...te Finance, Valuation and Investment Performance, 2010 Appraisal...

1177 6TH STREET

itute - Legislative, Regulatory and Judicial Update, 2009

Appraisal Institute - Delaware State Regulations, 2009

a is a I Institute - Appraising Distressed Commercial Real Estate

0 0 9 Appraisal Institute - PA State Regulations, 2009 Appraisal In s

1177 6TH STREET

titute_7HourNationalUSPAPUpdateCourse r2009AppraisalInstitut

ute_ValuationofConservationEasements r2008AppraisalInstitu

te_EvaluationgCommercialConstruction r2008AppraisalInstitut

e-Leadership Development & Advisory Council r2008 Appraisal Inst

itute-Delaware State Regulations r2007 Appraisal Institute-Lea

dership Development Advisory Council l r2007 Appraisal Institute-

1177 6TH STREET

7 Hour National USPAP Update Course - 2007 Appraisal Institute - REC

GA Conference - 2006 Appraisal Institute - Contemporary Legal & App

raisal Issues Involving Eminent Domain - 2006 Appraisal Institute

Pennsylvania Appraisal Statues, Regs, Bd, Policies, 2006 Apprai...

sal Institute – Market Analysis & Using the Site to Do Business, 2005

Appraisal Institute – The Latest Trends in Hotel Valuation and Mark

1177 6TH STREET

etStudies, 2005 Appraisal Institute – Maximizing the Value of an Ap

praisal Practice, 2005 Appraisal Institute – Attacking and Defend

ing an Appraisal in Litigation, 2005 Appraisal Institute – Subdivi

1177 6TH STREET

Appraisal Institute – Real Estate Finance, 2004

1177 6TH STREET

her 1998 Appraisal Institute - Highest and Best Use r 1997 Appraisal

Institute - Advanced Income Capitalization r 1996 Appraisal

itute - Basic Income Capitalization r 1993 Appraisal Institute - n

1177 6TH STREET

troto Appraising Real Property, 1987 Real Estate Courses taken and s

uccessfully completed Schlicher Kratz Institute – Real Estate Inve

stment, 2001 Polley Associates – Contemporary Legal Issues, 2000 P

1177 6TH STREET

Polley Associates - Using Technology, 2000

Polley Associates - Ethics (Let's Get It Right), 1996

Polley Associates - Appraisal Applications, 1995

Polley Associates - Standards of Practices & Ethics, 1994

# EXHIBIT E

## Updated Saucon Appraisal



# Appraisal Report

Saucon Valley Manor Senior Living
1050 Main Street
Hellertown, Pennsylvania 18055

Report Date: ~~April 20~~ June 12, 2026



FOR:

Mr. Abraham Atiyeh
1177 6th Street
Whitehall, PA 18052

**Valbridge Property Advisors | Philadelphia**

900 W. Valley Road, Suite 503
Wayne, PA 19087
215-545-1900 phone
215-545-8548 fax
*valbridge.com*

D-81

Valbridge File Number:
PA02-26-0050-000



900 W. Valley Road, Suite 503
Wayne, PA 19087
215-545-1900 phone
215-545-8548 fax
valbridge.com

~~April 20~~June 12, 2026


Mr. Abraham Atiyeh 1177
6th Street
Whitehall, PA 18052


RE:      Appraisal Report
          Saucon Valley Manor Senior Living
          1050 Main Street
          Hellertown, Pennsylvania 18055

Dear Mr. Atiyeh:

In accordance with your request, an appraisal of the above referenced property was performed. This appraisal report sets forth the pertinent data gathered, the techniques employed, and the reasoning leading to the value opinions. This letter of transmittal does not constitute an appraisal report and the rationale behind the value opinions reported cannot be adequately understood without the accompanying appraisal report.

The subject property, as referenced above, is located at 1050 Main Street, Hellertown, Pennsylvania and is further identified as tax parcel number Q7SW2A-1-3-0715. The subject is identified as Unit 1 on the Saucon Valley Manor Condominium Declaration Plan. The subject is a 2.70 acre site improved with a part 3 and 4 story assisted living facility containing 147,782 square feet, 169 units, and is licensed for 201 beds.

The analyses, opinions, and conclusions were developed, and this report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation; the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute; and the requirements of our client.

The client in this assignment is Mr. Abraham Atiyeh and the intended users of this report are Mr. Abraham Atiyeh and his legal counsel. The intended use is ~~for~~to provide guidance in connection with bankruptcy matters. The value opinions reported herein are subject to the definitions, assumptions, limiting conditions, and certifications contained in this report.



Mr. Abraham Atiyeh

The findings and conclusions are further contingent upon the following extraordinary assumptions and/or hypothetical conditions, the use of which might have affected the assignment results:

## Extraordinary Assumptions:

- ~~None~~This appraisal contains retrospective values. Our valuation date is December 26, 2025. We inspected the property on March 17, 2026. We assume the condition of the property as of the effective date was similar to the condition observed during our inspection.

## Hypothetical Conditions:

- None

The value conclusions are based on the analysis in the following report and presented in the following table:

**Value Conclusions**

| Component | Going Concern | Real Estate Only |
|---|---|---|
| Value Type | Market Value | Market Value |
| Real Property Interest | Fee Simple | Fee Simple |
| Effective Date of Value | ~~March 17~~December 26, ~~2026~~2025 | ~~March 17~~December 26, ~~2026~~2025 |
| **Value Conclusion** | **$8,800,000** | **$6,450,000** |
| | **$52,071 per unit** | **$38,166 per unit** |

Respectfully submitted,
Valbridge Property Advisors | Philadelphia

(Mod)

David Koczirka, MAI Senior Appraiser
PA Certified General Real Estate Appraiser
Certification No.: GA004457
License Expires: June 30, 2027

Richard F. Wolf, MAI, SRA, AI-GRS, CRE
Senior Managing Director
PA Certified General Real Estate Appraiser
Certification No.: GA-001514-L
License Expires: June 30, 2027

© 2026 VALBRIDGE PROPERTY ADVISORS | PHILADELPHIA



# Table of Contents

Cover Page

Letter of Transmittal

Table of Contents ................................................................................................................... 4

Summary of Salient Facts ...................................................................................................... 5

Aerial and Front Views .......................................................................................................... 6

Location Map .......................................................................................................................... 7

Introduction ............................................................................................................................ 8

Scope of Work ...................................................................................................................... 11

Regional and Market Area Analysis ............................................................................... ~~13~~14

City and Neighborhood Analysis ..................................................................................... ~~16~~17

Site Description .............................................................................................................. ~~19~~20

Improvements Description ............................................................................................... ~~23~~24

Subject Photographs ...................................................................................................... ~~30~~31

Assessment and Tax Data ............................................................................................... ~~38~~39

Market Analysis ............................................................................................................... 40

Highest and Best Use Analysis .................................................................................... ~~108~~109

Income Capitalization Approach .................................................................................... 110

Sales Comparison Approach .......................................................................................... 119

Reconciliation .................................................................................................................. 130

Liquidation Value and Market Rent ............................................................................... 131

General Assumptions and Limiting Conditions ............................................................ ~~131~~136

Certification – David Koczirka, MAI ............................................................................. ~~136~~141

Certification – Richard F. Wolf, MAI, SRA, AI-GRS, CRE ........................................... ~~137~~142

Addenda ...................................................................................................................... ~~138~~143

   Copy of Roof Replacement Cost Estimate .............................................................. 144

   Glossary ................................................................................................................... 147

   Qualifications of David Koczirka, MAI ...................................................................... 154

   Qualifications of Richard F. Wolf, MAI, SRA, AI-GRS, CRE ................................... 155



# Summary of Salient Facts

## Property Identification

| | |
|---|---|
| Property Name | Saucon Valley Manor Senior Living |
| Property Address | 1050 Main Street |
| | Hellertown, Northampton County, Pennsylvania 18055 |
| Latitude & Longitude | 40.583865, -75.341855 |
| Census Tract | 6931.02 |
| Tax Parcel Number | Q7SW2A-1-3-0715 |
| Property Owner | Saucon Trust |

## Site

| | |
|---|---|
| Zoning | Mixed Use (M) |
| FEMA Flood Map No. | 42095C0329E |
| Flood Zone | Zone X - Outside 100 and 500 year floodplains |
| Gross Land Area | 2.700 acres |

## Existing Improvements

| | |
|---|---|
| Property Use | Assisted Living Residences |
| Gross Building Area (GBA) | 147,782 sf |
| Number of AL Units | 101 |
| Number of MC Units | 68 |
| Total Number of Units | 169 |
| Number of Licensed Beds | 201 |
| Number of Buildings | 1 |
| Year Built | 1930 |
| Year Renovated to Current Use | 2000 |
| Condition | Average |
| Surface Parking | 35 spaces |

## Valuation Opinions

| | |
|---|---|
| Highest & Best Use - As Improved | Continued use as an assisted living facility |
| Reasonable Exposure Time | 6-12 months |
| Reasonable Marketing Time | 6-12 months |

## Value Indications

| Approach to Value | Going Concern | Real Estate Only |
|---|---|---|
| Cost | Not Developed | Not Developed |
| Sales Comparison | Not Developed | $6,350,000 |
| Income Capitalization | | |
| Direct Capitalization | $8,800,000 | $6,450,000 |

## Value Conclusions

| Component | Going Concern | Real Estate Only |
|---|---|---|
| Value Type | Market Value | Market Value |
| Real Property Interest | Fee Simple | Fee Simple |
| Effective Date of Value | ~~March 17~~December 26, ~~2026~~2025 | ~~March 17~~December 26, ~~2026~~2025 |
| **Value Conclusion** | **$8,800,000** | **$6,450,000** |
| | **$52,071 per unit** | **$38,166 per unit** |



# Aerial and Front Views

**AERIAL VIEW (LARGER CONDOMINIUM AREA)**



**FRONT VIEW**



SAUCON VALLEY MANOR SENIOR LIVING
LOCATION MAP

# Location Map





# Introduction

## Client and Intended Users of the Appraisal
The client in this assignment is Mr. Abraham Atiyeh and the intended users of this report are Mr. Abraham Atiyeh and his legal counsel.

## Intended Use of the Appraisal
The intended use of this report is to provide guidance in connection with bankruptcy matters.

## Real Estate Identification
The subject property is located at 1050 Main Street, Hellertown, Northampton County, Pennsylvania 18055. The subject property is further identified by the tax parcel number Q7SW2A-1-3-0715.

## Legal Description
The legal description was obtained from the deed and is shown below:

### DESCRIPTION OF 1050 MAIN STREET

ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 2006-5 Page 759, bounded and described as follows to wit:

BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

1.	South 86°47'33" West 266.09 feet; thence in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;
2.	North 03° 14'23" West 59.03 feet;
3.	North 86° 41'33" East 18.00 feet;
4.	North 03° 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same
5.	North 86° 48'59" East 247.48 feet to the westerly right of way line of Main Street; thence along the same
6.	South 03° 18'24" East 470.30 feet to the place of beginning.

CONTAINS:	117,610.588 Sq. Ft.	2.7000 Acres

## Use of Real Estate as of the Effective Date of Value
As of the ~~current~~retrospective date of value, the subject was an assisted living facility.

## Use of Real Estate as Reflected in this Appraisal
The ~~current~~retrospective opinions of value for the subject property reflect use as an assisted living facility.



## Ownership of the Property

According to the deed, title to the subject property is vested in Saucon Trust.

## History of the Property

Ownership of the subject property has not changed within the past three years.

## Active Listing/Offer/Contract

To the best of our knowledge, the subject property was not being marketed for sale and there were no unsolicited offers or pending contracts for sale.

## Type and Definition of Value

The appraisal problem is to develop an opinion of the market value of the subject property. Market value is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale with the buyer and seller each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- *buyer and seller are typically motivated;*

- *both parties are well informed or well advised, and acting in what they consider their own best interest;*

- *a reasonable time is allowed for exposure in the open market;*

- *payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and*

- *the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale[1]*

This assignment also includes development of Market Rent and Liquidation Value conclusions as of the same effective date.

Liquidation Value
According to the Appraisal of Real Estate 15th Edition published by the Appraisal Institute, the definition of liquidation value is:

The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a short time period.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and the seller are acting prudently and knowledgeably.
4. The seller is under extreme compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. A normal marketing effort is not possible due to the brief exposure time.

---

[1] *FIRREA Code of Federal Regulations, Title 12,  Part 34 Subpart C - 34.42, 1990; also Interagency Appraisal and Evaluation Guidelines, Federal Register / Vol.75, No. 237, 2010*

8. Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto.

9.   The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Market Rent

According to the Appraisal of Real Estate 15th Edition published by the Appraisal Institute, the definition of market rent is:

The most probable rent that a property should bring in a competitive and open market, reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (Tis).

Please refer to the Glossary in the Addenda section for additional definitions of terms used in this report.

## Valuation Scenarios, Property Rights Appraised, and Effective Dates of Value

Opinions of value for the subject property were developed under the following valuation scenarios:

| Valuation Scenario | Effective Date of Value |
|---|---|
| Retrospective Going Concern Market Value of the Fee Simple Interest | March 17, 2026 |
| December 26, 2025 Retrospective Real Estate Only Market Value of the Fee Simple Interest | March 17, 2026 |
| December 26, 2025 Retrospective Liquidation Value of the Fee Simple Interest | December 26, 2025 |
| Retrospective Market Rent | December 26, 2025 |

## Date of Report

The date of this report is April 20 June 12, 2026.

---

1 FIRREA Code of Federal Regulations, Title 12,  Part 34 Subpart C - 34.42, 1990; also Interagency Appraisal and Evaluation Guidelines, Federal Register / Vol.75, No. 237, 2010

## Assumptions and Conditions of the Appraisal

This appraisal assignment and the opinions reported herein are subject to the General Assumptions and Limiting Conditions contained in the report and the following extraordinary assumptions and/or hypothetical conditions, the use of which might have affected the assignment results.

Extraordinary Assumptions

- None This appraisal contains retrospective values. Our valuation date is December 26, 2025. We inspected the property on March 17, 2026. We assume the condition of the property as of the effective date was similar to the condition observed during our inspection.

Hypothetical Conditions

- None



# Scope of Work

The elements addressed in the Scope of Work are (1) the extent to which the subject property is identified, (2) the extent to which the subject property is inspected, (3) the type and extent of data researched, (4) the type and extent of analysis applied, (5) the type of appraisal report prepared, and
(6) the inclusion or exclusion of items of non-realty in the development of the value opinion. These items are discussed as below.

## Extent to Which the Property Was Identified

The three components of the property identification are summarized as follows:

- Legal Characteristics - The subject was legally identified via deed and assessment record.

- Economic Characteristics - The subject property economic characteristics were identified via documents provided by ownership and comparison to other properties with similar economic characteristics.

- Physical Characteristics - The subject property physical characteristics were identified via inspection.

## Extent to Which the Property Was Inspected

An appraisal inspection of the subject property was completed on March 17, 2026. The improvements were not measured during the course of the inspection.

## Type and Extent of Data Researched

The following data was researched and analyzed: (1) market area data, (2) property-specific market data, (3) zoning and land-use data, and (4) current data on comparable listings and transactions.

### Documents Considered

| Source File | Document Name / Actual Title | Document Date | Prepared By / Author |
|---|---|---|---|
| LVx-17.pdf | HealthTrust Real Estate Appraisal - Saucon Valley Manor | July 7, 2023 | HealthTrust |
| Saucon 1 Base Plan_1st Fl.pdf | Saucon Valley Manor - First Floor Base Plan | June 20, 2019 / revised July 31, 2023 | Not stated |
| Saucon 1 Base Plan_2nd Fl.pdf | Saucon Valley Manor - Second Floor Base Plan | June 20, 2019 / revised June 5, 2023 | Not stated |
| Saucon 1 Base Plan_Lower Level.pdf | Saucon Valley Manor - Lower Level / Basement Base Plan | June 20, 2019 / revised July 31, 2023 | Not stated |
| Saucon 1 Lower Level Southwest Corner _Below Prior Gym.pdf | Saucon Valley Manor - Lower Level Southwest Corner Below Prior Gym Plan | June 20, 2018 / revised July 31, 2023 | Not stated |
| Saucon 1 Third Floor Plan 2023 Secured _Wing Expansion.pdf | Saucon Valley Manor - Third Floor Plan 2023 Secured Unit A Expansion | June 7, 2023 | Not stated |
| Saucon 2024 Tax Return.pdf 2024 U.S. Income | Form 1120-S - Saucon Valley Manor, Inc. Tax Return | August 19, 2025 August 3, 2020 | Raymond P. Minich / R.P. Minich _P.C. Joel Wiener, Esq. / Wiener and _Wiener LLP |
| Saucon Condos-Amd3-2020.pdf Condominium for | Third Amendment to Declaration of Condos at Saucon Valley Manor | January 16, 2026 | Joyce |
| Saucon Trust book Depreciation 2025.pdf Number - Saucon | Depreciation Schedule by G/L Account Trust Book Basis 2025 | | |
| Saucon Trust Leases_Combined.pdf | Lease Agreement - Saucon Trust / Saucon Valley Manor Lease File | Various / 2005 onward | Not stated |
| saucon valley condo declaration.PDF | Declaration of Condominium of Saucon Valley Condominium | December 8, 2006 | Joel Wiener / Wiener and Wiener LLP |
| Saucon Valley Manor - deprec schedule.pdf | Depreciation Schedule by G/L Account Number - Saucon Valley Manor Federal Basis 2025 | January 16, 2026 | Joyce |
| Saucon valley manor Tax Return 2023.pdf | Form 1120-S - Saucon Valley Manor, Inc. 2023 U.S. Income Tax Return | July 17, 2024 | Raymond P. Minich / R.P. Minich P.C. |
| Saucon Valley Manor 1 Letter-Reroof | Saucon Valley Manor 1 Reroof Review / Rubber Roof _Replacement | March 18, 2026 | Eugene R. Gouck, AIA / Gouck |

*[Link-to-previous setting changed from off in original to on in modified.].*

SAUCON VALLEY MANOR SENIOR LIVING
SCOPE OF WORK

| | Letter | | Architects |
|---|---|---|---|
| Required.pdf | | | |
| Saucon Valley Manor 1 Reroof Cost Estimate.pdf | Saucon Valley Manor 1 Roof Removal and Replacement Cost Estimate | March 18, 2026 | Gouck Architects |
| Saucon Valley Manor 1 Reroof-Aerial Photo Highlighted Takeoff Sheet.pdf | Saucon Valley Manor 1 Reroof - Aerial Photo Highlighted Takeoff Sheet | March 18, 2026 | Gouck Architects |
| Saucon Valley Manor Book Depreciation 2025.pdf | Depreciation Schedule by G/L Account Number - Saucon Valley Manor Book Basis 2025 | January 16, 2026 | Joyce |
| Saucon valley manor tax Return_2022.pdf | Form 1120-S - Saucon Valley Manor, Inc. 2022 U.S. Income Tax Return | July 28, 2023 | Raymond P. Minich / R.P. Minich P.C. |
| Saucon Valley Manor-Operating Statements_2023-2024.xlsx | Saucon Valley Manor Inc. Operating Statements - January 2023 through December 2024 | 2023-2024 | Not stated |
| Saucon_Condos-2018AMD.pdf | Second Amendment to Declaration of Condominium for Condos at Saucon Valley Manor | January 5, 2018 | Joel Wiener, Esq. / Wiener and Wiener LLP |
| Saucon-2012-Amd_Condo-Sauc.pdf_SVM | First Amendment to Declaration of Condominium for Condos at Saucon Valley Manor | December 14, 2012 | Joel Wiener, Esq. / Wiener and Wiener LLP |
| Census 1-31-2023.xlsx | Saucon Valley Manor Census Report | January 31, 2023 | Not stated |
| SVM Census 2-28-2023.xlsx | Saucon Valley Manor Census Report | February 28, 2023 | Not stated |
| SVM Census 3-31-2023.xlsx | Saucon Valley Manor Census Report / Alpha Census | March 31, 2023 | Not stated |
| SVM Census 4-29-2023.xlsx | Saucon Valley Manor Census Report / Alpha Census | April 28, 2023 | Not stated |
| SVM Census 5-31-2023.xlsx | Saucon Valley Manor Census Report / Alpha Census | May 31, 2023 | Not stated |
| SVM Census 6-30-2023.xlsx | Saucon Valley Manor Census Report / Alpha Census | June 30, 2023 | Not stated |
| SVM Census 7-31-2023.xlsx | Saucon Valley Manor Census Report | July 31, 2023 | Not stated |
| SVM Census 8-31-2023.xlsx | Saucon Valley Manor Census Report | August 31, 2023 | Not stated |
| SVM Census 9-30.-2023_NO AL.xlsx | Saucon Valley Manor Census Report | September 30, 2023 | Not stated |
| SVM Census 10-31-2023 NO AL.xlsx | Saucon Valley Manor Census Report | October 31, 2023 | Not stated |
| SVM Census 11-30-2023 NO AL.xlsx | Saucon Valley Manor Census Report | November 30, 2023 | Not stated |
| SVM Census 12-31-2023 NO AL.xlsx | Saucon Valley Manor Census Report | December 31, 2023 | Not stated |
| SVM Census-MAR. 26-2026_Redacted.pdf | Saucon Valley Manor Census Report | March 26, 2026 | Not stated |
| SVM Rent Roll No Names_current.xlsx | Saucon Valley Manor - Main Building Rent Roll / Census | January 12, 2026 | Not stated |
| Whitehall_Saucon Manors_2023-2025_Operating Statements.xlsx | Saucon Valley Manor and Whitehall Manor - 2023-2025_Operating Statements | 2023-2025 | Not stated |
| 1050 Main Street.2 - Appraisal.pdf | Real Property Appraisal Report - Saucon Valley Manor Senior Living, Unit 1 | April 11, 2025 | Linda L. Dietrick, CCIM / Dietrick Group, LLC |
| 2021 Census_SVM.pdf | Saucon Valley Manor Census Report | 2021 | Not stated |
| Condos at Saucon Valley Manor -2020 Amd Dec Plan.pdf | Amended Condominium Declaration Plan - Condos at Saucon Valley Manor | July 28, 2020 | Jena Engineering Corp. |
| doc20260318135957.pdf | Saucon Valley Manor 2023-2025 Resident Count Summary | 2023-2025 | Not stated |
| image002.png | Logo / black image placeholder | Not stated | Not stated |
| IMG-20251118-WA0112.jpg | Manors of the Valley Senior Living Care - Saucon Valley Manor Rate Sheet | November 18, 2025 | Manors of the Valley / Saucon Valley Manor |

## Type and Extent of Analysis Applied (Valuation Methodology)

Surrounding land use trends, the condition of any improvements, demand for the subject property, and relevant legal limitations were observed in the process of concluding a highest and best use for the subject property. The subject property was then valued based on the highest and best use conclusion.

Appraisers develop an opinion of property value with specific appraisal procedures that reflect three distinct methods of data analysis: the cost approach, sales comparison approach, and income capitalization approach. One or more of these approaches are used in all ~~estimations~~estimates of value.

- Cost Approach - In the cost approach, the value indication reflects the sum of current depreciated replacement or reproduction cost, land value, and an appropriate entrepreneurial incentive or profit.

- Sales Comparison Approach - In the sales comparison approach, value is indicated by recent sales and/or listings of comparable properties in the market, with the appraiser analyzing the impact of material differences in both economic and physical elements between the subject and the comparables.

- Income Capitalization Approach - In the income capitalization approach, value is indicated by the

*[Link-to-previous setting changed from off in original to on in modified.].*

*[Link-to-previous setting changed from off in original to on in modified.]*

capitalization of anticipated future income. There are two types of capitalization: direct capitalization and yield capitalization, more commonly known as discounted cash flow (DCF) analysis.

All these approaches to value were considered. The availability of data and applicability of each approach to value within the context of the characteristics of the subject property, along with the needs and requirements of the client, were assessed. Based on this assessment, the Sales Comparison and Income Capitalization Approaches were developed. The Cost Approach was not developed because it is rarely employed for properties like the subject. The exclusion of this approach does not weaken the validity of the appraisal conclusions. The specific methods and analysis of each approach are further discussed in the respective valuation sections.

## Appraisal Conformity and Report Type

The analyses, opinions, and conclusions were developed and this report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation; the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute; and the requirements of our client. This is an Appraisal Report as defined by the Uniform Standards of Professional Appraisal Practice under Standards Rule 2-2a.

## Personal Property/FF&E

The subject property includes personal property generally identified as furniture, fixtures, and equipment (FF&E). The impact of this property component is analyzed later in this report.

*[Link-to-previous setting changed from off in original to on in modified.]*



# Regional and Market Area Analysis

**REGIONAL MAP**



## Overview

The subject is located in Hellertown, in Northampton County. It is part of the Allentown-Bethlehem-Easton MSA. The area is also referred to as the Lehigh Valley Region. This area is comprised of Carbon, Lehigh, and Northampton Counties. Furthermore, the area is also included in the New York-Newark, NY-NJ-CT-PA Combined Statistical Area (CSA) consisting of the Lehigh Valley, the Monroe County/East Stroudsburg, PA MSA, and several other metropolitan areas of New Jersey and New York.

## Transportation

Major transportation routes in the larger area ~~includes Incertitude~~include Interstate 476 (The Pennsylvania Turnpike) Interstate 78, Routes 309, 222, 100, and 145.

## Population

**Population**

| Area | Census Population (2020) | Current Population (2025) | Compound Annual Δ 2020 - 2025 | Projected Population (2030) | Compound Annual Δ 2025 - 2030 |
|---|---|---|---|---|---|
| United States | 331,449,520 | 335,707,897 | 0.26% | 343,238,675 | 0.44% |
| Pennsylvania | 13,002,700 | 13,074,028 | 0.11% | 13,138,831 | 0.10% |
| Allentown-Bethlehem-Easton, PA-NJ (MSA) | 861,889 | 880,179 | 0.42% | 890,426 | 0.23% |
| Northampton County | 312,951 | 321,589 | 0.55% | 325,099 | 0.22% |



| Hellertown Borough | 6,132 | 6,168 | 0.13% | 6,078 | -0.28% |

*Source: ESRI (ArcGIS)*

## Employment



*Employment by Industry for Northampton County  -  Source: ESRI (ArcGIS)*

## Unemployment

The following table exhibits current and past unemployment rates as obtained from the Bureau of Labor Statistics.

**Unemployment Rates**

| Area | YE 2020 | YE 2021 | YE 2022 | YE 2023 | YE 2024 | 2025[1] |
|------|---------|---------|---------|---------|---------|------|
| United States | 8.1% | 5.3% | 3.6% | 3.6% | 4.0% | 4.3% |
| Pennsylvania | 8.8% | 5.9% | 4.2% | 3.7% | 3.8% | 4.3% |
| Allentown-Bethlehem-Easton, PA-NJ (MSA) | 9.1% | 6.1% | 4.2% | 4.0% | 3.9% | 3.9% |
| Northampton County | 8.8% | 5.6% | 4.1% | 3.8% | 3.7% | 3.7% |

*Source: www.bls.gov*  *data not seasonally adjusted;*  *[1]Annual - most recent for US, others lag by 1-2 mos.)*

## Median Household Income

Total median household income for the region is presented in the following table.

**Income**

SAUCON VALLEY MANOR SENIOR LIVING

| Area | 2025 Median HH Income | 2025 Average HH Income | 2025 Per Capita Income |
|---|---|---|---|
| United States | $72,233 | $104,831 | $41,000 |
| Pennsylvania | $77,579 | $107,937 | $43,706 |
| Allentown-Bethlehem-Easton, PA-NJ (MSA) | $84,249 | $112,625 | $44,158 |
| Northampton County | $87,388 | $115,913 | $45,124 |
| Hellertown Borough | $80,050 | $95,011 | $39,666 |

*Source: ESRI (ArcGIS)*

## Conclusions

The subject's location in the Allentown-Bethlehem-Easton MSA provides a diverse demographic and a healthy economic environment, as well as providing accessibility throughout Pennsylvania and other significant economic areas throughout the Northeast and Mid-Atlantic regions. The region offers a positive environment for residents and businesses. Unemployment has declined and the continuous development and population growth throughout the MSA indicates there is interest in living and working in the Lehigh Valley. The total population in the Allentown-Bethlehem-Easton MSA has increased slightly and is projected to continue to increase slightly in the future.



# City and Neighborhood Analysis

**NEIGHBORHOOD MAP**

## Overview

The subject is located in Hellertown Borough, which is just east of the City of Allentown and south of the City of Bethlehem. Since the 1800's, Allentown was an industrial city, however a decrease in manufacturing caused many companies to shut down. The city experienced a period of decline with rising vacancy rates, increased blight, and economic instability. A more recent push towards revitalization by public and private organizations has led to the creation of government incentives that attempt to promote economic activity. The expected economic boom aims to fulfill the goal of turning the City of Allentown into an active urban core again by improving the physical characteristics and attracting new businesses and residents to the area.

The neighborhood is bounded by City of Bethlehem to the north, Lower Saucon Township to the east, Lower Saucon Township to the south, and Lower Saucon Township to the west.



SAUCON VALLEY MANOR SENIOR LIVING

## Demographics

The following table depicts the area demographics in Hellertown within a one-, three-, and five-mile radius from the subject.

### Neighborhood Demographics

| Radius (Miles) | 1 Mile | 3 Mile | 5 Mile |
|---|---|---|---|
| Trade Area (Sq. Mi.) | 3.14 | 28.27 | 78.54 |
| Trade Density (Pop/Sq. Mi.) | 2,782 | 1,492 | 1,525 |
| **Population** | | | |
| Census Population (2010) | 8,070 | 39,299 | 111,621 |
| Census Population (2020) | 8,547 | 39,681 | 114,349 |
| Current Population (2025) | 8,628 | 41,669 | 118,225 |
| Projected Population (2030) | 8,500 | 42,001 | 119,181 |
| *Compound Annual Growth* | | | |
| 2010 - 2020 | 0.6% | 0.1% | 0.2% |
| 2020 - 2025 | 0.2% | 1.0% | 0.7% |
| 2025 - 2030 | -0.3% | 0.2% | 0.2% |
| **Households** | | | |
| Census Households (2010) | 3,779 | 13,855 | 42,866 |
| Census Households (2020) | 3,783 | 14,280 | 44,354 |
| Current Households (2025) | 3,759 | 14,829 | 45,639 |
| Projected Households (2030) | 3,698 | 15,050 | 46,329 |
| *Compound Annual Growth* | | | |
| 2010 - 2020 | 0.0% | 0.3% | 0.3% |
| 2020 - 2025 | -0.1% | 0.8% | 0.6% |
| 2025 - 2030 | -0.3% | 0.3% | 0.3% |
| Average Household Size (2025) | 2.16 | 2.48 | 2.42 |

*Source: ESRI (ArcGIS)*                                    *(Lat: 40.583865, Lon: -75.341855)*

### Neighborhood Demographics (cont.)

| Radius (Miles) | 1 Mile | 3 Mile | 5 Mile |
|---|---|---|---|
| Trade Area (Sq. Mi.) | 3.14 | 28.27 | 78.54 |
| Trade Density (Pop/Sq. Mi.) | 2,782 | 1,492 | 1,525 |
| **2025 Housing Units** | | | |
| Median Home Value | $336,659 | $357,319 | $338,796 |
| Median Year Built | 1962 | 1957 | 1959 |
| Total Housing Units | 3,993 | 16,056 | 48,454 |
| Owner-Occupied Housing % | 62.8% | 51.0% | 59.2% |
| Renter-Occupied Housing % | 31.3% | 41.3% | 35.0% |
| Vacant Housing % | 5.9% | 7.6% | 5.8% |
| **2025 Employment** | | | |
| Total Establishments | 268 | 1,269 | 3,873 |
| Total Employees | 2,011 | 18,141 | 60,287 |
| Average Commute Time | n/a | n/a | n/a |
| % College Graduates | 41.7% | 34.2% | 36.3% |

SAUCON VALLEY MANOR SENIOR LIVING

**2025 Income Summary**

| | | | |
|---|---|---|---|
| Median Household Income | $81,679 | $68,459 | $77,928 |
| Average Household Income | $108,466 | $103,064 | $109,847 |
| Avg Spending/Household | $30,245 | $28,542 | $30,694 |
| Per Capita Income | $44,670 | $36,684 | $42,593 |

*Source: ESRI (ArcGIS)*                                                                                  *(Lat: 40.583865, Lon: -75.341855)*

The population is 41,669 within a three-mile radius of the subject property with a projected annual growth rate of 0.2%. There were 16,056 housing units within the three-mile radius. Most housing is owner-occupied. Property values in the area were increasing.

The median household income was $68,459 within a three-mile radius of the subject property. The median household income figures suggest residents were within the lower to middle income brackets.

## Adjacent Land Uses

| | |
|---|---|
| North: | Retail / Residential |
| South: | Retail / Residential |
| East: | Residential / Office |
| West: | Residential |

## Analysis and Conclusions

This area offers easy access to linkages, shopping, employment opportunities, nearby parks and amenities. Overall, the subject neighborhood is in the stable stage of its life cycle.



# Site Description

## Site Characteristics

| | |
|---|---|
| Gross Land Area: | 2.700 Acres |
| Shape: | Generally rectangular |
| Topography: | Gently sloping |
| Drainage: | Assumed adequate |
| Grade: | Slightly above street grade |
| Utilities: | Public water, public sewer, natural gas, and electricity |
| Interior or Corner: | Double Corner |

## Street Frontage / Access

| Frontage Road | Primary | Secondary | Tertiary |
|---|---|---|---|
| Street Name: | Main Street | E. Thomas Avenue | Sycamore Street |
| Street Type: | Two lane road with two parking lanes | Two lane road with two parking lanes | One-way one lane road with parking lane |
| Frontage (Linear Ft.): | 470.00 | 248.00 | 267.00 |

## Flood Zone Data

| | |
|---|---|
| Flood Map Panel/Number: | 42095C0329E |
| Flood Map Date: | 07-16-2014 |
| Flood Zone: | Zone X - Outside 100 and 500 year floodplains |

## Other Site Conditions

| | |
|---|---|
| Easements/Encroachments: | Typical utility easements are assumed |

## Site Ratings

| | |
|---|---|
| Access: | Good |
| Visibility: | Good |

## Zoning Designation

| | |
|---|---|
| Zoning Jurisdiction: | Hellertown Borough |
| Zoning Classification: | M, Mixed Use |
| | |
| Permitted Uses: | Uses permitted by right include retail, office, medical office, personal service, restaurant, membership club, forestry, residential single-family, residential multifamily, funeral home, commercial schools, municipal use, public utility, community center, and medical marijuana dispensaries.

Special exception uses include commercial recreation, apartments |

with stores or offices, conversion of dwelling units into apartments, convalescent or nursing home, group home, church, boardinghouse, repair shop, printing establishment, and assisted living facilities.

Conditional uses include pet grooming and veterinary care.

Zoning Comments:    The subject's current use as an assisted living facility is a legally conforming use by way of special exception.

## Analysis/Comments on Site

The subject site is adequate for a variety of permitted uses.

**CONDOMINIUM DECLARATION PLAN**



## TAX PLAT



## FLOOD MAP





**ZONING MAP**





# Improvements Description

The subject is identified as Unit 1 on the Saucon Valley Manor Condominium Declaration Plan. The subject is a 2.70 acre site improved with a part 3 and 4 story assisted living facility containing 147,782 square feet, 169 units, and is licensed for 201 beds.

## Improvement Characteristics

| | |
|---|---|
| Property Type: | Senior Housing |
| Property Subtype: | Assisted Living Residences |
| Gross Building Area (GBA): | 147,782 SF (based on County Records, Aerial Measurements) |

## Ratios & Parking

| | |
|---|---|
| Land-to-Building Ratio: | 0.80 to 1 (Land/GBA) |
| Floor Area Ratio (FAR): | 1.26 (based on GBA) |
| Parking Spaces: | 35 |
| Parking Ratio: | 0.24 (per 1,000 sf of GBA) |

## Age / Life

| | |
|---|---|
| Year Built: | 1930 |
| Renovated/Yr. Renovated: | 2000 |
| Condition: | Average |
| Actual Age: | 96 years |

## Structural Characteristics

| | |
|---|---|
| Foundation: | Reinforced concrete |
| Building Frame: | Steel and concrete |
| Exterior Walls: | Brick veneer and stucco |
| Roof Material: | Asphalt shingle and rubber membrane |

## Interior Characteristics

| | |
|---|---|
| Floors: | Hardwood, ceramic tile, and vinyl composition tile |
| Walls: | Painted drywall |
| Ceilings: | Acoustical tile and painted drywall |
| Lighting: | Fluorescent and LED lighting throughout |

## Mechanical Systems

| | |
|---|---|
| Electrical: | 3,000 amps, 480y/277v, 3 phase, 4 wire |
| Heating: | Gas and electric package units |
| Air Conditioning: | PTAC units for rooms; Package units for common areas |
| Fire Protection/Sprinklers: | Smoke detectors, fire alarm system / Wet system Number |
| of Elevators: | 4 |

## Analysis/Comments on Improvements

The subject building was originally built in 1930 as a middle school and high school and was converted into an assisted living facility in 2000 with an addition built at the northwest portion of the structure in 2010. The property has 169 units consisting of 101 personal care units and 68 memory care units. The unit mix is 26 one-bedroom units and 143 studios. The property is licensed for 201 beds. All personal care units have full private bathrooms while the memory care units have half bathrooms plus two central bathrooms. Personal care units have kitchenettes that include miniature refrigerators, dishwashers, microwaves, and ovens. Memory care units do not have stove/ranges.



BUILDING PLANS (FIRST FLOOR)

FE = FIRE EXTINGUISHER

FE = FIRE ALARM PULL STATION

LOWER LEVEL PLAN

BASEMENT PLAN



# Subject Photographs



Hallway



Lounge



Dining Area



Dining Area



Kitchen



Lounge





Unit Finishes



Unit Finishes



Unit Finishes



Unit Finishes



Unit Finishes



Unit Finishes



Unit Finishes



Unit Finishes



Unit Finishes



Unit Finishes



SAUCON VALLEY MANOR SENIOR LIVING

# Assessment and Tax Data

## Assessed Values and Property Taxes

The subject property's assessed values, assessment to value ratio, implied market value, applicable tax rates, and total tax expense are presented in the following table:

**Ad Valorem Tax Schedule**

**Tax Parcel Number: Q7SW2A-1-3-0715**

| Northampton County Year | Actual 2025 | Actual 2026 |
|---|---|---|
| **Assessed Value** | | |
| Land: | $0 | $0 |
| Improvements: | $2,000,000 | $2,000,000 |
| Total: | $2,000,000 | $2,000,000 |
| Per Square Foot: | $13.53 | $13.53 |
| **Assessment Ratio** | 18.21% | 17.01% |
| **Implied Market Value** | | |
| Land: | $0 | $0 |
| Improvements: | $10,982,976 | $11,757,790 |
| Total: | $10,982,976 | $11,757,790 |
| *% Change:* | | 7.1% |
| **Tax Rate per $1,000** | $87.505500 | $89.005500 |
| *% Change:* | | 1.7% |
| | Actual | Actual |
| **Tax Expense** | 2025 | 2026 |
| Total: | $175,011 | $178,011 |
| Per Unit: | $1,035.57 | $1,053.32 |

## Conclusions

Our opinion of value is significantly lower than the implied market value. An appeal of the assessment is recommended.



# Market Analysis

## Senior Housing Market Analysis

Below is the Senior Housing Market Outlook Report by NIC Map produced in 2025:







Senior Housing Market Outlook

# Executive Summary

## Polycrisis Resilience:

From 2020 to 2023, the senior housing industry has successfully weathered significant challenges, highlighting its resilience. These challenges included a series of pandemic-induced shocks: an occupancy and labor crisis due to COVID, followed by suppressed capital markets resulting from a rapid rise in the Federal Funds rate to battle inflation. While these difficulties put significant stress on the industry, the senior housing industry weathered these storms, a testament to its resilience and need-based value proposition.

## Recovery Indicators:

Post-COVID, supply and demand metrics recovered at a rapid pace. Entering 2024, occupancy and aggregate employment are within 1-2% of pre-COVID levels, and the capital markets show signs of life as the Fed telegraphs a coming rate-cutting cycle. Employment levels exceed pre-COVID levels, further underlining a recovery phase that is expected to continue. Within the industry, rents are rising while operating expenses and inflation are moderating, leading to expanding profit margins.

## Unprecedented Demand Growth:

Finally, explosive demand growth driven by the aging population presents a generational opportunity for industry stakeholders. Currently, growth of the population aged 80+ (the first Boomers turn 80 in 2025) significantly exceeds the growth of housing inventory. Additionally, senior housing continues to see historic absorption rates (that is, the net change in occupied units continues to rise), surpassing pre-COVID levels. In the first quarter of 2024, the absorption rate increased by 40% compared to 2023, which was a historic number in its own right.

NIC MAP

© 2025 NIC MAP®    3





## Record Absorption



**In 2023, absorption rates doubled any pre-pandemic four-quarter period, indicating robust demand.** Absorption surged to historic levels and points to both occupancy recovery and future investment potential.

Rapid occupancy recovery is underway as the pandemic recedes into the distance. Sequential occupancy growth and net absorption are both growing at historic levels. This historic demand growth is occurring even before the aging wave kicks into full gear in the coming years.

Source: NIC MAP® Data, powered by NIC MAP®, All Data from Primary and Secondary Markets.

 NIC MAP

© 2025 NIC MAP®    5



Historic Absorption Growth Continues in 1Q24, up 40% Year-Over-Year

**40%↑**

**A continuing trend of unprecedented absorption growth.**

First-quarter absorption in 2024 is up 40% year-over-year, marking the highest first-quarter reading in NIC MAP history. However, this is merely a continuation from last year, where the first quarter of 2023 also saw historic absorption growth.

Note that as a rule, first quarter absorption rates are lower than other quarters due to seasonal factors, making year-over-year comparisons more informative than quarter-over-quarter comparisons.

Source: NIC MAP® Data, powered by NIC MAP®, Primary and Secondary Markets.

 NIC MAP

© 2025 NIC MAP®    6



# 80+ Population Growth Materially Exceeds Inventory Growth

Senior Housing Returns to a Favorable Balance between Resident Growth and Inventory Growth.

Senior housing fundamentals largely depend on the relationship between the 80+ population and the supply of senior housing stock. For most of the past decade, supply growth (senior housing inventory) exceeded demand growth (80+ population), leading to gradually declining occupancy rates.

However, beginning in 2022, this relationship inverted, with the 80+ population exceeding inventory growth. By 2023, 80+ population growth began to materially outpace supply. As a result, there is a growing gap between supply and demand growth, which will continue over the coming years unless senior housing development rapidly increases. In the meantime, the growing gap will likely materially lift senior housing occupancies, as inventory growth lags well behind demand growth.



Senior Housing Inventory Growth vs. 80+ Population Growth

Source: NIC MAP® Data, powered by NIC MAP®, Primary and Secondary Markets; OECD.

 NIC MAP

© 2025 NIC MAP®    7

© 2026 VALBRIDGE PROPERTY ADVISORS | PHILADELPHIA



## Customer Adoption Levels Return to Pre-Pandemic Highs

### 80+ Penetration Rates Recover and Data Shows Aging Growth Now Driving Absorption

The 80+ occupied unit penetration rate is calculated by dividing the number of occupied senior housing units by the 80+ population. The 80+ occupied unit penetration rate provides a clear indicator of changes in overall senior housing product adoption, adjusting for changes in both population and inventory. Across the 2010s, the penetration rate slowly increased, reaching an all-time high on the eve of the pandemic.

Driven by COVID admissions bans and the lack of an effective vaccine, the penetration rate shed six years' worth of gains in one year, bottoming out in 1Q21. With the introduction of the vaccines and a lifting of admissions bans, the penetration rate returned to its all-time high by late 2022, suggesting a full recovery from the COVID shock.

As the penetration rate has recovered from its COVID decline, the data suggests that the historic absorption seen in 2023 and 1Q24 is driven by the surging growth of the 80+ population, and not merely a continuation of the COVID recovery.



80+ Occupied Unit Penetration Rate: Total Occupied Senior Housing Units / 80+ Population

Source: NIC MAP® Data, powered by NIC MAP®, All (2010-2014) and Primary and Secondary Markets (2015 forward); Census Bureau.

 NIC MAP

© 2025 NIC MAP®    8

## Rent Growth Remains Strong as Wage Growth and Inflation Moderate

### Rent and Occupancy Growth Drive Senior Housing Margin Expansion



In the decade prior to the pandemic, senior housing rent growth largely tracked the weighted average of wage growth and non-wage expense growth. During the pandemic, occupancy fell while wages and inflation soared. To recover and compensate, operators limited rent increases below expense growth, compressing margins while the industry worked to regain occupancy.

However, as inflation trends downward, rents are beginning to exceed expense growth, combining with improving occupancy to rebuild the industry's margin profile. This trend appears set to continue for the foreseeable future, as demand growth will continue to significantly outstrip supply growth.

As a result, senior housing margins are likely to continue to expand.

Source: NIC MAP® Data, powered by NIC MAP®; BLS; Inflation via FRED.

 NIC MAP

© 2025 NIC MAP®    9

## Staffing and Occupancy Recovery

**Staffing and Occupancy Recover to Near Pre-Pandemic Levels as Labor Markets Normalize**

Robust labor availability is a key driver of operational performance, service quality, and affordability. The COVID pandemic caused senior housing occupancy to decline while simultaneously reducing the pool of available workers. This led to significant upward pressure on wages and required the use of expensive agency staffing. Recently, both staffing levels and overall occupancy recovered to near pre-pandemic levels as labor markets have normalized. In fact, today, aggregate industry staffing is 5% above pre-pandemic levels. This employment rebound alleviated upward pressure on wages and significantly reduced the use of agency staffing, again improving the industry's overall margin profile.



Sources: NIC MAP® Data, powered by NIC MAP®, All Markets; BLS.

Improved staffing levels enhance operational efficiency and service quality overall for residents. As the next generation enters senior housing, there is an increased focus on service quality as a key factor in decision criteria.

 NIC MAP

© 2025 NIC MAP®    10

## Public Operating Portfolios Show Declining OpEx PPD, Expanding Margins

Senior Housing REIT RIDEA Portfolios Show Slowing OpEx Growth, Accelerating Margin Expansion

Public REIT operating portfolios provide real-time, diversified insight into changing operating expense and margin profile trends. Recent filings by the industry's major operating portfolios show moderating expense growth and margin expansion, as the combination of growing occupancy and favorable rent/expense growth trends drives margins upward.



Public portfolios provide diversified, timely insight into industry trends.

 NIC MAP

© 2025 NIC MAP® 11



## Margins Expanding Across Stabilized Portfolios



**Expanding margins are the clearest sign of strong fundamentals in the senior housing industry. The permanent financing market is showing strong margin growth.**

Financial filings by agency-financed senior housing properties provide a window into EBITDAR margin trends across the country. While soaring wage growth led to increased operating expenses and declining margins through 2021 and 2022, in 2023 that trend reversed, with margins expanding and operating expenses declining across the board. This margin expansion is likely to continue as demand growth outstrips supply growth for the foreseeable future.



Analysis of Agency Financed SH Properties

Source: Preliminary Analysis of Agency Financed Properties Completed by NIC MAP®

 NIC MAP

© 2025 NIC MAP®    12



## Supply Growth Slowing While Absorption Surges

Senior Housing Construction Starts Fall to Near NIC MAP Historical Lows



Senior Housing Construction Starts (as % of Inventory)

Source: NIC MAP® Data, powered by NIC MAP®, Primary and Secondary Markets.

Despite historic absorption and occupancy growth and exploding near-term demand growth, high interest rates and limited capital availability are driving senior housing construction starts to near all-time lows. In fact, senior housing construction starts are nearing lows not seen since the depths of the Great Recession in 2008.

### What does this mean?

With multi-year pre-development and construction timelines, the current level of construction starts means that supply growth will likely remain depressed for years to come. At the same time, the growth of the senior housing consumer base will grow dramatically as the first of the boomers turn 80 in 2025. As a result, the sector will see significant supply and demand imbalances and a favorable environment for both new development and for existing owners of senior housing properties.

 NIC MAP

© 2025 NIC MAP®    13

## Senior Housing Demand Growth Is Durable and Long Lasting

### 80+ Population Undertakes Historically Unparalleled Expansion Over Next 25 Years

**Demographics show promise for substantial future growth.**

The aging of the Baby Boomer generation is an unprecedented demographic megatrend. In the history of the US, the aging population has never grown so fast or so large. The explosive growth of the 80+ population will require the senior housing industry to rapidly expand for decades to come.

The 80+ population is projected to grow significantly over the next 25 years, which will drive corresponding growth in the senior housing sector. This rising tide provides a fertile environment for investment activity. Near term prospects are very positive as limited supply, limited pace of supply growth, and the spike of 80+ consumers place significant upward pressure on industry occupancy.



80+ Demographic Growth Rates | Census Bureau Projections 2025 - 2050

 NIC MAP

© 2025 NIC MAP®    14

---

## Public Markets Have Recognized the Opportunity

### Risk Free Rate Doubled, Yet Basket of Direct NOI-Exposure SH Public Equities Exceed 2019 Valuations

The performance of senior housing public equities is a direct barometer of investor confidence in the senior housing sector. Public market valuations of senior housing equities exceed pre-2019 levels despite higher risk-free rates. The performance of senior housing public equities is a direct barometer of investor confidence in the senior housing sector. In addition, current REIT dividend yields are well below the 10Y UST, suggesting that investors see opportunities for significant capital appreciation in the near future.



Source: Microsoft Stock Price Data; Quarterly Filings (Share Count), FRED (EFFR).



The performance of senior housing public equities reflects investor confidence in the senior housing sector and could attract more capital to the sector.

 NIC MAP

© 2025 NIC MAP® 15

---



Surging Fundamentals

Senior Housing Market Outlook

## Pending Growth Surge in Senior Housing

In 2023, senior housing saw absorption growth twice that of any non-pandemic period in NIC MAP history.

Simultaneously, the excess supply growth trend of the past decade reversed, falling well below surging demand growth of 80+ consumers.

Burgeoning demand, depressed supply growth, increasing rent growth, and declining expense growth are driving surging fundamentals as the aging wave begins to break.

The senior housing sector is seeing historic absorption growth, as the first ripples of the aging wave wash ashore. This unprecedented demand expansion, combined with flattening supply growth, will drive occupancy growth at the same time that the post-pandemic normalization of the labor market drives favorable rent/expense growth dynamics. Collectively, these forces should drive material improvements in industry financial health indicators, right as the aging wave begins to break in earnest.

NIC MAP

© 2025 NIC MAP®    16





Investment Activity

## Rate Hikes Triggered a Banking Crisis of Underappreciated Proportions

Bank Failures in 2023, in Terms of Total Assets, Exceed Those in 2008

Recent bank failures in 2023 exceeded those in 2008 in terms of total assets, impacting commercial real estate lending.





**U.S. bank failures in each year, adjusted for inflation**

$94 billion
24 other banks

$432 billion →
Washington
Mutual Bank

$110 billion →
**Signature Bank**

$209 billion →
**Silicon Valley Bank**

$213 billion →
**First Republic Bank**

Source: New York Times

NIC MAP

© 2025 NIC MAP®    18


Investment Activity

## Bank Failures Led to a Pull Back in Commercial Real Estate Lending

CRE Lending Pulled Back Significantly Due to Banking Conditions and Office Sector Challenges



Banking Conditions Survey – CRE Loan Volume

Bank failures led to a significant pullback in commercial real estate lending, including to the senior housing industry.

**However**, debt markets, though depressed, continue to function. Agency lending continued, and as of June 2024, nearly a quarter of banks report increases in their commercial real estate lending volumes.

Index Calculation: Subtract the percentage reporting a decrease from the percentage reporting an increase banking outlook and their evaluation of general business activity. Positive Index (>0): More respondents report an increase than a decrease. This suggests the indicator has increased since the last period. Negative Index (<0): More respondents report a decrease than an increase. This indicates the indicator has decreased since the last period.

Source: Federal Reserve Bank of Dallas; Banking Conditions Survey.

 NIC MAP

© 2025 NIC MAP®    19



## Credit Tightening Slowed Senior Housing Transaction and Construction

Transaction Volume Down 40%+ in 2022 and 2023;
Construction Activity Slips to 0.2% of Inventory

Credit tightening led to a significant reduction in senior housing transaction volume and caused a marked deceleration in construction activity.

Because of the pullback in the banking sector, capital sourcing and capital stack construction requires a more robust and thoughtful approach. For those who can accomplish this, deals are still getting done.





Source: NIC MAP® Data, powered by NIC MAP®. Transactions are National; Starts are Primary and Secondary Markets.



© 2025 NIC MAP®    20







Investment Activity

# Senior Housing Faces Growing Debt Maturities

## Despite Surging Fundamentals, Senior Housing Needs Increasing Debt and Equity Capital in the Near Term

The senior housing sector faces growing debt maturities in the near term, creating a pressing need for greater access to both debt and equity capital. These maturities, combined with the dislocated capital markets and surging fundamentals, create material opportunities for investors ready to deploy capital.



Senior Housing & Care Loan Maturities

Source: Cushman & Wakefield, October 2023.



 NIC MAP

© 2025 NIC MAP®    22

---





# The 21st Century's Great Economic Shocks Affirm the Durability of Demand

Senior Housing's GFC Performance and Rapid Return to Pre-COVID Penetration Highlight Need-Based Dynamics



The sector's performance during the major economic shocks of the 21st century demonstrates the durability of demand for senior housing. The sector outperformed during the Great Recession, despite a crippled housing market, the primary source of funds for senior housing residents. A decade later, the industry persevered through a global health pandemic. Despite the uniquely adverse impacts on the senior housing sector, the industry rapidly returned to pre-COVID penetration rates soon after the introduction of effective vaccines and the lifting of admissions bans. The performance of senior housing through adversity underscores the inelasticity of demand and highlights the extent to which the coming aging wave will continue to drive the fundamentals of senior housing growth.





"Indeed, during the Great Recession, returns for seniors housing, as measured by NCREIF, were less volatile and suffered an outright decline of 6.7 percent over the course of only two quarters versus returns on apartments, which declined 24 percent over the course of seven quarters." — Beth Burnham Mace, "Seniors Housing Stacks Up", CIRE Magazine.

"80+ Occupied Unit Penetration Rate" is Occupied Senior Housing Units / 80+ Population in NIC MAP Primary & Secondary Markets.
Source: NIC MAP® Data, powered by NIC MAP®; Census Bureau; NIC, NCREIF.

 NIC MAP

© 2025 NIC MAP®    24



## May Need Historic Near-Term Inventory Growth to Keep Pace with Demand

Must Develop at Nearly 2x the Maximum Pace and More Than 3.5x Current Pace For 90% Occupancy in 2030



The aging wave will begin to break in earnest in the back half of the 2020s. To keep pace, the industry will need historic near-term inventory growth. However, inventory growth is currently at near record lows. In fact, at current penetration rates, the industry will need to develop at nearly double its historical maximum development pace just to maintain 90% occupancy by 2030. At the current development pace, a significant supply gap will emerge by the end of the decade.

Source: NIC MAP® Data, powered by NIC MAP®; Census Bureau.

 NIC MAP

© 2025 NIC MAP®    25



## Senior Housing Development Falling Behind 80+ Growth

Senior Housing Industry's Current Development Pace Could Yield ~$275B Gap by 2030





At current penetration rates, projections suggest that the industry could return to 90% occupancy as soon as 2026, and occupancy will continue to expand after that. In fact, without further investments in development, the current development pace will result in a $275 billion supply gap by 2030.

**Surging demand and suppressed supply growth are creating favorable conditions for both acquisition and new development.**

 NIC MAP

© 2025 NIC MAP®    26



## Industry Could Return to Stabilized Occupancy (90%+) by 2026

Under Capacity in 2028, Based on 80+ Penetration Occupancy and Today's Development Rate





Source: NIC MAP® Data, powered by NIC MAP®; Census Bureau.

NIC MAP                                      © 2025 NIC MAP®    27

## Can Senior Housing Occupancy Catch Multifamily and Industrial?

Based on 4Q2023 80+ Growth, Occupied Penetration, and Development, the Answer May Be Yes



**Senior housing occupancy could potentially match that of multifamily and industrial sectors.**
Based on the combination of the current penetration rate, projected 80+ population growth, and current development rates, projections show tremendous upside for senior housing occupancy. For this reason, senior housing routinely ranks as an asset class with top-tier return prospects across the commercial real estate vertical.

Source: NIC MAP® Data, powered by NIC MAP®; Census Bureau, Apartments.com, NAREIT.



 NIC MAP

© 2025 NIC MAP®    28



## Rapidly Aging Existing Stock Will Drive Incremental Inventory Needs

### Functional Obsolesce Will Reduce the Effective Existing Inventory in the Coming Years

Nearly half of current senior housing stock opened before the year 2000. In the nearly twenty-five years since, senior housing customer preferences, profiles, and operating costs have changed substantially. Consequently, the rapidly aging existing stock will drive functional obsolescence and reduce effective inventory, further increasing demand for new supply. This will put even more pressure on the industry to expand to meet the demands of a rapidly aging population.



Senior Housing Distribution by Age of Units | All Markets | 1Q2020 and 4Q2023

Source: NIC MAP® Data, powered by NIC MAP®.

 NIC MAP

© 2025 NIC MAP®    29



## What Could Drive Penetration Rate Expansion?

Growing Customer Base Is Materially Wealthier than Generations Before



75⁺

Affordability is a key question governing the senior housing industry's ability to effectively meet the needs of a rapidly aging population. Fortunately, a look at the overall financial health of 65+ and 75+ households suggests that affordability will increase, rather than decrease, in the coming years.

Median senior household net worth and income have increased at rates far greater than senior housing rents over the past decade, suggesting that affordability is expanding. This could further increase penetration rates.

*SH Annual Rent based on Primary and Secondary Markets, except for 2004, which is based on Q1 2005 Primary Markets.

Source: Growing Wealth of Older Americans (Survey of Consumer Finances); NIC MAP® Data, powered by NIC MAP®.

 NIC MAP

© 2025 NIC MAP®    30



## Affordability at All Time High?

Ratio Between Median Senior Household Purchasing
Power and Senior Housing Rents Increasing

Residents typically pay for senior housing by first using monthly income, such as Social Security or pensions, and then cover any shortfall by spending down their net worth – often from the sale of their former home. Thus, a useful indicator of affordability is to look at the number of years of senior housing that net worth can afford after subtracting monthly income from the monthly senior housing rent.

Using that measure, the ratio between household purchasing power and senior housing rents is at an all-time high. The delta between these two factors further suggests that the next generation will enjoy greater affordability than the preceding generations, which could expand penetration rates.



*Income Adjusted Spend Down Years = Median Net Worth / (Median Income – CPI Adjusted SH Annual Rent). Directional Indicator of Years *Net* Worth Can Fund The Difference Between SH Rent & HH Income.

Source: Claritas; NIC MAP® Data, powered by NIC MAP®. Rents based on Primary and Secondary Market Aggregate, CPI-U via FRED.

 NIC MAP

© 2025 NIC MAP®    31

## The Wealthiest Cohorts of 75+ Households Are Set to Grow the Fastest

Private Pay SH's Typical Resident Cohorts ($35k+ and $50k+) Growing at 1.4x and 1.6× 75+ Growth Rate



Source: Claritas; NIC MAP® Data, powered by NIC MAP®.

In addition, the wealthiest cohorts of 75+ households are projected to grow significantly faster than the overall 75+ population. The private pay senior housing industry typically defines prospective residents as having incomes above $35k or $50k per year. We see that 75+ cohorts with incomes of $35k+ and $50k+ are growing at 1.4x and 1.6x the rate of the overall 75+ population, respectively. The rapid growth of high-income households supports the further expansion of the private pay senior housing market.

 NIC MAP

© 2025 NIC MAP®    32



## An Awe-Inspiring Challenge Faces the Senior Housing Industry

Industry May Need to Deliver 1.9x More Units Per Year Than Historical Maximum for Next 20 Years

The aging wave presents the senior housing industry with a challenge of historic proportions: develop at an unprecedented pace to meet unprecedented demand. To grow supply to levels needed to maintain 90% occupancy at current penetration rates, the industry needs to develop at nearly twice its maximum historical development pace each year for the next two decades.

The challenge is made more pronounced by the currently depressed pace of development, which is at roughly one quarter of the pace needed just to maintain current penetration rates. Addressing this issue requires historic investment across all segments of the industry and create unique and unprecedented investment opportunities.





Source: NIC MAP® Data, powered by NIC MAP®; Census Bureau.


NIC MAP

© 2025 NIC MAP®    33



## Huge Investment Gap in New Inventory to Maintain 90% Occupancy

Cumulative Development Cost at $500k/Unit at More Than $1 Trillion by 2041





At current 80+ penetration rates, the senior housing industry needs to develop more than $1 trillion in new inventory by the early 2040s. The current development pace is on track to yield a supply gap of approximately $800 billion. The significant investment gap in new inventory highlights the pressing need for an all-of-industry effort to meet the future housing needs of the aging population. Meeting this investment gap requires a substantial increase in the capital allocated to the sector and creates a generational investment opportunity along the way.

Source: NIC MAP® Data, powered by NIC MAP®; Census Bureau.

 NIC MAP

© 2025 NIC MAP®    34







Copyright © 2025 NIC MAP®. All rights reserved. Data believed to be accurate but not guaranteed; subject to future revision. Distribution of this report or any part of this report without prior written consent or license by NIC MAP is prohibited. For license information please contact NIC MAP at (844) 668-3282. www.nicmapvision.com

Below is the Market Trends & Investor Survey – Senior Living & Care by Cushman and Wakefield produced in the first half of 2025:







IN THIS
REPORT

01
Market Highlights

02
Property Markets Fundamentals

03
Capital Markets Fundamentals

04
Valuation Index

05
Investor Survey Results





Photo provided by Thrive Senior Living

# 01
# SENIOR LIVING & CARE MARKET HIGHLIGHTS

## MARKET HIGHLIGHTS

- U.S. senior living property market fundamentals continue to strengthen. Stabilized occupancy trended upward for the seventeenth consecutive quarter, surpassing 89% overall, with secondary markets reaching 90% occupancy, a level not obtained since 2017.

- The number of occupied units reached a new all-time-high in Q1 2025 with net absorption outpacing supply growth by 2.5 to 1, as inventory growth remains near historic lows.

- Annual rent growth, though tapered from prior quarters, has remained intact, averaging 3.9% in Q1 2025, a dip that is likely seasonal as the sector emerges from winter months. This outsized occupancy and rent growth has helped counterbalance short-term turbulence in the broader capital markets.

- Secular tailwinds are stronger than ever. To meet market demand at peak levels, supply growth must increase by 35,000 to 45,000 units per year, beginning today. For context, the highest number of units delivered in a year was 34,000 with less than 10,000 units delivered over the trailing 12-month period, with construction starts dipping to a new low.

- Affordability remains broadly unsolved, though new design trends are emerging. With the number of middle-income seniors projected to double by 2029, over half of this segment will not have adequate finances to afford conventional senior living and care.

- Active Adult communities continues to gain momentum in the market, achieving favorable rent growth indications that are consistent with conventional senior living, with operating expenses and debt underwriting that is more consistent with conventional multifamily.

- Valuations remain highly stratified and dependent on specific market segments. While active adult capitalization rates nearly mirror conventional multifamily, stand-alone independent living is trading at year 1 capitalization rates in the low 6's. Senior living communities that contain independent, assisted and memory care have a low water mark (cap rate) of approximately 6-6.5% with averages about 50-75bps higher. Assisted living with memory care are achieving a low water mark in the mid to high 6's and averages are falling in the 7.0-8.0% range.

- Of the 75+ senior living & care professionals who participated in Cushman & Wakefield's investor survey, 53% of participants expect capitalization rates to have peaked and to remain level through the remainder of the year. Conversely, 33% of respondents expect to see a decrease in capitalization rates in H2 2025.

- Interest rate levels remain the top concern as it relates to market valuations. Concerns over debt market liquidity subsides as more lenders return to the market. The most significant change from H1 2024 is the increased concerns over labor shortages and inflationary costs, as the industry aims to expand.

- In 2023, the amount of troubled loans reached the highest levels since the great financial crisis. Since that time, lenders have worked to resolve an estimated $65.8 billion in senior living debt.

- The percentage of distressed sales was reported at 2.77% of total transaction volume YTD in 2025, falling well below market expectations targeting distressed opportunities, resulting in a shift back to core and core-plus strategies, as noted by a combined 49% of survey participants.

- Basis point spreads between the going-in capitalization rate and terminal or exit capitalization rate have widened signaling that market participants are underwriting "higher-for-longer" as it relates to interest rates.





## 02
# PROPERTY MARKETS FUNDAMENTALS





# PROPERTY MARKETS

Property markets are performing stronger than ever





- U.S. senior living property market fundamentals continue to strengthen. Stabilized occupancy trended upward for the seventeenth consecutive quarter, surpassing 89% overall, with secondary markets reaching 90% occupancy, a level not obtained since 2017.

- The number of occupied units reached a new all-time-high in Q2025 with net absorption outpacing supply growth by 2.5 to 1, as inventory growth remains near historic lows.

- Annual rent growth, thought tapered from prior quarters, has remained intact, averaging 3.9% in Q2025, a dip that is likely seasonal as the sector emerges from winter months.

- Active adult rental properties, an emerging segment and hybrid between multifamily and traditional senior living, reached an average occupancy of 95.6% occupancy, with rental growth surpassing 5% in Q2025.

- The slowing residential housing market does raise some concern for the more lifestyle focused properties and should be monitored accordingly.

Source: Cushman & Wakefield, NICMAP, Q2025



# PROPERTY MARKETS

Construction starts reach a new all-time low





Source: Cushman & Wakefield, NICMAP, Q2025

- Cushman & Wakefield expects continued improvement in stabilized occupancy levels and rent growth as net demand from the aging U.S. population continues to mount and construction starts dip to a new all-time low.

- After turning positive in Q2 2021, net absorption surged to all time highs in primary and secondary markets. While net absorption did taper in Q2025, the YoY increase from Q2024 is nearly 22%, indicating the lag is seasonal.

- Stabilized occupancy trended upward at the fastest rate recorded for IL, AL and MC with the number of occupied units reaching a new all-time high in Q2025.

- Conversely, construction starts have subsided to levels not experienced since the Great Financial Crisis. This reduction in projected supply growth, coupled with the increase in consumer demand, will be critical in the sectors ability to offset the increased operating expenses caused by labor shortages and rising insurance premiums plaguing the sector.



# PROPERTY MARKETS



Submarket trends continue to strengthen as new supply is absorbed



■ Annual Rent Growth (%)  ■ Construction vs. Inventory (%)  ● Occupancy  ─ Stabilized Occupancy

- The Northeast region remains the strongest performer with stabilized occupancy nearing 91% and annual rent growth nearing 3.5%. While the Mid-Atlantic region is also achieving favorable occupancy and rent growth, construction levels remain elevated as a percentage of supply.

- Markets with high occupancy and low construction vs. inventory will experience the greatest rent growth and include Boston, Baltimore, Tampa, Portland and Phoenix. Some Midwest markets including Chicago, Minneapolis and Cleveland are also poised for favorable occupancy and rent growth.

- Markets such as San Jose, Washington DC, Denver, NYC and Atlanta all have significant construction relative to supply and will likely experience some downward pressure as this supply comes online, notwithstanding migration trends.

Source: Cushman & Wakefield, NCMAP, Q2025



# PROPERTY MARKETS

Labor shortages & construction costs remain elevated



Total U.S. Construction Employment (Millions)



Price Index, Construction Materials

- Construction employment has only recently surpassed pre-GFC levels of employment, hence little reduction in this cost component is expected.

- Reduced immigration could add upward pressure to labor costs if the labor market remains resilient. Further, as workers age out of the workforce, the shortage of construction workers is likely to persist.

- Cost pressures began to ease in 2024 and remained relatively level in Q2025, still well above pre-pandemic levels.

- The recent tariffs are expected to drive up construction material costs by an estimated 5-7% in 2025, according to Cushman & Wakefield Insights.

- These dynamics will slow new development, benefiting existing assets as the supply pipeline continues to contract.

Source: U.S. Bureau of Labor Statistics; Cushman & Wakefield



# PROPERTY MARKETS



Senior living long-term demand outlook points to massive shortage in supply



- After weathering a period oversupply, secular tailwinds are stronger than ever. To meet market demand at peak levels, supply growth must increase by 35,000 to 45,000 units per year, beginning today. For context, the highest number of units delivered in a year was 34,000 with less than 10,000 units delivered over the trailing 12-month period.

- According to NIC, an additional 2.2 million adults age 65+ will enter the rental market over the next decade, offering a prime opportunity for Active Adult properties, a sub-segment within senior living that offers significant opportunity to fill the demand gap and, potentially, affordability challenges faced by the more traditional senior living and care operating model.

- Affordability remains broadly unsolved, though new design trends are emerging. With the number of middle-income seniors projected to double by 2029, over half of this segment will not have adequate finances to afford conventional senior living and care.

Source: Cushman & Wakefield







03
# CAPITAL MARKETS FUNDAMENTALS



# CAPITAL MARKETS
## Quarterly transaction volume (millions)





Source: NIC MAP, Q2 2025; Cushman & Wakefield

- Senior living transaction volume reached the highest post-pandemic levels in the second half of 2024, marking a year-over-year increase of nearly 70%, as dry powder emerged from the sideline and debt liquidity cautiously returned to the sector.

- While the Federal Reserve did move to cut the Federal Funds rate in September 2024, the reduction was above market expectations. As of April 23, markets are now favoring three cuts despite market-based measures indicating that tariffs will be inflationary in the immediate term, resulting in continued market uncertainty.

- With NCREIF ODCE funds reporting an increase in fund allocations to alternative real estate sectors and debt markets becoming more liquid, positive investment activity, with notable entity level portfolios already taking place.

- Nursing care transaction volume also posted year-over-year increase, though slightly more modest at 27%, a positive sign for valuations. Regulatory uncertainty and ongoing staffing concerns will likely keep transaction volume at more moderate levels though the second half of 2025.



## CAPITAL MARKETS

Price per unit valuation trends (thousands)





- According to the National Investment Center for the Seniors Housing and Care Industry (NIC), the average transaction price per unit increased by 46% year-over-year in the first quarter of 2025, another sign that valuations are beginning to turn.

- This increase in average price per unit highlights investors shift back to core investment strategies, as buyer vs. seller expectations of well operated properties realign.

- Senior living pricing, however, remains below peak levels, with a significant spread from multifamily pricing (a leading indicator), suggesting valuations should continue to tick upwards.

- Cushman & Wakefield is once again conducting valuations with per unit indications surpassing $750,000 per unit, along with notable portfolio transactions.

- Skilled nursing pricing increased by 18% YoY after dipping to a six-year low, as volatility and uncertainty tapers investment activity.

Source: NICMAP, Q2025; Real Capital Analytics; Cushman & Wakefield



## CAPITAL MARKETS

Capitalization rates vs. 10-year treasury (basis points)



Source: Real Capital Analytics; Cushman & Wakefield



- Over the past 10 years, the senior living sector has averaged 426 bps spread between the 10Y and capitalization rates, with apartments averaging 288 bps—a 138 bp difference. The current spread at 250 bps, the widest spread between multifamily and senior living pricing in over a decade.

- Interest rates remain volatile, with the 10-year Treasury fluctuating significantly. Despite daily moments, our base case is that the 10-year Treasury yield will generally hover in the 4-4.5% range, consistent with long-run equilibrium.

- While credit and risk spreads may widen in the short term due to uncertainty, the fundamentals for a gradual recovery in debt and capital markets remain strong. Risk-off attitudes will drive demand for assets with stable income, with such deals continuing to draw selective interest from opportunistic investors as the recovery progresses which will help bring capitalization rate spreads closer to the strike zone.

- With spreads for senior living pricing returning to historical norms, more capital is expected to return from the sidelines in a meaningful way.



## CAPITAL MARKETS

Evolving investor landscape & investment strategies

### Buyer Composition



- Private capital investors stepped in as the primary buyer for senior living properties in 2023 and 2024, representing 50% to 60% of investment, mostly seeking opportunistic investment strategies.

- REITs returned to the market in the second half of 2024 a trend that continued into 2025, despite the public market volatility. Institutional investment activity remains below historical levels, sitting on dry powder, for more certain market conditions.

### Capital Flows (Millions)



- CRE fund flows may fluctuate as portfolios adjust to the near-term denominator effect. However, in the long term, CRE's diversification and inflation-hedging benefits will sustain capital flows and maintain its role in institutional and private portfolios.

- Investors are expected to focus more on resiliency and key drivers of income growth over time, a viewpoint that favors the senior living sector.

Source: RCA; Cushman & Wakefield



# CAPITAL MARKETS

Senior living debt maturities remain a focal point (billions)





Source: Real Capital Analytics; Cushman & Wakefield

- Senior living loan maturities, set to exceed $18 billion within the next 24 months, with $8.3 billion in senior living loans set to mature this year and projected to peak in 2027 after accounting for term extensions.

- These loan maturities have been identified by investors as an opportunistic opportunity to acquire newer and well-located properties as significant discounts to replacement cost, with funds raised in accordance.

- Favorable property market fundamentals and positive operating trends have helped to mitigate the level of loan defaults with lenders opting to work with their borrowers vs. default proceedings.

- With a significant amount of loan maturities still ahead, concern of additional valuation decreases due to debt market distress does still exist, yet investors are broadly pivoting back to more core investment strategies as this concern continues to subside, and valuations tick upward.

- Markets with the highest levels of loan maturities scheduled within the forward-looking three-year period include Seattle, Phoenix, Atlanta, Dallas and Chicago.



## CAPITAL MARKETS

Troubled loans remain below prior recessionary levels (billions)





- In 2023, the amount of troubled loans reached the highest levels since the great financial crisis. Since that time, lenders have worked to resolve an estimated $65.8 billion in senior living debt.

- The percentage of distressed sales has elevated from a 0.57% low in 2020 to 2.77% of total transaction volume YTD in 2025. However, this amount remains well below the 39% peak that was reached during the GFC (2009).

- The total dollar amount of troubled loans remain below prior recessionary levels as lenders work with borrowers of well performing properties to resolve outstanding issues, primarily driven by improving property market fundamentals.

- Despite the wave of loan maturities, debt liquidity is returning to the market, with Q2025 trailing four-quarter loan volume up 78% YoY, with the majority executed in Q4 2024 and Q2025.

- Of the total trailing four-quarter senior living loan volume, 12% was for construction with nearly 22% being for acquisitions, and the balance, at 66% of new loans, being for refinancings, indicating a 36% YoY increase in refinancing activity.

Source: Real Capital Analytics, Cushman & Wakefield Research, Data through March 31, 2025





04
# SENIOR LIVING & CARE
# VALUATION INDICES



## SENIOR LIVING & CARE VALUATION INDICES

H1 2025

**CUSHMAN & WAKEFIELD**

- The Cushman & Wakefield valuation index represents an aggregation of mark-to-market valuation conclusions from nearly 2,000 properties throughout the U.S., that were valued within the past twelve months.

- The aggregate market value of this proprietary dataset totals approximately $30 billion, or 6.25% of the total estimated market capitalization of $480 billion of institutional seniors housing & care supply.

| Stand Alone Active Adult | Lower Decile | Lower Quartile | Average | Upper Quartile | Upper Decile |
|---|---|---|---|---|---|
| Stabilized Occupancy (%) | 86 | 89 | 94 | 96 | 97 |
| Effective Monthly Rent per Revenue Unit ($) | 1,132 | 1,971 | 2,245 | 2,696 | 3,266 |
| Expense Ratio (%) | 53 | 46 | 41 | 39 | 36 |
| Capitalization Rate (%) | 6.45 | 6.3 | 5.15 | 4.75 | 4.5 |
| Stabilized Market Value per Revenue Unit ($) | 102,235 | 178,858 | 298,542 | 398,222 | 501,699 |

| Majority Independent Living | Lower Decile | Lower Quartile | Average | Upper Quartile | Upper Decile |
|---|---|---|---|---|---|
| Stabilized Occupancy (%) | 86 | 89 | 92 | 93 | 96 |
| Effective Monthly Rent per Revenue Unit ($) | 2,523 | 3,221 | 3,954 | 4,958 | 6,381 |
| Expense Ratio (%) | 76 | 69 | 66 | 60 | 58 |
| Capitalization Rate (%) | 7.9 | 7.2 | 6.5 | 6.3 | 5.9 |
| Stabilized Market Value per Revenue Unit ($) | 86,870 | 162,924 | 299,422 | 388,225 | 522,234 |

Source: Cushman & Wakefield Valuation Index (H12025)

## SENIOR LIVING & CARE VALUATION INDICES

H1 2025



| Majority Assisted Living | Lower Decile | Lower Quartile | Average | Upper Quartile | Upper Decile |
|---|---|---|---|---|---|
| Stabilized Occupancy (%) | 86 | 89 | 93 | 93 | 95 |
| Effective Monthly Rent per Revenue Unit ($) | 3,124 | 3,784 | 5,275 | 6,157 | 7,898 |
| Expense Ratio (%) | 80 | 78 | 71 | 69 | 62 |
| Capitalization Rate (%) | 8.4 | 7.9 | 7.1 | 6.5 | 6.0 |
| Stabilized Market Value per Revenue Unit ($) | 89,061 | 132,211 | 286,385 | 354,125 | 572,523 |

| Stand Alone Memory Care | Lower Decile | Lower Quartile | Average | Upper Quartile | Upper Decile |
|---|---|---|---|---|---|
| Stabilized Occupancy (%) | 81 | 84 | 89 | 90 | 90 |
| Effective Monthly Rent per Revenue Unit ($) | 3,201 | 3,714 | 4,722 | 5,279 | 6,289 |
| Expense Ratio (%) | 82 | 78 | 75 | 61 | 55 |
| Capitalization Rate (%) | 9.1 | 8.7 | 8.6 | 8.1 | 7.75 |
| Stabilized Market Value per Revenue Unit ($) | 89,672 | 121,465 | 181,697 | 241,572 | 345,357 |

| Majority Nursing Care | Lower Decile | Lower Quartile | Average | Upper Quartile | Upper Decile |
|---|---|---|---|---|---|
| Stabilized Occupancy (%) | 73 | 80 | 88 | 90 | 92 |
| Effective Daily Rate per Revenue Unit ($) | 143 | 162 | 251 | 288 | 372 |
| Expense Ratio (%) | 81 | 83 | 86 | 90 | 93 |
| Capitalization Rate (%) | 14.7 | 13.9 | 13.4 | 12.2 | 10.75 |
| Stabilized Market Value per Revenue Unit ($) | 36,222 | 67,214 | 121,211 | 145,964 | 169,913 |

Source: Cushman & Wakefield Valuation Index (H12025)





# SENIOR LIVING & CARE VALUATION INDICES
## H1 2025 Same Store Analysis



- Same store operating and valuation data were extracted from properties Cushman & Wakefield values annually. This data provides a unique insight into actual year-over-year changes in market valuation assumptions.

- Cushman & Wakefield's same-store indices suggest a decrease in capitalization rates of 25 bps over Q2 2024, with valuations turning upward for investment Class A and B properties, by 4% and 6%, respectively.

- After a nearly 20% peak-to-trough decline, valuations have likely reached the floor and will continue to trend in a positive direction, as property markets continue to strengthen and capital markets stabilize.

- The residential housing market, debt liquidity and still looming wave of loan maturities remain a red flag for investors and are all critical for the continued growth in market valuations for the sector.

Source: Cushman & Wakefield Valuation Index (H12025)

05
# INVESTOR SURVEY RESULTS





# SENIOR LIVING & CARE INVESTOR SURVEY RESULTS



H1 2025 survey results from over 75 of the industry's most influential leaders

| Primary Markets | Investment Class A | | | Investment Class B | | | Investment Class C | | |
|---|---|---|---|---|---|---|---|---|---|
| Capitalization Rates (%) | Low | High | Average | Low | High | Average | Low | High | Average |
| Active Adult | 4.5 | 6.3 | 5.2 | 5.0 | 6.5 | 5.8 | 5.5 | 7.3 | 6.6 |
| Majority Independent Living | 5.5 | 7.0 | 6.2 | 6.0 | 8.0 | 7.0 | 6.8 | 9.0 | 7.6 |
| Majority Assisted Living | 6.5 | 7.5 | 6.8 | 7.0 | 8.5 | 7.6 | 7.3 | 10.0 | 8.5 |
| Stand Alone Memory Care | 7.5 | 9.5 | 8.5 | 7.5 | 10.0 | 9.1 | 8.5 | 11.0 | 9.9 |
| Nursing Home | 9.5 | 12.8 | 11.9 | 11.0 | 13.5 | 12.6 | 12.5 | 14.5 | 14.0 |
| CCRC/ LPC | 6.0 | 8.5 | 7.4 | 6.5 | 9.0 | 8.2 | 7.5 | 11.0 | 9.0 |

| Secondary Markets | Investment Class A | | | Investment Class B | | | Investment Class C | | |
|---|---|---|---|---|---|---|---|---|---|
| Capitalization Rates (%) | Low | High | Average | Low | High | Average | Low | High | Average |
| Active Adult | 5.0 | 6.5 | 5.9 | 5.3 | 7.5 | 6.5 | 6.0 | 8.0 | 7.1 |
| Majority Independent Living | 6.0 | 7.5 | 6.7 | 6.5 | 8.0 | 7.4 | 7.0 | 9.5 | 8.1 |
| Majority Assisted Living | 6.8 | 8.0 | 7.3 | 7.5 | 9.0 | 7.9 | 8.0 | 10.5 | 8.8 |
| Stand Alone Memory Care | 7.5 | 10.5 | 8.8 | 8.0 | 10.5 | 9.4 | 9.0 | 11.5 | 10.1 |
| Nursing Home | 11.0 | 13.5 | 12.6 | 11.5 | 14.5 | 13.8 | 12.5 | 15.5 | 15.5 |
| CCRC/ LPC | 7.0 | 10.0 | 8.3 | 8.0 | 10.5 | 9.0 | 8.5 | 12.0 | 9.5 |

| Average Spreads by Location (Bps) | Primary Market Locations | | | Secondary Market Locations | | | Locational Spreads Primary vs. Secondary | | |
|---|---|---|---|---|---|---|---|---|---|
| Investment Class | A - B | B - C | A - C | A - B | B - C | A - C | A | B | C |
| Active Adult | 52.0 | 83.0 | 135.0 | 55.0 | 57.0 | 112.0 | 70.0 | 73.0 | 47.0 |
| Majority Independent Living | 79.8 | 63.2 | 143.0 | 69.7 | 72.3 | 142.1 | 52.6 | 42.5 | 51.7 |
| Majority Assisted Living | 72.0 | 96.0 | 168.0 | 67.5 | 82.5 | 150.0 | 42.0 | 37.5 | 24.0 |
| Stand Alone Memory Care | 59.9 | 77.1 | 137.0 | 64.2 | 64.9 | 129.1 | 29.3 | 33.5 | 21.4 |
| Nursing Home | 69.1 | 136.9 | 206.0 | 121.9 | 166.9 | 288.8 | 66.3 | 119.0 | 149.0 |
| CCRC/ LPC | 86.0 | 80.6 | 166.6 | 75.0 | 50.0 | 125.0 | 88.0 | 77.0 | 46.4 |

Source: Cushman & Wakefield Investor Survey (H1 2025)





















# LOOKING FORWARD

According to the Chinese zodiac, 2025 is the year of the wood snake, which symbolizes wisdom, creativity, and growth. The wood element emphasizing renewal and transformation, while encouraging growth and expansion. This sign indicates significant opportunities and a focus on strategic thinking throughout the year, an appropriate parallel for the state of the senior living & care sector. Trends and innovations in the senior living sector continue to accelerate, such as technology, infrastructure, and design components. From a valuation standpoint, it does appear that the market is at or near the bottom. In the years ahead, renewed interest from investors and lenders is expected due to the softening of some of the more core asset classes while senior living operating performance continues to show stable growth, once again highlighting the sector's resiliency.

As various crosscurrents between strong property market fundamentals for the sector and a choppy capital markets environment begin to normalize, investor sentiment is seemingly gaining optimism as investment strategies continue to evolve. Operators continue to grapple with labor challenges as occupancy and rental growth remains on a positive trajectory. There is also a continued focus on creating scale through size and strategic service delivery partnerships to help drive operating margins, a key component to the industries ability to meet future demand expectations.

Amid ongoing capital markets dislocation and uncertainty surrounding the tariffs, investors are resetting their strategies as they look to opportunistically deploy capital. While transactions involving properties with distressed capital stacks have ticked upward, the velocity of transaction activity anticipated from $18 billion of loan maturities within the next 24 months has yet to significantly impact market transactions as previously expected. Though elevated activity may still be in the immediate future, a level that will statistically depress valuations is not likely.

Increased transaction activity is expected during the second half of 2025. Debt is becoming more available as lenders more programmatically open their balance sheets and debt becomes less expensive, albeit still selective. In addition to the lower overall debt costs, this contraction in base rates helps the financial engineering of deals by restoring some neutral or positive leverage conditions for fixed-rate product relative to cap rates. These improvements in the debt markets may also help move the mountain of dry powder ($382 billion globally) off the sidelines, signaling the cusp of the next growth cycle as the strong performance of the senior living sector continues to capture the attention of investors.



Photo provided by Watermark Retirement Communities

Source: Cushman & Wakefield









Below is the NIC MAP 3Q25 Market Fundamentals Report.





## NIC MAP — 3Q25 Market Fundamentals

| | Senior Housing | | | Nursing Care |
|---|---|---|---|---|
| Source: NIC MAP® | Overall | Majority IL | Majority AL | Majority NC |
| **Market Fundamentals 3Q25** | | | | |
| Occupancy | 88.7% | 90.2% | 87.2% | 86.3% |
| Annual Rent Growth | 4.3% | 4.2% | 4.4% | 5.2% |
| Annual Absorption | 3.5% | 3.4% | 3.5% | 1.4% |
| Annual Inventory Growth | 0.7% | 0.7% | 0.7% | -0.7% |
| Construction vs. Inventory | 2.4% | 2.4% | 2.5% | 0.2% |
| Rolling 4-Quarter Starts vs. Inventory | 0.9% | 1.2% | 0.7% | 0.0% |
| **Capital Markets 2Q25** | | | | |
| Transaction Volume (millions) | | $3,837.2 | | $1,684.7 |
| Rolling 4-Quarter Price Per Unit | | $154,237 | | $91,341 |
| Rolling 4-Quarter Cap Rate | | Protected | | Protected |

Occupancy by Property Type
NIC MAP | Primary Markets

*Overall Senior Housing combines Majority IL and Majority AL Properties

Source: NIC MAP DATA

Data for the Market Fundamentals is representative of the Top 31 Primary metropolitan markets.

Data for the Capital Markets is representative of all U.S. property transaction of at least $2.5 million.

### Key Findings

- Senior housing occupancy for the third quarter of 2025 was 88.7%, up 70 basis points from the previous quarter.
- Independent living properties' average occupancy grew by 50 basis points to 90.2% in the third quarter.
- In the third quarter of 2025, assisted living properties' average occupancy was 87.2% - an increase of 90 basis points.
- The average occupancy for nursing care properties stayed the same for the third quarter at 86.3%, unchanged from the prior quarter.

### About NIC MAP:

NIC MAP believes data drives outcomes. We provide purpose-built data exclusively for senior housing, offering relevant, market-specific insights you won't find anywhere else, and we're empowering the senior housing industry to stay nimble and achieve optimal results. Our platform supports robust decision-making with real-time access to occupancy rates, transaction details, and construction project tracking, enabling industry leaders -- including the top senior housing operators, largest government agencies and major investors -- to navigate market complexities and capitalize on investment opportunities effectively. For more information, visit www.nicmap.com.

Copyright 2025 NIC MAP, LLC. All rights reserved.
Data believed to be accurate but not guaranteed; subject to future revision. This report is a part of the NIC MAP Data. Distribution of this report without prior written consent or licence by NIC MAP is prohibited. Subject to the Terms of Use. For license information please contact NIC MAP at (844) 668-3282.

## Conclusions

The senior housing sector has demonstrated resilience and strong performance amid post-pandemic recovery and economic challenges. According to the Cushman & Wakefield report for H1 2025, property market fundamentals are strong, with stabilized occupancy exceeding 89%—marking 17 consecutive



quarters of growth—and secondary markets hitting 90%, a level unseen since 2017. Net absorption has outpaced supply growth by 2.5 to 1, driving record occupied units, while annual rent growth holds at 3.9%, offsetting seasonal dips. The NIC MAP Vision report reiterates this, highlighting absorption rates that doubled pre-pandemic levels in 2023 and surged 40% year-over-year in Q1 2024, pushing occupancy and employment near or above pre-COVID benchmarks.

The industry has an optimistic outlook driven by increasing demand, with the baby boomer cohort turning 80 in 2025. Cushman & Wakefield projects a need for 35,000-45,000 new units annually to meet peak demand, far exceeding recent deliveries under 10,000. Increased transaction activity is anticipated in H2 2025 as debt becomes more accessible. Overall, the sector is positioned for growth and has a positive outlook.



# Highest and Best Use Analysis

The Highest and Best Use of a property is the physically possible, legally permissible and financially feasible use which results in the highest value. An opinion of the highest and best use results from consideration of the criteria noted above under the market conditions or likely conditions as of the effective date of value. Implied in the definition is that the determination of highest and best use results from the judgment and analytical skills of the appraiser; that is, that the use determined from analysis represents an opinion, not necessarily a fact to be found. In appraisal practice, the concept of highest and best use represents the premise upon which value is based.

While improved properties may have a highest and best use that is different than the existing use, the existing use will generally continue until land value exceeds the value of the property at its existing use plus demolition costs. It is not always necessary to determine the highest and best use of an improved property both As If Vacant and As Improved. In many cases the determination of whether the value as improved exceeds the site value is straightforward and does not require an opinion of market value of the site. In this instance the value as improved significantly exceeds any reasonable expectation of value of the site only. Thus the following analysis is limited to the highest and best use as improved.

## Analysis of Highest and Best Use as Improved

In determining the highest and best use of the property as improved, we consider three possibilities for the property: 1) continuation of the existing use with or without modification to improvements, 2) a change in use, or 3) demolition and redevelopment of the land.

### Continuation of Existing Use

Continuation of the existing use meets the tests for physical possibility, legal permissibility and financial feasibility. Market demand for such properties will continue to provide economic support for the existing use for the foreseeable future.

The improvements are in average condition and a new roof is needed ~~at this time~~ in order to maintain economic viability.

### Change in Use

Conversion of the improvements meets the tests for physical possibility and legal permissibility. Conversion of the existing improvements into apartments is the most likely alternative use. However, the overall functionality/design of the building for apartments would be limited due to the current layout of the building and lack of parking. Therefore, a change in use is unlikely to be maximally productive.

### Demolition

The total of demolition costs and our opinion of market value exceeds any reasonable value of the underlying land.

## Conclusion Of Highest And Best Use As Improved

The highest and best use of the subject property, as improved, is continued use as an assisted living facility.

## Most Probable Buyer

As of the date of value, the most probable buyer of the subject property is a senior housing operator.

---



# Income Capitalization Approach

## Methodology

The Income Capitalization Approach is developed by converting anticipated future income into a present value by a capitalization process. There are two types of capitalization: direct capitalization and yield capitalization, more commonly known as discounted cash flow (DCF) analysis.

Income-producing properties, by nature, are developed and purchased for investment purposes, where earning power, including an income stream and return of investment, are the most critical elements affecting value. The forecast of income and selection of appropriate rates are therefore important aspects of the valuation process. The process of developing the income approach consists of the following analyses: Income, Vacancy, Expense, and Rate Analysis.

## Application of Methodology

Given the nature of the property being appraised, the direct capitalization method was used to develop a value indication.

## Income Analysis

The income analysis involves a review of the existing subject leases and comparison to market rent levels, as well as additional income sources and expense recoveries. The sum of all income results in potential gross income (PGI).

### Subject Rent Analysis

The subject consists of 101 assisted living (AL) units, and 68 memory care (MC) units. Ownership provided rent rolls as of January 28, 2021, January through December 2023, January 12, 2026 and March 26, 2026. We utilized the rent rolls as of January 12, 2026 and March 26, 2026 in our analysis which state an AL monthly average rent of $4,105 and $4,234, and an MC monthly average rent of $4,825 and $4,865 respectively. We also surveyed the competition in the area and gathered asking monthly rents from each competitor, which are summarized in the chart below:

**Competition and Rent Analysis (Survey Conducted April 2026)**

| Competition and Rent Analysis | | | |
|---|---|---|---|
| Facility Name | Distance from Subject | AL - Average Asking Rent Per Bed | MC - Average Asking Rent Per Bed |
| Facility Name | Subject | Rent Per Bed | Rent Per Bed |
| Atria Bethlehem | 6 miles | $5,472 | $7,250 |
| Country Meadows of Allentown | 12 miles | $5,657 | $7,899 |
| Country Meadows of Bethlehem | 7 miles | $4,871 | $8,055 |
| Bethlehem Manor Senior Living | 5 miles | $4,374 | $5,316 |
| Atrium of Allentown | 10 miles | $5,200 | $7,000 |
| Abode Care of Allentown | 10 miles | $4,300 | $6,500 |
| Rittenhouse Village at Lehigh Valley | 12 miles | $5,200 | $7,075 |
| The Vero at Bethlehem | 8 miles | $5,722 | $7,440 |
| Moravian Village of Bethlehem | 7 miles | $3,800 | $6,250 |
| The Birches of Lehigh Valley | 10 miles | $5,745 | $6,750 |
| | Minimum | $3,800 | $5,316 |
| | Maximum | $5,745 | $8,055 |

SAUCON VALLEY MANOR SENIOR LIVING

| | | | |
|---|---|---|---|
| | Average | $5,034 | $6,954 |

The chart above indicates an average monthly rent per bed of $5,034 for AL and $6,954 for MC. Next, we reviewed the current asking monthly rental rates for the subject. After analyzing the preceding data, we conclude that the subject's existing rental rates are below market. Ownership has begun to increase their rental rates, as evidenced by their current asking rental rates as shown in the table below. Our rent projections for year 1 of this analysis are summarized in the chart below:

**Projected Monthly Rental Income**

| Category | Total Beds | Private Beds | Shared Beds | January 12, 2026 Actual (Average) Rent | March 26, 2026 Actual (Average) Rent | Asking Average Rent Per Private Bed | Asking Average Rent Per Shared Bed |
|---|---|---|---|---|---|---|---|
| Rental Income - AL | 123 | 73 | 50 | $4,105 | $4,234 | $5,960 | $5,020 |
| Rental Income - MC | 78 | 48 | 30 | $4,825 | $4,865 | $6,420 | $5,445 |

**Projected Monthly Rental Income**

| Category | Market (Average) | Projected Per Private Bed | Projected Per Shared Bed | Projected Per Bed (Total) | Units | Projected Per Unit |
|---|---|---|---|---|---|---|
| Rental Income - AL | $5,283 | $5,250 | $4,250 | $4,843 | 101 | $5,899 |
| Rental Income - MC | $8,555 | $6,250 | $5,250 | $5,865 | 68 | $6,728 |

In the chart above, we estimated the monthly rent per private and shared bed for each category. Then we multiplied the monthly rent by the number of private and shared beds and then multiplied those amounts amount by 12 (months) to arrive at a total potential annual rent. Then we divided the total potential annual rent by the number of total beds to arrive at the projected monthly rent per bed for each category. Lastly, we took the estimated total annual rent and divided it by the units for each category.

Other Income

This category includes income from a variety of sources, including but not limited to additional resident services, community fees, pet fees, late fees, salon and spa, resident purchases, personal laundry, pendant fees, and leased space fees. The following table presents the subject historical data used to estimate other income for the subject property and the stabilized estimate:

**Other Income**

| Income Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $1,573.63 | 3.0% |
| Subject Actual - 12/2024 | $1,070.15 | 1.9% |
| Subject Actual - 12/2025 | $1,094.64 | 1.9% |
| Subject Average | $1,246.14 | 2.2% |
| Stabilized Estimate: | $1,150.00 | 1.7% |

## Vacancy/Collection Loss

The subject property had an occupancy rate of 86% in 2023, 97% in 2024, and 98% in 2025. After taking into consideration the increase in rent rates, we have estimated a stabilized occupancy rate of 89% based on the subject's historical data as well as the assisted living market information previously shown in the market analysis section of this report.

Given the subject's location and the market data presented, a stabilized vacancy of 11.0% was estimated. In addition, a collection loss of 1.0% was applied. As a result of the preceding information, we project that the subject property will be stabilized in year 1 of this analysis.



## Expense Analysis

### Subject Expense History

The subject operating history was reviewed to estimate subject expenses and is presented in the following table:

**Subject Operating Statements**

| Statement Type | Actual | | | Actual | | | Actual | | |
| 12 Month Period Ending | December-23 | | | December-24 | | | December-25 | | |
|---|---|---|---|---|---|---|---|---|---|
| Occupancy | 86% | | | 97% | | | 98% | | |
| **Revenue** | Amount | Per Unit | % of EGI | Amount | Per Unit | % of EGI | Amount | Per Unit | % of EGI |
| Rental Income | $8,619,815 | $51,005 | 97.0% | $9,434,892 | $55,828 | 98.1% | $9,765,210 | $57,782 | 98.1% |
| Other Income | $265,943 | $1,574 | 3.0% | $180,855 | $1,070 | 1.9% | $184,995 | $1,095 | 1.9% |
| **Effective Gross Income** | **$8,885,758** | **$52,578** | 100.0% | **$9,615,747** | **$56,898** | 100.0% | **$9,950,205** | **$58,877** | 100.0% |
| **Operating Expenses** | | | | | | | | | |
| Real Estate Taxes | $184,751 | $1,093 | 2.1% | $60,125 | $356 | 0.6% | | | N/A |
| Property Insurance | $726,864 | $4,301 | 8.2% | $207,315 | $1,227 | 2.2% | $213,738 | $1,265 | 2.1% |
| Management Fees | $437,138 | $2,587 | 4.9% | $472,793 | $2,798 | 4.9% | $445,956 | $2,639 | 4.5% |
| Administrative | $1,028,282 | $6,085 | 11.6% | $1,085,052 | $6,420 | 11.3% | $1,217,090 | $7,202 | 12.2% |
| Utilities | $377,984 | $2,237 | 4.3% | $430,680 | $2,548 | 4.5% | $452,311 | $2,676 | 4.5% |
| Repairs & Maintenance | $480,678 | $2,844 | 5.4% | $351,533 | $2,080 | 3.7% | $455,965 | $2,698 | 4.6% |
| Cleaning & Janitorial | $691,785 | $4,093 | 7.8% | $744,224 | $4,404 | 7.7% | $761,051 | $4,503 | 7.6% |
| Marketing | $376,513 | $2,228 | 4.2% | $440,548 | $2,607 | 4.6% | $466,609 | $2,761 | 4.7% |
| Nursing | $3,277,227 | $19,392 | 36.9% | $3,541,901 | $20,958 | 36.8% | $3,702,671 | $21,909 | 37.2% |
| Dietary | $1,847,663 | $10,933 | 20.8% | $1,824,375 | $10,795 | 19.0% | $1,920,135 | $11,362 | 19.3% |
| Activities | $267,658 | $1,584 | 3.0% | $229,520 | $1,358 | 2.4% | $277,860 | $1,644 | 2.8% |
| **Total Operating Expenses** | **$9,696,543** | **$57,376** | 109.1% | **$9,388,066** | **$55,551** | 97.6% | **$9,913,386** | **$58,659** | 99.6% |
| **Net Operating Income** | **-$810,785** | **-$4,798** | **-9.1%** | **$227,681** | **$1,347** | **2.4%** | **$36,819** | **$218** | **0.4%** |

### Operating Expenses Real

### Estate Taxes

In the Assessment and Tax Data section of this report, we estimated a tax expense of $178,011 or $1,053.32 per ~~square foot~~unit in year 1 ~~of the discounted cash flow~~.

### Property Insurance

The following table presents the subject historical expense data used to estimate property insurance expense for the subject property and the stabilized estimate:

**Property Insurance**

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $4,301 | 8.2% |
| Subject Actual - 12/2024 | $1,227 | 2.2% |
| Subject Actual - 12/2025 | $1,265 | 2.1% |
| *Indicator Average* | *$2,264* | *4.2%* |
| *Stabilized Estimate:* | *$1,300* | *1.9%* |

### Management Fees

The following table presents the subject historical expense data used to estimate management fees for the subject property and the stabilized estimate:



### Management Fees

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $2,587 | 4.9% |
| Subject Actual - 12/2024 | $2,798 | 4.9% |
| Subject Actual - 12/2025 | $2,639 | 4.5% |
| *Indicator Average* | *$2,674* | *4.8%* |
| *Stabilized Estimate:* | *$3,341* | *5.0%* |

## Administrative

The following table presents the subject historical expense data used to estimate administrative expense for the subject property and the stabilized estimate:

### Administrative

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $6,085 | 11.6% |
| Subject Actual - 12/2024 | $6,420 | 11.3% |
| Subject Actual - 12/2025 | $7,202 | 12.2% |
| *Indicator Average* | *$6,569* | *11.7%* |
| *Stabilized Estimate:* | *$7,000* | *10.5%* |

Here we note our projected income anticipates significant turnover due to rate increases. This expense will continue to be at the upper end of the historical range due to more aggressive pricing

## Utilities

The following table presents the subject historical expense data used to estimate utilities expense for the subject property and the stabilized estimate:

### Utilities

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $2,237 | 4.3% |
| Subject Actual - 12/2024 | $2,548 | 4.5% |
| Subject Actual - 12/2025 | $2,676 | 4.5% |
| *Indicator Average* | *$2,487* | *4.4%* |
| *Stabilized Estimate:* | *$2,750* | *4.1%* |

## Repairs & Maintenance

The following table presents the subject historical expense data used to estimate repairs and maintenance expense for the subject property and the stabilized estimate:

### Repairs & Maintenance

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $2,844 | 5.4% |

| | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2024 | $2,080 | 3.7% |
| Subject Actual - 12/2025 | $2,698 | 4.6% |
| *Indicator Average* | *$2,541* | *4.5%* |
| *Stabilized Estimate:* | *$2,550* | *3.8%* |

## Cleaning & Janitorial

The following table presents the subject historical expense data used to estimate cleaning and janitorial expense for the subject property and the stabilized estimate:

### Cleaning & Janitorial

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $4,093 | 7.8% |
| Subject Actual - 12/2024 | $4,404 | 7.7% |
| Subject Actual - 12/2025 | $4,503 | 7.6% |
| *Indicator Average* | *$4,333* | *7.7%* |
| *Stabilized Estimate:* | *$4,600* | *6.9%* |

## Marketing

The following table presents the subject historical expense data used to estimate leasing expenses for the subject property and the stabilized estimate:

### Marketing

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $2,228 | 4.2% |
| Subject Actual - 12/2024 | $2,607 | 4.6% |
| Subject Actual - 12/2025 | $2,761 | 4.7% |
| *Indicator Average* | *$2,532* | *4.5%* |
| *Stabilized Estimate:* | *$2,750* | *4.1%* |

Here we note a more aggressive pricing model will require more marketing to maintain occupancy at market rates.

## Nursing

The following table presents the subject historical expense data used to estimate nursing/recreation expenses for the subject property and the stabilized estimate:

### Nursing

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $19,392 | 36.9% |
| Subject Actual - 12/2024 | $20,958 | 36.8% |
| Subject Actual - 12/2025 | $21,909 | 37.2% |
| *Indicator Average* | *$20,753* | *37.0%* |
| *Stabilized Estimate:* | *$23,000* | *34.4%* |



## Dietary

The following table presents the subject historical expense data used to estimate dietary expense for the subject property and the stabilized estimate:

### Dietary

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $10,933 | 20.8% |
| Subject Actual - 12/2024 | $10,795 | 19.0% |
| Subject Actual - 12/2025 | $11,362 | 19.3% |
| *Indicator Average* | *$11,030* | *19.7%* |
| *Stabilized Estimate:* | *$11,750* | *17.6%* |

## Activities

The following table presents the subject historical expense data used to estimate activities expense for the subject property and the stabilized estimate:

### Activities

| Expense Source | Per Unit | % of EGI |
|---|---|---|
| Subject Actual - 12/2023 | $1,584 | 3.0% |
| Subject Actual - 12/2024 | $1,358 | 2.4% |
| Subject Actual - 12/2025 | $1,644 | 2.8% |
| *Indicator Average* | *$1,529* | *2.7%* |
| *Stabilized Estimate:* | *$1,650* | *2.5%* |

## Replacement Reserves

We estimated a replacement reserve cost of $400 per unit, or $~~52,000~~67,600 per year.

## Net Operating Income (NOI) Calculation

The subject year 1 net operating income calculation is presented in the following table:

### Year 1 Net Operating Income Schedule

| Category | Units | | Per Unit | | Total | % of EGI |
|---|---|---|---|---|---|---|
| **Potential Rental Income** | | | | | | |
| Personal Care | 101 | x | $70,782.18 | = | $7,149,000 | 63.3% |
| Memory Care | 68 | x | $80,735.29 | = | $5,490,000 | 48.6% |
| **Total Potential Rental Income** | **169** | **x** | **$74,786.98** | **=** | **$12,639,000** | **111.9%** |
| | | | | | | |
| **Potential Gross Non-Rental Income** | | | | | | |
| Other Income | | | $1,150.00 | | $194,350 | 1.7% |
| **Plus: Total Potential Gross Non-Rental Income** | | | **$1,150.00** | | **$194,350** | **1.7%** |
| | | | | | | |
| **Potential Gross Income (PGI)** | | | **$75,936.98** | | **$12,833,350** | **113.6%** |
| | | | | | | |
| Less: Vacancy & Collection Loss  @ | | 12.0% | $9,112.44 | | $1,540,002 | 13.6% |
| **Effective Gross Income (EGI)** | | | **$66,824.54** | | **$11,293,348** | **100.0%** |
| | | | | | | |
| **Non-Reimbursable Expenses** | | | | | | |
| Real Estate Taxes | | | $1,053.32 | | $178,011 | 1.6% |
| Property Insurance | | | $1,300.00 | | $219,700 | 1.9% |

Valbridge
PROPERTY ADVISORS

| | | | |
|---|---|---|---|
| Management Fees | $3,341.22 | $564,667 | 5.0% |
| Administrative | $7,000.00 | $1,183,000 | 10.5% |
| Utilities | $2,750.00 | $464,750 | 4.1% |
| Repairs & Maintenance | $2,550.00 | $430,950 | 3.8% |
| Cleaning & Janitorial | $4,600.00 | $777,400 | 6.9% |
| Marketing | $2,750.00 | $464,750 | 4.1% |
| Nursing | $23,000.00 | $3,887,000 | 34.4% |
| Dietary | $11,750.00 | $1,985,750 | 17.6% |
| Activities | $1,650.00 | $278,850 | 2.5% |
| Replacement Reserves | $400.00 | $67,600 | 0.6% |
| **Total Non-Reimbursable Expenses** | **$62,144.54** | **$10,502,428** | **93.0%** |
| **Less: Total Operating Expenses** | **$62,144.54** | **$10,502,428** | **93.0%** |
| **Year 1 Net Operating Income (NOI)** | **$4,680.00** | **$790,920** | **7.0%** |

## Direct Capitalization Analysis

The Income Capitalization Approach to value is based on the premise that a direct relationship exists between the value of a property and the stabilized level of net income it is capable of generating. Direct capitalization is the process of converting a stabilized income stream into an estimate of value and is obtained by applying an overall capitalization rate (OAR) to the net operating income (NOI) before debt service. The direct capitalization rate is the ratio between a single year's net operating income expectancy and the total property price or value.

## Overall Capitalization Rate (OAR)

Investor surveys were used to estimate an appropriate overall capitalization rate for the subject property.

## Investor Surveys

The overall capitalization rates published by investor surveys are presented in the following table:

**Investor Surveys - Overall Capitalization Rates**

| Survey | Date | Rate Range | | | Average |
|---|---|---|---|---|---|
| BBG Senior Housing Investor Survey - AL | Fall 2025 | 6.00% | to | 9.00% | 7.73% |
| CBRE US Senior Housing & Care Investor Survey - AL | H2 2025 | 6.00% | to | 9.00% | 7.80% |
| Cushman and Wakefield Investor Survey - Majority AL | H1 2026 | 6.80% | to | 8.50% | 7.60% |
| CBRE US Senior Housing & Care Investor Survey - MC | Fall 2025 | 6.00% | to | 11.00% | 9.30% |
| BBG Senior Housing Investor Survey - MC | Fall 2025 | 7.50% | to | 11.50% | 9.45% |
| | **Average** | 6.46 6.38% | to | 9.80 10.13% | 8.38 8.57% |

## Overall Capitalization Rate Conclusion

We estimated a capitalization rate of 8.00% for the subject. This takes into consideration the fact that ownership needs to significantly raise the rental rates at the facility, which increases the risk of higher vacancy.

## Deferred Maintenance

As previously mentioned, the subject property is in need of a new roof. A cost estimate of $1,064,263 was provided by ownership for roof replacement. This amount was deducted from the preliminary going concern value indication.

## Furniture Fixtures and Equipment (FF&E)



Senior Housing Facilities typically have a significant portion of their value allocated to FF&E in place and intangible business value. In order to derive the retrospective as is fee simple market value of the real estate, we have separated the value of the FF&E and business component from the value of the overall going concern.

According to the CBRE Seniors Housing Development Costs Report dated September 14, 2022, the FF&E cost per room for senior housing properties ranges from $7,000 to $11,600 with an average of $9,700 per room.

The depreciated book value of the FF&E was reviewed. According to the book value, much of the subject's FF&E is fully depreciated. We considered the data from the CBRE Seniors Housing Development Costs Report as well as the subject's depreciated book value report. Based on the furniture fixtures and equipment observed during our inspection, we estimate a depreciated value of $5,000 per room or $845,000 for the subject's FF&E.

### Business Value
Given the locational, physical, and operating characteristics of the property discussed in the appraisal, an allocation of 15% of the going concern is typical for properties like the subject. This reflects the value of staff-in-place, contracts, goodwill, etc. The allocation of 15% was applied to the preliminary going concern shown in the table below.

## Direct Capitalization Conclusion
The direct capitalization technique calculation and conclusion is presented in the following table:

| Direct Capitalization Technique Value Indication | | |
|---|---|---|
| Stabilized Net Operating Income (NOI) | | $790,920 |
| Divided by Overall Capitalization Rate | ÷ | 8.00% |
| **Preliminary Going Concern** | | **$9,886,500** |
| Less Deferred Maintenance: | | $1,064,263 |
| **Going Concern** | **(Rounded)** | **$8,800,000** |
| Less FF&E: | | $845,000 |
| Less Business Value: | | $1,482,975 |
| **As Is Fee Simple Market Value Indication (Real Estate Only)** | **(Rounded)** | **$6,450,000** |



# Sales Comparison Approach

## Methodology

The sales comparison approach develops an indication of market value by analyzing closed sales, listings, or pending sales of properties similar to the subject, focusing on the difference between the subject and the comparables using all appropriate elements of comparison. This approach is based on principles of supply and demand, balance, externalities, and substitution, or the premise that a buyer would pay no more for a specific property than the cost of obtaining a property with the same quality, utility, and perceived benefits of ownership.

### Unit of Comparison

The unit of comparison selected depends on the appraisal problem and nature of the property and is intended to explain or mirror market behavior. The primary unit of comparison in the market and applied in this analysis is price per unit.

### Elements of Comparison

Elements of comparison are the characteristics or attributes of properties and transactions that cause the prices of real estate to vary. The primary elements of comparison considered in sales comparison analysis are as follows: (1) real property rights conveyed, (2) financing terms, (3) conditions of sale, (4) expenditures made immediately after purchase, (5) market conditions, (6) location, (7) physical characteristics, (8) economic characteristics, (9) legal characteristics, and (10) non-real components of value.

### Comparable Sales Data

The market was studied to identify sales and listings of comparable properties with a focus on those that appeal to the most probable buyer of the subject property. These properties typically attract similar occupants based on location and appeal and have similar risk profiles. Of these transactions, sufficient sales data was available for the following sale comparables, which were analyzed to estimate a unit value for the subject property. The following table summarizes the sale comparables utilized and a map illustrating the location of each in relation to the subject property follows. Details of each comparable follow the location map.

**Improved Sales Summary**

| Comp. No. | Date of Sale | Property Name | Location | | Year Built | No. of Units | Unadjusted Sale Price | per Unit |
|---|---|---|---|---|---|---|---|---|
| 1 | June-24 | Curaliving at East Norriton | 2101 New Hope Street | Norristown, Pennsylvania | 1988 | 114 | $5,564,000 | $48,807.02 |
| 2 | October-24 | Mount Vernon of South Park | 1400 Riggs Road | South Park Township, Pennsylvania | 1994 | 66 | $1,300,000 | $19,696.97 |
| 3 | October-24 | Amoroso Wellness at York | 2830 Carol Road | York, Pennsylvania | 1987 | 104 | $7,000,000 | $67,307.69 |
| 4 | July-25 | Franklin Court Senior Living | 1660 Park Avenue | Quakertown, Pennsylvania | 1988 | 89 | $5,650,000 | $63,483.15 |

**COMPARABLE SALES MAP**

# Valbridge
## PROPERTY ADVISORS



## SALE COMPARABLE 1

### Property Identification

| | |
|---|---|
| City County State Zip | Norristown, Montgomery County, Pennsylvania 19401 |
| MSA | Philadelphia, PA-NJ |
| Tax ID | 33-00-05938-005 |
| VPA Property/Sale ID | 10985839/1842686 |

### Transaction Data

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | 06-27-2024 |
| Grantor/Seller | AB East Norriton Owner, LLC |
| Grantee/Buyer | Brandywine PA Healthcare Realty, LLC |
| Deed Book/Page | 6368-2344 |
| Property Rights | Fee Simple |
| Financing | Cash to seller |
| Conditions of Sale | Typical |
| Sales Price | $5,564,000 |

### Units of Comparison

| | |
|---|---|
| Price PSF of GBA | $100.22 |
| Adj. Price per Unit | $48,807 |
| Adj. Price per Bed | $22,710 |

**Pr** ...01 New Hope St



### Property Description

| | | Property Type |
|---|---|---|
| No. of Units | 114 | |
| No. of Beds | 245 | |
| No. of Lots | 1 | |
| Year Built | 1988 | |
| Building Condition | Average | |
| Number of Stories | 3 | |
| Pkg/1,000 SF GBA | 0.99 | |
| Land/LtB Ratio | 5.270 Acres / 4.13:1 **Flood H** | |

### Verification

| | |
|---|---|
| Confirmation Source | Deed, Public Record, Articles |

### Remarks

Sale of an assisted

**Valbridge** PROPERTY ADVISORS

SAUCON VALLEY MANOR SENIOR LIVING

## SALE COMPARABLE 2



### Property Identification

| | |
|---|---|
| **City County State Zip** | South Park Township, Allegheny County, Pennsylvania 15129 |
| **MSA** | Pittsburgh |
| **Tax ID** | 884-S-225 and 884-R-54 |
| **VPA Property/Sale ID** | 1182111/1764084 |

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | 10-15-2024 |
| **Grantor/Seller** | PA Healthcare Holdings, LLC |
| **Grantee/Buyer** | KSSB Holdings, LLC **Deed Book/Page** 19842/411 **Property Rights** Fee Simple |
| **Financing** | Cash to seller |
| **Conditions of Sale** | Typical |
| **Sales Price** | $1,300,000 |

**Pr** 1400 Rigg

### Property Description

**Property Type**

| | |
|---|---|
| **No. of Units** | 66 |
| **No. of Beds** | 110 |
| **No. of Lots** | 2 |
| **Year Built** | 1994 |

### Units of Comparison

| | |
|---|---|
| **Price PSF of GBA** | $32.50 **Adj. Price per** |
| **Unit** | $19,697 **Adj. Price per** |
| **Bed** | $11,818 |

| | |
|---|---|
| **Building Condition** | Average |
| **Number of Stories** | 1 |
| **Pkg/1,000 SF GBA** | 1.38 |
| **Land/LtB Ratio** | 29.600 Acres / 32.23:1 |
| **Flood Hazard Zone** | Zone X |
| **Zoning Code** | R1 |

### Verification

| | |
|---|---|
| **Confirmation Source** | Lender, Public Record, Deed |

### Remarks

Sale of a vacant a

## SALE COMPARABLE 3

### Property Identification

| | |
|---|---|
| **City County State Zip** | York, York County, Pennsylvania 17402 |
| **MSA** | York |
| **Tax ID** | 46-000-IJ-0017.00-00000 |
| **VPA Property/Sale ID** | 11572751/1842728 |

**Pr** 30 Carol Road

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | 10-16-2024 |
| **Grantor/Seller** | 2830 Carol Propco LLC |
| **Grantee/Buyer** | 2830 Carol RE, LLC **Deed Book/Page** 2024041464 |
| **Property Rights** | Fee Simple |
| **Financing** | Cash to seller |
| **Conditions of Sale** | Typical |
| **Sales Price** | $7,000,000 |

### Property Description

**Property Type**

| | |
|---|---|
| **No. of Units** | 104 |
| **No. of Beds** | 125 |

### Units of Comparison

| | |
|---|---|
| **Price PSF of GBA** | $95.47 **Adj. Price per** |

| | |
|---|---|
| **Price PSF of GBA** | $95.47 **Adj. Price per** |

SAUCON VALLEY MANOR SENIOR LIVING

**Unit** $67,308 **Adj. Price per Bed** $56,000

| | |
|---|---|
| **No. of Lots** | |
| **Year Built** | 1987 |
| **Building Condition** | Average |
| **Number of Stories** | 2 |
| **Pkg/1,000 SF GBA** | 2.51 |
| **Land/LtB Ratio** | 5.000 Acres / 6.08:1 |
| **Flood Hazard Zone** | Zone X - Outside 100 and 500 year floodplains |
| **Zoning Code** | ID |

**Verification**

| | |
|---|---|
| **Confirmation Source** | Deed, Public Record, CoStar |

**Remarks** Sale of an assisted

## SALE COMPARABLE 4

Pr                                                                           1660 Park

### Property Identification

| | |
|---|---|
| **City County State Zip** | Quakertown, Bucks County, Pennsylvania 18951 |
| **MSA** | Philadelphia, PA-NJ |
| **Tax ID** | 35-003-031 |
| **VPA Property/Sale ID** | 11572746/1842725 |

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | 07-01-2025 |
| **Grantor/Seller** | Liberty Court Associates |
| **Grantee/Buyer** | Quakertown Propco LLC |
| **Deed Book/Page** | 2025029010 |
| **Property Rights** | Fee Simple |
| **Financing** | Cash to seller |
| **Conditions of Sale** | Typical |
| **Sales Price** | $5,650,000 |

### Units of Comparison

**Price PSF of GBA** $246.19 **Adj. Price per Unit** $63,483 **Adj. Price per Bed** $34,036



### Property Description

| | |
|---|---|
| **Property Type** | Assisted Living Residences |
| **Gross Building SF** | 22,950 |
| **No. of Units** | 89 |
| **No. of Beds** | 166 |
| **No. of Lots** | |
| **Year Built** | 1988 |
| **Building Condition** | Average |
| **Number of Stories** | 2 |
| **Pkg/1,000 SF GBA** | 1.87 |
| **Land/LtB Ratio** | 1.970 Acres / 3.74:1 |
| **Flood Hazard Zone** | Zone X - Outside 100 and 500 year floodplains |
| **Zoning Code** | HR |

**Verification**

| | |
|---|---|
| **Confirmation Source** | Deed, Articles, Public Record |

**Remarks**    Sale of an assisted

## Sales Comparison Analysis

When necessary, adjustments were made for differences in various elements of comparison, including property rights conveyed, financing terms, conditions of sale, expenditures made immediately after purchase, market conditions, location, and other physical characteristics. If the element in comparison is considered superior to that of the subject, a negative adjustment was applied. Conversely, a positive adjustment was applied if inferior. A summary of the elements of comparison follows.

## Transaction Adjustments

Transaction adjustments include: (1) real property rights conveyed, (2) financing terms, (3) conditions of sale, and (4) expenditures made immediately after purchase. These items, which are applied prior to the market conditions and property adjustments, are discussed as follows:

### Real Property Rights Conveyed

Real property rights conveyed influence sales prices and must be considered when analyzing a sale comparable. The property rights appraised reflect the fee simple interest. All of the sale comparables conveyed the same interest; therefore, no adjustments were required.

### Financing Terms

The transaction price of one property may differ from that of an identical property due to different financial arrangements. Sales involving financing terms that are not at or near market terms require adjustments for cash equivalency to reflect typical market terms. A cash equivalency procedure discounts the atypical mortgage terms to provide an indication of value at cash equivalent terms. All of the comparable sales involved typical market terms by which the sellers received cash or its equivalent and the buyers paid cash or tendered typical down payments and obtained conventional financing at market terms for the balance. Therefore, no adjustments for this category were required.

### Conditions of Sale

Atypical conditions of sale may result in a price that is higher or lower than a normal transaction. Such atypical conditions of sale often occur in conjunction with sales between related parties or those in which one of the parties is atypically motivated to complete the transaction. Additionally, a downward adjustment may be applied to a listing price, which usually reflects the upper limit of value. The sale comparables do not indicate any condition of sale adjustments were warranted for atypical conditions or for-sale listings.

### Expenditures Made Immediately After Purchase

A knowledgeable buyer considers expenditures required upon purchase of a property, as these costs affect the price the buyer agrees to pay. Such expenditures may include: costs to cure deferred maintenance, costs to demolish and remove any portion of the improvements, costs to petition for a zoning change, costs to remediate environmental contamination and/or costs to occupy or stabilize the property. The relevant figure is not the actual cost incurred, but the cost anticipated by both the buyer and seller. The parties to the sale comparables did not anticipate expenditures immediately after purchase; no adjustments were required.

## Market Conditions Adjustment

Market conditions change over time because of inflation, deflation, fluctuations in supply and demand, or other factors. Changing market conditions may create a need for adjustment to comparable sale transactions completed during periods of dissimilar market conditions.

Discussions with market participants and a review of market data indicated overall market conditions for



senior housing properties have been improving since COVID-19, with recent transactions confirming this trend. An annual adjustment factor of 2.00% was applied to each comparable to account for changes in market conditions.

## Property Adjustments

Property adjustments are usually expressed quantitatively as percentages or dollar amounts that reflect the differences in value attributable to the various characteristics of the property. In some instances, however, qualitative adjustments are used. These adjustments are based on locational and physical characteristics and are applied after the application of transaction and market conditions adjustments. The reasoning for the adjustments applied to each comparable follow.

### Location

Location adjustments may be required when the locational characteristics of a comparable are different from those of the subject. These characteristics can include general neighborhood characteristics, freeway accessibility, street exposure, corner- versus interior-lot location, neighboring properties, view amenities, and other factors.

We also took into consideration the surrounding population and median household incomes of the comparables compared to the subject.

Sales 1 and 4 are located in superior locations than the subject and required downward adjustments. Sales 2 and 3 are located in an inferior locations than the subject and required upward adjustments.

### Size

The size adjustment addresses variance in the units of the comparables and that of the subject, as a larger building typically commands a lower sale price per unit than a smaller building. This inverse relationship is due, in part, to the principle of "economies of scale."

The subject property consists of 169 units, while the sales range in size from 66 to 114 units and required adjustments.

### Age/Condition

All else being equal, older properties typically command a lower price per unit than newer properties. However, although a property may be older than another property, the effective age may be similar to a newer property with no adjustment warranted. This may be due to the older property being well maintained or a recent renovation. The adjustments to the comparables were based on effective age rather than actual age, which takes the remaining economic life estimate into consideration.

The subject is of older original construction relative to the comparable sales and requires a new roof. Downward adjustments were warranted for all comparables.

### Parking Ratio

Parking ratios impact market appeal to potential users. Higher ratios improve the functional utility of assisting living facilities like the subject.

Adjustments were made to comparables with material differences in parking ratios compared to the subject.

### Services / Room Types

The subject offers personal care and memory care services. Room types include private and shared studio and one-bedroom units. The subject's unit mix includes 26 one-bedroom units and 143 studios. We



analyzed the subject's services, mix of private and shared units, and types of units and compared them to the comparables.

All comparables offer similar services as the subject. Private rooms are more desirable and result in higher occupancy rates but typically result in less revenue per unit than shared rooms. Two-bedroom units generate more revenue than one-bedroom units, and one-bedroom units generate more revenue than studios.

Sale 1 offers private and shared personal care and memory care services with studios, one-bedroom, and two-bedroom units.
Sale 2 offers private and shared personal care and memory care services with studios, one-bedroom, and two-bedroom units available.
Sale 3 offers private and shared personal care and memory care services with studio and one-bedroom options available.
Sale 4 offers personal care and memory care services with private and shared one-bedroom and two-bedroom options.

Sales 1, 2, and 3 were considered superior and required downward adjustments.

## Operating Status

Sales 1, 3, and 4 were operating at the time of sales. No adjustments were required. Sale 2 was vacant at the time of sale. An upward adjustment was required.

## Summary of Adjustments

A summary of the adjustments made to the sale comparables is presented in the following adjustment grid:

### COMPARABLE SALES ADJUSTMENT GRID

| | Subject | Sale # 1 | Sale # 2 | Sale # 3 | Sale # 4 |
|---|---|---|---|---|---|
| Sale ID | | 1842686 | 1764084 | 1842728 | 1842725 |
| Sale ID | | 1842686 | 1764084 | 1842728 | 1842725 |
| Date of Value & Sale | March-26 December-25 | June-24 | October-24 | October-24 | July-25 |
| Property Name | Saucon Valley Manor Senior Living | Curaliving at East Norriton | Mount Vernon of South Park | Amoroso Wellness at York | Franklin Court Senior Living |
| Gross Building Area | 147,782 sf | 55,519 | 40,000 | 35,812 | 22,950 |
| Number of Units | 169 units | 114 | 66 | 104 | 89 |
| Land Area (acres) | 2.7000 | 5.2700 | 29.6000 | 5.0000 | 1.9700 |
| Unadjusted Sales Price | | $5,564,000 | $1,300,000 | $7,000,000 | $5,650,000 |
| **Unadjusted Sales Price per Unit** | | **$48,807** | **$19,697** | **$67,308** | **$63,483** |
| **Transactional Adjustments** | | | | | |
| **Transactional Adjustments** | | | | | |
| **Property Rights Conveyed** | *Fee Simple* | *Fee Simple* | *Fee Simple* | *Fee Simple* | *Fee Simple* |
| **Financing Terms** | *Cash to Seller* | *Cash to seller* | *Cash to seller* | *Cash to seller* | *Cash to seller* |
| **Conditions of Sale** | *Typical* | *Typical* | *Typical* | *Typical* | *Typical* |
| **Expenditures after Sale** | | | | | |
| Adjustment | | - | - | - | - |
| **Expenditures after Sale Market Conditions Adjustment** | | | | | |
| **Elapsed Time from Date of Value** | | *1.50 years* | *1.20 years* | *1.19 years* | *0.49 years* |

**Valbridge PROPERTY ADVISORS**

| | Subject | Comp 1 | Comp 2 | Comp 3 | Comp 4 |
|---|---|---|---|---|---|
| Market Trend Through | December-25 | 3.0% | 2.4% | 2.4% | 1.0% |
| **Analyzed Sales Price** | | **$50,270** | **$20,169** | **$68,916** | **$64,102** |
| **Property Adjustments** | | | | | |
| **Location** | 1050 Main Street, Hellertown, Pennsylvania | 2101 New Hope Street, Norristown, Pennsylvania | 1400 Riggs Road, South Park Township, Pennsylvania | 2830 Carol Road, York, Pennsylvania | 1660 Park Avenue, Quakertown, Pennsylvania |
| Relative Comparison | | Superior | Inferior | Inferior | Superior |
| Adjustment | | - | - | - | - |

**~~Market Conditions Adjustments~~**

| | Subject | Comp 1 | Comp 2 | Comp 3 | Comp 4 |
|---|---|---|---|---|---|
| ~~Elapsed Time from Date of Value~~ | | ~~1.72 years~~ | ~~1.42 years~~ | ~~1.42 years~~ | ~~0.71 years~~ |
| ~~Market Trend Through~~ | ~~March-26~~ | ~~3.4%~~ | ~~2.8%~~ | ~~2.8%~~ | ~~1.4%~~ |
| **~~Analyzed Sales Price~~** | | **~~$50,487~~** | **~~$20,256~~** | **~~$69,214~~** | **~~$64,384~~** |
| **~~Property Adjustments~~** | | | | | |
| **~~Location~~** | ~~1050 Main Street Norristown, Pennsylvania~~ | ~~2101 New Hope Street Hellertown, Pennsylvania~~ | ~~1400 Riggs Road South Park Township, Pennsylvania~~ | ~~2830 Carol Road York, Pennsylvania~~ | ~~1660 Park Avenue Quakertown, Pennsylvania~~ |
| ~~Relative Comparison~~ | | ~~Superior~~ | ~~Inferior~~ | ~~Inferior~~ | ~~Superior~~ |

| | Subject | Comp 1 | Comp 2 | Comp 3 | Comp 4 |
|---|---|---|---|---|---|
| **Size** | 169 units | 114 units | 66 units | 104 units | 89 units |
| Relative Comparison | Superior | Superior | Superior | Superior | Superior |
| **Age/Condition** Year Built | 1930 - Renovated 2000 | | 1988 - Renovated 2022 | 1994 | 1987 |
| Condition | Average | Average | Average | Average | Average |
| Relative Comparison | | Superior | Superior | Superior | Superior |



| | | | | | |
|---|---|---|---|---|---|
| **Parking Ratio** | *0.24 per 1,000* | *0.99 per 1,000* | *1.41 per 1,000* | *2.51 per 1,000* | *1.87 per 1,000* |
| Relative Comparison | | Superior | Superior | Superior | Superior |
| **Services / Room Types** | | *Superior* | *Superior* | *Similar* | *Superior* |
| Relative Comparison | | Superior | Superior | Similar | Superior |
| **Operating Status** | *Operating* | *Operating* | *Vacant* | *Operating* | *Operating* |
| Relative Comparison | Similar | Inferior | | Similar | Similar |
| **Overall Net Relative Comparison** | | **Superior** | **Inferior** | **Superior** | **Superior** |



## Sales Comparison Approach Value Indication

The comparables were adjusted based on pertinent elements of comparison. We considered a ranking analysis, which is a qualitative technique for analyzing comparable sales where comparable sales are ranked in descending or ascending order of desirability, and each is analyzed to determine its position relative to the subject. The chart below includes our concluded price per ~~guestroom~~unit for the subject and illustrates where the subject ranks amongst the comparable sales on an analyzed price per ~~guestroom~~unit basis.

### Ranking Analysis

| Comp # | Property Name | Address | Analyzed Price Per Unit |
|---|---|---|---|
| 2 | Mount Vernon of South Park | 1400 Riggs Road, South Park | $~~20,256~~20,169 |
| | Subject Conclusion | | $37,500 |
| 1 | Curaliving at East Norriton | 2101 New Hope Street, Norristown | $~~50,487~~50,270 |
| 4 | Franklin Court Senior Living | 1660 Park Avenue, ~~York~~Quakertown | $~~64,384~~64,102 |
| 3 | Amoroso Wellness at York | 2830 Carol Road, York | $~~69,214~~68,916 |

The sales comparison approach conclusion is presented in the following table:

| Improved Sales Comparison Approach Value Indication | | | | |
|---|---|---|---|---|
| Reasonable Adjusted Comparable Range | | | | |
| 169 units | x | $35,000 | = | $5,915,000 |
| 169 units | x | $40,000 | = | $6,760,000 |
| **As Is Fee Simple Market Value Indication (Real Estate Only)** | | | | |
| 169 units | x | **$37,500** | = | **$6,350,000** |

It should be noted that all sales represented real estate only and did not include FF&E and business value. Therefore, our value indication via the Sales Comparison Approach represents real estate only for the subject property.



# Reconciliation

## Summary of Value Indications

The indicated values from the approaches used and our concluded market values for the subject property are summarized in the following table.

**Value Indications**

~~Value Indications~~

| Approach to Value | Going Concern | Real Estate Only |
|---|---|---|
| Cost | Not Developed | Not Developed |
| Sales Comparison | Not Developed | $6,350,000 |
| Income Capitalization | | |
| Direct Capitalization | $8,800,000 | $6,450,000 |

**Value Conclusions**

| Component | Going Concern | Real Estate Only |
|---|---|---|
| Value Type | Market Value | Market Value |
| Real Property Interest | Fee Simple | Fee Simple |
| Effective Date of Value | ~~March 17~~December 26, ~~2026~~2025 | ~~March 17~~December 26, ~~2026~~2025 |
| **Value Conclusion** | **$8,800,000** | **$6,450,000** |
| | **$52,071 per unit** | **$38,166 per unit** |

The reliability and relevance of each value indication was considered based upon the quality of the data and applicability of the assumptions underlying each approach to reach a final opinion of value. Given the availability and reliability of data within the Income Approach, this approach was relied upon to reconcile final value conclusions. Furthermore, senior housing properties such as the subject property are typically purchased by senior housing operators, who primarily rely upon the methods employed by the Income Approach. The Sales Comparison Approach was developed as a check of reasonableness.

The findings and conclusions are further contingent upon the following extraordinary assumptions and/or hypothetical conditions, the use of which might have affected the assignment results:

## Extraordinary Assumptions:

- ~~None~~This appraisal contains retrospective values. Our valuation date is December 26, 2025. We inspected the property on March 17, 2026. We assume the condition of the property as of the effective date was similar to the condition observed during our inspection.

## Hypothetical Conditions:

- None

## Exposure Time and Marketing Period

Based on statistical information about days on market, escrow length, and marketing times gathered through national investor surveys, sales verification, and interviews of market participants, marketing and exposure time estimates of 6-12 months and 6-12 months, respectively, are considered reasonable and



appropriate for the subject property.



# Liquidation Value and Market Rent

According to the Appraisal of Real Estate 15th Edition published by the Appraisal Institute, the definition of liquidation value is:

The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a short time period.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and the seller are acting prudently and knowledgeably.
4. The seller is under extreme compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. A normal marketing effort is not possible due to the brief exposure time.
8. Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This report analyzes market evidence relating to liquidation sales of assisted living (AL) facilities and comparable senior housing assets. The analysis incorporates both current market research and transaction evidence derived from CoStar sales data.

CoStar Liquidation/Distressed Sale Evidence
The following liquidation sales were identified through CoStar transaction data. Discounts were measured between prior market transaction pricing and subsequent liquidation or distressed sale pricing.

**Liquidation/Distressed Sales Analysis**

| Comp # | Address | Market Sale Date | Market Sale Amount | Liquidation/Distressed Sale Date | Liquidation/Distressed Sale Amount | Days on Market as Distressed Sale | % Discount |
|---|---|---|---|---|---|---|---|
| 1 | 6333 Langston Avenue, New Port Richey, FL | July 11, 2023 | $2,000,000 | January 7, 2026 | $1,399,000 | 278 | 30.1% |
| 2 | 73685 Catalina Way, Palm Desert, CA | January 18, 2022 | $7,071,053 | August 21, 2025 | $4,910,000 | 70 | 30.6% |
| 3 | 1358 Manchester Drive, Conyers, GA | November 5, 2024 | $1,650,000 | August 13, 2025 | $1,500,000 | 201 | 9.1% |
| 4 | 601 E. Lake Street, Chisholm, MN | April 15, 2020 | $1,925,000 | October 3, 2023 | $1,700,000 | Unknown | 11.7% |
| 5 | 27601 Westchester Parkway, Westlake, OH | January 25, 2019 | $6,136,341 | February 26, 2025 | $1,300,000 | 45 | 78.8% |

| | |
|---|---|
| Min | 9.1% |
| Max | 78.8% |
| Median | 30.1% |
| Mean | 32.0% |

The CoStar dataset indicates a mean discount of 32.0%, with a median discount of 30.1%.

It should be noted that the assisted living occupancy rates started to drop in early 2020 and hit their low in late 2020 early 2021 due to COVID-19 before they started to recover. The chart below illustrates the occupancy rates over the timeframe. The market conditions as of the market sale and as of the liquidation/distressed sale for each comparable were considered.





Current Market Research and Industry Evidence

Recent market evidence from NIC (National Investment Center), CBRE Senior Housing Investor Surveys, and distressed senior housing transactions indicate continuing liquidity pressure within the senior housing sector.

The CBRE U.S. Senior Housing & Care Investor Survey H2 2025 identified stabilized assisted living capitalization rates near 7.8% in 2025, while distressed or turnaround assets frequently trade at capitalization rates ranging from approximately 10.5% to 12.0% with an average time on market of 90-180 days. This capitalization rate expansion implies valuation discounts generally ranging from approximately 25.7% to 35.0% with an average of 30.4%.

According to a Senior Housing News article dated November 10, 2025, a Wall Street Journal analysis found that Blackstone acquired 39 senior housing properties for around $755 million between 2022 and 2025 and later sold those same properties for about $536 million, representing a 29.0% discount from the original purchase price. Based on the pace of the dispositions, the average days on market per Blackstone property was approximately 150-180 days.

Comparison of Indicators





The CoStar-derived mean discount of 32.0% and the web-derived market evidence indicating approximately 29.7% were each given equal consideration. This results in a discount of approximately 30.9%.

Conclusions – Liquidation Value

Based upon the combined evidence from CoStar liquidation sale transactions, senior housing market research, and capitalization rate analysis, a supportable distressed sale discount for an assisted living facility like the subject marketed under a 90-day exposure period is estimated at approximately 30.9% below stabilized market value.

A reasonable appraisal conclusion would therefore support a liquidation or distressed sale adjustment in the range of approximately 25.0% to 35.0%, with 30.0% representing the most supportable indication.

We concluded a market going concern value of $8,800,000 as of December 26, 2025. Applying the 30.0% discount results in a liquidation value conclusion of $6,160,000, which we have rounded to $6,150,000.

We concluded a market real estate only value of $6,450,000 as of December 26, 2025. Applying the 30.0% discount results in a liquidation value conclusion of $4,515,000, which we have rounded to $4,500,000.

Our liquidation value conclusions are summarized in the chart below:

**Liquidation Value Conclusions**

| Component | Going Concern | Real Estate Only |
|---|---|---|
| Value Type | Liquidation Value | Liquidation Value |
| Real Property Interes | Fee Simple | Fee Simple |
| Effective Date of Val | December 26, 2025 | December 26, 2025 |
| **Value Conclusions** | **$6,150,000** | **$4,500,000** |
| | **$36,391 per unit** | **$26,627 per unit** |

## Market Rent

According to the Appraisal of Real Estate 15th Edition published by the Appraisal Institute, the definition of market rent is:



The most probable rent that a property should bring in a competitive and open market, reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (Tis).

The following summarizes the market rent analysis for the subject property, concluding a rent indication for the real estate only. The analysis applies the direct capitalization technique, utilizing the subject property's stabilized net operating income (NOI) and concluded overall capitalization rate. Market evidence from senior housing REIT transactions and lease agreements is incorporated to support lease type, term, and escalator conclusions.

Senior Housing Market Lease Analysis

In order to support our market rent conclusions, we gathered leases to determine the appropriate lease type and term for assisted living facilities like the subject. Our findings are below:

| (Added graphics) | | Renewal Options | Escalator | Notes |
|---|---|---|---|---|
| LTC Properties / Senior Lifestyle (2015) | 15 years | Not disclosed | 2.6%/yr | 13 AL properties, 500 units; NNN; $5.1M initial rent |
| LTC Properties / Veritas InCare (2015) | 10 years | Not disclosed | 2.5%/yr | 7 AL properties, Texas; $1.5M initial rent |
| LTC Properties / AL & MC Acquisition (2020) | 10 years | 4 × 5-year | 2.0%/yr (yr 2+) | 156 AL/MC units; NNN; 7.4% initial cash yield |
| Omega Healthcare / CommuniCare (SEC 8-K, 2005) | 10 years | 2 × 10-year | Annual (ND) | $11.6M annualized rent; AL/SNF portfolio |
| Omega Healthcare / Multiple (SEC 8-K, 2023) | Not specified | Standard | 2.0%– 2.5%/yr | Initial yields 8.0%–10.2%; consistent escalator structure |
| Welltower / NNN Portfolio (SEC 8-K, 2017) | ~20 years | Corporate guarantee | 3.0%/yr | Master lease at 7.5% initial yield; expires 2037 |
| Welltower / UK Portfolio (Oct 2025) | Not specified | Coverage reset q5 | 3.5%/yr | 152 NNN communities; rent reset at Welltower's election every 5 yrs |
| Ventas / Brookdale (Master Lease, exp. 2025) | Long-term | 2 × 10-year | 3.0%/yr | 120 communities; $113.6M/yr; renewal at greater of escalated or FMR (cap +10%/yr) |
| NHP / Emeritus (Essington AL, 2004) | ~15 years | 3 × 5-year | CPI-linked | Absolute NNN; renewal rent reset to FMR; SEC-filed |
| Assisted 4 Living (SEC Form 8-K, 2021) | ~11 years (2019– 2030) | 2 × 5-year | Annual (ND) | Absolute NNN; renewal at greater of escalated or FMR (capped +10%/yr) |
| CareTrust REIT / Ensign, Eduro, WLC (SEC XBRL, 2022) | 11–12 years | 2 × 5-year | Annual (fixed) | Amended NNN master leases; AL/SNF campuses |
| Spirit Finance / Senior Care (LawInsider) | 15–20 years | 2 × 10-year | Fixed annual | Multiple senior care master leases; 15- and 20-yr initial terms documented |

Given the data above as well as the characteristics of the subject property, we conclude the market lease type to be absolute net (NNN), a lease term of 10 years with two 5-year options, and 2.0% annual rental escalations.

Capitalization Rate Applied

We concluded a capitalization rate of 8.0% for the going concern. In order to determine an appropriate capitalization rate for the real estate only, we considered the risk associated with adding a 10-year



absolute net lease to the property and removing the business and FF&E from the property.

According to data published on December 28, 2022 by Greystone, a national commercial real estate lending and advisory firm, skilled nursing facilities provide useful data for understanding the relationship between going concern and leased-fee capitalization rates in the healthcare real estate sector. Greystone has noted that skilled nursing going concern capitalization rates are generally around 12.5%, while similar skilled nursing properties with net leases have capitalization rates of approximately 10.0%. This implies a going concern-to-leased-fee compression of approximately 200 to 250 basis points.

While assisted living facilities carry a different operational and regulatory profile than skilled nursing, this spread is a useful benchmark when transitioning from a going concern valuation premise to a leased-fee real property valuation supported by a long-term absolute net lease. Applied to the subject's going concern capitalization rate of 8.0%, a compression of 100 to 200 basis points is reasonable, reflecting the subject's assisted living use, the executed 10-year absolute net lease with 2.0% annual escalations and two 5-year renewal options. It also reflects the inherent re-tenanting and specialty-use risks associated with the absence of business and FF&E value. This supports a leased-fee real property capitalization rate conclusion in the range of 6.0% to 7.0%.

As a result, we concluded a capitalization rate of 6.50% for the real estate only which has been utilized to determine market rent of the real estate of the subject.

The formula applied to calculate the market rent under an absolute net lease is market rent = real estate only value multiplied by the capitalization rate. Our calculation and conclusion is shown in the table below:

### Market Rent Conclusion

| Component | Real Estate Only | | Capitalization Rate | | Real Estate Only |
|---|---|---|---|---|---|
| Value Type | Market Value | | | | Market Rent |
| Effective Date of Value | December 26, 2025 | | | | December 26, 2025 |
| Conclusion | $6,450,000 | x | 6.50% | = | $419,250 annual rent |

© 2026 VALBRIDGE PROPERTY ADVISORS | PHILADELPHIA    PAGE 126



# General Assumptions and Limiting Conditions

This appraisal is subject to the following general assumptions and limiting conditions:

1.      The legal description – if furnished to us – is assumed to be correct.

2.      No responsibility is assumed for legal matters, questions of survey or title, soil or subsoil conditions, engineering, availability or capacity of utilities, or other similar technical matters. The appraisal does not constitute a survey of the property appraised. All existing liens and encumbrances have been disregarded and the property is appraised as though free and clear, under responsible ownership and competent management unless otherwise noted.

3.      Unless otherwise noted, the appraisal will value the property as though free of contamination. Valbridge Property Advisors | Philadelphia will conduct no hazardous materials or contamination inspection of any kind. It is recommended that the client hire an expert if the presence of hazardous materials or contamination poses any concern.

4.      The stamps and/or consideration placed on deeds used to indicate sales are in correct relationship to the actual dollar amount of the transaction.

5.      Unless otherwise noted, it is assumed there are no encroachments, zoning violations or restrictions existing in the subject property.

6.      The appraiser is not required to give testimony or attendance in court by reason of this appraisal, unless previous arrangements have been made.

7.      Unless expressly specified in the engagement letter, the fee for this appraisal does not include the attendance or giving of testimony by Appraiser at any court, regulatory or other proceedings, or any conferences or other work in preparation for such proceeding. If any partner or employee of Valbridge Property Advisors | Philadelphia is asked or required to appear and/or testify at any deposition, trial, or other proceeding about the preparation, conclusions or any other aspect of this assignment, client shall compensate Appraiser for the time spent by the partner or employee in appearing and/or testifying and in preparing to testify according to the Appraiser's then current hourly rate plus reimbursement of expenses.

8.      The values for land and/or improvements, as contained in this report, are constituent parts of the total value reported and neither is (or are) to be used in making a summation appraisal of a combination of values created by another appraiser. Either is invalidated if so used.

9.      The dates of value to which the opinions expressed in this report apply are set forth in this report. We assume no responsibility for economic or physical factors occurring at some point at a later date, which may affect the opinions stated herein. The forecasts, projections, or operating estimates contained herein are based on current market conditions and anticipated short-term supply and demand factors and are subject to change with future conditions. Appraiser is not responsible for determining whether the date of value requested by Client is appropriate for Client's intended use.

10.     The sketches, maps, plats and exhibits in this report are included to assist the reader in visualizing the property. The appraiser has made no survey of the property and assumed no responsibility in connection with such matters.

11.     The information, estimates and opinions, which were obtained from sources outside of this office, are considered reliable. However, no liability for them can be assumed by the appraiser.

12.     Possession of this report, or a copy thereof, does not carry with it the right of publication. Neither all, nor any part of the content of the report, or copy thereof (including conclusions as to property value, the identity of the appraisers, professional designations, reference to any professional appraisal organization or the firm with which the appraisers are connected), shall be disseminated



to the public through advertising, public relations, news, sales, or other media without prior written consent and approval.

13. No claim is intended to be expressed for matters of expertise that would require specialized investigation or knowledge beyond that ordinarily employed by real estate appraisers. We claim no expertise in areas such as, but not limited to, legal, survey, structural, environmental, pest control, mechanical, etc.

14. This appraisal was prepared for the sole and exclusive use of the client for the function outlined herein. Any party who is not the client or intended user identified in the appraisal or engagement letter is not entitled to rely upon the contents of the appraisal without express written consent of Valbridge Property Advisors | Philadelphia and Client. The Client shall not include partners, affiliates, or relatives of the party addressed herein. The appraiser assumes no obligation, liability or accountability to any third party.

15. Distribution of this report is at the sole discretion of the client, but third-parties not listed as an intended user on the face of the appraisal or the engagement letter may not rely upon the contents of the appraisal. In no event shall client give a third-party a partial copy of the appraisal report. We will make no distribution of the report without the specific direction of the client.

16. This appraisal shall be used only for the function outlined herein, unless expressly authorized by Valbridge Property Advisors | Philadelphia.

17. This appraisal shall be considered in its entirety. No part thereof shall be used separately or out of context.

18. Unless otherwise noted in the body of this report, this appraisal assumes that the subject property does not fall within the areas where mandatory flood insurance is effective. Unless otherwise noted, we have not completed nor have we contracted to have completed an investigation to identify and/or quantify the presence of non-tidal wetland conditions on the subject property. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

19. The flood maps are not site specific. We are not qualified to confirm the location of the subject property in relation to flood hazard areas based on the FEMA Flood Insurance Rate Maps or other surveying techniques. It is recommended that the client obtain a confirmation of the subject property's flood zone classification from a licensed surveyor.

20. If the appraisal is for mortgage loan purposes 1) we assume satisfactory completion of improvements if construction is not complete, 2) no consideration has been given for rent loss during rent-up unless noted in the body of this report, and 3) occupancy at levels consistent with our "Income and Expense Projection" are anticipated.

21. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover them.

22. Our inspection included an observation of the land and improvements thereon only. It was not possible to observe conditions beneath the soil or hidden structural components within the improvements. We inspected the buildings involved, and reported damage (if any) by termites, dry rot, wet rot, or other infestations as a matter of information, and no guarantee of the amount or degree of damage (if any) is implied. Condition of heating, cooling, ventilation, electrical and plumbing equipment is considered to be commensurate with the condition of the balance of the improvements unless otherwise stated. Should the client have concerns in these areas, it is the client's responsibility to order the appropriate inspections. The appraiser does not have the skill or expertise to make such inspections and assumes no responsibility for these items.

23. This appraisal does not guarantee compliance with building code and life safety code requirements of the local jurisdiction. It is assumed that all required licenses, consents, certificates of occupancy



or other legislative or administrative authority from any local, state or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value conclusion contained in this report is based unless specifically stated to the contrary.

24.    When possible, we have relied upon building measurements provided by the client, owner, or associated agents of these parties. In the absence of a detailed rent roll, reliable public records, or "as-built" plans provided to us, we have relied upon our own measurements of the subject improvements. We follow typical appraisal industry methods; however, we recognize that some factors may limit our ability to obtain accurate measurements including, but not limited to, property access on the day of inspection, basements, fenced/gated areas, grade elevations, greenery/shrubbery, uneven surfaces, multiple story structures, obtuse or acute wall angles, immobile obstructions, etc. Professional building area measurements of the quality, level of detail, or accuracy of professional measurement services are beyond the scope of this appraisal assignment.

25.    We have attempted to reconcile sources of data discovered or provided during the appraisal process, including assessment department data. Ultimately, the measurements that are deemed by us to be the most accurate and/or reliable are used within this report. While the measurements and any accompanying sketches are considered to be reasonably accurate and reliable, we cannot guarantee their accuracy. Should the client desire more precise measurement, they are urged to retain the measurement services of a qualified professional (space planner, architect or building engineer) as an alternative source. If this alternative measurement source reflects or reveals substantial differences with the measurements used within the report, upon request of the client, the appraiser will submit a revised report for an additional fee.

26.    In the absence of being provided with a detailed land survey, we have used assessment department data to ascertain the physical dimensions and acreage of the property. Should a survey prove this information to be inaccurate, upon request of the client, the appraiser will submit a revised report for an additional fee.

27.    If only preliminary plans and specifications were available for use in the preparation of this appraisal, and a review of the final plans and specifications reveals substantial differences upon request of the client the appraiser will submit a revised report for an additional fee.

28.    Unless otherwise stated in this report, the value conclusion is predicated on the assumption that the property is free of contamination, environmental impairment or hazardous materials. Unless otherwise stated, the existence of hazardous material was not observed by the appraiser and the appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation or other potentially hazardous materials may affect the value of the property. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required for discovery. The client is urged to retain an expert in this field, if desired.

29.    The Americans with Disabilities Act ("ADA") became effective January 26, 1992. We have not made a specific compliance survey of the property to determine if it is in conformity with the various requirements of the ADA. It is possible that a compliance survey of the property, together with an analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this could have a negative effect on the value of the property. Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in developing an opinion of value.

30.    This appraisal applies to the land and building improvements only. The value of trade fixtures, furnishings, and other equipment, or subsurface rights (minerals, gas, and oil) were not considered in this appraisal unless specifically stated to the contrary.



31. No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated, unless specifically stated to the contrary.

32. Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute prediction of future operating results. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance.

33. Any estimate of insurable value, if included within the scope of work and presented herein, is based upon figures developed consistent with industry practices. However, actual local and regional construction costs may vary significantly from our estimate and individual insurance policies and underwriters have varied specifications, exclusions, and non-insurable items. As such, we strongly recommend that the Client obtain estimates from professionals experienced in establishing insurance coverage. This analysis should not be relied upon to determine insurance coverage and we make no warranties regarding the accuracy of this estimate.

34. The data gathered in the course of this assignment (except data furnished by the Client) shall remain the property of the Appraiser. The appraiser will not violate the confidential nature of the appraiser-client relationship by improperly disclosing any confidential information furnished to the appraiser. Notwithstanding the foregoing, the Appraiser is authorized by the client to disclose all or any portion of the appraisal and related appraisal data to appropriate representatives of the Appraisal Institute if such disclosure is required to enable the appraiser to comply with the Bylaws and Regulations of such Institute now or hereafter in effect.

35. You and Valbridge Property Advisors | Philadelphia both agree that any dispute over matters in excess of $5,000 will be submitted for resolution by arbitration. This includes fee disputes and any claim of malpractice. The arbitrator shall be mutually selected. If Valbridge Property Advisors | Philadelphia and the client cannot agree on the arbitrator, the presiding head of the Local County Mediation & Arbitration panel shall select the arbitrator. Such arbitration shall be binding and final. In agreeing to arbitration, we both acknowledge that, by agreeing to binding arbitration, each of us is giving up the right to have the dispute decided in a court of law before a judge or jury. In the event that the client, or any other party, makes a claim against Valbridge Property Advisors | Philadelphia or any of its employees in connections with or in any way relating to this assignment, the maximum damages recoverable by such claimant shall be the amount actually received by Valbridge Property Advisors | Philadelphia for this assignment, and under no circumstances shall any claim for consequential damages be made.

36. Valbridge Property Advisors | Philadelphia shall have no obligation, liability, or accountability to any third party. Any party who is not the "client" or intended user identified on the face of the appraisal or in the engagement letter is not entitled to rely upon the contents of the appraisal without the express written consent of Valbridge Property Advisors | Philadelphia. "Client" shall not include partners, affiliates, or relatives of the party named in the engagement letter. Client shall hold Valbridge Property Advisors | Philadelphia and its employees harmless in the event of any lawsuit brought by any third party, lender, partner, or part-owner in any form of ownership or any other party as a result of this assignment. The client also agrees that in case of lawsuit arising from or in any way involving these appraisal services, client will hold Valbridge Property Advisors | Philadelphia harmless from and against any liability, loss, cost, or expense incurred or suffered by Valbridge Property Advisors | Philadelphia in such action, regardless of its outcome.

37. The Valbridge Property Advisors office responsible for the preparation of this report is independently owned and operated by Lukens and Wolf LLC. Neither Valbridge Property Advisors, Inc., nor any of its affiliates has been engaged to provide this report. Valbridge Property Advisors, Inc. does not provide valuation services, and has taken no part in the preparation of this report.

38. If any claim is filed against any of Valbridge Property Advisors, Inc., a Florida Corporation, its



affiliates, officers or employees, or the firm providing this report, in connection with, or in any way arising out of, or relating to, this report, or the engagement of the firm providing this report, then (1) under no circumstances shall such claimant be entitled to consequential, special or other damages, except only for direct compensatory damages, and (2) the maximum amount of such compensatory damages recoverable by such claimant shall be the amount actually received by the firm engaged to provide this report.

39. This report and any associated work files may be subject to evaluation by Valbridge Property Advisors, Inc., or its affiliates, for quality control purposes.

40. Acceptance and/or use of this appraisal report constitutes acceptance of the foregoing general assumptions and limiting conditions.



# Certification – David Koczirka, MAI

I certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. The undersigned has not performed any services regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. A report for this property was delivered April 20, 2026 and a supplemental letter delivered May 18, 2026.

5. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

9. David Koczirka has personally inspected the subject property.

10. No one provided significant real property appraisal assistance to the person signing this certification, unless otherwise noted.

11. The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13. As of the date of this report, the undersigned has completed the continuing education program for Designated Members of the Appraisal Institute.

(Mod)

David Koczirka, MAI
Senior Appraiser
PA Certified General Real Estate Appraiser
Certification No.: GA004457
License Expires: June 30, 2027



# Certification – Richard F. Wolf, MAI, SRA, AI-GRS, CRE

I certify that, to the best of my knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.  I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.  The undersigned has not performed any services regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. A report for this property was delivered April 20, 2026 and a supplemental letter delivered May 18, 2026.

5.  I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6.  My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7.  My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8.  My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

9.  Richard F. Wolf ~~has~~did not personally ~~inspected~~inspect the subject property.

10. No one provided significant real property appraisal assistance to the person signing this certification, unless otherwise noted.

11. The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13. As of the date of this report, the undersigned has completed the continuing education program for Designated Members of the Appraisal Institute.

Richard F. Wolf, MAI, SRA, AI-GRS, CRE
Senior Managing Director
PA Certified General Real Estate Appraiser
Certification No.: GA-001514-L
License Expires: June 30, 2027



# Addenda

Copy of Roof Replacement Cost Estimate Glossary

Qualifications

- David Koczirka, MAI - Senior Appraiser

- Richard F. Wolf, MAI, SRA, AI-GRS, CRE - Senior Managing Director

Information on Valbridge Property Advisors

Office Locations

## Copy of Roof Replacement Cost Estimate





**GOUCK ARCHITECTS**

Stewart J. Gouck, AIA
Registered    Architect

Mr. Abraham Atiyeh
Saucon Valley Manor 1
1050 Main Street
Hellertown, PA 18055

March 18, 2026

RE: Saucon Valley Manor 1 Complete Re-Roof

Abe,

The modified bitumen and rubber roofs at Saucon Valley Manor 1 are alligator-cracked and pinholed, seams and details are delaminating, the roofs are leaking, and these roofs have reached the end of their life.

We recommend a complete tear-off and replacement of the entire roof at Saucon Valley Manor 1, with one exception: A roof re-cover can be done at the 4-story secured Alzheimer's wing (2006 addition), allowing the tapered insulation to remain intact at this location.


Best Regards,


Eugene Berg, Jr., AIA
Registered Architect
Gouck Architects
1304 Hamilton Street
Allentown, PA 18102


1304 Hamilton Street
Allentown PA 18102
610.439.8818
gouckarch@prodigy.net





Stewart J. Gouck, AIA
Registered    Architect

### Saucon Valley Manor 1- Total Reroof Cost Estimate
### 1050 Main Street
### Hellertown, PA 18055
### as of March 18, 2026

**General Notes:**

($2/SF tear-off & disposal + $3/SF ½" Carlisle SecurShield HD High Density Polyisocyanurate Cover Board + $7/SF fully adhered .060" EPDM rubber = $12/SF total)

Note: Another option at the gym courtyard floor is to remove the concrete pavers and install heat welded vinyl Duradek Membrane, which is a tough, walkable membrane.  For this option, add (1057SF)($6/SF add)=$6,342.

Note: 4-story Thomas Street Addition can be a roof re-cover rather than a complete tear-off.  The existing tapered insulation can remain.

Note: Building is already insulated with 10" R-30 fiberglass batt insulation laid on top of the Chicago Grid suspended drywall, so thicker insulation is not necessary at the roof

**Rubber Roof Replacement:**

At entire rubber roof including: 3rd Floor Roof, 2006 Addition, 2nd Floor prior Auditorium Roof, Cafeteria/Dining Room 1st Floor Roof, Front Porch Bus Canopy Roof, South Entry Roof off Sycamore Street,  Porte Cochere Roof at Lower Level Offices, & Gym Courtyard Rubber floor membrane.

Tear-Off & Disposal, ½" SecurShield HD Polyiso, Fully Adhered .060 EPDM

| | |
|---|---|
| 53,729 SF of Rubber Roof x $12/SF = | $644,748 |
| Parapet Rubber Wrap over Copings: (2529 lin ft coping)(3 feet wrap)($12/SF)= | $91,044 |
| Replace Metal Copings at all roof edges (2529 lin. ft.)($20/lin ft coping)= | $50,580 |
| Termination Bar where low roofs terminate into rising walls: (813 lin. ft)($10/lin. ft term bar)= | $8,130 |

1304 Hamilton Street
Allentown PA 18102
610.439.8818
gouckarch@prodigy.net



Metal Roof Edges
(82 lin ft)($15/lin ft metal roof edge)=                                    $1,230

Building Expansion Joint
(213 lin ft)($40/lin ft roof expansion joint)=                          $8,520

Roof Drains (following the pattern at the 4-story addition):
(47 Roof Drains)($1000/drain)=                                            $47,000

(Replace 12 Velux skylights & curbs, reflash )($4,000 each)=    $48,000

HVAC Curbs & Kitchen Exhaust Fan Curbs:
(15 HVAC Unit Curbs - Reflash w/ rubber, boots)($2,500)=      $37,500

Condensing Units:
(Lift 24 condensing units & set on rubber walk pads, boots)($800)= $19,200

**Shingled Roofs:**
10:12 slope shingled roofs (x1.3 slope multiplier calculated in area)
$2/SF tearoff + $6/SF new shingled roof = $8/SF total
1173 SF Front gabled Florida Room + 127 SF NW corner entrance
+ 145 SF Cafeteria entrance

(1445 SF shingled roofs)($8/SF total)=                                $11,560

Total Cost:                                                                        $967,512
10% Contingency for additional penetrations, deck rot & details   +$96,751

**Grand Total Saucon Valley Manor 1 Total Reroof Cost:**      $1,064,263

## Glossary

Definitions are taken from The Dictionary of Real Estate Appraisal, 7th Edition (Dictionary), the Uniform Standards of Professional Appraisal Practice (USPAP), and Building Owners and Managers Association International (BOMA).

### Absolute Net Lease
A lease in which the tenant pays all expenses including structural maintenance, building reserves, and management; often a long-term lease to a credit tenant. (Dictionary)

### Amortization
The process of retiring a debt or recovering a capital investment, typically through scheduled, systematic repayment of the principal; a program of periodic contributions to a sinking fund or debt retirement fund. (Dictionary)

### As Is Market Value
The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. (Interagency Appraisal and Evaluation Guidelines) Note that the use of the "as is" phrase is specific to appraisal regulations pursuant to FIRREA applying to appraisals prepared for regulated lenders in the United States. The concept of an "as is" value is not included in the Standards of Valuation Practice of the Appraisal Institute, Uniform Standards of

Professional Appraisal Practice, or International Valuation Standards. (Dictionary)

### Base Rent
The minimum rent stipulated in a lease. (Dictionary)

### Base Year
The year on which escalation clauses in a lease are based. (Dictionary)

### Building Common Area
In office buildings, the areas of the building that provide services to building tenants but that are not included in the office area or store area of any specific tenant. These areas may include, but shall not be limited to, main and auxiliary lobbies, atrium spaces at the level of the finished floor, concierge areas or security desks, conference rooms, lounges or vending areas, food service facilities, health or fitness centers, daycare facilities, locker or shower facilities, mail rooms, fire control rooms, fully enclosed courtyards outside the exterior walls, and building core and service areas such as fully enclosed mechanical or equipment rooms. Specifically excluded from building



common area are floor common areas, parking space, portions of loading docks outside the building line, and major vertical penetrations. (BOMA)

### Building Rentable Area

The sum of all floor rentable areas. Floor rentable area is the result of subtracting from the gross measured area of a floor the major vertical penetrations on that same floor. It is generally fixed for the life of the building and is rarely affected by changes in corridor size or configuration. (BOMA)

### Bulk Value

The value of multiple units, subdivided plots, or properties in a portfolio as though sold together in a single transaction. (Dictionary)

### Certificate of Occupancy (COO)

A formal written acknowledgment by an appropriate unit of local government that a new construction or renovation project is at the stage where it meets applicable health and safety codes and is ready for commercial or residential occupancy. (Dictionary)

### Common Area Maintenance (CAM)

The expense of operating and maintaining common areas; may or may not include management charges and usually does not include capital expenditures on tenant improvements or other improvements to the property. (Dictionary)

The amount of money charged to tenants for their shares of maintaining a [shopping] center's common area. The charge that a tenant pays for shared services and facilities such as electricity, security, and maintenance of parking lots. Items charged to common area maintenance may include cleaning services, parking lot sweeping and maintenance, snow removal, security, [amenities,] and upkeep. (ICSC – International Council of Shopping Centers, 4th Ed.)

### Condominium

An attached, detached, or stacked unit within or attached to a structure with common areas that are held as tenants in common (an undivided interest) with other owners in the project. The units can be residential, commercial, industrial, or parking spaces or boat docks. These units are commonly defined by state laws in their locations. Because units can be stacked on top of other units, these units can be defined both vertically and horizontally. (Dictionary)

### Conservation Easement

An interest in real estate restricting future land



use to preservation, conservation, wildlife habitat, or some combination of those uses. A conservation easement may



permit farming, timber harvesting, or other uses of a rural nature as well as some types of conservation-oriented development to continue, subject to the easement. (Dictionary)

## Contributory Value
A type of value that reflects the amount a property or component of a property contributes to the value of another asset or to the property as a whole.

The change in the value of a property as a whole, whether positive or negative, resulting from the addition or deletion of a property component. Also called deprival value in some countries. (Dictionary)

## Debt Coverage Ratio (DCR)
The ratio of net operating income to annual debt service (DCR = $NOI \div I_m$), which measures the relative ability of a property to meet its debt service out of net operating income; also called *debt service coverage ratio (DSCR)*. A larger *DCR* typically indicates a greater ability for a property to withstand a reduction of income, providing an improved safety margin for a lender. (Dictionary)

## Deed Restriction
A provision written into a deed that limits the use of land. Deed restrictions usually remain in effect when title passes to subsequent owners. (Dictionary)

## Depreciation
In appraisal, a loss in property value from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the value of the improvement on the same date.

In accounting, an allocation of the original cost of an asset, amortizing the cost over the asset's life; calculated using a variety of standard techniques. (Dictionary)

## Disposition Value
The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a specified time, which is shorter than the typical exposure time for such a property in that market.

2. The property is subjected to market conditions prevailing as of the date of valuation;

3. Both the buyer and seller are acting prudently and knowledgeably;

4. The seller is under compulsion to sell;

5. The buyer is typically motivated;

6. Both parties are acting in what they consider to be their best interests;

7. An adequate marketing effort will be made during the exposure time;

8. Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto; and

9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms. (Dictionary)

## Double Net (Net Net) Lease
An alternative term for a type of net lease. In some markets, a net net lease is defined as a lease in which the tenant is responsible to pay both property taxes and premiums for insuring the building(s). (Valbridge)

(The market definition of a double net lease varies depending on the market)

## Easement
The right to use another's land for a stated purpose. (Dictionary)

## EIFS
Exterior Insulation Finishing System. This is a type of exterior wall cladding system. Sometimes referred to as dry-vit.

## Effective Date
1. The date on which the appraisal opinion applies. (SVP)
2. The date to which an appraiser's analyses, opinions, and conclusions apply; also referred to as date of value. (USPAP, 2020-2021 ed.)
3. The date that a lease goes into effect. (Dictionary)

## Effective Gross Income (EGI)
The anticipated income from all operations of the real estate after an allowance is made for vacancy and collection losses and an addition is made for any other income. (Dictionary)

## Effective Rent
Total base rent, or minimum rent stipulated in a lease, over the specified lease term minus rent concessions; the rent that is effectively paid by a tenant net of financial concessions provided by a landlord. (TIs). (Dictionary)

## EPDM
Ethylene Propylene Diene Monomer Rubber. A type of synthetic rubber typically used for roof coverings.

## Escalation Clause

A clause in an agreement that provides for the adjustment of a price or rent based on some event or index. e.g., a provision to increase rent if operating expenses increase; also called *escalator clause, expense recovery clause or stop clause*. (Dictionary)

## Estoppel Certificate

A signed statement by a party (such as a tenant or a mortgagee) certifying, for another's benefit, that certain facts are correct, such as that a lease exists, that there are no defaults, and that rent is paid to a certain date. (Black's) In real estate, a buyer of rental property typically requests estoppel certificates from existing tenants. Sometimes referred to as an *estoppel letter*. (Dictionary)

## Excess Land

Land that is not needed to serve or support the existing use. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land has the potential to be sold separately and is valued separately. (Dictionary)

## Excess Rent

The amount by which contract rent exceeds market rent at the time of the appraisal; created by a lease favorable to the landlord (lessor) and may reflect unusual management, unknowledgeable or unusually motivated parties, a lease execution in an earlier, stronger rental market, or an agreement of the parties. (Dictionary)

## Expense Stop

A clause in a lease that limits the landlord's expense obligation, which results in the lessee paying operating expenses above a stated level or amount. (Dictionary)

## Exposure Time

1. The time a property remains on the market.
2. An opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. (USPAP, 2020-2021 ed.)

## Extraordinary Assumption

An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

**Comment:** Uncertain information might include physical, legal, or economic characteristics of the subject property; or conditions external to the property, such as market conditions or trends; or the integrity of data used in an analysis. (USPAP)

## Fee Simple Estate

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the



governmental powers of taxation, eminent domain, police power, and escheat. (Dictionary)

## Floor Common Area

In an office building, the areas on a floor such as washrooms, janitorial closets, electrical rooms, telephone rooms, mechanical rooms, elevator lobbies, and public corridors which are available primarily for the use of tenants on that floor. In essence, floor common area represents all of the area on the floor that is common to that respective floor with the exception of those areas that penetrate through the floor, such as the elevator shaft and stairwell. The significant point to be made is that floor common area is not part of the tenant's usable area. (BOMA)

## Full Service (Gross) Lease

A lease in which the landlord receives stipulated rent and is obligated to pay all of the property's operating and fixed expenses; also called a *full service lease*. (Dictionary)

## Furniture, Fixtures, and Equipment (FF&E)

Business trade fixtures and personal property, exclusive of inventory. (Dictionary)

## Going-Concern Value

An outdated label for the market value of all the tangible and intangible assets of an established and operating business with an indefinite life, as if sold in aggregate; more accurately termed the *market value of the going concern* or *market value of the total assets of the business*. (Dictionary)

## Gross Building Area (GBA)

1. Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above-grade area. This includes mezzanines and basements if and when typically included in the market area of the type of property involved.
2. Gross leasable area plus all common areas.
3. For residential space, the total area of all floor levels measured from the exterior of the walls and including the superstructure and substructure basement; typically does not include garage space. (Dictionary)

## Gross Measured Area

The total area of a building enclosed by the dominant portion (the portion of the inside finished surface of the permanent outer building wall which is 50 percent or more of the vertical floor-to-ceiling dimension, at the given point being measured as one moves horizontally along the wall), excluding parking areas and loading docks (or portions of same) outside the building

line. It is generally not used for leasing purposes and is calculated on a floor by floor basis. (BOMA)

## Gross Up Method

A method of calculating variable operating expenses in income-producing properties when less than 100% occupancy is assumed. Expenses reimbursed based on the amount of occupied space, rather than on the total building area, are described as "grossed up." (Dictionary)

## Gross Sellout Value (Sum of the Retail Values)

The sum of the separate and distinct market value opinions for each of the units in a condominium, subdivision development, or portfolio of properties, as of the date of valuation. The aggregate of retail values does not represent the value of all the units as though sold together in a single transaction; it is simply the total of the individual market value conclusions. An appraisal has an effective date, but summing the sale prices of multiple units over an extended period of time will not be the value on that one day unless the prices are discounted to make the value equivalent to what another developer or investor would pay for the bulk purchase of the units. Also called the *aggregate of the retail values, aggregate retail selling price or sum of the retail values*. (Dictionary)

## Ground Lease

A lease that grants the right to use and occupy land. Improvements made by the ground lessee typically revert to the ground lessor at the end of the lease term. (Dictionary)

## Ground Rent

The rent paid for the right to use and occupy land according to the terms of a ground lease; the portion of the total rent allocated to the underlying land. (Dictionary)

## HVAC

Heating, ventilation, air conditioning (HVAC) system. A unit that regulates the temperature and distribution of heat and fresh air throughout a building. (Dictionary)

## Highest and Best Use

1. The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.
2. The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use of for some alternative use. This is determined by the use that a market participant would have in



mind for the asset when formulating the price that it would be willing to bid. (IVS)

3. [The] highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future. (Uniform

Appraisal Standards for Federal Land Acquisitions) (Dictionary)

### Hypothetical Condition

1. A condition that is presumed to be true when it is known to be false. (SVP)
2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

**Comment:** Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP)

### Insurable Value (Replacement Cost for Insurance Purposes)

The estimated cost, at current prices as of the effective date of valuation, of a substitute for the building being valued, using modern materials and current standards, design, and layout for insurance coverage purposes guaranteeing that damaged property is replaced with new property (i.e., depreciation is not deducted). (Dictionary)

### Investment Value

1. The value of a property to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market. (Dictionary)
2. The value of an asset to the owner or a prospective owner given individual investment or operational objectives (may also be known as worth). (IVS)

### Just Compensation

In condemnation, the amount of loss for which a property owner is compensated when his or her property is taken. Just compensation should put the owner in as good a position pecuniarily as he or she would have been if the property had not been taken. (Dictionary)

### Leased Fee Interest

The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. (Dictionary)

### Leasehold Interest (Leasehold Estate)

The right held by the lessee to use and occupy real

estate for a stated term and under the conditions specified in the lease. (Dictionary)

See also Positive Leasehold and Negative Leasehold.

### Lessee (Tenant)

One who has the right to occupancy and use of the property of another for a period of time according to a lease agreement. (Dictionary)

### Lessor (Landlord)

One who conveys the rights of occupancy and use to others under a lease agreement. (Dictionary)

### Liquidation Value

The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a short time period.

2. The property is subjected to market conditions prevailing as of the date of valuation.

3. Both the buyer and seller are acting prudently and knowledgeably.

4. The seller is under extreme compulsion to sell.

5. The buyer is typically motivated.

6. Both parties are acting in what they consider to be their best interests.

7. A normal marketing effort is not possible due to the brief exposure time.

8. Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto.

9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (Dictionary)

### Loan to Value Ratio (LTV)

The ratio between a mortgage loan and the value of the property pledged as security, usually expressed as a percentage. (Dictionary)

### Major Vertical Penetrations

Stairs, elevator shafts, flues, pipe shafts, vertical ducts, and the like, and their enclosing walls. Atria, lightwells and similar penetrations above the finished floor are included in this definition. Not included, however, are vertical penetrations built for the private use of a tenant occupying office areas on more than one floor. Structural columns, openings for vertical electric cable or telephone distribution, and openings for plumbing lines are not considered to be major vertical penetrations. (BOMA)

### Market Rent

The most probable rent that a property should bring in a competitive and open market under all the conditions requisite to a fair lease transaction, the lessee and the lessor each acting prudently and knowledgeably, and

assuming the rent is not affected by undue stimulus. Implicit in this definition is the execution of a lease as of a specified date under conditions whereby:

1. Lessee and lessor are typically motivated;
2. Both parties are well informed or well advised, and acting in what they consider their best interests;
3. Payment is made in terms of cash or in terms of financial arrangements comparable thereto; and
4. The rent reflects specified terms and conditions, such as permitted uses, use restrictions, expense obligations, duration, concessions, rental adjustments and revaluations, renewal and purchase options, and tenant improvements (TIs). (Appraisal Institute)

## Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States: The most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;

2. Both parties are well informed or well advised, and acting in what they consider their own best interests;

3. A reasonable time is allowed for exposure in the open market;

4. Payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and

5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (Dictionary; 12 C.F.R. Part 34.42(g); 55 Federal Register 34696, August 24, 1990,
as amended at 57 Federal Register 12202, April 9, 1992; 59 Federal Register 29499, June 7, 1994)

## Marketing Time

An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. (Advisory Opinion 7 of the Appraisal Standards Board of the Appraisal Foundation)



### Master Lease

1. A lease in which a part or the entire property is leased to a single entity (the master lessee) in return for a stipulated rent. The master lessee then subleases the property to multiple tenants.
2. The first lease in a sandwich lease. (Dictionary)

### Modified Gross Lease

A lease in which the landlord receives stipulated rent and is obligated to pay some, but not all, of the property's operating and fixed expenses. Since assignment of expenses varies among modified gross leases, expense responsibility must always be specified. In some markets, a modified gross lease may be called a *double net lease, net net lease, partial net lease, or semi-gross le*ase. (Dictionary)

### Negative Leasehold

A lease situation in which the market rent is less than the contract rent. (Dictionary)

### Operating Expense Ratio

The ratio of total operating expenses to effective gross income (*TOE/EGI*); the complement of the net income ratio, i.e., *OER = 1 – NIR* (Dictionary)

### Option

A legal contract, typically purchased for a stated consideration, that permits but does not require the holder of the option (known as the *optionee*) to buy, sell, or lease real estate for a stipulated period of time in accordance with specified terms; a unilateral right to exercise a privilege. (Dictionary)

### Partial Interest

Divided or undivided rights in real estate that represent less than the whole, i.e., a fractional interest such as a tenancy in common or easement. (Dictionary)

### Pass Through

A tenant's portion of operating expenses that may be composed of common area maintenance (CAM), real property taxes, property insurance, and any other expenses determined in the lease agreement to be paid by the tenant. (Dictionary)

### Percentage Lease

A lease in which the rent or some portion of the rent represents a specified percentage of the volume of business, productivity, or use achieved by the tenant. (Dictionary)

### Positive Leasehold

A lease situation in which the market rent is greater than the contract rent. (Dictionary)

### Potential Gross Income (PGI)

The total income attributable to property at full occupancy before vacancy and operating expenses are deducted. (Dictionary)

### Prospective Opinion of Value

A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy. (Dictionary)

### Replacement Cost

The estimated cost to construct, at current prices as of a specific date, a substitute for a building or other improvements, using modern materials and current standards, design, and layout. (Dictionary)

### Reproduction Cost

The estimated cost to construct, at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship and embodying all of the deficiencies, superadequacies, and obsolescence of the subject building. (Dictionary)

### Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term *retrospective* does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion." (Dictionary)

### Sandwich Leasehold Estate

The interest held by the sandwich leaseholder when the property is subleased to another party; a type of leasehold estate. (Dictionary)

### Sublease

An agreement in which the lessee in a prior lease conveys the right of use and occupancy of a property to another, the sublessee, for a specific period of time, which may or may not be coterminous with the underlying lease term. (Dictionary)

## Subordination

A contractual arrangement in which a party with a claim to certain assets agrees to make that claim junior, or subordinate, to the claims of another party. (Dictionary)



### Surplus Land

Land that is not currently needed to support the existing use but cannot be separated from the property and sold off for another use. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel. (Dictionary)

### TPO

Thermoplastic polyolefin, a resilient synthetic roof covering.

### Triple Net (Net Net Net) Lease

An alternative term for a type of net lease. In some markets, a net net net lease is defined as a lease in which the tenant assumes all expenses (fixed and variable) of operating a property except that the landlord is responsible for structural maintenance, building reserves, and management; also called *NNN lease, net net net lease, or fully net lease*. (Dictionary)

(The market definition of a triple net lease varies; in some cases tenants pay for items such as roof repairs, parking lot repairs, and other similar items.)

### Usable Area

The measured area of an office area, store area, or building common area on a floor. The total of all the usable areas for a floor shall equal floor usable area of that same floor. (BOMA)

### Value-in-Use

1. The amount determined by discounting the future cash flows (including the ultimate proceeds of disposal) expected to be derived from the use of an asset at an appropriate rate that allows for the risk of the activities concerned. (FASB Accounting Standards Codification, Master Glossary)
2. Formerly used in valuation practice as a synonym for *contributory value* or *use value*. (Dictionary)

### VTAB (Value of the Total Assets of a Business) The

total amount that the real property, tangible personal property, and intangible property assets of a business would sell for in an asset-based transaction. (Dictionary)

## Qualifications of David Koczirka, MAI
## Senior Appraiser

Valbridge Property Advisors | Philadelphia

*Independent Valuations for a Variable World*

### State Certifications

PA State Certified Appraiser License No. GA004457

PA Real Estate Salesperson License No. RS318425

### Education

M.B.A. – West Chester University

B.A. in Economics
– Villanova University



<u>Contact Details</u> dkoczirka@valbridge.com
215-545-1900 (main)
484-965-9590 (direct)

Valbridge Property Advisors | Philadelphia
900 W. Valley Road, Suite 503
Wayne, PA 19087 www.valbridge.com

## Membership/Affiliations:
Member: Appraisal Institute – MAI
Designation Philadelphia Metro
Chapter of the Appraisal Institute

## Appraisal Institute & Related Courses:
Advanced Concepts and Case Studies
Advanced Market Analysis and
Highest and Best Use Advanced
Income Capitalization
Quantitative Analysis
General Appraiser Report Writing
and Case Studies General Appraiser
Income Approach (Parts 1 & 2)
General Appraiser Site Valuation and
Cost Approach General Appraiser
Sales Comparison Approach
General Appraiser Market Analysis and
Highest and Best Use Real Estate Finance,
Statistics, and Valuation Modeling
Basic
Appraisal
Procedure
s Basic
Appraisal
Principles
National
USPAP
PA State Laws and Regulations

## Experience:
**Senior Appraiser**
Valbridge Property Advisors|Philadelphia (August 2019 to Present)

**Real Estate Appraiser Trainee**
Valbridge Property Advisors|Philadelphia (July 2016 to August 2019)

**PA Real Estate Salesperson**
Reaves C Lukens Jr. Co. Inc. (January 2019 to Present) BHHS Fox and Roach (September 2011 to January 2019)

**Operations Associate- Commercial Real Estate**
M&T Bank (October 2014 to July 2016)

## Valuation Assignments Include:
A wide range of commercial properties including multi-family, industrial, office, retail, hotel, railroad, senior housing, residential



subdivision, manufactured housing, and land valuation assignments.



## Qualifications of Richard F. Wolf, MAI, SRA, AI-GRS, CRE
### Senior Managing Director
Valbridge Property Advisors | Philadelphia

*Independent Valuations for a Variable World*

### State Certifications
PA State Certified Appraiser GA-001514-L –
2/97
NJ State Certified Appraiser 42RG00206200 – 7/06
DE State Certified Appraiser X1-0000346 –
6/02
NY State Certified Appraiser 46000054261

### License
PA Real Estate Salesperson License NS-131771-A –
8/87-2025
PA Real Estate Instructor RI006507 - 3/15
PA Real Estate Brokers License RB070154 & RM426032
-3/2025

### Education
Villanova University
B.S., Business Administration -1983

### Additional Background
Former Chairman of Skippack Township Planning Commission Former Member of Central Perkiomen Valley Regional Planning Commission
Former Member of Skippack Township Open Space Committee Former owner/operator of an equestrian facility which boards 50 horses, employs 5 instructors, servicing 1,200 students and contains a 2,000 square foot retail store.

### Contact Details
rwolf@valbridge.com 215-545-1900
(main)
215-545-1903 (direct) Valbridge Property
Advisors | Philadelphia
900 W. Valley Road Suite 503
Wayne, PA 19087 www.valbridge.com

### Membership/Affiliations:
Member: Appraisal Institute - MAI Designation – Certificate No. 12292
– January 2005
SRA & AI-GRS - 2019
Chapter President – 2010
Chapter Education Chair 2011- 2017
Regional Director 2018 – 2022
Audit Member of National Board of Directors 2023-Current
Member of Counselors of Real Estate – CRE
Designation – Certificate No. 12475 – November
2006

### Experience:
**Senior Managing Director**
Valbridge Property Advisors | Lukens & Wolf LLC (2013-Present)

**Principal**
Lukens & Wolf LLC (2011-2013)

**Real Estate Appraiser**
Reaves C. Lukens Company (1997-2011)

**Investment Advisor**
Vanguard Group (1992-1997)

**Real Estate Appraiser**
Donald J. Reape, MAI, SREA & Associates (1995-1997)

**Independent Contractor**
Dowling & Associates (1994-1997)

**Scope of Appraisal and Counseling Activity**
Experience in a wide range of property types including: multi-family, industrial, office, retail and land in Greater Delaware Valley. Particular concentration in mining operations and land development analysis. Also experience with nursing homes, continuing care retirement communities (CCRC), farm/equestrian facilities, apartment complexes, hotels, and industrial/R & D facilities.

# Court Testimony

Bucks County, Pennsylvania - Board of Appeals (Tax Appeals)
Bucks County, Pennsylvania – Court of Common Pleas (Condemnation)
Bucks County, Pennsylvania - Divorce Proceeding (Appearance) Camden
County, District of New Jersey – Federal Court (Bankruptcy) Camden
County, New Jersey – Superior Court (Condemnation)
Chester County Pennsylvania – Court of Common Pleas (Tax Appeals)
Chester County, Pennsylvania - Board of Appeals (Tax Appeals) Chester
County, Pennsylvania - Board of Appeals (Tax Appeals) Chester County,
Pennsylvania - Board of View (Condemnation)
Chester County, Pennsylvania – Court of Common Pleas (Damage case)
Chester County, Pennsylvania - Court of Common Pleas (Environmental Damages)
Chester County, Pennsylvania – Court of Common Pleas (Land Development) Delaware
County, Pennsylvania - Board of Appeals (Tax Appeals)
Delaware County, Pennsylvania – Court of Common Pleas (Tax Appeal)
Lancaster County, Pennsylvania – Board of View (Condemnation) Lancaster
County, Pennsylvania – Court of Common Pleas (Tax Appeal) Montgomery
County, Pennsylvania - Board of Appeals (Tax Appeals)
Montgomery County, Pennsylvania – Court of Common Pleas (Condemnation)
Montgomery County, Pennsylvania – Court of Common Pleas (Tax Appeals)
Northampton County, Pennsylvania -Board of Appeals (Tax Appeals)
Northumberland County, Central District of Pennsylvania – Federal Court (Bankruptcy) Pennsylvania
Department of Revenue – Harrisburg (Transfer Tax case)
Philadelphia County, Pennsylvania – Board of Revision of Taxes
Philadelphia County, Pennsylvania -- Court of Common Pleas Willistown
Township - Chester County Zoning Board (Building Right) York County,
Pennsylvania – Court of Common Pleas (Board of View)

## Teaching / Education

Appraisal Institute 2015 Real Estate Trends
Appraisal Institute 2016 Real Estate Trends
Appraisal Institute 2017 Real Estate Trends
Counselors of Real Estate 2017 Real Estate Symposium
Pennsylvania Bar Institute August 2016 "A Lawyer's Guide to Appraisals and Appraisers"

# Partial List of Client

**PARTIAL LIST OF CLIENTS**

**BANKS AND SAVINGS & LOANS**

TD Bank
Republic Bank
First Niagara
Crusader Bank
PNC Bank
The Bryn Mawr Trust Company
The Glenmede Trust Company

**DEVELOPERS AND INVESTORS**

Acorn Development Corporation
C & M Builders
Dewey Commercial
Westrum Development Co.
Toll Brothers, Inc.
Heritage Homes Group
Hovnanian

**PRIVATE SECTOR**

Better Materials, Inc.
Chester County Airport Authority
Clemens Markets
Delancey Investment Corp.
Hanson Aggregates, PLC
Highway Materials
Pennsylvania Hospital
SAP America
SmithKline Beecham
Waste Management, Inc.
The DePaul Group
Main Line Health Wisler Pearlstine, LLP

**LAW FIRMS**

Ballard, Spahr, LLP
Dechert LLP
Duane Morris LLP
Eastburn and Gray, PC
Fox Rothschild LLP
High Swartz LLP
Lamb McErlane, PC
Mette, Evans & Woodside
Montgomery McCracken Walker & Rhodes, LLP
Riley, Riper, Hollin & Colagreco, Attorneys at Law
Sprague and Sprague

**EDUCATIONAL AND GOVERNMENTAL**

Abington School District Archdiocese
of Philadelphia Archdiocese of

Camden Montgomery County,
Pennsylvania Swarthmore College
Philadelphia Swarthmore College
University of Pennsylvania

Case 25-15245 Doc 216 Filed 07/10/26 Entered 07/13/26 10:26:38 Desc
Exhibit F    Page 380 of 418

## Educational Background

**APPRAISAL INSTITUTE -** Courses / Seminars successfully completed:

Counselors of Real Estate – Real Estate Symposium 2017
Appraisal Institute – Real Estate Trends Seminar 2017
Appraisal Institute – NJ Regulations 2017
Appraisal Institute – USPAP 2017 Appraisal
Institute – PA Regulations 2017
Appraisal Institute – Real Estate Trends Seminar 2016
Appraisal Institute – DE Regulations 2016
Appraisal Institute – Real Estate Trends Seminar 2015
Appraisal Institute – Supervisory / Trainee 2015 Appraisal
Institute – USPAP 2014
Appraisal Institute – Review Theory – General 2014
Appraisal Institute - Fundamentals of Separating Real Property,
 Personal Property and Intangible Business Assets, 2012
Appraisal Institute - Business Practices and Ethics, 2010
Appraisal Institute - Consumer Protection in the Appraisal Industry, 2010 Appraisal
Institute - Real Estate Finance, Value and Investment Performance, 2010 Appraisal
Institute - Legislative, Regulatory and Judicial Update, 2009
Appraisal Institute - Delaware State Regulations, 2009
Appraisal Institute - Appraising Distressed Commercial Real Estate, 2009 Appraisal
Institute - PA State Regulations, 2009
Appraisal Institute - 7 Hour National USPAP Update Course, 2009 Appraisal
Institute - Valuation of Conservation Easements, 2008 Appraisal Institute -
Evaluating Commercial Construction, 2008 Appraisal Institute - Leadership
Development & Advisory Council, 2008 Appraisal Institute - Delaware State
Regulations, 2007
Appraisal Institute - Leadership Development Advisory Council, 2007
Appraisal Institute - 7 Hour National USPAP Update Course, 2007 Appraisal
Institute - RECGA Conference, 2006
Appraisal Institute - Contemporary Legal & Appraisal Issues Involving Eminent Domain, 2006 Appraisal
Institute - Pennsylvania Appraisal Statues, Regs, Bd. Policies, 2006
Appraisal Institute - Market Analysis & Using the Site to Do Business, 2005 Appraisal
Institute - The Latest Trends in Hotel Valuation and Market Studies, 2005 Appraisal
Institute - Maximizing the Value of an Appraisal Practice, 2005
Appraisal Institute - Attacking and Defending an Appraisal in Litigation, 2005
Appraisal Institute - Subdivision Valuation, 2005
Appraisal Institute - Real Estate Finance, 2004
Appraisal Institute - Standards of Professional Practice A and B, 2001 Appraisal
Institute - Advanced Applications, 1998
Appraisal Institute - Sales Comparison & Cost Approaches, 1998
Appraisal Institute - Highest and Best Use, 1997
Appraisal Institute - Advanced Income Capitalization, 1996
Appraisal Institute - Basic Income Capitalization, 1993 Appraisal
Institute - Intro to Appraising Real Property, 1987

**Real Estate Courses taken and successfully completed**

Schlicher Kratz Institute - Real Estate Investment, 2001 Polley
Associates - Contemporary Legal Issues, 2000 Polley
Associates - Using Technology, 2000
Polley Associates - Ethics (Let's Get It Right), 1996
Polley Associates - Appraisal Applications, 1995
Polley Associates - Standards of Practices & Ethics, 1994



# FAST FACTS

- Valbridge specializes in appraising all types of real property.

- Valbrldge provides Independent valuation services. We are NOT owned by a brokerage firm or

- Every Valbndge office b overseen by a Senior Nlanaglng Director who holds the MAI designation of the Apgra at institute.

- Valbrldge b ewned by local offices.

- Valbrldge welcomes slngle-Ixoperty esslgnmena as well as ponfole, mule-market nrid other bu4c-property engagemen\s.

**Valbridge Property Advisors, Inc.**
Phone: 888.981.2029
**valbridge.com**

  

| **ALABAMA** | | |
|---|---|---|
| 26241 Equity Dr., Ste. 101 | 4245 Balmoral Dr. SW, Unit 4201 | 4732 Woodmere Blvd. |
| Daphne, AL 36526 | Huntsvllle, AL 35801 | Montgomery, AL 36106 |
| (251) 929-9090 | (256) 210-1555 | (334) 277-5077 |
| | | **CALIFORNIA** |



327-1660

17822 17'^ St., Ste. 211
Tustin, CA 92780
(714) 449&852

1530 The Alameda, Ste. 100
San Jose, CA 95126
(408) 279-1520

## COLORADO
5345 Arapahoe Ave., Ste. 6
Boulder, CO 80303
(303) 867-1935

## FLORIDA
301 Almeria Ave., Ste. 350
Coral Gables, FL 33134
(305) 639-8029

3780 Bums Rd., Ste. 4
Palm Beach Gardens, FL
33410
(561) 833-5331

## IDAFiO
3910 S. Yellowstone Hwy., Ste. BS
Iclaho Falls, ID 83402
(208) 534-5505

1875 N. Lakewood Dr., Ste. 100
Coeur dAlene, ID 83814
(208) 292-2965

## INDIANA
6801 Lake Plazs Dr., Ste. C-301
Indianapolis, IN 46220
(317} 687-2747

## KANSAS
10990 Oulvlra Ref., Ste. 100
Overland Park, KS 66210 (913)
451-1451

## KEMTUCKY
1890 Star Shoot Pkwy.
Lexington, KY 4O5O9
(502) 585-3651

9401 WIlliamsburg Plaza, Ste. 2O4
Louisville, KY 40222
(502) 585-3651

## MARYLAND
2709 Hanson Ave., Ste. T2
Baltimore, MD 21209
(443) 333-5525

## MA55ACf-iiJSETT5
31 Washington SL, Ste. 4
Wellesley, MA 02481
(781) 790-5645

(313) 986-3313

2127 University Park
Dr. Okemos, MI
48864
(517} 336-0001

## IyiiuuESOTA
1515 Central Pkwy., Ste. 120
Eagan, MN 55121
(651) 370-1475

## uississiwi
1010 Ford St.
Gulfport, MS 39507
(228) 604-1900

## 224AvaonCr
Brandon, MS 39047
(601) 853-0736

501 Highway 12 W., Ste. 150-M
Starkvllle, MS 39759
(662) 617-2350

## MISSOURI
1118 Hampton Ave., Ste. 208
St. Louis, MO 63139
(314) 255-1323

## NEW M5iXKO
7301 Indlan School Rd. NE, Ste. A
Albuquerque, NM 87110
(505) 884-4721

## MOUTH CAROLINA
S9SO Fairvlew Rd.,
Ste. 405 Charlotte,
NC 28210
(704) 376-5400

**CORPORATE OFFICE**
1250 Falrmont Avenue, Mount Pleasant, SC 29464 I Phone:
(239) 325-8234 I Fax: (239) 325-B356
*Each Volbridge office is Independently owned and opeiofied.*

**valbrldge.com**

*rev. 010726*



118 Broadway N., Ste. 509
Fargo, ND 58091
(701) 289-1676

**OHIO**

8298 Clough Pike, Ste. 1
Cincinnati, OH 45244
(513) 785-0820

**OKLAHOMA**

6666 S. Sheridan Rd., Ste. 104
Tulsa, OK 74133
(918) 712-9992

3121 Ouail Springs Pkwy., Ste. 1S0
Oklahoma City, OK 73134
(405) 603-1553

**PENNSYLVANIA**

900 West Valley Rd., Ste. 503 Wayne, PA 19O87
(215) 545-1900

4701 Baptist Rd., Pte. 304
Pittsburgh, PA 15227
(412) 881-6080

**SOUTI i CAROLINA**

1250 Fairmont Ave.
Mt. Pleasant, SC 29464
(843) 8841266

11 Cleveland Ct.
Greenvllle, SC 29607

29902
(843) 8841266

3500 RInggold Rd., Ste. 3
Chattanooga, TN 37412
(423) 206-2677

213 Fox Rd.
Knoxvllle, TN 37922
(865) 522-2424

756 Ridge Lake Blvd., Ste. 225
Memphis, TN 38120
(901) 7S3&977

**TEXAS**

901 Mopac Expy. S., Bldg. 1, Ste. 300
Austin, TX 78746
(737) 242-8585

10210 North Central Expy., Ste. 115
Dallas, TX 75231
(214) 44&1611

974 Campbell Rd., Ste. 204
Houston, TX 77024
(713) 467-5858

273181st St.
Lubbock, TX 79423
(806) 744-1188

9901 IH-10 West, Ste. 1035
San Antonio, TX 7823O
(210) 227-6229

**UTAH**

527 E. Pioneer Rd., Ste. 24O
Draper, UT 84020
(801) 262-3388

20 North Main St.
St. George, UT 84770
(435) 773-6300

321 N. County Blvd., Ste. D
American Fork, UT 84003 (801) 492-0000



Beaufort, SC

656 Independence Pkwy., Ste. 220
Chesapeake, VA 23320
{7S7} 410-1222

1231 Alverser Dr.
Midlothian, VA 23113
(757) 345-0010

51O7 Center SL, Ste. 2B
WIlliamsburg, VA 23188
(7S7} 345-OO1O

**WASHiMGTObi**

8378 W. Grandrldge Blvd., Ste. 110-D
Kennewick, WA 99336
(5O9) 221-1540

324 N. Mullan Rd.
Spokane Valley, WA 99206
(509) 747-0999

**W!SCONSIN**

1266O W. North Ave. Brookfield,
WI 53005
(262) 782-7990



**valbFi‹*ge.com**



150 S. Warner Road, Suite 440 WayneKing of Prussia, PA 1940619087
215-545-1900 phone
215-545-8548 fax
valbridge.com

May 18, 2026
Mr. Abraham Atiyeh
1050 Main Street
Hellertown, PA 18055
RE:    Supplemental Letter – Liquidation Value and Market Rent
        Saucon Valley Manor Senior Living
        1050 Main Street
        Hellertown,  Pennsylvania  18055

Dear Mr. Atiyeh:

On April 20, 2026, we published an appraisal report on the above referenced property. That report is hereby incorporated into this supplemental letter, which expresses our opinion of market rent and a liquidation value for the property.

Our analysis and conclusions are shown on the following pages.

Respectfully submitted,

Valbridge Property Advisors | Philadelphia

David Koczirka, MAI Senior Appraiser
PA Certified General Real Estate Appraiser
Certification No.: GA004457
License Expires: June 30, 2027

Richard F. Wolf, MAI, SRA, AI-GRS, CRE
Senior Managing Director
PA Certified General Real Estate Appraiser
Certification No.: GA-001514-L
License Expires: June 30, 2027

© 2026 VALBRIDGE PROPERTY ADVISORS | PHILADELPHIA



# Liquidation Value and Market Rent

Valbridge Property Advisors (VPA) completed an appraisal report on April 20, 2026, which included a market going concern value conclusion and real estate only value conclusion. This letter includes an opinion of the orderly liquidation value and market rent for the subject property.

## Liquidation Value

According to the Appraisal of Real Estate 15th Edition published by the Appraisal Institute, the definition of liquidation value is:

The most probable price that a specified interest in property should bring under the following conditions:
1. Consummation of a sale within a short time period.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and the seller are acting prudently and knowledgeably.
4. The seller is under extreme compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. A normal marketing effort is not possible due to the brief exposure time.
8. Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This report analyzes market evidence relating to liquidation sales of assisted living (AL) facilities and comparable senior housing assets. The analysis incorporates both current market research and transaction evidence derived from CoStar sales data.

## CoStar Liquidation/Distressed Sale Evidence

The following liquidation sales were identified through CoStar transaction data. Discounts were measured between prior market transaction pricing and subsequent liquidation or distressed sale pricing.

**Liquidation/Distressed Sales Analysis**

| Comp # | Address | Market Sale Date | Market Sale Amount | Liquidation/Distresse d Sale Date | Liquidation/Distressed Sale Amount | Days on Market as Distressed Sale | % Discount |
|---|---|---|---|---|---|---|---|
| 1 | 6333 Langston Avenue, New Port Richey, FL | July 11, 2023 | $2,000,000 | January 7, 2026 | $1,399,000 | 278 | 30.1% |
| 2 | 73685 Catalina Way, Palm Desert, CA | January 18, 2022 | $7,071,053 | August 21, 2025 | $4,910,000 | 70 | 30.6% |
| 3 | 1358 Manchester Drive, Conyers, GA | November 5, 2024 | $1,650,000 | August 13, 2025 | $1,500,000 | 201 | 9.1% |
| 5 | 601 E. Lake Street, Chisholm, MN | April 15, 2020 | $1,925,000 | October 3, 2023 | $1,700,000 | Unknown | 11.7% |
| 6 | 27601 Westchester Parkway, Westlake, OH | January 25, 2019 | $6,136,341 | February 26, 2025 | $1,300,000 | 45 | 78.8% |

| | |
|---|---|
| Min | 9.1% |
| Max | 78.8% |
| Median | 30.1% |
| Mean | 32.0% |

The CoStar dataset indicates a mean discount of 32.0%, with a median discount of 30.1%.

It should be noted that the assisted living occupancy rates started to drop in early 2020 and hit their low in late 2020 early 2021 due to COVID-19 before they started to recover. The chart below illustrates the occupancy rates over the timeframe. The market conditions as of the market sale and as of the liquidation/distressed sale for each comparable were considered.



1050 MAIN STREET



**(Deleted)** by Property Type
NIC MAP | Primary Markets

— Majority IL
— Majority AL
— Majority NC

Current Market Research and Industry Evidence
Recent market evidence from NIC (National Investment Center), CBRE Senior Housing Investor Surveys, and distressed senior housing transactions indicate continuing liquidity pressure within the senior housing sector.

The CBRE U.S. Senior Housing & Care Investor Survey H2 2025 identified stabilized assisted living capitalization rates near 7.8% in 2025, while distressed or turnaround assets frequently trade at capitalization rates ranging from approximately 10.5% to 12.0% with an average time on market of 90-180 days. This capitalization rate expansion implies valuation discounts generally ranging from approximately 25.7% to 35.0% with an average of 30.4%.
According to a Senior Housing News article dated November 10, 2025, a Wall Street Journal analysis found that Blackstone acquired 39 senior housing properties for around $755 million between 2022 and 2025 and later sold those same properties for about $536 million, representing a 29.0% discount from the original purchase price. Based on the pace of the dispositions, the average days on market per Blackston property was approximately 150-180 days.

Comparison of Indicators



1050 MAIN STREET



The CoStar-derived mean discount of 32.0% and the web-derived market evidence indicating approximately 29.7% were each given equal consideration. This results in a discount of approximately 30.9%.

Conclusions – Liquidation Value
Based upon the combined evidence from CoStar liquidation sale transactions, senior housing market research, and capitalization rate analysis, a supportable distressed sale discount for an assisted living facility like the subject marketed under a 90-day exposure period is estimated at approximately 30.9% below stabilized market value.

A reasonable appraisal conclusion would therefore support a liquidation or distressed sale adjustment in the range of approximately 25.0% to 35.0%, with 30.0% representing the most supportable indication.

We concluded a market going concern value of $8,800,000 as of March 17, 2026 in our appraisal report dated April 20, 2026. Applying the 30.0% discount results in a liquidation value conclusion of $6,160,000, which we have rounded to $6,150,000.

We concluded a market real estate only value of $6,450,000 as of March 17, 2026 in our appraisal report dated April 20, 2026. Applying the 30.0% discount results in a liquidation value conclusion of $4,515,000, which we have rounded to $4,500,000.

Our liquidation value conclusions are summarized in the chart below:

| Liquidation Value Conclusions | | |
| --- | --- | --- |
| Component | Going Concern | Real Estate Only |
| Value Type | Liquidation Value | Liquidation Value |
| Real Property Interes | Fee Simple | Fee Simple |
| Effective Date of Val | March 17, 2026 | March 17, 2026 |
| Value Conclusions | $6,150,000 | $4,500,000 |
| | $36,391 per unit | $26,627 per unit |

## Market Rent
According to the Appraisal of Real Estate 15th Edition published by the Appraisal Institute, the definition of market rent is:

The most probable rent that a property should bring in a competitive and open market, reflecting all



conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (Tis).

The following summarizes the market rent analysis for the subject property, concluding a rent indication for the real estate only. The analysis applies the direct capitalization technique, utilizing the subject property's stabilized net operating income (NOI) and concluded overall capitalization rate from our appraisal report dated April 20, 2026. Market evidence from senior housing REIT transactions and lease agreements is incorporated to support lease type, term, and escalator conclusions.

Senior Housing Market Lease Analysis

In order to support our market rent conclusions, we gathered leases to determine the appropriate lease type and term for assisted living facilities like the subject. Our findings are below:

| (Deleted graphics) | | Renewal Options | Escalator | Notes |
|---|---|---|---|---|
| LTC Properties / Senior Lifestyle (2015) | 15 years | Not disclosed | 2.6%/yr | 13 AL properties, 500 units; NNN; $5.1M initial rent |
| LTC Properties / Veritas InCare (2015) | 10 years | Not disclosed | 2.5%/yr | 7 AL properties, Texas; $1.5M initial rent |
| LTC Properties / AL & MC Acquisition (2020) | 10 years | 4 × 5-year | 2.0%/yr (yr 2+) | 156 AL/MC units; NNN; 7.4% initial cash yield |
| Omega Healthcare / CommuniCare (SEC 8-K, 2005) | 10 years | 2 × 10-year | Annual (ND) | $11.6M annualized rent; AL/SNF portfolio |
| Omega Healthcare / Multiple (SEC 8-K, 2023) | Not specified | Standard | 2.0%–2.5%/yr | Initial yields 8.0%–10.2%; consistent escalator structure |
| Welltower / NNN Portfolio (SEC 8-K, 2017) | ~20 years | Corporate guarantee | 3.0%/yr | Master lease at 7.5% initial yield; expires 2037 |
| Welltower / UK Portfolio (Oct 2025) | Not specified | Coverage reset q5 | 3.5%/yr | 152 NNN communities; rent reset at Welltower's election every 5 yrs |
| Ventas / Brookdale (Master Lease, exp. 2025) | Long-term | 2 × 10-year | 3.0%/yr | 120 communities; $113.6M/yr; renewal at greater of escalated or FMR (cap +10%/yr) |
| NHP / Emeritus (Essington AL, 2004) | ~15 years | 3 × 5-year | CPI-linked | Absolute NNN; renewal rent reset to FMR; SEC-filed |
| Assisted 4 Living (SEC Form 8-K, 2021) | ~11 years (2019–2030) | 2 × 5-year | Annual (ND) | Absolute NNN; renewal at greater of escalated or FMR (capped +10%/yr) |
| CareTrust REIT / Ensign, Eduro, WLC (SEC XBRL, 2022) | 11–12 years | 2 × 5-year | Annual (fixed) | Amended NNN master leases; AL/SNF campuses |
| Spirit Finance / Senior Care (LawInsider) | 15–20 years | 2 × 10-year | Fixed annual | Multiple senior care master leases; 15- and 20-yr initial terms documented |

Given the data above as well as the characteristics of the subject property explained in our appraisal report dated April 20, 2026, we conclude the market lease type to be absolute net (NNN), a lease term of 10 years with two 5-year options, and 2.0% annual rental escalations.

Capitalization Rate Applied

We concluded a capitalization rate of 8.0% for the going concern. In order to determine an appropriate capitalization rate for the real estate only, we considered the risk associated with adding a 10-year absolute net lease to the property and removing the business and FF&E from the property.

According to data published on December 28, 2022 by Greystone, a national commercial real estate



lending and advisory firm, skilled nursing facilities provide useful data for understanding the relationship between going concern and leased-fee capitalization rates in the healthcare real estate sector. Greystone has noted that skilled nursing going concern capitalization rates are generally around 12.5%, while similar skilled nursing properties with net leases have capitalization rates of approximately 10.0%. This implies a going concern-to-leased-fee compression of approximately 200 to 250 basis points.

While assisted living facilities carry a different operational and regulatory profile than skilled nursing, this spread is a useful benchmark when transitioning from a going concern valuation premise to a leased-fee real property valuation supported by a long-term absolute net lease. Applied to the subject's going concern capitalization rate of 8.0%, a compression of 100 to 200 basis points is reasonable, reflecting the subject's assisted living use, the executed 10-year absolute net lease with 2.0% annual escalations and two 5-year renewal options. It also reflects the inherent re-tenanting and specialty-use risks associated with the absence of business and FF&E value. This supports a leased-fee real property capitalization rate conclusion in the range of 6.0% to 7.0%.

As a result, we concluded a capitalization rate of 6.50% for the real estate only which has been utilized to determine market rent of the real estate of the subject.

The formula applied to calculate the market rent under an absolute net lease is market rent = real estate only value multiplied by the capitalization rate.  Our calculation and conclusion is shown in the table below:

| Market Rent Conclusion | | | | |
|---|---|---|---|---|
| Component | Real Estate Only | | Capitalization Rate | Real Estate Only |
| Value Type | Market Value | | | Market Rent |
| Effective Date of Value | March 17, 2026 | | | March 17, 2026 |
| Conclusion | $6,450,000 | x | 6.50% = | $419,250 annual rent |

# Certification – David Koczirka, MAI

I certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. The undersigned has performed any services regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.



9. David Koczirka has personally inspected the subject property.

10. No one provided significant real property appraisal assistance to the person signing this certification, unless otherwise noted.

11. The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13. As of the date of this report, the undersigned has completed the continuing education program for Designated Members of the Appraisal Institute.

(Del)

David Koczirka, MAI
Senior Appraiser
PA Certified General Real Estate Appraiser
Certification No.: GA004457
License Expires: June 30, 2027

# Certification – Richard F. Wolf, MAI, SRA, AI-GRS, CRE

I certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. The undersigned has performed services regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

9. Richard F. Wolf has personally inspected the subject property.

10. { Appraiser3Name } provided significant real property appraisal assistance to the person signing



this certification, unless otherwise noted.

11. The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13. As of the date of this report, the undersigned has completed the continuing education program for Designated Members of the Appraisal Institute.

(Del)

Richard F. Wolf, MAI, SRA, AI-GRS, CRE
Senior Managing Director
PA Certified General Real Estate Appraiser
Certification No.: GA-001514-L
License Expires: June 30, 2027

Qualifications of David Koczirka, MAI
Senior Appraiser
Valbridge Property Advisors | Philadelphia
*Independent Valuations for a Variable World*

State Certifications
PA State Certified Appraiser License No. GA004457

PA Real Estate Salesperson License No. RS318425

Education
M.B.A. – West Chester University
B.A. in Economics
– Villanova University

Contact Details dkoczirka@valbridge.com
215-545-1900 (main)
484-965-9590 (direct)
Valbridge Property Advisors | Philadelphia
900 W. Valley Road, Suite 503
Wayne, PA 19087 www.valbridge.com

Membership/Affiliations:
Member: Appraisal Institute – MAI
Designation Philadelphia Metro
Chapter of the Appraisal Institute

Appraisal Institute & Related Courses:
Advanced Concepts and Case Studies
Advanced Market Analysis and
Highest and Best Use Advanced
Income Capitalization
Quantitative Analysis
General Appraiser Report Writing
and Case Studies General Appraiser
Income Approach (Parts 1 & 2)
General Appraiser Site Valuation and
Cost Approach General Appraiser
Sales Comparison Approach
General Appraiser Market Analysis and
Highest and Best Use Real Estate Finance,
Statistics, and Valuation Modeling
Basic
Appraisal
Procedure
s Basic
Appraisal
Principles

Case 15245-pmb Doc 216-6 Filed 04/10/26 Entered 08/06/10/26 03:16:49 Desc

1050 MAIN STREET

National
USPAP
PA State Laws and Regulations

Experience:

**Senior Appraiser**
Valbridge Property Advisors|Philadelphia (August 2019 to Present)
**Real Estate Appraiser Trainee**
Valbridge Property Advisors|Philadelphia (July 2016 to August 2019)
**PA Real Estate Salesperson**
Reaves C Lukens Jr. Co. Inc. (January 2019 to Present) BHHS Fox and Roach (September 2011 to January 2019)

**Operations Associate- Commercial Real Estate**
M&T Bank (October 2014 to July 2016)

Valuation Assignments Include:
A wide range of commercial properties including multi-family, industrial, office, retail, hotel, railroad, senior housing, residential subdivision, manufactured housing, and land valuation assignments.

**Valbridge**
PROPERTY ADVISORS

1050 MAIN STREET

## Qualifications of Richard F. Wolf, MAI, SRA, AI-GRS, CRE
## Senior Managing Director

Valbridge Property Advisors | Philadelphia
*Independent Valuations for a Variable World*

### State Certifications
PA State Certified Appraiser GA-001514-L – 2/97
NJ State Certified Appraiser 42RG00206200 – 7/06
DE State Certified Appraiser X1-0000346 – 6/02
NY State Certified Appraiser 46000054261

### License
PA Real Estate Salesperson License NS-131771-A – 8/87-2025
PA Real Estate Instructor RI006507 - 3/15
PA Real Estate Brokers License RB070154 & RM426032 -3/2025

### Education
Villanova University
B.S., Business Administration -1983

### Additional Background
Former Chairman of Skippack Township Planning Commission Former Member of Central Perkiomen Valley Regional Planning Commission
Former Member of Skippack Township Open Space Committee Former owner/operator of an equestrian facility which boards 50 horses, employs 5 instructors, servicing 1,200 students and contains a 2,000 square foot retail store.

### Contact Details
rwolf@valbridge.com 215-545-1900 (main)
215-545-1903 (direct) Valbridge Property Advisors | Philadelphia
900 W. Valley Road Suite 503
Wayne, PA 19087 www.valbridge.com

### Membership/Affiliations:
Member: Appraisal Institute - MAI Designation – Certificate No. 12292 – January 2005
SRA & AI-GRS - 2019
Chapter President – 2010
Chapter Education Chair 2011- 2017
Regional Director 2018 – 2022
Audit Member of National Board of Directors 2023-Current
Member of Counselors of Real Estate – CRE Designation – Certificate No. 12475 – November 2006

### Experience:
**Senior Managing Director**
Valbridge Property Advisors | Lukens & Wolf LLC (2013-Present)

**Principal**
Lukens & Wolf LLC (2011-2013)

**Real Estate Appraiser**
Reaves C. Lukens Company (1997-2011)

**Investment Advisor**
Vanguard Group (1992-1997)

**Real Estate Appraiser**
Donald J. Reape, MAI, SREA & Associates (1995-1997)

**Independent Contractor**
Dowling & Associates (1994-1997)

**Scope of Appraisal and Counseling Activity**
Experience in a wide range of property types including: multi-family, industrial, office, retail and land in Greater Delaware Valley. Particular concentration in mining operations and land development analysis. Also experience with nursing homes, continuing care retirement communities (CCRC), farm/equestrian facilities, apartment complexes, hotels, and industrial/R & D facilities.

## Court Testimony

Bucks County, Pennsylvania - Board of Appeals (Tax Appeals)

**(Del) Valbridge** PROPERTY ADVISORS

1050 MAIN STREET

tey) Camden County - New Jersey - Superior Court (Condemnation) Che

ster County Pennsylvania - Court of Common Pleas (Tax Appeals) Che

ter County Pennsylvania - Pennsylvania - Board of Appeal s (Tax Appeals) Chester C

1050 MAIN STREET

Chester County, Pennsylvania – Court of Common Pleas (Damage case)

1050 MAIN STREET

ster County – Pennsylvania – Court of Common Pleas (Land Developmen

t) Delaware County – Pennsylvania – Board of Appeals (Tax Appeals) D

elaware County – Pennsylvania – Court of Common Pleas (Tax Appeal) L

1050 MAIN STREET

1050 MAIN STREET

~~gomery County, Pennsylvania – Court of Common Pleas (Condemnation~~

~~) Montgomery County, Pennsylvania – Court of Common Pleas (Tax Appe~~

~~als) Northampton County, Pennsylvania – Board of Appeals (Tax Appe~~

1050 MAIN STREET

als) Northumberland County rCentral District of Pennsylvania fe

deral Court (Bankruptcy) Pennsylvania Department of Revenue — Har

risburg (Transfer Tax ease) Philadelphia County rPennsylvania — B

oard of Revision of Taxes Philadelphia County, Pennsylvania - Cou

rt of Common Pleas Willistown Township - Chester County Zoning Boar

d (Building Right) York County, Pennsylvania - Court of Common Plea

**Valbridge** PROPERTY ADVISORS

s (Board of View)

Teaching / Education

Appraisal Institute 2015 Real Estate Trends App

faisal Institute 2016 Real Estate Trends Appraisal Institute 2017

Real Estate Trends

Counselors of Real Estate 2017 Real Estate Symposium
Pennsylvania Bar Institute August 2016 "A Lawyer's Guide to Appraisals and Appraisers"

## Partial List of Client

**PARTIAL LIST OF CLIENTS**

**BANKS AND SAVINGS & LOANS**

TD Bank
Republic Bank
First Niagara
Crusader Bank
PNC Bank
The Bryn Mawr Trust Company
The Glenmede Trust Company

**PRIVATE SECTOR**

Better Materials, Inc.
Chester County Airport Authority
Clemens Markets
Delancey Investment Corp.
Hanson Aggregates, PLC
Highway Materials
Pennsylvania Hospital
SAP America
SmithKline Beecham
Waste Management, Inc.
The



1050 MAIN STREET

**EDUCATIONAL AND GOVERNMENTAL**

Abington school District Archdiocese of Phila...

Philadelphia Archdiocese of Camden Montgomery County Pennsylvania...

Sprague and Sprague Main Line Health Wisler Peaillstine, LLP

byter y of Philadelphia Swarthmore College

University of Pennsylvania

## Educational Background

APPRAISAL INSTITU...

TE _ Courses / Seminars successfully completed: Counselor of Real

Estate_Real Estate Symposium 2017 Appraisal Institute_Real Esta

te Trends Seminar 2017 Appraisal Institute_NJ Regulations 2017 Ap

1050 MAIN STREET

praisal Institute – USPAP 2017 Appraisal Institute – PA regulation

s 2017 Appraisal Institute – Real Estate Trends Seminar 2016 Appra

sall Institute – DE Regulations 2016 Appraisal Institute – Real Esta

trends Seminar 2015

Appraisal Institute — Supervisory / Trainee

2015 Appraisal Institute — USPAP 2014

Appraisal Institute — Review Theory — General 2014

Appraisal Institute — Fundamentals of Separating Real Property, personal Property and Intangible Business Assets — 2012

Appraisal Institute — Business

1050 MAIN STREET

Practices and Ethics, 2010 Appraisal Institute - Consumer Protect

ion in the Appraisal Lending Industry, 2010 Appraisal Institute - Real Esta ta

te Finance, Value and Investment Performance, 2010 Appraisal Inst

1050 MAIN STREET

itute – Legislative Regulatory and Judicial Update, 2009

Appraisal Institute – Delaware State Regulations, 2009 App r

a is al Institute – Appraising Distressed Commercial Real Estate r 2

0 09 Appraisal Institute – PA State Regulations, 2009 Appraisal Ins

**Valbridge**
PROPERTY ADVISORS

1050 MAIN STREET

7 Hour National USPAP Update Course, 2007 Appraisal Institute - RC

GA Conference, 2006 Appraisal Institute - Contemporary Legal & App

raisal Issues Involving Eminent Domain, 2006 Appraisal Institute

1050 MAIN STREET

1050 MAIN STREET

~~et Studies – 2005 Appraisal Institute – Maximizing the Value of an Ap~~

~~praisal Practice – 2005 Appraisal Institute – Attacking and Defend~~

~~ing an Appraisal In Litigation – 2005 Appraisal Institute – Subdivi~~

...sion Valuation r 2005

Appraisal Institute - Real Estate Finance, 2004

Appraisal Institute - Standards of Professional Practice A and B r 2001

Appraisal Institute - Advanced Applications r 1998

Appraisal Institute - Sales Comparison & Cost Approac...

(Del) Valbridge PROPERTY ADVISORS

1050 MAIN STREET

he r1998 Appraisal Institute - Highest and Best Use r1997 Appraisa

Institute - Advanced Income Capitalization r1996 Appraisal Li Inst

itute - Basic Income Capitalization r1993 Appraisal Institute itn

**Real Estate Courses taken and s**uccessfully completed

...tro to Appraising Real Property - 1987

Schlicher-Kratz Institute - Real Estate Investment - 2001

Polley Associates - Contemporary Legal Issues - 2000 P...

olley Associates - Using Technology, 2000

Polley Associates - Ethics (Let's Get It Right), 1996

Polley Associates - Appraisal Applications, 1995

Polley Associates - Standards of Practices & Ethics, 1994

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Whitehall Manor, et al.,[1]<br><br>      Debtors. | Chapter 11<br><br>Case No. 25-15245 (PMM)<br><br>Jointly Administered |

## CERTIFICATE OF SERVICE

  I, Rachel Jaffe Mauceri, hereby certify that a true and correct copy of the *Amended Joint Motion Pursuant to 11 U.S.C. § 363 for Entry of an Order Authorizing the Debtors To Enter Into and Perform Under Use And Occupancy Agreements w*as filed electronically on July 10, 2026, with the United States Bankruptcy Court and served upon all case participants via CM/ECF and upon all parties on the attached Notice 2002 Service List via email notification and/or First-Class Mail.

                 **ROBINSON & COLE LLP**

                 */s/ Rachel Jaffe Mauceri*
                 Natalie D. Ramsey, Esquire
                 Rachel Jaffe Mauceri, Esquire
                 1650 Market Street, Suite 3030
                 Philadelphia, PA 19103
                 Tel.: (215) 398-0600
                 nramsey@rc.com
                 rmauceri@rc.com

---

[1] The Debtors in these chapter 11 cases are: (i) Whitehall Manor, Inc (5606); and (ii) Saucon Valley Manor, Inc. (2894).  On March 19, 2026, this Court entered an order [D.I. 25] granting the motion to dismiss Whitehall Trust for Senior Care (f/k/a Whitehall Trust) and Saucon Trust as debtors in these jointly administered chapter 11 cases. Pursuant to an order of this Court dated April 2, 2026 [D.I. 67], the dismissals of the Trusts have been stayed pending appeal and the Trusts remain debtors in these jointly administered cases.

Label Matrix for local noticing
0313-4
Case 25-15245-pmm
Eastern District of Pennsylvania
Reading
Fri Jul 10 16:41:27 EDT 2026

American Express National Bank
c/o Becket and Lee LLP
PO Box 3001
Malvern, PA 19355-0701

(p)CITY OF PHILADELPHIA LAW DEPARTMENT
MUNICIPAL SERVICES BUILDING
1401 JOHN F KENNEDY BLVD 5TH FLOOR
PHILADELPHIA PA 19102-1617

Lehigh Valley 1, LLC
2100 Ponce de Leon Blvd.
Coral Gables, FL 33134-5215

Omni Agent Solutions, Inc.
5955 DeSoto Avenue
Suite 100
Woodland Hills, CA 91367-5100

Robinson & Cole LLP
1650 Market Street
Suite 3030
Philadelphia, PA 19103-7223

Saucon Trust
1177 6th Street
Whitehall, PA 18052-5212

Whitehall Manor, Inc.
1177 Sixth Street
Whitehall, PA 18052-5212

Whitehall Trust
1177 Sixth Street
Whitehall, PA 18052-5212

Reading
United States Bankruptcy Court
Office of the Clerk, Gateway Building
201 Penn Street, 1st Floor
Reading, PA 19601-4038

(p)ADI GLOBAL DISTRIBUTION
ATTN ADAN TORRES CREDIT DEPARTMENT
275 BROADHOLLOW ROAD
SUITE 400
MELVILLE NY 11747-4863

Abraham Atiyeh
c/o Robert Lapowsky
Jason C. Manfrey
620 Freedom Business Center, Suite 200
King of Prussia, PA 19406-1330

Ameritas
575 Anton Blvd
Costa Mesa, CA 92626-7169

Andrea Sawarynski
REDACTED
New Tripoli, PA 18066

Aramsco Inc.
PO Box 783956
Philadelphia, PA 19178-3956

Astound Broadband powered by RCN
PO Box 830714
Philadelphia, PA 19182-0714

(p)BERKHEIMER
PO BOX 20662
LEHIGH VALLEY PA 18002-0662

Brookside Commercial Construction Co.
1177 6th St
Whitehall, PA 18052-5212

Cintas Corporation
Pitts
PO Box 630910
Cincinnati, OH 45263-0910

Cintas Corporation DC
PO Box 630910
Cincinnati, OH 45263-0803

Coplay Whitehall Sewer Authority
3213 Macarthur Rd
Whitehall, PA 18052-2921

Eastern Alliance
PO BOX 788961
Philadelphia, PA 19178-8961

Extended Care
Professional, LLC
PO Box 81 East
East Troy, WI 53120-0081

F.W. Webb Company
1665 E Race S
Allentown, PA 18109-9569

Global Sourcing Solutions
PO Box 1178020
Atlanta, GA 30368-0001

Great American Risk Solutions
301 E 4th St,
Cincinnati, OH 45202-4245

Great American Risk Solutions
301 East 4th St
Cincinnati, OH 45202-4245

Home Depot
Dept 32-215131842
PO Box 70614
Philadelphia, PA 19176-0614

Keystone Insurers Group Inc
7562 State Route 30
Irwin, PA 15642-7518

Lahoud Law Group, P.C.
600 Hamilton St
Suite 300
Allentown, PA 18101-2130

Lehigh Valley 1, LLC
c/o Matthew R. Kaufmann, Esq.
919 Conestoga Road,
Building 3, Suite 114
Bryn Mawr, PA 19010-1352

Lehigh Valley 1, LLC
Phillip D. Berger. Esq.
919 Conestoga Road
Building 3, Suite 114
Bryn Mawr, PA 19010-1352

Lehigh Valley 1, LLC.
c/o Matthew A. Hamermesh,Esquire
One Logan Square, 27th Floor
Philadelphia, PA 19103-6910

(p)MEDLINE INDUSTRIES INC
ATTN ANNE KISHA
ONE MEDLINE PL
MUNDELEIN IL 60060-4486

Natalie D. Ramsey
Rachel Jaffe Mauceri
ROBINSON & COLE LLP
1650 Market Street, Suite 3030
Philadelphia, PA 19103-7223

OTIS Elevator Co.
PO Box 13716
Newark, NJ 07188-3716

PA Department of Labor
Office of UC Service Centers
651 Boas St, Room 500
Harrisburg, PA 17121-0750

PA Department of Revenue
PO Box 280427
Harrisburg, PA 17128-0427

PPL Electric Utilities Corp.
PO Box 419054
Saint Louis, MO 63141-9054

Pennsylvania Department of Health
Health and Welfare Building
8th Floor
625 Forster Street
Harrisburg, PA 17120-0701

Pitney Bowes Bank INC Purchase Power
PO Box 981026
Boston, MA 02298-1026

Pocono Mountain Dairies
PO Box 1006
Blakeslee, PA 18610-1006

Primo Brands
PO BOX 9001003
Louisville KY 40290-1003

RCN
PO BOX 830714
Phila, PA 19182-0714

Raymond Minich
204 N West St
Ste 103
Doylestown, PA 18901-3507

Receiver Duane Morris LLP, by Erin Duffy, Es
c/o Brett L. Messinger Duane Morris LLP
30 S. 17th Street
Philadelphia, PA 19103-4001

Safeguard Business Systems
Lockbox 229 PO Box 7247
Philadelphia, PA 19170-0001

Securitas Healthcare
PO Box 646045
Pittsburgh, PA 15264-6045

Service Electric Cable TV
PO Box 20151
Lehigh Valley, PA 18002-0151

Service Electric Cablevision
PO Box 20151
Lehigh Valley, PA 18002-0151

(p)STEVENS & LEE
ATTN STEVEN ADAMS
PO BOX 679
READING PA 19603-0679

Sunoco, Inc.
PO Box 78013
Phoenix, AZ 85062-8013

The City of Philadelphia
c/o PAMELA ELCHERT THURMOND
1401 JFK Boulevard, 5th Floor
Philadelphia, PA 19102-1617

The Morning Call Media Group
PO Box 8020
Willoughby, OH 44096-8020

UGI Energy Services
Attn: Customer Care
P.O. Box 13009
Reading, PA 19612-3009

(p)UGI UTILITIES INC
ATTN CREDIT & COLLECTIONS
P O BOX 13009
READING PA 19612-3009

US Foodservice, Inc
Attn: Legal Department
9399 West Higgins Road, Suite 100
Des Plaines, IL 60018-4910

United States Trustee
Office of United States Trustee
Robert N.C. Nix Federal Building
900 Market Street
Suite 320
Philadelphia, PA 19107-4202

irs
po box 7346
Philadelphia, PA 19101-7346

us attorneys office
615 chestnut street, 12th floor
Philadelphia, PA 19106-4490

ANNE M. AARONSON
Dilworth Paxson LLP
1650 Market Street
Ste 1200
Philadelphia, PA 19103-7301

MICHELLE LEE
Dilworth Paxson LLP
1650 Market Street
Suite 1200
Philadelphia, PA 19103-7301

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

CITY OF PHILADELPHIA
Tax & Revenue Unit
1401 JOHN F. KENNEDY BLVD., 5TH FLOOR
Tax Litigation & Collections Unit
Philadelphia, PA 19102-1595 United State

ADI
25429 Network Place
Chicago IL 60673

Berkheimer
PO Box 25144
Lehigh Valley, PA 18002

(d)Berkheimer
PO Box 25144
Lehigh Valley, PA 18002

Medline
PO Box 382075
Pittsburgh, PA 15251

Stevens and Lee
111 N 6th St,
Reading PA 19601

UGI Utilities, Inc.
Attn: Customer Care
P.O. Box 13009
Reading, PA 19612-3009

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Receiver Duane Morris LLP, by Erin Duffy,

(u)US Foods, Inc.

(d)American Express National Bank
c/o Becket & Lee LLP
PO Box 3001
Malvern, PA 19355-0701

(d)American Express National Bank
c/o Becket and Lee LLP
PO Box 3001
Malvern  PA 19355-0701

(d)Aramsco Inc.
PO Box 783956
Philadelphia, PA 19178-3956

(d)Extended Care Professional, LLC
PO Box 81 East
East Troy, WI 53120-0081

(d)Lahoud Law Group, P.C.
600 Hamilton St Suite 300
Allentown, PA 18101-2130

(u)Abraham Atiyeh

End of Label Matrix
Mailable recipients    61
Bypassed recipients     8
Total                  69